1  Jeffrey Wilson McCoy (CO No. 43562), *pro hac vice* ~~application pending~~
2  Steven J. Lechner (CO No. 19853), *pro hac vice* ~~application pending~~
   MOUNTAIN STATES LEGAL FOUNDATION
3  2596 South Lewis Way
   Lakewood, Colorado 80227
4  (303) 292-2021
5  (303) 292-1980 (facsimile)
   jmccoy@mountainstateslegal.com
6  lechner@mountainstateslegal.com

7  Michael W. Pearson (AZ No. 016281)
8  Curry, Pearson, & Wooten, PLC
   814 West Roosevelt
9  Phoenix, Arizona 85007
   (602) 258-1000
10 (602) 523-9000 (facsimile)
11 mpearson@azlaw.com

12 Attorneys for Plaintiff Andrew Brigida and Putative Class Counsel
13

14          **IN THE UNITED STATES DISTRICT COURT**
15           **FOR THE DISTRICT OF ARIZONA**

16 ANDREW J. BRIGIDA, on behalf of     )
17 himself and the Class he seeks to represent, )   Case No. 2:15-cv-02654-DLR
                                        )
18         Plaintiff,                   )
                                        )
19    v.                                )   **FIRST AMENDED CLASS ACTION**
                                        )   **COMPLAINT FOR DECLARATORY**
20                                      )   **AND INJUNCTIVE RELIEF AND**
21 UNITED STATES DEPARTMENT OF          )   **DAMAGES**
   TRANSPORTATION; ANTHONY R.           )
22 FOXX, Secretary, U.S. Department of  )   **DEMAND FOR JURY TRIAL**
   Transportation; FEDERAL AVIATION     )
23 ADMINISTRATION; MICHAEL              )
24 HUERTA, Administrator, Federal Aviation )
   Administration; STEPHANIE JONES,     )
25 Acting Director, Departmental Office of )
26 Civil Rights, U.S. Department of      )
   Transportation; EQUAL EMPLOYMENT     )
27 OPPORTUNITY COMMISSION; JENNY         )
28 R. YANG, Chair, Equal Employment      )

Opportunity Commission,                    )
                                           )
                    Defendants.            )

Pursuant to Federal Rule of Civil Procedure 15(a)(2), Plaintiff, Andrew J. Brigida,

by and through ~~its~~ his attorneys, hereby files this First Amended Class Action Complaint

for Declaratory and Injunctive Relief and Damages against the above-named Defendants

on behalf of himself and the Class he seeks to represent.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction, pursuant to 28 U.S.C. § 1331, because the

matter in controversy arises under the Constitution and laws of the United States,

including but not limited to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,

and the Fifth Amendment to the United States Constitution.

2.     Venue rests properly in this Court, pursuant to 28 U.S.C. § 1391(e),

because "a substantial part of the events . . . giving rise to the claim occurred" within this

judicial district.

## PARTIES

3.     Plaintiff, Andrew J. Brigida, is a current resident of Arlington, Virginia.

He brings this action on behalf of himself individually, and on behalf of a Class of

persons similarly situated as described below.

4.     Defendant United States Department of Transportation ("DOT") is a

cabinet-level department within the Executive Branch of the federal government.

Through its various agencies, the DOT promulgates regulations and policies governing

transportation within the United States, including aviation.

2

5.     Defendant Anthony R. Foxx is the Secretary of the DOT.  In that capacity, Secretary Foxx is responsible for overseeing the actions of all the employees and officers within the agencies of the Department, including the Federal Aviation Administration.

6.     The Federal Aviation Administration ("FAA") is the national aviation authority of the United States.  As an agency of the DOT, it has authority to regulate all aspects of American civil aviation.  The FAA is responsible for setting policies for the hiring of Air Traffic Controllers in the United States.

7.     Michael Huerta is the Administrator of the FAA.  Administrator Huerta oversees more than 47,000 FAA employees and is responsible for ensuring the agency and its employees are the best prepared and trained professionals to meet the growing demands and requirements of the aviation industry.  In this capacity Administrator Huerta is responsible for setting the policies of the FAA, including hiring policies for Air Traffic Controllers.

8.     Defendant Stephanie Jones is the Acting Director of the DOT Departmental Office of Civil Rights.  In this capacity, Acting Director Jones is the designated advisor to the Secretary of Transportation on matters relating to civil rights within the DOT.  Acting Director Jones is also responsible for managing the Departmental Office of Civil Rights, which enforces civil rights and regulations within the DOT, including Title VII of the Civil Rights Act of 1964.

