# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                               )

ANDREW J. BRIGIDA, et al.,       )
                               )

           Plaintiffs,      )
                               )

          v.           )    Civil Action No. 16-cv-2227 (DLF)
                               )

ELAINE L. CHAO, Secretary, U.S.    )
Department of Transportation,      )
                               )

           Defendant.      )
_____)

# DEFENDANT'S OPPOSITION TO
# PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF EXHIBITS .................................................................................................... iv

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 1

I.      Federal Aviation Administration ......................................................................... 1

II.     Air Traffic Control Specialists ............................................................................ 2

        A.      Legacy Hiring Process for CTI Graduates (2008-2013) ......................... 5

        B.      Interim Hiring Process ........................................................................... 8

        C.      Hiring Process Since 2016 .................................................................... 11

III.    Named Plaintiffs ................................................................................................. 12

IV.     Procedural History ............................................................................................. 13

ARGUMENT .................................................................................................................. 14

I.      Plaintiffs Have Failed to Adequately Define a Class ....................................... 15

        A.      Plaintiffs' Central Criterion—"AT-CTI Qualified Applicant Register"—Is
                Ambiguous ............................................................................................. 16

        B.      Plaintiffs' Incorporation of the OPM Qualification Standards Renders the
                Definition Not Ascertainable to Putative Class Members .................... 19

        C.      The Class Definition Incorporates No Protected Characteristics ......... 21

II.     Plaintiffs Cannot Satisfy Rule 23(a) Requirements .......................................... 22

        A.      Commonality .......................................................................................... 22

        B.      Typicality ............................................................................................... 28

        C.      Adequacy of Representation .................................................................. 31

                1.      Intra-Class Conflicts .................................................................. 32

                2.      Counsel's Conflicts .................................................................... 34

III.    Plaintiffs Cannot Satisfy Rule 23(b)'s Requirements ....................................... 37

A.    Plaintiffs' Proposed Class Cannot Be Certified Under Rule 23(b)(2) .................. 37

B.    Plaintiffs Cannot Certify a Class Under Rule 23(b)(3) ......................................... 39

    1.    Predominance ................................................................................ 39

    2.    Superiority ..................................................................................... 41

C.    Hybrid Certification Is Inappropriate .................................................... 44

CONCLUSION ............................................................................................................. 45

# TABLE OF EXHIBITS

Declaration of Renee Coates (Dec. 21, 2018)................................................................................ A

    Ex. 1, Final Report, Independent Review Panel on the Selection, Assignment and Training of Air Traffic Control Specialists (Sept. 22, 2011)

    Ex. 2, Final Report, Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process (Apr. 16, 2013)

    Ex. 3, FAA Statement on the Barrier Analysis of the Air Traffic Control Specialist Centralized Hiring Process (undated)

    Ex. 4, Human Resource Policy Manual, Policy Bulletin No. 84, Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring (Feb. 7, 2014)

    Ex. 5, FAA, Air Traffic Controller Workforce Plan 2018-2027 (Mar. 2018) (link)

    Ex. 6, Teri Bristol, Statement Before the House Committee on Transportation and Infrastructure (June 15, 2016) (link)

Declaration of Richard Mitchell  (Dec. 21, 2018) ......................................................................B

    Ex. 1, Human Resource Operating Instruction, Air Traffic Collegiate Training Initiative (AT-CTI) Standard Operating Procedures (Apr. 1, 2007)

    Ex. 2, Air Traffic Controller Training Initiative (AT-CTI) Program, Program Overview and FAQs Collegiate Version (July 10, 2013)

Declaration of Nicole Gage  (Dec. 21, 2018) ...............................................................................C

    Ex. 1, Vacancy Announcement FAA-AMH-13-CTI-27053 (Aug. 2012)

    Ex. 2, Civil Aerospace Medical Institute, The Utility of the Air Traffic Selection and Training Test Battery in Hiring Graduates of an Air Traffic-Collegiate Training Initiative Program (June 2013)

    Ex. 3, Human Recourses Policy Manual, Policy Bulletin 84, Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring (Feb. 7, 2014)

    Ex. 4, Vacancy Announcement FAA-AMC-14-ALLSRCE-33537 (Feb. 2014)

    Ex. 5, Vacancy Announcement FAA-ATO-15-ALLSRCE-40166 (Mar. 2015)

    Ex. 6, Vacancy Announcement FAA-ATO-16-ALLSRCE-49075 (Aug. 2016)

    Ex. 7, Vacancy Announcement FAA-ATO-17-ALLSRCE-53474 (July 2017)

    Ex. 8, Vacancy Announcement FAA-ATO-18-ALLSRCE-57792 (July 2018)

Declaration of Nicole Gage  (continued) ........................................................................C

      Ex. 9, HRPM Policy Bulletin 90, Air Traffic Control Specialist Hiring for New
      Appointments (Aug. 8, 2016)

      Ex. 10, HRPM Policy Bulletin 90, Air Traffic Control Specialist Hiring for New
      Appointments (Revised, July 6, 2018)

Declaration of Joseph Teixeira  (Dec. 19, 2018) ......................................................... D

Civil Aeromedical Inst., Recovery of the FAA Air Traffic Control Specialist Workforce,
1981-1992 at 17 (Aug. 1998) (link).............................................................................E

Email from Mountain States Legal Foundation to Michael Drezner (December 6, 2018)............F

Anthony Brigida, Formal Equal Employment Opportunity Complaint (Apr. 12, 2014)
(excluding attachments) **FILED UNDER SEAL** ...................................................... G

## INTRODUCTION

Plaintiffs' motion for class certification is predicated on a fundamental misunderstanding of Federal Aviation Administration (FAA) hiring procedure.  Plaintiffs aver that their putative class was injured when the FAA stopped utilizing a "Qualified Applicant Register," which all class members were on or should have been on, and which constituted a "direct hire pool" for noncompetitive selections.  But such a register never existed.  Instead, all prospective air traffic controllers, regardless of background, were required to submit an application to a specific, competitive vacancy announcement in order to be considered for employment.

Without the common thread of a lost "Qualified Applicant Register," Plaintiffs' proposed class falls apart.  Indeed, Plaintiffs' class includes putative members who never applied for an air traffic control position and thus suffered no injury and have no colorable entitlement to relief.  Moreover, their proposed class definition does not address any specific protected characteristic under Title VII, and therefore includes both the intended victims and beneficiaries of the alleged discriminatory action by the FAA.  Due to these and other fundamental defects, Plaintiffs cannot establish the requisite commonality, typicality, or adequacy of representation required for certification of a class.  In addition, Plaintiffs' claims are not homogenous enough for certification of a class exclusively for injunctive relief.  And certification of a class involving monetary damages is inappropriate because individualized issues about damages, defenses, and participation in the class predominate over any shared issues.  Because Plaintiffs cannot satisfy the requirements for certifying a class, their motion should be denied with prejudice.

## BACKGROUND

### I.      Federal Aviation Administration

The FAA, an Administration in the U.S. Department of Transportation, regulates and oversees all aspects of civil aviation in the United States.  49 U.S.C. §§ 106(a), 40101(d)(4).  Its

mission is to provide the safest, most efficient aerospace system in the world. *Id.* § 40101(d)(4). The Air Traffic Organization (ATO) was established within FAA by Executive Order 13180 in 2000. The head of ATO is the Chief Operating Officer who oversees "the day-to-day operational functions of the [FAA] for air traffic control." 49 U.S.C. § 106(r)(5)(B). The ATO is responsible for providing air navigation services for the National Airspace System. *See* Exec. Order 13180 § 2(b). To provide air navigation services, the FAA operates 315 air traffic control facilities that guide aircraft through their various phases of flight. *See* Exhibit A, Declaration of Renee Coates ("Coates Decl."), Ex. 5, FAA, Air Traffic Controller Workforce Plan 2018-2027 at 10 (link) (hereinafter "2018 Workforce Plan"). FAA employees are thus responsible for managing a very complex and highly automated network of interconnected systems to ensure the safety of the nation's aviation. The FAA employs more than 14,000 air traffic control specialists ("ATCS" or "controllers") in such facilities. *Id.*

## II.    Air Traffic Control Specialists

Since the 1950s, the FAA (including predecessor organizations) has been studying how to recruit, select and train individuals to become successful air traffic control specialists. *See* Exhibit E, Civil Aeromedical Inst., Recovery of the FAA Air Traffic Control Specialist Workforce, 1981-1992 at 17 (Aug. 1998) (link). A large portion of this work is conducted by the Civil Aeromedical Institute (CAMI), a research institute established by statute. *See* 49 U.S.C. §106(j). It can take upwards of three years to become a fully certified air traffic controller. Since 2004, the Agency has annually issued a 10-year hiring plan. It looks at projected traffic levels, retirements, attritions and effectives ways to train and place controllers. *See* 2018 Workforce Plan at 2, 9.

Controllers carry out thousands of air traffic control activities daily—separating and controlling air traffic and providing advisory services to aircraft operators. *See id.* at 10, 19; 5

U.S.C. § 2109.  Because of the serious nature of this work and zero margin for error, the training regimen and proficiencies needed to become and remain a controller are demanding.  *See* FAA, Aviation Careers, Air Traffic Control Specialists (link).  To ensure that they can perform the essential functions of their positions without risking safety, potential controllers must meet rigorous medical requirements.  *See* OPM General Schedule Qualification Standards, Air Traffic Control Series, 2152 (link).  In addition, controllers are not eligible to be hired by FAA after the age of 30, or 35 with certain prior air traffic control experience.  *See* 5 U.S.C. § 3307(b); 49 U.S.C. § 44506(f)(3).  Controllers are generally subject to mandatory separation at age 56.  *See* 5 U.S.C. §§ 8335(a), 8425(a).

In order to meet the needs of our national airspace, the FAA must maintain an adequate number of controllers, including trainees, to address the demand for air traffic services.  *See* 2018 Workforce Plan at 6.  It hires from several sources, including the general public, Veterans' Recruitment Appointment,[1] and experienced controllers (either retired military or civilian).  *See* Exhibit C, Declaration of Richard Mitchell ("Mitchell Decl.") ¶ 4.  The source relevant to this lawsuit is the FAA's Air Traffic – Collegiate Training Initiative ("AT-CTI Program" or "CTI Program").  This program, established in 1990, is a partnership between FAA and educational institutions to prepare students for a career in aviation with the FAA.  *See id.* ¶ 5; *see also* FAA, Collegiate Training Initiative Schools (link).  CTI schools offer two- and four-year aviation degrees that teach a wide variety of topics relevant to air traffic control and aviation administration. Mitchell Decl. ¶ 6.  By 2013, the FAA had formally partnered with 36 different CTI schools offering 52 different degree options in the field of aviation. *See id.*  As independent institutions,

---

[1] This authority allows agencies to non-competitively appoint eligible veterans.  *See* 5 C.F.R. §307.101, *et seq.*

each of the CTI schools has its own requirements for successful completion of these degree programs, including graduation.  *Id.*  CTI graduates are not guaranteed employment with FAA. *Id.* ¶ 7; *see also* FAA, Collegiate Training Initiative Schools (link) ("Successful completion of the degree program(s) mentioned below does not guarantee employment with the FAA[.]").  Those graduates who do apply and are selected by FAA for controller positions are eligible to bypass the first five weeks of training at the FAA Academy.  Mitchell Decl. ¶ 8.

