**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| ANDREW J. BRIGIDA; POLLYANNA L. WANG; SUZANNE M. REBICH; and MATTHEW L. DOUGLAS-COOK, | ) ) ) ) | |
|  | ) | |
| Plaintiffs, | ) | Civil Action No. 16-cv-2227 (DLF) |
|  | ) | |
| v. | ) | |
|  | ) | |
| ELAINE L. CHAO, *Secretary, U.S. Department of Transportation* | ) ) | |
|  | ) | |
| Defendant. | ) | |

---

**DECLARATION OF RENEE COATES**

I, M. Renee Coates, hereby declare as follows:

1.      I am the Executive Director for Human Resource Services at the Federal Aviation Administration (FAA). I have held this position since August 18, 2014, and my duty location since that time has been Washington, DC.

2.      I make the following declaration based on my personal knowledge and on information made available to me in the performance of my official duties.

3.      The FAA is an operating administration within the U.S. Department of Transportation (DOT) and is headquartered at 800 Independence Avenue, SW, Washington, DC 20591. DOT is headquartered at 1200 New Jersey Avenue, SE, Washington, DC 20590.

4.      In May 2011, the FAA Administrator commissioned an Independent Review Panel to study the selection, assignment and training of air traffic control specialists. The panel issued a report in September 2011 making multiple recommendations for ways to improve these areas including



EXHIBIT
A

hiring practices.  Exhibit 1, Final Report, Independent Review Panel on the Selection, Assignment and Training of Air Traffic Control Specialists (Sept. 22, 2011)

5.     In 2013, Outtz and Associates—a contractor hired by the FAA—completed a Barrier Analysis of the Air Traffic Control Specialist Centralized Hiring Process.  That same year, the FAA hired APT Metrics to prepare the Extension to Barrier Analysis of the Air Traffic Control Specialist Centralized Hiring Process, which completed its report in April 2013.  Exhibit 2, Final Report, Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process (Apr. 16, 2013).

6.     In June 2013, the FAA established an Executive Steering Committee to oversee the implementation of recommendations to improve the ATCS hiring process.  Exhibit 3, FAA Statement on the Barrier Analysis of the Air Traffic Control Specialist Centralized Hiring Process.

7.     In February 2014, the FAA implemented a revised ATCS hiring process and issued a vacancy announcement pursuant to that new process.  *See* Exhibit 4, Human Resource Policy Manual, Policy Bulletin No. 84, Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring (Feb. 7, 2014); Exhibit 5, FAA, Air Traffic Controller Workforce Plan, 2018-2027 (March 2018).

8.     The FAA continued to refine its hiring process in 2015.  It contracted with a consulting firm to further develop the Biographical Assessment implemented in 2014.  The FAA also began the work to replace the AT-SAT with a newly validated test battery, the Air Traffic Skills Assessment ("ATSA").  *See* Exhibit 6, Teri Bristol, Statement Before the House Committee on Transportation and Infrastructure (June 15, 2016).

*  *  *  *

Executed this 21st day of December 2018.

M. Renee Coates



EXHIBIT
1

# FAA Independent Review Panel
# on the
# Selection, Assignment and Training
# of Air Traffic Control Specialists

FINAL REPORT

September 22, 2011

Mr. Michael Barr, Chairman
Dr. Tim Brady
Mr. Garth Koleszar
Dr. Michael New
Dr. Julia Pounds

# Certification of Report

We, the undersigned, delivered the "FAA Independent Review Panel on the Selection, Assignment, and Training of Air Traffic Control Specialists" report to Randy Babbitt, FAA Administrator, on Thursday, September 22, 2011, at FAA Headquarters in Washington, D.C.

We have completed the work as specified by our May 2011 charter.

Michael L. Barr, Chairperson

Dr. Tim Brady

Garth Koleszar

Dr. Michael New

Dr. Julia Pounds

Report of the Independent Review Panel on ATCS Selection, Assignment and Training

# Executive Summary

The Independent Review Panel convened by the FAA Administrator has produced a comprehensive set of recommendations on air traffic controller selection, assignment and training. The Panel reviewed hiring sources, screening, selection and facility assignments; instructor selection, training content and delivery; organizational structure; and professional standards.

**Hiring Sources and Selection:** An extensive review of the Air Traffic Collegiate Training Initiative (AT-CTI) program revealed significant differences in the air traffic controller curriculum among the various institutions that participate. A number of recommendations relate specifically to weaknesses in this program as well as the predictive value of the Air Traffic Selection and Training (AT-SAT) test as a hiring tool.

**Training Content and Delivery:** During the course of the review, the Panel identified opportunities to improve the preparation of new controllers. Several of the recommendations address the need to have quality content delivered using effective practices and well-integrated processes.

**Organizational Structure:** The panel feels it is very important that one office holds the responsibility for coordinating the provision of air traffic technical training, as well as the means to fund and execute this responsibility. The Panel also found a lack of common understanding of the specific roles, responsibilities and contributions of the Air Traffic Organization (ATO) Office of Technical Training and the FAA Academy.

**Professional Standards:** The Panel looked at all levels of ATC specialist training and included recommendations to increase awareness and reinforce professional standards.

The recommendations address issues in these broad categories:

**Selection Process**: Initial hiring process and sources; effectiveness of the AT-SAT; use of the Centralized Selection Panel; and role and effectiveness of the AT-CTI programs;

**Academy Training and Facility Assignment**: Links between candidate performance and facility level assignment;

**Field training**: Content and delivery from initial to refresher, learning technology, classroom, simulator and on-the-job-training instructor selection, preparation, and evaluation;

**Professional standards**: First exposure and throughout the entire career;

**Data and systems:** Availability, quality and use to support hiring, placement, program review and evaluation, and application of new technologies for learning;

**Coordination**: Within the Air Traffic Organization (ATO) and throughout the FAA; and

**Other observations:** General observations, areas of concern and issues not covered in other sections.

The report that follows provides a detailed description of the observations in each area of study and specific recommendations to improve the hiring, assignment and training of air traffic controllers. The panel drew from presentations by various FAA departments, visits to the FAA Academy, field units and AT-CTI institutions. During these visits, the Panel met with potential applicants, newly hired controllers, Air Traffic Control Specialists, On-the-Job-Training Instructors (OJTIs), training managers and operational leaders. The Panel also reviewed previous studies conducted by both internal FAA and external organizations such as ATO Safety, ATO Office of Technical Training, FAA Human Resources Management, the Department of Transportation Office of the Inspector General (DOT IG) and the MITRE Corporation.

This in-depth review and subsequent recommendations can serve as a significant roadmap to increase workforce effectiveness for the FAA.

Report of the Independent Review Panel on ATCS Selection, Assignment and Training

# Table of Contents

EXECUTIVE SUMMARY ....................................................................................... 3

TABLE OF CONTENTS ........................................................................................ 5

LIST OF FIGURES ............................................................................................... 6

SECTION 1: COLLEGIATE TRAINING INITIATIVE PROGRAMS AND THE
SELECTION PROCESS ........................................................................................ 7

    KEY OBSERVATIONS ........................................................................................ 7
    RECOMMENDATIONS ...................................................................................... 17

SECTION 2: ACADEMY TRAINING AND THE ASSIGNMENT PROCESS ...... 19

    KEY OBSERVATIONS ...................................................................................... 20
    RECOMMENDATIONS ...................................................................................... 23

SECTION 3: FIELD TRAINING .......................................................................... 26

    KEY OBSERVATIONS ...................................................................................... 26
    RECOMMENDATIONS ...................................................................................... 31

SECTION 4: PROFESSIONAL STANDARDS .................................................... 34

    KEY OBSERVATIONS ...................................................................................... 34
    RECOMMENDATIONS ...................................................................................... 36

SECTION 5: ORGANIZATIONAL STRUCTURE AND ASSOCIATED AREAS
OF RESPONSIBILITY ........................................................................................ 37

    KEY OBSERVATIONS ...................................................................................... 37
    RECOMMENDATIONS ...................................................................................... 40

SECTION 6: OTHER OBSERVATIONS AND RECOMMENDATIONS .............. 41

    KEY OBSERVATIONS ...................................................................................... 41
    RECOMMENDATIONS ...................................................................................... 42

SECTION 7: SUMMARY OF RECOMMENDATIONS ........................................ 43

APPENDICES ..................................................................................................... 48

    APPENDIX A: FAA PRESS RELEASE ................................................................ 49
    APPENDIX B: PANEL BIOGRAPHIES ................................................................. 51
    APPENDIX C: PANEL CHARTER ...................................................................... 54
    APPENDIX D: PANEL METHODOLOGY .............................................................. 56
    APPENDIX E: LIST OF REFERENCES ............................................................... 59
    APPENDIX F: LIST OF ACRONYMS .................................................................. 61

Report of the Independent Review Panel on ATCS Selection, Assignment and Training

## List of Figures

Figure 1-1 The USAF selection process for Undergraduate Pilot Training

Figure 1-2 Awarding points for AT-SAT scores

Figure 1-3 Awarding points for GPA scores

Figure 1-4 A proposed model for ATCS selection (AT-CTI hiring source only)

Figure 1-5 A graphical representation of the recommended changes to ATCS selection processes

Figure 2-1 A graphical representation of the recommended changes to ATCS initial training and assignment processes

# Section 1: Collegiate Training Initiative Programs and the Selection Process

This section looked deeply into the Air Traffic Collegiate Training Initiative (AT-CTI) program. The Panel noted that not all AT-CTI programs are equal, and prescribed actions to address the issue. The Panel also delved into the selection process for controller candidates without prior experience in air traffic control and provided a model by which these selections can be more effective. See Section 7 for a summary of the recommendations.

## Key Observations

**Air Traffic Collegiate Training Initiative**

### *Distinguishing Between AT-CTI Programs*

There are 36 AT-CTI programs around the country, each with varying capabilities. Some teach only Air Traffic Basics, the only course required by the FAA for approved AT-CTI schools; others teach a full air traffic control curriculum, which includes courses and laboratories (some include practice in high-fidelity simulators) in Tower, Terminal Radar, En Route and Non-Radar operations. Yet, the FAA does not break down each school's capability and further discriminate how in-depth the curriculum is at the different schools; all AT-CTI schools are in the same category. Failing to understand the capabilities of each approved school deprives the FAA of accurately assessing the full benefit from each of the programs. Some distinction should be made of the capabilities regarding each program and the distinction should be carried forward into the selection process for Air Traffic Control Specialists (ATCS).

### *Tracking Performance*

The Panel also concluded that the FAA should track the success of each hiring source so that it can determine from which source(s) success is prevalent. The use of this data would reduce the total training cost to the FAA. Currently, there is no means for tracking AT-CTI graduates through the process from AT-CTI program entrance to selection to full proficiency as a Certified Professional Controller (CPC). The data most likely resides in a variety of sources, but it has not been consolidated, collated and studied. This conclusion is supported in the ATC Hiring Process Tiger

Team Report[1] in which the team stated as a "short term modification" the need to "improve reporting capabilities and applicant tracking."

### AT-CTI Levels

The Panel has concluded that the FAA needs to categorize AT-CTI schools by levels based upon the strength of a program's curriculum. An FAA team similar in function to accreditation teams used to evaluate other programs of higher learning would evaluate these schools. In this case, controllers from the field and instructors from the FAA Academy would participate as part of the evaluation team.

A proposed categorization having four levels could be:

- Level 4: Those institutions that teach Air Traffic Basics and all options (Tower, Terminal Radar, En Route and Non-Radar) with supporting labs for each option.

- Level 3: Those institutions that teach Air Traffic Basics and at least one option with supporting lab(s).

- Level 2: Those institutions that teach Air Traffic Basics and the theory of at least one option with no supporting lab(s).

- Level 1: Those institutions that teach only Air Traffic Basics including aircraft identification and performance.

### Tracking Selectees by AT-CTI Levels and Other Categories

As briefed by the National Air Traffic Controllers Association (NATCA) working group[2], "an improved training and screening process should reduce attrition rates." Combining the methodology of evaluating AT-CTI schools and assigning a level to each program with the idea of tracking all selectees by hiring source (and, if AT-CTI, by level) from initial selection through full qualification will allow the FAA to determine the most efficient and most cost-effective groups to be trained as air traffic controllers. This, in turn, should reduce attrition rates of those selected for training.

### Sharing Performance Information with AT-CTI Programs

It will become increasingly important for the FAA to share AT-CTI selectee training performance data with the institution from which the individual was graduated. Through these means, the institution can discover its

---

[1] FAA Air Traffic Controller Hiring Process Tiger Team Report, 2008
[2] Concurring Recommendations, July 2011

weaknesses and strengthen its curriculum to better serve the needs of the FAA.

## Air Traffic Selection and Training (AT-SAT) Battery and Selection Testing

### *Predictive Value*

The Panel could not find any completed studies that determined if the AT-SAT actually predicted job performance success among those who took the exam, were accepted for Academy training, and who subsequently entered and completed on-the-job training in the field. Without having an understanding of this type of longitudinal data, the FAA cannot be sure that the AT-SAT is accomplishing its original goals of predictability.

### *Bands Rather than Specific Scores*

Also unknown is whether AT-SAT scores relate to training success. "Candidates who score from 70 to 84.9 are ranked in a band termed 'Qualified' while those who score from 85 to 100 are ranked as 'Well Qualified.'"[3] In a 2009 study relating to training failures, the Department of Transportation's Office of the Inspector General (DOT OIG) identified "a series of factors that could indicate trends and potential root causes of training failures. Those include: "… (3) hiring source and previous experience, (4) AT-SAT test scores and (5) Academy Performance Verification (PV) scores… there were not sufficient data on these factors to identify trends… aggregated data on these types of factors will become increasingly important."[4] To improve the predictability of the AT-SAT battery, it is important for the FAA to attempt to correlate controller training success and failure with specific scores on AT-SAT.

### *AT-SAT and Test Robustness*

Several groups at various levels of field facilities question the robustness of the AT-SAT as a major factor in selecting candidates for air traffic control training. A recent DOT OIG study stated that "… overall AT-SAT scores have been higher than originally expected. Although the FAA scientists who designed the AT-SAT predicted that only 67.5 percent of all applicants would pass AT-SAT as originally designed, nearly 93 percent of all applicants currently achieve a passing score. AT-SAT has a high pass rate primarily because FAA reweighed elements from the original test…"[5] The Panel has concluded that, in addition to AT-SAT test scores, other factors should also be given appropriate weight in the selection decision.

---

[3] DOT OIG, Report #AV-2010-049
[4] Training Failures Among Newly Hired Air Traffic Controllers, 2009
[5] DOT OIG, Report #AV-2010-049

### Exam Administration

Currently, a vendor administers the computer-based AT-SAT exam at various times and at various locations throughout the U.S. The FAA and the vendor, with input from AT-CTI program administrators, agree to the times and locations. This scheduling process results in making the test available only at specified times and places, which can result in a significant scheduling problem for the test taker, who has to try to match academic and personal schedules with testing times and test sites. The agency offers other FAA exams, such as those for pilots and aviation mechanics, through FAA-approved testing centers. The test taker can schedule the exam at his/her convenience at these centers. The Panel has concluded that the agency should offer the AT-SAT test through the existing FAA testing center system.

### Frequency of Exam Retakes

Currently, the time span to re-take the AT-SAT is three years. The Panel concluded that this protracted time does not serve the interests of the FAA or the applicant. The Panel recommends that FAA reduce the time to one year.

## Selection Process for Air Traffic Control Specialists

### Current Selection Methodology

As reported in a 2010 DOT OIG report, "FAA currently assigns new controller candidates to facilities by considering candidates' location preference, a summary of information from their employment application and a list of job openings.... Controller candidates are assigned to a facility before they undergo medical and security screening, receive a tentative employment offer from the Agency, or attend the FAA Academy for initial training. Candidates are not even given a face-to-face interview with FAA officials prior to receiving their facility assignment."[6]

This one-step process deprives the FAA from making facility assignments relative to a candidate's strengths. Quite likely, the process also results in protracted training time in the field with its attendant added costs. The Panel concluded that selection for ATCS training and selection for assignment to a facility should be a two-step process. This section covers selection for initial training at the FAA Academy. Selection for assignment to a facility is covered in Section 2 of this report.

---

[6] DOT OIG, Report #AV-2010-049

### *Centralized Selection Panel*

"The facility placement process is conducted by a Centralized Selection Panel, consisting of managers from selected air traffic facilities, that assigns candidates using a referral list… these Panel members have only limited data on candidates' AT-SAT results… They primarily base facility assignments on applicants' geographical choices by state… and applicants' choices on their desired type of facility—either En Route or terminal…"[7] Essentially, having been supplied with very little information, the Centralized Selection Panel is operating in the blind and is making selections that will obligate the FAA for years to come. The Panel confirmed this by conversations with several air traffic professionals who had served on a Centralized Selection Panel. In attempting to compare this process with that of other government agencies, the Independent Review Panel looked at the method used by the United States Air Force (USAF) to select pilots for undergraduate pilot training (UPT).

### The *Air Force Method*

"(The Air Force) selection for UPT is accomplished via an Order of Merit (OM) listing of qualified cadets that volunteer for rated duty. The OM list is a product of three objective components: Cumulative Grade Point Average (CGPA), Physical Fitness Assessment (PFA) score and Pilot Candidate Selection Model (PCSM) score; and two subjective components: detachment commander rankings as Relative Standing Score (RSS) and field training ranking. PCSM is an index whose value is derived from a cadet's score on the Air Force Officer Qualification Test-Pilot Index. . . Within the OM algorithm, RSS is weighted 50 percent, CGPA is weighted 15 percent, PFA score is weighted 10 percent, field training ranking is weighted 10 percent and PCSM is weighted 15 percent research done in the 90s demonstrated PCSM score had very high validity with regard to UPT attrition."[8]

Figure 1-1 represents this model.

---

[7] DOT OIG, Report #AV-2010-049
[8] Email correspondence with Frederick I. Guendel Jr., Colonel, USAF AETC, 2011

Report of the Independent Review Panel on ATCS Selection, Assignment and Training



**Figure 1-1 The USAF selection process for Undergraduate Pilot Training**

It is interesting to note that the PCSM component, which is the USAF Air Force Officers Qualifying Test (AFOQT), is comparable for selection purposes to the AT-SAT.

### *A Model for ATCS Selection*

This model described below is based largely on the concepts of the Air Force pilot selection model, but is tailored to fit the unique requirements of the FAA. It is a starting point for a similar model that could be developed for selecting ATCS candidates.

The model is composed of four objective (AT-SAT specific score, college GPA, Air Traffic Basics exam score and AT-CTI level) and two subjective (candidate interview and selection panel assessment) components. The algorithm for the model is based on a maximum of 100 points with the following maximum point count for each component.

| Objective | Points | Subjective | Points |
|---|---|---|---|
| AT-SAT | 15 | Interview | 15 |
| College GPA | 10 | Selection Panel Assessment | 15 |
| Air Traffic Basics Score | 5 | | |
| AT-CTI Level | 40 | | |

The reasoning for this algorithm is as follows:

*AT-SAT Specific Score (15 points)*: Under the assumption that the higher the AT-SAT score, the greater probability of success in training, a higher AT-SAT score would be awarded a higher number of points. Figure 1-2 shows how points can be awarded for specific AT-SAT scores. By assigning specific scores, the basic assumption could be tested and modified as necessary in a continuing longitudinal data collection effort to correlate training performance with test scores. The value of this score (15) relates well to that of the USAF in a similarly purposed exam, the AFOQT (15).

| AT-SAT Score | 99-100 | 97-98 | 96 | 95 | 94 | 93 | 92 | 91 | 90 | 89 | 88 | 87 | 86 | 85 | <85 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Points | 15 | 14 | 13 | 12 | 11 | 10 | 9 | 8 | 7 | 6 | 5 | 4 | 3 | 2 | 1 |

**Figure 1-2 Awarding points for AT-SAT scores**

*College GPA (10 points)*: This number of points assigned to this component somewhat mirrors that of the USAF UPT selection algorithm, which assigns 15 points.

Figure 1-3 illustrates how GPA points can be awarded.

| GPA | 4 | 3.9 | 3.8 | 3.7 | 3.6 | 3.5 | 3.4 | 3.2 | 3.1 | 3.0 | 2.9 | 2.8 | 2.7 | 2.6 | 2.5 | <2.5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Points | 10 | 10 | 9 | 9 | 8 | 8 | 7 | 6 | 5 | 4 | 3 | 3 | 2 | 2 | 1 | 0 |

**Figure 1-3 Awarding points for GPA scores**

*AT-CTI level (40 points)*: The quality and thoroughness of a candidate's undergraduate education, as reflected in the AT-CTI levels, is quite likely the strongest predictor of success in training. However, the FAA has failed to adequately track and evaluate the success of students from the varying AT-CTI levels. FAA is currently unable to identify potential efficiency gains based on the advanced education provided by the higher-level AT-CTI institutions. Each AT-CTI program will have been evaluated by air traffic professionals and a level will have been assigned by that team. A total of 40 points can be assigned as follows:

- Level 4 – 40
- Level 3 – 30
- Level 2 – 20
- Level 1 – 10

*Candidate interview (15 points)*: The current candidate interview process was criticized by several in the field as being a shallow selection component. The current interview data collection form (questionnaire) is titled "Air Traffic Control Specialist Interview

Evaluation Template," and is composed of six questions with three choices each (Poor, Satisfactory, Excellent) and one "Overall Recommendation" (Recommended, Marginal, Not Recommended). This three-choice type of scale is both difficult to quantify and provides the interviewer too few choices. The questionnaire could be simplified, strengthened and made quantifiable by using the widely accepted five-choice Likert scale. The purpose of the interview is not to determine if the candidate has the technical skills to become a good controller (that function should belong to the Academy), but rather to determine if the candidate would make a good FAA employee. Therefore, the questionnaire could be reduced to these three statements:

- the candidate is motivated to become an effective air traffic controller;
- the candidate seems dependable; and
- the candidate is an effective communicator.

The three statements would be evaluated on a five-point Likert scale of:

| 5 | 4 | 3 | 2 | 1 |
|---|---|---|---|---|
| Strongly agree | Agree | Neutral | Disagree | Strongly disagree |

Therefore, a candidate who was strong in all three would score 15.

The "ATCS Interview Guide for New Hires" is a 41-page document that, while politically and legally correct, can be daunting and off-putting. The same purpose could be achieved with a two-page handout on the do's and don'ts of interviewing, which could accompany the revised "Air Traffic Control Specialist Interview Evaluation Template."

*Selection Panel Assessment (20 points)*: The selection panel would examine and evaluate the candidate's entire package and award up to 20 points.

Figure 1-4 reflects this model. It is important to note that the algorithm in this model applies only to AT-CTI graduates. A similar algorithm would need to be developed for the evaluation of public-hire candidates.

Report of the Independent Review Panel on ATCS Selection, Assignment and Training



**Figure 1-4 A proposed model for ATCS selection (AT-CTI hiring source only)**

### *Air Traffic Basics Course and Exam Score (pre-Academy)*

The Independent Review Panel has concluded that the Air Traffic Basics exam should be completed by the candidate prior to entry into ATCS training to assure the candidate can pass an established minimum knowledge assessment. A minimum score of 70 percent would be required to pass the test, and one retake of the test would be permitted. This exam would be developed by the FAA Academy, offered through an approved FAA testing center and be taken by the controller candidate within six months before entering the FAA Academy. Preceding this exam, the candidate could take an online Air Traffic Basics course developed by the FAA Academy. This web-based course would be optional for AT-CTI graduates from Level 2 or higher AT-CTI programs but would be required for graduates of Level 1 AT-CTI programs or public-hire selectees. In addition, this online course would provide the opportunity for those AT-CTI graduates who completed the program as much as three years earlier to refresh their knowledge before taking (or retaking) the exam for entry into an ATCS qualification program.

Figure 1-5 describes the proposed selection process.

Report of the Independent Review Panel on ATCS Selection, Assignment and Training



**Figure 1-5 A graphical representation of the recommended changes to ATCS selection processes**

### Application Form

The current online application form for AT-CTI graduates limits the applicant's facility location choices to two states. It is unclear if the public hires have more choices. This facility choice limitation narrows the opportunity for both the applicant and the FAA. Some applicants may be willing to go anywhere, so that option should also be provided. In addition, the FAA would have greater placement flexibility if the applicant indicated a preference by region rather than by state.

### AT-CTI and Public Hires

The FAA has expended significant resources and time to create an AT-CTI program, yet it has failed to use that resource appropriately. In Fiscal Year (FY) 2010 and FY 2011 (at the time of the Panel's inquiry), the FAA has hired 1,000 students from AT-CTI air traffic controller programs and from general public sources. The agency hired more than twice the number of public hires (674) than AT-CTI students (326). On a field interview one trainer remarked, "Please tell them not to send me any more public hires." This type of comment, with other information reviewed by the Panel, indicates that the FAA needs to review its hiring practices to take advantage of the AT-CTI system it has created.

### Facility Assignment

"FAA currently assigns new controller candidates to facilities by considering candidates' location preference, a summary of information from their employment application and a list of job openings…. Controller

candidates are assigned to a facility before they undergo medical and security screening, receive a tentative employment offer from the Agency, or attend the FAA Academy for initial training. Candidates are not even given a face-to-face interview with FAA officials prior to receiving their facility assignment."[9] The Panel has concluded that the facility assignment decision should be made based on the candidate's performance during initial training at the FAA Academy. The Panel details this process in Section 2 of this report.

## Recommendations

**1.1** Evaluate AT-CTI schools based upon the strength of the ATC-related curriculum and assign levels (1 through 4).

**1.2** Use AT-CTI levels in the selection process (e.g., a CTI graduate from a Level 4 institution would be accorded more selection credit than one from a Level 1 institution).

**1.3** Share AT-CTI selectee training performance data with the source institutions.

**1.4** Track all selectees by source (including CTI levels) from selection through full qualification as a CPC.

**1.5** Conduct a longitudinal study to determine the predictive value of the AT-SAT. Institutionalize this process so that definitive decisions can be made about the value of the AT-SAT in the selection process.

**1.6** Correlate specific AT-SAT scores with candidate training performance.

**1.7** In addition to AT-SAT, other factors should be given appropriate weight in the selection decision for ATCS. (A model is offered in Section 2 of this report.)

**1.8** Offer the AT-SAT exam through existing FAA testing centers. Include this requirement in the next AT-SAT vendor requirement.

**1.9** Provide an ATCS candidate the opportunity to take the AT-SAT exam once each year.

**1.10** Selection for ATCS training and selection for assignment to a facility should be a two-step process. Step one is selection to ATCS; step two is assignment to a facility based on performance in ATCS. The Centralized Selection Panel for candidates for ATCS is operating in the blind and is

---

[9] DOT OIG, Report #AV-2010-049

making selections that will obligate the FAA for years to come. FAA should study selection methods used by other federal entities. The USAF Undergraduate Pilot Training candidate selection model is included in this report.

**1.11** A selection algorithm should be developed to help guide the selection panel's decisions. One is included in this report to provide, at least, a starting point.

**1.12** Change the air traffic control candidate interview form to three questions which the manager would evaluate using a five-choice Likert scale. Reduce the 41-page Interview Guide to a two-page handout listing the dos and don'ts of interviewing.

**1.13** The FAA Academy should create a web-based Air Traffic Basics course. Completion of this course should be required of all candidates entering ATCS training with the exception of those graduates from Levels 2, 3 and 4 AT-CTI schools for whom it would be optional.

**1.14** The FAA Academy should create an Air Traffic Basics exam to be offered at all FAA-approved testing centers. Selectees for ATCS would be required to take the exam within six months before attending training at the FAA Academy. A minimum score of 70 percent would be required to pass the exam and begin formal training.

**1.15** Change the air traffic controller application form so that applicants could select one region, one state, or anywhere.

**1.16** The FAA needs to review its hiring practices for controller candidates and take advantage of the AT-CTI system it has created.

# Section 2: Academy Training and the Assignment Process

In addition to attending presentations provided by various FAA organizations, the Panel visited the FAA Academy, field units and educational institutions participating in the Air Traffic-Collegiate Training Initiative (AT-CTI) program. During these visits, Panel members met with potential applicants, newly hired controller candidates, On-the-Job-Training Instructors (OJTIs), training managers and operational managers. The Panel based its observations and recommendations in this section on those meetings as well as previous studies conducted by internal FAA and external organizations. These organizations include Air Traffic Organization (ATO) Safety, ATO Technical Training, FAA Human Resources Management, DOT OIG and the MITRE Corporation[10].

During the course of the Panel's review, opportunities to improve the preparation of new controllers became apparent. Specifically, these include:

- improve the retention of basic ATCS knowledge by presenting the Air Traffic Basic course material as early in the educational process as possible via online training;
- decrease the amount of initial training conducted in the field by (a) reinforcing previously learned material through a cumulative testing strategy, and (b) providing "advanced courses" for Terminal and En Route ATCS candidates prior to reporting to the field;
- improve the quality of Academy-based training by (a) capturing additional performance samples during training, (b) replacing the "pass/fail" grading strategy with multi-level performance measures, and (c) providing detailed Academy training records to the gaining facility manager; and
- incorporate performance criteria in the assignment decision by basing track and facility assignments on objective measures and using "just-in-time" processes (such as the Facility Assignment Panel) to fill vacancies as soon as the resources are available.

The Panel discusses these items in the following paragraphs and offers recommendations for implementation into the current system at the end of this section.

---

[10] MITRE is a not-for-profit national technology resource that provides systems engineering, research and development, and information technology support to the government.

## Key Observations

### *Retention of Basic ATCS Knowledge*

Most field managers and OJTIs interviewed by the Panel reported frustration with the lack of basic knowledge possessed by new controllers assigned to their facility. Similar comments were documented in previous studies of ATC operations, which the Panel reviewed as part of this inquiry. For example, in 2007 the ATO Training organization reported that FAA Academy graduates did not possess adequate knowledge about:

- aircraft separation requirements;
- correct phraseology;
- aircraft performance characteristics; and
- reading or using maps and approach plates.[11]

Additionally, a report released by the DOT OIG in 2010 stated, "As currently structured, the FAA Academy does not provide new controller candidates with sufficient instruction in the fundamental air traffic control knowledge and skills necessary to become certified controllers. Air traffic managers the Panel interviewed cited weak basic skills in all candidates when they arrive at their assigned location to begin their facility training. This is largely due to the training and testing procedures at the FAA Academy, which facilitate student learning for the purpose of passing a specific test, instead of long-term retention of basic air traffic control procedures."[12]

Fortunately, the MITRE Corporation developed a strategy to facilitate long-term retention of required material in a study released in 2005[13]. In short, they recommend presenting the foundational courseware as early as possible in the educational process via online training. In addition to controlling for instructor variability and skill, this delivery strategy allows students to review the content several times at their own pace prior to being presented with more advanced material.

### *Amount of Initial Training Conducted in the Field*

It is widely acknowledged within the operational units that field-based training programs are struggling because a record number of inadequately prepared Academy graduates are being assigned to their facilities.[14] As a result, some newly hired controllers experience extended delays while

---

[11] Welp, Kelley, Doskow, Rounsavell, & Morrison, 2007
[12] DOT OIG, Report #AV-2010-049
[13] Celio, Jarvis, & Poore, 2005
[14] DOT OIG, Report #AV-2010-049

attempting to advance to the next level of certification and OJTI resources are strained to accommodate the increased training demands.

To address this problem, several studies[15] have recommended establishing "advanced" Academy-based courses within each assignment track. This solution allows the FAA to:

- leverage the centralized resources at the Academy;
- introduce a high degree of standardization within the ATCS population;
- introduce facility-specific content prior to reporting to the field unit; and
- "over train" the basic skills to help with knowledge retention.

### Quality of Academy-Based Training

The future success of ATO training relies on the FAA Academy being able to provide properly prepared ATCSs to the field units. In order for the FAA Academy leadership to meet this obligation and continuously improve their level of service, they must be able to monitor the performance of students and share that information with their stakeholders.

Unfortunately, current strategies for knowledge and skill validation in place at the Academy are of little benefit to their ATO stakeholders. For example, the OIG reported[16] that, for the knowledge-based portion of the Academy exit exam, "every candidate that has taken this test has passed." In the same report, they state that 95 percent of the candidates also pass the skills assessment portion of the same test. When a minimum number of performance measures are combined with a "pass/fail" assessment strategy, the field managers are left without insight as to the relative strengths and weaknesses of their incoming controllers and the FAA Academy is left without metrics to monitor the quality of their programs. Providing detailed Academy training records to gaining facilities will allow training managers to customize individual training plans.

An internal report[17] developed by the FAA Academy team provides a method for improving the ability of the Academy to monitor report and improve their level of service to the ATO. Specifically, they recommend:

- capturing additional performance samples during training;
- reinforcing previous knowledge by incorporating a cumulative testing strategy; and
- implementing multi-level performance measures.

---

[15] Celio et al., 2005; Federal Aviation Administration Academy, 2010; Welp et al., 2007
[16] DOT OIG, Report #AV-2010-049
[17] Welp et al., 2007

### *Incorporate Performance Criteria in the Assignment Decision*

A recent study[18] by the DOT OIG found that "new controller candidates are being assigned to some of the busiest air traffic control facilities in the nation with little consideration of whether they have the knowledge, skills and abilities necessary to become certified controllers at those locations." Later, the same report states, "The FAA Academy provides an opportunity for many experienced controllers to evaluate candidates in a controlled environment. However, FAA does not use candidates' performance during initial training in determining the level of facility in which the candidates are placed. FAA personnel at FAA Headquarters, the FAA Academy and selected air traffic control facilities almost unanimously supported making facility assignments after Academy graduation."

The resulting inefficiency of the current assignment policy – making the assignment decision prior to Academy training – becomes apparent when the success rates for newly hired ATCSs are calculated. For example, according to an OIG report released in 2011[19], the attrition rates for controllers hired in FYs 2008, 2009 and 2010 were 31 percent, 21 percent and 22 percent respectively. Additionally, managers of some of the most complex ATC facilities told Panel members that it is very rare for a new controller to achieve certification. This usually results in the apprentice controller either resigning from the FAA or transferring to a lower level facility. In either case, this represents a suboptimal outcome for the FAA and the individual.



**Figure 2-1 A graphical representation of the recommended changes to ATCS initial training and assignment processes**

---

[18] DOT OIG, Report #AV-2010-049
[19] DOT OIG, Report #AV-2011-072

## Recommendations

Based on the observations detailed above, the Independent Review Panel offers the following recommended changes to the current Academy-based training and facility assignment processes. Figure 2-1 provides a summary.

**2.1** Provide Air Traffic Basics training via an online module. In addition to the recommendations made by the ATO Office of Technical Training, the DOT OIG and the MITRE Corporation outlined in the previous paragraphs, ATO Safety also suggests presenting the material via an online method as the most effective solution. The details of their proposal[20] include, "Redesign course materials to reflect the study/application method for learning and make the materials available online along with practice exams. When the applicant has demonstrated mastery of the material through practice exams, an endorsement to take the knowledge test is issued. The knowledge test could be proctored in FAA facilities and a passing grade made prerequisite for hiring."

**2.2** Incorporate the Professional Standards module within the Academy-based ATCS curriculum and use contract instructors (augmented by field management and NATCA representatives, as needed) in this role. During the review of Academy courseware, Panel members noted that newly hired ATCSs were not provided an opportunity to study the professional components of their new career. The proposed "Initial ATCS Training" module is offered as a possible solution to fill this gap. Section 4, "Professional Standards" has additional details.

**2.3** Expose Academy students to all ATCS track specialties and use contract instructors and OJTIs in this role. As described in this report, a key aspect of the Panel's recommendation is to delay the facility assignment decision until after the student has demonstrated competence and aptitude in a specific area. In an effort to facilitate this performance-based approach (and provide broader exposure to the prospective ATCS to potential career paths), the Panel recommends that students be exposed to all ATC specialties prior to stating a preference for, and being assigned to, a particular track.

**2.4** Incorporate an "advanced" course for all candidates prior to reporting to the field units and use OJTIs in this role. As discussed in this section, several organizations have made a compelling case to add "advanced" courses to the FAA Academy curricula in an effort to reduce the training burden on field units. An additional benefit of this approach is the

---

[20] Federal Aviation Administration, Air Traffic Organization Safety Services, 2007

opportunity to further assess the prospective controller's ability to perform at more complex facilities in anticipation of the final assignment decision.

**2.5** Improve the quality of Academy-based training by (a) capturing additional performance samples during training, (b) replacing the "pass/fail" grading strategy with multi-level performance measures, and (c) providing detailed Academy training records to the gaining facility manager.

**2.6** Delay the *track assignment* until after the candidate's aptitude is assessed during initial training at the FAA Academy training and use OJTIs in this process. Given that different skills are required for each ATCS specialty, the Independent Review Panel recommends that the track assignment decision be delayed until after the candidate has the opportunity to demonstrate his or her aptitude for a particular specialty. Toward this goal, the Panel recommends establishing a "Track Assignment Panel" following the student's completion of the "Introductory" course. The decisions of the Track Assignment Panel should be based on the following objective measures:

- Air Traffic Basics test;
- Introduction Tower Training evaluation;
- Introduction TRACON Training evaluation;
- Introduction En Route Training evaluation;
- candidate preference; and
- needs of the FAA.

**2.7** Delay the *facility assignment* until after the candidate's aptitude is assessed during Academy training and use field management in this process. The Panel recommends that the facility assignment decisions incorporate Academy based performance criteria. Toward this goal, the Independent Review Panel recommends establishing a "Facility Assignment Panel" following the students' completion of the "Advanced" courses. Additionally, the Panel recommends that only candidates with previous controller experience be assigned to facilities greater than Level 9. The Facility Assignment Panel should base its decisions on the following objective measures:

- Air Traffic Basics test;
- Introduction Tower Training evaluation;
- Introduction TRACON Training evaluation;
- Introduction En Route Training evaluation;
- Advanced Terminal or En Route Training evaluation;
- candidate preference; and
- needs of the FAA.

Report of the Independent Review Panel on ATCS Selection, Assignment and Training

**2.8** Establish and maintain an integrated employment/training database across stakeholder offices that captures employees' data from application to retirement date.

# Section 3: Field Training

Once a student successfully completes the required curriculum at the Academy, they report to their assigned facility to begin facility-specific field qualification training. The goal of this training is to allow the student to achieve the CPC status. This training can take from two to five years, depending on the type and complexity of the facility to which they are assigned, and "is the longest and most expensive part of the training process."[21]

Field training consists of a combination of classroom, simulation and on-the-job training (OJT). OJT constitutes the majority of field training. Classroom and simulation training is provided by either non-FAA contract instructors or FAA instructors. Only operationally current CPCs who have successfully completed a required OJTI course provide OJT training.

The observations and recommendations in this section are based on field visits and discussions with students, OJTIs and training managers. The Panel also considered the work by numerous collaborative FAA and NATCA working groups currently in place to address field-training issues. Those workgroups include: OJTI Redesign, Terminal Redesign and En-Route Stage Redesign.

This section reports the Panel's observations on field training and identifies areas recommended for improvement.

## Key Observations

### Instructors

#### *Classroom and Simulation Instructors*

Classroom and simulation instructors, whether contractor or FAA, are required to go through cadre instruction and certification at the Academy in Oklahoma City. Contractor instructors are required to undergo a semi-annual performance evaluation that uses a systematic process identifying key elements of instructional performance. This evaluation is part of the quality assurance and oversight of the contractor that provides contractor instructors. The contractor provides regular performance and development feedback, best practices and lessons learned and modern learning theory to their employees. These evaluations and performance and development feedback are not provided to FAA instructors. Establishing the same systematic key element skill evaluation process would prevent a

---

[21] DOT OIG, Report #AV-2008-055

divergence of skills and training techniques between the two types of instructors.

Nearly every current contractor instructor was a previously certified CPC. While these contractor instructors are provided best practices and lessons learned from the contractor, they are unable to assess those practices and lessons against the ever-changing environment (live traffic) for which they are preparing their trainees. This is especially critical in the development of new training technologies that may be applied by the contractor in field instruction. As the time increases between the termination of FAA employment and employment as a contractor instructor, the ability to assess the impact of any new technologies decreases.

## Simulation Technology

### *Implementation*

It has been recognized for years that an increase in facility simulation training and availability would have an impact on reducing overall training times. This is especially true in less complex terminal facilities that traditionally have little to no simulation technology available. The cost savings can be significant. Net estimated cost avoidance with a six-month reduction on training time under the En Route option is $41,975. A 2005 MITRE report[22] estimated a potential cost savings (En Route and Terminal combined) of over $48 million per year beginning in FY 09.

The FAA has made some strides in increasing the use of simulators. A 2008 Inspector General report[23] credited the FAA for installing high-fidelity simulators at Chicago O'Hare, Miami, Ontario and Phoenix. The report cited a reduction in training days to certify on Ground Control in the range of 31-60 percent throughout the above facilities. The ATO reported to the Panel that twenty-two simulators identical to the Academy's tower simulators have been deployed in the field with four more to be added. Terminal Radar Approach Control (TRACON) facilities have received sixty desktop simulators.

The strategy for best using the simulators deployed to the field was to position them where they could be accessed by multiple facilities for controller training. For example, the new simulator for Cleveland-Hopkins International Airport Traffic Control Tower (ATCT) is used to also train controllers from the Akron-Canton ATCT (approximately 53 miles away), the Toledo ATCT (approximately 111 miles away) and the Detroit Metropolitan Wayne County ATCT (approximately 150 miles away).

---

[22] Celio, Jarvis, & Poore, 2005
[23] DOT OIG, Report #AV-2008-055

Anecdotal reports suggest that the deployed tower simulators may be under-utilized because of factors such as distance, travel time, available training time remaining and facility staff scheduling. Other issues with simulations include effectiveness of the simulation's communication capabilities for skills training scenarios, availability of expertise and staff resources across facilities having scenario development expertise and adequate numbers of simulation instructors. The Panel was advised that the ATO was only beginning to track usage information. The Panel is not clear if the ATO is monitoring the expected versus actual benefits from making these resources available for facility training.

Providing broad access to simulation technology continues to provide an additional difficulty. This holds true for both the En Route and Terminal options. The En Route environment is currently undergoing a transition to En Route Automation Modernization (ERAM), and the transition process places a restriction on the availability of the simulation equipment at each facility. This is caused by not only the transition itself, but also by the extensive retraining required of the current workforce, which results in the simulation equipment being unavailable for months at a time. In the terminal environment, access to current tower simulators is inhibited by both distance and use by the facilities in which it is installed.

The Panel observed several levels of simulation fidelity. There were benefits in training that appear to be available by using each level of simulation fidelity.

### Voice Recognition and Synthesis

The efficacy of voice recognition technology has improved significantly in past years and provides additional possibilities for efficiencies. Voice Recognition and Synthesis (VR&S) allows the trainee to practice and operate simulations alone. Trainees can increase skills development and situational awareness at their own pace when deficiencies are identified or in advance of traditional instructor based lessons. This can increase competency and reduce overall OJT training time. "The experience…of voice recognition in tower simulations has confirmed that VR&S technology has significantly matured and is viable for air traffic control simulation applications."[24]

## On-the-Job Training Instructors (OJTI)

### Selection

The selection process for OJTIs is dictated by FAA Order 3120.4M, *Air Traffic Technical Training*. FAA Order 3120.4M states, in part:

---

[24] Celio, Jarvis, & Poore, 2005

*3. On-the-Job Training and Position Certification.*

**a. Selection of OJTIs.** *To be eligible to be selected as an OJTI, individuals must meet the following criteria:*

*(1) Certified at the CPC/FPL level;*

*(2) Certified Air Traffic Assistants, FV-2154, may provide OJT on positions on which they are certified;*

*(3) Certified a minimum of 6 months on positions involved; and*

**Note:** *Controllers with previous OJTI experience on the same type position(s) are exempt from this requirement or as identified in the local training order. Transferring Certified Professional Controllers-in-Training (CPC-ITs) on the same-type position shall be certified on the positions involved for a minimum of 60 hours prior to conducting OJTI. This requirement may be waived at the Air Traffic Manager's (ATM) discretion for non-control positions.*

*(4) Recommended by the employee's Front-Line Manager (FLM).*

**b. Selection Panel.** *The ATM will designate a panel to recommend OJTI candidates. The panel is composed of a minimum of two (2) people, including any participant identified in current collective bargaining agreement(s). The panel must consider, at a minimum, the nominee's performance, human relation skills, motivation and attitude and objectivity. They must forward a recommendation to the ATM or their designee for their selection.*

While this guidance identifies the minimum the Panel must consider, there is no consistent guidance or direction in how those minimums should be evaluated or considered. There is no clear understanding on how they relate to particular necessary instructor attributes. A joint FAA/NATCA workgroup, tasked with redesigning the OJTI process, completed the first of several surveys last month of current OJTIs and trainees. The workgroup interviewed 39 subjects in the Central Region from high- and low-level terminal facilities, TRACON facilities and En Route centers. The interviewers found a wide and varied list of what qualities and attributes the subjects felt contributed to someone being a good OJTI.

### OJTI Requirements

The current requirements to become an OJTI are in FAA Order 3120.4M as shown above. Additionally, the 3120.4M requires that OJTI candidates complete an FAA Air Traffic OJTI course or OJTI Cadre course. Once successfully completed, the employee must be directly observed by their FLM during their first training session in order to be certified. A FLM must also conduct an annual evaluation of OJTIs while they are performing instructional duties.

There is little guidance to the FLMs on exactly what to look for and, in most cases; both the certification and evaluation take place during observations under live traffic situations. This ignores the debriefing session required after every OJTI training session. This debriefing session is typically where a large portion of the actual instruction takes place by reviewing actions taken during the past session and defining alternative solutions and means for improvement. Additionally, there are no courses or instructional methods available to assist OJTIs who have been identified as needing help to improve their teaching skills. The initial certification course is the only course available and is only assigned upon initial selection as an OJTI.

There are no clear defined key elements of instruction to be evaluated. In many cases, the FLMs certifying and evaluating the OJTIs have not provided instruction since becoming FLMs. They do not have recurrent training to identify best practices or new learning theory to help in their evaluations.

The current requirement to become an OJTI requires that a candidate be a CPC and has been certified for six months on the training sector involved. The interviews completed by the joint FAA/NATCA workgroup on OJTI redesign indicate the majority of those surveyed felt that six months did not provide enough experience to become an OJTI.

### Instruction

There are no current mechanisms in place to provide OJTIs with access to any current learning tools. There is no national database available to improve their current training techniques or lessons learned from either a local or a national perspective. There is no ability to share best practices amongst other OJTIs

The ATO's Training Technology Strategy, updated in February 2011, identifies both a Content Management System (CMS) and a Learning Content Management System (LCMS) as being able to provide access for a large number of people to share and store data and improve

communication. ATO Technical Training is currently in the process of acquiring and implementing both a CMS and an LCMS.

The Panel believes there is still much room for improvement by taking advantage of existing and emerging technologies to leverage the classroom learning experience, improve training programs and better manage available information within the organization.

### *Proficiency*

As part of the analysis, the Panel requested the following data from 32 FAA facilities including four En Route centers:

- the OJT certification date for every OJTI at each facility;
- the CPC certification date for each OJTI; and
- hours of OJTI provided over the last 90 and 180 days.

The Panel did not receive data from any of the four En Route centers. Twenty-four Terminal facilities of varying complexity, including TRACONS provided data. The Panel evaluated the length of time from certification to the date of the Panel's request for over 700 OJTIs.

The Panel discovered that the average length of time from initial OJTI certification to the present for this group was approximately 10.5 years. While some facilities averaged as low as 6.6 years, at least one facility averaged over 15 years and several individual OJTIs exceeded 25 years since certification.

The significance of these times is important considering that the FAA provides no recurrent or refresher training to these OJTIs. With the exception of the annual evaluation discussed earlier in this section, there is no ongoing effort to improve and utilize modern training technologies for the instruction the OJTIs provide. The ability to adapt and transfer new training skills and techniques to OJTIs becomes critical given that they provide the majority of field training necessary to become a CPC.

## Recommendations

**3.1** Identify key elements of instructional performance for FAA classroom and simulation instructors. Ensure that both contract and FAA classroom and simulation instructors are provided the same up to date teaching, best practices and learning theories in a similar and concurrent manner.

**3.2** Establish a group of early career controllers to evaluate changes in teaching methodology utilized by both non-FAA and FAA instructors and assess those changes against the current Air Traffic Control environment.

**3.3** Continue current actions to implement both a CMS and an LCMS and continue the planned technical training strategy to maintain the currency and accuracy of training by integrating training materials with the related source documentation. This is also in line with the related effort by ATO's Mission Support organization to integrate FAA Orders across the repository.

**3.4** Collect and monitor information to measure the effectiveness of the technologies used for classroom and facility training.

**3.5** Continue to move forward with the implementation of simulation technology in field training. The FAA should consider the implementation of simulation of differing degrees of fidelity. A laptop pc based simulation program can provide gains in training efficiencies at smaller facilities reducing the OJT training time needed. While it may not provide the same gains as a high fidelity system, it offers an alternative to an outlying, low-complexity facility.

**3.6** Develop a mobile simulator lab(s). This will provide a broader access to simulation environment. They can be used to address a lack of simulation equipment or temporary restrictions in facility simulation availability.

**3.7** Develop a voice recognition-training tool to be used supplement instructor based field training.

**3.8** Establish a list of key elements and guidance to be used when selecting OJTI candidates. It should relate to current training theories, be uniform for all facilities and be readily accessible. The list of attributes needed and desired should be communicated to all employees.

**3.9** Develop instructor skill enhancement courses for OJTIs that address specific areas to be improved.

**3.10** Develop refresher training for FLMs to assist in evaluating current training techniques and best practices in their certification and evaluation of OJTIs.

**3.11** Develop a skills assessment form that can help evaluate specific instructional skills for both FLMs and OJTIs.

**3.12** Require OJTI evaluations to go through all pieces of a training session, including the debriefing.

**3.13** Extend the current six-month requirement for OJTIs, identified in FAA Order 3120.4M, to one year.

**3.14** Develop a national database of best practices, lessons learned and current training techniques that are easily available to OJTIs. Capturing the time to utilize this data in any training plan is necessary.

**3.15** Establish an annual refresher course for OJTIs. This course must include classroom exercises applying any new modern training techniques while refreshing competency on established key training elements.

# Section 4: Professional Standards

Recent publicized events involving controller professionalism have brought attention to the question of ATCS professional standards. In response to these events, the FAA and NATCA initiated a nationwide "Call to Action" to increase awareness of professionalism for air traffic controllers.

NATCA, in developing a Professional Standards program, created the following code of conduct for Air Traffic Controllers:

- A Professional Air Traffic Controller's performance and actions are a demonstration of their personal commitment to safety, excellence and upholding their oath to the public trust, most specifically to the users of the National Airspace System. They shall conduct themselves in a manner that instills trust and merits the confidence bestowed on them by the public they serve.

- A Professional Air Traffic Controller, through his or her own conduct and performance, should inspire, motivate and provide examples of professionalism to others. The safety of the Airspace system is of the greatest importance and their performance should always demonstrate the highest standard of excellence.

- A Professional Air Traffic Controller accepts that their actions represent the conduct and character of all members of the profession. They shall act in a manner that brings honor and respect to the profession, establishes public trust and sets a global standard for excellence.

The Panel looked at the training of ATCSs at all levels for the application of the concepts of professionalism.

## Key Observations

### *Training*

Current training on professionalism deals little with the overall concepts of professionalism and is only provided in the FAA Academy curriculum. This is certainly a deficiency as "the development of professional conscience among new entrants into a profession is as important for the public welfare as technical competence."[25]

---

[25] Ethics and Professionalism, Kultgen, 1988

### Air Traffic Collegiate Training Initiative

One of the key hiring sources for air traffic controllers are graduates of one of the 36 AT-CTI schools. The FAA identifies a basic curriculum that is taught at each of the schools. While that curriculum identified Air Traffic Basics, it provides little guidance to the AT-CTI schools in the way of any formalized and uniform professional standards training requirements.

### FAA Academy

The current training provided at the Academy does not adequately establish a true concept in professionalism. "The professional school is the primary socializing agency that initiates novices into the profession….The individual typically follows the technical and ethical standards acquired through professional socialization."[26]

Consideration should be given to the possibility that the high success rate at the Academy removed a sense of 'uniqueness' for completion of the overall training process and resulted in an overall decrease in professionalism. The insertion of a screening mechanism into the FAA Academy, closer to the point at which socialization of professionalism is critical, may have a positive impact on overall long-term professional performance. If the ultimate placement of an individual out of the Academy is based on academy performance, as is suggested elsewhere in this report, the FAA can again move an evaluation point closer to that critical juncture of professional socialization.

Nearly all well-known professions (i.e. medical and legal) require an ethics and professionalism-based course for completion of a particular study. There is no current requirement for a course similar to these for air traffic controllers.

### Field Training

Because of the Collective Bargaining Agreement (CBA) between NATCA and the FAA, a joint national workgroup established to create a Professional Standards (ProStan) program. The goal of the ProStan is to promote and maintain the highest degree of professional conduct among participants. The ProStan group does that in compliance with the code identified in the introduction to this section. This program will create a peer-to-peer assessment of professionalism, provide mentorship and a lead-by-example approach to improving professionalism.

This program will be taught to ProStan committee members in three test areas – Dallas-Fort Worth, Chicago and Anchorage Air Route Traffic

---

[26] Kultgen, et.al.

Control Centers (ARTCCs) in October. These test programs will then be initiated on November 1, 2011, and will be followed by a roll-out to all En Route centers in 2012.

## Recommendations

**4.1** Develop an introductory professionalism curriculum. This curriculum could be added to the Air Traffic Basics course as required curriculum for all AT-CTI programs. It would provide initial exposure to the Code of the Professional Air Traffic Controller.

**4.2** Develop a complete Academy-level class on professional standards. This class should provide exercises and demonstrations on both ethics and professionalism and be taught upon initial entry to the FAA. It would contain the Code of the Professional Air Traffic Controller and should be taught by members of the Professional Standards Committee. It should be reinforced throughout Academy training. Consideration should be given to include professionalism as a key element in performance assessment.

**4.3** Continue to expand and develop the joint ProStan Program at the field level. Develop a refresher class on professional standards and require annual training.

# Section 5: Organizational Structure and Associated Areas of Responsibility

Organizational performance, like individual performance, often depends on good teamwork. Effective teamwork depends on having a leader with the vision and ability to keep the team oriented toward the team's goal, the right balance of the right people on the team and maintaining clear channels for communication and feedback. The Panel considered how the FAA organizational structure supports delivery of air traffic technical training including, but not limited to, the stakeholders in successful delivery, their relationships, roles and responsibilities, communication, and coordination. Successful training outcomes, like any other improvement process, depend on quality content delivered using effective practices and well-integrated processes.

## Key Observations

### *Stakeholders*

Multiple offices in the organizational hierarchy are stakeholders via their contribution either directly or indirectly to the training delivery process. For example, the annual number of new hires needed is reportedly determined by both budget and staffing numbers. These numbers are reportedly identified, in turn, by Headquarters offices and by facilities' staffing needs. Facility staffing needs result from coordination between the facility managers and the Service Center offices.

As noted in the Panel's review of training technologies, these stakeholders do not have an integrated process for following trainees through their training progression and professional development. Organizationally, this gap extends to ineffective execution in other important areas as well.

The variety of roles and responsibilities requires that all stakeholders acknowledge and execute clear and formal processes for coordination and communication. Information provided to the Panel indicates that needed communications between stakeholders are either not formally documented or not accomplished. These organizational characteristics do not support development of quality content or execution of effective training delivery practices. For example, once a new hire receives and accepts the firm job offer by the FAA and begins training at the Academy, a variety of stakeholders are involved to varying degrees, including (but probably not limited to) ATO Service Units' training staff, the Headquarters ATO Office for Air Traffic Technical Training, and the FAA Academy's Air Traffic Division at Mike Monroney Aeronautical Center in Oklahoma City.

Based on interviews with stakeholders about the Service Centers' role in ATC technical training, the Panel noted several issues related to organizational structure. The anecdotal evidence suggests that the realignment of the Air Traffic Service (ATS) into the Air Traffic Organization (ATO) included changes that have impacted training delivery. For example, prior to the ATO structure of three Service Areas (Western, Central and Eastern), the ATS training functions were organized and co-located with other FAA units in nine Regions, each coordinated through a regional office structure with a traditional vertical hierarchy that reported to Headquarters offices. The realignment changed this vertical structure. Service Area offices now functionally report directly to Headquarters Service Unit offices while Service Center offices, William J. Hughes Technical Center and Mike Monroney Aeronautical Center are in line with the regional offices, which remained organized around the legacy regional structure and functionally report through that structure. At present, the FAA still uses both regional and service area structures for organizing the various field offices

The decision to place the functions in the Service Centers but outside the direct vertical report to the Service Units has evidently had unintended consequences on the offices which support ATO delivery of technical training. Reportedly, there is now an organizational attitude that the Service Centers are outside the Service Unit structure and thus being in different lines of business has apparently resulted in a subtle "us vs. them" dynamic and this has resulted in gaps in coordination and communication. This organizational environment reportedly forces Service Center staff to ferret out information that should be readily available. Such a dysfunctional dynamic between groups sets up the organization to be ineffective with unproductive use of resources and ill-informed decisions. For example, the Service Center staff are finding that they are not included in communications, organizational updates, coordination, etc. between the Service Unit, Service Areas and facilities, although the Service Centers are tasked to perform functions to enable facility performance (i.e., coordinating annual staffing). Panel members observed instances during the visits to Service Centers.

### *Stakeholder Roles and Responsibilities*

Another outcome from the realignment was the distribution of technical training responsibilities between Service Unit (i.e., terminal and En Route), Service Area and Service Center offices. This redistribution also had the unintended consequence of disrupting networks of individuals who had organizational knowledge about how to accomplish the day-to-day routine coordination and communications to fill in any information shortfalls. Despite the disruption, some employees have deciphered how to make it

work in the new organizational structure; however, relying on specific individuals' to "make it work" makes the organization vulnerable when that knowledge is not documented or available to others. When an employee with a critical bit of knowledge leaves the organization through change of position, retirement, etc. the informal knowledge about "how things get done" walks with them.

Historically, the ATC Technical Training process has suffered from unclear lines of responsibilities, fragmented organization and lack of leadership. In 2005, a team appointed by the Administrator to examine controller training recommended a focused, managed training system. The Administrator executed several of the Team's recommendations including the appointment of an ATO training executive. Despite the changes, needs were still not being met. FAA offices and operational facilities continued to establish training requirements and to develop technical training programs without clear coordination, resulting in a national training program without a clear focus. For example, the Panel was unable to find out how the recommended ratio of a 35percent trainee-to-total-controllers gauge for facility staffing was initially determined. However, handling this training burden while maintaining safe operations continues to be expected of facilities.

Audits of the technical training process by the ATO and by the ATO's oversight organization (AVS Air Traffic Safety Oversight Service, AOV) have repeatedly found lapses in these areas. Consequences included safety concepts missing from training materials, instructors with outdated technical knowledge and lacking teaching proficiency, performance expectations constrained by limitations of classroom and lab technology, ineffective methods of technical skills training, unclear and subjective testing practices and performance standards. Feedback from facilities highlighted that students were not being prepared for the performance demands at high-density operational facilities.

A need existed to consolidate and coordinate the flow of disparate training requirements that various FAA offices were levying on the Academy and ATC operational facilities; and to ensure the development and delivery of quality, accuracy and appropriateness of technical training materials. The Academy's Air Traffic Division functions as a quasi-contractor to provide controller training services, such as instruction and instructional design, to the ATO.

Recommendations from several groups supported creation of the ATO Air Traffic Technical Training Directorate (AJL). The Research, Engineering and Development Advisory Committee's (REDAC) 2005 report to the Administrator called for the FAA to designate an individual to be responsible and accountable for all the interdependent activities

associated with the implementation of the "Plan for the Future." The individual should have executive and budgetary authority for implementing the plan, including all efforts regarding recruiting, selection, staffing and training; coordination of the AT-CTI program, the Academy's technical training activities, on-the-job training in facilities and evaluation of workforce initiatives for present requirements as well as for future NAS operations.

## Recommendations

**5.1** Clarify and document the specific roles and responsibilities of personnel *within each office* that contributes, receives or uses information related to provisioning of air traffic technical training, inclusive of the ATO Service Units, Service Areas, Service Centers and facilities, as well as any other FAA offices.

**5.2** Clarify and document the specific roles and responsibilities *between offices* that contribute, receive or use information related to provisioning of air traffic technical training, inclusive of the ATO Service Units, Service Areas, Service Centers and facilities, as well as any other FAA offices.

**5.3** Clarify and document the specific roles and responsibilities between the ATO and the FAA Academy, as each contributes to air traffic technical training.

**5.4** Empower one office with the responsibility, as the REDAC advised the Administrator in 2005, for coordinating the provisioning of air traffic technical training, including the means to fund and execute this responsibility.

# Section 6: Other Observations and Recommendations

This section covers observations, areas of concern or issues not addressed elsewhere in the report.

## Key Observations

### *Outcomes-Based Learning*

Traditional teaching methodology focuses on what is being taught rather than what is being learned. Outcomes-based learning shifts the focus to the student and on what is being learned. All of higher education has moved or is moving to outcomes-based learning. Regional Accreditation bodies such as the Southern Association of Schools and Colleges have embraced the concept. Program accrediting bodies such as the Accreditation Board for Engineering Technology (ABET) and the Aviation Accreditation Board, International (AABI) have completed the transition to the outcomes-based concept.

It is the Panel's view that the FAA Academy should embrace this modern model of learning and it should develop a plan to restructure its curriculum on the outcomes-based model over the next five years.

### *Franchise Fund*

While at the FAA Academy, the Panel received an excellent briefing on the FAA Franchise Fund, which is active at the Mike Monroney Aeronautical Center. This fund provides several advantages over traditional budgeting. A revolving fund crosses traditional fiscal periods and provides a great deal of flexibility for those who participate. It allows economies of scale, creates an operating reserve and maintains retained earnings for specified purposes. From a practical standpoint, it creates budget efficiency by preventing the fiscal year-end rush to buy more paper clips and take more trips just to fully consume the budget. Technical Training is not currently a member of the fund but its ability to react to unplanned needs such as additional courses at the FAA Academy would be enhanced if it joined the program. The Panel concluded that AJL should join the franchise fund to better serve its mission.

### *Use of the Term "Developmental"*

The FAA uses the term "developmental" to describe someone who is in training to become a CPC. In other parts of society, the term has a less

than positive meaning. Air traffic Controller trainees who come into the FAA are the products of the American public school system for the most part. Most likely, they have heard the term developmental used by their teachers and others to indicate someone who needs some level of remediation.

## Recommendations

**6.1** The FAA Academy should shift curriculum to the outcomes-based model over the next five years.

**6.2** AJL should join the franchise fund at the Mike Monroney Aeronautical Center to better serve its mission.

**6.3** The use of the term "Developmental" has a less than positive connotation. A better descriptor should be used.

# Section 7: Summary of Recommendations

This section provides a summary of the recommendations agreed to by the Independent Review Panel for the Selection, Assignment and Training of Air Traffic Control Specialists. The 49 recommendations are numbered sequentially and organized by categories to facilitate tracking of the recommendations, but a cross-reference number refers back to the specific section in this report, where the entire recommendation is listed. For example, **Recommendation 20 (2.4)** is the Panel's twentieth recommendation, and refers to the fourth recommendation found in Section 2 of the report and discusses a recommendation that deals with FAA Academy training.

### *Collegiate Training Initiative Programs*

**Recommendation 1 (1.1)** Evaluate AT-CTI schools based upon the strength of the ATC-related curriculum and assign levels (1 through 4).

**Recommendation 2 (1.2)** Use AT-CTI levels in the selection process.

**Recommendation 3 (1.3)** Share AT-CTI selectee training performance data with the source institutions.

### *Selection Process*

**Recommendation 4 (1.4)** Track all selectees by source from selection through full qualification as a CPC.

**Recommendation 5 (1.5)** Conduct a longitudinal study to determine the predictive value of the AT-SAT and institutionalize the process.

**Recommendation 6 (1.6)** Correlate specific AT-SAT scores with candidate training performance.

**Recommendation 7 (1.7)** In addition to AT-SAT, other factors should be given appropriate weight in the selection decision for ATCS.

**Recommendation 8 (1.8)** Offer the AT-SAT exam through existing FAA testing centers.

**Recommendation 9 (1.9)** Provide an ATCS candidate the opportunity to take the AT-SAT exam once each year.

**Recommendation 10 (1.10)** Selection for ATCS training and selection for assignment to a facility should be a two-step process.

**Recommendation 11 (1.11)** A selection algorithm should be developed to help guide the selection panel's decisions.

**Recommendation 12 (1.12)** Change the air traffic control candidate interview form to three questions which the manager would evaluate using a five-choice Likert scale. Reduce the 41-page Interview Guide to a two-page handout listing the dos and don'ts of interviewing.

**Recommendation 13 (1.13)** The FAA Academy should create a web-based Air Traffic Basics course. Completion of this course should be required of all candidates entering ATCS training.

**Recommendation 14 (1.14)** The FAA Academy should create an Air Traffic Basics exam to be offered at all FAA-approved testing centers. Selectees for ATCS would be required to take the exam.

**Recommendation 15 (1.15)** Change the air traffic controller application form so that applicants could select one region, one state, or anywhere.

**Recommendation 16 (1.16)** The FAA needs to review its hiring practices for controller candidates and take advantage of the AT-CTI system it has created.

### Academy Training

**Recommendation 17 (2.1)** Provide Air Traffic Basics training via an online module.

**Recommendation 18 (2.2)** Incorporate the Professional Standards module within the Academy-based ATCS curriculum and use contract instructors (augmented by field management and NATCA representatives, as needed) in this role.

**Recommendation 19 (2.3)** Expose Academy students to all ATCS track specialties and use contract instructors and OJTIs in this role.

**Recommendation 20 (2.4)** Incorporate an "advanced" course for all candidates prior to reporting to the field units and use OJTIs in this role.

**Recommendation 21 (2.5)** Improve the quality of Academy-based training by (a) capturing additional performance samples during training, (b) replacing the "pass/fail" grading strategy with multi-level performance

measures, and (c) providing detailed Academy training records to the gaining facility manager.

### Assignment Process

**Recommendation 22 (2.6)** Delay the *track assignment* until after the candidate's aptitude is assessed during initial training at the FAA Academy training and use OJTIs in this process.

**Recommendation 23 (2.7)** Delay the *facility assignment* until after the candidate's aptitude is assessed during Academy training and use field management in this process.

### Employee Records

**Recommendation 24 (2.8)** Establish and maintain an integrated employment/training database across stakeholder offices that captures employees' data from application to retirement date.

### Field Training

**Recommendation 25 (3.1)** Identify key elements of instructional performance for FAA classroom and simulation instructors.

**Recommendation 26 (3.2)** Establish a group of early career controllers to evaluate changes in teaching methodology utilized by both non-FAA and FAA instructors, and assess those changes against the current Air Traffic Control environment.

**Recommendation 27 (3.3)** Continue current actions to implement both a CMS and an LCMS and continue the planned technical training strategy to maintain the currency and accuracy of training.

**Recommendation 28 (3.4)** Collect and monitor information to measure the effectiveness of the technologies used for classroom and facility training.

### Simulation Strategy

**Recommendation 29 (3.5)** Continue to move forward with the implementation of simulation technology in field training.

**Recommendation 30 (3.6)** Develop a mobile simulator lab(s).

**Recommendation 31 (3.7)** Develop a voice recognition-training tool to be used supplement instructor based field training.

### On-the-Job Training Instructors

**Recommendation 32 (3.8)** Establish a list of key elements and guidance to be used when selecting OJTI candidates.

**Recommendation 33 (3.9)** Develop instructor skill enhancement courses for OJTIs that address specific areas to be improved.

**Recommendation 34 (3.10)** Develop refresher training for FLMs to assist in evaluating current training techniques and best practices in their certification and evaluation of OJTIs.

**Recommendation 35 (3.11)** Develop a skills assessment form that can help evaluate specific instructional skills for both FLMs and OJTIs.

**Recommendation 36 (3.12)** Require OJTI evaluations to go through all pieces of a training session, including the debriefing.

**Recommendation 37 (3.13)** Extend the current six-month requirement for OJTIs, identified in FAA Order 3120.4M, to one year.

**Recommendation 38 (3.14)** Develop a national database of best practices, lessons learned and current training techniques that are easily available to OJTIs.

**Recommendation 39 (3.15)** Establish an annual refresher course for OJTIs.

### Professional Standards

**Recommendation 40 (4.1)** Develop an introductory professionalism curriculum.

**Recommendation 41 (4.2)** Develop a complete Academy-level class on professional standards.

**Recommendation 42 (4.3)** Continue to expand and develop the joint ProStan Program at the field level. Develop a refresher class on professional standards and require annual training.

### Organizational Structure

**Recommendation 43 (5.1)** Clarify and document the specific roles and responsibilities of personnel *within each office* that contributes, receives or uses information related to provisioning of air traffic technical training,

inclusive of the ATO Service Units, Service Areas, Service Centers and facilities, as well as any other FAA offices.

**Recommendation 44 (5.2)** Clarify and document the specific roles and responsibilities *between offices* that contribute, receive or use information related to provisioning of air traffic technical training, inclusive of the ATO Service Units, Service Areas, Service Centers and facilities, as well as any other FAA offices.

**Recommendation 45 (5.3)** Clarify and document the specific roles and responsibilities between the ATO and the FAA Academy, as each contributes to air traffic technical training.

**Recommendation 46 (5.4)** Empower one office with the responsibility, as the REDAC advised the Administrator in 2005, for coordinating the provisioning of air traffic technical training, including the means to fund and execute this responsibility.

### *Other Recommendations*

**Recommendation 47 (6.1)** The FAA Academy should shift curriculum to the outcomes-based model over the next five years.

**Recommendation 48 (6.2)** AJL should join the franchise fund at the Mike Monroney Aeronautical Center to better serve its mission.

**Recommendation 49 (6.3)** The use of the term "Developmental" has a less than positive connotation. A better descriptor should be used.

# APPENDICES

APPENDIX A: FAA Press Release

APPENDIX B: Panel Biographies

APPENDIX C: Panel Charter

APPENDIX D: Panel Methodology

APPENDIX E: List of References

APPENDIX F: List of Acronyms

# APPENDIX A: FAA Press Release

 **Federal Aviation Administration**

## Press Release – FAA Announces Additional Actions as Part of Air Traffic Control Review

**For Immediate Release**
April 29, 2011
Contact: FAA Press Office
Phone: 202-267-3883

WASHINGTON – Federal Aviation Administration Administrator Randy Babbitt announced additional management changes and other actions today as part of the FAA's comprehensive review of the air traffic control system.

Three veteran FAA managers will be repositioned to assume oversight of critical air traffic roles:

> Walt Cochran will oversee Terminal Operations, where he will be responsible for all of the Agency's airport towers and TRACONS (approach and departure control).
> Chris Metts will oversee all of the Agency's En Route and Oceanic operations.
> Glen Martin will become the Air Traffic Manager at the Cleveland Air Route Traffic Control Center. He is currently the deputy air traffic manager at Chicago Center.

The FAA is also assessing key mid-level management positions to ensure that both technical and leadership expectations are being met.

Teams of FAA experts are also examining some of the agency's more complex facilities, including Cleveland and New York Centers, in an effort to make certain that operational policies and professional standards are being upheld.

"We are continuing to do everything in our power to ensure that our nation's aviation system remains the safest in the world. This is just the beginning of the process to make sure we have the best possible team in place," said Transportation Secretary Ray LaHood.

"The FAA's focus is safety. These changes ensure that we have the right people in the right places to help us carry out our mission," said FAA Administrator Babbitt. "I am confident our top-to-bottom review is making our air traffic system even safer."

Secretary LaHood and Administrator Babbitt announced earlier this month that the FAA would place an additional air traffic controller on the midnight shift at air traffic control towers and facilities around the country that were staffed with only one controller during that time.

Three controllers in Knoxville, Miami and Seattle were fired for sleeping while working an operational position. These employees have a due process right to respond to these actions.

Report of the Independent Review Panel on ATCS Selection, Assignment and Training

Additionally, the FAA instituted changes to air traffic controller scheduling practices that will allow controllers more time for rest between shifts. The FAA and the National Air Traffic Controllers Association (NATCA) are continuing to work together on additional changes that will help reduce controller fatigue, including a fatigue education program.

On Friday, the FAA also announced the members of an independent review panel that will evaluate the agency's air traffic control training curriculum, qualifications and placement process to make sure new controllers are properly prepared. The members of the panel are: Michael Barr, University of Southern California Aviation, Safety & Security program; Tim Brady, Embry Riddle Aeronautical University; Garth Koleszar, NATCA; Michael New, United Airlines; and Julia Pounds, FAA. The panel will submit a report to FAA Administrator Babbitt this fall.

The in-depth look at air traffic controller training is part of the FAA – NATCA Call to Action on air traffic control safety and professionalism. Administrator Babbitt, NATCA President Paul Rinaldi and members of their leadership teams have been visiting air traffic facilities around the country to reinforce the need for all air traffic personnel to adhere to the highest professional standards.

During the Call to Action, FAA and NATCA teams have so far visited air traffic personnel and facilities in and around: Atlanta; Boston; Chicago; Cleveland; Columbus; Dallas–Ft. Worth; Denver; Kansas City; Knoxville; Lincoln; Louisville; Miami; Minneapolis; New York; Oklahoma City; Oakland; Omaha; Reno; Sacramento; and Salt Lake City.

###

## APPENDIX B: Panel Biographies

# Michael L. Barr (Chairperson)

Former Director - Aviation Safety and Security Program
University of Southern California

Michael L. Barr currently teaches aviation safety management systems in the Aviation Safety and Security Program at University of Southern California's Viterbi School of Engineering. He joined the USC faculty in 1985, and was selected in 1993 as Director of the prestigious USC Aviation Safety and Security Program, a position he held for 13 years. He has taught in Israel, Indonesia, Singapore, Canada, Denmark, Norway, Sweden, Mexico, Brazil, Spain, South Africa, Trinidad, Korea, Taiwan and New Zealand, and is nationally and internationally known for his studies on management culture, Safety Management Systems and risk management programs. On September 12, 2001, Mr. Barr appeared on CNN's Larry King Show to discuss aviation safety risks involving commercial airlines following the 9/11 terrorist attacks. He is frequently asked by both national and international media to discuss aviation safety matters. In 2005, he was selected outstanding presenter at a Mitre seminar in Washington, D.C., having spoken about worldwide acceptance of Safety Management Systems. Mr. Barr is an invited member of Flight Safety Foundation's Corporate Advisory Committee. Mr. Barr was an Air Force Master Instructor Pilot and a decorated F-100 fighter pilot who flew 137 combat missions in the Republic of Vietnam. He earned the Distinguished Flying Cross for Heroism with Combat "V," seven Air Medals, two Meritorious Service Medals, two Air Force Commendation Medals, two Army Commendation Medals, two Presidential Unit Citations, and among other awards. Michael Barr graduated from the United States Naval Academy with a B.S. in Engineering and was awarded a M.A. in Human Relations from Webster College of St. Louis. He is a graduate of the USC Flight Safety Officers and Advanced Safety Management courses. He holds a commercial pilot's certificate and is a member of the International Society of Air Safety Investigators.

# Tim Brady, Ph.D.
## Dean of the College of Aviation - Daytona Beach Campus
## Embry-Riddle Aeronautical University

Dr. Tim Brady, host and originator of National Training Aircraft Symposium, is a professor, aviator and administrator of a preeminent education program. As Dean of the College of Aviation, Dr. Brady provides the resources of Embry-Riddle's Daytona Beach Campus to enhance the experience for NTAS participants through use of the college's excellent facilities, warm social gatherings, and demonstrations of contemporary education and training technology. He was past president of the University Aviation Association and the Aviation Accreditation Board International, and has been called to represent the collegiate flight training community at a crucial time in the evolution of training technologies, education pedagogy and regulatory practice. Through testimony in Congress, participation in FAA aviation rulemaking committees and outreach to colleagues, Dr. Brady has illuminated the issues surrounding preparation of first officer aspirants for aviation careers. He holds the Airline Transport Pilot Certificate, a Ph.D. in Education with a specialization in Higher Education Administration from St. Louis University, an M.S. in Management from Abilene Christian University, and a B.S. in Social Science from Troy State University. He has more than 30 years of experience in higher education, administration and teaching. Before joining Embry-Riddle, he was chairman of the aviation department at Central Missouri State University. He also served as Dean of Institutional Advancement and External Programs at St. Louis University's Parks College. Brady saw active duty with the U.S. Air Force from 1958 to 1980 as a pilot and was twice decorated with the Distinguished Flying Cross in addition to several air medals.

# Garth Koleszar
## Facility Representative - Los Angeles Center
## National Air Traffic Controllers Association

Garth Koleszar is a 20-year veteran controller at Los Angeles Air Route Traffic Control Center, where he also serves as the Center's Facility Representative for the National Air Traffic Controllers Association (NATCA). Mr. Koleszar is a member of the NATCA/FAA professional standards committee and was recently appointed as NATCA's national representative for training and professional standards. Koleszar has been nationally recognized for his contributions as an on-the-job training instructor, and he is an arbitration advocate who has served as a national legislative advocate for air traffic controllers. For the past 15 years, he has served in a leadership position for NATCA and has held every locally elected post for the organization. Mr. Koleszar was also part of the 2009 NATCA contract team that achieved a pivotal agreement that solidified a collaborative relationship between NATCA and the FAA. He earned his Bachelor of Arts degree in Business Management from California State University San Bernardino.

# Michael D. New, Ph.D.
## Vice President - Corporate Safety, Quality Assurance, and Training
## Aveos Fleet Performance, Inc.

Michael New began his flying career as a U.S. Air Force F-15 fighter pilot, instructor and evaluator. While in the Air Force, he served as the Supervisor of Flying, Chief of Training, Chief of Standardization and Evaluation, and regularly supplemented the Inspector General's office. After eight years in the USAF, he joined Delta Air Lines as a pilot and held several management positions at the airline including instructor, evaluator, General Manager of the fleet research and development group, and Director of the aviation safety department. He earned M.S. and Ph.D. degrees from Georgia Institute of Technology in engineering psychology (human factors engineering). Dr. New was a Delta Captain on the B-737NG aircraft and consulted for the Lockheed-Martin Corporation and the U.S. Navy. He also served as a member on several industry working groups including the Aviation Rulemaking Advisory Committee (Human Factors Harmonization Working Group), NASA Data-Mining Working Group (aviation industry co-chair), and the Flight Safety Foundation Icarus Committee. He has led several operational initiatives including modifications of aircraft hardware and operational procedures. As an operational leader, he has successfully instituted risk management programs in several countries and developed innovative analysis techniques to support data-driven decision-making. Prior to joining Aveos as the leader of the safety, quality assurance, and training organizations, Dr. New served as the Managing Director of Operations Training at United Airlines, where he was responsible for all pilot and dispatcher training programs, served on the Single Operating Certificate Steering Committee, and sponsored the development of the Controller-Pilot Awareness Program (an aircraft simulator-based program designed to increase ATCS awareness of aircraft performance and operational issues faced by the airline pilot community).

# Julia Pounds, Ph.D.
## Research Psychologist - Aviation Safety
## Federal Aviation Administration

Dr. Julia Pounds currently manages the Research and Analysis Branch of the Federal Aviation Administration's Air Traffic Safety Oversight Service. Prior to joining that office, she was an engineering research psychologist for the agency's Civil Aerospace Medical Institute's Division of Aerospace Human Factors Research in Oklahoma City. Since joining the FAA, she has been technical lead on several projects to optimize performance by understanding the role of cognitive processes in human performance, particularly judgment and decision-making associated with expert performance in air traffic control. She participated as the FAA technical lead for Action Plan 12: Management and Reduction of Human Error in Air Traffic Management, a research and development collaboration between the FAA and EUROCONTROL. She was the human factors representative on the FAA's team to support an Italian accident investigation at Linate Airport in Milan. Her research projects have included human factors centered techniques to identify system vulnerabilities contributing to air traffic operational errors, a 360-degree method for runway safety to identify interaction failures between air traffic control, flight, and/or ground operations, an innovative state-of-the-art approach to Air Traffic Control Specialist skill enhancement, and development of performance metrics to distinguish experts from lesser performers. Before joining the FAA, Dr. Pounds worked with the U.S. Army Research Institute at Ft. Leavenworth, Kansas on projects to identify and enhance the problem-solving skills of battlefield commanders and to develop class materials based on these skills for the Command and General Staff College.

# APPENDIX C: Panel Charter

### Charter of the
### FAA Independent Review Panel on Air Traffic Control Specialist Training

**Purpose**: The purpose of this Panel is to review the Federal Aviation Administration's (FAA) air traffic control technical training program, as well as the screening and assignment processes. The Panel will provide recommendations to the Administrator based on the results of the review.

The official title of this panel is the "FAA Independent Review Panel on Air Traffic Control Specialist Training."

**Scope**: The Panel will review the controller training program and make recommendations to address the FAA's approach to air traffic technical training to include, at a minimum, professional standards, hiring (qualifications, selection and screening) of air traffic controller candidates and assignment of air traffic controllers to operational facilities.

**Goal:** As a product of the review, the Panel will provide their findings and recommendations to the FAA Administrator.

**Structure and Operations**: The Panel will act by a four to one majority vote on each recommendation. A dissenting member may elect to provide a dissenting opinion to any recommendation within the final report.

The Panel is expected to meet as often as necessary to accomplish its purposes under this charter. The Panel may conduct meetings in public or in private, as it deems necessary, and is not precluded from meeting in any specific location.

The Panel will not release information to the public without first coordinating with the FAA Administrator and the FAA Press Office.

**Resources:** The Vice President of the Air Traffic Organization's Office of Technical Training will serve as the Agency's primary representative to the Panel. Additional support will be provided through the Superintendent of the FAA Academy and the directors of the Mike Monroney Aeronautical Center and the William J. Hughes Technical Center.

The Agency will provide to the Panel access to relevant guidance, coordination procedures, training materials, program plans, schedules, reports, records, audits, business cases, white papers and other documents and databases, as available, so long as such materials are not protected by the Privacy Act or by other agreements.

The Agency will arrange access to government facilities, employees and contractors in accordance with established procedures, so long as such activities do not impact FAA operations and individuals have expressly agreed to participate.

Panel members will serve without compensation. However, each appointed member may be reimbursed for per diem and travel expenses incurred while participating in Panel activities, in accordance with Federal Travel Regulations.

The FAA will be responsible for the Panel's financial and administrative support. Within the Agency, this support will be provided by the Air Traffic Organization's Office of Technical Training.

**Expected Outcomes and Timelines**:

Status Report: The Panel will provide a status report to the FAA by July 29, 2011, describing progress made and any additional assistance required.

Draft Report: The Panel will use its best efforts to deliver a draft report to the FAA by August 31, 2011, or as established in the July 29th Status Report. The FAA will have the opportunity to ask questions and provide comments to the draft report.

Final Report: Within 30 days after the receipt of any Agency comment(s) to the draft report, the Panel will deliver a final written report to the FAA Administrator. While the Agency may comment on the report and may seek correction of any factual inaccuracies, the Panel is solely responsible for the report's content.

Panel Outbrief: The Panel will provide a briefing of findings and recommendations to the FAA Administrator within 14 days after the delivery of the final written report.

**Membership**:

Michael Barr, former Director, Aviation Safety and Security Program
University of Southern California

Tim Brady, Ph.D., Dean, College of Aviation – Daytona Beach Campus
Embry-Riddle Aeronautical University

Garth Koleszar, Facility Representative, Los Angeles Center
National Air Traffic Controllers Association

Michael New, Ph.D., Managing Director, Operations Training
United Airlines

Julia Pounds, Ph.D., Research Psychologist, Aviation Safety
Federal Aviation Administration

NOTE:  During the course of the Panel's investigation, Dr. Michael New became the Vice President for Corporate Safety, Quality Assurance and Training at Aveos Fleet Performance, Inc.

# APPENDIX D: Panel Methodology

The Panel used the following methods to collect data and other sources of information in order to produce this report. The members prepared the final report and recommendations to the Administrator based on the methodology and materials described in this appendix.

## Meetings

Panel meetings: There were three consolidated Panel meetings that were each approximately three-and-a-half days long. At the final meeting, the Panel presented its findings and recommendations to the FAA Administrator.

- May 24-26, 2011, in Washington, D.C. At this meeting, the FAA Administrator gave the Panel its tasking. The Panel established its Charter (see Appendix C). Agency personnel presented detailed organizational briefings.

- June 21-23, 2011, in Oklahoma City, OK. The Director of the Mike Monroney Aeronautical Center and the Acting Superintendent of the FAA Academy briefed the Panel on the role of the Academy in training CPCs. The Panel observed training sessions, and key personnel provided briefings on delivery of educational material. The Aeronautical Center Director explained the Franchise Fund system for funding and providing services or deliverables between participating organizations. The Panel also had a briefing on the history and current status of the AT-CTI program as well as distance learning programs.

- July 26-28, 2011, in Washington, D.C. The previous Vice President of ATO Technical Training briefed the Panel on the history of the ATO training program. A NAV CANADA representative presented a detailed briefing via telephone on NAV CANADA's training program. At this meeting, the Panel began discussing its review and analysis of the information collected during site visits, document reviews and personal interviews.

- September 22, 2011, in Washington, D.C. The Panel presented the FAA Administrator with its report and recommendations.

## Facility Visits

Panel members visited the following sites as part of the information-collection process. The Panel conducted in-depth discussions and presented questions to management, union representatives, on-the-job

training instructors, certified controllers, certified controllers-in-training and developmental controllers. The Panel also reviewed different simulator programs.

- ATO Terminal Services facilities:
  - Chicago TRACON (C90), IL
  - Jacksonville International ATCT/TRACON (JAX), FL
  - Long Beach ATCT (LGB), CA
  - Los Angeles ATCT (LAX), CA
  - Midway International ATCT (MDW), Chicago, IL
  - O'Hare International ATCT (ORD), Chicago, IL (via telephone)
  - Orlando Sanford International ATCT (SFB), FL
  - Purdue University ATCT (LAF), Lafayette, IN

- ATO En Route and Oceanic Services facilities:
  - Chicago ARTCC (ZAU), Aurora, IL
  - Jacksonville ARTCC (ZJX), Hilliard, FL
  - Los Angeles ARTCC (ZLA), Palmdale, CA
  - Seattle ARTCC (ZSE), Auburn, WA

- ATO Service Centers:
  - Central Service Center, Fort Worth, TX
  - Eastern Service Center, College Park, GA
  - Western Service Center, Renton, WA

- Mike Monroney Aeronautical Center:
  - FAA Academy, Oklahoma City, OK

- AT-CTI programs:
  - Embry-Riddle Aeronautical University, Daytona Beach, FL
  - Lewis University, Romeoville, IL
  - Mt. San Antonio College, Walnut, CA
  - Purdue University, Lafayette, IN

**Document Reviews**

Panel members conducted an extensive review of reports and other materials. Materials are available on the Technical Training Knowledge Sharing Network (KSN).

Sources included:

- DOT OIG
- MITRE

- ATO
- AOV

Material types included:

- White Papers
- Training Reviews
- Curriculum Reviews
- Controller Workforce Plans
- Audit Reports
- Air Traffic Controller Workforce Recommendations
- Strategic Plans
- Business Plans

**Candidate Selection Process**

The Panel reviewed for each hiring source, Academy PV and facility assignment procedures.

**Time to CPC**

The Panel looked at the time required to complete training at the facilities according to the complexity of a facility's operations as well as differences in complexities between En Route and terminal facilities.

**Professional Standards and Refresher Training**

The Panel evaluated programs for currency and adequacy.

**Effectiveness of the Current Training Organization**

The Panel interviewed current and former leaders throughout the ATO and used the materials and briefings provided.

# APPENDIX E: List of References

Celio, J. C., Jarvis, K., & Poore, D. S. (2005). *Review and Analysis of Air Traffic Controller Education and Training, Revised* (MTR 04W0000098R01). Washington D.C.: MITRE Corporation.

*Concurring Recommendations* (2011). A Report Briefed to the FAA Independent Review Panel by the NATCA Placement Working Group on July 27, 2011. Washington D.C.

Department of Transportation Office of Inspector General (2011). *FAA Must Improve its Controller Training Metrics to Help Identify Program Needs* (AV-2011-72). Washington D.C.: U.S. Government Printing Office.

Department of Transportation Office of Inspector General (2009). *Report on Training Failures Among Newly Hired Air Traffic Controllers* (AV-2009-059). Washington D.C.: U.S. Government Printing Office.

Department of Transportation Office of Inspector General (2010). *Review of Screening, Placement and Initial Training of Newly Hired Air Traffic Controllers* (AV-2010-049). Washington D.C.: U.S. Government Printing Office.

Federal Aviation Administration Academy (2010). *Academy: Initial qualification Realignment Program.*

Federal Aviation Administration, AHR-1, (2008) Air Traffic Controller Hiring Process Tiger Team Report. Washington D.C.

Federal Aviation Administration, Air Traffic Organization Safety Services (2007). *Air Traffic Controller Stage I Training Program Assessment.*

Guendel, F.J. Colonel, USAF, (2011). *Criteria for UPT Selection (August 10, 2011 email to T. Brady).* Air Education and Training Command, Maxwell AFB, Montgomery, AL.

Hardison, C. M., Sims, C. S., Wong E. C. (2010). *The Air Force Officer Qualifying Test.* Santa Monica, CA: RAND Corporation.

Komons, N. A. (1978). Bonfires to Beacons: Federal Civil Aviation Policy Under the Air Commerce Act 1926-1938. Ann Arbor, MI: University of Michigan Library.

Welp, R., Kelley, S., Doskow, J., Rounsavell, L., & Morrison, M. (2007). *En Route Initial Qualification (Stage I) Training Redesign Front End Analysis.*

Kultgen, John H. *Ethics and Professionalism,* University of Pennsylvania Press, 1988

Federal Aviation Administration, AJL-41, (2011). Training Technology Strategy, The Future of Training-Closed Loop Training System. Washington D.C.

Report of the Independent Review Panel on ATCS Selection, Assignment and Training

# APPENDIX F: List of Acronyms

| Acronym | Description |
|---------|-------------|
| AABI | Aviation Accreditation Board, International |
| ABET | Accreditation Board for Engineering Technology |
| AFOQT | Air Force Officers Qualifying Test |
| AJL | Air Traffic Organization's Office of Technical Training |
| AOV | Aviation Safety's Air Traffic Oversight Service |
| ARTCC | Air Route Traffic Control Center |
| ATC | Air Traffic Control |
| ATCS | Air Traffic Control Specialist |
| ATCT | Airport Traffic Control Tower |
| ATM | Air Traffic Manager |
| ATO | FAA's Air Traffic Organization Line of Business |
| ATS | Air Traffic Services (pre-Air Traffic Organization) |
| AT-CTI | Air Traffic Collegiate Training Initiative |
| AT-SAT | Air Traffic Selection and Training |
| AVS | FAA's Aviation Safety Line of Business |
| CBA | Collective Bargaining Agreement |
| CGPA | Cumulative Grade Point Average |
| CMS | Content Management System |
| CPC | Certified Professional Controller |
| CPC-IT | Certified Professional Controllers-in-Training |
| CTI | Collegiate Training Initiative |
| DOT | Department of Transportation |
| ERAM | En Route Automation Modernization |
| FAA | Federal Aviation Administration |
| FLM | Front Line Manager |
| FPL | Full Performance Level |
| FY | Fiscal Year |
| GPA | Grade Point Average |
| KSN | Knowledge Sharing Network |
| LCMS | Learning Content Management System |
| NATCA | National Air Traffic Controllers Association |
| NTD | National Training Database |
| OIG | Office of the Inspector General |
| OJT | On-the-Job Training |
| OJTI | On-the-Job Training Instructor |

Report of the Independent Review Panel on ATCS Selection, Assignment and Training

| OM | Order of Merit |
|---|---|
| PCSM | Pilot Candidate Selection Model |
| PFA | Physical Fitness Assessment |
| PFT | Physical Fitness Test |
| ProStan | Professional Standards |
| PV | Performance Verification |
| REDAC | Research, Engineering and Development Advisory Committee |
| RSS | Relative Standing Score |
| TRACON | Terminal Radar Approach Control |
| UPT | Undergraduate Pilot Training |
| USAF | United States Air Force |
| VRA | Veterans Recruitment Appointment |
| VR&S | Voice Recognition and Synthesis |

EXHIBIT
2

# Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process

## FINAL REPORT

## *April 16, 2013*



© 2013 APTMetrics, Inc.

# TABLE OF CONTENTS

| Section | Page |
|---|---|
| Chapter 1: Executive Summary | 3 |
| Chapter 2: Overview, Barrier Analysis and Stakeholder Insights regarding the FAA ATCS Selection Process | 10 |
| Chapter 3: Root Cause Analysis of ATCS Decision Point Barriers | 18 |
| Chapter 4: Summary and Recommendations | 51 |
| Chapter 5: References/Appendices | 57 |
|     References | 57 |
|     Appendix A: IRP Review | 59 |
|     Appendix B: Documents Received and Reviewed | 77 |
|     Appendix C: FAA ATCS Stakeholder Interview Protocol | 83 |
|     Appendix D: Analysis Decisions | 90 |
|     Appendix E: Full Data Analysis Results | 97 |

**List of Figures**

| | | |
|---|---|---|
| Figure 1 | Total Applicants by Source (2008 – 2011) | 22 |
| Figure 2 | Applicant Demographics by Source (At Point of Application) | 22 |
| Figure 3 | Total Applicant Flow – Applicant Survival (2008 – 2011) | 23 |
| Figure 4 | Candidate Pool Representation Through to CSP by Ethnicity | 24 |
| Figure 5 | Total Applicant Flow by Ethnicity – Applicant Survival (2008 – 2011) | 25 |
| Figure 6 | Total Applicant Flow by Gender – Applicant Survival (2008 – 2011) | 26 |
| Figure 7 | Total Applicant Flow by Source – Applicant Survival (2008 – 2011) | 27 |
| Figure 8 | Percentage Qualified Applicants Who Are Referred (Announcements Throughout Nation/US Only) | 38 |
| Figure 9 | Process Used to Create CSP Location-Specific Referral Pools | 40 |
| Figure 10 | Distribution of Race & Gender Groups in AT-SAT Bands | 43 |

**List of Tables**

| | | |
|---|---|---|
| Table 1 | ATCS Minimum Qualifications by Applicant Source | 11 |
| Table 2 | Merit System Principles | 14 |
| Table 3 | Outtz and Associates Barrier Analysis Summary | 16 |
| Table 4 | Stakeholder Insights Regarding Barrier Analysis | 17 |
| Table 5 | SME Interviews | 19 |
| Table 6a | MQ: System Qualifications (from Applied) - Overall and By Applicant Source - Cumulative Applications Analysis - WHITE VS. AFRICAN AMERICAN | 30 |
| Table 6b | MQ: System Qualifications (from Applied) - Overall and By Applicant Source - Cumulative Applications Analysis - WHITE VS. HISPANIC | 31 |
| Table 6c | MQ: System Qualifications (from Applied) - Overall and By Applicant Source - Cumulative Applications Analysis - MALE VS. FEMALE | 31 |
| Table 6d | System Qualifications (from Applied) - Unique Analysis | 97 |
| Table 6e | System Qualifications (from Applied) - Cumulative Analysis | 99 |
| Table 7a | MQ: HR Qualifications (from System Qualifications) - Overall and By Applicant Source - Cumulative Applications Analysis - WHITE VS. AFRICAN AMERICAN | 32 |
| Table 7b | MQ: HR Qualifications (from System Qualifications) - Overall and By Applicant Source - Cumulative Applications Analysis - WHITE VS. HISPANIC | 32 |
| Table 7c | MQ: HR Qualifications (from System Qualifications) - Overall and By Applicant Source - Cumulative Applications Analysis - MALE VS. FEMALE | 33 |
| Table 7d | HR Qualifications Review (from System Qual) - Unique Analysis | 101 |
| Table 7e | HR Qualifications Review (from System Qual) - Cumulative Analysis | 103 |



# TABLE OF CONTENTS

| | | |
|---|---|---|
| Table 8a | MQ: HR Qualifications (from Applied) - Overall and By Applicant Source Cumulative Applications Analysis - WHITE VS. AFRICAN AMERICAN | 34 |
| Table 8b | MQ: HR Qualifications (from Applied) - Overall and By Applicant Source Cumulative Applications Analysis - WHITE VS. HISPANIC | 34 |
| Table 8c | MQ: HR Qualifications (from Applied) - Overall and By Applicant Source Cumulative Applications Analysis - MALE VS. FEMALE | 35 |
| Table 8d | HR Qualifications Review (from Applied) - Unique Analysis | 105 |
| Table 8e | HR Qualifications Review (from Applied) - Cumulative Analysis | 107 |
| Table 9a | AT-SAT Pass for Public Source - Unique Applicant Analysis - AFRICAN AMERICAN, HISPANIC, & FEMALE GROUPS | 35 |
| Table 9b | AT-SAT Pass (Public Source Only) - Unique Analysis | 109 |
| Table 10a | Geographic Location Preferences: Overall and By Applicant Source - Cumulative Applications Analysis – WHITE vs. AFRICAN AMERICAN | 37 |
| Table 10b | Geographic Location Preferences: Overall and By Applicant Source - Cumulative Applications Analysis – WHITE vs. Hispanic | 37 |
| Table 10c | Geographic Location Preferences: Overall and By Applicant Source - Cumulative Applications Analysis – Male vs. Female | 37 |
| Table 10d | Geographic Location Preferences - Cumulative Analysis | 110 |
| Table 11 | Impact of Location Preferences on African Americans | 39 |
| Table 12a | Overview of Adverse Impact by Individual CSP | 41 |
| Table 12b | CSP - Selected (from Referred) - Unique Analysis | 112 |
| Table 12c | CSP - Selected (from Referred) - Cumulative Analysis | 114 |
| Table 12d | CSP Overall - Selected (from Referred) - Unique Analysis | 116 |
| Table 12e | CSP Eastern Service Area - Selected (from Referred) - Unique Analysis | 120 |
| Table 12f | CSP Central Service Area - Selected (from Referred) - Unique Analysis | 124 |
| Table 12g | CSP Western Service Area - Selected (from Referred) - Unique Analysis | 128 |
| Table 13 | Examination of Impact of Lowering AT-SAT Cutoff Score | 44 |
| Table 14a | Interview, Medical, Suitability/Security, & Hire Decision - Unique Applicant Analysis - WHITE VS. AFRICAN AMERICAN | 47 |
| Table 14b | Interview, Medical, Suitability/Security, & Hire Decision - Unique Applicant Analysis - WHITE VS. HISPANIC | 47 |
| Table 14c | Interview, Medical, Suitability/Security, & Hire Decision - Unique Applicant Analysis - MALE VS. FEMALE | 48 |
| Table 14d | Interview Pass - Unique Analysis | 132 |
| Table 14e | Medical Pass - Unique Analysis | 133 |
| Table 14f | Conditional Suitability Pass - Unique Analysis | 134 |
| Table 14g | Final Suitability Pass - Unique Analysis | 135 |
| Table 14h | Both Conditional & Final Suitability Pass - Unique Analysis | 136 |
| Table 14i | Hire Decision Pass - Unique Analysis | 137 |
| Table 15a | Overall Hiring Process Decisions - Unique Applicant Analysis - WHITE VS. AFRICAN AMERICAN | 49 |
| Table 15b | Overall Hiring Process Decisions - Unique Applicant Analysis - WHITE VS. HISPANIC | 49 |
| Table 15c | Overall Hiring Process Decisions - Unique Applicant Analysis - MALE VS. FEMALE | 49 |
| Table 15d | Overall Process: Applied to Hired - Unique Analysis | 138 |
| Table 15e | Overall Process: Fully Qualified to Hired - Unique Analysis | 139 |
| Table 16 | HR Screen Comments | 90 |
| Table 17 | Referral Action Comment Recode | 93 |
| Table 18 | Overall Security Score | 94 |
| Table 19 | CSP Dates | 96 |



# Chapter 1

### EXECUTIVE SUMMARY

A Barrier Analysis of the FAA's Air Traffic Control Specialist (ATCS) centralized hiring process was recently completed by Outtz and Associates (October, 2012). This analysis was guided by EEOC's Management Directive 715 & the Uniform Guidelines on Employee Selection Procedures (1978). The results of that analysis indicated that barriers exist for certain protected groups on four of the seven critical decision points that comprise the ATCS centralized hiring process.  APT*Metrics* was contracted by the FAA's Office of Human Resources (OHR) in December, 2012 to conduct a detailed root cause analysis of the identified barriers and establish the foundation for corrective interventions. A summary of our approach, findings and recommendations are discussed below.

While there are 10 steps in the overall hiring process, from Vacancy Announcement (Step 1) through to Firm offer Letter (Step 10), seven of these steps require personnel actions that impact applicant flow and were therefore targeted for review by the barrier analysis (**See Chapter 2**). These seven decision points are:

- **Minimum Qualifications (MQs**).  The ATCS minimum qualifications are customized to each applicant source. The minimum qualification review is carried out in two stages: automated system screening and manual HR review.

- **Air Traffic Selection and Training (AT-SAT).** The AT-SAT is a computer-based selection test battery designed to assess key ATCS worker requirements, aptitude, and personal characteristics associated with success as an ATCS.  The AT-SAT is only relevant for individuals applying from CTI, General Public, and VTP applicant sources.

- **Generation of Referral Lists.**  For all applicant sources except General Public, referral lists are generated separately for each applicant source and geographic location that has vacancies.  Non-referral would occur if an applicant failed to specify a location preference or if the location preferences did not align with state/facility hiring needs.

- **Centralized Selection Panel (CSP).** Once referral lists have been generated, a CSP is convened to review these lists and select individuals to fill specific facility vacancies. The CSP is comprised of management representatives who have expertise in the ATCS occupation and knowledge of the facilities within their respective regions.

- **Interview.**  Applicants who are selected during the CSP are invited to participate in an interview with a facility manager, typically at the facility that is closest to the address on record for the applicant.

- **Medical Screen.** The medical screen consists of both physical and psychological components.



- **Security Clearance.** The security screen consists mainly of a primary screen (termed Conditional Suitability). If the primary screen is insufficient to make a determination, a subsequent secondary screen (termed Final Suitability) is then conducted.

The decision points described above combine to form a fairly complex hiring process. This complexity is due to a number of factors including the use of multiple applicant sources with different minimum qualifications, mixed uses of the AT-SAT, application knock-out factors unrelated to qualifications (e.g., location preference), a potentially multi-year hiring process from the point of application to hire, and referral lists organized by applicant source. Each of these factors is addressed in this report in terms of its impact on protected groups as well as how it can be changed or improved.

Based upon the Barrier Analysis and FAA stakeholder responses to this analysis (including ATO, CAMI, and AHR), a root-cause analysis was blueprinted to thoroughly investigate each of the barriers identified and determine whether any additional hurdles existed to the fair and accurate selection of candidates for the ATCS position (**See Chapter 3**).

The process for conducting this root cause analysis required a thorough understanding of how the various decision points of the hiring process impact candidates' "survival" from application through to the hire decision. Both qualitative and quantitative analyses were employed to interpret the impact of each decision point and tease out the underlying causes of differential pass rates for protected group members.

*Qualitative Review*

The qualitative review incorporated stakeholder interviews, site visits, a review of existing FAA documentation, and an evaluation of recommendations generated through the *FAA Independent Review Panel on the Selection, Assignment and Training of Air Traffic Control Specialists (IRP)*. Among the insights gleaned during this review was the need to: 1) increase standardization, consistency and documentation across all decision points in the hiring process, 2) establish the job-relatedness of all decision points in the hiring process, 3) minimize subjectivity, particularly in the MQ and CSP steps, 4) improve data capturing and tracking capabilities, and 5) establish a central group to oversee and improve the ATCS hiring process. This phase of the study provided additional context to the barrier analysis and allowed for a thorough understanding of how the hiring system works, the unique challenges involved in balancing applicant flow with adverse impact, and provided direction for the types of analyses that would lead to sustainable interventions.

*Quantitative Review*

The quantitative review relied on data housed in the AVIATOR system between 2006 and 2011, as well as AT-SAT testing data provided by CAMI. This phase of the study began with a high-level evaluation of where important subgroup differences are occurring in the hiring process.

<u>Survival Analysis</u>. When examining the underlying diversity of the various applicant sources, the most dramatic difference was found between the Collegiate Training Initiative (CTI) source and



all other applicant sources with respect to African American representation.  African American applicants comprise only 5% of the CTI pool compared to an average of 34% African American representation across the non-CTI applicant sources. While the CTI applicant source is relatively small compared to the other sources, the CTI subgroup differences are magnified when considering the relatively high "survival" rate of CTI candidates through the hiring process.

An analysis of survival rates by race, gender, and applicant source was conducted for each step in the hiring process. This applicant flow information provided insights into which of the decision points in the hiring process serve to disproportionately screen out minority candidates and certain applicant sources. These analyses illustrated a number of important findings:

- Nearly all applicant screening occurs prior to the interview stage, primarily during the MQ and CSP stages of the hiring process;

- Advancement in the hiring process is clearly correlated with race. White applicants pass the MQ screening and CSP stages at a significantly higher rate than African American applicants;

- Advancement in the hiring process is clearly correlated with applicant source. CTI applicants pass the MQ qualification and CSP hurdles at a significantly higher rate than all other applicant sources, and

- MQ screening dramatically alters the overall diversity of the applicant pool that moves forward in the hiring process. For example, prior to any screening, 32% of all applicants are African Americans and 48% are White. However, following the MQ screening, 16% of all applicants moving forward are African American while 65% are White.  Moreover, this is the stage at which at least 80% of applicants from the most diverse sources are eliminated.

The applicant flow information above highlights several important points which were used to drive our subsequent analyses.  First, the steps from application to CSP selection are the most likely places for systematic adverse impact simply because these steps are responsible for the vast majority of applicant fails.  Second, African Americans stand out as having a very different survival rate for these earlier hurdles.  Third, applicant sources show very different demographics.  Because the CTI source is much less diverse, the CTI source itself can confound analyses by ethnicity.

Root Cause Analyses by Decision Point.  Using the applicant survival analysis, the results of the Barrier Analysis, and our in depth interviews with SMEs, analyses were conducted to evaluate the underpinnings of this differential impact across the hiring decision points.

*MQ Stage*. The MQs were developed to be tailored to each applicant source and therefore differ significantly across sources. This approach impacts pass rates, which happen to vary considerably by applicant source. Results of our adverse impact analyses indicate that the overall MQ stage produces adverse impact for African Americans and Hispanics for all applicant sources except CTI (98% of CTI candidates pass through the MQ stage).  Adverse impact was also found for Females for all applicant sources except CTI and General Public.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

*Air Traffic Selection and Training (AT-SAT).* The AT-SAT serves as a hurdle after qualification for the General Public and VTP applicants and as a minimum qualification for CTI applicants.  All three of these sources must score at least a 70 to pass their respective AT-SAT hurdle.  However, the AT-SAT is used again during the CSP process to differentiate applicants into "qualified" and "well qualified" bands (see below). When used as a minimum qualification with a 70% pass score, approximately 95% of applicants pass the exam with no resulting adverse impact for African Americans, Hispanics, and Females

*Referral Stage.* The referral decision point is an automated decision based solely on the location preference provided by applicants. If the applicant chooses a location for which an ATCS candidate need exists, then the applicant is referred for that location.[4] However, the use of location preferences as a basis for the referral is problematic.  Our analyses revealed that referral rates vary considerably by applicant source. Applicants from the CTI, CTO, and Reinstatement sources were referred at twice the rate of applicants from the RMC and VRA sources, and these also happen to be the sources with the largest percentage of African Americans. Ultimately, African American diversity is reduced disproportionality in the overall process because African American membership is highest for those sources that are referred at much lower rates.  Given that the referral rates are so different (i.e., 97% vs. 47%) suggests that perhaps the CTI, CTO, and Reinstatement sources are better informed as to the location of open positions.

*CSP Stage.* For the CSP process, adverse impact was observed for African Americans and Females, for specific panel sessions, though no consistent pattern of adverse impact was observed over the 2008-2011 time period. One significant finding was that adverse impact only occurs for African Americans within the CSP when national Public announcements are used.  This is due largely to how the AT-SAT is used to prioritize the selection of General Public applicants.

Currently, applicants are split into two bands based on predetermined score ranges.  Scores less than 85 and greater than or equal to 70 are considered to be "qualified." Scores at or above 85 are considered to be "well qualified."  Applicants who score in the "well qualified" band are given substantial preference in CSP selection decisions.

Applicants who score in the "Well Qualified" band on the AT-SAT receive priority over those scoring in the "Qualified" band. White applicants score in the preferred band at a disproportionately higher rate than racial minorities (e.g., 70% White vs. 36% African American and 47% Hispanic).

---

[4]  The referral process for General Public applicants is slightly different in that applicants are placed on national referral lists and are therefore considered for all locations.



*Interview Stage.* Almost 100% of applicants who were interviewed passed the interview. No race or gender adverse impact was found for the interview. The interview questions and answers can be found online.

*Medical Stage.* More than 90% of applicants passed the medical screen. No race or gender adverse impact was found for the medical screening.

*Security Stage.* Selection rates for all groups remained very high (greater than 95%). No race or gender adverse impact was found for passing the overall security screening process.

*Overall Hiring Process.* Adverse impact was found at several hurdles in the ATCS selection process, as well as across the overall ATCS selection process. Specifically, two of the three focal groups (African Americans and Females) have disproportionately lower pass rates than White and Male applicants for both minimum qualification hurdles (automated and HR) as well as for the CSP selection process. Regarding the minimum qualification hurdles, adverse impact was found within most of the applicant sources as well. Adverse impact was not observed for CTI at any point in the hiring process, though the qualification rate was very high in general. Importantly, adverse impact for the CSP process does vary considerably by individual CSP event and appears to be a function of using General Public source national referral lists. Also, the current method of using location preferences is decreasing applicant diversity due to vastly different referral rates for the applicant sources.

A summary of our findings along with a number of recommendations for each of the decision points that were identified as problematic are presented in **Chapter 4**. In addition, specific suggestions to improve assessment tool vulnerabilities, process inefficiencies, and overall design challenges that need to be addressed to ensure the sustainability of recommended interventions over time are discussed.

**STEP 1: Vacancy Announcements.** A structured process, involving a job analysis and formal validation, should be conducted to determine and validate the differentiating criteria for ranking and deciding upon which applicant sources should be drawn upon for each open position.

In addition, it is recommended that the FAA continue community outreach efforts to educate applicants about the ATCS occupational series and more broadly, establish a national recruitment outreach and education program around the ATCS position.

**STEP 2: Minimum Qualifications.** It is strongly recommended that the MQs be reviewed against the job analysis and revised and validated accordingly. Additionally, every attempt should be made to build consistent MQs across recruitment sources.

Consideration should also be given to the use of preferred qualifications (PQs) that could be used to differentiate between a large number of candidates meeting the MQs and other



qualification requirements (e.g., passing the AT-SAT).  As with MQs, job relevance and potential for adverse impact must be considered for PQs.

A tracking system should also be established to evaluate MQ screening decisions for accuracy and adverse impact on an ongoing basis.

**STEP 3: AT-SAT**.  Roughly 95% of applicants score at or above the passing score of 70, however, this rate drops precipitously and produces significant adverse impact for the cutoff associated with the well qualified band. Operationally, the cutoff score for selection in the CSP is 85 since applicants in the "qualified" band are rarely selected.

One potential solution to this issue is to replace the use of the AT-SAT within the CSP with a measure that can differentiate candidates without increasing adverse impact.  For example, the use of validated preferred qualifications that are collected during the application process could be used for this purpose.

In terms of the AT-SAT itself, it is recommended that supplemental validation research be conducted to confirm its relevance to the job. Specifically, the AT-SAT should be reviewed against an updated job analysis to ensure that it is still measuring the most important requirements for success in the ATCS position.

**STEP 4: Generation of Referral Lists.**  It is recommended that the air traffic controller application form be changed so that applicants could select the "anywhere in the nation" option. They should also be provided with information as to which facilities have openings.  This is in line with the Independent Review Panel's recommendation (ATO & AHR: Review of Independent Review Panel (IRP) Recommendations & Current Projects, November 6, 2012).

**STEP 5: Centralized Selection Panel (CSP).**  It is recommended that the full CSP process design be evaluated for efficiency, accuracy and fairness.  It is quite likely that alternative approaches to the CSP model would result in more precise, fair outcomes along with tremendous cost savings.  For example, there may be potential to automate much of the current decision making localized in the CSP selection process.  Under this scenario CSP panelists could operate in more of a final review/quality control role.

It will also be critical to implement a rigorous evaluation of the CSP decision making process to ensure that the process is operating as intended.  Initially it will be important to closely monitor and oversee a full cycle of CSPs to ensure real-time decisions are fair and job-related. Decision making in the CSP should continue to be monitored by HR on an on-going basis thereafter.

**STEP 6: Interview**.  The interview has become more of a formality in the ATCS hiring process as almost 100% of the candidates pass.  It is recommended that new interview content be developed and validated, using the job analysis as the driver of which competencies need to be measured.

Additionally, it is recommended that training be provided to all hiring managers involved in conducting the interviews to ensure they understand how to fairly and accurately conduct the



interview process. Training should include "frame of reference" exercises in order to help calibrate judgments and ratings across hiring managers.

**ATCS Overall Design Considerations**

The current ATCS selection process is highly decentralized, with decision making and process tracking occurring across multiple departments and organizations.  The absence of a clear structure and accountability for the full selection process results in significant challenges to the evaluation, ongoing improvement, and long-term success of the program.  It is our recommendation that a single organization take charge of this process so that it can be centrally managed from announcement through to placement into the FAA Academy.  The organization best positioned to "own" and run this process is the Office of Human Resources.

A centralized process, housed in AHR, would enable improved standardization and targeted outreach of the recruitment process, an improved ability to track and evaluate the hiring process, and enhanced coordination of the entire process.



# Chapter 2

**OVERVIEW, BARRIER ANALYSIS AND STAKEHOLDER INSIGHTS REGARDING THE FAA ATCS SELECTION PROCESS**

In order to set the context for these analyses, a brief description of the steps and decision points that comprise the ATCS hiring process is provided below.

**Overview of ATCS Hiring Process**

**STEP 1: Vacancy Announcements.**  Applicants for ATCS positions must apply online to formal vacancy announcements.  The vacancy announcements are specific to an applicant hiring source[5].  Applicant sources used in the ATCS hiring process include the following:

- Reinstatements/Transfers
    - Former FAA controllers
    - PATCO
    - Department of Defense (DOD)
- Former military controllers
    - Veterans' Recruitment Appointment (VRA)
    - Retired Military Controllers (RMC)
- Graduates from FAA accredited collegiate programs
    - Collegiate Training Initiative (CTI)
- General Public
    - Includes Veterans Training Program (VTP) candidates
- Control Tower Operators (CTO)

The mix of applicant sources chosen during any hiring period is based on a combination of the number of positions that need to be filled and preferences of the FAA for particular applicant sources.  Notably, candidates can apply to multiple applicant source announcements at any given time.

Announcements, when made, are also designated to a specific geographic area.  "National" announcements (i.e., Throughout the US/Nation) are typically issued to cover hiring needs across the US and US territories, though announcements have also been issued for specific states and facilities at different points in time.  When applicants apply to an announcement, the applicant must indicate up to two location preferences.  For example, for an announcement designated "Throughout the Nation," an applicant might indicate both "Illinois" and "Indiana." These location preferences can be changed by the applicant until the announcement is closed.

---

[5] There are two exceptions to the announcement and application process. First, in 1993, a list of reinstatement and transfer eligible ATCS who were separated from the FAA as a result of the PATCO job action of 1981 was created (known as the PATCO list). This list represents an additional source of applicants. Vacancy announcements are not issued for PATCOs.  Second, exceptions were accorded to Flight Service Station (FSS) employees whose positions were eliminated when FSS functions were contracted out,



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

For all applicant sources except General Public, location preferences dictate which location-specific referral list(s) (e.g., RMC-Illinois referral list) an applicant can be placed on once the applicant is deemed fully qualified.  Qualified General Public applicants, however, are placed on a national referral list.

**STEP 2: Minimum Qualifications (MQs).**  All applications, regardless of applicant hiring source, are then screened against the established minimum qualifications. The ATCS minimum qualifications are customized to each applicant source.  Table 1 below outlines the minimum qualifications by applicant source.

### Table 1.  ATCS Minimum Qualifications by Applicant Source

| | VRA | RMC | CTO | REIN | PUBLIC | CTI |
|---|---|---|---|---|---|---|
| **Citizenship** | U.S. citizen | | | | | |
| **Language** | Must be able to speak English clearly enough to be understood over radios, intercoms, and similar communications equipment | | | | | |
| **Age** | Maximum entry age of 31* | | | | | |
| **Experience or Education** | 52 consecutive weeks of certified ATC experience | | Experience in a military or air traffic tower facility | ATCS in FAA / DoD **-CPC**: Federal Civilian CPC or FPL **-DOD**: 52 wks certified ATC experience | 3 yrs progressive responsible FT work experience OR Bachelor's degree OR Comb. of experience / education equal to 3 yrs OR Alternative requirements | Successful completion of FAA-approved curriculum with university rec |
| **Ratings, Certifications, and/or Assessments** | -- | ATCS certification or facility rating according to FAA standards | Valid CTO certificate with facility rating of Tower/Cab | ATCS certification or facility rating according to FAA standards | -- | AT-SAT score of 70 or higher |
| **Eligibility** | Veterans' Recruitment Appointment eligibility | On terminal leave pending retirement from active duty military svc. or retired from active duty on or after 1999-09-17 | -- | -- | -- | Within eligibility time period from graduation |

*Some applicant sources (i.e., VRA, Reinstatement, CTI) allow for applicants to be over the age of 31 as long as the applicant's initial appointment as an ATCS occurred prior to turning 31.  Additionally, the maximum entry age requirement does not apply to the RMC applicant source.



The minimum qualification review is carried out in two stages: automated system screening and manual HR review. As part of the application process, applicants are required to answer a series of "Yes/No" questions to indicate whether or not they meet specific minimum requirements (e.g., age, experience). The minimum qualifications screening process begins with an automated system review of applicant responses to these online screening questions. Applicants are also required to provide specific documentation to support their responses. Applicants who pass the automated screening are then subject to further review by HR representatives to ensure they in fact meet the source-specific minimum qualifications. This includes a detailed review of the application, including work history (if relevant) and required supporting documentation (e.g., facility ratings, veteran's service forms, certifications). Once an applicant has passed both of the qualification stages (automatic and manual HR review), they are considered to be fully qualified.

Note, there is no policy that prohibits an individual from applying through multiple applicant sources within a given hiring period. If an applicant chooses to apply to multiple applicant source announcements, this can result in cases of the same applicant both meeting and not meeting the minimum qualifications of the ATCS position within the same hiring period. Also, due to age requirements and military retirement dates, it is possible for a candidate who is minimally qualified at one point in the process to later be disqualified.

**STEP 3: Air Traffic Selection and Training (AT-SAT).** The AT-SAT is a computer-based selection test battery designed to assess key ATCS worker requirements, aptitude, and personal characteristics associated with success as an ATCS (Ramos, Heil, & Manning, 2001). The AT-SAT is only relevant for individuals applying to CTI, General Public, and VTP announcements, though the timing of when the test must be taken and passed differs between these applicant sources. Individuals applying to a VTP and General Public announcement who have been determined to be fully qualified based on the prior minimum qualification screening must then take and pass the AT-SAT in order to receive further consideration in the ATCS hiring process (i.e., be placed on a referral list). Individuals applying to a CTI vacancy announcement must first pass the AT-SAT before they can apply to a CTI vacancy announcement.

A score of 70 is required to pass the AT-SAT. Roughly 95% of applicants score at or above this passing score.

If the announcement was for a specific state or facility, these applicants must travel to that state to sit for the exam.

Notably, the AT-SAT scores of CTI, VTP, and General Public applicants are also considered during the Centralized Selection Process (CSP) which occurs later in the ATCS hiring process. Here, applicants are placed into either a Well Qualified band (score of 85 or higher) or a Qualified band (score between 70 and 84.9). A score of 85 or higher has become the operational cut score during the CSP selection phase. This is discussed in more detail below.

**STEP 4: Generation of Referral Lists.** Applicants who pass the previous stages of the ATCS hiring process are then referred on to the CSP for further consideration. More specifically,



referral lists are automatically generated on the basis of the applicant's previously specified location preferences. The only reasons an applicant who passed all prior stages of the ATCS hiring process would not be referred on to the CSP is if they failed to specify any location preference or if the applicant's location preferences did not align with state/facility hiring needs.

For all applicant sources except General Public, referral lists are generated separately for each applicant source and geographic location that has vacancies (e.g., RMC-Illinois, CTI-Illinois). Applicants on a specific state referral list can be considered by the CSP for selection for any facility vacancies within that state.

For the General Public applicant source, a single "national" referral list is generated containing those General Public applicants who passed all prior stages of the ATCS hiring process. Referred General Public applicants can be considered by the CSP for selection for any facility vacancy within the US or US territories.

The ordering and presentation of candidates on referral lists varies by applicant source. The following summarizes the rules for each applicant source:

> *Reinstatements/Transfers:* Candidates are sorted by alpha order

> *Veterans' Recruitment Appointment (VRA):* Candidates are sorted by Priority Veterans Preference

> *Retired Military Controllers (RMC):* Candidates are sorted by Priority Veterans Preference

> *Veterans Training Program (VTP):* Candidates are first sorted by AT-SAT score category grouping (85 and above, 70 to 84.9); candidates are then presented in random order within these two categories

> *Collegiate Training Initiative (CTI):* Candidates are first sorted by AT-SAT score category grouping (85 and above, 70 to 84.9); candidates are then sorted by Priority Veterans Preference and secondarily presented in random order within these two categories

> *General Public:* Candidates are first sorted by AT-SAT score category grouping (85 and above, 70 to 84.9); candidates are then sorted by Priority Veterans Preference and secondarily presented in random order within these two categories

> *Control Tower Operators (CTO):* Candidates are sorted by Priority Veterans Preference.

**STEP 5: Centralized Selection Panel (CSP).** Once referral lists have been generated, a CSP is convened to review the referral lists and select individuals to fill specific facility vacancies. The CSP is comprised of management representatives who have expertise in the ATCS occupation and knowledge of the facilities within their respective regions. Facility selections must be made from amongst the pool of applicants referred on either the relevant state-specific list or national General Public referral list. Panelists have access to applications and vitas (if provided) to



inform their decision making.   Panelists are instructed to treat each applicant source with equal weight.  Additionally, panelists are instructed by HR that all selections must be made in compliance with merit system principles, veteran's preference, and agency policy.  The merit system principles presented to CSP panelists are listed below in Table 2.

**Table 2.  Merit System Principles**

| Merit System Principles (FAA PMS VII and 5 U.S.C. § 2301 (b)) |
| --- |
| Recruit qualified people to achieve a workforce that fairly represents our society |
| Select and promote on the basis of relative knowledge, skills, and abilities as they relate to the requirements of the job to be filled |
| Use fair and open competition to assure equal opportunity |
| Treat employees and applicants fairly and equitably |
| Maintain high standards of integrity, conduct, and concern for the public interest |

**STEP 6: Interview.**  Applicants who are selected during the CSP are invited to participate in an interview with a facility manager, typically at the facility that is closest to the address on record for the applicant.  The interview is used to assess six competencies: Dependability, Job Motivation, Reactions to Job Demands, Team Work, Air Traffic Control, and Spoken English.  Interviewers provide an overall rating of either "Recommended", "Marginal", or "Not Recommended" to Selecting Officials.  Applicants must receive a rating of "Recommended" in order to receive a Tentative Offer Letter (discussed in the next section).

Currently, interviews are not standardized and those conducting the interviews are not trained on how to administer and score the interview.

Importantly, interview questions can be found on the internet, providing applicants ample opportunity to practice the interview prior to its administration.  Additionally, Selecting Officials, who are not present at the time of the interview, review all "Marginal" and "Not Recommended" decisions and make the final determination as to whether a "Marginal" or "Not Recommended" applicant should be "Recommended".  During stakeholder interviews, it was noted that the pass rate at the interview stage is very high (e.g. 95%).  Based on the cleaned, final sample used in this report, we found an even higher pass rate for the interview at approximately 99%.

**STEP 7: Tentative Offer Letter.**  The tentative offer letter (TOL) is issued after the applicant passes the interview.  At the point of a tentative offer it is generally assumed the applicant will be hired barring failure of medical or security clearance.

It should be noted that the TOL stage in the selection process can be somewhat of a "freezing" point for applicants.  Specifically, applicants are permitted to turn age 31 after the TOL has been issued with no penalty to their application process (see FAA Policy Bulletin #12, In-Process Rule for Air Traffic Control Specialist Positions).  Further, applicants who are on active duty in



the military may also be issued a TOL, which essentially holds the applicant's place in the selection process until their active duty service term is complete.  In this case, the applicant's security and medical clearance would be postponed until the applicant nears the end of their active duty term.  Once medical and security clearances have been conducted and the applicant is no longer on active duty, the applicant can then proceed through the final steps of the selection process.

**STEP 8: Medical and Security Clearance.**  While distinct steps, both medical and security clearance screens can be initiated simultaneously.  The medical screen consists of both physical and psychological components.  The security screen consists mainly of a primary screen (termed Conditional Suitability).  If the primary screen is insufficient to make a determination, a subsequent secondary screen (termed Final Suitability) is then conducted.

**STEP 9: Coordination with Air Traffic Organization on Entry on Duty (EOD) dates.** Following the medical and security screens, HR must coordinate with ATO to determine EOD dates.  These dates indicate when the applicant will begin training at the Academy.

**STEP 10: Firm Offer Letter.**  The last step of the ATCS centralized hiring process is the issuance of a firm offer letter.

The decision points described above combine to form a fairly complex hiring process.  This complexity is due to a number of factors including the use of multiple applicant sources with different minimum qualifications, mixed uses of the AT-SAT, application knock-out factors unrelated to qualifications (e.g., location preference), a potentially multi-year hiring process from the point of application to hire, and referral lists organized by applicant source.  Each of these factors is addressed in this report in terms of its impact on protected groups as well as how it can be changed or improved.

## RESULTS OF BARRIER ANALYSIS

As a first step in the root cause analysis, Outtz and Associates' Barrier Analysis (2012) was thoroughly reviewed.  A high level summary table created by Outtz and Associates is presented below.  As can be seen in Table 3, four of the seven evaluated decision points present barriers to protected group members.  These decision points were therefore specifically targeted by APT*Metrics* for follow-up root cause analysis.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Table 3. Outtz and Associates Barrier Analysis Summary**

| Decision Points | Evaluation Comments | Female | Asian | AA | Hispanic | Multi |
|---|---|---|---|---|---|---|
| Minimum Qualifications Determination | Non-standardized training for HR Specialists | ✓ | ✓ | * | * | * |
| AT-SAT Testing | Decision to use well qualified band results in substantial reduction of RNO and gender representation<br>Validity needs to be reestablished | * | * | * | * | * |
| Preparation of Referral Lists | Use of the minimum qualifications in the referral process builds on adverse impact caused by the qualifications determination | ✓ | ✓ | * | ✓ | ✓ |
| Centralized Selection Panel | CSP members do not receive formal training<br>Inconsistent follow-up on references<br>Applicant location preference has potential to create RNO issues<br>Conflict of interests (candidates may be known to CSP panelists) | ✓ | ✓ | * | ✓ | ✓ |
| Interview | Interview questions are available to candidates on public web site – candidates all well prepared as a result<br>Interview not effective in current form | ✓ | ✓ | ✓ | ✓ | ✓ |
| Medical Clearance | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Security Clearance | | ✓ | ✓ | ✓ | ✓ | ✓ |

*Statistical criteria indicate that selection decision point is a barrier
✓Statistical criteria indicate that selection decision point is not a barrier

The Barrier Analysis was also reviewed internally by FAA stakeholders, including ATO, CAMI, and AHR. Insights from these constituents were thematically organized to provide additional direction for the root cause analysis. Table 4 presents a summary of these comments.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Table 4.  Stakeholder Insights Regarding Barrier Analysis**

| Barrier | Stakeholder Insights |
|---|---|
| **Choice of Applicant Source Pools** | • Clarify bases for past selection of applicant source pools and the impact of these choices on subpopulations within the pools<br>• Recommend development of explicit rationale for balancing use of sources in the future to achieve desired RNO/gender/veteran/disabled representation in the FAA controller workforce<br>    • Rationale should take into account Federal guidance/mandates on hiring diversity (e.g., increase veterans) and preferences that are allowed under laws governing federal agencies<br>• Compare non-BA CTI program AA drop-out rates to BA CTI programs<br>    • Compare US college drop-out rates to CTI BA programs<br>• Recommend that FAA work to help CTI partners expand diversity and retain minority/women students in the program<br>• Investigate whether further targeted recruitment is needed to source candidates, particularly in CTI programs who will fare better in the selection process<br>• Establish whether it is reasonable to consider the amount of training required for different applicant sources as a factor in source selection |
| **Minimum Qualifications** | • Conduct further analysis to determine impact of MQs used for each applicant source and their impact on diversity of the candidate output<br>    • E.g., Noted much lower qualification rates for VRA and RMC than other sources.  Needs to be explored further<br>• Minimum qualifications applied to each source need to be validated and modified based on findings; should be standardized to the extent feasible<br>• Recommend process enhancements to ensure consistency in application of minimum qualifications |
| **AT-SAT Testing** | • Investigate need to bolster analysis of job-relatedness of the AT-SAT<br>• Review bi-level cutoff currently in use to assess impact on gender/RNO subgroups<br>• Determine reason for including test segments that were not previously shown as having incremental validity<br>• Investigate whether test may have been compromised by its availability through public websites |
| **Referral List Preparation** | • Gather additional information on the process from interviews<br>• Analyze actual process for creating the referral list<br>• Review impact of AT-SAT score and location preference information on referral list and panel decisions |
| **Centralized Selection Panel** | • Review selection of panel members, including their diversity, the training provided, and process as now documented and implemented<br>• Recommend guidelines for the process, selection of CSP decision-makers, and their training<br>• Consider potential impact of bias based on perceived race/ethnicity as represented by applicant names<br>• Examine the impact of changing the way location preference is handled<br>    • Potential inconsistency of application of location information by panel members<br>• Propose improvements to increase consistency and reduce disparate impact<br>• Consider elimination of panel approach |

Based upon the Barrier Analysis and FAA stakeholder comments, a root cause analysis was blueprinted to thoroughly investigate each of the barriers identified and determine whether any additional hurdles existed to the fair and accurate selection of candidates for the ATCS position.



# Chapter 3

## ROOT CAUSE ANALYSIS

### Methodology

*APTMetrics* took a two-pronged approach in executing the root cause analysis.  First, we conducted a qualitative review, incorporating stakeholder interviews, existing FAA documentation, and best practices insights generated through the *FAA Independent Review Panel on the Selection, Assignment and Training of Air Traffic Control Specialists (IRP)* (contained within ATO & AHR: Review of Independent Review Panel (IRP) Recommendations & Current Projects, November 6, 2012).  The qualitative review ultimately guided the quantitative review insofar as understanding how selection process decisions were made, interpreting the data we received, and highlighting where root causes may be located.  The quantitative review relies on data housed in the AVIATOR system between 2006 and 2011, as well as AT-SAT testing data received from CAMI. The following two sections summarize the approaches used within the qualitative and quantitative reviews.

### Qualitative Review

As a first step in the root cause analysis of potential barriers, APT*Metrics* was asked to review the IRP report, mentioned above, and provide specific recommendations and analysis of the panel's recommendations.  Using several criteria, we evaluated each panel recommendation. The full report we prepared in November 2012 can be found in Appendix A.  Note that much of the information collected for the root cause analysis was not yet available at the time of our original review of the IRP report[6]. However, the IRP report did highlight several key considerations that ultimately guided several analyses within this report, as well as the interview protocol developed and used for interviewing key stakeholders.

For the second, and primary step of APT*Metrics*' qualitative analysis, we conducted subject matter expert (SME) interviews, an on-site visit to the training academy, and a thorough policy and documentation review (all documents reviewed/used can be found in Appendix B).  Table 5 lists the SMEs who were interviewed. The interview protocol is presented in Appendix C.

---

[6] Our review of the IRP recommendations occurred prior to the commencement of our barrier analysis extension work described herein and was limited to the information presented in the FAA IRP Report.  As such, APT*Metrics* did not have the opportunity to speak with any individuals to gather more information related to the IRP recommendations nor were any policy/process documentation available prior to preparation of the IRP report.



**Table 5.  SME Interviews**

| Key Stakeholder Interviews | |
| --- | --- |
| December 3, 2012 | |
| HR Director | Diana Pearsall |
| Aviation Careers Manager | Rick Mitchell |
| Aviator Program Manager | J.B. Goelz |
| CAMI Representatives | Kate Bleckley, Ph.D., and Dana Broach, Ph.D. |
| Technical Workforce Representative | Henry Mogilka |
| Academy Representative | Brian Harmelink |
| December 4, 2012 | |
| Aviation Careers Manager and Aviation Careers Supervisors | Rick Mitchell (Manager), Nancy-Owens Curtis & Elaine McCollum (Supervisors) |
| January 9, 2013 | |
| Human Resources Specialist | Barbara Goldberg |
| VP of Management Services | Mike McCormick |
| January 10, 2013 | |
| Manager of Corporate Recruitment and Marketing | Regina Jones |
| ATO Hiring Lead | Lisa Giordano |
| January 11, 2013 | |
| Personnel Research Psychologist | Lexee Waterford, Ph.D. |
| Human Resources Specialist | Sheila Robinson |
| Supervisory Human Resources Specialist and former Director, ATO Support Team, AHR-4 | Jay Aul, Ph.D. |

Initial insights that emerged during this second phase of qualitative analysis included:

**Enhance Process Controls**.  A consistent theme running through the SME interviews was a call for greater standardization, consistency and documentation across all decision points in the hiring process.  The MQ review and CSP stage were singled out as decision points in particular need of attention.  Training for HR specialists and CSP panelists was thought to be particularly important in achieving greater consistency.  These conclusions were further reinforced by a review of existing policies and procedures and are aligned with the findings reported in the Barrier Analysis.

**Improve Validation & Ongoing Evaluation of ATCS Hiring Effectiveness**.  While the AT-SAT has received a good deal of research attention and has been formally validated, the other steps in the selection process have not.  Since each step in the hiring process is considered to be a selection tool under the Uniform Guidelines (1978), each requires documented evidence of job relatedness.  Additionally, formal program evaluation was suggested as a way to ensure ongoing improvement and overall effectiveness of the ATCS hiring process.

**Reduce Subjectivity and Close "Loopholes" in the Hiring Process**.  Information gained from the interviews indicated that too much subjectivity exists in the process, particularly in the MQ and CSP steps. This is a result of inconsistent MQ requirements by recruitment source and a lack of structured criteria for making CSP decisions.  In addition, the use of location preference appears to benefit those who are able to determine where vacancies exist.



**Improve Data Capturing and Tracking Capabilities**. The FAA's ability to accurately track and analyze its hiring process is compromised by the AVIATOR system due to system limitations. Examples include repurposing variables, recording late process decisions in earlier process decision fields, lack of integration with AT-SAT data, and not recording specific minimum qualification pass/fail values.

**Establish a Central Group to Monitor and Improve the ATCS Hiring Process.** A common issue brought to light through the SME interviews, documentation review and Barrier Analysis is that the decision points within the hiring process are disjointed from one another. This is compounded by continual changes to various components of the process with little or no monitoring of the overall impact from year to year. There is currently no centralized entity in place to monitor, manage and take ownership of the full process.

The qualitative review provided additional context to the barrier analysis and allowed for a thorough understanding of how the hiring system works and the unique challenges involved in balancing applicant flow with adverse impact, and provided insight into additional data analyses that would be required to support recommended interventions. The next section details the results of the quantitative phase of the root cause analysis.

## Data Cleaning

Before the quantitative analyses could get underway, it was necessary to merge multiple databases and perform extensive data cleaning to ensure that the conclusions would be accurate.

**General Data Cleaning.** APT*Metrics* received multiple iterations of AVIATOR-exported data for the 2006-2011 time period. After confirming which files were appropriate for analysis with our stakeholders, we first merged this data into a master database, along with separate files containing AT-SAT data, facility information and location, referral list locations, and supplemental suitability data exports. After reviewing the data and the information obtained in the qualitative review, it became apparent that AVIATOR had incomplete data for 2006-2007. Specifically, not all applicant sources used during this time period proceeded through the AVIATOR system. Further, the medical and security clearance data was deemed unreliable for these years as it was not entered into the AVIATOR system until 2007. Therefore data for 2006-2007 were excluded from our analyses.

Significant data cleaning was used where necessary to ensure the data accurately reflects decisions made during the ATCS selection process. A full explanation of data cleaning and analysis decisions can be found in Appendix D, but the following are the key decisions that impacted the resulting clean data set to the greatest extent:

> Individuals who were qualified but not referred were excluded (except for General Public applicants who failed the AT-SAT) based on the assumption of no vacancies and/or location preferences were not a match



Individuals who did not fully complete an application or did not submit all required documents were excluded

If an individual was selected from a referral list, they were removed from other referral lists within that same announcement (i.e. they cannot be hired twice)

Gender and ethnicity were filled in for individuals who may have indicated these values on an earlier or later application but did not indicate it on a given application

Individuals who declined somewhere during the process as indicated by referral actions and/or comments were excluded from analyses

Applications for announcements that did not have resulting location-specific referral lists (e.g. General Public) were assigned to all possible state/territory CSP location pools. For those selected from these lists, the location/facility that the applicant was selected for was extracted from the referral comments to withhold that individual from other referral list pools to ensure a selected applicant was not counted as an applicant elsewhere

Comments found in the both the HR MQ screen and the referral notations were categorized and used in data cleaning rules. Comments were coded using a combination of manual review and automated categorization based on key terms.

**Applicant Flow (Survival) Analysis**

Once the above data decision rules were put into place, we examined the flow of applicants using a variety of approaches. Importantly, our first goal was to diagnose at a high level where important differences in the hiring process may be occurring. To this end, we first examined the diversity of applicants within the ATCS applicant sources. We then examined applicant survival rates for ATCS decision points by race, gender and applicant source. The survival charts presented below visually illustrate the flow of applicants within each racial and gender subgroup across the hiring process. This approach helps highlight the parts of the hiring process that are resulting in the largest percentage decrease of minority applicants. Additionally, we examined the proportional racial and gender representation among those surviving each phase in the hiring process.

Figure 1 presents the total number of unique applicants by source for the 2008-2011 time period. While the General Public makes up the largest percentage of applicants, it is important to note that this applicant source is not consistently used across announcements.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Figure 1.  Total Applicants by Source (2008 – 2011)**



As can be seen below in Figure 2, applicant sources vary considerably in their respective demographic makeup.  Importantly, representation of African Americans and Females is significantly lower in the CTI source.

**Figure 2.  Applicant Demographics by Source (At Point of Application)**





We then examined the survival of all applicants through the entire hiring process to understand which ATCS selection hurdles were screening out the most applicants.  Figure 3 displays the percentage of applicants that remained in the ATCS selection process at each hurdle.  This figure reveals three important insights.  First, both the automated and HR minimum qualification screen reduce the applicant pool substantially.  Second, the CSP is also responsible for a significant reduction in applicants.  Lastly, after the point of the CSP, the selection rates for applicants are exceptionally high, suggesting little practical adverse impact is likely to exist in the later stages of the process.

**Figure 3.  Total Applicant Flow – Applicant Survival (2008 – 2011)**

The chart shows applicant survival percentages across hurdles: Application 100%, System… 54%, HR Qual 39%, Referral 37%, CSP 14%, Interview 14%, Medical 13%, Security 13%, Hire 13%.

Annotations: "38,645 valid, unique applicants entered the process"; "2% drop due to the AT-SAT; of the 10,059 applicants that had to take the AT-SAT 95% passed"; "5,572 applicants were selected by the CSP".

Figure 3 presents the percentage of the original applicant pool passing the hurdle.  Results are based on unique applicant counts.  Due to missing data, post CSP hurdle percentages were calculated using the overall estimated pass rate of each hurdle.

Figure 4 displays the proportional RNO representation of candidates at each stage from initial application through the CSP. The figure presents several key insights. First, MQ screening dramatically alters the overall diversity of the applicant pool that moves forward in the hiring process. For example, prior to any screening, 32% of all applicants are African Americans and 48% are White. However, following the MQ screening, 16% of all applicants moving forward are African American while 65% are White.  Moreover, this is the stage at which at least 80% of applicants from the most diverse sources are eliminated. Second, the proportion of non-White and non-African American applicants relative to all applicants surviving each stage in the process is virtually constant across the process. However, relative to African American representation in the initial applicant pool, African Americans become increasingly underrepresented within the surviving applicant pool as the hiring process progresses.



**Figure 4.  Candidate Pool Representation Through to CSP by Ethnicity**



Figure 5 displays the survival of applicants across the ATCS selection process by ethnicity.  The figure presents several key insights.  First, and similar to Figure 3, the vast majority of applicant screening occurs prior to the interview for all ethnicities.  Second, substantial differences exist between ethnic groups.  Whites are passing the minimum qualification review at a much higher rate than other groups.  A large effect is apparent for African Americans, with African Americans passing the minimum qualification and CSP hurdles at a much lower rate than Whites.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Figure 5.  Total Applicant Flow by Ethnicity – Applicant Survival (2008 – 2011)**



Figure 5 presents the percentage of the original applicant pool passing the hurdle.  Results are based on unique applicant counts. Due to missing data, post CSP hurdle percentages were calculated using each group's estimated pass rate.

Figure 6 displays the survival of applicants across the ATCS selection process by gender.  The figure also provides several insights.  First, the vast majority of applicant screening occurs prior to the interview for both genders.  Second, differences exist between men and women, particularly early on in the process during the minimum qualification screening.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Figure 6.  Total Applicant Flow by Gender – Applicant Survival (2008 – 2011)**



Figure 6 presents the percentage of the original applicant pool passing the hurdle.  Results are based on unique applicant counts.
Due to missing data, post CSP hurdle percentages were calculated using each group's estimated pass rate.

Figure 7 displays the survival of applicants across the ATCS selection process by applicant source.  Similar to Figure 3, the vast majority of applicant screening occurs prior to the interview for all groups.  More importantly, the figure illustrates that there are substantial differences in survival rates across the applicant sources.  CTI applicants are passing the minimum qualification and CSP hurdles at a drastically higher rate than all other applicant sources. It is important to note here that survival rates in the hiring process should not be interpreted as indicative of the caliber of the applicants. Caliber is an empirical question, whereas our survival rates are merely descriptive of how groups of applicants fare in the hiring process. The fact that CTI applicants are hired at a significantly higher rate than any other applicant sources does not mean this is the strongest source of applicants.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Figure 7. Total Applicant Flow by Source – Applicant Survival (2008 – 2011)**



Figure 7 presents the percentage of the original applicant pool passing the hurdle. Results are based on unique applicant counts. Due to missing data, post CSP hurdle percentages were calculated using each group's estimated pass rate.

**Summary of Applicant Flows and Analysis Considerations**

The applicant flow information above highlights several important points which were used to drive our subsequent analyses. First, nearly all screening (i.e., hurdle failures) of applicants occurs prior to the interview process. The steps from application to CSP selection are the most likely places for systematic adverse impact simply because these steps are responsible for the vast majority of applicant fails. Second, African Americans stand out as having a very different survival rate for these earlier hurdles. Third, applicant sources show very different demographics. Because the CTI source is much less diverse, the CTI source itself can confound analyses by ethnicity. We analyze sources distinctly throughout the process to determine if effects are due to applicant source alone.

Using the applicant survival analysis, the results of Outtz and Associates (October, 2012) Barrier Analysis, and our in depth interviews with SMEs, we developed a plan to best model the ATCS selection process so we could further evaluate potential points of adverse impact. The following section outlines our approach and decision rules used in our quantitative analysis.



**Statistics Used in Quantitative Analysis**

For the primary quantitative analyses, APT*Metrics* analyzed all applicant sources and data from 2008-2011 simultaneously.  All applicant sources chosen for announcements during a given hiring period are considered simultaneously during the process.  Thus, an analysis of the overall process should treat these various candidate pools as a single pool.  However, because applicant sources are subjected to many source-specific criteria and processes throughout the ATCS selection process, significant differences in adverse impact may exist by applicant source.  To address these potential differences we also evaluated the impact of each decision point on each applicant source.

**Cumulative vs. Unique Person Counts**. When aggregating selection data, decisions and applicants can be combined in two different ways: using a cumulative person count, and using a unique person count. The cumulative person approach counts an applicant as many times as he or she appears on one or more decision points in the process. Therefore, if an applicant is on four announcements or referral lists over the relevant time period being examined (e.g., 2008-2011), he/she is counted four times.  A unique person count, on the other hand, counts each unique applicant only once regardless of the number of times he or she appears on different referral lists over the relevant time period being examined.  With a unique person count, a decision must be made as to which disposition to use in the analysis when there is conflicting information (e.g., applicant failed the MQ screening at time one but passed the MQ screening at time two).  Using a cumulative count can provide a more accurate representation of the potential biases in the decisions and hurdles of a process.  A unique count can provide a better assessment of the true impact of the process on the applicant pool. Both unique and cumulative approaches are used for our analyses, up to and including the point of CSP selection decisions. For the unique count, the applicant's best disposition (i.e. pass) at each hurdle/decision point was used.  When both types of approaches were used, only the cumulative results are presented within the report text.  Please refer to Appendix E for unique count results.

**Methods Used to Evaluate Adverse Impact**. APT*Metrics* used three primary methods to examine the FAA's hiring data for evidence of adverse impact: the Four-Fifths Rule, the standard deviation of the difference in selection rates, and the Mantel-Haenszel z test.  All three analytical methods examine the differences in selection rates between subgroups (e.g. Female versus Male, African Americans versus Whites).

*Four-Fifths Rule*. The four-fifths rule is a non-statistical comparison or "rule of thumb" articulated in the federal Uniform Guidelines on Employee Selection Procedures (EEOC et al., 1978). Both the Guidelines and the Questions and Answers to the Guidelines (1979, 1980) (Q&As) indicate that the purpose of the Four-Fifths Rule is to assist the agencies in interpreting the practical meaningfulness of statistically significant differences in selection rates.  Adverse Impact Ratios (AIR) less than 80% or .80 are regarded as an indication of adverse impact (EEOC et al., 1978).

When sample sizes are large, statistical significance can often be found when the "practical significance" of the difference is very small.  Because the sample size is large in many of our analyses within the FAA selection process, it is especially important to couple a measure of



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

practical significance, such as the AIR, with measures of statistical significance.   While an adverse impact ratio greater than 0.80 does not indicate a significant statistical result is invalid, it does assist in the interpretation of the relative impact.

*Standard Deviation of the Difference (SD diff).* The standard deviation of the difference in selection rates is a statistical test used to determine whether the selection rates between two groups are significantly different.  Calculating the standard deviation of the difference results in a Z-score and associated probability value (i.e., p-value) which indicates the likelihood that the observed differences in selection rates occurred by chance alone. An SD diff value of greater than 1.96 indicates a statistically significant difference in selection rates.

Adverse impact was determined to be present when the indicators of statistical significance (i.e., SD diff) and practical significance (i.e., impact ratio) are present (i.e., SD difference is greater than 1.96; impact ratio is less than .80).

*Mantel-Haenszel z test.* The Mantel-Haenszel test examines the adverse impact at the cumulative person count level and was applied specifically for CSP decisions.  The advantage of the Mantel-Haenszel z test is that it calculates the probability of majority and minority selection for each pool of applicants, and then aggregates these expectancies over time and/or applicant pools to arrive at an overall evaluation of the selection process.  This approach allows accurate modeling of the CSP process even though the mix of sources is highly variable across years.  A significant Mantel-Haenszel p-value indicates that the actual number of selections is statistically different than the expected number of selections, and hence is an indicator of adverse impact.

The two different ways for combining the data — using the cumulative person count or the unique person count — have different implications in terms of the strengths and challenges that they each impose on the interpretation of adverse impact analyses and results.  Given the nature of the CSP hurdle, the cumulative count is analytically the most appropriate in conjunction with the Mantel-Haenszel z test.  A cumulative person count also yields larger sample sizes which leads to increased statistical power, or an increased likelihood of finding a statistically significant result if one, in fact, exists. For completeness, however, both cumulative person and unique person count methods were calculated for all selection decisions through to the CSP process.

In the following review, we present statistics for three primary reference groups: African Americans, Hispanics, and Females.  Data for all groups can be found in Appendix E.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Quantitative Analysis**

**FAA ATCS Selection Hurdle 1: Automated MQ Screen**. The qualifications vary greatly across the various applicant sources leading to different selection rates by applicant source. We analyzed the automated MQ screening step distinctly from the HR MQ screen. This analysis includes all applicants who applied to an announcement and met our data cleaning rules (see Appendix D). The automated screen consists of system-related decisions that automatically exclude applicants based on responses to previously determined minimum qualifications.

Overall, adverse impact was found for African Americans and Hispanics using both aggregation approaches (see Tables 6a-c for focal group cumulative results; see Tables 6d-e in Appendix E for full unique and cumulative approach results).

Importantly, the adverse impact associated with this decision point varies by applicant source. As noted above, the various applicant sources have a wide variety of minimum qualifications, which can lead to very different selection rates by source and by demographic groups. Adverse impact was found for African Americans, Hispanics, and Females for all applicant sources except CTI and General Public for the automated MQ screen.

**Table 6a. MQ: System Qualifications (from Applied) - Overall and By Applicant Source Cumulative Applications Analysis WHITE VS. AFRICAN AMERICAN**[*]

| | # African Americans Considered | # Whites Considered | # African Americans Selected | # Whites Selected | # Expected African Americans Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **28,637** | **45,170** | **6,557** | **25,543** | **12,455** | **5,898** | **0.40** | **89.86** |
| CTI | 474 | 5,233 | 472 | 5,219 | 473 | 1 | 1.00 | 0.61 |
| Other - CTO | 2,307 | 4,285 | 244 | 2,220 | 862 | 618 | 0.20 | 33.00 |
| Public | 6,267 | 13,567 | 4,604 | 11,804 | 5,184 | 580 | 0.84 | 23.45 |
| Reinstatement | 903 | 1,816 | 75 | 909 | 327 | 252 | 0.17 | 21.34 |
| RMC | 9,975 | 8,335 | 373 | 1,172 | 842 | 469 | 0.27 | 25.02 |
| VRA | 8,711 | 11,934 | 789 | 4,219 | 2,113 | 1,324 | 0.26 | 43.53 |

---

[*] *Practical Significance Indices:*
*Shortfall #* = Difference between observed and expected frequencies of minority applicants.
*AIR* = Adverse Impact Ratio: 80% rule was applied.
*Statistical Significance Indices:*
*Standard Deviation Difference* =the proportion difference in standard deviation units: >= |1.96| indicates statistical significance.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Table 6b.  MQ: System Qualifications (from Applied) - Overall and By Applicant Source**
**Cumulative Applications Analysis**
**WHITE VS. HISPANIC***

| | # Hispanics Considered | # Whites Considered | # Hispanics Selected | # Whites Selected | # Expected Hispanics Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **5,285** | **45,170** | **2,271** | **25,543** | **2,913** | **642** | **0.76** | **18.78** |
| CTI | 549 | 5,233 | 546 | 5,219 | 547 | 1 | 1.00 | 1.15 |
| Other - CTO | 427 | 4,285 | 126 | 2,220 | 213 | 87 | 0.57 | 8.79 |
| Public | 1,432 | 13,567 | 1,122 | 11,804 | 1,234 | 112 | 0.90 | 9.02 |
| Reinstatement | 176 | 1,816 | 32 | 909 | 83 | 51 | 0.36 | 8.09 |
| RMC | 1,311 | 8,335 | 111 | 1,172 | 174 | 63 | 0.60 | 5.54 |
| VRA | 1,390 | 11,934 | 334 | 4,219 | 475 | 141 | 0.68 | 8.42 |

**Table 6c.  MQ: System Qualifications (from Applied) - Overall and By Applicant Source**
**Cumulative Applications Analysis**
**MALE VS. FEMALE***

| | # Females Considered | # Males Considered | # Females Selected | # Males Selected | # Expected Females Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **21,007** | **65,780** | **7,892** | **30,638** | **9,326** | **1,434** | **0.81** | **22.88** |
| CTI | 1,363 | 5,821 | 1,359 | 5,801 | 1,358 | -1 | 1.00 | -0.29 |
| Other - CTO | 1,659 | 5,992 | 466 | 2,478 | 638 | 172 | 0.68 | 9.83 |
| Public | 5,555 | 17,685 | 4,587 | 14,673 | 4,604 | 17 | 1.00 | 0.68 |
| Reinstatement | 737 | 2,413 | 187 | 930 | 261 | 74 | 0.66 | 6.54 |
| RMC | 6,007 | 15,012 | 238 | 1,589 | 522 | 284 | 0.37 | 15.40 |
| VRA | 5,686 | 18,857 | 1,055 | 5,167 | 1,441 | 386 | 0.68 | 13.44 |

**FAA ATCS Selection Hurdle 2: HR MQ Screen.** We next analyzed the HR MQ screening step. This analysis includes all applicants who passed the automated MQ screen.  The HR screen consists of minimum qualification pass/fail decisions made by HR representatives to screen out applicants based on detailed reviews of applicant work history and official documents (e.g., facility ratings, veteran's service forms, certifications) submitted during the application process.

Overall, adverse impact was found for African Americans using both aggregation approaches (see Table 7a-c for focal group cumulative results; see Tables 7d-e in Appendix E for full unique and cumulative results).

Importantly, and as found for the automated MQ screen, adverse impact for the HR MQ screen varies by applicant source.  HR MQ screening for the General Public source resulted in adverse

---

*\* Practical Significance Indices:*
*Shortfall # = Difference between observed and expected frequencies of minority applicants.*
*AIR = Adverse Impact Ratio: 80% rule was applied.*
*Statistical Significance Indices:*
*Standard Deviation Difference =the proportion difference in standard deviation units: >= |1.96| indicates statistical significance.*



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

impact for African Americans and Hispanics.  HR MQ screening for the RMC source resulted in adverse impact for Hispanics and Females.  HR MQ screening for the Reinstatement source resulted in adverse impact for Hispanics.

**Table 7a.  MQ: HR Qualifications (from System Qualifications) - Overall and By Applicant Source**
**Cumulative Applications Analysis**
**WHITE VS. AFRICAN AMERICAN** [*]

|  | # African Americans Considered | # Whites Considered | # African Americans Selected | # Whites Selected | # Expected African Americans Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **6,557** | **25,543** | **4,018** | **20,222** | **4,951** | **933** | **0.77** | **30.05** |
| CTI | 472 | 5,219 | 463 | 5,129 | 464 | 1 | 1.00 | 0.29 |
| Other - CTO | 244 | 2,220 | 222 | 2,102 | 230 | 8 | 0.96 | 2.37 |
| Public | 4,604 | 11,804 | 2,538 | 8,780 | 3,176 | 638 | 0.74 | 23.96 |
| Reinstatement | 75 | 909 | 53 | 663 | 55 | 2 | 0.97 | 0.42 |
| RMC | 373 | 1,172 | 219 | 564 | 189 | -30 | 1.22 | -3.56 |
| VRA | 789 | 4,219 | 523 | 2,984 | 553 | 30 | 0.94 | 2.50 |

**Table 7b.  MQ: HR Qualifications (from System Qualifications) - Overall and By Applicant Source**
**Cumulative Applications Analysis**
**WHITE VS. HISPANIC** [*]

|  | # Hispanics Considered | # Whites Considered | # Hispanics Selected | # Whites Selected | # Expected Hispanics Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **2,271** | **25,543** | **1,606** | **20,222** | **1,782** | **176** | **0.89** | **9.39** |
| CTI | 546 | 5,219 | 530 | 5,129 | 536 | 6 | 0.99 | 2.00 |
| Other - CTO | 126 | 2,220 | 121 | 2,102 | 119 | -2 | 1.01 | -0.66 |
| Public | 1,122 | 11,804 | 667 | 8,780 | 820 | 153 | 0.80 | 10.78 |
| Reinstatement | 32 | 909 | 18 | 663 | 23 | 5 | 0.77 | 2.07 |
| RMC | 111 | 1,172 | 36 | 564 | 52 | 16 | 0.67 | 3.17 |
| VRA | 334 | 4,219 | 234 | 2,984 | 236 | 2 | 0.99 | 0.26 |

---

[*] *Practical Significance Indices:*
*Shortfall #* = Difference between observed and expected frequencies of minority applicants.
*AIR* = Adverse Impact Ratio: 80% rule was applied.
*Statistical Significance Indices:*
*Standard Deviation Difference* =the proportion difference in standard deviation units: >= |1.96| indicates statistical significance.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Table 7c.  MQ: HR Qualifications (from System Qualifications) - Overall and By Applicant Source**
**Cumulative Applications Analysis**
**MALE VS. FEMALE**[*]

|  | # Females Considered | # Males Considered | # Females Selected | # Males Selected | # Expected Females Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **7,892** | **30,638** | **5,730** | **23,395** | **5,966** | **236** | **0.95** | **6.92** |
| CTI | 1,359 | 5,801 | 1,325 | 5,706 | 1,335 | 10 | 0.99 | 2.16 |
| Other - CTO | 466 | 2,478 | 433 | 2,354 | 441 | 8 | 0.98 | 1.83 |
| Public | 4,587 | 14,673 | 3,018 | 10,205 | 3,149 | 131 | 0.95 | 4.78 |
| Reinstatement | 187 | 930 | 136 | 684 | 137 | 1 | 0.99 | 0.23 |
| RMC | 238 | 1,589 | 80 | 812 | 116 | 36 | 0.66 | 5.03 |
| VRA | 1,055 | 5,167 | 738 | 3,634 | 741 | 3 | 0.99 | 0.25 |

**FAA ATCS Point of Full Qualification.** The point of full qualification is examined as applicants need to pass both the automated screen and HR screen to be considered fully qualified.  This analysis includes all applicants who applied to an announcement and met our data cleaning rules, combining the pass/fail decisions at both the automated and HR MQ screen.

Overall, adverse impact was found for African Americans, Hispanics, and Females for the point of full qualification using both aggregation approaches (see Tables 8a-c for focal group cumulative results; see Tables 8d-e in Appendix E for full unique and cumulative results).

Importantly, and as was found in the separate analysis of the automated and HR MQ screening steps, the adverse impact for full qualification hurdle varies by applicant source.  As noted previously, the various applicant sources have a wide variety of minimum qualifications, which can lead to very different selection rates by source and by demographic groups.  Ultimately, adverse impact was found for African Americans and Hispanics for all applicant sources except CTI.  Adverse impact was also found for Females for all applicant sources except CTI and General Public.

---

[*] *Practical Significance Indices:*
*Shortfall #* = Difference between observed and expected frequencies of minority applicants.
*AIR* = Adverse Impact Ratio: 80% rule was applied.
*Statistical Significance Indices:*
*Standard Deviation Difference* =the proportion difference in standard deviation units: >= |1.96| indicates statistical significance.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Table 8a.  MQ: HR Qualifications (from Applied) - Overall and By Applicant Source**
**Cumulative Applications Analysis**
**WHITE VS. AFRICAN AMERICAN**[*]

|  | # African Americans Considered | # Whites Considered | # African Americans Selected | # Whites Selected | # Expected African Americans Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **28,637** | **45,170** | **4,018** | **20,222** | **9,405** | **5,387** | **0.31** | **86.65** |
| CTI | 474 | 5,233 | 463 | 5,129 | 464 | 1 | 1.00 | 0.49 |
| Other - CTO | 2,307 | 4,285 | 222 | 2,102 | 813 | 591 | 0.20 | 31.96 |
| Public | 6,267 | 13,567 | 2,538 | 8,780 | 3,576 | 1,038 | 0.63 | 32.03 |
| Reinstatement | 903 | 1,816 | 53 | 663 | 238 | 185 | 0.16 | 17.08 |
| RMC | 9,975 | 8,335 | 219 | 564 | 427 | 208 | 0.32 | 15.22 |
| VRA | 8,711 | 11,934 | 523 | 2,984 | 1,480 | 957 | 0.24 | 35.90 |

**Table 8b.  MQ: HR Qualifications (from Applied) - Overall and By Applicant Source**
**Cumulative Applications Analysis**
**WHITE VS. HISPANIC**

|  | # Hispanics Considered | # Whites Considered | # Hispanics Selected | # Whites Selected | # Expected Hispanics Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **5,285** | **45,170** | **1,606** | **20,222** | **2,286** | **680** | **0.68** | **19.97** |
| CTI | 549 | 5,233 | 530 | 5,129 | 537 | 7 | 0.98 | 2.28 |
| Other - CTO | 427 | 4,285 | 121 | 2,102 | 201 | 80 | 0.58 | 8.18 |
| Public | 1,432 | 13,567 | 667 | 8,780 | 902 | 235 | 0.72 | 13.52 |
| Reinstatement | 176 | 1,816 | 18 | 663 | 60 | 42 | 0.28 | 7.02 |
| RMC | 1,311 | 8,335 | 36 | 564 | 82 | 46 | 0.41 | 5.60 |
| VRA | 1,390 | 11,934 | 234 | 2,984 | 336 | 102 | 0.67 | 6.74 |

---

[*] ***Practical Significance Indices:***
*Shortfall #* = Difference between observed and expected frequencies of minority applicants.
*AIR* = Adverse Impact Ratio: 80% rule was applied.
***Statistical Significance Indices:***
*Standard Deviation Difference* =the proportion difference in standard deviation units: >= |1.96| indicates statistical significance.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Table 8c.  MQ: HR Qualifications (from Applied) - Overall and By Applicant Source
Cumulative Applications Analysis
MALE VS. FEMALE**[*]

| | # Females Considered | # Males Considered | # Females Selected | # Males Selected | # Expected Females Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **21,007** | **65,780** | **5,730** | **23,395** | **7,050** | **1,320** | **0.77** | **22.15** |
| CTI | 1,363 | 5,821 | 1,325 | 5,706 | 1,334 | 9 | 0.99 | 1.87 |
| Other - CTO | 1,659 | 5,992 | 433 | 2,354 | 604 | 171 | 0.66 | 9.88 |
| Public | 5,555 | 17,685 | 3,018 | 10,205 | 3,161 | 143 | 0.94 | 4.43 |
| Reinstatement | 737 | 2,413 | 136 | 684 | 192 | 56 | 0.65 | 5.36 |
| RMC | 6,007 | 15,012 | 80 | 812 | 255 | 175 | 0.25 | 13.25 |
| VRA | 5,686 | 18,857 | 738 | 3,634 | 1,013 | 275 | 0.67 | 10.87 |

**FAA ATCS Selection Hurdle 3: AT-SAT**.

The next hurdle, the AT-SAT exam, occurs only for General Public and VTP applicants, although CTI applicants must complete and pass the AT-SAT prior to application.  This analysis includes all General Public applicants (VTP applicants were dropped from the analysis due to their small sample size) who passed the minimum qualification stage.  A unique count analysis approach was used for evaluating adverse impact related to the AT-SAT.

To pass the AT-SAT and move on to the referral stage, applicants must score at least a 70 on the exam.  A score of 70 corresponds to a very low cut score, resulting in approximately 95% of applicants passing the exam.

As can be seen in Table 9a, the use of a passing score of 70 does not result in adverse impact for African Americans, Hispanics, and Females (see Table 9b in Appendix E for full results).

**Table 9a.  AT-SAT Pass for Public Source - Unique Applicant Analysis
AFRICAN AMERICAN, HISPANIC, & FEMALE GROUPS**[*]

| | # Minority Considered | # Majority Considered | # Minority Selected | # Majority Selected | # Minority Expected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **White vs. African American** | 1,942 | 6,235 | 1,715 | 6,049 | 1,844 | 129 | 0.91 | 15.30 |
| **White vs. Hispanic** | 494 | 6,235 | 451 | 6,049 | 477 | 26 | 0.94 | 6.75 |
| **Male vs. Female** | 2,185 | 7,361 | 1,997 | 7,052 | 2,071 | 74 | 0.95 | 8.14 |

---

[*] *Practical Significance Indices:*
*Shortfall #* = Difference between observed and expected frequencies of minority applicants.
*AIR* = Adverse Impact Ratio: 80% rule was applied.
*Statistical Significance Indices:*
*Standard Deviation Difference* =the proportion difference in standard deviation units: >= |1.96| indicates statistical significance.



**FAA ATCS Selection Hurdle 4: Referral.**  Adverse impact was not analyzed at the Referral decision point in our primary analyses because this screen is purely automated based on the geographic location preferences as discussed above.  Once an applicant is qualified (and if a General Public applicant passes the AT-SAT), that applicant is automatically placed on a referral list if they indicated a location that has an open vacancy.  If the applicant chose a location for which no identified ATCS candidate need exists, the applicant is not referred (the only exception is General Public applicants who are placed on national referral lists and are therefore considered for all locations).

Given the automatic nature of the process and our data cleaning rule that excluded individuals who were qualified but not referred due to location preferences, APT*Metrics* did not analyze the Referral decision point with our final, clean database.  However, because there could be significant group differences in how location preferences impact selection rates, we did create a secondary data set specifically to evaluate the impact of location preferences in a separate analysis.

The data cleaning rules used to produce the data set for this analysis are distinct from those found in Appendix D and are listed below:

1) The analysis does not exclude applicant declines, incomplete applications, and applicants already selected elsewhere, which are exclusion rules used in our primary analysis.
2) The analysis approach uses a cumulative count rather than a unique count.  From a process perspective, applicants can be referred/not referred many times, and it is important to use a cumulative perspective to capture these potential differences.
3) The analysis excludes General Public applicants who failed the AT-SAT.  These applicants would not have been eligible for referral and therefore it is not known if location or the AT-SAT led to the applicants' failure to be referred.

As can be seen in Tables 10a-c, the use of geographic location preferences does not result in adverse impact within or across applicant sources for race or gender (see Table 10d in Appendix E for full results). However, this practice does serve to disproportionately reduce the diversity and the representation of certain applicant sources in the overall hiring process.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Table 10a.  *Geographic Location Preferences: Overall and By Applicant Source - Cumulative Applications Analysis***
**WHITE VS. AFRICAN AMERICAN[*]**

|  | # African Americans Considered | # Whites Considered | # African Americans Selected | # Whites Selected | # Expected African Americans Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **6,897** | **33,752** | **4,242** | **24,301** | **4,843** | **601** | **0.85** | **17.37** |
| CTI | 605 | 7,651 | 598 | 7,575 | 599 | 1 | 1.00 | 0.39 |
| Other - CTO | 262 | 2,472 | 251 | 2,361 | 250 | -1 | 1.00 | -0.22 |
| Public | 3,702 | 12,051 | 2,357 | 9,016 | 2,673 | 316 | 0.85 | 13.24 |
| Reinstatement/DoD CPC | 61 | 775 | 61 | 744 | 59 | -2 | 1.04 | -1.59 |
| RMC | 486 | 1,344 | 237 | 643 | 234 | -3 | 1.02 | -0.35 |
| VRA | 1,781 | 9,459 | 738 | 3,962 | 745 | 7 | 0.99 | 0.35 |

**Table 10b.  *Geographic Location Preferences: Overall and By Applicant Source - Cumulative Applications Analysis***
**WHITE VS. HISPANIC[*]**

|  | # Hispanics Considered | # Whites Considered | # Hispanics Selected | # Whites Selected | # Expected Hispanics Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **2,672** | **33,752** | **1,874** | **24,301** | **1,920** | **46** | **0.97** | **2.06** |
| CTI | 717 | 7,651 | 714 | 7,575 | 710 | -4 | 1.01 | -1.52 |
| Other - CTO | 136 | 2,472 | 133 | 2,361 | 130 | -3 | 1.02 | -1.27 |
| Public | 948 | 12,051 | 646 | 9,016 | 705 | 59 | 0.91 | 4.53 |
| Reinstatement/DoD CPC | 21 | 775 | 20 | 744 | 20 | 0 | 0.99 | 0.18 |
| RMC | 98 | 1,344 | 47 | 643 | 47 | 0 | 1.00 | -0.02 |
| VRA | 752 | 9,459 | 314 | 3,962 | 315 | 1 | 1.00 | 0.07 |

**Table 10c.  *Geographic Location Preferences: Overall and By Applicant Source - Cumulative Applications Analysis***
**MALE VS. FEMALE[*]**

|  | # Females Considered | # Males Considered | # Females Selected | # Males Selected | # Expected Females Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall** | **9,558** | **39,361** | **6,541** | **27,789** | **6,708** | **167** | **0.97** | **4.15** |
| CTI | 1,887 | 8,349 | 1,862 | 8,266 | 1,867 | 5 | 1.00 | 1.27 |
| Other - CTO | 516 | 2,763 | 497 | 2,634 | 493 | -4 | 1.01 | -0.99 |
| Public | 4,275 | 14,097 | 2,915 | 10,348 | 3,086 | 171 | 0.93 | 6.67 |
| Reinstatement/DoD CPC | 174 | 786 | 166 | 760 | 168 | 2 | 0.99 | 0.83 |
| RMC | 201 | 1,923 | 90 | 920 | 96 | 6 | 0.94 | 0.83 |
| VRA | 2,505 | 11,443 | 1,011 | 4,861 | 1,055 | 44 | 0.95 | 1.95 |

[*] ***Practical Significance Indices:***
*Shortfall #* = Difference between observed and expected frequencies of minority applicants.
*AIR* = Adverse Impact Ratio: 80% rule was applied.
***Statistical Significance Indices:***
*Standard Deviation Difference* =the proportion difference in standard deviation units: >= |1.96| indicates statistical significance.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

As can clearly be seen in Figure 7, referral rates for each applicant source vary considerably. CTI, CTO, and Reinstatement applicants are referred at a much higher rate. It is believed that location preferences are at the root of these differential rates. The use of location preferences also has a differential impact on the referral rate of White and African American applicants, with qualified African Americans being referred at a substantively lower rate than qualified Whites (see Table 11). As can be seen in Table 11, the sources with the highest African American representation (Public, RMC, and VRA) at the point of referral are also the sources least likely to be referred based on location preferences. Ultimately, African American diversity is reduced disproportionality in the overall process because African American membership is highest for those sources that are referred at much lower rates. This effect is also exacerbated by the fact that the Public, RMC, and VRA applications constitute 68% of total applications at the point of referral.

**Figure 8. Percentage Qualified Applicants Who Are Referred (Announcements Throughout Nation/US Only)**





*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Table 11. Impact of Location Preferences on African Americans**

|  | % Qualified Who are Referred | % Qualified Who are African American |
|---|---|---|
| CTI | 99% | 6% |
| Reinstatement/DoD CPC | 97% | 6% |
| Other - CTO | 95% | 8% |
| Public | 72% | 20% |
| RMC | 48% | 23% |
| VRA | 45% | 13% |

**FAA ATCS Selection Hurdle 5: Centralized Selection Panel (CSP).** Once applicants are referred, the centralized selection panel process is used to select and slot applicants for specific facilities as needed. CSP panelists are provided referral lists containing the pool of applicants from which each specific facility vacancy can be filled. Once an applicant is selected, the applicant cannot be considered for another facility.

In order to analyze the CSP decisions, it was important to accurately model the constraints the CSP panelists had for making their selection decisions. To this end, APT*Metrics* reconstructed the candidate pools considered at each of the twelve CSP meetings from 2008 to 2012. Applicant pools were reconstructed by assigning referral lists with referral dates coinciding with the appropriate CSP date. Referral lists within a given CSP were then grouped into applicant pools based on the referral location (e.g. state or facility). Referral lists that were not location-specific (primarily occurring for the General Public source) were replicated to each location-specific pool. Figure 8 illustrates a simplified version of this process and how we arrived at location specific referral pools for each CSP.



**Figure 9. Process Used to Create CSP Location-Specific Referral Pools**

**Announcement 1**

- CTI Texas Referral
- CTI Illinois Referral
- VRA Texas Referral
- VRA Illinois Referral
- Public US Referral

**Location Specific Referral Pools**

- Texas CSP Pool
- Illinois CSP Pool

**CSP Panel Time 1**

**Announcement 2**

- CTI Texas Referral
- CTI Illinois Referral
- VRA Texas Referral
- VRA Illinois Referral
- Public US Referral

- Texas CSP Pool
- Illinois CSP Pool

**CSP Panel Time 2**



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

As discussed in the methodology section earlier, a Mantel-Haenszel approach is appropriate when modeling discrete applicant pools, such as location specific referral pools. We also conducted adverse impact analyses to examine demographic group differences for the following points of aggregation:

- By service area for each CSP meeting

- By service area across all CSP meetings

- For each CSP meeting

- Across all CSP meetings

Results indicate that across all CSPs from 2008-2012, adverse impact can be seen for African Americans and Females based on significant (>1.96) and positive Mantel-Haenszel Z values (see Tables 12b-g in Appendix E for all results). We also analyzed the data by CSP service area to determine whether the observed adverse impact was merely a function of decision making in a particular service area as opposed to a pattern observed for all service areas. Our results indicated adverse impact for all service areas across the CSPs. Finally, the data were analyzed by individual CSP. Reviewing adverse impact across CSPs highlights that some CSP events contain adverse impact while other events do not. Table 12a summarizes the adverse impact by individual CSP.

### Table 12a. Overview of Adverse Impact by Individual CSP

| CSP | African American | Hispanic | Asian | Native American | Hawaiian | Multi | Female | Public Source Used | Public Announcement Type |
|---|---|---|---|---|---|---|---|---|---|
| February 26-28, 2008 | | | | | | | | ✓ | State Specific |
| May 6-8, 2008 | | | | | | | | ✓ | State Specific |
| June 10-12, 2008 | * | * | * | | * | * | * | ✓ | Throughout US |
| September 8-10, 2008 | * | | * | | | | * | ✓ | Throughout US |
| January 13-15, 2009 | * | | | * | | * | * | ✓ | Throughout US |
| April 28-30, 2009 | * | | | | | | * | ✓ | Throughout US |
| October 27-29, 2009 | * | | * | | | | * | ✓ | Throughout US |
| March 23-25, 2010 | | | * | * | | | | | |
| October 19-21, 2010 | * | | | | | | | ✓ | Throughout US |
| March 8-10, 2011 | | | | | | | | | |
| November 1-3, 2011 | | | | | | * | | | |
| March 6-8, 2012 | | | | | | | * | | |



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

Taken together our results indicate the CSP hurdle does have adverse impact for protected groups, particularly African Americans and Females, for specific panel sessions, though no consistent pattern of adverse impact was observed over the 2008-2012 time period. However, closer investigation does reveal that adverse impact only occurs for African Americans when national Public announcements are used.

*Analysis and Impact of AT-SAT during the CSP Process.* In evaluating the CSP selection decisions, and why adverse impact may be occurring, it is necessary to review how the AT-SAT is used within the CSP process. As discussed above, the AT-SAT serves as a hurdle after qualification for the General Public and VTP applicants and as a minimum qualification for CTI applicants. All three of these sources must score at least a 70 to pass their respective AT-SAT hurdle. However, the AT-SAT is used again during the CSP process to differentiate applicants into "qualified" and "well qualified" bands.

Currently, applicants are split into these two bands based on predetermined score ranges. Scores less than 85 and greater than or equal to 70 are considered to be "qualified." Scores at or above 85 are considered to be "well qualified." Applicants who score in the "well qualified" band are given substantial preference in CSP selection decisions.

Figure 9 shows a breakdown of % passing in each of the AT-SAT bands by race and gender groups. African Americans, Hawaiians, Females, and Hispanics have the lowest number of applicants falling into the Well Qualified band.



**Figure 10. Distribution of Race & Gender Groups in AT-SAT Bands**



APT*Metrics* conducted a focused analysis to understand potential barriers associated with the use of the AT-SAT in the upcoming ATCS hiring in early 2013. More specifically, an analysis was conducted to evaluate the impact of lowering the AT-SAT well-qualified band cutoff score on predicted success on the job and adverse impact for CTI candidates[4]. Table 13 outlines the impact of lowering the cutoff for achieving a "well qualified" score from an 85 to either an 80 or 75. Table 13 is organized as follows:

• Expected performance data based on two research studies (columns 2-3)

• Historical adverse impact for the AT-SAT with real applicants (column 4)

• Distribution of scores for the most recent CTI candidate group (columns 5-8)

An explanation of performance data in column 2 is drawn from a report entitled *Revision of the AT-SAT* (Wise, Tsacoumis, Waugh, Putka, & Hom, 2001). It is explained as follows: *Performance ratings were collected using an anchored 7-point scale… a '4' reflected generally acceptable performance, but a '3' reflected performance that is not always acceptable. The*

---

[4] While applicants from the General Public also take the AT-SAT as part of the hiring process, the General Public applicant source was not used for this particular hiring wave.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

*dividing point between these two levels, 3.5, was mapped onto 70, the minimum passing score on the final reporting scale… Further, a value of 5.5 divided the middle (acceptable) range of performance and the upper two categories indicating outstanding or superior performance. This value was mapped onto a 90 on the final reporting scale. Because the mapping was linear, a final score of 65 was equivalent to a rating score of 3.0, 70 was equivalent to 3.5, 75 was equivalent to 4.0 and so forth.* (Wise, et al., 2001, p. 5).

The performance data presented in column 3 is based on a study, *The Validity of the Air Traffic Selection and Training (AT-SAT) Test Battery in Operational Use* (Broach, Byrne, Manning, Pierce, McCauley, & Bleckley, M. K., under review), that examined the correlation between the AT-SAT and achievement of CPC status at the first field facility.

Based on Table 13, we can see that the current operational cut score of 85 predicts the following: 1) candidates are likely to achieve a job performance rating of "5" on a 7 point scale (Wise et al., 2001); 2) candidates have a 75% probability of achieving Certified Professional Controller (CPC) status (Broach et al.); 3) the adverse impact ratio for African Americans is .48 (using 2007-11 data analyzed by APT*Metrics*) and 4) 70% of the CTI candidates pass the AT-SAT at this level.

At an AT-SAT score of 80, the predicted job performance rating is 4.5 and the probability that candidates will achieve CPC status is 71%. The adverse impact ratio for African Americans is .62 and 87% of the CTI candidates pass the AT-SAT at this level.

At an AT-SAT score of 75, the predicted job performance rating is 4.0 and the probability that candidates will achieve CPC status is 67%. The adverse impact ratio for African Americans is .76 and 96% of the CTI candidates pass the AT-SAT at this level.

### Table 13. Examination of Impact of Lowering AT-SAT Cutoff Score

| AT-SAT "Well Qualified" Cutoff | Job Performance Rating (7 point scale) (Wise et al, 2001) | Probability of achieving CPC Status at First Field Facility (Broach et al, under review) | White vs. African American Adverse Impact Ratio (2007-2011 app data) | Current CTI Applicants | | | |
|---|---|---|---|---|---|---|---|
| | | | | Pass N | Total N | % Pass | Additional Passing |
| 70 | 3.5 | 60% | .88 | 1321 | 1321 | 100% | 390 |
| 75 | 4 | 67% | .76 | 1269 | 1321 | 96% | 338 |
| 80 | 4.5 | 71% | .62 | 1153 | 1321 | 87% | 222 |
| 85 | 5 | 75% | .48 | 931 | 1321 | 70% | - |

This analysis demonstrates that lowering the cutoff score to a 75 still reflects the prediction of acceptable performance with substantially less adverse impact. Despite this improvement in adverse impact, and given the historical pass rates for the General Public on the AT-SAT, a lower well-qualified band cutoff would be expected to have a sizeable increase in the number of



well qualified applicants included in the CSP process.  Considerations for making a cut score change for entry into the well qualified band need to include adverse impact, predicted performance, and the number of additional candidates passing that will need to be incorporated into the evaluation phase (CSP).

*Data Management for Post-CSP Decisions.*  Before discussing the analyses and results for the remaining selection hurdles, a brief note on data treatment is warranted.  Given the process by which post-CSP selection information is entered into the AVIATOR system, the data for the interview, medical, and security clearance stages were sometimes incomplete.  For example, 15% (1,273 out of 8,068) of individuals who were selected by the CSP did not have an interview score.  As such, the analyses on these stages do not include the exact same applicants and applications at each step, e.g., an application may have been included in the security analysis but not in the medical and interview analyses, even though the latter screens should occur first in the overall process.  Each analysis for interview, medical, and security screens contains only the applicants for which data existed (or was recoded based on data cleaning rules).

Data cleaning rules were established in an effort to attain the cleanest and most accurate applicant pools as possible.  Due to missing data, rules were developed to maintain consistency in recoding and handling the data and can be found in Appendix D.

**FAA ATCS Selection Hurdle 6: Interview.**  After applicants are selected by the CSP, the next step in the process is to take an interview.  The interview is conducted by a selecting official and assesses six critical competencies: Dependability, Job Motivation, Reactions to Job Demands, Team Work, Air Traffic Control, and Spoken English.  The applicants included in these analyses are those who had interview data in our database.  These analyses were conducted across all applicant sources using the unique applicant count approach.

As can be seen in Tables 14a-c, almost 100% of applicants who were interviewed passed the interview.  No race or gender adverse impact was found for the interview (see Table 14d in Appendix E for full results).

**FAA ATCS Selection Hurdle 7: Medical.**  After passing the interview, candidates receive a tentative offer letter (TOL) and are moved into the medical and security screening stages.  The medical screen consists of both physical and psychological components and results in an overall pass or fail determination.  Applicants included in these analyses are those who had medical data in our database.  These analyses were conducted across all applicant sources using the unique applicant count approach.

As can be seen in Tables 14a-c, more than 90% of applicants passed the medical screen.  No race or gender adverse impact was found for the medical screening (see Table 14e in Appendix E for full results).

**FAA ATCS Selection Hurdle 8: Suitability/Security.**  As was previously discussed, the security screen consists of two possible stages: a primary screen (termed Conditional



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

Suitability) and a subsequent secondary screen (Final Suitability). These screens will be discussed separately, followed by a discussion of the results for the overall security screen.

Applicants included in these analyses are those who had security/suitability data in our database. These analyses were conducted across all applicant sources using the unique applicant count approach.

*Primary Screen: Conditional Suitability.* As can be seen in Tables 14a-c, more than 90% of applicants passed the conditional suitability screen. No race or gender adverse impact was found for the conditional suitability screening (see Table 14f in Appendix E for full results).

*Secondary Screen: Final Suitability.* As can be seen in Tables 14a-c, passing rates remained very high (close to 100%) for the Final Suitability Screen. No race or gender adverse impact was found for the final suitability screening (see Table 14g in Appendix E for full results).

*Overall Security/Suitability Screen: Passing both Conditional and Final Suitability.* Tables 14a-c show the overall results for passing the suitability/security screen (incorporating both the Conditional and Final Suitability determinations). Selection rates for all groups remained very high (greater than 95%). No race or gender adverse impact was found for passing the overall security screening process (see Table 14h in Appendix E for full results).

**FAA ATCS Selection Hurdle 9: Hire Decision.** The final hurdle in the ATCS selection process is the hiring decision. Once an applicant has passed the medical and security clearances and coordinated with the FAA on facility and Academy dates, they are issued a firm offer letter (FOL) that indicates an official hiring decision. The applicants included in these analyses are those who had firm offer letter data in our database. These analyses were conducted across all applicant sources using the unique applicant count approach.

As can be seen in Tables 14a-c, once again a large majority of applicants at this stage received a firm offer letter. No race or gender adverse impact was found for the issuance of a FOL (see Table 14i in Appendix E for full results).



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Table 14a.  *Interview, Medical, Suitability/Security, & Hire Decision - Unique Applicant Analysis***
**WHITE VS. AFRICAN AMERICAN**[*]

| | # African Americans Considered | # Whites Considered | # African Americans Selected | # Whites Selected | # Expected African Americans Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Interview** | 515 | 3,834 | 512 | 3,820 | 513 | 1 | 1.00 | 0.74 |
| **Medical** | 446 | 3,367 | 411 | 3,167 | 419 | 8 | 0.98 | 1.57 |
| **Overall Suitability/Security** | 484 | 3,721 | 472 | 3,670 | 477 | 5 | 0.99 | 1.89 |
| Conditional Suitability | 484 | 3,721 | 456 | 3,642 | 472 | 16 | 0.96 | 4.81 |
| Final Suitability | 317 | 2,420 | 313 | 2,383 | 312 | -1 | 1.00 | -0.37 |
| **Hire Decision** | 413 | 3,171 | 408 | 3,139 | 409 | 1 | 1.00 | 0.38 |

**Table 14b.  *Interview, Medical, Suitability/Security, & Hire Decision - Unique Applicant Analysis***
**WHITE VS. HISPANIC**[*]

| | # Hispanics Considered | # Whites Considered | # Hispanics Selected | # Whites Selected | # Expected Hispanics Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Interview** | 252 | 3,834 | 252 | 3,820 | 251 | -1 | 1.00 | -0.96 |
| **Medical** | 218 | 3,367 | 204 | 3,167 | 205 | 1 | 0.99 | 0.29 |
| **Overall Suitability/Security** | 241 | 3,721 | 237 | 3,670 | 238 | 1 | 1.00 | 0.37 |
| Conditional Suitability | 241 | 3,721 | 233 | 3,642 | 236 | 3 | 0.99 | 1.23 |
| Final Suitability | 152 | 2,420 | 150 | 2,383 | 150 | 0 | 1.00 | -0.21 |
| **Hire Decision** | 204 | 3,171 | 204 | 3,139 | 202 | -2 | 1.01 | -1.44 |

---

[*] ***Practical Significance Indices:***
*Shortfall #* = Difference between observed and expected frequencies of minority applicants.
*AIR* = Adverse Impact Ratio: 80% rule was applied.
***Statistical Significance Indices:***
*Standard Deviation Difference* =the proportion difference in standard deviation units: >= |1.96| indicates statistical significance.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Table 14c.  *Interview, Medical, Suitability/Security, & Hire Decision - Unique Applicant Analysis***
**MALE VS. FEMALE**[*]

| | # Females Considered | # Males Considered | # Females Selected | # Males Selected | # Expected Females Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| Interview | 912 | 4,273 | 911 | 4,256 | 909 | -2 | 1.00 | -1.34 |
| Medical | 824 | 3,722 | 780 | 3,488 | 774 | -6 | 1.01 | -1.03 |
| Overall Suitability/Security | 881 | 4,126 | 870 | 4,062 | 868 | -2 | 1.00 | -0.67 |
| Conditional Suitability | 881 | 4,126 | 864 | 4,013 | 858 | -6 | 1.01 | -1.37 |
| Final Suitability | 535 | 2,631 | 529 | 2,594 | 528 | -1 | 1.00 | -0.52 |
| Hire Decision | 780 | 3,497 | 769 | 3,468 | 773 | 4 | 0.99 | 1.52 |

## FAA ATCS Full Process Review

Now that each hurdle in the selection process has been analyzed and examined separately, an important final analysis is a review of the ATCS selection process as a whole to determine the impact of decisions on adverse impact overall.  Two analyses were undertaken here, both from a unique counts perspective, but distinguished by the starting applicant pool.

The first set of analyses was conducted using all applicants who applied to the position, or in other words, the full, clean database.  The second set of analyses was conducted on an initial pool of individuals who were fully qualified, i.e., passed both the automated and HR MQ screens.  Both analyses use the final hire decision as the outcome (see Tables 15a-c for results).

Given the fact that the job posting system essentially allows any applicant to apply through any applicant source, even though they may not meet even the most basic eligibility requirements on the vacancy announcement (e.g., is a veteran), it is impossible to discern who are "true" applicants for the specific applicant sources from those who indiscriminately applied. As such, we chose to model the hiring process two different ways to understand the adverse impact picture associated with the different definitions of an applicant (i.e., anyone who applies, only those applicants who meet the MQs).

**"Applied" Applicant Pool.**  As can be seen in Tables 15a-c, our analyses of the overall hiring process (i.e., from application to hire) found adverse impact for African Americans, Hispanics, and Females (see Table 15d in Appendix E for full results).

**"Fully Qualified" Applicant Pool.** When excluding applicants who did not pass the minimum qualifications screening, adverse impact is also observed for African Americans though not for Hispanics and Females for the overall hiring process (i.e., from qualification to hire) (see Tables 15a-c below; see Table 15e in Appendix E for full results).



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Table 15a.** *Overall Hiring Process Decisions - Unique Applicant Analysis*
**WHITE VS. AFRICAN AMERICAN**[*]

|  | # African Americans Considered | # Whites Considered | # African Americans Selected | # Whites Selected | # Expected African Americans Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall Process: Applied to Hired** | 12,278 | 18,627 | 408 | 3,139 | 1,409 | 1,001 | 0.20 | 36.51 |
| **Overall Process: Fully Qualified to Hired** | 2,350 | 9,658 | 408 | 3,139 | 694 | 286 | 0.53 | 14.43 |

**Table 15b.** *Overall Hiring Process Decisions - Unique Applicant Analysis*
**WHITE VS. HISPANIC**[*]

|  | # Hispanics Considered | # Whites Considered | # Hispanics Selected | # Whites Selected | # Expected Hispanics Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall Process: Applied to Hired** | 2,267 | 18,627 | 204 | 3,139 | 363 | 159 | 0.53 | 9.63 |
| **Overall Process: Fully Qualified to Hired** | 756 | 9,658 | 204 | 3,139 | 243 | 39 | 0.83 | 3.13 |

**Table 15c.** *Overall Hiring Process Decisions - Unique Applicant Analysis*
**MALE VS. FEMALE**[*]

|  | # Females Considered | # Males Considered | # Females Selected | # Males Selected | # Expected Females Selected | Shortfall # | AIR | Standard Deviation Difference |
|---|---|---|---|---|---|---|---|---|
| **Overall Process: Applied to Hired** | 8,861 | 27,037 | 769 | 3,468 | 1,046 | 277 | 0.68 | 10.50 |
| **Overall Process: Fully Qualified to Hired** | 3,008 | 11,189 | 769 | 3,468 | 898 | 129 | 0.82 | 5.78 |

---

[*] *Practical Significance Indices:*
*Shortfall #* = Difference between observed and expected frequencies of minority applicants.
*AIR* = Adverse Impact Ratio: 80% rule was applied.
*Statistical Significance Indices:*
*Standard Deviation Difference* =the proportion difference in standard deviation units: >= |1.96| indicates statistical significance.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

**Summary of Quantitative Analyses**

Adverse impact was found at several hurdles in the ATCS selection process, as well as across the overall ATCS selection process. Specifically, two of our three focal groups (African Americans and Females) have disproportionately lower pass rates than White and Male applicants for both minimum qualification hurdles (automated and HR) as well as for the CSP selection process. Regarding the minimum qualification hurdles, adverse impact was found within most of the applicant sources as well. Adverse impact was not observed for CTI at any point in the hiring process, though the qualification rate was very high in general.  Importantly, adverse impact for the CSP process does vary considerably by individual CSP event and appears to be a function of using General Public source national referral lists.  Also, the current method of using location preferences is decreasing applicant diversity due to vastly different referral rates for the applicant sources.

Overall, our conclusions align with the findings in the Outtz and Associates Barrier Analysis although some specific analyses (e.g. referral, suitability) have changed substantially due to process and data insights gathered after that report was produced.  The following chapter provides a summary of issues identified, associated recommendations, and additional questions that should be addressed.



# Chapter 4

## SUMMARY AND RECOMMENDATIONS

In addition to the adverse impact found at key points in the hiring process, this analysis also uncovered assessment tool vulnerabilities, process inefficiencies, and overall design challenges that need to be addressed to ensure the sustainability of recommended interventions.

The first step towards ensuring a high-quality, sustainable ATCS hiring process is to clearly understand and specify the candidate qualifications (i.e., knowledge, skill, ability, other personal characteristics; KSAOs) necessary for success on the job. This can be accomplished through a well-executed job analysis. Job analysis should serve as the foundation for the ATCS hiring process. Legal guidelines (Equal Employment Opportunity Commission [EEOC], 1978) and professional standards (APA, 1999; SIOP, 2003) describe the importance of job analysis in the development of legally defensible, fair, and effective selection programs. It is our understanding that a job analysis was conducted to support the AT-SAT. At the time of our review, we were only aware of the SACHA job analysis study. This study was published 18 years ago and is too dated to be regarded as professionally acceptable to support the hiring process. However, in response to our draft report, CAMI has noted that subsequent efforts have in fact been carried out that should be incorporated into this recommendation. APT*Metrics* is currently in possession of these subsequent studies and would propose to include their evaluation as part of this recommendation.

With an up-to-date job analysis in place, a blueprint can be established for refining the key decision points in the process, addressing the assessment tool vulnerabilities and refining the overall design. It is with the understanding that a current job analysis exists or will be conducted that the following recommendations are made. These recommendations have been organized into two categories: ATCS Decision Points and Overall Hiring Design.

## ATCS DECISION POINT RECOMMENDATIONS

**STEP 1: Vacancy Announcements.** As described in this report, there appears to be no consistent rationale for determining which applicant source pools are chosen for use for a given hiring period. There may in fact be certain applicant sources that are justifiably ranked above others based upon job-related experience, credentials or other factors. However, this determination needs to be based upon the job analysis, consultation with ATO subject matter experts and confirmed through a validation process using current incumbents. It is therefore recommended that a structured process, involving a job analysis and formal validation, be conducted to determine and validate the differentiating criteria for ranking applicant sources.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

In addition, since the choice of applicant sources significantly impacts the diversity of the applicant pool, it is recommended that the applicant pool criteria explicitly serve to balance recruitment needs, operational issues, and commitment to diversity.

There is also a need to better populate the applicant pools with more diverse candidates. To this end, it is recommended that the FAA continue community outreach efforts to educate applicants about the ATCS occupational series and more broadly, establish a national recruitment outreach and education program around the ATCS position.

Furthermore, while CTI schools appear to be a preferred applicant source, this applicant source tends to have very little diversity. It is highly recommended that the FAA work with CTI schools to address the low retention rates of minority candidates in their programs. Specifically, it is recommended that the FAA work with CTI schools to evaluate how diversity can be increased at these schools to more generally represent the US population. For example, this might include targeted recruiting efforts, working with CTI school marketing to ensure both minority and majority population are targeted with advertising.

**STEP 2: Minimum Qualifications.** The MQs as they currently stand were drawn from standards provided by the Office of Personnel Management (OPM). There is no evidence that these qualifications have been recently reviewed or even validated against the ATCS position. Furthermore, these MQs are specific to each applicant source, which results in inconsistent eligibility and qualification standards being applied for individuals applying to perform the same job. Beyond that, many of the MQs are vague and open to interpretation. It is therefore strongly recommended that the MQs be reviewed against a current job analysis and revised and validated accordingly. Additionally, every attempt should be made to build consistent MQs across recruitment sources.

Consideration should also be given to the use of preferred qualifications (PQs) that could be used to differentiate between a large number of candidates meeting the MQs and other qualification requirements (e.g., passing the AT-SAT). As with MQs, job relevance and potential for adverse impact must be considered for PQs.

It is also recommended that the evaluation of MQs be automated to the extent possible through the creation of a standardized application blank. Criteria that cannot be automatically evaluated must be articulated in such a way as to be objectively evaluated by HR Specialists – with minimal opportunity for differential interpretation. HR Specialists engaged in this evaluation should receive training and a standard operating manual with accompanying screening checklists for each recruitment source. Refresher training should be conducted periodically and documented.

Finally, a tracking system should be established to evaluate MQ screening decisions for accuracy and adverse impact on an ongoing basis.

**STEP 3: AT-SAT.** The AT-SAT is approximately 12 years old and while more recent studies have been conducted to establish its ongoing job relevance and weighting, this test battery



continues to produce adverse impact. The AT-SAT is used at two points in the hiring process: 1) to determine whether particular applicants will be referred on to the CSP (i.e., achieve at least a score of 70) and 2) to prioritize selection decisions in the CSP for particular applicants (i.e., use of "well qualified" and "qualified" bands). Roughly 95% of applicants score at or above the passing score of 70, however, this rate drops precipitously and produces significant adverse impact for the cutoff associated with the well qualified band. Operationally, the cutoff score for selection in the CSP is 85 since applicants in the "qualified" band are rarely selected.

One potential solution to this issue is to replace the use of the AT-SAT within the CSP with a measure that can differentiate candidates without increasing adverse impact.  For example, the use of validated preferred qualifications that are collected during the application process could be used for this purpose. These PQs would be based on background and experience dimensions (and other factors) identified through the job analysis and established as valid through a proper validation study. This approach has been successfully leveraged for similar applications. We would propose to leverage CAMI's previous work and experience in the development of PQs for this position. We therefore recommend that PQs are explored as a valid differentiator and substitute for the AT-SAT for use during the CSP.

In terms of the AT-SAT itself, it is recommended that supplemental validation research be conducted to confirm its relevance to the job. Specifically, the AT-SAT should be reviewed against a recent job analysis to ensure that it is still measuring the most important requirements for success in the ATCS position. A determination can then be made as to whether any gaps exist in its coverage of the important requirements.  If it is determined that the test covers the essential requirements of the job, the next step would be to review the subtest weights and cutoff scores to determine whether a different configuration of subtests could be modeled and cutoff scores modified to more effectively balance validity and adverse impact considerations.

If the mapping of the AT-SAT to the job analysis identifies gaps in coverage of the essential requirements of the job, then new tests should be proposed to fill in these gaps. Regardless of the findings of the job analysis/AT-SAT mapping process, it is highly recommended that the AT-SAT, or its revised form, be revalidated using a criterion-related strategy, which is outlined below[5].

1. Review/conduct job analysis of ATCS position

   ▪ Verify importance of key responsibilities and required knowledge, skill, ability and personal characteristics

2. Map current AT-SAT against job requirements

   ▪ Identify any gaps in competency coverage

   ▪ Recommend as needed any additions/revisions to test components

   ▪ Develop new components as required

---

[5] As CAMI noted in their response to a prior draft of this report, a properly conducted criterion-related validation study will require a meaningful investment of time and resources.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

3. Conduct criterion validation study

- Develop training and performance criteria

- Administer experimental version of revised AT-SAT to representative sample of incumbents and applicants

- Collect performance data on participating incumbents

- Conduct psychometric, validation and adverse impact analyses

4. Finalize and implement revised test

**STEP 4: Generation of Referral Lists.**  At present, when applicants apply to an announcement, the applicant must also indicate up to two location preferences.  Except for General Public applicants, location preferences ultimately drive which referral lists an applicant can be placed on once the applicant is deemed fully qualified. Applicants who select a location that does not have a position opening are *not* referred on to the CSP even though they meet the source-specific minimum qualifications. It is therefore recommended that the air traffic controller application form be changed so that applicants could select the "anywhere in the nation" option. They should also be provided with information as to which facilities have openings.  This is in line with the Independent Review Panel's recommendation (ATO & AHR: Review of Independent Review Panel (IRP) Recommendations & Current Projects, November 6, 2012).

**STEP 5: Centralized Selection Panel (CSP).**  Based upon both the qualitative and quantitative reviews, it was determined that there is a significant opportunity for improvement of the CSP process.  The process has been described by stakeholders as complex, unstandardized and subjective.  In addition, the CSP process has exhibited adverse impact for protected groups, although those effects are not consistent from one CSP to another.

It is recommended that the full CSP process design be evaluated for efficiency, accuracy and fairness.  It is quite likely that alternative approaches to the CSP model would result in more precise, fair outcomes along with tremendous cost savings.  For example, there may be potential to automate much of the current decision making localized in the CSP selection process.  Under this scenario CSP panelists could operate in more of a final review/quality control role.

Regardless of the final CSP configuration, it is highly recommended that the criteria by which decisions are made at this stage in the hiring process be firmly established and validated against the essential requirements of the job. Once the criteria have been documented and validated, CSP panelists should be trained and monitored in the application of these criteria. It will be important to develop clear policies, rating guidelines, and standardized processes for reviewing applicants and making decisions, including criteria that can and cannot be considered.  All panel members must have the same understanding of the purpose of the process and be provided with an approach that will ensure accurate and fair treatment of the candidates.



Finally, it will be critical to implement a rigorous evaluation of the CSP decision making process to ensure that the process is operating as intended. Initially it will be important to closely monitor and oversee a full cycle of CSPs to ensure real-time decisions are fair and job-related. Decision making in the CSP should continue to be monitored by HR on an on-going basis thereafter.

**STEP 6: Interview**. The interview has become more of a formality in the ATCS hiring process as almost 100% of the candidates pass. It is recommended that new interview content be developed and validated, using the job analysis as the driver of which competencies need to be measured. Specifically, the interview should be developed and mapped against required knowledge, skills, and abilities and validated using subject matter experts. Multiple questions should be developed to assess each competency and behavioral anchors should be developed and validated for each of the questions to help guide interviewers in making accurate ratings.

Additionally, it is recommended that training be provided to all individuals involved in conducting the interviews to ensure they understand how to fairly and accurately conduct the interview process. Training should include "frame of reference" exercises in order to help calibrate judgments and ratings across interviewers.

## ATCS Overall Design Considerations

The current ATCS selection process is highly decentralized, with decision making and process tracking occurring across multiple departments and organizations. The absence of a clear structure and accountability for the full selection process results in significant challenges to the evaluation, ongoing improvement, and long-term success of the program. It is our recommendation that a single organization take charge of this process so that it can be centrally managed from announcement through to placement into the FAA Academy. The organization best positioned to "own" and run this process is the Office of Human Resources.

A centralized process, housed in AHR, would enable improved standardization and targeted outreach of the recruitment process, an improved ability to track and evaluate the hiring process, and enhanced coordination of the entire process.

AHR centralization and benefits include:

1.  Review and coordination of the applicant sources chosen for a given hiring period, ensuring choices are aligned with FAA diversity and inclusion goals and overall ATCS openings in the field.

2.  Coordinated and consistent development, validation, and training on and implementation of minimum qualification screens.

3.  Generation of referral lists and tracking applicants throughout the selection process to ensure declinations, location assignments, and communications to applicants are handled fairly and consistently.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

4. Coordination of applicant selections from referral lists, using formulaic and standardized decision rules for moving applicants further along in the selection process.

5. Coordination, review, and sign off on all applicant interview results.

6. Review of the medical and security screen processes.

7. Consistent documentation of decisions regarding the selection process.

8. Consistent documentation of applicant dispositions throughout the process.

9. Coordination with FAA facilities, Training Academy, and applicants on EODs and distribution of tentative and firm offer letters.



# Chapter 5

## REFERENCES/APPENDICES

### References

Air Traffic Organization & Office of Human Resource Management. (2012). *ATO & AHR: Review of Independent Review Panel (IRP) Recommendations & Current Projects.* November 6, 2012.

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education. (1999). *Standards for educational and psychological testing.* Washington, DC: American Educational Research Association.

Broach, D., Byrne, C. L., Manning, C. A., Pierce, L., McCauley, D., & Bleckley, M. K. (under review). *The Validity of the Air Traffic Selection and Training (AT-SAT) Test Battery in Operational Use.* [Draft report in review for publication as an Office of Aerospace Medicine technical report.]

Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor, & Department of Justice. (1978). Uniform guidelines on employee selection procedures. *Federal Register, 43*(166), 38290-38315.

Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor, & Department of Justice. (1979). Adoption of questions and answers to clarify and provide a common interpretation of the uniform guidelines on employee selection procedures. *Federal Register, 44*(43), 11996-12009.

Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor, & Department of Justice. (1980). Adoption of additional questions and answers to clarify and provide a common interpretation of the uniform guidelines on employee selection procedures. Federal Register, *45*(87), 29530-29531.

FAA PMS VII and 5 U.S.C. § 2301 (b). *Merit System Principles.*

Federal Aviation Administration. (2010). *Policy Bulletin #12, In-Process Rule for Air Traffic Control Specialist Positions.* [Effective 10/07/02; modified 06/1/10.]

Outtz, J. L., & Hanges, P. J. (2012). *Barrier Analysis of the Air Traffic Control Specialists (ATCS) Centralized Hiring Process.* October 19, 2012.

Ramos, R. A., Heil, M. C., & Manning, C. A. (2001). *Documentation of validity for the AT-SAT computerized test battery* (Volumes I and II). DOT/FAA/AM-01/5. Washington, D.C.: Office of Aviation Medicine.

Society of Industrial and Organizational Psychology. (2003). *Principles for the Validation and Use of Personnel Selection Procedures* (4th ed.). Bowling Green, OH: Author.



*Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process*

Wise, L. L., Tsacoumis, S., Waugh, G. W., Putka, D. J., & Hom, I. (2001). *Revision of the AT-SAT* (DTR-04-58). Alexandria, VA: Human Resources Research Organization.



EXHIBIT
**3**

**FAA Statement
on the
Barrier Analysis of the Air Traffic Control Specialist
Centralized Hiring Process**

Administrator Michael Huerta has made an historic commitment to transform the Federal Aviation Administration (FAA) into a more diverse and inclusive workplace that reflects, understands, and relates to the diverse customers we serve. To meet this goal and satisfy the requirements of the Equal Employment Opportunity Commission MD-715, the Administrator tasked the Office of the Assistant Administrator for Civil Rights to conduct barrier analyses of the Air Traffic Control Specialist (ATCS) Centralized Hiring Process, Aviation Safety Inspectors, and Airway Transportation Systems Specialists.

The first study completed is on the ATCS series; therefore, the FAA is pleased to submit the reports entitled, "Barrier Analysis of the Air Traffic Control Specialist (ATCS) Centralized Hiring Process" and "Extension to Barrier Analysis of the Air Traffic Control Specialist Centralized Hiring Process." These reports reflect a collaborative effort undertaken by the FAA's Office of Civil Rights, Office of Human Resources, and the Air Traffic Organization. The primary purpose of these reports is to identify and analyze potential barriers to equal employment opportunities within the ATCS Centralized Hiring Process and to offer solutions to establish the foundation for improving the Process.

The reports reflect a detailed scope of work, approaches and methodologies, work plans, and analytical provisions including overall hiring conditions within the ATCS job series 2152. Our consultant, Outtz and Associates, was commissioned to conduct the barrier analysis, which began in April 2012, with the issuance of the final report in May 2013. The barrier analysis identified that four (4) of seven (7) decision points in the air traffic controller hiring process resulted in adverse impact to applicants from at least one demographic group. Subsequently, another independent consultant, APT Metrics, was hired to analyze the barrier decision points, specifically reflecting on the differential pass rates for protected group members. APT Metrics' report was finalized and issued in February 2013. These reports, in tandem, present recommendations and specific suggestions to improve the ATCS Centralized Hiring Process and to ensure that there will be no barriers to equal employment opportunity.

Significant progress is now underway. To date, progress includes the establishment of an Executive Steering Committee comprised of senior agency executives. The Steering Committee provides oversight for the new hiring process and has implemented multiple cross functional project teams to operationalize the recommendations identified in the report.

ATCS Centralized Hiring Process improvements being implemented to support the Fiscal Year 2014 hiring of air traffic controllers include (1) comprehensive outreach and recruitment, (2) improved automation enhancements to our application process, (3) revisions to the Air Traffic Selection Assessment Tools, and (4) standardization of human resource procedures in review of applications.

These efforts will result in important improvements in the ATCS Centralized Hiring Process, further demonstrating the FAA's commitment to equal employment opportunity for all.



EXHIBIT

4

**Human Resources Policy Manual (HRPM)**
**Policy Bulletin # 84**

## Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring

**This policy bulletin applies to:** (1) Non-bargaining unit employees/positions and (2) bargaining unit employees/positions, except where the applicable collective bargaining agreement contains conflicting provisions or the subject has not been negotiated.

**Policy bulletin effective date:** 02/07/2014. This policy bulletin will remain in effect until cancelled by the Office of Human Resource Management or until new assessment/selection process has been incorporated in agency policy(ies), whichever occurs first.

**Background information:** In the spirit of continuous process improvement, the FAA reviewed the end-to-end process of hiring air traffic control specialists. As a result, the FAA chose to make several improvements to the way it selects, trains, and assigns air traffic controllers in order to enhance decision making and increase objectivity in the assessment of candidates. The new process will ensure compliance with statutory requirements including antidiscrimination laws, apply Merit System Principles, and align with the applicable FAA HR employment policies related to permanent external hiring.

_____

1. Purpose
2. Interim Process—Overview
3. Policy Suspension/Modification
4. Points of Contact

**1. Purpose:** This policy bulletin suspends provisions of FAA Human Resources (HR) policy related to the recruitment, assessment, selection and appointment of Air Traffic Control Specialist (ATCS) Academy Trainees.

**2. Interim Process—Overview:**

**a.** The Agency will apply the existing FG-2152-01 position description and minimum experience/education requirements under the single agency qualification standard for FG-2152-01, Air Traffic Control Trainee-FAA Academy.

**b.** Generally, the FAA will use a single external competitive vacancy announcement open to all U.S. citizens to create an ATCS Academy trainee candidate inventory. At its discretion, the Agency may consider using another candidate source (such as reinstatement, or an on-the-spot hiring authority such as Veterans' Recruitment Appointment, 30% or More Disabled Veteran Program, People With Disabilities) to fill specific positions as appropriate.

**c.** The FAA will close previous ATCS Academy trainee competitive inventories, notifying candidates that their prior applications and pre-employment test scores will no longer be considered and encouraging them to apply to future vacancy announcements.

**d.** Applicants may indicate preferred geographical region and state(s) but this information will not be used in the selection process. The Agency may consider designated geographic preferences in the post-Academy facility placement process but staffing needs will be paramount.

**e.** All applicants will complete the Biographical Assessment.

**f.**  Applicants with a passing score on the Biographical Assessment will be screened for eligibility (citizenship, Selective Service registration, etc.) and minimum experience/education.

**g.**  Applicants meeting the requirements for eligibility and experience/education and with passing scores on the Biographical Assessment will be contacted regarding scheduling of the AT-SAT exam.

**h.**  Candidates meeting all requirements for eligibility and experience/education and with passing scores on the Biographical Assessment and the AT-SAT exam will be placed into one of three quality categories based on a weighted composite of both pre-employment tests and veterans' preference.

**i.**  Selections will be made beginning with the candidates at the top of the category group and working down the list.   Randomization will be used to break any ties.  Veterans' passover procedures will be used if necessary.

**3.  Policy Suspension/Modification:**

**a.**  Effective immediately, provisions of FAA HR policy documents related to the recruitment, assessment, selection and appointment of Air Traffic Control Specialist Academy Trainees are suspended.  While some provisions of these policy documents may be referred to as guidance, the FAA will not be bound by their provisions.  This includes (but is not limited to) the following documents:

- **Human Resources Operating Instruction (HROI): Air Traffic Collegiate Training Initiative (AT-CTI) Standard Operating Procedures** effective 04/01/2007;

- **HROI: Eligibility Period for AT-CTI Graduates** effective 04/01/2007; originally established 05/26/2006;

- **HRPM EMP-1.7a Supplement (Series 2152) Testing Policy for Filling Entry Level  Air Traffic Control Specialist Positions in Terminal and En Route Options** effective 04/01/2007;

- **HRPM EMP-1.11b Supplement (ATCS Employment Policy) Entry Level Pay and Grade for Air Traffic Academy Trainees** effective 06/25/2009; originally established 04/07/2007;

- **FAPM Letter 330-3 Placement of Entry Level Air Traffic Control Specialists** effective 10/04/85; and

- **AHF Operating Procedure #18: Use of On-the-Spot (OTS) Hiring Authority for Air Traffic Control Specialist (ATCS) Positions** effective 3/26/09

**b.**  Some exceptions or modifications to FAA HR policy provisions that are not specific to ATCS employment may also occur as part of the implementation (for example, using more than the two categories specified in EMP-1.28 Category Rating for ranking candidates.)   Any such an exception/modification must be approved by the Director, HR Policy and Compliance Division, AHR-100.

**4.  Points of Contact:**  Questions about this policy should be directed to the Office of Human Resource Management HR Policy and Compliance Division, AHR-110.

EXHIBIT
5

2018-2027

# AIR TRAFFIC CONTROLLER WORKFORCE PLAN

2018
2019
2020
2021
2022
2023
2024
2025
2026
2027

US Department of Transportation
**Federal Aviation Administration**

This 2018 report is the FAA's thirteenth annual update to the controller workforce plan. The FAA issued the first comprehensive controller workforce plan in December 2004. It provides staffing ranges for all of the FAA's air traffic control facilities and actual on-board controllers as of September 30, 2017.

Section (221) of Public Law (108-176) (updated by Public Law 115-141) requires the FAA Administrator to transmit a report to the Senate Committee on Commerce, Science and Transportation and the House of Representatives Committee on Transportation and Infrastructure that describes the overall air traffic controller workforce plan. It is due by March 31 of each fiscal year, otherwise the FAA's appropriation is reduced by $100,000 for each day it is late.

# TABLE OF CONTENTS

3   Table of Contents

**4   EXECUTIVE SUMMARY**

**6   Chapter 1 | INTRODUCTION**

6   Staffing to Traffic

9   Meeting the Challenge

**10  Chapter 2 | FACILITIES & SERVICES**

10  Terminal and En Route Air Traffic Services

10  FAA Air Traffic Control Facilities

**12  Chapter 3 | STAFFING REQUIREMENTS**

15  Staffing Ranges

19  Air Traffic Staffing Standards Overview

20  Tower Cab Overview

21  TRACON Overview

22  En Route Overview

22  Summary

23  Air Traffic Controller Scheduling

23  Air Traffic Scheduling Software Implementation

24  Technological Advances

**27  Chapter 4 | LOSSES**

27  Controller Loss Summary

28  Actual Controller Retirements

28  Cumulative Retirement Eligibility

29  Controller Workforce Age Distribution

30  Controller Retirement Eligibility

31  Controller Retirement Pattern

32  Controller Losses Due to Retirements

33  Controller Losses Due to Resignations, Removals and Deaths

33  Developmental Attrition

34  Academy Attrition

34  Controller Losses Due to Promotions and Other Transfers

35  Total Controller Losses

**37  Chapter 5 | HIRING PLAN**

38  Controller Hiring Profile

39  Trainee-to-Total-Controller Percentage

**42  Chapter 6 | HIRING PROCESS**

42  Controller Hiring Sources

42  Recruitment

**43  Chapter 7 | TRAINING**

44  The Training Process

45  Designing and Delivering Effective Training

45  Infrastructure Investments

45  Time to Certification

46  Investing for the Future

**47  Chapter 8 | FUNDING STATUS**

**48   Appendix | 2018 FACILITY STAFFING  RANGES**

# Executive Summary

**Safety is the top priority of the Federal Aviation Administration (FAA) as it manages America's National Airspace System (NAS). The NAS is the common network of U.S. airspace — air navigation facilities, equipment and services; airports or landing areas; aeronautical charts, information and services; rules, regulations and procedures; technical information; and manpower and material. Thanks to the expertise of people and the support of technology, tens of thousands of aircraft are guided safely and expeditiously every day through the NAS to their destinations.**

### WORKLOAD

An important part of managing the NAS involves actively aligning controller resources with demand. The FAA "staffs to traffic," matching the number of air traffic controllers at its facilities with traffic volume and workload. The FAA's staffing needs are dynamic due to the dynamic nature of the workload and traffic volume.

### TRAFFIC

Air traffic demand has declined significantly since 2000, the peak year for traffic. For the purposes of this plan, air traffic includes aircraft that are controlled, separated and managed by air traffic controllers. This includes commercial passenger and cargo aircraft as well as general aviation and military aircraft. Since 2000, traffic volume has declined by 21 percent. Although traffic is expected to grow, it is not expected to return to those levels in the near term. While there have been decreases year over year for system-wide traffic counts, there are some facilities that have experienced traffic increases. The FAA's staffing standards incorporate location-specific traffic counts and forecasts to account for these changes.

New on the horizon is the introduction of Unmanned Aircraft Systems (UAS). These are different from manned aircraft and introducing them safely into the nation's airspace is challenging for both the FAA and the aviation community. The FAA is taking an incremental approach to safe UAS integration; this is aided by the FAA's new compliance philosophy designed to help identify and correct potential hazards before they result in an incident or accident. The extent of UAS' impact on air traffic control will most certainly evolve.

### HEADCOUNT

In many facilities, the current Actual on Board (AOB) number may exceed the facility's target staffing ranges. This is because many facilities' current AOB (all controllers at the facility) numbers include many developmental controllers in training to offset expected future attrition. While the FAA strives to keep Certified Professional Controllers (CPCs) and Certified Professional Controllers in Training (CPC-ITs) within the range, individual facilities can be above the range due to advance hiring. The FAA hires and staffs facilities so that trainees are fully prepared to take over responsibilities when senior controllers leave.

### RETIREMENTS

The long-anticipated wave of controller retirements peaked a decade ago, in 2007, at 828 retirements. Over the past five years, FAA has averaged 670 controller retirements per year. However, due to the shifting demographics of the workforce, controller retirements are expected to drop significantly over the next five years, before leveling off around 200–250 per year. In the last five years, 3,354 controllers have retired. Fiscal year 2017 retirements were lower than projected, and are expected to fall significantly for the next decade. Cumulative Retirement Eligibility has also fallen. Tens of thousands of controllers were hired after the 1981 strike and at the end of FY 2017 only 45 controllers remain from those who were hired before 1984. This clearly demonstrates that the controller retirement wave is over.

The FAA carefully tracks actual retirements and projects losses to ensure its recruitment and training keep pace.

The FAA's goal is to ensure that the agency has the flexibility to match the number of controllers at each facility with traffic volume and workload. Staffing to traffic is just one of the ways we manage America's National Airspace System.

**HIRING**

In FY 2016, Public Law 114-190 – FAA Extension, Safety, and Security Act (FESSA) of 2016 was enacted. The law established three separate hiring pools.

FESSA requires that the first pool, which included individuals with previous air traffic control experience, be given priority consideration. It also increases the maximum hiring age to 35 for those meeting certain requirements. Over 1,400 applicants responded to the air traffic control experience vacancy announcement in May 2017. Over 900 were referred for employment consideration.

FESSA establishes a separate track that was then divided into two pools. The first pool includes graduates from Collegiate Training Initiative (CTI) programs and also military veterans. The second pool is open to the general public. Only the second pool is required to pass a biographical assessment screen. FESSA mandates that there be no more than a 10 percent variance between those two pools in making final selections. Out of 1,100 applicants referred for employment consideration from the CTI/Veteran pool, approximately 611 were selected. Out of 1,500 applicants referred for employment consideration from the general public pool, approximately 656 were selected.

Once applicants are notified of selection and have accepted the offer, they will then be required to attain medical and security clearances. Upon successful completion of clearances, the applicants will then be scheduled for FAA Air Traffic Academy training as agency needs are identified.

Over the past five years, the FAA has hired over 6,500 new air traffic controllers. We exceeded our hiring target in 2017, hiring 1,880 new controllers compared to a plan of 1,781.

**TRAINING**

As the FAA brings these new employees on board, training continues to be closely monitored at all facilities. We must carefully manage the process to ensure that our trainees are hired in the places we need them and progress in a timely manner to become CPCs. The FAA will also continue to take action at the facility level should adjustments become necessary due to changes in traffic volume, retirements or other attrition.

Ongoing hiring and training initiatives, as well as increased simulator use, are helping the FAA meet its goals. While the FAA is managing today's air traffic, we must also integrate new technologies into air traffic operations. From state-of-the-art simulators to satellite technology, air traffic is evolving into a more automated system. The FAA is working diligently to ensure well-trained controllers continue to uphold the highest safety standards as we plan for the future.

Chapter 1

# Introduction

**STAFFING TO TRAFFIC**

Air traffic controller workload and traffic volume are dynamic, and so are the FAA's staffing needs. A primary factor affecting controller workload is the demand created by air traffic, encompassing both commercial and non-commercial activity. Commercial activity includes air carrier and commuter/air taxi traffic. Non-commercial activity includes general aviation and military traffic.

Unmanned Aircraft Systems (UAS) have operated on a limited basis in the National Airspace System (NAS) and mainly supported public operations, such as military and border security operations. In recent years, UAS and operations have significantly increased in number, technical complexity and application. The list of uses has rapidly expanded to encompass a broad range of activities, including aerial photography, surveying, communications and broadcast, as well as hobby and recreation. In December 2015, the FAA began registration of all UAS. As policy and technology updates allow widespread use of UAS for commercial applications, the impact on the air traffic control workload will be incorporated into our models and forecasts. Oversight of UAS is aided by the FAA's new compliance philosophy which is designed to help identify and correct potential hazards before they result in an incident or accident.

Adequate numbers of controllers must be available to cover the peaks in traffic caused by weather and daily, weekly or seasonal variations, so we continue to "staff to traffic." Although the FAA generally staffs to traffic counts, it is not a one-to-one relationship. Safety rules and hours of operation require watch schedules that establish staffing during low-volume periods or in facilities with low traffic counts. This practice gives us the flexibility throughout each day to match the number of controllers at each facility with traffic volume and workload.

System-wide, air traffic has declined by 21 percent since peak year 2000. The chart in Figure 1.1 shows that air traffic volume is not expected to return to peak levels in the near term. Although there have been decreases year over year for system-wide traffic counts, there are some facilities that have experienced traffic increases. The FAA's staffing standards incorporate location-specific traffic counts and forecasts to account for these changes.

**FIGURE 1.1 | TRAFFIC FORECAST**



*Total Workforce Operations = Tower + TRACON + Aircraft Handled by En Route Centers

Figure 1.2 shows system-wide controller staffing and traffic, indexed from FY 2000 and projected through FY 2027. Indexing is a widely used technique which compares the change over time of two or more data series (in this case, total controller headcount, certified profession controllers (CPC) and certified professional controllers in training (CPC-IT) and traffic). The data series are set equal to each other (or indexed) at a particular point in time (in this case, FY 2000, a high mark for traffic) and measured relative to that index point in each successive year. This way we know how much growth or decline has occurred compared to the base value.

Staffing to traffic not only applies on a daily basis, but also means that we staff to satisfy expected needs two to three years in advance. We do this to ensure sufficient training time for new hires. Despite the decline in air traffic shown in Figure 1.2, "staffing to traffic" requires us to anticipate controller attrition, so that we plan and hire new controllers in advance of need. This is one reason that staffing remains well ahead of traffic. The gap between the blue line (Headcount) and the green line (CPC and CPC-IT staffing) is the advance hire trainee pipeline and is projected to close significantly by 2022. The headcount and CPC+CPCIT lines converge due to reduced retirements and other losses.

**FIGURE 1.2 | SYSTEM - WIDE TRAFFIC AND TOTAL CONTROLLER TRENDS**





**MEETING THE CHALLENGE**

The FAA's hiring plan is designed to phase in new hires as needed over time. This will avoid creating another major spike in retirement eligibility in future years like the one resulting from the retirement of a large number of controllers hired after the 1981 controller strike. Annual retirements are leveling off and still well below those experienced in 2007 when the long-anticipated wave of retirements peaked. Retirements are expected to continue to fall for the next decade.

The FAA hires to address all attrition, not just retirements.

We revised the hiring plan to increase FY 2016 through FY 2018 hiring to near-capacity levels so that we can catch up from a variety of challenges. They include: a nearly year-long hiring freeze resulting from sequestration in 2013 and effects from an Office of Personnel Management (OPM) security breach, which shut down the automated ability to process clearances to applicants for approximately one month. The combined impact of these issues disrupted the hiring pipeline and set us back in our staffing plans.

Hiring, however, is just one part of the challenge. Other challenges involve controller placement, controller training and controller scheduling. It is important that newly hired and transferring controllers are properly placed in the facilities where we will need them. Once they are placed, they need to be effectively and efficiently trained, and assigned to efficient work schedules.

To address these challenges, the FAA has:

- Updated the battery of tests collectively referenced as the Air Traffic Skills Assessment (ATSA). ATSA was tested, validated and introduced in 2016 to replace the Air Traffic Selection and Training (AT-SAT) battery.

- Revamped its placement process for air traffic controller trainees allowing increased flexibility for the agency and improved efficiency in both hiring and initial training of air traffic controllers.

- Introduced a new collaborative and centralized process to balance the controller ranks by revamping the employee requests for reassignments, matching employee requests with the agency's needs and establishing a national release policy aimed at expediting requests into facilities with the greatest staffing needs.

Effective and efficient training, as well as properly placing new and transferring controllers, are two important factors in the agency's success.

Systematically replacing air traffic controllers where we need them, as well as ensuring the knowledge transfer required to maintain a safe NAS, is the focus of this plan.

## Chapter 2
# Facilities and Services

America's NAS is a network of people, procedures and equipment. Pilots, controllers, technicians, engineers, inspectors and supervisors work together to make sure millions of passengers move through the airspace safely every day.

More than 14,000 federal air traffic controllers in airport traffic control towers, terminal radar approach control facilities and air route traffic control centers guide pilots through the system. An additional 1,297 civilian contract controllers and almost 9,900 military controllers also provide air traffic services for the NAS.

These controllers provide air navigation services to aircraft in domestic airspace, in addition to 24.6 million square miles of international oceanic airspace delegated to the United States by the International Civil Aviation Organization

**TERMINAL AND EN ROUTE AIR TRAFFIC SERVICES**

Controller teams in airport towers and radar approach control facilities watch over all aircraft traveling through the Terminal airspace. Their main responsibility is to organize the flow of aircraft into and out of an airport. Relying on visual observation and radar, they closely monitor each aircraft to ensure a safe distance between all aircraft and to guide pilots during takeoff and landing. In addition, controllers keep pilots informed about changes in weather conditions.

Once airborne, the aircraft quickly departs the Terminal airspace surrounding the airport. At this point, controllers in the radar approach control notify En Route controllers, who take charge in the vast airspace between airports. There are 21 air route traffic control centers around the country. Each En Route center is assigned a block of airspace containing many defined routes. Aircraft fly along these designated routes to reach their destination.

En Route controllers use surveillance methods to maintain a safe distance between aircraft. En Route controllers also provide weather advisory and traffic information to aircraft under their control. As an aircraft nears its destination, En Route controllers transition it to the Terminal environment, where Terminal controllers guide it to a safe landing.

**FAA AIR TRAFFIC CONTROL FACILITIES**

As of October 1, 2017, the FAA operated 315 air traffic control facilities, including the Air Traffic Control System Command Center. Table 2.1 lists the type and number of these FAA facilities. More than one type of facility may be collocated in the same building.

Each type of FAA facility has several classification levels based on numerous factors, including traffic volume, complexity and sustainability of traffic. To account for changes in traffic and the effect of investments that reduce complexity, as well as to compensate controllers that work the highest and most complex volume of traffic, facilities are monitored for downward and upward trends.

**TABLE 2.1 | TYPES AND NUMBER OF FAA AIR TRAFFIC CONTROL FACILITIES**

| TYPE | NUMBER OF FACILITIES | DESCRIPTION |
|------|------|------|
| Tower | 131 | An airport traffic control tower terminal that provides traffic advisories, spacing sequencing, and separation services to visual flight rules (VFR) and instrumental flight rules (IFR) aircraft operating in the vicinity of the airport, using a combination of radar and visual observations. |
| Approach Control* | 26 | An air traffic control facility that provides approach and departure  services to IFR and VFR aircraft arriving or departing an airport and to aircraft transiting the terminals airspace using radar and/or non-radar separation.<br><br>*These facilities are also known as Terminal Radar Approach Control or TRACON |
| Tower and Approach Control | 132 | An airport traffic control facility divided into two functional areas, tower and approach and departure control, that provides  services to IFR and VFR aircraft including aircraft traffic advisories, spacing sequencing, and separation services to aircraft operating in the vicinity of the airport, arriving or departing an airport and to aircraft transiting the terminals airspace using radar and/or non-radar separation. |
| Combined Control Facility | 4 | An air traffic control facility that provides approach control services for one or more airports as well as en route air traffic control (center control) for a large area of airspace. Some may provide tower services along with approach control and en route services. Also includes Combined Center Radar Approach (CERAP) facilities. |
| Air Route Traffic Control Center (ARTCC)/En Route | 21 | An air traffic control facility that provides air traffic control service to aircraft operating on IFR flight plans within controlled airspace and principally during the en route phase of flight. When equipment capabilities and controller workload permit, certain advisory/assistance services may be provided to VFR aircraft. |
| Air Traffic Control System Command Center | 1 | The Air Traffic Control System Command Center is responsible for the strategic aspects of the NAS. The Command Center modifies traffic flow and rates when congestion, weather, equipment outages, runway closures or other operational conditions affect the NAS. |
| **TOTAL FACILITIES** | **315** | |

Chapter 3
# Staffing Requirements

The FAA issued the first comprehensive controller workforce plan in December 2004. "A Plan for the Future: 10-Year Strategy for the Air Traffic Control Workforce" detailed the resources needed to keep the controller workforce sufficiently staffed. This report is updated each year to reflect changes in traffic forecasts, retirements and other factors.

"Staffing to traffic" requires the FAA to consider many facility-specific factors. They include traffic volumes based on FAA forecasts and hours of operation, as well as individualized forecasts of controller retirements and other non-retirement losses. In addition, staffing at each location can be affected by unique facility requirements such as temporary airport runway construction, seasonal activity and the number of controllers currently in training. Staffing numbers will vary as the requirements of the location dictate.

Proper staffing levels also depend on the efficient scheduling of employees, so the FAA tracks a number of indicators as part of its continuous staffing review. Some of these indicators are overtime, time on position, leave usage and the number of trainees. Time on position is defined as the amount of cumulative time controllers spend while "plugged in" to their position controlling live traffic. When not on position, controllers are on periodic breaks, in training, or performing other assigned duties.

In FY 2017, the system average for overtime was 3.5 percent, a slight increase from the FY 2016 level. Meanwhile, cumulative average time on position per eight-hour shift was 4 hours and 8 minutes, the same rate for the past two fiscal years.

Figure 3.1 shows the expected end-of-year total headcount (blue line), CPC & CPC-IT headcount (green line), new hires and losses (blue and yellow bars) by year through FY 2027.

Figures for FY 2017 represent actual end-of-year headcount, losses and hires. Losses include retirements, promotions and transfers, resignations, removals, deaths, developmental attrition and academy attrition. The FAA ended FY 2017 with 94 controllers below the 2017 headcount plan.

In general, the FAA strives to keep the number of CPCs and CPC-ITs near the middle of the calculated staffing range. Figure 3.1 shows that FY 2018 staffing values are within the calculated staffing range shown by the "min" and "max" dotted lines. However, a facility's total staffing levels are often above the defined staffing range because new control-lers are typically hired two to three years in advance of expected attrition to allow for sufficient training time. The total expected end-of-year staffing number shown in Figure 3.1 reflects this projected advanced hiring.

**FIGURE 3.1 | PROJECTED CONTROLLER TRENDS**



The FAA hires and staffs facilities so that trainees are fully
prepared to take over responsibilities when senior controllers retire.

# THE FAA USES MANY METRICS TO MANAGE ITS FACILITIES

TIME ON POSITION

OVERTIME

PRODUCTIVE TIME

TRAINEES

STAFFING RANGES

RETIREMENTS

FIELD INPUT

SIMULATORS AND INSTRUCTORS

TRAFFIC



**STAFFING RANGES**

Each of the FAA's air traffic facilities typically staffs open positions with a combination of certified controllers who are proficient, or checked out, in specific sectors or positions. Because traffic and other factors are dynamic at these facilities, the FAA produces facility-level controller staffing ranges. These ranges are calculated to ensure that there are enough controllers to cover operating positions every day of the year.

Ensuring that we have enough controllers is not only important on a daily basis, but also means that we staff to satisfy expected needs two to three years in advance. We do this to ensure sufficient training time for new hires. The uptick caused by hiring two to three years ahead of time is one reason that staffing remains well ahead of traffic.

The FAA uses four data sources to calculate staffing ranges. Three are data driven; the other is based on field judgment. They are:

1. Staffing standards – output of mathematical models used to relate controller workload to air traffic activity.

2. Service unit input – the number of controllers requested to staff the facility, typically based on past position utilization and other unique facility operational requirements. The service unit input is provided by field management.

3. Past productivity – the headcount required to match the historical best productivity for the facility. Productivity is defined as operations per controller. Facility productivity is calculated using operations and controller data from the 10-year period of 2008 to 2017. If any annual point falls outside +/- 5 percent of the 2008 to 2017 average, it is eliminated from the analysis. From the remaining data points, the highest productivity year is then used.

4. Peer productivity – the headcount required to match peer group productivity. Like facilities are grouped by type, level and part-time or full-time status, and their corresponding productivity is calculated. If the facility being considered is consistently above or below the peer group, the peer group figure is not used in the overall average and analysis.

The average of this data is calculated, multiplied by +/- 10 percent and then rounded to determine the high and low points in the staffing range.

Exceptional situations or outliers are removed from the averages (for example, if a change in the type or level of a facility occurred over the period of evaluation). By analyzing the remaining data points, staffing ranges are generated for each facility.

The 2018 staffing ranges for controllers are published by facility in the Appendix of this report. In general, the FAA strives to keep the number of CPCs and CPC-ITs near the middle of the range. In many facilities, the current Actual on Board (AOB) number may appropriately exceed the range. This is because many facilities' current AOB (all controllers at the facility) numbers include larger numbers of developmental controllers in training to offset expected future attrition. Individual facilities can be above the range due to advance hiring. Facilities may also be above the range based upon facility-specific training and attrition forecasts.

In the longer term, the number of new hires and total controllers will decline. This is because the surge of developmental controllers that were hired to replace the long-expected retirement wave over the past decade will have become CPCs. In the future, the vast majority of the controllers will be CPCs and CPC-ITs, and more facilities will routinely fall within the ranges.

**FIGURE 3.2 | CONTROLLER STAFFING**



FACILITY X STAFFING

CONTROLLER STAFFING

HIGH

**CHARACTERISTICS / DRIVERS OF HIGH STAFFING LEVELS**

Inefficient scheduling
Fewer losses than projected
Less overtime
Reduction in traffic volumes
Decrease in hours of operation
Temporary airport construction
Higher number of position-qualified controllers
Higher number of advance hire trainees

**CHARACTERISTICS / DRIVERS OF LOW STAFFING LEVELS**

Higher than expected attrition
Greater use of overtime
Increase in traffic volumes
Increase in hours of operation
Temporary airport construction
Lower number of position-qualified controllers
Lower number of advance hire trainees

LOW

Figure 3.3 depicts an example of a large Tower and Approach Control facility. This facility is one in which controllers work in the tower cab portion and in the approach control or radar room (also known as a TRACON). To be a CPC in these types of facilities, controllers must be checked out on all positions in both the tower and the TRACON.

Trainees are awarded "D1" status (and the corresponding increase in pay) after being checked out on several positions. The levels of responsibility (and pay) gradually increase as the trainees progress through training. Once developmental controllers are checked out at the D1 level, they can work several positions in the tower independently and without training supervision (Clearance Delivery, Ground Control and Local Control). Once checked out on the Runway Crossing Coordinator position, developmental controllers would be tower-certified and able to work any position in the tower cab independently and without training supervision. They would still not be a "D2" however, as there are also several positions in the TRACON to be checked out on (Arrival Data, Departure Data, Final Vector 1 and Final Vector 2). A controller in Figure 3.3 must be certified on all positions in the tower and TRACON to become a CPC.

NOTE: All air traffic control (ATC) facilities have individualized training progression to CPC based upon their type and level of complexity

**FIGURE 3.3 | EXAMPLE OF CONTROLLER TRAINING PROGRESSION**



The levels of responsibility continue to increase as one progresses toward CPC status, but trainees can and do control traffic much earlier in the training process. Historically, the FAA has used these position-qualified controllers to staff operations and free up CPCs for more complex positions as well as to conduct training.

Having the majority of the workforce certified as CPCs makes the job of scheduling much easier at the facility. CPCs can cover all positions in their assigned area, whereas position-qualified developmentals require the manager to track who is qualified to work which positions independently. This task becomes much easier with a scheduling tool.



Trainees include both developmental controllers and certified professional controllers in training (CPC-IT). A CPC-IT is a controller who moves to another area within a facility or to a new facility and must be trained to the qualifications of that new environment. CPC-ITs are different from developmentals in that developmentals have never been fully checked out and certified as a CPC anywhere.

**AIR TRAFFIC STAFFING STANDARDS OVERVIEW**

The FAA has used air traffic staffing standards to help determine controller staffing levels since the 1970s and they are periodically updated to reflect changes in workload, equipment and procedures.

FAA facilities are currently identified and managed as either Terminal facilities where airport traffic control services are provided, including the immediate airspace around an airport, or En Route facilities where high-altitude separation services are provided using computer systems and surveillance technologies. Terminal facilities are further designated as tower cabs or TRACONs. These Terminal facilities may be collocated in the same building, but because of differences in workload, their staffing requirements are modeled separately. Figure 3.4 provides an overview of FAA facilities and air traffic control positions.

**FIGURE 3.4 | AIR TRAFFIC CONTROL POSITION AND FACILITY OVERVIEW**

| PREFLIGHT + TAKEOFF | DEPARTURE | EN ROUTE | DESCENT   APPROACH | POST FLIGHT + LANDING |
|---|---|---|---|---|
| **AIRPORT TRAFFIC CONTROL TOWER (ATCT)** | **TERMINAL RADAR APPROACH CONTROL (TRACON)** | **AIR ROUTE TRAFFIC CONTROL CENTER (ARTCC)** | **TERMINAL RADAR APPROACH CONTROL (TRACON)** | **AIRPORT TRAFFIC CONTROL TOWER (ATCT)** |
| **Ground Controller** Issues approval for push back from gate and issues taxi instructions and clearances. **Local Controller** Issues takeoff clearances, maintains prescribed separation between departure aircraft, provides departure aircraft with latest weather/field conditions. **Clearance Delivery** Issues IFR and VFR flight plan clearance. **Flight Data** Receives and relays weather information and Notice to Airmen. | **Departure Controller** Assigns headings and altitudes to departure aircraft. Hands off aircraft to the En Route Radar Controller. **Flight Data - Radar** Issues IFR flight plan clearances to aircraft at satellite airports, coordinates releases of satellite departures. | **Radar Controller** Ensures the safe separation and orderly flow of aircraft through En Route center airspace (includes oceanic airspace). **Radar Associate** Assists the Radar Controller **Radar Associate** (Flight Data) Supports the Center Radar Controller by handling flight data. | **Arrival Controller** Assigns headings and altitudes to arrival aircraft on final approach course. | **Local Controller** Issues landing clearances, maintains prescribed separation between arrivals, provides arrival aircraft with latest weather/field conditions. **Ground Controller** Issues taxi instructions to guide aircraft to the gate. |

The dynamic nature of air traffic controller workload coupled with traffic volume and facility staffing needs are all taken into account during the development of FAA staffing models and standards.

All FAA staffing models incorporate similar elements:

> • Controller activity data is collected and processed quarterly, commensurate with the type of work being performed in the facilities.

> • Models are developed that relate controller workload to air traffic activity. These requirements are entered into a scheduling algorithm.

> • The modeled workload/traffic activity relationship is forecast for the 90th percentile (or 37th busiest) day for future years for each facility. Staffing based on the demands for the 90th percentile day assures that there are adequate numbers of controllers to meet traffic demands throughout the year.

> • Allowances are applied for off-position activities such as vacation, training and additional supporting activities that must be accomplished off the control floor.

All staffing models go through similar development processes. Some components of the model-development phase vary as a function of the work being performed by the controllers. For example, a crew-based approach was used to model tower staffing requirements because the number and type of positions in a tower cab vary considerably as traffic changes, compared to those of a single sector in a TRACON or En Route center. All staffing models reflect the dynamic nature of staffing and traffic. Controller staffing requirements can vary throughout the day and throughout the year.

**TOWER CAB OVERVIEW**
Air traffic controllers working in tower cabs manage traffic within a radius of a few miles of the airport. They instruct pilots during taxiing, takeoff and landing, and they grant clearance for aircraft to fly. Tower controllers ensure that aircraft maintain minimum separation distances between landing and departing aircraft, transfer control of aircraft to TRACON controllers when the aircraft leave their airspace, and receive control of aircraft for flights coming into their airspace.

> • There are a variety of positions in the tower cab, such as Local Control, Ground Control, Flight Data, Coordinator, etc. Depending on the airport layout and/or size of the tower cabs (some airports have more than one tower), there can be more than one of the same types of position on duty.

> • As traffic, workload and complexity increase, more or different positions are opened; as traffic, workload and complexity decrease, positions are closed or combined with other positions. In practice, minimum staffing levels may be determined by hours of operation and work rules.

Important factors that surfaced during the tower staffing model development included the availability, accessibility and increased reliability of traffic data and controller on-position reporting systems. The FAA is now able to analyze much larger quantities of tower data at a level of granularity previously unattainable. Staffing data and traffic volumes are collected for every facility.

The tower cab staffing models were updated in early 2008. The revised tower cab staffing models were developed using regression analysis as the primary method for modeling the relationship between staffing and workload drivers. The models relate observed, on-position controllers to the type and amount of traffic they actually handle. Regression analysis allows us to relate modeled controller staffing requirements with traffic activity and then use this relationship to predict future staffing requirements (standards) based on traffic projections.

**TRACON OVERVIEW**

Air traffic controllers working in TRACONs typically manage traffic within a 40-mile radius of the primary airport; however, this radius varies by facility. They instruct departing and arriving flights, and they grant clearance for aircraft to fly through the TRACON's airspace. TRACON controllers ensure that aircraft maintain minimum separation distances between landing and departing aircraft, transfer control of aircraft to tower or En Route center controllers when the aircraft leave their airspace, and receive control of aircraft for flights coming into their airspace.

   • TRACON airspace is divided into sectors that often provide services to multiple airports. Consolidated or large TRACONs in major metropolitan areas provide service to several primary airports. Their airspace is divided into areas of specialization, each of which contains groups of sectors.

   • Controllers are assigned to various positions such as Radar, Final Vector, Departure Data, etc., to work traffic within each sector. These positions may be combined or de-combined based on changes in air traffic operations.

   • As traffic, workload and complexity increase, the sectors may be subdivided (de-combined) and additional positions opened, or the sector sizes can be maintained with an additional controller assigned to an assistant position within the same sector.

   • Similarly, when traffic, workload and complexity decline, the additional positions can be closed or the sectors recombined. In practice, minimum staffing levels may be determined by hours of operation and work rules.

Like the tower analysis, the FAA is able to analyze much larger quantities of TRACON data at a level of granularity previously unattainable. Important factors surfaced during the TRACON staffing model review including the availability, accessibility and increased reliability of traffic data and controller on-position reporting systems. Staffing data and traffic volumes were collected for every facility.

The TRACON staffing models were updated in early 2009. These revised TRACON models were developed using regression analysis as the primary method for modeling the relationship between staffing and workload drivers. The models relate observed, on-position controllers to the type and amount of traffic they actually handled. Regression allows us to relate modeled controller staffing requirements with traffic activity and then use this relationship to predict future staffing requirements (standards) based on traffic projections.

**EN ROUTE OVERVIEW**

Air traffic controllers assigned to En Route centers guide aircrafts flying outside of Terminal airspace. They also provide approach control services to small airports around the country where no Terminal service is provided. As aircraft fly across the country, pilots talk to controllers in successive En Route centers.

- En Route center airspace is divided into smaller, more manageable blocks of airspace called areas and sectors.

- Areas are distinct, and rarely change based on changes in traffic. Within those areas, sectors may be combined or de-combined based on changes in air traffic operations.

- Controllers are assigned to positions within the sectors (e.g., Radar, Radar Associate, Tracker). As traffic increases, sectors can be de-combined and additional positions opened, or the sector sizes can be maintained but additional controllers added to assistant positions within the sectors.

- Similarly, when traffic declines, the additional positions can be closed or the sectors recombined. In practice, minimum staffing levels may be determined by hours of operation and work rules.

The FAA's Federally Funded Research and Development Center, operated by the MITRE Corporation, developed a model to generate data needed for the FAA's staffing models. Like the tower and TRACON standards models, this approach incorporated actual traffic and more facility-specific data.

MITRE's modeling approach reflects the dynamic nature of the traffic characteristics in a sector. It estimates the number of controllers, in teams of one to three people, necessary to work the traffic for that sector in 15-minute intervals. Differences in traffic characteristics in a sector could require different numbers of controllers to handle the same volume of traffic. For example, at one time most traffic might be cruising through a sector toward another location requiring minimal controller intervention. At another time, traffic might be climbing and descending through the same sector, a more complex scenario requiring more controllers. The same modeling techniques were applied uniformly to all sectors, providing results based on a common methodology across the country.

During FY 2013 and FY 2014, MITRE collaborated with the FAA and the National Air Traffic Controllers Association (NATCA) to conduct an evaluation of the En Route on-position staffing model at the request of the National Academy of Sciences to validate its core assumptions and parameters via empirical data collection. The evaluation, completed in the field and in a controlled laboratory setting, established values for model parameters, identified additional controller tasks for coverage by the model, and informed other enhancements to the model. In FY 2015, these updates were made and the on-position staffing model was re-calibrated. The evaluation results were shared with the FAA, NATCA and the National Academy of Sciences. In FY 2016, the evaluation results were incorporated into the on-position staffing model.

**SUMMARY**

The FAA's staffing models incorporate output provided by the Tower, TRACON and En Route workload models which is run through a shift scheduling algorithm. Next, factors are applied to cover vacation time, break time, training, etc. Lastly, traffic growth forecasts are applied to provide the annual staffing standards that are incorporated into the staffing ranges presented in this plan for each facility.

## AIR TRAFFIC CONTROLLER SCHEDULING

Optimizing controller schedules is a critical aspect of efficient workforce planning, since inefficient facility schedules can lead to excess staffing and/or increased overtime. Currently, the FAA's air traffic facilities do not have access to a standardized, automated tool to assist them in developing optimal schedules and analyzing long-term workforce planning requirements. FAA facilities currently use a variety of non-standard methods that do not fully incorporate the complex resource management requirements that exist in today's environment.

To address this need, the FAA is in the process of implementing a widely used, commercially available "off-the-shelf" system that has been configured to FAA-specific requirements (e.g., national labor contract terms, FAA policy). The FAA's Operational Planning and Scheduling (OPAS) tool will provide a common tool set for FAA facilities to effectively develop and maintain optimal schedules based on traffic, staffing, work rules and employee qualifications. Similar systems are being used by air navigation service providers worldwide and are commonplace in best-practice companies.

## AIR TRAFFIC SCHEDULING SOFTWARE IMPLEMENTATION

In November 2017, FAA's Air Traffic Organization (ATO) initiated air traffic managers training on OPAS at 35 facilities. Training completion is scheduled for May 2018. ATO is currently determining an implementation strategy for the remaining air traffic facilities.

| Code | Facility | Completion | | Code | Facility | Completion |
|------|----------|------------|---|------|----------|------------|
| ZMA | MIAMI ARTCC | 2/9/18 | | ZFW | FORT WORTH ARTCC | 4/6/18 |
| ZHU | HOUSTON ARTCC | 2/9/18 | | D10 | DALLAS-FORT WORTH TRACON | 4/6/18 |
| I90 | HOUSTON TRACON | 2/9/18 | | ZLC | SALT LAKE ARTCC | 4/13/18 |
| ZJX | JACKSONVILLE ARTCC | 2/16/18 | | ZDC | WASHINGTON ARTCC | 4/20/18 |
| F11 | CENTRAL FLORIDA TRACON | 2/16/18 | | PCT | POTOMAC TRACON | 4/20/18 |
| ZKC | KANSAS CITY ARTCC | 2/16/18 | | ZLA | LOS ANGELES ARTCC | 4/20/18 |
| ZME | MEMPHIS ARTCC | 3/2/18 | | LAX | LOS ANGELES TOWER | 4/20/18 |
| ZAN | ANCHORAGE ARTCC | 3/2/18 | | SCT | SOUTHERN CALIFORNIA TRACON | 4/20/18 |
| ZTL | ATLANTA ARTCC | 3/9/18 | | ZNY | NEW YORK ARTCC | 5/4/18 |
| A80 | ATLANTA TRACON | 3/9/18 | | ZOA | OAKLAND ARTCC | 5/4/18 |
| ZAU | CHICAGO ARTCC | 3/9/18 | | NCT | NORTHERN CALIFORNIA TRACON | 5/4/18 |
| C90 | CHICAGO TRACON | 3/9/18 | | N90 | NEW YORK TRACON | 5/11/18 |
| ORD | CHICAGO O'HARE TOWER | 3/9/18 | | ZSE | SEATTLE ARTCC | 5/11/18 |
| ZAB | ALBURQUEERQUE ARTCC | 3/16/18 | | HCF | HONOLULU CONTROL FACILITY | 5/11/18 |
| ZID | INDIANAPOLIS ARTCC | 3/23/18 | | ZBW | BOSTON ARTCC | 5/18/18 |
| ZDV | DENVER ARTCC | 3/23/18 | | A90 | BOSTON TRACON | 5/18/18 |
| ZMP | MINNEAPOLIS ARTCC | 4/6/18 | | ZOB | CLEVELAND ARTCC | 5/18/18 |

Air Navigation Service Providers "in other countries including Australia, Canada, and Germany have replaced their legacy scheduling tools with sophisticated software capable of incorporating all constraints while generating efficient controller schedules." – National Academy of Sciences

## TECHNOLOGICAL ADVANCES

A new foundational infrastructure along with transformational programs continue to modernize the NAS as part of the Next Generation Air Transportation System (NextGen). These contribute to the NextGen goal of Trajectory Based Operations (TBO), which will manage traffic with the knowledge of where an aircraft will be at critical points during its flight.

En Route Automation Modernization (ERAM), Automatic Dependent Surveillance– Broadcast (ADS-B) and System Wide Information Management (SWIM) are fully implemented and used by controllers. ERAM and SWIM will continue to evolve with technology refreshes and enhancements while the Standard Terminal Automation Replacement System (STARS), Terminal Flight Data Manager (TFDM), NAS Voice System (NVS) and Data Communications (Data Comm) are near full implementation or are anticipated in the years ahead.

Two examples of advances for terminal controllers come from the Data Comm and Terminal Automation Modernization and Replacement (TAMR) programs. Data Comm's departure clearance service has been provided to the initial commitment of 55 airport towers and the program has been authorized to be installed at seven more airports. The TAMR program has completed, ahead of schedule, its installation of STARS at the 11 large Terminal Radar Approach Control (TRACON) facilities. TAMR continues to deploy and upgrade STARS at 39 of the 133 remaining TRACONs.

Data Comm provides a digital data communication link between air traffic controllers and pilots. About 36,000 flights per week used the departure clearance service in 2017. The FAA is realizing the benefits of reduced taxi-out delays, reduced gate delays, fewer communication errors, and improved pilot and controller efficiency credited to less time spent communicating over voice. According to one FAA analysis across two months of data collection at four airports, Data Comm on average resulted in taxi-out time savings between 0.2 and 8.5 minutes per rerouted flight.

With tower service in full operation, initial en route Data Comm is the next part to be implemented starting in 2019. Controllers will be able to reroute, hand off aircraft to the next center, and send messages to change altitude. Pilots also will be able to send requests to controllers using the data link. When full en route services are available beginning in 2022, additional messages will become possible, including full holding instructions, crossing restrictions, direct-to-fix messages, controller-initiated routes, and advisory messages. Data Comm also enables future NextGen services, including TBO.

TAMR upgrades multiple air traffic control technologies to a single, state-of-the-art platform: STARS. This platform along with the ERAM system form the FAA foundational technology supporting NextGen. They enable ADS-B and other NextGen capabilities, giving air traffic controllers a more complete airspace picture that will be necessary for TBO.

STARS offers new features that make the system easier for controllers to use than the aging systems it is replacing. Keyboard backlighting can be adjusted to improve visibility for easier data entry while flat-panel LED displays increase the traffic picture quality. Controllers can assign a color to an aircraft to make it easier to follow, and with a recall capability, workstation settings preferred by an individual controller can be saved and retrieved at the touch of a button.

Weather displays show six different levels of radar returns to provide a better view of storms for controllers as they work with pilots to steer aircraft around hazardous weather. Using multiple radars and ADS-B, STARS can track 1,300 aircraft in a 400-square-nautical-mile area to provide controllers with a clearer view of overall operations.

STARS also assists with terrain avoidance and conflict alerts. A minimum separation capability enables controllers to select two aircraft and ensure the required separation will be maintained, and a data block feature automatically lists the number of aircraft in a formation—a function that previously had to be performed manually.

Reliability should improve as STARS includes two redundant systems as a backup that can be activated with the flip of a switch, and an infrastructure that is easier for technicians to maintain because a common system will be present at all TRACONs.

ADS-B Out, which will be mandatory by January 1, 2020, for aircraft operating in most controlled U.S. airspace, has been integrated into automation platforms at all en route air traffic control facilities and major terminal radar facilities. Full TRACON deployment is expected to be completed by 2020. The FAA completed the nationwide deployment of ADS-B ground stations in 2014, and ADS-B traffic and weather broadcasts are available nationwide. As of January 2018, more than 42,000 aircraft have been equipped with ADS-B avionics.

NVS is the Voice over Intranet Protocol system that will carry the ground portion of voice communications digitally over the secure FAA Telecommunications Infrastructure (FTI). Once it's deployed nationwide, NVS will serve all FAA air traffic control facilities. NVS software began testing in 2017. Deployment of NVS is expected to begin as early as 2020.

SWIM streamlines shared information for improved planning and execution. Airlines and other users are able to more efficiently access the most current information affecting their area than they were able to using legacy systems, thereby improving decision-making. The SWIM Visualization Tool (SVT) is used at 12 air traffic control facilities across the country and was enhanced to include traffic flow management data, specifically gate assignment information that airline partners started to publish into SWIM.

SVT deployment is supporting early implementation of TFDM. Another component of TFDM early implementation is the prototype Advanced Electronic Flight Strips (AEFS) system, which replaces traditional paper flight strips and manual tracking of incoming and outgoing flights with an electronic flight data display. The prototype AEFS was implemented in the Phoenix, Charlotte and Cleveland towers to provide feedback and lessons learned into the TFDM design and implementation. Phoenix is set to receive TFDM in January 2020, the first of 89 sites scheduled to receive the production electronic flight strip system along with additional surface management capabilities.

For other decision support systems, the FAA continues to develop future concepts for Traffic Flow Management System modeling and predicting capabilities, and a seven-day FAA Academy course for controllers at the FAA Mike Monroney Aeronautical Center in Oklahoma City, OK, has been effective in reducing the national Time Based Flow Management training shortfall. Most of the workforce has completed the training, which has improved the skills and knowledge level of our air traffic management staff. TBO is a time-based management system, so a solid understanding and use of TBFM in conjunction with Performance Based Navigation (PBN) are at the core of TBO's success.

The NextGen Advisory Committee (NAC) identified a fifth focus area called the Northeast Corridor (NEC) in 2017. The NEC is looking to improve operations in the busy airspace between Washington, D.C., and Boston. This focus area joins the other high-priority, high-readiness NextGen capabilities identified in 2014 of increasing the use of PBN, making multiple runway operations more efficient, improving surface operations and data sharing, and implementing Data Comm. The FAA has met 157 of 161 planned commitments in the original four areas as of the end of fiscal year 2017.

Increased productivity and efficiency, and their ultimate impact on the size and composition of the FAA's workforce, depend on many factors. The scope and precise impact of NextGen enhancements are unknown as they are still under development. Final impacts are still to be determined given the complex nature of the interaction of controllers and their tools.

The relationship between pilots and air traffic controllers as well as the relationship between controllers and automated systems will evolve. These changes will occur gradually and require continued testing and analysis to ensure the safety of the NAS. Implementing TBO in the NAS will require the integration of multiple systems, training, and a culture change by controllers and pilots.
.



## Chapter 4

# Losses

In total, the FAA expects to lose over 1,600 controllers due to retirements, promotions and other losses this fiscal year. Other controller losses include transfers, resignations, removals, deaths, developmental attrition and academy attrition.

The FAA hires and staffs facilities so that trainees are fully prepared to take over responsibilities when senior controllers leave.

**CONTROLLER LOSS SUMMARY**
Table 4.1 shows the total estimated number of controllers that will be lost, by category, over the period FY 2018 through FY 2027.

**FIGURE 4.1 | CONTROLLER LOSS SUMMARY**



TOTAL LOSSES (2018-2027) **11,029**

ACADEMY ATTRITION 3,903

RETIREMENTS 3,098

DEVELOPMENTAL ATTRITION 637

RESIGNATIONS, REMOVALS, & DEATHS 689

PROMOTIONS & TRANSFERS 2,702

**ACTUAL CONTROLLER RETIREMENTS**

Fiscal year 2007 was correctly projected to be a peak year for retirements of controllers hired in the early 1980s. The long-anticipated retirement wave has passed. Annual retirements decreased for a few years then increased during fiscal years 2010 to 2015, but still below the 2007 peak, and are leveling off. In the last five years, 3,354 controllers have retired. Fiscal year 2017 retirements were lower than projected, and future retirements are expected to fall over the next decade..

**FIGURE 4.1A | ACTUAL CONTROLLER RETIREMENTS**



**CUMULATIVE RETIREMENT ELIGIBILITY**

The table below shows historical and forecasted Controller Retirement Eligibility from FY 2005 to FY 2027. Data shows a significant decline in the number of controllers eligible to retire from the peak in FY 2012 to FY 2025. At the end of fiscal year 2017, only 45 controllers remain from those who were hired before 1984. This clearly demonstrates that the controller retirement wave is over.

**FIGURE 4.1B | CUMULATIVE RETIREMENT ELIGIBILITY**



**CONTROLLER WORKFORCE AGE DISTRIBUTION**

The agency hired a substantial number of controllers in the years immediately following the 1981 strike. This concentrated hiring wave meant a large portion of the controller workforce would reach retirement age in roughly the same time period. In September 2005, the age distribution peak on the right side of Figure 4.2 was greater than 1,900 controllers. Today, the magnitude of that remaining peak is down to less than 600 controllers because the majority of the controllers hired shortly after the 1981 strike have already retired and been replaced.

The FAA's hiring plan is designed to phase in new hires as needed. Two distinct age bands can be seen in Figure 4.2. Controllers hired in the past several years can be seen in the 24 to 37 age band, which spans 14 years. The age band of those hired after the 1981 strike is shown in the 46-55 age band and covers only 10 years. By phasing in new hires, the age band of recent hires has become wider and is designed to avoid a spike in retirement eligibility in future years.

**FIGURE 4.2 | CONTROLLER WORKFORCE AGE DISTRIBUTION AS OF SEPTEMBER 30, 2017**



The FAA's hiring plan is designed to phase in new hires as needed.

**CONTROLLER RETIREMENT ELIGIBILITY**

In addition to normal civil service retirement criteria, controllers can become eligible under special retirement criteria for air traffic controllers (age 50 with 20 years of "good time" service or any age with 25 years of "good time" service). "Good time" is defined as service in a covered position, as defined in Public Law 92-297. Under Public Law 92-297, air traffic controllers are usually required to retire at age 56.

After computing eligibility dates using all criteria, the FAA assigns the earliest of the dates as the eligibility date. Eligibility dates are then aggregated into classes based on the fiscal year in which eligibility occurs.

Figure 4.3 shows the number of controllers who are currently retirement eligible as of September 2017 and those projected to become retirement-eligible each fiscal year through FY 2027. Agency projections show that an additional 115 controllers will become eligible to retire in FY 2018. The number of retirement-eligible controllers has been in decline in recent years from the peak and should continue to decline for the next few years.

Due to advance hiring, we have sufficient new hires in place to replace controllers currently eligible to retire when they do retire. The FAA strives to minimize retirement, hiring and training spikes through the process of examining trends and proactively planning years in advance of expected activity.

**FIGURE 4.3 | RETIREMENT ELIGIBILITY**



**CONTROLLER RETIREMENT PATTERN**

History shows that not all controllers retire when they first become eligible. In recent years, 16 percent of controllers who first became eligible actually retired.

The FAA has observed that many controllers delay retirement until they get closer to the mandatory retirement age of 56. Because most controllers are retirement eligible at the age of 50, they typically reach mandatory retirement age in their seventh year of eligibility.

These trends are seen in Figure 4.4 below, which shows fewer controllers are retiring earlier in their eligibility and are waiting until closer to their mandatory retirement age.

Despite the increased likelihood of delayed retirement, the majority of controllers still leave the controller workforce prior to reaching the mandatory age.

**FIGURE 4.4 | PERCENT OF CONTROLLERS RETIRING IN THE NTH FISCAL YEAR OF THEIR ELIGIBILITY**



**CONTROLLER LOSSES DUE TO RETIREMENTS**

For the current plan, the agency incorporated FY 2013 to FY 2017 retirement data into the retirement histogram used for future retirement.

As in prior years, the FAA projected future retirements by analyzing both the eligibility criteria of the workforce (Figure 4.3) and the pattern of retirement based on eligibility (Figure 4.4).

For each eligibility class (the fiscal year the controller first becomes eligible to retire), the agency applied the histogram percentage in Figure 4.3 to the retirement pattern in Figure 4.4 to estimate in Figure 4.5 the retirements for each class by year.

**FIGURE 4.5 | RETIREMENT PROJECTION**



FY 2007 provided the high-water mark for controller retirements.
Annual retirements are expected to continue to decline for the next decade.

**CONTROLLER LOSSES DUE TO RESIGNATIONS, REMOVALS AND DEATHS**

Estimated controller losses due to resignations, removals (excluding developmental attrition) and deaths are based on historical rates and shown in Table 4.2.

**TABLE 4.2 | CONTROLLER LOSSES DUE TO RESIGNATIONS, REMOVALS AND DEATHS**

| FISCAL YEAR | 2017 (actual) | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NUMBER OF CONTROLLERS | 65 | 68 | 68 | 68 | 68 | 69 | 69 | 69 | 70 | 70 | 70 |

**DEVELOPMENTAL ATTRITION**

Estimated losses of trainees who terminate from the FAA while still in developmental status are shown in Table 4.3. Hiring from FY 2013 to FY 2015 was lower than projected, which caused the need for increased hiring at near-capacity levels from FY 2016 through FY 2018. Correspondingly, this plan incorporates a projected increase in developmental attrition for FY 2016 through FY 2020 as hires from these years progress through their training program.

**TABLE 4.3 | DEVELOPMENTAL ATTRITION**

| FISCAL YEAR | 2017 (actual) | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NUMBER OF CONTROLLERS | 74 | 81 | 86 | 90 | 73 | 55 | 50 | 50 | 49 | 51 | 52 |

**ACADEMY ATTRITION**

Estimates of losses from new hires that are not successful in the FAA Academy training program are based on both historical rates and projections, and are shown in Table 4.4. The projected academy attrition in this plan is higher than the projections in prior plans. This was driven by observed higher failure rates at the FAA Academy recently. The FAA will continue to monitor academy failure rates moving forward for the impact of these changes and adjust future projections accordingly. In addition, hiring from FY 2013 to FY 2015 was lower than projected, which causes the need for increased hiring at near-capacity levels from FY 2016 through FY 2018. Correspondingly, this plan incorporates a projected increase in academy attrition for FY 2018 through FY 2019 as hires from these years progress through their training program.

**TABLE 4.4 | ACADEMY ATTRITION**

| FISCAL YEAR | 2017 (actual) | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NUMBER OF CONTROLLERS | 735 | 656 | 516 | 356 | 322 | 348 | 328 | 337 | 342 | 352 | 346 |

**CONTROLLER LOSSES DUE TO PROMOTIONS AND OTHER TRANSFERS**

This section presents FAA estimates of controller losses due to internal transfers to other positions (staff support specialists, traffic management coordinators, etc.) and controller losses due to promotions to front line manager (FLM) or air traffic management/supervisory positions.

Over the past five years, we've observed an average of 155 net promotions each year from CPC to supervisory positions. The majority of these promotions replace retiring supervisors. We expect total net transfers and promotions to increase slightly, to peak at 357 in FY 2019 and to slightly fall in future years as seen in Figure 4.6.

**FIGURE 4.6 | CONTROLLER LOSSES DUE TO PROMOTIONS AND OTHER TRANSFERS**



**TOTAL CONTROLLER LOSSES**

The FAA projects a total loss of 11,029 controllers over the next 10 years. Should losses outpace projections for FY 2018, the FAA will hire additional controllers to reach the end-of-year goal of 14,497 air traffic controllers on board.

**FIGURE 4.7 | TOTAL CONTROLLER LOSSES**





## Chapter 5
# Hiring Plan

The FAA safely operates and maintains the NAS because of the combined expertise of its people, the support of technology and the application of standardized procedures. Every day tens of thousands of aircraft are guided safely and expeditiously through the NAS to their destinations.

Deploying a well-trained and well-staffed air traffic control workforce plays an essential role in fulfilling this responsibility. The FAA's current hiring plan has been designed to phase in new hires as needed. To staff the right number of people in the right places at the right time, the FAA develops annual hiring plans that are responsive to changes in traffic and in the controller workforce.

The FAA hires new developmental controllers in advance of the agency's staffing needs in order to have ample time to train them to offset future attrition, including retirements, promotions, etc. Proper execution of the hiring plan, while flexibly adapting to the dynamic nature of traffic and attrition, is critical to the plan's success. If the new developmentals are not placed correctly or if CPCs are not transferred from other facilities, shortages could occur at individual facilities that may affect schedules, increase overtime usage or require the use of more developmentals on position.
Staffing is and will continue to be monitored at all facilities throughout the year. The agency will continue to modify the hiring plan at the facility level should adjustments become necessary due to changes in traffic volume, retirements or other attrition.

The FAA continues to be able to attract large numbers of qualified controller candidates. Through a revised two-track controller hiring process, and use of the updated Employee Request Reassignment process, the FAA will attract and recruit a sufficient number of applicants to achieve this hiring plan

**CONTROLLER HIRING PROFILE**

The controller hiring profile is shown in Figure 5.1. The FAA hired 1,880 controllers compared with the plan of 1,781 controllers in FY 2017. Missed hiring goals in prior years created a significant backlog and subsequently increased the need for new controller hiring for several fiscal years into the future. We currently plan to spread hiring through FY 2020, raising hiring projections in those years relative to last year's plan. We spread the hiring to support better predictability at the academy and facilities, and to smooth out workload for our medical and security personnel. The number of controllers projected to be hired through FY 2027 is 10,773.

**FIGURE 5.1 | CONTROLLER HIRING PROFILE**



The FAA hired 1,680 controllers in FY 2016 and 1,880 in FY 2017.

**TRAINEE-TO-TOTAL-CONTROLLER PERCENTAGE**

The hiring plan allows the FAA to maintain an appropriate number of trainees (developmental and CPC-IT) in the workforce. The percentage shown is calculated as the sum of CPC-ITs plus developmentals divided by all controllers. While the FAA strives to keep the trainee percentage below 35 percent for both Terminal and En Route controllers, it is not the only metric used by the agency to measure trainee progress.

Figure 5.2 shows the projected trainee-to-total-controller percentages for En Route and Terminal by year to 2027.

While Terminal facilities are showing a decline through 2022, there is a slight uptick in the En Route percentage for the next couple of years as controllers in the current developmental pipeline become fully certified. Note the trainee percentage for both En Route and Terminal is still well below 35 percent. In general, the En Route trainee ratio exceeds the Terminal ratio primarily because of the longer times to certify (on average) in En Route facilities.

**FIGURE 5.2 | TRAINEE-TO-TOTAL-CONTROLLER PERCENTAGE**



Before the 1981 strike, the FAA experienced trainee percentages ranging from 23 percent to 44 percent. Following the strike, through the end of the hiring wave in 1992, the trainee percentage ranged from 24 percent to 52 percent. When the post-strike hires became fully certified by the end of the decade, the trainee percentage declined.

As the new controllers hired en masse in the early 1980s achieved full certification, the subsequent need for new hires dropped significantly from 1993 to 2006. This caused trainee percentages to reach unusually low levels. The FAA's current hiring plans return trainee percentages to their historical averages.

By phasing in new hires as needed, the FAA will level out the significant training spikes and troughs experienced over the last 40 years. Even though there was a long-expected trainee peak in 2009, the trainee percentage remains low as thousands of trainees hired over the past decade have become certified controllers. Figure 5.3 shows historical trainee percentages from 1969 to the present.

**FIGURE 5.3 | HISTORICAL TRAINEE PERCENTAGE FROM 1969 to PRESENT**



The FAA uses many metrics (e.g., 35 percent trainee to total controllers) to manage the flow of trainees while accomplishing daily operations. Facilities meter training to coincide with a number of dynamic factors, including technology upgrades, new runway construction and recurrent proficiency training for existing CPCs. Facility training is enabled by many factors. Examples include the use of contract instructors, access to simulators, scheduled overtime, and the seasonality and complexity of operations.

In itself, the actual number of trainees does not indicate the progress of each individual in the training program or the additional utility they provide that can help to supplement other on-the-job training instruction and support operations. A key facility measure of training performance is the measurement of trainee completion time against the goals. The goal ranges from one-and-a-half years at our lower-level Terminal facilities to three years at our En Route facilities

The FAA is striving to meet these goals by improving training and scheduling processes through increased use of simulators and better tracking of controller training using the FAA's national training database.

The FAA will continue to closely monitor facilities to make sure trainees are progressing through each stage of training while also maintaining the safe and efficient operation of the NAS.



## Chapter 6

# Hiring Process

**CONTROLLER HIRING SOURCES**
The FAA has two primary categories of controller hiring sources.

- No prior air traffic control specialist (ATCS) experience: These individuals are not required to have prior air traffic control experience and may apply for vacancies announced by the FAA.

- Prior ATCS experience: These individuals have at least 52 weeks of certified air traffic control experience and may apply for vacancies announced by the FAA.

**RECRUITMENT**
The agency continues to attract and recruit high-quality applicants into the controller workforce to meet staffing requirements.

In FY 2014, the FAA instituted an interim change to the air traffic control hiring process. The changes allowed the FAA to more efficiently compare applicants across previous hiring sources to select those candidates most likely to succeed as air traffic control specialists. The new approach included: (1) single vacancy announcement for Collegiate Training Initiative (CTI)/veterans and general public applicants; (2) a single set of minimum qualifications/eligibility requirements; (3) a multi-hurdle selection process with increased efficiency; and (4) elimination of the Centralized Selection Panel process and interview.

In January 2015, the FAA modified the interim changes by establishing a two-track announcement process for hiring air traffic control specialists. The first track targeted candidates without operational air traffic control experience.

The second track included an announcement targeting applicants who have at least 52 weeks of certified air traffic control experience in either civilian or military air traffic control facilities. In December 2015, the FAA launched an extended announcement for applicants with previous experience.

In 2016, Public Law 114-190 established three separate hiring pools.

FESSA requires that the first pool, which included individuals with previous air traffic control experience, be given priority consideration. It also increases the maximum hiring age to 35 for those meeting certain requirements. Over 1,400 applicants responded to the air traffic control experience vacancy announcement in May 2017. Over 900 were referred for employment consideration.

FESSA establishes a separate track that was then divided into two pools. The first pool includes graduates from CTI programs and also military veterans. The second pool is open to the general public. Only the second pool is required to pass a biographical assessment screen. FESSA mandates that there be no more than a 10 percent variance between those two pools in making final selections. Out of 1,100 applicants referred for employment consideration from the CTI/veteran pool, approximately 611 were selected. Out of 1,500 applicants referred for employment consideration from the general public pool, approximately 656 were selected.

Once applicants are notified of selection and have accepted the offer, they will then be required to attain medical and security clearances. Upon successful completion of clearances, the applicants will then be scheduled for FAA Air Traffic Academy training as agency needs are identified.

In FY 2018, the FAA will continue to recruit and hire air traffic control specialists to meet staffing requirements through the use of the two-track announcement process,

## Chapter 7
# Training

The FAA develops the national training curriculum and learning tools that increase the knowledge of its technical workforce who serve the world's largest, most efficient and safest National Airspace System – today and for the future.

The cohort of air traffic professionals we hired in 2017 and continue to hire in 2018 are essential to the transition to the Next Generation Air Transportation System. Our controllers are increasingly using real-time information to direct aircraft more efficiently while reducing delays. Capabilities such as Performance Based Navigation and Data Communications increase controller productivity while reducing communication errors. They must also, in coming years, effectively incorporate new entrants such as unmanned aircraft systems (UAS) and commercial space into routine operations.

We are meeting the challenge of training both new and experienced controllers by streamlining the training process, refreshing course content and modernizing our technologies used for learning. The training program, directed by FAA Order 3120.4, Air Traffic Technical Training, is reviewed annually to ensure its technical accuracy. We regularly review performance metrics and work with research centers to identify areas for improvement and innovation so the training program evolves with operations.

**THE TRAINING PROCESS**

New hires with no previous air traffic control experience begin their federal career training at the FAA Academy, where they learn foundational aviation knowledge through classroom lectures, team exercises and computer-based instruction, and practice basic air traffic control skills using low-, medium- and high-fidelity simulation devices.

The academy lays the foundation for employee development by teaching common, fundamental air traffic control principles and procedures that are used at facilities throughout the country. After successfully completing training at the FAA Academy, developmental controllers are assigned to a field location, where they enter additional, site-specific qualification training and hone their technical abilities in the operational environment. This phase of training begins in the classroom, where students learn facility-specific equipment, rules and procedures. After students master initial learning objectives, the instruction transitions to simulators where learners can apply their knowledge and improve their skills in a hands-on, repetitive and safe environment. Finally, employees enter the on-the-job training phase working the control position, where their performance is carefully monitored by certified professional controllers who help trainees develop their techniques in a progressively more difficult live-traffic environment.

New hires with previous air traffic experience are selected directly for a field facility and usually begin their federal service in an accelerated training program customized for their prior aviation experience. They are able to bypass certain phases of training, but they are required to meet the same certification standards for each control position as new hires with no previous experience.

The goal of all new employees is to become a CPC, which is when they are finally considered to be at the full-performance level. Once developmental controllers are certified on control positions, they often work independently in those positions under the direction of a supervisor to gain experience and to supplement staffing.

All controllers are assigned periodic proficiency training and participate in both mandatory and optional supplemental training. One of the most successful uses of optional supplemental training is the Flight Deck Training (FDT) program. The program provides controllers real-time experience of air traffic control from the flight crew's perspective by observing flight operations from the flight deck. The process for allocation of FDT was automated to allow more opportunities for this supplemental training.

The FAA's recurrent training program is administered every six months as a combination of classroom and computer-based instruction for all operational personnel. It delivers evidence-based topics derived from a number of data sources. As contrasted with annually required refresher training on static topics, recurrent training delivers timely and relevant training based on safety trends and lessons learned from our analysis. Recurrent training is developed in collaboration with subject matter experts from the controller workforce.

**DESIGNING AND DELIVERING EFFECTIVE TRAINING**

Experienced instructors, CPCs and contractors provide both classroom and simulation training at the FAA Academy and at many field locations. The FAA ensures everyone who instructs developmental controllers – whether they are federal employees or contractors – has the background and skills needed to train new employees.

The FAA completed a comprehensive update to three training courses for on-the-job-training field instructors to incorporate modern learning theory, human factors and process changes. It is especially important for field instructors to maintain proficiency on all of the latest skills, new procedures and technologies coming into the system through NextGen improvements, as well as prepare to instruct students who represent a new generation.

**INFRASTRUCTURE INVESTMENTS**

The FAA continues to expand accessibility of the high-fidelity Tower Simulator System (TSS), a training device that has provided an interactive, realistic environment for controller training. There are 58 simulators installed at 40 locations, and these systems support training for 195 airports using a "hub and spoke" arrangement where employees at remote facilities travel to central locations to use the simulator. The FAA started the upgrade of these systems to improve the scenario generation capabilities, screen resolution, software responsiveness, and access to the system.

The FAA completed the installation of eight U.S. Marine Corps small-footprint simulation systems in FY 2017. These systems complement the original procurement and provide us with a capability of installing a smaller-sized simulator at locations where it would have been cost-prohibitive for the full-sized system.

**TIME TO CERTIFICATION**

The FAA continues to meet its overall goals for time to certification and number of controllers certified. Implementation of foundational NextGen platforms, such as ERAM and TAMR, and new training requirements are factors that affect overall time to CPC. Depending on the type of facility, facility level (complexity) and the number of candidates to certify, controllers are expected to complete certification in one-and-a-half years to three years.

Over 86 percent of those who began training in fiscal years FY 2010 through FY 2014 successfully completed training at their first facility or a subsequent facility.

Completion means that employees achieved FAA CPC status. The remaining members of the hiring classes (14 percent) have been removed from the agency, resigned or are still in training. Developmental controllers who fail to certify at a facility may be removed from service or reassigned to a less complex facility in accordance with agency policies and directives.

Table 7.1 shows the FAA's training targets and average training completion time by facility type for those who began training in fiscal years FY 2010 through FY 2014. Only those who achieved CPC status at their first facility assignment are included in the average training completion times displayed because incorporation of training times at additional facilities can skew the average. Additionally, training data for hiring classes after FY 2015 are not reported here because greater than 10 percent of the students are still in active phases of training, resulting in continuously changing metrics as those students certify or fail.

**TABLE 7.1 | YEARS TO CERTIFY (FIRST ASSIGNED FACILITY ONLY)**



*Calculations do not include transfers or trainees who were reinstated.

**INVESTING FOR THE FUTURE**

As the FAA transitions to NextGen, the key to providing safe, reliable and efficient air traffic services remains the same: highly skilled, trained and certified professionals. The FAA must maintain curricula to keep pace with the evolving NAS, modernize how it trains employees, incorporate new techniques and technologies for learning, and improve data collection and sharing. Training professionals are part of an FAA team that evaluates how NextGen will change the air traffic work environment and what competencies will be required for the future workforce. The FAA is incorporating what it learns from this evolving and ongoing process into training programs as new systems are implemented. Outcomes-based training aligns NextGen functionality with job tasks as well so that the training organization can make predictions on how programs will need to change as NextGen matures.

# Chapter 8
# Funding Status

In addition to direct training costs, the FAA will incur salary and other costs for developmental controllers before they certify. The average compensation cost of a developmental in FY 2018 is projected to be $108,740.

Figure 8.1 depicts expected annual compensation costs of developmentals, as well as the expected number of developmentals by year through 2027. As training takes one-and-a-half to three years, the chart depicts a rolling total of hires and costs from the current and previous years. It also incorporates the effect of the controller contract.

**FIGURE 8.1 | ESTIMATED COST OF DEVELOPMENTALS BEFORE CERTIFICATION**



## Appendix

# 2018 Facility Staffing Ranges

The Appendix below presents controller staffing ranges, by facility, for En Route and Terminal air traffic control facilities for FY 2018. Additional detail on how the staffing ranges are calculated is provided in Chapter 3.

In general, the FAA strives to keep the number of CPCs and CPC-ITs near the middle of the range. While most of the work is accomplished by CPCs, work is also being performed in facilities by CPC-IT and position-qualified developmental controllers who are proficient, or checked out, in specific sectors or positions and handle work independently. Accordingly, facilities can safely operate even with CPC staffing levels below the defined staffing range.

Conversely, a facility's total staffing levels are often above the defined staffing range because new controllers are typically hired two to three years in advance of expected attrition to allow for sufficient training time. The total expected end-of-year staffing number shown in Figure 3.1 reflects this projected advanced hiring.

## En Route

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| --- | --- | --- | --- | --- | --- | --- | --- |
| ZAB | Albuquerque ARTCC | 146 | 10 | 48 | 204 | 170 | 207 |
| ZAN | Anchorage ARTCC | 80 | 9 | 33 | 122 | 84 | 102 |
| ZAU | Chicago ARTCC | 271 | 17 | 61 | 349 | 287 | 351 |
| ZBW | Boston ARTCC | 208 | 1 | 15 | 224 | 176 | 215 |
| ZDC | Washington ARTCC | 242 | 13 | 77 | 332 | 260 | 317 |
| ZDV | Denver ARTCC | 219 | 14 | 10 | 243 | 234 | 286 |
| ZFW | Fort Worth ARTCC | 239 | 16 | 59 | 314 | 251 | 306 |
| ZHU | Houston ARTCC | 206 | 20 | 79 | 305 | 229 | 280 |
| ZID | Indianapolis ARTCC | 259 | 11 | 53 | 323 | 261 | 319 |
| ZJX | Jacksonville ARTCC | 232 | 8 | 3 | 243 | 241 | 295 |
| ZKC | Kansas City ARTCC | 208 | 6 | 33 | 247 | 202 | 247 |
| ZLA | Los Angeles ARTCC | 203 | 17 | 54 | 274 | 227 | 278 |
| ZLC | Salt Lake City ARTCC | 135 | 5 | 10 | 150 | 149 | 182 |
| ZMA | Miami ARTCC | 206 | 3 | 78 | 287 | 219 | 267 |
| ZME | Memphis ARTCC | 225 | 6 | 59 | 290 | 232 | 284 |
| ZMP | Minneapolis ARTCC | 207 | 10 | 92 | 309 | 220 | 269 |
| ZNY | New York ARTCC | 229 | 2 | 97 | 328 | 240 | 293 |

# En Route

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
|---|---|---|---|---|---|---|---|
| **ZOA** | Oakland ARTCC | 155 | 8 | 104 | 267 | 187 | 228 |
| **ZOB** | Cleveland ARTCC | 294 | 17 | 23 | 334 | 282 | 344 |
| **ZSE** | Seattle ARTCC | 136 | 12 | 39 | 187 | 137 | 167 |
| **ZSU** | San Juan CERAP | 41 | 2 | 19 | 62 | 44 | 54 |
| **ZTL** | Atlanta ARTCC | 280 | 19 | 50 | 349 | 312 | 382 |
| **ZUA** | Guam CERAP | 16 | 1 | 2 | 19 | 14 | 18 |
| **EN ROUTE TOTAL** | | 4,437 | 227 | 1,098 | 5,762 | 4,658 | 5,691 |

Note: Facility numbers do not include new hires at the FAA Academy.

# Terminal

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
|---|---|---|---|---|---|---|---|
| **A11** | Anchorage TRACON | 17 | 5 | 3 | 25 | 21 | 25 |
| **A80** | Atlanta TRACON | 68 | 16 | 9 | 93 | 86 | 105 |
| **A90** | Boston TRACON | 55 | 11 | 0 | 66 | 52 | 63 |
| **ABE** | Allentown Tower | 23 | 5 | 9 | 37 | 21 | 26 |
| **ABI** | Abilene Tower | 16 | 1 | 8 | 25 | 14 | 17 |
| **ABQ** | Albuquerque Tower | 19 | 4 | 3 | 26 | 22 | 27 |
| **ACK** | Nantucket Tower | 9 | 0 | 1 | 10 | 9 | 10 |
| **ACT** | Waco Tower | 16 | 0 | 10 | 26 | 16 | 20 |
| **ACY** | Atlantic City Tower | 15 | 2 | 16 | 33 | 19 | 23 |
| **ADS** | Addison Tower | 9 | 2 | 1 | 12 | 10 | 13 |
| **ADW** | Andrews Tower | 11 | 1 | 3 | 15 | 9 | 12 |
| **AFW** | Alliance Tower | 14 | 1 | 1 | 16 | 13 | 16 |
| **AGC** | Allegheny Tower | 14 | 0 | 2 | 16 | 11 | 13 |
| **AGS** | Augusta Tower | 10 | 1 | 7 | 18 | 12 | 15 |
| **ALB** | Albany Tower | 17 | 0 | 14 | 31 | 20 | 25 |
| **ALO** | Waterloo Tower | 9 | 0 | 5 | 14 | 9 | 11 |
| **AMA** | Amarillo Tower | 15 | 0 | 9 | 24 | 14 | 17 |

# Terminal

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
|---|---|---|---|---|---|---|---|
| **ANC** | Anchorage Tower | 20 | 3 | 1 | 24 | 23 | 28 |
| **APA** | Centennial Tower | 20 | 1 | 2 | 23 | 20 | 24 |
| **APC** | Napa Tower | 6 | 0 | 7 | 13 | 7 | 8 |
| **ARB** | Ann Arbor Tower | 10 | 0 | 0 | 10 | 7 | 9 |
| **ARR** | Aurora Tower | 11 | 0 | 0 | 11 | 7 | 9 |
| **ASE** | Aspen Tower | 13 | 0 | 5 | 18 | 10 | 13 |
| **ATL** | Atlanta Tower | 36 | 6 | 0 | 42 | 46 | 56 |
| **AUS** | Austin Tower | 32 | 9 | 0 | 41 | 37 | 45 |
| **AVL** | Asheville Tower | 17 | 0 | 1 | 18 | 13 | 16 |
| **AVP** | Wilkes-Barre Tower | 16 | 0 | 6 | 22 | 16 | 20 |
| **AZO** | Kalamazoo Tower | 18 | 1 | 4 | 23 | 16 | 19 |
| **BDL** | Bradley Tower | 14 | 0 | 2 | 16 | 12 | 14 |
| **BED** | Hanscom Tower | 14 | 0 | 4 | 18 | 12 | 14 |
| **BFI** | Boeing Tower | 18 | 1 | 3 | 22 | 18 | 21 |
| **BFL** | Bakersfield Tower | 16 | 1 | 9 | 26 | 15 | 18 |
| **BGM** | Binghamton Tower | 15 | 0 | 2 | 17 | 11 | 13 |
| **BGR** | Bangor Tower | 21 | 0 | 3 | 24 | 17 | 21 |
| **BHM** | Birmingham Tower | 23 | 3 | 7 | 33 | 22 | 27 |
| **BIL** | Billings Tower | 13 | 0 | 13 | 26 | 17 | 20 |
| **BIS** | Bismarck Tower | 9 | 0 | 5 | 14 | 11 | 13 |
| **BJC** | Broomfield Tower | 10 | 0 | 2 | 12 | 11 | 13 |
| **BNA** | Nashville Tower | 31 | 7 | 2 | 40 | 37 | 45 |
| **BOI** | Boise Tower | 22 | 5 | 7 | 34 | 24 | 29 |
| **BOS** | Boston Tower | 24 | 5 | 1 | 30 | 29 | 35 |
| **BPT** | Beaumont Tower | 9 | 0 | 3 | 12 | 9 | 11 |
| **BTR** | Baton Rouge Tower | 18 | 0 | 12 | 30 | 14 | 18 |
| **BTV** | Burlington Tower | 16 | 0 | 13 | 29 | 15 | 18 |
| **BUF** | Buffalo Tower | 27 | 3 | 8 | 38 | 23 | 28 |
| **BUR** | Burbank Tower | 18 | 0 | 5 | 23 | 16 | 19 |
| **BWI** | Baltimore Tower | 21 | 1 | 1 | 23 | 21 | 26 |
| **C90** | Chicago TRACON | 68 | 23 | 3 | 94 | 84 | 102 |
| **CAE** | Columbia Tower | 19 | 0 | 7 | 26 | 18 | 23 |

# Terminal

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
|---|---|---|---|---|---|---|---|
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| CAK | Akron-Canton Tower | 18 | 1 | 7 | 26 | 18 | 22 |
| CCR | Concord Tower | 9 | 1 | 2 | 12 | 10 | 13 |
| CDW | Caldwell Tower | 10 | 0 | 3 | 13 | 9 | 11 |
| CHA | Chattanooga Tower | 14 | 2 | 7 | 23 | 15 | 19 |
| CHS | Charleston Tower | 21 | 0 | 4 | 25 | 20 | 25 |
| CID | Cedar Rapids Tower | 14 | 2 | 2 | 18 | 13 | 16 |
| CKB | Clarksburg Tower | 14 | 0 | 6 | 20 | 12 | 15 |
| CLE | Cleveland Tower | 38 | 1 | 4 | 43 | 31 | 38 |
| CLT | Charlotte Tower | 79 | 11 | 0 | 90 | 72 | 88 |
| CMA | Camarillo Tower | 12 | 0 | 1 | 13 | 9 | 11 |
| CMH | Columbus Tower | 36 | 6 | 0 | 42 | 39 | 48 |
| CMI | Champaign Tower | 15 | 1 | 0 | 16 | 13 | 16 |
| CNO | Chino Tower | 8 | 1 | 4 | 13 | 10 | 12 |
| COS | Colorado Springs Tower | 22 | 3 | 1 | 26 | 22 | 27 |
| CPR | Casper Tower | 11 | 0 | 3 | 14 | 9 | 12 |
| CPS | Downtown Tower | 9 | 0 | 2 | 11 | 11 | 13 |
| CRP | Corpus Christi Tower | 24 | 5 | 9 | 38 | 29 | 35 |
| CRQ | Palomar Tower | 11 | 0 | 0 | 11 | 11 | 13 |
| CRW | Charleston Tower | 20 | 0 | 6 | 26 | 17 | 20 |
| CSG | Columbus Tower | 5 | 1 | 3 | 9 | 5 | 6 |
| CVG | Cincinnati Tower | 33 | 10 | 5 | 48 | 38 | 47 |
| D01 | Denver TRACON | 70 | 20 | 1 | 91 | 72 | 88 |
| D10 | Dallas-Fort Worth TRACON | 64 | 29 | 12 | 105 | 78 | 96 |
| D21 | Detroit TRACON | 44 | 16 | 1 | 61 | 47 | 57 |
| DAB | Daytona Beach Tower | 42 | 14 | 7 | 63 | 47 | 57 |
| DAL | Dallas Love Tower | 21 | 3 | 1 | 25 | 21 | 26 |
| DAY | Dayton Tower | 15 | 0 | 0 | 15 | 12 | 14 |
| DCA | Washington National Tower | 20 | 7 | 1 | 28 | 24 | 30 |
| DEN | Denver Tower | 32 | 11 | 0 | 43 | 35 | 43 |
| DFW | Dallas-Fort Worth Tower | 46 | 12 | 0 | 58 | 48 | 59 |
| DLH | Duluth Tower | 15 | 0 | 7 | 22 | 17 | 21 |
| DPA | Dupage Tower | 13 | 0 | 6 | 19 | 11 | 14 |

# Terminal

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
|----|---------------|-----|--------|--------------|-------|-----|------|
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| DSM | Des Moines Tower | 19 | 6 | 3 | 28 | 17 | 21 |
| DTW | Detroit Tower | 30 | 7 | 0 | 37 | 28 | 34 |
| DVT | Deer Valley Tower | 15 | 3 | 2 | 20 | 17 | 20 |
| DWH | Hooks Tower | 14 | 0 | 1 | 15 | 9 | 11 |
| ELM | Elmira Tower | 10 | 0 | 5 | 15 | 9 | 11 |
| ELP | El Paso Tower | 18 | 2 | 13 | 33 | 19 | 23 |
| EMT | El Monte Tower | 9 | 2 | 1 | 12 | 9 | 11 |
| ERI | Erie Tower | 15 | 0 | 5 | 20 | 15 | 18 |
| EUG | Eugene Tower | 20 | 1 | 2 | 23 | 17 | 20 |
| EVV | Evansville Tower | 10 | 0 | 13 | 23 | 12 | 15 |
| EWR | Newark Tower | 27 | 11 | 0 | 38 | 32 | 39 |
| F11 | Central Florida TRACON | 33 | 7 | 4 | 44 | 45 | 56 |
| FAI | Fairbanks Tower | 16 | 1 | 8 | 25 | 18 | 22 |
| FAR | Fargo Tower | 15 | 0 | 5 | 20 | 17 | 20 |
| FAT | Fresno Tower | 20 | 5 | 6 | 31 | 20 | 24 |
| FAY | Fayetteville Tower | 11 | 0 | 12 | 23 | 18 | 22 |
| FCM | Flying Cloud Tower | 10 | 0 | 1 | 11 | 9 | 11 |
| FFZ | Falcon Tower | 11 | 0 | 3 | 14 | 13 | 16 |
| FLL | Fort Lauderdale Tower | 24 | 0 | 1 | 25 | 24 | 29 |
| FLO | Florence Tower | 8 | 1 | 5 | 14 | 9 | 12 |
| FNT | Flint Tower | 12 | 1 | 5 | 18 | 12 | 14 |
| FPR | St. Lucie Tower | 10 | 0 | 2 | 12 | 10 | 12 |
| FRG | Farmingdale Tower | 12 | 1 | 1 | 14 | 12 | 14 |
| FSD | Sioux Falls Tower | 16 | 1 | 3 | 20 | 15 | 18 |
| FSM | Fort Smith Tower | 22 | 0 | 12 | 34 | 21 | 26 |
| FTW | Meacham Tower | 13 | 1 | 4 | 18 | 15 | 18 |
| FWA | Fort Wayne Tower | 18 | 0 | 6 | 24 | 18 | 22 |
| FXE | Fort Lauderdale Executive Tower | 10 | 3 | 4 | 17 | 14 | 17 |
| GCN | Grand Canyon Tower | 8 | 1 | 0 | 9 | 8 | 10 |
| GEG | Spokane Tower | 28 | 4 | 4 | 36 | 23 | 28 |
| GFK | Grand Forks Tower | 19 | 1 | 0 | 20 | 18 | 22 |
| GGG | Longview Tower | 12 | 2 | 14 | 28 | 14 | 17 |

# Terminal

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
|---|---|---|---|---|---|---|---|
| GPT | Gulfport Tower | 14 | 0 | 5 | 19 | 13 | 16 |
| GRB | Green Bay Tower | 18 | 1 | 2 | 21 | 16 | 19 |
| GRR | Grand Rapids Tower | 16 | 5 | 5 | 26 | 17 | 21 |
| GSO | Greensboro Tower | 12 | 4 | 12 | 28 | 22 | 27 |
| GSP | Greer Tower | 22 | 0 | 6 | 28 | 17 | 21 |
| GTF | Great Falls Tower | 11 | 0 | 8 | 19 | 12 | 15 |
| HCF | Honolulu Control Facility | 63 | 13 | 18 | 94 | 82 | 100 |
| HEF | Manassas Tower | 8 | 3 | 0 | 11 | 9 | 11 |
| HIO | Hillsboro Tower | 13 | 3 | 2 | 18 | 12 | 15 |
| HLN | Helena Tower | 5 | 0 | 7 | 12 | 7 | 9 |
| HOU | Hobby Tower | 17 | 2 | 1 | 20 | 19 | 23 |
| HPN | Westchester Tower | 13 | 3 | 1 | 17 | 12 | 14 |
| HSV | Huntsville Tower | 15 | 0 | 4 | 19 | 15 | 18 |
| HTS | Huntington Tower | 17 | 0 | 3 | 20 | 15 | 18 |
| HUF | Terre Haute /Hulman Tower | 10 | 2 | 9 | 21 | 14 | 17 |
| HWD | Hayward Tower | 10 | 0 | 2 | 12 | 9 | 11 |
| I90 | Houston TRACON | 69 | 26 | 1 | 96 | 79 | 96 |
| IAD | Dulles Tower | 23 | 7 | 1 | 31 | 25 | 31 |
| IAH | Houston Intercontinental Tower | 37 | 2 | 0 | 39 | 31 | 38 |
| ICT | Wichita Tower | 17 | 4 | 16 | 37 | 26 | 32 |
| ILG | Wilmington Tower | 9 | 0 | 2 | 11 | 8 | 10 |
| ILM | Wilmington Tower | 17 | 1 | 8 | 26 | 15 | 18 |
| IND | Indianapolis Tower | 32 | 5 | 2 | 39 | 35 | 43 |
| ISP | Islip Tower | 14 | 3 | 7 | 24 | 12 | 15 |
| ITO | Hilo Tower | 12 | 3 | 2 | 17 | 11 | 14 |
| JAN | Jackson Tower | 15 | 0 | 8 | 23 | 13 | 16 |
| JAX | Jacksonville Tower | 28 | 8 | 14 | 50 | 40 | 48 |
| JCF | Joshua Control Facility | 18 | 7 | 3 | 28 | 19 | 23 |
| JFK | Kennedy Tower | 26 | 9 | 0 | 35 | 30 | 37 |
| JNU | Juneau Tower | 13 | 0 | 0 | 13 | 9 | 12 |
| K90 | Cape TRACON | 19 | 0 | 1 | 20 | 17 | 21 |
| L30 | Las Vegas TRACON | 33 | 6 | 0 | 39 | 41 | 51 |

# Terminal

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| LAF | Lafayette Tower | 8 | 0 | 3 | 11 | 8 | 10 |
| LAN | Lansing Tower | 20 | 0 | 4 | 24 | 17 | 21 |
| LAS | Las Vegas Tower | 33 | 8 | 0 | 41 | 35 | 43 |
| LAX | Los Angeles Tower | 31 | 17 | 0 | 48 | 44 | 54 |
| LBB | Lubbock Tower | 13 | 2 | 4 | 19 | 15 | 18 |
| LCH | Lake Charles Tower | 11 | 0 | 9 | 20 | 12 | 15 |
| LEX | Lexington Tower | 22 | 0 | 9 | 31 | 19 | 24 |
| LFT | Lafayette Tower | 16 | 1 | 6 | 23 | 13 | 16 |
| LGA | La Guardia Tower | 28 | 10 | 0 | 38 | 29 | 36 |
| LGB | Long Beach Tower | 17 | 3 | 1 | 21 | 18 | 23 |
| LIT | Little Rock Tower | 24 | 4 | 3 | 31 | 22 | 27 |
| LNK | Lincoln Tower | 9 | 0 | 4 | 13 | 9 | 10 |
| LOU | Bowman Tower | 13 | 0 | 0 | 13 | 10 | 12 |
| LVK | Livermore Tower | 10 | 2 | 1 | 13 | 8 | 10 |
| M03 | Memphis TRACON | 25 | 2 | 5 | 32 | 27 | 34 |
| M98 | Minneapolis TRACON | 45 | 18 | 0 | 63 | 50 | 62 |
| MAF | Midland Tower | 16 | 1 | 6 | 23 | 14 | 17 |
| MBS | Saginaw Tower | 9 | 1 | 6 | 16 | 10 | 12 |
| MCI | Kansas City Tower | 33 | 3 | 6 | 42 | 30 | 37 |
| MCO | Orlando Tower | 29 | 1 | 0 | 30 | 25 | 30 |
| MDT | Harrisburg Tower | 21 | 0 | 9 | 30 | 22 | 27 |
| MDW | Midway Tower | 16 | 5 | 2 | 23 | 21 | 25 |
| MEM | Memphis Tower | 23 | 1 | 4 | 28 | 21 | 25 |
| MFD | Mansfield Tower | 14 | 1 | 6 | 21 | 13 | 15 |
| MGM | Montgomery Tower | 13 | 1 | 9 | 23 | 15 | 18 |
| MHT | Manchester Tower | 13 | 1 | 1 | 15 | 11 | 14 |
| MIA | Miami Tower | 69 | 32 | 5 | 106 | 81 | 100 |
| MIC | Crystal Tower | 10 | 0 | 2 | 12 | 8 | 10 |
| MKC | Downtown Tower | 11 | 3 | 1 | 15 | 11 | 14 |
| MKE | Milwaukee Tower | 32 | 11 | 0 | 43 | 33 | 40 |
| MKG | Muskegon Tower | 13 | 0 | 8 | 21 | 12 | 14 |
| MLI | Quad City Tower | 12 | 0 | 10 | 22 | 13 | 15 |

# Terminal

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
|---|---|---|---|---|---|---|---|
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| MLU | Monroe Tower | 10 | 0 | 7 | 17 | 10 | 12 |
| MMU | Morristown Tower | 7 | 1 | 2 | 10 | 9 | 11 |
| MOB | Mobile Tower | 20 | 2 | 1 | 23 | 17 | 21 |
| MRI | Merrill Tower | 11 | 1 | 1 | 13 | 9 | 12 |
| MRY | Monterey Tower | 7 | 1 | 1 | 9 | 9 | 11 |
| MSN | Madison Tower | 16 | 0 | 6 | 22 | 16 | 20 |
| MSP | Minneapolis Tower | 35 | 7 | 0 | 42 | 31 | 37 |
| MSY | New Orleans Tower | 30 | 5 | 0 | 35 | 32 | 39 |
| MWH | Grant County Tower | 7 | 0 | 12 | 19 | 11 | 14 |
| MYF | Montgomery Tower | 12 | 2 | 0 | 14 | 11 | 13 |
| MYR | Myrtle Beach Tower | 15 | 6 | 5 | 26 | 20 | 25 |
| N90 | New York TRACON | 131 | 19 | 2 | 152 | 177 | 216 |
| NCT | Northern California TRACON | 131 | 32 | 1 | 164 | 152 | 185 |
| NEW | Lakefront Tower | 8 | 1 | 1 | 10 | 7 | 8 |
| OAK | Oakland Tower | 19 | 3 | 3 | 25 | 22 | 27 |
| OGG | Maui Tower | 8 | 2 | 5 | 15 | 11 | 13 |
| OKC | Oklahoma City Tower | 16 | 1 | 15 | 32 | 28 | 34 |
| OMA | Eppley Tower | 14 | 0 | 3 | 17 | 11 | 13 |
| ONT | Ontario Tower | 11 | 0 | 4 | 15 | 13 | 16 |
| ORD | Chicago O'Hare Tower | 55 | 13 | 0 | 68 | 58 | 71 |
| ORF | Norfolk Tower | 21 | 5 | 6 | 32 | 25 | 31 |
| ORL | Orlando Executive Tower | 8 | 2 | 2 | 12 | 9 | 12 |
| P31 | Pensacola TRACON | 27 | 9 | 1 | 37 | 29 | 36 |
| P50 | Phoenix TRACON | 53 | 9 | 2 | 64 | 55 | 67 |
| P80 | Portland TRACON | 21 | 4 | 6 | 31 | 25 | 31 |
| PAE | Paine Tower | 10 | 0 | 2 | 12 | 9 | 10 |
| PAO | Palo Alto Tower | 9 | 0 | 3 | 12 | 8 | 10 |
| PBI | Palm Beach Tower | 38 | 10 | 3 | 51 | 39 | 48 |
| PCT | Potomac TRACON | 139 | 28 | 9 | 176 | 134 | 164 |
| PDK | DeKalb-Peachtree Tower | 14 | 4 | 0 | 18 | 13 | 16 |
| PDX | Portland Tower | 19 | 5 | 3 | 27 | 21 | 26 |
| PHF | Patrick Henry Tower | 7 | 0 | 4 | 11 | 9 | 11 |

## Terminal

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| **PHL** | Philadelphia Tower | 67 | 14 | 0 | 81 | 66 | 81 |
| **PHX** | Phoenix Tower | 29 | 3 | 0 | 32 | 29 | 35 |
| **PIA** | Peoria Tower | 14 | 1 | 11 | 26 | 15 | 18 |
| **PIE** | St. Petersburg Tower | 10 | 1 | 3 | 14 | 9 | 11 |
| **PIT** | Pittsburgh Tower | 29 | 11 | 4 | 44 | 36 | 43 |
| **PNE** | Northeast Philadelphia Tower | 8 | 1 | 3 | 12 | 8 | 10 |
| **PNS** | Pensacola Tower | 11 | 0 | 0 | 11 | 9 | 11 |
| **POC** | Brackett Tower | 9 | 1 | 1 | 11 | 9 | 11 |
| **POU** | Poughkeepsie Tower | 9 | 0 | 4 | 13 | 7 | 9 |
| **PRC** | Prescott Tower | 11 | 3 | 2 | 16 | 11 | 14 |
| **PSC** | Pasco Tower | 17 | 0 | 4 | 21 | 15 | 18 |
| **PSP** | Palm Springs Tower | 9 | 0 | 4 | 13 | 9 | 11 |
| **PTK** | Pontiac Tower | 9 | 2 | 1 | 12 | 10 | 12 |
| **PUB** | Pueblo Tower | 13 | 0 | 3 | 16 | 12 | 14 |
| **PVD** | Providence Tower | 26 | 2 | 5 | 33 | 24 | 29 |
| **PWK** | Chicago Executive Tower | 11 | 0 | 0 | 11 | 9 | 11 |
| **PWM** | Portland Tower | 20 | 1 | 3 | 24 | 16 | 20 |
| **R90** | Omaha TRACON | 19 | 0 | 1 | 20 | 19 | 23 |
| **RDG** | Reading Tower | 13 | 0 | 6 | 19 | 14 | 17 |
| **RDU** | Raleigh-Durham Tower | 38 | 6 | 1 | 45 | 38 | 47 |
| **RFD** | Rockford Tower | 19 | 0 | 6 | 25 | 19 | 23 |
| **RHV** | Reid-Hillview Tower | 9 | 0 | 3 | 12 | 10 | 12 |
| **RIC** | Richmond Tower | 14 | 0 | 3 | 17 | 11 | 14 |
| **RNO** | Reno Tower | 14 | 2 | 0 | 16 | 11 | 14 |
| **ROA** | Roanoke Tower | 21 | 0 | 4 | 25 | 18 | 23 |
| **ROC** | Rochester Tower | 22 | 0 | 9 | 31 | 21 | 26 |
| **ROW** | Roswell Tower | 10 | 0 | 7 | 17 | 9 | 11 |
| **RST** | Rochester Tower | 11 | 0 | 2 | 13 | 12 | 14 |
| **RSW** | Fort Myers Tower | 20 | 6 | 5 | 31 | 25 | 31 |
| **RVS** | Riverside Tower | 11 | 0 | 5 | 16 | 11 | 13 |
| **S46** | Seattle TRACON | 36 | 11 | 3 | 50 | 46 | 57 |
| **S56** | Salt Lake City TRACON | 38 | 6 | 8 | 52 | 37 | 46 |

# Terminal

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
|----|---------------|-----|--------|--------------|-------|-----|------|
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| SAN | San Diego Tower | 20 | 4 | 2 | 26 | 20 | 24 |
| SAT | San Antonio Tower | 33 | 14 | 2 | 49 | 38 | 46 |
| SAV | Savannah Tower | 22 | 2 | 7 | 31 | 20 | 24 |
| SBA | Santa Barbara Tower | 20 | 4 | 11 | 35 | 21 | 26 |
| SBN | South Bend Tower | 21 | 0 | 8 | 29 | 18 | 23 |
| SCK | Stockton Tower | 9 | 1 | 1 | 11 | 8 | 10 |
| SCT | Southern California TRACON | 189 | 47 | 8 | 244 | 202 | 246 |
| SDF | Standiford Tower | 34 | 8 | 2 | 44 | 36 | 44 |
| SDL | Scottsdale Tower | 11 | 0 | 2 | 13 | 11 | 13 |
| SEA | Seattle Tower | 24 | 2 | 0 | 26 | 28 | 35 |
| SEE | Gillespie Tower | 12 | 1 | 2 | 15 | 12 | 15 |
| SFB | Sanford Tower | 17 | 0 | 2 | 19 | 16 | 20 |
| SFO | San Francisco Tower | 25 | 6 | 0 | 31 | 30 | 37 |
| SGF | Springfield Tower | 24 | 0 | 6 | 30 | 22 | 27 |
| SHV | Shreveport Tower | 18 | 2 | 7 | 27 | 18 | 22 |
| SJC | San Jose Tower | 12 | 0 | 2 | 14 | 12 | 15 |
| SJU | San Juan Tower | 15 | 0 | 4 | 19 | 13 | 16 |
| SLC | Salt Lake City Tower | 28 | 4 | 0 | 32 | 26 | 32 |
| SMF | Sacramento Tower | 12 | 3 | 1 | 16 | 11 | 14 |
| SMO | Santa Monica Tower | 10 | 2 | 7 | 19 | 10 | 12 |
| SNA | John Wayne Tower | 15 | 4 | 2 | 21 | 20 | 24 |
| SPI | Springfield Tower | 10 | 0 | 4 | 14 | 10 | 12 |
| SRQ | Sarasota Tower | 10 | 1 | 1 | 12 | 10 | 12 |
| STL | St. Louis Tower | 16 | 2 | 1 | 19 | 17 | 20 |
| STP | St. Paul Tower | 11 | 1 | 1 | 13 | 8 | 10 |
| STS | Sonoma Tower | 7 | 0 | 4 | 11 | 7 | 9 |
| STT | St. Thomas Tower | 10 | 1 | 2 | 13 | 8 | 10 |
| SUS | Spirit Tower | 10 | 0 | 1 | 11 | 9 | 12 |
| SUX | Sioux Gateway Tower | 8 | 0 | 8 | 16 | 9 | 11 |
| SYR | Syracuse Tower | 17 | 0 | 4 | 21 | 18 | 21 |
| T75 | St. Louis TRACON | 29 | 0 | 0 | 29 | 27 | 33 |
| TEB | Teterboro Tower | 13 | 4 | 5 | 22 | 22 | 27 |

# Terminal

| ID | FACILITY NAME | Actual on board as of 09/30/17 | | | | Staffing Range | |
|----|---------------|-----|--------|-------------|-------|------|------|
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| TLH | Tallahassee Tower | 10 | 0 | 8 | 18 | 15 | 18 |
| TMB | Tamiami Tower | 17 | 1 | 1 | 19 | 16 | 19 |
| TOA | Torrance Tower | 10 | 1 | 0 | 11 | 8 | 10 |
| TOL | Toledo Tower | 18 | 0 | 6 | 24 | 17 | 21 |
| TPA | Tampa Tower | 49 | 20 | 0 | 69 | 50 | 61 |
| TRI | Tri-Cities Tower | 11 | 0 | 8 | 19 | 13 | 16 |
| TUL | Tulsa Tower | 25 | 3 | 6 | 34 | 25 | 31 |
| TUS | Tucson Tower | 11 | 3 | 4 | 18 | 13 | 15 |
| TVC | Traverse City Tower | 8 | 1 | 1 | 10 | 7 | 9 |
| TWF | Twin Falls Tower | 9 | 1 | 2 | 12 | 7 | 8 |
| TYS | Knoxville Tower | 20 | 0 | 16 | 36 | 21 | 26 |
| U90 | Tucson TRACON | 15 | 1 | 1 | 17 | 16 | 20 |
| VGT | North Las Vegas Tower | 11 | 0 | 1 | 12 | 11 | 13 |
| VNY | Van Nuys Tower | 18 | 7 | 0 | 25 | 16 | 20 |
| VRB | Vero Beach Tower | 10 | 0 | 2 | 12 | 11 | 13 |
| Y90 | Yankee TRACON | 14 | 2 | 7 | 23 | 20 | 25 |
| YIP | Willow Run Tower | 12 | 0 | 2 | 14 | 10 | 12 |
| YNG | Youngstown Tower | 14 | 1 | 6 | 21 | 14 | 18 |
| **TERMINAL TOTAL** | | 6,107 | 978 | 1,162 | 8,247 | 6,388 | 7,812 |

Note: Facility numbers do not include new hires at the FAA Academy.

| | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
|---|-----|--------|---------------|-------|-----|------|
| **EN ROUTE TOTAL** | 4,437 | 227 | 1,098 | 5,762 | 4,658 | 5,691 |
| **TERMINAL TOTAL** | 6,107 | 978 | 1,162 | 8,247 | 6,388 | 7,812 |
| **GRAND TOTAL** | 10,544 | 1,205 | 2,260 | 14,009 | 11,046 | 13,503 |
| **GRAND TOTAL INCLUDING STUDENTS AT FAA ACADEMY** | | | | 14,481 | | |




















U.S. Department of Transportation

**Federal Aviation Administration**

800 Independence Avenue, SW
Washington, DC 20591



US Department of Transportation
**Federal Aviation Administration**

2018
2019
2020
2021
2022
2023
2024
2025
2026
2027

EXHIBIT
6

STATEMENT OF TERI BRISTOL, CHIEF OPERATING OFFICER, AIR TRAFFIC ORGANIZATION, AND RICKIE CANNON, DEPUTY ASSISTANT ADMINISTRATOR FOR HUMAN RESOURCE MANAGEMENT, FEDERAL AVIATION ADMINISTRATION, BEFORE THE COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE, ON AVIATION, ON A REVIEW OF THE FEDERAL AVIATION ADMINISTRATION'S AIR TRAFFIC CONTROLLER HIRING, STAFFING AND TRAINING PLANS, JUNE 15, 2016.

Chairman LoBiondo, Congressman Larsen, Members of the Subcommittee:

Thank you for the opportunity to appear before you today to discuss the agency's ongoing efforts to ensure that the Federal Aviation Administration (FAA) continues to provide the safest, most efficient air traffic control system in the world.  The FAA's national airspace system (NAS) is an extremely complex operation.  On any given day, FAA's air traffic controllers safely control more than 50,000 flights ranging from small general aviation to large commercial aircraft operations.  In addition, the NAS is ever changing and we must be in a position to manage those changes that are occurring in aviation. For example, we are currently integrating new aviation technologies into the NAS, such as unmanned aircraft systems (UAS) and the emerging commercial space industry.

Delays in our hiring process, such as what we experienced in 2013 with sequestration, can create ripples across our training and placement process.  We want the very best air traffic controllers and these are positions that involve the highest levels of public trust, so medical and security clearances take a considerable amount of time.  We have made significant strides in recent months to ensure that our processes and our pipeline of applicants are as efficient as possible. These changes include filling slots at the FAA Academy more efficiently and placing trainees once they leave the Academy at facilities where the FAA needs them most, with preferences

dictated by their class ranking.  All of these improvements have resulted in the fact that we are on target to meet or exceed our FY 2016 hiring plan.

Key to our ability to meet both the ongoing and emerging needs of the users of the system is our ability to attract, train and retain individuals who possess certain unique capabilities that translate into becoming proficient air traffic controllers.  How best to identify those individuals has been the topic of many studies.  We are applying a data driven approach to hiring air traffic controllers which we believe will result in a more accurate prediction of who can succeed at the job.  Air traffic control is a highly sought after occupation where we typically have a lot more candidates than we have the capacity to hire.

Today, I would like to focus on four areas; how we hire controllers, how we train controllers, how we place controllers, and how we collaborate with the National Air Traffic Controllers Association (NATCA) to ensure everyone understands what we are doing and why.  We think the processes and plans we have in place better target our ideal candidates, train them more effectively, and properly place them at the right facilities that will meet the needs of the NAS as a whole.

## **Hiring**

In 2011, FAA Administrator Babbitt chartered an Independent Review Panel (IRP) that focused on the many facets of controller hiring, selection, training and professional standards.  The IRP made 49 recommendations that the agency has been following up on.  In 2012, the FAA undertook a comprehensive review of the Air Traffic Control Specialist (ATCS) Centralized Hiring Process as called for by the Equal Employment Opportunity Commission (EEOC).  The

EEOC requires agencies to regularly evaluate their employment practices to identify barriers to equality of opportunity for all individuals.  This review identified a number of concerns in the hiring process echoing some of the findings of the IRP.  Consequently, in 2013, the FAA undertook a comprehensive analysis of how to improve the ATCS hiring process.   This resulted in the development of both short- and long-term recommended improvements and an interim hiring process in 2014.  The changes were intended to ensure that the agency selects applicants with the highest probability of successfully completing our rigorous air traffic controller training program and achieving final certification as ATCSs.

The interim process differed from prior agency practice for hiring ATCSs in two primary ways.  First, we created a single, nation-wide vacancy announcement for entry-level air traffic controllers, and a single process to evaluate and assess those applicants, resulting in one set of qualifications for all applicants.  Second, an applicant had to achieve a passing score on a new component of the hiring process, the Biographical Assessment.  Upon passing the Biographical Assessment, applicants were eligible to take the Air Traffic Selection and Training (AT-SAT) exam, which they also had to pass in order to proceed.  The goal was to create a national process that did not create different eligibility standards for the same entry-level air traffic controller position.  More than fifteen hundred applicants were selected as a result of the interim process that was initiated in February 2014.

While using the interim process, the agency continued to incorporate more long-term recommendations for hiring in 2015 while retaining key features of the interim process.  We completed an Occupational Job Task Analysis and Validation, updated the Biographical Assessment and initiated a study to replace the AT-SAT with a validated alternative test.   The

agency also focused on hiring experienced ATCS candidates, creating two approaches, or tracks. The general experience/education track (entry-level ATCS) is open to all U.S. citizens who apply in response to a general public vacancy announcement. Our focus for this track is to reach candidates without air traffic experience, who nevertheless have the aptitude for ATCS work, evidenced by passing the position's minimum qualifications, including the Biographical Assessment and AT-SAT. These applicants are hired at the FG-1 (entry) level and attend FAA Academy training. The second track, the specialized ATC experience track, focuses on reaching candidates with operational experience, such as reinstating former FAA Certified Professional Controllers or military veterans with air traffic control experience. This group must have a minimum of 52 weeks of post-certification ATC experience and are hired at a higher pay level than the general experience/education track, reflecting the fact that the FAA will not have to invest the same amount of resources in training these applicants. Because of their specialized experience, this group does not take the biographical assessment or the AT-SAT. In addition, this group reports directly to a facility, rather than the FAA Academy.

We believe these changes will improve efficiencies and have addressed the concerns identified in our initial reviews of the hiring process. This process better addresses the agency's current hiring needs. It also ensures equitable treatment and the broadest pool of qualified candidates. The biographical assessment is a computerized test that measures important and demonstrably job-related personal characteristics of applicants. Replacing AT-SAT with a validated alternative air traffic skills assessment eliminates the possibility that AT-SAT has been over-exposed and is potentially compromised. We will continue to monitor and refine the process as necessary to ensure that the best possible individuals are selected to maintain the safety and efficiency of the NAS.

Controller needs in future years are driving current hiring decisions.  The FAA uses a series of models to forecast staffing and develop hiring plans.  The FY 2016 controller workforce plan, a plan we provide to Congress annually, reflects expected hiring based on operational needs.  It reflects the fact that we hired below plan objectives in FY 2013 through FY 2015 due to the impact of sequestration initially, and then subsequent throughput issues with the hiring process. FAA has hired 4,759 new controllers over the past five years.  We are on track to meet or exceed our hiring target for this year, which is 1,619 controllers.  As of June 2, 2016, FAA has issued 1,653 firm offers to applicants, of which 1,277 have been hired, and the remaining 376 holding firm offers have a FY 2016 start date.  More than 2,000 qualified candidates remain in the hiring pool.

It is important to understand that FAA's retirement forecast, and the other models we use to predict the needs of the NAS, have been extremely accurate.  Over the past five years in aggregate, the forecast was 98.7% accurate.  Consequently, the improved hiring process, which results in a better selection of candidates most likely to succeed in becoming a certified controller, will better focus the agency's investment in individuals who are the most likely to succeed.  We are confident that our new approach, together with recent enhancements, has resulted in greater ability for the FAA to meet staffing goals moving forward.

## **Training**

At the end of FY 2015, the FAA employed 10,947 certified professional controllers (CPC) plus an additional 2,964 personnel in ATC field qualification training for a total of 13, 911.  New hires who do not possess previous air traffic control experience attend training at the FAA Academy in Oklahoma City where foundational air traffic control knowledge is obtained through

classroom and simulation training.  ATCS training at the FAA Academy is basic in nature and is used to determine whether  students can master  rudimentary air traffic control skills before moving on to more advanced, facility-specific training.  All new hires who report to the FAA Academy must successfully complete an air traffic control initial qualification training course in one of two options; Terminal (tower) or En Route, before graduating to the next phase of training where they will learn more advanced skills.  Each option focuses on different aspects of air traffic control.  FAA identifies an Academy throughput quota for each fiscal year for both Terminal and En Route options.  For FY 2016, the Academy throughput quota for the Terminal option is 446 and the En Route option quota is 1,044.  Pass rates for new hires at the Academy are approximately 74% for Terminal (tower) training and 68% for En Route.  A cumulative grading system is utilized for all initial qualification training at the FAA Academy.  This progressive grading system includes progress checks for students so they can better understand how well they are doing in comparison to a well-established standard as well as identifying areas for improvement throughout this process.

Upon successful completion of Academy training, graduates are assigned to air traffic control facilities based on FAA needs.  At their assigned facilities, they must complete additional rigorous classroom, simulation, and on-the-job training to achieve final certification as a CPC.  On-the-job training times vary based on the facilities' operational complexity.  On average, on-the-job training takes 1.5 years at a tower, 2 years at terminal radar facilities (TRACON), and up to 3.5 years at an En Route facility.  Even after final certification, all controllers are assigned periodic proficiency training, such as recurrent, refresher, or supplemental training.

In April 2015, after a full and open competition, a contract award was made to Science Applications International Corporation (SAIC) for air traffic controller training. The Controller Training Contract (CTC) incorporates the use of a resource management approach to training. This approach ensures that resources are aligned with national training needs and plans. The FAA developed the training requirements tool (TRT) to document and track all monthly training requirements and expenditures at both the FAA Academy and field facilities. The TRT also serves as a reporting engine used for forecasting future training budget needs. The contract calls for FAA to determine training requirements and to allocate funds for FAA Academy and field facilities based on training needs. We have established processes designed to provide program oversight along with a governance structure which ensures job analysis information and the training curriculum remains aligned and updated.

As with our hiring process, FAA continually strives to improve the training we provide our controllers. The Air Traffic Organization (ATO) supports the air traffic controller basic qualification training working group under the Aviation Rulemaking Advisory Committee (ARAC) structure. Currently, there is an 11-person volunteer panel representing a broad range of academic and industry stakeholders working with FAA experts tasked with evaluating possible alternative visions to national hiring and training.

We are also establishing a center of excellence (COE) for Technical Training and Human Performance. This will enable us to tap into innovation, motivation and technology resources for cost-share research on issues that contribute to safety and training improvements. Research from COE grants could be used to help shape the future of air traffic controller training.

**Placement**

The FAA national facility placement strategy is focused on having the right controller in the right place, in the right seat, at the right time.  More centralized staffing decisions are the key to maximizing the agency's resources.  The FAA uses its staffing standards to set overall hiring targets for a NAS-wide workforce, and also collaborates with NATCA on establishing facility-specific targets that are used for placing and transferring controllers strategically at facilities across the country.

The FAA uses a priority placement tool to forecast and prioritize controller staffing requirements.  It captures the latest priority ranking of all 315 facilities and is sorted in order of greatest staffing need.  This is based on current staffing, known gain and losses and projected attrition.  Using data from the priority placement model, the FAA centralized the controller transfer process at the headquarters level in order to best implement a national prioritization process.

The FAA takes great pride in its safety record.  Current Air Traffic Control Specialists acting as On the Job Instructors are very careful to ensure that individuals who are going through the certification process truly have what it takes to be successful.  We place trainees where they are most likely to succeed.  There are certain facilities that have a higher success rate in certifying trainees with limited FAA experience.  These facilities provide further training before a controller moves to one of our more complex locations.  It is our practice to place Academy graduates and non-FAA experienced candidates at En Route centers and terminal facilities that have a proven record of being able to certify trainees with limited Air Traffic Control experience.  These are generally smaller, less busy towers.  By placing our trainees in these facilities, it

8

permits more experienced controllers at those facilities the opportunity to move on to a larger, more complex facility with a higher pay level.

An integral part of the placement process is to support facility-to-facility transfers. To support this, we established a national release policy that identifies facilities that are able to release employees quickly based on two categories. The first category identifies facilities that are staffed above 90% of the facility-specific target for Certified Professional Controllers. These facilities are able to release employees within three months of selection at another facility, or up to six months at the election of the employee. The second category identifies facilities that are above the national average of CPCs. These facilities are able to release employees within one year of selection.

Also critical to the success of facility-to-facility transfers is widely distributing the priority placement tools so controllers looking to take advantage of opportunities available at other facilities are able to anticipate where they can transfer, rather than placing requests for transfers to facilities that are already properly staffed  Our efforts have also refined staffing tools that have allowed us to obtain a much more granular understanding of the unique staffing scenarios that occur at individual facilities. Having tools such as temporary assignments out of the bargaining unit and Employee Requested Reassignment (ERR) in place paved the way for establishing a collaborative national centralized ERR placement team or National Centralized ERR Process Team (NCEPT). NATCA is a member of the team to review all requests for reassignment. This collaborative team will ensure the process works as intended, to staff our most challenged facilities with individuals who can transfer and, most important, certify as quickly as possible.

**Collaboration**

Change is always challenging, even when it is necessary. Our ability to meet the challenge requires collaboration with our labor partners and our colleagues across the FAA. This means building relationships, establishing trust, and working together to make better decisions. First and foremost, we have streamlined our placement process to incorporate best practices from the national priority placement tool, which helps us balance our workforce and allows controllers to rank their top choices from the availabilities on the national list. This reduces the time it takes to facilitate needed transfers and meet the changing needs of the NAS

We established a Collaborative Resource Workgroup with NATCA that is reviewing the staffing models that are in place. That review is underway, and the Workgroup also established facility-specific targets across the facilities that have allowed us to have a common and easy-to-understand placement strategy when it comes to balancing the Air Traffic Controller workforce. Facilities that are above the current CPC average are able to release controllers that are currently below the average.

**Conclusion**

The FAA has faced hiring and training challenges in the past several years due, in part, to resource constraints and process inefficiencies. We have worked very hard to refine our hiring, training, and placement processes to protect the future of the safety and efficiency of the NAS for its current and future users. We are confident that these continuing efforts have resulted in a sustainable hiring process which will meet our needs this year and in the future. The

improvements to training to ensure proficiency along with smarter placement strategies will ensure that staffing challenges, where they exist, are positively addressed.

We are now strategically placing new hires where we need them. We have collaboratively established CPC facility-specific targets that allow us to balance the workforce by executing staffing to the national average.  We are posting this information online to make the information available to our workforce.  We have implemented sophisticated automated tools, standardized processes, and a national ERR placement team to facilitate the transfer of experienced controllers.  In addition, we have implemented a national release policy to expedite that movement to and from identified facilities.

The FAA has a solid and comprehensive plan in place to address controller hiring, training, and placement.  While we are always looking to improve, the air traffic system in the United States is the envy of the world.  The complexity of our system does not exist anywhere else.  We are open to new ideas and are looking forward to working with our government and industry partners to consider improved ways to approach meeting the air traffic needs of the future.

This concludes my statement.  I will be happy to answer your questions at this time.