# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANDREW J. BRIGIDA; POLLYANNA L. WANG; SUZANNE M. REBICH; MATTHEW L. DOUGLAS-COOK | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 16-cv-2227 (DLF) |
| vs. | ) ) | |
| ELAINE L. CHAO, Secretary, U.S. Department of Transportation, | ) ) ) | |
| Defendant. | ) ) ) | |

## REPLY BRIEF IN SUPPORT OF CLASS CERTIFICATION

# INTRODUCTION

Plaintiffs' straightforward class definition satisfies the requirements for certification under Rules 23(a) and 23(b)(3), or as a hybrid class under Rules 23(b)(3) and 23(b)(2). Specifically, Plaintiffs propose to represent a discrete, identifiable class of persons who were uniformly discriminated against when the FAA made a race-based decision to, in one single action, eliminate the Qualified Applicant Register, invalidating the class members' investments in their FAA-approved degrees and their performance on FAA-created and validated job-related aptitude testing. All the proposed class members graduated from an FAA-approved educational program, passed the FAA's AT-SAT testing, and were qualified to apply for selective hiring. This is not a complicated "pattern and practice" class, alleging discrimination based on hundreds, thousands, or even millions of employment decisions, made by multiple individuals, in multiple locations, and taking place over the course of years. Here the Plaintiffs challenge one single discriminatory action that affected each class member at the same time and in the same way. This case is perfectly situated for class treatment and the accompanying benefits of judicial and party economy.

## I.    CLASS DEFINITION

Plaintiffs define a clear, ascertainable class based on objective criteria that easily allows individuals to determine whether they are a member of the class. *See Artis v. Yellen*, 307 F.R.D. 13, 23 (D.D.C. 2014).[1] Indeed, Defendant's purported confusion as to the meaning of a "Qualified Applicant Register" is easily resolved by referring to the list of qualifications

---

[1] Defendant correctly points out that Plaintiffs' class definition excludes persons "who have been employed by the FAA as an air traffic control series GS-2152" but that new controllers were hired using a "FG-2152 designation" or "AT-2152 designation." Def.'s Resp. at 19–20 n.11. The class definition should be modified to reflect this fact.

Defendant provides.  Additionally, contrary to Defendant's presumption, a putative class member satisfies the "OPM qualification standards" in the class definition unless such individual's contemporaneous medical records document the existence of disqualifying medical or psychiatric conditions.  Finally, while harmed individuals should not be excluded from the class, if the Court determines that the class definition must incorporate reference to "protected characteristics" of groups identified in Title VII, the class could be limited to a reverse-discrimination class, which excludes the intended beneficiary class of African Americans. Plaintiffs' proposed class definition makes the roughly 2,600 individuals harmed by Defendant's purge of previously accepted employment qualifications easy to objectively identify, satisfying the requirement for the existence of a "class."[2]

### A.    The "Qualified Applicant Register" Is a Subset of the AT-CTI Inventory

Plaintiffs' class definition includes those who "were on, or eligible to be on, the FAA's AT-CTI Qualified Applicant Register."  Pls.' Mem. at 2, 10.  Defendant acknowledges the existence of relevant lists and collected data (designated by the FAA as a "register"); Defendant also identifies qualifications needed to make an applicant eligible to apply for an FAA CTI-specific vacancy; yet Defendant purports to be flummoxed by the term "Qualified Applicant Register."  Def.'s Resp. at 16.  Defendant's own documents and orders aptly illuminate the meaning of this term in great detail.

First, the meaning of "Register" is clear and has been used by the FAA itself when describing terms relevant to this lawsuit.  Specifically, the FAA defines AT-CTI Inventory as a "centralized register . . . maintained by the [FAA's] Aviation Career Division" that "tracks

---

[2] Should the Court have further concerns about the existence of a class given Defendant's position, Plaintiffs respectfully request oral argument.

important information about applicant eligibility including graduation date, recommendation

status, and AT-SAT score." Pls.' Mem., Ex. 1 at PLA0045. To provide further context, the

Defendant explains that "[t]he FAA developed a system to track CTI students and graduates."

Def.'s Resp. at 6. "Each CTI school provided the FAA's Aviation Careers office with an

electronic list of current CTI students and graduates at regular intervals . . . ." Def.'s Resp. at 6.

The FAA "merge[d] this information into a database and added additional information" over

time. *Id.* The entirety of data in the database was "commonly referred to as the 'AT-CTI

Inventory.'" Mitchell Decl. ¶¶ 9–12. Using the FAA's definition, this Inventory was a register, [3]

and a subset of this register comprises Plaintiffs' term "Qualified Applicant Register."

Second, "Qualified Applicants" are those CTI graduates on the AT-CTI Inventory who

were eligible to apply for CTI-specific ATCS vacancies. *See, e.g.*, Pls.' Mem., Ex. 2 at

PLA0069 ("The Aviation Careers Division "maintain[ed] an inventory of students enrolled in the

AT-CTI program provided by schools officials, *and of eligible AT-CTI graduates*."); *id.* (FAA

used the inventory "to track information on applicant eligibility, graduation dates, school

recommendation status, and for scheduling the pre-employment list."). Defendant explains:

> …to be eligible to apply for a CTI-specific vacancy announcement, a CTI student
> must have had, among other things: (1) graduated from an AT-CTI school in a
> FAA-approved program, (2) received a recommendation from that AT-CTI
> school, (3) achieved a passing score on the Air Traffic Selection and Training
> Test Battery (AT-SAT), (4) be a U.S. citizen, and (5) be younger than 31…"

Def.'s Resp. at 5; Mitchell Decl. ¶ 19. The FAA used the AT-CTI Inventory/Register, "as a

basis for . . . providing a 'job code' which gave eligible individuals access to apply for CTI-

---

[3] Defendant's exhibit defines the AT-CTI Inventory as: "A centralized register of AT-CTI candidates maintained by the Aviation Careers Division . . . used for placement and hiring of AT-CTI students." Mitchell Decl., Ex. 1 at 10 (¶ 3(b)).

specific vacancy announcements." Def.'s Resp. at 7. Defendant's "eligible individuals" are "Qualified Applicants" as that term is used in the class definition.

