# Exhibit 16

PLA0193

# 110769

```
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2018 SEP 12  PM 4: 14

DEPUTY CLERK_____
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## XXXXX DIVISION

| | |
|---|---|
| Lucas K. Johnson, on behalf of himself and the Class he seeks to represent, | Case No: _____ |
| Plaintiff, | **3 - 18 C V 2 4 3 1 - M** |
| vs. | |
| United States Department of Transportation; Elaine L. Chao, Secretary of the U.S. Department of Transportation; Federal Aviation Administration; Daniel K. Elwell, Acting Administrator of the Federal Aviation Administration; Charles E. James, Sr., Director of the U.S. Department of Transportation Departmental Office of Civil Rights, | **CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES** |
| Defendants. | |

Plaintiff, Lucas K. Johnson, through undersigned attorneys, hereby files this Class Action Complaint for Declaratory and Injunctive Relief and Damages against the above-named defendants on behalf of himself and the Class he seeks to represent.

## PARTIES

1.      Plaintiff Lucas K. Johnson is a resident of and is domiciled in Dallas, Texas. He brings this action on behalf of himself individually and on behalf of a class of persons similarly situated as described further below.

2.      Defendant United States Department of Transportation ("DOT") is a cabinet-level department within the Executive Branch of the federal government. Through its various agencies, the DOT promulgates regulations and policies governing transportation within the

PLA0194

United States, including aviation matters.

3.     Defendant Elaine L. Chao is the Secretary of the DOT. In that capacity, Secretary Chao is responsible for overseeing the actions of all the employees and officers within the DOT agencies, including the Federal Aviation Administration.

4.     Defendant Federal Aviation Administration ("FAA") is the national aviation authority of the United States. As a DOT agency, the FAA has authority to regulate all aspects of American civil aviation. The FAA is responsible for setting policies for the hiring of air traffic controllers in the United States and ensuring the safest aerospace system in the world.

5.     Defendant Daniel K. Elwell is the Acting Administrator of the FAA. Acting Administrator Elwell oversees more than 47,000 FAA employees and is responsible for ensuring the FAA and its employees are the best prepared and trained professionals to meet the growing demands and requirements of the aviation industry. In this capacity, Acting Administrator Elwell is responsible for setting FAA policies, including hiring policies for air traffic controllers.

6.     Defendant Charles E. James, Sr. is the Director of the DOT Departmental Office of Civil Rights ("DOCR"). In this capacity, Director James is the designated advisor to the Secretary of Transportation on matters relating to civil rights within the DOT. Director James is also responsible for managing the DOCR, which enforces civil rights and regulations within the DOT, including Title VII of the Civil Rights Act of 1964.

**JURISDICTION, VENUE, & EXHAUSTION OF ADMINISTRATIVE RIGHTS**

7.     This Court has jurisdiction, pursuant to 28 U.S.C. § 1331, as the matter in controversy arises under the laws of the United States, including but not limited to, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

8.     Venue rests properly in this Court, pursuant to 28 U.S.C. § 1391(e), because the Plaintiff and putative class agent resides within this judicial district and Defendants are agencies, officers or employees of the United States. On information and belief, a significant number of the additional putative class members also reside in the State of Texas and within

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

PLA0195

this judicial district.

9.     Plaintiff has exhausted his administrative remedies and complied with all statutory and administrative prerequisites to his Title VII claims. Plaintiff filed a charge of discrimination individually and on behalf of all similarly situated individuals with the United States Department of Transportation Office of Civil Rights on August 15, 2015. On July 6, 2016 the U.S. Equal Employment Opportunity Commission ("EEOC") issued an order of dismissal. Plaintiff timely appealed the order of dismissal to the EEOC on July 26, 2016. By notice dated June 15, 2018, the EEOC issued a Notice of Right to Sue. This Complaint is made within ninety days of the Notice of Right to Sue.

## SUMMARY OF THE CLAIMS

10.     This case involves the decision by FAA policymakers to engage in racial balancing by screening and eliminating qualified applicants for air traffic control positions based upon their race.

11.     It is a violation of Title VII of the Civil Rights Act of 1964 to make hiring decisions based upon race unless a bona fide occupational qualification ("BFOQ") exists. A BFOQ is a quality or an attribute that employers are allowed to consider when making decisions on the hiring and retention of employees. A general desire for racial diversity in the workplace does not constitute a BFOQ. No BFOQ exists as a defense to Defendants' actions as enumerated further herein.

12.     Plaintiff brings this action alleging violations of Title VII of the Civil Rights Act of 1964, 72 U.S.C. § 2000e et. seq. ("Title VII") to challenge Defendant Federal Aviation Administration's ("FAA") policy, pattern, and practice of discriminatory hiring practices regarding applicants for air traffic controller positions ("ATC Applicants") as enumerated further herein. The FAA implemented these policies and practices in 2014 intending them to have a disparate impact on Title VII protected groups, including Caucasian, Hispanic, Asian, and mixed-race applicants ("Applicant Groups"). Furthermore, the FAA has engaged in

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

3

PLA0196

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

intentional disparate treatment of the same Applicant Groups to unlawfully advantage African-American ATC Applicants

13.    As a result of the FAA's policies, patterns, and practices, the Applicant Groups did not have a fair and equal opportunity to be considered for employment as air traffic control specialists ("ATCS"). The FAA engaged in racial-balancing without just cause. The FAA's hiring policies and practices, announced in 2013 and implemented in 2014, systematically violated the Applicant Groups' rights and resulted in the unchecked racial bias that improperly favored African-American ATC Applicants and infected the hiring process. The disadvantage to the Applicant Groups' employment opportunities is not isolated or exceptional, but rather the regular and predictable result of the FAA's Human Resources and Civil Rights policies and practices as well as the lack of proper accountability measures to ensure fairness.

14.    Prior to December 31, 2013, ATC Applicants who meet general qualification requirements regarding work or college experience were required to pass a validated air traffic aptitude test, the Air Traffic Selection and Training Examination ("AT-SAT"), in order to be eligible for employment as a trainee controller. The AT-SAT was developed, validated, and periodically reviewed by the FAA's Civil Aeronautical Medical Institute ("CAMI"). Since the FAA first instituted the AT-SAT, it has been validated multiple times to ensure the test was in accord with law and professional guidelines. The AT-SAT was most recently validated in March of 2013.

15.    For over twenty years the FAA hired ATC Applicants from three sources. First, the FAA hired military trained controllers ("Veteran's Recruitment Appointment" or "VRAs"), who had separated or retired from military service. Second, (prior to 2014) graduates from 36 Air Traffic Collegiate Training Institutions ("AT-CTI" or "CTI") programs at various institutions of higher learning who passed the validated AT-SAT assessment were given hiring priority, much like military controllers, for ATCS positions. Third, if the pool of VRAs and CTI students was exhausted, the FAA hired through a General Public Announcement ("GPA" or "PUBNAT"), commonly referred to as off-the-street ("OTS")

PLA0197

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

hiring. A personal interview was also required of ATC Applicants.

16.     During the approximate time period of 2010 through 2014, select FAA employees and members of an FAA employee special interest group, the National Black Coalition of Federal Aviation Employees ("NBCFAE"), were collectively and actively working to change the air traffic control hiring process to a system more favorable to African-American applicants because they felt that the candidate pool and air traffic workplace was composed of too few African-American applicants and that the hiring practices and policies, in place since the mid-1990s, unfairly benefited non-African-American Applicant Groups.

17.     As elaborated further infra, the NBCFAE and certain FAA employees persuaded the FAA to purge the qualified applicant register list composed of approximately 2,700 CTI graduates, implement a non-validated "Biographical Assessment" ("BA"), eliminate personal interviews, and develop policies and procedures where all ATC Applicants were treated as general public hires regardless of aviation or air traffic control experience or background. When these changes were implemented, the FAA initially stated that the changes were made to "add diversity to the workforce."

18.     The FAA's new hiring policy, implemented in January of 2014, required all ATC Applicants to first use the USAJOBS.gov website to complete an electronic application and answer general questions, including those about race, gender, and experience. ATC Applicants were required to submit a resume along with other relevant data. After completing the electronic application, ATC Applicants next had to pass a biodata questionnaire, the BA, to be further considered for employment. Lastly, and only if the ATC Applicant passed the BA, the ATC Applicant would then proceed to the AT-SAT. The BA was a new step in the hiring process. The FAA hired a contractor named Applied Psychological Techniques, Inc. ("APT" or "APTMetrics") to develop and present recommendations regarding revisions to the hiring process, to develop and implement the BA, and to allegedly validate the BA.

19.     On February 10, 2014, the FAA opened vacancy announcement FAA-AMC-14-ALLSRCE-33537 ("33537") to solicit ATC Applicants. In accord with the new ATC

PLA0198

Applicant hiring policy, implemented in January of 2014, all ATC Applicants were now required to take the computerized, non-proctored BA. At the time the test was taken, ATC Applicants were not given a numerical grade or any indication of whether they passed or failed. Approximately one month after taking the BA, ATC Applicants received electronic notice as to if they passed or failed. According to the FAA, 28,511 ATC Applicants, seeking a fair and equal opportunity chance to become an air traffic controller, took the February 2014 BA. 2,407 applicants "passed" the BA and were therefore allowed to take the AT-SAT. No numerical grade was given to the ATC Applicants who took the BA, just a red "!" for failure or a green "checkmark" indicating a passing grade.

20.    A very large number of ATC Applicants failing the 2014 BA possessed extensive professional and academic aviation experience including air traffic education, flight training, and advanced FAA certifications in a variety of aviation fields. Many ATC Applicants failing the BA were prior military air traffic controllers, graduates of college management, flight, and air traffic control programs, private and commercial pilots, military pilots, and others with extensive aviation experience. Despite the extensive experience and qualifications, these individuals were road-blocked from the job because of their failure to "pass" the BA.

21.    The FAA repeatedly stated to ATC Applicants, the American public, Congress, the Courts[1], and the media that the February 2014 BA was professionally validated. These collective statements were manifestly untrue. The FAA knew that the BA was not properly validated. The non-validated 2014 BA was intentionally misused by the FAA as a minimum qualification screening tool despite affirmative knowledge that such use was improper. Furthermore, select FAA personnel, and on information and belief their contractors, used the BA to illegally identify, target, and eliminate ATC Applicants from employment consideration based on the applicant's race by identifying responses to various questions on

---

[1] While challenges to the *withholding of information regarding* the BA have been filed, Plaintiff avers that the *use of* the BA has not been challenged in Court thus far.

PLA0199

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

the BA. Lastly, when a national television network identified cheating meant to benefit one race and disadvantage others, the FAA took affirmative steps to cover-up the illegal activity. The FAA's intentional misuse of the BA as a screening tool infected the hiring process with racial bias resulting in disparate treatment and impact as further enumerated herein.

## LEGAL ANALYSIS

## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

22.    The purpose of Title VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color. *Ricci v. DeStefano*, 557 U.S. 557 (2009).

23.    Title VII prohibits employment discrimination or disparate treatment on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e.

24.    Title VII claimants need only demonstrate lack of objective criteria and disparity in hiring or promotions; they need not prove that they would have been most qualified for the job. *Hung Ping Wang v. Hoffman*, 694 F.2d 1146, 1148 (9th Cir. 1982) (citing *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 240-43 (5th Cir.1974), *cert. denied*, 439 U.S. 1115 (1979)).

25.    Title VII prohibits discrimination against employees of the federal government and prospective applicants for employment within the federal government. 42 U.S.C. § 2000e-16.

26.    Title VII provides that "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin" is unlawful employment discrimination. 42 U.S.C. § 2000e(a)(1).

27.    Title VII provides that for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin" is an unlawful employment practice. 42 U.S.C. § 2000e(a)(2).

7

PLA0200

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

28.    Title VII provides that for an employer to give and to act upon the results of any professionally developed ability test designed, intended or used to discriminate because of race, color, religion, sex or national origin is an unlawful employment practice. 42 U.S.C. § 2000e-2(h).

29.    Title VII provides that for an employer, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of employment related tests on the basis of race, color, sex or national origin is an unlawful employment practice. 42 U.S.C. § 2000e-2(l).

30.    Title VII prohibits employers from using facially neutral tests or selection procedures that have the effect of disproportionately excluding persons, or regarding in disparate treatment, based on race, color, or national origin. *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 988 (1988).

31.    Title VII does not require employers to engage in racial balancing by granting preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area. 42 U.S.C. § 2000e-2(j).

32.    Absent a valid defense, Title VII prevents a government agency from refusing to accept the outcome of a race-neutral hiring process solely because of the racial makeup of the successful applicants. *See Ricci*, 557 U.S. at 579.

33.    Specifically, a government agency may not disregard the outcome of a race-neutral hiring process unless it has a "strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Id.* at

PLA0201

585. An agency will be liable for disparate-impact discrimination only if a hiring process is not job related and consistent with business necessity, or if there exists an equally valid, less discriminatory alternative that served the needs of the agency but the agency refused to adopt. *Id.* at 547.

34.    A government-imposed racially discriminatory preference is constitutional only if the government demonstrates that the preference was necessary to achieve a compelling state interest. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995).

35.    Governments may use racially discriminatory preferences only in remedying "extreme" cases of "systematic[]" patterns of deliberate racial discrimination to "break down patterns of deliberate exclusion." *City of Richmond v. J.A. Croson Co.* 488 U.S. 469, 509 (1989).

