<pre>
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3   ANDREW J. BRIGIDA, et al.,      .
                                     .  Case Number 16-cv-2227
 4            Plaintiffs,            .
                                     .
 5        vs.                        .  Washington, D.C.
                                     .  September 13, 2019
 6   UNITED STATES DEPARTMENT OF     .  10:06 a.m.
     TRANSPORTATION, et al.,         .
 7                                   .
              Defendants.            .
 8   - - - - - - - - - - - - - - - -

 9                    TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                   UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiffs:        ZHONETTE BROWN, ESQ.
                                BRIAN SHELDON, ESQ.
13                              Mountain States Legal Foundation
                                2596 South Lewis Way
14                              Lakewood, Colorado 80227

15                              MICHAEL PEARSON, ESQ.
                                Curry, Pearson & Wooten PLC
16                              814 West Roosevelt
                                Phoenix, Arizona 85007
17
     For the Defendants:        GALEN THORP, ESQ.
18                              MICHAEL DREZNER, ESQ.
                                United States Department of Justice
19                              Civil Division
                                Federal Programs Branch
20                              1100 L Street Northwest
                                Washington, D.C. 20005
21

22   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                333 Constitution Avenue Northwest
23                              U.S. Courthouse, Room 4704-B
                                Washington, D.C. 20001
24                              202-354-3284

25   Proceedings recorded by stenotype shorthand.
     Transcript produced by computer-aided transcription.
</pre>

```
1                    P R O C E E D I N G S
2          (Call to order of the court.)
3          THE COURTROOM DEPUTY:  This is Civil Case Year
4    2016-2227, Andrew J. Brigida versus United States Department of
5    Transportation, et al.
6          Counsel, please come forward and introduce yourselves for
7    the record, beginning with the plaintiff.
8          MS. BROWN:  Good morning, Your Honor.  My name is
9    Zhonette Brown from Mountain States Legal Foundation, and I am
10   here on behalf of Mr. Brigida and the class.
11         THE COURT:  Good morning, Ms. Brown.
12         MR. PEARSON:  Good morning, Your Honor.  Michael
13   Pearson.  I'm also on behalf of the plaintiff with my
14   co-counsel, Mountain States Legal Foundation.
15         THE COURT:  Good morning, Mr. Pearson.
16         MR. THORP:  Good morning, Your Honor.  Galen Thorp on
17   behalf of defendants.  With me at counsel table is Michael
18   Drezner from my office, and from the agency, Lisa Holden.
19         THE COURT:  Good morning.
20         All right.  Who will be arguing for Mr. Brigida?
21   Ms. Brown?
22         MS. BROWN:  I will be, Your Honor.
23         THE COURT:  All right.  Ms. Brown, before -- if you
24   can come up to the podium, please.
25         Before we get into the argument, can you help me understand
```

1    exactly what kind of information was in the background, the

2    biographical questionnaire, what kind of questions were on that?

3           MS. BROWN:  Actually, I am going to turn that over to

4    my co-counsel, Mr. Pearson.  He is more closely associated, and

5    it relates to another case that he is working on.

6           THE COURT:  All right.  Very well.

7           MR. PEARSON:  Thank you, Your Honor.

8       A broad, macro view of the biographical questionnaire --

9    and also sometimes called the biographical assessment.  The

10   terms are not necessarily interchangeable because the FAA

11   changed the name of the test, but for our purposes, pretty much

12   the same thing.

13      The biographical questionnaire was a test developed after

14   the elimination or purging of the list in December 2013.  When I

15   say "developed after," it might have been developed during the

16   time period, but it was actually implemented after the purging,

17   as the FAA called it, of the list in 2013.

18      The biographical assessment was a test that used factors, a

19   series of questions, high school education, any military

20   experience, what was your worst subject in high school, and a

21   laundry list of various other questions that were developed and

22   weighted by the FAA in conjunction with a private testing firm

23   called APTMetrics.

24      The case we are here for today, the Brigida matter, has

25   some areas that cross into potentially from a discovery

1    standpoint some issues dealing with the biographical

2    questionnaire and the biographical assessment, but they are

3    really two wholly different cases.  The case, the Brigida case

4    deals with the termination of approximately 2,700 prospective

5    CTI students.  "Controller training initiative" is what the

6    acronym stands for.  The FAA, like a lot of government agencies,

7    is very big on acronyms.

8        After they had already completed their requisites, the

9    prerequisites to be hired by the FAA, they had graduated from a

10    recognized and certified institution, they had taken -- at that

11    time the test was called the AT-SAT.  And the definitions are

12    important because later the FAA developed a exam, an aptitude

13    called the AT-SA.

14        Well, our students and our plaintiff and punitive

15    plaintiffs had all basically undertook the training that the FAA

16    required.  They matriculated, graduated.  They went to either

17    two-year or four-year programs.  They had either gotten a

18    recommendation from the school or eligible for recommendation

19    from the school, and they successfully passed that long-

20    validated and long-used by the FAA exam called the AT-SAT exam.

21        After the purging of the list or the December 2013 change

22    to the hiring process, moving into the next series of hiring,

23    that's when the biographical questionnaire and biographical

24    assessment was used by the FAA.  And they said that it was

25    basically used to determine if people had the aptitude to take

1    the next version of the aptitude test, the AT-SA test that the

2    FAA also developed that was different than the long-used and

3    well-validated AT-SAT exam.

4        So when we are talking about the biographical questionnaire

5    and biographical assessment, it really didn't pertain to the

6    students who were purged from the list.  And our allegations, of

7    course, is that the FAA engaged in disparate treatment because

8    of alleged disparate impact that we can show was not there.

9        We believe that the CTI students were a very diverse group

10   of applicants.  They are very well-qualified.  They certainly

11   met the agency mandates to obtain the preferential hiring or be

12   in the hiring list with FAA-selected future air traffic

13   controllers.

14       At the time of the list purge, the FAA had two sources to

15   select air traffic controllers from.  The first was the CTI

16   program, the students that met those recommendations we just

17   talked about and successfully matriculated from school.  The

18   second was military controllers.

19       Now, the FAA always had the ability to take off-the-street

20   applicants.  They just chose not to do so.  So even at the time

21   of the purge, if the FAA wanted to, they could have hired from

22   that third source, the general public source that's also used in

23   the vernacular in our pleadings called by both sides

24   "off-the-street hires."

25       So while the BA and biographical assessment -- biographical

1    questionnaire certainly is related at the very end of this case

2    because it was the prerequisite test that all of those students

3    that were purged off the list had to then take to determine if

4    they were going to be able to move on into the FAA's next

5    version of the hiring program.

6        So that's where the BQ, biographical questionnaire, or

7    biographical assessment, BA, comes into play in this matter.

8            THE COURT:  All right.  Thank you.

9            MR. PEARSON:  You are very welcome.

10            THE COURT:  All right.  Ms. Brown?

11            MS. BROWN:  Relatedly, Your Honor, we would be happy

12    to provide the Court with the version, at least one of the

13    versions of the BA/BQ.  It asked random questions and --

14    seemingly random and seemingly irrelevant questions, such as

15    have you been unemployed, did you play sports, what was your

16    favorite -- or what was your worst subject in high school, are

17    you a pilot.  So it was sort of all over the map.

18            THE COURT:  All right.  Ms. Brown, the defendants have

19    argued that your definition of "qualified applicant register" is

20    different than what you allege in your complaint.

21        Do you agree with that?

22            MS. BROWN:  I do not agree with that, Your Honor.  So

23    we have used in particular in this case, if you look back to the

24    original EEO complaint, "qualified applicant register" is the

25    term that has always been used by the plaintiffs and at some

1    points in time had been used by the defendant to identify those

2    people who were on the inventory who were qualified to apply.

