Zhonette M. Brown, D.C. Bar No. 463407
Brian Gregg Sheldon, CO Bar No. 51063, *pro hac vice*
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
zhonette@mslegal.org
brian@mslegal.org

Michael W. Pearson, AZ Bar No. 016281, *pro hac vice*
Curry, Pearson, & Wooten, PLC
814 West Roosevelt
Phoenix, Arizona 85007
(602) 258-1000
(602) 523-9000 (facsimile)
mpearson@azlaw.com

Attorneys for Plaintiff and Putative Class Counsel

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDREW J. BRIGIDA,<br><br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>ELAINE L. CHAO, Secretary,<br>U.S. Department of Transportation,<br><br>　　　　　*Defendant*. | Civil Action No. 16-2227 (DLF) |

## FOURTH AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT

Plaintiff Andrew J. Brigida, and additional putative Class Representatives Suzanne M. Rebich, and Matthew L. Douglas-Cook,[1] by and through their attorneys, hereby file this Fourth Amended and

---

[1] Should class certification be denied, Ms. Rebich, Mr. Douglas-Cook and several other putative class members intend to seek to be added as individual plaintiffs.

Supplemental Class Action Complaint against the above-named Defendant on behalf of themselves and the Class they seek to represent.

## INTRODUCTION

From approximately 2010 through early 2014 the Federal Aviation Administration ("FAA") developed and implemented a race-based decision to abandon its merit-based system for hiring new air traffic controllers. Previously, candidates for air traffic controller positions were chosen, in part, based on their excellence in an aviation-specific education program and their performance on a scientifically-verified aptitude test designed to objectively determine their fit for the job. Indeed, the FAA advised those interested in becoming air traffic controllers that their most reliable path to success was through these FAA partnered aviation-specific education programs or the military. But in the early 2010's era of the Obama administration, the FAA cooperated with special interest groups whose primary objective was to increase hiring of African-American candidates as air traffic controllers. The FAA adopted the argument of these special interest groups that the pool of college-trained, aptitude-tested candidates served as an unacceptable barrier to hiring an increased percentage of African Americans. The FAA did not, however, invest the time and effort to create an actual affirmative action program. Instead, trading public safety and operational efficiency for political expediency, the FAA abruptly abandoned its merit-based employment screening system in early 2014. The motive and consequences of the FAA's actions were so egregious that Congress had to supply a partial legislative correction in 2016, mandating that the FAA once again consider job-specific training as part of the hiring process. This legislation, however, did not remedy the race-based hiring decisions the FAA inflicted on the Plaintiff and the thousands of would-be air traffic controllers they seek to represent in this case. Having invested years of their lives and thousands of dollars to establish their careers, the putative Class members in this case found themselves largely jobless or underemployed, burdened with significant debt and a disvalued college degree – even divorced

or homeless in some cases – all because the government decided to illegally further race-based objectives. These thousands of aspiring air traffic controllers were harmed by the FAA's race-based hiring and employment decisions and are entitled to relief under Title VII of the Civil Rights Act of 1964.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction, pursuant to 28 U.S.C. § 1331, because the matter in controversy arises under the Constitution and laws of the United States, including but not limited to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

2.      Venue rests properly in this Court, pursuant to 28 U.S.C. § 1391(e), because "a substantial part of the events … giving rise to the claim occurred" within this judicial district.

3.      Additionally, this matter was transferred to this venue pursuant to Defendant's motion.

## PARTIES

4.      Plaintiff Andrew J. Brigida is a current resident of Falls Church, Virginia.  He brings this action on behalf of himself individually, and on behalf of a Class of persons similarly situated as described below.

5.      Putative Class Representative Suzanne M. Rebich is a current resident of Anchorage, Alaska and member of the putative class.  Ms. Rebich seeks to serve as a Class Representative.

6.      Putative Class Representative Matthew L. Douglas-Cook is a current resident of Vancouver, Washington and member of the putative class.  Mr. Douglas-Cook seeks to serve as a Class Representative.

7.      Defendant Elaine L. Chao is the Secretary of the United States Department of Transportation ("DOT"), a cabinet-level department within the Executive Branch of the federal government.  In that capacity, Secretary Chao is responsible for overseeing the actions of all the employees

and officers within the agencies of the Department, including the Federal Aviation Administration. Secretary Chao is sued in her official capacity.

## LEGAL BACKGROUND

8.      Title VII prohibits employment discrimination on the basis of race.  42 U.S.C. § 2000e; *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Title VII prohibits discrimination against employees of, and applicants for employment in, the federal government.  42 U.S.C. § 2000e-16.  Additionally, the D.C. Circuit has held that Title VII is the sole method by which federal employees can enforce the Equal Protection component of the Due Process Clause against the federal government for employment discrimination.  *See Kizas v. Webster*, 707 F.2d 524 (D.C. Cir. 1983) (citing *Brown v. GSA*, 425 U.S. 820 (1976)).

9.      Title VII provides that it is unlawful employment discrimination "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race …."  42 U.S.C. § 2000e-2(a)(1).

10.     Absent a valid defense, Title VII prevents a government agency from refusing to accept the outcome of a race-neutral hiring process solely because of the racial makeup of the successful applicants.  *See Ricci*, 557 U.S. at 579.  However, it is not simply the consequences of a racially motivated employment decision that violates the statute.  The sheer fact that the "ultimate aim" of the employment decision was "because of race" is contrary to the statute.  *Id.* at 579-80.

11.     A prima facie case of employment discrimination can be established even if a job applicant does not have a "bona fide interest" in working for a particular employer.  *Kyles v. J.K. Guardian Security,* 222 F.3d 289 (7th Cir.2000) (holding that an employment "tester" whose sole purpose in applying for a job was to detect possible racial discrimination had standing to bring a Title VII failure-to-hire claim

because the simple act of violating the statute constitutes injury-in-fact); *see also America v. Preston*, 468 F. Supp. 2d 118, 124 (D.D.C. 2006) (citing *Kyles* and holding the same).

