# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
ANDREW J. BRIGIDA, et al.,              )
                                        )
              Plaintiffs,               )
                                        )
       v.                               )          Civil Action No. 16-cv-2227 (DLF)
                                        )
ELAINE L. CHAO, Secretary, U.S.         )
Department of Transportation,           )
                                        )
              Defendant.                )
_____)


**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND,
AND ALTERNATIVELY MOTION TO STRIKE CLASS CLAIM**

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................................ii

TABLE OF EXHIBITS ...........................................................................................................iv

INTRODUCTION ...................................................................................................................1

BACKGROUND ......................................................................................................................3

I.      Federal Aviation Administration ...................................................................................3

II.     Air Traffic Control Specialists......................................................................................4

        A.     Overview of Controller Hiring..........................................................................5

        B.     Legacy Hiring Process for CTI Graduates (2008-2013).........................................7

        C.     Revised Hiring Process (2014) ...........................................................................9

III.    Named Plaintiffs & Class Representatives ......................................................................12

IV.    Procedural History ..........................................................................................................13

STANDARD OF REVIEW .....................................................................................................14

ARGUMENT............................................................................................................................16

I.      Plaintiffs' Motion to Amend Should Be Denied............................................................16

        A.     The Proposed Class Claim is Futile Because it is Subject to Dismissal For Failure to State a Claim........................................................................................16

              1.     Plaintiffs Cannot Make Out a Claim of Class-wide Discrimination Because They Have Not Alleged a Plausible Adverse Employment Action...................................................................................................18

                     i.     Withdrawing an alleged hiring preference between rounds of hiring does not constitute a "personnel action" under Title VII. ....................................................................................19

                    ii.    Plaintiffs have failed to allege a putative class of applicants........23

                  iii.    Taking a pre-employment test does not make a CTI graduate an applicant. ...............................................................25

                  iv.   Plaintiffs cannot evade their failure to allege a class-wide personnel action by claiming FAA "refused to accept the outcome of a race-neutral hiring process." .................................28

2.      Plaintiffs Cannot Meet Rule 23's Requirements. .................................... 31

        i.      Plaintiffs' class definition is fatally overbroad. ........................... 32

        ii.     Plaintiffs cannot establish commonality or typicality for a
                class that inherently includes non-applicants............................... 33

        iii.    Plaintiffs cannot show that the class is sufficiently
                homogenous or that common issues predominate where
                individualized inquiry is needed to determine whether each
                non-applicant was even injured. ..................................................... 35

        iv.     Plaintiffs have also failed to establish adequacy of
                representation due to their counsel's conflict of interests............. 37

    B.  Plaintiffs' Failure to Cure the Deficiency of the Class Claim Weighs
        Against Postponing Disposition of Plaintiffs' Class Claim................................. 41

    C.  The Court Should Not Permit Two Plaintiffs to Withdraw Subject to
        Another Motion to Amend After Class Certification Is Denied. .......................... 42

II.     Alternatively, Plaintiffs' Class Claims Should Be Stricken. ............................................ 43

CONCLUSION...................................................................................................................... 45

**TABLE OF EXHIBITS**

<u>**Agency Documents**</u>

FAA, Human Resource Operating Instruction, Air Traffic Collegiate Training Initiative Standard Operating Procedures (Apr. 1, 2007)...............................................................................1

FAA, A Plan for the Future, 10-Year Strategy for the Air Traffic Controller Workforce 2013-2022 (Mar. 2013).........................................................................................................2

APT Metrics, Final Report, Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process (Apr. 16, 2013) (link) (appendices excluded) ...................3

FAA Statement on the Barrier Analysis of the Air Traffic Control Specialist Centralized Hiring Process (May 2013) (link) ..............................................................................................4

FAA, AT-CTI Program Overview and FAQs (July 10, 2013) ........................................5

FAA, Human Resource Policy Manual, Policy Bulletin No. 84, Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring (Feb. 7, 2014)..............................6

FAA, Aviation Careers, Air Traffic Control Specialists (link)........................................7

FAA, Collegiate Training Initiative Schools (link) .........................................................8

OPM, General Schedule Qualification Standards, Air Traffic Control Series, 2152 (link) ...........9

<u>**Controller Announcements**</u>

AAC-AMH-08-PUBNAT1-08232 (Jan. 2008) ...............................................................10

AAC-AMH-08-CTI-08458 (Feb. 2008) ........................................................................11

AAC-AMH-08-CTI-09135 (Apr. 2008) ........................................................................12

AAC-AMH-08-PUBNAT2-09140 (Apr. 2008)..............................................................13

AAC-AMH-08-PUBNAT3-09613 (May 2008) ..............................................................14

AAC-AMH-08-CTI-09622 (May 2008) ........................................................................15

AAC-AMH-08-PUBNAT4-09989 (June 2008) .............................................................16

AAC-AMH-08-PUBNAT5-10363 (July 2008) ..............................................................17

AAC-AMH-08-CTI-10709 (Aug. 2008) ........................................................................18

AC-AMH-08-PUBNAT6-10764 (Aug. 2008)................................................................19

AC-AMH-09-PUBNAT7-11589 (Dec. 2008) ................................................................ 20

AAC-AMH-09-CTI-11766 (Nov. 2008) ..................................................................... 21

AAC-AMH-09-PUBNAT8-12162 (July 2009) ........................................................... 22

AAC-AMH-09-CTI-12655 (Sept. 2010) .................................................................... 23

AAC-AMH-11-CTI-19558 (June 2011) ..................................................................... 24

FAA-AMH-13-VRA-26915 (Aug. 2012) ................................................................... 25

FAA-AMH-13-RMC-27006 (Aug. 2012) .................................................................. 26

FAA-AMH-13-CTO-27017 (Aug. 2012) ................................................................... 27

FAA-AMH-13-CTI-27053 (Aug. 2012) ..................................................................... 28

FAA-AMC-14-ALLSRCE-33537 (Feb. 2014) ........................................................... 29

**Plaintiffs' Documents**

Brigida EEO Complaint (Apr. 14, 2014) ................................................................... 30

## INTRODUCTION

Plaintiffs' motion for leave to amend their complaint for the fourth time should be denied because Plaintiffs have failed to cure key defects in their putative class.[1]  In this brief, the Federal Aviation Administration (FAA) focuses the Court's attention on two reasons so clear and so central that there can be no doubt that they should be resolved by denying the motion to amend or dismissing the class claim—Plaintiffs have failed to plausibly allege that the putative class as a whole was (1) subject to discriminatory "personnel actions" which (2) affected a class of "applicants."  *See* 42 U.S.C. § 2000e-16(a) (requiring federal employers to make "*personnel actions* affecting employees or *applicants* for employment . . . free from any discrimination based on race, color, religion, sex, or national origin." (emphasis added)).

Faced with the Court's doubts about the viability of a class that includes individuals who voluntarily chose not to apply for a controller position, Plaintiffs have doubled down on including non-applicants in their putative class.  Plaintiffs' class definition pointedly does not require putative class members to have *actually applied* for any specific vacancy announcement.  Instead, they erroneously argue that the loss of an alleged "hiring preference" gives the entire putative class a claim without any need to apply.  This fails to state a claim in two distinct ways.  First, elimination of an alleged hiring preference is an alleged change of practice, not a personnel action; thus, they have failed to plead the first element of a Title VII claim on behalf of the putative class.  Second, even if they were to identify a personnel action affecting portions of the putative class, they would still have failed to allege a class made up of applicants.  It is not enough to have passed a pre-

---

[1] Defendant recognizes that Plaintiffs have dropped one plaintiff, Pollyanna Wang, and propose converting two others—Suzanne Rebich and Matthew Douglas-Cook—exclusively to putative class representatives.  Defendant opposes this action.  *See infra*, Arg. § I.C.  Because the Court has not yet ruled on that proposal, this brief refers Mr. Brigida, Ms. Rebich, and Mr. Douglas-Cook collectively as "Plaintiffs."

application test, and Plaintiffs have not alleged facts supporting the narrow exceptions allowing non-applicants to assert failure-to-hire claims—either unpublished postings or futility of application. For both of these reasons, Plaintiffs have failed to plead essential elements of a Title VII claim on behalf of the putative class as a whole, and cannot meet Rule 23's requirements. No amount of discovery could change this straightforward failure to plead a plausible class claim.

Moreover, despite direction from the Court and ample briefing on numerous defects in their class claims, Plaintiffs' proposed complaint perpetuates or creates many additional defects. For example, in an effort to improve ascertainability, Plaintiffs have dropped all reference to the U.S. Office of Personnel Management (OPM) qualifications standards, including the stringent medical requirements that must be met before an applicant can receive a final offer. *See* Proposed 4th Am. Compl. ¶ 100, ECF No. 87-1 (hereinafter, for brevity, "4th Am. Compl."). While it simplifies the class definition, this accentuates Plaintiffs' commonality and predominance problems because they must show that each class member could actually have been hired in order to justify front pay or damages. Similarly, Plaintiffs acknowledge that for a Collegiate Training Initiative (CTI) graduate to be eligible to apply for a pre-2014 vacancy announcement, the graduate must have received a recommendation from their CTI school, *id.* ¶ 25, yet they expand the class to include all graduates regardless of recommendation unless their "academic records . . . explicitly stated that they were ineligible to receive a letter of recommendation." *Id.* ¶ 100. This clarity comes at the expense of making the class overbroad by including people who would not have received this prerequisite for the pre-2014 hiring process. More starkly, while their previous class definition was limited to those who "have not been employed by the FAA as an . . . air traffic control specialist," *see* Pls.' Mot. for Class Cert. at 1, ECF No. 73, their proposed definition would include anyone who received an offer after March 23, 2015. This approach undermines typicality and

adequacy because selectees who failed their medical, security, and drug screen; hirees who failed out of the FAA Academy; and current employees hired after 2014 are unlikely to share the same interests as applicants who were never selected.  Moreover, including such people in the putative class further accentuates that individualized injury and damages issues will predominate over the alleged common issues.  Plaintiffs have thus failed to take to heart the Court's admonition that it is their burden to fashion an appropriate class definition.

Nevertheless, because Plaintiffs are likely to protest that they should receive an opportunity to address these additional defects in a renewed motion for class certification after expansive discovery, *see* Pls.' Mot. for Pre-Cert. Class Discovery and to Begin Discovery, ECF No. 89, Defendant does not rely on these additional defects in opposing Plaintiffs' Motion to Amend. Instead, Plaintiffs' failure to propose a class of applicants who were affected by allegedly discriminatory personnel actions is fatal to their class claims, apart from any other considerations. Accordingly, the motion to amend should be denied as futile.  Alternatively, the Court could permit amendment but strike the class claims, so that Plaintiffs can proceed with litigating their individual claims.

## BACKGROUND

### I.    Federal Aviation Administration

The FAA, an Administration in the U.S. Department of Transportation, regulates and oversees all aspects of civil aviation in the United States.  49 U.S.C. §§ 106(a), 40101(d)(4).  Its mission is to provide the safest, most efficient aerospace system in the world.  *Id.* § 40101(d)(4). Within FAA, the Air Traffic Organization (ATO) is responsible for providing air navigation services for the National Airspace System.  *See* Exec. Order 13180 § 2(b), 65 Fed. Reg. 77493 (Dec. 7, 2000).  To provide air navigation services, ATO operates 315 air traffic control facilities that guide aircraft through their various phases of flight.  *See* Exhibit 2, FAA, A Plan for the Future,

10-Year Strategy for the Air Traffic Controller Workforce Plan 2013-2022 at 10 (Mar. 2013) ("2013 Workforce Plan"). FAA employees are thus responsible for managing a very complex and highly automated network of interconnected systems to ensure the safety of the nation's aviation. FAA employs more than 14,000 air traffic control specialists ("ATCS" or "controllers") in such facilities. *Id.* FAA annually issues a 10-year hiring plan that looks at projected traffic levels, retirements, attritions and effectives ways to train and place controllers. *See, e.g.*, *id.* at 2.

