Zhonette M. Brown, D.C. Bar No. 463407
Brian Gregg Sheldon, CO Bar No. 51063, *pro hac vice*
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
zhonette@mslegal.org
brian@mslegal.org

Michael W. Pearson, D.C. Bar No. 997169
Curry, Pearson, & Wooten, PLC
814 West Roosevelt
Phoenix, Arizona 85007
(602) 258-1000
(602) 523-9000 (facsimile)
mpearson@azlaw.com

Attorneys for Plaintiffs and Putative Class Counsel

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDREW J. BRIGIDA, | |
| *Plaintiff*, | Civil Action No. 16-2227 (DLF) |
| v. | |
| ELAINE L. CHAO, Secretary, U.S. Department of Transportation, | |
| *Defendant.* | |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO AMEND AND RESPONSE IN OPPOSITION TO MOTION TO STRIKE

**Table of Contents**

INTRODUCTION ................................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ........................................... 3

STANDARD OF REVIEW .................................................................................... 5

    A.   Motions to Amend Pleadings ............................................................... 5

    B.   Motions to Strike Class Allegations ................................................... 7

ARGUMENT ......................................................................................................... 8

    I.    Amendment of Plaintiff Brigida's Non-Class Allegations Is Not Contested ......... 9

    II.   Members of the Class Suffered Adverse Employment Actions .......................... 10

        A.  Failure to Hire is An Adverse Employment Action ........................................ 11

        B.  Elimination of the Qualified Applicant Status Was an
           Adverse Employment Action ........................................................................ 12

           1.  Replacing a Hiring Preference for Skill, Training, and Aptitude
              With a Racial Preference is an Adverse Employment Action ................. 12

           2.  The FAA's Illegal Action is Not Protected by its Timing ....................... 15

           3.  The FAA's Assertions About the Existence and Effect of
              The CTI Hiring Preference and the Utility and Purpose of
              AT-SAT Testing Should be Tested in Discovery .................................... 18

    III.  The Amended Complaint Satisfies the Pleading Requirements of Rule 23 ......... 20

        A.  The FAA's Motion to Strike Procedurally Disfavored and Premature ........... 20

        B.  All Purposed Class Members Suffered a Title VII Injury .............................. 22

        C.  The Breadth of the Class Does Not Destroy Commonality or
           Typicality, Particularly for a Liability Determination and
           Declaration and Injunctive .......................................................................... 22

        D.  The *Johnson* Litigation Does Not Create a Conflict of Interest .................... 23

CONCLUSION ..................................................................................................... 25

# Table of Authorities

**Cases**                                                               **Page(s)**

*Baker v. D.C. Pub. Sch.*,
  720 F. Supp. 2d 77 (D.D.C. 2010) .................................................................. 5

*Banneker Ventures, LLC v. Graham*,
  798 F.3d 1119 (DC Cir. 2015) ....................................................................... 4

*Bauchman v. West High Sch.*,
  132 F.3d 542 (10th Cir. 1997) ...................................................................... 7

*Bode & Genier*,
  808 F.3d 852 (D.C. Cir. 2015) ..................................................................... 6

*Borum v. Brentwood Village, LLC*,
  324 F.R.D. 1 (D.D.C. 2018) .................................................................... 3, 13

*Bourdais v. City of New Orleans*,
  485 F.3d 294 (5th Cir. 2007) ...................................................................... 16

*Bourdais v. City of New Orleans*,
  No. CIV.A., 99-1434, 2005 WL 3801576 (E.D. La. Apr. 29, 2005) ............... 16, 17

*Branch v Spencer*,
  No. 16-1713 (TJK), 2019 WL 4277413 (D.D.C. Sep. 10, 2019)....................... 6

*Briscoe v. City of New Haven*,
  654 F.3d 200 (2d Cir. 2011).......................................................................... 18

*Burlington Indus., Inc. v. Ellerth*,
  524 U.S. 742 (1998) ............................................................................... 14, 15

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ...................................................................................... 13

*Bush v. Ruth's Chris Steak House*,
  277 F.R.D. 214 (D.D.C. 2011) ..................................................................... 6

*Canady v. Erbe Elektromedizin GmbH*,
  307 F. Supp. 2d 2 (D.D.C. 2004) ........................................................... 7, 21

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
  148 F.3d 1080 (D.C. Cir. 1998) ............................................................. 5, 6

*Casey v. Mabus*,
  878 F. Supp. 2d 175 (D.D.C. 2012) ........................................................... 13

*Cones v. Shalala*,
  199 F.3d 512 (D.C. Cir. 2000) .................................................................. 13

*Connecticut v. U.S. Dep't of the Interior*,
  363 F. Supp. 3d 45 (D.D.C. 2019) .............................................................. 5

*Cuyler v. Sullivan*,
  446 U.S. 335 (1980) .................................................................................... 24

*DL v. District of Columbia*,
  713 F.3d 120 (D.C. Cir. 2013) .................................................................... 3

*DL v. District of Columbia*,
  860 F.3d 713 (D.C. Cir. 2017) .................................................................... 3

*Doe v. McMillan*
  566 F.2d 713 (D.C. Cir. 1977) .................................................................... 6

*Douglas v. Donovan*,
  559 F.3d 549 (D.C. Cir. 2009) ................................................................... 13

## Table of Authorities

*Dukes v. Wal–Mart, Inc.*,
  509 F.3d 1168 (9th Cir. 2007) ................................................................................... 10
*Duling v. Gristed's Operating Co.*,
  265 F.R.D. 91 (S.D.N.Y. 2010) ..................................................................................... 6
*Firestone v. Firestone*,
  76 F.3d 1205 (D.C. Cir. 1996) ..................................................................................... 5
*Foman v. Davis*,
  371 U.S. 178 (1962) ..................................................................................................... 5
*Forkkio v. Powell*,
  306 F.3d 1127 (D.C. Cir. 2002) ................................................................................. 13
*Franklin-Mason v. Dalton*,
  No. CIVA962505(RWR/JFM), 2006 WL 825418 (D.D.C. Mar. 21, 2006) .......................... 22
*Franklin-Mason v. Dalton*,
  742 F.3d 1051 (D.C. Cir. 2014) ................................................................................. 22
*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147  (1982) ................................................................................................... 10
*Glassman v. Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996) ......................................................................................... 7
*Henderson v. Stanton*,
  Nos. 97-5358, 97-5359, 172 F.3d 919 (D.C. Cir. Dec. 1, 1998) ............................... 7
*Hutchinson v. Holder*,
  668 F. Supp. 2d 201 (D.D.C. 2009) ........................................................................... 14
*In re McCormick & Co., Inc.*,
  217 F. Supp. 3d 124, 140 (D.D.C. 2016) ............................................................ passim
*In re McCormick & Co, Inc. Pepper Prods. Mktg & Sales Practices*,
  MDL No. 2665, Misc. no. 15-1825 (ESH), 2019 WL 3021245 (D.D.C. Dec. 22, 2019)....... 2, 8
*In re Wal–Mart Stores, Inc. Wage & Hour Litig.*,
  505 F. Supp. 2d 609 (N.D. Cal. 2007) ......................................................................... 8
*Judicial Watch, Inc. v. U.S. Dept. of Commerce*,
  224 F.R.D. 261 (D.D.C. 2004) ..................................................................................... 9
*Koch v. White*,
  134 F. Supp. 3d 158 (D.D.C. 2015) ...................................................................... 7, 21
*Krueger v. Wyeth, Inc.*,
  310 F.R.D. 468 (S.D. Cal. 2015) ............................................................................... 10
*Lester v. Natsios*,
  290 F. Supp. 2d 11 (D.D.C. 2003) ............................................................................. 14
*Lewis v. Nat. Football League*,
  146 F.R.D. 5 (D.D.C. 1992) ....................................................................................... 24
*Little v. Washington Metropolitan Area Transit Authority*,
  No. CV 14-1289 (RMC), 2017 WL 7310147 (D.D.C. Dec. 7, 2017) ........................... 3
*Maraschiello v. City of Buffalo Police Dep't*,
  709 F.3d 87 (2d Cir. 2013) ................................................................................... 17, 18
*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ................................................................................................... 11
*Moore v. U.S.*,
  318 F. Supp. 3d 188 (D.D.C. 2018) ............................................................................. 8

