**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                      )
ANDREW J. BRIGIDA, et al.,            )
                                      )
            Plaintiffs,               )
                                      )
      v.                              )      Civil Action No. 16-cv-2227 (DLF)
                                      )
ELAINE L. CHAO, Secretary, U.S.       )
Department of Transportation,         )
                                      )
            Defendant.                )
_____)


**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND,
AND ALTERNATIVELY MOTION TO STRIKE CLASS CLAIM**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF EXHIBITS ................................................................................................... iii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 3

I.     Air Traffic Control Specialists ................................................................................. 3

     A.     Overview of Controller Hiring ................................................................... 3

     B.     Legacy Hiring Process for CTI Graduates (2008-2013) ........................... 5

     C.     Revised Hiring Process (2014) ................................................................. 6

     D.     Statutory Changes (2016 & 2019) ........................................................... 9

II.     Named Plaintiffs & Class Representatives ........................................................... 10

III.     Procedural History ................................................................................................ 10

STANDARD OF REVIEW ............................................................................................. 12

ARGUMENT ................................................................................................................... 14

I.     Plaintiffs' Motion to Amend Should Be Denied .................................................. 14

     A.     Justice Does Not Require That Plaintiffs Receive Another Bite at the Apple. ...................................................................................................... 14

     B.     Plaintiffs Proposed "Hiring Preference" Claim is Futile Because it is Subject to Dismissal For Failure to State a Claim and Cannot Satisfy Rule 23 ............................................................................................................. 19

          1.     Plaintiffs have not plausibly alleged either element of a disparate treatment cause of action. ........................................................... 19

               i.     Plaintiffs' hiring preference claim again fails to allege a plausible adverse employment action. ........................................... 20

               ii.     Plaintiffs have not plausibly alleged that the challenged actions constituted intentional discrimination against non-African Americans. ................................................................... 26

          2.     Plaintiffs' new disparate impact claim is not administratively exhausted and is contradicted by their proposed pleading ....................... 30

3.      Plaintiffs' challenge to selection decisions made in 2012 and 2013 is untimely and thus could not be exhausted by Mr. Brigida's initial EEO contact in February 2014. ....................................................... 32

4.      Plaintiffs' hiring preference claim does not meet Rule 23's requirements........................................................................................... 33

    i.      Plaintiffs' class definition is fatally overbroad. ........................... 33

    ii.     Plaintiffs cannot establish commonality or typicality for a class including those ineligible to apply for a CTI-only announcement and those unlikely to be selected under the prior process............................................................................... 35

    iii.    Plaintiffs cannot show that the class is sufficiently homogenous or that common issues predominate. ....................... 36

C.      Plaintiffs' Proposed Biographical Assessment Claim is Futile Because It is Subject to Dismissal For Failure to State a Claim. ................................................. 38

1.      Mr. Brigida did not administratively exhaust a challenge to the Biographical Assessment. ........................................................................... 38

2.      Plaintiffs have not plausibly alleged a disparate impact or disparate treatment claim with respect to the Biographical Assessment.................. 41

II.     Alternatively, Plaintiffs' Class Claims Should Be Stricken. ............................................ 44

CONCLUSION.................................................................................................................. 45

# TABLE OF EXHIBITS

**Federal Aviation Administration Documents**

FAA, A Plan for the Future, 10-Year Strategy for the Air Traffic Controller Workforce 2011-2020 (Mar. 2011) (excerpts) ................................................................................... 1

FAA, A Plan for the Future, 10-Year Strategy for the Air Traffic Controller Workforce 2012-2021 (Mar. 2012) (excerpts) ................................................................................... 2

FAA, A Plan for the Future, 10-Year Strategy for the Air Traffic Controller Workforce 2013-2022 (Mar. 2013) (excerpts) ................................................................................... 3

FAA, A Plan for the Future, 10-Year Strategy for the Air Traffic Controller Workforce 2014-2023 (Mar. 2014) (excerpts) ................................................................................... 4

FAA, Annual EEO Program Status Report, Fiscal Year 2011 (Mar. 1, 2012) (link) (excerpts) ..................................................................................................................... 5

APT Metrics, Final Report, Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process (Apr. 16, 2013) (link) (appendices excluded) ................... 6

Statement of FAA Administrator Michael Huerta (Apr. 16, 2013) (link) .................................... 7

FAA Administrator Michael Huerta, FAA Report, NextGen Advisory Committee (June 4, 2013) (link) ............................................................................................................... 8

FAA, AT-CTI Program Overview and FAQs (July 10, 2013) ....................................................... 9

FAA, Human Resource Policy Manual, Policy Bulletin No. 84, Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring (Feb. 7, 2014) ...................................... 10

Results of Air Traffic Control Specialist (ATCS) Interim Hiring Process (undated) .................. 11

**Other Agency Documents**

OPM, Federal Equal Opportunity Recruitment Program for Fiscal Year 2012 (Jan. 2014) (link) (excerpts) ............................................................................................................ 12

GAO, Report 14-244, 2013 Sequestration (Mar. 2014) (link) (excerpts) .................................... 13

Cong. Research Serv., Sequestration at the FAA: Air Traffic Control Furloughs and Congressional Response (May 7, 2013) ...................................................................... 14

**Controller Announcements**

AAC-AMH-08-PUBNAT1-08232 (Jan. 2008) ........................................................................... 15

AAC-AMH-08-CTI-08458 (Feb. 2008) ..................................................................................... 16

AAC-AMH-08-CTI-09135 (Apr. 2008) ................................................. 17

AAC-AMH-08-PUBNAT2-09140 (Apr. 2008)................................................. 18

AAC-AMH-08-PUBNAT3-09613 (May 2008) ................................................. 19

AAC-AMH-08-CTI-09622 (May 2008) ................................................. 20

AAC-AMH-08-PUBNAT4-09989 (June 2008) ................................................. 21

AAC-AMH-08-PUBNAT5-10363 (July 2008) ................................................. 22

AAC-AMH-08-CTI-10709 (Aug. 2008) ................................................. 23

AC-AMH-08-PUBNAT6-10764 (Aug. 2008)................................................. 24

AC-AMH-09-PUBNAT7-11589 (Dec. 2008) ................................................. 25

AAC-AMH-09-CTI-11766 (Nov. 2008) ................................................. 26

AAC-AMH-09-PUBNAT8-12162 (July 2009) ................................................. 27

AAC-AMH-09-CTI-12655 (Sept. 2010) ................................................. 28

AAC-AMH-11-CTI-19558 (June 2011) ................................................. 29

FAA-AMH-13-VRA-26915 (Aug. 2012) ................................................. 30

FAA-AMH-13-RMC-27006 (Aug. 2012) ................................................. 31

FAA-AMH-13-CTO-27017 (Aug. 2012) ................................................. 32

FAA-AMH-13-CTI-27053 (Aug. 2012) ................................................. 33

FAA-AMC-14-ALLSRCE-33537 (Feb. 2014)................................................. 34

FAA-ATO-16-ALLSRCE-49075 (Aug. 2016)................................................. 35

FAA-ATO-17-ALLSRCE-53474 (July 2017)................................................. 36

**Other Documents**

Brigida EEO Complaint (Apr. 14, 2014) ................................................. 37

Pl.'s Appeal of Dismissal, *Johnson v. Foxx*, EEOC No. 570 -2016-0095X (July 26, 2016) ....... 38

Pl.'s Response to Mot. to Dismiss, *Johnson v. U.S. Dep't of Transp.*, No. 3:18-2431
(N.D. Tex. Mar. 29, 2019), ECF No. 26 ................................................. 39

## INTRODUCTION

Well over four years after bringing suit, Plaintiffs seek leave to file a sixth version of their putative class action complaint after the Court rejected their fifth attempt on the ground that it failed to state a claim of class-wide discrimination.[1]  While Plaintiffs claim that "prior objections to class treatment have been remedied," Pls.' Mot. for Leave to File Fourth Am. and Suppl. Class Action Compl. at 9 ("Pls.' Mot."), ECF No. 99, in fact their newly proposed complaint spawns additional problems and fails to remedy key issues previously raised by Defendants and the Court.  Plaintiffs have attempted an awkward merger of their original theory that CTI graduates lost a "hiring preference" with an unexhausted new theory (borrowed from Lucas Johnson's recently dismissed class action) that the Biographical Assessment (BA) used to screen 2014 applicants was discriminatory.  The Court should deny Plaintiffs' motion on numerous grounds.

Justice does not require granting Plaintiffs another opportunity to revamp their case.  Plaintiffs' new proposed complaint, almost twice as long as the last version, belatedly attempts to cure deficiencies flagged by the Federal Aviation Administration (FAA) in its opposition to class certification in December 2018 and emphasized by the Court at the class certification hearing in September 2019.  Only after another failed attempt, which refused to accept the Court's guidance and the straightforward caselaw precluding Title VII claims by non-applicants, have Plaintiffs offered a revised class definition limited to those who actually applied in 2014.  But Plaintiffs continue to push the same hiring preference theory as in their last draft, hoping that the Court will let it in as long as it accompanies a challenge to their unsuccessful 2014 applications.  In addition,

---

[1] There are currently four named plaintiffs.  *See* 3d Am. Compl., ECF No. 68.  While Plaintiffs wish to (i) drop Pollyanna Wang because she accepted the FAA's offer of a position as an air traffic controller trainee and (ii) remove Suzanne Rebich and Matthew Douglas-Cook as named plaintiffs, *see* Motions for Leave to Amend, ECF Nos. 87, 99, neither of those changes are yet effective.  This brief refers to Mr. Brigida, Ms. Rebich, and Mr. Douglas-Cook collectively as "Plaintiffs."

Plaintiffs for the first time assert that the BA constituted disparate treatment and also add disparate impact theories to all of their claims. Nowhere do Plaintiffs explain why these new claims could not have been raised *years* earlier, and they should not receive this additional bite at the apple.

Moreover, the proposed amendment should again be denied for futility. Neither Plaintiffs' hiring preference claim nor their challenge to the BA can survive a motion to dismiss. The hiring preference claim suffers numerous defects. First is the one previously briefed—it is not a personnel action cognizable under Title VII. It also does not state a class-wide claim because the putative class includes people who would have been ineligible to apply to a CTI-only announcement; it includes those whose AT-SAT scores had long expired and those who did not receive recommendations from their CTI school. Plaintiffs have also failed to allege a plausible reverse discrimination claim—or a *prima facie* showing that the FAA is the unusual employer who discriminates against the majority—based on the FAA's efforts to identify and address barriers to equal employment opportunity. If this were not enough, their new theory that the alleged loss of a hiring preference caused a disparate impact was not administratively exhausted and contradicts their factual claim that the CTI program did not have a disparate impact on African Americans. Their allegations regarding hiring decisions in 2012 and 2013 are likewise untimely claims that Mr. Brigida did not exhaust. In addition to requiring dismissal of this claim, these factors collectively would preclude certifying a class as well.

As for the Biographical Assessment challenge, Plaintiffs did not administratively exhaust this claim because the entire focus of Mr. Brigida's administrative complaint was on events occurring *before* the new hiring process was implemented in February 2014. Moreover, Plaintiffs' counsel repeatedly and expressly disclaimed any challenge to the Biographical Assessment in this lawsuit. And even if this claim was properly raised here, it fails to plausibly allege that the

Biographical Assessment constituted disparate treatment or had a disparate impact.  Indeed, one of the documents on which Plaintiffs rely shows that African Americans only received about 10% of the job offers in 2014 while non-African Americans received about 90% of the offers. Moreover, CTI graduates received more than one third of the job offers in 2014.  For these reasons, Plaintiffs new claim could also not be certified as a viable class action.

Accordingly, the motion to amend should be denied.  Alternatively, the Court could permit amendment to the extent that Plaintiffs' individual claims survive, but strike the class claims.

## BACKGROUND

I.    **Air Traffic Control Specialists**[2]

A.    **Overview of Controller Hiring**

The FAA's hiring process for air traffic control specialists (controllers) begins with publishing a vacancy announcement.  *See, e.g.*, Exhibit 33, FAA-AMH-13-CTI-27053 (2012) ("2012 CTI Announcement") at 1.  An individual must submit an application using the on-line system for each announcement to receive consideration under that announcement, regardless of whether the individual had submitted a prior application.  *Id.* at 3-4.  After an applicant has been selected, several additional steps follow: the selectee receives a tentative offer letter; if the selectee accepts the offer, he or she must pass medical and psychological exams, a security investigation, and a drug test.  *Id.* at 2.  Upon satisfactory results from those processes, FAA sends the selectee a final offer letter, and inexperienced selectees report to the FAA Academy in Oklahoma City for training.  *Id.* at 3.

---

[2] Because the FAA has repeatedly laid out the statutory framework and the broader context regarding FAA's hiring processes, *see, e.g.*, Def.'s Opp'n to Mot. for Class Cert., ECF No. 75; Def.'s Opp'n to Mot. for Leave to Amend, ECF No. 91, only the facts most relevant to this briefing are repeated here.

