## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDREW J. BRIGIDA<br>and MATTHEW L.<br>DOUGLAS-COOK,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>ELAINE L. CHAO, Secretary,<br>U.S. Department of Transportation,<br><br>        *Defendant*. | Civil Action No. 16-2227 (DLF) |

## FOURTH AMENDED AND SUPPLEMENTAL CLASS ACTION COMPLAINT

Plaintiffs Andrew J. Brigida and Matthew L. Douglas-Cook,[1] on behalf of themselves and the Class they seek to represent by and through their attorneys, hereby file this Fourth Amended and Supplemental Class Action Complaint against the above-named Defendant.

## INTRODUCTION

In 2014 the Federal Aviation Administration ("FAA"), with illegal race-based motives, stripped graduates of the Air Traffic-College Training Initiative ("AT-CTI") of their merit-based, prequalified employment status. These students had legitimate expectations for their hiring after they invested thousands of dollars and years of time to graduate from FAA-partnered academic programs, and pass FAA-designed, peer-validated, and proctored aptitude tests in order to be prequalified for hiring as FAA Air Traffic Control Specialists ("ATCS").

---

[1] Should class certification be denied, a number of other putative class members may seek to be added as individual plaintiffs.

Special interest groups and activists, however, felt the preference provided to those who successfully completed the AT-CTI program had a disparate impact on African Americans. After over a decade of lobbying, in 2012 and 2013 these activists convinced the FAA to engage non-agency consultants who would support their arguments. As a result, the FAA traded public safety and operational efficiency for political expediency, abruptly abandoned its well validated merit-based employment screening system in early 2014, and arbitrarily purged its inventory of prequalified ATCS applicants. The FAA then doubled-down on its race-motivated hiring scheme, using an unvalidated race-engineered "biographical" test to screen and hire new ATCS candidates. This race-biased hiring violated Title VII and eliminated over one thousand qualified students from the 2014 ATCS hiring process.

This case seeks remedies for the class of students harmed by the FAA's illegal actions. After the FAA implemented discriminatory hiring, the putative Class members found themselves largely jobless or underemployed, burdened with significant debt and a disvalued college degree—even divorced or homeless in some cases. These aspiring air traffic controllers are entitled to relief under Title VII of the Civil Rights Act of 1964.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction, pursuant to 28 U.S.C. § 1331, because the matter in controversy arises under the Constitution and laws of the United States, including but not limited to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

2.     Venue rests properly in this Court, pursuant to 28 U.S.C. § 1391(e), because "a substantial part of the events … giving rise to the claim occurred" within this judicial district.

3.     Additionally, this matter was transferred to this venue pursuant to Defendant's motion.

## PARTIES

4.     Plaintiff Andrew J. Brigida is a current resident of Cave Creek, Arizona.  He brings this action on behalf of himself individually, and on behalf of a Class of persons similarly situated, the Instatement Class, as described below.

5.     Plaintiff Matthew L. Douglas-Cook is a current resident of Vancouver, Washington.   He brings this action on behalf of himself individually, and on behalf of a Class of persons similarly situated, the Instatement Class, as described below.

6.     Defendant Elaine L. Chao is the Secretary of the United States Department of Transportation ("DOT"), a cabinet-level department within the Executive Branch of the federal government.  In that capacity, Secretary Chao is responsible for overseeing the actions of all the employees and officers within the agencies of the Department, including the Federal Aviation Administration. Secretary Chao is sued in her official capacity.

## LEGAL BACKGROUND

7.     Title VII prohibits employment discrimination on the basis of race.  42 U.S.C. § 2000e; *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Title VII prohibits discrimination against employees of, and applicants for employment in, the federal government. 42 U.S.C. § 2000e-16.  Additionally, the D.C. Circuit has held that Title VII is the sole method by which federal employees can enforce the Equal Protection component of the Due Process Clause against the federal government for employment discrimination. *See Kizas v. Webster*, 707 F.2d 524, 542 (D.C. Cir. 1983) (citing *Brown v. GSA*, 425 U.S. 820 (1976)).

8.     Title VII provides that it is unlawful employment discrimination "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race …." 42 U.S.C. § 2000e-2(a)(1).

9.      Absent a valid defense, Title VII prevents a government agency from refusing to accept the outcome of a race-neutral hiring process, depriving applicants of their legitimate expectations, solely because of the racial makeup of the successful applicants. *See Ricci*, 557 U.S. at 579.  However, it is not simply the consequences of a racially motivated employment decision that violate the statute.  The sheer fact that the "ultimate aim" of the employment decision was "because of race" is contrary to the statute. *Id.* at 579–80.

10.      The FAA violated Title VII and harmed the Class by refusing to accept the outcome of a race-neutral hiring process that made Class members eligible for application to CTI-only ATCS vacancy announcements and relatedly by purging the list of CTI qualified applicants.  But for the FAA's illegal action, Class members were pre-qualified and preferenced for hiring and would likely have been hired or at least offered ATCS positions.

11.      The FAA violated Title VII and harmed the Class by taking adverse employment actions, including purging Class members' qualifications and failing to fully consider for employment or to hire Class members, with an ultimate aim that was because of race – to decrease the number/proportion of non-African Americans fully considered for ATCS positions and increase the number/proportion of African American applicants in the final hiring pool.

12.      The FAA violated Title VII by using an unvalidated biographical screening mechanism to decrease the number/proportion of non-African Americans fully considered for ATCS positions and increase the number/proportion of African American applicants in the final hiring pool.

## FACTUAL BACKGROUND

A.   **FAA Hiring Process and Research prior to 2014**

13.   The FAA's mission is to provide the safest, most efficient aerospace system in the world.

14.   ATCSs make up the single largest and most publicly visible workforce in the FAA and an ATCS position is considered a desirable job with a six-figure income and federal benefits.

15.   As of 2012, the FAA sought to maintain a workforce of approximately 15,000 ATCSs.

16.   ATCSs are a key component of the FAA's responsibility to ensure safe, efficient air travel. ATCSs carry out thousands of air traffic control actions daily and require significant training to prepare them for this job.

17.   Indeed, in the past, less than 4% of applicants successfully completed the grueling gauntlet of aptitude tests, screens, classroom training, simulation training, on-the-job training and over-the-shoulder performance evaluations with live traffic to become fully certified controllers.

18.   During the 1980s, the FAA hired air traffic controller candidates from two main sources. First, the FAA hired military-trained controllers ("Veteran's Recruitment Appointments" or "VRAs"), who had separated or retired from military service.  Second, the FAA hired through General Public ("GP") announcements, commonly referred to as Off-the-Street ("OTS") hiring.

19.   OTS hiring was inefficient, often resulting in candidates lacking air traffic control or relevant college experience.  In addition, besides being expensive to administer, the FAA deemed the quality of candidates unsatisfactory and noted training failure ("washout") rates in the range of 40% with OTS applicants.

20.   In 1989, the FAA, experiencing drastically increased and deregulated air travel and rapid technological changes, determined that it had entered its most demanding period in history and published

the *Flight Plan for Training*. This publication proposed a new system to solve some of the failures of OTS hiring by implementing and supporting air traffic controller college training programs.

21.     The FAA expected the result to "be *skilled applicants* who come to the FAA prepared to pass the required tests and screens," and that "only those that can be trained" would be hired. (Emphasis in original). With such background educational opportunities available, the FAA recruiting would "target pre-trained applicants who require less training on the job…" because "pre-hire training at the college and university level will provide an economical new source of highly qualified and motivated Air Traffic Control Specialists."

22.     When recruiting schools for the new collegiate training program, the FAA told schools, "it is the intention of the FAA to place graduates of such programs who are qualified to enter the ATC occupation directly at FAA ATC facilities, depending on hiring needs." The FAA would "seek to hire all qualified graduates" but was not offering guarantees of employment.

23.     In January 1991, the FAA promulgated FAA Order 3120.26, which established the Air Traffic-Collegiate Training Initiative ("AT-CTI" or "CTI") program to develop, deliver, and implement air traffic control recruiting, selection, and training. The program was initially launched with "a select, few, accredited, post-secondary educational institutions" as a five year "proof of concept" test for improving ATCS recruitment and training. Diversity was one aim of the program, and the FAA Office of Civil Rights helped to vet the schools to ensure that they had the "ability and experience to recruit minorities and females."

