**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| ANDREW J. BRIGIDA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-cv-2227 (DLF) |
| | ) | |
| ELAINE L. CHAO, Secretary, U.S. | ) | |
| Department of Transportation, | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FOURTH AMENDED
COMPLAINT IN PART**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF EXHIBITS ................................................................................................. ii

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

I.     Air Traffic Control Specialists ......................................................................... 2

       A.     Overview of Controller Hiring ............................................................... 2

       B.     Legacy Hiring Process for CTI Graduates (2008-2013) ......................... 4

       C.     Revised Hiring Process (2014) ............................................................... 5

       D.     Subsequent Statutory Changes (2016 & 2019) ....................................... 8

II.    Named Plaintiffs & Class Representatives ........................................................ 9

III.   Procedural History ........................................................................................... 9

STANDARD OF REVIEW ......................................................................................... 11

ARGUMENT ............................................................................................................. 12

I.     Under the Clear Statutory Language, a Title VII Claim Requires Discrete
       Employment Action Causing a Change in Employment Status for an Applicant or
       Employee. ....................................................................................................... 13

II.    Since Plaintiffs Did Not Have Pending Applications at the Time of the Alleged
       Elimination of a Hiring Preference, They Do Not Challenge Any Discrete
       Employment Action. ........................................................................................ 15

III.   Changing Hiring Processes to be Allow More People to Be Considered for
       Employment is Not an Adverse Employment Action ........................................ 17

IV.    Potential Applicants Do Not Acquire a Title VII Claim Merely Because They Had
       an Advantage Under an Old Process or Had Taken a Pre-Employment Test. ..... 19

V.     Ricci v. DeStefano Does Not Support Plaintiffs' Claim Because It Does Not Alter
       Title VII's Requirement of a "Personnel Action" Affecting "Applicants." ......... 21

CONCLUSION .......................................................................................................... 24

# TABLE OF EXHIBITS

**FAA Reports and Policies**

FAA, A Plan for the Future, 10-Year Strategy for the Air Traffic Controller Workforce 2011-2020 (Mar. 2011) (excerpts) ................................................................................. 1

FAA, A Plan for the Future, 10-Year Strategy for the Air Traffic Controller Workforce 2012-2021 (Mar. 2012) (excerpts) ................................................................................. 2

FAA, A Plan for the Future, 10-Year Strategy for the Air Traffic Controller Workforce 2013-2022 (Mar. 2013) (excerpts) ................................................................................. 3

FAA, A Plan for the Future, 10-Year Strategy for the Air Traffic Controller Workforce 2014-2023 (Mar. 2014) (excerpts) ................................................................................. 4

APT Metrics, Final Report, Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process (Apr. 16, 2013) (link) (appendices excluded) ................... 5

FAA, AT-CTI Program Overview and FAQs (July 10, 2013) .................................................... 6

FAA, Human Resource Policy Manual, Policy Bulletin No. 84, Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring (Feb. 7, 2014) ......................................... 7

**Controller Announcements**

AAC-AMH-09-PUBNAT8-12162 (July 2009) ......................................................................... 8

AAC-AMH-09-CTI-12655 (Sept. 2010) ................................................................................. 9

FAA-AMH-13-VRA-26915 (Aug. 2012) ................................................................................ 10

FAA-AMH-13-RMC-27006 (Aug. 2012) ............................................................................... 11

FAA-AMH-13-CTO-27017 (Aug. 2012) ................................................................................ 12

FAA-AMH-13-CTI-27053 (Aug. 2012) ................................................................................. 13

FAA-AMC-14-ALLSRCE-33537 (Feb. 2014) ........................................................................ 14

FAA-ATO-16-ALLSRCE-49075 (Aug. 2016) ........................................................................ 15

FAA-ATO-17-ALLSRCE-53474 (July 2017) .......................................................................... 16

## INTRODUCTION

Plaintiffs' hiring preference claim must be dismissed because an employer's decision to broaden the pool of potential applicants between rounds of hiring is not a personnel action cognizable under Title VII. The parties have repeatedly briefed this issue, yet Plaintiffs have identified no caselaw supporting their theory—that people who were not applicants when the hiring process was revised can have a Title VII claim for loss of the old hiring process even though they remained eligible to apply under the new process. To the contrary, both the statutory text and relevant caselaw preclude this unwarranted expansion of Title VII liability.

Suits against a federal employer must challenge "personnel actions affecting . . . applicants for employment." *See* 42 U.S.C. § 2000e-16(a). "Personnel actions" refer to discrete employment actions such as hiring or firing an individual, not programmatic actions such as revising a hiring process before accepting new applications. Plaintiffs here graduated in late 2013, shortly before the FAA revised its hiring process, and they never applied under the old hiring process. Thus, FAA's revision of its hiring process was not, by itself, a cognizable "personnel action."

Moreover, revising a hiring process to permit Plaintiffs to apply alongside a broader pool of applicants than Plaintiffs prefer is not an adverse employment action. Title VII protects equal treatment, not preferential treatment. Accordingly, even if Plaintiffs would have had an advantage if they applied under the old hiring process, Title VII does not give them a claim to seek to preserve that advantage. Instead, Plaintiffs must show that the hiring process in which they actually participated discriminated against them on the basis of some protected characteristic.

Finally, as this Court has recognized, Plaintiffs' claims significantly differ from those in *Ricci v. DeStefano*, 557 U.S. 567 (2009), because that case involved "successful applicants" for whom the employer "refuse[d] to accept the outcome of a race neutral hiring process." Order at 3, Oct. 12, 2020, ECF No. 112. Here, Plaintiffs were merely potential applicants and their

graduations and passing a pre-employment test did not constitute the outcome of the hiring process. Moreover, *Ricci* did not modify the "adverse employment action" requirement and it affirmed the appropriateness of modifying selection processes before accepting applications.

For all of these reasons, Plaintiffs' hiring preference claim must be dismissed for failure to state a claim under Title VII upon which relief can be granted.

