## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANDREW J. BRIGIDA and MATTHEW L. DOUGLAS-COOK, | ) ) ) |  |
| Plaintiffs, | ) ) ) |  |
| vs. | ) ) | Case No. 16-cv-2227 (DLF) |
| ELAINE L. CHAO, Secretary, U.S. Department of Transportation, | ) ) ) |  |
| Defendant. | ) ) ) |  |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FOURTH AMENDED COMPLAINT IN PART

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION .......................................................................................... 1

FACTS ........................................................................................................... 2

ARGUMENT ................................................................................................. 5

I.     STANDARD OF REVIEW ................................................................. 5

II.    PLAINTIFFS HAVE ADEQUATELY STATED A
CLAIM CONCERNING THE FAA'S INTENTIONAL
EMPLOYMENT DISCRIMINATION ........................................... 8

      A.    Plaintiffs Suffered an Adverse Employment Action ......................... 9

            1.    The CTI Program Focused on Employment of ATCSs. ........... 9

            2.    Eliminating CTI-Based Qualifications and Vacancies
Had Material Adverse Consequences ........................................ 11

            3.    Plaintiffs' Participation in the CTI Program and
Achievement of Qualified Applicant Status is Akin
to Failure to Hire or Failure to Promote, Where an
Adverse Employment Action is Presumed .............................. 12

            4.    Federal Personnel Definitions Do Not Define
Adverse Employment Actions. ................................................. 14

            5.    Plaintiffs Suffered "Discrete" Adverse Employment
Actions ..................................................................................... 15

      B.    Plaintiffs were ATCS Applicants ................................................... 16

            1.    Plaintiffs Were Applicants—Qualified Applicants ................. 17

            2.    This Case Tracks *Ricci* More Than it does *Maraschiello* ........ 17

            3.    Plaintiffs' Status as Applicants Does Not Expand Title VII .... 20

III.   THE FAA DRAMATICALLY ALTERED THE HIRING PROCESS
AND DID NOT MERELY EXPAND IT TO MORE PEOPLE .................. 21

CONCLUSION ............................................................................................. 25

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................ 5, 6

*Baloch v. Kempthorne*,
   550 F.3d 1191 (D.C. Cir. 2008) ............................................................ 8, 14

*Banneker Ventures, LLC v. Graham*,
   798 F.3d 1119 (D.C. Cir. 2015) .............................................................. 7

*Bartlette v. Hyatt Regency*,
   208 F. Supp. 3d 311 (D.D.C. 2016) ........................................................ 6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................ 5, 6

*Bourdais v. New Orleans City*,
   485 F.3d 294 (5th Cir. 2007) .............................................................. 16, 19

*Cones v. Shalala*,
   199 F.3d 512 (D.C. Cir. 2000) ....................................................... 8, 13, 17, 20

*Connecticut v. Teal*,
   457 U.S. 440 (1982) ............................................................................. 16

*Czekalski v. LaHood*,
   589 F.3d 449 (D.C. Cir. 2009) .............................................................. 9

*Czekalski v. Peters*,
   475 F.3d 360 (D.C. Cir. 2007) .............................................................. 13

*Douglas v. Donovan*,
   559 F.3d 549 (D.C. Cir. 2009) .............................................................. 12, 13

*EEOC v. Metal Service Co.*,
   893 F.2d 341 (3d Cir. 1990) ................................................................. 17, 21

*Figueroa v. Pompeo*,
   923 F.3d 1078 (D.C. Cir. 2019) ............................................................ 11, 14

*Forkkio v. Powell*,
   306 F.3d 1127 (D.C. Cir. 2002) ............................................................ 9

*Halcomb v. Powell*,
   433 F.3d 889 (D.C. Cir. 2006) .............................................................. 13

*Harding v. Gray*,
   9 F.3d 150 (D.C. Cir. 1993) ................................................................. 14, 22

*Hettinga v. United States*,
    677 F.3d 471 (D.C. Cir. 2012) ................................................................ 5

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984) ................................................................ 6

*King v. Jackson*,
    468 F. Supp. 2d 33 (D.D.C. 2006) ................................................................ 18

*Lewis v. City of Chicago*,
    560 U.S. 205 (2010) ................................................................ 16

*Maraschiello v. City of Buffalo Police Dep't*,
    709 F.3d 87 (2d Cir. 2013) ................................................................ 17, 18, 19

*Massaquoi v. District of Columbia*,
    81 F. Supp. 3d 44 (D.D.C. 2015) ................................................................ 6

*Menoken v. McGettigan*,
    273 F. Supp. 3d 188 (D.D.C. 2017) ................................................................ 10, 14

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ................................................................ Passim

*Rodriguez v. Donovan*,
    922 F. Supp. 2d 11 (D.D.C. 2013) ................................................................ 6

*Russell v. Principi*,
    257 F.3d 815 (D.C. Cir. 2001) ................................................................ 12

*Shea v. Kerry*,
    796 F.3d 42 (D.C. Cir. 2015) ................................................................ 22, 23

*Stephens v. Mnuchin*,
    317 F. Supp. 3d 413 (D.D.C. 2018) ................................................................ 6

*Stoyanov v. Winter*,
    643 F. Supp. 2d 4 (D.D.C. 2009) ................................................................ 18

*Swierkiewicz v. Sorema, N.A.*,
    534 U.S. 506 (2002) ................................................................ 6

*Tallbear v. Perry*,
    318 F. Supp. 3d 255 (D.D.C. 2018) ................................................................ 12

*Taylor v. FDIC*,
    132 F.3d 753 (D.C. Cir. 1997) ................................................................ 6

*Taylor v. Small*,
    350 F.3d 1286 (D.C. Cir. 2008) ................................................................ 13

*Thomas v. WMATA*,
    305 F. Supp. 3d 77 (2018) ................................................................ 7, 8

*Walker v. Jackson,*
   798 F.3d 1085 (D.C. Cir. 2015) ................................................................. 8
*Webster v. Spencer,*
   **No. 17-cv-1472 (DLF),** 2020 WL 2104231 (D.D.C. June 30, 2020) ...................... 18
*White v. Burlington N. & Santa Fe R. Co.,*
   364 F.3d 789 (6th Cir. 2004) .................................................................. 12

## Statutes

5 U.S.C. § 2302(a)(2)(A) ........................................................................ 14
5 U.S.C. § 2951 ...................................................................................... 14
22 U.S.C. § 3905 .................................................................................... 14
42 U.S.C. § 2000e-16(a) ......................................................................... 14

## Rules

Fed. R. Civ. P. 8(a)(2) ............................................................................ 5
Fed. R. Civ. P. 12(b)(6) .......................................................................... 5
Fed. R. Civ. P. 12(d) ............................................................................. 6, 7
Fed. R. Civ. P. 56 ................................................................................. 7, 8

## INTRODUCTION

In 2013 the Federal Aviation Administration's ("FAA") abandoned its tried and tested, merits-based Air Traffic Controller Specialist ("ATCS") hiring process for a discriminatory, race-biased process to increase the proportion of African Americans employed as ATCSs. The FAA's actions in eliminating the Collegiate Training Initiative ("CTI") program and purging Class Members from the list of Qualified Applicants because of the purported racial makeup of CTI graduates represent a prima facie case of racial discrimination in hiring prohibited by Title VII of the Civil Rights Act of 1964. Defendant, however, attempts to portray Class Members as merely frustrated onlookers, upset that the new hiring process might incidentally be less favorable to them than the previous process, but this could not be further from the truth.

