<pre>
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2

 3      ANDREW J. BRIGIDA, et al.,       .
                                         .
 4                 Plaintiffs,           .   Case Number 16-cv-2227
                                         .
 5            vs.                        .
                                         .
 6      ELAINE CHAO, Secretary,          .
        U.S. Department of              .   April 21, 2021
 7      Transportation,                  .   10:03 a.m.
                                         .
 8                 Defendant.            .
        - - - - - - - - - - - - - - - - -

 9

10                      TRANSCRIPT OF MOTION HEARING
                   BEFORE THE HONORABLE DABNEY L. FRIEDRICH
11                    UNITED STATES DISTRICT JUDGE

12      APPEARANCES:

13      For the Plaintiffs:        ZHONETTE BROWN, ESQ.
                                   WILL TRACHMAN, ESQ.
14                                 DAVID MCDONALD, ESQ.
                                   COREY BARTKUS, ESQ.
15                                 Mountain States Legal Foundation
                                   2596 South Lewis Way
16                                 Lakewood, Colorado 80227

17                                 MICHAEL PEARSON, ESQ.
                                   Curry, Pearson & Wooten PLC
18                                 814 West Roosevelt
                                   Phoenix, Arizona 85007
19

20      For the Defendant:         GALEN THORP, ESQ.
                                   MICHAEL DREZNER, ESQ.
21                                 U.S. Department of Justice
                                   Civil Division
22                                 Federal Programs Branch
                                   1100 L Street Northwest
23                                 Room 11220
                                   Washington, D.C. 20005
24

25
</pre>

Official Court Reporter:          SARA A. WICK, RPR, CRR
                                  333 Constitution Avenue Northwest
                                  U.S. Courthouse, Room 4704-B
                                  Washington, D.C. 20001
                                  202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                      P R O C E E D I N G S

 2          (All participants present via video conference.)

 3              THE COURTROOM DEPUTY:  Your Honor, we are in Civil

 4     Action 16-2227, Andrew Brigida versus the U.S. Department of

 5     Transportation, et al.

 6          If I can have the parties identify themselves for the

 7     record, beginning with counsel for the plaintiff.

 8              MS. BROWN:  Your Honor, this is Zhonette Brown on

 9     behalf of the plaintiff.  And with me today are Mike Pearson,

10     Will Trachman, David McDonald, and Corey Bartkus, and one of the

11     clients, Mr. Douglas, is also on the line.

12              THE COURT:  All right.  Good morning, Ms. Brown.

13              MS. BROWN:  Good morning, Your Honor.

14              MR. THORP:  Your Honor, Galen Thorp for the defendant.

15     With me on the line are Carlie Wells, my supervisor, and Michael

16     Drezner, my colleague.  And then also from the agency, Lisa

17     Holden, Elisabeth Fry, and Joy Clark.

18              THE COURT:  Good morning to all of you.  This is a

19     video conference hearing being conducted pursuant to the Chief

20     Judge's order relating to the pandemic.

21          Before me now is the defendant's partial motion to dismiss.

22     I lost -- who did I lose?  I lost the courtroom deputy.  All

23     right.  I've got the attorneys.