9.     Defendant Equal Employment Opportunity Commission ("EEOC") is a federal agency that administers and enforces civil rights laws, including Title VII of the Civil Rights Act of 1964.  The EEOC is responsible for investigating employment and

3

hiring discrimination complaints against, *inter alia*, the federal government.

10.    Defendant Jenny R. Yang is the Chair of the EEOC.  In this capacity, Chair Yang is responsible for the administration and implementation of policy within the EEOC, including the investigating of employment and hiring discrimination complaints. Chair Yang is sued in her official capacity.

## LEGAL BACKGROUND

**A.    TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.**

11.    Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e; *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

12.    Specifically, Title VII provides that it is unlawful employment discrimination "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

13.    Title VII prohibits discrimination against employees of, and applicants for employment in, the federal government.  42 U.S.C. § 2000e-16.

14.    Absent a valid defense, Title VII prevents a government agency from refusing to accept the outcome of a race-neutral hiring process solely because of the racial makeup of the successful applicants.  *See Ricci*, 557 U.S. at 579.

15.    Specifically, a government agency may not disregard the outcome of a race-neutral hiring process unless it has a "strong basis in evidence to believe it will be

subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *See id.* at 585. An agency will be liable for disparate-impact discrimination only if a hiring process is not job related and consistent with business necessity, or if there exists an equally valid, less discriminatory alternative that served the needs of the agency but the agency refused to adopt. *Id.* at 547.

**B.    EQUAL PROTECTION COMPONENT OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT.**

16.    The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V.

17.    Like the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clause of the Fifth Amendment protects persons from race-based discrimination by the federal government. *Buckley v. Valeo*, 424 U.S. 1, 93 ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment . . . .").

18.    The equal protection component of the Due Process Clause of the Fifth Amendment is self-executing and a person can assert a cause of action directly under the Clause. *Bolling v. Sharpe*, 347 U.S. 497, 498–500 (1954); *Davis v. Passman*, 442 U.S. 228, 242–43 (1979).

19.    A government-imposed racially discriminatory preference is constitutional only if the government demonstrates that the preference was necessary to achieve a compelling state interest. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995).

20.    Governments may use racially discriminatory preferences only in

remedying "extreme" cases of "systematic[]" patterns of deliberate racial discrimination to "break down patterns of deliberate exclusion." *City of Richmond v. J.A. Croson Co.* 488 U.S. 469, 509 (1989) ("*Croson*").

21.    Therefore, in order to establish a compelling interest, the government must "identify" the invidious discrimination to be remedied "with some specificity before [it] may use race-conscious relief . . . ." *Croson*, 488 U.S. 505.  A mere showing of disparity in not sufficient to demonstrate extreme cases of systematic patterns of deliberate racial discrimination.  *Western States Paving Co. v. Washington State Dept. of Transp.*, 407 F.3d 983, 1000 (9th Cir. 2005) ("This oversimplified evidence is entitled to little weight, however, because it does not account for factors that may affect the relative capacity of [Disadvantaged Business Enterprises] to undertake contracting work."); *Associated General Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 736 (6th Cir. 2000). ("[E]vidence of mere statistical disparities has been firmly rejected as insufficient by the Supreme Court, particularly in a context such as contracting, where special qualifications are so important.").

22.    Federal courts have the jurisdiction and authority to grant necessary relief to protect rights safeguarded by the U.S. Constitution, including the right to equal protection protected by the Due Process Clause of the Fifth Amendment.  *See Bell v. Hood*, 327 U.S. 678, 683–84 (1946); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949); *Davis*, 442 U.S. at 242–43 (1979).

**FACTUAL BACKGROUND**

**A.    FAA's Change In Hiring Practices For Air Traffic Controllers.**

6

23.     In 1989, the FAA published the *Flight Plan for Training*.  This publication proposed a new system to implement and support air traffic controller recruiting, selection, and training programs.

24.     In January 1991, the FAA promulgated FAA Order 3120.26, which established the Air Traffic-Collegiate Training Initiative ("CTI") program to develop, deliver, and implement air traffic control recruiting, selection, and training.   The CTI program began with 5 schools around the country.

25.     The objective of the CTI program was to develop a professional air traffic controller workforce that possessed the skills necessary to succeed in training at a lower cost to the government.

26.     In order to achieve the objectives of the CTI program, the FAA entered into partnership agreements with colleges, universities and other schools ("CTI Institutions") in order to administer CTI programs throughout the country.