FAA begins its hiring process by publishing a vacancy announcement that provides a window for eligible individuals to submit an application.  *See id.* ¶ 23.  Each vacancy announcement specifies the source to which it applies.  Exhibit B, Declaration of Nicole Gage ("Gage Decl.") ¶¶ 5-6.  For example, a vacancy announcement might only be for experienced controllers.  *Id.* ¶ 18.  Up until 2014, there were multiple announcements for multiple sources.  *Id.* ¶¶ 21.  Some announcements have been exclusively for CTI graduates.  *Id.*  But CTI graduates can also apply to announcements open to the general public, and some CTI graduates are eligible to apply for Veterans' Recruitment Appointment.  *Id.* ¶ 10.  Accordingly, CTI graduates had multiple avenues to apply for employment with the FAA.  The FAA typically issued CTI vacancy announcements once or twice per calendar year.  *Id.* ¶ 6; Mitchell Decl. ¶ 21.  An individual must have submitted an application using the on-line system for each announcement to receive consideration under that announcement, regardless of whether the individual had submitted a prior application.  Mitchell Decl. ¶ 23.

Individuals who apply to a vacancy announcement are screened for whether they meet the basic eligibility criteria for that announcement.  *Id.* ¶ 25.  Those determined to be eligible receive

further consideration in the hiring process.[2]  *Id.* ¶ 26.  After an applicant has been selected, several additional steps follow: the selectee receives a tentative offer letter; if the selectee accepts the offer, he or she must pass medical and psychological exams, a security investigation, and a drug test.  *Id.* ¶ 29.  Upon satisfactory results from those processes, FAA sends the selectee a final offer letter. *Id.*  Experienced selectees who accept employment report for duty to the assigned FAA facility. *Id.* ¶ 30.  Inexperienced selectees first attend the FAA Academy in Oklahoma City for training, and upon arrival become temporary FAA employees.  *Id.*; Gage Decl. ¶ 28.  Upon successful graduation from the FAA Academy, the selectees are converted to permanent employees.  Mitchell Decl. ¶ 30.

A.    **Legacy Hiring Process for CTI Graduates (2008-2013)**

Since at least 2008, CTI graduates have only been hired using competitive procedures.  *See* Mitchell Decl. ¶¶ 20-23.  Contrary to Plaintiffs' assertions, the CTI graduates were selected competitively, and they were not given a hiring preference over other sources of controller applicants.  *Id.* ¶ 7.  CTI graduates were selected only on the basis of applications to published vacancy announcements.  *Id.* ¶ 23; Gage Decl. ¶¶ 5-6, 10.  Before 2014, to be eligible to apply for a CTI-specific vacancy announcement, a CTI student must have had, among other things: (1) graduated from an AT-CTI school in a FAA-approved program, (2) received a recommendation from that AT-CTI school, (3) achieved a passing score on the Air Traffic Selection and Training Test Battery (AT-SAT), (4) be a U.S. citizen, and (5) be younger than 31 when entering FAA duty. Mitchell Decl. ¶ 19.

---

[2] The process of selecting from among the eligible applicants has changed and will be addressed in the following sections.

While the FAA set certain minimum standards for the curriculum necessary for a degree at a CTI school to qualify for the CTI program, the FAA did not set graduation requirements for the wide variety of two- and four-year degrees involved. *Id.* ¶ 6. Each school determined their own criteria for graduation. *Id.* The FAA repeatedly emphasized that CTI graduates are not guaranteed jobs as controllers with the FAA. *See, e.g.*, *Id.* ¶ 7; Mitchell Decl., Ex. 2, AT-CTI Program Overview (July 10, 2013) at 1; FAA, Collegiate Training Initiative Schools (link).

The AT-SAT was a computerized pre-employment test designed to assess a candidate's aptitude for performing the duties of a controller. *See* Gage Decl., Ex. 2, Civil Aerospace Medical Institute, Utility of the AT-SAT in Hiring Graduates of an AT-CTI Program (June 2013) at 1. It was first used in 2002 for applicants with no prior experience or education in air traffic control, and in 2005 was extended to include CTI graduates. *Id.* A minimum score of 70 was required to pass the AT-SAT; those with a score of 85 or higher were categorized "well qualified" and those with a score between 70 and 84 were categorized "qualified." *Id.* CTI students could take the AT-SAT before graduation, at their school and their score was valid for three years after graduation. *Id.* at 2.

FAA developed a system to track CTI students and graduates. Each CTI school provided the FAA's Aviation Careers office with an electronic list of current CTI students and graduates at regular intervals, including relevant information such as expected graduation date. Mitchell Decl. ¶¶ 9-11; *id.* Ex. 1, Human Resource Operating Instruction, Air Traffic Collegiate Training Initiative (AT-CTI) Standard Operating Procedures § 5 (Apr. 1, 2007) ("2007 AT-CTI SOP"). The FAA merged this information into a database and added additional information, as it was provided by CTI schools over time. *See* Mitchell Decl. ¶¶ 12-14. The total of the information in this Aviation Careers database, the centralized collection of all the data from the student lists, was

commonly referred to as the "AT-CTI Inventory." *Id*. ¶ 12. Inclusion on the Inventory did not confer any direct benefit on CTI students or graduates. *Id.* ¶ 15. Instead, at least since 2008 when the FAA started using vacancy announcements for CTI graduates, the Inventory was maintained solely for informational purposes by the FAA. *Id.* ¶¶ 13, 15. For example, because the FAA had to allocate funding for administering the AT-SAT around the country, the Inventory was used to project the number of CTI students who would be referred for the AT-SAT in a given period. *Id.* ¶¶ 15-16. The FAA also used the Inventory as a basis both for notifying CTI graduates when a vacancy announcement was scheduled to be advertised, and for providing a "job code" which gave eligible individuals access to apply to the CTI-specific vacancy announcements. *Id.* ¶ 24.

All CTI graduates who wished to apply to a vacancy announcement were required to submit an electronic application pursuant to each vacancy announcement to be eligible for employment consideration under that vacancy announcement. *See, e.g*., Gage Decl. Ex. 1, FAA-AMH-13-CTI-27053 (2012) ("Announcement 27053"); Mitchell Decl. ¶ 23. Among other components, each applicant identified one or two locations he or she was willing to be assigned to. Mitchell Decl. ¶ 26. After a vacancy announcement period closed, the FAA's Aviation Career Office would review the submitted CTI graduate applications in the electronic application system, AVIATOR, and check each application against FAA records to determine whether that applicant met the FAA's basic eligibility/qualification requirements. *Id.* ¶ 25. Only those applicants who met the FAA's basic eligibility/qualification requirements were considered for employment. *Id.* ¶ 26. For each job opening to be filled, Aviation Careers would generate from the electronic system a referral list of eligible and qualified CTI applicants who had listed that location in their application. *Id*. The referral lists for all job openings to be filled under the vacancy announcement were then submitted to a centralized selection panel, which used the list to make selections for

controller vacancies.  *Id.*  Depending on the desired geographic areas specified by the applicant, an applicant could appear on multiple referral lists under one vacancy announcement.  *Id.* But inclusion on a referral list under one announcement had no effect on a future vacancy announcement; every individual who wished to be considered had to submit an application to the new announcement.  *Id. ¶* 28.  Once the selection panel filled the vacancies contemplated under the vacancy announcement, or if hiring did not occur for budgetary or other reasons, the relevant referral lists were closed.  *Id. ¶* 31.

> ## B.    Interim Hiring Process

In February 2014, after several years of studies and analysis, the FAA implemented changes to the controller hiring process.  *See* Coates Decl. ¶ 7.  The changes were based on a series of independent analyses.  First, in 2011, FAA commissioned an independent review panel to evaluate the controller hiring and training process.  *Id.* ¶ 4 & Ex. 1, Final Report, Indep. Review Panel on the Selection, Assignment and Training of Air Traffic Control Specialists (Sept. 22, 2011).  The panel included two aviation academics, a representative from the National Air Traffic Controllers Association, an industry representative, and an FAA psychologist.  *Id.* Ex. 1 at 51.  The panel recommended changes to the CTI Program and identified concerns regarding the AT-SAT, centralized selection panel, and the candidate interviews.  *Id.* at 17-18. Second, pursuant to Equal Employment Opportunity Commission (EEOC) Management Directive 715 ("MD-715"), the FAA contracted with outside experts to conduct a barrier analysis of the centralized controller hiring process.  *Id.* ¶ 5.[3]  The 2013 Outtz and Associates report

---

[3] Pursuant to 42 U.S.C. § 2000e-16(b), among other authorities, the EEOC issued MD-715 in 2003.  It explains that all federal agencies are required to, inter alia:

> take proactive steps to ensure equal employment opportunity for all their employees and applicants for employment. This means that agencies must work to proactively prevent potential discrimination before it occurs and establish systems to monitor compliance with Title VII. Agencies must regularly evaluate their employment practices to identify

"identified that four . . . decision points in the air traffic controller hiring process resulted in adverse impact to applicants from at least one demographic group." *Id.* Ex. 3, FAA Statement on the Barrier Analysis of the Air Traffic Control Specialist Centralized Hiring Process ("FAA Statement"). To further study the issue, APT Metrics conducted a detailed root cause analysis of the identified barriers and establish a foundation for corrective interventions. *See id.* ¶ 5 & Ex. 2, Final Report, Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process (Apr. 16, 2013). Third, the FAA established an Executive Steering Committee of senior agency executives to oversee revision of the hiring process and implementation of the recommendations. *See id.* ¶ 6 & Ex. 3, FAA Statement.

Several key issues were identified. For example, the AT-SAT did not effectively function to screen applicants, as over 95% of test takers passed the exam. *See id.* Ex. 2, Extension to Barrier Analysis at 6, 8. The studies also noted the inefficiency in issuing separate vacancy announcements directed towards different populations, with distinct eligibility standards for each source. *Id.* at 10. In addition, because the independent consultants had identified certain factors as potential barriers to equal opportunity at the agency, it was the FAA's responsibility to explore ways to adjust them to better serve the agency's goals while reducing the barriers to full participation. *See* MD-715; *see also King v. Jackson*, 468 F. Supp. 2d 33, 35 (D.D.C. 2006) ("MD–715's overriding objective . . . [was] to ensure that all employees and

---

barriers to equality of opportunity for all individuals. Where such barriers are identified, agencies must take measures to eliminate them. With these steps, agencies will ensure that all persons are provided opportunities to participate in the full range of employment opportunities and achieve to their fullest potential.