Using Defendant's own terms, "Qualified Applicant Register" is thus those "eligible individuals," (those meeting the five qualifications identified in the prior paragraph) from the AT-CTI Inventory who, but for the FAA purging and failing to maintain the Inventory, would have been eligible as of December 31, 2013 to receive a job code to apply for a CTI-specific vacancy announcement.

Claiming not to understand the term "Qualified Applicant Register," Defendant hypothesizes that the term means: (1) a list "from which CTI graduates could be non-competitively selected . . . without any formal application";[4] (2) the full AT-CTI Inventory/student roster; or (3) "referral lists" created after applicants responded to a specific vacancy announcement. Def.'s Resp. at 16–17. After setting up these straw definitions, Defendant proceeds to knock them down, arguing that the first is false because the FAA had no list from which it would hire "non-competitively. . . without . . . application," the second is over-

---

[4] Defendant's claim that "[s]ince at least 2008, CTI graduates have only been hired using competitive procedures," Def.'s. Resp. at 5, does not tell the entire story. The federal government consists of three types of services: Competitive Service, the Excepted Service, and the Senior Executive Service. Office of Personnel Management, Hiring Information, https://www.opm.gov/policy-data-oversight/hiring-information/hiring-authorities/ (last visited January 24, 2019). "In the competitive service, individuals must go through a competitive hiring process (i.e., competitive examining) before being appointed which is open to all applicants." *Id*. Meanwhile, "[a]ppointments in the Excepted Service are civil service appointments within the Federal Government that do not confer competitive status." *Id*. Current law, 49 U.S.C. § 44506(c)(2)(A), provides: "The Administrator of the [FAA] may appoint an individual who has successfully completed a course of training in a [CTI] program described in paragraph (1) of this subsection to the position of air traffic controller noncompetitively in the excepted service . . . ." A current OPM SF-50 shows a CTI graduate being appointed through the excepted service, despite being categorized as "Competitive." *See* Ex. 13 at PLA0123–PLA0124 (Boxes 5-B, 5-F, 34). Further, the ATCS vacancy announcements provided by Defendant list the positions as "Excepted." Gage Decl., Ex. 4 at 40; Ex. 6 at 52; Ex. 7 at 61; Ex. 8 at 69.

inclusive, and the third is under-inclusive. Def.'s Resp. at 17–19. These arguments are unavailing because "Qualified Applicant Register," as explained above, means none of those.

### B.    The Use of OPM Qualification Standards Is Appropriate

Plaintiffs' class definition requires that members "met the requirements for . . . Office of Personnel Management qualification standards for employment as an air traffic control specialist." Pls.' Mem. at 2, 10. As with the meaning of "Qualified Applicant Register," Defendant interprets this requirement in an over-complicated fashion. Plaintiffs intend this element merely to exclude those individuals whose medical or other records would demonstrate that they were objectively unfit for an ATCS position as of December 31, 2013.

Defendant argues that the OPM qualification standards are applied during the "application process itself" and include such vague requirements such as the possession "of the traits and characteristics important for air traffic control work." Def.'s Resp. at 20. Defendant asserts that without actual application of the standards during the application process it is impossible to know if the standards are met. Def.'s Resp. at 19–20. Defendant argues that the class definition's incorporation of OPM standards therefore creates the sort of impermissible merits-dependent class definition rejected in *Artis*. Def.'s Resp. at 19–20.

The concerns of the *Artis* court are inapplicable here. In *Artis* the court found that the proposed class definition made "membership in the class contingent on an individualized merits determination," such as whether the claimant had suffered "discrimination." *Artis v. Yellen*, 307 F.R.D. 13, 24 (D.D.C. 2014). In such a case it is "impossible to determine who is in the class until the case ends." *Id.* (quoting *Bolden v. Walsh Const. Co.*, 688 F.3d 893, 895 (7th Cir. 2012)). In this case, however, application of the OPM standards does not require a merits determination.

The OPM qualification standards for air traffic control specialists include various objective criteria. For example, the standards set forth medical requirements for the applicant's eyes, ears, nose, throat, mouth, cardiovascular system, neurological system, musculoskeletal system, general medical condition, psychiatric condition, and the absence of substance dependency.[5] Including the OPM qualification standards in the class definition is meant only to exclude from the class those persons whose medical, psychiatric, or other conditions objectively disqualified them from being hired as a ATCS.[6] Should the Court have any hesitation in this regard, the term "objective" may be inserted into the definition so that it includes "persons who met the objective requirements for . . . Office of Personnel Management qualification standards."

C.     **At This Stage The Class Definition Should Not Be Refined to Exclude Those in the Race of Persons the FAA Intended to Benefit**

Arguing that the Supreme Court's holdings in *Ricci v. DeStefano*, 557 U.S. 557 (2009), were not, and impliedly could not be, made in a class setting, Defendant finds fault with the proposed class definition because it does not incorporate a limitation related to race or other protected characteristics. Def.'s Resp. at 21, 23 n.13. Defendant claims that without identifying a protected characteristic, the class definition suffers from a "mismatch" with Title VII. Def.'s Resp. at 21. In *Ricci*, however, the Supreme Court was not troubled by any purported "mismatch."[7]

---

[5] U.S. Office of Personnel Management, General Qualification Standards, Air Traffic Control Series 2152, https://www.opm.gov/policy-data-oversight/classification-qualifications/general-schedule-qualification-standards/2100/air-traffic-control-series-2152/ (last visited Jan. 22, 2019).