36.    The Uniform Guidelines on Employee Selection Procedures ("UGESP") have been adopted by the EEOC, Department of Labor, Department of Justice, and Civil Service Commission. 29 C.F.R. §1607.18, Uniform Guidelines on Employee Selection Procedure (1978); 43 Fed. Reg. 38295, 38312 (August 25, 1978).

37.    The UGESP guidelines draw upon and make reference to professional standards of test validation established by the American Psychological Association. 29 C.F.R. §1607.5(a).

38.    The UGESP are entitled to deference by the court although the guidelines do not have the force of law. Civil Rights Act of 1964, § 703(h) as amended 42 U.S.C. § 2000e–2(h). *James v. Stockham Valves & Fittings Co*., 394 F.Supp. 434 (N.D.Ala.1975), reversed 559 F.2d 310, *cert. denied*, 434 U.S. 1034.

39.    The UGESP are not administrative regulations promulgated pursuant to formal procedures established by Congress. However, "...they do constitute '(t)he administrative interpretation of the Act by the enforcing agency,' and consequently they are 'entitled to great deference.' *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975) (citing *Griggs v. Duke Power Co.,* 401 U.S. 424, 433-434).

PLA0202

40.    The UGESP incorporate a set of principles that are designed to assist employers in complying with requirements of federal law prohibiting employment practices which discriminate on the grounds of race, color, gender, and sex. 29 C.F.R. §1607.1.

41.    The UGESP is applied by the federal government in Title VII cases and applies to tests and selection procedures that are the basis for any employment decision, including hiring. 29 C.F.R. §1607.2 (A)(D).

42.    The UGESP guidelines allow selection procedures "...for the purpose of determining qualifications or for the purpose of selection on the basis of relative qualifications, if the selection procedure has been validated in accord with [UGESP] guidelines for each such purpose for which it is used...." 29 C.F.R. §1607.2(C).

43.    According to the UGESP, "[t]he use of any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any race, sex, or ethnic group will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated in accordance with these guidelines, or the provisions of section [§1607.6] are satisfied." 29 C.F.R. §1607.3(A).

44.    Discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." 29 C.F.R. § 1607.4(c).

45.    While the UGESP does not require a user to conduct validity studies of selection procedures where no adverse impact results, all users operating under merit principles are encouraged to use valid selection procedures. 29 C.F.R. § 1607.1(b).

46.    According to the UGESP "[d]isparate treatment occurs where members of a race, sex, or ethnic group have been denied the same employment, promotion, membership, or other employment opportunities as have been available to other employees or applicants." 29 C.F.R. § 1607.11.

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

10

PLA0203

47.    According to the United States Merit Systems Protection Board ("MSPB")[2]:

Assessment and selection of Federal employees is central to MSPB's mission to promote the management of the civil service in accordance with the merit system principles.[3] The first merit system principle requires that Federal employee "…selection and advancement should be determined solely on the basis of relative ability, knowledge and skills." When a selecting official considers prior training and experience as part of a hiring or promotion decision, the decision must be made that best identifies true differences in ability as accurately as possible. **No assessment methods should be used which fail to meet professional testing standards for validity.**[4] (Emphasis added).

## GENERAL ALLEGATIONS

48.    Plaintiff incorporates the allegations and information in the preceding paragraphs as if fully set forth here.

49.    In December of 2013, the FAA announced the sweeping changes to the process by which they hired air traffic controllers.

50.    Prior to the 2013 change to the hiring process, the FAA hired from three main sources. First, the FAA hired military trained controllers ("Veteran's Recruitment Appointment" or "VRAs") who had separated or retired from military service. Second, the FAA hired graduates of air traffic collegiate training initiative training ("AT-CTI" or "CTI") programs that were sanctioned by the FAA. Lastly, if there were not enough VRA and CTI applicants to meet the hiring demand, the FAA hired through a General Public Announcement ("GPA"), commonly referred to as off-the-street ("OTS") hiring.

[2] U.S. Merit Systems Protection Board, Evaluating Job Applicants: The Role of Training and Experience in Hiring, A Report to the President and Congress of the United States (January 2014), at pg. 3, https://www.mspb.gov/mspbsearch/viewdocs.aspx?docnumber=968357&version=972211&application=ACROBAT.
[3] Title 5 United States Code §2301 and §2302. The merit system principles and prohibited personnel practices referenced in this report can be accessed on the web at http://mspb.gov/meritsystemsprinciples.htm and http://mspb.gov/ppp/ppp.htm.
[4] Defined in the U.S. Office of Personnel Management's ("OPM") Assessment Decision Tool as "The extent to which the assessment method has been shown to accurately measure a job-related competency and/or predict successful performance on the job."

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

PLA0204

51.     At the end of 2012, the FAA announced that it would not be conducting any further OTS hiring because the CTI schools, along with the VRA applicant pool, were producing sufficient quantities of qualified applicants to meet demand.

52.     The FAA controller hiring plan required the FAA to hire over one thousand controllers per year in 2012, 2013, and 2014.

53.     The hiring process used before 2014 required ATC Applicants to pass a validated air traffic aptitude test, known as the Air Traffic Selection and Training Examination ("AT-SAT") in order to be eligible for employment as a trainee controller.

54.     The FAA developed the AT-SAT in approximately 2000-2001 in order to provide a selection tool for new Air Traffic Control Specialist ("ATCS") positions within the FAA.

55.     The AT-SAT was an aptitude test developed to assess the likelihood of an applicant successfully learning ATCS skills as well as a valid predictor of achievement of Certified Professional Controller ("CPC") status. CPC status is achieved after successful completion of air traffic training at an applicant's assigned field facility.

56.     The AT-SAT tested for characteristics needed to effectively perform as an air traffic controller. The characteristics include numeric ability, prioritization, planning, tolerance for high intensity, decisiveness, visualization, problem-solving, and movement detection.

57.     Since the FAA first instituted the AT-SAT, it was validated multiple times to ensure it was in accord with the law and professional guidelines. The AT-SAT was most recently validated in March of 2013.

58.     In 2013, the FAA published an employment plan that stated that the FAA was "planning to open a general public announcement in FY 2014 to add more depth and diversity to our controller hiring sources." Federal Aviation Administration, A Plan for the Future: 10-

PLA0205

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

Year Strategy for the Air Traffic Control Workforce 2013-2022 44 (2013).[5]

59.    On or around December 30, 2013, Joseph Teixeira, then the FAA's Vice President for Safety and Technical Training, sent an e-mail ("Teixeira E-mail") regarding the future of hiring for air traffic controller positions. The Teixeira E-mail is attached hereto as Exhibit 1.

60.    The Teixeira E-mail stated, inter alia, that "[r]ecently, the FAA completed a barrier analysis of the ATC occupation pursuant to the Equal Employment Opportunity Commission's (EEOC) Management Directive 715. As a result of the analysis, recommendations were identified that we are implementing to improve and streamline the selection of ATC candidates."

61.    The Teixeira E-mail further stated that "[a] nationwide competitive FG-01 vacancy announcement open to all U.S. Citizens will be issued in February 2014. Any individual desiring consideration for employment (including CTI graduates) MUST apply. Existing inventories of past applicants will not be used."

62.    The Teixeira E-mail also stated that "[t]he existing testing process has been updated. The revised testing process is comprised of a biographical questionnaire (completed as part of the application process) and the cognitive portion of the AT-SAT. The cognitive portion of the AT-SAT will be administered only to those who meet the qualification standards and pass the biographical questionnaire [BA]. Applicants for the February 2014 announcement will be required to take and pass the new assessments in order to be referred on for a selection decision."[6]

63.    The FAA subsequently scheduled a teleconference with the CTI schools on January 8, 2014.

64.    During the January 8, 2014 teleconference, Mr. Teixeira falsely stated that "there were no special interest groups involved in the design of the [new] FAA policy at all.

---

[5] https://www.faa.gov/air_traffic/publications/controller_staffing/media/CWP_2013.pdf
[6] The Biographical Assessment was initially referred to as the Biographical "Questionnaire."

13

PLA0206

This was done by experts in the human resources department and civil rights . . . ."

65.    During the January 8 teleconference, Mr. Teixeira also falsely stated that "[w]e really have not announced these changes to anyone other than to CTI schools, and you received that for the first time on the 30th of December. There's been no announcement . . . ."

66.    In sum, on or around December 30, 2015, the FAA changed the air traffic control hiring process which resulted in ATC Applicants having to pass the BA in order to be considered for selection.

67.    Despite the FAA's unequivocal denial, several members of the FAA Human Resources ("HR") and Civil Rights ("CR") Offices had notified, inter alia, the NBCFAE that the FAA was going to eliminate the Qualified Applicant Register prior to the announcement to the CTI institutions, as well as specific detailed information on the FAA's new hiring practices.

68.    Specifically, on June 20, 2013, FAA officials met with members of the FAA National Employee Association Forum, which is composed of eight employee associations that represent various minority, women, and disadvantaged sub-groups, including the NBCFAE. The stated purpose of this meeting was to brief the various employee associations on recommended changes in the air traffic controller hiring process.

69.    Among those conducting the June 2013 briefing was FAA consultant Dr. James Outtz. Dr. Outtz presented information about a recently concluded barrier analysis of the FAA air traffic controller hiring process. Dr. Outtz stated that the FAA's hiring process purportedly had a disparate impact on minority candidates, primarily African-American males.

70.    On information and belief, and after a reasonable opportunity for discovery, Dr. Outtz's assertions were incorrect, results oriented, and intentionally biased in favor of African-American air traffic applicants.

71.    The NBCFAE had been privy to information that was not publically available as to how ATC Applicants for the February 2014 announcement could increase their chances

14

PLA0207

of advancing in the hiring process. The NBCFAE e-mailed their members with advice on how to apply for the open air traffic controller positions. *See* Exhibits 2-3, attached hereto.

72.    This information was provided by a FAA HR employee who was also a member of the NBCFAE. *See* Exhibit 2.

73.    These documents further demonstrate that NBCFAE National President Roosevelt Lenard, Jr. was in contact with senior FAA officials, including then Director of FAA Human Resources ("AHR-1") Carrolyn Bostick, regarding Lenard's desire to change the hiring process to benefit certain ATC applicants based on race. *See* Exhibit 3.

74.    Ms. Bostick assured Mr. Lenard that the Register would be "purged" and none of these post-assessment applicants would be offered a letter of employment. *See* Exhibit 2.

75.    Numerous FAA employees and officials, including those formulating or implementing hiring policies at the time in question, were, or are, active members of the NBCFAE.

76.    Several members of the FAA Human Resources and Civil Rights Offices had been working with the NBCFAE to change the air traffic controller hiring process since 2010.

77.    On May 20, 2015, FOX Business Network revealed that the NBCFAE, specifically Shelton Snow, was actively involved in providing 2014 BA questions and answers to select ATC Applicants based on the race of the applicant. This occurred during FAA vacancy announcement 33537 and prior to, or in the course of, the applicants taking the 2014 BA and which gave them an unfair advantage. Exhibit 4.

78.    Mr. Snow is a Supervisory Air Traffic Control Specialist and employee of Defendant FAA.

79.    The FOX expose revealed that prior to the 2014 BA, Mr. Snow, a federal employee and officer of the NBCFAE, sent email communications to NBCFAE members and recruits that coached them on how to fill out their applications and suggested that certain information and keywords be included in the applications so that the applicants could be identified as a member of the NBCFAE and/or as being a particular race which would give

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

15

PLA0208

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

them preferential treatment.

80.    During this same time period, and prior to FAA vacancy announcement 33537, FAA Human Resources employees appeared after hours at several churches and other venues while wearing government identification. Select applicants, based on race, were invited to attend these functions while others were intentionally excluded. During these events, FAA employees coached, formatted, and actually entered prospective NBCFAE recruits' information and resumes into the USAJOBS.gov and FAA application database.

81.    On information and belief, and subject to further discovery, much of the information entered by select FAA employees for the aforementioned applicants was fabricated and inputted to increase the number of African-American candidates meeting the minimum basic qualifications.

82.    At or about this time, Plaintiff first became aware of the widespread discriminatory actions of the FAA regarding the application and hiring process.

83.    In February 2014, FAA spokesman and Public Affairs Officer for the Great Lakes and Central Regions, Tony Molinaro, stated that the decision to change the FAA's hiring process for air traffic controllers was made to "add diversity to the workforce." Exhibit 5.

84.    On or about March 2014, then DOT Secretary Foxx stated before Congress that the changes to the hiring process were made "to do a more broad opening of the aperture if you will to get a larger universe of applicants into the program." https://www.youtube.com/watch?v=3OrfVpKMQ_c (last accessed September 9, 2018).

85.    Various other FAA and DOT officials and employees stated that the change in the hiring process was for diversity purposes.

86.    On information and belief, then Deputy FAA Administrator, Molly Harris, stated in an email to senior FAA officials that it was important for them "to find a way to address Congressional inquiries without hurting our case when it comes to litigation."

87.    As a precondition of employment, the FAA has always had basic minimum

PLA0209

qualification standards, including having a minimum amount of work experience, U.S. citizenship, and passing medical and security screening requirements.

88.    The United States Office of Personnel Management ("OPM") defines "qualification standards" as the minimum requirements necessary to perform work of a particular occupation successfully and safely. These minimum requirements may include specific job-related work experience, education, medical or physical standards, training, security, and/or licensure. Furthermore, according to the OPM "…qualification standards are not designed to rank candidates, identify the best qualified for a particular position, or substitute for an analysis of an applicant's knowledge, skills, and abilities/competencies…." https://www.opm.gov/FAQs/QA.aspx?fid=de14aff4-4f77-4e17-afaa-fa109430fc7b&pid=56f 30860-6b28-4899-a8f8-459aa856a077.