3        So the defendant makes a great deal of discussion and

4    differentiation about people who are on the inventory and how

5    there's actually more than one inventory, one is too broad, one

6    is too narrow.  We are not talking about either of those.  We're

7    using the term "qualified applicant register" to refer to that

8    subset of people on the inventory who are qualified to apply for

9    a CTI-only application.

10            THE COURT:  All right.  So in your complaint, you

11    say, "Prior to 2014 and after the introduction of the CTI

12    program, graduates from the CTI programs that pass the validated

13    AT-SAT assessment entered a direct hire pool of applicants, were

14    placed on a qualified applicant register list, and were given

15    hiring preference for ATCS positions."  Right?

16            MS. BROWN:  That's correct.

17            THE COURT:  Okay.  And according to you, the FAA

18    ceased adding names of the CTI graduates who had passed the

19    AT-SAT onto the qualified applicant register?

20            MS. BROWN:  I'm sorry.  What was that, Your Honor?

21            THE COURT:  You allege that the FAA ceased adding

22    names of CTI graduates who passed the AT-SAT onto the qualified

23    applicant register?

24            MS. BROWN:  That's correct.  At some time while the

25    FAA was working behind the scenes to change the application

1    method, they stopped updating the inventory.  So there are

2    students, roughly 500 students who graduated, for example, in

3    December 2013.  Those people's information is likely not updated

4    on some version of the inventory that the government had.

5        That's not to say, I think were they pressed, they don't

6    have that information elsewhere from other sources.  But the

7    inventory from the CTI schools stopped being updated shortly

8    before the 2014 announcement.

9        THE COURT:  Okay.  So sometimes when you use the

10   term "qualified applicant register," you mean inventory, and

11   other times you mean a subset?

12       MS. BROWN:  We never mean the entire inventory,

13   because the entire inventory includes people who are -- who are

14   not eligible, people who had not yet graduated, for instance.

15   So we do not ever mean the entire inventory of all of the CTI

16   students, including those who are still enrolled and hadn't

17   graduated, nor do we mean the inventory of people who had been

18   referred for prior applications.

19       THE COURT:  Okay.  So just define it for me concisely

20   what -- I'm confused.

21       MS. BROWN:  Sure.  And it would help, Your Honor, if

22   we had the data elements from the government's inventory.  If

23   you look at, for instance, our Exhibit 1 at ECF-73-2 at 13,

24   that's a document that sets forth a list of at least some of the

25   items that are on the inventory that the government kept.

1    What we are looking for off of that inventory to identify

2    people that we call the "qualified applicant register" are

3    people who have graduated from school or would have graduated

4    prior to the 2014 announcement, people who had received a

5    recommendation from their school or would have received a

6    recommendation but for the fact that the government stopped

7    asking for those recommendations, people who received a passing

8    grade on the AT-SAT test, so a 70 or higher, and then there are

9    a few other qualifications, such as U.S. citizen, that are set

10    forth in our complaint -- in the reply brief.

11    THE COURT:  So is the issue that the government

12    stopped asking for those recommendations?

13    MS. BROWN:  The government stopped maintaining its

14    list and, yes, stopped asking for the -- it's my understanding

15    that the government, on a conference call with some of the

16    schools, essentially told them they no longer needed to send the

17    recommendation letters.

18    THE COURT:  So when you say they stopped adding names

19    to the applicant register, what you really mean is they stopped

20    asking for these recommendations and adding those names to an

21    inventory list?

22    MS. BROWN:  Well, what we mean is that they no longer

23    updated the inventory in a way that would allow us to pull out

24    this subset of people that we're calling the "qualified

25    applicant register."

1          So for instance, on a data set, like I said, there were

2     roughly 500 people, not quite but roughly 500 people who

3     graduated in December of 2013.  On the government's database, in

4     the, quote unquote, inventory, they may not show as having

5     graduated or they likely don't show as having letters of

6     recommendation.  They should be in this class because they

7     graduated, and but for the fact that the government stopped

8     asking for recommendations, they would have received a

9     recommendation.  They would have been eligible to apply for the

10    2014 opening.

11          THE COURT:  Okay.  So when you say they purged the

12    list, you mean they purged the inventory?

13          MS. BROWN:  My understanding -- we haven't had

14    discovery on exactly what they did and what they purged.  My

15    understanding is they have the data.  But when we say they

16    purged the list, they essentially made the list and the

17    prequalifications irrelevant.  They sent a communication to all

18    applicants and people on the inventory that essentially said

19    we've changed our method of doing this, your prior test is

20    inapplicable, you're going to have to start over.

21          So that's what -- the group of people that we are talking

22    about are people who would have been eligible to apply in 2014.

23          THE COURT:  All right.  So just to be clear, do the

24    folks who you're seeking to have a class certified for, do they

25    need to have graduated and received a recommendation or simply

1    be eligible to graduate and receive a recommendation?

2         MS. BROWN:  They need to have graduated by February

3    2014, and they need to have been eligible to -- either have

4    received or been eligible to receive a recommendation.

5         THE COURT:  Okay.  And how do we determine who could

6    have been eligible to receive a recommendation?

7         MS. BROWN:  I think there's a number of different ways

8    we could go about that, Your Honor.  For instance, there are

9    very few students who did not receive recommendations.

10         THE COURT:  Like Matthew Douglas Cook, for example;

11    right?

12         MS. BROWN:  Well -- okay.  There are very few

13    students -- let me rephrase that.

14         There are very few students who were affirmatively not

15    recommended.  While there's more than --

16         THE COURT:  You mean once they graduate?

17         MS. BROWN:  Yes.

18         THE COURT:  So are you essentially saying anyone who

19    graduates receives a recommendation?

20         MS. BROWN:  Not completely, but the vast majority.

21         THE COURT:  So how do we suss out who would have

22    received a recommendation but they've only graduated?  How do we

23    make that determination?

24         MS. BROWN:  I think there are a couple of different

25    ways we can go about that, Your Honor.  First of all, I would

suspect that a number of those records are available from the schools that they went to, as well as the criteria that the school used to determine if they were not going to make a recommendation.

THE COURT:  But what?  Give me an example.  What might that be?

MS. BROWN:  What criteria might they use --

THE COURT:  To make a recommendation or not make a recommendation.

MS. BROWN:  Well, I assume, for example, if they determine that a student was lacking in integrity, that they had had some sort of severe discipline.  I haven't had discovery on the schools, but I think that it would have been something that reflects on their character and ability to be an air traffic controller, and it had to be fairly egregious.

THE COURT:  All right.  So according to your class -- well, what about Matthew Douglas Cook?  He did not receive a recommendation; right?  He's one of your named plaintiffs.

MS. BROWN:  He did not, that's correct.

THE COURT:  But you say he's still, you think, appropriately part of a class because you will learn from the school that he had good integrity and they would have given him a recommendation had the FAA asked?

MS. BROWN:  No, it's not going to be that individualized, Your Honor.  We will learn from the school any

criteria that they used to not recommend, to affirmatively not recommend someone for a position. We also may be able to identify some of that from the records once we're able to get discovery and identify students, the few students who were not recommended. We can identify the criteria that were used.

So I think what we will rely on in the greatest part is objective records from the schools, as well as objective records that are in the government's possession.

THE COURT: But at this point you really don't have the specifics about who will be in this class because you don't know? You don't know what the schools will say. You're speculating.