## **FACTUAL BACKGROUND**

**A.    FAA Hiring Plans prior to 2014 and The FAA's Collegiate Training Initiative.**

12.    Prior to the 1990s, the FAA hired air traffic controller candidates from two main sources. First, the FAA hired military-trained controllers ("Veteran's Recruitment Appointment" or "VRAs"), who had separated or retired from military service.    Second, the FAA hired through General Public Announcement ("GPA"), commonly referred to as Off-the-Street ("OTS") hiring.

13.    OTS hiring was inefficient, often resulting in candidates lacking air traffic control or college experience.    In addition, besides being expensive to administer, the FAA deemed the quality of candidates unsatisfactory and noted high training failure ("washout") rates with OTS applicants.

14.    In 1989, the FAA published the *Flight Plan for Training*.    This publication proposed a new system to solve some of the failures of OTS hiring by implementing and supporting air traffic controller college training programs.

15.    In January 1991, the FAA promulgated FAA Order 3120.26, which established the Air Traffic-Collegiate Training Initiative ("CTI") program to develop, deliver, and implement air traffic control recruiting, selection, and training.

16.    The objective of the CTI program was to develop a professional air traffic controller workforce that possessed the skills necessary to succeed at a lower screening and training cost to the government.

17.    In order to achieve the objectives of the CTI program, the FAA entered into partnership agreements with colleges, universities and other schools (collectively, "CTI Institutions") to administer CTI programs throughout the country.

18.     The FAA actively encouraged potential applicants to pursue CTI training as the primary means of obtaining employment as an air traffic controller. The FAA's website advertised the CTI program nationwide, informing any interested parties that the various CTI college programs or the military were the best ways to be hired. In addition, the FAA stated that the FAA desired to hire all qualified graduates of the CTI program.

19.     By 2012, there were 36 CTI Institutions around the country. From at least 2008 through 2013, most new hiring of air traffic controllers was from the pool of CTI graduates and VRAs.

20.     Since the early 2000s, graduates from the CTI programs were required to pass a validated air traffic aptitude test, known as the Air Traffic Control Selection and Training examination ("AT-SAT") in order to be eligible for employment as a trainee controller.

21.     The FAA developed the AT-SAT in approximately 2000-2001 to assess the likelihood of an applicant successfully learning Air Traffic Control Specialist ("ATCS") skills as well as a to predict achievement of Certified Professional Controller ("CPC") status and air traffic controller job performance. CPC status is achieved after the successful completion of air traffic training.

22.     The AT-SAT tests for characteristics needed to perform effectively as an air traffic controller. The characteristics include numeric ability, prioritization, planning, tolerance for high intensity situations, decisiveness, visualization, problem-solving, and movement detection.

23.     A CTI student had to affirm his or her United States citizenship prior to being allowed to take the AT-SAT test. Applicants who scored 85 and above on the AT-SAT were classified as "well-qualified" by the FAA. Applicants who scored between 70 and 84.9 were classified as "qualified" by the FAA. Applicants who scored below 70 were classified as "not qualified" by the FAA and were not eligible for hire for ATCS positions.

6

24.    Since the FAA first instituted the AT-SAT, it has been validated multiple times to ensure the test complied with applicable law and professional guidelines.  The AT-SAT was validated most recently in March of 2013.

25.    By 2008, after the introduction of the CTI program and the AT-SAT test, the FAA created and used CTI-only job postings. Between 2008 and 2013, most air traffic controller candidates hired had been CTI-trained.  Only graduates from CTI programs who passed the validated AT-SAT assessment, had not aged out of eligibility, and had received a recommendation from their CTI school (hereinafter referred to as "Qualified Applicants") were eligible to apply for CTI-only job postings.  Prior to 2014, CTI Qualified Applicants received hiring preference for ATCS positions.  *See* Section 6 of the Standard Operating Procedures of the FAA's Aviation Careers Division, defining Qualified Applicants, ECF No. 73-2 at 12-13.

26.    In 2005, the FAA forecast a controller shortage due to a large number of controllers who were becoming eligible for retirement.  This retirement-eligible group had been hired after the 1981 Professional Air Traffic Controllers Organization strike.

27.    The CTI schools were unable to keep up with the increased demand for replacement controllers and, as a result, the FAA once again used OTS hiring announcements to supplement the VRA and CTI applicant pools.

28.    At the end of 2012, however, the FAA announced via a mass e-mail that it would not be conducting any further OTS hiring because the CTI schools, along with the VRA applicant pool, were producing sufficient quantities of qualified applicants to fulfill demand.

29.    The FAA controller hiring plan required the FAA to hire over one thousand controllers per year in calendar years 2012, 2013, and 2014.

**B.**    **FAA's 2014 Race-Based Change in Hiring Practices for Air Traffic Controllers.**

30.    Despite the agency's stated demand for ATCS, the FAA slowed and eventually froze the processing and hiring of new ATCS applicants. Upon information and belief, the FAA intentionally slowed its hiring in 2012 and 2013 in anticipation of abandoning the Qualified Applicant hiring preference and adopting a new, yet to be determined, hiring process that would favor African-Americans.

31.    After a job posting that closed on October 12, 2012, the FAA ceased recording the names of CTI graduates who had passed the AT-SAT, beginning a process of terminating the Qualified Applicant hiring preference. Neither the CTI schools, nor the CTI graduates, were notified of this change.