## II.    Air Traffic Control Specialists

Controllers carry out thousands of air traffic control activities daily—separating and controlling air traffic and providing advisory services to aircraft operators. *See id*. at 10; 5 U.S.C. § 2109. Because of the serious nature of this work and zero margin for error, the training regimen and proficiencies needed to become and remain a controller are demanding. *See* Exhibit 7, FAA, Aviation Careers, Air Traffic Control Specialists (link). OPM has set rigorous medical requirements that applicants must meet. *See* Exhibit 9, OPM General Schedule Qualification Standards, Air Traffic Control Series, 2152 (link). OPM's qualifications standard also requires that applicants have three years of progressively responsible work experience, a four year college degree, or some combination of work experience and post-secondary education. *Id.* Under statutory authority, controllers are not eligible to be hired by FAA after the age of 30, or 35 with certain prior air traffic control experience, *see* 5 U.S.C. § 3307(b); 49 U.S.C. § 44506(f)(3), and are generally subject to mandatory separation at age 56. *See* 5 U.S.C. §§ 8335(a), 8425(a). New hires must first attend training at the FAA Academy, and only those who successfully graduate are placed in FAA facilities. *See* 2013 Workforce Plan at 34, 47. Once a trainee is placed in their first FAA facility, it can take upwards of three years of additional training to progress through increasing levels of responsibility to become a fully certified air traffic controller. *Id.* at 16-17,

49. A portion of every batch of new hires fails to complete FAA Academy or FAA facility training. *See id.* at 34.

## A.    Overview of Controller Hiring

FAA annually projects its staffing needs over the upcoming ten-year period and adjusts its controller hiring to anticipate those needs. *See, e.g.*, 2013 Workforce Plan at 6-7. FAA must anticipate attrition from retirements, failure to complete training, and other causes. *See id.* at 28-37. This is especially important due to the time it takes to fully train new hires. *Id.* at 7. FAA hires from several sources including the general public, Air Traffic Collegiate Training Initiative ("AT-CTI" or "CTI Program"), and experienced controllers (either retired military or civilian). *See id.* at 44; 4th Am. Compl. ¶¶ 12, 27. FAA adjusts the mix of hiring from these sources due to their availability and its staffing needs. *See* 4th Am. Compl. ¶ 27; 2013 Workforce Plan at 44.

The controller hiring process begins with publishing a vacancy announcement that provides a window for eligible individuals to submit an application. *See, e.g.*, Exhibit 28, FAA-AMH-13-CTI-27053 (2012) ("2012 CTI Announcement") at 1; *see also* Exhibit 5, AT-CTI Program Overview and FAQs at 59-60 (July 10, 2013) ("CTI Program Overview") ("First there must be an 'announcement' or 'job vacancy' that is open. All announcements are listed at www.usajobs.gov."). An individual must have submitted an application using the on-line system for each announcement to receive consideration under that announcement, regardless of whether the individual had submitted a prior application. *See, e.g.*, 2012 CTI Announcement at 3 ("4) Applicants must apply on-line to receive consideration for this vacancy announcement. . . . 6) This replaces announcement AAC-AMH-11-CTI-19558."); *id.* at 4 ("How to Apply. You must apply online to receive consideration.").

**Table 1: Nationwide Announcements for Inexperienced Controllers 2008-2013**

| Full Posting Number | Open Period | Source |
|---|---|---|
| AAC-AMH-08-PUBNAT1-08232 | Jan. 23-Feb. 15, 2008 | General Public |
| AAC-AMH-08-CTI-08458 | Feb. 19-Mar. 25, 2008 | CTI Only |
| AAC-AMH-08-CTI-09135 | Apr. 9-22, 2008 | CTI Only |
| AAC-AMH-08-PUBNAT2-09140 | Apr. 14-May 2, 2008 | General Public |
| AAC-AMH-08-PUBNAT3-09613 | May 19-30, 2008 | General Public |
| AAC-AMH-08-CTI-09622 | May 19-30, 2008 | CTI Only |
| AAC-AMH-08-PUBNAT4-09989 | June 17-30, 2008 | General Public |
| AAC-AMH-08-PUBNAT5-10363 | July 17-31, 2008 | General Public |
| AAC-AMH-08-CTI-10709 | Aug. 13-26, 2008 | CTI Only |
| AC-AMH-08-PUBNAT6-10764 | Aug. 18-29, 2008 | General Public |
| AC-AMH-09-PUBNAT7-11589 | Dec. 9-16, 2008 | General Public |
| AAC-AMH-09-CTI-11766 | Nov. 26-Dec. 10, 2008 | CTI Only |
| AAC-AMH-09-PUBNAT8-12162 | July 6-17, 2009 | General Public |
| AAC-AMH-09-CTI-12655 | Sept. 23-Oct. 26, 2010 | CTI Only |
| AAC-AMH-11-CTI-19558 | June 1, 2011 – Feb. 28, 2012 | CTI Only |
| FAA-AMH-13-CTI-27053 | Aug. 27-Sept. 10, 2012 | CTI Only |

Source: Exhibits 10-24, 28.

Before 2014, FAA issued separate announcements for each source. *See, e.g.*, Table 1 (summarizing announcements for inexperienced controllers); *see also* Exhibits 25-27 (separate August 2012 announcements for three types of experienced controllers).[2]  Individuals who apply to a vacancy announcement are screened for whether they meet the basic eligibility criteria for that announcement.  *See* 2012 CTI Announcement at 6.  Those determined to be eligible receive further consideration in the hiring process.  *Id.*  After an applicant has been selected, several additional steps follow: the selectee receives a tentative offer letter; if the selectee accepts the offer, he or she must pass medical and psychological exams, a security investigation, and a drug test.  *Id.* at 2.  Upon satisfactory results from those processes, FAA sends the selectee a final offer letter, and

---

[2] FAA posted an announcement for veterans eligible for a Veterans Recruitment Appointment, *see* Exhibit 25, FAA-AMH-13-VRA-26915 (Aug. 27, 2012); *see also* 5 C.F.R. §307.101, *et seq.* (providing authority allows agencies to non-competitively appoint eligible veterans).  FAA also posted announcements for retired military controllers, *see* Exhibit 26, FAA-AMH-13-RMC-27006 (Aug. 27, 2012), and for controllers with an appropriate Control Tower Operator (CTO) certificate, *see* Exhibit 27, FAA-AMH-13-CTO-27017 (Aug. 27, 2012).

inexperienced selectees become temporary FAA employees when they arrive at the FAA Academy in Oklahoma City for training. *Id.* at 3. Upon successful graduation from the FAA Academy, the selectees are converted to permanent employees. *Id.*

**B.    Legacy Hiring Process for CTI Graduates (2008-2013)**

Through the CTI Program, FAA partners with educational institutions which offer two- and four-year aviation degrees that include basic courses in air traffic control and aviation administration. *See* Exhibit 8, FAA, Collegiate Training Initiative Schools (link); *see also* 4th Am. Compl., Ex. 13, ECF No. 87-13 (FAA's AT-CTI webpage as updated Aug. 10, 2011). CTI graduates who apply and are selected by FAA for controller positions are eligible to bypass the first five weeks of training at the FAA Academy. *Id.* By 2013, FAA had formally partnered with 36 different schools offering 16 associates degrees, 34 bachelor's degrees, and 2 master's degrees. *See* 4th Am. Compl. ¶ 19; CTI Program Overview at 5. While these degrees could support any number of career choices, each one included curriculum that covered the material in FAA's Air Traffic Basics Course. *See* 4th Am. Compl., Ex 12 at 3, ECF No. 87-12; CTI Program Overview at 62-63 ("Understand that CTI schools are not training ATCS per se, but providing an aviation education that includes FAA mandatory and approved curriculum in the degree programs that qualify them as CTI partner institutions."). CTI graduates have never been guaranteed employment with FAA. *See* FAA, Collegiate Training Initiative Schools (link); CTI Program Overview at 1, 12; 4th Am. Compl., Ex. 13; *see also* Exhibit 1, Human Resource Operating Instruction, Air Traffic Collegiate Training Initiative Standard Operating Procedures ("2007 AT-CTI SOP") § 9 (Apr. 1, 2007) ("Employment of AT-CTI graduates . . . is in accordance with established FAA hiring policies and practices used to fill air traffic control positions.").

Since at least 2008, CTI graduates have only been hired using competitive vacancy announcements. *See* Exhibits 10-28. CTI graduates had multiple avenues to apply for FAA

controller positions.  FAA posted some announcements exclusively for CTI graduates.  *See, e.g.*, 2012 CTI Announcement.  They could also apply to announcements open to the general public, *see, e.g.*, Exhibit 22, AAC-AMH-09-PUBNAT8-12162 (July 2009) ("2009 Public Announcement"), and some CTI graduates may be eligible to apply for Veterans' Recruitment Appointment.  *See, e.g.*, Exhibit 25 at 2.  To be eligible to apply for a CTI-specific vacancy announcement, a CTI student, among other things, must: (1) have graduated from an AT-CTI school in a FAA-approved program, (2) have received a recommendation from that AT-CTI school, (3) have achieved a passing score on the Air Traffic Selection and Training Test Battery (AT-SAT), (4) be a U.S. citizen, and (5) be younger than 31 when entering FAA duty.  *See, e.g.*, 2007 AT-CTI SOP § 6(a)-(d); 2012 CTI Announcement at 2; 4th Am. Compl. ¶ 25.

The AT-SAT was a computerized pre-employment test designed to assess a candidate's aptitude for performing the duties of a controller.  *See* 4th Am. Compl. ¶¶ 20-22.  A minimum score of 70 was required to pass the AT-SAT; those with a score of 85 or higher were categorized "well qualified" and those with a score between 70 and 84 were categorized "qualified."  *Id.* ¶ 23. CTI students could take the AT-SAT before graduation at their school and their score was valid for three years after graduation.  *Id.* ¶ 20; 2007 AT-CTI SOP §§ 7-8.  By contrast, general public applicants would take the AT-SAT after applying to a vacancy announcement.  *See, e.g.*, 2009 Public Announcement at 2.

FAA developed a system to track CTI students and graduates for planning purposes.  Each CTI school provided FAA's Aviation Careers office with an electronic list of current CTI students and graduates at regular intervals, including relevant information such as expected graduation date. 2007 AT-CTI SOP § 5.  FAA merged this information into a database and added additional information, as it was provided by CTI schools over time.  *See id.*; 4th Am. Compl. ¶ 31.  The

database was maintained for informational purposes, such as providing a "job code" which gave eligible individuals access to apply to the CTI-specific vacancy announcements. *See* 2012 CTI Announcement at 4 ("A unique job code is required to apply for this announcement.").

All CTI graduates who wished to apply to a vacancy announcement were required to submit an electronic application pursuant to each vacancy announcement to be eligible for employment consideration under that vacancy announcement. *See, e.g.*, 2012 CTI Announcement at 3-4. After an announcement period closed, FAA's Aviation Career Office would review the submitted applications in the electronic application system, AVIATOR, and check each application against FAA records to determine whether that applicant met FAA's basic eligibility/qualification requirements. *See* 2012 CTI Announcement at 6. Only those applicants who met FAA's basic eligibility/qualification requirements were considered for employment. *Id.* For each job opening to be filled, Aviation Careers would generate from the electronic system a referral list of eligible and qualified CTI applicants who had listed that location in their application. *See* CTI Program Overview at 65. The referral lists for all job openings to be filled under the announcement were then submitted to a centralized selection panel, which used the list to schedule interviews and make selections for controller vacancies. *Id.* at 31, 65; 2007 AT-CTI SOP § 6.f.

## C.    Revised Hiring Process (2014)

In February 2014, after several years of studies and analysis, FAA implemented changes to the controller hiring process. The changes were based on a series of independent analyses. First, in 2011, FAA convened an independent review panel to evaluate the controller hiring and training process. *See* 2013 CWP at 5, 46. The panel recommended changes to the controller hiring process, including the CTI Program. *Id.* Second, pursuant to Equal Employment Opportunity Commission (EEOC) Management Directive 715 ("MD-715"), FAA contracted with outside experts to conduct a barrier analysis of the controller hiring process. *See* Exhibit 4, FAA Statement on the Barrier

Analysis of the Air Traffic Control Specialist Centralized Hiring Process ("FAA Statement") (link).[3]  The 2013 Outtz and Associates report "identified that four . . . decision points in the air traffic controller hiring process resulted in adverse impact to applicants from at least one demographic group."  *Id.*  To further study the issue, APT Metrics conducted a detailed root cause analysis of the identified barriers to establish a foundation for corrective interventions.  *See* Exhibit 3, Final Report, Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process (Apr. 16, 2013) ("Extension to Barrier Analysis"); *see also id.* at 59-76 (reviewing Independent Review Panel recommendations).  Third, FAA established an Executive Steering Committee of senior agency executives to oversee revision of the hiring process and implementation of the recommendations.  *See* FAA Statement.