### Table of Authorities

*Nwachukwu v. Karl,*
    216 F.R.D. 176 (D.D.C. 2003) .......................................................... 8
*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999) .......................................................... 24
*Otto v. Variable Annuity Life Ins. Co.,*
    98 F.R.D. 747 (N.D. Ill. 1983) .......................................................... 22
*Ricci v. DeStefano,*
    557 U.S. 567 (2009) .......................................................... 2, 18
*Russell v. Principi,*
    257 F.3d 815 (D.C. Cir. 2001) .......................................................... 15
*Smith v. Washington Post Co.,*
    962 F. Supp. 2d 79 (D.D.C. 2013) .......................................................... 7, 12, 21
*Sullivan v. Chase Inv. Servs. of Bos., Inc.,*
    79 F.R.D. 246 (N.D. Cal. 1978) .......................................................... 24
*Uzlyan v. Solis,*
    706 F. Supp. 2d 44 (D.D.C. 2010) .......................................................... 7, 21
*Wal-Mart Stores v. Dukes,*
    564 U.S. 338 (2011) .......................................................... 4, 22, 23
*Weber v. Battista,*
    494 F.3d 179 (D.C. Cir. 2007) .......................................................... 14
*Whittlestone, Inc. v. Handi-Craft Co.,*
    618 F.3d 970 (9th Cir. 2010) .......................................................... 7
*Wilson v. American Trans Air, Inc.,*
    874 F.2d 386 (7th Cir. 1989) .......................................................... 7

**Rules**

Fed. R. Civ. P. 15 .......................................................... 5, 10
Fed. R. Civ. P. 23 .......................................................... 10, 20, 22

**Other Authorities**

5C Charles A. Wright, et al, Federal Practice and Procedure § 1380 (3d ed. 2015) .................... 7
7AA Charles A. Wright, et al, Federal Practice and Procedure § 1785.3 (3d ed.) .................. 8, 22
1 McLaughlin on Class Actions § 4:39 (15th ed. 2018) .......................................................... 25

## INTRODUCTION

The Federal Aviation administration ("FAA") violated Title VII of the Civil Rights Act multiple times when it elevated race over job training, skills, and aptitude as hiring considerations. First, after encouraging candidates to attend and graduate from FAA-partnered schools, take FAA-approved courses, and complete and pass an FAA-designed aptitude test, in approximately January 2014 the FAA precipitously nullified Collegiate Training Initiative ("CTI") students' hard-earned qualifications specifically to make way for a race-biased hiring process. This action had material adverse consequences affecting future employment opportunities for the non-African American CTI students who had obtained "Qualified Applicant" status[1]—in other words, it was an adverse employment action. Second, in February 2014, the FAA implemented its race-biased, unvalidated biographical screening mechanism as a preliminary step in hiring Air Traffic Control Specialist ("ATCS") candidates. The non-African American Qualified Applicants who applied and "failed" the "biographical" screening mechanism suffered an adverse employment action. This case seeks justice for both Title VII violations.

The FAA's Motion to Strike[2] is premised on its argument that the proposed class is overbroad. Specifically, the FAA acknowledges that unsuccessful "applicants" state a claim, but argues "non-applicants" did not suffer an injury and have no claim. The FAA seeks partial summary judgment prior to any discovery, asking the Court to determine that "Qualified

---

[1] Plaintiffs define "Qualified Applicants" as someone who by January 27, 2014: (1) graduated from a CTI program that was approved by the FAA and (2) had passed the AT-SAT exam and who did not receive a tentative offer of employment letter from the FAA prior to March 23, 2015. Qualified Applicants do *not* include the few CTI graduates whose academic records as of January 27, 2014 explicitly stated that they were ineligible to receive a letter of recommendation from their CTI school or who by January 27, 2014 had aged out of eligibility for FAA ATCS employment.

[2] Def.'s Mot. to Strike, *Brigida et al. v. Chao*, 1:16-cv-2227-DLF (D.D.C. Nov. 27, 2019) (ECF No. 91) (hereinafter cited as "Def.'s Mot."). All ECF cites are to the electronic docket maintained in this case unless otherwise specified.

Applicants" could not have suffered an adverse employment action.  The FAA bears but cannot carry its burden to pre-emptively preclude nonapplicants from this lawsuit.  Discovery will prove that Qualified Applicants, as a matter of policy or as a matter of practice, were preferentially hired. This is borne out by the FAA's earlier statements that it desired to hire all qualified CTI graduates and by the FAA's Barrier Analysis and Extension Report (ECF No. 75-1)—the documents the FAA relies upon to justify its changed hiring methods.  Discovery will also show that the FAA eliminated the Qualified Applicant status because it was "too white," and that eliminating this status was a mere step on the way to a race-biased hiring process.  Finally, discovery will verify that the FAA's biographical screening was designed on a rush basis, with no valid testing, and with an intention of benefitting African American applicants over others.  These facts, and likely others, demonstrate the applicability of *Ricci* to this case, the inapplicability of cases where a hiring process improved as part of a well-studied and validated process, and that striking the Qualified Applicant status was in fact an adverse employment action.  *Ricci v. DeStefano*, 557 U.S. 567, 577 (2009).

Regardless of the ultimate outcome of the claims asserted for all Qualified Applicants, the FAA does not dispute that Qualified Applicants screened out by the "biographical" tool used in the 2014 hiring process have asserted failure to hire claims.  As a result, any concerns the FAA raises regarding commonality, typicality, and predominance are easily addressed.  For instance, one logical way to proceed would be to create the class, which includes all Qualified Applicants, to create a subclass that includes only the Qualified Applicants who applied to the 2014 ATCS job announcement, and to bifurcate the case so that the questions of liability and declaratory and injunctive relief are determined in the first phase of the case.  At that point the Court and the parties

will be able to evaluate whether individual claim forms, subclasses, or some other method is appropriate for resolving damages claims.

This jurisdiction's recently-decided class action cases demonstrate that class definitions evolve and that the FAA's motion to strike should be denied. In particular, in *In re McCormick & Co., Inc.*,[3] *Borum v. Brentwood Village, LLC*,[4] *D.L. v. District of Columbia*,[5] and *Little v. Washington Metropolitan Area Transit Authority*,[6] initially proposed classes were revised and approved. In these cases, revisions made to class definitions, the creation of subclasses, or some combination of each resolved asserted commonality, typicality and adequacy issues. Here, Plaintiffs' proposed class is not overbroad, but even if it were, it is far too early to strike all class allegations and force dozens of individual plaintiffs to litigate separate cases with potentially conflicting outcomes. The FAA's Motion to Strike should be denied and this case should proceed with discovery, class certification, and ultimately trial.