The FAA hires from several sources including the general public, Air Traffic Collegiate Training Initiative ("AT-CTI" or "CTI Program"), and experienced controllers (either retired military or civilian).  *See id.* at 44; Proposed Compl. ¶¶ 19, 68, ECF No. 99-1.  The FAA adjusts the mix of hiring from these sources due to their availability and its staffing needs.  *See* Proposed Compl. ¶ 42; Exhibit 3, A Plan for the Future, 10-Year Strategy for the Air Traffic Controller Workforce Plan 2013-2022 at 44 (Mar. 2013) ("2013 Workforce Plan").  Before 2014, FAA issued separate announcements for each source of applicants.  *See, e.g.*, Table 1 (summarizing announcements for inexperienced controllers).[3]

**Table 1: Nationwide Announcements for Inexperienced Controllers 2008-2013**

| Full Posting Number | Open Period | Source |
|---|---|---|
| AAC-AMH-08-PUBNAT1-08232 | Jan. 23-Feb. 15, 2008 | General Public |
| AAC-AMH-08-CTI-08458 | Feb. 19-Mar. 25, 2008 | CTI Only |
| AAC-AMH-08-CTI-09135 | Apr. 9-22, 2008 | CTI Only |
| AAC-AMH-08-PUBNAT2-09140 | Apr. 14-May 2, 2008 | General Public |
| AAC-AMH-08-PUBNAT3-09613 | May 19-30, 2008 | General Public |
| AAC-AMH-08-CTI-09622 | May 19-30, 2008 | CTI Only |
| AAC-AMH-08-PUBNAT4-09989 | June 17-30, 2008 | General Public |
| AAC-AMH-08-PUBNAT5-10363 | July 17-31, 2008 | General Public |
| AAC-AMH-08-CTI-10709 | Aug. 13-26, 2008 | CTI Only |
| AC-AMH-08-PUBNAT6-10764 | Aug. 18-29, 2008 | General Public |
| AC-AMH-09-PUBNAT7-11589 | Dec. 9-16, 2008 | General Public |
| AAC-AMH-09-CTI-11766 | Nov. 26-Dec. 10, 2008 | CTI Only |
| AAC-AMH-09-PUBNAT8-12162 | July 6-17, 2009 | General Public |
| AAC-AMH-09-CTI-12655 | Sept. 23-Oct. 26, 2010 | CTI Only |
| AAC-AMH-11-CTI-19558 | Jun. 1, 2011 – Feb. 28, 2012 | CTI Only |
| FAA-AMH-13-CTI-27053 | Aug. 27-Sept. 10, 2012 | CTI Only |

Source: Exhibits 15-29, 33.

---

[3] Before 2014, the last round of announcements for experienced controllers involved three announcements posted in August 2012.  *See* Exhibit 30, FAA-AMH-13-VRA-26915 (Aug. 27, 2012) (for veterans eligible for a Veterans Recruitment Appointment, *see* 5 C.F.R. § 307.101, *et seq.*); Exhibit 31, FAA-AMH-13-RMC-27006 (Aug. 27, 2012) (for retired military controllers); Exhibit 32, FAA-AMH-13-CTO-27017 (Aug. 27, 2012) (for controllers with an appropriate Control Tower Operator (CTO) certificate).

However, once FAA had pools of applicants from separate announcements, it drew from all available announcements in making selections. *See* Proposed Compl. ¶ 68; 2013 Workforce Plan at 44. Due to the number of available applicants, new announcements were not necessary for each source every year. *See* 2013 Workforce Plan at 44 ("Due to the thousands of qualified . . . applicants available from previously advertised general public announcements, the agency did not offer a vacancy announcement to this pool in FY 2012[.]"). Thus, for example, hiring continued from the general public source between 2010 and 2013, even though there was no general public announcement during those years. *See* Table 2 (summarizing hiring by fiscal year and source).

**Table 2: Controller Hiring by Fiscal Year**

| FY | Controllers hired | From CTI-only announcements | From general public announcements | From experienced announcements |
|------|------|------|------|------|
| 2010 | 998 | 252 | 520 | 226 |
| 2011 | 824 | 245 | 391 | 188 |
| 2012 | 925 | 467 | 268 | 190 |
| 2013 | 554 | 361 | 64 | 129 |

Source: Exhibit 1 at 41; Exhibit 2 at 41; Exhibit 3 at 44; Exhibit 4 at 41.

### B.    Legacy Hiring Process for CTI Graduates (2008-2013)

Through the CTI Program, FAA partners with educational institutions which offer two- and four-year degrees that include basic courses in air traffic control and aviation administration. *See* Proposed Compl. ¶¶ 26, 31; Exhibit 9, AT-CTI Program Overview and FAQs at 5, 62-63 (July 10, 2013) ("CTI Program Overview") ("Understand that CTI schools are not training ATCS per se, but providing an aviation education that includes FAA mandatory and approved curriculum in the degree programs that qualify them as CTI partner institutions."). CTI graduates who apply and are selected by FAA for controller positions are eligible to bypass the first five weeks of training at the FAA Academy. Proposed Compl. ¶ 37. However, CTI graduates have never been guaranteed employment with FAA. *See* CTI Program Overview at 1, 12; Proposed Compl. ¶ 23.

Since at least 2008, CTI graduates have only been selected using competitive vacancy announcements. *See* Exhibits 15-36. CTI graduates had multiple avenues to apply for FAA controller positions. FAA posted some announcements exclusively for CTI graduates. *See, e.g.*, 2012 CTI Announcement. They could also apply to announcements open to the general public, *see, e.g.*, Exhibit 27, AAC-AMH-09-PUBNAT8-12162 (July 2009) ("2009 Public Announcement"), and some CTI graduates may be eligible to apply for Veterans' Recruitment Appointment. *See, e.g.*, Exhibit 30 at 2. To be eligible to apply for a CTI-specific vacancy announcement, a CTI student, among other things, must: (1) have graduated from an AT-CTI school in a FAA-approved program, (2) have received a recommendation from that AT-CTI school, (3) have a current passing score on the Air Traffic Selection and Training Test Battery (AT-SAT), (4) be a U.S. citizen, and (5) be younger than 31 when entering FAA duty. *See, e.g.*, 2012 CTI Announcement at 2; Proposed Compl. ¶ 36. CTI students could take the AT-SAT before graduation and their score was valid for three years after graduation. Proposed Compl. ¶ 33; EMP-1.7, Testing Policy § 4.d, ECF No. 73-2 (page 29 of Exhibit 1 to Plaintiffs' motion for class certification).

All CTI graduates were required to submit an electronic application pursuant to each vacancy announcement to be eligible for consideration under that announcement. *See, e.g.*, 2012 CTI Announcement at 3-4. For each job opening to be filled, FAA would generate from the electronic system a referral list of eligible and qualified CTI applicants who had listed that location in their application. *See* CTI Program Overview at 65. The referral lists for all job openings to be filled under the announcement were then submitted to a centralized selection panel, which used the list to schedule interviews and make selections for controller vacancies. *Id.* at 31, 65.

### C.    Revised Hiring Process (2014)

In February 2014, after several years of studies and analysis, FAA implemented changes

6

to the controller hiring process. The changes were based on a series of independent analyses. First, in 2011, FAA convened an independent review panel to evaluate the controller hiring and training process. *See* Proposed Compl. ¶ 44. The panel recommended changes to the controller hiring process, including the CTI Program. *Id*. ¶ 45. Second, based on disparities in representation by race, gender, and disability, the FAA decided to conduct a barrier analysis of the controller hiring process pursuant to Equal Employment Opportunity Commission (EEOC) Management Directive 715 ("MD-715").[4] It was scheduled to be conducted in 2012. *See* Exhibit 5, Annual EEO Program Status Report (Mar. 1, 2012) at 38-40. Subsequently, in March 2012, the Secretary of the Department of Transportation and FAA Administrator met with members of an FAA employee association, the National Black Coalition of Federal Aviation Employees (NBCFAE) to hear their concerns regarding disparities in the FAA workforce and hiring practices. *See* Proposed Compl. ¶¶ 63-65, 69. The barrier analysis was initiated shortly thereafter. *See id.* ¶¶ 72-73. An initial version of the barrier analysis was completed in October 2012, which found that several decision points in the controller hiring process had a potential adverse impact on several demographic groups. *Id.* ¶ 73. To further study the issue, the FAA contracted with APT Metrics in December 2012 to conduct a detailed root cause analysis of the identified barriers to establish a foundation

---

[4] Pursuant to 42 U.S.C. § 2000e-16(b), among other authorities, the EEOC issued MD-715 in 2003. It explains that all federal agencies are required to, inter alia:

> take proactive steps to ensure equal employment opportunity for all their employees and applicants for employment. This means that agencies must work to proactively prevent potential discrimination before it occurs and establish systems to monitor compliance with Title VII. Agencies must regularly evaluate their employment practices to identify barriers to equality of opportunity for all individuals. Where such barriers are identified, agencies must take measures to eliminate them. With these steps, agencies will ensure that all persons are provided opportunities to participate in the full range of employment opportunities and achieve to their fullest potential.

MD-715 § Part A.I (link); *see also Worth v. Jackson*, 451 F.3d 854, 856 (D.C. Cir. 2006) ("MD–715 declares that agencies have 'an ongoing obligation to eliminate barriers that impede free and open competition in the workplace and prevent individuals of any racial or national origin group or either sex from realizing their full potential.'" (quoting MD-715 at 8)).

for corrective interventions. *See id.* ¶ 75; Exhibit 6, Final Report, Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process (Apr. 16, 2013) ("Extension to Barrier Analysis"). Third, FAA established an Executive Steering Committee of senior agency executives to oversee revision of the hiring process and implementation of the recommendations. *See* Proposed Compl. ¶ 88.

Several key issues were identified. For example, the AT-SAT did not effectively function to screen applicants, as over 95% of test takers passed the exam. *See* Extension to Barrier Analysis at 6, 8; *see also* Proposed Compl. ¶ 53 (citing another study showing that between 92.1% and 97.7% of applicants passed the AT-SAT, depending on hiring source). The studies also noted the inefficiency in issuing separate vacancy announcements directed towards different populations, with distinct eligibility standards for each source. *See* Extension to Barrier Analysis at 10. In addition, because these independent analyses had identified certain factors as potential barriers to equal opportunity at the agency, it was FAA's responsibility to explore ways to adjust them to better serve the agency's goals while reducing the barriers to full participation. *See* MD-715 Part A § IV; *see also King v. Jackson*, 468 F. Supp. 2d 33, 35 (D.D.C. 2006) ("MD–715's overriding objective . . . [is] to ensure that all employees and applicants for employment enjoy equality of opportunity in the federal workplace regardless of race").

After considering all of the issues raised in the reports, along with overarching concerns about efficiency and effectiveness, in February 2014, FAA implemented a revised hiring process for its next controller announcement. *See* Exhibit 10, Human Resources Policy Manual, Policy Bulletin No. 84, Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring (Feb. 7, 2014) ("Policy Bulletin No. 84"). The outlines of the revisions had been announced in letters sent to CTI schools on December 30, 2013. *See* Proposed Compl. ¶¶ 104-07. FAA issued

a single nationwide vacancy announcement open to all U.S. citizens who would compete against all other applicants.  *See* Exhibit 34, FAA-AMC-14-ALLSRCE-33537 (Feb. 10, 2014) ("2014 Announcement").  All applicants (regardless of whether the applicant was a CTI graduate) were required to take a new pre-employment screening tool referred to as the Biographical Assessment. *Id.* at 3.  Applicants who passed the BA would then take the AT-SAT and were ranked based on a weighted composite of the BA, AT-SAT, and veterans' preference.  *See id.* Selections were made based on this composite score.  *Id.*; Policy Bulletin No. 84 § 2(h)-(i).

### D.    Statutory Changes (2016 & 2019)

In 2016, Congress enacted statutory requirements for controller hiring.  *See* FAA Extension, Safety, and Security Act of 2016, Pub. L. No. 114-190, Title II § 2106 (July 15, 2016) (codified at 49 U.S.C. § 44506(f)).  Under this law, the FAA continues to issue "All Sources" controller vacancy announcements, but experienced controllers receive a statutory hiring preference, and the FAA then must hire approximately equally from two applicant pools—a pool of eligible CTI graduates and military veterans and a general public pool.  49 U.S.C. § 44506(f)(1). The law prohibited use of a biographical assessment for applicants from the first pool.  *Id.* § 44506(f)(2)(A).  Congress also provided that CTI graduates and veterans who applied in 2014 but were disqualified by the BA could reapply under the revised hiring procedures, waiving the age restriction for applications submitted through December 31, 2017.  *Id.* § 44506(f)(2)(B). Accordingly, under the FAA's All Source vacancy announcements in 2016 and following, the BA was no longer required for CTI graduates.  And in 2016 and 2017, the FAA's announcements reiterated that CTI graduates who failed the 2014 BA could reapply with the age restriction waived. *See, e.g.*, Exhibit 35, FAA-ATO-16-ALLSRCE-49075 (Aug. 2016) at 4; Exhibit 36, FAA-ATO-17-ALLSRCE-53474 (July 2017) at 4.  In December 2019, Congress amended § 44506(f) to give applicants from the first pool "preferential consideration, within each qualification category based

upon pre-employment testing results" before general public applicants. *See* Pub. L. No. 116-92, Nat'l Defense Auth. Act, Div. A, Title XI § 1132, 133 Stat. 1198, 1615 (Dec. 20, 2019).