24.     In order to achieve the objectives of the CTI program, the FAA entered into partnership agreements with colleges, universities, and other schools (collectively, "CTI Institutions") to administer CTI programs throughout the country.

25. The FAA provided the CTI Institutions with an air traffic curriculum that included approximately 200 hours of classroom instruction. The schools could then supplement that curriculum with other related training.

26. The FAA defined AT-CTI as a "recruitment source", a "program established for the employment of entry level Air Traffic Controllers…". FAA literature also stated that the FAA "hopes to employ all eligible AT-CTI graduates" but could not guarantee employment.

27. The FAA actively encouraged potential applicants to pursue CTI training as the primary means of obtaining employment as an air traffic controller. The FAA's website advertised the CTI program nationwide, informing any interested parties that the various CTI college programs or the military were the best ways to be hired.

28. Since 2005, graduates from the CTI programs were required to pass a validated air traffic aptitude test, known as the Air Traffic Control Selection and Training examination ("AT-SAT") in order to be eligible for employment as a trainee controller.

29. The FAA first used the AT-SAT in 2002 to screen GP applicants by assessing whether they could successfully learn ATCS skills as well as a to predict achievement of Certified Professional Controller ("CPC") status and air traffic controller job performance. CPC status is achieved after the successful completion of air traffic training.

30. The AT-SAT test had spent years in development and was thoroughly validated. The test ultimately included 8 out of 17 researched test modules.

31. The AT-SAT test lasts approximately eight hours and tests for characteristics needed to perform effectively as an air traffic controller. The characteristics include numeric ability, prioritization, planning, tolerance for high intensity situations, decisiveness, visualization, problem-solving, and movement detection.

32.     Once the AT-SAT became part of the hiring consideration for CTI students, a student had to affirm his or her United States citizenship and be within a year of completing the CTI program prior to being allowed to take the test.  Applicants who scored 85 and above on the AT-SAT were classified as "well-qualified" by the FAA.  Applicants who scored between 70 and 84.9 were classified as "qualified" by the FAA.  Applicants who scored below 70 were classified as "not qualified" by the FAA and were not eligible for hire for ATCS positions.

33.     Since the FAA first instituted the AT-SAT, it has been validated multiple times to ensure the test complied with applicable law and professional guidelines.  The AT-SAT was validated most recently in March of 2013.

34.     By 2008, after the introduction of the CTI program and the AT-SAT test, the FAA created and used CTI-only job postings in addition to GP and VRA postings.

35.     Only graduates from CTI programs who were U.S. citizens, passed the validated AT-SAT assessment, and had not aged out of eligibility (hereinafter referred to as "Qualified Applicants") were eligible to apply for CTI-only job postings.  As described more fully below, prior to 2014, CTI Qualified Applicants, including the Class members, received hiring preference or were more likely to be hired for ATCS positions.

36.     Whether hired from a CTI or GP posting, a new hire would be assigned to training at the FAA Academy in Oklahoma.  CTI students, however, were excused from the Academy's first five weeks of basic air traffic training.  If they successfully complete the Academy, ATCS trainees are assigned positions in the field for further training.  An ATCS must complete months or even years of rigorous training before becoming a CPC.

37.     A report initially issued in 2012 and then finalized in 2013 stated that the FAA planned to hire 12,500 ATCSs in the next decade and projected that 11,000 air traffic controllers would leave the

FAA by 2014.  The FAA controller hiring plan required the FAA to hire over 1,000 controllers per year in calendar years 2012, 2013, and 2014.

38.    Despite the agency's dire need for ATCSs, the FAA slowed and eventually froze the processing and hiring of new ATCS applicants.  Upon information and belief, the FAA intentionally slowed its hiring in 2012 and 2013 in anticipation of abandoning the CTI Qualified Applicant hiring preference and adopting a new, yet to be determined, hiring process that would favor African Americans.

**B.    The CTI Program Increases in Volume and Influence**

39.    Starting in approximately 2007, the momentum and influence of the CTI program increased.

40.    The CTI program started with five institutions in 1992 and grew to 14 by 1997.  Between 2007 and 2009, the program more than doubled, bringing the number of CTI Institutions to 36.

41.    By 2008, the FAA created and used CTI-only job postings; from 2010 to 2013 the FAA did not use any GP announcements for ATCS openings.

42.    In April 2011, after Congress and the public took note of three controllers being fired for sleeping on the job, the FAA announced numerous steps it would take to improve the safety provided by the ATCS workforce, including the establishment of a panel to evaluate ATCS selection, training, and placement.

43.    In September 2011 the FAA Independent Review Panel on the Selection, Assignment and Training of Air Traffic Control Specialists published its Final Report.  The Panel noted that the "FAA has expended significant resources and time to create an AT-CTI program, yet it has failed to use that resource appropriately."

44.    The Independent Panel recommended various changes to improve ATCS hiring, including closer evaluation and ranking of CTI Institutions that would directly impact ATCS selection.  Specifically,

the panel recommended a numerical formula to use when hiring ATCS candidates and the level of the CTI school would have been entitled up to 40 points of consideration, with the next highest category of points being worth less than half of that. The Panel concluded that "the quality and thoroughness of a candidate's undergraduate education, as reflected in the AT-CTI levels, is quite likely the strongest predictor of success in training."

45.     In public and Congressional reports between 2011 and 2014, the FAA repeatedly touted the work of the Independent Review Panel and stated that it was working to implement Panel recommendations. For example, funding provided to the FAA during this period required the FAA to conduct studies, including on the adequacy of training for ATCSs, and report to Congress. The report concerning ATCS Training noted that the FAA had organized the Independent Review Panel, and that the Panel had conducted research and interviews for over four months and provided 49 recommendations including better use of the AT-CTI program.

46.     In March 2012, the FAA ATO Safety and Technical Training Office of External Training Initiatives published a report titled "CPC Analysis: Success of CTI New Hires Compared to All Other Hiring Sources." The report found that the CTI program resulted in new hires obtaining CPC status at a rate "more than 50% greater than GP hires." For example, for hires made in financial year 2006, 84.57% of CTI students obtained CPC status, compared to just 44.68% of general public hires. Additionally, the CTI students obtained CPC status an average of six months sooner than the general public hires.

47.     The March 2013 report that again validated the AT-SAT test confirmed that the AT-SAT is a valid predictor of achievement of CPC status at a first assigned field facility. The report concluded that the "AT-SAT is a valid predictor of both OTJ ["on the job"] outcome (achievement of CPC status) and, more importantly, of on-the-job performance after certification. In other words, the empirical evidence supports the validity of AT-SAT as a personnel selection procedure for the ATCS occupation."

48.     A later study in 2013 specifically validated the use of the AT-SAT in combination with the CTI program.

49.     Prior to 2014, CTI Qualified Applicants received hiring preference for ATCS positions.

50.     For example, one field trainer was quoted as remarking to the 2011 Independent Review Panel, "[p]lease tell them not to send me any more public hires."  The Panel's related observation was that "the FAA needs to review its hiring practices to take advantage of the AT-CTI system it has created."

51.     Statistically, a 2013 report found that applicants from the CTI source experienced no barriers in the hiring process, were referred to selection panels at twice the rate as were general public applicants, and that a general public vacancy announcement had not been issued since FY 2009.

52.     Another 2013 report found that only 2.3% of CTI graduates failed the AT-SAT test as opposed to 6.9% of general public applicants, that most CTI and general public applicants selected for training scored as well qualified, and that 24.2% of CTI qualified applicants were hired as opposed to only 5.8% of qualified general public applicants.

53.     This 2013 report, authored by the FAA Civil Aerospace Medical Institute ("CAMI"), found that CTI candidates scored an average of 2.49 points higher on the AT-SAT than general public applicants and CTI trainees were successful more often and failed less often then general public hires.  The report stated that CTI graduates are considered as a primary hiring source of ATCSs and recommended the continued use of the AT-SAT in the hiring process of CTI graduates and that selections went primarily to those ranked as well qualified.

**C.     Opposition to the CTI Program**

54.     Despite or perhaps because of the CTI program's success, the program had its detractors. In July 2000 a Task Force of the FAA National Employee's Forum published "A Business Case and Strategic Plan to Address Under-Representation of Minorities, Women, and People with Targeted

Disabilities."  The Task Force observed that of the 680 persons hired out of the CTI program by 2000, 401 of them were "White Males."