## BACKGROUND

### I.  Air Traffic Control Specialists[1]

#### A.  Overview of Controller Hiring

The FAA's hiring process for air traffic control specialists (controllers) begins with publishing a vacancy announcement.  *See, e.g.*, Exhibit 13, FAA-AMH-13-CTI-27053 (2012) ("2012 CTI Announcement") at 1.  An individual must submit an application using the on-line system for each announcement to receive consideration under that announcement, regardless of whether the individual had submitted a prior application.  *Id.* at 3-4.  After an applicant has been determined to meet the basic eligibility criteria for an announcement and has been selected, several additional steps follow: the selectee receives a tentative offer letter; if the selectee accepts the offer, he or she must pass medical and psychological exams, a security investigation, and a drug test.  *Id.* at 2.  Upon satisfactory results from those processes, FAA sends the selectee a final offer letter, and inexperienced selectees report to the FAA Academy in Oklahoma City for training.  *Id.* at 3.

The FAA hires from several sources including the general public, Air Traffic Collegiate Training Initiative ("AT-CTI" or "CTI Program"), and experienced controllers (either retired military or civilian).  *See id.* at 44; 4th Am. Compl. ¶¶ 18, 34, ECF No. 114.  The FAA adjusts the

---

[1] Because the FAA has repeatedly laid out the statutory framework and the broader context regarding FAA's hiring processes, *see, e.g.*, Def.'s Opp'n to Mot. for Leave to Amend, ECF Nos. 105, 91; Def.'s Opp'n to Mot. for Class Cert., ECF No. 75, only the facts most relevant to this briefing are repeated here.

mix of hiring from these sources due to their availability and its staffing needs.  *See* 4th Am. Compl. ¶¶ 41, 67; Exhibit 3, A Plan for the Future, 10-Year Strategy for the Air Traffic Controller Workforce Plan 2013-2022 at 44 (Mar. 2013) ("2013 Workforce Plan").  Before 2014, FAA issued separate announcements for each source of applicants.  *See* 4th Am. Compl. ¶ 34; *see, e.g.,* Exhibit 8, AAC-AMH-09-PUBNAT8-12162 (July 2009) (general public announcement); Exhibit 9, AAC-AMH-09-CTI-12655 (Sept.-Oct. 2010) (CTI announcement).  The last announcements before the revised hiring process were issued in August 2012.  *See* Exhibit 10, FAA-AMH-13-VRA-26915 (Aug. 27, 2012) (for veterans eligible for a Veterans Recruitment Appointment, *see* 5 C.F.R. § 307.101, *et seq.*); Exhibit 11, FAA-AMH-13-RMC-27006 (Aug. 27, 2012) (for retired military controllers); Exhibit 12, FAA-AMH-13-CTO-27017 (Aug. 27, 2012) (for controllers with an appropriate Control Tower Operator certificate); Exhibit 13, AAC-AMH-11-CTI-19558 (June 2011-Feb. 2012) (CTI announcement).

Once FAA had pools of applicants from separate announcements, it drew from all available announcements in making selections.  *See* 4th Am. Compl. ¶ 67; 2013 Workforce Plan at 44.  Due to the number of available applicants, new announcements were not necessary for each source every year.  *See* 2013 Workforce Plan at 44 ("Due to the thousands of qualified . . . applicants available from previously advertised general public announcements, the agency did not offer a vacancy announcement to this pool in FY 2012[.]").  Thus, for example, hiring continued from the general public source between 2010 and 2013, even though there was no general public announcement during those years.  *See* Table 1 (summarizing hiring by fiscal year and source).

**Table 1: Controller Hiring by Fiscal Year**

| FY | Controllers hired | From CTI-only announcements | From general public announcements | From experienced announcements |
|----|----|----|----|----|
| 2010 | 998 | 252 | 520 | 226 |
| 2011 | 824 | 245 | 391 | 188 |
| 2012 | 925 | 467 | 268 | 190 |
| 2013 | 554 | 361 | 64 | 129 |

Source: Exhibit 1 at 41; Exhibit 2 at 41; Exhibit 3 at 44; Exhibit 4 at 41.

**B.    Legacy Hiring Process for CTI Graduates (2008-2013)**

Through the CTI Program, FAA works with educational institutions which offer two- and four-year degrees that include basic courses in air traffic control and aviation administration. *See* 4th Am. Compl. ¶ 24; Exhibit 6, AT-CTI Program Overview and FAQs at 5, 62-63 (July 10, 2013) ("CTI Program Overview") ("Understand that CTI schools are not training ATCS per se, but providing an aviation education that includes FAA mandatory and approved curriculum in the degree programs that qualify them as CTI partner institutions."). CTI graduates who apply and are selected by FAA for controller positions are eligible to bypass the first five weeks of training at the FAA Academy. 4th Am. Compl. ¶ 36. However, CTI graduates have never been guaranteed employment with FAA. *See* CTI Program Overview at 1, 12; 4th Am. Compl. ¶ 22.

Since at least 2008, CTI graduates have only been selected using competitive vacancy announcements. *See* 4th Am. Compl. ¶ 34; *see, e.g.*, Exhibits 8-16. CTI graduates had multiple avenues to apply for FAA controller positions. FAA posted some announcements exclusively for CTI graduates. *See* 4th Am. Compl. ¶ 34; *see, e.g.*, 2012 CTI Announcement. They could also apply to announcements open to the general public, *see, e.g.*, Exhibit 8, AAC-AMH-09-PUBNAT8-12162 (July 2009) ("2009 Public Announcement"), and some CTI graduates may be eligible to apply for Veterans' Recruitment Appointment. *See, e.g.*, Exhibit 10 at 2. To be eligible to apply for a CTI-specific vacancy announcement, a CTI student, among other things, must: (1)

have graduated from an AT-CTI school in a FAA-approved program, (2) have received a recommendation from that AT-CTI school, (3) have a current passing score on the Air Traffic Selection and Training Test Battery (AT-SAT), (4) be a U.S. citizen, and (5) be younger than 31 when entering FAA duty. *See, e.g.*, 2012 CTI Announcement at 2; 4th Am. Compl. ¶ 35.  CTI students could take the AT-SAT before graduation and their score was valid for three years after graduation.  4th Am. Compl. ¶¶ 32, 173, 186; EMP-1.7, Testing Policy § 4.d, ECF No. 73-2 (page 29 of Exhibit 1 to Plaintiffs' motion for class certification).