Far from a "programmatic" change taken "between rounds of hiring" merely intended to expand the pool of potential ATCS hires, the FAA's conscious dismantling of the merits-based CTI hiring path was a discrete employment action with significant adverse effects on Class Members. In making its "programmatic" decision to eliminate the Qualified Applicant hiring preference and purge its records of Class Members' qualifications, the FAA took away the status Class Members had earned, materially harming the likelihood that each Class Member would be hired as an ATCS. Title VII does not permit an employer to pull the rug out from under job applicants in this way in the name of racial diversity, particularly when that employer had induced those applicants to invest significant time and resources in the prior system.

By the time their status as Qualified Applicants was stripped, Class Members had expended significant time and money attending FAA-approved ATCS training programs, studying FAA-mandated curricula, and preparing for an FAA-created and administered aptitude test. The FAA chose, partnered with, and continually evaluated the schools participating in the CTI program, and

even received regular updates on the progress of individual CTI students. Class Members are no mere onlookers; they unqualifiedly expressed their interest in applying for ATCS positions through undertaking rigorous, specialized, and FAA approved training to become ATCSs and were indeed labeled as applicants *by the FAA itself*.

At the heart of Title VII of the Civil Rights Act of 1964 is the simple axiom that employees and job applicants have the right to be judged on their merits, not on the color of their skin or the nationality of their ancestors. The FAA's actions in refusing to post for existing vacancies during a protracted  period of significant need, refusing to recognize the CTI as a continued hiring source because of the alleged racial characteristics of the applicant pool, and refusing to consider validated qualifications over race was a gross violation of that axiom. Plaintiffs have more than sufficiently pleaded facts necessary to survive a motion to dismiss.

## FACTS

Plaintiffs dispute most of the alleged facts and strained inferences underlying Defendant's Motion to Dismiss. For example, Defendant opens her brief with the statement that "an employer's decision to broaden the pool of applicants between rounds of hiring is not a personnel action." Def.'s Motion to Dismiss, ECF No. 119 at 4.[1]  Motive, however, is a question of fact. Plaintiffs have consistently and repeatedly alleged that the actions challenged in this lawsuit were not part of a legal affirmative action program. Defendant intentionally erected arbitrary barriers to the hiring of non-African American CTI Graduates and created illegal express lanes to usher African American ATCS candidates to the front of the candidate pool. Fourth Am. & Supp. Compl., ECF No. 114 at Intro. ¶¶ 38, 55–56, 61, 66–70, 72–73, 81, 84–85, 88, 97, 99, 126, 149, 195–97.

---

[1] Page numbers refer to the numbering assigned by the CM/ECF system, located at the upper right of the document.

Similarly, whether the FAA's actions were taken "between rounds of hiring," why the FAA sought to arrange such timing, and whether that description actually aligns with the FAA hiring process for qualified CTI Graduates rather than the hiring process for general public applicants are questions of fact. Plaintiffs have alleged that although the FAA projected needing over 1000 new ATCSs per year, the FAA, after lobbying by special interest groups, purposely stopped issuing or hiring from new CTI vacancy announcements in 2012–2013, while the FAA papered-over then created its new race-biased hiring process. *Id.* at Intro. ¶¶ 37–38, 66–70, 72–73, 76, 79, 85, 88, 99, 149, 195–97. The FAA had discretion over when to issue new vacancy announcements, what sources to target for a vacancy announcement, and how long to hire from any given vacancy announcement. ECF No. 119 at 5–7. The FAA used that discretion to further its illegal race-based hiring motives.

Perhaps most importantly for purposes of this motion, Plaintiffs dispute that Class Members were not "applicants" for ATCS positions. The FAA had different hiring paths for persons from the general public, persons with relevant military aviation experience, and CTI Graduates. *Id.* ¶¶ 18–19, 28–29, 32, 34–36, 46, 50–53, 68, 76,79–80, 95, 157. While someone from the general public may not be an "applicant" until they had actually applied to a posted ATCS vacancy announcement, presumably their first tangible expression of interest in an ATCS position, the CTI Graduates within the Class unqualifiedly expressed their interest in ATCS positions and were labeled and considered applicants before any associated vacancy announcement. *Id.* ¶¶ 27–28, 32, 35, 157. The FAA created the AT-CTI program specifically to identify, train, and select ATCS applicants. *Id.* ¶¶ 20–21. The FAA publicly endorsed the AT-CTI program as one of the best ways to be hired as an ATCS and stated that the AT-CTI program was expected to supply skilled, pretrained applicants, and the FAA represented it would "seek to hire all qualified [AT-

CTI] graduates." *Id.* ¶¶ 21–22, 26–27. The very purpose of the AT-CTI program was to "develop, deliver, and implement air traffic control recruiting, *selection*, and training," and the program was established "for the *employment* of entry level" ATCSs. *Id.* ¶¶ 23, 26 (emphasis added). The FAA chose, partnered with, and continually evaluated the schools participating in the AT-CTI program, mandated around 200 hours of specific classroom instruction, and received regular updates from the AT-CTI schools about individual students' enrollment in and progression through the AT-CTI program and AT-SAT testing. *Id.* ¶¶ 23–26.