24          Mr. Thorp, I take it you will be arguing for the defendant?

25              MR. THORP:  Yes, Your Honor.
```

1          THE COURT:  All right.  Would you like to go ahead and

2     begin.

3          MR. THORP:  Again, good morning, Your Honor.  Galen

4     Thorp for the defendant.

5          The Court should dismiss plaintiffs' hiring preference

6     claim because it's not cognizable under Title VII, which is

7     limited to discrimination against employees and applicants.  The

8     FAA modified its hiring process before the two named plaintiffs

9     became applicants in February 2014.  Plaintiffs can have no

10     claim based on the hiring process that existed before they

11     applied, nor is there a hiring preference claim based on any

12     cognizable defect in the February 2014 hiring process.  Title

13     VII simply does not give college graduates or any other group

14     the right to demand special treatment.

15          I have four points essentially, Your Honor, and I would

16     like to lay them out briefly and then discuss them at whatever

17     length the Court desires.

18          First, as plaintiffs themselves acknowledge, their claim

19     depends on showing that they were already applicants in 2014.

20     But the Court has already recognized they were not, and the

21     Court's conclusion is correct for numerous reasons.

22          Second, federal sector Title VII claims require a personnel

23     action, which means that plaintiffs must point to discrete

24     employment actions such as hiring, firing, or discipline.

25     Changing the hiring process before plaintiffs applied is not a

personnel action affecting plaintiffs as applicants.

Third, dismissal is warranted here because an adverse employment action is an element of a Title VII discrimination claim in the D.C. Circuit, not merely a part of the prima facie case.

And lastly, there is no issue of fact preventing dismissal here. Plaintiffs' own complaint makes clear they cannot satisfy the applicant and personnel action requirements for this claim.

The central question is the applicant question. Plaintiffs, on page 22 of their opposition brief, acknowledge that, quote, absent harm to existing applicants, employers are free to change their hiring processes.

But in its October 2020 opinion, the Court already concluded, quote, Brigida was not already an applicant at the time the FAA allegedly changed its process.

THE COURT:  Sorry to interrupt you, but let me address that.  So that is true, the Court did hold that.  But I was thinking there in the formal sense of have these plaintiffs submitted a formal application.  They're certainly distinguishable from the plaintiff in *Ricci* for that reason.

But given the long-standing practice in the way this system worked, were they not effectively applicants, given the way the FAA had operated the system over time?  So if you can address that point.  Can they be considered applicants because of the way in which the FAA hired individuals in this scheme that they

1    set up?

2         MR. THORP:  Yes, Your Honor.

3    I think for four reasons they cannot.  They are properly

4    considered potential applicants, like any number of folks who

5    have worked towards the requirements to apply for a job.

6         So first, I think it's also clear -- the first piece of

7    this is the complaint.  Plaintiffs' complaint alleges in

8    paragraph 35 that they were eligible to apply for CTI-only job

9    postings and that plaintiffs first applied in February 2014 in

10   describing the circumstances of the two named plaintiffs.

11        The notion that they were already applicants is again an

12   innovation that they've developed in briefing that is not

13   reflected in their complaint.

14        Second, we pointed to definitions of "applicant" that focus

15   on the request for consideration.  Here, plaintiffs had not

16   responded to any prior vacancy announcement, nor do they allege

17   that they ever contacted the FAA directly to request a job.

18   Plaintiffs merely took an aptitude test that would be relevant

19   if they did apply, and their colleges shared information about

20   students and graduates with the FAA.

21        Third --

22             THE COURT:  Sorry to keep jumping in here, but while

23   it's on my mind, you said that they had not -- that neither

24   Mr. Brigida nor Mr. Douglas-Cook had applied in the past.  Would

25   this analysis be different if they had submitted an application

1    for one of the vacancies or tried to apply in 2012 when the FAA

2    shut down hiring?  Would this be a different situation?

3           MR. THORP:  Certainly, Your Honor, they would be

4    applicants under that vacancy announcement.  And to the extent

5    their claim wasn't unexhausted or time barred or something, they

6    would have a claim for the FAA's actions towards those

7    applicants.

8           But here, these plaintiffs, the only claim they can have is

9    for their own applications.  And so plaintiffs are seeking to

10   treat people who had merely engaged in preparatory steps as

11   applicants.  And it's not clear how far plaintiffs' theory would

12   go, the theory that everybody that took the AT-SAT, for example,

13   is an applicant.  But hundreds of people take the AT-SAT and

14   then never pursue a job with the FAA.

15          And it's merely a -- like the LSAT or something else like

16   that, it is a prerequisite for the application process.  But

17   just as an employer could limit a job to attorneys who had

18   passed the Bar or had a certain number of years of practice or

19   limit it to people who graduated from school, it is simply not

20   the case that everybody who has invested the time and money in

21   meeting those prerequisites becomes an applicant.

22          THE COURT:  Why aren't they applicants by taking the

23   AT-SAT, at least with respect to members of the general public

24   who apply?  They're required to take the AT-SAT after they

25   apply; right?

1    MR. THORP:  Yes.

2    THE COURT:  And so does that change the calculus here?

3    Is it not in effect the way the FAA seeks applicants, through

4    this test, passing grade on this test coupled with graduating

5    from a CTI school and having a recommendation and meeting the

6    other requirements?

7    MR. THORP:  Your Honor, those are simply prerequisites

8    for applying.  And it's not the case that everybody who pursues

9    those prerequisites ever actually applies to the agency, nor

10   could the agency simply because -- the way they have structured

11   their process under the pre-2014 process, nor could they have

12   picked someone merely because they attended a certain school,

13   graduated, and took the AT-SAT.  The only people that they

14   consider for selection are the people who actually apply.

15   THE COURT:  That is in response to a vacancy

16   announcement?

17   MR. THORP:  Yes, Your Honor.  So they publish --

18   sorry.  Go ahead, Your Honor.

19   THE COURT:  And you say I can take judicial notice of

20   the vacancy announcement with regard to the February 2014

21   hiring?

22   MR. THORP:  Certainly.  And I think you could also

23   take judicial notice of the prior vacancy announcements.

24   They're published on USAJOBS.  They're not subject to reasonable

25   dispute.  And plaintiffs have never disputed the fact of how the

1   agency engages in this hiring both before and after --

2          THE COURT:  And help me understand that.  Is there an

3   online application form?  Is there something -- what do they do

4   to activate the application?

5       Clearly, the FAA, as the plaintiff alleged, has been

6   tracking these folks, has been compiling lists as they've

7   alleged, knows their potential applicants.  At what point is

8   this triggered and how?

9          MR. THORP:  Yes, Your Honor.

10      Like virtually any other government job, the job vacancies

11  are posted on USAJOBS.  People have to create an account there,

12  fill out the application form, attach documents, including, I

13  believe, college transcripts, a resume, things like that, answer

14  specific questions certifying that they meet criteria, and then

15  submit -- and then submit the application.  That provides the

16  pool of applicants under any given announcement.

17      In February 2014, there were, I believe, 26,000 people who

18  filled out that application.

19         THE COURT:  Is there any reason why an individual

20  would take the AT-SAT if they weren't going to apply to be an

21  air traffic controller?  Is there any other basis to do that, or

22  is this just a test for that position?

23         MR. THORP:  It is a prerequisite for that position.

24  The CTI program was structured so that college students would

25  get two-year or four-year degrees in a variety of air

traffic-related fields -- or air traffic-related fields, and as
long as the program included a certain number of hours that met
certain agency prerequisites, they could -- they would graduate
with a certified -- with a degree from a certified program.

But many people came in and out of the program.  They
thought maybe they wanted to be an air traffic controller, but
then they decided to be a pilot or do something else.  So the
degrees could be used for any number of different jobs, not
merely air traffic control with the FAA.

So people could take the AT-SAT, like people take the LSAT,
I'm thinking about being an air traffic controller, let me take
the test and see how I do, and then go on to apply or to pursue
a different career path.

So while the AT-SAT was an FAA test that was a prerequisite
for the people coming through the CTI program, not everyone who
took the AT-SAT went on to apply.

THE COURT:  Okay.

MR. THORP:  Unlike an aggressive screening test, at
this point in time, between 93 and 97 percent of people who took
the AT-SAT passed it, whether from the general public or from
the CTI students.  So this was not a test, an aggressive screen
like some aptitude tests that exclude a large number of people.
Most people who take it pass.

And so I think that also is relevant here, because unlike,
say, the test in the promotion process in *Ricci* where the people

who passed the test therefore knew they were going to be picked,
nobody who passed the AT-SAT knew they were going to be picked
if they applied -- even if they applied.

THE COURT:  So folks who scored 85 and above were
rated well qualified and, it sounds like based on past
practices, were a shoe-in assuming there were spaces available?

MR. THORP:  No, Your Honor.  They are more likely to
be hired than people who qualified, but not everybody who
applied in the well-qualified band was -- would be selected.
There's no testimony -- there's no allegation in plaintiffs'
complaint, and I don't think the facts actually bear it out,
that people who were in the well-qualified plan were a shoe-in.

THE COURT:  Okay.  So those folks who had taken the
AT-SAT previously before the FAA changed its hiring process in
2014, did they have to take the new AT-SAT, or did they rely on
the old scores?

MR. THORP:  Your Honor, the agency for the 2014 hiring
process decided they would have to take a new -- take the AT-SAT
again in the hiring process.  So everyone under the public
announcement in 2014 took the AT-SAT again if they passed the
biographical assessment.

THE COURT:  And I don't understand.  Why was that
necessary historically?

MR. THORP:  Your Honor, to answer that I have to go
beyond the allegations in the complaint.  But the short answer

1   is that the AT-SAT included a -- a portion of it was essentially

2   a biographical questionnaire, another version of getting at some

3   of the same things, and that portion had lost its validity.  And

4   so because they were using a screen, they decided not to double

5   up.  So basically, what they used in the 2014 hiring process was

6   most of the same AT-SAT minus the portion that was no longer

7   valid.

8        But again here, this did not affect these plaintiffs.

9   Because even if the agency had taken on the other route and just

10  said your AT-SAT scores are valid, that would have no effect on

11  these plaintiffs, because needing to retake the AT-SAT did not

12  dissuade them from applying in 2014, nor is it -- do it play any

13  role in their nonselection because they were -- did not proceed

14  further because they didn't pass the biographical assessment,

15  and the only people who retook the AT-SAT were the people who

16  did, in fact, pass the biographical assessment.