27.     In 2012, there were 36 CTI Institutions around the country.

28.     Graduates from these CTI programs were required to pass a validated air traffic aptitude test, known as the Air Traffic Control Selection and Training examination ("AT-SAT") in order to be eligible for employment as a trainee controller.

29.     The AT-SAT is an aptitude assessment test developed to assess the likelihood of an applicant successfully learning Air Traffic Control Specialist ("ATCS") skills as well as a valid predictor of achievement of Certified Professional Controller ("CPC") status and air traffic controller job performance.  CPC status is achieved after the successful completion of air traffic training ~~at the applicant's first assigned field~~

7

facility.

30.    The AT-SAT tests for characteristics needed to effectively perform as an air traffic controller.  The characteristics include numeric ability, prioritization, planning, tolerance for high intensity, decisiveness, visualization, problem-solving, and movement detection.

31.    The FAA developed the AT-SAT in approximately 2000-2001 in order to provide a selection tool for new applicants for ATCS positions within the FAA.

32.    Since the FAA first instituted the AT-SAT, it has been validated multiple times to ensure the test was in accord with the law and professional guidelines.  The AT-SAT was most recently validated in March of 2013.

33.    Prior to 2014, and after the introduction of the CTI program, graduates from CTI programs that passed the validated AT-SAT assessment entered a direct hire pool of applicants, were placed on a "Qualified Applicant Register" List, and were given hiring preference for ATCS positions.

34.    Prior to the introduction of the CTI program, the FAA hired from two main sources.  First, the FAA hired from military trained controllers ("Veteran's Recruitment Appointment" or "VRAs"), who had separated or retired from military service.  Second, the FAA hired through General Public Announcement ("GPA"), commonly referred to as Off-the-Street ("OTS") hiring.

35.    OTS hiring most often resulted in candidates lacking air traffic control or college experience.

30.    All air traffic controller applicants, regardless of source, were required to

8

~~take the AT-SAT assessment before the FAA deemed the applicant a qualified applicant.~~

36.    The FAA identified <u>additional</u> problems with ~~the~~ OTS hiring ~~program~~. Besides being expensive to administer, the FAA deemed the quality of candidates unsatisfactory and noted high training failure ("washout") rates with OTS applicants.  As a result of these issues, the FAA developed the CTI program.

37.    Since the CTI program was instituted, most air traffic controller hiring has been from the pool of CTI graduates and VRAs.

38.    In 2005, the FAA forecast a controller shortage due to a large number of controllers who were becoming eligible for retirement.  This retirement eligible group had been hired after the 1981 Professional Air Traffic Controllers Organization strike.

39.    The CTI schools were unable to keep up with the increased demand for replacement controllers and, as a result, the FAA made an OTS hiring announcement to supplement the VRA and CTI applicant pools.

40.    At the end of 2012, the FAA announced that it would not be conducting any further OTS hiring because the CTI schools, along with the VRA applicant pool, were producing sufficient quantities of qualified applicants to fulfill demand.

41.    The FAA controller hiring plan required the FAA to hire over one thousand controllers per year in calendar years 2012, 2013, and 2014.  Despite this stated demand for ATCS, the FAA slowed and eventually froze the processing and hiring of new ATCS applicants.

42.    The CTI program, and VRA applicant pool, met ~~this~~ <u>the stated</u> demand <u>for ATCS</u> and successfully prepared air traffic control applicants, including minority

candidates, for ATCS positions.

43.    In 2013, the FAA published an employment plan that provided that the FAA was "planning to open a general public announcement in FY 2014 to add more depth and diversity to our controller hiring sources."  Federal Aviation Administration, *A Plan for the Future: 10-Year Strategy for the Air Traffic Control Workforce 2013-2022* 44 (2013), *available at* https://www.faa.gov/air_traffic/publications/controller_staffing/media/CWP_2013.pdf (last visited December 30, 2015).

44.    On February 8, 2013, Terry Craft, the FAA's CTI program manager, sent an e-mail to CTI schools in which he stated he believed that stated that he saw that the CTI applicant pool was as diverse.[1]

45.    Also in February 2013, the FAA published a report on the CTI program that provided that "it is clear that the FAA AT-CTI schools are making great strides to incorporate minority students and faculty into their programs . . . ."  Federal Aviation Administration, *Air Traffic Collegiate Training Initiative (AT-CTI) Partner School Diversity and Outreach 2012-13* 1 (February 25, 2013), *available at* http://www.ctiassociation.org/app/download/2351245/AT-CTI+Diversity+and+Outreach+Complete+Report.pdf (last visited April 18, 2016).