MD-715 § Part A.I (link); *see also Worth v. Jackson*, 451 F.3d 854, 856 (D.C. Cir. 2006) (emphasizing that "MD–715 declares that agencies have 'an ongoing obligation to eliminate barriers that impede free and open competition in the workplace and prevent individuals of any racial or national origin group or either sex from realizing their full potential.'" (quoting MD-715 at 8)).

applicants for employment enjoy equality of opportunity in the federal workplace regardless of race").[4]

After considering all of the issues raised in the reports, along with overarching concerns about efficiency and effectiveness, in February 2014, the FAA implemented a revised hiring process. *See* Coates Decl. ¶ 7 & Ex. 4, HRPM Policy Bulletin No. 84, Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring (Feb. 7, 2014); *see also* 2018 Workforce Plan at 42. It began issuing single nationwide vacancy announcements open to all U.S. citizens who would compete against all other applicants. *See* Gage Decl. ¶¶ 12-13 & Ex. 4, Vacancy Announcement FAA-AMC-14-ALLSRCE-33537 (Feb. 10, 2014) ("Announcement 33537"). All applicants (regardless of whether the applicant was a CTI Graduate) were required to take a new pre-employment screening tool referred to as the Biographical Assessment ("BA"). Gage Decl. ¶ 15 & Ex. 4, Announcement 33537. Applicants who passed the BA and met other eligibility requirements were ranked based on a weighted composite of the BA, AT-SAT, and veterans' preference. *See* Gage Decl. ¶ 16. Instead of selection panels and interviews, hiring was conducted solely using this composite score. *Id.* The same process was used for the

---

[4] Plaintiffs assert that the "Barrier Report and Extension Report both . . . relied on AT-CTI diversity data provided to them by the FAA" which was "seriously flawed" because it was "manipulated and intentionally changed by the FAA to make AT-CTI schools appear less racially diverse." Pls.' Mem. at 7-8 (relying exclusively on declaration of Anthony Gagliardo). The Court need not address this factual allegation for purposes of Plaintiffs' motion. However, Mr. Gagliardo's statements should not ultimately be credited. His supervisor, Joseph Teixeira, flatly contradicts Mr. Gagliardo's version of events. *See* Exhibit D, Declaration of Joseph Teixeira ¶¶ 3-13. Mr. Teixeira directed that Mr. Gagliardo be removed from federal service for inappropriate conduct in October 2014, and the Washington Regional Office of the Merit Systems Protection Board (MSPB) upheld the FAA's termination of Mr. Gagliardo's employment on the grounds that he misused his position to further the private interest of another through advice or recommendation and engaged in inappropriate communications with coworkers. *See Gagliardo v. Dep't of Transp.*, DC-0752-15-0117-I-1, 2016 WL 2893538 (MSPB May 13, 2016). Plaintiffs' counsel, Michael W. Pearson, also represented Mr. Gagliardo during that proceeding and in his pending petition for review before the full MSPB.

vacancy announcement for inexperienced applicants in 2015. *See id.* ¶¶ 14-15, 18 & Ex. 5, Vacancy Announcement ATO-15-ALLSRCE-41066 (2015) (Announcement 41066).

After issuing Announcement 33537, the FAA continued to refine its hiring and selection process in 2015 and 2016. It contracted with a consulting firm to further develop the BA. Coates Decl. ¶ 8. And it laid the groundwork for entirely replacing the AT-SAT with a newly validated test battery, the Air Traffic Skills Assessment ("ATSA"). *Id.* For the 2015 vacancy announcement, most procedures remained the same, but the updated BA was used. *See id.* Ex. 6, Teri Bristol, Statement Before the House Committee on Transportation and Infrastructure (June 15, 2016) (link); Gage Decl. ¶¶ 14-15.

### C.    Hiring Process Since 2016

Subsequently, in 2016, Congress enacted statutory requirements for controller hiring. *See* FAA Extension, Safety, and Security Act of 2016, Pub. L. No. 114-190, Title II § 2106 (July 15, 2016) (codified at 49 U.S.C. § 44506(f)). Under this law, the FAA continues to issue "All Sources" controller vacancy announcements, but is required to give hiring preference first to experienced controllers, and then must hire approximately equally from two applicant pools. 49 U.S.C. § 44506(f)(1). Pool 1 consists of eligible CTI graduates and military veterans, while Pool 2 consists of the general public. *Id.* Under the statute, the FAA may not use a biographical assessment with respect to a CTI graduate who could qualify as an applicant in Pool 1. *Id.* § 44506(f)(2)(A). Congress also provided that certain 2014 applicants (CTI graduates or veterans) who failed the BA in 2014 could reapply under the revised hiring procedures. *Id.* § 44506(f)(2)(B).

Accordingly, under the FAA's All Source vacancy announcements in 2016 and 2017, the BA was no longer required for CTI graduates. *See* Gage Decl. ¶ 21; *see also id.* ¶ 22 (noting that 2018, the BA was no longer required for any applicant). And, beginning in 2016, the new Air

Traffic Skills Assessment ("ATSA") test battery was used in place of the AT-SAT.  *See id.* ¶ 22

& Ex. 9, HRPM Policy Bulletin No. 90 (Aug. 8, 2016); *id.* Ex. 6, FAA-ATO-16-ALLSRCE-49075

(2016) ("Announcement 49075").  In Announcement 49075, FAA specifically noted that "[Pool

1] Applicants who applied for the air traffic controller vacancy FAA-AMC-14-ALLSRCE-33537

(issued on February 10, 2014), and were found disqualified from the position as the result of a BA

are eligible to reapply under this announcement."  *Id.* Ex. 6 at 3.  This remedial opportunity expired

at the end of 2017.  *See id.* Ex. 10, HRPM Policy Bulletin No. 90 (Revised July 6, 2018).

## III.    Named Plaintiffs

The named Plaintiffs, Andrew Brigida, Matthew Douglas-Cook, Suzanne Rebich, and

Pollyanna Wang, are four individuals who purportedly graduated from an AT-CTI program,

applied to the all sources Announcement 33537 in February 2014, took and were disqualified by

the BA, and were accordingly not eligible for further employment consideration under that

vacancy announcement.  *See* 3d Am. Compl. ¶¶ 77-107.  There are also several material

distinctions between them.

First, Mr. Brigida, Ms. Rebich, and Ms. Wang claim that they graduated from a CTI

program and received a recommendation from their school.  *Id*. ¶¶ 78, 91, 97.  Mr. Douglas-

Cook did not receive a recommendation from his CTI school, allegedly because "the FAA did

not request any recommendations from the December 2013 graduating class."  *Id*. ¶ 104.

Second, Plaintiffs Wang and Rebich submitted applications under the 2012 CTI vacancy

announcement (FAA-AMH-13-CTI-27053), and were placed on one or more referral lists, but

were not hired as controllers under that announcement.  *See* Gage Decl. ¶¶ 8-9.  Yet, Plaintiffs

Brigida and Douglas-Cook, who did not graduate until August and December 2013, respectively,

*see* 3d Am. Compl. ¶¶ 78, 103, did not apply to any controller vacancy announcement before the

FAA's 2014 revision of the controller hiring process, and were never included on any FAA

referral lists at any time.  Gage Decl. ¶¶ 8-9.  Thus, as explained further below, to the extent

Plaintiffs assert an injury or claim predicated on placement in a pre-2014 referral list, both

Plaintiffs Brigida and Douglas-Cook could not maintain this claim.

Third, Plaintiffs Rebich and Wang repeatedly reapplied under All Sources vacancy

announcements.  *Id*. ¶¶ 9, 19, 26-27.  In 2015, Plaintiffs Rebich and Wang again did not receive

a passing score on the BA.  *Id.* ¶ 19.  In 2016 and 2017, Plaintiff Rebich did not receive a passing

score on the required ATSA examination and, in 2017, Plaintiff Wang applied but did not take

the ATSA, such that both Plaintiffs were not considered for controller positions under their

respective vacancy announcements.  *Id*. ¶¶ 26-27.  In July 2018, however, both Plaintiffs Wang

and Rebich reapplied to the All Sources vacancy announcement (FAA-ATO-18-ALLSRCE-

57792) issued by the FAA.  *Id*.  Both passed the ATSA examination and both are currently on an

active referral list for employment consideration.  *Id*.  However, Plaintiffs Brigida and Douglas-

Cook never reapplied for controller positions with the FAA.  *Id*. ¶¶ 24-25.

## IV.    Procedural History

Plaintiff Brigida initially filed a putative class action complaint in the District of Arizona,

claiming that the FAA violated Title VII and the Fifth Amendment in promulgating the 2014

revised controller hiring policy.  *See* Compl., ECF No. 1, *Brigida v. U.S. Dep't of Transp.*, No.

2:15-cv-02654 (D. Ariz.).  Plaintiff thereafter filed two amended complaints, with the second

version taking into account the FAA Extension, Safety, and Security Act of 2016, Pub. L. No.

114-190 (codified at 49 U.S.C. § 44506(f)).  *Id.*, ECF Nos. 18, 25.  Because Plaintiff did not

challenge the statutory hiring process as unlawful, he abandoned his request for an order

enjoining the FAA's current hiring procedures.  *See id.*, ECF No. 25-1 at 23.

Defendant then moved to dismiss Plaintiff's Second Amended Complaint in part,

specifically to dismiss all defendants except the Secretary of the Department of Transportation,

to dismiss Plaintiff's Fifth Amendment claim, and to dismiss Plaintiff's request for equitable relief.  Defendant also sought transfer of the case to this Court.  *Id.*, ECF No. 27.  The U.S. District Court for the District of Arizona granted Defendant's motion in full.  *Id.*, ECF No. 33.

After the case was transferred, Plaintiff moved for reconsideration in part, seeking reinstatement of his Fifth Amendment claim and request for equitable relief.  *Brigida v. Chao*, No. 1:16-2227 (D.D.C.), ECF No. 39.  This Court granted Plaintiff's request to reinstate his claim for equitable relief, but denied Plaintiff's request to reinstate his Fifth Amendment claim. ECF No. 50.  Following that decision, Plaintiffs filed their Third Amended Complaint, adding for the first time three additional named Plaintiffs: Ms. Wang, Ms. Rebich and Mr. Douglass-Cook.  ECF No. 68.  Plaintiffs contend that the FAA "purged the Qualified Applicant Register and adopted a new hiring practice for Air Traffic Controllers with the intent and purpose of increasing the racial diversity of Air Traffic Controllers," and that this constitutes intentional discrimination in violation of Title VII because the FAA "refus[ed] to consider for hiring and/or refus[ed] to hire qualified applicants because of those applicants' race, color, religion, sex or national origin."  ECF No. 68, 3d Am. Compl. ¶¶ 118, 121.  After the Court denied Plaintiffs' motion for class certification discovery, Plaintiffs filed a motion for class certification on November 12, 2018.  ECF Nos. 66, 73.

## ARGUMENT

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original); *see also McCarthy v. Kleindienst*, 741 F.2d 1406, 1414 n.9 (D.C.

Cir. 1984) ("[I]t is the party seeking class certification that bears the burden of establishing the

class action requirements.").  "Oftentimes, this inquiry resembles an appraisal of the merits, for

'it may be necessary for the court to probe behind the pleadings before coming to rest on the

certification question.'"  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 249

(D.C. Cir. 2013) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).

"Ultimately, the district court's determination must rest on a rigorous analysis to ensure that all

the requirements are satisfied, and actual, not presumed, conformance with Rule 23 is

indispensable."  *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 311 (D.D.C.

2018) (quotation marks and alterations omitted).[5]

## I.    Plaintiffs Have Failed to Adequately Define a Class

"It is axiomatic that for a class action to be certified a 'class' must exist."  *Campbell*, 311

F. Supp. 3d at 313.  "Defining the class is of critical importance because, among other things, it

identifies the persons entitled to relief and bound by a final judgment, and as a result, the

definition must be precise, objective, and presently ascertainable."  *Ross v. Lockheed Martin

Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017).  Accordingly, "there is an implied requirement

that the class be adequately defined and clearly ascertainable before it can be certified."