[6] According to Defendant's own data, "[m]ore than 90% of applicants passed the medical screen." Coates Decl., Ex. 2 at 73.

[7] Allowing Defendant's interpretation of the law would allow a disingenuous employer the ability to frustrate the law simply by placing sacrificial minority candidates on a hiring list, purge the list, and then claim immunity from disparate treatment claims.

Petitioners in *Ricci* included 17 white firefighters and one Hispanic firefighter.  In that case a city had refused to implement the results of a promotion test because the results of the test demonstrated a "statistical disparity based on race-*i.e.*, how minority candidates had performed when compared to white candidates."  *Ricci*, 557 U.S. at 579.  The Supreme Court found that the city's actions violated Title VII's prohibition against disparate treatment.[8]  *Id.* at 579–80, 592– 93.  The Supreme Court then held that petitioners were entitled to summary judgment on their Title VII claim.  *Id.* at 593.  The Court did not exclude the Hispanic firefighter from its findings, even though the "raced-based" employment action was premised on a comparison of "white" versus "minority" results.  *Id.* at 579–80, 586–88.

Similarly, and particularly prior to any discovery, it would be inappropriate to prevent some putative class members from benefiting from the protections of Title VII merely because they are members of a class that was meant to benefit from Defendant's discrimination.  Just as in *Ricci*, it is likely that there are some members of the "minority" that stood to benefit from their placement on the Qualified Applicant Register.  After discovery such members may be identified more discretely and/or made a subclass if necessary, but they should not be preemptively excluded from the class.

Should the Court find, however, that Title VII requires, even at this early stage of the case, exclusion of the class of persons meant to be benefited by Defendant's discriminatory actions, then the class in this case would have to exclude African Americans.  As alleged in the Third Amended Complaint, as a result of a "barrier analysis" conducted by the FAA, the FAA

---

[8] Defendant errs in placing *Ricci* "in the disparate impact context."  Def.'s Resp. at 23 n.13.  In *Ricci* the Supreme Court concluded that the defendant's illegal disparate treatment of the plaintiffs was not justified/excused as a result of defendant's fear of a hypothetical disparate impact claim.  557 U.S. at 593.

decided to scrap its use of the Qualified Applicant Register.  Third Am. Compl. ¶¶ 49–51.[9]

Defendant's own exhibit corroborates this allegation.  Coates Decl., Ex. 2 at 71–72 ("When

examining the underlying diversity of the various applicant sources, the most dramatic difference

was found between the [CTI] source and all other applicant sources with respect to African

American representation. African American applicants comprise only 5% of the CTI pool

compared to an average of 34% African American representation across the non-CTI applicant

sources.  While the CTI applicant source is relatively small compared to other sources, the CTI

subgroup differences are magnified when considering the relatively high 'survival' rate of CTI

candidates through the hiring process."); *see also* Pls.' Mem., Ex. 7 at PLA0104–PLA0105

(Broach Controller Hiring Proposal).  This barrier analysis was the result of the FAA's

coordination with and catering to the request of the National Black Coalition of Federal Aviation

Employees ("NBCFAE") to purge the Qualified Applicant Register.  Third Am. Compl. ¶¶ 57–

58, 61–63.  The barrier analysis found that the FAA's existing hiring practice, including the use

of the Qualified Applicant Register, "had a disparate impact on minority candidates, primarily

African-American males."  Third. Am. Compl. ¶ 60.  Plaintiff Brigida made these same

allegations in his formal EEO complaint.  *See* Ex. 14, ¶¶ 40–51 at PLA0134–PLA0136.

　　　　The natural conclusion of Defendant's analysis is that purging the Qualified Applicant

Register would generally benefit African Americans and harm non-African American

candidates.  Plaintiffs anticipate that discovery in this case will provide additional evidence to

support its contention that non-African Americans were intentionally and specifically harmed by

---

[9] As explained in Plaintiffs' Memorandum, the April 2013 *Extension to Barrier Analysis of Air Traffic Control Centralized Hiring Process* provided by Defendant is only a piece of the puzzle regarding the FAA's diversity data.  *See* Pls. Mem. at 6–7 & n.4–5; *see also* Ex. 6 (Gagliardo Decl.) at PLA0099–PLA0102.

the elimination of the Qualified Applicant Register.  For example, discovery may show that non-African Americans graduated from CTI institutions at a higher rate than African Americans, or that referred African Americans were hired at a lower rate than referred non-African Americans. Thus, while Plaintiffs believe that *Ricci* makes it premature to exclude entire classes of persons who may benefit from this lawsuit, should the Court find that such exclusion is required by Title VII, then African Americans that were the intended beneficiaries of Defendant's actions.

## II.    PLAINTIFFS HAVE SATISFIED ALL RULE 23(A) REQUIREMENTS

### A.    Commonality

Plaintiffs satisfy the commonality requirement by showing the central issue in this case—the common answer sought—is whether the FAA's uniform disparate treatment of those on the Qualified Applicant Register due to improper racial motivations was made legally permissible by Defendant's conclusion that the Qualified Applicant Register created a racially disparate impact. *Little v. Washington Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 419 (D.D.C. 2017) (citing *Bynum v. District of Columbia*, 214 F.R.D. 27, 33–34 (2003); *Wal-Mart v. Dukes*, 564 U.S. 338, 353 (2011)).  This single, central common question and answer satisfies Rule 23(a)(2) commonality.  Contrary to Defendant's assertion, Plaintiffs do not assert that class-wide resolution here requires the resolution of "no fewer than seven separate questions".  Def.'s Resp. at 24.  Moreover, as explained above, Defendant's assertion that commonality requires that the Court exclude African Americans from the class is in error.