89.    Minimum qualifications are defined as the minimum amounts of education or experience and the minimum level of knowledge, skills, abilities, licensures, certifications and other job-related requirements that must be met for a candidate to be considered for a position.

90.    The implementation of the new hiring process, FAA vacancy announcement 33537, first occurred in February of 2014. The FAA issued vacancy announcement FAA-AMC-14-ALLSRCE-33537 on February 10, 2014.

91.    ATC Applicants first completed an electronic on-line application and uploaded a resume. They were then required to take and pass the BA.

92.    On information and belief, the BA's grading was elusory and, due to the failure to validate, was not adequate to be used as an employment screening examination.

93.    On information and belief, the BA's grading was designed to disadvantage candidates with aviation experience and provide an advantage to "off the street" applicants.

94.    On information and belief, the BA's grading was not properly designed to identify the individuals most qualified for the air traffic control specialist position.

95.    ATC Applicants did not receive a numerical grade or any indication of whether they passed or failed the BA at the time they took the test.

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

17

PLA0210

96.     ATC Applicants failing the BA were provided an electronic "application status" notification that stated, in relevant part: "[b]ased upon your responses to the Biographical assessment, we have determined that you are NOT eligible for the position as a part of the current vacancy announcement." Exhibit 6 attached hereto and incorporated herein. Furthermore, the application status notification stated: "[t]he biographical assessment measures ATCS job applicant characteristics that have been shown empirically to predict success as an air traffic controller in the FAA....This biographical assessment was independently validated by outside experts." *Id.*

97.     According to the BA's co-creator, John Scott of APTMetrics, the BA was not designed to be used as a minimum qualification assessment or tool. According to Mr. Scott, "[w]e need to be clear that this assessment program [BA] was never designed as a minimum qualification. Assuming that we had the empirical evidence (which we don't) to set a cutoff on these tests that would screen in only the minimally qualified, the result of the application would be to strip this assessment program of its power and utility and essentially render it useless." The email, dated November 26, 2013, in which Mr. Scott made this statement is attached hereto as Exhibit 7.

98.     Mr. Scott's email was addressed to numerous upper-level FAA managers, including Rickie Cannon, who was the Deputy Director of Human Resources at the time. *Id.*

99.     Mr. Cannon was a member of the Executive Steering Committee and the chair of the Barrier Analysis Implementation Team, both of which oversaw work on the changes to the hiring process.

100.    The Executive Steering Committee was, at the time of the changes, chaired by Deputy Administrator Michael Whitaker and served in an advisory and decision-making role.

101.    Furthermore, Mr. Scott stated that "[m]inimum qualifications are best assessed by education, experience, training and potentially through certification or job knowledge tests- not through tests of personal characteristics and aptitude." *Id.*

102.    However, the FAA ignored Mr. Scott's admonishment and inappropriately used

18

PLA0211

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

the BA to screen applicants while ignoring education, experience, training and potentially through certification or job knowledge test.

103.    On information and belief, the FAA did not review the qualifications or verify that requirements of the vacancy announcement were met until after individuals passed the BA.

104.    On information and belief, the FAA allowed some individuals to provide supplemental information or modify their application, after submission, after they passed the BA, if they did not meet the minimum qualifications or provide enough supporting information.

105.    Dana Broach, Ph.D. is a personnel research psychologist at the FAA Civil Aerospace Medical Institute (CAMI). CAMI is the medical research, education, and occupational health wing of the FAA's Office of Aerospace Medicine. Dr. Broach's primary research area is personnel selection.

106.    Dr. Broach co-authored a CAMI study in October 2013. According to this study "[Researchers] recommend that if biodata are used to select ATCSs, additional research is needed to identify and validate items predictive of success in training. We also recommend that a criterion measure representative of job performance of air traffic controllers be developed and validated for use in future research on the selection of air traffic controllers." Linda G. Pierce, Dana Broach, Cristina L. Byrne,  M. Kathryn Bleckley, *Using Biodata to Select Air Traffic Controllers*, Civil Aerospace Medical Institute, Federal Aviation Administration (October 2013).

107.    Dr. Broach, in an internal FAA document dated April 9, 2013, titled Controller Hiring Proposal, states that "There is a trade-off between diversity (adverse impact) and predicted job performance/outcomes." Exhibit 8.

108.    Dr. Broach's document also asks the question "How much of a change in job performance is acceptable to achieve what diversity goals?" *Id*.

109.    The FAA has repeatedly stated, most recently in March 2018, and affirmed to

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

PLA0212

the public, members of Congress, and the Courts, that the 2014 BA was professionally validated. Exhibit 6. Exhibit 9 ¶ 11.

110.    The 2014 BA was not validated and the FAA did not have the empirical data necessary for the use of the BA, according to industry standards. Exhibit 7 and Exhibit 10.

111.    Federal employee selection is required to be based on the relative ability, knowledge, and skills of the applicant.

112.    On information and belief, the FAA used the non-validated BA in a manner that resulted in disparate treatment and adverse impact upon qualified non-African-American ATC Applicants to engage in unlawful racial balancing which was neither job-related nor consistent with business necessity.

113.    Misusing the non-validated 2014 BA and then matching the "results" with resumes entered into the FAA's system by FAA employees to ensure that certain applications would pass basic minimum criteria despite the applicants actual background and status, or matching the "results" with resumes seeded with code-words so as to give an unlawful preference to NBCFAE members or African-American ATC Applicants, violates the constitutional rights of all the ATC Applicants who applied to FAA vacancy announcement 33537.

114.    Following the Fox Expose, the FAA conducted an investigation into Mr. Snow's actions surrounding the new hiring process.

115.    An investigation was also conducted by the DOT Office of the Inspector General ("OIG"), including as to whether Mr. Snow violated 14 C.F.R. 65.18 – Written Tests: Cheating or other unauthorized conduct.

116.    The DOT OIG Investigation Report revealed that Mr. Snow "organized and facilitated a teleconference for NBCFAE members to 'walk through' the application process, including addressing questions from the BA test, during the open vacancy period."

117.    The DOT OIG Investigation Report also revealed that Mr. Snow "provided a list of 'buzzwords' to NBCFAE members" obtained "as confidential information coming from

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

PLA0213

an NBCFAE member in FAA's [HR] office."

118.    The DOT OIG Investigation Report also revealed that Mr. Snow initially omitted or withheld information regarding his participation in these meetings but after being shown text messages and consulting with counsel, he admitted "responding to these [BA] questions from the group saying he explained to each person how they should answer."

119.    The FAA and DOT OIG took no adverse or administrative action against Mr. Snow.

120.    The FAA and DOT withheld information regarding Mr. Snow's admissions and lying to federal investigators from the public and Congress.

121.    On information and belief, thousands of qualified ATC Applicants failed the 2014 BA and were improperly eliminated from consideration as to FAA vacancy announcement 33537.

122.    Defendants did not, and cannot proffer a legitimate, integral, or important reason to justify the implementation and use of the 2014 BA. Even if substantial, legitimate justification was demonstrated, a less discriminatory alternative to the implementation of the BA was available.

## Class Action Allegations

123.    Plaintiff incorporates the allegations and information in the preceding paragraphs as if fully set forth herein.

124.    This is a class action brought by Plaintiff on his own behalf and on behalf of others similarly situated, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and 29 C.F.R. § 1614.204.

125.    The putative class Plaintiff seeks to represent are ATC Applicants who met the minimum qualifications to be hired by the FAA yet were improperly screened from further consideration by the FAA's improper use of the 2014 BA.

126.    Specifically, the putative class members were required to take the BA which was intentionally used as a screening tool by FAA personnel to improperly favor or

21

PLA0214

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

1    disadvantage the applicants based upon their race.

2    127.    As such, putative Class members were illegally denied a fair and equal

3    opportunity to be considered for employment.

4    128.    Commonality.  There are common questions of law, practices, and fact as to the

5    members of the Class which predominate over questions affecting only individual members

6    of the Class. Specifically, this case challenges the FAA's 2014 decision to improperly use the

7    non-validated BA, on FAA vacancy announcement 33537 to target and eliminate from

8    consideration ATC Applicants based upon the applicants' race and not on consideration of

9    proper minimum qualifications. The FAA's use of the BA resulted in members of the Class

10   being eliminated from hiring consideration, even though they met or exceeded the minimum

11   qualifications for the job. There are no unique factual or practice factors that would make

12   Class status disadvantageous to any member of the Class. The FAA instituted a single decision

13   to adopt a new hiring practice for air traffic controllers and improperly use the BA which

14   affected all Class members. Defendants' motivation and purported evidence for the decision

15   is common to all Class members.

16   129.    Typicality.  Plaintiff's claims for the remedies stated herein are typical of the

17   claims of all members of the putative Class because all members of the prospective Class were

18   improperly denied employment although they met the minimum qualifications to be further

19   considered for employment. Class members sustained similar injuries and damages arising

20   out of Defendants' common course of unlawful conduct. The injuries and damages of all

21   members of the Class were caused by Defendants' single decision to utilize the BA for

22   improper purposes.

23   130.    Numerosity. The potential quantity of members of the putative Class as defined

24   is so numerous that joinder of all members would be unfeasible and impractical.

25   Approximately 28,511 ATC Applicants took the 2014 BA. Of those, 26,104 "failed" the BA

26   and were eliminated from further employment consideration. A large number of those

27   eliminated met the FAA's actual stated minimum qualifications and, but for the BA, should

22

PLA0215

have been given the opportunity to be further considered for employment. They "failed" because the FAA used the BA as a tool to improperly screen for minimum qualifications as well as to identify, target, and eliminate candidates based on race. The disposition of their claims through this class action will benefit both the parties and this Court. While the exact quantity of members of the Class is unknown at this time, it is estimated that the Class number is in excess of 20,000 individuals. The quantity and identity of such membership, or those meeting the FAA's stated minimum qualifications, is easily ascertainable through inspection of Defendants' records. Specifically, and according to the relative Air Traffic Applicant Announcement numbered 33537, ATC Applicants minimum "basic" qualifications, excluding the BA, were: U.S Citizenship; 30 years or less in age; 3 years of progressively responsible work experience at 40 hours per week; or, 4 years of college study leading or a bachelor's degree; or, a combination of work experience and college totaling 3 years. It is assumed a large number of the putative class members will meet these basic qualifications.

131. <u>Adequacy</u>. Plaintiff is an adequate representative of the putative Class and, as Class Representative, will fairly protect the interests of the members of the Class. Plaintiff has no interests antagonistic to the members of the Class and will vigorously pursue this suit via attorneys who are competent, skilled, and experienced in litigating complex matters of this type. Putative Class Counsel are competent and experienced in litigating large cases, are preeminent in their fields, and members of the firms have experience in litigating complex matters including employment and constitutional law cases. Approximately 450 potential Class members have contacted Plaintiff's Counsel prior to the filing of this Complaint.

132. <u>Ascertainable Class</u>. The proposed Class and each subclass are ascertainable in that their members can be identified and located using information contained in Defendants' records. The FAA's Human Resources Office, as well as other offices, maintain a list of job applicants, their qualifications, and exam scores based on announcement number.

133. <u>Superiority</u>. The nature of this action and the questions of law or fact common to Class members predominate over any questions affecting only individual members. A class

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

23

PLA0216

action is superior to other available methods for fairly and efficiently adjudicating this controversy for the following reasons, without limitation:

a.      This case involves federal agencies and officials and a sufficient group of individual Class members with many claims and common issues of law and fact;

b.      if each individual member of the Class was required to file an individual lawsuit, Defendants would necessarily gain an unjust advantage because Defendants would be able to exploit and overwhelm the limited resources of each individual member of the Class with Defendants' vastly superior financial and legal resources;

c.      requiring each individual member of the Class to pursue an individual lawsuit would discourage the assertion of lawful claims by the members of the Class who would be disinclined to pursue an action against Defendants because of an appreciable and justifiable fear of retaliation and permanent damage to their lives, careers, and well-being;

d.      proof of a common practice or factual pattern, of which the members of the Class experienced, is representative of the Class herein and will establish the right of each of the members of the Class to recover on the causes of action alleged herein;

e.      the prosecution of separate actions by the individual members of the Class, even if possible, would create a substantial risk of inconsistent or varying verdicts adjudications with respect to the individual members of the Class against Defendants and which would establish potentially incompatible standards of conduct for Defendants;

f.      many members of the putative Class were not aware of the FAA's actions at the time they took the BA. Plaintiff exhausted administrative remedies and is properly before the Court. As federal job applicants have a very short time period to pursue administrative remedies, and therefore file suit, individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs, while an important public interest will be served by addressing the matter as a Class Action; and

g.      the cost to the judicial system of such individualized litigation would be substantial and a waste of valuable adjudicative and judicial resources.

PLA0217

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

**Curry, Pearson & Wooten, PLC**
814 W. Roosevelt Street
Phoenix, Arizona 85007

134.    <u>Manageability of Class and Common Proof</u>.  The nature of this action makes this class action a particularly efficient and appropriate procedure to afford relief to Plaintiff for the FAA's alleged unlawful actions. Specifically, the primary issue turns upon the FAA's single decision force minimally qualified ATC Applicants to take a non-validated test that was unlawfully used as a screening mechanism. Assuming that equitable tolling is available due to the effected ATC Applicants' lack of awareness of the FAA's unlawful hiring activities, individual adjudication would prejudice Defendants opposing the Class by requiring the United States government to allocate scarce judicial resources to individually adjudicate the claims of an estimated 20,000 to 25,000 disenfranchised applicants.