MS. BROWN: We don't know what the schools will say. We know the vast majority of the students who graduated will be in. We also know, going to when we asked for discovery in this matter, the government's response as to why we didn't need discovery was their theory about the standard for ascertainability. And if you look at their opposition to our motion for precertification discovery, they say, "On the question of ascertainability, the class need not be so ascertainable that every potential member can be identified when the action commences. It is sufficient that the criteria by which the membership of the class is determinable" -- "by which membership of the class is determinable exists at the outset of litigation."

1      Those criteria exist, and we've set those criteria forth.

2   The criteria to clarify, okay, whether any student meets the

3   criteria will be available in discovery.

4          THE COURT:  Okay.  But what are they?  What are those

5   criteria?  It looks like you can't tell me right now what they

6   are.

7          MS. BROWN:  I can tell you what my class looks like.

8   I can tell you that, as I said, my class is the roughly 2,600

9   people who had graduated from a AT-CTI school, who had passed

10  their AT-SAT, who received or would have received a

11  recommendation.  And I understand that's Your Honor's concern.

12  But those people are not going to be difficult to identify.

13         THE COURT:  But what about the OPM qualifications, the

14  medical issues?

15         MS. BROWN:  So on the OPM qualifications, I think

16  there's a number of different ways of addressing the OPM

17  qualifications.  First, Your Honor, you will note from our

18  definition in our -- proposed definition in our complaint, that

19  our motion actually narrows the scope of the class somewhat.  We

20  were trying to be essentially as reasonable and objective as

21  possible.

22         THE COURT:  Can you do that from the complaint?  Don't

23  I have to go off the complaint?

24         MS. BROWN:  I believe you can narrow.  I believe you

25  cannot expand.  It's a question of notice.  So while you can't

1    amend your pleadings, for example, by motion, you can narrow the

2    claims or narrow the class so long as we've reached

3    administrative exhaustion for the claims and we've provided

4    notice in the complaint.

5            THE COURT:  All right.  What about -- again, back to

6    OPM, tell me what the standard would be there.

7            MS. BROWN:  We propose, Your Honor, that the standard

8    is anyone who -- unless a student has records that would

9    objectively disqualify them from being an air traffic control

10   specialist --

11           THE COURT:  Such as?

12           MS. BROWN:  Color blindness, such as specific

13   psychological conditions.  There's a defined list of criteria

14   that will kick you out, if you will, of this pool, and that

15   defined list is in the government's possession.

16           THE COURT:  But who will decide this?  Will they go to

17   a doctor and go through the process to eliminate that?

18           MS. BROWN:  No, they will not do that, Your Honor.

19   What we propose when we ultimately reach the claims element of

20   the case is they would submit a claim.  And we may have -- for

21   example, with the *Little* case that was just certified and

22   approved, we may have a short-form and a long-form claim.  If

23   somebody wants to assert a longer-form claim, they can supply

24   medical records.  But my suggestion, Your Honor, is that they

25   certify on their claim form that they didn't have any

1    disqualifying medical conditions.

2            THE COURT:  Can they do that themselves without expert

3    opinion?

4            MS. BROWN:  It depends on -- yes.  Well, some of them

5    can, and some of them will not be able to.  But I believe it

6    depends on how the question is phrased.

7        So the question, for example, on the claim form could be,

8    Are you aware of any disqualifying medical conditions that you

9    had?

10       But taking that aside for one instance, I want to focus on

11   the fact that even if you would have fallen out, even if you

12   would have fallen out at the OPM stage, even if you would have

13   fallen out, washed out of the academy, these people were still

14   harmed.  These students here were still harmed.  These students

15   invested in their education, relied on the process that had been

16   established, as in *Ricci*, relied on the fact that they were

17   going to get a return on their investment in improving

18   themselves and making themselves eligible, and they were harmed.

19       And so while we have put in the OPM qualification, I think,

20   frankly, it would be completely fair to go back to the

21   definition in our original complaint and remove the OPM

22   qualification.

23           THE COURT:  Say that again.

24           MS. BROWN:  I think in terms of ascertainability,

25   fairness, notice, pleading, et cetera, I think that it would be

1    entirely fair and appropriate to remove the OPM qualification if

2    that's going to be a hurdle for this class.  Because as I said,

3    even if a student would not have passed the medical examination,

4    they were harmed by the violation of Title VII.  They were

5    harmed by the government making a race-based decision to

6    eliminate their effort, their work, their investment.

7              THE COURT:  To prevent them from being able to compete

8    as opposed to not getting the job?

9              MS. BROWN:  Correct.

10             THE COURT:  But to pursue this, don't you need to move

11   to amend the complaint?  You have amended the complaint now

12   three times.  I don't think that through briefing you can narrow

13   this in that way.

14             MS. BROWN:  I don't believe that we actually have to

15   amend the complaint.  If you again look at the class definition

16   in the third amended complaint, we say it's the approximately

17   2,000 to 3,500 qualified applicants that possessed a degree from

18   a CTI school, had passed the AT-SAT, were on or should have been

19   on the qualified applicant register prior to the 2014 strike,

20   striking of the list.

21        So I don't believe we would actually need to amend the

22   complaint, for example, if Your Honor has concerns about the OPM

23   criteria.  We could go back to, Your Honor could go back to the

24   original complaint, note that that was never a part of the

25   original requirement, and we could strike it.

 1          So there are a number of different ways we can go about

 2     this.

 3               THE COURT:  That's not the only concern, but that's

 4     certainly one of them.

 5          Am I correct that your class would include individuals who

 6     are not eligible for a controller position because they did not

 7     meet the citizenship or age requirements?

 8               MS. BROWN:  I don't -- so for example, before a

 9     student takes the AT-SAT, they do a self-certified citizenship

10     application.  So they self-certify their citizenship.  So by

11     virtue of the fact that they went to these schools, they

12     invested in this education, they took this test, they knew what

13     the criteria were.  So I don't believe -- my list would not

14     include -- when I talk about a qualified applicant register, I

15     know there were people on the inventory who were not U.S.

16     citizens, but those people would not be a part of the class.

17               THE COURT:  All right.  Considering the Rule 23(a)

18     requirements, explain to me, how were African American class

19     members harmed by the new hiring policy?

20               MS. BROWN:  Again, Your Honor, it goes back to when

21     and how the harm occurred and why the government made this

22     decision.  Looking at *Ricci*, looking at *Adarand*, each individual

23     here, each individual who is on that AT-CTI inventory has a

24     right not to suffer an adverse employment action as a result of

25     a race-based decision.  Each one of the students who were on

that list who had invested in their education, who had graduated
or were about to graduate, who had put in the effort to take and
pass the AT-SAT test, every one of them was harmed when that
investment was invalidated by the government striking the list
and deciding to use, frankly, an invalidated test to screen.

THE COURT:  No, I understand that.  But you've alleged
in your complaint that this whole policy change was to benefit
African Americans; right?

MS. BROWN:  Yes; that's correct.  That was the purpose
behind the policy.  That said --

THE COURT:  So if they're a part of your class, do
they want this policy set aside?

MS. BROWN:  Well, as an initial matter, Congress has
already partially set aside the policy, and the FAA has already
abandoned the use of the BA/BQ.  So what we are talking about
here would be relief and/or damages that would benefit every
person who is on that list.  If they were hired, they're not on
the list, as it stands, and so they did not benefit.  So we're
not seeking anything that would be contrary to the interest of
any class member.

We have, as you can tell from the gallery, Your Honor, we
have a diverse group of students and former students, including
African Americans who I can guarantee you know and feel that
they were harmed by this test, by the fact that they invested in
their education, and that investment was thrown away by the

government for race-based reasons.