32.    On or around February 8, 2013, Terry Craft, the FAA's Manager for External Training Initiatives, sent an e-mail ("Craft e-mail") to the CTI schools about its "CTI Diversity Initiatives." [2]

33.    The Craft e-mail provided, *inter alia*, that the FAA was concerned about the diversity of its applicant pool, stating that "[m]y objective, should it be true, is to demonstrate that the CTI pool is as diverse as the other hiring pols including VRA and Gen Pub. *There is a perception that it is not*. So far I do not see this as true, so I need data to back this up before perception becomes perceived truth." (emphasis added).

34.    In 2013, the FAA published an employment plan providing that the FAA was "planning to open a general public announcement in FY 2014 to add more depth and diversity to our controller hiring sources." Federal Aviation Administration, *A Plan for the Future: 10-Year Strategy for the Air Traffic Control Workforce 2013-2022* 44 (2013).

---

[2] A copy of the Craft e-mail is attached hereto as Exhibit 8.

35.     On or around December 30, 2013, over CTI schools' holiday break, Joseph Teixeira, the FAA's Vice President for Safety and Technical Training, sent an e-mail ("Teixeira e-mail") to the CTI schools about the future of hiring for ATCS positions.[3]

36.     The Teixeira e-mail provided, *inter alia*, that "[r]ecently, the FAA completed a barrier analysis of the ATC occupation pursuant to the Equal Employment Opportunity Commission's (EEOC) Management Directive 715.  As a result of the analysis, recommendations were identified that we are implementing to improve and streamline the selection of ATC candidates."

37.     The Teixeira e-mail further provided "[a] nationwide competitive FG-01 vacancy announcement open to all U.S. Citizens will be issued in February 2014.  Any individual desiring consideration for employment (including CTI graduates) MUST apply.  Existing inventories of past applicants will not be used." The Teixeira email also invited the CTI Institutions to a teleconference to explain the proposed hiring changes.  The teleconference was held on January 8, 2014.

38.     The Teixeira e-mail also provided that "[t]he existing testing process has been updated. The revised testing process is comprised of a biographical questionnaire[4] (completed as part of the application process) and the cognitive portion of the AT-SAT.  The cognitive portion of the AT-SAT will be administered only to those who meet the qualification standards and pass the biographical questionnaire.  Applicants for the February 2014 announcement will be required to take and pass the new assessments in order to be referred on for a selection decision."

39.     In February 2014, FAA spokesman Tony Molinaro, Public Affairs Officer for the FAA in the Great Lakes and Central Regions, stated that the decision to change the FAA's hiring process for Air Traffic Controllers was made to "add diversity to the workforce."  Anna Burleson, *Want to be an air*

---

[3] A copy of the Teixeira e-mail is attached hereto as Exhibit 5.

[4] Eventually this test was referred to as the "biographical assessment" but is consistently referred to here as the "biographical questionnaire."

*traffic controller? UND says FAA has 'dumbed down the process'*, Grand Forks Herald, March 5, 2014, http://www.grandforksherald.com/content/want-be-air-traffic-controller-und-says-faa-has-dumbed-down-process (last visited October 16, 2019).

40.    On information and belief, and after a reasonable opportunity for discovery, the FAA failed to validate the biographical questionnaire to ensure the test was in accordance with the law and professional guideline.  This is because the FAA intended and implemented the questionnaire to provide a better score to African-Americans.

41.    In sum, between October 2012 and January 27, 2014, the FAA eliminated the CTI program's merit-based hiring preference in favor of implementing a race-skewed screening mechanism, which resulted in Plaintiff, and other putative Class Members, losing their employment preference and opportunity.  The FAA's decision to strike the CTI qualifications was not part of an affirmative action program.

C.    **The FAA's Race-Based Motives.**

42.    On information and belief, and after a reasonable opportunity for discovery, since approximately 2010 several members of the FAA Human Resources ("HR") and Civil Rights ("CR") Offices had been working with, at least, the National Black Coalition of Federal Aviation Employees ("NBCFAE") to eliminate the CTI merit-based hiring preference for Qualified Applicants and to concomitantly increase hiring of African-Americans.

43.    On February 10, 2010, the NBCFAE published a "Talking Points" document that described its efforts to pressure the FAA into addressing alleged problems with the agency's racial diversity since at least 2008.  *See* Exhibit 9.  This document mentioned that NBCFAE had sent a number of letters to the FAA concerning alleged "disparate treatment and under-representation" of African-Americans within the agency.  *Id.* at 1-2.  NBCFAE also stated that it re-directed its budget to fund this effort and was in the

10

process of "building a coalition of supporters from entities, outside the FAA, that possess the power to influence the FAA…." *Id.* at 4. This "Talking Points" document also mentioned the formation of a group of senior members of NBCFAE called "Team 7" who had "drafted a plan to move the FAA towards the desired diversity in their workforce." *Id.* at 3.

44.    Thereafter, Team 7 released a document titled "Team 7 On the Move – Visit to the Hill," which described multiple trips to Washington D.C. to meet with the FAA concerning a perceived "lack of an Affirmative Employment Plan…" and forecasting additional such meetings in 2013. Exhibit 10 at 3. The document mentioned several meetings with Congressional staff towards this end. *Id.*

45.    On June 20, 2013, FAA officials met with members of the FAA National Employee Association Forum, which is composed of eight employee associations that represent various minority, women, and disadvantaged sub-groups, including NBCFAE. The stated purpose of this meeting was to brief the various employee associations of recommended changes in the Air Traffic Controller hiring process.

46.    Among the persons conducting the June 2013 briefing was an FAA consultant named Dr. James Outtz. Dr. Outtz presented information about a recently completed Barrier Analysis of the FAA Air Traffic Controller hiring process. Dr. Outtz stated that the FAA's hiring process purportedly had a disparate impact on minority candidates, primarily African-American males.