Several key issues were identified.  For example, the AT-SAT did not effectively function to screen applicants, as over 95% of test takers passed the exam.  *See* Extension to Barrier Analysis at 6, 8.  The studies also noted the inefficiency in issuing separate vacancy announcements directed towards different populations, with distinct eligibility standards for each source.  *Id.* at 10.  In addition, because the independent consultants had identified certain factors as potential barriers to

---

[3] Pursuant to 42 U.S.C. § 2000e-16(b), among other authorities, the EEOC issued MD-715 in 2003.  It explains that all federal agencies are required to, inter alia:

> take proactive steps to ensure equal employment opportunity for all their employees and applicants for employment. This means that agencies must work to proactively prevent potential discrimination before it occurs and establish systems to monitor compliance with Title VII. Agencies must regularly evaluate their employment practices to identify barriers to equality of opportunity for all individuals. Where such barriers are identified, agencies must take measures to eliminate them. With these steps, agencies will ensure that all persons are provided opportunities to participate in the full range of employment opportunities and achieve to their fullest potential.

MD-715 § Part A.I (link); *see also Worth v. Jackson*, 451 F.3d 854, 856 (D.C. Cir. 2006) (emphasizing that "MD–715 declares that agencies have 'an ongoing obligation to eliminate barriers that impede free and open competition in the workplace and prevent individuals of any racial or national origin group or either sex from realizing their full potential.'" (quoting MD-715 at 8)).

equal opportunity at the agency, it was FAA's responsibility to explore ways to adjust them to better serve the agency's goals while reducing the barriers to full participation. *See* MD-715 Part A § IV; *see also King v. Jackson*, 468 F. Supp. 2d 33, 35 (D.D.C. 2006) ("MD–715's overriding objective . . . [was] to ensure that all employees and applicants for employment enjoy equality of opportunity in the federal workplace regardless of race").

After considering all of the issues raised in the reports, along with overarching concerns about efficiency and effectiveness, in February 2014, FAA implemented a revised hiring process for its next controller announcement. *See* Exhibit 6, Human Resources Policy Manual, Policy Bulletin No. 84, Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring (Feb. 7, 2014) ("Policy Bulletin No. 84"). The outlines of the process changes had been announced in letters sent to CTI schools on December 30, 2013. *See* 4th Am. Compl. ¶¶ 35-38 & Ex. 5. FAA issued a single nationwide vacancy announcement open to all U.S. citizens who would compete against all other applicants. *See* Exhibit 29, FAA-AMC-14-ALLSRCE-33537 (Feb. 10, 2014) ("2014 Announcement"). All applicants (regardless of whether the applicant was a CTI graduate) were required to take a new pre-employment screening tool referred to as the Biographical Assessment ("BA"). *Id.* at 3. Applicants who passed the BA and met other eligibility requirements were ranked based on a weighted composite of the BA, AT-SAT, and veterans' preference. *See id.* Instead of selection panels and interviews, hiring was conducted solely using this composite score. *Id.*; Policy Bulletin No. 84 § 2(h)-(i).

Information regarding FAA's further refinements to the hiring process after 2014 and the statutory changes which occurred in 2016, *see* Def.'s Opp'n Mot. Class Cert. at 11-12, ECF No. 75, are not necessary for this round of briefing.

11

### III.    Named Plaintiffs & Class Representatives

The proposed sole named Plaintiff, Andrew Brigida, along with proposed class representatives, Matthew Douglas-Cook and Suzanne Rebich, are three individuals who graduated from a CTI program, applied to the 2014 Announcement, took and were disqualified by the BA, and were accordingly not eligible for further employment consideration under that vacancy announcement.  *See* 4th Am. Compl. ¶¶ 76-98.  They and the putative class rely exclusively on Mr. Brigida for exhaustion of administrative remedies.  *See id.* ¶¶ 81, 83-86.  Mr. Brigida initiated the Equal Employment Opportunity (EEO) process on February 25, 2014.  *Id.* ¶ 81.  He filed a formal EEO complaint on behalf of a putative class of "eligible CTI graduates," who allegedly "entered a direct hire pool of applicants, were placed on a 'Qualified Applicant Register' or 'List,' and were given hiring preference," until that register was "eliminated or purged by the FAA" in 2014.  *See* Exhibit 30, Brigida EEO Complaint ¶¶ 12, 58-59, 100 (Apr. 14, 2014).

The putative class representatives differ from Mr. Brigida in certain material ways.  First, while Mr. Brigida and Ms. Rebich received a recommendation from their CTI school, 4th Am. Compl. ¶¶ 77, 89, Mr. Douglas-Cook did not receive a recommendation from his CTI school, allegedly because "the FAA did not request any recommendations from the December 2013 graduating class."  *Id.* ¶ 95.  Second, while Ms. Rebich submitted applications under pre-2014 announcements, *id.* ¶ 90, Mr. Brigida and Mr. Douglas-Cook—who did not graduate until August and December 2013, respectively, *see* 4th Am. Compl. ¶¶ 77, 95—did not apply to any controller vacancy announcement before FAA's 2014 revision of the controller hiring process.  Third, while Mr. Brigida does not allege that he ever reapplied for controller positions with FAA, *see id.* ¶¶ 80-87, Ms. Rebich repeatedly reapplied under post-2014 controller vacancy announcements, *id.* ¶ 93.

IV.    **Procedural History**

In December 2015, Plaintiff Brigida filed a putative class action complaint in the U.S. District Court for the District of Arizona, claiming that FAA violated Title VII and the Fifth Amendment in promulgating the 2014 revised controller hiring policy.  *See* Compl., ECF No. 1, *Brigida v. U.S. Dep't of Transp.*, No. 2:15-cv-02654 (D. Ariz.).  Plaintiff thereafter filed two amended complaints.  *Id.*, ECF Nos. 18, 26.  In November 2016, upon Defendants' motion, that court dismissed improper defendants, the Fifth Amendment claim, and the request for equitable relief, and transferred the case to this Court.  *See id.*, ECF Nos. 26, 33.

After the case was transferred, Plaintiff moved for reconsideration in part, and the Court reinstated his claim for equitable relief, but denied reinstatement of the Fifth Amendment claim. *Brigida v. Chao*, No. 1:16-2227 (D.D.C.), ECF Nos. 39, 50.  Following that decision, Plaintiffs filed their Third Amended Complaint, adding for the first time three additional named Plaintiffs: Ms. Wang, Ms. Rebich and Mr. Douglass-Cook.  ECF No. 68.  The Court denied Plaintiffs' motion for class certification discovery because Plaintiffs failed to "advance[e] a prima facie showing that the class action requirements of Federal Rule of Civil Procedure 23 are satisfied or that discovery is likely to produce substantiation of the class allegations."  ECF No. 66.  Plaintiffs then filed a motion for class certification, which the Court denied without prejudice after full briefing and a hearing because (1) it was inconsistent with the Third Amended Complaint, (2) including African Americans in the class potentially created commonality, typicality, and adequacy problems, (3) "it's difficult to certify a class that includes individuals who voluntarily chose not to apply for a controller position or withdraw their application after successfully obtaining an offer," and (4) "the class appears to include individuals who did not actually receive a recommendation from an AT-CTI school."  Hr'g Tr. at 49:6-50:9, Sept. 13, 2019; Minute Order, Sept. 13, 2019.

13

Plaintiffs have now filed a motion for leave to amend their complaint and a renewed motion for pre-certification discovery. *See* ECF Nos. 87, 89. Their proposed new complaint defines the putative class as follows:

> the approximately 2,500 to 3,000 non-African American CTI students who by January 27, 2014: (1) graduated from a CTI program that was approved by the FAA and (2) had passed the AT-SAT (thereby indicating their intent to apply for FAA ATC employment), and who did not receive a tentative offer of employment letter from the FAA prior to March 23, 2015 (when the FAA posted its next vacancy announcement). Excluded from the Class are the few CTI graduates whose academic records as of January 27, 2014 explicitly stated that they were ineligible to receive a letter of recommendation from their CTI school or who by January 27, 2014 had aged out of eligibility for FAA ATCS employment

4th Am. Compl. ¶ 100, ECF No. 87-1.

## STANDARD OF REVIEW

When a plaintiff moves for leave to amend her complaint after her time to do so as of right has expired, she may do so "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) also provides that the court "should freely give leave when justice so requires." *Id.* "Whether 'to grant or deny leave to amend, however, is vested in the sound discretion of the trial court.'" *Branch v. Spencer*, No. 16-1713, 2019 WL 4277413, at *4 (D.D.C. Sept. 10, 2019) (quoting *Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977)); *see also Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 860 (D.C. Cir. 2015) (holding that "the grant or denial of leave to amend is committed to a district court's discretion"). "It is well-established that the district court's discretion to deny leave to amend is particularly broad where a plaintiff previously has amended the complaint." *Hudson v. Am. Fed'n of Gov't Emps.*, No. 17-1867, 2019 WL 3533602, at *5 (D.D.C. Aug. 2, 2019) (quotation marks omitted).[4]

---

[4] Hereinafter, internal citations, alterations, and quotation marks are omitted unless otherwise noted.

In deciding whether to grant leave to amend, courts may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Barkley v. U.S. Marshals Serv.*, 766 F.3d 25, 38 (D.C. Cir. 2014) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). A court errs if it "fail[s] to provide reasons for refusing to grant leave to amend." *Brink v. Cont'l Ins. Co.*, 787 F.3d 1120, 1129 (D.C. Cir. 2015). "[T]he non-movant generally carries the burden in persuading the court to deny leave to amend." *Hudson*, 2019 WL 3533602, at *3.

"A district court has discretion to deny a motion to amend on grounds of futility where the proposed pleading would not survive a motion to dismiss." *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215-16 (D.C. Cir. 2010). Thus, a court applies the standards relevant to a Rule 12(b)(6) motion. *See Corsi v. Mueller*, No. 18-2885, 2019 WL 5653640, at *15 (D.D.C. Oct. 31, 2019). The proposed complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Shenk v. Mallinckrodt plc*, No. 17-00145, 2019 WL 3491485, at *5 (D.D.C. July 30, 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts alleged "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. Courts "assume the truth of all well-pleaded factual allegations in the complaint and draw all reasonable inferences from those allegations in the plaintiff's favor." *Shenk*, 2019 WL 3491485, at *5 (quoting *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 99-100 (D.C. Cir. 2015)).