## BACKGROUND AND PROCEDUAL HISTORY

The lengthy background section in the FAA's Motion to Strike is largely irrelevant. For instance, the FAA points out the number of ATCSs employed, the number of ATC facilities, the number of CTI schools, the various options for CTI degrees, the opportunities along the way to fail and not become a certified controller, and so on. Def.'s. Mot. at 3–7. This appears to be

---

[3] *In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 140 (D.D.C. 2016), *amended on reconsideration sub nom. In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 218 (D.D.C. 2017); *subsequently aff'd* MDL No. 2665, Misc. no. 15-1825 (ESH), 2019 WL 3021245 (D.D.C. Dec. 22, 2019) (granting class certification in part).
[4] *Borum v. Brentwood Village, LLC,* 324 F.R.D. 1 (D.D.C. 2018).
[5] *D.L. v. District of Columbia,* 713 F.3d 120, 125 (D.C. Cir. 2013) (vacating class certification and remanding for further proceedings), *aff'd* 860 F.3d 713 (D.C. Cir. 2017) (affirming class certification).
[6] *Little v. Washington Metro. Area Transit Auth.*, No. CV 14-1289 (RMC), 2017 WL 7310147 (D.D.C. Dec. 7, 2017) (granting preliminary approval of proposed class action settlement), *aff'd* 313 F. Supp. 3d 27 (D.D.C. 2018) (granting motion to approve settlement).

provided to subtly invoke the reasoning of *Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011), and imply that there are so many variables, there cannot be commonality. Such argument is misplaced. Here, Plaintiff Brigida does not challenge thousands, hundreds, or even dozens of individual employment decisions made by different decision makers. Rather, Plaintiff Brigida challenges the uniform policy decision to strike the consideration of his qualifications and replace such consideration with race-biased screening.

Likewise, the possibility that applicants may not pass OPM screening, graduate from the FAA Academy, or achieve certified status, while perhaps shaping ultimate damages classes, is irrelevant to questions of liability and declaratory relief. Plaintiffs challenge not only their failure to be hired after the 2014 job announcement, but the delay in the resolution of their FAA employment and the harm that resulted from the elimination of Qualified Applicant status.

In any event, Plaintiff Brigida objects to consideration of the FAA's characterization of its selection and use of hiring methods, of the facts related to its "Revised Hiring Process," Def.'s Mot. at 5, 9-11, and of Defendant's Exhibits 2–4, which purportedly serve as a justification for the changed hiring policy. Plaintiffs' Fourth Amended Complaint (ECF No. 87-1) explains the background, reasoning behind, and impact of the "Revised Hiring Process," including the discriminatory intent behind the Barrier Analysis and Extension Report. Fourth Am. Compl. ¶¶ 30-41. These allegations must be taken as true at this stage of the proceedings despite whatever exculpatory language the FAA may have planted in these documents. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1132-34 (D.C. Cir. 2015) (rejecting defendant's argument that report referenced in complaint was "adopted *in toto*" by the plaintiff and refusing to consider entire report attached to motion to dismiss where report was referenced in complaint for a limited purpose and reliability of the report was unknown). It is noteworthy, however, that the FAA's explanation for

the "Revised Hiring Process" rings with the sound of an effort to provide a legitimate, non-discriminatory reason for the FAA's facially discriminatory actions.

As to procedural history, the FAA's motion drastically underplays the differences between the Third (ECF No. 68) and Fourth Amended Complaints. The class proposed in the Fourth Amended Complaint: (1) no longer incorporates the term "Qualified Applicant Register", which the FAA previously purported not to exist or to be ascertainable; (2) resolves any ambiguity regarding the role of actual or potential letters of recommendation in the class definition; (3) removes from the class definition considerations that would not arise until after a tentative offer letter was issued, such as compliance with OPM job requirements; (4) identifies the class of the harmed and benefitted groups and describes Plaintiff Brigida and the proposed class representatives as belonging to the harmed protected class; and (5) removes from the class those who received a tentative offer letter after the 2014 job announcement and so arguably suffered no harm. These changes are substantial and should not be minimized.

## STANDARD OF REVIEW

### A.   Motions to Amend Pleadings

Federal Rule of Civil Procedure 15 specifies that "[t]he court should freely give leave [to amend] when justice so requires;" a mandate this Court and circuit have regularly recognized. *See Baker v. D.C. Pub. Sch.*, 720 F. Supp. 2d 77, 81 (D.D.C. 2010) (quoting *Firestone v. Firestone,* 76 F.3d 1205, 1208 (D.C. Cir. 1996) and citing *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1083 (D.C. Cir. 1998)). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Baker*, 720 F.Supp. 2d at 81 (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962)); *see Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 54 (D.D.C. 2019).

Accordingly, reason to deny an amendment has been limited to extraordinary circumstances, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Connecticut*, 363 F. Supp. 3d at 54; *accord Bode & Grenier*, 808 F.3d 852, 860 (D.C. Cir. 2015) (citing *Firestone,* 76 F.3d at 1208); *Baker*, 720 F.Supp. 2d at 81 (citing *Firestone,* 76 F.3d at 1208 and *Caribbean Broad. Sys.,* 148 F.3d at 1083). No such reason is present here.

Notably, cases cited to by the FAA demonstrate that Plaintiff Brigida's Motion for Leave to Amend is timely and ought to be granted. In *Bush v. Ruth's Chris Steak House*, this Court allowed the plaintiff to amend the underlying complaint to add class allegations because that amendment was sought within the time permitted by the court's scheduling order. 277 F.R.D. 214, 216–17 (D.D.C. 2011); Def.'s. Mot. at 18. The FAA also cites *Duling v. Gristede's Operating Co.*, which stands for the same proposition. 265 F.R.D. 91, 105 (S.D.N.Y. 2010); Def.'s. Mot. at 17, n. 6. The case before this Court is still more nascent procedurally than the cases cited by the FAA, as there is not yet even a scheduling order in place.

Further, a number of the cases cited to by the FAA are irrelevant to the timeliness inquiry. For example, in *Bode & Grenier*, the D.C. Circuit denied a plaintiff's attempt to amend the complaint after summary judgment briefing was finalized and only days before trial. 808 F.3d at 860. In *Branch v. Spencer*, this Court denied a plaintiff's amendment attempted ten months after summary judgment briefing. No. 16-1713 (TJK), 2019 WL 4277413, at *4 (D.D.C. Sep. 10, 2019). Additionally, in *Doe v. McMillan*, the D.C. Circuit approved denial of a plaintiff's attempt to amend the complaint after the case had already been appealed to the U.S. Supreme Court. 566 F.2d 713, 720 (D.C. Cir. 1977).