## II.    Named Plaintiffs & Class Representatives

The proposed sole named Plaintiff, Andrew Brigida, along with proposed class representatives, Matthew Douglas-Cook and Suzanne Rebich, are three individuals who graduated from a CTI program, applied to the 2014 Announcement, took and were disqualified by the BA, and were accordingly not eligible for further employment consideration under that vacancy announcement. *See* Proposed Compl. ¶¶ 154-180.  They and the putative class rely exclusively on Mr. Brigida for exhaustion of administrative remedies. *See id.* ¶¶ 160-166.  Mr. Brigida initiated the Equal Employment Opportunity (EEO) process on February 25, 2014. *Id.* ¶ 160.  He filed a formal EEO complaint on behalf of a putative class of "eligible CTI graduates," who allegedly "entered a direct hire pool of applicants, were placed on a 'Qualified Applicant Register' or 'List,' and were given hiring preference," until that register was "eliminated or purged by the FAA" in 2014. *See* Exhibit 37, Brigida EEO Complaint ¶¶ 12, 58-59, 100 (Apr. 14, 2014).  Plaintiff filed suit before the EEOC acted on his formal complaint, and his administrative complaint was subsequently dismissed.  Proposed Compl. ¶ 166.

## III.    Procedural History

In December 2015, Mr. Brigida filed a putative class action complaint in the U.S. District Court for the District of Arizona, claiming that FAA engaged in disparate treatment in violation of Title VII and the Fifth Amendment when it revised the controller hiring process for 2014. *See* Compl., ECF No. 1, *Brigida v. U.S. Dep't of Transp.*, No. 2:15-cv-02654 (D. Ariz.).  Plaintiff thereafter filed two amended complaints. *Id.*, ECF Nos. 18, 26.  In November 2016, upon Defendants' motion, that court dismissed improper defendants, the Fifth Amendment claim, and the request for equitable relief, and transferred the case to this Court. *See id.*, ECF Nos. 26, 33.

After the case was transferred, the Court reinstated Plaintiff's claim for equitable relief on a motion for reconsideration, but denied reinstatement of the Fifth Amendment claim. *Brigida v. Chao*, No. 1:16-2227 (D.D.C.), ECF No. 50. Following that decision, Plaintiffs filed their Third Amended Complaint, adding for the first time three additional named Plaintiffs: Ms. Wang, Ms. Rebich and Mr. Douglas-Cook. ECF No. 68. The Court denied Plaintiffs' motion for class certification without prejudice after full briefing and a hearing because (1) it was inconsistent with the Third Amended Complaint, (2) including African Americans in the class potentially created commonality, typicality, and adequacy problems, (3) "it's difficult to certify a class that includes individuals who voluntarily chose not to apply for a controller position or withdraw their application after successfully obtaining an offer," and (4) "the class appears to include individuals who did not actually receive a recommendation from an AT-CTI school." Hr'g Tr. at 49:6-50:9, Sept. 13, 2019, ECF No. 86; Minute Order, Sept. 13, 2019. Plaintiffs filed a motion for leave to file a fourth amended complaint, ECF No. 87, which the Court denied "on the ground that his proposed amendments would be futile" because "the [proposed] complaint fail[ed] to remedy the deficiency noted above because it does not exclude CTI graduates who never applied to the roles in question." Order at 2-3, Apr. 5, 2020, ECF No; *see also id.* at *4 ("Upon receiving an opportunity to fix the flaws specifically identified by the Court, Brigida has failed to do so.").

Plaintiffs have now filed yet another motion for leave to amend their complaint. *See* ECF No. 99. Their proposed new complaint has grown to 44 pages, with more than 200 numbered paragraphs. *See* Proposed Compl., ECF No. 99-1. In addition to the alleged loss of a hiring preference that was the focus of the last proposed complaint, *id.* ¶¶ 11-12, 204-06, 211, Plaintiffs now assert a disparate treatment claim regarding the BA. *See id.* ¶¶ 13, 207-08, 212. Also, Plaintiffs assert disparate impact theories for the first time, both for their hiring preference claim

and their new BA claim. *See id.* ¶¶ 187.b, 187.e, 211-212, Prayer for Relief ¶ 5. They have defined the putative class as follows:

> the approximately 2,500 to 3,000 non-African American CTI students who: (1) by February 10, 2014: (a) graduated from a CTI program at one of the 36 FAA-partnered CTI Institutions and (b) passed the AT-SAT, (2) applied to be an ATCS trainee through the 2014 all sources vacancy announcement but failed the Biographical Questionnaire that was incorporated into the 2014 ATCS hiring process and was therefore not hired; and (3) have never been offered employment as an FAA ATCS. Excluded from the Class are any CTI graduates who were not U.S. citizens as of February 10, 2014 or by February 21, 2014 had reached 31 years of age (or 35 years of age if they had had 52 consecutive weeks of prior air traffic control experience).

*Id.* ¶ 182. Plaintiffs also appear to have abandoned their request for compensatory damages, removing all reference to "damages" and seeking only "statutory equitable remedies" *id.*, Prayer for Relief ¶ 7, perhaps in an effort to avoid a jury trial despite their previous jury demand. *See* ECF No 1 at 24; ECF No. 18 at 26; ECF No. 26 at 26; *cf.* 42 U.S.C. § 1981a(c) (permitting a jury trial only where compensatory damages are sought).

## STANDARD OF REVIEW

When a plaintiff moves for leave to amend her complaint after the time for amendment of right has expired, she needs "the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) provides that the court "should freely give leave when justice so requires." *Id.* "Whether 'to grant or deny leave to amend, however, is vested in the sound discretion of the trial court.'" Apr. 25, 2020 Order at 2, ECF No. 98 (ultimately quoting *Doe v. McMillan*, 566 F.2d 713, 720 (D.C. Cir. 1977)). In evaluating whether to deny leave to amend, courts generally consider five grounds for denial identified in *Foman v. Davis*, 371 U.S. 178 (1962): " (1) undue delay; (2) prejudice to the opposing party; (3) futility of the amendment; (4) bad faith; and (5) whether the plaintiff has previously amended the complaint." *Jacksonville Urban League, Inc. v. Azar*, No. 18-2275, 2019 WL 3208686, at *2 (D.D.C. July 16, 2019)

(quotation marks and alteration omitted).[5]  But the district court's discretion is not limited to these factors.  *See Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 344 (D.C. Cir. 1997) ("The District Court possesses sufficient familiarity with the circumstances of a case to exercise its discretion wisely and determine whether any of the five enumerated *Foman* factors, or others implied by the Court's "etc.," apply in a given case.").

"A district court has discretion to deny a motion to amend on grounds of futility where the proposed pleading would not survive a motion to dismiss."  *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215-16 (D.C. Cir. 2010).  "This review for futility is functionally identical to review of a Rule 12(b)(6) dismissal based on the allegations in the amended complaint."  *Jacksonville Urban League*, 2019 WL 3208686, at *2.  The proposed complaint must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The facts alleged "must be enough to raise a right to relief above the speculative level."  *Id.* at 555-56.  Courts "assume the truth of all well-pleaded factual allegations in the complaint and draw all reasonable inferences from those allegations in the plaintiff's favor."  *Shenk v. Mallinckrodt plc*, No. 17-0145, 2019 WL 3491485, at *5 (D.D.C. July 30, 2019).  However, courts "do not assume the truth of legal conclusions, nor do [they] accept inferences that are unsupported by the facts set out in the complaint."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015); *see also Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice.").  "When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials."  *Stephens v. Mnuchin*, 317 F.

---

[5] Hereinafter, internal citations, alterations, and quotation marks are omitted unless otherwise noted.

Supp. 3d 413, 417 (D.D.C. 2018).[6]

## ARGUMENT

## I.    Plaintiffs' Motion to Amend Should Be Denied.

As best Defendants can discern, Plaintiffs now propose to challenge two alleged adverse employment actions—loss of a purported hiring preference and failure to be hired in 2014 because they were disqualified by the BA—and allege both disparate treatment and disparate impact as to each action.  Plaintiffs are not entitled to this belated opportunity to radically alter the scope of their claims, *see infra* Arg. § I.A, and all of their reconfigured claims are futile.  Defendants address Plaintiffs' claim of a lost hiring preference, *see infra* Arg. § I.B, before turning to their new claim regarding the BA, *see infra* Arg. § I.C.

## A.    Justice Does Not Require That Plaintiffs Receive Another Bite at the Apple.

Under Rule 15(a)(2), amendment should be granted "when justice so requires."  Here, after their failed motion to certify a class, the Court gave Plaintiffs an opportunity to cure central defects in their putative class action, including its impermissible inclusion of non-applicants.  *See* Hr'g Tr. at 49:18-20, 50:5-11; Minute Order, Sept. 13, 2019.  Instead, Plaintiffs squandered that opportunity by doubling down on including non-applicants in their next proposed complaint.  *See* Proposed Compl. ¶ 100, ECF No. 87-1.  Now, after the Court again ruled against them, Plaintiffs grudgingly propose to limit their putative class to 2014 applicants, but attempt to retain their theory of an adverse employment action occurring before they even became applicants—forcing Defendant to again debunk this nonviable claim.  *See infra*, Arg. § I.B.1.  Plaintiffs also propose to radically

---

[6] Here, in addition to the Proposed Complaint, it is appropriate for the Court to consider Defendant's exhibits 1-4, 6, 10-12, 15-37, which are attached to or referred to in the complaint and therefore incorporated by reference, *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015), and Defendant's exhibits 5, 7-9, 13-14, 38-39, which are subject to judicial notice as public records and as undisputed material on government websites. *See John Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-0252, 2019 WL 5597740, at *2 (D.D.C. Oct. 30, 2019).  Most of these documents have been previously filed or cited in this case, and Plaintiffs have not disputed their authenticity.

alter the scope and nature of their complaint, asserting a new challenge to the Biographical Assessment and adding a disparate impact theory to all of their claims—each of which give rise to additional threshold deficiencies. *See infra*, Arg. § I.B.2, I.C. And the proposed complaint foreshadows more amendments to come. Despite the Court's observation that African-Americans do not belong in their proposed class, *see* Hr'g Tr. at 49:6-50:9, Plaintiffs intend to pursue a class claim on behalf of African Americans. *See* Proposed Compl. ¶ 182 n.8, ECF No. 99-1; Proposed Compl. ¶ 100 n.8, ECF No. 87-1. Plaintiffs also anticipate amending again to include individuals like former plaintiffs Lucas Johnson and Pollyanna Wang who fall outside the new proposed class definition because they "were later offered an ATCS position." Proposed Compl. ¶ 182 n.9, ECF No. 99-1.