55.     The Task Force observed that the FAA had the second-lowest rate of employing African Americans of the federal executive agencies.  To remedy this situation, the Task Force recommended, among other things, that the FAA (1) conduct a workplace cultural audit to identify barriers to diversity; (2) develop diversity "hiring targets" for each year, acknowledging that "this type of analysis may imply 'hiring quotas'…."; and (3) in the most "egregious cases….vigorously pursue allowing RNO- [Race and National Origin] and gender-conscious hiring."

56.     The Task Force consisted of three members, including one from the Council of African American Employees, Alfredia Brooks, and one from the National Black Coalition of Federal Aviation Employees ("NBCFAE"), Mamie Mallory.  Both of these individuals were actively involved in the ATCS hiring process of 2014.

57.     The Task Force was advised by Dr. Herbert Wong of Herbert Z. Wong and Associates. Dr. Wong later served as an advisor for the NBCFAE, helping them in 2009–2010 to analyze FAA diversity data and to later use that analysis to advocate for changes in the hiring process, eventually leading to the changes made in 2014.

58.     As the CTI program grew in scope and influence, its detractors became more vocal.  In 2008, while the program was more than doubling in size, the NBCFAE requested five years of EEOC data from the FAA Office of Civil Rights.

59.     During the summer of 2009 Dr. Herbert Wong, retained by the NBCFAE, completed an analysis of the FAA EEOC reports and concluded that the FAA was the least diverse agency within the executive branch of the federal government and would have to increase employment of African Americans by 8.13% to mirror the Federal Civilian Workforce.

60.     Armed with those findings, in July and October of 2009, the NBCFAE sent letters to the FAA Administrator and then the Secretary for the Department of Transportation asserting that the FAA was engaged in disparate treatment and demanding meetings.

61.     On information and belief, and after a reasonable opportunity for discovery, since approximately 2010 several members of the FAA Human Resources ("HR") and Civil Rights ("CR") Offices were members of and/or had been working with the NBCFAE to eliminate the CTI merit-based hiring preference for Class member Qualified Applicants and to concomitantly increase hiring of African Americans.

62.     The NBCFAE adopted a 2010-2014 Strategic Plan which included advocating for affirmative employment, obtaining an "independent evaluation of hiring and/or screening tools," and pursuing litigation.

63.     The NBCFAE 2010-2014 Strategic Plan echoed the comparisons the 2000 Business Case made of the FAA workforce versus other executive agencies, the Civilian Labor Force, and the Federal Civilian Workforce, as well as the demand for a workplace cultural audit.

64.     On February 10, 2010, the NBCFAE published a "Talking Points" document that described its efforts to pressure the FAA into addressing diversity since at least 2008.  *See* ECF No. 72-3.  This document mentioned that NBCFAE had sent a number of letters to the FAA concerning alleged "disparate treatment and under-representation" of African Americans within the agency.  *Id.* at 1–2.  NBCFAE also stated that it re-directed its budget to fund this effort and was in the process of "building a coalition of supporters from entities, outside the FAA, that possess the power to influence the FAA…."  *Id.* at 4.

65.     This "Talking Points" document also mentioned the formation of a group of senior members of NBCFAE called "Team 7" who had already met with FAA officials in the CR, HR, and legal offices of the FAA.  *Id.* at 3.

66.     During this time, FAA CR and HR employees were also working to oppose or slow-walk the implementation of the Independent Review Panel's recommendation to make better use of the AT-CTI program.  For example, HR noted that according to the Uniform Guidelines on Employee Selection Process (29 C.F.R. § 1607), the recommendation to use AT-CTI levels, changing how geographic preferences of applicants were considered, and other changes in hiring decisions could not be implemented until validation studies were conducted, and such validation studies had not yet been commissioned or funded.  They noted that it would take much longer than 6 months to perform such validation, more like 18 months.[2]  FAA HR also disagreed with a recommendation to return to original, stricter AT-SAT scoring because of the unequal results by race.

67.     HR provided one of its lengthiest responses to the Panel's recommendation that the FAA "take advantage of the AT-CTI system it has created":

> This recommendation is vague.  AHR needs a clearer understanding of the intent of this recommendation before we can fully comment on it.  However, this recommendation seems to imply that the FAA is not hiring enough/or should hire more AT-CTI applicants, almost to the exclusion of other controller hiring sources. FAA's hiring policies must be consistent with merit system principles as follows: "Recruitment should be from qualified individuals from appropriate sources in an endeavor to achieve a work force from all segments of society, and selection and advancement should be determined solely on the basis of relative ability, knowledge and skills, after fair and open competition which assures that all receive equal opportunity."

> Consistent with merit system principles, the FAA selects its air traffic controller candidates from a variety of sources to meet its hiring needs.  The FAA uses a multi-path approach for hiring and training air traffic controllers, and over the years, has built a substantial inventory of eligible air traffic controller applicants with varying degrees of experience and education.  The FAA's objective has been to maximize the use of the existing inventory of candidates and refer applicants from all hiring sources equitably and fairly while complying with Veterans' Preference requirements.

---

[2] HR was careful to note that "[e]rroneously performed validation studies can be misleading and place the government at considerable legal risk.  As is the case today, special agreements must be established to ensure that only authorized parties, e.g. CAMI, conduct certain studies and-- analysis."

68.     In March and April 2012, after the report was released indicating that CTI hires obtain CPC status at twice the rate of general public hires, members of the NBCFAE Team 7 met with the Secretary of the Department of Transportation, the FAA Administrator, and other senior leaders in the FAA.  One of these FAA leaders was the Acting Administrator for Civil Rights.

69.     The Acting Administrator for Civil Rights, Ms. Mallory, had been the author of the 2000 Task Force Business Case who at that time was associated with the NBCFAE.  In fact, just a few years before this 2012 meeting, the NBCFAE had created a non-profit foundation named after the Acting Administrator.

70.     Following the NBCFAE meetings, the FAA Administrator, Michael Huerta, tasked the Office of the Assistant Administrator for Civil Rights, led by Ms. Mallory, to conduct barrier analyses of the ATCS position.

71.     The next month an FAA presentation announced that a barrier analysis for the ATCS positions would be starting soon.

72.     An initial version of the Barrier Analysis was completed in October 2012.  One of the recommendations from this Barrier Analysis was to put "non-cognitive" measures ahead of consideration of the AT-SAT in order to alter the racial mix of the candidates being considered.

73.     The Barrier Analysis also repeatedly stated that hiring from CTI-only sources served as a barrier to African Americans.

74.     In December 2012, FAA HR contracted with APTMetrics to "conduct a detailed root cause analysis of the identified barriers and establish the foundation for corrective interventions."

75.     Meanwhile, NBCFAE released a document titled "Team 7 On the Move – Visit to the Hill," which described multiple trips to Washington D.C. to meet with the FAA concerning a perceived "lack of

15

an Affirmative Employment Plan…" and forecasting additional such meetings in 2013.  See ECF No. 72-4 at 3.  The document mentioned several meetings with Congressional staff.  *Id.*

76.     During these meetings NBCFAE requested support from Congress to "slow down or stop the hiring of new [FAA] employees until some changes are made by the FAA."   In an unsurprising coincidence, while the FAA had issued a CTI-only ATCS job posting in August of 2012, no hires were made as a result of that posting.  ATCSs were still needed, however, so a VRA posting was issued in early 2013.

77.     In early 2013, Terry Craft, a manager of and advocate for the FAA AT-CTI program, began communicating with the CTI Institutions to obtain diversity data that would be "pushed up to the highest levels of the FAA."  Craft stated, "my objective, should it be true, is to demonstrate that the CTI pool is as diverse as the other hiring pools including VRA and Gen Pub.  There is a perception that it is not.  So far I do not see this as true, so I need data to back this up before perception becomes perceived truth."

78.     The diversity data and report ultimately drafted by Mr. Craft commended the CTI Institutions for their diversity results and efforts, but this report was watered down and weakened by Joseph Teixeira, Vice President of the FAA ATO Safety and Technical Training office.