All CTI graduates were required to submit an electronic application pursuant to each vacancy announcement to be eligible for consideration under that announcement. *See, e.g*., 2012 CTI Announcement at 3-4.  For each job opening to be filled, FAA would generate from the electronic system a referral list of eligible and qualified CTI applicants who had listed that location in their application. *See* CTI Program Overview at 65.  The referral lists for all job openings to be filled under the announcement were then submitted to a centralized selection panel, which used the lists to schedule interviews and make selections for controller vacancies. *Id.* at 31, 65.

### C.    Revised Hiring Process (2014)

In February 2014, after several years of studies and analysis, FAA implemented changes to the controller hiring process.  The changes were based on a series of independent analyses.  First, in 2011, FAA convened an independent review panel to evaluate the controller hiring and training process. *See* 4th Am. Compl. ¶ 43.  The panel recommended changes to the controller hiring process, including the CTI Program. *Id*. ¶ 44.  Second, based on disparities in representation by race, gender, and disability, the FAA decided to conduct a barrier analysis of the controller hiring process pursuant to Equal Employment Opportunity Commission (EEOC) Management Directive

715 ("MD-715").[2]  Subsequently, in March 2012, the Secretary of Transportation and the FAA Administrator met with members of an FAA employee association, the National Black Coalition of Federal Aviation Employees (NBCFAE) to hear their concerns regarding disparities in the FAA workforce and hiring practices.  *See* 4th Am. Compl. ¶ 68.  The barrier analysis was initiated shortly thereafter.  *See id.* ¶¶ 71-72.  An initial version of the barrier analysis was completed in October 2012, which found that several decision points in the controller hiring process had a potential adverse impact on several demographic groups.  *Id.* ¶ 72.  To further study the issue, the FAA contracted with APT Metrics in December 2012 to conduct a detailed root cause analysis of the identified barriers to establish a foundation for corrective interventions.  *See id.* ¶ 74; Exhibit 5, Final Report, Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process (Apr. 16, 2013) ("Extension to Barrier Analysis").  Third, FAA established an Executive Steering Committee of senior agency executives to oversee revision of the hiring process and implementation of the recommendations.  *See* 4th Am. Compl. ¶ 87.

　　　　Several key issues were identified.  For example, the AT-SAT did not effectively function

---

[2] Pursuant to 42 U.S.C. § 2000e-16(b), among other authorities, the EEOC issued MD-715 in 2003.  It explains that all federal agencies are required to, inter alia:

> take proactive steps to ensure equal employment opportunity for all their employees and applicants for employment. This means that agencies must work to proactively prevent potential discrimination before it occurs and establish systems to monitor compliance with Title VII. Agencies must regularly evaluate their employment practices to identify barriers to equality of opportunity for all individuals. Where such barriers are identified, agencies must take measures to eliminate them. With these steps, agencies will ensure that all persons are provided opportunities to participate in the full range of employment opportunities and achieve to their fullest potential.

MD-715 § Part A.I (link); *see also Worth v. Jackson*, 451 F.3d 854, 856 (D.C. Cir. 2006) ("MD–715 declares that agencies have 'an ongoing obligation to eliminate barriers that impede free and open competition in the workplace and prevent individuals of any racial or national origin group or either sex from realizing their full potential.'" (quoting MD-715 at 8)).

to screen applicants, as over 95% of test takers passed the exam.  *See* Extension to Barrier Analysis at 6, 8; *see also* 4th Am. Compl. ¶ 52 (citing another study showing that between 92.1% and 97.7% of applicants passed the AT-SAT, depending on hiring source).  The studies also noted the inefficiency in issuing separate vacancy announcements directed towards different populations, with distinct eligibility standards for each source.  *See* Extension to Barrier Analysis at 10.  In addition, because these independent analyses had identified certain factors as potential barriers to equal opportunity at the agency, it was FAA's responsibility to explore ways to adjust them to better serve the agency's goals while reducing the barriers to full participation.  *See* MD-715 Part A § IV; *see also King v. Jackson*, 468 F. Supp. 2d 33, 35 (D.D.C. 2006) ("MD–715's overriding objective . . . [is] to ensure that all employees and applicants for employment enjoy equality of opportunity in the federal workplace regardless of race").

After considering all of the issues raised in the reports, along with overarching concerns about efficiency and effectiveness, in February 2014, FAA implemented a revised hiring process for its next controller announcement.  *See* Exhibit 7, Human Resources Policy Manual, Policy Bulletin No. 84, Suspension of Policy on Air Traffic Control Specialist Academy Trainee Hiring (Feb. 7, 2014) ("Policy Bulletin No. 84").  The outlines of the revisions had been announced in letters sent to CTI schools on December 30, 2013.  *See* 4th Am. Compl. ¶¶ 103-06.  FAA issued a single nationwide vacancy announcement open to all U.S. citizens who would compete against all other applicants.  *See* Exhibit 14, FAA-AMC-14-ALLSRCE-33537 (Feb. 10, 2014) ("2014 Announcement").  All applicants (regardless of whether the applicant was a CTI graduate) were required to take a new pre-employment screening tool referred to as the Biographical Assessment ("BA").  *Id.* at 3.  Applicants who passed the BA would then take the AT-SAT and were ranked based on a weighted composite of the BA, AT-SAT, and veterans' preference.  *See id.* Selections

7

were made based on this composite score.  *Id.*; Policy Bulletin No. 84 § 2(h)-(i).

### D.    Subsequent Statutory Changes (2016 & 2019)

In 2016, Congress enacted statutory requirements for controller hiring.  *See* FAA Extension, Safety, and Security Act of 2016, Pub. L. No. 114-190, Title II § 2106 (July 15, 2016) (codified at 49 U.S.C. § 44506(f)).  Under this law, the FAA continued to issue "All Sources" controller vacancy announcements, but experienced controllers received a statutory hiring preference, 49 U.S.C. § 44506(f)(1)(A); and the FAA then was required to hire approximately equally from two applicant pools—a pool of eligible CTI graduates and military veterans and a general public pool, *id.* § 44506(f)(1)(B) (2016).  The law prohibited use of a biographical assessment for applicants from the first pool.  *Id.* § 44506(f)(1)(C)(ii), (f)(2)(A).  Congress also provided that CTI graduates and veterans who applied in 2014 but were disqualified by the BA could reapply under the revised hiring procedures, waiving the age restriction for applications submitted through December 31, 2017.  *Id.* § 44506(f)(2)(B).  Accordingly, beginning with the FAA's 2016 vacancy announcement, the BA was no longer required for CTI graduates.  The FAA's 2016 and 2017 announcements also reiterated that CTI graduates who failed the 2014 BA could reapply with the age restriction waived.  *See, e.g.*, Exhibit 15, FAA-ATO-16-ALLSRCE-49075 (Aug. 2016) at 4; Exhibit 16, FAA-ATO-17-ALLSRCE-53474 (July 2017) at 4.