The FAA also established what qualifications, beyond participation in and graduation from an AT-CTI program, would make one a "Qualified Applicant *as defined by the FAA*. In addition to graduating from an AT-CTI program, if a student took and passed the FAA created, validated, and administered AT-SAT test within a year of graduating,[2] maintained an un-expired passing AT-SAT score, was a U.S. citizen, had not aged out of eligibility, and received a letter of recommendation from their AT-CTI school, then the student was listed as a Qualified Applicant, eligible to receive a job code to apply for a CTI-only ATCS vacancy announcement. *Id.* ¶¶ 28, 30–32, 35, 109. Beginning in 2008, the FAA started posting CTI-only vacancy announcements. *Id.* ¶ 41. From 2010 to 2012 the FAA posted CTI-only vacancy announcements and no general public vacancy announcements. *Id.*

The AT-CTI program accomplished its objective and, due to the pre-trained, pre-qualified applicants it supplied, became the FAA's preferred hiring source. Research conducted by or for the FAA found that the CTI Qualified Applicants were more likely to complete all of the ATCS trainings and qualifications and become Certified Professional Controllers, to achieve this goal

---

[2] AT-SAT tests were not administered or available to general public applicants until they had applied to a specific general public vacancy announcement. *Id.* ¶ 29.

more quickly than other candidates, and to have satisfactory on-the-job performance even after certification. *Id.* ¶¶ 46–47. Anecdotal evidence revealed that trainers within the FAA preferred CTI hires to public hires, and that the CTI schools, students, and others recognized that the CTI students' credentials provided an advantage. *Id.* ¶¶ 46–53, 80, 109, 112. Studies also verified that the CTI Qualified Applicants experienced no "barriers" or hurdles to hiring and were more likely to be hired than general public candidates with similar AT-SAT scores. *Id.* ¶¶ 46–53, 80, 109, 112. In sharp contrast, the new hiring process was designed to screen out 70% of the ATCS applicants, particularly qualified non-African Americans, and screened out around 86% of the approximately 4,000 CTI student or graduate applicants. *Id.* ¶¶ 72, 82, 97, 101, 115. As a result of the FAA's actions, Plaintiffs and the putative Class Members lost employment opportunities. *Id.* ¶ 173.

## ARGUMENT

## I.    STANDARD OF REVIEW.

In evaluating a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *See Hettinga v. United States.*, 677 F.3d 471, 476 (D.C. Cir. 2012). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint need only set forth "a short and plain statement of the claim," Fed. R. Civ.  P. 8(a)(2), and be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Twombly*, 550 U.S. at 555 (2007).  This standard does not amount to a "probability requirement" and does not require certainty of harm, but requires more than a mere possibility that the defendant acted illegally. *Iqbal*, 556 U.S. at 678.

Further, "[w]hile an employment discrimination plaintiff must 'plead sufficient facts to show a plausible entitlement to relief,' he is 'not required to plead every fact necessary to establish a prima facie case of discrimination in order to survive a Rule 12(b)(6) motion to dismiss.'" *Bartlette v. Hyatt Regency*, 208 F. Supp. 3d 311, 322 (D.D.C. 2016) (quoting *Massaquoi v. District of Columbia*, 81 F. Supp. 3d 44, 49 (D.D.C. 2015)); *see Rodriguez v. Donovan*, 922 F. Supp. 2d 11, 17 (D.D.C. 2013). The United States Supreme Court unanimously held that a prima facie discrimination case, for example under the *McDonnell Douglas* burden shifting paradigm, is an evidentiary standard—to be used at summary judgment and trial—*not* a pleading standard to be used on a motion to dismiss. *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002). Because a *McDonnell Douglas* prima facie case is a flexible standard that may not even need to be applied depending on the evidence developed during discovery, it cannot be used as a pleading standard. *Id.* at 510–12. Consistent with the Federal Rules pleading standards, "[a] court may dismiss a complaint only if it is clear no relief could be granted under any set of facts that could be proved consistent with the allegations" in the complaint. *Id* at 514 (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).[3]

Facts alleged by Defendant outside or inconsistent with the Complaint, its attachments, or incorporated documents, or facts that are not subject to judicial notice are not properly considered in the context of a Rule 12(b)(6) motion to dismiss. *See* Fed. R. Civ. P. 12(d); *Thomas v. WMATA*, 305 F. Supp. 3d 77, 82 (2018). Defendant's motion attached 313 pages in 16 exhibits. *See* ECF

---

[3] Defendant's articulation of the standard, derived from a case predating *Swierkiewicz, Iqbal*, and *Twombly*, and evaluating claims concerning alleged violations of the RTC Whistleblower Act, ECF No. 119 at 14 (citing *Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997)), ignores developments and nuances of Title VII law. Indeed, the only discrimination case cited in Defendant's argued "standard of review," *Stephens v. Mnuchin*, 317 F. Supp. 3d 413 (D.D.C. 2018), pertains to the allegations a court may consider rather than the pleading standard to be evaluated. ECF No. 119 at 11–12.

No. 119 at 3; ECF No. 119-1. None of those documents were attached to or incorporated into Plaintiffs' Fourth Amended Complaint. ECF No. 114.[4]  Moreover, Defendant's statement that documents referred to in the complaint are therefore incorporated by reference, ECF No. 119 at 15 n.3, overstates the law, as recognized by the very case Defendant cites. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1132–34 (D.C. Cir. 2015) ("The incorporation by reference doctrine has limits, however. If a document itself comes before the court only as an attachment to the defendant's motion to dismiss, it may not be appropriate for the court to treat the entire document as incorporated into the complaint."  Referencing a document does not mean that the plaintiff has to "adopt every word within the exhibits as true").[5]

Plaintiffs request that the Court exclude consideration of all matters presented by Defendant outside the pleadings. Fed. R. Civ. P. 12(d). Should the Court not exclude such matters and treat the motion as one for summary judgment under Fed. R. Civ. P. 56, then Plaintiffs request

---

[4] Only Plaintiff Brigida's prior EEO filing was incorporated into the Complaint. ECF No. 114 ¶ 163, n.6. One of the FAA's exhibits, the APT Metrics Extension to Barrier Analysis, Ex. 5; ECF No. 119-1 at 105–63, is explicitly referenced in the Complaint, where it is also alleged to be "deeply flawed and outcome-driven" and created for supporting race-biased hiring. ECF No. 114 ¶¶ 79–81. Explicitly criticizing the report does not incorporate it by reference. Even more remotely, the document from which Ex. 3 is derived is referenced in the EEO filing incorporated in the Complaint but is not itself incorporated.

[5] Defendant asserts that her Exhibit 6, ECF No. 119-1 at 164–248, a self-serving summary of the CTI program, is subject to judicial notice. ECF No. 119 at 15, n.3. Not so. The Court may take judicial notice of the existence of the document, but not the truth of all the statements therein. The need for circumspection is particularly acute where the document in question "was commissioned by a defendant and its reliability is unknown," as here. *Banneker Ventures*, 798 F.3d at 1134. Defendant attempts to overcome this by claiming that Plaintiffs have not disputed the facts in Ex. 6. Plaintiffs have not had access to discovery which would provide the various facts and data contrary to those in Ex. 6. Plaintiffs do not accept, for example, various statistics in Ex. 6 related to percentages of CTI students hired because the FAA did not adequately track CTI Graduates who applied through general public vacancy announcements. Due to space constraints Plaintiffs cannot address all facts asserted in 24-page motion and 313 pages of attachments; in brief Plaintiffs reject all facts not consistent with the allegations in the Complaint.

the opportunity to present matters outside the pleadings and to file a motion pursuant to Fed. R. Civ. P. 56(d).