17       So if anyone had a claim for the agency's choice to require

18  retaking the AT-SAT, it would seem to be merely the people who

19  actually retook the AT-SAT in 2014.

20       So plaintiff's claim is not really about the AT-SAT.  It's

21  that the agency changed their hiring process and inserted the

22  new requirement, the biographical assessment, in 2014 and that

23  they didn't get to apply under the process they thought they

24  would get to apply under, the pre-2014 one.

25       So plaintiffs are focusing very heavily on the AT-SAT in

1    trying to force this into the *Ricci* model, but I think it really

2    doesn't apply here.

3        Another aspect of why plaintiffs were not applicants and

4    why they should be recognized as potential applicants rather

5    than trying to create some new model is that, as the Court

6    recognized in its April 2020 opinion, there are -- the courts

7    have recognized only two limited exceptions for constructive

8    applicants, one where the agency had pervasive discrimination

9    that made it futile to apply and, two, where there was a failure

10   to advertise.

11       Neither of -- as the Court recognized in its prior opinion,

12   neither of those fit the allegations here, and they simply don't

13   apply.  And there's no need to create some new constructive

14   application process where here there was a straightforward

15   public announcement application process, and these plaintiffs

16   are frustrated that the agency changed its process before they

17   had a chance to apply.  And that is comparable to any number of

18   other circumstances that come up when an agency is -- or when an

19   employer is revising its process.

20       The alternative here is that because the agency had in the

21   past structured it where people worked -- for the CTI program

22   worked on these prerequisites, then there would presumably never

23   be a point at which the agency could revise its process under

24   plaintiffs' theory because there's always a stream of people

25   taking the AT-SAT and graduating from these programs.  And

1   plaintiffs are -- is suggesting that that has to remain in

2   perpetuity or give rise to a Title VII claim if the agency

3   actually considers the applicant pools, the nature of barriers

4   to equal participation, things of that nature that *Ricci* said

5   are appropriate and important for agencies to pursue.

6          I would note that from the failure to advertise case law,

7   plaintiffs essentially hijack one of the observations there that

8   where, in *Cones versus Shalala*, the D.C. Circuit case from 2000,

9   it paper-referred to a Third Circuit case that failure to

10  formally apply is not a bar to a Title VII claim where plaintiff

11  made every reasonable attempt to convey its interest in the job.

12  And plaintiffs are seeking to extend that observation to say

13  that these plaintiffs, having engaged in some of these -- in

14  these prerequisites for application, had made every reasonable

15  attempt to convey interest.

16         One of your colleagues in *Daniels versus Chugach Government*

17  *Services* back in 2019 observed that when there's a formal

18  application process you can't make every reasonable attempt to

19  convey your interests until you've completed that application.

20         So I think that that case law simply doesn't apply or

21  provide a basis for extending things here.

22         And I think perhaps most significant here in thinking about

23  how to look at this, plaintiffs have identified no case where

24  preapplication investments of time and resources of potential

25  applicants were construed to transform them into applicants

under Title VII.

I don't want to be long-winded, Your Honor.  The other lens to look at this through is the personnel action requirement under Title VII.  And for federal sector cases, Title VII requires that federal employers make personnel actions affecting employees or applicants for employment free from any discrimination based on the protected categories.

Last year, Justice Alito, writing for the Supreme Court in *Babb v. Wilkie* -- I don't think this is cited in the briefs, but 140 S. Ct. 1168 -- observed in the federal sector ADEA context, which has a parallel provision, that "personnel actions" has a meaning that is easy to understand, and the Court assumed it has the same meaning as the definition under the CSRA.

The D.C. Circuit in 1999 adopted the same approach in *Brown versus Brody* in the footnote 8 there looking to the CSRA definition of "personnel action" for purposes of Title VII.

And that list of definitions, which is referenced in our briefs, I think, just makes clear that "personnel action" refers to discrete employment actions, like hiring, firing, discipline, specific actions that apply to an individual.  Changing a hiring process that affects the interests of this potential pool of applicants that might have liked the old system better than a new system is simply not a personnel action.

And I think that the statutory text really matters, and I would note that the statutory text is getting renewed attention

1    in the D.C. Circuit with regard to the adverse employment action

2    requirement that the D.C. Circuit adopted back in 1999 in

3    *Brown versus Brody*.  As we noted in our brief, two judges of the

4    D.C. Circuit had questioned whether adversity actually fits the

5    text of Title VII.  And I would note that recently, earlier this

6    year, two additional judges on the D.C. Circuit in

7    *Chambers versus D.C.*, 988 F.3d 497, joined them in calling for

8    reconsideration of the adversity prong that the D.C. Circuit has

9    imposed on an employment action, focusing on the text

10   of "personnel action."

11       There's actually a petition for initial en banc which the

12   government has acquiesced in in a case *Townsend versus United*

13   *States*, which is pending before the circuit to address that

14   question.

15       None of that -- the answer to that intra-circuit dispute

16   won't control this case, but the focus on the text of "personnel

17   action" is consistent here, because plaintiffs want to construe

18   virtually anything to fit within this adverse employment action

19   requirement, and the statutory text, I believe, point -- they

20   need to point to a discrete employment action, which is simply

21   not the case when there's a broad change to the hiring process.

22       For example, in *Maraschiello versus City of Buffalo Police*

23   *Department*, it held that a generalized overhaul of a hiring

24   process does not amount to race-based adverse action in

25   violation of *Ricci*.

1    Your Honor, to the extent I have time, I would like to

2    reserve time for rebuttal, just noting that it's not clear that

3    plaintiffs have any basis to dispute that an adverse employment

4    action is an element of a Title VII claim, therefore making it

5    appropriate to weigh it on a motion to dismiss and that there

6    are no issues of fact because discovery would not clarify any

7    relevant fact.  It's clear that plaintiffs were using graduates

8    who had never applied, I think merely passed the aptitude tests,

9    and that their claim challenges no aspect of the revised

10   process.

11       For these reasons, the Court should dismiss plaintiffs'

12   hiring preference claim and permit plaintiffs to proceed only on

13   their actual challenge to the 2014 hiring process and the

14   biographical assessment.

15       THE COURT:  Thank you, Mr. Thorp.

16   Ms. Brown, before I hear from you, let me clarify two

17   things with you.  First, you list a number of reported personnel

18   actions in your briefing, but isn't the only real actionable one

19   failure to hire here?

20       MS. BROWN:  Well, Your Honor, it's failure to hire.

21   So if we're limiting our conversation, if that question is

22   limited to the issue of getting rid of the AT-SAT test, then

23   yes, it's failure to hire or, alternatively, sort of rejection

24   of an application.

25       Obviously, if we're talking about the 2014 biographical

assessment, it is also a failure to hire, but it's the use of
the examination, which in some instances it's analyzed
separately.  So I don't want to --

THE COURT:  Here today for purposes of this motion,
we're focused on the first; correct?

MS. BROWN:  Correct.

THE COURT:  All right.  And then secondly, I just want
to make sure -- as I read your brief, it's not clear to me --
you're not really arguing that this falls within one of the key
exceptions, the futility rule or the failure to solicit?

MS. BROWN:  That is correct, Your Honor.  We are
arguing and we have alleged from the beginning, from the initial
EEO complaint, that Andrew Brigida and the class that he seeks
to represent were applicants.

THE COURT:  All right.  I just wanted to make sure I
was reading that right.

And you don't contest, do you, that they were not eligible
to apply until late in 2013, right, after they had graduated
from the colleges and taken the AT-SAT?

MS. BROWN:  Well, for instance, plaintiff Andrew
Brigida, who had taken the AT-SAT, I believe, in April of 2013
and graduated in August of 2013, he would have been, quote
unquote, eligible to apply to a job, CTI-only job posting as of
August of 2013, had one been posted.

Likewise, Mr. Douglas would have been eligible to apply to

1      a CTI posting as soon as he had graduated.

2            Those are prerequisites for the CTI postings.  Obviously,

3      had a general public posting been open, they would have been

4      eligible to apply under that posting prior to graduating.

5            But as Your Honor has noted, from the plaintiff

6      interpretation of the application process, the plaintiff applied

7      to ATC positions, air traffic controller trainee positions

8      before there was an actual posting.  In other words, this

9      process, this hiring process for the air traffic controllers

10     involved, according to defendant's own analysis and what they've

11     attached to their brief, a 10-step hiring process.  And they've

12     acknowledged both in that analysis and in their brief that the

13     AT-SAT is one part of the hiring process.

14            So for instance, in their motion at 24, they say taking the

15     AT-SAT was one step in the pre-2014 legacy hiring process.

16     That's exactly what the plaintiffs have argued from the

17     beginning, that once these students took the AT-SAT -- and we've

18     stated before, the students had to apply to take the AT-SAT.

19     They had to verify that they were U.S. citizens, that they were

20     eligible.  The schools had to verify that they were eligible.

21     And we have found from one of the schools through response to

22     the subpoena, the FAA also had a standard operating procedure

23     that required people taking the AT-SAT to verify that they were

24     intending to become air traffic controllers.

25            So when one looks at how the FAA characterizes the hiring

process, they consider the AT-SAT a part of the hiring process,
and once those -- or class members took that, they became
applicants.

THE COURT:  I'm sorry to interrupt.  I don't think
anyone disputes that it was a part of the process, but what do
you say in response to Mr. Thorp's argument that until they
submitted that final application form in response to the vacancy
they had not applied?  Why is that not the triggering event?

MS. BROWN:  Your Honor, that's not the triggering
event because that's not how, first of all, the FAA represented
this process to the plaintiffs, the CTI students, and the
schools.  So like *Ricci,* the employer has specified this is our
hiring process and if you proceed through this process in this
manner this is who will be hired.  The students had the
expectation and the understanding that they were applicants once
they had taken the AT-SAT test.

THE COURT:  But previous vacancies, before the change,
is it not the case that applicants to be air traffic controllers
still had to submit that form in response to a vacancy?  They
still had to push that final button and say yes, we're in this
process for this position?  Wasn't that always the case?

MS. BROWN:  I don't actually believe that was always
the case, Your Honor.  I think the discovery will show that as
the CTI program advanced the manner in which the hiring was
accomplished was changed.  So I do believe that certainly during

1    part of the CTI program the students were not required to

2    separately submit applications.

3        I will also note that while we disagree with consideration