46.    In 2012-2013, 11.5 percent of CTI school enrollees were African-American.  *Id.* at 3.  This percentage of African-American enrollees exceeded the percentage of African Americans in the civilian labor workforce pool in the same years.  United States Office of Personnel Management, *Federal Equal Opportunity Recruitment*

---

[1] A copy of this e-mail is attached hereto as Exhibit 1.

*Program (FEORP) for Fiscal Year 2012 Report to the Congress* 8 (January 2014), *available at* https://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reports/feorp-2012.pdf (last visited April 18, 2016).

47. ~~On information and belief, and after a reasonable opportunity for discovery, further documents from the FAA demonstrate that the CTI institutions provide a sufficiently diverse applicant pool to the FAA for ATCS positions.~~

47. On information and belief, and after a reasonable opportunity for discovery, CTI institutions were providing a sufficiently diverse applicant pool to the FAA for ATCS positions.

48. On information and belief, and after a reasonable opportunity for discovery, the FAA's own evidence showed that CTI institutions were providing a sufficiently diverse applicant pool to the FAA for ATCS positions.

49. On or around December 30, 2013, Joseph Teixeira, the FAA's Vice President for Safety and Technical Training, sent an e-mail ("Teixeira e-mail") to the CTI schools about the future of hiring for ATCS positions.[2]

50. The Teixeira e-mail provided, *inter alia*, that "[r]ecently, the FAA completed a barrier analysis of the ATC occupation pursuant to the Equal Employment Opportunity Commission's (EEOC) Management Directive 715. As a result of the analysis, recommendations were identified that we are implementing to improve and streamline the selection of ATC candidates."

51. The Teixeira e-mail further provided "[a] nationwide competitive FG-01

---

[2] A copy of the Teixeira e-mail is attached hereto as Exhibit 2.

vacancy announcement open to all U.S. Citizens will be issued in February 2014.  Any individual desiring consideration for employment (including CTI graduates) MUST apply.  Existing inventories of past applicants will not be used."

52.     The Teixeira e-mail also provided that "[t]he existing testing process has been updated.  The revised testing process is comprised of a biographical questionnaire (completed as part of the application process) and the cognitive portion of the AT-SAT. The cognitive portion of the AT-SAT will be administered only to those who meet the qualification standards and pass the biographical questionnaire.   Applicants for the February 2014 announcement will be required to take and pass the new assessments in order to be referred on for a selection decision."

53.     On information and belief, and after a reasonable opportunity for discovery, the FAA failed to validate the biographical questionnaire to ensure the test was in accord with the law and professional guidelines.

54.     In sum, on or around December 30, 2013, the FAA eliminated the CTI Applicant Register, which resulted in Plaintiff Brigida, and other putative Class Members, losing their employment preference and opportunity.

55.     The FAA subsequently scheduled a teleconference with the CTI schools on January 8, 2014.

56.     During the January 8, 2014 teleconference, Teixeira stated that "there were no special interest groups involved in the design of the [new] FAA policy at all.  This was done by experts in the human resources department and civil rights . . . ."

57.     During the January 8, 2014 teleconference, Teixeira also stated that "[w]e

really have not announced these changes to anyone other than to CTI schools, and you received that for the first time on the 30th of December. There's been no announcement . . . ."

58.    On information and belief, and after a reasonable opportunity for discovery, several members of the FAA Human Resources ~~FAA~~ ("HR") and Civil Rights ("CR") Offices had notified, *inter alia*, the National Black Coalition of Federal Aviation Employees ("NBCFAE"), and other select special interest groups, that the FAA was going to eliminate the Qualified Applicant Register prior to the announcement to the CTI institutions, as well as specific detailed information on the FAA's new hiring practices.

59.    On information and belief, and after a reasonable opportunity for discovery, several members of the FAA HR and CR ~~Human Resources ("HR") and Civil Rights ("CR")~~ Offices had been working with the NBCFAE to eliminate the CTI Qualified Applicant Register since 2010.

60.    On June 20, 2013, FAA officials met with members of the FAA National Employee Association Forum, which is composed of eight employee associations that represent various minority, women, and disadvantaged sub-groups, including NBCFAE. The stated purpose of this meeting was to brief the various employee associations of recommended changes in the Air Traffic Controller hiring process.

61.    Among the persons conducting the June 2013 briefing was an FAA consultant named Dr. James Outtz. Dr. Outtz's presented information about a recently concluded Barrier Analysis of the FAA Air Traffic Controller hiring process. Dr. Outtz stated that the FAA's hiring process purportedly had a disparate impact on minority

candidates, primarily African-American males.