*Campbell*, 311 F. Supp. 3d at 313.  "[A] class may be certified only when an individual would be

able to determine, simply by reading the class definition, whether he or she [is] a member of the

proposed class." *Artis v. Yellen*, 307 F.R.D. 13, 23 (D.D.C. 2014).[6]  Three flaws in Plaintiffs'

proposed class definition demonstrate why no class should be certified here.

---

[5] Hereinafter, internal quotation marks, citations, and alterations are omitted unless otherwise noted.

[6] A few courts in this district have queried, in dicta, the applicability of the ascertainability requirement.
*See, e.g., Ramirez v. U.S. Immigration & Customs Enf't*, No. 18-508, 2018 WL 4178176, at *29 (D.D.C.
2018); *Hoyte v. D.C.*, 325 F.R.D. 485, 490 n.3 (D.D.C. 2017).  However, these decisions nevertheless
continued to apply the ascertainability requirement, as the weight of authority in this district maintains
this "common-sense requirement [which] demands that the plaintiff be able to establish that the general

### A. Plaintiffs' Central Criterion—"AT-CTI Qualified Applicant Register"—Is Ambiguous

First, Plaintiffs' definition turns on identifying individuals who "were on, or eligible to be on, the FAA's AT-CTI Qualified Applicant Register."  Pls.' Mem. in Supp. Mot. Class Certification at 1, ECF No. 73-1 ("Pls.' Mem.").[7]  Yet Plaintiffs do not define "Qualified Applicant Register," nor does that term appear in the FAA policy documents attached to Plaintiffs' motion.  Whatever meaning Plaintiffs intend cannot readily be reconciled either with FAA policies attached by Plaintiffs or with FAA's implementation of those policies.  Accordingly, the ambiguity of Plaintiffs' class definition is fatal to their certification effort.

FAA maintained two types of lists relevant to the AT-CTI Program, both of which were sometimes referred to as an "inventory."  First, FAA maintained a "roster of AT-CTI students" based on electronic information provided by AT-CTI schools.  *See* Mitchell Decl. Ex. 1, 2007 AT-CTI SOP § 5.a-b.  This included all students at AT-CTI schools, regardless of graduation status or whether the students ultimately applied for FAA positions.  *See id.*  This information was useful to FAA both because it provided data about the pipeline of potential applicants and because an individual's information could be cross-referenced if they ultimately applied for a vacancy announcement.  Mitchell Decl. ¶¶ 13, 25.  Second, in conjunction with each vacancy announcement, FAA created referral lists of eligible candidates.  *See* Mitchell Decl. ¶ 26; *see also id.* Ex. 1, 2007 AT-CTI SOP § 5.b (describing an "inventory of eligible candidates").  These lists were created from applications submitted by candidates in response to a specific vacancy

---

outlines of the membership of the class are determinable at the outset of this litigation."  *See Campbell*, 311 F. Supp. 2d at 313.

[7] Plaintiffs include four other criteria in their class definition, individuals who:  (1) met the graduation requirements for a CTI program by December 31, 2013, (2) met the OPM qualification standards for an air traffic control specialist, (3) were eligible to receive a recommendation from their CTI program, and (4) never became employed by FAA as an air traffic control series, GS-2152.  Pls.' Mem. at 1-2.

announcement.  *See* Mitchell Decl. ¶¶ 26-27.  They included the candidates who met all eligibility criteria and expressed a preference for the geographic location of the specific opening. *Id.* ¶ 26.  The last vacancy announcement under the legacy hiring system to use a CTI referral list was FAA-AMH-13-CTI-27053 (Announcement 27053), which was open from August 27-September 10, 2012.  Gage Decl. ¶ 8.

Plaintiffs, however, do not appear to be referring to either type of list maintained by FAA, but instead to a notional free-standing list from which CTI graduates could be non-competitively selected for hiring without any formal application or vacancy announcement.  *See* Pls.' Br. at 14 (alleging that all class members "met the FAA's requirements to be considered for direct non-competitive employment"); 3d Am. Compl. ¶ 31 (alleging that CTI graduates who passed the AT-SAT "entered a direct hire pool of applicants, were placed on a 'Qualified Applicant Register' List, and were given hiring preference for ATCS positions").  No list of the sort imagined by Plaintiffs was created or used by FAA—CTI graduates were only selected from among applicants to specific vacancy announcements.  Mitchell Decl. ¶¶ 25-27.[8]  Because no

---

[8] The court is not obliged to assume the accuracy of Plaintiffs' counter-factual assertions that are contradicted by the very documents on which they rely.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d at 253 ("It is now indisputably the role of the district court to scrutinize the evidence before granting certification, even when doing so 'requires inquiry into the merits of the claim.'" (quoting *Comcast Corp.*, 569 U.S. at 35)); *cf. Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272-73 (D.C. Cir. 2018) (holding that at motion to dismiss stage a court "need not accept inferences unsupported by facts" or "the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice"); *Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 26 n. 4 (D.D.C. 2014) ("[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true.").  While FAA had statutory authority to employ a non-competitive process for CTI graduates, *see* 49 U.S.C. § 44506(c)(2), it has only employed a competitive hiring process based on vacancy announcements and applications since at least 2008.  *See* Mitchell Decl. ¶¶ 20-23.  And FAA's standard operating procedure expressly refers to an inventory of "candidates," which makes clear that it is made up of "applicants," not merely CTI students or graduates.  *See id.* Ex. 1, 2007 AT-CTI SOP § 3.b (defining AT-CTI Inventory as a "centralized register of AT-CTI candidates" and as containing "information about applicant eligibility"); *id.* § 5.b (distinguishing the "inventory of eligible candidates" from the "roster of AT-CTI students"); *id.* § 9 (explaining that AT-CTI graduates are hired "in accordance with established FAA hiring policies and practices used to fill air traffic control positions").

such list exists, a class defined by reference to such a list is not adequately defined or ascertainable.

Nor can Plaintiffs' definition be salvaged by construing it to refer to either of the two types of lists actually maintained by the FAA. If Plaintiffs' definition referred to the student roster, the definition would sweep far too broadly. It would include all students enrolled in a CTI program, regardless of whether they actually graduated, applied for an FAA vacancy, or whether they were rejected from employment for reasons having nothing to do with a protected characteristic. Plaintiffs do not, and cannot, allege that people were injured merely because they had been students in a CTI program before December 31, 2013. Thus, defining the class by reference to the student roster would be fatally overbroad. *See Ross*, 267 F. Supp. 3d at 191 ("[I]f the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad."); *see also Borum v. Brentwood Village, LLC*, 324 F.R.D. 1, 9 (D.D.C. 2018) (stating that due to plaintiff's overbroad definition "is impossible to tell . . . whether those individuals have any claims in common, as required by Rule 23(a)(2)"); *Thorpe v. Dist. of Columbia*, 303 F.R.D. 120, 141–42 (D.D.C. 2014) (assessing whether class definition was "fatally overbroad" by virtue of including individuals who had not plausibly suffered an injury).

Finally, Plaintiffs' definition would not be comprehensible if "Qualified Applicant Register" were construed to refer to the inventory of applicants (i.e. "referral lists") concerning a specific vacancy announcement. The last CTI-specific vacancy announcement was Announcement 27053, with an application deadline of September 10, 2012. *See* Gage Decl. ¶ 8. But Plaintiff Andrew Brigida, on whom Plaintiffs rely for exhaustion of their administrative remedies, did not graduate from a CTI school until August 2013, almost a year after that

application deadline.  *See* 3d Am. Compl. ¶ 78.[9]  Accordingly, Mr. Brigida's reference to a

"Qualified Applicant Register" that he allegedly "satisfied all FAA requirements for being

placed on," *id.* ¶ 79, cannot reasonably be understood to refer to an applicant list for an

announcement to which he did not apply.[10]  Nor does Plaintiffs' term plausibly refer to the next

vacancy announcement—Announcement 33537 in February 2014—which was open to all

sources and did not involve an inventory of CTI graduates.  Thus one cannot determine who was

"on, or eligible to be on" Plaintiffs' notional list.

### B.    Plaintiffs' Incorporation of the OPM Qualification Standards Renders the Definition Not Ascertainable to Putative Class Members

Distinct problems also arise from Plaintiffs' criterion that class members must meet the

"U.S. Office of Personnel Management qualification standards for employment as air traffic

control specialists."  Pls.' Mem. at 1.[11]  This criterion does not give rise to an ascertainable class

---

[9] *See Hamilton v. Geithner*, 666 F.3d 1344, 1349 (D.C. Cir. 2012) ("Government employees alleging discrimination in violation of Title VII . . . must exhaust administrative remedies before bringing their claims to federal court."); *Brooks v. District Hosp. Partners, L.P.*, 606 F.3d 800, 807 (D.C. Cir. 2010) (holding that a "single filing" exception to the exhaustion requirement "allows non-filing parties to join the lawsuit of a filing party if they possess claims "that are so similar to those asserted by the original plaintiff that no purpose would be served by requiring them to file independent [EEO] charges").

[10] Moreover, any claims based on individual applications to Announcement 27053 are unexhausted.  Such claims do not reasonably come within the scope of Mr. Brigida's formal administrative complaint, which is focused on a putative "Qualified Applicant Register" which "he earned a position on."  *See* Exhibit G, EEO Complaint ¶¶ 58-59 (Apr. 14, 2014).  Mr. Brigida's formal administrative complaint contained no allegations regarding the closure of Announcement 27053.  *See generally id.*  And claims about a prior announcement do not grow out of his allegations.  *See Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (holding that a federal lawsuit may only contains "claims that are like or reasonably related to the allegations of the [EEO] charge and growing out of such allegations"); *see also Crawford v. Duke*, 867 F.3d 103, 110 (D.C. Cir. 2017) (holding that plaintiff failed to exhaust promotion claim because a "fleeting and skeletal reference to temporary interference with the promotion process could not reasonably be expected to alert the Department to investigate the claim that Crawford was denied an unidentified promotion in favor of another unidentified individual").

[11] Another defect in Plaintiffs' definition is their exclusion of persons who "have been employed by the FAA as an air traffic control series, GS-2152."  Pls.' Mem. at 2.  This is apparently intended to exclude from the class all individuals who have been hired by FAA as controllers.  However, it does not serve that purpose.  The FAA does not hire using the general schedule, so no recent hires have been employed as a "GS-2152."  *See* Gage Decl. ¶ 27.  Instead, new controllers were hired using either the FG-2152

because it cannot readily be known whether each class member satisfied each of the
requirements set forth in each of the OPM standards.  The OPM standards incorporate
assessments made by the FAA at different stages of the application process itself.  If a potential
class member did not participate in the stage of the process where each assessment was
conducted, neither the class member nor the Court can know whether the individual is actually in
the class.  Thus, a potential class member would not "be able to determine, simply by reading the
class definition, whether he or she [is] a member of the proposed class."  *Artis*, 307 F.R.D. at 23.