In *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174 (D.D.C. 2017), this court aptly framed the key question regarding commonality: "the commonality requirement is met in an employment discrimination case only where the plaintiff demonstrates 'that examination of all the class members' claims for relief will produce a common answer to the crucial question *why*

*was I disfavored*.'" *Id.* at 196 (quoting *Dukes*, 564 U.S. at 352) (emphasis in original).  The common answer presented here is simple: Plaintiffs and the putative class were disfavored because the FAA made a race-based decision to engage in disparate treatment to avoid a potential disparate impact that the FAA feared resulted from the Qualified Applicant Register. *See Ricci*, 557 U.S. at 579; Third Am. Compl.  ¶¶ 118–21.

Contrary to Defendant's argument, this case stands in sharp relief to *Dukes*, where the Court noted that plaintiffs "wish to sue about literally millions of employment decisions at once."  564 U.S. at 352; *see also Artis*, 307 F.R.D. at 25 (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1229 (10th Cir. 2013) ("In the wake of [*Dukes*], courts 'have generally denied certification when allegedly discriminatory policies are highly discretionary and the plaintiffs do not point to a common mode of exercising discretion that pervades the entire company.'").  Here, in contrast to the "literally millions" of widely dispersed decisions in *Dukes*, Defendant took a single illegal employment action—purging the Qualified Applicant Register with its records of validated AT-SAT test results.  *See, e.g.*, Coates Decl., Ex. 4 at 126 (Human Resources Policy Bulletin No. 84, Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring) ("The FAA will close previous ATCS Academy trainee competitive inventories, notifying candidates that their prior applications and pre-employment test scores will no longer be considered and encouraging them to apply to future vacancy announcements.").

Indeed, a case cited by Defendant demonstrates how Plaintiffs' claims are much more compatible with commonality than those raised in *Dukes*.  *See Houser v. Pritzker*, 28 F. Supp. 3d 222, 242–43 (S.D.N.Y. 2014) (quoting *Dukes*, 564 U.S. at 353) ("[T]he *Dukes* court made clear that when an employer uses the same 'testing procedure to evaluate [all] applicants for employment,' 'a class action on behalf of every applicant or employee who might have been

prejudiced' by the allegedly biased procedure 'clearly would satisfy the commonality' requirement."). In *Houser*, the court found that whether allegedly discriminatory criminal background procedures were justified by legitimate business needs was a common question. 28 F. Supp. 3d at 243. Similarly, Plaintiffs have asserted that "whether the FAA had a strong basis in evidence to believe it would be subject to disparate impact liability if it failed to take race conscious action" and "whether the FAA had a strong basis in evidence to believe the AT-SAT taken by those on the AT-CTI Register were not job related and consistent with business necessity" are common questions. Pls.' Mem. at 14.

Defendant asserts that commonality requires "(i) discrimination (ii) against a particular group (iii) of which the plaintiff is a member, *plus* (iv) some additional factor that permits the court to infer that members of the class suffered from a common policy of discrimination." Def.'s Resp. at 22. [10] Such requirement is satisfied here because the FAA: (i) discriminated by using race-based motives to strike the results the objective, race-neutral job qualifications (ii) of those on or eligible to be on the Qualified Applicant Register, (iii) which Plaintiffs were or should have been on, and (iv) did so through the common act/policy of purging the Qualified Applicant Register.

Finally, as explained *infra*, because Plaintiffs have satisfied the more stringent predominance requirement of Rule 23(b)(3), they necessarily satisfy the lower commonality threshold of Rule 23(a)(2). *See Artis*, 307 F.R.D. at 28 (noting "[predominance] inquiry is

---

[10] While Plaintiffs satisfy this test, it is doubtful that such a test should apply. The test Defendant identifies is derived from "pattern and practice" cases, not from cases where a single, precise employment action resulted in disparate treatment. *See* Def.'s Resp. at 22–23 (citing *Love v. Johanns*, 439 F.3d 723, 728 (D.C. Cir. 2006); *Moore v. Napolitano*, 269 F.R.D. 21, 29 (D.D.C. 2010); *Taylor v. Dist. of Columbia Water & Sewer Auth.*, 241 F.R.D. 33, 38 (D.D.C. 2007)).

similar to the commonality inquiry, but if anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).") (quotations omitted).

### B.    Typicality

Defendant's argument against typicality simply retreads its same objections to and misunderstandings of the class definition and commonality, and is defective for the reasons explained above.  The purpose of the typicality requirement is to "ensure[ ] that the claims of the representative and absent class members are sufficiently similar so that the representatives' acts are also acts on behalf of, and safeguard the interests of, the class."  *Littlewolf v. Hodel*, 681 F. Supp. 929, 935 (D.D.C. 1988) (citation omitted).  The named Plaintiffs' claims are typical of the class claims.

First, typicality is focused on the claims of the class and class representatives as they relate to the liability of the defendant.  *See Pigford v. Glickman*, 182 F.R.D. 341, 349 (D.D.C. 1998) ("[Typicality] is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties . . . . ").  Plaintiffs and putative class members were each harmed by the elimination of the Qualified Applicant Register.  *See Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 161 (D.D.C. 2014) (finding typicality when "the injuries that the named plaintiffs allegedly suffered were caused by the exact same conduct as the alleged injury to the rest of the class"); *see also McReynolds v. Sodexho Marriott Servs., Inc.*, 208 F.R.D. 428, 445 (D.D.C. 2002) (typicality satisfied when plaintiffs "made a convincing showing of a common policy of discriminatory treatment that extend[ed] across divisions, units, and geographic regions, including those where the proposed representatives worked").