## Claims of Named Plaintiff

135.    Plaintiff incorporates the allegations and information in the preceding paragraphs as if fully set forth herein.

136.    Plaintiff has significant academic qualifications and aviation experience.

137.    Plaintiff greatly exceeds the FAA's minimum basic qualifications required of ATC Applicants.

138.    Specifically, Plaintiff has been awarded two college degrees in aviation related subject matter by Arizona State University. The degrees are a Bachelor of Science ("BS") degree in Aeronautical Management and a BS Degree in Air Traffic Management. Plaintiff received both degrees in 2013 – prior to applying for FAA vacancy announcement 33537 as an ATC Applicant.

139.    Plaintiff also had aviation job experience, working for a major U.S. airline as a safety specialist, before applying to FAA vacancy announcement 33537 as an ATC Applicant.

140.    Plaintiff was less than 30 years old and a U.S. citizen when he applied to FAA vacancy announcement 33537 as an ATC Applicant.

141.    Plaintiff applied for FAA vacancy announcement 33537 and took the February 2014 BA in good faith based on representations and belief that the BA was fairly constructed, validated, related to the job qualifications necessary to become an air traffic controller, and

PLA0218

that he would be given a fair and equal opportunity.

142.    Despite aviation academic and work experience that greatly exceeded the minimum qualifications for employment as an air traffic control specialist, Plaintiff was notified approximately one month after taking the BA that he did not "pass." He did not receive a numerical score on the BA.

143.    Plaintiff was not hired in vacancy announcement 33537 and therefore suffered an adverse employment action (non-selection).

144.    At the time Plaintiff took the BA, he was not aware that it was not validated.

145.    Furthermore, Plaintiff was not aware that certain FAA employees and agents were using the BA to screen candidates and actually penalize those with aviation education or work experience.

146.    On information and belief, a certain element within FAA Human Resources, infected with NBCFAE bias, believed that those with aviation education or experience were largely non-African-American ATC Applicants.

147.    FAA Human Resources improperly used the BA as a race or national origin screening tool and eliminated outstanding candidates that exceeded the actual minimum requirements for employment consideration as an air traffic controller.

148.    Plaintiff became aware that the BA test had been compromised by the NBCFAE and that the BA was improperly used to screen and unfairly to target him, and others similarly situated, in August 2015.

149.    Plaintiff filed a timely administrative complaint and exhausted administrative remedies as enumerated above.

150.    Due to the FAA's actions, Plaintiff suffered damages as enumerated further herein.

**First Cause of Action**

**Intentional Discrimination (Title VII-42 U.S.C. § 2000e-16 of 1964, et. seq.)**

(On behalf of Plaintiff and the Class)

PLA0219

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

151.   Plaintiff incorporates the allegations and information in the preceding paragraphs as if fully set forth herein.

152.   This claim is brought on behalf of the Plaintiff and the Class he seeks to represent. Plaintiff has filed a timely charge with the EEOC and thus exhausted his administrative remedies.

153.   The FAA engaged in intentional, agency-wide and systemic policy, pattern and/or practice of discrimination against non-African-American ATC Applicants regarding vacancy announcement FAA-AMC-14-ALLSRCE-33537 ("33537"). The FAA has intentionally discriminated against Plaintiff and the Class in violation of Title VII by, among other things:

a.     utilizing a biased, non-validated biodata examination (the BA) to improperly screen applicants for federal employment by race and national origin;

b.     illegally assisted a special interest group, the NBCFAE, in providing access to BA questions and answers, thereby favoring candidates based on race and national origin and excluding others;

c.     illegally assisting a special interest group, the NBCFAE, by having FAA employees creating resumes, work history, and educational history, for ATC Applicants favored by the NBCFAE, and entering the data for the employee into the USAJOBS.gov system that could later be identified and used to give an individual illegal preference based upon the race or national origin of the ATC Applicant;

d.     when the illegal and improper BA cheating was discovered, engaging in a cover-up and not subjecting individuals in the illegal activity to any Agency discipline or prosecution;

e.     failing to take reasonable and adequate steps to prevent and correct the use of standardless, non-validated and/or illegitimate criteria to unfairly determine whether an ATC Applicant would be considered for employment; and

f.     using criterion outside the listed minimum qualifications to prevent well

27

PLA0220

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

qualified applicants from further consideration based upon race and national origin.

154.    These policies and practices were intended to and had the effect of discriminating against ATC Applicants based upon race and/or national origin.

155.    The discriminatory acts that constitute the FAA's pattern and/or practice of discrimination have occurred both within and outside the liability period enumerated herein.

156.    As a direct result of the FAA's discriminatory policies and/or practices as described above, Plaintiff and the Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

157.    The foregoing conduct illustrated throughout this Complaint constitutes illegal intentional discrimination and unjustified disparate treatment prohibited by 42 U.S.C. § 2000e, et. seq.

158.    Plaintiff requests relief as hereinafter described.

### Second Cause of Action

### Disparate Impact Discrimination (Title VII- 42  U.S.C. § 2000e-16 of 1964, et. seq.)

(On behalf of Plaintiff and the Class)

159.    Plaintiff incorporates the allegations and information in the preceding paragraphs as if fully set forth herein.

160.    This claim is brought on behalf of Plaintiff and the Class he seeks to represent. Plaintiff has filed a timely charge with the EEOC and thus exhausted his administrative remedies.

161.    On information and belief, the FAA's reliance on illegitimate and non-validated systems and criteria in the evaluation and hiring of prospective air traffic controllers regarding vacancy announcement FAA-AMC-14-ALLSRCE-33537 ("33537") have had an adverse impact on non-African-American ATC Applicants in violation of Title VII and are not, and cannot be, justified by business necessity. Even if such systems and/or policies could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

28

PLA0221

162.    The discriminatory acts that constitute the FAA's pattern and/or practice of discrimination have occurred both within and outside the liability period enumerated herein.

163.    As a direct result of the FAA's discriminatory policies and/or practices as described above, the Plaintiff and the Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

164.    The foregoing conduct illustrated throughout this Complaint constitutes illegal intentional discrimination and unjustified disparate treatment prohibited by 42 U.S.C. § 2000e, et. seq.

165.    Plaintiff requests relief as hereinafter described.

**WHEREFORE**, Plaintiff prays:

A.    for certification of the case as a class action on behalf of the proposed Class;

B.    for designation of Plaintiff as the representative of the Class;

C.    for designation of Plaintiff's Counsel as Class Counsel;

D.    that this Court declare that the FAA's racially motivated implementation and use of the 2014 BA violated Title VII of the Civil Rights Act of 1964;

E.    that this Court an order enjoining the FAA, its employees, agents, and representatives and any and all persons acting in concert with them, from engaging in policies and patterns and/or practices that discriminate against Plaintiff or the Class because of their race, national origin, or participation in this lawsuit;

F.    that this Court enter an order that the FAA is to institute and carry out polices, practices, and programs that provide equal employment opportunities regardless of race or national origin and that it eradicate the effects of their past and present unlawful employment actions;

G.    that this Court enter an order requiring the FAA to develop and institute accurate and validated standards for hiring air traffic controllers;

H.    that this Court enter an order appointing a monitor to ensure that the FAA complies with the injunction provisions of any decree that the Court orders;

Curry, Pearson & Wooten, PLC
814 W. Roosevelt Street
Phoenix, Arizona 85007

PLA0222

I.    that this Court enter an order retaining jurisdiction over this action to ensure that the FAA complies with any such decree;

J.    that this Court award damages including, but not limited to, back pay, front pay, hiring, and reinstatement of the opportunity to be hired;

K.    that this Court award costs and attorney's fees in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(k);

L.    that this Court award pre-judgment and post-judgment interest, as provided by law; and

M.    that this Court award such further relief as this Court deems just and equitable.

**RESPECTFULLY SUBMITTED** this 12th day of September, 2018.

Lori Blair, TX Bar No. 24061256
King Blair, PC
9124 Caddo Trial
Flower Mound, TX 75022
Office: (214) 326-0491
Facsimile: (214) 326-0493
lblair@kingblair.com

*Attorneys for Plaintiff Lucas Johnson and Putative Class*

PLA0223

# EXHIBIT 1

PLA0224

**From:** Joseph.Teixeira@faa.gov <Joseph.Teixeira@faa.gov>
**Sent:** Monday, December 30, 2013 4:18 PM
**To:** les.wilkinson@aims.edu; lstephe4@aims.edu; verne.latham@asu.edu; Mary.Niemczyk@asu.edu; joseph.gridley@asu.edu; john.gilding@asu.edu; ecolageo@broward.edu; asikora@broward.edu; jshakesp@broward.edu; senglish@broward.edu; dbraun1@broward.edu; Jim.Scott@ccbc.edu; hayden_scott@dwc.edu; wyman_peter@dwc.edu; donofrij@dowling.edu; koplinkl@dowling.edu; LindenfM@dowling.edu; dalyt@dowling.edu; Deborah.abingdon@roswell.enmu.edu; Dusty.lewis@roswell.enmu.edu; juan.salmon@roswell.enmu.edu; Coynea7e@erau.edu; smithabc@erau.edu; mummeb6e@erau.edu; gregory.mcguirk@erau.edu; frances.mitchell@erau.edu; Brent.Spencer@erau.edu; Jack.Panosian@erau.edu; moore@fit.edu; dwilt@fit.edu; Fischer, Sam; Cheatum, Carter L.; Gallion Jr, Donald K.; Cabral-Maly , Margarita A.; cscott@greenriver.edu; gcomollo@greenriver.edu; aviation@greenriver.edu; Eely@greenriver.edu; Margaret.browning@hamptonu.edu; beverly.byrdsong@hamptonu.edu; eric.sheppard@hamptonu.edu; carey.freeman@hamptonu.edu; sandyt@hesston.edu; danm@hesston.edu; sandraz@hesston.edu; mtfranqui@gmail.com; JCALAF@BAYAMON.INTER.EDU; jmartinez@bayamon.inter.edu; ryates@ju.edu; Rusty.Chandler@cecilairport.com; mwillet@ju.edu; jmerkt@ju.edu; mmcfarl2@kent.edu; jboerger@kent.edu; rpriestl@kent.edu; lefton@kent.edu; Jonweber@letu.edu; Seanfortier@letu.edu; SteveKintner@letu.edu; parrotwi@lewisu.edu; streitmi@lewisu.edu; broganwi@lewisu.edu; kuhlmank@msudenver.edu; forrestj@msudenver.edu; vgolich@msudenver.edu; anaumann@mdc.edu; dlewis4@mdc.edu; jeffery.thomas@mdc.edu; ataylor@mgc.edu; lhenry@mgc.edu; rpace@mgc.edu; rcharles@mgc.edu; gzlotky@mtsu.edu; mtsuatc@mtsu.edu; ron.ferrara@mtsu.edu; linda.bracewell@minneapolis.edu; David.Kangas@minneapolis.edu; trena.mathis@minneapolis.edu; rrogus@mtsac.edu; Sshackelford@mtsac.edu; sdaum@mtsac.edu; bdbowen@purdue.edu; mnolan@purdue.edu; congert@scc.losrios.edu; millers@scc.losrios.edu; idar@scc.losrios.edu; webbd@scc.losrios.edu; slanderson@stcloudstate.edu; jwpalmer@stcloudstate.edu; james.rowland@tstc.edu; ramon.claudio@tstc.edu; Rosalinda.Herrera@tstc.edu; Albert.culp@tstc.edu; Brad.Sherman@tstc.edu; jeichelberger@ccbcmd.edu; dwilliams@ccbcmd.edu; ckomsa@ccbcmd.edu; gwescott@tulsacc.edu; RBancroft@tulsacc.edu; rpcapozzi@uaa.alaska.edu; afsll@uaa.alaska.edu; ancds@uaa.alaska.edu; dcushwa@uaa.alaska.edu; afach@uaa.alaska.edu; afrpc@uaa.alaska.edu; lovelace@aero.und.edu; drechsel@aero.und.edu; craigc@aero.und.edu; nradi@aero.und.edu; bsmith@aero.und.edu; kencarson@ou.edu; stephenwest@ou.edu; sharon.devivo@vaughn.edu; domenic.proscia@vaughn.edu; felix.esquibel@wmich.edu; ryan.seiler@wmich.edu; gil.sinclair@wmich.edu; dave.powell@wmich.edu
**Subject:** Hiring of Air Traffic Controllers by the FAA

Dear Colleagues,

The quoted text below, is an extract from letters we sent today to all our primary Collegiate Training Initiative (CTI) contacts. This email is being

sent to an expanded list of CTI stakeholders to initiate a dialogue on
upcoming changes to the hiring process for of air traffic controllers by
the FAA.

"The Federal Aviation Administration (FAA) has enjoyed a long-standing
relationship with your organization and values our partnership in the
training of potential Air Traffic Controllers (ATC).  Recently, the FAA
completed a barrier analysis of the ATC occupation pursuant to the Equal
Employment Opportunity Commission's (EEOC) Management Directive 715. As a
result of the analysis, recommendations were identified that we are
implementing to improve and streamline the selection of ATC candidates.
These improvements will have a direct and present impact on all hiring
sources, including CTI.
An overview of the immediate changes being made to the ATC hiring process
is presented below.

Revisions to ATC Hiring Process

·   A nationwide competitive FG-01 vacancy announcement open to all U.S.
Citizens will be issued in February 2014. Any individual desiring
consideration for employment (including CTI graduates) MUST apply.
Existing inventories of past applicants will not be used.