THE COURT:  All right.  And so the individuals who never applied for a vacancy, is your argument that they were harmed because they were denied the ability to compete on an even playing field?

MS. BROWN:  So the individuals who never applied, I believe that, for instance, taking the AT-SAT test in and of itself stands in for an application.  The only reason -- the government --

THE COURT:  Wait, wait.  Just because you took the test, that's as though you applied?  That seems a stretch to me.  People take tests all the time to go to graduate school and never decide to go for other reasons.  Is that really true?  Simply because you took the test, you intended to follow through but for this change?

MS. BROWN:  So there's a couple of questions in there, Your Honor.  First, as to those people who took the test, this test, unlike a college exam, even a law school exam, this test was only and specifically for this purpose.

THE COURT:  I know.  But let's say they decided, you know, I don't want to go to the FAA at all and want to pivot and do something else with my life.

MS. BROWN:  And your Honor, I wouldn't blame them if they decided that after the government threw out their qualifications and made the decision that they made.

1          The law is, generally speaking, you need to be an

2    applicant.  The Title VII law for a failure-to-hire case is,

3    generally speaking, you need to be an applicant.  There are

4    recognized exceptions when you do not have to have actually

5    applied.  And I think it is too early in this case, without

6    discovery, to see if any of those recognized exceptions apply.

7          THE COURT:  All right.  Can you help me understand,

8    were you seeking certification under Rule 23(b)(2) class or a

9    hybrid class in your complaint?

10         MS. BROWN:  No.  In our complaint, we are seeking

11   certification under Rule 23(b).

12         THE COURT:  And that remains the case?

13         MS. BROWN:  That's correct.

14         THE COURT:  All right.  Tell me what kind of

15   injunctive relief you are seeking in this case.  I know that I

16   reinstituted the injunctive relief, but help me understand what

17   it is, what you see I could award in terms of injunctive relief.

18         MS. BROWN:  Sure.  Again, we are moving under

19   23(b)(3).  But in terms of injunctive relief, I believe the

20   Court could order certain hiring preferences, that the Court

21   could order hiring -- a specific hiring opening.  The Court

22   could order a lot of relief in terms of making these students'

23   investment come to fruition.

24         Some students are not going to be able to apply.  Some

25   students are going to choose not to apply.  But I know from

speaking to these students and the people in the gallery that

some of them are still interested in this position.  And I

believe that Your Honor could -- we could craft an injunction

that would make it so that they are preferenced for those

positions.

THE COURT:  And how would I determine damages?  Your

briefing wasn't very specific on this point.

MS. BROWN:  I think that -- well, again, I would like

to get into discovery.  I would like to see the actual data,

because I think there are different ways that people were

harmed.  So for people who applied and were turned down,

obviously, that harm, we are talking about determining whether

they would have been hired, they would have been hired in 2014,

figuring out back pay, et cetera.

For people who wouldn't have been applicants, we may have a

class of nominal damages.  I believe that the class, frankly, in

the future could be expanded.  But what we are talking about is

examining essentially these students' records and the capacity

of the FAA to hire, determining when to start back pay, which

for most of them will be in February -- or in 2014.

I think that there's going to be a number of classes that

could potentially be certified once we get a chance to analyze

the data.  There could be subclasses as it relates to damages

where the damages could be determined on a formulaic basis for

the subclass, not counting, obviously -- I'm not aware right now

1    that anyone's going to make claims, for example, for emotional

2    distress.  But not counting those claims, the back pay, the

3    front pay, a lot of the elements of damages are fairly

4    mechanical, given the fact that these people were all harmed at

5    the same time and were seeking the exact same position.

6         THE COURT:  All right.  The problem I had with your

7    initial motion for discovery at the time I denied it was that it

8    seemed to me that you were seeking to define your class by

9    getting discovery.  And you have to make a prima fascia showing,

10    right, in order to get discovery?  So that's why it was denied

11    at the time, and I'm still concerned about whether your class is

12    defined in a way that I should even grant discovery.

13         MS. BROWN:  Your Honor, I believe that it is.  Again,

14    we have and the government has, the schools have the list of the

15    students who enrolled, who took the AT-SAT tests, who graduated.

16    All of those people are eligible to be on this -- in this class.

17         So the concern that you have would seem to relate to should

18    there be a few exclusions from this class.  And again, those

19    people, if there should be a few exclusions, can be identified

20    in discovery, generally through objective criteria such as

21    whether it's the OPM and whether it's the school's policy for

22    why they would recommend or not recommend a student.

23         We know exactly who those -- well, with not 100 percent

24    precision, but we know what our class looks like.  We know the

25    people who invested in their two- and four-year degrees.  We

know the people who took and passed the test.  The schools know

their students.  The schools know who graduated, who took and

passed the test.  The schools were also harmed by this process.

So I think -- honestly, I think that this class is

extremely finite, very well-defined --

THE COURT:  I wouldn't say it's "very well-defined."

I think you've got a number of we're not sure, let us have

discovery, and we will figure that piece out.

MS. BROWN:  Well, the criteria are identifiable;

right?  So we have 2,600-plus students.  Whether a student met

one criteria that I am not aware of or did not meet one criteria

that I am not aware of, I won't know until I get in discovery.

But I can tell you what the criteria are.  The criteria are, did

they graduate or would they -- did they graduate, did they

receive a recommendation or not, were they eligible to receive a

recommendation, did they take and pass the AT-SAT, were they

under the age requirement, and were they a U.S. citizen.

THE COURT:  And all those folks should be a part of

the class?  Regardless of whether they ultimately were ever

going to apply to the FAA, regardless of whether they had the

appropriate qualifications to pass the OPM screening, they

should all be in this class?

MS. BROWN:  Most definitely regardless of whether they

had the qualifications.  In terms of intent to apply, if they

never had an intent to apply, if they went through all of that,

1    took the AT-SAT and never had an intent to apply, one could

2    argue that, perhaps, they weren't harmed.

3    　　But I think when you look at, for example, some of the

4    employee tester cases where the courts find standing and allow

5    people who apply for jobs for the specific purposes of

6    identifying discrimination with no intent to ever take the job,

7    those people are allowed standing in the Title VII area.

8    　　So I think that every one of the students who took the

9    test, who invested in their education would fall well beyond the

10   criteria of, for example, an employment tester.

11   　　THE COURT:  The struggle I'm having, Ms. Brown, is

12   over time, from the complaint to the initial brief to the reply

13   brief to the argument here, the way in which you're defining the

14   class is shifting.

15   　　MS. BROWN:  Yes, I understand, Your Honor.  As I said,

16   from the original complaint, we took a very broad-brush

17   approach.  We didn't put in as many qualifications.  Once we got

18   into the original motion, we did put in more qualifications to

19   try to narrow the class to make it -- to allay any concerns

20   regarding, for instance, injury in fact, et cetera.

21   　　And then frankly -- so in the reply brief, we addressed

22   some of the issues raised by the government.  For instance, this

23   idea that there's no qualified applicant register, from the

24   beginning, from 2013, 2014, we have been using that term.  It's

25   not as if we've made that term up for either purposes of the

1    complaint or purposes of the motion, nor was it an issue in

2    discussions that we have had with the government.  So we are not

3    shifting our definition.  As I said, I would be happy to go back

4    to the original class definition, the original complaint

5    definition.

6         THE COURT:  I think the appropriate way to move

7    forward is for you to move to amend your complaint and clarify

8    the class definition, because through the briefing it's evolved,

9    and the argument, it's evolving.  And I think it needs to be

10   teed up precisely what your class is.  In order to do that, you

11   need to file a motion to amend the complaint, and then we can

12   address the issues then.