47.    In addition, on April 16, 2013, the FAA released Extension to the Barrier Analysis ("Extension Report") which largely echoed the same conclusion of the Barrier Analysis. *See* ECF No. 75-1 at 69 ("The results of that [the Barrier Analysis] indicated that barriers exist for certain protected groups on four of the seven critical decision points that comprise the ATCS centralized hiring process."). For example, The Extension Report concluded that "[w]hen examining the underlying diversity of the various applicant sources, the most dramatic difference was found between the Collegiate Training

11

Initiative (CTI) source and all other applicant sources with respect to African American representation. African American applicants comprise only 5% of the CTI pool compared to an average of 34% African American representation across the non-CTI applicant sources."  ECF No. 75-1 at 70-71.

48.    On information and belief, the Barrier Analysis and Extension Report were solicited and conducted in part to bolster the FAA's plan to eliminate the merits considerations of Qualified Applicants in favor of a race-based or race-biased hiring process.

49.    On October 2, 2013, NBCFAE's Team 7 issued a "Progress Report" that described its continuing efforts to press for "improvement in workforce diversity."  *See* Exhibit 13 at 2.  This document spoke of the need for a "systemic solution … that will improve the effectiveness of the agency's efforts to recruit, hire, promote, retain, develop, and train a diverse and inclusive workforce and that it be incorporated into the agency's human capital plan."  *Id.* at 2–3.

50.    The FAA further sought to unlawfully benefit African-Americans in the new hiring process by providing them with non-public information concerning the new screening technique.

51.    Several documents demonstrate that the NBCFAE had information on how applicants for the February 2014 announcement could increase their chances of advancing in the hiring process.[5]  The NBCFAE e-mailed their members with advice on how to apply for the open Air Traffic Controller positions.  *See* Exhibits 2-3.  This information was provided by an FAA HR employee who was also a member of the NBCFAE.  *See* Exhibit 2.  ("If the entire country caught wind of this attachment, then how will your resume be distinguished from others?").

52.    These documents further demonstrate that NBCFAE National President Roosevelt Lenard, Jr. was in contact with senior FAA officials, including Carrolyn Bostick, an FAA management official at

---

[5] Copies of these documents are attached hereto as Exhibits 1 through 4.

the Office of Human Resources (abbreviated by the agency as "AHR-1"), about Lenard's desire to eliminate the entire merit-based hiring preference for Qualified Applicants. *See* Exhibit 3.

53.     On or about January 27, 2014, FAA HR Official Bostick assured NBCFAE National President Lenard that the current group of Qualified Applicants would be "purged" and none of these applicants would be offered a letter of employment. *Id.* Relatedly, a NBCFAE Google Group posted a communication from NBCFAE President Roosevelt Lenard, Jr. on January 24, 2014, which confirmed that AHR-1 was terminating the "old hiring process" and that the "list [of Qualified Applicants] has been purged." *See* Exhibit 3 at 1. Moreover, President Lenard acknowledged that "[d]uring the [2013-2013] holidays CTI schools were informed that they will no longer receive the preferences they have been receiving." *Id.*

54.     The FAA misrepresented the participation of these special interest groups to the CTI schools. Specifically, during a January 8, 2014 teleconference with CTI school representatives, Joseph Teixeira stated that "there were no special interest groups involved in the design of the [new] FAA policy at all. This was done by experts in the human resources department and civil rights …."

55.     Teixeira also stated that "[w]e really have not announced these changes to anyone other than to CTI schools, and you received that for the first time on the 30th of December. There's been no announcement …."

56.     On information and belief, and after a reasonable opportunity for discovery, FAA HR and CR employees and officials cooperating with the NBCFAE efforts to eliminate Qualified Applicant hiring preferences and implement a race-biased hiring process included active members of the NBCFAE.

**D.     Diversity of the CTI Program prior to 2014**.

57.     Not only were the FAA's raced-based actions illegal, they were unjustified.

58.    In 2012-2013, 11.5 percent of CTI school enrollees were African-American. Federal Aviation Administration, Air Traffic Collegiate Training Initiative (AT-CTI) Partner School Diversity and Outreach 2012-13 report at 3 (February 25, 2013).   This percentage of African-American enrollees exceeded the percentage of African Americans in the relevant civilian labor workforce pool in the same years.  United States Office of Personnel Management, Federal Equal Opportunity Recruitment Program (FEORP) for Fiscal Year 2012 Report to the Congress 8 (January 2014), https://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reports/feorp-2012.pdf (last visited October 8. 2019).

59.    Indeed, on February 8, 2013, Terry Craft, the FAA's CTI program manager, sent an e-mail to CTI schools in which he stated he believed that the CTI applicant pool was diverse.   Further, in February 2013, the FAA published a report on the CTI program that provided that "it is clear that the FAA AT-CTI schools are making great strides to incorporate minority students and faculty into their programs…."  Federal Aviation Administration, Air Traffic Collegiate Training Initiative (AT-CTI) Partner School Diversity and Outreach 2012-13 1 (February 25, 2013).

60.    The FAA's then-Director of Technical Training Support, Anthony Gagliardo stated that FAA manager Joseph Teixeira manipulated the data in the FAA's Partner School Diversity and Outreach 2012-13 report to make the CTI institution student body appear to be much less diverse than it actually was. In addition, 2-year schools such as CTI community college institutions with historically diverse student populations were eliminated from the FAA's calculations to further diminish the actual minority participation.[6]

61.    Further, on information and belief and after reasonable opportunity for discovery, no affirmative action programs were in place or deemed necessary by the FAA either before or after 2014.

---

[6] A copy of the November 8, 2018 declaration, originally submitted in Support of the Plaintiff's Motion for Class Certification, is attached hereto as Exhibit 7.