However, courts "do not assume the truth of legal conclusions, nor do [they] accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015); *see also Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the

complaint or matters subject to judicial notice."). "When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials." *Stephens v. Mnuchin*, 317 F. Supp. 3d 413, 417 (D.D.C. 2018) (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).[5]

## ARGUMENT

**I.    Plaintiffs' Motion to Amend Should Be Denied.**

> **A.    The Proposed Class Claim is Futile Because it is Subject to Dismissal For Failure to State a Claim.**

This Court has held that motions for leave to amend "should be denied where amendment . . . would be futile, i.e., if the proposed claim would not survive a motion to dismiss." *Clean Water Action v. Pruitt*, 315 F. Supp. 3d 72, 80 (D.D.C. 2018); *cf. In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215-16 (D.C. Cir. 2010) ("A district court has discretion to deny a motion to amend on grounds of futility where the proposed pleading would not survive a motion to

---

[5] Here, in addition to the Proposed Fourth Amended Complaint, it is appropriate for the Court to consider Defendant's exhibits 1-4, 6, 10-30, which are attached to or referred to in the complaint and therefore incorporated by reference, *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015), and Defendant's exhibits 5, 7-9, which are subject to judicial notice as public records and as undisputed material on government websites. *See John Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-0252, 2019 WL 5597740, at *2 (D.D.C. Oct. 30, 2019) ("A court may take judicial notice of any fact 'not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (quoting Fed. R. Evid. 201(b)); *see also Citizens for Responsibility and Ethics in Washington v. Trump*, 924 F.3d 602, 607 (D.C. Cir. 2019) (taking judicial notice of document on government agency website); *Harris v. Bowser*, No. 19-00886, 2019 WL 3891041, at *4 n.4 (D.D.C. Aug. 19, 2019) ("Courts in this jurisdiction have frequently taken judicial notice of information on official public websites of government agencies."); *Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 99 n.8 (D.D.C. 2019) ("Court[s] may take judicial notice of historical, political, or statistical facts, or any other facts that are verifiable with certainty."); *Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 62 n.2 (D.D.C. 2019) ("[J]udicial notice may be taken of public records and government documents available from reliable sources."); *McIver v. Mattis*, 318 F. Supp. 3d 245, 250 (D.D.C. 2018) ("EEO documents . . . are judicially noticeable public records."). Most of these documents have been previously filed or cited in this case, and Plaintiffs have not disputed their authenticity.

dismiss."). Where the purpose of the amendment is to support certification of a class action, courts also deny amendment where it "would be futile because a subsequent motion to certify the proposed classes would be denied." *Hilliard v. Int'l City/County Mgmt. Ass'n-Retirement Corp.*, No. 08-2201, 2010 WL 11678002, at *2 (D.D.C. Feb. 2, 2010) (explaining that the court had "denied a motion to certify the proposed classes without prejudice and suggested that if plaintiffs still wished to purse a class action they should move to amend their complaint to add sufficient allegations to support class certification" but that plaintiffs' "proposed amended complaint fails to cure the [Rule 23] deficiencies in the original complaint that the Court identified at the status conference"); *White v. Hilton Hotels Retirement Plan*, No. 16-856, 2019 WL 1440223, at *3-4 (D.D.C. Mar. 31, 2019) (considering whether amendment would satisfy Rule 23(a) requirements "as that is Plaintiffs' motive for requesting this amendment" but ultimately finding futility on other grounds).[6] Some courts in this district have been hesitant to dismiss class claims before discovery, suggesting that dismissal is only appropriate "when the complaint [fails to] state[] a plausible claim for class-wide relief." *In re McCormick & Co.*, 217 F. Supp. 3d at 140; *see also Burton v. Dist. of*

---

[6] *See also In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 140 (D.D.C. 2016) (collecting cases from several courts of appeals that "have held that Rule 12(b)(6) motions can be used to strike class allegations when it is apparent on the face of the complaint that they cannot satisfy the requirements of Rule 23"); *Robertson v. Sun Life Fin.*, No. 17-2148, 2018 WL 2389181, at *2 (E.D. La. May 25, 2018) (holding that "amendment would be futile because [plaintiff's] proposed amendment fails to support a reasonable inference that he can satisfy the minimum requirements to maintain a class action under Federal Rule of Civil Procedure 23(a)"); *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 105 (S.D.N.Y. 2010) ("When a plaintiff seeks to amend her complaint in order to cure deficiencies in her motion for class certification, the futility inquiry focuses on whether the amendments will enhance the likelihood of class certification, rather than on whether they state a claim."); *Orthocraft, Inc. v. Sprint Spectrum L.P.*, No. 98-5007, 2002 WL 31640477 at *2 (E.D.N.Y. Nov. 16, 2002) (Where "Plaintiff has acknowledged that the primary purpose in amending its Complaint ... is to attempt to overcome the deficiencies that led to the denial of its initial motion for class certification ... the relevant inquiry is whether the proposed amendments would allow Plaintiff to prevail on a ... motion for class certification."); *Smith v. Transworld Sys., Inc.*, 953 F.2d 1025, 1033 (6th Cir. 1992) ("Because Smith's proposed amendment failed to allege facts from which the district court could reasonably infer that the mandatory prerequisites of Fed. R. Civ. P. 23(a) had been met, the district court properly denied Smith's motion.").

*Columbia*, 277 F.R.D. 224, 230 (D.D.C. 2011) ("[P]re-certification discovery should ordinarily be available where a plaintiff has alleged a potentially viable class claim[.]"); *Bush v. Ruth's Chris Steak House, Inc.*, 277 F.R.D. 214, 216–17 (D.D.C. 2011) (considering "whether Plaintiffs' proposed Amended Complaint contains sufficient allegations to implicate a Rule 23 claim, but only in relation to whether Plaintiffs have satisfied the plausibility pleading requirements governing resolution of a motion to dismiss").  Under either approach, Plaintiffs' putative class cannot be certified, rendering their class claims implausible and therefore subject to dismissal.

        **1.**      **Plaintiffs Cannot Make Out a Claim of Class-wide Discrimination Because They Have Not Alleged a Plausible Adverse Employment Action.**

Plaintiffs have not alleged facts showing that the putative class as a whole has been subject to an adverse employment action, which is fatal to their class claim.  This is especially clear for the CTI graduates who never applied for an FAA controller vacancy announcement and those who, unlike Plaintiffs, did not apply to the 2014 Announcement.

"Dismissal under Rule 12(b)(6) is proper when . . . the court finds that the plaintiffs have failed to allege all the material elements of their cause of action." *Taylor v. FDIC*, 132 F.3d 753, 761 (D.C.Cir.1997).  Title VII requires a federal employer to make "personnel actions affecting employees or applicants for employment . . . free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).  The D.C. Circuit has characterized this to mean that "the two essential elements of a discrimination claims are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  Under Circuit precedent, an adverse employment action requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*,

350 F.3d 1286, 1293 (D.C. Cir. 2003).  Because an adverse action is an element of a Title VII

claim, it is required for each class member to have a claim.  *See, e.g.*, *Aliotta v. Bair*, 614 F.3d 556,

569 (D.C. Cir. 2010) (holding that certain actions "were not adverse employment actions and thus

should not be considered as part of class members' case"); *Perry v. Donovan*, 733 F. Supp. 2d 114,

119 (D.D.C. 2010) ("Alleged acts of discrimination that do not constitute adverse employment

actions fail as a matter of law.").

> i.  *Withdrawing an alleged hiring preference between rounds of*
> *hiring does not constitute a "personnel action" under Title VII.*

Plaintiffs allege that the "adverse employment action which affected all Class members"

was FAA's "uniform course of action to purge the merit-based hiring preference for Qualified

Applicants with the expectation of implementing a new race-biased hiring practice."  4th Am.

Compl. 101.  This fails to plausibly allege a class-wide "personnel action" or "adverse employment

action" both as a matter of law and fact.

First, Title VII protects equal treatment, not preferential treatment.  *See Ricci v. DeStefano*,

557 U.S. 567, 577 (2009) (explaining that disparate treatment "occur[s] where an employer has

treated a particular person less favorably than others because of a protected trait"); *Int'l Bhd. of

Teamsters v. United States*, 431 U.S. 324, 338 n. 18 (1977) ("Title VII provides for equal

opportunity to compete for any job[.]"); *Figueroa v. Pompeo*, 923 F.3d 1078, 1082-83 (D.C. Cir.

2019) ("Title VII . . . reflects the American promise of equal opportunity in the workforce[.]").

Thus a process change withdrawing *preferential treatment* for future selections does not readily

satisfy Title VII's adverse action or discrimination elements.  *See Turner v. Billington*, No. 02-

00219, 2006 WL 618420, at *8 (D.D.C. Mar. 10, 2006) (holding that "for the reason that the policy

applied equally, by definition there can be no showing of an 'adverse personnel action' suffered

by plaintiff").  It does not violate Title VII for an employer to adjust its practices to provide an

opportunity for all individuals to compete in a subsequent round of hiring or promotions.  *See Ricci*, 557 U.S. at 585 ("Nor do we question an employer's affirmative efforts to ensure that all groups have a fair opportunity to apply . . . and to participate in the process by which [selections] are made.").  To the extent that Plaintiffs believe that CTI graduates are inherently entitled to special treatment as compared to general public applicants, no such claim is cognizable under Title VII.

Second, "losing a hiring preference" due to a process change before a subsequent round of hiring, 4th Am. Compl. ¶ 101, does not constitute a "*personnel action*[] affecting employees or *applicants* for employment." 42 U.S.C. § 2000e-16(a) (emphasis added).  Title VII does not permit everyone to challenge a federal agency's policies, but instead only "employees or applicants" who are affected by a "personnel action" (often called an adverse employment action).  *See Ricci*, 557 U.S. at 579 (characterizing "Title VII's command" to be "that employers cannot take *adverse employment actions* because of an individual's race" (emphasis added)).  In the absence of a vacancy announcement, applications, and selection decisions, a process change is not a personnel action.  *See Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 608 (2008) (describing "employment action[s]" and "personnel action[s]" as "hiring and firing decisions" along with actions "such as promotion, salary, or work assignments"); *Taylor*, 350 F.3d at 1293 (holding that an adverse employment action involves a "significant change in employment status").  Here, where Plaintiffs do not appear to rely on any specific defects in the 2014 hiring process or even require that putative class member have applied to the 2014 Announcement, *see* 4th Am. Compl. ¶ 100,[7]

---

[7] Plaintiffs, to date, have insisted that they are not relying on alleged defects in FAA's revised hiring process, noting that the claim that "the 2014 BA was validated improperly and used inappropriately to screen applicants due to race" is "not asserted in this matter."  Pls.' Mot. for Class Cert. at 32, ECF No. 73-1; *see also* Hr'g Tr. at 5:4-6, Sept. 13, 2019 (stating that the BA "really didn't pertain to the students who were purged from the list").

they cannot show that the process change itself constitutes a personnel action.  To put it another way, an alleged loss of a preference that would have been available *if you applied* does not make all of those potential applicants subject to an adverse employment action.  *Cf. Bourdais v. New Orleans City*, 485 F.3d 294, 300 (5th Cir. 2007) (holding, in case alleging improper hiring preference in favor of African Americans, that district court properly dismissed certain plaintiffs who had not completed application process and thus "failed to show that they suffered any adverse employment action whatsoever"); *Carter v. City of Philadelphia*, 989 F.2d 117, 122 (3d Cir. 1993) (emphasizing that statutory hiring preference for veterans did not give plaintiff an interest "in the promotion per se but in being given a preference *when his promotion is considered*" (emphasis added)).

Third, there was, in fact, no hiring preference to lose.  Plaintiffs cite § 6 of FAA's 2007 AT-CTI SOP as the basis for a "hiring preference for ATCS position," 4th Am. Compl. ¶ 25, but nothing in the FAA's 2007 AT-CTI SOP or any other FAA policy actually conferred a hiring preference on CTI graduates.[8]  Unlike veterans who received specific hiring preferences (even in CTI-only announcements), *see, e.g.*, 2012 CTI Announcement at 4, Plaintiffs identify no FAA policy that gave an individual CTI graduate a preference over a similarly qualified general public applicant.  Instead, by "hiring preference," Plaintiffs appear to merely refer to FAA's practice of posting CTI-only vacancy announcements.  *See id.* ¶ 25 (discussing "CTI-only job postings").  But

---

[8] While frequently repeated in the proposed complaint, Plaintiffs' unsupported allegation of a "hiring preference" is not a "well pleaded factual allegation" that can be assumed true at this stage.  *See Shenk*, 2019 WL 3491485, at *5.  Instead, this is an unwarranted and unreasonable inference from the undisputed facts which should not be credited.  *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions . . . will not do."); *Arpaio*, 797 F.3d at 19; *O'Gilvie v. Corp. for Nat'l Community Serv.*, 802 F. Supp. 2d 77, 82 (D.D.C. 2011) (discounting allegations that were "entirely conclusory" and thus "need not be treated as true, and . . . are insufficient to defeat the motion to dismiss").

because general public hiring proceeded alongside these CTI-only announcements, this cannot reasonably be considered a hiring preference or a benefit to which CTI graduates were entitled.