The parties agree that when determining futility of a proposed amendment, this Court imports the standard applied under Rule 12(b)(6), yet the FAA effectively pursues summary judgment. The FAA motion consists of 45 pages and cites to 30 exhibits constituting hundreds of pages of alleged evidence with disputed interpretations. This is not a Rule 12(b)(6) analysis. This Circuit has explicitly recognized that summary judgment does *not* provide the "appropriate standard for determining whether an amendment would be futile" in situations where "discovery has not occurred and no summary judgment motion is pending." *Henderson v. Stanton*, Nos. 97-5358, 97-5359, 172 F.3d 919, at *2 (D.C. Cir. Dec. 1, 1998) (citing *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir. 1996); *Bauchman v. West High Sch.,* 132 F.3d 542, 546, 561 (10th Cir. 1997); and *Wilson v. American Trans Air, Inc.*, 874 F.2d 386, 392 (7th Cir. 1989)). Plaintiffs object to this premature summary judgment process and renew their request for discovery (ECF No. 89).

### B. Motions to Strike Class Allegations

The Court's approach in deciding a motion to strike class allegations is informed by "[t]wo fundamental principles." *Smith v. Washington Post Co.*, 962 F. Supp. 2d 79, 89 (D.D.C. 2013). "First, a motion to strike is a disfavored, drastic remedy, . . . and courts favor an adjudication on the merits . . . ." *Id.* at 89–90 (citing *Uzlyan v. Solis*, 706 F. Supp. 2d 44, 51 (D.D.C. 2010) and *Canady v. Erbe Elektromedizin GmbH*, 307 F. Supp. 2d 2, 8–9 (D.D.C. 2004)); *see also Koch v. White*, 134 F. Supp. 3d 158, 164 (D.D.C. 2015) ("[Rule 12(f)] is not 'a proper way to procure the dismissal of all or a part of a complaint' based on the legal insufficiency of the pleading.") (quoting 5C Charles Alan Wright et al, Federal Practice and Procedure §1380 (3d ed. 2015) and citing *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974–75 (9th Cir. 2010)).

"Second, courts rarely grant motions to dismiss or strike class allegations before there is a chance for discovery." *Washington Post*, 962 F. Supp. 2d at 90 (citing *In re Wal–Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007) ("[C]ourts . . . have made clear that dismissal of class allegations at the pleading stage should be done rarely and that the better course is to deny such a motion because the shape and form of a class action evolves only through the process of discovery.") (internal quotation and citation omitted) *and* 7AA Charles Alan Wright et al, Federal Practice and Procedure §1785.3 (3d ed. 2005) ("[C]ourts frequently have ruled that discovery relating to the issue whether a class action is appropriate needs to be undertaken before deciding whether to allow the action to proceed on a class basis.")); *see also In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 140 (D.D.C. 2016), *amended on reconsideration* 275 F. Supp. 3d 218 (D.D.C. 2017) (quoting *Washington Post Co.*, 962 F. Supp. 2d at 90–91). In *McCormick*, this Court also refused to strike allegations "for which it does not yet know if grouping is possible" given that "class claims should not be dismissed if it is possible that the plaintiffs could demonstrate a manageable grouping . . . ." 217 F. Supp. 3d at 141–42. After the *McCormick* class survived a motion to strike in 2016, plaintiffs proposed alternative formulations of classes—some formulations with multi-jurisdiction claims and other formulations with single state jurisdiction claims—and class certification was granted for some classes. *See In re McCormick & Co, Inc. Pepper Prods.*, No. MC 15-1825 (ESH), 2019 WL 3021245 (D.D.C. 2019 July 10, 2019).

Finally, when this Court considers a motion to strike, it "draw[s] all reasonable inferences in the pleader's favor and resolve[s] all doubts in favor of denial of the motion to strike." *Moore v. U.S.*, 318 F. Supp. 3d 188, 191 (D.D.C. 2018) (citing *Nwachukwu v. Karl*, 216 F.R.D. 176, 178 (D.D.C. 2003)) (citations omitted); *see Bush*, 277 F.R.D. at 216–17 (applying a plausibility standard to the proposed amendment to add class allegations, resolving ambiguities in favor of

plaintiffs, and refusing to weigh the merits of the parties' argument at this stage). Thus, given how disfavored motions to strike in this context are, the proponent carries "a formidable burden." *Judicial Watch, Inc. v. U.S. Dept. of Commerce*, 224 F.R.D. 261, 264 (D.D.C. 2004) (granting motion to strike declaration "under Rule 12(f), as containing immaterial, impertinent and scandalous statements," as well as under Rule 56(e) for "containing hearsay and opinion statements").

## ARGUMENT

**I.    Amendment of Plaintiff Brigida's Non-Class Allegations Is Not Contested.**

Plaintiff Brigida's proposal to amend his non-class allegations appears to be undisputed and should be granted. While Plaintiff Brigida's substantive claims remain generally unchanged, the proposed Fourth Amended and Supplemental Class Action Complaint represents a substantial revision of the prior complaint, with very few paragraphs left unchanged. The Fourth Amended Complaint clarifies the protected class harmed by the FAA's discrimination, Fourth Am. Compl. ¶ 102, Plaintiff Brigida's membership in that class, *Id.* ¶ 103, and the class that was meant to be benefitted by the FAA's unlawful conduct, *Id.* ¶ 109.

The FAA acknowledges that Plaintiff Brigida was an "applicant," no matter how that term is defined for purposes of this case, Def.'s Mot. at 1, that Plaintiff Brigida "failed" the FAA's biographical screening,  Def.'s Mot. at 16, precluding him from being hired as an ATCS, and that Plaintiff Brigida had satisfied the criteria that would have allowed him to apply for a CTI job announcement had one been posted in 2014, Def.'s Mot. at 38. Indeed, the FAA proposes striking the class allegations and allowing Plaintiff Brigida to proceed with individual claims.  Def.'s Mot. at 3, 48, 49. As the FAA articulates no objections to amendment of the non-class allegations, the appropriateness of these amendments is conceded.

9

As to putative class representatives Rebich and Douglas-Cook, the FAA's objections to their roles is of no consequence at this stage. Ms. Rebich and Mr. Douglas-Cook consent to remain in the class as full parties so long as the FAA is not going to use their roles to yet again delay discovery. If, however, the FAA seeks to prevent discovery while it challenges their individual claims, then they will move to withdraw from this case without prejudice. Regardless, a full scheduling order will eventually be entered in this case and that order will include a deadline for the date by which any other parties shall be joined or the pleadings amended. Should the class allegations be struck or the class denied, additional plaintiffs will seek to be added to this case.[7]

## II.    Members of the Class Suffered Adverse Employment Actions.

All of the putative class members suffered an adverse employment action. Many class members, including Plaintiff Brigida and proposed class representatives Rebich and Douglas-Cook, suffered the FAA's failure to hire them after they "failed" a race-biased biographical screening. The failure to hire based on discriminatory reasons or methods is an archetypical Title VII adverse employment action.