Justice does not require granting Plaintiffs a sixth, seventh, or even an eighth opportunity to amend their complaint. *Cf. Cheeks v. Fort Myers Constr. Corp.*, 216 F. Supp. 3d 146, 169-70 & n.16 (D.D.C. 2016) (denying amendment where plaintiffs "have had more than their fair share of attempts to bring comprehensible and plausible claims against the defendants," noting that the plaintiffs had "inundated the docket in this case with five complaints" and appeared to be "gearing up once again to seek to amend their Complaint"); *Hawkins v. Washington Metro. Area Transit Auth.*, 311 F. Supp. 3d 94, 109 & n.13 (D.D.C. 2018) (dismissing claim despite plaintiffs' suggestion that "any defects could be cleared up by amending the complaint yet again" where they "already had an opportunity to cure such defects in their amended complaint" but did not). Plaintiffs are "not entitled to leisurely repeated bites at the apple, forcing a district judge to decide whether each successive complaint was adequate." *City of Livonia Emps.' Retirement Sys. v. The Boeing Co.*, No. 09-7143, 2010 WL 2169491, at *5 (N.D. Ill. May 26, 2010) (denying request to amend class period and add class representative where plaintiffs "had ample opportunity to seek

leave to amend its complaint").[7]

Justice does not require allowing Plaintiffs another chance where "[u]pon receiving an opportunity to fix the flaws specifically identified by the Court, Brigida [] failed to do so." Order at 4, ECF No. 98. Indeed, disregarding the Court's guidance to cure deficiencies warrants denial of additional amendments. *See, e.g.*, *Foman*, 371 U.S. at 82 (noting that denial is warranted for "repeated failure to cure deficiencies by amendments previously allowed"); *Nichols v. Holder*, 238 F. Supp. 3d 1, 12 (D.D.C. 2017) (denying leave to file third amended complaint because last "amended pleading does not cure—and, in fact, scarcely addresses—the shortcomings noted in the Court's prior opinion"); *Chapman v. First Index, Inc.*, No. 09-5555, 2014 WL 3511227, at *3 (N.D. Ill. July 16, 2014) ("Now that [plaintiff] has not succeeded on his initial definition, he seeks a second bite at the apple based on a theory he could have pursued years ago. Such gamesmanship is not appropriate, particularly where [plaintiff] was aware of the potential that his class definition was deficient yet spurned several opportunities to cure that deficiency.").[8]

---

[7] Plaintiffs have received numerous opportunities to amend their complaint over the years. *See Hudson v. Am. Fed'n of Gov't Emps.*, No. 17-1867, 2019 WL 3533602, at *5 (D.D.C. Aug. 2, 2019) ("It is well-established that the district court's discretion to deny leave to amend is particularly broad where a plaintiff previously has amended the complaint."). After filing the original complaint in December 2015, Plaintiffs amended their complaint three times without Defendant's objection. *See* Notice of Filing 1st Am. Compl., ECF No. 17, Apr. 18, 2016 ("add[ing] allegations to support and clarify [claims] . . . and correct various allegations"); Notice of Filing 2d Am. Compl., ECF No. 25, Aug. 19, 2016 (addressing statutory changes and dismissing certain defendants, claims and requests for relief); Mot. for Leave to File 3d Am. Compl., ECF No. 67, Oct. 22, 2018 (removing Equal Protection claim, "add[ing] additional class agents and [] clarify[ing] facts that have come to light since August 2016"). The Court has previously denied further amendment where a plaintiff had a similar number of opportunities. *See, e.g.*, *Doe v. Lee*, No. 19-0085-DLF, 2020 WL 759177, at *5 n.3 (D.D.C. Feb. 14, 2020); *Hillier v. Dep't of Homeland Security*, No. 16-1836-DLF, 2019 WL 4737066, at *1 n.4 (D.D.C. Sept. 27, 2019).

[8] *See also Andy's BP, Inc. v. City of San Jose*, 605 F. App'x 617, 619 (9th Cir. 2015) (affirming denial of motion to amend because "Plaintiff failed to follow [district court's] instruction to show in the amended complaint that [an element of the claim was met]"); *Pugh v. Tribune Co.*, 521 F.3d 686, 698 (7th Cir. 2008) (noting that courts "have rejected the argument that the plaintiffs now make—namely, that they were entitled to wait and see what the district court said before making any changes to the complaint," and denying amendment where "defendants pointed out this deficiency before the plaintiffs filed their [last motion to amend], but they chose not to remedy it"); *Begala v. PNC Bank, Ohio Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000) ("Plaintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies."); *In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*, 586 F. Supp. 2d 172, 196 (S.D.N.Y. 2008) (denying leave to amend where class action plaintiffs "had the benefit of filing their Second Amended Complaint after the Court's extensive Opinion and Order . . . detailing the deficiencies in their original

Justice also does not require allowing Plaintiffs to add completely new claims relating to the BA and new disparate impact claims after years of litigation, based on additional facts known to Plaintiffs at the time that they filed their original complaint.  One of Plaintiffs' counsel, Michael Pearson, submitted an administrative class complaint in August 2015 in a separate action, raising the same allegations against the BA months before this lawsuit was initially filed in December 2015.  *See* 2d Am. Complaint ¶ 6, ECF No. 36, *Johnson v. U.S. Dep't of Transp.*, No. 19-1916 (D.D.C.).  Thus, these "are claims [Plaintiffs] certainly knew of at the outset of this litigation, and, even if they had a shred of merit, they should have been brought then."  *Stanko v. Fed. Bureau of Prisons*, 842 F. Supp. 2d 132, 140 (D.D.C. 2012).  Such dramatic expansion of the claims is not warranted more than four years into this case.  *See, e.g.*, *Howard v. Blank*, 891 F. Supp. 2d 95, 101-02 (D.D.C. 2012); *aff'd in relevant part*, *Howard v. Pritzker*, 775 F.3d 430, 446 (D.C. Cir. 2015) (denying leave to assert disparate treatment claims in disparate impact case because they would "radically alter the scope and nature of this case" and plaintiffs had "offered no reason for failing to assert these claims earlier in this action").[9]

Moreover, justice does not require allowing Plaintiffs to burden the Court's resources by filing numerous complaints until one finally sticks.  *See McGee v. Dist. of Columbia*, 646 F. Supp. 2d 115, 119 (D.D.C. 2009) ("A court considering a motion to amend a complaint should evaluate the amendment's effect on judicial resources and the judicial system."); *see also Hensley v.*

---

pleading," concluding that "[h]aving already had two bites at the apple, the Class Plaintiffs will not be granted a third"); *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 304 n. 27 (S.D.N.Y. 2000) ("Leave to amend is appropriately denied where, as here, the plaintiff has already had an opportunity to replead after specific warnings as to a complaint's deficiencies").

[9] *See also United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 301 F.R.D. 5, 9 (D.D.C. 2013) ("Courts that have found an undue delay in filing have generally confronted cases in which the movants failed to promptly allege a claim for which they already possessed evidence."); *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir. 1986) ("[L]ate amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action.").

*Imprivata, Inc.*, 260 F. Supp. 3d 101, 126-27 (D. Mass. 2017) ("Plaintiffs are not entitled to wait and see if their amended complaint is rejected by the district court before being put to the costs of filing [another] amended complaint" because "[s]uch a practice would lead to delays, inefficiencies, and wasted work by both the courts and party opponents.").  Here, Plaintiffs' strategic choices have burdened both the Court's and the Defendants' resources and have repeatedly delayed the case from proceeding beyond the threshold, "impos[ing] unnecessary costs and inefficiencies on both the courts and party opponents."  *Pugh*, 521 F.3d at 698; c*f. In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 626 (S.D.N.Y. 2013) (denying leave to file amended complaint to belatedly "seek to plug the holes in their complaints identified by the [court's order]" after plaintiffs did not seek to amend when defects were raised in motion to dismiss, requiring "tremendous effort [to be] expended by defendants and the Court in considering and ruling on the motions to dismiss"); *Clark v. Comcast Corp.*, 582 F. Supp. 2d 692, 707 (E.D. Pa. 2008) ("Under these circumstances, wherein defendants have already had to defend against two [class action] complaints in the matter, allowing the plaintiffs a third bite at the pleading apple would result in prejudice to the defendants.").  The Court should not countenance this approach to litigation, which has "the perverse effect of turning defense counsel and the Court into plaintiffs' counsel's co-counsel, with plaintiffs waiting to see what objections defendants raise and how the Court rules on those objections and then amending their proposed class definitions as necessary based on what they learned in the process."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 465 (S.D.N.Y. 2018).

For all of these reasons, the Court should cease further expenditures of resources on this ever-shifting putative class action, which has repeatedly failed to state a viable claim to class-wide

relief, and deny Plaintiffs' motion to amend.[10]

### B. Plaintiffs Proposed "Hiring Preference" Claim is Futile Because it is Subject to Dismissal For Failure to State a Claim and Cannot Satisfy Rule 23.

Motions for leave to amend should also "be denied where amendment . . . would be futile, i.e., if the proposed claim would not survive a motion to dismiss." *Clean Water Action v. Pruitt*, 315 F. Supp. 3d 72, 80 (D.D.C. 2018). Courts in this district have suggested that dismissal of a class claim is appropriate, without the need for discovery, "when the complaint [fails to] state[] a plausible claim for class-wide relief." *In re McCormick & Co.*, 217 F. Supp. 3d at 140; *see also Burton v. Dist. of Columbia*, 277 F.R.D. 224, 230 (D.D.C. 2011). Where the purpose of the amendment is to support certification of a class action, courts also deny amendment where it "would be futile because a subsequent motion to certify the proposed classes would be denied." *Hilliard v. Int'l City/County Mgmt. Ass'n-Retirement Corp.*, No. 08-2201, 2010 WL 11678002, at *2 (D.D.C. Feb. 2, 2010) (denying amendment after failed class certification motion because plaintiffs' "proposed amended complaint fails to cure the [Rule 23] deficiencies in the original complaint that the Court identified at the status conference"). Under either approach, Plaintiffs' hiring preference claim is futile for numerous reasons.

### 1. Plaintiffs have not plausibly alleged either element of a disparate treatment cause of action.

"Dismissal under Rule 12(b)(6) is proper when . . . the court finds that the plaintiffs have failed to allege all the material elements of their cause of action." *Taylor v. FDIC*, 132 F.3d 753,

---

[10] For related reasons, the Court should not grant Plaintiffs' unexplained effort to withdraw Ms. Rebich and Mr. Douglas-Cook as named plaintiffs but retain them as proposed class representatives. *Compare* Proposed Compl. ¶¶ 5-6; *with* 3d Am. Compl. ¶¶ 5-6. Defendant previously briefed this issue, showing that class representatives must be named parties and that it would be prejudicial for these named plaintiffs to withdraw only to later seek amendment to state individual claims. *See* Def.'s Opp'n to Mot. for Leave to Amend at 42-43, ECF No. 91. Plaintiffs previously professed a willingness to leave the caption alone, *see* Pls.' Reply on Mot. for Leave to Amend at 10, ECF No. 93 ("Ms. Rebich and Mr. Douglas-Cook consent to remain in the class as full parties so long as the FAA is not going to use their roles to yet again delay discovery."), but have again proposed the same incoherent distinction.

761 (D.C. Cir. 1997). Title VII requires a federal employer to make "personnel actions affecting employees or applicants for employment . . . free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). The D.C. Circuit has characterized this to mean that "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). Plaintiffs' hiring preference claim fails to establish either element.

       i.     *Plaintiffs' hiring preference claim again fails to allege a plausible adverse employment action.*

Plaintiffs reiterate their argument that it was an "adverse employment action" for the FAA to "refus[e] to accept the outcome of a race-neutral hiring process that made Class members eligible for application to CTI-only ATCS vacancy announcements and relatedly by purging the list of CTI qualified applicants." Proposed Compl. ¶ 11; *see also id.* ¶ 12, 187.a-b, 188, 193, 200, 204-06. The FAA has already shown that this fails to state a claim under Title VII. *See* Def.'s Mem. at 16-31, ECF No. 91; Def.'s Reply at 3-11, ECF No. 94. And the Court did not accept Plaintiffs' theory in the last round of briefing. *See, e.g.*, Pls.' Mot. at 8 (noting that the Court did not accept Plaintiffs' argument that "the scope of adverse employment action . . . include[d] . . . CTI graduates who had not applied in response to the 2014 ATCS vacancy announcement but had been preferenced for hiring and had that preference stripped away"). Plaintiffs' limitation of the putative class to unsuccessful 2014 applicants does not convert their hiring preference theory into a cognizable employment action. Accordingly, this claim still fails.

Under Circuit precedent, an adverse employment action requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*,

350 F.3d 1286, 1293 (D.C. Cir. 2003); *Webster v. Spencer*, No. 17-1472, 2020 WL 2104231, at *8 (D.D.C. May 1, 2020). Because an employment action is an element of a Title VII claim, it is required for each class member to have a claim. *See, e.g.*, *Aliotta v. Bair*, 614 F.3d 556, 569 (D.C. Cir. 2010) (holding that certain actions "were not adverse employment actions and thus should not be considered as part of class members' case"); *Perry v. Donovan*, 733 F. Supp. 2d 114, 119 (D.D.C. 2010) ("Alleged acts of discrimination that do not constitute adverse employment actions fail as a matter of law."). Plaintiffs claimed "adverse employment action[]" based on "purging Class members' qualifications and failing to fully consider for employment or hire [them]," Proposed Compl. ¶ 12, fails to plausibly allege a cognizable "personnel action" or "adverse employment action" both as a matter of law and fact.