79.     On April 16, 2013, the FAA released APTMetrics' Extension to the 2012 Barrier Analysis ("Extension Report").  The Extension Report took a more focused aim at the alleged disparate impact of CTI hiring on African Americans. For example, the Extension Report concluded that "[w]hen examining the underlying diversity of the various applicant sources, the most dramatic difference was found between the Collegiate Training Initiative (CTI) source and all other applicant sources with respect to African American representation. African American applicants comprise only 5% of the CTI pool compared to an average of 34% African American representation across the non-CTI applicant sources."  ECF No. 75-1 at 70–71.

80.     The deeply flawed and outcome-driven Extension Report repeatedly blamed the CTI program for racial imbalances in ATCS hiring, stating, for example "Advancement in the hiring process is clearly correlated with race … Advancement in the hiring process is clearly correlated with applicant source.  CTI applicants pass … hurdles at a significantly higher rate than all other applicant sources." Further, after erroneously claiming that African Americans comprise only 5% of the CTI hiring pool and recounting various barriers faced by African Americans in the hiring process, the Extension Report found "[a]dverse impact was not observed for CTI at any point in the hiring process…."

81.     On information and belief, the Barrier Analysis and Extension Report were solicited and conducted in part to bolster the FAA's plan to eliminate the merits considerations of Class member Qualified Applicants in favor of a race-based or race-biased hiring process.

82.     The Extension Report recommended consideration and use of preferred qualifications based on "background and experience dimensions (and other factors)" to "differentiate between the large number of candidates meeting the [minimum qualifications] and other qualification requirements (e.g., passing the AT-SAT)"—essentially the role the Biographical Questionnaire came to play in the 2014 ATCS selection process.

83.     On May 8, 2013, the Extension Report was supplemented with a revised version of the Barrier Analysis.  This 2013 Barrier Analysis reinforced the Extension Report and opined that the CTI application source exhibited "diminished diversity" and "there are serious diversity consequences for not fully using the General Public application source."  The 2013 Barrier Analysis further speculated that use of CTI applicant pools was "the result of attempts to manage the application workload, rather than a legitimate issue of business necessity."

84.     In other words, as if they were specifically commissioned for such a purpose, the Extension Report and the Barrier Analysis took aim at the CTI program and the use of AT-SAT scores, playing into

17

arguments by NBCFAE and members of the FAA CR that education and cognitive requirements disadvantaged African Americans.

85.     On information and belief, the Barrier Analysis and Extension Report were solicited and conducted in part to bolster the FAA's plan to eliminate the merits considerations of Class member Qualified Applicants in favor of a race-based or race-biased hiring process.

**D.     FAA Fast-Tracks Development of Racially Biased Hiring Methodology**

86.     In contrast to the glacial pace and guarded stance with which they evaluated the 2011 Independent Review Panel's recommendation to enhance AT-CTI hiring, the FAA HR and CR immediately began to implement APTMetric's recommendations to use only general public hiring, to demote the prominence of cognitive testing as a screening mechanism, and to implement "preferred qualifications" that focused on biographical information as a screening mechanism.

87.     Within approximately one month of the final Barrier Analysis, an Executive Steering Committee, including representatives of HR and CR, had been created to oversee a new ATCS hiring process.

88.     Within another two weeks, HR and CR provided a presentation on the Barrier Analysis and Extension Report. "Corrective actions for consideration" included considering RNO [Race and National Origin] and gender diversity a high priority when determining applicant sources and revising or replacing the AT-SAT.

89.     The June 2013 presentation stated that the approximately 800 applicants who had already been selected from prior openings would be given a training slot, but that the rest of the approximately 3,000 applicants "in the ATC pipeline" would be subject to the revised hiring process.

90.     In mid-July 2013, a Barrier Analysis Implementation Team ("BAIT") had been created and held their first organizational meeting.

91.     In an August 2013 briefing to the FAA Administrator, Michael Huerta, Joseph Teixeira stated that "preferred qualifications" would be implemented in the ATCS hiring process in the near term. In an appendix to that briefing, Mr. Teixeira also stated the "FAA will also need to establish an algorithm that will ensure diversity is an outcome of the hiring process."   The use of an "algorithm" was also suggested to mitigate the risk that education was considered too highly over skills and to "ensur[e] that everything is fully legal".

92.     Also in August 2013, and per APTMetrics' recommendation, a change request was submitted to alter the online ATCS application process and eliminate the ability of new applicants to input geographic preferences—a change that had to be studied when it was recommended by the Independent Panel but that was blindly implemented, upon information and belief, without any validation/study when recommended to change racial hiring results to favor African Americans.

93.     In September 2013, APTMetrics was awarded a contract specifically to develop and present recommended changes to the ATCS hiring process.  APTMetrics provided their recommendations that same month and sub-teams were formed to investigate and implement the recommendations.

94.     In late October 2013, the APTMetrics recommendations were presented to the Executive Steering Committee overseeing the ATCS hiring changes.  The Committee adopted the recommendation to incorporate a biographical assessment into the next ATCS vacancy announcement.

95.     Within days, a new change request was submitted to alter the mechanics of the ATCS online application process to disable CTI, public, and other hiring source options and create an "all sources" application.  This change request indicated that there would be a minimum score to be selected for the new biographical assessment.

96.     In mid-November 2013, the first draft of the proposed biographical assessment was provided to the office that would be required to program the test into the online application process.

97.     An email later that month convened a call "to discuss how [the FAA] can use the biodata measure as a valid and legally defensible means to mitigate adverse impacts."  The email chain stated that the biographical assessment was designed to "serv[e] a lot of masters" and "meet[] a number of goals," including screening out 70% of ATCS applicants.  The biographical assessment, however, was clearly not to be considered a "minimum qualification."

98.     In early December 2013, APTMetrics provided suggested "pass/fail" scores for the Biographical Assessment.

99.     A few days later, members of the BAIT team agreed that the inventory of CTI students who had previously applied for ATCS positions would be purged, but that the race and national origin of the military/veterans' sources would be evaluated to see if they could still be used.

100.    Throughout this time HR and CR were keeping the National Employee Forum, including the NBCFAE, updated on the revisions to the ATCS hiring process.

101.    On approximately December 31, 2013, testing began on the new online ATCS application process, including the newly implemented biographical assessment.  During this testing period the process was modified so that the expected 70% failure rate for the biographical assessment would not be known to applicants or the public until after the vacancy announcement closed.

**E.     CTI Institutions Informed and Mis-Informed**

102.    While NBCFAE and other special interests were involved in and appraised of the ongoing changes, the CTI Institutions were largely kept in the dark.

103.    Finally, on or around December 30, 2013, over CTI schools' holiday break, Joseph Teixeira sent an e-mail ("Teixeira e-mail") to the CTI schools about the future of hiring for ATCS positions.

104.    The Teixeira e-mail stated that "[r]ecently, the FAA completed a barrier analysis of the ATC occupation pursuant to the Equal Employment Opportunity Commission's (EEOC) Management

Directive 715.  As a result of the analysis, recommendations were identified that we are implementing to improve and streamline the selection of ATC candidates."

105.    The Teixeira e-mail further provided "[a] nationwide competitive FG-01 vacancy announcement open to all U.S. Citizens will be issued in February 2014.  Any individual desiring consideration for employment (including CTI graduates) MUST apply.  Existing inventories of past applicants will not be used."

106.    The Teixeira e-mail provided "[t]he existing testing process has been updated.  The revised testing process is comprised of a biographical questionnaire[3] (completed as part of the application process) and the cognitive portion of the AT-SAT.  The cognitive portion of the AT-SAT will be administered only to those who meet the qualification standards and pass the biographical questionnaire.  Applicants for the February 2014 announcement will be required to take and pass the new assessments in order to be referred on for a selection decision."  The Teixeira email invited the CTI Institutions to a teleconference to explain the proposed hiring changes.

107.    The teleconference between the FAA and the CTI Institutions took place on January 8, 2014, and was attended on behalf of the FAA by Mr. Teixeira; Deputy Administrator for HR, Rickie Cannon; HR Assistant Administrator, Carolyn Bostick; and ATO Vice President of Management Services, Mike McCormick, accompanied by an APTMetrics employee.  During the call, FAA representatives stated that using CTI lists for hiring provided a pool that was not diverse enough, that the existing inventory of applicants would be purged, that the FAA needed to improve hiring of minority applicants, that they were using the recommendations in the Barrier Analysis to do that, and that the new hiring

---

[3] Eventually this test was referred to as the "biographical assessment" but is consistently referred to here as the "biographical questionnaire."

process would result in "an automatic scoring algorithm" that would weight biodata, AT-SAT, and veterans' preference.