In December 2019, Congress further amended § 44506(f) to give applicants from the first pool "preferential consideration, within each qualification category based upon pre-employment testing results" before general public applicants.  *See* Pub. L. No. 116-92, Nat'l Defense Auth. Act, Div. A, Title XI § 1132, 133 Stat. 1198, 1615 (Dec. 20, 2019).  Accordingly, unlike in 2014, CTI graduates with recommendations or endorsements from their CTI programs and certain veterans now generally receive preferential consideration, pursuant to the statute, over general public applicants in the same test band.

## II.    Named Plaintiffs & Class Representatives

The two named Plaintiffs, Andrew Brigida and Matthew Douglas-Cook, graduated from CTI programs in August and December 2013, respectively.  *See* 4th Am. Compl. ¶¶ 154, 168. They both applied to the 2014 Announcement.  *See* 4th Am. Compl. ¶¶ 157, 170.  It was the first time either of them applied for a controller position.  *See id.* ¶¶ 157, 170.    They both, took and were disqualified by the BA, and were accordingly not eligible for further employment consideration under that vacancy announcement.  *See id.* ¶¶ 153, 158, 160, 167, 170-71.  They and the putative class rely exclusively on Mr. Brigida's April 2014 formal Equal Employment Opportunity complaint for exhaustion of administrative remedies.  *See id.* ¶¶ 159-65.    Plaintiff filed suit before the EEOC acted on his formal complaint, and his administrative complaint was subsequently dismissed.  *Id.* ¶ 165.

## III.    Procedural History

In December 2015, Mr. Brigida filed a putative class action complaint in the U.S. District Court for the District of Arizona, claiming that FAA engaged in disparate treatment in violation of Title VII and the Fifth Amendment when it revised the controller hiring process for 2014.  *See* Compl., ECF No. 1, *Brigida v. U.S. Dep't of Transp.*, No. 2:15-cv-02654 (D. Ariz.).  Plaintiff thereafter filed two amended complaints.  *Id.*, ECF Nos. 18, 26.  In November 2016, upon Defendants' motion, that court dismissed improper defendants, the Fifth Amendment claim, and the request for equitable relief, and transferred the case to this Court.  *See id.*, ECF Nos. 26, 33.

After the case was transferred, the Court reinstated Plaintiff's claim for equitable relief on a motion for reconsideration, but denied reinstatement of the Fifth Amendment claim.  *Brigida v. Chao*, No. 1:16-2227 (D.D.C.), ECF No. 50.  Following that decision, Plaintiffs filed their Third Amended Complaint which added three additional named Plaintiffs, including Mr. Douglas-Cook. The Court denied Plaintiffs' motion for class certification without prejudice after full briefing and

a hearing because the proposed class was inconsistent with the Third Amended Complaint, included African Americans, "include[d] individuals who voluntarily chose not to apply for a controller position or withdraw their application after successfully obtaining an offer," and "include[d] individuals who did not actually receive a recommendation from an AT-CTI school." Hr'g Tr. at 49:6-50:9, Sept. 13, 2019, ECF No. 86; Minute Order, Sept. 13, 2019.

In November 2019, Plaintiffs filed a motion for leave to file an amended complaint, ECF No. 87, which the Court denied "on the ground that his proposed amendments would be futile" because "the [proposed] complaint fail[ed] to remedy the deficiency noted above because it does not exclude CTI graduates who never applied to the roles in question." Order at 2-3, Apr. 5, 2020, ECF No; *see also id.* at *4 ("Upon receiving an opportunity to fix the flaws specifically identified by the Court, Brigida has failed to do so."). Plaintiffs subsequently filed yet another motion for leave to file an amended complaint that finally limited the putative class to 2014 applicants but continued to press a claimed loss of a hiring preference allegedly given to CTI graduates. *See* ECF No. 99. The Court struck Plaintiffs disparate impact claim for failure to exhaust administrative remedies, permitted amendment to challenge the 2014 BA, and stated that the Court would "hold Brigida to his representation that the putative class will only include 'recent graduates'" and instructed Plaintiffs to exclude from their class definition "CTI graduates whose academic records as of January 27, 2014 explicitly stated that they were ineligible to receive a letter of recommendation from their CTI school." *See* Mem. Opinion & Order at 4-5, Oct. 12, 2020, ECF No. 112. The Court also postponed deciding a challenge to the hiring preference claim, noting that it was "less clear . . . whether the FAA's alleged changes to its hiring process constituted an 'adverse employment action' under Title VII," and stating that the Court would "revisit the issue should FAA move to dismiss the complaint on this ground." *See id.* at 2-3. Finally, the Court also

emphasized that "[g]iven the history of this litigation, further attempts to amend the complaint will be disfavored." *Id.* at 7 n.4.

Plaintiffs have now amended their complaint. *See* ECF No. 114. Plaintiffs allege disparate treatment in violation of Title VII both in the alleged loss of a hiring preference, *id.* ¶¶ 10-11, 195-97, 202, and in the implementation of the BA. *See id.* ¶¶ 12, 198-99, 203. They have defined the putative class as follows:

> the approximately 1,000 to 1,500 non-African American CTI students who: (1) by February 10, 2014: (a) graduated from a CTI program at one of the 36 FAA-partnered CTI Institutions between 2009-2013 and (b) passed the AT-SAT, (2) applied to be an ATCS trainee through the 2014 all sources vacancy announcement but failed the Biographical Questionnaire that was incorporated into the 2014 ATCS hiring process and was therefore not hired; and (3) have never been offered employment as an FAA ATCS. Excluded from the Class are any CTI graduates: (a) who were not U.S. citizens as of February 10, 2014; (b) who by February 21, 2014 had reached 31 years of age (or 35 years of age if they had had 52 consecutive weeks of prior air traffic control experience); (c) whose academic records as of February 21, 2014 explicitly stated that they were ineligible to receive a letter of recommendation from their CTI school; or (d) whose AT-SAT scores had expired as of February 21, 2014.