## II.    PLAINTIFFS HAVE ADEQUATELY STATED A CLAIM CONCERNING THE FAA'S INTENTIONAL EMPLOYMENT DISCRIMINATION.[6]

Plaintiffs' allegations are more than sufficient to support their claim that the FAA intentionally discriminated against them by refusing to post for ATCS vacancies and slowing hiring while the FAA developed a race-biased alternative hiring scheme, by purging Class Members' Qualified Applicant status with the specific intent of interfering with Class Members' eligibility for full consideration for an ATCS position, and by simultaneously either continuing with or planning to continue other sources of hiring if they had a "better" race and national origin diversity. ECF No. 114 Intro. ¶¶ 38, 55–56, 61, 66–70, 72–73, 76, 79, 81–82, 84–85, 88, 97, 99, 101, 126, 149, 173, 195–97.

Though not required at the motion to dismiss stage, to establish a prima facie case for Title VII liability, a plaintiff "must allege she is part of a protected class . . . , she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *See Thomas*, 305 F. Supp. 3d at 85 (quoting *Walker v. Jackson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015)); *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) ("A disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action.") (citations omitted); ECF No. 119 at 15 (citing *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008)); *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (purpose of prima facie case is to eliminate most common nondiscriminatory explanations for a plaintiff's rejection—lack of qualifications and lack of a position to be filled). In addressing Plaintiffs' motion to amend the complaint, the

---

[6] Because the FAA's motion is targeted at Plaintiffs' claim addressing the striking of their qualifications and lost opportunity for employment, Plaintiffs do not address their claim stemming from the FAA's use of the illegal Biological Assessment/Biological Questionnaire ("BA/BQ").

Court already found that Plaintiffs have "alleged sufficient facts to satisfy the intentional discrimination element" of their hiring preference claim and that the "concrete, plausible allegations suggest there is 'something fishy' about the facts of the case" to support "an inference of discrimination" necessary for a reverse discrimination claim. Memorandum and Order, ECF No. 112 at 2. Plaintiffs have also adequately alleged their membership in a protected class of non-African Americans, and Defendant does not argue otherwise. ECF No. 114 at Intro. ¶¶ 38, 54–56, 61, 79–81, 153, 167, 173. Furthermore, even before the BA/BQ was administered, members of the Class suffered an adverse employment action.

## A.    Plaintiffs Suffered an Adverse Employment Action.

Each Class member "*experience[d] materially adverse consequences affecting* the terms, conditions, or privileges of employment or *future employment opportunities such that a reasonable trier of fact could find objectively tangible harm*,"—an adverse employment action. *Czekalski v. LaHood*, 589 F.3d 449, 454 (D.C. Cir. 2009) (emphasis added) (quoting *Forkkio* v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002) ("[A]n employee suffers an adverse employment action if he experiences materially adverse consequences affecting . . . . future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.")).

### 1.    The CTI Program Focused on Employment of ATCSs.

The AT-CTI program, including the early administration of the AT-SAT test and the establishment of Qualified Applicant criteria, existed to improve opportunities for future employment. The FAA created the AT-CTI program to train and *select* ATCS applicants, ECF No. 114 ¶¶ 20–21; endorsed the CTI program as *one of the best ways to be hired* as an ATCS, *id.* ¶¶ 26–27; and stated it would "*seek to hire* all *qualified* [AT-CTI] graduates." *Id.* ¶¶ 21–22, 26–27 (some emphasis added). The program was established "*for the employment* of entry level" ATCSs.

*Id*. ¶¶ 23, 26 (emphasis added). The FAA mandated about 200 hours of classroom instruction and received regular updates from the AT-CTI schools about individual students' enrollment in and progression through the AT-CTI program and AT-SAT testing—the progression from student to Qualified Applicant. *Id.* ¶¶ 23–26. Class Members, unlike the general public, were afforded the opportunity to take the AT-SAT test prior to any ATCS vacancy announcement and be deemed qualified or well-qualified. *Id.* ¶¶ 28, 30–32, 35.

Because of their partially FAA-directed education and their FAA-verified aptitude, Class Members were much more likely to be hired (and to succeed) than general public applicants, a fact borne out by the FAA's statistical data and acknowledged by CTI schools, the National Black Coalition of Federal Aviation Employees ("NBCFAE"), and the FAA itself. ECF No. 114 ¶¶ 23, 48–54, 80–81, 110, 113. Class Members experienced no "barriers" or "hurdles" to being hired as ATCSs. *Id.* ¶¶ 46–53, 80, 109, 112.

Plaintiffs have adequately alleged that dismantling the CTI hiring path and actively purging records of the Class Members' qualifications and indications of future success in employment affected the Class Members' future employment opportunities. *Id.* at Intro. ¶¶ 46–53, 61, 66–68, 84–85, 109, 112, 125, 131, 149, 173, 175. Class Members' employment opportunities were also affected when the FAA refused to post CTI vacancy announcements while it studied ways to disadvantage the CTI Graduates for race-based reasons and when it purged the CTI program as a hiring source but planned to keep the military/veterans' sources if satisfied with the race and national origin of that candidate pool. *Id.* at Intro. ¶¶ 38, 99, 131, 149, 173, 175. *See  Menoken v. McGettigan*, 273 F. Supp. 3d 188, 199 (D.D.C. 2017) (employer's method of selecting applicants for further consideration was an employment practice); *Perry v. Donovan*, 773 F. Supp. 2d 114,

119 (D.D.C. 2010) (refusing to advertise a new position or interfering with the upward classification of a position are adverse employment actions).

> 2. Eliminating CTI-Based Qualifications and Vacancies Had Material Adverse Consequences.