4    of it necessarily at the motion to dismiss stage, if the Court

5    would look at the attachments that the FAA attached to its own

6    motion, the 10-year plans from 2010, 2011, '12, '13, the FAA

7    itself stated that it had a continuous announcement for the CTI

8    students.

9        And so if one looks at, for instance, the 2011 plan, which

10   is at -- starts at ECF 119-1, and look at ECF page 11 of that,

11   towards the bottom of that page in the penultimate paragraph,

12   this document states, "The FAA did, however, issue an open,

13   continuous announcement for AT-CTI graduates."  And they repeat

14   that statement in the plan for 2012, in the plan for 2013.  And

15   it's only once we get to the 2014 document that the FAA

16   recharacterizes how it was hiring CTI graduates.

17            THE COURT:  But even with that open, continuous

18   announcement, did the applicants still not have to submit

19   something saying yes, we're in, we want to be considered now,

20   we've completed A through Z of these requirements that you

21   encouraged us to do, we've done that, and yes, we're ready to be

22   considered now?  Back in 2012 before the process shut down, did

23   applicants not have to do that to become a formal applicant?

24            MS. BROWN:  I believe that they --

25            THE COURT:  Do you agree that I can take judicial

1    notice of the vacancy announcement?

2          MS. BROWN:  I do agree that you can take judicial

3    notice of the fact that there were vacancy announcements, yes,

4    Your Honor.  Again, I have issue with taking judicial notice of

5    facts that were stated within the notices, but I do believe and

6    we do not contest that there were vacancy announcements that

7    were made.

8          But going to the question of whether responding to a

9    vacancy announcement was required to be considered an applicant,

10   again, I don't believe that was necessary, because the FAA

11   itself developed the AT-SAT test.  They developed it for this

12   purpose.  They designed it.  They validated it.  They

13   administered it.  They screened people who could take it.  They

14   required people to be eligible to take that test.  They had to

15   be verified that they were U.S. citizens.  They had to verify

16   their intent to become air traffic controllers.  So they

17   themselves also within their own documents, including some that,

18   I believe, the FAA had attached to their motion, refer to the

19   AT-SAT as a pre-employment test.

20         So the documents that we've referred to and the allegations

21   that we have made throughout have taken the position that by

22   taking the AT-SAT test a person was an applicant.  And granted,

23   there were steps remaining to complete the job hiring process.

24   There were steps remaining in the application process, just as

25   there were in *Ricci*, just as there were in the other cases that

1    the FAA has cited.

2         So for instance, in *Ricci*, the fact that those applicants,

3    those test takers had taken the test and reached a certain score

4    did not, in fact, guarantee them a position.  They were ranked

5    just like the AT-SAT-ranked students, and they were presented to

6    the City of New Haven based upon a rule of three.  And the

7    district court opinion in that case clarified that even the

8    highest scoring candidate may not necessarily be hired.  And so

9    there was no guarantee.  There was a process through which you

10   became qualified and which ranked the qualified candidates.  And

11   that is the same function that the AT-SAT served here for the

12   CTI students.

13        And so --

14        THE COURT:  The big difference, of course, is they

15   were employees.  They were already in the agency.

16        MS. BROWN:  That is a difference, Your Honor, but as

17   it relates to whether or not these students were applicants, I

18   don't think that it is a disqualifying or a distinguishing

19   difference.  The government says we've never pointed to a case

20   where -- that is analogous to this one in terms of using the

21   AT-SAT as a applicant -- as a step in the application process.

22        I have seen honestly no other case where an employer has a

23   10-step hiring process and they apply those steps in different

24   orders and may or may not apply every step to every hiring pool.

25        So for instance, and the FAA admits in their brief and

elsewhere, they had a different hiring path and process for the CTI students. They had a different hiring path and process for general public applicants. They had a different hiring path and process for the veterans.

And so I acknowledge that I've not seen a case where an employer has three different hiring paths where they reorder the elements of the hiring process according to the path. But that doesn't change the fact that under the facts of this case, the way that the FAA developed, treated, and administered, the way that the FAA characterized the AT-SAT test to the students, to the schools, the way that the FAA referred to the AT-SAT test internally as a pre-employment test, the way that the FAA referred to the CTI students who had taken the AT-SAT test as applicants, all of that, Your Honor, at this motion to dismiss stage, I think, does establish that at a very minimum there's a question of fact as to whether or not these students were applicants.

THE COURT: Your complaint itself says that this extensive process made the plaintiffs eligible for application, not applicants, eligible for application. In the complaint, you allege that the FAA reached out and offered people jobs just based on the path means, the test, and completion of the other steps. It does seem like even your complaint appreciates that there is some additional triggering event.

MS. BROWN: Your Honor, two responses to that. The

first one is, as the government has noted and as cases in this
district have pointed out, the EEOC complaint is a part of the
complaint.  It is incorporated within the complaint.  And so the
very cover of the EEOC complaint asks for the employment status
in relation to this complaint, and the box of applicant is
checked.

Under -- on the second page, the position, title, vacancy
announcement, the plaintiff refers to himself as a CTI-preferred
applicant or the issuance of CTI-preferred applicant list
termination.

In the general background, in paragraphs 2, 3, 7, 8, 9, 12,
15, throughout, the plaintiff refers to himself and his class as
a class of applicants, the air traffic control applicant class
members.  They refer to the AT-SAT test as the air traffic
controller application assessment process.  And the complaint is
that the FAA changed the process midstream, post-assessment,
just as they had done in *Ricci*.

And the EEOC complaint does refer to the plaintiffs as
being a part of a pool of direct hire.  It refers to the AT-SAT
as a selection tool for applicants.  It states air traffic
controller applicants, regardless of source, were required to
take the AT-SAT before they were deemed qualified.

THE COURT:  Okay.  Did Mr. Brigida or Mr. Douglas-Cook
ever reach out to anyone at the FAA to express interest in a
particular position?

1          MR. BROWN:  I'm not sure about particular position.

2          THE COURT:  Particular location, particular time, did

3     they have any conversations along those lines?  I don't think

4     the complaint or the EEO documents reflect that.  Am I right?

5          MS. BROWN:  I don't know at what point the CTI

6     students -- and I think that changed over time -- indicated

7     their geographic preference, which was actually stripped out of

8     the 2014 process itself.  So indicating geographic preference

9     had been a part of the CTI process.  It was not, my

10    understanding, a part of the general public process.  So I don't

11    know that that was a necessary part of an application step.

12         As I said, each of the students and all of the students who

13    took the AT-SAT test were required to affirmatively verify

14    things like their citizenship, their eligibility to take the

15    AT-SAT test.  And while it's not in the complaint because we

16    didn't have the document at the time, like I said, there is an

17    FAA standard operating procedure that indicates the students

18    were required to verify their interest in becoming air traffic

19    controllers.

20         And the way that the air traffic controller process worked,

21    the CTI program, I believe it's adequately alleged in our

22    complaint that once those students were on that qualified list,

23    once they had taken that AT-SAT, they were on a list, that the

24    students, the schools, and the FAA understood the FAA would

25    affirmatively reach out to those students to inform them of

vacancies.  I don't know how else that would be anything other than requesting notification and availability of positions.

THE COURT:  Say that again, Ms. Brown.  I'm sorry.  I missed that.  Can you state that again.

MS. BROWN:  Sure.  The way that the CTI program worked, the way that we've referred to the qualified applicant list, once the students had taken the AT-SAT, they were basically placed in an in-hold category within the FAA.  They were in the FAA's qualified applicant list.  According to the students' understanding, the schools' understanding, and the FAA's understanding, because the students had taken the steps necessary to enroll in the CTI program, had taken the steps necessary to prove that they were eligible to take the AT-SAT test, had taken the AT-SAT test, they were now on this list, this inventory or register, however you want to refer to it, of candidates, applicants that the FAA would notify when they posted a vacancy announcement.

In other words, those students had completed a certain number of steps, at least the first step in becoming applicants, and the FAA would notify them when they were able to continue through the path of application.

And so the FAA's point that not everyone who took the AT-SAT test maybe necessarily applied, as has been explained in all of the pleadings, the application process was a very long and complex process.  According to the FAA's documents and an

attachment to their motion, the extension of the barrier

process, it could take years from the point of application to

hiring.

So just as in any job application process, someone may

begin their application and decide not to continue the

application process.  That could have been true in *Ricci*.  It

could have been true that one of those students or one of those

first responders who took that test moved after they took the

test and before they were eligible.  It could have been true

that they were offered another opportunity.  But they were

applicants, and these students who took the AT-SAT test were

applicants.  They were in a complex, long, drawn-out application

process, but they had started the process.  They had started

that process according to their understanding, the schools'

understanding, the FAA's representations, and our allegations.

THE COURT:  And you're saying the FAA would reach out

to that list and say we have a vacancy now?

MS. BROWN:  Yes, yes, Your Honor.

THE COURT:  Wouldn't they then have to say yes, we're

in or execute a form or something?  Would there not have to be

some response from the individual to then put them in the

applicant category?

MS. BROWN:  Not to put them in the applicant category,

Your Honor, I don't believe.  As I said, taking the AT-SAT test,

making the verifications required to be able to take the AT-SAT

test, they were applicants.

Would they have to respond to an announcement to continue in the application process?  Yes.  Just as in, for example, *Bourdais*, the Fifth Circuit case that the government cites, those students took an aptitude test like the AT-SAT test here, and then there were additional tests, agility tests, et cetera. The city could well have contacted any one of those applicants and the applicant not responded to take the next step in the process.  But that doesn't mean that they were never an applicant to begin with.  That means they hadn't continued in the application process, but they were an applicant.

And moreover, the idea that the government can take one part of the application process, move it forward for a certain class of applicants, and call it a prerequisite and therefore preclude them from being applicants is rife with danger.

So in other words, the FAA, the way they look at it is the AT-SAT test, yes, it was a part of the application process for the general public, but for CTI students, it was just a qualification, and so we can decide to throw away those qualification results because it wasn't a part of the application.