62.     Several documents demonstrate that the NBCFAE had information on how applicants for the February 2014 announcement could increase their chances of advancing in the hiring process.[3]  The NBCFAE e-mailed their members with advice on how to apply for the open Air Traffic Controller positions.  *See* Exhibits 7–8.  This information was provided by a FAA HR employee who was also a member of the NBCFAE.  *See* Exhibit 7.

63.     These documents further demonstrate that NBCFAE National President Roosevelt Lenard, Jr. was in contact with senior FAA officials, including Carrolyn Bostick, the FAA management official in charge of human resources ("AHR-1"), about Lenard's desire to eliminate the entire Qualified Applicant Register.  *See* Exhibit 8.

64.     On or about January 27, 2015, FAA HR Official Bostick assured NBCFAE National President Lenard that the Register would be "purged" and none of these post-assessment applicants would be offered a letter of employment.  *Id.*

65.     On information and belief, and after a reasonable opportunity for discovery, numerous FAA employees and officials are active members of the NBCFAE.

66.     In February 2014, FAA spokesman Tony Molinaro, Public Affairs Officer for the FAA in the Great Lakes and Central Regions, stated that the decision to change the FAA's hiring process for Air Traffic Controllers was made to "add diversity to the workforce."  Anna Burleson, *Want to be an air traffic controller? UND says FAA has 'dumbed down the process'*, Grand Forks Herald, March 5, 2014, *available at*

---

[3] Copies of these documents are attached hereto as Exhibits 3 through 9.

http://www.grandforksherald.com/content/want-be-air-traffic-controller-und-says-faa-has-dumbed-down-process (last visited April 19, 2016).

67.    Various other FAA officials and employees initially stated that the change in the hiring process was for diversity purposes.

68.    On information and belief, and after a reasonable opportunity for discovery, there were approximately 2,000 to 3,500 qualified applicants that possessed a degree from a CTI school, had passed the AT-SAT, and were on the FAA's Qualified Applicant Register prior to the FAA's 2014 decision to eliminate the Register.    Plaintiff and putative Class Representative Brigida was one of those qualified applicants.

**B.    Plaintiff Brigida.**

69.    On May 13, 2013, while attending an FAA approved CTI Institution, Arizona State University ("ASU"), Plaintiff Brigida took, and successfully passed the AT-SAT assessment with the top numerical score possible of 100%.

70.    On August 13, 2013, Plaintiff Brigida graduated from an FAA approved CTI institution, Arizona State University ("ASU"), and was recommended to the FAA by ASU on August 28, 2013.

71.    Subsequently, the FAA placed Plaintiff Brigida on the Qualified Applicant Register.

72.    On or about January 27, 2014, while Plaintiff Brigida was residing in Arizona, the FAA informed Plaintiff Brigida of the changes to the Air Traffic Controller hiring process, that the Qualified Applicant Register was being eliminated, and that Mr. Brigida would need to reapply under the new hiring process if he wished to be considered

for an Air Traffic Controller position.

73.    On February 10, 2014, while residing in Arizona, Plaintiff Brigida reapplied for an Air Traffic Controller position under the new hiring processes.  While reapplying for the position, Plaintiff Brigida took the Biographical Questionnaire.

74.    On February 25, 2014, while residing in Arizona, Plaintiff Brigida contacted an Equal Employment Opportunity ("EEO") counselor for the DOT by filing an informal electronic complaint, and alleged that the FAA discriminated against him on the basis of race and gender by changing its Air Traffic Controller hiring practice in order to achieve more diversity.

75.    On February 27, 2014, the FAA notified Plaintiff Brigida, who was residing in Arizona, that he had failed the biographical questionnaire and was ineligible to be hired for an Air Traffic Controller position.

76.    On March 31, 2014, Plaintiff Brigida, while residing in Arizona, received his notice of right to file a formal EEO Complaint with the DOT.

77.    On April 12, 2014, Plaintiff Brigida, while residing in Arizona, filed a formal EEO Complaint, individually and as a putative Class Representative on behalf of those similarly situated, with the DOT.[4]

78.    On April 16, 2014, the DOT sent a letter to Plaintiff Brigida which acknowledged receipt of the formal EEO Complaint and provided that the Complaint was forwarded to the EEOC for their recommendation to accept or reject the Complaint.

79.    The EEOC has neither certified nor denied certification of the putative

---

[4] Plaintiff Brigida's formal EEO Complaint is incorporated by reference herein.

Class, nor has it responded to the allegations in the EEO Complaint from the date of the filing of the EEO Complaint (April 12, 2014) through the date of filing of this amended Complaint.