For example, under the OPM standards the candidate must "demonstrate possession of
the traits and characteristics important in air traffic control work," and "have the capacity to
perform the essential functions of these positions without risk to themselves or others" as
manifested at a "pre-employment physical/medical evaluation."  *See* OPM, General Schedule
Qualification Standards, Air Traffic Control Series, 2152 (link).  In the legacy hiring process,
these standards were implemented through individual screenings and interviews.  *See, e.g.*, Gage
Decl. Ex. 1, Announcement 27053 ("Applicants selected for ATCS positions must pass a
medical examination that includes psychological screening prior to appointment."); *id.*
("Candidates for ATCS positions may be subject to pre-appointment interviews to determine
whether they possess the personal characteristics necessary to perform air traffic control work.").
Accordingly, many of the OPM standards are not subject to objective measure by potential class
members, and only the outcome of an actual hiring process could establish whether each CTI
student or graduate "met" each of the standards.  Because a potential class member cannot know

---

designation or the AT-2152 designation.  *See id.*  Thus, Plaintiffs' class inexplicably appears to include
even applicants who accepted an offer and began training for controller positions.

with certainty whether he or she meets this criteria at the outset, defining a class by reference to such standards violates the ascertainability requirement. *See Artis*, 307 F.R.D. at 23.

### C. The Class Definition Incorporates No Protected Characteristics

Finally, Plaintiffs' proposed class definition includes certain individuals who attended CTI schools without regard to race, sex, or any other characteristic protected by Title VII. *See* Pls.' Mem. at 2-3. This creates a mismatch between the proposed class and Title VII, which has two essential elements: "that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). Because Plaintiffs seek to establish liability under Title VII on a classwide basis, *see* Pls.' Mem. at 2, their proposed class must be united by a protected characteristic. Indeed, "plaintiffs in Title VII class actions must . . . demonstrate that class plaintiffs suffered discrimination on the basis of membership in a particular group." *Moore v. Napolitano*, 269 F.R.D. 21, 29 (D.D.C. 2010); *see also Hartman v. Duffey*, 19 F.3d 1459, 1472 (D.C. Cir. 1994) (noting that a Title VII class action requires more than "a demonstration that class plaintiffs suffered discrimination on the basis of membership in a particular group"); *McManus v. Dist. of Columbia*, 530 F. Supp. 2d 46, 76 (D.D.C. 2007) (dismissing Title VII claims because plaintiffs "do not even state their individual races" and thereby "do not allege that they are members of any of the classes protected by that statute"). Attendance at a particular type of institution is obviously not a protected characteristic under Title VII. Thus Plaintiffs' attempt to represent CTI graduates regardless of race, sex, or other protected characteristic, is

accordingly improper.[12]  And as addressed below, this definitional issue is fatal to Plaintiffs'

commonality, typicality, and adequacy arguments.

In sum, Plaintiffs have failed to specify a definite, ascertainable class and their motion

may accordingly be denied on this ground alone.

## II.      Plaintiffs Cannot Satisfy Rule 23(a) Requirements

No class may be certified that does not meet each of the prerequisites set forth in Federal

Rule of Civil Procedure 23(a).  *See Falcon*, 457 U.S. at 161.  These include the requirements that

"there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), that "the

claims or defenses of the representative parties are typical of the claims or defenses of the class,"

Fed. R. Civ. P. 23(a)(3), and that "the representative parties will fairly and adequately protect the

interests of the class."  Fed. R. Civ. P. 23(a)(4).  Plaintiffs fail to demonstrate that they meet any

of these three prerequisites.

### A.      Commonality

"[C]ommonality under Rule 23(a) requires a named plaintiff to show (i) discrimination

(ii) against a particular group (iii) of which the plaintiff is a member, *plus* (iv) some additional

factor that permits the court to infer that members of the class suffered from a common policy of

discrimination."  *Love v. Johanns*, 439 F.3d 723, 728 (D.C. Cir. 2006); *see also Moore v.*

*Napolitano*, 269 F.R.D. 21, 29 (D.D.C. 2010) (applying *Love* generally to "cases where plaintiffs

alleging disparate treatment of a class"); *Taylor v. Dist. of Columbia Water & Sewer Auth.*, 241

F.R.D. 33, 38 (D.D.C. 2007) (same).  As the Supreme Court explained in *Wal-Mart v. Dukes*,

commonality under Rule 23(a)(2) requires not merely the literal raising of "common

---

[12] The proposition that "racial discrimination is by definition class discrimination," *Falcon*, 457 U.S. at 157.

'questions,'" but rather "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." 564 U.S. 338, 350 (2011); *see also D.L. v. Dist. of Columbia*, 713 F.3d 120, 125 (D.C. Cir. 2013). In other words, not only must the plaintiffs' claims depend on a "common contention," but that contention "must be of such a nature that it is capable of classwide resolution." *Wal-Mart,* 564 U.S. at 350. "A plaintiff seeking class certification is not required to prove the elements of his claim at the certification stage, but he must show that the elements of the claim are susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 491 (2013).

Plaintiffs have not pled discrimination "against a particular group . . . of which the plaintiff is a member." *Love*, 439 F.3d at 728. Instead, they seek to represent "thousands of diverse AT-CTI applicants on the Register," Pls.' Mem. at 8; *see also id.* at 22 ("thousands of well prepared and diverse candidates"), in pressing the claim that the FAA improperly changed its hiring policy because it "did not like the racial makeup of the majority of the register," and "belie[ved] that too many Caucasians passed the [AT-SAT] examination." Pls.' Mem. at 2. Thus Plaintiffs' proposed class includes not only their own (unspecified) racial and ethnic group, but all other CTI graduates regardless of race. But it cannot be argued that FAA intentionally "discriminated" against all racial groups alike, for that is not disparate treatment. *See, e.g.*, *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986 (1988) (explaining disparate treatment claims require a showing that "an employer has treated that particular person less favorably than others because of the plaintiff's race, color, religion, sex, or national origin").[13] Accordingly,

---

[13] Similarly, in the disparate impact context, *Ricci v. DeStefano*, 557 U.S. 557 (2009), was not a class action, but instead was brought by specific individuals who were injured by the challenged policy change—"17 white firefighters and 1 Hispanic firefighter who passed the examinations but were denied a chance at promotions." *Id.* at 574. Nothing in *Ricci* suggests that these individuals could have represented a class made up of all people who took the test.

Plaintiffs' theory that the FAA intended to benefit certain racial groups at the expense of others precludes a class that includes both the allegedly favored and disfavored groups. *See Amgen*, 568 U.S. at 491 (requiring that "the elements of the claim" be "susceptible to classwide proof").

Even assuming this glaring defect could be overlooked, Plaintiffs cannot establish commonality simply as a result of challenging the FAA's revision to the controller hiring process in 2014. Instead, under Rule 23(a)(2), a common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of *each one* of the claims *in one stroke.*" *Wal-Mart*, 564 U.S. at 350 (emphasis added). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* According to Plaintiffs, this case will require the Court to answer no fewer than seven separate questions on a classwide basis. But because of the dissimilarities within the class, Plaintiffs cannot show that any of the key questions of liability, injury and relief are capable of classwide resolution.

The first question Plaintiffs propose—"(1) whether the FAA unlawfully eliminated the Qualified Applicant Register in violation of the rights of the Class members," Pls.' Mem. at 14— depends on patent factual misunderstandings, as discussed above, *see supra*, Arg. § I.A, and is thus not central to the validity of all the class members' claims.[14] If the "Qualified Applicant Register" could mean referral lists generated from vacancy announcements, such as

---

[14] This question, along with most of Plaintiffs other questions, is also framed at a high level of generality that is inappropriate in this context. *See Love*, 439 F.3d at 729-30 ("[A]t a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." (quoting with approval *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998))). As the Supreme Court noted in *Wal-Mart*, "Is that an unlawful employment practice?" is not a question "sufficient to obtain class certification." 564 U.S. at 349; *see also D.L.*, 713 F.3d at 126 (holding that question did not give rise to commonality that that "speaks too broadly because it constitutes only an allegation that the class members 'have all suffered a violation of the same provision of law'") (quoting *Wal-Mart*, 564 U.S. at 350). Instead, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Id.* at 350.

Announcement 27053 to which Plaintiffs Rebich and Wang applied, Plaintiffs' question actually highlights the absence of commonality among the named *Plaintiffs*, let alone the putative *class*. Neither Plaintiff Brigida nor Plaintiff Douglas-Cook submitted an application to the FAA before the policy change.  *See* Gage Decl. ¶ 9.  Therefore, at the time the legacy process was discontinued, two Plaintiffs were not "applicants" and were not on any referral lists generated from vacancy announcements.  The putative class similarly includes those who had submitted prior applications, those who applied for the first time after the policy change, and those who never applied.  *See* Pls.' Mem. at 2-3.  Regardless of the meaning of "Qualified Applicant Register," the answer to Plaintiffs' question will play no role in resolving the claims of the class members who either *never applied* for controller positions with FAA or were not "applicants" at the time of the policy change (such as Plaintiff Brigida himself).  Accordingly, Plaintiffs' fundamental legal claim, whether the elimination of a "Qualified Applicant Register" violated Title VII, is both incoherent and, if it has any basis in fact, is not susceptible to classwide proof. For this reason alone, Plaintiffs have failed to establish commonality.

If this defect were not enough, two more of Plaintiffs' questions—"(2) whether the FAA unlawfully eliminated the Class members' bona fide AT-SAT scores due to race-conscious reasons . . ." and "(5) whether the FAA, once establishing the AT-CTI employment process and making the selection criteria clear, was justified in purging the AT-CTI Register and AT-SAT scores of those on the Register due to race conscious reasons"—present similar deficiencies.  For one thing, Plaintiffs never allege in their Third Amended Complaint that the "elimination" of AT-SAT scores constituted intentional racial discrimination.  *See* 3d Am. Compl. ¶¶ 118-19 (stating only that the FAA "purged the Qualified Applicant Register" and "adopted a new hiring practice" for discriminatory reasons).  Plaintiffs cannot use their motion for class certification to

add new claims and thereby amend the operative complaint. *See Harbury v. Hayden,* 444 F. Supp. 2d 19, 40 (D.D.C. 2006) (rejecting claim raised only in briefing, because "Plaintiff has attempted to turn her Second Amended Complaint into a moving target, and unfairly so").

Even if the above questions had been properly raised in Plaintiffs' Third Amended Complaint, their answers would not move forward resolution of the claims of a significant portion of the class. Not everyone who takes a pre-application aptitude test, such as the AT-SAT, actually applies to a given employment position. CTI graduates received degrees that included some controller-related curriculum but could also be used for a variety of other career choices. *See* Mitchell Decl. Ex. 2, AT-CTI Overview at 5-9 (explaining that "CTI partner schools provide students with a diverse choice in aviation degree types and areas," listing 52 different degree programs that satisfy CTI Program criteria). Moreover, the class includes CTI graduates who were successful in the application process, but chose to withdraw at some point before arriving at the FAA Academy. The class even includes people who may not have met FAA's eligibility criteria such as U.S. citizenship and graduation and recommendation from a CTI school. *See* Pls.' Mem. at 2 (broadly including students who "met the requirements for graduation" and were "eligible to receive[] a recommendation" even though the FAA only considered those who received a degree and a recommendation). Given these variations within the class, Plaintiffs' questions concerning the AT-SAT and "Qualified Applicant Register" have no relevance to numerous putative class members. Thus, these questions are not "of such a nature that [they are] capable of classwide resolution." *Wal-Mart,* 564 U.S. at 350.

Moreover, two of Plaintiffs' proposed common questions address what Plaintiffs imagine the FAA's defenses might be. *See* Pls.' Mem. at 14 ("(3) whether the FAA had a strong basis in evidence to believe it would be subject to disparate impact liability if it failed to take race

26

conscious action, (4) whether the FAA had a strong basis in evidence to believe the AT-SAT taken by those on the AT-CTI Register were not job related and consistent with business necessity"). This is a dubious way to attempt to justify class certification, as the FAA has not yet advanced these defenses and may rely on any number of other approaches to demonstrate that Plaintiffs' claims are not meritorious, including, but not limited to, these defenses.