The proposed named Plaintiffs' claims are also typical of the class under Defendant's definition.  Specifically, Defendant argues that the "central inquiry" is "whether the 'class

representative [is] part of the class and 'possess[es] the same interest and suffers the same injury' as the class members.'"  Def.'s Resp. at 28.  Here each named Plaintiff has asserted that he or she was or should have been on the Qualified Applicant Register and otherwise meets the class definition.[11]  Each named Plaintiff was not awarded an ATCS position and has a uniform interest in seeing the benefit of their membership on the Qualified Applicant Register restored or compensated.  Each named Plaintiff suffered the same injury of having FAA make a race-based decision to disregard their investment of time, effort and money in becoming a Qualified Applicant, and thereby disregard their prequalified status.  *See* Coates Decl., Ex. 4 at 126.

Finally, contrary to Defendant's argument, typicality does not require the damages suffered by each named plaintiff to be the same as absent class members.  *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 261 (D.D.C. 2002) (citing *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 691 (D. Minn. 1995) ("Nor will differing damages, resulting from varied methods of procuring and purchasing the product, defeat satisfaction of Rule 23(a)(3).")); *see also Bynum*, 214 F.R.D. at 35 (finding typicality because all injuries arose from the same conduct, despite the fact that the injuries themselves were not identical); *Greenberg v. Colvin*, 63 F. Supp. 3d 37, 44 (D.D.C. 2014) (typicality satisfied when plaintiff and class members received SSA benefits and challenged SSA's illegal application of policy to reduce those benefits).

C.    **Adequacy**

1.    **The Class Has Unified Interests, Not Conflicts**

Named Plaintiffs satisfy the requirement of Rule 23(a)(4) that they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The criteria for an

---

[11] Even if the Court finds that African Americans must be excluded from the class because the Defendant intended to benefit their race, Plaintiffs' claims are still typical.  None of the proposed named Plaintiffs are African American.

adequate class representative are well established and includes the condition that "the named representative must not have antagonistic or conflicting interests with the unnamed members of the class." *Little*, 249 F. Supp. 3d at 421 (citing *Twelve John Does v. District of Columbia,* 117 F.3d 571, 575 (D C. Cir. 1997)).

Defendant once again implicitly argues that the proposed class may not include African Americans because "[i]t is not adequate representation for the class representative to accuse some members of the class of having received preferred treatment." Def.'s Resp. at 33 (citing *Moore v. Nat'l Ass'n of Sec. Dealers, Inc*., No 80-3067, 1981 WL 274 at *7 (D.D.C. Aug. 31, 1981)). By virtue of the class definition, however, there are no "beneficiaries" of Defendant's action within the class. This potential conflict is avoided because the class explicitly excludes anyone who has "been employed by the FAA . . . as an air traffic control specialist." Pls.' Mem. at 2, 10. No one in the class has an interest in defending Defendant's purging of the Qualified Applicant Register. Further, as in *Ricci*, Plaintiffs believe that persons harmed by Defendant's race-based disparate treatment may receive relief under Title VII, even when such persons are of the race that the Defendant allegedly intended to benefit.[12]

The cases that Defendant relies upon to argue for the existence of intra-class conflicts are fundamentally different than the case before the Court. Specifically, in *Moore*, *Talley*, and *Orlowski*, two classes were proposed—one, a class of women, and one, a class of a racial minority. *Moore*, 1981 WL 274 at *7; *Talley v. ARNIC, Inc.*, 222 F.R.D. 260, 269–70 (D. Md. 2004); *Orlowski v. Dominick's Finer Foods, Inc.*, 172 F.R.D. 370, 375 (N.D. Ill. 1997). In each of these cases, members of the proposed class of women asserted that they had been harmed by

---

[12] Should this Court hold otherwise, as explained above, the class may be contoured accordingly.

decisions favoring men, including men in the proposed class of a racial minority. This case presents no such competing classes.

Finally, there is no conflict among the class members in the relief sought. Contrary to Defendant's characterization, Plaintiffs do not ask the Court to declare that policies designed to "increase minority hiring" are illegal. Def.'s Resp. at 34. Likewise, Plaintiffs do not ask this Court to overturn the FAA Extension, Safety, and Security Act of 2016, defeating legislative judgments made to advance the goal of FAA hiring from a diverse and well qualified pool of applicants, returning the parties to the system in place in 2012. Plaintiffs do not seek the "across-the-board" reinstatement that Defendant suggests. Rather, Plaintiffs ask that Defendant's actions be held illegal, that any of Defendant's class-wide defenses, such as acting in anticipation of a disparate impact, be overruled, and the Plaintiff class be prioritized for hiring and/or compensated for the harm they have suffered. Nothing about any of the named Plaintiffs makes them inadequate to represent a class seeking such relief.

## 2.    Counsel's Representation of a Different Class Is Not a Conflict

The FAA made multiple unlawful decisions in its hiring process between 2012 and 2018. One such decision, striking the Qualified Applicant Register and thereby disregarding the results of an objective, race-neutral, job qualification test, is challenged by the Plaintiffs in this case. Separately, the FAA's unlawful implementation of a non-validated Biographical Questionnaire to disqualify tens of thousands of applicants for its available ATCS positions is challenged in a putative class action in Texas. These cases are not in conflict and counsel's involvement in both cases does not create a conflict.

As with Defendant's assertion of conflicts within the proposed class, Defendant's theory that Mr. Pearson has a conflict in representing both proposed classes is unwarranted. Defendant

cites, for example, *Lewis v. Nat. Football League,* 146 F.R.D. 5, 11–12 (D.D.C. 1992).  Def.'s. Resp. at 35.  In that case, unlike here, the proposed class counsel was suing some of the proposed class representatives he also sought to represent.  *Id.*  In this case Mr. Pearson is not adverse to any member of either proposed class.