·   All applicants will be evaluated against the same set of
qualification standards. Specifically, applicants must have at least
3 years of progressively responsible work experience, a 4 year
degree, or a combination of the two.

·   The existing testing process has been updated. The revised testing
process is comprised of a biographical questionnaire (completed as
part of the application process) and the cognitive portion of the
AT-SAT.  The cognitive portion of the AT-SAT will be administered
only to those who meet the qualification standards and pass the
biographical questionnaire. Applicants for the February 2014
announcement will be required to take and pass the new assessments in
order to be referred on for a selection decision.

·   Since a single vacancy announcement will be used for all applicant
sources, a single nationwide referral list will be generated
containing all candidates who meet the qualification standards and
pass the assessments. Location preference will no longer be used as a
determining factor for referral or selection.

Centralized selection panels will no longer be convened to make selections
from the referral list. Selections will now be fully automated, grouping
candidates by assessment scores and veteran's preference.

These improvements to the ATC hiring process will significantly strengthen
the long term sustainability of our program and offer our candidates a fair
and viable opportunity to demonstrate their capabilities and potential for
the ATC position.

We recognize that you may have questions concerning these changes.
Considering the upcoming holiday season, we are planning a teleconference
for Mid-January when we will more fully address questions and concerns you
may have.

We want to reiterate that we very much value our partnership with the CTI
program and look forward to assisting you in understanding our changes to
the ATC selection process.  We will be contacting you soon to schedule the
January teleconference."

Best Regards, Joseph

PLA0226

Joseph Teixeira
Vice President for Safety &
Technical Training
Air Traffic Organization
Tel:  202-267-3341
Email:  joseph.teixeira@faa.gov
(Embedded image moved to file: pic26439.gif)

PLA0227

# EXHIBIT 2

PLA0228

Subject: IMPORTANT UPDATE ON ATC Vacancy Announcement.
Date: Tuesday, January 28, 2014

**TO: NBCFAE Family,**

Please read the information below carefully.  This process is constantly evolving.

**_So here's what is fact so far._**

1. The controller vacancy announcement is open to all US citizens that meet the minimum qualifications of the vacancy.  Everyone interested should bid.  The list will also be used to fill future vacancies.

2. Rumors have been spreading that temporary offer letters (TOL) may still be offered to people that went through the old hiring process.  As you know this has been a big issue for NBCFAE.  I confirmed yesterday with agency leadership including AHR-1 that the agency will not offer jobs to people that may have been in that pipeline.  Their words were "That list has been purged."  So please tell everyone impacted by this to apply on the upcoming bid.

3. College Training Initiative (CTI schools): During the holidays CTI schools were informed that they will no longer receive the preferences they have been receiving. I received a lot of feedback from people impacted by the change.  Some of it was very negative and some centered around not understanding why NBCFAE fought the issue the way it did. That conversation will continue but the bottom line is all CTI students need to apply on the upcoming bid.

4. Veteran Preference remains.  There will be more coming on this one.

5. There is an effort to hire people with targeted disabilities to work in the ATO.  The ATO has set a 2014 goal of hiring 10 people with targeted disabilities. The key word is the definition of targeted.  More to come.

**_WHAT WE DO NOT KNOW_**
We do not know exactly what the new ATSAT test will look like.  We have a general idea based on the skill set needed to perform the job. The test will have two components: a biographical test and a cognitive test. You will have to pass the biographical portion to take the cognitive portion.

We do not know exactly how the selection factors will be applied but we do know that a diverse pool must come from the process.

The Federal Aviation Administration (FAA) is still working on both of the above issues and as soon as I know you will know.  Please bear with me if it takes time.  I want to share the correct information the first time.

**_WHAT'S DIFFERENT_**
The hiring process for applicants will be a modified Pepsi hiring process which means there will be five locations where a person can travel to at their own expense to go through the hiring process before attending the academy.  The locations are Seattle, Dallas, Atlanta, Chicago and the fifth site is to be determined.

Applicants will be able to go through the security and human resources part of the process but will have to handle their medical clearance separately.  If a person chooses not to use the Pepsi process then they will still have the option to use the standard hiring process which takes more time. More to come.

The FAA plan to issue a number of vacancy announcements on February 10, 2014 for air traffic control specialists on a nation-wide basis.  It will only be open for 10 days.  Go to the link below:
http://www.faa.gov/jobs/career_fields/aviation_careers/

Visit the FAA Virtual Career Fair (VCF) and learn about select aviation careers FAA is offering. FAA recruitment experts will be available for live chats on Jan. 29, 12–4 p.m. EST, and Feb. 12, 12–4 p.m. EST.  To register for the VCF and to learn about these aviation careers, go to http://vshow.on24.com/vshow/network/registration/5492 Also, visit the USAJOBS Resource Center at help.usajobs.gov to learn how to build your resume and access tips and tutorials on applying and interviewing for federal jobs. You are highly encouraged to use the resume builder. available on the USAJOBS website usajobs.gov.

PLA0229

_Let me say a few things in closing._

We have been very successful in spreading the word on this announcement and it is no surprise, especially in these times, that the response has been enormous. I have seen so many diverse and talented young folks looking for opportunities. Our challenge is to assist them in any way we can to find opportunities wherever they can including in other areas of the federal government if possible. More to come and we will need your help.

NBCFAE has a proud history of helping everyone who ask us for help. We do not ask the ethnicity of anyone seeking our assistance and we want the best and brightest to work for the FAA. I believe what is sometimes lost is that we are also the best and brightest. NBCFAE's goals include assisting in recruiting African Americans, females, and minority individuals into the FAA and to promote equal employment opportunities through all lawful means. We do not apologize for our commitment to that end.

We encourage everyone to become members of NBCFAE. We believe that NBCFAE's work speaks for itself and we encourage people to become a member. Please go to www.NBCFAE.org. Click on the Member Login on the Home Page. Then go to the Resources header. Use the drop down menu to go to Documents and then to ATC vacancy for additional information on the ATC hiring process.

Please email any questions you have to me. I will compile them and send a Frequently Asked Questions often.

Have a GREAT DAY!


 In Unity,
Roosevelt Lenard, Jr.
NBCFAE National President

PLA0230

# EXHIBIT 3

PLA0231

*NBCFAE'S TEAM SEVEN UPDATE*   January 30, 2014



### *Ronald Bagley, NBCFAE EEO Chairperson*

### CURRENT ACTIVITIES:

Ronald Bagley has been attending the Coalition for the Peoples' Agenda meeting (Rev. Dr. Joseph E. Lowery's group). Randy Williams continues to work with the Moral Monday group on behalf of Team 7.

### *Pending & Ongoing*

Schedule meeting with Washington, DC Congressional Black Caucus (CBC) for some time in February.

Follow up on our face to face in March regarding the items below: Questions to Federal Aviation Administration (FAA) Administrator Michael P. Huerta regarding the FAA's barriers and its trend analysis of the workforce's major occupations by race, national origin, sex and disability. FAA's responses were that they are working on the issues. DOT alliances indicated to the CBC that they should actively remain on this discrimination issue.

CBC leaders met with DOT and FAA to discuss the agency's hiring process. Next steps are to include appropriations language in to the FAA letters as this may be a vehicle that could remove these barriers very quickly. Additionally, CBC's support to NBCFAE is to ask for best practices that align to FAA's hiring practices for a concentration of minority hiring.

Also, during this visit met with CBC constituents including Congressman Elijah E. Cummings (House Representative, Maryland). Congressman Cummings, Chair of the Committee on Oversight and Government Reform is engaged with the CBC Policy Director and will aid in the development of strategies regarding FAA's infrastructure and political taskforce.

Follow up with membership (joining) requirements of the Coalition of the Peoples Agenda. Follow up on a meeting with Dr. Joseph E. Lowery; currently pursuing information on the status of the IOU's from our last meeting with Rainbow PUSH Coalition's Vice President of Legal Affairs, Attorney Janice E. Mathis. We then will move forward on the following: Letter to and meeting with DOT, FAA and EEOC.

# EXHIBIT 4

PLA0233



## Trouble in the Skies

May 20, 2015   | In The News

*By Adam Shapiro*

**Fox Business Network**



❝❞    FOX Business' "Trouble in the Skies," a six month investigation of the FAA's new hiring practices, uncovered changes that may put the nation's flying public at risk as well as allegations that the newest air traffic control recruits had access to answers on a key test that helped them gain jobs with the FAA.

Lawmakers are taking notice, in a statement to FOX Business Correspondent Adam Shapiro U.S. Rep. Randy Hultgren (IL) said. "The latest report elevates the need to dig deeper to find out what the FAA is hiding. What is clear is that the FAA's lack of transparency and disturbing agenda puts the safety of our skies at risk. I repeat: it's time to compel the FAA to come before Congress to answer for their actions."

Also uncovered was an FAA effort to promote diversity that discarded 3000 qualified college graduates with degrees in air traffic control despite their following FAA procedure and obtaining FAA accredited degrees.

**Trouble in the Skies**

Millions of Americans are about to fly to summer vacations unaware that some of the air traffic controllers guiding their planes may have cheated on a key test to get their jobs.  A six month investigation by the FOX Business Network into the hiring and training of air traffic controllers raises troubling questions about the nation's air safety and the men and women the Federal Aviation Administration, FAA, hires to staff airport control towers.

PLA0234

It takes several years of study to acquire the complex skills necessary to become an air traffic controller, or ATC. It's considered among the highest pressured jobs in America. The path for new ATC recruits begins with questions like this, "The number of different high school sports I participated in was A) 4 or more… B) 3… C) 2… D) 1… E) Didn't play sports." It was on the Federal Aviation Administration's 2014 new and controversial exam called the Biographical Questionnaire or BQ. The FAA says it created the BQ to promote diversity among its work force. All air traffic control applicants are required to take it. Those who pass are deemed eligible and those who fail are ruled ineligible.

## More on this...

- **New FAA hiring practices threatening America's skies?**

- **Unqualified air traffic control candidates cheating to pass FAA exams?**

- **Rep. Hultgren's take on FAA hiring practices, new legislation**

In 2014, 28,000 people took the BQ and 1591 were offered jobs. FOX Business, as first reported on FBN's "The Willis Report", has uncovered evidence that FAA employees' including some within the agency's human resources department may have helped applicants cheat on that test.

Air traffic control applicants take the BQ at home, on their personal computers, without any supervision. The agency's web site says the BQ is "… proven to be a valid instrument for assessing experience work habits, education, and dimensions that are related to success on the job." Other questions on the 2014 BQ included, "How would you describe your ideal job? What has been the major cause of your failures? More classmates would remember me as humble or dominant? 26-year-old Matthew Douglas, a Native American from Washington State, took the BQ last year and failed. "How does this relate to the job? How does this determine what's gonna make a successful candidate?" he asked.

It's a good question and one the FAA is reluctant to answer. The federal agency will not reveal what the BQ specifically measures or how the exam determines eligibility to become an air traffic controller because it is worried that would compromise the test. But what really upsets Douglas is until January 1st, 2014, he was the kind of person the FAA considered incredibly eligible and gave preference in hiring to become an air traffic controller.



Matthew Douglas - *CTI Graduate*

PLA0235

Matthew Douglas is an energetic young man who had a good job working for Google Maps when a friend invited him to tour the FAA's control center in Seattle. "I was hooked. The work was fascinating and I knew this was my calling," he said. Douglas decided to throw caution to the wind, left his job, loaded his dog into the car and made the 2200 mile trek north to the University of Alaska Anchorage, UAA, where he set out to obtain a degree in air traffic control. He says, "I opted for the UAA because they had simulators and a well-respected program." Like several other young men and women pursuing air traffic control degrees, Douglas borrowed thousands of dollars, $30,000 in his case, to earn an FAA accredited degree from programs the FAA calls Collegiate Training Initiative or CTI Schools. The FAA created the CTI program more than 20 years ago to provide the agency with a reliable source of qualified air traffic control applicants.

The FAA knew back in the early 1990s, that it would face a shortage of qualified air traffic controllers as old timers began to retire. The FAA requires controllers to stop working at 56 years of age and the predicted shortage is now developing. The agency says it needs to hire 1000 new air traffic controllers a year for the next ten years to replace those it's losing to retirement. Air safety and the U-S economy depend on it. Air traffic controllers are the backbone of a system that routes 87,000 flights daily in North America and contributes $1.5 trillion annually to the US economy according to the FAA.

Between 1994 and 2006, the FAA recruited colleges and universities nationwide to establish CTI programs, on their campuses, to teach potential air traffic controllers the basics. At its peak the CTI program was offered at 36 two and four year institutions. And until last year, the FAA WEB page advised people like Douglas that the CTI program was the way to become an air traffic controller. Things were looking good for him when he graduated from UAA's CTI Program in 2013.

Matthew Douglas earned a perfect score, 100, on the FAA's old screening test called the Air Traffic Selection and Training exam, or AT-SAT. The FAA says the AT-SAT is an eight hour computer based test that measures, "aptitude required for entry-level air traffic control positions." Douglas calls it a rigorous measure of cognitive ability. He said, "There is time speed distance equations that you do in your head, actual control scenarios, games that test your ability to multitask; all skills that are essential to this job." His perfect score earned him the designation of "well qualified" a status in the FAA's old hiring nomenclature given to anyone with a score on the AT-SAT above 85. "Well qualified" CTI graduates were considered the best of the best according to a source at the FAA who wishes to remain anonymous.