13        MS. BROWN:  In order for that to be the most

14   productive exercise possible, we will renew our motion for

15   discovery.  In other words, to answer some of the questions that

16   Your Honor has asked, I would like to have a chance for a better

17   sense from the government's records who were those few students

18   who were not recommended and why.

19        THE COURT:  You can renew that motion, but again, you

20   are going to have to make a prima fascia showing that you have

21   established the Rule 23 requirements.  If you have done so, then

22   I will grant it.  But I think it's only fair at this point to

23   say you need to file a motion to amend your complaint.  And the

24   government, I will hear whether they consent to that or not, and

25   perhaps they will.  But if not -- I'm just not comfortable now,

1    it's very unclear to me even today what the class definition is.

2            MS. BROWN:  Your Honor, may I address the

3    requirements?  Under Rule 23(a), numerosity is not even

4    disputed; right?  Under commonality, all of these students went

5    to the CTI schools.  They graduated, went through the class,

6    took the tests.  They were all eligible to apply to be a CTI

7    student, to be a CTI applicant.

8        The class is people who were eligible to apply to be a CTI

9    applicant.  And there's a very distinct list of qualifications

10   that's in the government's own declaration.  So there is a very

11   distinct and finite list of ways in which you are eligible to

12   apply for a CTI application, and only those are -- only then

13   would you receive, for example, the job code that they talk

14   about in the declaration, the Mitchell declaration.

15       So the class, Your Honor, is not amorphous.  While I may

16   not be able to provide you with a list of every student who is

17   in the class, again going back to the opposition to discovery

18   and the case law, that's not the test.  There are criteria.

19       So all of those people, that list, that class is definable

20   and ascertainable.  The students all were commonly hurt.  They

21   all suffered the same type of injury.  They all suffered the

22   same type of injury from the same action that the government

23   took.

24           THE COURT:  But how can you say that with respect to

25   the African American applicants?

1          MS. BROWN:  Because, Your Honor, if they weren't

2    hired, they 100 percent were harmed.  They did not benefit from

3    this.  Our class excludes people who were hired.

4          So for instance, we have a gentleman here --

5          THE COURT:  But you say the other policy was to

6    benefit them; right?

7          MS. BROWN:  That's correct.  But Your Honor, if you

8    look at *Ricci* and Title VII and *Adarand*, while the broad-brush

9    stroke of what was going on behind the scenes was race motivated

10   on a broad scale, the implementation, obviously, wasn't perfect.

11   It was far from perfect, besides being illegal.

12         So there are students, African American students who were

13   on that list who went through school, who graduated, who passed,

14   who were well-qualified under the AT-SAT scores who would have

15   absolutely statistically gotten a job as an air traffic

16   controller but for the fact that the government, for race-based

17   reasons, changed the way that you go about the application and

18   they didn't pass this BA/BQ process.

19         So they invested.  They suffered from this race-based

20   decision.  They had their education discarded, essentially.  You

21   have to start over and find a new path for what they're going to

22   do and how they're going to make a living after they've already

23   gone through all of this because the government decided that

24   they need to make a race-based hiring decision.

25         THE COURT:  And do you think that all those folks who

would be in your class would want me to strike down the policy
that you claim is unlawful?

        MS. BROWN:  Well, again, to some extent, it's not a
question of striking down the policy, because the policy has
changed.  It's a question of going back and looking at what
happened in 2013 and 2014 and determining that that was illegal,
that was a race-based hiring decision that is not allowed by
Title VII, and that people were harmed from that.  And we can
figure out injunctive relief, and we can certainly figure out
damages.

    But I don't think that we have people in the class who
invested in their education, who took the test, who passed the
test, who would have been hired and weren't hired that aren't
going to be in favor of getting some relief out of this case.

        Moreover, since we are seeking this class under Rule
23(b)(3), of course, they would be able to opt out.

        THE COURT:  All right.  So the class that you seek to
certify now, can I just simply ignore the OPM standards for that
class, and do you have to establish that everyone in that class
sought to apply to the FAA?

        MS. BROWN:  I believe that you could ignore the OPM
standards.  And again, that's something that we could revisit in
discovery, Your Honor, but absolutely, you could certify the
class, ignore the OPM standards.

    And in terms of the application, again -- so for instance,

1    as I said, there's roughly 500, not quite 500 students who

2    graduated in December of 2013.  They never had the chance to

3    apply.  Right?  They may have applied for the 2014, but they

4    hadn't applied before.

5         So I want to be cautious when we are using the

6    term "applicant."  But yes, I believe that Your Honor could do

7    that.

8              THE COURT:  All right.  Anything else you would like

9    to add?

10             MS. BROWN:  Well, Your Honor, in addition to -- well,

11   I guess I would like to know if Your Honor has any concerns

12   about any of the other Rule 23(a) criteria that we can address

13   for the Court.

14             THE COURT:  I do, but these are my principal concerns.

15   And again, I'm concerned that I'm having to rewrite the class

16   for you, and that's really not my role.

17             MS. BROWN:  Your Honor, in terms of rewriting the

18   class, again, I would invite the Court to go back to the third

19   amended complaint.  And I don't believe that we would need to

20   amend the complaint.  Let's go to the third amended complaint,

21   and that's our class.

22             THE COURT:  All right.  Anything else?

23             MS. BROWN:  Not at this time, Your Honor.

24             THE COURT:  All right.  Mr. Thorp?

25             MR. THORP:  Your Honor, plaintiffs have not satisfied

Rule 23's requirements and cannot continue to press their
challenges to the 2014 revisions to the FAA's hiring process for
new air traffic controllers as a class action.  Class
certification should be denied, and this case should proceed on
behalf of the named individuals only.

This is plaintiffs' fourth complaint in a case that has
been pending almost four years.  They shouldn't receive another
do-over and prejudice the defendants with further delay.

I would like to focus on four fundamental defects, some of
which have already been under discussion today.

First, they have a major uninjured class problem that
defeats commonality and predominance under Rule 23(b)(3).

Second, the plaintiffs have failed to set forth a credible
means to calculate class-wide damages or show how individuals of
injury and damages won't predominate.

Third, the class definition continues to cause confusion,
and people can't tell by looking at it whether they're, in fact,
members of the class.

And finally, plaintiffs miss the fact that in a class
action alleging intentional discrimination, the group must share
an attribute protected by Title VII.  Title VII does not protect
their status as CTI graduates.

So first, on the issue of this -- of "eligible to apply"
means that they have a class-wide injury.  It's simply not the
case.  Their class, by definition, which is now clarified to

1    mean those eligible to apply, includes those who weren't injured

2    by the 2014 policy change.  They suffered no adverse employment

3    action.

4         As the Court noted, people take pre-employment tests for

5    any variety of reasons.  The job degrees at issue here, by

6    graduating in a CTI program, that merely means that they went to

7    one of the 36 schools that have programs or -- in 50 different

8    degree programs.  People who graduate with one of these degrees

9    could have pursued any number of careers, not merely an air

10   traffic controller.  And as with people who take the LSAT or

11   GMAT as a part of their exploration of what job they may pursue,

12   simply taking a test like that at government expense is not

13   evidence -- is not an application.

14        So here now -- I think this is fundamental, because now

15   they have clarified that these are not people who are as their

16   complaint alleged, in a direct hiring pool from which the

17   government could noncompetitively select them.  That's simply

18   not the case.  Instead, this was a pipeline of potential

19   applicants.

20        And so as the Supreme Court said in *International*

21   *Brotherhood of Teamsters v. United States* back in 1977,

22   nonapplicants bear the, quote, not always easy burden of proving

23   that they would have applied for the job had it not been for

24   these alleged discriminatory practices.