E.     **Congressional Action.**

62.     The Defendant's actions soon attracted the attention of Congress.  Concerned with the risk to public safety posed by the FAA's abandonment of a merit-based system for selecting future ATCS, in 2016 Congress inquired into the FAA's racially discriminatory hiring practices.

63.     The FAA actively brainstormed ways of explaining itself to various Congressional inquiries while deflecting liability for scuttling the Qualified Applicant hiring preference.  *See* e-mail from Molly Harris, Exhibit 6 ("We have to find a way to address Congressional inquiries without hurting our cause when it comes to litigation.").

64.     On July 15, 2016, Congress passed the FAA Extension, Safety, and Security Act of 2016 which, *inter alia*, addressed the hiring of ATCS positions by the FAA.  FAA Extension, Safety, and Security Act of 2016, Pub. L. 114-190, Section 2106, 130 Stat. 615, 620 (July 15, 2016), *codified at* 49 U.S.C. § 44506 ("the Act").

65.     The Act provides that the FAA should give preferential treatment for ATCS positions to qualified individuals maintaining 52 consecutive weeks of civilian or military air traffic control experience.  49 U.S.C. § 44506(f)(1)(A).

66.     For any remaining open ATCS positions, the FAA is then required to hire equally from two applicant pools.  49 U.S.C. § 44506(f)(1)(B)(i).

67.     The first pool consists of: (1) CTI graduates who have received recommendations from their institution; (2) honorably discharged veterans eligible for a recruitment appointment pursuant to Section 4214 of Title 38; (3) eligible veterans "maintaining aviation experience obtained in the course of the individual's military experience"; and (4) preference eligible veterans.  49 U.S.C. § 44506(f)(1)(B)(ii).

68.     The second pool consists of OTS applicants.  49 U.S.C. § 44506(f)(1)(B)(ii).

69.     Although the Act prevents the FAA from using the Biographical Questionnaire on applicants from the first pool of applicants (as well as those with previous air traffic control experience), it does not prevent the FAA from using the Biographical Questionnaire on OTS hires.  49 U.S.C. § 44506(f)(2)(A).

70.     Accordingly, the revised hiring practices restricts the number of CTI graduates that can be appointed to ATCS positions and requires approximately half of appointments to come from OTS applicants.  49 U.S.C. § 44506(f)(1)(B)(i).

71.     Although the Act provides that the FAA shall "provide … an opportunity to reapply" for an ATCS position under the "revised hiring practices" for any applicant that "was disqualified from the position as the result of a biographical assessment," the Act does not require the FAA to make any specific hiring or appointment decisions with respect to any CTI graduates.  49 U.S.C. § 44506(f)(2)(B)(i).

72.     In addition, the Act did not change the fact that some graduates on the CTI list had already "aged-out."

73.     Furthermore, the Act provides no compensation for the CTI graduates that were Qualified Applicants prior to the FAA's decision to eliminate its previous merit-based hiring preference.

74.     Plaintiff Brigida and the proposed Class were injured by the FAA's raced-based decision to disregard Qualified Applicants' existing pre-qualifications.  These injuries have not been remedied.

**F.     Plaintiff and Proposed Class Representatives.**

75.      On information and belief, and after a reasonable opportunity for discovery, there were approximately 2,500 to 3,000 qualified applicants who possessed a degree from a CTI school, had passed the AT-SAT, and were entitled to Qualified Applicant status prior to the FAA's January 2014 elimination of this merit-based hiring preference.  Plaintiff and putative Class Representatives Brigida, Rebich, and

Douglas-Cook were among those who were, or should have been, entitled to the FAA's merit-based hiring preference.

### *Plaintiff Brigida.*

76.    On April 3, 2013, while attending an FAA approved CTI Institution, Arizona State University ("ASU"), Plaintiff Brigida took and successfully passed the AT-SAT assessment with the top numerical score possible of 100%.  Plaintiff Brigida is Caucasian.

77.    On August 13, 2013, Plaintiff Brigida graduated from ASU, and was recommended to the FAA by ASU on August 28, 2013.

78.    Plaintiff Brigida satisfied all FAA requirements for being defined as a Qualified Applicant.

79.    On or about January 27, 2014, the FAA informed Plaintiff Brigida of the changes to the Air Traffic Controller hiring process, that the merit-based hiring preference for Qualified Applicants was being eliminated, and that Mr. Brigida would need to apply under the new hiring process if he wished to be considered for an Air Traffic Controller position.

80.    On February 10, 2014, Plaintiff Brigida applied for an Air Traffic Controller position under the new hiring processes.   While applying for the position, Plaintiff Brigida took the Biographical Questionnaire.

81.    On February 25, 2014, Plaintiff Brigida contacted an Equal Employment Opportunity ("EEO") counselor for the DOT by filing an informal electronic complaint, and alleged that the FAA discriminated against him on the basis of race by changing its Air Traffic Controller hiring practice.

82.    On February 27, 2014, the FAA notified Plaintiff Brigida that he had not passed the Biographical Questionnaire and was ineligible to be hired for an ATCS position.

83.    On March 31, 2014, Plaintiff Brigida received his notice of right to file a formal EEO Complaint with the DOT.

84.    On April 12, 2014, Plaintiff Brigida filed a formal EEO Complaint, individually and as a putative Class Representative on behalf of those similarly situated, with the DOT.[7]

85.    On April 16, 2014, the DOT sent a letter to Plaintiff Brigida which acknowledged receipt of the formal EEO Complaint and provided that the Complaint was forwarded to the EEOC for their recommendation to accept or reject the Complaint.

86.    On June 30, 2016, Administrative Judge Cynthia G. McKnight dismissed Plaintiff Brigida's EEO Complaint without prejudice under 29 C.F.R. § 1614.409 as a result of the filing of this action.