Plaintiffs themselves acknowledge that before 2014, FAA took a variety of approaches to issuing announcements for different sources. *See* 4th Am. Compl. ¶¶ 25-27. For example, in 2008, FAA issued parallel CTI-only and general public announcements almost monthly, *see* Exhibits 10-21 & Table 1, but in 2009, it issued a general public announcement but not a CTI-only one, *see* Exhibit 22, while from 2010-2012 the only announcements for inexperienced candidates were CTI-only ones. *See* Exhibits 23-24, 28. This recent history demonstrates that, even under the legacy process on which Plaintiffs rely, FAA could simultaneously invite applications from and select both CTI graduates and people from the general public. Indeed, before FAA decided to make the challenged changes to its hiring process, it announced in March 2013 that it intended to issue another "general public announcement in FY 2014." *See* 4th Am. Compl. ¶ 34; 2013 Workforce Plan at 44. If FAA had not made changes to the hiring process but issued only a general public announcement in 2014—as it had done in 2009, *see* Exhibit 22—Plaintiffs would have been free to apply and could not claim they lost something to which they were entitled. By comparison, FAA's actual decision to stop issuing announcements for specific sources and instead issue a general announcement for all sources did not fundamentally alter FAA hiring. It certainly did not constitute a "personnel action" affecting all CTI graduates *per se*.[9]

---

[9] Plaintiffs also sow confusion by conflating the closure of prior applications with the decision to issue a single announcement in 2014—characterizing both as a decision to "purge the hiring preference." *See, e.g.*, 4th Am. Compl. ¶¶ 107, 102, 111-113, Prayer for Relief ¶ 1. Plaintiffs only identify one time that the word "purge" was apparently used—as shorthand by an FAA official in a January 2014 call while explaining that applicants from prior years would need to re-apply to be considered in 2014. *See* 4th Am. Compl. ¶ 53 & Ex. 3. The need for new applications had already been explained in the December 2013 letter to CTI schools. *See* 4th Am. Compl. Ex. 5, Teixeira Email at 3 ("An individual desiring consideration for employment (including CTI graduates) MUST apply. Existing inventories of past applicants will not be used."); *see also* Exhibit 6, Policy Bulletin No. 84 § 2(c) ("FAA will close previous ATCS Academy trainee competitive inventories, notifying candidates that their prior applications and

ii.    *Plaintiffs have failed to allege a putative class of applicants.*

Moreover, Plaintiffs' putative class is not made up of "applicants" as required by Title VII. *See* 42 U.S.C. § 2000e-16(a). Plaintiffs' use of "applicants" and "qualified applicants" throughout the complaint is disingenuous. *See, e.g.*, 4th Am. Compl. ¶ 115 (alleging claim for "refusing to consider for hiring and/or refusing to hire qualified applicants because of those applicants' race"). Instead, Plaintiffs use those terms to refer to those "*eligible to apply* for CTI-only job postings." *Id.* ¶ 25 (emphasis added); *see also id.* (defining "Qualified Applicants" as "graduates from CTI programs who passed the validated AT-SAT assessment, had not aged out of eligibility, and had received a recommendation from their CTI school").[10] Thus, the putative class extends far beyond Mr. Brigida and others who applied for the 2014 Announcement. It includes people who applied for FAA controller positions in 2012 or earlier but did not apply in 2014. And it includes people who never applied for an FAA controller position.

It is well-established that such non-applicants generally cannot press Title VII claims because they have not suffered an adverse employment action. *See Lathram v. Snow*, 336 F.3d

_____

pre-employment test scores will no longer be considered and encouraging them to apply to future vacancy announcements."). It is thus clear both that this action affected *all* prior applicants—both general public and CTI applicants—and that it did not affect CTI graduates like Mr. Brigida who had not applied to a pre-2014 vacancy announcement. There was no "purge" that could be considered a class-wide adverse employment action.

[10] Plaintiffs purport to draw this definition from FAA's 2007 AT-CTI SOP § 6, *see* 4th Am. Compl. ¶¶ 25, 100, however that document sets forth additional "basic qualification requirements for AT-CTI graduates" including (1) "[b]e a U.S. citizen," (2) "[n]ot have reached their 31st birthday *when entering on duty* in an FAA terminal or en route facility," (3) "[m]eet FAA medical, security, and suitability requirements," and (4) "[s]uccessfully complete an interview to determine whether the candidate possesses the personal characteristics necessary for the performance of air traffic control work and that the candidate is able to speak English clearly enough." 2007 AT-CTI SOP § 6 (emphasis added). That document also explains that CTI graduates are only eligible within three years of their graduation, unless they have applied for an extension. *Id.* § 7(a)-(b). Moreover, Plaintiffs' class definition differs from their own definition of "Qualified Applicants" by excluding only *some* individuals who did not receive a recommendation from their CTI program and only *some* individuals who had aged out of the 2014 application process (those who aged out by January 27, 2014). *See* 4th Am. Compl. ¶ 100.

1085, 1089 (D.C. Cir. 2003) (holding that plaintiff's "allegation that [the agency] violated Title VII by not promoting her to the GS–14 position is defeated by her failure to apply for that position"); *Kline v. Archuleta*, 99 F. Supp. 3d 1, 4 (D.D.C. 2015) (holding that plaintiff "did not suffer any adverse action in this case, as she . . . she failed to apply for the positions that did encompass these duties" she wanted); *Moore v. Hagel*, No. 10-00632, 2013 WL 2289940, at *2 (D.D.C. May 24, 2013) ("Not being selected for a position for which she did not apply cannot be considered an adverse employment action."); *Burt v. Nat'l Republican Club of Capitol Hill*, 828 F. Supp. 2d 115, 125 (D.D.C. 2011) ("There can be no adverse employment action where a plaintiff, of his own volition and despite being individually encouraged to do so, failed to complete the application process."); *Stoyanov v. Winter*, 643 F. Supp. 2d 4, 13 (D.D.C. 2009) ("[P]laintiff cannot even establish a prima facie case of discriminatory or retaliatory failure to promote if he did not apply for the position"); *cf.* Hr'g Tr. at 21:1-3, Sept. 13, 2019 (Plaintiffs' counsel acknowledging that "Title VII law for a failure-to-hire case is, generally speaking, you need to be an applicant").[11]

Nor have Plaintiffs pled allegations that could support the limited exceptions to the application requirement. *Cf.* Hr'g Tr. at 21:3-6, Sept. 13, 2019 (Plaintiffs' counsel acknowledging limited "exceptions where you do not have to have actually applied" but claiming that it is "too early in this case . . . to see if any of those recognized exceptions apply"). A Title VII claim by a

---

[11] *See also Rodriguez v. Brownsville Indep. Sch. Dist.*, 739 F. App'x 227, 231 (5th Cir. 2018) ("[A]n employee's failure to apply for a promotion will bar a failure-to-promote claim unless there is a showing that such an application would have been a futile gesture."); *Allen v. Raley's*, 707 F. App'x 486, 487 (9th Cir. 2017) (holding that there was no "adverse employment action . . . because he did not apply for any promotions or transfers during the relevant period"); *Peters v. Wal-Mart Stores East, LP*, 512 F. App'x 622, 626 (7th Cir. 2013) ("[Plaintiff] admits that she did not apply for the support-manager position, and this dooms her prima facie claim for failure to promote."); *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 114 (11th Cir. 2010) (explaining that circuit law required "plaintiff [to] show that she applied for and was qualified for an available position to establish adverse employment action in failure-to-hire context").

non-applicant may be viable if they are "claiming that [they were] deterred from applying for the job by the employer's discriminatory practices." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 368 (1977).  In this district, that requires showing either that "applying would have been futile because members of her protected class were subject to gross and pervasive discrimination," or that the "employer filled the position without soliciting applications." *Carroll v. England*, 321 F. Supp. 2d 58, 67-68 (D.D.C. 2004).  The narrow futility prong is "intended to reach only the most invidious effects of employment discrimination," and the nonsolicitation prong "is unavailable if an employer openly advertised job vacancies to all employees." *Id.*[12]  Here, Plaintiffs have not alleged that anyone was deterred from applying by the alleged discrimination.  Nor could they prove futility or nonsolicitation.  It is undisputed that the 2014 Announcement was published online, *see* 2014 Announcement and that many CTI graduates, including Plaintiffs, were invited to apply, 4th Am. Compl. ¶ 79, and actually applied, *id.* ¶¶ 80, 91, 96.  Indeed, their class definition acknowledges that some CTI graduates "receive[d] a tentative offer of employment letter from the FAA" as a result of the 2014 Announcement.  *Id.* ¶ 100.  Accordingly, Plaintiffs' cannot hide behind a request for discovery when it is plain that these narrow exceptions cannot give non-applicants a Title VII claim here.

        iii.    *Taking a pre-employment test does not make a CTI graduate an applicant.*

Disregarding these well-established principles regarding the need for each class member in a failure-to-hire case to either apply or show that application would be futile, Plaintiffs instead

---

[12] *See also Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 576 (6th Cir. 2004) (holding that *Teamsters* exception for non-applicants applied where the circumstances "reveal overwhelming evidence of pervasive discrimination in all aspects of the employer's [hiring] practices, and that any application would have been futile and perhaps foolhardy"); *Yartzoff v. Thomas*, 809 F.2d 1371, 1374 (9th Cir. 1982) ("In unusual circumstances, failure to apply for a position may not vitiate a Title VII action. . . . The record in this case, however, to say the least, does not show that Yartzoff was discouraged from applying. He simply failed to do so.").

assert that taking the AT-SAT "indicat[es] their intent to apply for FAA ATC employment."  4th Am. Compl. ¶ 100; *id.* ¶ 105 ("[A]n AT-SAT score may serve as a proxy . . . for the student's intent to apply to the FAA to be accepted for ATC employment[.]").  This fails at the threshold because "intent to apply" is irrelevant, apart from the futility exception which Plaintiffs do not attempt to meet.  For a failure-to-hire claim (like a non-promotion claim) the individual must actually apply for the publically-announced vacancy.  *See, e.g.*, *Lathram*, 336 F.3d at 1089; *Kline*, 99 F. Supp. 3d at 4.  Plaintiffs have offered no legal justification that an abstract intent to apply is legally sufficient here.

Moreover, Plaintiffs' proposed inference that CTI students who took the AT-SAT before graduation is a "proxy" for intent to apply to a CTI-only vacancy, 4th Am. Compl. ¶ 105, is not entitled to a presumption of fact, even at this stage of the case, because it is implausible and unsupported.  *See Arpaio*, 797 F.3d at 19.  Plaintiffs have alleged no reasons why anyone who "intend[ed] to apply" would not in fact have applied to the next vacancy announcement in February 2014—the first announcement for inexperienced controllers that FAA had posted since September 2012.  *See supra* Table 1.  The low threshold of an application to a nationwide announcement suggests that these non-applicants in fact did not intend to pursue a controller career with FAA.

Furthermore, it is readily apparent that many individuals who take a pre-employment or pre-application test have not decided whether to apply for the position or academic program for which the test is a prerequisite.  *Cf.* Hr'g Tr. at 20:10-13, Sept. 13, 2019 (Court observing that "[j]ust because you took the test, that's as though you applied? That seems a stretch to me. People take tests all the time to go to graduate school and never decide to go for other reasons.").  For example, more than 100,000 people have taken the Law School Admission Test (LSAT) each year for decades, yet only about 50-60,000 students have applied to ABA approved law schools each

year;[13] and similar trends can be expected with the Graduate Record Examination (GRE),[14] Graduate Management Admission Test (GMAT),[15] Medical College Admission Test (MCAT),[16] and others.  Nor can one presume that passing the AT-SAT solidified that intent—or the class definition—where more than 90% of test takers received a passing score.  *See* Extension to Barrier Analysis at 6, 8.

Given the variety of two- and four-year degrees that are included in the CTI Program— from Applied Meteorology, to Airport Management, to Aviation Maintenance, to Professional Flight, *see* CTI Program Overview at 5—graduates may pursue any number of careers in addition to air traffic control.  Indeed, because Plaintiffs' class definition sweeps in most CTI graduates born after January 1983 who passed the AT-SAT and did not get a tentative offer for an FAA controller position, *see* 4th Am. Compl. ¶ 100, it inherently includes those who voluntarily pursued other careers before the 2014 changes which Plaintiffs challenge.[17]  And to the extent that the class definition is intended to model people who would have been eligible to apply for a new CTI-only vacancy announcement in 2014 (if FAA had not changed its hiring practice), Plaintiffs' model fails—by relying so heavily on AT-SAT passage, the class definition includes people who would

---

[13] *See* Law School Admission Council (LSAC), LSAT Trends: Total LSATs Administered by Admin & Year (link); LSAC, Admission Trends: ABA Applicants, Admitted Applicants & Applications (link).

[14] *See* ETS, A Snapshot of the Individuals Who Took the GRE General Test (July 2012-June 2017) (link) (more than 500,000 test takers annually).