Further, all class members suffered an adverse employment action when the FAA—who had encouraged class members to attend and invest their time and money in the CTI schools, and

---

[7] To that end, the FAA's claims that the agency will somehow be prejudiced by the possibility of an enlarged class and/or by the change of Ms. Rebich and Mr. Douglas-Cook from plaintiffs to class representatives is unpersuasive. *See* Def.'s Mot. at 42-43. The FAA's piecemeal references to the plain language of Rule 23 should be weighed against the plain language of Rule 15 and interpreting case law, which makes clear that amendment to leave must be "freely granted" when justice requires. Moreover, the actual harm alleged by the government—namely, the risk of future amendment to include more class members—is not cognizable. It is axiomatic in class action lawsuits that the class definition may morph over time between the certification, liability, and damages stages. *See Krueger v. Wyeth, Inc.*, 310 F.R.D. 468, 473–74 (S.D. Cal. 2015) (holding that "courts retain discretion to revisit class certification throughout the legal proceedings, and may rescind, modify, or amend the class definition in light of subsequent developments in the litigation.") (citing Fed. R. Civ. P. 23(c)(1)(C); *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147 160 (1982); and *Dukes v. Wal–Mart, Inc.,* 509 F.3d 1168, 1176 (9th Cir. 2007)).

who had "partnered" with the CTI schools and repeatedly validated and administered the AT-SAT test—suddenly stripped the class members of what would otherwise have been their "Qualified Applicant" status.  The FAA coyly argues that Title VII "protects equal treatment, not preferential treatment." Def.'s Mot. at 19.  This argument, however, pointedly disregards that the FAA's hiring "preference" shifted from a preference for validated evidence of skill, training, and aptitude, the sort of guideposts Title VII is meant to encourage, to a preference for a particular race, the type of partiality Title VII prohibits.  Additionally, in consideration of the effort CTI students devoted to career steps the FAA recommended and administered, those students who became "Qualified Applicants" were more than just prospective candidates and were in fact harmed by the FAA's hiring changes.  It would be unjust and contrary to the spirit of Title VII for this race-motivated hiring decision to be considered anything other than an adverse employment action.

### A.  Failure to Hire Is an Adverse Employment Action.

Plaintiff Brigida challenges the full scope of the FAA's unlawful discrimination against him, including his non-selection during the hiring process, which is undisputedly an adverse employment action.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also* Fourth Am. Compl. ¶¶ 76–87.  From at least 2012 through early 2014 the FAA intentionally made hiring decisions that prioritized race over job training, aptitude, and experience.  For Plaintiff Brigida and thousands of other individuals, this process culminated when they applied for ATCS positions in 2014 and were rejected for "biographical" reasons.

The Fourth Amended Complaint is replete with references not just to the striking of Plaintiffs' qualifications, but with the objective and result of race-biased hiring.  The Complaint objects to the "race-based hiring decisions inflicted by the FAA" and asserts that Plaintiffs were "harmed by the FAA's race-based hiring and employment decisions."  Fourth Am. Compl. at 2–

3; *Id.* ¶¶ 56, 101, 107.  The Complaint further alleges that the FAA "[s]lowed its hiring in 2012-2013 in anticipation of abandoning the Qualified Applicant preference and adopting a new, yet to be determined hiring process that would favor African-Americans." Fourth Am. Compl. ¶ 30. The FAA simultaneously announced the elimination of the Qualified Applicant status and the introduction of biographical screening.  Fourth Am. Compl. ¶¶ 36–38.  The Complaint challenges the validity of the biographical questionnaire, asserting that the test was not validated and was intended and implemented to provide better scores to African-Americans.  Fourth Am. Compl. ¶ 40.  Summarizing these allegations, the Complaint alleges that "the FAA eliminated the CTI program's merit-based hiring preference in favor of implementing a race-skewed screening mechanism, which resulted in Plaintiff Brigida and other putative Class Members losing their employment preference *and opportunity*."  Fourth Am. Compl.  ¶ 41 (emphasis added).  Finally, Plaintiffs' claim for relief states that the FAA "intentionally discriminated against Plaintiff Brigida and other putative Class members and violated Title VII…by refusing to consider for hiring and/or refusing to hire qualified applicants because of those applicants' race."  Fourth Am. Compl. ¶ 115.

In short, Plaintiff Brigida seeks justice for the entire span of the FAA's unlawful discrimination.  The FAA's Motion to Strike is premised on the theory that only those people who actually applied to the 2014 job opening and were rejected on the basis of the biographical questionnaire suffered any cognizable injury.  These actual applicants are part of the class as defined, have asserted *prima facie* claims, and should be able to pursue their claims, with class discovery and certification briefing.  As this Court previously noted, "courts rarely grant motions to dismiss or strike class allegations before there is a chance for discovery and refuse to grant motions to dismiss when the complaint states a plausible claim for class-wide relief."  *McCormick*, 217 F. Supp. 3d at 140 (citing *Smith*, 962 F.Supp.2d at 90–91) (internal quotations omitted).  Here

the FAA carefully couches its objections based on the alleged failure of "the putative class as a whole," Def.'s Mot at 1, 2, 18, 31, but nowhere argues that the non-African American Qualified Applicants actually screened out by the 2014 "biographical questionnaire" fails as a subclass. As such, this class of applicants should proceed. *See Borum*, 324 F.R.D. at 8 (dividing original class definition into two subclasses, granting certification for one subclass but not the other).

B.    **Elimination of the Qualified Applicant Status Was an Adverse Employment Action.**

1.    **Replacing a Hiring Preference for Skill, Training, and Aptitude with a Racial Preference is an Adverse Employment Action.**

The FAA committed an adverse employment action when it stripped CTI students of their "Qualified Applicant" status and the associated recognition of job-related qualifications as a stepping-stone to instituting a race-biased hiring screen. A Title VII employment action includes the suffering of "materially adverse consequences affecting the terms, conditions, or *privileges* of employment or *future employment opportunities* such that a reasonable trier of fact could find objectively tangible harm." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (emphasis added) (citing *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C. Cir. 2002)). In various circumstances adverse employment actions include being denied the opportunity to compete for a position, being denied training opportunities, being denied supervisory opportunities, receiving a "lateral" assignment, or even receiving an adverse performance review, all in part because they can affect future employment opportunities. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (whether a reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question); *Douglas*, 559 F.3d at 552 (being "denied the opportunity to compete for a promotion"—let alone not receiving the promotion—means that a claimant has "suffered an adverse employment action; we do not inquire whether she would have received the position but for the discrimination.") (citing *Cones v. Shalala,* 199 F.3d 512 (D.C. Cir. 2000); *Casey v. Mabus*,

878 F. Supp. 2d 175, 184 (D.D.C. 2012) (quoting *Lester v. Natsios*, 290 F.Supp.2d 11, 29 (D.D.C. 2003) (to inflict objectively tangible harm, the "denial of a training opportunity" must cause a "material change in [one's] employment conditions, status or benefits.")); *Hutchinson v. Holder*, 668 F. Supp. 2d 201, 216–17 (D.D.C. 2009) (when a negative "evaluation determines some objectively tangible benefit or consequence, it may constitute an adverse employment action.") (citing *Weber v. Battista,* 494 F.3d 179, 185–86 (D.C. Cir. 2007) (performance evaluation that resulted in loss of performance award was adverse); and *Douglas,* 559 F.3d at 553 ("If [an] evaluation determines [a] bonus ... then the employee may show the evaluation caused an objectively tangible harm.")).