First, Title VII protects equal treatment, not preferential treatment. *See Ricci v. DeStefano*, 557 U.S. 567, 577 (2009) (explaining that disparate treatment "occur[s] where an employer has treated a particular person less favorably than others because of a protected trait"); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 338 n. 18 (1977) ("Title VII provides for equal opportunity to compete for any job[.]"); *Figueroa v. Pompeo*, 923 F.3d 1078, 1082-83 (D.C. Cir. 2019) ("Title VII . . . reflects the American promise of equal opportunity in the workforce[.]"). Thus a process change withdrawing *preferential treatment* for future selections does not readily satisfy Title VII's adverse action or discrimination elements. *See Connecticut v. Teal*, 457 U.S. 440, 451 (1982) ("Title VII strives to achieve equality of opportunity by rooting out 'artificial, arbitrary, and unnecessary' employer-created barriers to professional development"); *Turner v. Billington*, No. 02-00219, 2006 WL 618420, at *8 (D.D.C. Mar. 10, 2006) (holding that "for the reason that the policy applied equally, by definition there can be no showing of an 'adverse personnel action' suffered by plaintiff"). It does not violate Title VII for an employer to adjust its

21

practices to provide an opportunity for all individuals to compete in a subsequent round of hiring or promotions. *See Ricci*, 557 U.S. at 585 ("Nor do we question an employer's affirmative efforts to ensure that all groups have a fair opportunity to apply . . . and to participate in the process by which [selections] are made."). Plaintiffs' belief that CTI graduates are inherently entitled to special treatment as compared to general public applicants is not cognizable under Title VII.

Second, "losing their employment preference" due to a process change before a subsequent round of hiring, Proposed Compl. ¶ 126, does not constitute a "*personnel action*[] affecting employees or applicants for employment." 42 U.S.C. § 2000e-16(a). Title VII does not permit everyone to challenge a federal agency's policies, but instead only "employees or applicants" who are affected by a "personnel action" (often called an adverse employment action). *See Ricci*, 557 U.S. at 579 (characterizing "Title VII's command" to be "that employers cannot take *adverse employment actions* because of an individual's race" (emphasis added)). A mere process change is not an independent personnel action. *See Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 608 (2008) (describing "employment action[s]" and "personnel action[s]" as "hiring and firing decisions" along with actions "such as promotion, salary, or work assignments"); *Taylor*, 350 F.3d at 1293 (holding that an adverse employment action involves a "significant change in employment status"). Even if the Court allows Plaintiffs to add new claims contending that their 2014 applications were unsuccessful, *see infra* Arg. § I.C, their hiring preference claim still fails because it does not challenge a personnel action. *Cf. Aliotta*, 614 F.3d at 569 (dismissing some claims for lack of an adverse employment action even though other claims did allege a cognizable personnel action). In other words, the putative class of CTI graduates were not subject to an employment action merely from the loss of a preference that would have been available *if they applied while it was in place*. *Cf. Bourdais v. New Orleans City*, 485 F.3d 294, 300 (5th Cir. 2007) (holding that

district court properly dismissed certain plaintiffs who had not completed application process and thus "failed to show that they suffered any adverse employment action whatsoever"); *Carter v. City of Philadelphia*, 989 F.2d 117, 122 (3d Cir. 1993) (emphasizing that statutory hiring preference for veterans did not give plaintiff an interest "in the promotion per se but in being given a preference *when his promotion is considered*" (emphasis added)).

Indeed, Plaintiffs acknowledge that their alleged "preference" essentially refers to the FAA's use of CTI-only vacancy announcements. *See, e.g.*, Proposed Compl. ¶ 11 (claiming that the FAA "refus[ed] to accept the outcome of a race-neutral hiring process that make Class members eligible for application to CTI-only ATCS vacancy announcements"), *id.* ¶ 110.[11]  Unlike veterans who received specific hiring preferences (even in CTI-only announcements), *see, e.g.*, 2012 CTI Announcement at 4, or the hiring preferences established by Congress in 2016 and 2019, *see supra*, Background § I.D, Plaintiffs identify no FAA policy that gave an individual CTI graduate a preference over a similarly qualified general public applicant.  Because general public hiring proceeded alongside these CTI-only announcements and there was no year in which only CTI graduates were hired, Plaintiffs cannot conjure a hiring preference from the annual variations in the FAA's reliance on different hiring sources.  Even under the legacy process on which Plaintiffs rely, FAA could simultaneously invite applications from and select both CTI graduates and people from the general public.  *See, e.,g.*, Background § I.A, Tables 1, 2.  In fact, under Plaintiffs' theory, the FAA would have committed an adverse action against CTI graduates if the agency had merely issued a general public announcement in 2014—as it had done in 2009.  But it

---

[11] While frequently repeated in the proposed complaint, Plaintiffs' unsupported allegation of a "hiring preference" is not a "well pleaded factual allegation" that must be assumed true.  *See Shenk*, 2019 WL 3491485, at *5.  Instead, this is an unwarranted and unreasonable inference from the undisputed facts which should not be credited.  *See Arpaio*, 797 F.3d at 19 (courts do not "accept inferences that are unsupported"); *O'Gilvie v. Corp. for Nat'l Community Serv.*, 802 F. Supp. 2d 77, 82 (D.D.C. 2011) (discounting allegations that were "entirely conclusory" and thus "need not be treated as true, and . . . are insufficient to defeat the motion to dismiss").

cannot be the case that such a new opportunity for everyone constitutes a "personnel action" affecting all CTI graduates *per se*.[12]

Moreover, while Plaintiffs repeatedly cite *Ricci v. DeStefano* in their proposed complaint, that case plainly does not support the claim that a process change, standing alone, constitutes an employment action giving rise to a Title VII claim. The *Ricci* plaintiffs plainly challenged an employment action—they were applicants "eligible for immediate promotion" but were not promoted because the "City chose not to certify the examination results." 557 U.S. at 566, 579. In clarifying the narrowness of its holding,[13] the Supreme Court reiterated the appropriateness of modifying a selection process between rounds of employment actions to promote equal opportunity. *See Ricci*, 557 U.S. at 585 ("Title VII does not prohibit an employer from considering, *before* administering a test or practice, how to design that test or practice in order to provide a fair opportunity for all individuals, regardless of their race.") (emphasis added). Employers must be able to assess and adjust their practices to ensure that "race is not a barrier to opportunity." *Id.* at 580; *see also id.* at 585 ("Nor do we question an employer's affirmative efforts to ensure that all groups have a fair opportunity to apply for promotions and to participate in the process by which promotions will be made."); *Shea v. Kerry*, 796 F.3d 42, 55 (D.C. Cir. 2015)

---

[12] Plaintiffs also sow confusion by conflating the closure of prior applications, Proposed Compl. ¶¶ 100, 106, 108, 113, with the decision to issue a single "all sources" announcement in 2014, *id.* ¶ 11, 12, 187.a-b, 188, 193, 200, 204-206—characterizing both as a decision to "purge the hiring preference." The need for applicants from prior years to reapply to be considered in 2014 had already been explained in the December 2013 letter to CTI schools. *See* Proposed Compl. ¶ 106 ("An individual desiring consideration for employment (including CTI graduates) MUST apply. Existing inventories of past applicants will not be used."). It is thus clear both that this action affected *all* prior applicants—both general public and CTI applicants—and that it did not affect CTI graduates like Mr. Brigida who had not applied to a pre-2014 vacancy announcement. There was no "purge" that could be considered a class-wide personnel action.

[13] In *Ricci*, the Supreme Court "articulates the contours of a specific affirmative defense" available in Title VII disparate treatment cases, *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 95 (2d Cir. 2013)—that "before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability." 557 U.S. at 585.

(distinguishing *Ricci* on the ground that the "employers [in certain affirmative action cases] . . . did not modify the outcomes of personnel processes for the asserted purpose of avoiding disparate-impact liability under Title VII"); *Maraschiello*, 709 F.3d at 96 (holding that plaintiff "cannot demonstrate that the generalized overhaul of departmental promotional requirements amounted to the sort of race-based adverse action discussed in *Ricci*").

Here, the FAA did not "refuse[] to accept the outcome of a race-neutral hiring process solely because of the racial makeup of the successful applicants." Proposed Compl. ¶ 205. Instead, the FAA rolled out a new hiring process after extensive analysis and before a new vacancy announcement was issued. *See supra* Background § II.C; *cf. Maraschiello*, 709 F.3d at 96 ("Completing the last phase of a long-planned adoption of a new standard is a far cry from rejecting a set of results out of hand because of their racial makeup."); *id.* at 95-96 (finding no "race-based adverse action" where city did not make "its promotion decision from the 2006 list that included [plaintiff] but . . . instead chose to delay the appointment decision for a month in order to use the results of the new test," even if the "choice to adopt a new test was motivated in part by its desire to achieve more racially balanced results"). The fact that some CTI students and graduates had taken the AT-SAT does not make them comparable to the firefighters who had passed the promotion test in *Ricci* because the AT-SAT did not dictate the outcome of a hiring process, and indeed was not the beginning of an application process. CTI students who passed the AT-SAT—as almost all test-takers did—and graduated from their CTI program still had to apply within the window of a new vacancy announcement, meet all eligibility requirements, be picked by a centralized selection panel, and complete an interview before they could receive a tentative offer letter, then pass additional screening before they could be hired. *See supra* Background § II.B.

In sum, deciding in advance of a new vacancy announcement to issue all-sources

announcements rather than CTI-only ones cannot constitute rejecting the "outcome" of a hiring process; otherwise, FAA could never revise its hiring process in light of observed barriers to equal opportunity but would be required to perpetually carry forward the CTI graduates' alleged "preference."

For all of these reasons, Plaintiffs have failed to set forth a plausible class-wide Title VII "hiring preference" claim.  This class claim should be dismissed for failure to state a claim.

                *ii.*     *Plaintiffs have not plausibly alleged that the challenged actions constituted intentional discrimination against non-African Americans.*

Plaintiffs have also failed to plausibly allege that the alleged loss of their hiring preference occurred "because of" race.  *See Baloch*, 550 F.3d at 1196; *Watson*, 487 U.S. at 986 (stating that in a disparate treatment case "the plaintiff is required to prove that the defendant had a discriminatory intent or motive").  In attempting to make out their claim, Plaintiffs allege a grand conspiracy whereby the Secretary of the Department of Transportation's and the FAA Administrator's 2012 meetings with an employee association concerned about barriers to equal employment opportunity led FAA leadership to agree to conduct barrier analyses that were predetermined to justify intentional discrimination (despite being conducted pursuant to EEOC guidelines by independent industrial psychologists), which discrimination was then conducted by a steering committee of senior agency leaders.  *See, e.g.*, Proposed Compl. ¶¶ 69-75, 81-86, 88, 95.  But the well-pleaded facts merely demonstrate the FAA's appropriate concern for equal opportunity and leveling the playing field, which cannot be contorted into the basis for a plausible claim of intentional discrimination.

Indeed, here, Plaintiffs have alleged "reverse" discrimination, and point to no direct evidence of discriminatory intent.   The *prima facie* case for inferred discrimination against the majority requires more than a mere adverse employment action because "there is nothing

inherently suspicious about an employer's decision to promote a minority applicant instead of a white applicant, or to fire a white employee." *Mastro v. Potomac Electric Power Co.*, 447 F.3d 843, 851 (D.C. Cir. 2006). "[I]n our society, where 'reverse discrimination' is the exception, white plaintiffs must show more than the mere fact that they are white before an adverse employment action against them will raise an inference of discrimination." *Id.* "As a result, a majority-group plaintiff alleging Title VII discrimination must show 'additional background circumstances that support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Id.* (ultimately quoting *Parker v. Balt. & Ohio R.R.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981)). This "background circumstances" requirement "substitutes for the minority plaintiff's burden to show that he is a member of a racial minority." *Id.* While plaintiffs are not inherently required to establish a *prima facie* case at the pleading stage, courts have found the Title VII *prima facie* case helpful in assessing dismissal arguments. *See, e.g.*, *Cravens v. Pact, Inc.*, No. 19-1357, 2020 WL 956526 (D.D.C. Feb. 27, 2020) ("Courts have found the *McDonnell Douglas* framework helpful, however, in determining at the motion to dismiss stage whether the plaintiff can ever meet her initial burden to establish a prima facie case of discrimination."); *Tressler v. Nat'l R.R. Passenger Corp.*, 819 F. Supp. 2d 1, 5 (D.D.C. 2011) ("[T]he Court may explore the plaintiff's prima facie case at the dismissal stage to determine whether the plaintiff can ever meet his initial burden to establish a prima facie case for Title VII discrimination.").

Plaintiffs here lack any "background circumstances" from which discriminatory intent could be inferred. Courts have recognized two general categories of such circumstances—"(1) evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against whites . . . ; and (2) evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Harding v.*

27

*Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993).  Neither category is implicated here.  The FAA's conduct of barrier analyses stemming from requirements in EEOC regulations and concern for lowering barriers to equal employment do not amount to evidence of invidious discrimination.  *Cf. Parker*, 652 F.2d at 1018 n.9 (noting that "a lawful affirmative action program" would not necessarily "in itself constitute suspicious circumstances" justifying an inference of discrimination).