108.    The FAA representatives also stated: (1) the Biographical Questionnaire was a "valid and efficient measure" of "education, experience [and] work habits"; (2) the Biographical Questionnaire would "get at" and impliedly treat positively those that were CTI students; (3) if in the past a CTI student was a competitive applicant they would remain a competitive applicant under the new process; (4) the Biographical Questionnaire was developed and thoroughly researched by CAMI, the department that created the AT-SAT; (5) no special interest groups were involved in the design of the FAA hiring policy at all; and (6) the FAA had not announced the ATCS hiring changes to anyone other than to CTI schools. Upon information and belief, each one of those statements was false.

109.    The CTI Institutions, justifiably shaken by the FAA's sudden disregard for aviation education, asked numerous questions.  For example, one CTI representative stated that attending a CTI program had provided students with "a very distinct advantage" which was "the reason these students came to CTI schools, because they gained that advantage," and asked why students would attend a CTI Institution now.  Another CTI representative stated "there was a preference in the past for CTI students because they had a separate hiring announcement…"  One of the FAA representatives, Mr. McCormick, eventually acknowledged that CTI students had had an advantage because of the FAA issuing CTI-only announcements and no public announcements in the past few years and that this advantage was going away.

## F.    FAA Implements Biographical Questionnaire to Illegally Preference African Americans

110.    The FAA continued to doggedly pursue and immediately implement the unvalidated changes to the ATCS hiring process and further sought to unlawfully benefit African Americans in the

new hiring process by providing them with non-public information concerning the new screening technique.

111.     Several documents demonstrate that the NBCFAE had information on how applicants for the February 2014 announcement could increase their chances of advancing in the hiring process.  The NBCFAE e-mailed their members with advice on how to apply for the Air Traffic Controller positions. *See* ECF Nos. 72-6; 72-7.  The advice was reported to have been provided by an FAA HR employee who was also a member of the NBCFAE.  These documents further demonstrate that NBCFAE National President Roosevelt Lenard, Jr. was in contact with senior FAA officials, including Carolyn Bostick, about Lenard's desire to eliminate the entire merit-based hiring preference for Qualified Applicants.  *See* ECF No. 72-8.

112.     On or about January 27, 2014, FAA HR Official Bostick assured NBCFAE National President Lenard that the current group of Qualified Applicants would be "purged" and none of these applicants would be offered a letter of employment.  *Id.*  Relatedly, a NBCFAE Google Group posted a communication from NBCFAE President Roosevelt Lenard, Jr. which confirmed that HR was terminating the "old hiring process" and that the "list [of Qualified Applicants] has been purged."  *See* ECF No. 72-8 at 1.  Moreover, President Lenard acknowledged that "[d]uring the [2012–2013] holidays CTI schools were informed that they will no longer receive the preferences they have been receiving."  *Id.*

113.     A January 30, 2014 Team 7 update informed NBCFAE members that the organization had congressional support to align "FAA's hiring practices for a concentration of minority hiring."

114.     In February 2014, FAA spokesman Tony Molinaro, Public Affairs Officer for the FAA in the Great Lakes and Central Regions, stated that the decision to change the FAA's hiring process for Air Traffic Controllers was made to "add diversity to the workforce."  Anna Burleson, *Want to be an air traffic controller? UND says FAA has 'dumbed down the process'*, Grand Forks Herald, March 5, 2014,

23

https://bringmethenews.com/news/faa-changes-in-air-traffic-controller-training-has-und-official-concerned (last visited October 16, 2019).

115.    On February 10, 2014, the FAA opened the new general public announcement for the ATCS positions.  The named plaintiffs and thousands of other non-African American students took and failed the Biographical Questionnaire, despite the fact that they were qualified or well qualified under the previous merit-based process.  Approximately 4,000 CTI graduates took the Biographical Questionnaire and less than 14% of them passed.

116.    During the ATCS opening, the NBCFAE held "workshops" to help their associate members apply, including reviewing resumes and assisting with completing the applications.  Upon information and belief, HR and CR employees attended these workshops to assist the NBCFAE members.

117.    On information and belief, and after a reasonable opportunity for discovery, the FAA failed to validate the Biographical Questionnaire to ensure the test was in accordance with the law.  This is because the FAA intended and implemented the questionnaire to provide a better score to African Americans.

118.    When the FAA later analyzed the results of the 2014 hiring process, it found that "whites" received offers for employment at a rate 23.3% below the proportion of white CPCs, the greatest change for any ethnic group, while the percent of African Americans receiving offers was 4.8% greater than the number of African American CPCs.  The FAA also touted the "savings" that resulted from the 2014 process—but the biggest apparent savings resulted because so many people failed the Biographical Questionnaire that the AT-SAT was administered to fewer people.

119.    As an example of evidence that calls the Biographical Questionnaire into doubt, an October 2013 draft and a January 27, 2014 print out of the Biographical Questionnaire indicate that a candidate could be awarded 15 points, the highest possible for any question, if they indicated that their lowest grades

in high school were in science[4] and their lowest grades in college were in history or political science.  In contrast, an applicant was awarded only 2 points if they had a pilot's certificate and no points were awarded for having a Control Tower Operator rating or having Instrument Flight Rules experience.  In these drafts, applicants were awarded more points if they heard of the ATCS opening from the media rather than from a college, if they had participated in more sports in high school, or if they had worked 5–6 jobs in the previous three years.

120.    In addition, one question on the Biographical Questionnaire awarded an applicant 10 points, the most available for that question, if the applicant answered s/he had not been employed in the prior three years.  Another question awarded 4 or 8 points if the applicant had been unemployed five or more months in the prior three years.  Statistics from the Department of Labor indicate that African Americans had the highest unemployment rate in 2010–2014.

121.    Further, the Biographical Questionnaire was vulnerable to being "gamed" or cheated because if an applicant answered every question but, for instance Question 16, "A" and then answered Question 16 "D," one would pass the Biographical Questionnaire.

122.    An October 2014 CAMI analysis of "Using Biodata to Select Air Traffic Controllers" found that the evidence for using biodata items for controller selection was weak and that if it were to be used, additional research and validation was required.  The study found that after screening applicants based upon age and for a mere passing AT-SAT score, biodata did little to improve the ability to select applicants likely to reach CPC status and that biodata should not be used without further study.

123.    The CAMI report disclaimed a material role in the 2014 Biographical Questionnaire, stating "In 2014, the FAA began using a biodata assessment, designed under contract for the FAA Office

---

[4] Data from "National Assessment of Educational Process," The Nation's Report Card, indicates that African Americans score lower in science than other ethnic groups. https://www.nationsreportcard.gov/ndecore/xplore/nde (last visited Oct. 20, 2020).

of Human Resource Management…"  The report noted that in historic research, items such as having a pilot's certificate or instrument flight rating had been found to have a positive relationship with ATCS training outcomes (in contrast to the lack of relationship reflected in the APT design).

124.    The October 2014 CAMI report stated that while biographical items from a Controller Background Assessment Survey were under study in 2012, the Survey had not been examined as a predictor of controller training performance.  Items from this Survey were nonetheless incorporated into the 2014 biographical screening of ATCS applicants.  The report explicitly stated that CAMI had never studied biodata as a method of screening applicants prior to any other form of assessment such as the AT-SAT aptitude testing.

125.    In sum, the FAA eliminated the CTI program's merit-based hiring preference in favor of implementing an unvalidated race-skewed screening mechanism, which resulted in Plaintiffs, and other putative Class Members, losing their employment preference, failing the "Biographical Questionnaire", and therefore not being hired by the FAA as a result of the 2014 process.

126.    The FAA's actions in changing ATCS hiring during 2012–2014 were not part of an affirmative action program.

127.    The Biographical Questionnaire was not job-related, nor was it justified or driven by a business necessity.

128.    The Biographical Questionnaire was unnecessarily restrictive because, on the basis of "biographical" considerations that were irrelevant to any fair determination of a candidate's suitability for or success as an ATCS, it excluded qualified and well qualified non-African American CTI applicants who were statistically likely to succeed as ATCSs.