*Id.* ¶ 173. Plaintiffs also appear to have abandoned their request for compensatory damages, removing all reference to "damages" and seeking only "statutory equitable remedies" *id.*, Prayer for Relief ¶ 7, perhaps in an effort to avoid a jury trial despite their previous jury demand. *See* ECF No 1 at 24; ECF No. 18 at 26; ECF No. 26 at 26; *cf.* 42 U.S.C. § 1981a(c) (permitting a jury trial only where compensatory damages are sought).

## STANDARD OF REVIEW

A complaint is properly dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, "when . . . the court finds that the plaintiffs have failed to allege all the material elements of their cause of action." *Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997). A complaint may also be dismissed where it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To

11

survive a motion to dismiss, the facts alleged "must be enough to raise a right to relief above the speculative level." *Id.* at 555-56. Courts "assume the truth of all well-pleaded factual allegations in the complaint and draw all reasonable inferences from those allegations in the plaintiff's favor." *Shenk v. Mallinckrodt plc*, No. 17-0145, 2019 WL 3491485, at *5 (D.D.C. July 30, 2019). However, courts "do not assume the truth of legal conclusions, nor do [they] accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015); *see also Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) ("Nor must we accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."). "When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials." *Stephens v. Mnuchin*, 317 F. Supp. 3d 413, 417 (D.D.C. 2018).[3]

## ARGUMENT

In this Circuit, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). While their allegation is not a model of clarity, it appears that Plaintiffs allege they suffered an adverse employment action when the FAA decided to discontinue issuing CTI-only vacancy

---

[3] Here, in addition to the Proposed Complaint, it is appropriate for the Court to consider Defendant's exhibits 1-5, 7-16, which are referred to in the complaint and therefore incorporated by reference, *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015), and Defendant's exhibit 6, which, along with the other exhibits, is subject to judicial notice as public records and as undisputed material on government websites. *See John Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-0252, 2019 WL 5597740, at *2 (D.D.C. Oct. 30, 2019). Each of these documents has been previously filed in this case, and Plaintiffs have not disputed their authenticity or the facts for which they are cited.

announcements and, instead, open completion to all members of the general public at a time when Plaintiffs had no pending job applications.  That simply is not "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003); *Webster v. Spencer*, No. 17-1472, 2020 WL 2104231, at *8 (D.D.C. May 1, 2020).  Accordingly, Plaintiffs "have failed to allege all the material elements of their cause of action," *Taylor*, 132 F.3d at 761, and their hiring preference claim must be dismissed.

I.    **Under the Clear Statutory Language, a Title VII Claim Requires Discrete Employment Action Causing a Change in Employment Status for an Applicant or Employee.**

Title VII requires a federal employer to make "personnel actions affecting employees or applicants for employment . . . free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a).[4]  While "Title VII does not itself define what constitutes 'personnel actions' by federal employers," *Brown v. Brody*, 199 F.3d 446, 455 n.8 (D.C. Cir. 1999), the term is generally understood to refer to certain types of discrete decisions regarding the applicant or employee.  *See, e.g.*, *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 608 (2008) (describing "employment action[s]" and "personnel action[s]" as "hiring and firing decisions" along with actions "such as promotion, salary, or work assignments").  For example, federal agencies are required to report specific personnel "actions" to the Office of Personnel Management—"appointment," "separation during probation," "transfer," "resignation," and "removal."  5 U.S.C. § 2951.  The D.C. Circuit has assessed the scope of Title VII "personnel

---

[4] This text differs from Title VII's provision for non-federal government employers, which makes it "an unlawful employment practice for an employer--(1) to fail or refuse to hire . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

actions" in light of Title V's definition for purposes of prohibited personnel practices. *See Brown*, 199 F.3d at 455 n.8 (concluding that "involuntary transfers, performance evaluations, and refusals of transfer applications are 'personnel actions' covered by § 2000e–16(a)" in light of the fact that 5 U.S.C. § 2302(a)(2)(A) "mentions [such] employment actions"). The items in Title V's definition of personnel action are discrete decisions regarding the applicant or employee. *See* 5 U.S.C. § 2302(a)(2)(A) (defining "personnel action" to mean, inter alia, "(i) an appointment; (ii) a promotion; (iii) . . . disciplinary or corrective action; (iv) a detail, transfer, or reassignment; (v) a reinstatement; . . . (viii) a performance evaluation . . .; . . . and (xii) any other significant change in duties, responsibilities, or working conditions"). Other statutory definitions of "personnel action" substantially overlap. *See, e.g.*, 22 U.S.C. § 3905 (defining "personnel action" for application of merit principles to the State Department's Foreign Service to be "any appointment, promotion, assignment . . . , award of performance pay or special differential, within-class salary increase, separation, or performance evaluation"); 50 U.S.C. § 3234(a)(3) (essentially replicating Title V's definition for prohibited personnel practices in the intelligence community).

The D.C. Circuit's requirement of an "adverse employment action" largely paraphrases this "personnel action" requirement. While "adversity" is not at issue here,[5] the D.C. Circuit's

---

[5] D.C. Circuit caselaw has generally dealt with claims that plainly involved a "personnel action," and thus has been "less concerned with the *kind* of employment action involved, than with its *effect* on the employee." *Brown*, 199 F.3d at 455. In this regard, the D.C. Circuit has concluded that only "personnel actions" that are "adverse" are cognizable under Title VII. *See, e.g.*, *Brown*, 199 F.3d at 453-57. Although *Brown*'s requirement of an "adverse" employment action is binding precedent, judges have questioned that conclusion, *see, e.g.*, *Ortiz-Diaz v. United States Dep't of Hous. & Urban Dev.*, 867 F.3d 70, 81 (D.C. Cir. 2017) (Kavanaugh, J., concurring)), and the position of the United States is that "[u]nder the plain meaning of the statutory text, the discriminatory denial of a job transfer is a 'personnel action[]' cognizable under Title VII's federal-sector provision, 42 U.S.C. 2000e-16(a), even if no change in pay or working conditions results." Cert. Opp'n at 8, *Forgus v. Esper*, No. 18-942 (May 22, 2019) (link), *certiorari denied* (Oct. 5, 2020). This position has no effect on the FAA's arguments here, because it remains undisputed that a Title VII claim requires an "employment action." *See id.* at 2-3, 8, 10-11, 17.

gloss on "adverse employment action" hits the same notes—"a significant change in employment status, such as hiring, firing, failing to promote . . . ." *Taylor*, 350 F.3d at 1293. Thus, under both the plain text of Title VII's federal employer provision and D.C. Circuit caselaw, the first element of a Title VII claim requires a discrete employment action causing a change in employment status.