Plaintiffs have adequately alleged that they suffered material adverse employment consequences. Plaintiffs invested in a partially FAA-directed education, studied for and passed FAA-validated aptitude tests, graduated from FAA-partnered schools, and satisfied all the other criteria the FAA outlined for Qualified Applicants. As Qualified Applicants, Plaintiffs placed themselves in a position to be ***at least*** two to four times more likely to be hired than a general public applicant with a similar AT-SAT score. *Id.* ¶¶ 51–53, 80. The FAA cast the Plaintiffs' efforts and qualifications aside with specific intent to disadvantage CTI Graduates in its quest to have more African Americans considered for employment, potentially through quotas, algorithms or other race-biased mechanisms, and to disqualify 70% of ATCS applicants. *Id.* ¶¶ 38, 54–56, 68–70, 72, 76, 81–85, 88, 91, 97, 101, 110–13. At the close of the 2014 vacancy announcement over 86% of the CTI students who had applied—and all of the Class Members—had been disqualified early in the hiring process and were not even provided the opportunity to complete the new application process. *Id.* ¶¶ 115, 149, 173. Even if Plaintiffs were not guaranteed employment, a reasonable juror could find their loss of opportunity to be a material adverse consequence of the FAA's conduct.

The harm that Plaintiffs suffered is the harm meant to be prevented and remedied by Title VII. Title VII is designed to enforce the American promise that people will be evaluated on their merit and qualifications, and not for the color of their skin. *See Figueroa v. Pompeo*, 923 F.3d 1078, 1082–83 (D.C. Cir. 2019) ("Title VII . . . reflects the American promise of equal opportunity in the workforce . . . ."). Plaintiffs' qualifications were devalued in favor of race.

Nor did Plaintiffs suffer the sort of trivial, subjective annoyances the "adverse employment action" requirement is meant to identify and eliminate. Courts have striven to differentiate between "trivial workplace dissatisfactions," that do not fall within the purview of Title VII and actions creating a "materially adverse change in the terms and conditions of [a plaintiff's] employment," that are subject to Title VII. *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795, 802 (6th Cir. 2004), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ("The adverse-employment-action element is a warranted judicial interpretation of Title VII intended to deter discrimination lawsuits based on trivial employment actions, such as those that cause a 'mere inconvenience' or a 'bruised ego.'"). In deference to this limitation, courts routinely find workplace changes that do not affect the terms, conditions, or privileges of employment— undesirable shift changes, unfavorable performance reviews, delays in performance reviews, lack of selection or nomination for special assignments or awards, and lateral transfers—do not rise to the level of adverse employment actions. *See Douglas v. Donovan*, 559 F.3d 549, 552–53 (D.C. Cir. 2009); *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001); *Tallbear v. Perry*, 318 F. Supp. 3d 255, 261 (D.D.C. 2018) (discussion of Redskins football team found offensive by Native American employee was not adverse employment action). Plaintiffs here suffered much more than trivial annoyances; they were never hired into existing jobs for which they had spent years training and testing under strict FAA protocols despite being demonstrably qualified.

3.     <u>Plaintiffs' Participation in the CTI Program and Achievement of Qualified Applicant Status is Akin to Failure to Hire or Failure to Promote, Where an Adverse Employment Action is Presumed</u>.

Plaintiffs' experience aligns with failure to hire or failure to promote cases, where an adverse employment action is presumed. In *Douglas*, the D.C. Circuit explained that when hiring, firing, failing to promote, or "reassignment with significantly different responsibilities" is at issue, adverse employment action is presumed, even if the actual harm is speculative. *Id*. at 552–53

(citing *Cones*, 199 F.3d at 521); *see Perry,* 773 F. Supp. 2d at 119 (refusing to advertise a new position or interfering with the upward classification of a position are adverse employment actions, even when it is unknown whether plaintiff would have received the position/promotion). Plaintiffs invested in an FAA education and training program, and were in an FAA database as Qualified Applicants having met various pre-qualification requirements. The FAA, though, refused to post for job vacancies, refused to hire Plaintiffs despite their known qualifications, and refused to advance Plaintiffs from Qualified Applicant to trainee status. Thus, this case is more akin to a failure to hire or failure to promote case than, as Defendant argues, a situation in which there is no relationship between a potential applicant and an employer. For this same reason, and contrary to the FAA's assertion, ECF No. 119 at 23, the FAA is not shielded from liability because it refused to permit Plaintiffs to complete applications for either the 2014 vacancy announcement or earlier existing vacancies.

Further, the *Douglas* court reiterated that the D.C. Circuit does "not categorically reject a particular personnel action as non-adverse simply because it does not fall into a cognizable type," rather in such cases "an employee must go the further step of demonstrating how the decision nonetheless caused such an objectively tangible harm."  *Douglas*, 559 F.3d at 553 (quoting *Halcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006); and citing *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2008)). Plaintiffs have gone that further step, and several more, in the Fourth Amended Complaint. At a minimum, Plaintiffs' allegations push their claim of suffering an adverse employment action into the realm of a fact question for the jury or ultimate factfinder. *See Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007) (whether a reassignment constitutes an adverse action is generally a jury question).

4.     Federal Personnel Definitions Do Not Define Adverse Employment
       Actions.

Defendant's argument that the Court should use inapplicable statutory definitions of "personnel" actions to define what is a Title VII "employment" action fails for several reasons. Defendant argues that provisions of the US Code regulating "Government Organization and Employees" or regulating foreign relations, such as 5 U.S.C. § 2951, 5 U.S.C. § 2302(a)(2)(A), and 22 U.S.C. § 3905 should define Title VII's use of "personnel action" in 42 U.S.C. § 2000e-16(a). ECF No. 119 at 16–17. None of the statutory definitions cited by Defendant, however, include failure to hire, failure to advertise open positions, or removal of responsibilities—all of which have been recognized as potentially discriminatory employment actions. *See Menoken*, 273 F. Supp. 3d at 198–99 (denying dismissal of failure to hire claim where plaintiff alleged hiring method disproportionately disqualified African Americans from hiring consideration); *Perry*, 773 F. Supp. 2d at 119 (refusing to advertise a new position or interfering with the upward classification of a position are adverse employment actions); *Figueroa,* 923 F.3d at 1082–83 (reversing dismissal of failure to promote claim); *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (prolonged reduction in responsibilities was sufficient adverse action to support retaliation claim); *Harding v. Gray*, 9 F.3d 150, 153–54 (D.C. Cir. 1993) (reversing dismissal of failure to promote claim). On the other hand, some of the statutory definitions Defendant offers as a proxy for Title VII employment actions include disciplinary or corrective action and performance evaluations, which courts regularly reject as subject to Title VII. *See Baloch,* 550 F.3d at 1199 (letter of counseling, letter of reprimand, and unsatisfactory performance review were not adverse employment actions). Put simply, statutory definitions of a "personnel action" not meant to be applicable to Title VII are not applicable to Title VII.

Defendant's error in this regard is captured in the conclusion to her Motion to Dismiss. Wrapping up her analysis on the above point, Defendant contends that "under both the plain text of Title VII's federal employer provision and D.C. Circuit caselaw, the first element of a Title VII claim requires a discrete employment action causing a change in employment status." ECF No. 119 at 18. Logically this argument would preclude a Title VII claim for failure to hire, failure to promote, or other "non-selection" which, by definition, precludes a change in employment status. Such actions are subject to Title VII and Defendant's argument to the contrary would improperly constrain protections against discrimination in federal employment.