You could have done the same thing in any number of these hiring tests that we're talking about and say you know what, the *Ricci* test, that was not an application process, that was a part of qualifying to be a lieutenant or a colonel, it was a part of

qualifying to be a firefighter, in *Maraschiello*, it's a part of
qualifying, it wasn't an application.

Just as some of the justices have raised concerns about
moving the test forward or moving the application process one
way or the other, it would be contrary to the intent and purpose
of Title VII to say okay, we're going to let employers say hey,
yeah, I am going to develop and administer as an employer this
pre-employment test, but you're not an applicant when you take
the test, you're just qualifying.  I think that in and of itself
rings hollow and indicates why the AT-SAT test, a test
administered by the employer as a pre-employment test, is a part
of the application process.

THE COURT:  Okay.  So Title VII's complex statutory
scheme (distorted audio).

COURT REPORTER:  Your Honor, you are cutting out.
Could you repeat your question?

THE COURT:  I'm sorry, everyone.  Can you hear me?
I'm fighting Zooming students.

Anyway, as I was saying, Ms. Brown, Title VII is a complex
scheme, a lot of, you know, rife attached at a certain point.
There has to be a point at which it becomes relevant here to
potential applicants.  There's got to be a triggering event.

And if I understand your argument, that triggering event is
taking and passing the AT-SAT?  That makes Brigida and
Douglas-Cook an applicant, assuming they've graduated from

schools and have recommendations and everything?  It's that test?

What is the triggering event?  It just can't be that at some point you start this cumbersome process and at any point you're an applicant.  That cannot be.  There must be some triggering event, and I'm trying to understand from your perspective what that triggering event was with respect to Brigida and Douglas-Cook.

MS. BROWN:  Yes, Your Honor, and yes, it was at a minimum taking the AT-SAT test.  I mean, we could -- there could be arguments about whether people were applicants before.  We are not asserting or arguing that position.  We are saying that once a student applied for, qualified for, and took the AT-SAT test, that they were applicants.  It is a pre-employment test.

THE COURT:  And passed it?

MS. BROWN:  Well, arguably, Your Honor, once you took it and if you failed, you were an unsuccessful applicant, but you were still an applicant.  So if you were unsuccessful, you were not qualified, and you wouldn't have suffered an adverse employment action because you weren't eligible to be hired.

But if the question is --

THE COURT:  But some students could take the AT-SAT before they graduated from school, and yet, you would concede those aren't applicants?

MS. BROWN:  I would not, Your Honor.

1          THE COURT:  You would not concede?  They are

2    applicants even though they're still going through school and

3    they haven't graduated and they don't have the recommendation

4    and all those other things?

5          MS. BROWN:  That's correct, because the AT-SAT test

6    was limited to students who had completed a certain amount of

7    their course work.  Again, not only the student but the school

8    had to certify that according to the FAA's standards that person

9    was eligible to take the AT-SAT test.  And so as has been

10   acknowledged in this case, these students could have applied

11   through not only the CTI process but the general public process.

12   Through either process, they would have been required to take

13   the AT-SAT test.

14       And so once they had taken the AT-SAT test, they were

15   applicants.  And according to the FAA's HRPM, the Human

16   Resources Policy Manual, that they attached to their motion,

17   their application, their status was placed on hold.  Their test

18   results were placed on hold until they graduated.  So again,

19   they had started the application process.  They could not move

20   forward in the application process under the CTI band or path

21   until they had graduated.  They could have moved forward in a

22   general public announcement.

23       And so because the AT-SAT test is a test that was conceived

24   by, researched by, designed by, validated by, administered by

25   the FAA as an employer and only the FAA and the students knew

1    the results of those tests -- they didn't go to the schools.

2    They didn't go to other employers.  They were not for any

3    purpose other than for being hired as an air traffic controller.

4        So for the purpose of triggering Title VII, coming back

5    around to Your Honor's original question, if a person applies to

6    take and takes an employer's prescreening or employment test,

7    then they're an applicant.

8        So I acknowledge that if I'm an MIT graduate and I want to

9    apply to NASA, okay, I'm not an applicant until I actually

10   apply.  But NASA hasn't administered a pre-employment test to

11   me.  If I'm a law student and I have graduated from Harvard or

12   wherever and I think that I should have a job at one of the Am

13   Law 50 schools -- firms, I'm not an applicant until I have

14   actually applied, even though I may have expectations.  We

15   acknowledge that there are differences between expectations of

16   people who are working on developing credentials and actual

17   applicants.

18       And from the facts that we have alleged from the way in

19   which the FAA developed, implemented, advertised, and used the

20   AT-SAT test, taking the AT-SAT test made a student an applicant.

21   They didn't administer the AT-SAT test to general public

22   applicants until they had passed a certain amount of minimum

23   screening, meaning the CTI students had already passed that

24   minimum screening.  They had already proven that they were

25   within the proper age, proper education, proper citizenship,

1    et cetera.  They had already expressed their interest.

2        And so Your Honor, from our point of view, they didn't have

3    to graduate to be an applicant.  Once they took the AT-SAT test,

4    because of the way that it was developed and administered, the

5    screening that happened before it was administered, it was a

6    part of the employment process.

7        THE COURT:  That just seems odd that there is a

8    requirement to graduate from one of these CTI schools and

9    they're an applicant before they've completed that requirement

10   under your interpretation.  Once they signed up for the test,

11   even if they have, I don't know what could be left, six months,

12   a year of schooling, you submit they're an applicant as soon as

13   they take the test?

14       MS. BROWN:  Yes, Your Honor, we do.  And again --

15       THE COURT:  As soon as they apply to take the test or

16   as soon as they complete the exam or as soon as they pass the

17   exam?

18       MS. BROWN:  Certainly once they've taken the test,

19   Your Honor.  I think that one could have disputes about whether

20   applying to take the AT-SAT made one an applicant.  So for

21   instance, if I went to, again, NASA and I said I want to be one

22   of your employees, let me see what your application process

23   looks like, and they give me prerequisites to take the first

24   version of a NASA employment test or screening test and I look

25   at those requirements, and I'm, like, okay, I'm not going to

1    meet those requirements, I'm not going to finish this process.

2    Right?  So not just applying but having taken the AT-SAT, having

3    passed the screening, having made the verifications that were

4    required, once you passed the AT-SAT, you were an applicant.

5    And I would say once you took it you were an applicant, but if

6    you failed, you were an unsuccessful applicant.

7            THE COURT:  So what about if you want to become a

8    member of the D.C. Bar.  You take the D.C. Bar exam.  You apply

9    to take it; you take it.  By analogy, you're an applicant before

10   you fill out the form for admission just by virtue of applying

11   and taking the Bar exam?

12           MS. BROWN:  I'm -- so if I'm understanding the

13   Court's --

14           THE COURT:  I'm just struggling with this idea that as

15   soon as you apply and take an exam for anything -- and the

16   closest thing I can think of -- I agree with you this is

17   different than the LSAT because the FAA itself is creating and

18   encouraging this test.  So I was thinking the closest thing to

19   that I could come up with was taking the Bar exam to be admitted

20   to a state Bar.

21           MS. BROWN:  Again, I think that there are significant

22   differences, because the bar exam isn't a prescreening test.

23   It's not developed by an employer.  It's developed by the

24   judiciary and the committees and the things that they put into

25   place.  This is a pre-employment test administered by the

1    employer.

2         So I could take the D.C. Bar and never practice in D.C.  I

3    could take the D.C. Bar and pass the D.C. Bar exam and go work

4    in-house somewhere else.  I could go to another country.

5              THE COURT:  Here, Mr. Brigida could have passed the

6    exam.  He could have graduated from school.  He could have been

7    informed by the FAA, we're putting out a vacancy announcement,

8    and he could have decided, I don't want to do this, I want to go

9    be a pilot.  Right?

10        So I'm just struggling with this idea that the applying for

11   and the taking of the test is enough for him to be an applicant

12   in the sense that Title VII is triggered if there's an

13   additional step, that he needs to say yes, I really mean it, I

14   want to apply for that position that you say is available right

15   now.

16             MS. BROWN:  But again, that's true in every one of

17   these employment test cases that we look at.  You look at *Ricci*.

18   Those people had to be put on the list of three, and they had to

19   confirm that they were interested in it at that time.  So if you

20   go back and look at the New York statutes and the rule of three,

21   those people had to go through another process.  The people in

22   *Maraschiello* had to go through another process.  The applicants

23   in *Bourdais* had to go through another process.

24        So the fact that in this case the FAA had, according to

25   their own characterization, at least 10 steps to the hiring

process doesn't mean that if I fail to complete every single step I'm not an applicant. They had started the hiring process. They had started the application process, just as in *Ricci*. The court in *Ricci* said essentially the hangup, the problem was that employer created expectations. They said if you do these things and you pass this test, which is an objective test, and you get this score, we are going to hire and rank people in this way. And so they created these expectation. And yes, the *Ricci* court said okay, you know what, you can change how you administer a test before you administer the test but not after, not after you've seen the results.

So the FAA argues here, well, this never would have ended, it never would have been a natural termination process. That's not true because the FAA itself had stopped administering the AT-SAT test in the latter half of 2013. They could have stopped administering. They could have told the schools and the students, we are going to change how we do this process, and then they simply would have had to continue through for those people who had started the application process.

But to your point, the fact that they were merely in the CTI program, which they had to affirmatively sign up for, did not make them applicants. The fact that they attended these schools, the fact that they took these classes that were in the FAA-designated curriculum, none of that made them an applicant.

And so the FAA would have been able to change its hiring

process by seeing through the process that had started in

implementing a new process.

THE COURT:  So you're saying that once the test was

administered the process was frozen for some period of time?

The FAA could not change the process until anyone who took that

exam for three years exercised their right to become -- to

apply -- well, not to apply.  They've already applied.

So by administering that test, the application process is

frozen for three years?  I can't remember how long those tests