**CLASS ACTION ALLEGATIONS**

80.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth here.

81.    This is a class action brought by Plaintiff Brigida on his own behalf and on behalf of others similarly situated, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and 29 C.F.R. § 1614.204.   The putative Class Plaintiff Brigida seeks to represent is the approximately 2,000 to 3,500 qualified applicants that possessed a degree from a CTI school, had passed the AT-SAT, and were on the FAA's Qualified Applicant Register prior to the FAA's 2014 decision to eliminate the Register.

82.    Commonality.  There are common questions of law, practices, and fact as to the members of the Class which predominate over questions affecting only individual members of the Class.  Specifically, this case challenges the FAA's decision to eliminate or purge the Qualified Applicant Register, which resulted in all members of the Class being eliminated from hiring consideration, even though they had graduated from a CTI school and passed the AT-SAT assessment.   There are no unique factual or practice factors that would make Class status disadvantageous to any member of the Class.  The FAA instituted a single decision to purge the Qualified Applicant Register and adopt a new hiring practice for Air Traffic Controllers, which adversely affected all Class members.  Defendants' motivation and purported evidence for the decision is common to

all Class members.

83.    Typicality.    Plaintiff Brigida's claims for the remedies stated herein are typical of the claims of all members of the putative Class because all members of the prospective Class sustained similar injuries and damages arising out of Defendant's common course of unlawful conduct.    The injuries and damages of all members of the Class were caused by the FAA's single decision to purge the Qualified Applicant Register and adopt a new hiring practice for Air Traffic Controllers.

84.    Numerosity.    The potential quantity of members of the putative Class as defined is so numerous that joinder of all members would be unfeasible and impractical. The disposition of their claims through this class action will benefit both the parties and this Court.    While the exact quantity of members of the Class is unknown at this time, it is estimated that Class number is in excess of 2,000 individuals.    The quantity and identity of such membership is easily ascertainable through inspection of Defendants' records.

85.    Adequacy.    Plaintiff Brigida is an adequate representative of the putative Class and as Class Representative will fairly protect the interests of the members of the Class, has no interests antagonistic to the members of the Class, and will vigorously pursue this suit via attorneys who are competent, skilled and experienced in litigating complex matters of this type.    Putative Class Counsel are competent and experienced in litigating large cases, are preeminent in their fields, and members of the firms have experience in litigating complex matters including employment and constitutional law cases.    Approximately 270 400 potential Class members have contacted Plaintiff's legal

counsel and approximately 151 ~~175~~ have filed informal EEO Complaints with the FAA listing Plaintiff's legal counsel as potential legal counsel. <u>Approximately 34 potential class members graduated from CTI Institutions in Arizona and/or reside in Arizona.</u>

86.    Ascertainable Class.    The proposed Class and each subclass are ascertainable in that their members can be identified and located using information contained in Defendants' records.    Specifically the FAA's Aviation Careers Division maintained an inventory of eligible CTI graduates and the Qualified Applicant Register comprised of the putative class.

87.    Superiority.    The nature of this action and the questions of law or fact common to Class members predominate over any questions affecting only individual members.    A class action is superior to other available methods for fairly and efficiently adjudicating this controversy for the following reasons, without limitation:

a.    This case involves federal agencies and officials and a sufficient numerous group of individual Class Members with many claims and common issues of law and fact;

b.    If each individual member of the Class was required to file an individual lawsuit, Defendants would necessarily gain an unjust advantage because Defendants would be able to exploit and overwhelm the limited resources of each individual member of the Class with Defendants' vastly superior financial and legal resources;

c.    Requiring each individual member of Class to pursue an individual lawsuit would discourage the assertion of lawful claims by the members of

the Class who would be disinclined to pursue an action against Defendants because of an appreciable and justifiable fear of retaliation and permanent damage to their lives, careers, and well-being;

d.      Proof of a common practice or factual pattern, of which the members of the Class experienced, is representative of the Class herein and will establish the right of each of the members of the Class to recover on the causes of action alleged herein;

e.      The prosecution of separate actions by the individual members of the Class, even if possible, would create a substantial risk of inconsistent or varying ~~verdicts~~ adjudications with respect to the individual members of the Class against Defendants; and which would establish potentially incompatible standards of conduct for Defendants;

f.      Many members of the putative Class are recent college graduates with large student loan balances and the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs, while an important public interest will be served by addressing the matter as a Class Action; and

g.      The cost to the judicial system of such individualized litigation would be substantial and a waste of valuable adjudicative and judicial resources.