Plaintiffs' last two questions are obviously inadequate—"(6) whether the FAA's unlawful conduct caused harm and adverse effects, including pecuniary harm to the Class members; and (7) whether each Class member is entitled to statutory damages plus attorneys' fees and costs." Pls.' Mem. at 15. Accordingly, even if this Court could resolve the preceding five questions, it would still have to determine whether the individual class members were harmed by FAA conduct, and whether each class member is entitled to damages. Plaintiffs identify no adverse employment action that can be attributed to the whole class, and as a result the basic questions of injury and relief here are inherently individualized inquiries. *See, e.g.*, *Wal-Mart*, 564 U.S. at 349-350 (holding that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury"). Moreover, there are no automatic "statutory damages" under Title VII, only compensatory damages. *See* 42 U.S.C. § 1981a. Plaintiffs provide no explanation for their assertion that injury, compensatory damages, or the calculation of front and back pay can be determined on a classwide basis and, therefore, have failed to carry their burden. *See Does I through III v. Dist. of Columbia*, No. 01-2398, 2006 WL 2864483, at *3 ("[T]he nature of the damages sought can militate against class treatment.").

In sum, due to the nature of Plaintiffs' claims and their class definition, Plaintiffs' proposed questions are not susceptible to classwide proof and are not "apt to drive the resolution of the litigation," *Wal-Mart*, 564 U.S. at 350, because the answers would not suffice to establish

any element of Plaintiffs' claims, let alone resolve an issue central to the claims of each and every class member. *See id.* (holding that to satisfy Rule 23(a)(2), a common question must be such that "determination of its truth or falsity will resolve an issue that is central to the validity of *each one* of the claims *in one stroke*" (emphasis added)).

**B.    Typicality**

The central inquiry in determining whether a proposed class has Rule 23(a)(3) typicality is whether the "class representative [is] part of the class and 'possess[es] the same interest and suffers the same injury' as the class members." *Council of & for the Blind of Delaware Cty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1544-45 (D.C. Cir. 1983). While commonality requires a showing that the *members* of the class suffered an injury resulting from the defendant's conduct, typicality focuses on whether the *representatives* of the class suffered a similar injury from the same course of conduct. *Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 34 (D.D.C. 2003).

Like the commonality requirement, it seeks to "measure the degree of interrelatedness between the claims in a class action," but it "is more exacting because it requires sufficient factual and legal similarity between the class representative's claims and those of the class to ensure that the representative's interests are in fact aligned with those of the absent class members." William B. Rubenstein, *Newberg on Class Actions* § 3:31 (5th ed. 2013); *In re Navy Chaplaincy*, 306 F.R.D. 33, 53 (D.D.C. 2014). Thus, "typicality screens out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Ramirez v. U.S. Immigration & Customs Enf't*, No. 18-508, 2018 WL 4178176, at *27 (D.D.C. Aug. 30, 2018).

Here, Plaintiffs are unable to establish typicality for several reasons. First, the incoherence of Plaintiffs' class definition precludes a finding of typicality. That is, Plaintiffs insist that "[e]ach putative class member was affected directly in the exact same way," namely

by "eliminating" the so-called Qualified Applicant Register and AT-SAT scores. Pls.' Mem. at 16. But the "Register," as described by Plaintiffs, never existed. *See supra*, Arg. § 1.A. And as explained above, the inventories actually utilized by the FAA cannot salvage Plaintiffs' claim. *Id.* Thus, the named Plaintiffs cannot show that they share any injury with unnamed class members.

Second, Plaintiffs claim that under their proposed class definition "there are no variations among harm suffered by class members," Pls.' Mem. at 24, but this is simply untrue, and the lack of typicality here is not surprising. Plaintiffs' class definition focuses solely on whether an individual would have been eligible to apply for a controller position as a CTI graduate under the prior hiring system. The putative class is thus defined purely by reference to qualifications for potential employment, without any requirement that a class member be turned down or even apply for that employment. *Cf. Little v. Washington Metro. Area Transit Auth*., 249 F. Supp. 3d 394, 406 (D.D.C. 2017) (certifying class of African-American applicants and employees, who were suspended or denied employment due to Criminal Background Check Policy); *Moore v. Napolitano,* 926 F. Supp. 2d 8, 16 (D.D.C. 2013) (certifying class of "African-American special agents who bid for promotion . . . and were not promoted"). Without any requirement in the class definition that a putative member was harmed and the nature of that harm, by definition, the purported injury suffered by the named Plaintiffs will not be shared by all putative class members.

Putting aside the meritless allegation of a "Qualified Applicant Register," the named Plaintiffs claim that they were injured because they each graduated from a CTI institution, and then applied for and were rejected for controller positions with FAA in 2014. *See* 3d Am. Compl. ¶¶ 77-107. By contrast, Plaintiffs' putative class encompasses a wide variety of

purported members who do not share the named Plaintiffs' purported injury.  For instance, to constitute a class member under Plaintiffs' definition, neither graduation nor a recommendation from a CTI school is required.  *See* Pls.' Mem. at 2 (including those who "met the requirements for graduation" and were "eligible to receive[] a recommendation").  In addition, to be a putative class member, a CTI graduate did not need to apply to a controller vacancy announcement *at any point*.  Contrary to Plaintiffs' assertions, CTI students and graduates were required, at the very least, to apply to vacancy announcements, both before and after the changeover in hiring practices, to be considered for employment.  *See* Mitchell Decl. ¶¶ 25-27.  Thus, a class member who did not graduate from a CTI school, did not receive a recommendation to the FAA, and never applied to be a controller, would not have been considered for controller positions and could not have been turned down from that employment.  *See id.*  These putative class members accordingly do not share any injury with the named Plaintiffs, who all applied for controller positions and were turned down.  *See Daskalea v. Washington Humane Soc.*, 275 F.R.D. 346, 358 (D.D.C. 2011) (denying certification for lack of typicality where "the members of the proposed class suffered a wide range of deprivations . . . and claim distinct injuries").

On the other end of the scale, putative class members would also include CTI graduates who applied and received an offer for employment as a controller, but turned down the offer, or otherwise were never "employed by the FAA as an air traffic control[ler]," Pls.' Mem. at 2, for any number of reasons.  Similar to those putative class members who never applied, putative class members who were offered employment as a controller are not similarly situated to any of the named Plaintiffs, nor could they have suffered any harm from the changeover in hiring practices.  *See Moore v. Napolitano*, 269 F.R.D. 21, 33 (D.D.C. 2010) (denying certification for lack of typicality where "[a] particular class member may not have suffered an injury at all,

much less an injury typical of the injuries alleged by the class representatives."); *see also*

*Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994) ("Normally, an employee who was not

aggrieved by a particular test or hiring requirement lacks standing to challenge that test or

requirement.").[15]

In sum, Plaintiffs' proposed class definition includes numerous putative class members

who are not similarly situated to any of the named Plaintiffs, and typicality therefore is absent.

### C.    Adequacy of Representation

Plaintiffs' motion should also be denied because it fails to establish that they are adequate

representatives of absent putative class members.  Rule 23(a)(4) provides that "one or more

members of a class may sue or be sued as representative parties on behalf of all members only if

. . . the representative parties will fairly and adequately protect the interests of the class."  Fed. R.

Civ. P. 23(a)(4).  Where, as here, money damages are sought, this requirement has constitutional

due process implications.  *See Cobell v. Salazar*, 679 F.3d 909, 922 (D.C. Cir. 2012).  Because

absent class members will be bound by a final judgment when a class action is certified, courts

are required to "undertake a stringent and continuing examination of the adequacy of

representation by the named class representatives at all stages of the litigation."  *Nat'l Ass'n of

Reg'l Med. Programs v. Matthews,* 551 F.2d 340, 344 (D.C. Cir. 1976).  The adequacy of

representation inquiry concerns both the behavior of the class representatives and class counsel.

*See, e.g.*, *Twelve John Does v. Dist. of Columbia,* 117 F.3d 571, 575 (D.C. Cir. 1997).  It is

meant to uncover conflicts of interest between the named plaintiffs and the class they seek to

---

[15] Plaintiffs may also not be typical of some ethnic or racial groups present in the putative class, but that cannot be fully assessed because they have not revealed or relied on their protected characteristics under Title VII. *Cf. Houser v. Pritzker*, 28 F. Supp. 3d 222, 245-46 (S.D.N.Y. 2014) (concluding that African American plaintiffs were not typical of the Latino applicants included in the class definition).

represent, as well as conflicts within the class or conflicts that implicate class counsel's ability to vigorously prosecute the case on behalf of the whole class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 & n.20 (1997); *Gen. Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 331 (1980).

### 1.    Intra-Class Conflicts

For the named Plaintiffs to satisfy the adequacy requirement, they "must not have antagonistic or conflicting interests with the unnamed members of the class." *Thorpe*, 303 F.R.D. at 150 (quoting *Twelve John Does,* 117 F.3d at 575). This includes conflicts among the unnamed class members. *See also Barnes v. Dist. of Columbia*, 242 F.R.D. 113, 122 (D.D.C. 2007). The D.C. Circuit has stressed that "[c]lass members whose interests are antagonistic in fact to, or even 'potentially conflicting' with, the interests of the ostensibly representative parties cannot be bound, consistent with the requirements of due process to an adjudication taken in their name." *Phillips v. Klassen*, 502 F.2d 362, 366 (D.C. Cir. 1974). Here, the named representatives have multiple conflicting interests with unnamed class members, and certification should accordingly be denied.

The named Plaintiffs have fundamental conflicts of interest because they purport to represent a class that includes both the allegedly intended beneficiaries of racial discrimination and the alleged victims of that discrimination. As noted above, Plaintiffs aver that the FAA altered its hiring practices because "of a belief that too many Caucasians passed the [AT-SAT] examination." Pls.' Mem. at 2. In other words, Plaintiffs contend that the FAA intentionally discriminated against white applicants in an effort to benefit minority applicants. *See* 3d Am. Compl. ¶ 118 ("The FAA purged the Qualified Applicant Register . . . with the intent and purpose of increasing the racial diversity of Air Traffic Controller applicants."). Yet they seek to represent "[a]ll persons" who held certain qualifications for controller positions, Pls.' Mem. at 2, thus including "thousands of well prepared and diverse candidates." *Id.* at 22. And while the

four named Plaintiffs never state their membership in any protected class, even if they collectively reflect that diversity, it would not resolve the material conflicts of interest. "It is not adequate representation for the class representative to accuse some members of the class of having received preferred treatment." *Moore v. Nat'l Ass'n of Sec. Dealers, Inc.*, No. 80-3067, 1981 WL 274, at *7 (D.D.C. Aug. 31, 1981).