Nor are the conflict concerns raised in *Ortiz* or *Lou* present in this case.  In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), the Court was confronted with a proposed limited fund settlement class.  *Id.* at 856.  It was the limitation on the funds available and the resulting inherent competition for limited resources that created a conflict.  In this case there is no allegation that the FAA is troubled by such limited funds.  Further, in the *Lou* case, counsel did not merely seek to represent another group of plaintiffs in "parallel litigation" as Defendant suggests.  Def.'s Resp. at 36.  Rather, the counsel in that case sought to represent competing classes that asserted the same legal and factual claims against the same defendant.  *Lou v. Ma Labs., Inc.*, No 12-05409, 214 WL 68605 at *1–2 (N.D. Cal. Jan. 8, 2014).  Here the claim of CTI graduates that Defendant violated Title VII's prohibition on disparate treatment by eliminating the Qualified Applicant Register differs from the claims in the proposed *Johnson* class action that Defendant violated the rights of tens of thousands of job applicants by using an unvalidated and skewed Biographical Questionnaire.

All the other conflicts that Defendant proposes regarding litigation timing and tactics are purely hypothetical and are not a valid basis for finding that counsel is inadequate.  Def.'s Resp. at 35–36.  Further, while Defendant quotes *McLaughlin on Class Actions*, the quote and analysis are incomplete.  After noting situations that may give rise to a conflict, *McLaughlin* goes on to note that, "Where multiple, separate counsel jointly represent the class, however, absent an actual conflict the simultaneous representation of individuals or another class by a member of the

16

counsel group against the same defendants is not disqualifying." *McLaughlin on Class Actions* § 4:39 (15th ed. 2018). In the case at bar multiple counsel will be representing and protecting the interests of the class. In short, Mr. Pearson can pursue the interests of each proposed class, unhindered by his representation of a different class challenging different actions. Counsel are adequate to represent the class.[13]

## III. PLAINTIFFS HAVE SATISFIED THE REQUIREMENTS FOR CERTIFICATION UNDER RULE 23(B)(3)

### A. Predominance

The common questions of fact and law identified above predominate this case. "[P]redominance is met when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." *Little*, 249 F. Supp. 3d at 424 (quotations omitted). Like Defendant's attempts to negate commonality, its arguments against predominance fall demonstrably short. There is no legitimate basis for concluding that "whether and how the FAA's hiring policies affected class members" would "rely on individualized proof." Def.'s. Resp. at 40.

To prevail under Title VII, "[a] disparate-treatment plaintiff must establish that the defendant had a discriminatory intent or motive for taking a job-related action." *Ricci*, 557 U.S. at 577 (quotations omitted). This means that Plaintiffs must prove that race was a motivating factor when Defendant eliminated the Qualified Applicant Register. *See id*. at 593. Under

---

[13] Zhonette M. Brown, General Counsel of Mountain States Legal Foundation, was sworn in as a member of the bar of this Court on January 7, 2019 and entered her appearance in this case on January 16, 2019. Ms. Brown's curriculum vitae is attached for the Court's consideration as to the adequacy of class counsel. Ex. 15. William Perry Pendley left the employment of Mountain States Legal Foundation in December 2018 and no longer seeks to represent the class. *See* Def.'s Resp. at 34 n.16.

Plaintiffs' legal theory and class definition, if a class member was on, or should have been on, the Qualified Applicant Register and was not hired after the Qualified Applicant Register was eliminated, then that class member suffered a violation of Title VII at the hands of the Defendant.  Thus, issues of injury and liability will not turn upon highly individualized facts.

Defendant's comparison to *Little* is misguided.  Def.'s Resp. at 39–40.[14]  In *Little*, a disparate impact case, the court found that the case required more individualized inquiries than simply an individual damages determination.  *Little*, 249 F. Supp. 3d at 425.  The *Little* court noted that even once it found that the challenged background check disparately impacted African Americans and that the employer had no legitimate business justification for it, the trier of fact would still have to determine whether each class member was not hired due to the policy or some other reason.  *Id.* (noting government had "provided some facts to demonstrate that class representatives may have lied on their applications, which could provide a legitimate, non-discriminatory reason for failing to hire the individual").  There is no such issue here where all class members were at least partially pre-qualified and the class excludes persons who were objectively unfit for an ATCS position.

Further, while Defendant argues that Plaintiffs' request for backpay prevents the common questions from predominating, other Title VII actions post-*Dukes* and *Comcast* have been certified notwithstanding more complex damages determinations than exist in this case.  In *Porter v. Pipefitters Ass'n Local Union 597*, 208 F. Supp. 3d 894, 911 (N.D. Ill. 2016), African

---

[14] Damages only predominate "when the damages that class members could recover would be dependent on the intangible, subjective differences of each class member's circumstances and would entail complex individualized determinations."  *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 199 (D.D.C. 2013) (quotations and alternations omitted); *see also Little*, 249 F. Supp. 3d at 425 (noting the D.C. Circuit has "held that the necessity to determine individual damages awards does not itself preclude certification under Rule 23(b)(3)") (citing *McCarthy v. Kleindienst*, 741 F.2d 1406, 1415 (D.C. Cir. 1984)).

American pipefitters alleged that their union violated Title VII through an inequitable job assignment system which impacted all class members upon racial lines.  The court ruled that "the fact that separate determinations concerning the harms suffered by class members would be necessary [did] not mean individualized issues predominate[d]" over the common issues concerning the job assignment system.  *Id.; see also Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201 (N.D. Ill. 2014) (Title VII class alleging hostile work environment and discrimination).