The FAA used to give hiring preference to CTI graduates, like Douglas, who achieved the "well qualified" designation on the AT-SAT, successfully earned a degree from a CTI program and obtained a recommendation from the CTI program's administrators. Douglas had it all as he awaited the FAA's 2014 bid for jobs. It appeared, to him, that he was at the front of the FAA's line to be hired as 2013 came to a close. "I finished my air traffic control program with a 4.0 and I interned for the FAA. I think that I had a decent chance, absolutely," he said.

But just as Matthew Douglas prepared for a new year and a new life, the FAA dropped a bomb. On December 30, 2013 the FAA threw out his AT-SAT score, CTI diploma and recommendations from his CTI program administrators. In fact, the FAA threw out the AT-SAT scores and CTI qualifications of an estimated 3000 CTI graduates and military veterans who were all previously designated "well qualified" to become air traffic controllers. The FAA told them all to start over. But this time, when they applied for a job, their college degrees and previous military experience would mean nothing. They would now compete with thousands of people the agency calls "off the street hires"; anyone who wants to, can walk in off the street without any previous training and apply for an air traffic control job. The FAA's only requirements, to apply, are be a U.S. citizen, have a high school diploma, speak English and pass the FAA's new BQ, Biographical Questionnaire.

PLA0236

What Douglas and thousands of other CTI graduates didn't know was that the FAA was planning these changes long before the agency made them public.

FAA administrator Michael Huerta announced pending changes to the Air Traffic Control hiring process in April 2013, several months before Douglas and the other CTI graduates were discarded.  But Huerta made no mention of what the agency actually planned to do as Douglas and his CTI classmates were preparing to graduate. An FAA press release issued in April 2013 says, "Administrator Michael Huerta has made an historic commitment to transform the Federal Aviation Administration (FAA) into a more diverse and inclusive workplace that reflects, understands, and relates to the diverse customers we serve."



*FAA administrator Michael Huerta*

The FAA made those changes based on a barrier analysis started in 2012 which identified, "... four of seven decision points in the air traffic controller hiring process that resulted in adverse impact to applicants from at least one demographic group." In other words, the agency's analysis determined there were barriers for minority applicants to obtain the FAA's air traffic control jobs.  The FAA then hired Atlanta based APT Metrics to further analyze those barriers and recommend solutions.  APT Metrics issued its report, **Extension to barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process** on April 16, 2013.  It says that while the CTI schools appear to be a preferred applicant source, the program "...tends to have very little diversity." This is a conclusion the Association of Collegiate Training Institutions, a group representing the 36 CTI schools, fiercely disputes.

Doug Williams, a spokesperson for the association says the barrier analysis and APT Metrics report were flawed because they considered CTI enrollment at 4 year schools and failed to include enrollment data from two year schools, like community colleges, which have much larger minority enrollments. The APT Metrics report also took aim at the AT-SAT as a screening tool for air traffic control candidates and it's well qualified scoring preference saying, "One potential solution to the issue is to replace the use of the AT-SAT...with a measure that can differentiate candidates without increasing adverse impact." That replacement became the Biographical Questionnaire which Matthew Douglas failed.

As a Native American, Matthew Douglas is the kind of diverse candidate you would think the FAA wants and he's in favor of diversity. "It generates a better atmosphere when you have people from different backgrounds I completely agree with it," he said.  30 year old Moranda Reilly also agrees with diversity. She graduated from

PLA0237

the CTI program at the Community College of Baltimore County, Maryland in 2013. Reilly spoke exclusively with FOX Business about her experience applying for a job with the FAA and taking the BQ.



*Moranda Reilly - CTI Graduate*

Moranda Reilly is eager to become an air traffic controller.  She was the aviation club president at her community college, won the National Air Traffic Controller Association's contest explaining the role controllers play in aviation and excelled in her classes. Reilly is hooked on aviation and now getting her private pilot's license.  "I think it's fascinating. This industry is a unique one," she said.  At first, the FAA's hiring changes didn't worry Reilly who scored 86 on her AT-SAT, lower than Matthew Douglas scored, but still considered "well qualified."  And Reilly had something Douglas didn't; access to the BQ test and the right answers.   "I was shocked when I first heard it," she told FOX Business.

Moranda Reilly says friends in the CTI program encouraged her to join an organization called the National Black Coalition of Federal Aviation Employees or NBCFAE.  It's one of several organizations which offer membership to people of color and minorities who work for the FAA.  Reilly says her friends told her joining the NBCFAE, as a female applicant, would help improve her chances of being hired.  The NBCFAE WEB page says it has 1000 members and advocates on behalf of 5000 African American and minority FAA employees. "For over 35 years, NBCFAE, a nationwide network, has been dedicated to promoting equal employment for African Americans, female and minority employees; improving employee-management relations and providing an effective liaison amongst FAA employees and the community at large."  Reilly signed up just as the FAA launched a new round of hiring in February 2014.

Reilly told FOX Business that she received a recorded voice text message from FAA employee and air traffic controller Shelton Snow a few days after the FAA hiring process started and applicants began taking the BQ. Candidates were, and still are, allowed to take the test unsupervised, on their own time and on their home computers over a two week period.

Snow is an FAA employee and president of the NBCFAE's Washington Suburban Chapter. He has recently been promoted to be an FAA Front Line Manager at the FAA's New York Center.

Moranda Reilly says Snow sent her and other ATC applicants a recorded message on February 12, 2014 as they were preparing to take the Biographical Questionnaire test.  Reilly shared the recording exclusively with FOX Business.

Snow Voice Text Message:

*"I know each of you are eager very eager to apply for this job vacancy announcement and trust after tonight you will be able to do so….there is some valuable pieces of information that I have taken a screen shot of and I am going to send that to you via email.  Trust and believe it will be something you will appreciate to the utmost.  Keep in mind we are trying to maximize your opportunities…I am going to send it out to each of you and as you progress through the stages refer to those images so you will know which icons you should select…I am about 99 point 99 percent sure that it is exactly how you need to answer each question in order to get through the first phase."*



*Shelton Snow - FAA employee and president of the NBCFAE's Washington Suburban Chapter*

Snow refused to discuss the recording with FOX Business and has declined several requests for interviews telling FOX Business, "Journalists must stop contacting me."  When confronted on camera by FOX Business about the allegations of cheating and providing answers to the test, Snow declined to comment.  On his recorded message, Snow discusses the screen shots and icons applicants should select. Snow goes on to refer to "one of my HR representatives" and giving them "the opportunity to sign off on it before you actually click it."  The recording was sent to NBCFAE associate members when it became clear some of them were failing the BQ test.

Snow Voice Text Message:

*"People have been getting rejection notices and those rejection notices have been coming after about 24 to 36 hours after clicking submit and I want to avoid that so what we are going to do is we are going to take our time and we're going to make sure that everything we click on, and you going to even have to go back to your resume and make some changes because one of our members and I have caught something and we want to go back and want to fine tune those details…"*

NBCFAE National President Paquita Bradley also declined repeated requests from FOX Business to discuss the recording and accusations that NBCFAE members helped applicants cheat.  The FAA rejected requests from FOX Business to grant interviews with FAA employees about the BQ but in a written statement about the cheating said, "No individuals have made credible allegations to the FAA about this issue." Reilly says, "I want to talk about it because I joined the NBCFAE and when I saw what was going on, I knew that I had to stand on the right side of the fence."

Reilly says Snow and other NBCFAE officials conducted workshops showing NBCFAE associate members, applying for FAA jobs, the correct answers to select on the BQ as well as key words to use on their resumes in order to be selected by FAA hiring personnel who were also NBCFAE members. Reilly insists that she didn't

cheat. She failed the BQ. "It breaks your heart to work so hard for something and for someone to say that you're not eligible because of a personality exam" she said. Disappointed but not deterred, Reilly decided to do something about what she says she witnessed.

Reilly went to her CTI advisor with the recording she got from Snow. The advisor told Reilly to contact aviation lawyer Michael Pearson a retired air traffic controller who now practices law in Phoenix, Arizona. "I believe the flying public has a right to know this is going on. I believe the people engaged in this behavior need to be held accountable," he said.

Pearson represents Moranda Reilly and several CTI graduates who may sue the FAA if they can obtain class action status. As of now, they've filed an equal employment opportunity complaint with the FAA's Equal Employment Opportunity office. But Pearson suspects something more egregious is taking place. "You had social engineering in my belief, my opinion, going on. It was driven by two arms of the FAA, two different organizations. One was a human resources group and I believe there was another group for different motives were engaging in what I believe is discrimination against qualified candidates," he said. At the center of the accusations is the BQ which Pearson says is being misused to disqualify worthy job applicants like Moranda Reilly and Matthew Douglas.

The FAA, responding to questions from FOX Business, insisted the BQ was professionally developed and "… validated based upon years of extensive research…" The new hiring process was implemented "…to ensure the FAA selects applicants with the highest probability of successfully completing our rigorous air traffic controller training program and achieving final certification as an ATCS (Air Traffic Control Specialist)."

Applicants who pass the BQ and subsequent FAA hiring review are sent to the agency's training academy in Oklahoma City, Oklahoma. Course work there lasts 13 weeks but it takes another two to three years, during which trainees apprentice at air traffic control centers across the country, for an applicant to achieve Certified Professional Controller status or CPC. It can cost as much as $420,000, on average, to fully train an air traffic controller and the FAA tries to select candidates based on the likelihood they will successfully complete their training. But, CTI School advocates say the old program saved the FAA time and money.



Photo Source: Reuters

Data from the FAA indicates CTI graduates complete their FAA academy course work five weeks sooner than off the street hires. And, CTI advocates say CTI graduates are more likely to achieve certified professional controller (CPC) status which saves the FAA money since the CTI graduates complete the program at greater rate than applicants hired off the street. FOX Business obtained a never made public FAA report that supports those claims. Studies of Next Generation Air Traffic Control Specialists II: Analysis of Facility Training Outcomes by Recruitment Source was written in October 2014 by Dana Broach, Ph.D. a researcher at the FAA's Civil Aerospace Medical Institute in Oklahoma City, Oklahoma. The report concludes, "Overall, larger

proportions of…CTI hires achieved CPC (Certified Professional Controller) status than did general public hires."

The FAA refused to let Broach talk to FOX Business but called his report "inconclusive". His unpublished report however speaks loudly and recommends preferring, "…CTI hires over general public hires…" because it "… could produce more net CPCs (Certified Professional Controller) than a policy of equal or no preference for recruitment sources." It's just one of several reports Broach has authored questioning the FAA's current hiring procedures.

Broach co-authored another report last year which questions the FAA's use of biographical data to predict training success; one of the reasons the FAA says it now uses the BQ. <u>Using Biodata to Select Air Traffic Controllers, October 2014</u>says, "…the evidence for using these biodata items for controller selection is weak." The report recommends additional research is needed to validate items predictive of success in training. The FAA declined requests to discuss Broach's research. Moranda Reilly finds it all very troubling. "They just base an entire hiring force on biographical data and now they're saying that it's weak so how can you stand behind what you, what you've put in place?" Matthew Douglas says it makes no sense. "Where's the logic behind it? If it's weak then why would you use it?"

Congress asked the same questions last year during hearings on the hiring changes. The FAA has not yet fully responded but has said publicly, "Disclosure of the Biographical Assessment items and the basis for scoring and weighting given to each question would diminish the validity and utility of the instrument for the selection of persons into the ATCS (Air Traffic Control Specialst) occupation." Congressman Randy Hultgren (R) Illinois doesn't believe it. "I just fundamentally disagree with that. You might get lucky in finding a few people that are qualified and able to do this, but again what I've seen from CTI programs, you've got passionate people willing to commit themselves." When FOX Business played the Snow voice text message for Hultgren, he called it "cheating."

Hultgren is cosponsoring the Air Traffic Controllers Hiring Act of 2015 to force the FAA to abandon the BQ and restore preferred hiring status for CTI graduates and military veterans who score high enough on the AT-SAT to be designated "well qualified". "The biggest objective is to make sure that our air travel is still the safest in the world and air traffic controllers are a big part of that," he said. The bill also requires the FAA to let the 3000 CTI graduates whose lives were disrupted by the BQ's implementation, reapply for air traffic control jobs even if they are older than the 31 year age cutoff.

But the FAA continues to stand behind the controversial BQ saying it helps select, "…those applicants with the highest probability of success in the FAA's rigorous air traffic controller training process. Of the 1591 cleared to be hired in 2014, 742 have been sent, as of May 2015, to the Academy with 564 passing their basic training. The 24 percent washout rate is consistent with failure rates under the FAA's old hiring guidelines according to a FAA source who wishes to remain anonymous.

Moranda Reilly doubts a new law will help her. "I will never be an air traffic controller and it's heart breaking, it really is," she said. Matthew Douglas is more optimistic and he has a message for the FAA. "You're toying with lives. You're toying with students who invested so much time and effort into this and you're also toying with aviation safety. There's 3000 of us who are more than willing to do the work so if anyone wants to reach out to us please do, we're ready, we're passionate and we want to work."

*Additional reporting by Pamela Browne, Gregory Johnson and Mallory Edmondson*

*Adam Shapiro joined FOX Business Network (FBN) in September 2007 as a New York based reporter.*

# EXHIBIT 5

PLA0242



# Want to be an air traffic controller? UND says FAA has 'dumbed down the process'

By Anna Burleson on Mar 5, 2014 at 5:30 a.m.



The Federal Aviation Administration has leveled the playing field for anyone wanting to work as an air traffic controller.

But is that a good thing?

Instead of giving preferential treatment to people with degrees in the field, as of February, anyone can be considered for the job as long as they pass a preliminary test and have a bachelor's degree or three years of work experience in any field whatsoever.