25        So by plaintiffs' definition inherently and no amended

complaint, it appears, is going to resolve this -- is going to

resolve this issue or have a fundamental problem because the

determination of whether all of these nonapplicants would, in

fact, have applied is something that defeats predominance

typicality, et cetera.

They also have an uninjured class problem at the opposite

end of the class.

THE COURT:  But let me stop you there.  Is there never

a case in which it's unclear who the potential applicants are,

that you can't narrow the class, you can't put some sort of

requirement on the plaintiffs who come forward who are a part of

this class to certify a class?

Can I never -- could a Court never certify a class in a

case in which they can't establish for certain someone's going

to apply for that job?  Can we not fashion a class where they

would have to make some showing, the plaintiffs, that is,

declarations from everyone, we were going to apply, for example?

MR. THORP:  Your Honor, but there's, I think, a couple

aspects to that.  First, let me address it as a part of the

factual context here.

It's not as though this one path to hiring ended and then

there was nothing else.  There was immediately the following

year an application process.  And plaintiffs have not limited

their class to the people who applied in 2014.  They're being

very careful to try not to talk about 2014 because some of the

1    co-counsel have another class that wants to fight about what

2    happened in 2014 itself, which creates some odd difficulties

3    here.

4         But they have not limited their class to the people who

5    actually applied in 2014 or 2015 or since that time.  Their

6    class includes people who after this period have never applied

7    to the agency for a controller position, even after in 2016

8    Congress directed the agency to change its hiring process,

9    including elimination of the biographical assessment for CTI

10   graduates and provided a period for people who had applied and

11   not succeeded in that assessment to reapply to the agency.

12        So plaintiffs' class inherently includes people who never

13   applied.  Your Honor suggested could you --

14             THE COURT:  But couldn't there --

15             MR. THORP:  -- could you create a process to screen

16   out the nonapplicants.

17             THE COURT:  But could --

18             MR. THORP:  Last month --

19             THE COURT:  Let me ask you one question.  Could there

20   not be potential applicants who would have applied under the old

21   policy but, once the new came out, they just said it's

22   impossible, I'm not going to apply, but they did want to apply

23   before the policy changed?

24             MR. THORP:  I don't see why that would be the case,

25   because the agency has always had -- or over the years has had

1    both vacancy announcements that were specific to the CTI program

2    and vacancy announcements to which the general public could

3    apply.  CTI graduates apply through the general public

4    announcement and are often very successful at it.  So having a

5    general public announcement in no way limits CTI graduates from

6    applying or necessarily decreases their chances of success.

7        So the hypothetical that they were just discouraged from

8    applying -- and plaintiffs in their complaint or their motion

9    have not actually argued a -- have presented a discouraged

10   applicant argument.  It's simply not in there.  They just treat

11   "eligible to apply" as a class with its own injury.

12       I want to highlight, last month, the D.C. Circuit in the

13   latest iteration of *In re Rail Freight Fuel Surcharge Antitrust*

14   *Litigation* in its decision on August 16th said, quote, Uninjured

15   class members cannot prevail on the merits.  So their claims

16   must be winnowed away as a part of the liability determination.

17   And that prospect raises the question, when do the need for

18   individualized proof of injury and causation destroy

19   predominance?

20       And that approach is why it's sufficient here, even without

21   proceeding to an amended complaint that attempts to clarify

22   their class definition, that plaintiffs are by their class

23   definition creating a class that inherently includes so many

24   individualized issues that they will not be able to show

25   predominance under Rule 23(b).

1    In addition to what we just talked about, there's another

2    uninjured class group that are those who did apply in 2014 and

3    received an offer but declined that offer or didn't make it

4    through the clearance process.  The clearance process is not

5    merely medical clearance.  It's also a background check and --

6    yeah, it's also a background check.

7    So there are -- there is another set of their class members

8    who actually received an offer from the agency in 2014 or

9    received an offer from the agency on a subsequent application.

10   And so by merely defining their class to exclude people who were

11   ultimately employed by the agency, they're missing the fact that

12   there are people who were successful in the immediately

13   subsequent process.  And to say that those people had an adverse

14   employment action is simply not -- is simply implausible.

15   THE COURT:  Is there not a way, if they narrow their

16   class tremendously, that they could actually propose a

17   legitimate class here?

18   MR. THORP:  I think it would be speculative to

19   examine -- perhaps -- I think in many contexts, there might be a

20   class somewhere that could be certified.  But plaintiffs

21   certainly haven't put forward that class, and they haven't shown

22   any willingness to narrow their class in a way that would

23   address these issues.

24   THE COURT:  Well, no, they are suggesting that they

25   could narrow it.

1          MR. THORP:  Your Honor, only in the minutest way.

2     They're suggesting that they would drop the OPM requirement.

3     But that, I would just highlight, they included the OPM

4     requirement to attempt to make the class more homogenous, to

5     exclude some of these people who couldn't have been hired by the

6     agency.

7          So they're willing to drop that requirement, which merely

8     heightens their predominance problem, because people who

9     couldn't -- they want to establish front pay on a class-wide

10    basis apparently, but yet, they are including in the class

11    people who never could have been employed as controllers.

12         That's -- so by avoiding -- by dropping that as a

13    definitional problem, they're merely heightening the problem at

14    the back end, which can't be put off now because -- and this

15    brings me to my next point, that it's their obligation to put

16    forward a way to deal with damages now.

17         In *Little v. WMATA*, it denied a (b)(3) certification

18    because plaintiffs had no reasonable theory for computing

19    class-wide damages.  Plaintiffs have offered nothing other than

20    platitudes here.  They've vaguely referred to a hiring

21    preference.  They've today referred to an order or some order of

22    a special opening for these graduates.  But they haven't put

23    forward a specific theory that shows that their entire class

24    could be entitled to the same injunction on the injunctive side,

25    let alone the damages side.

1          And the D.C. Circuit in *DL v. District of Columbia* back in

2     2017 said to certify a class under (b)(2), it requires a single

3     injunction capable of providing relief to each class member.

4          I would just note a further confusion here.  Their briefing

5     argued for hybrid certification.  A moment ago, they appeared to

6     concede that they are exclusively seeking (b)(3).

7          So it's -- so it seems like their case is largely about

8     damages.  And I mean, there is no front pay.  None of these

9     people were -- back pay.  These people weren't hired.  But for

10    the front pay, they have a fundamental problem because they seem

11    to assume that the entire class would have been hired and then

12    succeeded as a controller.  Presumably, they are going to try to

13    project pay-off into the future.

14         But even if you met the threshold requirements and you

15    applied and you were qualified, so you could have been selected,

16    that doesn't mean you're going to be a controller.  The first

17    thing you do when you join the FAA is you go to the FAA Academy,

18    and the attrition rate at the academy is substantial because

19    these are really challenging jobs, and the FAA has no room for

20    error in the controller field.  And then after that, you go to a

21    first position, and the attrition rate there is substantial

22    because even people who have gone through -- successfully pass

23    the training don't necessarily succeed as a controller.  So

24    their front-pay claim creates intractable problems for the

25    class.

1    Indeed, I think this is highlighted because one of the

2    named plaintiffs, Pollyanna Wang, was selected last year, went

3    to the academy, and didn't succeed at the academy now.  And so

4    she, I believe, should no longer -- is no longer within the

5    class definition because she was employed as a trainee by the

6    FAA, and I think that fails the last term of their criteria.

7            THE COURT:  I don't want to interrupt your thought,

8    but --

9            MR. THORP:  Yes, Your Honor.

10           THE COURT:  -- can you help me understand the OPM's

11   screening procedures?