87.    Since being precluded from Qualified Applicant status in 2014, Plaintiff Brigida applied for at least 36 positions with the FAA.  Of those 36 applications, 32 were not referred for further consideration, two were cancelled, and only one was reviewed for further consideration and ultimately denied.  Ultimately Plaintiff Brigida was hired by the FAA in November 2016 as a Project Management Specialist.

***Putative Class Representative Rebich.***

88.    On November 5, 2010, while attending an FAA approved CTI Institution, the University of Alaska at Anchorage ("UAA"), Ms. Rebich took and successfully passed the AT-SAT assessment with a score of 80.2%.  Ms. Rebich received a rating of "qualified."  Ms. Rebich is Caucasian.

89.    On December 17, 2010, Ms. Rebich graduated from UAA, and was recommended to the FAA by UAA on January 18, 2011.

90.    Subsequently, Ms. Rebich met the requirements for Qualified Applicant status and applied for ATC positions.

---

[7] Plaintiff Brigida's formal EEO Complaint is incorporated by reference herein. *See* ECF No.78-2.

91.    In February 2014, Ms. Rebich was forced to reapply under the FAA's new hiring processes for Air Traffic Controllers.    While reapplying for the position, Ms. Rebich took the Biographical Questionnaire.

92.    Ms. Rebich did not pass the Biographical Questionnaire.

93.    Ms. Rebich reapplied for open ATCS positions on several subsequent occasions, but the FAA did not hire Ms. Rebich.

***Putative Class Representative Douglas-Cook.***

94.    In April 9, 2013, while attending an FAA approved CTI Institution, UAA, Mr. Douglas-Cook took and successfully passed the AT-SAT assessment with the top numerical score possible of 100%.  Mr. Douglas-Cook is Native American.

95.    In December 2013, Mr. Douglas-Cook graduated from UAA and satisfied all requirements for Qualified Applicant status except that UAA did not recommend Mr. Douglas-Cook to the FAA because the FAA did not request any recommendations concerning the December 2013 graduating class.  Had a recommendation been requested, UAA would have provided a positive recommendation for Mr. Douglas-Cook.

96.    In February 2014, Mr. Douglas-Cook was forced to apply under the FAA's new hiring processes for Air Traffic Controllers.  While applying for the position, Mr. Douglas-Cook took the Biographical Questionnaire.

97.    Mr. Douglas-Cook did not pass the Biographical Questionnaire.

98.    The FAA did not hire Mr. Douglas-Cook for an ATCS position.

## CLASS ACTION ALLEGATIONS

99.    Plaintiff and putative Class Representatives incorporate the allegations in the preceding paragraphs as if fully set forth herein.

100.    This is a class action brought by Plaintiff Brigida, and putative Class Representatives Rebich and Douglas-Cook, on behalf of themselves and others similarly situated, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure and 29 C.F.R. § 1614.204.  The Class that Plaintiff and putative Class Representatives seek to represent is the approximately 2,500 to 3,000 non-African American[8] CTI students who by January 27, 2014: (1) graduated from a CTI program that was approved by the FAA and (2) had passed the AT-SAT (thereby indicating their intent to apply for FAA ATC employment), and who did not receive a tentative offer of employment letter from the FAA prior to March 23, 2015 (when the FAA posted its next vacancy announcement). Excluded from the Class are the few CTI graduates whose academic records as of January 27, 2014 explicitly stated that they were ineligible to receive a letter of recommendation from their CTI school or who by January 27, 2014 had aged out of eligibility for FAA ATCS employment, thereby excluding them from possibly meeting the definition of Qualified Applicants per Section 6 of the Standard Operating Procedures of the FAA's Aviation Careers Division.

101.    **Commonality**.  There are common questions of law, practices, and fact as to the members of the Class which predominate over questions affecting only individual members of the Class. Specifically, this case challenges the FAA's race-based decision to eliminate or purge the Qualified Applicant hiring preference, which resulted in all members of the Class losing a hiring preference, even though they had graduated from a CTI school and passed the AT-SAT assessment.  There are no unique factual or practice factors that would make Class status disadvantageous to any member of the Class.  The FAA followed a uniform course of action to purge the merit-based hiring preference for Qualified

---

[8] Plaintiff and putative Class Representatives have excluded African-Americans from the class definition to overcome certain objections the FAA has raised to the class and to move this case forward after several delays. Plaintiff and putative Class Representatives hope that after appropriate briefing African Americans can be added to the class and/or become a separate sub-class.

Applicants with the expectation of implementing a new race-biased hiring practice, which constituted an adverse employment action which affected all Class members. Defendant's race-based motivation, alleged justification for the decision, and actions taken between 2010 and 2014 to further race-based hiring are common to all Class members. *See Moore v. Napolitano*, 926 F. Supp. 2d 8, 29 (D.D.C. 2013) ("factual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members [and] class members have suffered the same injury.") (internal quotations omitted).

102.    **Typicality**. Plaintiff's claims for the remedies stated herein are typical of the claims of all members of the putative Class because all members of the putative Class were simultaneously harmed by the FAA's programmatic illegal race-based actions. All Class members will benefit from a declaration that the FAA race-based decisions violated Title VII. All Class members will also benefit from injunctive relief restraining further race-based decision making by the FAA and mandating remedial measures. Whatever factual variations among the prospective Class members that may exist, they do not alter the fact that all prospective Class members suffered the same injuries caused by the FAA's single race-based decision to purge the Qualified Applicant hiring preference. *See Cohen v. Chilcott*, 522 F. Supp. 2d 105, 115 (D.D.C. 2007) ("The typicality requirement is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability.) (quotations omitted).