[15] *See* Graduate Management Admission Council, GMAT Geographic Trend Report 2018 (link) (more than 250,000 people sat for the GMAT in FY 2017).

[16] *See* Ass'n of Am. Med. Colleges, Using MCAT Data in 2019 Medical Student Selection at 4 (link) (about 186,000 test-takers between 2015 and 2017).

[17] Indeed, the class definition appears to include someone born on or after January 28, 1983, who graduated from a two-year CTI program in 2004 and passed the AT-SAT at that time, but never applied for an FAA controller position and instead chose to pursue a different career for the entirety of the ten years that elapsed before FAA implemented a revised hiring policy in February 2014.

have been ineligible to apply.[18]  For all of these reasons, taking the AT-SAT does not turn all of the putative class members into *de facto* applicants.[19]

> iv.    Plaintiffs cannot evade their failure to allege a class-wide personnel action by claiming FAA "refused to accept the outcome of a race-neutral hiring process."

Plaintiffs cannot solve their failure to propose a class of applicants who were subject to a personnel action by characterizing FAA's 2014 changes to the controller hiring process as "refus[ing] to accept the outcome of a race-neutral hiring process solely because of the racial makeup of the successful applicants."  4th Am. Compl. ¶ 112.  This naked attempt to force this case into the mold of *Ricci v. DeStefano* conflicts with the legal principles in that case and the undisputed facts here.

In *Ricci*, the Supreme Court reiterated the appropriateness of modifying a selection process between rounds of employment actions to promote equal opportunity.  *See Ricci*, 557 U.S. at 585 ("Title VII does not prohibit an employer from considering, before administering a test or practice, how to design that test or practice in order to provide a fair opportunity for all individuals, regardless of their race.").  Employers must be able to assess and adjust their practices to ensure that "race is not a barrier to opportunity."  *Id.* at 580; *see also id.* at 585 ("Nor do we question an employer's affirmative efforts to ensure that all groups have a fair opportunity to apply for promotions and to participate in the process by which promotions will be made."); *Shea v. Kerry*,

---

[18] Those within Plaintiffs' class definition but ineligible for a CTI-only vacancy announcement include: (1) noncitizens, *see* 2007 AT-CTI SOP § 6(c); (2) those who would turn 31 before their entry-on-duty date at the FAA Academy, which would necessarily occur months after the job posting, *id.* § 6(d); (3) those who had graduated from a CTI program before February 2011 and had not applied to extend their eligibility, *id.* § 7(a)-(b).

[19] Plaintiffs gain no support from cases in which applicants were testers who did not plan to accept the position if it was offered.  *See, e.g.,* 4th Am. Compl. ¶¶ 11, 115.  These cases do not suggest that *non-applicants* have been discriminated against or subjected to an adverse employment action.

796 F.3d 42, 55 (D.C. Cir. 2015) (distinguishing *Ricci* on the ground that the "employers [in certain affirmative action cases] . . . did not *modify the outcomes of personnel processes* for the asserted purpose of avoiding disparate-impact liability under Title VII" (emphasis added)); *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 96 (2d Cir. 2013) (holding that plaintiff "cannot demonstrate that the generalized overhaul of departmental promotional requirements amounted to the sort of race-based adverse action discussed in *Ricci*").

And that is what FAA did here—rolling out a new hiring process after extensive analysis and immediately before a new vacancy announcement.  *See supra* Background § II.C; *cf. Maraschiello*, 709 F.3d at 96 ("Completing the last phase of a long-planned adoption of a new standard is a far cry from rejecting a set of results out of hand because of their racial makeup."). While those changes may have disappointed CTI students and graduates, they did not constitute rejection of the "outcome of a . . . hiring process."  4th Am. Compl. ¶ 112.  After all, Mr. Brigida did not apply to any vacancy announcement before 2014, nor does he seek to represent a class of applicants to pre-2014 vacancy announcements. [20]  Nor could Mr. Brigida press such a claim.[21]

---

[20] Plaintiffs have made clear that they are not alleging that pre-2014 *applications* provided any basis for the class definition in this case.  *See* Pls.' Reply in Supp. of Mot. for Class Cert. at 4-5, ECF No. 78 (declaring that the term "Qualified Applicant Register" did not refer to the "'referral lists' created after applicants responded to a specific vacancy announcement," and dismissing it as a "straw argument"). Regardless, none of the thousands of people remaining in the applicant pool in 2013 (only a fraction of whom may be class members), *see* 2013 Workforce Plan at 44, could consider themselves entitled to a promotion.  *Cf. Ricci*, 557 U.S. at 566 (addressing situation where 19 candidates were "eligible for an immediate promotion" due to the test results).  Instead, those applicants would have to be selected by a centralized panel and successfully pass an interview before receiving a tentative offer.  *See supra* Background § II.B.  Thus, in deciding to exclusively rely on the new announcement rather than the announcements from 2012 or earlier, FAA did not reject the outcome of its earlier hiring process.

[21] Mr. Brigida did not administratively exhaust any claim for the closure of pre-2014 applications.  *See Hamilton v. Geithner*, 666 F.3d 1344, 1349 (D.C. Cir. 2012) ("Government employees alleging discrimination in violation of Title VII . . . must exhaust administrative remedies before bringing their claims to federal court."); *Brooks v. District Hosp. Partners, L.P.*, 606 F.3d 800, 807 (D.C. Cir. 2010) (holding that people who did not exhaust administrative remedies may join the lawsuit of someone with exhausted claims only if the new claims "are so similar to those asserted by the original plaintiff that no purpose would be served by requiring them to file independent [EEO] charges"); *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994) ("Normally, an employee who was not aggrieved by a particular test or

Instead, he seeks to represent a class of those "eligible to apply for CTI-only job postings." 4th Am. Compl. ¶ 25. Because the class as a whole had not yet applied, there is no "outcome" of a hiring process to reject. *Shea*, 796 F.3d at 55. The mere fact that under FAA's pre-2014 policy CTI students took the AT-SAT and graduated on a rolling basis, *see supra* Background § II.B, does not require FAA to permit all CTI graduates who took that pre-employment test to apply under the old process.

Instead, FAA had to choose a point at which to begin implementing its revised process. *See, e.g.*, *Maraschiello*, 709 F.3d at 95-96 (finding no "race-based adverse action" where city did not make "its promotion decision from the 2006 list that included [plaintiff] but . . . instead chose to delay the appointment decision for a month in order to use the results of the new test," even if the "choice to adopt a new test was motivated in part by its desire to achieve more racially balanced results"). Choosing to draw that line at the beginning of 2014 did not give a claim to all prior CTI graduates. Unlike the promotion test in *Ricci*, for CTI students, the AT-SAT was merely a threshold requirement that almost everyone passed, and it was not the beginning of the application process, let alone dictating the outcome. CTI students who passed the AT-SAT and graduated from their CTI program still had to apply within the window of a new vacancy announcement,

---

hiring requirement lacks standing to challenge that test or requirement."). Mr. Brigida's administrative complaint contained no allegations regarding the closure of pre-2014 applications. *See* Exhibit 30, Brigida EEO Complaint (Apr. 14, 2014). Instead, he alleged that FAA "maintained an inventory of eligible CTI graduates," *id.* ¶ 100, who constituted a "direct hire pool," *id.* ¶¶ 12, 58-60, a factual claim which FAA debunked during class certification briefing, *see* ECF Nos. 75, 82, and which Plaintiffs have now abandoned. Accordingly, claims about prior announcements to which Mr. Brigida did not apply cannot grow out of his allegations. *See Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (holding that a federal lawsuit may only contains "claims that are like or reasonably related to the allegations of the [EEO] charge and growing out of such allegations"); *see also Crawford v. Duke*, 867 F.3d 103, 110 (D.C. Cir. 2017) (holding that plaintiff failed to exhaust promotion claim because a "fleeting and skeletal reference to temporary interference with the promotion process could not reasonably be expected to alert the Department to investigate the claim that Crawford was denied an unidentified promotion in favor of another unidentified individual").

meet all eligibility requirements, be picked by a centralized selection panel, and complete an interview before they could receive a tentative offer letter. *See supra* Background § II.B. By contrast, in *Ricci*, the test results made 19 specific individuals "eligible for an immediate promotion," 557 U.S. at 566, and "the City chose not to certify the examination results because of the statistical disparity based on race," *id.* at 579. Also unlike the promotion test abandoned in *Ricci*, FAA continued to use the AT-SAT under the 2014 Announcement, albeit only for those who passed the new Biographical Assessment. *See supra* Background § II.C.

In sum, Plaintiffs cannot be correct that the mere existence of the CTI program and its rolling set of new graduates constituted an "outcome" of a hiring process; otherwise, FAA could never revise its hiring process in light of observed barriers to equal opportunity but would be required to perpetually carry forward the CTI graduates' alleged "preference." Regardless, because *Ricci*'s analysis does not—and cannot—extend Title VII beyond "personnel actions" affecting employees and applicants, Plaintiffs' theory does not create a cause of action for the putative class they seek to represent.

For all of these reasons, Plaintiffs have failed to set forth a plausible class-wide Title VII claim because the putative class inherently includes individuals without a "personnel action" to challenge. Where that is so clear at the outset, the class claim should be dismissed for failure to state a claim. In addition, for reasons discussed below, the same defect precludes certification of a class under Rule 23.

### 2.    Plaintiffs Cannot Meet Rule 23's Requirements.

Because Plaintiffs have failed to allege a class-wide adverse employment action affecting applicants, they also cannot satisfy Rule 23 requirements. The same defects underscore that it would be futile to amend the class complaint in an effort to paper over this fundamental flaw in Plaintiffs' proposed class definition. These defects are plain from the face of the complaint and

Plaintiffs have refused to narrow their putative class to exclude non-applicants despite full class certification briefing and the Court's expression of concern on this very issue. Accordingly, the Court should deny Plaintiffs' motion to amend as "futile because a subsequent motion to certify the proposed class[] would be denied." *See Hilliard*, 2010 WL 11678002, at *2; *see also In re McCormick* & Co., 217 F. Supp. 3d at 144-45 (holding that courts "can dismiss class claims if factual variations among plaintiffs' experiences will prevent class certification," noting that if "predominance is not plausible, a Rule 12(b)(6) motion can be used to strike class allegations").

### i. *Plaintiffs' class definition is fatally overbroad.*

"Defining the class is of critical importance because, among other things, it identifies the persons entitled to relief and bound by a final judgment, and as a result, the definition must be precise, objective, and presently ascertainable." *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017). Courts in this district have rejected class definitions that include people who could not have been injured. *See Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017) ("[I]f the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad."); *see also Borum v. Brentwood Village, LLC*, 324 F.R.D. 1, 9 (D.D.C. 2018) (stating that due to plaintiff's overbroad definition "is impossible to tell . . . whether those individuals have any claims in common, as required by Rule 23(a)(2)"); *Thorpe v. Dist. of Columbia*, 303 F.R.D. 120, 141–42 (D.D.C. 2014) (assessing whether class definition was "fatally overbroad" by virtue of including individuals who had not plausibly suffered an injury). For the reasons discussed above, Plaintiffs' proposed class definition plainly sweeps in uninjured people.

> ii. *Plaintiffs cannot establish commonality or typicality for a class that inherently includes non-applicants.*

As the Supreme Court explained in *Wal-Mart Stores v. Dukes*, commonality under Rule 23(a)(2) requires not merely the literal raising of "common 'questions,'" but rather "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." 564 U.S. 338, 350 (2011); *see also D.L. v. Dist. of Columbia*, 713 F.3d 120, 125 (D.C. Cir. 2013). In other words, not only must the plaintiffs' claims depend on a "common contention," but that contention "must be of such a nature that it is capable of classwide resolution." *Wal-Mart,* 564 U.S. at 350. "A plaintiff seeking class certification is not required to prove the elements of his claim at the certification stage, but he must show that the elements of the claim are susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 491 (2013).