In this case, Qualified Applicants invested time, effort, and money into their ATCS training and passing the AT-SAT test.  Further, due to the nature and timing of ATCS hiring, the Qualified Applicants were often forced to temporarily take other jobs while they waited for an ATCS opening and then selection, purposefully but hopefully stalling their careers as they waited.  They made these decisions at the encouragement[8] of the FAA, including the FAA's representation that CTI programs or the military were the best ways to be hired as an ATCS and that the FAA desired to hire all qualified graduates of the CTI program.  Fourth Am. Compl. ¶ 18; Hr'g Tr. 5:14-24.  Then, just as they were anticipating the first job opening in over a year, the FAA announced that their education, training, and aptitude were no longer primary considerations and they would only be considered if they matched a desired "biographical" profile.  *See* Fourth Am. Compl. ¶ 37.  In

---

[8] Contrary to the FAA's assertion that Plaintiffs' Fourth Amended Complaint is not well-plead on this point, Plaintiffs point to Exhibit 2 to their previous motion for class certification (ECF No. 73-3).  This contained screenshots of the FAA's website concerning the CTI program and states, *inter alia*, that "[t]he FAA hopes to employ *all* eligible AT-CTI graduates" for ATCS positions.  ECF No. 73-2 at 3 (emphasis added).  Thus, the FAA actively encouraged would-be ATCS hires to participate in the CTI program.

these circumstances, the loss of the Qualified Applicant hiring status is a measurable, materially adverse consequence. It is not merely some subjective sense of being "unhappy," *Russell v. Principi,* 257 F.3d 815, 818 (D.C. Cir. 2001), but a "tangible employment action [that] inflicts direct economic harm." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 762 (1998).

Further, the FAA's effort to set up and destroy straw men and assertion of counter-factual hypotheticals demonstrates the weaknesses of the FAA's arguments in the face of the actual facts of this case. For example, the FAA mischaracterizes Plaintiffs' arguments, asserting that "Plaintiffs believe that CTI graduates are inherently entitled to special treatment as compared to general public applicants." Def.'s Mot. at 20. That is false. The Plaintiffs believe that all ATCS candidates should be evaluated on the basis of job qualifications and training, not on the basis of biographical screening. In similar fashion, the FAA argues that striking the Qualified Applicant status would not have been subject to challenge if the FAA had simply opened a general public announcement as it had in the past. Def.'s Mot. at 22. But that is not what happened. What happened, is that the FAA put a downward weight on non-African American CTI students and other applicants. The active, intentional conversion of a positive hiring consideration to a negative hiring consideration for the purposes of advancing discrimination is illegal under Title VII. The FAA also asserts that "Title VII does not permit *everyone* to challenge a federal agency's policies, but only 'employees or applicants' who are affected by a 'personnel action'. . ." Def.'s Mot. at 20 (emphasis added). The Qualified Applicants, however, are not "everyone." They are a small, identifiable group of people who participated in becoming prequalified under the FAA's guidance for an FAA position. They invested, had something to lose, and lost their pre-qualified status when the FAA chose race as the preliminary screening tool for hiring.

## 2.  The FAA's Illegal Action is Not Protected By its Timing.

The illegality of the FAA's discrimination is not shielded by its timing.  The FAA seeks to avoid Title VII scrutiny by arguing that it simply engaged in "a change of practice, not a personnel action" or "a process change before a subsequent round of hiring." Def.'s. Mot. at 1, 20.  This, the FAA asserts, cannot be an adverse employment action "in the absence of a vacancy announcement."   Def.'s. Mot. at 20.  The FAA also seeks to protect the elimination of Qualified Applicant status by divorcing the act from the motive.  Def.'s Mot. at 19 ("a process change withdrawing preferential treatment for future selections does not readily satisfy Title VII's adverse action or discrimination elements").   While the FAA is engaging in a time-honored tradition of trying to isolate and sterilize each individual action it took, such isolation and sterilization are contrary to the actual facts underlying this case, as encapsulated in the allegations in the Complaint and must fail.  The Complaint explains the FAA's unified campaign between 2012 and 2014 to eliminate qualification-based hiring *in favor of* race-based hiring.  *See* Fourth Am. Compl. ¶¶ 42–56.  The FAA intentionally avoided issuing a vacancy announcement in 2013, while it attempted to lay the groundwork for its desired discriminatory process.  *See* Fourth Am. Compl. ¶¶ 30–37 (citing the Teixeira e-mail (ECF No.87-6)).  Further, the FAA simultaneously announced the implementation of the "biographical" considerations and its de-emphasis of objective job qualifications.  Fourth Am. Compl. ¶¶ 37–38.  The FAA did not merely change its hiring process, it abandoned qualifications specifically to prioritize race.

Moreover, the Qualified Applicants here are distinguishable from the partially qualified plaintiffs dismissed from *Bourdais v. City of New Orleans*, 485 F.3d 294, 300 (5th Cir. 2007).  Def.'s. Mot. at 21.  *Bourdais* and other related cases established the liability that arose from New Orleans implementing a quota system for hiring firefighters.  *Id.* at 297.  Similar to this case, before the quota system, applicants were hired based on the results of their pre-qualification tests.  *Id.*

Eventually the city disrupted the qualifications-based hiring to implement a quota system. *Id.*; *see also Bourdais v. City of New Orleans*, No. CIV.A. 99-1434, 2005 WL 3801576, at *3 (E.D. La. Apr. 29, 2005) (case below describing the new racial quota as an attempt to adhere to a "50%/50% racial quota in hiring"). As a result, some otherwise-qualified applicants were never hired and some suffered a deferral in their hiring, each of which the courts found to be actionable. 2005 WL 3801576, at **6–7. In *Bourdais*, a firefighter took an aptitude test and was placed on a register if s/he passed. *Id.* at *1. Being placed on the register, however, was only one step toward placement on the list of recruits eligible for hire; other tests had to be passed before a candidate could be considered for hiring. *Id.* at **1–2. The *Bourdais* court therefore dismissed those plaintiffs who had not completed all pre-qualifications and so could not establish that they were eligible to be hired before they were actually hired.[9] *Id.* at **13–15.

Here, however, the "Qualified Applicants" had already satisfied all the pre-application qualification requirements and had established themselves as persons entitled to participate in skills-based hiring. *See* Fourth Am. Compl. ¶ 100. In other words, the Qualified Applicants are equivalent to the firefighters who were eligible to hire, while other CTI students who had not graduated or had not yet passed the AT-SAT are akin to the plaintiffs dismissed in *Bourdais.*

Further, unlike *Maraschiello* or other precedent cited by the FAA (Def.'s Mot. at 34), in this case the FAA intentionally took a step backward, away from Title VII compliance and marched willfully toward discrimination. *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 89 (2d Cir. 2013). The test at issue in *Maraschiello* was over thirty years old, out of date, and

---

[9] The FAA may try to distinguish *Bourdais* on the basis that pre-quota hiring in that case proceeded "top down" from the highest scored. Such a distinction, however, is ripe for challenge in discovery, where Plaintiffs expect to be able to demonstrate a strong correlation between hiring and CTI graduates' AT-SAT scores.

deemed unsuited to the recruitment of police officers by a technical expert several years before the suit at hand. *Id.* at 89. Moreover, as a consequence of its unsuitability, the test had been the subject of "several civil rights actions" over several decades since its inception. *Id.* Here, the AT-SAT was validated multiple times, most recently in March 2013. Fourth Am. Compl. ¶ 24. This was only nine months before the test and related CTI program was abruptly discarded by the FAA in favor of an unvalidated, unscientific "biographical questionnaire" designed to "qualify" applicants based on demographic data. Fourth Am. Compl. ¶¶ 38-40. Thus, unlike a benign "process change" designed to mitigate discrimination, the FAA's "process change" was adopted to facilitate discrimination. Yes, as recognized in *Ricci*, "[e]mployers must be able to assess and adjust their practices to ensure that 'race is not a barrier to opportunity.'" Def's Mot. at 28 (quoting *Ricci*, 557 U.S. at 580). But here the FAA implemented the biographical screening precisely to make race a barrier to opportunity. While the FAA may have a different explanation, Plaintiffs' allegations are plausible and entitled to be tested in discovery and briefing.[10]

3.      **The FAA's Assertions About the Existence and Effect of the CTI Hiring Preference and the Utility and Purpose of AT-SAT Testing Should be Tested in Discovery.**

---

[10] Moreover, the *Maraschiello* case also recognized that the definition of Title VII liability set forth in *Ricci* was expansive:

> We do not read *Ricci* as confined to situations involving the discarding of civil service test results based on the disparity those results reflect. Rather, the case establishes more generally that "before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Ricci,* 557 U.S. at 585, 129 S.Ct. 2658; *see Briscoe v. City of New Haven,* 654 F.3d 200, 206–07 (2d Cir. 2011). In other words, it articulates the contours of a specific affirmative defense to claims of unlawful disparate treatment based on race—it does not expressly limit what may constitute disparate treatment.