There is nothing "fishy" about the FAA seeking to identify and lower barriers to full participation of minorities throughout its workforce, as required by Title VII and MD-715.  Indeed, one of the documents Plaintiffs rely on highlights the concern about historical barriers to equal opportunity because in 2013 the FAA's fully certified controller workforce was roughly 84% white and male (more than 9,600 out of 11,567).[14]  *See* Proposed Compl. ¶ 119 (citing data from document attached as Exhibit 11); Exhibit 11 at 5.  Nor is there anything fishy in Department of Transportation and FAA leadership listening to the concerns of its employee associations and keeping them apprised of developing changes to its hiring processes.  Proposed Compl. ¶¶ 69, 71, 101.  While Plaintiffs cast the NBCFAE as a villain and "special interest," *see id.* ¶¶ 103, 215, there is nothing nefarious about its longstanding effort to encourage the FAA to conduct an "independent evaluation of hiring and/or screening tools."  *See id.* ¶ 63, *see also id.* ¶¶ 55-66, 76-77.  Nor is there anything fishy about the FAA's decision not to issue another CTI-only announcement but instead to issue an all sources vacancy announcement in light of evidence that the CTI-only announcements might have been barriers to equal opportunity.  *See, e.g.*, Proposed Compl. ¶¶ 80-81; Extension to Barrier Analysis at 4-5, 22, 51-52.

Plaintiffs have also not demonstrated that there was anything fishy about the results of the

---

[14] This is well above white representation in the civilian labor force or even the professional occupations in the federal workforce.  *See* Exhibit 12, OPM, Federal Equal Opportunity Recruitment Program for FY 2012 (Jan. 2014) at 8 (68.5% of civil labor force); *id.* at 67 (72.8% of professional federal workforce).

new hiring process—the document Plaintiffs rely on shows that among the applicants who self-identified their race, non-African Americans received 89.8% of the tentative offers in 2014, while African Americans only received 10.2% of the offers.  *See* Exhibit 11 at 5; *cf.* Proposed Compl. ¶ 134 (suggesting that African Americans constituted 11.5% of CTI students, and citing OPM report for civilian labor force statistics); Exhibit 12 at 8 (stating that African Americans constituted 10.1% of the total civilian labor force).  And more CTI graduates received offers in 2014 than the FAA had hired *in any prior fiscal year*.  *See* Exhibit 11 at 3.[15]  Indeed, CTI graduates received more than one third of the tentative offer letters in 2014,[16] and received offers at more than three times the rate of all other applicants.[17]

Plaintiffs single out two statistics from Exhibit 11, noting that white applicants "received offers for employment at a rate 23.3% below the proportion of white [Certified Professional Controllers]" and that African American applicants received offers at a rate "4.8% greater than the number of African American CPCs."  Proposed Compl. ¶ 119 (citing data from Exhibit 11 at 5).  These two comparisons do not suggest anything fishy about FAA's hiring process; instead they simply reflect the fact that the vast majority of the FAA's existing pool of fully certified controllers were white, while only 5.4% of them were African American.  *See* Exhibit 11 at 5.  They do not support the notion that the FAA intentional designed a hiring process to over-select African Americans or to exclude CTI graduates.

In sum, stripped of their rhetoric, the facts Plaintiffs allege, even viewed in their most favorable light, do not support the inference that the FAA intentionally discriminated in favor of

---

[15] According to Exhibit 11, CTI graduates received 569 offers, while the most CTI graduates hired in prior fiscal years was 467 in 2012.  *See* Background § I.A, Table 2.

[16] *See* Exhibit 11 at 3 (stating that CTI graduates received 569 of the 1591 tentative offer letters).

[17] *See* Exhibit 11 at 3 (stating that 13.91% of 4092 CTI graduates received an offer letter, while only 1,022 of 24,382 non-CTI graduates (including those who did some CTI coursework) received an offer letter, which is 4.19%).

African Americans by deciding not to issue a CTI-only announcement and adopting the interim hiring process.

### 2. Plaintiffs' new disparate impact claim is not administratively exhausted and is contradicted by their proposed pleading.

While their "hiring preference" disparate treatment claim fails for the reasons set forth above, Plaintiffs have also added a disparate impact theory to their "hiring preference" claim for the first time. *See* Proposed Compl. ¶¶ 211; *see also id.* ¶¶ 187.b (alleging commonality based on whether "eliminate[ing] . . . Class members' pre-qualified hiring status . . . had a disparate impact"). They did not acknowledge this change in their motion for leave to amend, apart perhaps from the vague statement that Plaintiffs seek to "make other modifications to the Complaint." Pls.' Mot. at 1, ECF No. 99. Amendment to include this new theory should be denied because Plaintiffs did not exhaust the claim and because it cannot be reconciled to their factual allegations.

"Title VII complainants must timely exhaust their administrative remedies before bringing their claims to court." *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010); *Stephens*, 317 F. Supp. 3d at 417. Thus, "[g]enerally, a plaintiff may only bring claims in district court that were actually part of the administrative [claim]." *Haynes v. Dist. of Columbia Water and Sewer Auth.*, 924 F.3d 519, 526 (D.C. Cir. 2019). Here, Mr. Brigida did not raise or exhaust a disparate impact theory in the administrative process. Through counsel he filed a lengthy complaint that expressly focused exclusively on disparate treatment. *See* Exhibit 37, Brigida EEO Compl. ¶ 2 ("intentional race-based discrimination"); ¶ 3 ("disparate treatment"); ¶ 60 ("intentionally eliminated"); ¶ 75 ("true motive . . . was to intentionally discriminate"); ¶ 76 ("intentionally discriminate"); ¶ 92 ("illegal disparate treatment discrimination"); ¶ 96.b ("uniform intentional action"). Disparate impact and disparate treatment are distinct "causes of action." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015); *see also Hopkins v. Whipple*, 630 F. Supp. 2d 33, 40 (D.D.C. 2009)

("A disparate impact claim is distinct from the disparate treatment claims [plaintiff] has alleged, and requires distinct elements of proof.").  Accordingly, courts have regularly dismissed disparate impact claims that were not raised in the administrative process on the ground that the plaintiffs' disparate treatment allegations did not exhaust this distinct theory.  *See Hopkins*, 630 F. Supp. 2d at 40-41; *Bartlette v. Hyatt Regency*, 208 F. Supp. 3d 311, 324 (D.D.C. 2016); *Achagzai v. Broadcasting Bd. of Gov'rs*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016); *Fields v. Geithner*, 840 F. Supp. 2d 128, 134-35 (D.D.C. 2012), *aff'd on other grounds*, 2012 WL 3059585 (D.C. Cir. July 11, 2012).[18]  For the same reason, Mr. Brigida's administrative complaint did not give the FAA notice of a disparate impact theory and its different proof requirements.  He cannot press this new cause of action for the first time in litigation, let alone more than four years into the case.

In addition, Plaintiffs "do[]not allege facts that, even if accepted as true, state a 'plausible' claim for relief on a disparate impact theory."  *Hylton v. Watt*, No. 17-2023, 2018 WL 4374923, at *4 (D.D.C. Sept. 13, 2018).  Disparate impact claims involve employment practices that are "facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Aliotta*, 614 F.3d at 561. Plaintiffs do not allege facts supporting the conclusion that alleged loss of a hiring preference "disproportionately affected a protected class." *2922 Sherman Ave. Tenants' Ass'n v. Dist. of Columbia*, 444 F.3d 673, 681 (D.C. Cir. 2006).  To the contrary, they argue that the pool of CTI students and graduates was diverse and included a reasonable proportion of African Americans, Proposed Compl. ¶¶ 133-35, and that the barrier analyses' findings to the contrary were erroneous, *see id.* ¶¶ 78-80.  They make no reference to any "statistical disparities."  *Smith v. City of Jackson*,

---

[18] While some courts have been more forgiving with *pro se* plaintiffs who generally alleged discrimination without precision, *see, e.g.*, *Jones v. Mukasey*, 565 F. Supp. 2d 68, 80-81 (D.D.C. 2008); *Jones v. Ashcroft*, 321 F. Supp. 2d 1, 9-10 (D.D.C. 2004), Mr. Brigida was represented by one of his current counsel throughout the administrative process and there is no reason to question the deliberate specificity of his legal claim.

544 U.S. 228, 241 (2005); *cf. Ricci*, 557 U.S. at 587 (characterizing the disparate impact *prima facie* case as "essentially a threshold showing of a significant statistical disparity"). Indeed, Plaintiffs continue to propose that African Americans should be able to participate in this case as well, claiming in essence that the revised hiring process affected all CTI graduates, regardless of race. *See* Proposed Compl. ¶ 182 n.8. Thus, Plaintiffs have not stated a plausible claim that the alleged loss of a hiring preference fell more harshly on non-African American CTI graduates than it did on African American CTI graduates. This disparate impact claim fails on its face.

### 3. Plaintiffs' challenge to selection decisions made in 2012 and 2013 is untimely and thus could not be exhausted by Mr. Brigida's initial EEO contact in February 2014.

Plaintiffs also appear to seek liability on the claim that the putative class was "harmed" by FAA "failing . . . to hire Class members" in 2012 and 2013. Proposed Compl. ¶ 12; *id.* ¶¶ 39, 77. This claim is untimely because Mr. Brigida's EEO contact on February 25, 2014, *see* Proposed Compl. ¶ 160, cannot exhaust challenges to discrete actions occurring in 2012 or 2013.[19] "[W]hen the employee alleges that he or she was the victim of a 'discrete retaliatory or discriminatory act,' the timeliness inquiry focuses on that particular act." *Stephens*, 317 F. Supp. 3d at 418 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). Any discrete acts occurring more than 45 days earlier (i.e., before January 11, 2014) are not exhausted. *See* 29 C.F.R. § 1614.105(a)(1) ("An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory[.]"); *Stephens*, 317 F. Supp. 3d at 418 (disparate

---

[19] Moreover, Mr. Brigida lacks standing to press any claim regarding pre-2014 applicants because he did not graduate until August 2013, *see* Proposed Compl. ¶ 155, and the last CTI-only vacancy announcement had been in August 2012, *see id.* ¶ 77. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("[S]tanding is not dispensed in gross. To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."); *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994) ("Normally, an employee who was not aggrieved by a particular test or hiring requirement lacks standing to challenge that test or requirement."); *Brewer v. Holder*, 20 F. Supp. 3d 4, 14 (D.D.C. 2013) ("[A] putative class member who did not suffer the same injury as the putative class lacks standing to bring the class claim.").

treatment discrimination claims are "discrete . . . discriminatory acts that are not actionable if time

barred, even if they are related to acts alleged in timely filed charges").  Mr. Brigida did not exhaust

claims that "the FAA intentionally slowed its hiring in 2012 and 2013."  Proposed Compl. ¶ 39.

*See, e.g.*, *Achgzai v. Broadcasting Bd. of Gov'rs*, 170 F. Supp. 3d 164, 171-79 (D.D.C. 2016)

(dismissing claims regarding events occurring more than 45 days prior to initial EEO contact).[20]

### 4.    Plaintiffs' hiring preference claim does not meet Rule 23's requirements.

Because Plaintiffs have failed to exhaust administrative remedies or plausibly plead their

disparate treatment or disparate impact theories, they also cannot satisfy Rule 23 requirements.

These, along with additional defects discussed below, underscore that it would be futile to amend

the class complaint in an effort to paper over these fundamental flaws.  Accordingly, the Court

should deny Plaintiffs' motion to amend as "futile because a subsequent motion to certify the

proposed class[] would be denied."  *See Hilliard*, 2010 WL 11678002, at *2; *see also In re*

*McCormick* & Co., 217 F. Supp. 3d at 144-45 (holding that courts "can dismiss class claims if

factual variations among plaintiffs' experiences will prevent class certification," noting that if

"predominance is not plausible, a Rule 12(b)(6) motion can be used to strike class allegations").