129.    Upon information and belief, the Biographical Questionnaire was intended to have a discriminatory effect on non-African American CTI graduates.   By virtue of the Biographical

Questionnaire, they were disqualified for further consideration for employment in a position they were qualified for so that other, less qualified candidates could be considered at their expense.

130.     Assuming that the desire for greater diversity drove the hiring changes made in the ATCS position culminating in the February 2014 vacancy announcement, there were other less restrictive, non-discriminatory ways to achieve that objective.  Employment processes engineered to increase diversity can and should be accomplished in compliance with all laws, but that was not the case for the FAA ATCS 2014 hiring process.

131.     On information and belief, and after a reasonable opportunity for discovery, FAA HR and CR employees and officials cooperating with the NBCFAE efforts to eliminate Class member Qualified Applicant hiring preferences and implement a race-biased hiring process included active members of the NBCFAE.

**G.     Diversity of the CTI Program prior to 2014**.

132.     Not only were the FAA's raced-based actions illegal, they were unnecessary.

133.     In 2012–2013, 11.5% of CTI school enrollees were African American.  Federal Aviation Administration, Air Traffic Collegiate Training Initiative (AT-CTI) Partner School Diversity and Outreach 2012–13 report at 3 (February 25, 2013).  This percentage of African American enrollees exceeded the percentage of African Americans in the relevant civilian labor workforce pool in the same years.  United States Office of Personnel Management, Federal Equal Opportunity Recruitment Program (FEORP) for Fiscal Year 2012 Report to the Congress 8 (January 2014), https://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reports/feorp-2012.pdf (last visited Oct. 20, 2020).

134.     Indeed, on February 8, 2013, Terry Craft, the FAA's CTI program manager, sent an e-mail to CTI schools in which he stated he believed that the CTI applicant pool was diverse.  Further, in February 2013, the FAA published a report on the CTI program that provided that "it is clear that the FAA AT-CTI

schools are making great strides to incorporate minority students and faculty into their programs…." Federal Aviation Administration, Air Traffic Collegiate Training Initiative (AT-CTI) Partner School Diversity and Outreach 2012-13 1 (February 25, 2013).

135.    The FAA's then-Director of Technical Training Support, Anthony Gagliardo stated that FAA manager Joseph Teixeira manipulated the data in the FAA's Partner School Diversity and Outreach 2012-13 report to make the CTI institution student body appear to be much less diverse than it actually was.   In addition, 2-year schools such as CTI community college institutions with historically diverse student populations were eliminated from the FAA's calculations to further diminish the actual minority participation.[5]

136.    Further, Mr. Teixeira disciplined Mr. Craft for assembling and releasing the report, which ran contrary to the efforts of certain higher-level FAA managers to reduce CTI hiring to increase African American hiring.

## H.    Congressional Action

137.    The FAA's actions soon attracted the attention of Congress.   Concerned with the risk to public safety posed by the FAA's abandonment of a merit-based system for selecting future ATCSs, in 2016 Congress inquired into the FAA's racially discriminatory hiring practices.

138.    The FAA actively brainstormed ways of explaining itself to various Congressional inquiries while deflecting liability for scuttling the Qualified Applicant hiring preference.   E-mail from Molly Harris ("We have to find a way to address Congressional inquiries without hurting our cause when it comes to litigation.").

---

[5] A copy of the November 6, 2018 declaration, originally submitted in Support of the Plaintiff's Motion for Class Certification, is filed at ECF No. 73-7.

139.    On July 15, 2016, Congress passed the FAA Extension, Safety, and Security Act of 2016 which, *inter alia*, addressed the hiring of ATCSs.  FAA Extension, Safety, and Security Act of 2016, Pub. L. 114-190, Section 2106, 130 Stat. 615, 620 (July 15, 2016), *codified at* 49 U.S.C. § 44506 ("the Act").

140.    The Act provides that the FAA should give preferential treatment for ATCS positions to qualified individuals maintaining 52 consecutive weeks of civilian or military air traffic control experience.  49 U.S.C. § 44506(f)(1)(A).

141.    For any remaining open ATCS positions, the FAA is then required to hire equally from two applicant pools.  49 U.S.C. § 44506(f)(1)(B)(i).

142.    The first pool consists of: (1) CTI graduates who have received recommendations from their institution; (2) honorably discharged veterans eligible for a recruitment appointment pursuant to Section 4214 of Title 38; (3) eligible veterans "maintaining aviation experience obtained in the course of the individual's military experience"; and (4) preference eligible veterans.  49 U.S.C. § 44506(f)(1)(B)(ii).

143.    The second pool consists of OTS applicants.  49 U.S.C. § 44506(f)(1)(B)(ii).

144.    Although the Act prevents the FAA from using the Biographical Questionnaire on applicants from the first pool of applicants (as well as those with previous air traffic control experience), it does not prevent the FAA from using the Biographical Questionnaire on OTS hires.  49 U.S.C. § 44506(f)(2)(A).

145.    Further, upon information and belief, while the FAA is not using the Biographical Questionnaire in the same form or manner as it was used in 2014–2015, the FAA continues to use biodata components in the current ATCS screening/aptitude test.

146.    Although the Act provides that the FAA shall "provide … an opportunity to reapply" for an ATCS position under the "revised hiring practices" for any applicant that "was disqualified from the

position as the result of a biographical assessment," the Act does not require the FAA to make any specific hiring or appointment decisions with respect to any CTI graduates.  49 U.S.C. § 44506(f)(2)(B)(i).

147.    In addition, the Act did not change the fact that some graduates on the CTI list had already "aged-out."

148.    Furthermore, the Act provides no compensation for the Class members who were Qualified Applicants prior to the FAA's decision to eliminate its previous merit-based hiring preference but were screened out of the 2014 hiring process by the FAA's race-motivated hiring changes.

149.    Plaintiffs Brigida and Douglas-Cook and the proposed Class were injured by the FAA's raced-based decision to disregard Class members' existing pre-qualifications, upsetting their legitimate expectations of being hired, because of the racial makeup of those who had successfully completed the CTI program and passed the AT-SAT.

150.    Plaintiffs Brigida and Douglas-Cook and the proposed Class were also injured by the FAA's raced-based decision to implement race-biased and unvalidated screening as part of the 2014 hiring process.

151.    These injuries have not been remedied.

**I.    Plaintiffs**

152.    On information and belief, and after a reasonable opportunity for discovery, there were over 1,000 Class member qualified applicants who possessed a degree from a CTI school and had passed the AT-SAT prior to the FAA's January 2014 elimination of this merit-based hiring preference.  Plaintiffs Brigida and Douglas-Cook were among those who were entitled to the FAA's merit-based hiring preference.

### *Plaintiff Brigida*

153.    On April 3, 2013, while attending an FAA approved CTI Institution, Arizona State University ("ASU"), Plaintiff Brigida took and successfully passed the AT-SAT assessment with the top numerical score possible of 100%.  Plaintiff Brigida is Caucasian.

154.    On August 13, 2013, Plaintiff Brigida graduated from ASU, and was recommended to the FAA by ASU on August 28, 2013.

155.    Plaintiff Brigida satisfied all FAA requirements for being defined as a Qualified Applicant.

156.    Plaintiff Brigida satisfied all objective requirements for an ATCS position.

157.    On or about January 27, 2014, the FAA informed Plaintiff Brigida of the changes to the Air Traffic Controller hiring process, that the merit-based hiring preference for Qualified Applicants was being eliminated, and that Mr. Brigida would need to apply under the new hiring process if he wished to be considered for an Air Traffic Controller position.

158.    On February 10, 2014, Plaintiff Brigida applied for an Air Traffic Controller position under the new hiring processes.  While applying for the position, Plaintiff Brigida took the Biographical Questionnaire.

159.    On February 25, 2014, Plaintiff Brigida contacted an Equal Employment Opportunity ("EEO") counselor for the DOT by filing an informal electronic complaint, alleging that the FAA discriminated against him on the basis of race by changing its Air Traffic Controller hiring practice.

160.    On February 27, 2014, the FAA notified Plaintiff Brigida that he had not passed the Biographical Questionnaire and was ineligible to be hired for an ATCS position.

161.    Plaintiff Brigida exhausted his administrative remedies and complied with all statutory and administrative prerequisites to his Title VII claim.