## II.    Since Plaintiffs Did Not Have Pending Applications at the Time of the Alleged Elimination of a Hiring Preference, They Do Not Challenge Any Discrete Employment Action.

Plaintiffs challenge no discrete employment action. They assert that the FAA "[took] adverse employment actions, including purging Class members' qualifications and failing to fully consider for employment or to hire Class members," 4th Am. Compl. ¶ 11, but their hiring preference claim does not actually challenge any specific aspect of the 2014 hiring process. Instead, distinct from their failure to pass the 2014 BA—which, incidentally, is the objective reason that the FAA did not "fully consider [Plaintiffs] for employment"—Plaintiffs continue to press the notion that Title VII allows them to challenge the loss of a hiring process to which they did not apply. Plaintiffs are mistaken. There is no "change in employment status" when an agency changes a hiring process to which a plaintiff has not yet applied. *Taylor*, 350 F.3d at 1293. There is no "personnel actions affecting . . . applicants for employment." 42 U.S.C. § 2000e-16(a).

Plaintiffs' unwarranted effort to dramatically expand potential Title VII liability must be rejected. Despite filing several briefs on this issue already, Plaintiffs have cited no case in which a programmatic change was considered a "personnel action" or "employment action" affecting a non-applicant. Nor are undersigned counsel aware of any such case. *Cf. Valentino v. U.S. Postal Serv.*, 511 F. Supp. 917, 947-48 (D.D.C. 1981) ("[A] decision to move a program [within an agency hierarchy] is not a 'personnel action' within the meaning of § 717(a) of Title VII, 42 U.S.C. § 2000e-16(a)."). To the contrary, in *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87 (2d Cir. 2013), a court of appeals specifically rejected a similar argument—that a "generalized

overhaul of departmental promotional requirements amounted to the sort of race-based adverse action" prohibited by Title VII. *Id.* at 96. *Maraschiello* concluded that the plaintiff failed to allege an "adverse employment action" where a city did not make "its promotion decision from the 2006 list that included [plaintiff] but . . . instead chose to delay the appointment decision for a month in order to use the results of the new test," even if the "choice to adopt a new test was motivated in part by its desire to achieve more racially balanced results." *Id.* at 95-96.

Similarly here, the FAA engaged in a "generalized overhaul of departmental [hiring] requirements" between rounds of hiring. This is not a case where any group of potential applicants were prevented from applying for the position or where the employer preempted the hiring process by selecting someone without competition. *Cf. Carroll v. England*, 321 F. Supp. 2d 58, 67, 68 (D.D.C. 2004). Instead, the FAA reorganized its separate vacancy announcements for hiring new controllers into a single vacancy announcement to which all inexperienced applicants could apply. Indeed, this procedural change had no impact on Plaintiffs' eligibility to apply for a controller position. Plaintiffs' preference for the old process because they believed they were "more likely to be hired," 4th Am. Compl. ¶ 35, does not translate into a Title VII claim merely because the FAA changed the process before they had a chance to apply. After all, "[n]ot being selected for a position for which [one] did not apply cannot be considered an adverse employment action." *Moore v. Hagel*, No. 10-632, 2013 WL 2289940, at *2 (D.D.C. May 24, 2013); *see also Lathram v. Snow*, 336 F.3d 1085, 1089 (D.C. Cir. 2003); *Stoyanov v. Winter*, 643 F. Supp. 2d 4, 13 (D.D.C. 2009). Plaintiffs' approach would give anyone in a protected class who believes they were more likely to succeed under a prior process a viable discrimination claim, *regardless of whether they were challenging any part of the new process and regardless of whether they were ever an applicant.* Neither the text of Title VII, nor decades of judicial experience support such an

expansion.  It simply cannot be the case that such a new opportunity for everyone constitutes a "personnel action" affecting all CTI graduates *per se*.

### III.    Changing Hiring Processes to be Allow More People to Be Considered for Employment is Not an Adverse Employment Action.

Moreover, Title VII protects equal treatment, not preferential treatment.  *See Ricci v. DeStefano*, 557 U.S. 567, 577 (2009) (explaining that disparate treatment "occur[s] where an employer has treated a particular person less favorably than others because of a protected trait"); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 338 n. 18 (1977) ("Title VII provides for equal opportunity to compete for any job[.]"); *Figueroa v. Pompeo*, 923 F.3d 1078, 1082-83 (D.C. Cir. 2019) ("Title VII . . . reflects the American promise of equal opportunity in the workforce[.]").  Thus a process change withdrawing alleged *preferential treatment* and allowing all members of the general public to apply for a position does not satisfy Title VII's adverse action or discrimination elements.  *See Connecticut v. Teal*, 457 U.S. 440, 451 (1982) ("Title VII strives to achieve equality of opportunity by rooting out 'artificial, arbitrary, and unnecessary' employer-created barriers to professional development"); *Turner v. Billington*, No. 02-00219, 2006 WL 618420, at *8 (D.D.C. Mar. 10, 2006) (holding that "for the reason that the policy applied equally, by definition there can be no showing of an 'adverse personnel action' suffered by plaintiff").  It does not violate Title VII for an employer to adjust its practices to provide an opportunity for all individuals to compete in a subsequent round of hiring or promotions.  *See Ricci*, 557 U.S. at 585 ("Nor do we question an employer's affirmative efforts to ensure that all groups have a fair opportunity to apply . . . and to participate in the process by which [selections] are made.").

Plaintiffs appear to be believe that CTI graduates are inherently more qualified than other applicants and are thus entitled to special treatment.  They allege that under the FAA's pre-2014 hiring process CTI graduates were less likely to fail the AT-SAT, *see* 4th Am. Compl. ¶ 52, had

slightly higher average scores, *see id.* ¶ 53, were more likely to be hired than general public

applicants, *see id.* ¶¶ 35, 52, and were more likely to succeed in training, *see id.* ¶ 53. But even if

these comparisons are accurate, Title VII does not require an employer to limit its applicant pool

to a group that, on average, is most likely to succeed. Nor does Title VII require such a group to

receive a categorical preference in the hiring process. While comparative qualifications play a role

in the *McDonnell Douglas* burden-shifting approach for individual cases—*see, e.g.*, *Thomas v.*

*Washington Metro. Area Transit Auth.*, No. 17-cv-1508, 2019 WL 4225582, at *3 (D.D.C. Sept.