5.    Plaintiffs Suffered "Discrete" Adverse Employment Actions.

Defendant's argument that the FAA's employment policy decisions cannot be actionable as "discrete" employment actions ignores the implications and actual implementation of those policies. Embedded within Defendant's motion is the contention that Title VII regulates only "discrete decisions." ECF No. 119 at 4, 18–21. From there, Defendant argues that the FAA's "programmatic" change to a hiring process is not a "discrete" employment action and so not subject to Title VII. ECF No. 119 at 18–20. Once again, Defendant's argument proves too much.

Before the FAA decided to purge Class Members' qualifications, each Class member had a record at the FAA revealing the Class member's age, citizenship status, status as a student or college graduate, place of college education, completion or lack of completion of FAA-mandated courses, and possession or lack of possession of a passing AT-SAT score. The FAA labeled graduates meeting certain requirements as Qualified Applicants. The FAA proactively communicated with the Qualified Applicants about vacancy announcements and various other hiring plans. The FAA provided Qualified Applicants with job codes to apply to narrower ATCS vacancy announcements. Before the FAA purged their records, each Class member had expressed

to the FAA their interest in an ATCS position and earned a status that materially increased the likelihood that such person would be hired. Each Class Member's record of qualifications was deleted or deactivated so that race could be afforded greater priority in hiring. The FAA's "programmatic" decisions had discrete material adverse employment impacts on the Class Members; those impacts, those specific acts of discrimination, are subject to Title VII.

Employment policies and "programmatic" decisions become actionable when they have a specific employment impact on a specific candidate. *See Lewis v. City of Chicago*, 560 U.S. 205, 212 (2010) (holding city engaged in employment practice each time it used an applicant qualification cut-off policy it had established in 1996 to fill a new class of occupants. Each use of the pre-existing policy was a discrete action enabling the filing of an EEOC complaint). This is the very basis for Title VII pattern and practice and disparate impact cases. *See Connecticut v. Teal*, 457 U.S. 440, 442, 445–46 (1982) (employer liable for programmatic use of discriminatory promotion test, even where "bottom line" results of promotion process was not statistically discriminatory). In *Ricci*, the defendant made a "programmatic" decision to strike all test results, not just specific individuals' test results. That "programmatic" decision impacted and violated the Title VII rights of the employees in that case. *See Ricci*, 557 U.S. at 577; *Bourdais v. New Orleans City,* 485 F.3d 294, 296–97 (5th Cir. 2007) (plaintiffs whose employment was denied or delayed because of City's use of discriminatory policy established claims).

### B.   Plaintiffs were ATCS Applicants.

Plaintiffs were applicants for ATCS positions and Defendant's factual allegations and inferences to the contrary must be rejected. Defendant begins the alleged factual section of her brief with the statement, "[t]he FAA's hiring process for air traffic control specialists (controllers) begins with publishing a vacancy announcement." ECF No. 119 at 5. This factual characterization forms the cornerstone for her later arguments that the FAA's actions were permissible benevolent

policy changes made between rounds of hiring rather than "discrete" employment actions. ECF
No. 119 at 16–19, 22–26. Defendant's argument must give way to the allegations in the Complaint.

        1.     <u>Plaintiffs Were Applicants—Qualified Applicants</u>.

As described above, the AT-CTI program was designed and advertised to train, identify,
and select applicants for ATCS employment. Once CTI Graduates had met certain requirements,
the FAA labeled them as Qualified Applicants who would be notified of vacancy announcements
and provided job codes. These Qualified Applicants had a statistically significant greater
likelihood of being hired than did general public applicants. The FAA also had the ability to engage
in direct hiring.  Air Traffic Controllers, Pub. L. No. 104-287, § 5(9), 110 Stat. 3389 (1996)
(current version at 49 U.S.C. § 44506(c)(2)(A)). From the perspective of the Class Members, the
application process to become an ATCS started much earlier than the posting of a vacancy
announcement; they had done all they could to express their interest in the ATCS positions and
establish their qualifications, and they were each applicants. *See Cones*, 199 F.3d at 518 ("Courts
have generally held that the failure to formally apply for a job opening will not bar a Title VII
plaintiff from establishing a prima facie case of discriminatory hiring, as long as the plaintiff made
every reasonable attempt to convey his interest in the job to the employer.") (quoting *EEOC v.
Metal Service Co.*, 893 F.2d 341, 348 (3d Cir. 1990)).

        2.     <u>This Case Tracks *Ricci* More Than it Does *Maraschiello*</u>.

Contrary to Defendant's contention, *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d
87 (2d Cir. 2013), does not compel a finding in her favor, particularly at this stage of the case. In
*Maraschiello*, the plaintiff, a white male, ranked first on a promotion examination in 2006. *Id.* at
89. By February 2008, the City of Buffalo had implemented the first half of a new promotion
testing program—administering the written test to any interested applicants. *Id.* at 90. Mr.

Maraschiello voluntarily did not take that test. *Id.* After the new testing regime was underway, on March 18, 2008, a retirement opened a position that Mr. Maraschiello would have been eligible to fill under the 2006 promotion examination. *Id.* Testing under the new program was completed by March 31, 2008. *Id.* The person who scored highest on the 2008 test (and also had scored the second highest on the 2006 test), another white male, was awarded the position. *Id.*

To begin with, it is noteworthy that the *Maraschiello* court denied the City's motion to dismiss, finding that the case could not then be distinguished from *Ricci*. *Id.* at 91.[7] Because the plaintiff had alleged that the promotion test results were discarded for race-based reasons, the motion to dismiss was denied. *Id.* Only after discovery was the plaintiff's case dismissed "because the case was **factually** distinguishable" from *Ricci*. *Id.* (emphasis added). Here, Plaintiffs' Complaint cites, and their allegations track, the relevant claims in *Ricci*. This claim cannot be dismissed just because Defendant believes that upon a fully developed record this case may be **factually** distinguishable from *Ricci*.