were valid before the change.  But your position would be that

from 2013 -- let's see.  The AT-SAT, Brigida passed it in April.

I'm not sure when Douglas-Cook passed it.  But --

MS. BROWN:  Also April.

THE COURT:  Okay.  So from April 2013 until April

2016, those two and anyone else who took the exam on that date

was an applicant, and the FAA couldn't change the test for three

years?

MS. BROWN:  Actually, Your Honor, that's not --

because of the complexity of the FAA process, that's not our

argument.  I believe that the FAA could have, for instance,

changed the test or the process for the other channels.  The

veterans, for example, I don't believe ever took the --

THE COURT:  I mean just for this channel.  For this

channel, you're saying the CTI channel needed to be frozen

for -- correct me if I'm wrong.  My understanding, my memory is

1    that these tests were valid for three years after they were

2    taken.  Is that right?

3             MS. BROWN:  For three years after they had taken it or

4    they had graduated, depending upon timing.

5             THE COURT:  Okay.  So even later maybe.  So here, they

6    graduated in December.  So from December 2013 until December

7    2016, you're saying the CTI hiring process was frozen?

8             MS. BROWN:  Not exactly, Your Honor.  So here's what I

9    think the FAA could have done should they have chosen to, you

10   know, not throw out the test results.  I think that what the FAA

11   could have done -- because again, they stopped administering the

12   AT-SAT in the latter half of 2013.  I'm not sure if there were

13   tests administered after April or May of 2013.  But what the FAA

14   could have done, for example, for the 2014 hiring process, they

15   could have issued multiple vacancy announcements, one for the

16   general public, one for the CTI students.  If they had issued

17   that, all of the CTI students who had taken the AT-SAT and were

18   eligible to apply could have responded to that vacancy

19   announcement.

20        And then just as they did with the general public hiring

21   and the announcement that they had made in 2010 and continued to

22   hire from, they could have continued to hire from the CTI

23   vacancy announcement.  In other words, they wouldn't have had to

24   continually issue CTI announcements.

25        Once they had allowed those CTI graduates who had satisfied

1    the requirements, taken the AT-SAT to apply to a CTI posting or

2    even to a general posting with their qualifications intact --

3            THE COURT:  Only one announcement, one vacancy

4    announcement, and they could have scratched it?

5            MS. BROWN:  I believe that's correct, Your Honor.  I

6    think that if they -- depending on how they implemented it.  It

7    had to have been done in good faith.  The students would have

8    had to have a legitimate shot.

9        So for instance, when the FAA opened an announcement in

10    2012, a bunch of people applied, and then they refused to hire

11    anyone -- we think because this process was already in play --

12    we would potentially still have a claim.

13        But if they in good faith opened a process to which the

14    existing applicants could have applied, could have responded if

15    they had allowed the people who had taken the AT-SAT test, the

16    proper use of that test according to the FAA's own rules and the

17    students' justified expectation, then yeah, they could have

18    changed it.

19        So for instance, they could have issued an application -- a

20    vacancy announcement in 2014.  All of the AT-SAT students who

21    were qualified applicants, as much as that term is hated in this

22    case, but were qualified applicants could have responded, and

23    the FAA could have continued to hire from the people who

24    responded to that vacancy announcement until the applicants were

25    exhausted or the FAA in good faith no longer needed those

applicants.  And they could have allowed the other students who
were in the CTI program to continue to apply either through a
modified CTI path or just continue to apply through the general
public or all sources paths.

THE COURT:  But it still seems like you're changing
the expectations that the individuals have when they took the
test by not keeping it open to all of them for three years to
apply.  You're just not changing it to the same degree that they
changed it here, but their expectation when they took that test
was this is going to be good for three years, and under your
theory, I'm an applicant for three years for any hiring.

MS. BROWN:  Yeah, so again, if they had issued that
announcement in 2014, that entire applicant pool would have
expired three years later.  Right?  So then those students, all
of those expectations are satisfied.  And I don't know how
long --

THE COURT:  But you're basically saying you need to
freeze it for three years.

MS. BROWN:  I'm saying that the students who took the
AT-SAT test, the students who were applicants had the right to
have their application considered on the terms under which they
had applied.

According to sort of the Court's analysis in *Ricci*, the
employer announced how it was going to hire.  The employer began
that employment process, didn't like the racial results, changed

the process.  And in *Ricci*, it didn't matter that those
applicants could have applied under a new process later.  What
mattered was they had made sacrifices.  They had engaged in this
process with expectations set by the employer, and the employer
changed the expectations, changed the process for race-based
reasons.

So yeah, I think any students who had taken the AT-SAT,
they had the right to have that qualification, that application
process seen through.  And I'm not saying they had the right to
be hired.  Absolutely, I'm not saying that.  But just as in
*Ricci*, there was no guarantee that the top scorer was going to
be hired, but they had the right to be considered fairly.

THE COURT:  Anything else, Ms. Brown?

MS. BROWN:  One second, Your Honor.

For the reasons that I've stated, the FAA views this as --
or they argue that this is an expansion of *Ricci* or of Title
VII.  We do not believe it is an expansion of Title VII.  As
I've said, these students are applicants.  They're not general
college students.  They're not specific post-graduate students.
They are applicants who took the employer's application
pre-employment test or employment test.  They were in the hiring
process.  So we don't view that as being a part of the -- an
expansion of Title VII.

Coming back to our complaint, also -- in the complaint,
even in the introduction to the complaint, we refer to the fact

that these students were prequalified applicants.  And so we've

made that argument throughout.  I acknowledge and I want to come

back to a point the Court made earlier.  We dialed back the

applicant language after the Court, during the class action

hearing and in prior rulings, said that nonapplicants must be

excluded.  We narrowed our class, I think more than was

necessary, to make sure that we had nothing but applicants in

this class.  And so we were very careful to reframe the class,

reframe the analysis in a way that limits this to applicants.

But I think nothing in our complaint as it's revised makes

any sort of admission or acknowledgment that these students were

not applicants.  They were eligible to respond to the CTI

vacancy announcements.  And whether you want to characterize

that as applying to the next step in the application or

responding to that announcement, again, our view is they had

already started the application process beforehand.

I also want to take note of the FAA's discussion in

*Maraschiello*, because what happened in that case, if you go back

again and look at what -- the history of that case, in the

district court ruling where the district court ruled on summary

judgment in that case, the district court did not address

adverse employment action.  The district court found in that

case that the plaintiff failed to satisfy two elements:  One,

that he was qualified, and one, that he could establish an

inference of discrimination.  So there's nothing about the

*Maraschiello* case that says the way in which the city hired

there was, quote unquote, not an adverse employment action or

not a personnel action.  The Court was looking --

THE COURT:  I'm sorry, Ms. Brown.  My computer

glitched as you were stating your last sentence or two.

MS. BROWN:  Sure.  My point, Your Honor, is that the

*Maraschiello* case, if you look at the district court case and

then look at the Court of Appeals ruling, what was being

analyzed there by both the courts was whether or not the

plaintiff could establish an inference of discrimination.  And

in fact, in the *Maraschiello* case, the Court of Appeals

basically said that the plaintiff had provided no direct or

circumstantial evidence of discrimination.  That's why that

plaintiff lost that case.  It wasn't because either court made a

finding that there was no adverse employment action.

And I would also note, Your Honor, I don't understand --

and I would like a clarification of this from the government,

but I don't understand the government to be arguing that there

is a difference between a personnel action and an illegal

employment practice under Title VII.  If the FAA is trying to

argue that somehow there is a narrower scope of Title VII that

applies to the government, I don't think that's born up in the

cases.  And I can cite cases where the D.C. Circuit and the

D.D.C. has essentially said that the government as an employer

is held to the same standard as private employers.

1    And there is a regulation as it relates to civil protection

2    that defines employment practices.  For the government, it is

3    5 C.F.R. Section 300.101.  And it says, "Employment practices

4    includes the development and use of examinations, qualification

5    standards, tests, and other measurement instruments," which

6    would apply both to the biographical assessment but more

7    importantly here to the AT-SAT test.

8    And that goes along with some of the other cases that we

9    had cited where the Court, I believe it was the Seventh Circuit

10   in that case, said that the use of an employment test, the

11   implication of that test at any given time is an employment

12   practice regardless of whether the policy that gives rise to

13   that practice is established once years earlier.

14   So I wanted to point out the regulation about what is an

15   employment practice in the federal context and the distinction

16   in *Maraschiello*.

17   Also, the FAA in their briefing had drawn attention to

18   *Bourdais*, the Fifth Circuit case.  I wanted to analyze that case

19   sort of and place our plaintiffs on that spectrum.  So in the

20   Fifth Circuit case, the Court found that there were -- they

21   didn't address whether anyone was an applicant.  Everyone had

22   taken the aptitude test, and they were on a register.  But the

23   Court found that those people who were not eligible to be hired

24   because they hadn't moved forward, they were -- they did not

25   suffer an adverse employment action.

1        There is a huge distinction in that case between those

2   plaintiffs and our class, because those plaintiffs weren't

3   eligible to move forward in the application process.  Our class

4   was eligible to move forward in the application process.  So our

5   plaintiffs were the people who, like the successful plaintiffs

6   in *Bourdais*, they were harmed by the government changing its

7   process midstream.  And I think it's important to understand and

8   appreciate the difference.  Again, facts matter.

9        And in *Bourdais*, the government, the City of New Orleans

10  there, moved candidates through the application process

11  according to bands in sort of a conveyor belt fashion rather

12  than in chunks as they did here with vacancy announcements.  And

13  so that's a case that the government had made an issue of, and I

14  wanted to distinguish that case.

15       Other than that, Your Honor, unless you have specific

16  questions, I think that that's a concise summary of our

17  arguments, or not so concise.

18           THE COURT:  Thank you, Ms. Brown.  I just want to make

19  sure I understand.  You don't dispute that the plaintiffs need

20  to be applicants?

21           MS. BROWN:  I do not dispute that the plaintiffs need

22  to be applicants, whether they're active, actual, or

23  constructive, and in this case we are arguing they are active,

24  actual applicants.