88.      Manageability of Class and Common Proof. The nature of this action make this class action a particularly efficient and appropriate procedure to afford relief to

Plaintiffs for the FAA's alleged unlawful actions. Specifically, the primary issue turns upon the FAA's single decision to purge the Qualified Applicant Register and adopt a new hiring practice for Air Traffic Controllers. Individual adjudication would prejudice Defendants opposing the Class by requiring the United States government to allocate scarce judicial resources <u>and taxpayer dollars</u> to individually adjudicate the claims of approximately 2,000 to 3,500 air traffic controller applicants.

## **FIRST CLAIM FOR RELIEF**
(Violation of Title VII)

89.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth here.

90.    The FAA purged the Qualified Applicant Register and adopted a new hiring practice for Air Traffic Controllers with the intent and purpose of increasing the racial diversity of Air Traffic Controller applicants.

91.    By purging the Qualified Applicant Register and adopting a new hiring practice for Air Traffic Controllers, the FAA refused to accept the outcome of a race-neutral hiring process solely because of the racial makeup of the successful applicants. *See Ricci*, 557 U.S. at 579.

92.    The FAA did not have strong basis in evidence to believe its use of the CTI program would cause it to be subject to disparate-impact liability under Title VII of the Civil Rights Act of 1964.

93.    Accordingly, Defendants intentionally discriminated against Plaintiff Brigida and other putative Class members and violated Title VII of the Civil Rights Act

by refusing to consider for hiring and/or refusing to hir~~eing~~ qualified applicants because of those applicants' race, color, religion, sex, or national origin." 42 U.S.C. § 2000e(a)(1).

94.     Plaintiff Brigida and other putative Class Members are entitled to an order declaring that the FAA's actions violated Title VII of the Civil Rights Act of 1964, an order enjoining the FAA from implementing its new hiring practice, and an order directing the FAA to reinstate the Qualified Applicant Register. 42 U.S.C. § 2000e-5(g)(1).

95.     Additionally, Plaintiff Brigida and other putative Class Members are entitled to damages, to be determined at trial, including, but not limited to, back pay, front pay, hiring, and reinstatement.

## SECOND CLAIM FOR RELIEF
(Equal Protection)

96.     Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth here.

97.     The FAA purged the Qualified Applicant Register and adopted a new hiring practice for Air Traffic Controllers with the intent and purpose of increasing the racial diversity of Air Traffic Controller applicants.

98.     The FAA's actions, while perhaps <u>laudable</u> ~~facially neutral~~, were motivated by discriminatory intent and were adopted as a result of a discriminatory purpose based on race.

22

99.    Accordingly, the FAA's actions constituted intentional racial discrimination.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977); *Shaw v. Reno*, 509 U.S. 630, 643, (1993).

100.    The FAA's racially discriminatory actions were not narrowly tailored to achieve a compelling state interest.

101.    Specifically, the FAA, prior to implementing its racially discriminatory hiring policy, did not have evidence that the CTI program failed to produce a racially diverse applicant pool for Air Traffic Controllers.

102.    Assuming, *arguendo*, that the FAA had evidence that the CTI program failed to produce a racially diverse applicant pool for Air Traffic Controllers, the FAA did not have a strong basis in evidence that this purported disparate impact was a result of previous systematic patterns of deliberate racial discrimination within the agency. department.

103.    Therefore, the FAA's purging of the Qualified Applicant Register and adoption of a new hiring practice for Air Traffic Controllers were not made to remedy an extreme case of systematic patterns of deliberate racial discrimination.  *Croson*, 488 U.S. at 509.

104.    Accordingly, the FAA's purging of the Qualified Applicant Register and adoption of a new hiring practice for Air Traffic Controllers violated the Equal Protection Component of the Due Process Clause of the Fifth Amendment.

105.    Plaintiff Brigida and other putative Class Members are entitled to an order declaring the FAA's actions unconstitutional, an order enjoining the FAA from

implementing its new hiring practice, and an order directing the FAA to reinstate the Qualified Applicant Register.

106.    Additionally, Plaintiff Brigida and other putative Class Members are entitled to damages, to be determined at trial, including, but not limited to, back pay, front pay, hiring, and reinstatement.

**THIRD CLAIM FOR RELIEF**
(Failure to Complete Administrative Action)

107.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth here.

108.    Plaintiff Brigada's EEO Complaint has been pending with the ~~DOT~~ EEOC since approximately April 1~~2~~6, 2014.

109.    To the extent Defendants claim any additional administrative action is still necessary regarding Plaintiff Brigada's EEO Complaint, they have a duty to expeditiously complete those actions.