Courts routinely hold that class certification is improper where the purported class includes members of different races or genders, and where conflicts of interest arise as a result. *See id.* (rejecting on adequacy grounds a plaintiff's effort to "represent a class composed of both black and female employees" where plaintiff's own allegations "indicate antagonism between the two groups" and plaintiff "believe[d] she was treated less favorably than white females"); *Talley v. ARINC, Inc.*, 222 F.R.D. 260, 269-70 (D. Md. 2004) (finding conflict and striking class action allegations for classes composed of African Americans employees and female employees, where at least one named plaintiff claimed that he was denied a promotion in favor of a female); *Orlowski v. Dominick's Finer Foods, Inc.*, 172 F.R.D. 370, 375 (N.D. Ill. 1997) (holding that "where a minority woman holds interests in conflict with those of minority men, she cannot represent the minority class composed of both" and such conflicts were present where "proof of gender discrimination will involve evidence of . . . more favorable treatment of Hispanic men than Hispanic women").

Here, it readily apparent that the interests of the class are antagonistic to each other. Despite Plaintiffs' assertion that the FAA discriminated against all putative class members "because of those applicants' race, color, religion, sex, or national origin," 3d Am. Compl. ¶ 121, they only support the notion that majority applicants were discriminated against. *See* Pls.' Mem. at 2 (alleging that the FAA committed an "unlawful employment practice" because of "a belief

that too many Caucasians passed the [AT-SAT] examination"). Minority class members do not share Plaintiffs' claim that the FAA refused to hire them "because of [their] race," and as a result minority class members possess interests directly at odds with white class members. *See* 3d Am. Compl. ¶ 121 (alleging that the FAA violated Title VII by "refusing to consider for hiring and/or refusing to hire qualified applicants because of those applicants' race"). Moreover, it is unlikely that most minority class members share Plaintiffs' goal of holding unlawful a policy which, Plaintiffs contend, was implemented in order to increase minority hiring. *See id.* It is also unlikely that most minority class members share Plaintiffs' desire for across-the-board reinstatement of a process that purportedly served as a barrier to minority hiring. *See* 3d Am. Compl. at 22 (seeking "reinstate[ment of] the purged Qualified Applicant Register"). Indeed, such injunctive remedies would be likely to harm a significant number of minority class members. *Cf. Spano v. Boeing Co.*, 633 F.3d 574, 587 (7th Cir. 2011) (holding that adequacy of representation had not been proven when the proposed class was defined so broadly that it included individuals who would actually be harmed by the relief plaintiffs sought).

### 2.    Counsel's Conflicts

It is Plaintiffs' obligation to demonstrate that they will "vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does,* 117 F.3d at 575. Plaintiffs have failed to support the assertions regarding their counsel's qualification with any specific evidence, such as sworn declarations. *Cf. Daskalea*, 275 F.R.D. at 377 (recommending a finding of adequacy only after plaintiffs' counsel submitted a declaration).[16] A putative class counsel's

---

[16] It is not clear that Plaintiffs' counsel has demonstrated sufficient experience with class actions. Mr. Pearson does not claim significant class action experience. *See* Pls.' Mem. at 19-20 (stating only that he "has been involved in heparin class and multidistrict litigation"). While Mr. Pendley has not withdrawn his appearance, it seems that he is no longer associated with Mountain States Legal Foundation. *See* MSLF Announces Resignation of President William Perry Pendley, *Fairfield Sun Times* (Dec. 13, 2018) (link); *see also* Exhibit F, Email from William Perry Pendley to Michael Drezner (December 6, 2018).

conflicts of interest are also fatal to class certification.  *See, e.g., Lewis v. Nat'l Football League*,

146 F.R.D. 5, 11-12 (D.D.C. 1992).  Here, putative class counsel Michael Pearson has a conflict

of interest stemming from his decision to simultaneously prosecute an overlapping class action in

another district—*Johnson v. U.S. Dep't of Transp.*, No. 3:18-cv-2431-M (N.D. Tex.).  In that

case the proposed class is the approximately 25,000 people who took and were disqualified by

the BA in 2014.  Thus, each of the named Plaintiffs in this case is an absent class member in

*Johnson*.  And Lucas Johnson, the named plaintiff in that case, is a CTI graduate who comes

within the class definition in this case.

A conflict of interest arises for a lawyer, "when, in behalf of one client, it is his duty to

contend for that which duty to another client requires him to oppose."  *Cuyler* v. *Sullivan*, 446

U.S. 335, 356 n.3 (1980) (Brennan, J., concurring) (quoting with favor Canon 6 of the 1937

Canons of Professional Ethics).  "Courts have consistently held that counsel cannot

simultaneously represent a class and prosecute either individual or class claims against the same

defendants in a different proceeding."  1 *McLaughlin on Class Actions* § 4:39 (15th ed. 2018).

*See also* 5 *Moore's Federal Practice* § 23.120 (2018) ("An attorney who represents another class

in an unrelated suit against the same defendant may not serve as class counsel."); *Ortiz v.*

*Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (citing *Moore's Federal Practice* with approval and

finding conflict of interest where attorneys represented settlement class as well as individual

---

And while Plaintiffs' motion indicates that Ms. Brown has newly joined Mountain States Legal
Foundation and that she has served as counsel for a plaintiff class and "been involved in state and federal
class action proceedings," her role in the case remains unclear as she has not "submit[ed] an application
for admission shortly" as promised in Plaintiffs' November 24, 2018 motion.  *See* Pls.' Mem. at 20 n.8.
Mr. Corrigan's experience appears to be limited to "assisting with class certification issues" in a single
case last year.  *See id.* at 20; *see also* MSLF Staff, Christian Corrigan, Staff Attorney (link) (indicating
that Mr. Corrigan graduated from law school six years ago and occupied primarily non-litigation roles).  It
is unlikely that the vague assertion that the two firms "have other attorneys with plaintiff and class action
experience" bolster any of these showing.  *See id.* at 21.

clients with more favorable settlement); *In re Lorazepam & Chlorazepate Antitrust Litig.*, 205

F.R.D. 24, 28 (D.D.C. 2001) (noting possibility of "conflict stemming from Class Counsel's dual

representation" that "could help the Court in evaluating the adequacy of representation of the

class"). The mere appearance of conflict is a sufficient basis to deny certification. *See Kayes v.*

*Pacific Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (responsibility to class members "does

not permit even the appearance of divided loyalties of counsel").

  This parallel litigation against the same defendant challenging the same set of policy

changes from another angle creates a conflict of interest because the interests of the overlapping

classes may not be aligned. *See Lou v. Ma Labs., Inc.*, No. 12-05409, 2014 WL 68605, at *1-2

(N.D. Cal. Jan. 8, 2014) (refusing to certify class where same firm represented another group of

plaintiffs in parallel litigation against the same defendants). "The interests need not conflict

directly, but the mere fact of adjusting or compromising legal tactics or arguments to

accommodate both classes of plaintiffs obviously impairs counsel's use of independent

professional judgment as to each class." *Moore v. Margiotta*, 581 F. Supp. 649, 653 (E.D.N.Y.

1984). Here, for example, proposed class counsel may seek to simultaneously settle both cases,

but settlement might not be in one or the other class's interest. *See Krim v. pcOrder.com, Inc.*,

210 F.R.D. 581, 589-90 (W.D. Tex. 2002). Or tactical decisions in one case could harm the

interests of clients in the other case. *See Moreno v. Autozone, Inc.*, No. C05-04432, 2007 WL

4287517, *15 (N.D. Cal. Dec. 6, 2007) ("[P]lacing a class at risk that its interests will be

compromised for the benefit of parties in another action."); *Kurczi v. Eli Lilly & Co.*, 160 F.R.D.

667, 679 (N.D. Ohio 1995) ("Every decision to hasten or delay the litigation on behalf of one set

of plaintiffs could alternately harm or benefit the other set of plaintiffs."). Such considerations

are relevant even if counsel has not yet taken a position contrary to the interests of the class. *See Sullivan v. Chase Inv. Serv., Inc.*, 79 F.R.D. 246, 258 (N.D. Cal. 1978).

Accordingly, "[b]ecause plaintiffs have not proposed for consideration a class free of conflicts of interests, the representation as proposed is inadequate." *Moore,* 269 F.R.D. at 35.

## III.    Plaintiffs Cannot Satisfy Rule 23(b)'s Requirements

Plaintiffs assert that "certification is warranted under either Rule 23(b)(2) . . . or under Rule 23(b)(3)." Pls.' Mem. at 2. They also obliquely suggest that the Court could "certify a hybrid (b)(2) and (b)(3) class" without specifying the contours of such a proposal. *See* Pls.' Mem. at 21. In fact, a class cannot be certified under any of these provisions.

### A.    Plaintiffs' Proposed Class Cannot Be Certified Under Rule 23(b)(2)

The putative class cannot be certified pursuant to Rule 23(b)(2) for several reasons. First, Plaintiff's Third Amended Complaint invokes only a class under Rule 23(b)(3), and does not seek certification of a class pursuant to Rule 23(b)(2) or any type of hybrid class. *See* 3d Am. Compl. ¶ 109 (stating that Plaintiffs seek to bring a class action only "pursuant to Rule 23(b)(3)"); *see also* Local Rule 23.1(a)(1) (stating that class action complaints must identify the subsection of Rule 23 "under which the suit is claimed properly to be maintained as a class action"). Plaintiffs have not sought a Rule 23(b)(2) class in any of the four complaints filed in this action, and accordingly cannot not now obtain certification of a class which they did not request in their operative complaint. *See Richards v. Delta Air Lines, Inc.,* 453 F.3d 525, 532 (D.C. Cir. 2006) (holding that where plaintiff did not seek a Rule 23(b)(3) class in complaint, and for years into the litigation, dismissal was warranted "for that reason alone").

Second, even had Plaintiffs properly sought certification under Rule 23(b)(2), certification should still be denied because this provision "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages."

*Wal-Mart*, 564 U.S. at 360-61.  But Plaintiffs here seek "statutory damages and compensatory damages of up to $300,000 per Class member[.]"  *See* Pls.' Mem. at 16.  As explained *supra* Arg. § 1.A, the numerous factual differences between putative class members make individualized determinations of damages a certainty, assuming that liability and injury could be proven.  Thus, "because [Plaintiffs are] not seeking monetary relief that is only 'incidental,' certification under Rule 23(b)(2) alone is inappropriate."  *Greenberg v. Colvin*, 63 F. Supp. 3d 37, 45 n.3 (D.D.C. 2014).

Third, Plaintiffs' proposed class does not meet the requirement of Rule 23(b)(2) to show that final injunctive relief be "appropriate as to the class as a whole."  *See Wal-Mart*, 564 U.S. at 366 (for certification under Rule 23(b)(2), challenged conduct must be "such that it can be enjoined . . . only as to all of the class members or as to none of them").  By way of equitable relief, Plaintiffs ask this Court to reinstate the "purged Qualified Applicant Register" and to give "hiring preference to Plaintiffs and other putative class members."  3d Am. Compl. at 22.  Yet this Court previously found that it could not reinstate Plaintiffs' purported "Qualified Applicant Register" because of the 2016 FAA statute which now governs controller hiring.  *See* ECF No. 50 at 8.  To be sure, this Court did not rule out "a remedy involving some type of hiring preference," *see id.*, but Plaintiffs do not even propose a "preference" that could provide relief to every putative class member here.  Where Defendant and this Court are left to guess at what Plaintiffs may seek by way of injunctive relief, and whether it would provide a class-wide remedy, certification under Rule 23(b)(2) is inappropriate.  *See D.L. v. Dist. of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) ("To certify a class under this provision, a single injunction must be able to 'provide relief to each member of the class.'" (quoting *Wal-Mart*, 564 U.S. at 360)).