Plaintiffs' class is similar in some respects to *Parra v. Bashas', Inc*., 291 F.R.D. 360 (D. Ariz. 2013), *amended in part sub nom. Estrada v. Bashas' Inc.*, No. CV-02-00591-PHX-RCB, 2014 WL 1319189 (D. Ariz. Apr. 1, 2014), where the court certified a class of current and former Hispanic employees challenging an employer's wage scale—alleging both disparate treatment and disparate impact and seeking backpay.  The plaintiffs identified a single common policy which caused the wage disparity and satisfied predominance because the backpay claim was predicated on the common issue of the wage scales.  *Id.* at 391.  Moreover, backpay was calculable on a class-wide basis because plaintiffs could rely on "objective factors" such as "the individual employee payroll record (dates of employment job position, hours worked) and the wage scale."  *Id.* at 393.

Once it is determined that a putative class member is truly in the class (and thus was eligible to be hired as an ATCS), their expected "but for" date of hire can be determined based on data such as their year of graduation and the FAA actual hiring rate/practices.  This information can be mechanically combined with the average/applicable compensation rate for an ATCS of that hire date, data the putative class member supplies concerning mitigation of harm (for example applicable W-2 or 1099 records), and other data that may be gathered in the class proceeding or claim making process and used to calculate damages.

Finally, the Court has a plethora of options available to help it administer the class after a finding of liability. *See, e.g.*, *DL v. D.C.,* 302 F.R.D. 1, 10 (D.D.C. 2013), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017); *see also United States v. City of New York*, 276 F.R.D. 22, 50 (E.D.N.Y. 2011) ("[T]he Second Circuit . . . admonished the district court to 'bear in mind that there are a number of management tools available to a district court to address any individualized damages issues, such as bifurcation, the use of a magistrate or special master, alteration of the class definition, the creation of subclasses, or even decertification after a finding of liability.'") (quoting *In re Nassau County Strip Search Cases*, 461 F.3d 219, 231 (2d Cir. 2006)).[15]  If individual issues were to arise, the Court can adjust accordingly.  *See In re Johnson*, 760 F.3d 66, 74 (D.C. Cir. 2014) (upholding certification because "district court held common issues predominated over individual issues," "because there are no individual issues involved in determining whether the [policy] was discriminatory," "and because the court, when and if it ever reaches individualized questions, will send those questions to separate hearings outside the class proceedings.") (citing *Moore*, 926 F. Supp. 2d at 33–34 & n. 7).

**B.    Superiority**

A class action is by far the superior method for vindicating the Title VII rights of approximately 2,600 CTI graduates who had their careers stymied at the hands of the Defendant. Once again, Defendant's arguments mainly resurrect its failed attempt to discredit the class definition and deny obvious common issues of fact and law at play.

First, although the awards in Title VII discrimination cases may be larger than other class actions, the damages here are generally likely to consist of the difference between expected

---

[15] Superiority was also met because "the determination of the aggregate amount of backpay, retroactive seniority, and priority hiring relief depends on largely the same classwide statistical proof . . . to establish the City's liability for disparate impact violations."  *City of New York*, 276 F.R.D. at 50.

ATCS compensation and the compensation Plaintiffs actually received and do not rise to a level

that would motivate each plaintiff to control their own case.  Indeed, Title VII is still particularly

suited for class actions.  *See Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293,

313 (D.D.C. 2007) (Rule 23(b)(3) does not exclude from certification cases in which individual

damages run high) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997)).  In

fact, "[s]ince the purpose of Title VII is to eliminate such class based discrimination, class

actions are favored in Title VII actions for salutary policy reasons."  *Gay v. Waiters' & Dairy*

*Lunchmen's Union*, 549 F.2d 1330, 1333 (9th Cir. 1977).  "Moreover, the legislative history of

Title VII shows that Congress itself recognized the importance of class actions by private

litigants in accomplishing the statutory purpose of eliminating discrimination in employment."

*Id*.  As explained in the discussion of both commonality and typicality, this class action "would

certainly be more desirable than thousands of smaller suits . . . based on essentially the same

operative facts and legal theories." *Hardy v. D.C*., 283 F.R.D. 20, 29 (D.D.C. 2012); *see also*

*City of New York*, 276 F.R.D. at 49 ("By proving that the City engaged in classwide

discrimination against a protected group, the liability-phase class significantly reduced the

burden of time and expense on any individual victim of discrimination to obtain relief.").

Defendant's argument that potentially large Title VII damages militate against a class action

should therefore be rejected.

      Additionally, when common issues such as the elimination of the Qualified Applicant

Register predominate so strongly, "it is reasonable to assume that 'the class members' interests in

individually controlling the prosecution or defense of separate actions' are limited because their

'claims may be so closely related to the claims of others that litigation by others will achieve

their ends without the need for their involvement.'" *Coleman through Bunn v. D.C.*, 306 F.R.D. 68, 88 (D.D.C. 2015) (quoting Newberg on Class Actions § 4:69 (5th ed. 2014)).

Defendant also errs in arguing that the analysis from *Little* is inapposite.  Although Plaintiffs' claims are not for disparate impact, Defendant may claim, similar to *Ricci*, that it had a strong basis in evidence for committing intentional discrimination—triggering disparate impact analysis.  *See Ricci*, 557 U.S. at 585.  The *Little* court noted that "Title VII disparate impact cases often require complicated and costly expert evidence and involve voluminous discovery. When a group of individuals may be disparately affected by a single policy, resolving the question of liability on a class-wide basis is the most efficient use of limited judicial resources and allows for consistent findings for all similarly-situated individuals."  249 F. Supp. 3d at 424.

"Superiority is also often found when use of the class action device would enable vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  *Coleman,* 306 F.R.D. at 88 (internal quotations and changes omitted).  In this case the Plaintiffs are all young, recent college graduates, dispersed throughout the nation, likely burdened with student and other loans, working to start their careers after they were denied the positions for which they were trained, and likely deterred from bringing suit in part because of the imbalance of resources between them and the United States government.  Class resolution for these Plaintiffs is easily superior to the bringing of individual claims.