Paul Drechsel, assistant chairman of UND's air traffic control program said the decision was confusing and definitely a cause for concern.

"It's almost like they dumbed down the process," he said. "If I was the flying public I would be very concerned about this."

FAA Spokesman Tony Molinaro said the decision was made to "add diversity to the workforce."

"There's always a need for ATC because by age 55 you have to does happen faster than in a normal workplace."

Molinaro said it's great if people with ATC degrees apply becaus easier for them, but it doesn't necessarily mean they have a leg

"We know that we have to hire 'so many thousands' over the ne we can find the best applicants across the whole population," he said.

But Drechsel doesn't see it that way.

PLA0243

"We're confused," he said. "We haven't had any feedback yet, but we requested it from the FAA so we can make adjustments."

UND's Department of Aviation has assembled a legislative affairs committee to essentially convince state and local politicians to use their influence to get the decision reversed.

"I think with patience, this will change," Drechsel said.

UND is certified as a Collegiate Training Initiative school, meaning before the rule change, students who earned degrees could skip the first five weeks of a 12-week FAA-mandated training session at the Mike Monroney Aeronautical Center in Oklahoma City.

Now, a person who has no experience in the field can take the course after passing an initial test to measure things such as one's ability to handle stress.

But Molinaro said it still requires a certain skill set to pass all of the tests and work in ATC.

"We're looking at not just basic knowledge, we're looking at reaction time, working under stress, multitasking, thinking in three dimensions, things like that," he said.



**Anna Burleson**
Anna Burleson is the higher education reporter for The Grand Forks Herald. She is a 2013 graduate of the University of South Dakota's Mass Communication program and is originally from Watertown, S.D. Contact her with story ideas or tips by phone, email or Twitter, all of which are listed below. Examples of her work can be accessed here.

aburleson@gfherald.com



Recommended for you                                          X

They were at the playground. Then everything changed: After a fleeing driver veered into a Minneapolis park, the Peltiers have known pain, anger and hope

PLA0244

# EXHIBIT 6

PLA0245



**Federal Aviation Administration**

## Application Status

### Application Status for ▮▮▮▮▮▮ on announcement **FAA-AMC-14-ALLSRCE-33537**

Thank you for submitting your application for announcement FAA-AMC-14-ALLSRCE-33537. Based upon your responses to the Biographical Assessment, we have determined that you are NOT eligible for this position as a part of the current vacancy announcement.

The biographical assessment measures ATCS job applicant characteristics that have been shown empirically to predict success as an air traffic controller in the FAA. These characteristics include factors such as prior general and ATC-specific work experience, education and training, work habits, academic and other achievements, and life experiences among other factors. This biographical assessment was independently validated by outside experts.

Many candidates applied for this position and unfortunately we have fewer job openings than there were candidates. We encourage you to apply to future vacancy announcements. Thank you again for your interest in the Federal Aviation Administration.

If you require further information, please make your request in writing to ▮▮▮▮▮▮▮@faa.gov.

# EXHIBIT 7

PLA0247

Subject:    Re: Briefing from the Barrier Analysis Executive Steering Committee

11

We are not going to be able by Dec 2 to meet again with the ESC or get 11      and 11      together, and we can't miss Dec 2 date to get functional requirements to 11 . Therefore, I am willing to give you the go ahead provided there is no objection from policy or legal to this framework. I'm also not sure if these decisions need to be codified in policy. What constitutes qualified and well-qualified, beyond the floor normally established by OPM, is left to the agency.

So, I need to hear any objections or concerns from those on this note by noon EST today. Otherwise, APT proceed with preparing functional requirements for 11 .

Sent from my iPad

On Nov 26, 2013, at 5:21 PM, 11                              wrote:

> Hey 11
>
> The implementation team met this afternoon regarding the proposed assessment program and attempted to flesh out the issues raised in the email below and 11      follow-up email  The real key for everyone was how to define "minimally qualified" and whether the proposed assessments aligned with that definition.  The other critical issue was how veterans factored in to the process.
>
> 11      suggested, and the team agreed,  that minimally qualified really means satisfactory performance and that our baseline of 71% shown on the attached slide could reasonably represent the "floor" of minimally qualified. This 71% represents the current number (on average) of new hires that make it through the academy and achieve CPC status.  Furthermore, it was discussed that a higher standard could be justified (e.g., 85%) by ATO on the basis of business necessity due to the costs associated with wash out from the academy or once on the job.  We are currently running some separate analyses to investigate how these base rates may vary by facility type.
>
> All of this discussion resulted in agreement that as long as the FAA could agree on, and establish policy, for what constitutes success, the process outlined in the slide, and previously presented to the ESC, makes sense.  In addition, it was agreed that veterans would be ranked only once as part of the final banding using a composite of Biodata and AT-SAT.
>
> The team recommended that the ESC review this decision to ensure that they are on board but more importantly, that 11      and 11          meet to agree on the standard of success (e.g., 85% ) going forward and that this be memorialized as policy.  The trick here is that all this needs to happen by December 2nd (next Monday) so that 11 can program the selection cuts into the system.  It may or may not be necessary to re-present this to the ESC as they have already signed off on it, but Carrolyn's and David Grizzle's establishment of policy is critical path for finalizing the selection score cuts and moving ahead with Aviator.
>
> 11      and Humberto - please fill in anything I may have missed.  Thanks!
>
> Best Regards,
> 11
>
> -----Original Message-----
> From: John C. Scott
> Sent: Tuesday, November 26, 2013 7:30 AM
> To: David M. Finch; Rick.Mitchell@faa.gov; Rickie Cannon/AWA/FAA; dana.broach@faa.gov; gene.burdick@faa.gov; Jacqueline.Yeatman@faa.gov; Anthony.Chu@faa.gov; Humberto.Ruiz@faa.gov; Christina Kominoth/AWA/ James.Goelz@faa.gov
> Cc: Brandon Fleener
> Subject: RE: Briefing from the Barrier Analysis Executive Steering Committee

FAA 9570001782

PLA0248

>
> Greetings!
>
> We want to set some context for this afternoon's meeting in writing, recognizing that not all invitees may be able to attend. We think (and hope) that this meeting will serve to clear up some confusion over what the proposed assessment program (Biodata & AT-SAT) is and what it isn't.
>
> We need to be clear that this assessment program was never designed as a minimum qualification. Assuming that we had the empirical evidence (which we don't) to set a cutoff on these tests that would screen in only the minimally qualified, the result of this application would be to strip this assessment program of its power and utility and essentially render it useless. It would be akin to hiring a highly competent carpentry crew to come to our house for a week to pound in one nail. Minimum qualifications are best assessed by education, experience, training and potentially through certification or job knowledge tests - not through tests of personal characteristics and aptitude.
>
> If we were to follow through and treat this assessment program as a minimum qualification, the cutoff would need to be set so low (equated to a 70 on the legacy AT-SAT) that we would have overwhelming numbers of candidates passing through the process (almost everyone taking the AT-SAT) and no CSP to tease through this large volume and make selection decisions. How do we decide among the 97% of candidates who should be selected?
>
> This proposed assessment program was designed to automate and obviate the need for the CSP. We cannot have our cake and eat it too - or keeping with the holiday season, we cannot have our pumpkin pie and eat it too. If we want to eliminate the CSP, we need a process that will screen in the "best and the brightest" candidates for referral to the Academy - and one which does that in a fair and balanced fashion. The system that we have assembled relies on extensive CAMI research as well as best practice in maximizing validity and minimizing adverse impact.
>
> This process was designed to remedy the adverse impact associated with the legacy AT-SAT and CSP processes. It places a non-cognitive screening tool up front in the process that validly screens out 70% (projected) of candidates with no discernible adverse impact. This reduced group then goes on to take the cognitive assessment portion of the AT-SAT - which screens out 20% (projected) of the remaining candidates with only minimal adverse impact projected. The final composite test battery is a combination of 2.5 X Biodata & 1 X AT-SAT Cognitive for use in placing the remaining candidates into 3 bands. This combined test battery does not show adverse impact based on our current research. The 3 bands are then used for placement into the Academy - exhaust the top band before moving on to the second band.
>
> The proposed assessment process is serving a lot of masters here and we are meeting a number of goals. But we should be clear that this is not an MQ and not treat it as such. Hopefully this framing will help in our discussion later today.
>
> Best Regards,
> 11
>
> -----Original Message-----
> From: 11
> Sent: Monday, November 25, 2013 7:29 PM
> To: Rick.Mitchell@faa.gov; Rickie Cannon/AWA/FAA; dana.broach@faa.gov; gene.burdick@faa.gov; Jacqueline.Yeatman@faa.gov; Anthony.Chu@faa.gov; Humberto.Ruiz@faa.gov; Christina Kominoth/AWA/FAA
> Cc: John C. Scott; Brandon Fleener
> Subject: RE: Briefing from the Barrier Analysis Executive Steering Committee
> Importance: High
>
> Good evening,
>
> In light of a meeting earlier today, we believe we need to reconvene with those on this note to discuss how we can use the biodata measure as a valid and legally defensible means to mitigate adverse impact. We're working against a Dec 2 deadline to provide final cut scores to the Aviator team, and need to work through this prior to this. We're hopeful everyone on this note can still meet during this time slot tomorrow to talk through this. I have attached a few slides, including the testing model which we presented to the ESC, to frame up our discussion.
>
> 11 , can you send out an invitation including bridge info for the originally held time tomorrow?
>
> Thanks,
> David

3

FAA 9570001783

PLA0249

# EXHIBIT 8

PLA0250



Federal Aviation
Administration

# Controller Hiring Proposal

Presented to: AJI

By: Dana Broach, Ph.D. (AAM-520)

Date: April 9, 2013

PLA0251

# Key questions for leadership

- **What does leadership want to predict?**
  - Achievement of CPC status?
  - Post-CPC on-the-job performance?
  - Impacts weights, cut-scores, & categories (score bands)

- **What are the relative values of diversity and the prediction of performance/outcomes?**
  - There is a trade-off between diversity (adverse impact) and predicted job performance/outcomes
  - How much of a change in job performance is acceptable to achieve what diversity goals?
  - Impacts weights, cut-scores, & categories (score bands)



**Federal Aviation
Administration**

Controller Hiring by the Numbers
April 9, 2013

12

# EXHIBIT 9

PLA0253

Case 1:16-cv-02227-DLF    Document 78-4    Filed 01/24/19    Page 62 of 71
Case 2:18-cv-02431-JM   Document 2   Filed 09/12/18   Page 61 of 70   PageID 63
Case 2:16-cv-03067-GMS   Document 33-2   Filed 03/30/18   Page 40 of 86

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Jorge Alejandro Rojas,

        Plaintiff,

    v.

Federal Aviation Administration,

        Defendant.

No. CV-16-03067-PHX-GMS

## DECLARATION OF DAVID HAMILL

I, David Hamill, declare as follows:

1.      I am employed as the Director, Headquarters Human Resource Services (AHF-100) and have been in this position since October 31, 2016.  This is the only position I have held at the Federal Aviation Administration (FAA).   I make the statements herein based on my personal knowledge as well as knowledge and information acquired in the performance of my official duties.

2.      I have been a Human Resources professional for over 20 years, with experience in Federal agencies, large private sector organizations, and HR consulting firms.   I have led the talent acquisition and pre-employment assessment functions for several organizations for most of my career, and have a Master's degree in Industrial/Organizational psychology.

3.      I am currently the Director of Human Resources at FAA's Headquarters region.  I oversee the hiring for HQ positions and oversee the corporate recruitment and corporate engagement, and strategic workforce planning functions for the FAA.  In addition, as a trained Industrial/Organizational psychologist, I am the technical expert for the assessments used to assess job applicants for Air Traffic Controller positions. I was selected to review these documents because I have extensive experience in psychometrics in developing, validating, and

1

PLA0254

Case 1:16-cv-02227-DLF    Document 78-4    Filed 01/24/19    Page 63 of 71
Case 2:18-cv-02431-M  Document 2   Filed 09/12/18   Page 62 of 70   PageID 64
Case 2:16-cv-03067-GMS   Document 33-2   Filed 05/30/18   Page 42 of 50

2) revising the testing process to include a new Biographical Assessment, and 3) replacing the existing Air Traffic Selection and Training (AT-SAT) computerized test with an alternate form of the assessment.  The configuration of the selection process for this announcement followed a multiple-hurdle approach that included the following components: 1) Minimum Qualifications, 2) Biographical Assessment, 3) Alternate AT-SAT, 4) Medical Screening, and 5) Security Clearance.

9.     Biographical assessments can be very effective at measuring important non-cognitive characteristics such as teamwork and work ethic. They can also be quite effective at counterbalancing the adverse impact associated with cognitive measures while adding critical non-cognitive characteristics to the assessment battery and enhancing predictive validity.

10.    The new BA was designed to measure the critical attributes that could most readily be assessed with a biodata instrument, including those attributes that are not substantially assessed by the alternate form of the AT-SAT.  Specifically, the BA is a computerized test that measures important and demonstrably job-related personal characteristics of applicants, including flexibility; risk tolerance; self-confidence; dependability; resilience; stress tolerance; cooperation; teamwork; and, rules application.

11.    The BA is a critical tool in the multistep process to identify the most qualified job applicants. The BA was professionally developed and validated based upon years of extensive research of the ATCS occupation in accordance with relevant professional standards and legal guidelines for pre-employment selection testing. The BA was validated to predict pass rates at the FAA Academy, and predict certification of an ATCS at his or her first assigned facility.