12           MR. THORP:  So yeah.  So it's probably not the best to

13   describe them as "OPM screening procedures" because the OPM

14   standard sets out certain criteria that includes a lot of

15   things.  Plaintiffs are merely signaling out -- singling out the

16   medical qualifications that are stated there.

17       So if an applicant receives a -- an offer, a tentative

18   offer, they then go into a clearance process.  And not everyone

19   who receives a tentative offer even responds.  Some people don't

20   respond.  Some people decline at that point.  But if they

21   proceed, then they submit to medical examinations and

22   psychiatric evaluations.  And that includes proprietary vision

23   testing and other things that applicants can't on the outside

24   ensure that they're going to pass.

25       So I think this creates a -- this highlights one of the

1    problems for plaintiffs, that even people who are successful at

2    the initial stage of the application may not succeed in becoming

3    employed.

4           THE COURT:  So there's no way they would know upfront

5    whether they would pass the screening?

6           MR. THORP:  So some of them, some of the criteria are

7    clear.  Do you have a congenital heart defect?  I'm not looking

8    at the criteria.  Some of them are clear in a way that anyone

9    looking at it could know, but not all of them are.  Do I possess

10   the psychological criteria?  So plaintiffs only want to

11   exclude -- only want to deal with part of that screening, and

12   they apparently want to do it by a self-representation by the

13   plaintiffs themselves.

14       I think they're avoiding the fact that this actually -- the

15   individualized examination that would certainly go into any

16   front-pay calculation would be substantial, because this would

17   not merely -- the government would have -- would need some

18   opportunity to challenge whether each of these potential

19   applicants would -- could, in fact, have been hired by the

20   agency, I think is essentially the problem.

21       So it doesn't really matter whether you drop it from the

22   definition or not.  It's a problem here that they haven't dealt

23   with.

24           THE COURT:  All right.  What about with respect to the

25   black applicants who weren't hired?  Can you respond to their

1    points?

2          MR. THORP:  Yeah.  So here, the D.C. Circuit has made

3    clear, Title VII has two elements, that a plaintiff suffered an

4    adverse employment action because of the plaintiff's race,

5    color, religion, sex, national origin, age, or disability.

6    That's *Balloch v. Kempthorne* from 2008.

7          Plaintiffs are -- essentially argue that *Ricci* creates a

8    new world in which any race-conscious decisionmaking violates

9    Title VII, and that is simply not the case.  The D.C. Circuit

10   has rejected that.  In *Shea v. Kerry*, a D.C. Circuit case from

11   2015 which was an affirmative action case, it was similarly

12   argued that -- it was argued there that *Ricci* overturned *Johnson*

13   and *Weber*.  And the D.C. Circuit noted that in *Weber* the

14   plaintiffs had argued that Title VII prohibits all race-

15   conscious employer actions.  And plaintiffs here have borrowed

16   very similar language.  And the D.C. Circuit said that the

17   Supreme Court disagreed in *Weber* and that *Weber* and *Johnson* were

18   subsequently overruled by *Ricci*.

19         So it is not the case that -- for example, that conducting

20   a barrier analysis as required under EEOC regulations and

21   seeking to lower barriers of entry for across different minority

22   groups is the sort of race-conscious decisionmaking that

23   inherently violates Title VII.  That is key to their argument

24   that they don't have to show intentional discrimination against

25   any person or any group.  They want to show that any

race-conscious decisionmaking makes a claim for intentional

discrimination against everyone.  And that -- no court has found

that that is, in fact, what Title -- how Title VII works.

        And instead, I think we should be in the ordinary space

where, for example, as in *Love vs. Johanns*, the D.C. Circuit

case from 2006, it said that in a Title VII intentional

discrimination context, commonality under Rule 23(a) requires a

named plaintiff to show discrimination against a particular

group of which the plaintiff is a member, plus some additional

factor to infer that the members of the group suffered from a

common policy of discrimination.

        Plaintiffs want to scramble that up, because they say their

particular group is CTI graduates.  But the fact of the matter

is that in a intentional discrimination case, under Title VII,

the class needs to share a protected attribute.  And here, the

protected attribute the plaintiffs want to share is being human

or being a CTI graduate, and those aren't the protected

characteristics under Title VII.

        THE COURT:  All right.  Any other points you would

like to make?

        MR. THORP:  Give me a moment, Your Honor.

        I want to highlight one quote from *Little*, the D.D.C. case

they referenced decided two years ago, which rejected a (b)(3)

class request.  Quote, predominance was destroyed by the need

for, quote, individual determinations of why a class member was

not hired by defendant.  And I think the same problems are in
play here.

     And a final note about sort of the path forward, Your
Honor, I don't -- while we agree that plaintiffs are at variance
in their complaint enough that they can't -- that a class can't
be certified, it's not clear that they should be given a new
opportunity to amend their complaint and then rebrief class
certification.  There's sufficient grounds for all of these
reasons to deny class certification at this point.

     In *Williams v. Glickman* back in 1997, another panel of this
court noted that ordinarily when class certification is denied,
the case continues as individual cases with respect to the
claims in the named plaintiffs.

     Essentially, plaintiffs would be seeking reconsideration,
and as this court ruled last year in *Discepolo v. Department of
Justice*, reconsideration is not a vehicle for presenting
theories or arguments that could have been advanced earlier.

     Plaintiffs were on notice with these defects of their claim
even in the briefing on this case, and they could have sought to
correct it.  At this point further delay and further rebriefing
merely prejudices the defense, especially with regard to witness
availability for events that now occurred five to six years ago.
We've had a substantial number of retirements, and even speaking
with the witnesses can be difficult, let alone the further
erosion of witness memory.

1      So we urge the Court to deny class certification for all

2  the manifold defects at this point and set the case to proceed.

3          THE COURT:  All right.  Thank you.

4  Ms. Brown?

5          MS. BROWN:  Your Honor, a couple of points.

6      As it relates to *Ricci*, I would point to what the Supreme

7  Court itself said and apply that to the FAA in this context.

8  All of the evidence demonstrates that the FAA, the city in that

9  case, chose not to certify or to throw away the results because

10  of a statistical disparity based on race.

11      And if you look at the Barrier Analysis Extension Report,

12  you can see that.  And I specifically invite you to look at, I

13  believe, table or figure 7 which shows the differentiation

14  between CTI students and anyone else proceeding on the air

15  traffic control path and shows how CTI students don't fall out

16  at the rates that the general public or other people fall out

17  because they're already screened for those things.  They've

18  already self-certified.  We know that their age meets the

19  requirements.

20      So just like in *Ricci*, here, the FAA didn't certify the

21  exam because of statistical disparity based on race, i.e., too

22  many whites and not enough minorities would be promoted.  The

23  pipeline was too white.  Without some other justification, this

24  express race-based decisionmaking violates Title VII.

25      That's what we're alleging here.  We're alleging that the

1    FAA made an express race-based decision that harmed all of the

2    CTI students who would have been eligible to apply.  And if --

3    in *Ricci*, as the lower courts, the trial court and the Court of

4    Appeals denied summary judgment to the plaintiffs and granted

5    summary judgment to the defendants.  The Supreme Court reversed

6    that at the Supreme Court level, granting summary judgment to

7    the plaintiffs, finding that there were race-based decision that

8    had an adverse impact on the plaintiffs before it.

9        So the idea that you can't have a *Ricci* class, I think, in

10   and of itself would violate the rule's enabling act and is

11   inconsistent with the reasoning that the Supreme Court offered.

12       Additionally, defense counsel --

13       THE COURT:  Aren't I bound by the D.C. Circuit?

14   Didn't *Shea*, a subsequent case, say that -- address that,

15   please.