103.    **Numerosity**. The potential quantity of members of the putative Class as defined is so numerous that joinder of all members would be unfeasible and impractical. The disposition of their claims through this class action will benefit both the parties and this Court. The quantity of the members of the Class is approximately 2,600 people. *See* ECF No. 73-9 (December 5, 2013 e-mail from Rickie Cannon stating that "there are approximately 2,668 candidates in the [AT-CTI] Inventory but AT-SATs are

expiring and candidates are aging out daily."). The quantity and identity of such membership is easily ascertainable through inspection of Defendant's, and potentially the CTI schools' records.

104.   **Adequacy**.  Plaintiff and putative Class Representatives are adequate representatives of the putative Class and as Class Representatives will fairly protect the interests of the members of the Class, have no interests antagonistic to the members of the Class, and will vigorously pursue this suit via attorneys who are competent, skilled, and experienced in litigating complex matters of this type.  Putative Class Counsel are competent and experienced in litigating large cases, are preeminent in their fields, and members of the firms have experience in litigating complex matters including employment and constitutional law cases.  Approximately 350 potential Class members have contacted Plaintiff's legal counsel and approximately 151 have filed informal EEO Complaints with the FAA listing Plaintiff's legal counsel as potential legal counsel.

105.   **Ascertainable Class**.  The proposed Class is ascertainable in that its members can be readily identified using objective information that already exists and is contained in Defendant's and/or CTI-affiliated school records.  Specifically, Defendant has records indicating CTI students' graduation dates, AT-SAT scores, age or date of birth, and race and national origin.  Further, the existence of an AT-SAT score may serve as a proxy for the CTI student's citizenship since the student had to certify citizenship to take the test, and for the student's intent to apply to the FAA to be accepted for ATC employment since, upon information and belief, the AT-SAT score is not considered as part of the hiring for any other FAA position. The Class that Plaintiff and putative Class Representatives seek to represent is the approximately 2,500 to 3,000 non-African American CTI students who by January 27, 2014: (1) graduated from a CTI program that was approved by the FAA and (2) had passed the AT-SAT (thereby indicating their intent to apply for FAA ATC employment), and who did not receive a tentative offer of employment letter from the FAA prior to March 23, 2015.  Excluded from the Class are the few CTI

graduates whose academic records as of January 27, 2014 explicitly stated that they were ineligible to receive a letter of recommendation from their CTI school or who by January 27, 2014 had aged out of eligibility for FAA ATCS training, thereby excluding them from possibly meeting the definition of Qualified Applicants per Section 6 of the Standard Operating Procedures of the FAA's Aviation Careers Division.

106.    **Predominance and Superiority**.  The nature of this action and the questions of law or fact common to Class members predominate over any questions affecting only individual members.  A class action is superior to other available methods for fairly and efficiently adjudicating this controversy for the following reasons, without limitation:

a.    This case involves a federal agency and officials and a sufficiently numerous group of individual Class members with many common claims and issues of law and fact;

b.    If each individual member of the Class were required to file an individual lawsuit, Defendant would necessarily gain an unjust advantage because Defendant would be able to exploit and overwhelm the limited resources of each individual member of the Class with Defendant's vastly superior financial and legal resources – an outcome that contradicts this Court's single-file doctrine, *see e.g., Campbell v. Nat'l R.R. Passenger Corp.*, 163 F. Supp. 2d 19, 25 (D.D.C. 2001) ("The single-file rule allows an individual plaintiff, who has not filed an EEOC charge, to satisfy the administrative exhaustion requirements under Title VII by relying on a charge filed by another plaintiff.");

c.    Requiring each individual member of the Class to pursue an individual lawsuit would discourage the assertion of lawful claims by the members of the Class who would be disinclined to pursue an action against Defendant because of an appreciable and justifiable fear of retaliation and permanent damage to their lives, careers, and well-being;

23

d.      Proof of a common practice or factual pattern, of which the members of the Class experienced, is representative of the Class herein and will establish the right of each of the members of the Class to recover on the causes of action alleged herein;

e.      The prosecution of separate actions by the individual members of the Class, even if possible, would create a substantial risk of inconsistent or varying adjudications with respect to the individual members of the Class against Defendant; and which would establish potentially incompatible standards of conduct for Defendant;

f.      Many members of the putative Class are college graduates with large student loan balances and the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress their injuries, while an important public interest will be served by addressing the matter as a Class Action; and

g.      The cost to the judicial system of such individualized litigation would be substantial and a waste of valuable adjudicative and judicial resources.

107.    **Manageability of Class and Common Proof**.  The nature of this action makes this class action a particularly efficient and appropriate procedure to afford relief to Plaintiff and putative Class Representatives for the FAA's alleged unlawful actions.  Specifically, the primary issue turns upon the FAA's single decision to purge the Qualified Applicant hiring preference and adopt a new race-based or race-biased hiring practice for Air Traffic Controllers.  Individual adjudication would prejudice Defendant opposing the Class by requiring the United States government to allocate scarce judicial resources and taxpayer dollars to individually adjudicate the claims of approximately 2,500 to 3,000 air traffic controller applicants.

108.    **Subclasses**.  Plaintiff and putative Class Representatives reserve the right to move for the creation of any subclasses as may be proper as discovery proceeds.  This may include a subclass of Class Members meriting only nominal damages.