Plaintiffs plainly cannot meet this standard because the putative class inherently includes people who were not injured because they did not apply for the 2014 announcement. *See Wal-Mart*, 564 U.S. at 349-50 ("Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."). Indeed, by seeking to represent a group of individuals who merely *could have applied* under a competitive process, Plaintiffs fail to allege any cognizable basis by which all of these individuals necessarily suffered the same injury when the FAA changed its hiring procedures. Plaintiffs allege commonality on the ground that FAA's "decision to eliminate or purge the Qualified Applicant hiring preference . . . resulted in all members of the Class losing a hiring preference, even though they had graduated from a CTI school and passed the AT-SAT assessment." 4th Am. Compl. ¶ 101. But as discussed above, the hiring preference allegation appears to refer primarily to FAA's practice of issuing CTI-only announcements, and a decision not to issue a CTI-only announcement in 2014 could not have injured those who did not apply to the general public announcement that was available. *See supra* Arg. § I.A.1. Accordingly,

it is simply not the case that "class members have suffered the same injury." 4th Am. Compl. ¶ 101 (quoting *Moore v. Napolitano*, 926 F. Supp. 2d 8, 29 (D.D.C. 2013)).

For similar reasons, Plaintiffs—as unsuccessful applicants—cannot show that they have the "same interest and . . . same injury," *Council of & for the Blind of Delaware Cty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1544-45 (D.C. Cir. 1983), as absent class members who never applied or did not apply in 2014. They thus cannot meet Rule 23(a)(3)'s typicality requirement. *See Daskalea v. Washington Humane Soc.*, 275 F.R.D. 346, 358 (D.D.C. 2011) (denying certification for lack of typicality where "the members of the proposed class suffered a wide range of deprivations . . . and claim distinct injuries"); *Moore v. Napolitano*, 269 F.R.D. 21, 33 (D.D.C. 2010) (denying certification for lack of typicality where "[a] particular class member may not have suffered an injury at all, much less an injury typical of the injuries alleged by the class representatives."). Plaintiffs have failed to support their boilerplate legal conclusions that "all members of the putative Class were simultaneously harmed" and that "all prospective Class members suffered the same injury." 4th Am. Compl. ¶ 102. Indeed, because Plaintiffs have not alleged that the non-applicants were discriminatorily deterred from applying, they cannot rely on *International Brotherhood of Teamsters* to establish the predicate employment action. *See supra* Arg. § I.A.1.ii. But even if they could have alleged a plausible personnel action for these non-applicants, they would still have failed to meet the class action standard. The Supreme Court noted that, under Title VII, non-applicants bear the "not always easy burden of proving that [they] would have applied for the job had it not been for those [discriminatory] practices." *Int'l Bhd. of Teamsters*, 431 U.S. at 367-68. This creates an insurmountable problem for typicality here. *Cf. Moore v. Napolitano*, 269 F.R.D. 21, 33 (D.D.C. 2010) ("With no class representative who was deterred from ever bidding, there is every risk that the interests of the absent, wholly deterred

bidders would not at all stages of this litigation be equally advanced and protected by the merely deferred bidders.").[22]

> iii.  *Plaintiffs cannot show that the class is sufficiently homogenous or that common issues predominate where individualized inquiry is needed to determine whether each non-applicant was even injured.*

Plaintiffs assert that they are seeking certification "pursuant to Rules 23(b)(2) and 23(b)(3)." 4th Am. Compl. ¶ 100.  As constituted, the putative class is fatal to certification under either provision.

Plaintiffs' proposed class does not meet the requirement of Rule 23(b)(2) to show that final injunctive relief be "appropriate as to the class as a whole."  *See Wal-Mart*, 564 U.S. at 366 (for certification under Rule 23(b)(2), challenged conduct must be "such that it can be enjoined . . . only as to all of the class members or as to none of them").  The injunctions Plaintiffs seek simply do not apply to non-applicants.  *See* 4th Am. Compl. ¶ 116 & Prayer for Relief ¶ 2 (asking the Court to "give hiring preference to . . . putative Class members" and for an order to process "applications" and related matters that were "terminated, ignored, or otherwise neglected" when FAA made its 2014 policy changes).  *See D.L. v. Dist. of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) ("To certify a class under this provision, a single injunction must be able to 'provide relief to each member of the class.'" (quoting *Wal-Mart*, 564 U.S. at 360)).[23]

---

[22] While "typicality is ordinarily met if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct," *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019), typicality is "destroy[ed]" if "a distinction must differentiate the 'claims or defenses' of the representatives from those of the class."  *Id.* (quoting Fed. R. Civ. P. 23(a)(3)).  Thus Plaintiffs err in relying on the generality that typicality is satisfied where "each class member's claim arises from the same course of events that led to the claims of the representative parties."  4th Am. Compl. ¶ 102 (quoting *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 115 (D.D.C. 2007)).  Where much of the putative class are non-applicants, unlike Plaintiffs, that distinction destroys typicality.

[23] Nor does Rule 23(b)(2) "authorize class certification when each class member would be entitled to an individualized award of monetary damages."  *Wal-Mart*, 564 U.S. at 360-61.  *See* 4th Am. Compl. ¶ 118 & Prayer for Relief ¶ 3 (seeking "statutory damages and remedies").

Moreover, the commonality and typicality problems also preclude certification under Rule 23(b)(2). While Rule 23(b)(2) includes no explicit predominance or superiority requirements, this is because certification of a class under Rule 23(b)(2) is only appropriate where the satisfaction of those conditions is "self-evident." *Wal-Mart*, 564 U.S. at 363. Where a class is not "sufficiently cohesive" —where it lacks homogeneity—the legality of the behavior at issue cannot be settled with respect to the class as a whole, and certification under Rule 23(b)(2) is inappropriate. *See Lightfoot v. D.C.*, 273 F.R.D. 314, 329 (D.D.C. 2011). As explained above, *see supra* Arg. § I.A.1, Plaintiffs' proposed class encompasses individuals who could not have been harmed by the FAA's revised hiring process. Thus, the wide range of putative class members here lack cohesion and certification under Rule 23(b)(2) must be denied.

Plaintiffs have fallen even farther short of Rule 23(b)(3)'s requirements. As the D.C. Circuit has admonished, Rule 23(b)(3) demands that Plaintiffs "must . . . show that they can prove, through common evidence, that all class members were in fact injured," by a purported legal violation. *In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*In re Rail Freight I*"), 725 F.3d 244, 252 (D.C. Cir. 2013). Here, where it is clear that members of the putative class were not injured, Plaintiffs cannot show predominance. *See id.* at 252-53 ("Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact."); *id.* at 252 ("we do expect the common evidence to show all class members suffered some injury"). Indeed, even if Plaintiffs had alleged a plausible personnel action for non-applicants—and they have not— the need for such non-applicants to individually prove that they would have applied but for the alleged discrimination defeats predominance. *See Rodriguez v. U.S. Dep't of Transp.*, 131 F.R.D. 1, 7 (D.D.C. 1990) (holding "that the inclusion of deterred individuals would cause a shift in the litigation to predominately individual questions and render the case unmanageable"); *In re Rail*

36

*Freight I*, 725 F.3d at 252 ("When a case turns on individualized proof of injury, separate trials are in order.").  There is no viable way for Plaintiffs to work around this difficulty because it is inappropriate for a damages model to "detect[] injury where none could exist."  *In re Rail Freight I*, 725 F.3d at 252; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*In re Rail Freight II*"), 934 F.3d 619, 624 (D.C. Cir. 2019) (affirming district court's finding that common issues did not predominate where putative class included more than a *de minimis* number of members "with no common proof" of injury and causation, which are "essential elements of liability").

> iv.  *Plaintiffs have also failed to establish adequacy of representation due to their counsel's conflict of interests.*

Plaintiffs' motion should also be denied because it again fails to establish that they are adequate representatives of absent putative class members.  Rule 23(a)(4) provides that "one or more members of a class may sue or be sued as representative parties on behalf of all members only if . . . the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Where, as here, money damages are sought, this requirement has constitutional due process implications.  *See Cobell v. Salazar*, 679 F.3d 909, 922 (D.C. Cir. 2012).  Because absent class members will be bound by a final judgment when a class action is certified, courts are required to "undertake a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation."  *Nat'l Ass'n of Reg'l Med. Programs v. Matthews,* 551 F.2d 340, 344 (D.C. Cir. 1976).  The adequacy of representation inquiry concerns both the behavior of the class representatives and class counsel.  *See, e.g.*, *Twelve John Does v. Dist. of Columbia,* 117 F.3d 571, 575 (D.C. Cir. 1997).  This includes uncovering conflicts of interest that implicate class counsel's ability to vigorously prosecute the case on behalf of the whole class.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 & n.20 (1997).

A putative class counsel's conflicts of interest are fatal to class certification. *See, e.g., Lewis v. Nat'l Football League*, 146 F.R.D. 5, 11-12 (D.D.C. 1992). Here, putative class counsel Michael Pearson has a conflict of interest stemming from his decision to simultaneously prosecute an overlapping class action—*Johnson v. U.S. Dep't of Transp.*, No. 1:19-cv-1916 (RDM). In that case the proposed class is the approximately 25,000 people who took and were disqualified by the BA in 2014. Thus, each of the named Plaintiffs in this case is an absent class member in *Johnson*. And Lucas Johnson, the named plaintiff in that case, is a CTI graduate who comes within the class definition in this case.

A conflict of interest arises for a lawyer, "when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." *Cuyler* v. *Sullivan*, 446 U.S. 335, 356 n.3 (1980) (Brennan, J., concurring) (quoting with favor Canon 6 of the 1937 Canons of Professional Ethics). "Courts have consistently held that counsel cannot simultaneously represent a class and prosecute either individual or class claims against the same defendants in a different proceeding." 1 *McLaughlin on Class Actions* § 4:39 (15th ed. 2018). *See also* 5 *Moore's Federal Practice* § 23.120 (2018) ("An attorney who represents another class in an unrelated suit against the same defendant may not serve as class counsel."); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (citing *Moore's Federal Practice* with approval and finding conflict of interest where attorneys represented settlement class as well as individual clients with more favorable settlement); *In re Lorazepam & Chlorazepate Antitrust Litig.*, 205 F.R.D. 24, 28 (D.D.C. 2001) (noting possibility of "conflict stemming from Class Counsel's dual representation" that "could help the Court in evaluating the adequacy of representation of the class"). The mere appearance of conflict is a sufficient basis to deny certification. *See Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1465

(9th Cir. 1995) (responsibility to class members "does not permit even the appearance of divided loyalties of counsel").

This parallel litigation against the same defendant challenging the same set of policy changes from another angle creates a conflict of interest because the interests of the overlapping classes may not be aligned. *See Lou v. Ma Labs., Inc.*, No. 12-05409, 2014 WL 68605, at *1-2 (N.D. Cal. Jan. 8, 2014) (refusing to certify class where same firm represented another group of plaintiffs in parallel litigation against the same defendants). "The interests need not conflict directly, but the mere fact of adjusting or compromising legal tactics or arguments to accommodate both classes of plaintiffs obviously impairs counsel's use of independent professional judgment as to each class." *Moore v. Margiotta*, 581 F. Supp. 649, 653 (E.D.N.Y. 1984). Proposed class counsel may seek to simultaneously settle both cases, but settlement might not be in one or the other class's interest. *See Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 589-90 (W.D. Tex. 2002). Or tactical decisions in one case could harm the interests of clients in the other case. *See Moreno v. Autozone, Inc.*, No. C05-04432, 2007 WL 4287517, *15 (N.D. Cal. Dec. 6, 2007) ("[P]lacing a class at risk that its interests will be compromised for the benefit of parties in another action."); *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 679 (N.D. Ohio 1995) ("Every decision to hasten or delay the litigation on behalf of one set of plaintiffs could alternately harm or benefit the other set of plaintiffs."). Such considerations are relevant even if counsel has not yet taken a position contrary to the interests of the class. *See Sullivan v. Chase Inv. Serv., Inc.*, 79 F.R.D. 246, 258 (N.D. Cal. 1978).