*Maraschiello*, 709 F.3d at 95.

Finally, discovery is required before the Court may evaluate the FAA's assertions that there were no effective hiring preferences for Qualified Applicants and that taking the AT-SAT test had no practical meaning.  For example, the FAA errs when it claims that "there was, in fact, no hiring preference to lose" because (1) "nothing in the FAA's 2007 AT-CTI SOP or any other FAA policy actually conferred a hiring preference on CTI graduates," Def.'s Mot. at 21, and (2) the CTI program was just one of many ways one could become an air traffic controller.  Def.'s Mot. at 22. Prior to the creation of the CTI program, the FAA hired air traffic controllers from two sources: Veteran Recruitment Appointment ("VRA program") and off-the-street ("OTS") hires.  Fourth Am. Compl. ¶ 12.  The CTI program was developed largely because the VRA program produced an insufficient number of candidates and the OTS hiring was inefficient and produced few high-quality candidates.  Fourth Am. Compl. ¶¶ 13–16.  Over time, the CTI program became the primary source of the FAA's new hires, especially after the development of the AT-SAT test.  Fourth Am. Compl. ¶¶ 20–22, 25.  In 2012, the FAA announced that the CTI program and VRA program were the only two methods of becoming an air traffic controller, and that OTS hiring would not be conducted even though the agency forecasted hiring over one thousand controllers per year in 2012–2014.  Fourth Am. Compl. ¶¶ 28–29.  Moreover, the entire reason the FAA developed the "biographical" hiring screen was because it determined the success rate of CTI graduates in hiring was so high that it served as a barrier to other potential applicants.  *See* Extension Report, ECF No. 75-1 at 119 (describing success rate of CTI graduates) and 92-93 (Figure 7, showing that CTI graduates were by far the largest source of ATCS applicants).  The FAA cannot credibly claim both that it revised its hiring process to overcome the success of the CTI students and that the CTI students were not disproportionally successful.

Likewise, the FAA's analogy between the AT-SAT test and the LSAT, the MCAT, or other *admissions* tests is unavailing and warrants testing in discovery. Def.'s Mot. At 26-27. Potential students may take *admissions* tests to see if they are eligible to attend a school of their choice, to see if they are eligible for financial aid, or to settle any number of variables relevant to that student's evaluation of the benefits and risks of participating in a course of education. CTI students, however, did not take the AT-SAT before they started their education. They could only take the test after they had reached a certain stage in their education and after they had certified elements of their eligibility to be hired as an ATCS. In this regard the AT-SAT test is more akin to a bar exam or medical boards than to an admissions test. Discovery will likely reveal a very tight correlation between those who took the AT-SAT and those who eventually applied for an ATCS position. Further, the fact that some few students may not have followed through on their intention, because they won the lottery, received an inheritance, or suffered a family crisis, should not be a basis to find that a class of Qualified Applicants could not be certified.

### III.    The Amended Complaint Satisfies the Pleading Requirements of Rule 23.

The amended class action allegations satisfy the pleading requirements of Rule 23. Fed. R. Civ. P. 23. First, a motion to strike Rule 23 allegations is disfavored because plausible class allegations should be tested in discovery and class certification briefing. Second, all class members, all those satisfying Qualified Applicant status as of January 2014, suffered the same harm from the same cause when the Qualified Applicant status was struck in the pursuit of racial favoritism. This satisfies commonality and typicality. The existence of class members who suffered an additional adverse employment action from the biographical screening may result in subclasses, but should not result in the striking of the class allegations. Finally, Plaintiffs here and in the *Johnson* action (*Johnson v. U.S. Dep't of Transp.*, No. 1:19-cv-1916 (RDM) (D.D.C.)) share

the objective of proving that the FAA's actions were racially motivated. The FAA's dreamscape of potential conflicts does not exist, is mitigated by the role of co-counsel, and could be further addressed with subclasses should a divergence in interest arise in the damages phase of the cases.

### A. The FAA's Motion to Strike is Procedurally Disfavored and Premature.

Courts uniformly hold that "a motion to strike is a disfavored, drastic remedy, . . . and courts favor an adjudication on the merits . . . ." *Smith*, 962 F. Supp. 2d at 89–91 (citing *Uzlyan v. Solis*, 706 F. Supp. 2d 44, 51 (D.D.C. 2010) and *Canady v. Erbe Elektromedizin GmbH*, 307 F. Supp. 2d 2, 8–9 (D.D.C. 2004)); *see also Koch v. White*, 134 F. Supp. 3d 158, 164 (D.D.C. 2015) ("[Rule 12(f)] is not 'a proper way to procure the dismissal of all or a part of a complaint' based on the legal insufficiency of the pleading."). Moreover, Plaintiffs have met their minimal burden of "stat[ing] a claim to relief that is plausible on its face." *In re McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 140 (D.D.C. 2016), *amended on reconsideration sub nom. In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 218 (D.D.C. 2017) (observing that "[t]he D.C. Circuit has not considered the application of the plausibility standard to class allegations").

The FAA suggests that dismissal of the class claims while retaining Plaintiff Brigida's individual claims would somehow further judicial economy. Def.'s Mot. at 43–44 ("judicial economy and Defendant's interests could also be protected by striking the class claims."). But this apparent admission that Plaintiff Brigida has a viable Title VII claim undercuts any pretense of efficiency. If Andrew Brigida has a viable Title VII claim against the FAA, then so do thousands of other similarly situated CTI graduates. The multitude of lawsuits stemming from the FAA's race-based decision to terminate the Qualified Applicant hiring preference in favor of the Biographical Questionnaire demonstrates that this litigation will not go away until the FAA is held accountable for its Title VII violation. *See, e.g., Johnson v. U.S. Dep't of Transp.*, No. 1:19-cv-

1916 (RDM).  Even if the parties disagree over the precise contours of the putative class, it cannot be reasonably argued that maintaining thousands of identical individual suits—many of whom would appear before this Court—is somehow in furtherance of judicial economy.[11]

### B.  All Proposed Class Members Suffered a Title VII Injury.

As explained above, the proposed class members all suffered an adverse employment action, there are no uninjured persons in the class, and the class definition is therefore not overbroad.  Every class member was a Qualified Applicant in January 2014 and suffered tangible harm when the FAA invalidated primary consideration of their job qualifications so it could preference "biographical" or race considerations.  Recognition of this harm defeats the FAA's argument that there was no class-wide adverse employment action.  Moreover, even if there are distinctions between the degree to which different class members were harmed, this does not ultimately speak to the class members' ability to satisfy the requirement of Rule 23 because nominal damages are also permissible in Title VII cases.  *See Franklin-Mason v. Dalton*, No. CIVA962505 (RWR/JFM), 2006 WL 825418, at *16 (D.D.C. Mar. 21, 2006), *aff'd in part,* 742 F.3d 1051, n.5 (D.C. Cir. 2014).  Accordingly, the FAA cannot be allowed to obscure the certification and liability stages of this lawsuit with the damages phase.