#### i.    Plaintiffs' class definition is fatally overbroad.

"Defining the class is of critical importance because, among other things, it identifies the

---

[20] Objective factors also discredit Plaintiffs' unsupported speculation that the FAA "intentionally slowed its hiring in 2012 and 2013 in anticipation of . . . adopting a . . . hiring process that would favor African Americans." Proposed Compl. ¶ 39.  The FAA hired more CTI controllers in both fiscal years 2012 and 2013 than it had in 2010 or 2011. *See supra*, Background § II.A, Table 2 (showing that 467 CTI graduates were hired in FY 2012 and 361 were hired in FY 2013, up from 252 and 245 in FY 2010 and FY 2011, respectively).  And while the FAA "froze" its hiring from March-December 2013, Proposed Compl. ¶ 39, that, along with the closure of the FAA Academy for the same period, were due to the government-wide budget sequestration beginning March 1, 2013 that required the FAA to cut more than $600 million from its budget. *See, e.g.*, Exhibit 7, Statement of FAA Administrator Michael Huerta, Apr. 16, 2013 (link); Exhibit 8, FAA Report, NextGen Advisory Committee, June 4, 2013 (link); Exhibit 13, GAO Report 14-244, 2013 Sequestration at 7, 48-50 (Mar. 2014) (link); Exhibit 14, Cong. Research Serv., Sequestration at the FAA: Air Traffic Control Furloughs and Congressional Response (May 7, 2013).

persons entitled to relief and bound by a final judgment, and as a result, the definition must be precise, objective, and presently ascertainable." *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017).  Courts in this district have rejected class definitions that include people who could not have been injured.  *See Borum v. Brentwood Village, LLC*, 324 F.R.D. 1, 9 (D.D.C. 2018); *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017); *Thorpe v. Dist. of Columbia*, 303 F.R.D. 120, 141–42 (D.D.C. 2014).  Plaintiffs sought to define the putative class to encompass those allegedly injured both by the decision not to issue a CTI-only vacancy announcement and by the 2014 BA.  They did not succeed, because Plaintiffs' putative class includes those who would not have been "eligible for application to CTI-only ATCS vacancy announcements."  Proposed Compl. ¶ 11.  Under the FAA's legacy hiring process, it was not sufficient to have graduated from a CTI program and passed the AT-SAT; instead, one must have an unexpired AT-SAT score (generally within three years of the vacancy announcement) and also have received a recommendation from their CTI program.  *See supra* Background § I.B.  By excluding these criteria in their class definition, Plaintiffs' definition would sweep in people who graduated years before 2014 but were never recommended by their CTI program, along with people whose AT-SAT scores had long expired—for example someone who took the AT-SAT in 2005, graduated shortly thereafter, and whose eligibility for a CTI-only announcement expired in 2008.  In this way, Plaintiffs have again rejected the Court's guidance.  *See, e.g.*, Hr'g Tr. at 49:22-23, Sept. 13, 2019 (denying class certification in part because "the class appears to include individuals who did not actually receive a recommendation from an AT-CTI school").  Such putative class members could not have been harmed by the FAA's decision to give them an opportunity to apply in 2014 when they had *ceased to be eligible* to apply for a CTI-only announcement long beforehand.

> ii.  *Plaintiffs cannot establish commonality or typicality for a class including those ineligible to apply for a CTI-only announcement and those unlikely to be selected under the prior process.*

As the Supreme Court explained in *Wal-Mart Stores v. Dukes*, commonality under Rule 23(a)(2) requires not merely the literal raising of "common 'questions,'" but rather "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." 564 U.S. 338, 350 (2011); *see also D.L. v. Dist. of Columbia*, 713 F.3d 120, 125 (D.C. Cir. 2013). In other words, not only must the plaintiffs' claims depend on a "common contention," but that contention "must be of such a nature that it is capable of classwide resolution." *Wal-Mart,* 564 U.S. at 350. "A plaintiff seeking class certification is not required to prove the elements of his claim at the certification stage, but he must show that the elements of the claim are susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 491 (2013).

Plaintiffs cannot meet this standard. Plaintiffs allege commonality on the ground that FAA "eliminate[d] or purge[d] Class members' pre-qualified hiring status," Proposed Compl. ¶ 187.a-b, but in fact, this claim lacks commonality because the putative class inherently includes people who were not injured because they *could not have applied* for a CTI-only announcement in 2014. *See Wal-Mart*, 564 U.S. at 349-50 ("Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."). Because their putative class includes people who did not meet the requirements for applying to a CTI-only announcement, *see supra* Arg. § I.B.4.i, Plaintiffs fail to allege any cognizable basis by which all of these individuals "suffered the same injuries" when the FAA changed its hiring procedures. Proposed Compl. ¶ 193. Moreover, Plaintiffs' putative class includes both CTI graduates whose AT-SAT scores ranked them well-qualified and those who passed the AT-SAT with a lower score and were far less likely to be selected under the prior hiring process. *See, e.g.*, Proposed Compl. ¶¶ 53-54 (noting that "selections went primarily to those ranked well-qualified" and that one study found that less than

25% of CTI graduates with lower scores were hired under the prior process). These lower-scoring CTI graduates do not suffer the same injury from the loss of a hiring process under which they were unlikely to be selected.

For similar reasons, Plaintiffs cannot show that they have the "same interest and . . . same injury," *Council of & for the Blind of Delaware Cty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1544-45 (D.C. Cir. 1983), as absent class members who were not eligible or were unlikely to be hired under the prior process. They thus cannot meet Rule 23(a)(3)'s typicality requirement. *See Daskalea v. Washington Humane Soc.*, 275 F.R.D. 346, 358 (D.D.C. 2011) (denying certification for lack of typicality where "the members of the proposed class suffered a wide range of deprivations . . . and claim distinct injuries"); *Moore v. Napolitano*, 269 F.R.D. 21, 33 (D.D.C. 2010) (denying certification for lack of typicality where "[a] particular class member may not have suffered an injury at all, much less an injury typical of the injuries alleged by the class representatives."). Plaintiffs have failed to support their boilerplate legal conclusions that "all members were simultaneously harmed" and that "all members of the Class suffered the same injuries." Proposed Compl. ¶¶ 190, 193.[21]

> iii.    *Plaintiffs cannot show that the class is sufficiently homogenous or that common issues predominate.*

Plaintiffs assert that they are seeking certification "pursuant to Rules 23(b)(2) (for a liability determination and declaratory and equitable relief) and 23(b)(3) (for liability, backpay,

---

[21] While "typicality is ordinarily met if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct," *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019), typicality is "destroy[ed]" if "a distinction must differentiate the 'claims or defenses' of the representatives from those of the class." *Id.* (quoting Fed. R. Civ. P. 23(a)(3)). Thus Plaintiffs err in relying on the generality that typicality is satisfied where "each class member's claim arises from the same course of events that led to the claims of the representative parties." Proposed Compl. ¶ 193 (quoting *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 115 (D.D.C. 2007)). Where the putative class includes those who were ineligible to apply for a CTI-only announcement, unlike Plaintiffs, that distinction destroys typicality.

frontpay, and other economic relief)."  Proposed Compl. ¶ 182.  As constituted, the putative class

is fatal to certification under either provision.

Plaintiffs' proposed class does not meet the requirement of Rule 23(b)(2) to show that final

injunctive relief be "appropriate as to the class as a whole."  *See Wal-Mart*, 564 U.S. at 366 (for

certification under Rule 23(b)(2), challenged conduct must be "such that it can be enjoined . . .

only as to all of the class members or as to none of them").  The injunctions Plaintiffs seek do not

apply to those who were ineligible to apply for a CTI-only announcement.  *See* Proposed Compl.

Prayer for Relief ¶ 6 (asking Court to direct FAA to "comply with Title VII," "prevent race-based

hiring decisions from occurring in the future," and remediate "past unlawful employment

practices" by "instatement preferences and eligibility extensions").  *See D.L. v. Dist. of Columbia*,

860 F.3d 713, 726 (D.C. Cir. 2017) ("To certify a class under this provision, a single injunction

must be able to 'provide relief to each member of the class.'" (quoting *Wal-Mart*, 564 U.S. at 360).

Moreover, the commonality and typicality problems also preclude certification under Rule

23(b)(2).  While Rule 23(b)(2) includes no explicit predominance or superiority requirements, this

is because certification of a class under Rule 23(b)(2) is only appropriate where the satisfaction of

those conditions is "self-evident."  *Wal-Mart*, 564 U.S. at 363.  Where a class is not "sufficiently

cohesive" —where it lacks homogeneity—the legality of the behavior at issue cannot be settled

with respect to the class as a whole, and certification under Rule 23(b)(2) is inappropriate.  *See*

*Lightfoot v. D.C.*, 273 F.R.D. 314, 329 (D.D.C. 2011).  As explained above, *see supra* Arg. §

I.B.4.i, Plaintiffs' proposed class encompasses individuals who could not have been harmed by

the alleged loss of a hiring preference and those unlikely to be harmed by it.  Thus, the wide range

of putative class members here lack cohesion and certification under Rule 23(b)(2) must be denied.

Plaintiffs have fallen even farther short of Rule 23(b)(3)'s requirements.  As the D.C.

Circuit has admonished, Rule 23(b)(3) demands that Plaintiffs "must . . . show that they can prove, through common evidence, that all class members were in fact injured," by a purported legal violation. *In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*In re Rail Freight I*"), 725 F.3d 244, 252 (D.C. Cir. 2013). Here, where it is clear that members of the putative class were not injured, and that any injuries vary widely among the class, Plaintiffs cannot show predominance. *See id.* at 252-53 ("Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact."); *id.* at 252 ("we do expect the common evidence to show all class members suffered some injury"); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*In re Rail Freight II*"), 934 F.3d 619, 624 (D.C. Cir. 2019) (affirming district court's finding that common issues did not predominate for class with more than a *de minimis* number of members "with no common proof" of injury and causation, which are "essential elements of liability").

### C.    Plaintiffs' Proposed Biographical Assessment Claim is Futile Because It is Subject to Dismissal For Failure to State a Claim.

Plaintiffs' hiring preference claim fails for all the reasons set forth above, and their only other substantive legal challenge is a new claim challenging the BA on both disparate treatment and disparate impact grounds. *See, e.g.*, Proposed Compl. ¶¶ 13, 116, 182-83, 207-08, 212. This claim also fails.

### 1.    Mr. Brigida did not administratively exhaust a challenge to the Biographical Assessment.

Mr. Brigida, on whom Plaintiffs exclusively rely for administrative exhaustion, *see id.* ¶ 162, did not state a claim in the administrative process regarding the BA or a corresponding failure to be hired under the 2014 Vacancy Announcement.[22]   Indeed, his formal EEO complaint never

---

[22] Nor could Mr. Brigida rely on Lucas Johnson's administrative class complaint to exhaust this separate theory because courts do not permit class actions to piggy-back on each other. *See China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1806 (2018); *Contreras v. Ridge*, 305 F. Supp. 2d 126, 134 n.4 (D.D.C. 2004). Moreover, Plaintiffs here may not rely on vicarious exhaustion under the "single-filing rule" because they have not joined Johnson's suit. *See Brooks v. Dist. Hosp. Partners*, 606 F.3d 800, (D.C. Cir. 2010) ("[T]he single-filing exception does not apply where

mentioned applying under the 2014 Vacancy Announcement or not passing the BA.  *See generally*

Exhibit 37, Brigida EEO Complaint.  This is striking because he filed his informal EEO complaint

two days *before* being informed that he did not pass the BA.  *See* Proposed Compl. ¶¶ 160-161.

And his formal EEO complaint listed the dates he became aware of the challenged actions as either

"on or about February 9, 2014," Brigida EEO Compl. at 2, or "in late January [2014]", *id.* at 14,

both of which came *before* the 2014 Announcement opened on February 10, 2014.  *See* Exhibit

34, 2014 Announcement.  Mr. Brigida's administrative complaint thus focused exclusively on the

allegation that "on or about December 20, 2013, the FAA eliminated the CTI Applicant Register

or List resulting in Complainant and putative Class Members losing their employment preference

and opportunity."  Brigida EEO Compl. ¶ 29; *see also id.* ¶ 12 (relying on the mistaken notion that

CTI graduates "entered a direct hire pool of applicants" rather than needing to apply for specific

vacancy announcements).

Because Mr. Brigida did not raise his unsuccessful 2014 application in his formal

administrative complaint, he cannot now claim that he exhausted administrative remedies

regarding it.  *See, e.g.*, *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997)

("[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge

would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged

party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge.");

*McIver v. Mattis*, 318 F. Supp. 3d 245, 251 (D.D.C. 2018) (concluding "that a failure to provide

notice of a particular claim is no different—as far as that claim goes—than a wholesale failure to

---

there is no joinder to the suit brought by the original filer."); *cf. Hall v. Hall*, 138 S. Ct. 1118, (2018) (consolidation under Rule 42(a) is not understood as "completely merging the constituent cases into one, but instead as enabling more efficient case management while preserving the distinct identities of the cases and the rights of the separate parties in them").  Defendant also disputes that Johnson's complaint was timely because it was filed in 2015 regarding events in February 2014 or earlier.  *See* Answer ¶¶ 6, 152, 155 & 2d Defense, ECF No. 95.

file" and dismissing claim).  Indeed, plaintiffs are generally required to separately exhaust claims
regarding discrete subsequent acts.  *See, e.g.*, *Redding v. Mattis*, 327 F. Supp. 3d 136, 139-40
(D.D.C. 2018); *Dudley v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 174 (D.D.C.
2013); *Hunter v. Dist. of Columbia*, 797 F. Supp. 2d 86, 95 (D.D.C. 2011).  Because an
unsuccessful 2014 application is distinct from, and subsequent to, the alleged "purge" affecting all
CTI graduates, it should require separate exhaustion.[23]

Perhaps for this very reason, Plaintiffs specifically and repeatedly have represented to this
Court before seeking to amend that the claim that "the 2014 BA was validated improperly and
used inappropriately to screen applicants due to race" is "*not asserted in this matter*." Pls.' Mot.
for Class Cert. at 32, ECF No. 73-1 (emphasis added); *see also* Pls.' Reply on Mot. for Class Cert.
at 15, ECF No. 78 ("The FAA made multiple unlawful decisions in its hiring process between
2012 and 2019.  One such decision . . . is challenged by Plaintiffs in this case. Separately, the
FAA's unlawful implementation of a non-validated Biographical Questionnaire . . . is challenged
in a putative class action in Texas."); Hr'g Tr. at 5:4-6, Sept. 13, 2019 (stating that the BA "really
didn't pertain to the students who were purged from the list"); *id.* at 3:24-4:5 (stating that this case
"has . . . from a discovery standpoint some issues dealing with the [BA]" but is a "wholly different
case[]" from *Johnson* and only "deals with the termination of approximately 2,700 [] CTI
students").[24]  It is thus clear that Mr. Brigida did not intend to exhaust any challenge to the 2014

---

[23] The two fleeting references to the 2014 BA in the formal complaint do not alert the FAA that Mr. Brigida
intended to separate challenge that aspect of the revised hiring process.  See Formal Compl. ¶¶ 27-28 (quoting Dec.
30, 2013 email describing revising hiring process); *id.* ¶ 73 (speculating that FAA goal was "making students who
had already passed the prior validated assessment process 'pass' a highly suspect Biographical Analysis ('BA')
questionnaire").  Such a "fleeting and skeletal reference . . . could not reasonably be expected to alert the [agency] to
investigate the claim that" Mr. Brigida's unidentified 2014 application was denied.  *See Crawford v. Duke*, 867 F.3d
103, 110 (D.C. Cir. 2017) (holding that "vague allegation about a supervisor interfering in his application for an
unidentified promotion" did not reasonably trigger investigation where plaintiff "nowhere alleges anything about the
ultimate outcome of that promotion application").