162.    On March 31, 2014, Plaintiff Brigida received his notice of right to file a formal EEO Complaint with the DOT.

163.    On April 12, 2014, Plaintiff Brigida filed a formal EEO Complaint, individually and as a putative Class Representative on behalf of those similarly situated, with the DOT.[6]

164.    On April 16, 2014, the DOT sent a letter to Plaintiff Brigida which acknowledged receipt of the formal EEO Complaint and provided that the Complaint was forwarded to the EEOC for their recommendation to accept or reject the Complaint.

165.    On June 30, 2016, Administrative Judge Cynthia G. McKnight dismissed Plaintiff Brigida's EEO Complaint without prejudice under 29 C.F.R. § 1614.409 as a result of the filing of this action.

166.    Since being precluded from Qualified Applicant status in 2014, Plaintiff Brigida applied for at least 36 positions with the FAA.  Of those 36 applications, 32 were not referred for further consideration, two were cancelled, and only one was reviewed for further consideration and ultimately denied.  Ultimately Plaintiff Brigida was hired by the FAA in November 2016 as a Program Analyst.

*Plaintiff Douglas-Cook*

167.    In April 9, 2013, while attending an FAA approved CTI Institution, UAA, Mr. Douglas-Cook took and successfully passed the AT-SAT assessment with the top numerical score possible of 100%.  Mr. Douglas-Cook is Native American.

168.    In December 2013, Mr. Douglas-Cook graduated from UAA and satisfied all requirements for Qualified Applicant status except that UAA did not recommend Mr. Douglas-Cook to the FAA because the FAA told schools during the January 8, 2014 conference call that they should not bother to submit

---

[6] Plaintiff Brigida's formal EEO Complaint is incorporated by reference herein. *See* ECF No.78-2.

recommendations.   Had a recommendation been requested, UAA would have provided a positive recommendation for Mr. Douglas-Cook.

169.   Mr. Douglas-Cook satisfied all objective requirements for an ATCS position.

170.   In February 2014, Mr. Douglas-Cook was forced to apply under the FAA's new hiring processes for Air Traffic Controllers.   While applying for the position, Mr. Douglas-Cook took the Biographical Questionnaire.

171.   Mr. Douglas-Cook did not pass the Biographical Questionnaire.

172.   The FAA did not hire Mr. Douglas-Cook for an ATCS position.

## CLASS ACTION ALLEGATIONS

173.   Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein. Plaintiffs Brigida and Douglas-Cook, on behalf of themselves and others similarly situated, pursuant to Rules 23(b)(2) (for a liability determination and declaratory and injunctive relief) and 23(b)(3) (for liability,[7] backpay, front-pay, and other economic relief) of the Federal Rules of Civil Procedure and 29 C.F.R. § 1614.204 bring this class action.   The Class that Plaintiffs Brigida and Douglas-Cook seek to represent is the approximately 1,000 to 1,500 non-African American CTI students who: (1) by February 10, 2014: (a) graduated from a CTI program at one of the 36 FAA-partnered CTI Institutions between 2009-2013 and (b) passed the AT-SAT , (2) applied to be an ATCS trainee through the 2014 all sources vacancy announcement but failed the Biographical Questionnaire that was incorporated into the 2014 ATCS hiring process and was therefore not hired; and (3) have never been offered employment as an FAA ATCS.   Excluded from the Class are any CTI graduates: (a) who were not U.S. citizens as of February 10, 2014; (b) who by February 21, 2014 had reached 31 years of age (or 35 years of age if they had had 52

[7] Plaintiffs may additionally or alternatively move to have the issue of liability determined on a class basis pursuant to Rule 23(c)(4).

consecutive weeks of prior air traffic control experience); (c) whose academic records as of February 21, 2014 explicitly stated that they were ineligible to receive a letter of recommendation from their CTI school; or (d) whose AT-SAT scores had expired as of February 21, 2014.

### Rule 23 Requirements

174.    The FAA's use of the unvalidated, non-job related, and unnecessary Biographical Questionnaire harmed all members of the Class.

175.    The FAA's striking of the hiring preference for qualified and well qualified CTI graduates harmed all members of the Class.

176.    The FAA's relationship to and treatment of the Class as it relates to their eligibility for and application to the 2014 ATCS vacancy announcement was substantially uniform.

177.    The FAA acted in a manner generally applicable to all members of the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

178.    There are common questions of law, practices, and fact as to the members of the Class which predominate over questions affecting only individual members of the Class.[8]   Such common questions include but are not limited to:

      a.    Whether the FAA's decision to eliminate or purge Class members' pre-qualified hiring status, including their prior AT-SAT score, violated Title VII;

      b.    Whether the FAA's decision to eliminate or purge Class members' pre-qualified hiring status, including their prior AT-SAT score, was made in whole or in part, with race-based motives;

---

[8] These common questions or issues may also/alternatively be subject to certification under Fed. R. Civ. P. 23(c)(4).

c.   Whether the FAA's use of the Biographical Questionnaire violated Title VII or is evidence of race-based motives;

d.   Whether the implementation of the Biographical Questionnaire was made, in whole or in part, with race-based motives;

e.   Whether the Biographical Questionnaire excluded applicants who were otherwise eligible for employment; and

f.   What declaratory, equitable, and injunctive relief for the Class is warranted.

179.   There are no unique factual or practice factors that would make Class status disadvantageous to any member of the Class.  The FAA followed a uniform course of action to purge the merit-based hiring preference for Class member Qualified Applicants and implement a new race-biased hiring practice, which constituted an adverse employment action which affected all members of the Class.

180.   Defendant's race-based motivation and alleged justification for the decisions made and actions taken between 2010 and 2014 to further race-based hiring are common to all members of the Class. *See Moore v. Napolitano*, 926 F. Supp. 2d 8, 29 (D.D.C. 2013) ("factual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members [and] class members have suffered the same injury.") (internal quotations omitted).

181.   Plaintiffs' claims stated herein are typical of the claims of all members of the putative Class because all members were simultaneously harmed by the FAA's programmatic illegal race-based actions and have never been offered employment as an FAA ATCS.

182.   All members of the Class will benefit from a declaration that the FAA's race-based decisions complained of herein violated Title VII.

183.     All Class members will benefit from injunctive relief restraining further race-based decision making by the FAA and mandating remedial measures.

184.     Whatever factual variations may exist among the prospective Class members do not alter the fact that all members of the Class suffered the same injuries caused by the FAA's uniform race-based decisions to purge the Qualified Applicant hiring preference and to implement an unvalidated, race-biased biographical screening mechanism.  *See Cohen v. Chilcott*, 522 F. Supp. 2d 105, 115 (D.D.C. 2007) ("The typicality requirement is satisfied if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability.) (quotations omitted).

185.     The potential quantity of members of the putative Class is so numerous that joinder of all members would be unfeasible and impractical such that the disposition of their claims through the Class action will benefit both the parties and this Court.

186.     The quantity of the members of the Class is approximately 1,000 to 1,500 people.  *See* ECF No. 73-9 (December 5, 2013 e-mail from Rickie Cannon stating that "there are approximately 2,668 candidates in the [AT-CTI] Inventory but AT-SATs are expiring and candidates are aging out daily." [but the number of Class members also increased with graduations that occurred in or after December 2013]). The quantity and identity of such membership is easily ascertainable through inspection of Defendant's, and potentially the CTI schools' records.

187.     Plaintiffs Brigida and Douglas-Cook are adequate representatives of the putative Class and will fairly protect the interests of the members of the Class, have no interests antagonistic to the members of the Class, and will vigorously pursue this suit via attorneys who are competent, skilled, and experienced in litigating complex matters of this type.

188.   Putative Class Counsel are competent and experienced in litigating large cases, are preeminent in their fields, and members of the firms have experience in litigating complex matters including employment and constitutional law cases.

189.   The proposed Class is ascertainable in that its members can be readily identified using objective information that already exists and is contained in Defendant's and/or CTI-Institution records. Specifically, Defendant has records indicating CTI students' graduation dates, AT-SAT scores, age or date of birth, race and national origin, affirmation of citizenship, application to the 2014 ATCS vacancy announcement, and failure to pass the Biographical Questionnaire in 2014.