5, 2019) (noting that an individual plaintiff may show that an employer's nondiscriminatory reason

for a personnel action was pretextual by showing that the plaintiff was "significantly better

qualified than the successful candidate")—that evidentiary approach cannot mandate special

treatment for *groups* with better average results than the general population.

Because Title VII does not require any employer to give a hiring preference to a particular

group of potential applicants, an employer's decision to take away an alleged hiring preference

between rounds of hiring does not give rise to a new Title VII claim. Here, the "hiring preference"

to which Plaintiffs apparently refer is the FAA's practice of issuing "CTI-only ATCS vacancy

announcements," 4th Am. Compl. ¶ 10, or perhaps that CTI graduates were simply "more likely

to be hired" by the relevant decisionmakers, *id.* ¶ 35. In 2014, the FAA chose to expand its

application pool to include members of the general public, which inherently did not exclude any

of the CTI graduates who would have been able to apply to a CTI-only announcement. While

Plaintiffs are free to challenge aspects of the 2014 process that had an allegedly discriminatory

effect on them—as they have with their BA claim—they cannot make a claim out of the FAA's

choice to expand the applicant pool. *Cf. Nichols v. Truscott*, 424 F. Supp. 2d 124, 138 (D.D.C.

2006) ("That other individuals may have received favorable treatment plaintiff does not believe

they deserved simply is not an adverse employment action with respect to plaintiff."). Indeed, to date Plaintiffs have cited no case in which an employer's choice to invite applications from a larger pool before the next round of hiring gave rise to a viable Title VII claim.

## IV.    Potential Applicants Do Not Acquire a Title VII Claim Merely Because They Had an Advantage Under an Old Process or Had Taken a Pre-Employment Test.

As discussed above, Title VII does not permit everyone to challenge a federal agency's policies, but instead only "employees or applicants" who are affected by a "personnel action." *See* 42 U.S.C. § 2000e-16(a); *Ricci*, 557 U.S. at 579 (characterizing "Title VII's command" to be "that employers cannot take *adverse employment actions* because of an individual's race" (emphasis added)). Here, the putative class of CTI graduates were not subject to an employment action merely from the loss of an alleged preference that would have been available *if they applied while it was in place*. *Cf. Bourdais v. New Orleans City*, 485 F.3d 294, 300 (5th Cir. 2007) (holding that district court properly dismissed certain plaintiffs who had not completed application process and thus "failed to show that they suffered any adverse employment action whatsoever"); *Carter v. City of Philadelphia*, 989 F.2d 117, 122 (3d Cir. 1993) (emphasizing that statutory hiring preference for veterans did not give plaintiff an interest "in the promotion per se but in being given a preference *when his promotion is considered*" (emphasis added)).

This is best illustrated by examining the details of Plaintiffs' allegations. Plaintiffs base their claim on the assertion that the FAA "refus[ed] to accept the outcome of a race-neutral hiring process that made Class members eligible for application to CTI-only ATCS vacancy announcements." 4th Am. Compl. ¶ 10. This demonstrates that Plaintiffs' references to "Qualified Applicants" throughout their complaint merely refer to CTI graduates who were *potential applicants*. They had merely reached the stage where they were "eligible" to apply by, inter alia, passing the AT-SAT, graduating from a CTI program, and being recommended by their school.

*See id.* ¶¶ 10, 28, 35.   Indeed, both Plaintiffs graduated long after the last pre-2014 vacancy announcements closed in September 2012.   *See, e.g.*, *id.* ¶ 155 (describing Plaintiff Brigida as a "Qualified Applicant" upon his graduation in August 2013); *id.* ¶ 168 (stating that Plaintiff Douglas-Cook graduated in December 2013).   Therefore, both Plaintiffs had never been eligible to apply for any of the FAA's actual CTI-only vacancy announcements and their February 2014 applications under the revised hiring process were the first time either of them had applied for a controller position with the FAA.

The FAA did not "refus[e] to accept the *outcome* of a race-neutral hiring process," 4th Am. Compl. ¶¶ 10, 196 (emphasis added), by modifying its hiring process between rounds of hiring. While Plaintiffs claim that they were "pre-qualified," *id.* ¶¶ 10, 149, 178, they were not applicants, let alone "successful applicants."   *Id.* ¶ 196.   Neither graduating with an appropriate degree nor passing a pre-employment test entitled them to be hired.   And the FAA only considered those who actually applied under one or more vacancy announcements.   *See supra* Background § I.B.   Thus, no outcome of a hiring process had been reached.   CTI graduates had no right to the FAA's perpetual use of CTI-only vacancy announcements and no right to be hired.   *See, e.g.*, 4th Am. Compl. ¶ 22 (acknowledging that FAA "was not offering guarantees of employment").

Indeed, if Plaintiffs contend that they had some contractual right to continuation of the alleged hiring preference and that FAA breached this alleged contract by revising the hiring process, that claim must fail.   Under federal law, FAA hiring is by "appointment."   49 U.S.C. § 106(l)(1).   Thus, applicants do not have any contractual rights vis-à-vis the selection process.   *See Anderson v. United States*, 64 Fed. Cl. 759, 762-63 (2005).   Plaintiffs could not have "legitimate expectations of being hired," 4th Am. Compl. ¶¶ 9, 149, and even if they did, their expectations had no legal significance.