Ultimately, the *Maraschiello* case did not withstand summary judgment because, unlike in *Ricci*, Maraschiello had the benefit of his prior test result (he was eligible for promotion under his test for a year, yet no vacancies had come open). In *Maraschiello*, the employer's problem was with the test itself, which was 30 years old and had spawned many lawsuits, not with the particular

---

[7] In fact, only one of the Title VII cases cited by Defendant, *King v. Jackson*, 468 F. Supp. 2d 33 (D.D.C. 2006), was resolved purely on a motion to dismiss; in that case the court held that the plaintiff had not engaged in a protected activity that would trigger anti-retaliation protection. 468 F. Supp. 2d at 37. In *Stoyanov v. Winter*, 643 F. Supp. 2d 4, 9–10 (D.D.C. 2009), the court disposed of some pro se Title VII claims brought against improper defendants on a motion to dismiss but addressed a retaliation claim via summary judgment. Similarly, in *Webster v. Spencer*, No. 17-cv-1472 (DLF), 2020 WL 2104231, *6–7 (D.D.C. June 30, 2020), the court dismissed Title VII claims that were not administratively exhausted, but addressed the remaining claims on summary judgment. The rest of the Title VII claims cited by Defendant were resolved on summary judgment or after trial.

test results at issue; and *Maraschiello* chose not to participate in the new promotion process, which had already reached an implementation stage before any vacancy existed.

This case is more like *Ricci* than *Maraschiello*. Here, there was a backlog of thousands of ATCS position vacancies, but the FAA chose not to hire for them. Plaintiffs such as Brigida and Douglas-Cook never had a chance to benefit from the ranking and employment opportunity earned by their test results. Also like *Ricci*, the FAA's "problem" was with the specific AT-SAT test results, or the racial pool passing the test, not with the test itself. The AT-SAT test was developed in the late 1990s or early 2000, had only been implemented for general public hires in 2002, was implemented for CTI Graduates in 2005, was adjusted in 2006, and was repeatedly verified as valid by the FAA. ECF No. 114 ¶¶ 28–33, 47–48. It was re-validated in 2013, less than a year before the 2014 vacancy announcement. *Id.* ¶¶ 33, 48. The FAA, however, walked away from those test results after manipulating the CTI school diversity data in unfavorable ways and after commissioning the Barrier Analysis and Extension reports to assert that the CTI hiring path— including the pre-existing AT-SAT scores—was a barrier to African Americans. *Id.* ¶¶ 72–73, 77–81.

Additionally, Plaintiffs here are more like the prevailing plaintiffs in *Bourdais* than the unsuccessful plaintiffs Defendant references. 485 F.3d at 300. Defendant cites *Bourdais* because some plaintiffs in that case who could not establish that they were eligible for hire before they were hired were found not to suffer adverse employment actions. ECF No. 119 at 22. In *Bourdais* the losing plaintiffs had not taken each available step that would place them on a list of recruits eligible for hire. *Id.* at 296, 299–300. Those plaintiffs had passed an aptitude test but not completed the remaining steps required to be on a list of eligible recruits. *Id.* In this case, however, all Plaintiffs were Qualified Applicants. They had completed each FAA-required step available to

them to establish their pre-qualified status. These Plaintiffs may not be deprived of a remedy because the FAA, unlike New Orleans, finished final eligibility screening only after providing a tentative employment offer letter, leaving Plaintiffs' final eligibly lost to history because the FAA refused to screen them.

Contrary to Defendant's factual assertions, ECF No. 119 at 19; this in fact *is* a case where applicants were prevented from applying, or at least completing the application process for vacant positions; the FAA *did* preempt the hiring process by selecting candidates without legitimate competition based on qualifications; and the changes made by the FAA unequivocally impacted Plaintiffs' eligibility to complete an application for a controller position.

3.    Plaintiffs' Status as Applicants Does Not Expand Title VII.

Recognizing Plaintiffs as applicants will not "dramatically expand" Title VII to potential applicants as the FAA portends. The FAA asserts that if Plaintiffs are permitted to pursue their Title VII action, then "anyone in a protected class who believes they are more likely to succeed under a prior process" would have a discrimination claim "regardless of whether they were challenging any part of the new process and regardless of whether they were ever an applicant." ECF No. 119 at 19. Not so. Plaintiffs had already completed significant parts of the application process—they had supplied the FAA with their educational and aptitude qualifications, they had supplied the FAA with their ages, and they had certified their status as United States citizens. Plaintiffs attended FAA-directed classes at FAA selected schools and passed FAA-created and validated tests. They had earned credentials that would allow them to apply for vacancy announcements directed to only the pre-qualified. Plaintiffs here were not strangers to the FAA before 2014; they had followed an FAA-recommended career path, providing the FAA with updates along way, for at least two to four years before 2014. *See Cones*, 199 F.3d at 518 ("Courts

have generally held that the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie case of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer.") (quoting *EEOC v. Metal Service Co.*, 893 F.2d 341, 348 (3d Cir. 1990)).

Defendant relies on other, similar, oversimplifications that must also be rejected. Plaintiffs' adverse employment action claims stem not merely from the FAA's decision to discontinue issuing CTI-only vacancy announcements,  ECF No. 119 at 15–16, but, *inter alia,* from the FAA's intentional decision to stop CTI hiring while it implemented race-conscious hiring, despite its acknowledged need for ATCS trainees, ECF No. 114 ¶¶ 37–38, 76, 89; from the FAA's insistence on long validation periods and studies to increase CTI hiring due to the perception that the CTI pool was short on African Americans, but no such insistence on similar validation periods or studies to implement race-based hiring, *id.* ¶¶ 66–67, 86, 92–96, 101, 110, 117, 122–24; from the FAA's decision to elevate considerations of race over qualifications, *id.* ¶¶ 38, 55–56, 61, 72, 81, 85; 88, 91, 97, 107, 113–14, 131; from the FAA's decision to abandon CTI hiring based on the racial make-up of the applicants, but to continue military/veterans hiring so long as they were satisfied with the racial makeup of those applicants, *id.* ¶ 89, 99, 105; and from the FAA's decision that it would actively purge and ignore Plaintiffs' already proven qualifications in any future hiring process, *id.* at Intro. ¶¶ 38, 89, 97, 105–07, 112.

## II.   THE FAA DRAMATICALLY ALTERED THE HIRING PROCESS AND DID NOT MERELY EXPAND IT TO MORE PEOPLE.

Defendant argues that "changing hiring processes to allow more people to be considered for employment is not an adverse employment action," and that employers need not limit applicant pools to the most qualified, ECF No. 119 at 20–21. That may be true as far as it goes but it is also irrelevant because that is not a complete summation of what happened in this case. As detailed

above, in a very short period of time, the FAA made multiple changes to its ATCS hiring process. When the dust had cleared, the FAA willfully ignored Class Members' verified training and aptitude and implemented a process that prevented over 86% of CTI students from even completing the new ATCS application process.