25       I will also note that when I looked for cases in which the

1    Court questioned whether an employee was an applicant, the only

2    case that I found where a Court addressed that question and said

3    that is a question of fact actually is -- was a case regarding

4    an FAA PATCO application.  And that's *Yeschick versus Mineta*,

5    and that's 521 F.3d 498.  That's the Sixth Circuit, 2008.

6    Different process there because the Court was analyzing whether

7    or not the FAA, sort of to your point earlier, had improperly

8    terminated someone's status as an applicant.

9        But the point from -- my point from that case is that

10    whether or not someone is an applicant can indeed be a question

11    of fact.  We've alleged the plaintiffs are applicants, and we do

12    believe that there is no factual basis -- or that there is no

13    basis under the standards applicable to a motion to dismiss to

14    find that these were not applicants.

15        THE COURT:  All right.  I will just note, I don't

16    think either party cited it, but I actually do have a prior

17    decision involving the FAA in which I addressed the

18    term "applicant for employment" in the context of Title VII and

19    The Rehabilitation Act, and I looked at what that meant.  And

20    it's not completely on point.  There the issue was whether an

21    individual had applied when she hadn't filled out a written

22    application but had communicated her intention early.  So I just

23    note that that is a somewhat relevant case involving the FAA

24    interestingly.  It's *Pueschel*, 357 F.Supp.3d at 18.

25        All right.  Mr. Thorp?

1          MR. THORP:  Yes, Your Honor.

2          Plaintiffs have made a lot of arguments and nuances that

3     are not in their briefing.  So I just want to touch on some of

4     them quickly, a few factual issues that they raised that I don't

5     think get them very far.

6          One, they point out that the FAA used some tracking

7     information to try to keep track of how many people were coming

8     through the CTI process and that they provided a job code to CTI

9     graduates when there was going to be a CTI-only vacancy

10    announcement.

11         This is essentially a courtesy.  The jobs are posted on

12    USAJOBS.  Anyone who meets the criteria can apply.  The fact

13    that the agency was keeping track of the pool and telling them

14    about the vacancy announcements is no indication that they're

15    already applicants.  In fact, I think it indicates the opposite,

16    that the agency had invested some time and money in curating

17    this potential pool of applicants and wanted to make sure that

18    people actually applied.

19         The other fact they raised is that at some point in the

20    past there was a different process.  That appears to be the

21    case, but we have explained via sworn declaration and other

22    things and by putting in the vacancy announcements since 2008

23    that at least since the beginning of 2008 the only way people

24    are hired in this training path is through the public vacancy

25    announcements.

1        So whatever happens --

2              THE COURT:  On a motion to dismiss, I can't consider

3    all of these affidavits and other exhibits you've put in.

4              MR. THORP:  Certainly, Your Honor, but plaintiffs are

5    raising these things that are well outside their complaint.  So

6    I'm just explaining the facts.

7        I think what's clear is I think you can take judicial

8    notice of the vacancy announcements, and we have repeatedly put

9    in every entry-level vacancy announcement since --

10             THE COURT:  The fact of the announcement; right?

11             MR. THORP:  Yes.  So plaintiffs do not allege in their

12   operative complaint that there was any path to being selected

13   other than responding to the vacancy announcement and going

14   through that process.  So plaintiffs seek to muddy the waters

15   otherwise.  The reference to a continuous announcement which

16   they reference, we have put in the actual announcements into the

17   record.  And they explain that in 2011 the agency opened it for

18   basically a whole year; whereas most other times, the

19   announcements were open for a couple weeks or a month.

20       So the reference to a continuous announcement in that

21   workforce plan was a reference to the fact that they tried out

22   for one time having a CTI announcement that was open for a year

23   rather than just taking applications from CTI graduates for like

24   a month at a time.

25       But I don't think any of those factual issues really gets

to the point.  I just wanted to clarify some of the things
plaintiffs raised.

I also want to note that their complaint matters.  When
plaintiffs filed this suit, Mr. Pearson appeared to be under the
impression that the agency was still -- still had, if it ever
had, a direct hire pool, that the CTI graduates merely by
graduating and passing the AT-SAT could have been picked at that
point rather than actually applying.  So the administrative
complaint and the complaint in the federal suit for several
years asserted that there was a direct hire pool.  And that's
why they called them applicants.

We disabused plaintiffs of that notion in the things that
were laid out at the class cert briefing, and they subsequently
amended their complaint.  And then instead of saying there was a
direct hire pool of applicants, they said that they were people
who were eligible to apply.  I think they acknowledged that they
were not applicants because they had a mistake of fact before,
and now they are trying again to walk back from the allegations
in their complaint to a different theory.

The problem with plaintiffs' approach -- the fundamental
problem with plaintiffs' approach is that it is a concept of
applicants that, as the Court pressed, has no clear line.
Plaintiffs picked a line merely of convenience in focusing on
the AT-SAT.  If plaintiffs are correct, then anybody -- then as
soon as the agency set up a process where it moved the AT-SAT

before the application for these students, which is at

considerable expense to the agency but allows sort of more

clarity for who could -- who might ultimately be successful in

the process, as soon as they moved it outside, before the

application, then anybody who took the AT-SAT has a settled

expectation that there will be no change to the hiring process

until they're hired, until that timing expired.

As the Court noted, that essentially locks it in.  That, I

think, makes no sense as a matter of Title VII.  I think it also

makes no sense practically here.

For example, the agency, in setting up the CTI program, did

not guarantee there would be a CTI announcement every year.  So

in 2009, for example, the only announcement that year was a

general public announcement.  If plaintiffs are right that

taking the AT-SAT means that people have a settled expectation

that there will be a CTI-only announcement under the exact same

structure as their expectation was, then it wouldn't be

legitimate, and plaintiffs would have a complaint if instead of

the 2014 changes to the hiring process the agency merely issued

a general public announcement instead of a CTI vacancy

announcement for 2014 and 2015.  That apparently would make

people applicants who could complain to the FAA that there

wasn't a CTI announcement.

Alternatively, and this is how their convenient focus on

the AT-SAT, I think, is misplaced here, the agency could have

1    allowed the AT-SAT scores to continue in 2014 and simply

2    interpose the new biographical assessment.  Plaintiffs

3    presumably would be objecting just as strenuously if the AT-SAT

4    scores had been fine for people who also passed the biographical

5    assessment.

6        So what they're showing is that the problem is not the

7    AT-SAT, and instead, they want to lock in so there's no change

8    to this process.  Plaintiffs -- if you agree with plaintiffs,

9    then I have every expectation that they're just going to turn

10   around and seek to amend their complaint again to include now

11   the thousands and thousands more people who took the AT-SAT at

12   some point before 2014 and whose scores had not expired.

13   Because it's not merely the people who took the AT-SAT in April

14   of 2013 before the sequester and the government shutdown issues,

15   but it's everybody who had taken it at any point in the past and

16   was within three years of graduation.  So everybody who

17   graduated as early as 2010 or '11, they may have taken the test

18   as early as 2008 or '9.  Most people took it within a year of

19   graduation, but some people took it and then didn't end up

20   completing the two-year or four-year program for several years.

21   So there are people -- I've shared the data with opposing

22   counsel, and I expect she's looked at it, too.  There are people

23   who graduated in 2012 or 2013 who took their test in like 2007.

24       So on plaintiffs' theory, the government is locked in in

25   this massive way and could not make -- if the government decided

that the CTI process was not the best way to go, under
plaintiffs' approach, they could not change that for years to
come without giving rise to a Title VII claim on the theory that
all of these people are applicants who are entitled to a
process.

I think this shows how plaintiffs' interests really
conflict with the goals of Title VII and of *Ricci*.  Plaintiffs
have quoted *Ricci*'s observation at page 585 that Title VII does
not prohibit an employer from considering before administering a
test or practice how to design that test or practice in order to
provide a fair opportunity for all individuals regardless of
their race.

It should not be the case that the agency's assessment of
what is a fair opportunity is locked in for years to come merely
because an assessment goes out before the application process
and treats everyone as applicants.  Unlike *Ricci* where the
assessment that was in play left people ranked with essentially
nothing else for them to do with a certified list that was valid
for two years, that the agency explained the only way they were
going to pick was from the people who were ranked on that cert
list, this is nothing like that.  Here, there was much else to
do, including apply to a vacancy announcement.

*Bourdais*, *Bourdais* -- I don't speak French -- I think cuts
strongly against plaintiffs, because the Court there said that
the plaintiffs who had started the application process but had

not completed it did not have an adverse employment action.
That has to apply at least as strongly here.  So even if --
under that approach, even if the Court were to agree with
plaintiffs that they are somehow applicants, they still have
failed to suffer an adverse employment action because they had
not actually applied and could not have been picked.

The agency did not change the process at a point where
either Mr. Brigida or Mr. Douglas-Cook could have been picked
for a job.  And I think this was an eminently appropriate point
for the agency to assess its hiring process, and including
considering the racial demographics of its pools, the potential
barriers to equal participation, and to implement a new process.

And if they can't do that -- and plaintiffs' larger view is
that an agency should essentially never be able to do that, they
should never be able to sort of look at barriers or look at the
demographics of different streams of approach.  But that is
simply not what Title VII focuses on.

THE COURT:  I think she's saying for a period of time,
in this case the three-year window, she's saying effectively the
FAA was locked down and until that ran its course, but --

MR. THORP:  I just want to note -- yes, Your Honor.  I
did want to note that here it would simply not be a three-year
window, because people who had taken the -- it was dependent
upon when people who had taken the AT-SAT many years ago
ultimately graduated.

1          THE COURT:  It only lasts for three years; right?

2     The --

3          MR. THORP:  Three years -- I'm sorry, Your Honor.

4     Three years after you take the test or after you graduate.  So

5     people could take it within what they expected would be a year

6     before they graduated.  But if they didn't ultimately graduate,

7     it's still three years after they actually graduate.  So they're

8     still in the system with scores as far ago as 2007 who recently

9     graduated.

10          THE COURT:  And why is that if they have to reach a

11    certain stage in their schooling, that they would not graduate