110.    To the extent Defendants have not completed administrative action regarding Plaintiff Brigada's EEO Complaint, Defendants' failure to do so is agency action within the meaning the Administrative Procedure Act ("APA").  5 U.S.C. § 551(13).

111.    To the extent Defendants have not completed administrative action regarding Plaintiff Brigada's EEO Complaint, Defendants' failure to do so is subject to judicial review as final agency action for which there is no adequate remedy at law.  5 U.S.C. § 704.

112.    To the extent Defendants have not completed administrative action regarding Plaintiff Brigada's EEO Complaint, Plaintiff Brigada suffers legal wrong and is adversely affected and/or aggrieved by Defendants' failure to do so.  5 U.S.C. § 702.

113.    To the extent Defendants have not completed administrative action regarding Plaintiff Brigada's EEO Complaint, Defendants have unlawfully withheld and/or unreasonablye delayed the completion of administrative action on Plaintiff Brigada's EEO Complaint.

114.    The APA requires federal courts to compel agency action that is unlawfully withheld and/or unreasonablly delayed.  5 U.S.C. § 706(1).

115.    The EEOC's regulations require that the EEOC "shall assign the [class] complaint to an administrative judge or complaints examiner with a proper security clearance when necessary.  The administrative judge may require the complainant or agency to submit additional information relevant to the complaint."  29 C.F.R. § 1614.204.

116.    To the extent Defendants have not completed administrative action regarding Plaintiff Brigada's EEO Complaint, this Court has the authority, pursuant to the APA, to compel Defendants EEOC and Yang to immediately complete administrative action regarding Plaintiff Brigada's EEO Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Brigada, on behalf of himself and the Class he seeks to represent, respectfully requests that this Court:

1.      Declare that the FAA's racially motivated purging of the Qualified Applicant Register and adoption of a new hiring practice for Air Traffic Controllers violated Title VII of the Civil Rights Act of 1964;

2.      Declare that the FAA's racially motivated purging of the Qualified Applicant Register and adoption of a new hiring practice for Air Traffic Controllers violated the Equal Protection Component of the Due Process Clause of the Fifth Amendment;

3.      Enter an order enjoining the FAA from implementing its new hiring practice for Air Traffic Controllers;

4.      Enter an order directing the FAA to reinstate the purged Qualified Applicant Register;

5.      Award Plaintiff Brigida and other putative Class Members damages ~~, to be determined at trial,~~ including, but not limited to, back pay, front pay, hiring, and reinstatement, the amounts of which are to be determined at trial;

6.      To the extent Defendants have not completed administrative action regarding Plaintiff Brigada's EEO Complaint, enter an order compelling Defendants to immediately complete administrative action regarding Plaintiff Brigada's EEO Complaint;

7.      Award Plaintiff Brigida's and other putative Class Members' costs and attorney's fees in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(k); and

8.    Award Plaintiff Brigada and other putative Class Members such further

relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff Brigada and other putative Class Members demand trial by jury in this

action of all issues so triable.

DATED this <u>18th day of April 2016.</u> ~~30th day of December 2015~~.

Respectfully submitted,

/s/ Jeffrey Wilson McCoy

Jeffrey Wilson McCoy (CO No. 43562)
 *pro hac vice* ~~*application pending*~~
Steven J. Lechner (CO No. 19853)
 *pro hac vice* ~~*application pending*~~
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
jmccoy@mountainstateslegal.com
lechner@mountainstateslegal.com

Michael W. Pearson (AZ No.0016281)
Curry, Pearson, & Wooten, PLC
814 West Roosevelt
Phoenix, Arizona 85007
(602) 258-1000
(602) 523-9000 (facsimile)
mpearson@azlaw.com

Attorneys for Plaintiff Andrew Brigida and
Putative Class Counsel

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 18th day of April 2016, I caused a true and correct copy of the foregoing **FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** to be electronically filed with the Clerk of the Court using the Court's CM/ECF system which sent notification of such filing to the following counsel of record in this matter:

    Arjun Garg
    Arjun.garg@usdoj.gov

        /s/ Jeffrey Wilson McCoy
        Jeffrey Wilson McCoy, Esq. (CO No. 43562)
        *pro hac vice*
        MOUNTAIN STATES LEGAL FOUNDATION
        2596 South Lewis Way
        Lakewood, Colorado 80227
        (303) 292-2021
        (303) 292-1980 (facsimile)
        jmccoy@mountainstateslegal.com

        Attorney for Plaintiff Andrew Brigida and Putative Class Counsel