Fourth and finally, the problems outlined above in satisfying Rule 23(a)'s requirements of commonality and typicality, for example, also preclude certification under Rule 23(b)(2). Unlike Rule 23(b)(3), Rule 23(b)(2) includes no explicit predominance or superiority requirements. This is because certification of a class under Rule 23(b)(2) is only appropriate where the satisfaction of those conditions is "self-evident." *Wal-Mart*, 564 U.S. at 363. Where a class is not "sufficiently cohesive" —where it lacks homogeneity—the legality of the behavior at issue cannot be settled with respect to the class as a whole, and certification under Rule 23(b)(2) is inappropriate. *See Lightfoot v. D.C.*, 273 F.R.D. 314, 329 (D.D.C. 2011). As explained *supra* Arg. § II.A-B, Plaintiffs' proposed class encompasses individuals who could not have been harmed by the FAA's interim hiring process, such as those who never applied at all, or putative class members that were offered employment as a controller, but never began work for the FAA. Because similarity of facts and legal claims is certainly not "self-evident" among the wide range of putative class members here, certification under Rule 23(b)(2) should be denied.

### B.    Plaintiffs Cannot Certify a Class Under Rule 23(b)(3)

Plaintiffs also cannot certify a class under Rule 23(b)(3), because they are not able to satisfy the strict requirements of that rule. Specifically, a court must conclude that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. Pro. 23(b)(3).

### 1.    Predominance

Rule 23(b)(3)'s predominance requirement is "even more demanding than Rule 23(a)." *Comcast Corp.*, 569 U.S. at 34. For this inquiry, courts in this circuit use a qualitative analysis to weigh the respective issues in the case subject to common proof, against those subject to individualized proof. *See Coleman through Bunn v. Dist. of Columbia*, 306 F.R.D. 68, 85

(D.D.C. 2015).  Accordingly, where issues of injury and liability "turn upon highly individualized facts," denial of certification is warranted.  *See McCarthy*, 741 F.2d at 1415.

For the same reasons that Plaintiffs' proposed class cannot satisfy Rule 23(a)'s commonality requirement, Plaintiffs similarly fail to meet Rule 23(b)(3)'s even more stringent predominance requirement.  That is, by virtue of Plaintiffs' expansive proposed class, whether and how the FAA's hiring policies affected class members will necessarily rely on individualized proof.  Plaintiffs' assertion that "[n]o individualized inquiries are required," Pls.' Mem. at 23, is plainly incorrect; to determine injury and corresponding liability, among numerous other inquiries, this Court would need to examine each potential class member as to whether he or she met all qualifications to be an FAA controller, whether he or she ever applied to be a controller, the fate of the application(s), and the specific reasons for every result both before and after the change in FAA hiring practices.  The countless variations between Plaintiffs' class members plainly overwhelm any common questions in this case.  *See also Little*, 249 F. Supp. 3d at 425 (holding that predominance was "destroy[ed]" by the need for "individual determinations of why a class member was not hired by [defendant]").

Moreover, Plaintiffs have not satisfied the further requirement under Rule 23(b)(3) to establish "that damages are capable of measurement on a classwide basis."  *Comcast Corp.*, 569 U.S. at 34; *see also Little*, 249 F. Supp. 3d at 413 ("In order to certify a class under Rule 23(b)(3), Plaintiffs must present a reasonable theory for computing class-wide damages.").  Certification should be denied where a proposed methodology cannot reliably establish damages on a classwide basis.  *See Comcast Corp.*  569 U.S. at 34.  Yet here, Plaintiffs fail to present any method for calculating damages at all.  Plaintiffs insist that "there will be little variation in the damages award to class members, and "the FAA's own records will adequately establish

damages owed to Class members," and that calculation would "largely be a mechanical task." Pls.' Mem. at 24. How FAA's records could "establish damages" Plaintiffs do not say, and any method for calculating these damages is similarly absent. Plaintiff's' silence is not surprising. The differences between putative class members, in terms of type of injury and entitlement to any relief, precludes any methodology which could reasonably apportion damages among such a group. For example, the amount, if any, of emotional distress damages necessarily will vary by individual plaintiff. Similarly, the determination of front and back pay, if any, as well as any mitigation efforts, necessarily turns on the individual facts and circumstances of individual plaintiffs. Rather than being a "mechanical task," ECF No. 73-1 at 24, these highly individualized damages calculations dwarf any common issues in this case. In sum, Plaintiffs are unable to show that common issues predominate either with respect to legal inquiries such as injury and liability, or over the determination of relief, and accordingly certification should be denied.

### 2.    Superiority

Plaintiffs also cannot satisfy Rule 23(b)(3)'s further requirement that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." In determining whether superiority is present, Courts examine factors such as the interest of the class members in controlling their own litigation, whether there is related litigation pending elsewhere, and the likely difficulties in managing the proposed class action. *See* Fed. R. Civ. Pro. 23(b)(3)(A), (B), (D). Here, all relevant factors counsel against certifying Plaintiffs' proposed class.

First, Plaintiffs assert that "[t]he interest of Class members individually controlling the prosecution of separate claims against Defendant is relatively small," Pls.' Mem. at 25, but Plaintiffs provide no facts or reasoning as to why that might be the case. Plaintiffs' bare *ipse*

*dixit* on this point is insufficient to carry their "burden to establish the propriety of certification[.]"  *See Daskalea*, 275 F.R.D. at 369.  To the contrary, assuming that any putative class member could establish some lost hiring preference and employment opportunity, he or she would likely care deeply about the litigation of that claim, since, according to Plaintiffs, it could result in both the recovery of damages and even potential employment with the FAA.

Plaintiffs curiously cites *Little* for the proposition that "[a] class action in this case is 'superior to individual actions due to the cost of litigating a disparate impact case and the relatively low damages available to a single successful litigant.'"  Pls.' Mem. at 25 (quoting *Little*, 249 F. Supp. 3d at 424).  But this is not a disparate impact case; Plaintiffs here instead allege disparate *treatment*.  *See* 3d Am. Compl. ¶ 121 (claiming only intentional discrimination); *see also* ECF No. 73-1 at 1 ("The underlying case arises out of the Federal Aviation Administration's ("FAA") intentional race-based discrimination . . .").  It is on this basis that Plaintiffs assert that putative class members are each "entitled" to compensatory damages of "up to $300,000," Pls.' Mem. at 16, damages which are authorized in a disparate treatment suit, but not a disparate impact action.  *See* 42 U.S.C. § 1981a(a)(1).  Accordingly, because the damages sought here by each putative class member are anything but small, Plaintiffs' argument is unavailing.

Indeed, "[w]hile small claims cases somewhat automatically meet the test that a class suit is superior to other forms of adjudication, in large claim situations, courts generally find individual lawsuits superior to a class action."  *Newberg on Class Actions* § 4:88 (5th ed.) (collecting cases); *see also Amchem Prods.*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.").  Thus, if

Plaintiffs are correct that each class member has a colorable claim worth hundreds of thousands

of dollars, individual class members would have a significant interest in directing their own

litigation. This factor weighs against a finding of superiority.

The second factor of the Court's analysis, the presence of related litigation elsewhere,

further suggests that a class action is not superior here. On September 12, 2018, class counsel

filed another related class action suit in the Northern District of Texas. *See* Pls. Mem. at 25.

Plaintiffs concede that the named representative in that action similarly challenges the 2014 FAA

hiring process, that the named representative was also an AT-CTI graduate, "was, or should have

been on the purged Register," and may become a class member here. *Id*. at 26. At the very least,

this overlapping litigation is "*evidence* that individuals have an interest in controlling their own

litigation," in this matter, contrary to Plaintiffs' claims. *See  Newberg on Class Actions* § 4:70

(5th ed.) (emphasis in original).

Plaintiffs' proposed class would also be unmanageable. Where, as here, the "proposed

class action would require significant individualized inquiries regarding both injury and

damages, the court cannot conclude that a class action would be superior in this case." *In re Rail

Freight Fuel Surcharge Antitrust Litig*., 292 F. Supp. 3d 14, 144-45 (D.D.C. 2017). Relatedly,

Plaintiffs also point out that certification is inappropriate where a proposed class presents

"potential difficulties in identifying the class members and sending them notice[.]" *Bynum*, 214

F.R.D. at 40. That is certainly the case with Plaintiffs' proposed class. Among other things, the

Court would be required to identify individuals who: (1) were on, or eligible to be on a

"Qualified Applicant Register," (2) met certain OPM standards, (3) met the requirements for

graduating from an AT-CTI program, and (4) were eligible to receive a recommendation from an

AT-CTI school. But the "Register," as described by Plaintiffs, did not exist, and Plaintiffs fail to

demonstrate that any of the remaining criteria can be established on a classwide basis. Plaintiffs suggest that the FAA has information concerning "all Class members," presumably referring to the AT-CTI Inventory, but because the specific criteria set forth above was not tracked by the FAA, the FAA cannot determine which CTI graduates and students would constitute class members. Pls.' Mem. at 26. As Plaintiffs' proposed class is indeterminate and unwieldy, this Court should find that a class action is not superior to other methods of adjudicating this matter.

### C.    Hybrid Certification Is Inappropriate

In a final swing, Plaintiffs reference the possibility of "certify[ing] a hybrid (b)(2) and (b)(3) class," Pls.' Mem. at 22, but do not elaborate on this request. *See id.* at 21 (simply noting that "the Court may certify a hybrid (b)(2) and (b)(3) class to allow for declaratory relief and monetary damages"). Because Plaintiffs never sought a hybrid class in the Third Amended Complaint, and because they devote a single sentence to the request here, Plaintiffs have not carried their burden to show the propriety of such a class or how it would function, and the Court need not address this underdeveloped argument. *See Steele v. United States*, 159 F. Supp. 3d 73, 79 (D.D.C. 2016) (explaining that "plaintiffs bear the burden of establishing that the requirements set forth in FRCP 23 have been satisfied").

In any event the "hybrid approach" recognized by the D.C. Circuit—"certifying a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief," *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997)—is not warranted here. A hybrid class may be maintained in unusual instances where the "cohesion of the class certified for one remedy—injunctive relief—breaks down as to individual damages claims." *See Keepseagle v. Veneman*, No. 99-3119, 2001 WL 34676944, at *14 (D.D.C. Dec. 12, 2001). Otherwise, such a class "must meet the requirements of both subsections (b)(2) and (b)(3)." *Id*. Where, as here, a class cannot be certified under either Rule 23(b)(2) or (b)(3), it cannot function

as a hybrid.  *See Garcia v. Veneman*, 211 F.R.D. 15, 24–25 (D.D.C. 2002).  Plaintiffs' mere mention of a "hybrid class" should accordingly be rejected as a basis for certification.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Class Certification.


DATED: December 24, 2018                    JOSEPH H. HUNT
                                            Assistant Attorney General

                                            JOSHUA E. GARDNER
                                            Special Counsel
                                            Civil Division, Federal Programs Branch

                                            */s/ Michael Drezner*
                                            MICHAEL DREZNER (V.A. Bar No. 83836)
                                            Trial Attorney
                                            GALEN N. THORP (V.A. Bar No. 75517)
                                            Senior Counsel
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street NW
                                            Washington, DC 20530
                                            Telephone: (202) 514-4505
                                            Facsimile: (202) 616-8470
                                            Email: michael.l.drezner@usdoj.gov

                                            *Counsel for Defendant*