As explained above, contrary to Defendant's assertion, there is no related litigation elsewhere.  The *Johnson* litigation in Texas, while also challenging illegal conduct by the FAA, is a challenge to the FAA's use of the Biographical Questionnaire, a screening tool implemented after the Qualified Applicant Register was eliminated.  *See* Ex. 16.

Finally, there is no credence in Defendant's argument that this case is unmanageable.  As explained, *supra*, there is no difficulty identifying the proposed class because it is the subset of the CTI Inventory that Defendant admits exists and that Defendant maintained.[16]  Without the pretense of being unable to identify class members, Defendant's arguments dissolve.

## IV.    THE COURT MAY ALSO CERTIFY A HYBRID CLASS UNDER RULES 23(B)(2) AND 23(B)(3)

A hybrid class may also be appropriate here.  Plaintiffs' Third Amended Complaint seeks injunctive and declaratory relief in addition to damages.  Third Am. Compl. ¶ 122; Third. Am. Compl. at 22 (Prayer for Relief).  Specifically, Plaintiffs requested the Court to declare that Defendant violated Title VII and asked for an injunctive order directing the FAA to give hiring preference to class members.  *Id.*  The inadvertent omission of a citation to Rule 23(b)(2) in the Complaint in addition to Rule 23(b)(3) does not prevent the Court from exercising its discretion to certify a hybrid class under Rule 23(b)(2) and 23(b)(3).  *See, e.g.*, *DL*, 302 F.R.D. at 10 n.2 (citing *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997)); *Bynum*, 217 F.R.D. at 38–39; *Taylor*, 205 F.R.D. at 48 (discussing hybrid scenarios); *cf. Little*, 249 F. Supp. 3d at 410 (noting the court may "exercise its discretion under Rule 23(c)(4) to isolate the liability and injunctive relief questions, certify a single class under Rule 23(b)(2) to address those issues, and leave damages calculations for individualized hearings.") (quoting *Houser*, 28 F. Supp. 3d at 241).

Rule 23(b)(2) demands a showing that a defendant has acted or refused to act in ways generally applicable to the entire class.  *See McReynolds*, 208 F.R.D. at 448 ("Title VII and other civil rights class actions are frequently certified pursuant to Rule 23(b)(2).") (quoting *Eubanks*,

---

[16] *See, e.g.*, Pls.' Mem., Ex. 1 at PLA0045 (FAA Human Resources Procedures showing information on AT-CTI Inventory); Ex. 8 at PLA0107 (Email showing FAA providing AT-CTI inventory document internally).

23

110 F.3d at 92). Plaintiffs have satisfied that burden. As discussed at length above, Defendant's elimination of the Qualified Applicant Register is clearly suited for a 23(b)(2) class.

If, at this preliminary stage of the case, the Court is concerned about the possible eventual need for individualized damage calculations, a hybrid approach allays such concerns. In *McReynolds*, the court certified the Title VII class pursuant to Rule 23(b)(2) for the purpose of determining liability but held off certification for the remedies stage due to the concern that classwide relief could begin to break down when the class seeks to recover back pay or other forms of monetary damages to be allocated based on individual injuries. 208 F.R.D. at 448–49 (citing *Eubanks*, 110 F.3d at 96 n.14; *Pigford*, 182 F.R.D. at 351). The court explained: "At the remedy phase, for example, the court may adopt a 'hybrid' approach, certifying a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief . . . [or] the court may conclude that the claims of particular class members are unique or sufficiently distinct from the claims of the class as a whole, and that opt-outs should be permitted on a selective basis." *Id.* at 449 n.35 (citing *Eubanks*, 110 F.3d at 96; *Thomas v. Albright*, 139 F.3d 227, 234–36 (D.C. Cir. 1998) (internal quotations omitted)). Throughout this case the Court retains the ability to create sub-classes, to certify specific issues, to de-certify all or part of the class, or to otherwise manage the class. Plaintiffs request that the Court certify a class based on the common issues before it and not deny a potential remedy to thousands of CTI graduates for the Defendant's fear of how the case may evolve.

## CONCLUSION

Plaintiffs propose to represent a unified class, all simultaneously harmed by Defendant's race-based disparate treatment. The proposed class presents common questions, Plaintiffs' claims are typical of the class, Plaintiffs will adequately represent the class, and numerosity is

not challenged.  The common issues presented predominate over any individual issues and proceeding with this class is superior to the alternative of up to 2,600 individual lawsuits. Plaintiffs therefore request class certification.


DATED:  January 24, 2019                    Respectfully submitted,


                                            /s/ Zhonette M. Brown
                                            Zhonette M. Brown (D.C. Bar No. 463407)
                                            Christian B. Corrigan (KS Bar No. 25622), *pro hac vice*
                                            MOUNTAIN STATES LEGAL FOUNDATION
                                            2596 South Lewis Way
                                            Lakewood, Colorado 80227
                                            (303) 292-2021
                                            zhonette@mountainstateslegal.com
                                            ccorrigan@mountainstateslegal.com

                                            Michael W. Pearson (AZ Bar No. 016281), *pro hac vice*
                                            Curry, Pearson, & Wooten, PLC
                                            814 West Roosevelt
                                            Phoenix, Arizona 85007
                                            (602) 258-1000
                                            (602) 523-9000 (facsimile)
                                            mpearson@azlaw.com

                                            *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of January 2019, I caused a true and correct copy of the foregoing **REPLY BRIEF IN SUPPORT OF CLASS CERTIFICATION** to be electronically filed with the Clerk of the Court using the Court's CM/ECF system which sent notification of such filing to counsel of record in this matter.

/s/ Zhonette M. Brown
Zhonette M. Brown (D.C. Bar No. 463407)
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO  80227
(303) 292-2021
zhonette@mountainstateslegal.com