3

PLA0255

Case 1:16-cv-02227-DLF    Document 78-4    Filed 01/24/19    Page 64 of 71
Case 2:18-cv-02431-JMC  Document 2  Filed 09/12/18  Page 63 of 70  PageID 65
Case 2:16-cv-03067-GMS   Document 33-2  Filed 05/30/18  Page 45 of 86

use the biographic assessment in the future. If this information were disclosed, this would cause the FAA to spend potentially millions of dollars for a complete redesign of the assessment which would take approximately a year to complete, thus crippling FAA's ability to hire our most critical occupations.

19.     I carefully reviewed each page of the records described above, and withheld from release pursuant to Exemption 2 only that information that was related to the internal rules and practices of the agency. Any non-exempt material that could be reasonably segregated without rendering the text meaningless was segregated and released to Plaintiff. For the 31 pages of records withheld in full, I determined that segregation was not reasonable because the exempt material was so extensive that segregation would produce an essentially meaningless set of words and phrases which, taken separately or together, would have minimal or no information content.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Sworn to and signed this 29th day of March, 2018


David Hamill    3/29/2018
Washington, D.C.

6

PLA0256

# EXHIBIT 10

PLA0257

# A REVIEW OF THE FEDERAL AVIATION ADMINIS-TRATION'S AIR TRAFFIC CONTROLLER HIRING, STAFFING, AND TRAINING PLANS

## (114–45)

# HEARING

BEFORE THE

## SUBCOMMITTEE ON AVIATION

OF THE

# COMMITTEE ON TRANSPORTATION AND INFRASTRUCTURE

## HOUSE OF REPRESENTATIVES

ONE HUNDRED FOURTEENTH CONGRESS

SECOND SESSION

JUNE 15, 2016

Printed for the use of the
Committee on Transportation and Infrastructure



Available online at: http://www.gpo.gov/fdsys/browse/
committee.action?chamber=house&committee=transportation

U.S. GOVERNMENT PUBLISHING OFFICE

20–499 PDF                WASHINGTON : 2017

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

PLA0258

20

healthy to less healthy facilities. But we have to account for the developmentals that are also in the building.

So, in working together, I am very confident that is how we have a laser approach on who we are putting into which facilities.

Mr. DEFAZIO. OK. Mr. Rinaldi, can you comment on this BA process? I mean when they did the control, how many—do you know how many controllers took the test and what their pass and fail rate was with the BA, actually working controllers?

Mr. RINALDI. Sure. I thank you, sir. When they did the first one in 2014, 28,511 applicants took the BQ; 2,407 passed. So, you know, roughly 10 percent passed.

Then we found out later on that—and I am not a scientist, but all you have to do is read the first page about a biographical assessment. It says that the test must be validated with a large group of incumbents. And being the only person who represents a large group of air traffic controllers, it was never validated with us. So we asked the FAA, "If you are going to do this again, you probably need to validate this test," and they did. We did it together, and validated it, and roughly 18,000 took it and roughly 5,000 passed the BQ, about 28 percent. Again, I don't know much about the science, but I do know there are a lot of qualified people out there that are actually doing the job today that have not passed it.

Mr. DEFAZIO. OK, thank you. Thank you, Mr. Chairman. I am over my time.

Mr. LOBIONDO. Just very briefly, I want to strongly associate with Mr. DeFazio's comments on the revised hiring process.

And Ms. Bristol and Mr. Cannon, do you realize when we are talking about a military air traffic controller that can't be qualified for civilian air traffic control, and you are telling this committee and the rest of the world that you are justifying that your process is valid, and trying to make all of us understand how that is OK, how absurd and ridiculous it is to us, that somehow you don't kind of regroup and say, "Look, maybe we have got to relook at this, and if we have got military air traffic controllers that have gone through CTI, maybe we have done something wrong here"? So this—you are hurting yourself by doing this.

Very briefly, we are going to go to Mr. Rokita, but Mr. Shuster asked to make a brief comment.

Mr. SHUSTER. I also want to strongly associate myself with Mr. DeFazio, what he said. He has hit the nail right on the head. So I appreciate that.

But I also want to make sure that the record reflects that in my ATC reform it accomplishes everything that we want—that he wants, I think, too—except for it is not in a failed—the history of America has been failed Government corporations. And it takes it out of that. And we have seen around the world that this system will work. So I just want to make sure that stands in the record, too. Thank you.

Mr. LOBIONDO. Mr. Rokita, you are recognized.

Mr. ROKITA. I thank the chairman. And Ms. Bristol, so the military training program doesn't suffice? Military controllers can't pass your processes and cannot work in the civil——

Mr. CANNON. No, sir. We are hiring any number of former military controllers. In fact, our most recent track 2 announcement, we

21

did an all-sources announcement open and continuous back last December. Air Traffic Organization recently hired 260 and they are all veterans, all former military.

Mr. ROKITA. All right.

Mr. CANNON. Controllers.

Mr. ROKITA. Well, why can't—why do they fail?

Mr. CANNON. Sir, the biographical assessment, like any test, is basically—it predicts success at the academy, and CPC at first facility. It is not flawless, like all other tests. so——

Mr. ROKITA. So you agree to correct the flaws?

Mr. CANNON. Well, what we have done is we have done—our consultants have done the validation work to ensure that the test is valid. That is legally an obligation we have as an agency, that any selection procedure or tool we use must be validated under the uniform guidelines——

Mr. ROKITA. Mr. Rinaldi—thank you—do you have a comment on this?

Mr. RINALDI. Just—Mr. Cannon said something about an open and continuous bid, and that is—that was closed in March. So if it is open and continuous, it would be open all the time, I would think. So it is not. It is actually closed. They have not issued another open continuous bid for experienced controllers or direct hires out of the military.

The individual that Mr. DeFazio was speaking about is a actual CTI graduate, highly recommended from the school, and is working in one of our Federal contract towers, actually performing air traffic control, and is not able to pass the BQ, either.

Mr. ROKITA. Roger, thank you.

Continuing on with the CTI schools, Mr. Cannon, can you explain why the FAA decided to use a BA, bachelor of arts, for general public candidates, including graduates of CTI schools? And second, can you explain why the FAA modified the BA so quickly?

Mr. CANNON. Modified the BA?

Mr. ROKITA. Yes.

Mr. CANNON. And why we use it? Again, we created and used the biographical assessment for the 2014 announcement because it is a good screen, and it is validated for success at the academy and success at CPC at first facility.

We modified the biographical assessment in 2015 because between the 2014 and the 2015 announcement we had enough time to do a job task analysis to take a deeper look at the occupation to see if it had changed.

Mr. ROKITA. Why did you use the same contractor for the biographical analysis?

Mr. CANNON. Why would we use the same contractor?

Mr. ROKITA. Yes, when the—that contractor failed the first time.

Mr. CANNON. Well, I don't——

Mr. ROKITA. Failed to do the job correctly the first time.

Mr. CANNON. Well, the contractor did not fail to do the job correctly the first time, sir.

Mr. ROKITA. Mr. Rinaldi, is that your opinion?

Mr. RINALDI. That is certainly not my opinion. The test was never validated with air traffic controllers. So it wasn't valid, and that is why it had such a horrible success rate.

PLA0260

22

More importantly, they did have time. They had 3,000 qualified CTI students on a list that they basically expunged. They could have hired them for that year and given us the opportunity to validate the test.

My executive vice president brought this up to who was the head of HR who is no longer there at this time, and they basically put the hand up and said, "We know exactly what we are doing, this science doesn't lie." It did lie. It was flawed.

Mr. ROKITA. Thank you very much for that testimony.

Ms. Bristol, Purdue University in my district is one of the 36 schools approved to participate in the Collegiate Training Initiative. When the hiring process was changed, CTI students no longer received a bonus on their application, whatever that looks like, for completing the program.

Why do you think that is right, that is the right decision, not to give priority to these students who were specifically trained to do air traffic control at what—you know, unless you are a hard IU [Indiana University] fan, wouldn't agree that Purdue is not a good place to get that kind of work done, that kind of training done?

Mr. CANNON. Sir, CTI students never got a bonus. What they had was a separate announcement in which they were placed in the inventory. The only thing we have done, if you really look at it closely, is we have taken them, and they are just competing in the pool with the rest of the U.S. citizens——

Mr. ROKITA. Well, there is a——

Mr. CANNON [continuing]. And they are doing very, very well.

Mr. ROKITA. There is a shortage, sir. Why not—you have these people trained already. Why not get them to the front of the line and get them in a tower, or get them in a TRACON?

Mr. CANNON. Sir——

Mr. ROKITA. I don't get it.

Mr. CANNON. Sir, they are actually doing better. If you can indulge me just for a second, they are actually doing better than they ever have. Let me give you just a few examples.

In fiscal year 2008 the FAA hired 2,196 controllers; 823 of those were CTI students. These numbers, by the way, are reported in the controller workforce plan. That is 37 percent. In fiscal year 2009 FAA hired 1,731 controllers, and only 335 were CTI students, 19 percent.

And then, in fiscal year 2010 and 2011, in the independent panel review report that was commissioned by Mr. Babbitt, and when he was the FAA Administrator, the FAA was roundly criticized because in fiscal year 2010 and 2011 out of 1,000 controller selections only 33 percent were CTI students.

Now, in fiscal year 2014, 47 percent of the 1,593 people selected were CTI grads or had some CTI education. And fiscal year 2015 that number ballooned to 50 percent. There were 1,452 out of 2,895 people who referred. So that is a 50-percent growth doing nothing at all but putting this new process in place.

Mr. ROKITA. I thank the chairman for his time. I yield back. Apparently we don't need to have this hearing, Chairman.

Mr. LoBIONDO. Mr. Lipinski.

Mr. LIPINSKI. Thank you, Mr. Chairman. Been a lot of discussion about whether or not there are shortages or not or—I think a cou-

JS 44   (Rev. 06/17) – TXND (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Lucas K. Johnson

**(b)** County of Residence of First Listed Plaintiff   Maricopa, Arizona
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See separate sheet.

## DEFENDANTS

See separate sheet.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

3-18CV2431-M

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government
  Plaintiff
- ☐ 3   Federal Question
  *(U.S. Government Not a Party)*
- ☒ 2   U.S. Government
  Defendant
- ☐ 4   Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                     *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product       Product Liability |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |       Liability   ☐ 367 Health Care/ |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &       Pharmaceutical |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
|       & Enforcement of Judgment |       Slander       Personal Injury |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'       Product Liability |  | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted |       Liability   ☐ 368 Asbestos Personal |  |       New Drug Application | ☐ 470 Racketeer Influenced and |
|       Student Loans | ☐ 340 Marine       Injury Product |  | ☐ 840 Trademark |       Corrupt Organizations |
|       (Excludes Veterans) | ☐ 345 Marine Product       Liability |  | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment |       Liability   **PERSONAL PROPERTY** | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
|       of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending |       Act | ☐ 863 DIWC/DIWW (405(g)) |       Exchange |
| ☐ 190 Other Contract |       Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal       Property Damage |       Relations | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise |       Injury   ☐ 385 Property Damage | ☐ 740 Railway Labor Act |  | ☐ 893 Environmental Matters |
|  | ☐ 362 Personal Injury -       Product Liability | ☐ 751 Family and Medical |  | ☐ 895 Freedom of Information |
|  |       Medical Malpractice |       Leave Act |  |       Act |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 899 Administrative Procedure |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee |       Income Security Act |       or Defendant) |       Act/Review or Appeal of |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment   ☐ 510 Motions to Vacate |  | ☐ 871 IRS—Third Party |       Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/       Sentence |  |       26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability |       Accommodations   ☐ 530 General |  |  |       State Statutes |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** |  |  |
|  |       Employment   **Other:** | ☐ 462 Naturalization Application |  |  |
|  | ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 465 Other Immigration |  |  |
|  |       Other   ☐ 550 Civil Rights |       Actions |  |  |
|  | ☐ 448 Education   ☐ 555 Prison Condition |  |  |  |
|  |   ☐ 560 Civil Detainee - |  |  |  |
|  |       Conditions of |  |  |  |
|  |       Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original
  Proceeding
- ☐ 2 Removed from
  State Court
- ☐ 3 Remanded from
  Appellate Court
- ☐ 4 Reinstated or
  Reopened
- ☐ 5 Transferred from
  Another District
  *(specify)*
- ☐ 6 Multidistrict
  Litigation -
  Transfer
- ☐ 8 Multidistrict
  Litigation -
  Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII of the Civil Rights Act of 1964; 42 U.S.C. 2000e

Brief description of cause:
Title VII Employment discrimination based on race.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
09/12/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Lori Blair

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

PLA0262

**DEFENDANTS:**

United States Department of Transportation;
Elaine L. Chao, Secretary of the U.S. Department of Transportation;
Federal Aviation Administration;
Daniel K. Elwell, Acting Administrator of the Federal Aviation Administration; and
Charles E. James, Sr., Director of the U.S. Department of Transportation Departmental Office of
Civil Rights.

**Plaintiff's Attorneys**

Michael W. Pearson, AZ Bar No. 016281
(*Pro hac vice forthcoming*)
814 W. Roosevelt St.
Phoenix, AZ 85007
Office: (602) 258-1000
Facsimile: (602) 523-9000
docket@azlaw.com
mpearson@azlaw.com

Lori Blair, TX Bar No. 24061256
King Blair, PC
9124 Caddo Trial
Flower Mound, TX 75022
Office: (214) 326-0491
Facsimile: (214) 326-0493
lblair@kingblair.com

PLA0263