16       MS. BROWN:  Absolutely.  That's where I was headed.

17       So *Shea v. Kerry* is an affirmative action case.  This is

18   not an affirmative action case.  The government has never said

19   this is a legitimate, under the MD-17 and all of the other

20   requirements, affirmative action case.  There are specific

21   elements and tests and processes that one goes through, and

22   they're laid out in *Shea v. Kerry*, to approve an affirmative

23   action case.

24       We're not here challenging a program of affirmative action.

25   We're here challenging the decision, the race-based decision to

eliminate this group of students' qualifications based on a lot
of machinations and manipulations that had been going on for the
prior several years because other people wanted to be rid of the
CTI graduates specifically because of the, frankly,
misperception that's created by the barrier extension report
which shows the CTI graduates not falling out at a high rate but
doesn't do apples-to-apples comparisons with the other groups.
And then another figure in that barrier report shows the
differentiation of people progressing through the air traffic
control specialist process based on race.

If you put those two charts together, that's what drove
this case.  That's what drove their decision.  That's why we're
here.  And so as it relates to *Shea v. Kerry*, this is not
*Shea v. Kerry*.  This is not an affirmative action program.  This
is a sleight of hand to try to attempt something that they
couldn't justify through legal means or didn't want to go
through the steps to justify through a legal means.

THE COURT:  But haven't you alleged that the whole
purpose of the policy was to help black applicants?

MS. BROWN:  Yes, but that's a long ways from saying
it's a legitimate, valid, affirmative action process.

When you look at, I believe, the *Shea* case, they set out
the requirements, and there are various requirements for an
affirmative action process.  The EEOC has guidelines and
standards to help people establish an affirmative action

1    process.

2        Yes, the reason that these decisions were made was to

3    benefit people who are reflected in the barrier analysis as

4    having a barrier through the air traffic control process.  But

5    what happened here was a race-based decision.

6        And when we get into how the barrier report came together,

7    when we get into how the QA, the biographical questionnaire and

8    the biographical assessment, how they came together, how they're

9    not validated, how the government won't provide any information

10    on the validation of those tests, all of that information

11    collectively will make very clear that striking the CTI

12    qualified applicant register or that subset of the inventory was

13    a race-based decision.  It was not affirmative action.

14            THE COURT:  All right.

15            MS. BROWN:  Your Honor, in terms of commonality,

16    again, we have one claim in our complaint.  We have one Title

17    VII claim with all of the students who met criteria.  We

18    absolutely have commonality among the class.  We have

19    typicality.  We have adequacy.

20        Mr. Brigida here has been working this case since 2014.  I

21    agree, it's time to move on with the case.  Let's get some

22    discovery.  Let's get going on finding out what really was going

23    on behind these tests and reports and e-mails and people

24    receiving copies of the questionnaire before it was even used.

25    I agree that we should get going.

1       I don't think, however, that we should be denied the

2   opportunity to represent every one of those 2,600-plus students

3   because we haven't had the opportunity to get discovery from the

4   defendants.  We know exactly who we want to represent.  We know

5   exactly how they were harmed.  They are harmed in the same way

6   that the *Ricci* plaintiffs were harmed, and they're on lists

7   through the schools and the government.  Those people are our

8   class.

9       And I can -- and as it relates to damages, there are a

10  number of different ways of going about damages.  And frankly,

11  the Court, as in *Little*, the *Little* class was actually

12  certified.  There was an appendix A, appendix C, and appendix F

13  class that was certified, and they settled that case last year

14  for, I think, roughly $6 million.  So as it relates to *Little*,

15  the way that that case resolved was with a settlement for all

16  three of those classes.

17      Similarly, some of the other classes that have been before

18  this court, the class involving criminal background checks,

19  there are different classes and subclasses.  There comes to be a

20  civil damages class that gets certified even if it's not

21  certified at the outset.

22      The Court certainly has the flexibility and the freedom, if

23  it so chooses, under (c)(4) or the rules in general to certify a

24  class for purposes of liability only, and let us go forward with

25  discovery, and we will show you how we can prove damages on a

1   class basis --

2          THE COURT:  Okay.

3          MS. BROWN:  -- or through individualized hearings,

4   which also in *Little* and other cases do not destroy the class

5   requirements.

6          THE COURT:  All right.  Ms. Brown, the concerns I

7   have, as I've expressed through these questions, with your

8   motion is, first of all, it's inconsistent with the

9   representations you've made in your most recent amended

10  complaint.  And even if it were consistent, I see three problems

11  that make me concerned about whether you can meet the

12  commonality, typicality, and adequacy requirements of Rule 23.

13         First, I am concerned that the class would include African

14  Americans.  I know you've raised a number of arguments here.

15  I'm not convinced at this point that you would be able to

16  adequately represent their interests, and there are not issues

17  with respect to commonality and typicality with those.

18         Second, it seems to me it's difficult to certify a class

19  that includes individuals who voluntarily chose not to apply for

20  a controller position or withdraw their application after

21  successfully obtaining an offer.

22         And third, the class appears to include individuals who did

23  not actually receive a recommendation from an AT-CTI school.

24         Now, you say throughout your briefing and you have said

25  here that I should sui sponte narrow the class so that it

1    complies with the requirements of Rule 23.  But as the Supreme

2    Court made clear in *Walmart* and this court did in *Borum,* it's

3    the plaintiffs and not the Court's burden to fashion an

4    appropriate class definition.

5        And so I'm not now going to address all of the other

6    arguments the government has raised, and I cannot say for sure

7    that curing any of the defects that I've just mentioned alone

8    would permit class certification.

9        But I'm going to deny the motion without prejudice now.

10   I'm going to allow you to file another motion for leave to file

11   an amended complaint.  The government, of course, can oppose

12   that, and I will consider that motion.

13       At that time if you also want to file a motion for

14   discovery, I will consider that.  But again, realize you're

15   going to have to make a prima fascia case that you can meet the

16   requirements of Rule 23 before I will grant discovery.

17       How long would you like to file a motion for leave to file

18   an amended complaint?

19            MS. BROWN:  Your Honor, we would like to have 45 days,

20   if we may.

21            THE COURT:  Sorry?

22            MS. BROWN:  45 days, please.

23            THE COURT:  All right.  That's fine.  I don't have a

24   calendar to calculate that.  Do you want to propose a date?

25            MS. BROWN:  It'll be a rough guesstimate of 45 days.

1    October 31st, Your Honor?

2         THE COURT:  All right.  How long does the government

3    need?

4         MR. THORP:  30 days, Your Honor.

5         THE COURT:  All right.  So October 31st and

6    November 30th roughly.

7         MR. THORP:  All right.

8         THE COURT:  I will say, if we get to the stage where

9    you all are filing another meet-and-confer report, if we ever

10   get there -- we will get there -- I need you all to do a better

11   job of trying to agree.  The last one that came in had disputes

12   over every date and every move forward.  So when I do issue that

13   minute order, I do expect you all to make a better effort to try

14   to reach agreement on some issues.  All right?

15        MR. THORP:  Your Honor, November 29th is the Friday.

16        THE COURT:  November 29th.  Very well.

17      And Ms. Brown, you can file a reply within seven days of

18   that, I trust?

19        MS. BROWN:  Yes, Your Honor.

20        THE COURT:  All right.  Anything else we need to

21   address now?  No?  All right.  Thank you.

22      (Proceedings adjourned at 11:20 a.m.)

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9    /s/ Sara A. Wick                 October 7, 2019

10   SIGNATURE OF COURT REPORTER      DATE