109.    **Non-named parties.** In addition to the Plaintiff and putative Class Representatives named above, numerous putative Class Members have been harmed by Defendant's race-based employment decision.

a.    Most Qualified Applicants have struggled to find work in the wake of the FAA's change of hiring preferences.  The skillset and qualifications provided by the CTI program relate exclusively to the work of air traffic controllers and cannot translate easily to other fields.  As such, the FAA's abandonment of the Qualified Applicant hiring preference meant that CTI graduates now possess a college degree that is effectively worthless outside the field of aviation.

b.    Making matters worse, most CTI graduates incurred student loans to finance their now-worthless degrees.  This significant amount of debt was exacerbated by the inability of many Class members to find employment following the FAA's abandonment of the Qualified Applicant hiring preference.  Relatedly, some CTI graduates had to incur additional student loan debt in order to pursue additional education for different jobs.

c.    In some cases, this financial strain experienced by putative Class members has led to divorce.  Other putative Class Members have been rendered homeless because of the same.

### CLAIM FOR RELIEF
(Violation of Title VII)

110.    Plaintiff and putative Class Representatives incorporate the allegations in the preceding paragraphs as if fully set forth herein.

111.    The FAA purged the merit-based hiring preference for Qualified Applicants for Air Traffic Controllers with the intent and purpose of benefitting African-American Air Traffic Controller applicants and hindering qualified and well-qualified non-African American applicants.

112.    By purging the Qualified Applicant hiring preference the FAA refused to accept the outcome of a race-neutral hiring process solely because of the racial makeup of the successful applicants. *See Ricci*, 557 U.S. at 579.

113.    The FAA's race-based decision to purge the Qualified Applicant hiring preference harmed every non-African American who met the requirements of Qualified Applicant status.

114.    The FAA did not have a strong basis in evidence to believe its use of the CTI program would cause it to be subject to disparate-impact liability under Title VII of the Civil Rights Act of 1964. The FAA's decision to strike the CTI qualifications was not part of an affirmative action program.

115.    Accordingly, Defendant intentionally discriminated against Plaintiff Brigida and other putative Class members and violated Title VII of the Civil Rights Act by refusing to consider for hiring and/or refusing to hire qualified applicants because of those applicants' race.  42 U.S.C. § 2000e(a)(1); *see also Kyles*, 222 F.3d 289 *and America*, 468 F. Supp. 2d 118.

116.    Plaintiff, putative Class Representatives, and other putative Class members are entitled to an order declaring that the FAA's actions constituted an adverse employment action which violated Title VII of the Civil Rights Act of 1964, and an order directing the FAA to give hiring preference to Plaintiff Brigida and other putative Class members.  42 U.S.C. § 2000e-5(g)(1).  Similarly, Plaintiff, putative Class Representatives, and other putative Class members are entitled to an order requiring the FAA to process any applications, employment recommendations, and any other outstanding matters that were terminated, ignored, or otherwise neglected by the agency's race-based decision to change its hiring practices.

117.    Additionally, Plaintiff, putative Class Representatives, and other putative Class members request an injunction: (a) barring the FAA from employing race-preferential hiring practices for at least five years; (b) barring the FAA from involving special interest groups (including NBCFAE) associated with protected classifications from involvement in designing hiring methodologies; (c) requiring that any new hiring process include a neutral third-party expert review of the process for Title VII compliance prior to adoption; (d) requiring Title VII training for the HR and CR departments; and (e) requiring that the FAA evaluate the forgiveness of student loan debt incurred by Class members.

118.    Plaintiff, putative Class Representatives, and other putative Class members are also entitled to damages, to be determined at trial, including, but not limited to, back pay and front pay. Nominal damages are also permissible in Title VII cases.  *See Franklin-Mason v. Dalton*, No. CIVA962505(RWR/JFM), 2006 WL 825418, at *16 (D.D.C. Mar. 21, 2006), *aff'd in part,* 742 F.3d 1051, n.5 (D.C. Cir. 2014) (upholding award of nominal damages for breach of settlement agreement concerning a Title VII employment discrimination case).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and putative Class Representatives, on behalf of themselves and the Class they seek to represent, respectfully request that this Court:

1.    Declare that the FAA's racially motivated purging of the merit-based hiring preference for Qualified Applicants violated Title VII of the Civil Rights Act of 1964;

2.    Enter an order directing the FAA:

(a) give hiring preference to Plaintiff, putative Class Representatives, and other putative Class members;

(b) process any applications, employment recommendations, and any other outstanding matters that were terminated, ignored, or otherwise neglected by the agency's race-based decision to change its hiring practices in 2014; and

(c) implement training and other measures to prevent race-based hiring decisions;

3.    Award Plaintiff, putative Class Representatives, and other putative Class members applicable statutory damages and remedies, the amounts of which are to be determined at trial;

4.    Award Plaintiff, putative Class Representatives, and other putative Class members' costs and attorney's fees in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(k); and

5.    Grant Plaintiff, putative Class Representatives, and other putative Class members such further declaratory and injunctive relief as this Court deems just and equitable.

DATED this 1st day of November 2019.        Respectfully submitted,

*/s/ Zhonette M. Brown*

Zhonette M. Brown, D.C. Bar No. 463407
Brian Gregg Sheldon, CO Bar No. 51063, *pro hac vice*
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
zhonette@mslegal.org
brian@mslegal.org

Michael W. Pearson, AZ Bar No. 016281, *pro hac vice*
Curry, Pearson, & Wooten, PLC
814 West Roosevelt
Phoenix, Arizona 85007
(602) 258-1000
(602) 523-9000 (facsimile)
mpearson@azlaw.com

Attorneys for Plaintiff and Putative Class Counsel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of November 2019, I caused a true and correct copy of the

foregoing **FOURTH AMENDED AND SUPPLEMENTALCLASS ACTION COMPLAINT** to be

electronically filed with the Clerk of the Court using the Court's CM/ECF system which sent notification

of such filing to the following counsel of record in this matter:

Michael L. Drezner
Michael.L.Drezner@usdoj.gov

Galen Nicholas Thorp
galen.thorp@usdoj.gov

*/s/ Meri Pincock*
Meri Pincock
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
meri@mslegal.org