Here, the conflict is evident. The *Brigida* class seeks a "hiring preference" for CTI graduates and the processing of CTI-only applications, *see* 4th Am. Compl. ¶ 116 & Prayer for Relief ¶ 2, which conflicts with the interests of the *Johnson* class, which is primarily made up of

unsuccessful general public applicants from 2014, who would be disadvantaged by a preference for CTI graduates.  Moreover, the incentive to adopt conflicting strategies is demonstrated by Mr. Pearson's vigorous efforts to keep the two class actions distinct, effectively giving himself (and the CTI graduates who unsuccessfully applied in 2014) two bites at the same apple.  *See, e.g.*, Pls.' Mem. in Supp. Mot. Class Cert. at 25-26, ECF No. 73-1; Pls.' Reply in Supp. Mot. Class Cert. at 16, 22, ECF No. 78; *see also* Pl.'s Opp'n to Mot. to Dismiss at 1, 5-7, ECF No. 26, *Johnson v. U.S. Dep't of Transp.*, No. 19-1916 (D.D.C.); Hr'g Tr. at 3:24-4:3, 5:4-6, Sept. 13, 2019.  Indeed, Mr. Pearson just withdrew the disparate treatment claim in *Johnson* in a transparent effort to decrease the legal and factual overlap between the cases and avoid *Johnson*'s reassignment to this Court under the related case rule.  *See* 2d Am. Compl. ¶¶ 154-61, ECF No. 36 in Case No. 19-1916 (D.D.C Nov. 26, 2019) (asserting only a "disparate impact" cause of action); Pl.'s Response to Defs.' Mot. for Related Case Designation at 9-10, ECF No. 35 in Case No. 19-1916 (D.D.C. Nov. 25, 2019).  Because similar strategic decisions are likely to occur in *Brigida*, Plaintiffs here have not demonstrated their adequacy so long as Mr. Pearson is a driving force behind the litigation. [24]

Accordingly, "[b]ecause plaintiffs have not proposed for consideration a class free of conflicts of interests, the representation as proposed is inadequate."  *Moore,* 269 F.R.D. at 35.

---

[24] These conflicts show that the presence of additional counsel in *Brigida* is not sufficient to ameliorate adequacy problem.  *See, e.g.*, *McLaughlin on Class Actions* § 4:39 (15th ed. 2018) (noting that "multiple, separate counsel jointly represent[ing] the class" can prevent disqualification "*absent an actual conflict*" (emphasis added)); *Wallace v. Powell*, No. 3:09-cv-286, 3:09-cv-0291, 3:09-cv-0357, 3:09-cv-0630, 3:09-cv-2535, 3:10-cv-1405, 2013 WL 2042369, *9 (M.D. Pa. 2013) (finding no conflict because all of the actions "appear to pursue the same goal").  *Cf.* Pls.' Reply on Mot. for Class Cert. at 16-17, ECF No. 78 (previously arguing that Mr. Pearson is "unhindered by his representation of a different class challenging different actions," because the potential conflicts are "purely hypothetical" and "multiple counsel will be representing and protecting the interests of the class.").

**B.      Plaintiffs' Failure to Cure the Deficiency of the Class Claim Weighs Against
         Postponing Disposition of Plaintiffs' Class Claim.**

In determining whether to grant leave to amend, courts not only consider futility of
amendment, but also other factors, including "undue delay, . . . repeated failure to cure deficiencies
by amendments previously allowed, [and] undue prejudice to the opposing party by virtue of
allowance of the amendment." *Barkley*, 766 F.3d at 38 (quoting *Foman*, 371 U.S. at 182). Here,
Plaintiffs' failure to cure deficiencies highlighted by Defendant and the Court over the past year
weigh strongly against permitting amendment. *See Nichols v. Holder*, 238 F. Supp. 3d 1, 12
(D.D.C. 2017) (denying leave to file third amended complaint because "amended pleading does
not cure—and, in fact, scarcely addresses—the shortcomings noted in the Court's prior opinion");
*Hudson v. Am. Fed'n of Gov't Emps.*, No. 17-1867, 2019 WL 3533602, at *5 (D.D.C. Aug. 2,
2019) ("It is well-established that the district court's discretion to deny leave to amend is
particularly broad where a plaintiff previously has amended the complaint.").

In December 2018, responding to Plaintiffs' motion for class certification under their Third
Amended Complaint, *see* ECF No. 73, Defendant pointed out numerous defects in Plaintiffs'
proposed class definition, including that "Plaintiffs' class includes putative members who never
applied for an air traffic control position and thus suffered no injury and have no colorable
entitlement to relief," Def.'s Opp'n to Motion for Class Certification at 1, ECF No. 75, that
"Plaintiffs identify no adverse employment action that can be attributed to the whole class," *id.* at
27, and that commonality was lacking because the putative class "includes those who had
submitted prior applications, those who applied for the first time after the policy change, and those
who never applied," *id.* at 25; *see also id.* at 30, 33, 39. Defendant reiterated those concerns in a
surreply and at oral argument. *See* Def.'s Surreply at 4-5, ECF No. 82; Hr'g Tr. at 31:23-35:25,
Sept. 13, 2019. The Court ultimately denied class certification without prejudice for several

reasons, including that "it's difficult to certify a class that includes individuals who voluntarily chose not to apply for a controller position or withdraw their application after successfully obtaining an offer."  Hr'g Tr. at 49:18-21, 50:9, Sept. 13, 2019; Minute Order, Sept. 13, 2019.

Thus, Plaintiffs' failure to proffer a class that resolves this fundamental defect is particularly egregious.  Having failed to meet the Rule 12 and 23 requirements despite a generous opportunity to do so, the Court should not give Plaintiffs yet another bite at the apple.  *See Nichols*, 248 F. Supp. 3d at 12 (concluding "that the ends of justice would not be served by simply repeating a process that has already failed to cure precisely the same deficiencies"); *Cheeks v. Fort Myers Constr. Corp.*, 218 F. Supp. 3d 146, 170 (D.D.C. 2016) (holding that because plaintiffs "have had more than their fair share of attempts to bring comprehensible and plausible claims against the defendants," they "do not get another bite at the apple"); *cf. Andy's BP, Inc. v. City of San Jose*, 605 F. App'x 617, 619 (9th Cir. 2015) (affirming denial of motion to amend because "Plaintiff failed to follow [district court's] instruction to show in the amended complaint that the gas stations are similarly situated").

### C.    The Court Should Not Permit Two Plaintiffs to Withdraw Subject to Another Motion to Amend After Class Certification Is Denied.

Plaintiffs offer no explanation for their proposal to withdraw Ms. Rebich and Mr. Douglas-Cook as named plaintiffs but retain them as proposed class representatives.  *Compare* 4th Am. Compl. ¶¶ 5-6; *with* 3d Am. Compl. ¶¶ 5-6.  There is no justification for this distinction.  Rule 23 requires that the representatives of a class be parties to the litigation.  *See* Fed. R. Civ. P. 23(a) (addressing the circumstances under which "[o]ne or more members of a class may sue or be sued as representative *parties* on behalf of all members"); *id.* Rule 23(a)(3) (requiring that the claims of "the representative *parties* are typical of the claims or defenses of the class"); *id.* Rule 23(a)(4) (requiring that "the representative *parties* will fairly and adequately protect the interests of the

class"); *id.* Rule 23(d)(1)(C) (permitting the court to "impose conditions on the representative *parties*"); *cf. Wal-Mart*, 564 U.S. at 349 ("Rule 23(a) ensures that the *named plaintiffs* are appropriate representatives of the class whose claims they wish to litigate." (emphasis added)).

Moreover, even if feasible, it would prejudice Defendant for these two individuals to proceed in this litigation only on behalf of the putative class, but later be afforded the opportunity to amend the complaint again to press "individual" claims. *See* 4th Am. Compl. at 1 n.1. *Cf. White*, 2019 WL 1440223, at *3-4 (acknowledging as "factors weighing against amendment" defendants' arguments that "they have been prejudiced by, inter alia, briefing multiple rounds of motions to amend, as well as the motion for class certification" including that the court's denial of the "motion for class certification without prejudice . . . may result in re-briefing"). Defendant is entitled to probe and defeat the individual claims of the putative class representatives from the outset of the litigation and should not be limited to some future point after class certification is finally denied. Nor should Plaintiffs be permitted to amend their complaint now in ways that will likely require additional amendments in the future.[25]

## II.   Alternatively, Plaintiffs' Class Claims Should Be Stricken.

In the alternative, the Court could strike the class claims pursuant to Federal Rule of Civil Procedure 12(f) and Local Rule 23.1(b) ("A defendant may move at any time to strike the class action allegations or to dismiss the complaint."). While denial of the motion to amend is preferred due to Plaintiffs' declaration that they seek further amendments once the class claims are dismissed, *see supra* Arg. § I.C; 4th Am. Compl. at 1 n.1, judicial economy and Defendant's

---

[25] We note that Plaintiffs have also suggested that they intend to seek amendment in the future to expand the class to include African American CTI graduates. *See* 4th Am. Compl. ¶ 100 n. 8. For all of the reasons noted by the Court, *see* Hr'g Tr. at 27:24-29:2, 49:13-17, Sept. 13, 2019, and in FAA's prior briefing, a class defined without regard to characteristics protected by Title VII is not viable. *See* ECF No. 75 at 21-22; ECF No. 82 at 7-9. Such further attempts to amend this action should not be encouraged.

interests could also be protected by striking the class claims. This approach would permit Plaintiffs to proceed on their individual claims under the restructured pleading, but preclude further litigation over Plaintiffs' plainly defective class allegations.

"The decision of whether to strike all or part of a pleading rests within the sound discretion of the Court." *Barnes v. Dist. of Columbia*, 289 F.R.D. 1, 6 (D.D.C. 2012). It is appropriate to "'eliminate class allegations,' in cases where 'a suit must proceed as a nonclass, individual action.'" *Artis v. Yellen*, 309 F.R.D. 69, 73 (D.D.C. 2015) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 183 n. 6 (1974)). While some courts in this district are cautious about "strik[ing] class allegations before there is a chance for discovery," it is clear that motions to strike can be granted without discovery when the complaint fails to "state[] a plausible claim for class-wide relief." *In re McCormick & Co.*, 217 F. Supp. 3d at 140.[26]

For all the reasons discussed above, Plaintiffs have failed to state a plausible claim for class-wide relief. Even if leveling the playing field for all applicants in advance of a new round of hiring could be deemed a violation of Title VII, Plaintiffs' refusal to limit the putative class to individuals who actually applied under the new hiring process precludes certification of a class in this case. Plaintiffs have been on notice of several defects in their proposed class definition since at least December 2018. *See* ECF No. 75. Yet, even when afforded the opportunity they have refused to address them all and have not put forward a putative class that could satisfy Rule 23's

---

[26] Indeed, numerous courts have held that it is appropriate to strike class allegations when, on the face of the complaint, it is clear that the no class can be certified. *See, e.g.*, *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946-50 (6th Cir. 2011); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1308 (11th Cir. 2008); *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007); *Kennedy v. Unumprovident Corp.*, 50 F. App'x 354, 355-56 (9th Cir. 2002); *Williams v. Potomac Family Dining Group Operating Co.*, LLC, No. GJH-19-1780, 2019 WL 5309628, at *4-5 (D. Md. Oct. 21, 2019); *Young v. Standard Fire Ins. Co.*, No. 2:18-CV-031-RMP, 2019 WL 4751856, at *6 (E.D. Wash. Sept. 30, 2019); *Fullerton v. Corelle Brands, LLC*, Nos. 18-cv-4152, 18-cv-4198, 2019 WL 4750039, at *14-15 (N.D. Ill. Sept. 30, 2019); *MSP Recovery Claims, Series LLC and Series 17-04-631 v. Plymouth Rock Assurance Corp.*, No. 18-cv-11702, 2019 WL 3239277, at *10-11 (D. Mass. July 18, 2019).

requirements. Accordingly, if the Court is inclined to allow Plaintiffs to amend their individual claims, FAA respectfully requests that the Court strike the class claims set out in the Proposed Fourth Amended Complaint, including paragraphs 99-109 and other references to the proposed class in the Claim for Relief and Prayer for Relief.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Leave to Amend the Complaint, or, alternatively, strike Plaintiffs' class claims.


DATED: November 27, 2019                JOSEPH H. HUNT
                                        Assistant Attorney General

                                        CARLOTTA P. WELLS
                                        Assistant Director
                                        Civil Division, Federal Programs Branch

                                        */s/ Galen N. Thorp*
                                        GALEN N. THORP (V.A. Bar No. 75517)
                                        Senior Counsel
                                        MICHAEL DREZNER (V.A. Bar No. 83836)
                                        Trial Attorney
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street NW
                                        Washington, DC 20530
                                        Telephone: (202) 514-4781
                                        Facsimile: (202) 616-8470
                                        Email: galen.thorp@usdoj.gov

                                        *Counsel for Defendant*