---

[11] At the very least, the FAA's motion to strike should be held in abeyance given how intertwined it is with the merits of this case.  *See* 7AA Charles Alan Wright et al, Federal Practice and Procedure §1785.3 (3d ed. 2005) ("When ruling on defendants' motion to strike and dismiss and for summary judgment would have required the court to go well beyond the face of the pleadings and into the merits of plaintiff's claim, that ruling would be held in abeyance pending ruling on plaintiff's motion for class certification.") (citing *Otto v. Variable Annuity Life Ins. Co.*, 98 F.R.D. 747 (N.D. Ill. 1983)).

**C.   The Breadth of the Class Does Not Destroy Commonality or Typicality, Particularly for a Liability Determination and Declaratory and Injunctive Relief**.

Likewise, the FAA's argument that Plaintiffs cannot demonstrate commonality and typicality under Rule 23 fails.  The agency claims that the commonality prong of Rule 23 is not met because the putative class is not capable of class-wide resolution given that it allegedly includes "non-injured" parties, meaning there is a distinction between the "interest" and the "injury" alleged by various plaintiffs.  Def.'s Mot. at 33–34.  The FAA ignores the fact that both applicants and non-applicants suffered identical harm when the Qualified Applicant hiring preference was suddenly terminated for race-based reasons—whether recognition of this fact dissuaded some class members from applying for ATCS positions does not change the harm such an individual suffered.  *See Wal-Mart Stores v. Dukes*, 564 U.S. at 349–50.  As explained above, there may be a subclass distinction between the those who did and those who did not go on to apply to the 2014 job announcement.

As the FAA notes, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  Def.'s Mot. at 33–34. (citing *Wal-Mart Stores v Dukes*, 564 U.S. at 349-50).  What matters is the unity of the class enabled by the presence of a common question requiring a common answer.  564 U.S. at 350.  Here, the legality of the FAA's termination of the Qualified Applicant hiring status presents a question common to all.

The FAA also claims that the presence of non-applicants creates an "insurmountable problem for typicality."  Def.'s Mot. at 34.  But as described above, the FAA is making far too much of this factual scenario.  Any non-applicants can be properly grouped into a subclass.  The same can be said as to the agency's claims that the presence of non-applicants destroys the concept of predominance among Plaintiffs' claims by creating a "lack of cohesion."  Def.'s Mot. at 36.  In short, the FAA prematurely argues against class certification.

### D.  The *Johnson* Litigation Does Not Create a Conflict of Interest.

Plaintiffs' co-counsel Michael Pearson's role in *Johnson v. U.S. Dep't of Transp.*, No. 1:19-cv-1916 (RDM), does not create a disqualifying conflict.  The precedent that the FAA cites states that "[a] lawyer represents conflicting interests when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." *Cuyler v. Sullivan*, 446 U.S. 335, 356 (1980).  Here, there is nothing for Mr. Pearson to oppose relative to the *Johnson* case and the case at bar.  The FAA has not proffered any evidence showing that "divided loyalties" might exist between the *Brigida* and *Johnson* cases, which is the requisite showing for denial of class certification based on inadequacy of representation.  Def.'s Mot. at 39 (citing *Sullivan v. Chase Inv. Servs. of Bos., Inc.*, 79 F.R.D. 246, 258 (N.D. Cal. 1978)).  Although the FAA spends several pages describing the legal standard for conflicts of interest, it can at best only speculate that "similar strategic decisions are *likely* to occur in *Brigida*."  Def.'s Mot. at 40 (emphasis added).

The FAA's theory that Mr. Pearson has a conflict in representing both proposed classes is unwarranted.  The FAA cites, for example, *Lewis v. Nat. Football League*, 146 F.R.D. 5, 11–12 (D.D.C. 1992).  Def.'s Mot. at 37.  In that case, unlike here, the proposed class counsel was suing some of the proposed class representatives he also sought to represent.  *Id.*  In this case Mr. Pearson is not adverse to any member of either proposed class.

Nor are the conflict concerns raised in *Ortiz* or *Lou* present in this case.  In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), the Court was confronted with a proposed limited fund settlement class.  *Id.* at 856.  It was the limitation on the funds available and the resulting inherent competition for limited resources that created a conflict.  In this case there is no allegation that the FAA is troubled by such limited funds.  Further, in the *Lou* case, counsel did not merely seek to represent another group of plaintiffs in "parallel litigation" as the agency suggests.  *Lou v. Ma*

*Labs., Inc.*, No 12-05409, 214 WL 68605 at *1–2 (N.D. Cal. Jan. 8, 2014). Rather, the counsel in that case sought to represent competing classes that asserted the same legal and factual claims against the same defendant. *Id*.

All the other conflicts that the FAA proposes regarding litigation timing and tactics are purely hypothetical and are not a valid basis for finding that counsel is inadequate. Def.'s Mot. at 39-40. Further, while the agency quotes *McLaughlin on Class Actions*, the quote and analysis are incomplete. *McLaughlin* actually supports Plaintiffs' position. After discussing situations that may give rise to a conflict, McLaughlin goes on to further note that, "Where multiple, separate counsel jointly represent the class, however, absent an actual conflict the simultaneous representation of individuals or another class by a member of the counsel group against the same defendants is not disqualifying." 1 McLaughlin on Class Actions § 4:39 (15th ed. 2018). In the case at bar multiple counsel will be representing and protecting the interests of the class. In short, Mr. Pearson can pursue the interests of each proposed class, unhindered by his representation of a different class challenging different actions. Counsel are adequate to represent the class.

## CONCLUSION

Plaintiff respectfully requests that the Court grant his motion for leave to amend and deny the FAA's motion to strike class allegations.

DATED this 23rd day of December 2019.

Respectfully submitted,

*/s/ Zhonette M. Brown*
Zhonette M. Brown, D.C. Bar No. 463407
Brian Gregg Sheldon, CO Bar No. 51063, *pro hac vice*
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021

zhonette@mslegal.org
brian@mslegal.org

Michael W. Pearson, D.C. Bar No. 997169
Curry, Pearson, & Wooten, PLC
814 West Roosevelt
Phoenix, Arizona 85007
(602) 258-1000
(602) 523-9000 (facsimile)
mpearson@azlaw.com

Attorneys for Plaintiffs and Putative Class Counsel

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this 23rd day of December 2019, I caused a true and correct copy of the foregoing **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR LEAVE TO AMENDAND RESPONSE IN OPPOSITION TO MOTION TO STRIKE** to be electronically filed with the Clerk of the Court using the Court's CM/ECF system which sent notification of such filing to the following counsel of record in this matter:

      Michael L. Drezner
      Michael.L.Drezner@usdoj.gov

      Galen Nicholas Thorp
      galen.thorp@usdoj.gov

                     */s/ Meri Pincock*