[24] Moreover, Michael Pearson, one of Plaintiffs' counsel who represented Mr. Brigida throughout the administrative
process, consistently argued throughout the *Johnson* matter that *Brigida* did not challenge the 2014 BA.  *See, e.g.*,

BA through his administrative class complaint or raise it in this litigation.[25]

### 2. Plaintiffs have not plausibly alleged a disparate impact or disparate treatment claim with respect to the Biographical Assessment.

Even had Plaintiffs properly exhausted their claim regarding the BA, they fail to plausibly

allege a disparate impact or a disparate treatment claim on that issue. First, Plaintiffs' disparate

impact challenge fails because they have not alleged that the facially neutral assessment "in fact

fall[s] more harshly on one group than another," *Aliotta*, 614 F.3d at 561, or results in a "significant

statistical disparity." *Ricci*, 557 U.S. at 587. Plaintiffs do not allege that the BA actually rejected

non-African American applicants at a higher rate than it rejected African American applicants. *Cf.*

*Boykin v. Fenty*, 650 F. App'x 42, 44 (D.C. Cir. 2016) (holding that "district court correctly

dismissed . . . claim that the District's closure of the shelter produced an unlawful disparate impact

based on appellants' disabilities" because "complaint failed to allege facts suggesting that the

closure affected a greater proportion of disabled individuals than non-disabled"); *Prince v. Rice*,

453 F. Supp. 2d 14, 27 (D.D.C. 2006); *cf. Texas Dep't of Housing and Community Affairs v.*

*Inclusive Communities Project*, Inc., 135 S. Ct. 2507, 2523 (2015) (noting that plaintiffs must

---

Pl.'s Response to Mot. for Related Case Designation at 7, *Johnson v. U.S. Dep't of Transp.*, No. 19-1916 (D.D.C. Nov. 25, 2019), ECF No. 35 (arguing "that the purging of the CTI Inventory and other discriminatory acts targeted solely at CTI graduates is one event, which gives rise to the *Brigida* case, and the implementation and use of the BA is a second, separate event, which gives rise to the *Johnson* case"); Exhibit 39, Pl.'s Response to Mot. to Dismiss at 5, 6, *Johnson v. U.S. Dep't of Transp.*, No. 3:18-2431 (N.D. Tex. Mar. 29, 2019), ECF No. 26 (accord); Exhibit 39, Pl.'s Appeal of Dismissal at 2, *Johnson v. Foxx*, EEOC No. 570 -2016-0095X (July 26, 2016) (accord); Compl. ¶ 20 n.1, *Johnson v. U.S. Dep't of Transp.*, No. 3:18-2431 (N.D. Tex. Sept. 12, 2018) ("Plaintiff avers that the *use* of the BA has not been challenged in Court thus far."); 1st Am. Compl. ¶ 21, ECF No. 10 (Dec. 5, 2018) (same); 2d Am. Compl. ¶ 29, ECF No. 36 (Nov. 26, 2019) (same).

[25] Some judges in this district permit a plaintiff to file claims that are "like or reasonably related to the allegations of the [EEO] charge and growing out of such allegations" where the claims "at a minimum arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Haynes*, 924 F.3d at 526 & n.1 (declining to decide whether D.C. Circuit's "'like or reasonably related' doctrine survives *Morgan*"); *see also Coleman v. Duke*, 867 F.3d 204, 213 n.7 (D.C. Cir. 2017) (same). The Court need not reach this alternative standard because those cases do not address the circumstance where the complainant so clearly intended to limit the scope of his complaint. *Cf. Mount v. Johnson*, 36 F. Supp. 3d 74, 89 (D.D.C. 2014) (holding that claims did not "come within the scope of any investigation that reasonably could be expected to result" where "[plaintiff] and his attorney unequivocally cut off that investigation, expressly limiting its scope to [one] non-selection").

"allege facts at the pleading stage . . . demonstrating a causal connection" to make out a disparate impact claim).

Instead, Plaintiffs suggest that three questions on drafts of the BA might have advantaged African Americans—claiming that a question regarding one's lowest high school grade, Proposed Compl. ¶ 120, and two questions about employment history, *id.* ¶ 121, awarded the most points for demographics where African Americans were the most highly represented.  Such isolated anecdotal evidence does not suggest that the challenged employment practice—the 2014 BA— had a disparate impact as a whole.  *Cf. Teal v. Connecticut*, 645 F.2d 133, 138 (2d Cir. 1981), *aff'd on other grounds*, *Connecticut v. Teal*, 457 U.S. 440 (1982) ("Where all of the candidates participate in the entire selection process, and the overall results reveal no significant disparity of impact, scrutinizing individual questions or individual sub-tests would, indeed, conflict with the dictates of common sense.").  And, as discussed above, the only statistics Plaintiffs highlight—a decrease in the ratio of white selectees as compared to incumbents, *see* Proposed Compl. ¶ 119— do not suggest a disparate impact because those comparisons merely reflect the fact that in 2013 FAA's fully certified controllers were overwhelmingly white.  *See* Exhibit 11 at 5; *see also supra*, Arg. § I.B.1.ii & n.14.  Data about incumbents selected years or decades earlier, often under different processes, have no significance for disparate impact analysis of a new selection process. *See, e.g.*, *Banks v. East Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 578-79 (5th Cir. 2003); *EEOC v. Francis W. Parker Sch.*, No. 91-4674, 1993 WL 106523, at *10 (N.D. Ill. Mar. 24, 1993). Instead, one must generally compare selectees to the pool of *applicants*, and Plaintiffs fail to make any plausible allegation that the BA caused an overall disadvantage to white (or all non-African American) applicants.  *See, e.g.*, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975); *Davis v. Dist. of Columbia*, 925 F.3d 1240, 1255 (D.C. Cir. 2019); *Young v. Covington & Burling LLP*,

846 F. Supp. 2d 141, 156–57 (D.D.C. 2012).

More to the point, the document Plaintiffs rely on shows that Plaintiffs' own demographics were very successful under the 2014 process—among the applicants who self-identified their race, non-African Americans received 89.8% of the tentative offers in 2014, while African Americans only received 10.2% of the offers.  *See* Exhibit 11 at 5.  Plaintiffs provide no plausible allegation demonstrating that this is a disparate result or that the BA itself overselected African Americans and thus had a disparate impact on non-African Americans.  *Cf.* Proposed Compl. ¶ 134 (suggesting that African Americans constituted 11.5% of CTI students, Proposed Compl. ¶ 134); Exhibit 12 at 8 (stating that 10.1% of civilian labor force in 2013 was African American).  Accordingly, Plaintiffs have failed to plead a plausible disparate impact claim and the statistics they cite undermine any speculation they might indulge.

As for Plaintiffs' disparate treatment challenge to the BA, it follows the same path as the hiring preference claim in attempting to convert evidence of an agency's efforts to level the playing field into invidious discrimination.  Thus, this claim likewise fails on Title VII's second element because it does not to plausibly allege that the putative class was not selected "because of" race. *See supra*, Arg. § I.B.1.ii.  Plaintiffs cannot show intentional discrimination from the FAA's completion of barrier analyses and efforts to improve equal opportunity based on the results.

Accordingly, amendment of the complaint to add Plaintiffs' new challenge to the BA would be futile and would not provide a basis for a viable class claim.  *See, e.g.*, *In re James*, 444 F.3d 643, 647 (D.C. Cir. 2006) (characterizing Title VII exhaustion issues as "necessarily prerequisite to a Rule 23 analysis"); *Marable v. Dist. Hosp. Partners, LP*, No. 01-2361, 2008 WL 5501106, at * (D.D.C. Dec. 1, 2008) (holding that "proposed class cannot be certified" because "the named representatives . . . [have not] exhausted administrative remedies"); *Taylor*, 132 F.3d

at 761 (holding dismissal proper where "plaintiffs have failed to allege all the material elements of their cause of action").

## II.    Alternatively, Plaintiffs' Class Claims Should Be Stricken.

In the alternative, the Court could strike the class claims pursuant to Federal Rule of Civil Procedure 12(f) and Local Rule 23.1(b) ("A defendant may move at any time to strike the class action allegations or to dismiss the complaint.").  *See Barnes v. Dist. of Columbia*, 289 F.R.D. 1, 6 (D.D.C. 2012) ("The decision of whether to strike all or part of a pleading rests within the sound discretion of the Court.").  A motion to strike the class claims employs the same standard as futility of amendment and a motion to dismiss.  *See In re McCormick & Co.*, 217 F. Supp. 3d at 140.[26] While denial of the motion to amend is preferred, especially because justice does not require giving Plaintiffs an additional bite at the apple, striking the class claims on all of the grounds the FAA has identified above—going to both Title VII and Rule 23 issues—would give the parties the opportunity to assess whether any of Plaintiffs' individual claims survive in light of the Court's reasoning.  *Cf. Artis v. Yellen*, 309 F.R.D. 69, 73 (D.D.C. 2015) (holding that a motion to strike is appropriate to "'eliminate class allegations,' in cases where 'a suit must proceed as a nonclass, individual action.'" (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 183 n. 6 (1974)).  Accordingly, if the Court is inclined to allow Plaintiffs to amend the operative complaint, FAA respectfully requests that the Court strike the class claims set out in the Proposed Fourth Amended Complaint, including paragraphs 181-201 and other references to the proposed class in the Claim

---

[26] Indeed, numerous courts have held that it is appropriate to strike class allegations when, on the face of the complaint, it is clear that the no class can be certified.  *See, e.g.*, *Pilgrim v. Universal Health Card*, LLC, 660 F.3d 943, 946-50 (6th Cir. 2011); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1308 (11th Cir. 2008); *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007); *Kennedy v. Unumprovident Corp.*, 50 F. App'x 354, 355-56 (9th Cir. 2002); *Williams v. Potomac Family Dining Group Operating Co.*, LLC, No. GJH-19-1780, 2019 WL 5309628, at *4-5 (D. Md. Oct. 21, 2019); *Young v. Standard Fire Ins. Co.*, No. 2:18-CV-031-RMP, 2019 WL 4751856, at *6 (E.D. Wash. Sept. 30, 2019); *Fullerton v. Corelle Brands, LLC*, Nos. 18-cv-4152, 18-cv-4198, 2019 WL 4750039, at *14-15 (N.D. Ill. Sept. 30, 2019); *MSP Recovery Claims, Series LLC and Series 17-04-631 v. Plymouth Rock Assurance Corp.*, No. 18-cv-11702, 2019 WL 3239277, at *10-11 (D. Mass. July 18, 2019).

for Relief and Prayer for Relief.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Leave to Amend

the Complaint, or, alternatively, strike Plaintiffs' class claims.


DATED: June 5, 2020

JOSEPH H. HUNT
Assistant Attorney General

CARLOTTA P. WELLS
Assistant Director
Civil Division, Federal Programs Branch

*/s/ Galen N. Thorp*
GALEN N. THORP (V.A. Bar No. 75517)
Senior Counsel
MICHAEL DREZNER (V.A. Bar No. 83836)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Telephone: (202) 514-4781
Facsimile: (202) 616-8470
Email: galen.thorp@usdoj.gov

*Counsel for Defendant*