190.   A class action is superior to other available methods for fairly and efficiently adjudicating this controversy for the following reasons, without limitation:

a.   The FAA acted on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief appropriate for the Class as a whole.

b.   This case involves a federal agency and officials and a sufficiently numerous group of individual Class members with many common claims and issues of law and fact;

c.   If each individual member of the Class was required to file an individual lawsuit, Defendant would necessarily gain an unjust advantage because Defendant would be able to exploit and overwhelm the limited resources of each individual with Defendant's vastly superior financial and legal resources;

d.   Requiring each member of the Class to pursue an individual lawsuit would discourage the assertion of lawful claims by the members of the Class who would be disinclined to pursue an action against Defendant because of an appreciable and justifiable fear of retaliation and permanent damage to their lives, careers, and well-being;

e.     Proof of a common practice or factual pattern, of which all members of the Class experienced, is representative of the Class herein and will establish the right of each Class member to recover on the cause of action alleged herein;

f.     The prosecution of separate actions by the individual members of the Class, even if possible, would create a substantial risk of inconsistent or varying adjudications with respect to the individual members of the Class; and would establish potentially incompatible standards of conduct for Defendant;

g.     Many members of the putative Class are college graduates with large student loan balances and the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress their injuries, while an important public interest will be served by addressing the matter as a Class Action; and

h.     The cost to the judicial system of such individualized litigation would be substantial and a waste of valuable adjudicative and judicial resources.

191.   **Manageability of Class and Common Proof**.  The nature of this action makes this class action a particularly efficient and appropriate procedure to afford relief to Plaintiffs and putative Class members for the FAA's unlawful actions.  Specifically, the primary issue for the Class turns upon the FAA's single decision to purge the Class Members' Qualified Applicant hiring preference and adopt a new race-based or race-biased hiring practice for Air Traffic Controllers.  Individual adjudication would prejudice Defendant by requiring the United States government to allocate scarce resources and taxpayer dollars to individually adjudicate the claims of approximately 1,000 to 1,500 air traffic controller applicants.

192.    **Subclasses**.  Plaintiffs reserve the right to move for the creation of any subclasses as may be proper pursuant to Fed. R. Civ. P. 23(c)(5) as discovery proceeds.

<u>**CLAIM FOR RELIEF**</u>
(Violation of Title VII)

193.    Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

194.    Plaintiffs Brigida and Douglas-Cook bring this claim on their own behalf and on behalf of the Class.

195.    The FAA purged the merit-based hiring preference for Qualified Applicants for Air Traffic Controllers with the intent and purpose of benefitting African American Air Traffic Controller applicants and hindering the Class members.

196.    By purging the Qualified Applicant hiring preference, including while contemplating retaining applicants from other hiring sources, the FAA refused to accept the outcome of a race-neutral hiring process solely because of the racial makeup of the successful applicants.  *See Ricci*, 557 U.S. at 579.

197.    The FAA's race-based decision to purge the Qualified Applicant hiring preference harmed the Class members.

198.    The FAA implemented the Biographical Questionnaire into the 2014 ATCS hiring process with the intent and purpose of benefitting African American Air Traffic Controller applicants and hindering the Class members.

199.    FAA's race-based decision to use the Biographical Questionnaire in the 2014 ATCS hiring process harmed the Class members.

200.    The FAA did not have a strong basis in evidence to believe its use of the CTI program would cause it to be subject to disparate-treatment liability under Title VII of the Civil Rights Act of 1964.

201.    The FAA's decision to strike the CTI qualifications and to implement the Biographical Questionnaire was not part of an affirmative action program.

202.    Defendant intentionally discriminated against Plaintiffs Brigida and Douglas-Cook and all members of the Class and violated Title VII of the Civil Rights Act by refusing to fully and fairly consider for hiring and/or refusing to hire Class members because of those applicants' race.  42 U.S.C. § 2000e(a)(1); *see also Kyles*, 222 F.3d 289 *and America*, 468 F. Supp. 2d 118.

203.    Defendant intentionally discriminated against Plaintiffs Brigida and Douglas-Cook and all members of the Class and violated Title VII of the Civil Rights Act by using an unvalidated, non-job-related hiring screening mechanism, the Biographical Questionnaire, that was not consistent with business necessity.  Even if Defendant's use of the Biographical Questionnaire could be justified as a business necessity, which it cannot, less discriminatory alternatives existed that would serve any legitimate purpose.

204.    Plaintiffs and the Class members have no plain, adequate remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief.  Plaintiff and the Class members continue to suffer injury from Defendant's discriminatory acts.

205.    Plaintiffs and other putative Class members are entitled to an order declaring that the FAA's actions constituted adverse employment actions which violated Title VII of the Civil Rights Act of 1964.

206.    Additionally, Plaintiffs Brigida and Douglas-Cook and other putative Class members request an injunction: (a) barring the FAA from employing illegal race-preferential hiring practices; (b) barring the FAA from using biodata to screen Class members or CTI graduates or to provide evidence, established and reviewed by CAMI and external experts, that the biodata considered and as applied to CTI

graduates has a statistically significant correlation to ATCS performance; (c) requiring the FAA to evaluate providing hiring preferences to Class members and potentially extend their age eligibility for ATCS positions; (d) barring the FAA from involving special interest groups (including NBCFAE) associated with protected classifications from involvement in designing hiring methodologies; (e) requiring that any new hiring process include a neutral third-party expert review of the process for Title VII compliance prior to adoption; (f) requiring Title VII training for the HR and CR departments; and (g) requiring that the FAA evaluate the forgiveness of student loan debt incurred by Class members or partial reimbursement of tuition.

207.    The FAA's conduct has caused and continues to cause Plaintiffs and the Class members substantial losses in earnings and other employment benefits.

208.    After a determination of liability, Plaintiffs and other putative Class members, likely through the use of subclasses, mini-trials, or agreed claim procedures, are entitled to other equitable relief including, but not limited to, back pay and front pay.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class they seek to represent, respectfully request that this Court:

1.    Certify this case as a class action on behalf of the proposed Class;

2.    Designate Plaintiffs Brigida and Douglas-Cook as representatives of the Class;

3.    Designate Plaintiffs' counsel as Class Counsel;

4.    Issue a declaratory judgment that the FAA's racially motivated purging of the merit-based hiring preference for Class Member Qualified Applicants violated Title VII of the Civil Rights Act of 1964;

5.      Issue a declaratory judgment that the FAA's racially motivated use of the unvalidated Biographical Questionnaire in 2014 violated Title VII of the Civil Rights Act of 1964;

6.      Enter an injunctive order directing the FAA to:

    (a)      Comply with Title VII in the hiring of ATCSs;

    (b)      Eradicate the effects of past unlawful employment practices in the hiring of ATCSs, including through possible instatement preferences and eligibility extensions; and

    (c)      Implement training and other measures to prevent race-based hiring decisions from occurring in the future.

7.      Award Plaintiffs and other putative Class members applicable statutory equitable remedies, the amounts of which are to be determined after a finding of liability, possibly through sub-classes, mini-trials, or another mandated or agreed procedure;

8.      Award Plaintiffs and other putative Class members' costs and attorney's fees in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(k); and

9.      Grant Plaintiffs and other putative Class members such further declaratory and injunctive relief as this Court deems just and equitable.

DATED this 27th day of October 2020.

Respectfully submitted,

*/s/ Zhonette M. Brown*

Zhonette M. Brown, D.C. Bar No. 463407
Brian Gregg, CO Bar No. 51063, *pro hac vice*
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
zhonette@mslegal.org
brian@mslegal.org

Michael W. Pearson, D.C. Bar No. 997169
CURRY, PEARSON, & WOOTEN, PLC
814 West Roosevelt
Phoenix, Arizona 85007
(602) 258-1000
(602) 523-9000 (facsimile)
mpearson@azlaw.com

Attorneys for Plaintiffs and Putative Class Counsel

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 27th day of October 2020, I caused a true and correct copy of the

foregoing to be electronically filed with the Clerk of the Court using the Court's CM/ECF system which

sent notification of such filing to the following counsel of record in this matter:

Michael L. Drezner
Michael.L.Drezner@usdoj.gov

Galen Nicholas Thorp
galen.thorp@usdoj.gov

*/s/ Meri Pincock*
Meri Pincock
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
meri@mslegal.org