Finally, Plaintiffs cannot muster up an adverse employment action merely because the FAA "eliminate[d]" their "prior AT-SAT score[s]."  4th Am. Compl. ¶¶ 178.a-b.  In prior briefing, Plaintiffs have insisted that "striking" their AT-SAT scores was an adverse employment action that somehow "disqualified" them from employment, *see* Pls.' Reply in Supp. Mot. For Leave to Amend at 17, ECF No. 107, but in fact CTI graduates all remained eligible to apply under the 2014 hiring process.  Moreover, because taking the AT-SAT was only one step in the pre-2014 legacy hiring process and actually applying for a position is what triggers a potential adverse employment action, Plaintiffs did not suffer any adverse employment action when the FAA revised the hiring process to no longer use pre-2014 AT-SAT scores.  *See Bourdais*, 485 F.3d at 300; *see also Taylor*, 350 F.3d at 1293.  Indeed, Plaintiffs' focus on the AT-SAT is a red herring.  Under the FAA's pre-2014 legacy process, more than 90% of applicants passed it, whether general public applicants or CTI students.  *See* 4th Am. Compl. ¶ 52.  Thus, putative class members were not "likely to be hired," 4th Am. Compl. ¶¶ 10, 35, merely because they passed the AT-SAT.  And the FAA continued to use "the cognitive portion of the AT-SAT" for all who passed the BA.  *See* 4th Am. Compl. ¶ 106.  Moreover, no putative class member was affected by the 2014 requirement for those who passed the BA to retake "the cognitive portion of the AT-SAT," *id.*, because the putative class is defined to include only those who did *not* pass the BA.  Thus, any way one looks at it, "eliminat[ing] Class members' . . . prior AT-SAT score," 4th Am. Compl. ¶ 178, before they were applicants in order to make way for the new process is not "an adverse employment action" under the circumstances at issue here.

**V.    *Ricci v. DeStefano* Does Not Support Plaintiffs' Claim Because It Does Not Alter Title VII's Requirement of a "Personnel Action" Affecting "Applicants."**

While Plaintiffs repeatedly cite *Ricci v. DeStefano* in their complaint, that case plainly does not support the argument that a process change, standing alone, constitutes an employment action

giving rise to a Title VII claim.  As this Court already noted, "in contrast to the *Ricci* plaintiffs,

Brigida was not yet an 'applicant' at the time the FAA . . . changed its process."  Order at 3, Oct.

12, 2020, ECF No. 112.  The *Ricci* plaintiffs plainly challenged an employment action—they were

applicants "eligible for immediate promotion" but were not promoted because the "City chose not

to certify the examination results."  557 U.S. at 566, 579.    In clarifying the narrowness of its

holding,[6] the Supreme Court reiterated the appropriateness of modifying a selection process

between rounds of employment actions to promote equal opportunity.  *See Ricci*, 557 U.S. at 585

("Title VII does not prohibit an employer from considering, *before* administering a test or practice,

how to design that test or practice in order to provide a fair opportunity for all individuals,

regardless of their race.") (emphasis added).  Employers must be able to assess and adjust their

practices to ensure that "race is not a barrier to opportunity."  *Id.* at 580; *see also id.* at 585 ("Nor

do we question an employer's affirmative efforts to ensure that all groups have a fair opportunity

to apply for promotions and to participate in the process by which promotions will be made.");

*Shea v. Kerry*, 796 F.3d 42, 55 (D.C. Cir. 2015) (distinguishing *Ricci* on the ground that the

"employers [in certain affirmative action cases] . . . did not modify the outcomes of personnel

processes for the asserted purpose of avoiding disparate-impact liability under Title VII");

*Maraschiello*, 709 F.3d at 96 (holding that plaintiff "cannot demonstrate that the generalized

overhaul of departmental promotional requirements amounted to the sort of race-based adverse

action discussed in *Ricci*").

        Here, the FAA did not "refuse[] to accept the outcome of a race-neutral hiring process

---

[6] In *Ricci*, the Supreme Court "articulates the contours of a specific affirmative defense"
available in Title VII disparate treatment cases, *Maraschiello*, 709 F.3d at 95—that "before an
employer can engage in intentional discrimination for the asserted purpose of avoiding or
remedying an unintentional disparate impact, the employer must have a strong basis in evidence
to believe it will be subject to disparate-impact liability."  557 U.S. at 585.

solely because of the racial makeup of the successful applicants." 4th Am. Compl. ¶ 205. Instead, the FAA rolled out a new hiring process after extensive analysis and before a new vacancy announcement was issued. *See supra* Background § II.C; *cf. Maraschiello*, 709 F.3d at 96 ("Completing the last phase of a long-planned adoption of a new standard is a far cry from rejecting a set of results out of hand because of their racial makeup."); *id.* at 95-96 (finding no "race-based adverse action" where city "chose to delay the appointment decision for a month in order to use the results of the new test," even if the "choice to adopt a new test was motivated in part by its desire to achieve more racially balanced results"). The fact that some CTI students and graduates had taken the AT-SAT does not make them comparable to the firefighters who had passed the promotion test in *Ricci* because the AT-SAT did not dictate the outcome of a hiring process, and indeed was not the beginning of an application process. CTI students who passed the AT-SAT— as almost all test-takers did—and graduated from their CTI program still had to apply within the window of a new vacancy announcement, meet all eligibility requirements, be picked by a centralized selection panel, and complete an interview before they could receive a tentative offer letter, then pass additional screening before they could be hired. *See supra* Background § II.B. Therefore, unlike the firefighters in *Ricci*, Plaintiffs and the putative class were not applicants who "would have indisputably been hired" absent the allegedly discriminatory policy change. *See* Order at 3, Oct. 12, 2020, ECF No. 112.

In sum, deciding in advance of a new vacancy announcement to issue all-sources announcements rather than CTI-only ones cannot constitute rejecting the "outcome" of a hiring process; otherwise, FAA could never revise its hiring process in light of observed barriers to equal opportunity but would be required to perpetually carry forward the CTI graduates' alleged "preference."

For all of these reasons, Plaintiffs have failed to set forth a plausible class-wide Title VII "hiring preference" claim.  This class claim should be dismissed for failure to state a claim.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiffs' hiring preference claim.


DATED: November 13, 2020                JEFFREY BOSSERT CLARK
                                        Acting Assistant Attorney General

                                        CARLOTTA P. WELLS
                                        Assistant Director
                                        Civil Division, Federal Programs Branch

                                        */s/ Galen N. Thorp*
                                        GALEN N. THORP (V.A. Bar No. 75517)
                                        Senior Trial Counsel
                                        MICHAEL DREZNER (V.A. Bar No. 83836)
                                        Trial Attorney
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street NW
                                        Washington, DC 20530
                                        Telephone: (202) 514-4781
                                        Facsimile: (202) 616-8470
                                        Email: galen.thorp@usdoj.gov

                                        *Counsel for Defendant*