Defendant's statements that Title VII protects equality, not preferences, and that withdrawing the "preference" accorded Class Members was proper, ECF No. 119 at 20, approximates Orwellian double-speak. As detailed above and in the Fourth Amended Complaint, Plaintiffs had established education, training, commitment, and aptitude making them objectively more likely to succeed as ATCSs and reducing the FAA's cost and time to train them. ECF No. 114 ¶¶ 36, 46–53. As the DC Circuit previously recognized, "a rational employer can be expected to promote the more qualified applicant over the less qualified . . . . And when an employer acts contrary to his apparent best interest in promoting a less-qualified minority applicant, it is more likely than not that the employer acted out of a discriminatory motive." *Harding*, 9 F.3d at 153–54.  In other words, a rational employer prefers the more qualified applicant over the less and when an employer acts contrary to this principle, its motive is suspect. So too here.

Plaintiffs acknowledge, as the *Ricci* court reinforced, that absent harm to existing applicants, employers are free to change their hiring processes. But Plaintiffs here, like the *Ricci* plaintiffs, had already taken their aptitude tests. Plaintiffs here, like the *Ricci* plaintiffs, had measurably higher likelihoods of advancing in their career. Plaintiffs here, like the *Ricci* plaintiffs, had established a record at the FAA of meeting required qualifications.

Plaintiffs also acknowledge that in *Shea v. Kerry*, 796 F.3d 42 (D.C. Cir. 2015), the DC Circuit found that *Ricci* does not bar affirmative action programs nor preempt other precedent developed specifically in the affirmative action context. *Id.* at 54–55. Such affirmative action

programs, however, are permissible only when the employer can establish, for example, that it is remedying a manifest imbalance in a traditionally segregated job category and that it does not unnecessarily trammel the rights of non-minority employees. *Id*. at 51–52. As the *Shea* Court observed, affirmative action programs do not "modify the outcomes of personnel processes for the asserted purpose of avoiding disparate-impact liability" like in *Ricci*, rather they are created to "expand job opportunities for minorities and women." *Id.* at 55. The question of the FAA's motivation here is one of fact that has yet to be determined. Plaintiffs have alleged that the FAA, already being threatened with disparate impact litigation, ECF No. 114 ¶¶ 60–64, acted with same motivation as the *Ricci* defendant; that question cannot be resolved on a motion to dismiss for failure to state a claim. Moreover, as the *Shea* Court warned, a valid affirmative action plan is nondiscriminatory, but an invalid affirmative action plan is discriminatory. *Shea*, 796 F.3d at 57. Whether the FAA's actions were "valid" or discriminatory remains to be determined, but the FAA's conduct giving rise to Plaintiffs' claims has been adequately pleaded.

The Supreme Court's holdings in *Ricci* and that case's parallels to this one are instructive. In *Ricci*, a fire department had positions open for promotion, used a valid standardized test to rank applicants, allowed applicants to study and prepare for the test, administered the test, then discarded the results when the results of the test disproportionately favored white applicants. 557 U.S. at 563–74. The Supreme Court held that the fire department's conduct, preventing the qualifying scores from being considered or implemented, and its racial motive for doing so, violated Title VII. *Id.* at 592–93.

Here, the FAA had created a backlog of open ATCS positions, ECF No. 114 ¶¶ 38, 76, 89; used a valid standardized test for selecting ATCS applicants, *id.* ¶¶ 30, 33, 47; allowed the ATCS applicants to study, prepare for, and take the eight-hour test, *id.* ¶¶ 31–32; then discarded the results

when the results disproportionately favored white applicants. *Id.* ¶¶ 55–56, 62, 68, 74, 80–83, 91–97, 105–07. Just as in *Ricci*, putative Class Members were likely to be hired and had legitimate expectations that the FAA would adhere to its test results, but the FAA abandoned the results for racial motives. *Id.* The FAA's race-based striking of Class Members' test results was an adverse employment action. The FAA could easily have left the CTI hiring, the AT-SAT scores, and/or the qualified and well qualified status of the Class in place while simultaneously expanding hiring sources.

Defendant also attempts to distinguish this case from *Ricci* in arguing that "the AT-SAT did not dictate the outcome of a hiring process, and indeed was not the beginning of the application process." ECF No. 119 at 26. Defendant's assertion, however, once again ignores the facts unique to this case. The FAA treated CTI training as the primary means of obtaining employment as an air traffic controller, urged potential applicants to pursue CTI training, defined AT-CTI as a "program established for employment of entry level Air Traffic Controllers," stated that the FAA "hopes to employ all eligible AT-CTI graduates," and excused CTI students from the first five weeks of the FAA's ATCS training. ECF No. 114 ¶¶ 26–27, 36. Data in the FAA's possession, and some summarized in the Complaint, establish that even if Plaintiffs were not "guaranteed" employment as an ATCS, they had assured themselves of a place on the FAA's inventory or roster of Qualified Applicants and of better than average odds. The FAA took that from them, causing them harm; specifically, adverse employment consequences.

The FAA's actions in refusing to post for existing vacancies, refusing to recognize the CTI as a continued hiring source because of the racial characteristics of the applicant pool, and refusing to consider validated qualifications over race violated Title VII's assurance that applicants are not to be judged on the basis of race. ECF No. 114 ¶ 149. This parallels the court's holding in *Ricci*,

that once "employers have made clear their selection criteria, they may not then invalidate the test

results, thus upsetting an employee's legitimate expectation not to be judged on the basis of race."

*Ricci*, 557 U.S. at 585. Just as in *Ricci*, the FAA's actions, here, "amount[] to the sort of racial

preference that Congress has disclaimed, § 2000e–2(j), and are antithetical to the notion of a

workplace where individuals are guaranteed equal opportunity regardless of race." *Id.*

Accordingly, Plaintiffs have established a prima facie case of employment discrimination and at a

minimum have adequately pleaded the essential elements of their discrimination claim.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Defendant's Motion to Dismiss.

DATED this 3rd day of December 2020.

Respectfully submitted,

*/s/ Zhonette M. Brown*

Zhonette M. Brown, D.C. Bar No. 463407
David C. McDonald, D.C. Bar No. CO0079
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
zhonette@mslegal.org
dmcdonald@mslegal.org


Michael W. Pearson
CURRY, PEARSON, & WOOTEN, PLC
814 West Roosevelt
Phoenix, Arizona 85007
(602) 258-1000
mpearson@azlaw.com

*Attorneys for Plaintiffs and Putative Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of December 2020, I caused a true and correct copy of the foregoing **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FOURTH AMENDED COMPLAINT IN PART** to be electronically filed with the Clerk of the Court using the Court's CM/ECF system which sent notification of such filing to the following counsel of record in this matter:

*/s/ Zhonette M. Brown*
Zhonette M. Brown