12    until only recently?

13          MR. THORP:  There are people who drop out temporarily

14    and come back.  There are people who are not citizens when they

15    start the process and become citizens along the way.  I'm not

16    sure of all the factual scenarios, but the data shows that

17    there's actually sort of a -- so if plaintiffs are right, then

18    the potential class is far, far larger and includes people who

19    are -- really have not taken the steps to -- as the Court noted,

20    are not eligible to apply yet at the point when she's saying

21    they're already applicants.

22         Your Honor, I think that addresses the points I have had

23    the opportunity to address.  I will look at some of the other

24    things plaintiff raised about the C.F.R. provision for hiring

25    practice.  I don't think that changes the fundamental question

1    here, which is whether there is an adverse employment action

2    affecting these plaintiffs as applicants at this point in time.

3    Of course, it's not the case -- merely because something is

4    characterized as an employment practice doesn't mean that any

5    individual has a basis to challenge it at any specific point in

6    time.

7            THE COURT:  All right.  So Mr. Thorp, I find the FAA's

8    arguments compelling.  I am struggling with whether it's

9    appropriate to decide at this stage.  Looking solely at the

10   complaint and the EEOC complaint, you emphasize that the

11   plaintiffs themselves concede that they were eligible to apply,

12   at least in the complaint, the fourth amended complaint, but the

13   EEO complaint refers to themselves as applicants.

14       What am I to make of that?  That they've disavowed that now

15   with their fourth amended complaint?

16           MR. THORP:  I think whatever they call themselves,

17   Your Honor, what matters is whether the facts alleged in the

18   complaint add up to them being applicants.  And here we have a

19   hiring process with vacancy announcements where they acknowledge

20   that they did -- the first time they actually applied was in

21   February 2014.  They had previously had people who were -- as

22   named plaintiffs who had applied in 2012 and other times, but

23   the named applicants now are only people who applied for the

24   first time in 2014.

25       It's also clear that, as they've laid out, they're resting

1      on the allegation that taking the AT-SAT potentially years

2      before they graduated or met other criteria made them

3      applicants.  I think it's a straightforward question of law as

4      to whether that is sufficient to make one an applicant under

5      this hiring process.  And we submit that it plainly is not and

6      that to extend the Title VII concept of applicant in this way

7      would harm Title VII's purposes and undermine the plain reading

8      of the statutory text.

9              THE COURT:  All right.  And that's true regardless of

10     what she argues about the process and the path, that it hasn't

11     always been the case that employees had to submit a form in

12     response to vacancy announcements?

13             MR. THORP:  That's an assertion that she's just

14     making.  That's not in the complaint.  It's not something she

15     can rest on, I think, at this stage.  And I have my counter-

16     explanation, which is also not in the complaint, but the only

17     allegations here are -- we know how the process worked

18     immediately before this and immediately after, and it was

19     vacancy announcements that you actually had to apply for.

20             THE COURT:  All right.  Ms. Brown, why is it your

21     position that the two plaintiffs who applied in February 2014

22     are not enough for me to conclude they're not applicants for

23     purposes of Title VII?

24             MS. BROWN:  Your Honor, I think that you have to look

25     at the complaint in its entirety, obviously.  And when you look

1    at the complaint in its entirety, including the EEOC piece, I

2    think that it does allow you to find that they were applicants.

3         Again, beginning with the introduction of the complaint, we

4    say that the students were stripped of their prequalified

5    employment status, that they were prequalified for hiring.

6         Again, in the introduction, we say there was a preference

7    for those who successfully completed the program and that the

8    FAA abandoned its employment screening system, which is the

9    whole system that we set forth in the complaint, and arbitrarily

10   purged its list of prequalified ATCS applicants.

11        And again, as you go through the complaint, there's

12   explanations of the fact that there were different hiring paths

13   for the general public applicants and for the AT-SAT students,

14   the fact that the AT-SAT was a prequalification and a

15   requirement for being employed under both paths but was

16   administered by the FAA's choice to the CTI students before they

17   graduated because they had passed essentially the same minimum

18   qualifications as were required of general public applicants.

19        And so again, continuing through the complaint, we refer to

20   it throughout as the fact that they were taking these adverse

21   employment actions, that these were qualified applicants,

22   despite the adversity or the resistance to that term during the

23   class certification hearing, in that process.  We have

24   maintained from the time that the EEOC complaint was filed

25   through the filing of this complaint, through the response to

the government's motion to dismiss that these students, once
they took the AT-SAT test, were applicants.

And so the reference to the vacancy announcement is an
acknowledgment, I suppose, that the vacancy announcement was a
continued step in the application process, and they -- the named
plaintiff had not taken that next step until it was available to
take.  But that doesn't mean that they weren't applicants.

And again, I think consistently the government
characterized it as sort of a recent litigation-driven position
that they're applicants.  It's not.  It goes back to 2014.  And
Your Honor had noted previously that part of the reason that the
plaintiffs weren't able to challenge the biographical assessment
as a disparate impact claim was because of the timing of their
claim which indicated the test hadn't even been administered
yet.

And so again, looking at the timing and the context and the
content of the original EEOC complaint, we have always alleged
that the plaintiffs were applicants.  And I don't think that
there is any acknowledgment, there is no admission at any point
in this process that these plaintiffs weren't applicants.  We
tailored this complaint to respond to the government -- to the
Court's April 2020 ruling that nonapplicants could not be
considered.

And I agree with Mr. Thorp that our class is probably
narrower than it should be.  We're not going to go back at this

point and rescope the class to add in other students beyond what

we've defined.  We're not going to do that certainly before we

get any discovery.  We are not going to try and expand the

class, even though we do believe that the definition

of "applicant" should be larger than what was previously sort of

recognized in this proceeding.  But we've stuck with our

definition.  We've narrowed our class to ensure that we're

within the definition.

THE COURT:  All right.  Given that the named

plaintiffs -- there's no question they applied in February 2014.

So they certainly can challenge the biographical assessment.

And defendants may disagree on this, but regardless of what I

rule on this motion, which I think I will take under advisement

and try to issue a ruling promptly, I hope within the next week,

but regardless of what I rule, it seems to me, Mr. Thorp, that

discovery related to this shift in process nonetheless would be

relevant to the plaintiffs' claim with respect to the

biographical question in order to show discriminatory intent.

Do you disagree, or is it the FAA's position that if I

throw out this portion of the claim that none of that comes in?

I don't see how that would not still be relevant for purposes of

them trying to prove discriminatory intent.

MR. THORP:  Your Honor, as to the practical

significance at this point, I think, one, this claim that

they're making, I think, raises a different set of class

1   certification issues.  So I think not disclosing -- not

2   disclosing this claim at this stage will make the class

3   certification arguments more complicated as to commonality,

4   predominance, superiority, et cetera.

5       I also think even though some aspects of this history will

6   be relevant, I think that the burden and proportionality of

7   establishing all the details of the history really differs

8   whether the challenge is focused on the biographical assessment

9   itself or this broad, really open-ended theory that plaintiffs

10  were entitled to a hiring preference that they were deprived of

11  as applicants.  I think the nature of the discovery going to

12  that is going to be much more extensive and complicated in

13  digging through that history.

14      And so given Rule 26's proportionality standard, et cetera,

15  I think there really is a -- are significant questions in both

16  of these areas that will be affected by the Court's ruling.

17      And I just want to sort of note that sort of whether

18  plaintiffs are applicants is not the only question for this

19  motion.  We've offered another path, and I think the Fifth

20  Circuit decision emphasizes this, that people who may have --

21  even people who have started the application process may not

22  have an adverse employment action that entitles them to a Title

23  VII claim at this stage.  So the Court dismissed people who had

24  started the application process and had crossed one aptitude

25  test but had not met the other requirements to have a complete

1    application.

2        So here, even under plaintiffs' approach, these people have

3    not actually completed an application, and it's -- so under that

4    approach -- and the focus on a personnel action that affects

5    them as applicants, the changing the hiring process not

6    midstream but before they actually apply, I think, means that

7    this claim should be dismissed and they should proceed to

8    challenge the process itself.

9        THE COURT:  All right.  As I said, I am going to take

10   this under advisement.  I expect to issue a decision shortly.

11   Once I do, I will ask you all to sit down again -- I know you

12   have dispute about the timing for classification and the scope

13   of discovery and all that.  So I would ask you to again try to

14   work out these things and reach agreement to the extent you can

15   and file another status report setting forth your respective

16   positions, and if necessary, I will schedule a status hearing to

17   discuss.

18       But I am very sympathetic to the plaintiffs' position that

19   we need to get this case moving and we need to begin discovery.

20   So as soon as I issue a ruling, I'm going to direct you all to

21   propose a schedule for briefing on the class certification

22   motion promptly so that we can get this case rolling with

23   discovery.

24       Ms. Brown, is there anything else you would like to raise

25   now?

1          MS. BROWN:  No, Your Honor.  I wanted to point out

2     that Mr. Thorp referred to *Bourdais* as the plaintiffs being

3     dismissed.  That case was post-trial.  That case had gone all

4     the way through to trial.  So those plaintiffs were not

5     dismissed.  They went all the way through trial, and the finding

6     in that case again, I believe, was limited to the facts of that

7     application process.

8          Other than that, no, Your Honor.

9          THE COURT:  Okay.  Anything for you, Mr. Thorp?

10         MR. THORP:  No.  I would just note that the parties

11    have cooperated and have exchanged some discovery.

12         THE COURT:  And I appreciate that.  Thank you both.

13         (Proceedings adjourned at 11:46 a.m.)

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7          Please Note:  This hearing occurred during the

8    COVID-19 pandemic and is, therefore, subject to the

9    technological limitations of court reporting remotely.

10

11

12   /s/ Sara A. Wick_____          May 24, 2021_____

13   SIGNATURE OF COURT REPORTER          DATE

14

15

16

17

18

19

20

21

22

23

24

25