UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANDREW J. BRIGIDA, *et al.*,

    *Plaintiffs*,

v.

PETE BUTTIGIEG,[1]
Secretary, U.S. Dep't of Transportation,

    *Defendant*.

No. 16-cv-2227 (DLF)

**MEMORANDUM OPINION**

Plaintiffs Andrew Brigida and Matthew Douglas-Cook, on behalf of themselves and a putative class, assert employment discrimination claims against the Federal Aviation Administration (FAA) under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* (Title VII). Before the Court is the FAA's Motion to Dismiss in Part the Plaintiffs' Fourth Amended Complaint, Dkt. 119. For the reasons that follow, the Court will deny the motion.

**I.   BACKGROUND[2]**

"The FAA's mission is to provide the safest, most efficient aerospace system in the world." Fourth Am. Compl. ¶ 13, Dkt. 114. To help execute this mission, the FAA employs Air Traffic Controller Specialists (ATCS). "ATCSs carry out thousands of air traffic control actions

---

[1] When this suit began, Elaine Chao was the Secretary of Transportation. When Pete Buttigieg became the Secretary, he was automatically substituted as the proper defendant. *See* Fed. R. Civ. P. 25(d).

[2] As required when deciding a Rule 12(b)(6) motion, the facts in this opinion are drawn only from the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015); *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

daily and require significant training to prepare" for a job with zero margin for error. *Id.* ¶ 16. The FAA hires air traffic controllers from multiple sources, including military veterans and members of the general public. *Id.* ¶ 18. Because of the number of controllers needed, the difficulty of the training, and the demands of the role, in 1991, the FAA also established the Air Traffic-Collegiate Training Initiative (AT-CTI or CTI) program, entering into "partnership agreements with colleges, universities, and other schools (collectively, CTI [i]nstitutions) to administer" the AT-CTI program. *Id.* ¶¶ 21–25 (internal quotation marks omitted). According to the plaintiffs, CTI institutions provide students with an air traffic curriculum that includes approximately 200 hours of classroom instruction. *Id.* ¶ 25.

In the years following the program's creation, AT-CTI candidates proved successful, and the FAA "actively encouraged potential applicants to pursue CTI training as the primary means of obtaining employment as an air traffic controller." *Id.* ¶ 27. By 2008, the FAA used a separate hiring process for qualified CTI candidates. *Id.* ¶ 34. Graduates of CTI institutions who were U.S. citizens, received their institution's recommendation, were below a maximum age, *id.* ¶ 35, and who "pass[ed] a validated air traffic aptitude test, known as the Air Traffic Control Selection and Training examination" (AT-SAT), *id.* ¶ 28, were "eligible to apply for CTI-only job postings," *id.* ¶ 35. Those who scored 85 and above on the AT-SAT were classified as "well-qualified," while candidates who scored between 70 and 84.9 were classified as "qualified." *Id.* ¶ 32.

From these three recruitment pipelines—the general public, veterans, and AT-CTI candidates—the FAA "built a substantial inventory of eligible air traffic controller applicants with varying degrees of experience and education." *Id.* ¶ 67. Plaintiffs allege, however, that "CTI Qualified Applicants . . . received hiring preference or were more likely to be hired for

ATCS positions," *id.* ¶¶ 35, 49, and that CTI students were significantly more likely to succeed once hired as a trainee and to ultimately obtain "Certified Professional Controller" status than those hired from the general public, *id.* ¶ 46.

Allegedly in response to outside pressure, *id.* ¶¶ 54–70, over the course of 2012 and 2013, the FAA conducted a "barrier analysis for the ATCS positions," *id.* ¶ 71, to determine whether the existing hiring processes served to discourage hiring minority applicants, *id.* ¶¶ 72–79. Though plaintiffs characterize it as "deeply flawed and outcome-driven," *id.* ¶ 80, the report determined that "African American applicants comprise only 5% of the CTI pool compared to an average of 34% African American representation across the non-CTI applicant sources," *id.* ¶ 79.

In response to this analysis, in 2014, the FAA implemented several changes to its hiring process for air traffic controllers, eliminating CTI-only vacancy announcements, creating a new testing and evaluation process, and ending its consideration of prior applicants in the FAA's inventory of eligible applicants. *See id.* at 2. These changes form the basis of this case.

According to the plaintiffs, they "had legitimate expectations for their hiring after they invested thousands of dollars and years of time to graduate from FAA-partnered academic programs, and pass FAA-designed, peer-validated, and proctored aptitude tests in order to be prequalified for hiring as FAA Air Traffic Control Specialists (ATCS)." *Id.* at 1 (internal quotation marks omitted). Plaintiffs allege that the FAA violated Title VII when it "purged" its "merit-based hiring preference for Qualified Applicants for Air Traffic Controllers with the intent and purpose of benefitting African American Air Traffic Controller applicants and hindering the Class members." *Id.* ¶ 195. The FAA then violated Title VII again when it "implemented" a "Biographical Questionnaire into the 2014 [Air Traffic Controller] hiring process with the intent and purpose of benefitting African American Air Traffic Controller

3

applicants and hindering the Class members." *Id.* ¶ 198.  The plaintiffs claim that in so doing "the FAA refused to accept the outcome of a race-neutral hiring process solely because of the racial makeup of the successful applicants," *id.* ¶ 196, and in its place, created a new "race-motivated hiring scheme," *id.* at 2.

Plaintiffs further allege that to accomplish its objective of limiting the hiring of qualified non-African American CTI candidates, "the FAA intentionally slowed its hiring in 2012 and 2013 in anticipation of abandoning the CTI Qualified Applicant hiring preference." *Id.* ¶ 38. Indeed, according to the plaintiffs, the FAA "issued a CTI-only ATCS job posting in August of 2012" but "no hires were made as a result of that posting." *Id.* ¶ 76.  These actions were taken even though the FAA's "hiring plan required the FAA to hire over 1,000 controllers per year in calendar years 2012, 2013, and 2014." *Id.* ¶ 37.  When the FAA opened the "new general public announcement for the ATCS positions" on February 10, 2014, "[a]pproximately 4,000 CTI graduates took the Biographical Questionnaire" but "less than 14% of them passed."[3]  *Id.* ¶ 115.

Plaintiff Andrew Brigida is a Caucasian male, a resident of Arizona, and an August 2013 graduate of Arizona State University, a CTI institution.  *Id.* ¶¶ 153–54.  Brigida passed the AT-SAT on April 3, 2013 "with the top numerical score possible of 100%." *Id.* ¶ 153.  Following the FAA's changes in the air traffic controller hiring process, he took and failed the newly

---

[3] Though not at issue in this motion, the Plaintiffs allege that the FAA failed to "validate" the Biographical Questionnaire, Fourth Am. Compl. ¶ 117, and that the Biographical Questionnaire awarded points to applicants in a fashion untethered to the qualifications necessary to be an air traffic controller, *id.* ¶¶ 119–20.  For instance, applicants could be awarded fifteen points, the highest possible for any question, if they indicated their lowest grade in high school was in a science class.  *Id.* ¶ 119.  But applicants received only two points if they had a pilot's certificate, and no points at all if they had a Control Tower Operator rating, *id.*, even though historic research data indicated that those criteria had "a positive relationship with ATCS training outcomes," *id.* ¶ 123.  Further, if applicants answered that they had not been employed at all in the prior three years, they received 10 points, the most awarded for that question.  *Id.* ¶ 120.

implemented Biographical Questionnaire in 2014. *Id.* ¶¶ 158, 160. Plaintiff Matthew Douglas-Cook, a Native American male, resident of the State of Washington, and December 2013 graduate of another CTI institution, also took and passed the AT-SAT, recording the top numerical score possible. *Id.* ¶¶ 5, 167–68. He too subsequently failed the Biographical Questionnaire. *Id.* ¶¶ 170–71. Neither Brigida nor Douglas-Cook were hired by the FAA as an air traffic controller. *Id.* ¶¶ 160, 172.

## II.    LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Id.* (internal quotation omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). But the assumption of truth does not apply to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal

quotation marks omitted).  An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

## III.   ANALYSIS

The FAA contends that the plaintiffs have not plausibly alleged that they were either employees or applicants for employment at the time the FAA changed its process for appointing air traffic controllers.  As a result, the FAA argues that the plaintiffs cannot state a claim under Title VII because the FAA cannot be said to have taken any employment action, let alone one that was adverse.  The Court disagrees.  The plaintiffs have plausibly alleged both that they were applicants and that they suffered an adverse employment action.

Title VII requires executive agencies to make "[a]ll personnel actions affecting employees or *applicants for employment* . . . free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a) (emphasis added).  To state a claim under Title VII, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin[.]"  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  The challenged personnel action must entail "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003).

A. Applicant Requirement

Title VII does not define "applicant for employment," but this Court has previously explained that the term "applicant for employment . . . contemplates a person who has filed a written application for a particular position with a government agency, or who has sought to file such an application but has been denied the opportunity." *See Pueschel v. Chao*, 357 F. Supp. 3d 18, 26 (D.D.C. 2018), *aff'd*, 955 F.3d 163 (D.C. Cir. 2020). Because Title VII's "complaint procedure is complex and expensive," courts looks for a "triggering event" that is "concrete and specific" so as to "give[] individuals the power to invoke" its protections. *Id.*; *see also Hockett v. Adm'r of Veterans Affs.*, 385 F. Supp. 1106, 1112 (N.D. Ohio 1974).

The parties disagree over when CTI candidates became "applicants" for purposes of Title VII. The plaintiffs contend they became applicants at the point they took the AT-SAT. *See* Fourth Am. Compl. at 1 (stating plaintiffs had "legitimate expectations for their hiring" after they took and passed the "FAA-designed, peer-validated, and proctored aptitude tests"); Mot. Hr'g Tr. at 20, Dkt. 134[4] ("[O]nce . . . class members took [the AT-SAT], they became applicants."). On the other hand, the FAA argues that the plaintiffs were never applicants because they did not respond to any specific vacancy announcement, *see* Def.'s Reply at 9, Dkt. 121, and the FAA "ha[d] a highly structured process that only consider[ed] those who respond[ed] to specific public vacancy announcements," *id.* at 6.

Although the FAA's position—that CTI candidates were required to respond to an official vacancy announcement before they could be deemed applicants under Title VII, *see id.* at 9—has some appeal, it does not prevail at this stage. As alleged in the complaint, the plaintiffs became applicants for employment with the FAA when they took the AT-SAT, *see*

---

[4] This opinion was updated to include the citations to the final hearing transcript.

7

Fourth Am. Compl. at 1, the "Air Traffic *Selection* and Training Test Battery (AT-SAT)," *id.* ¶ 28 (emphasis added), because the FAA "designed, peer-validated, and proctored" the examination, *id.* at 1, in order to screen out applicants, *see id.* ¶ 32 ("Applicants who scored below 70 were classified as 'not qualified' by the FAA and were not eligible for hire to ATCS positions.").

Other courts in this district have recognized that taking a screening examination, created and scored by an agency for a specific position, can qualify an individual as an applicant for employment under Title VII, even if other steps in the application process remain. *See Hartman v. Gelb*, No. 77-cv-2019, 1992 WL 754646, at *2 n.3 (D.D.C. July 9, 1992) (noting in the context of a Title VII class action that "any woman who *took* the [State Department's Foreign Service] examination qualified as an 'applicant'" even if she did not "survive[] every stage of the hiring process" (emphasis added); *cf. Reynolds v. Sheet Metal Workers Local 102*, 498 F. Supp. 952, 966 (D.D.C. 1980) ("[A]ny applicant who was willing to pursue the rather rudimentary, and at times disagreeable, program afforded preapprentices . . . was clearly interested in the apprenticeship program and sheet metal trade.  There is nothing misleading in classifying those individuals routed into preapprenticeship[s] as applicants.").  Similarly, here, the AT-SAT examination was a prequalifying test designed to screen individuals for a specialized position. *See* Fourth Am. Compl. ¶¶ 28–29, 32.  And individuals who took the AT-SAT did so *solely* to become FAA air traffic controllers.  *See id.* ¶ 28.  The fact that other steps in the process remained did not make the CTI candidates who took the AT-SAT any less applicants than other individuals who took similar prequalifying tests.  *See e.g.*, *Hartman*, 1992 WL 754646, at *2 n.3; *cf. Lewis v. City of Chicago*, 560 U.S. 205, 208–09, 212 (2010) (holding that "the exclusion of

passing applicants who scored below 89 . . . when selecting those who would advance" to future application steps constituted an "employment practice" giving rise to liability under Title VII).

Several aspects of the FAA's past practice also support the plaintiffs' claim that they were applicants. First, the FAA concedes, and the complaint alleges, *see* Fourth Am. Compl. ¶ 52, that the AT-SAT examination was part of the application for individuals who applied through the public vacancy process, *see* Defs.' Mot. at 21; Mot. Hr'g Tr. at 7–8. Accepting the FAA's position, then, would mean that the AT-SAT was merely a preapplication prerequisite for one set of individuals but a critical step in the application process for another set of individuals, even though the FAA used the same test in both circumstances to cull the pool of candidates under consideration for a job as an air traffic controller. And second, the FAA not only designed and administered the AT-SAT, Fourth Am. Compl. ¶ 1, it also spent time and resources tracking CTI candidates' progress in school and their performance on the AT-SAT. As alleged, the FAA kept an inventory of CTI students who passed the AT-SAT, *see id.* ¶ 186, and it ranked them according to their performance, *id.* ¶ 32. The FAA then notified those who were prequalified for an air traffic controller vacancy whenever a CTI-only vacancy became available. *See id.* ¶ 35, 109; Mot. Hr'g Tr. at 26–27. Thus, "the FAA gave [the plaintiffs] reason to believe that [their] application[s] would remain on file for consideration as Controller positions became available." *Yeschick v. Mineta*, 521 F.3d 498, 504–05 (6th Cir. 2008) (holding that plaintiff plausibly alleged he was an "applicant for employment" with the FAA even though he "did not follow up on his application" because, *inter alia*, he reasonably believed that his application would remain on file for consideration as "positions became available").

The FAA's categorical position that the plaintiffs were not Title VII "applicants for

9

employment" because they had not yet responded to an official vacancy announcement, *see* Defs.' Reply at 9, is also undermined by the D.C. Circuit's decision in *Chambers v. Burwell,* 824 F.3d 141 (D.C. Cir. 2016). There, the Circuit cautioned courts against focusing excessively on whether an employer has technically opened a vacancy in determining whether an employee is an applicant for promotion. *Id.* at 144; *cf. Lewis*, 560 U.S. at 212, 214 (suggesting that the protections of Title VII extended to firefighters who took a required employment examination even though no vacancies were open). As the court in *Chambers* explained, an undue focus on an open vacancy announcement would, for instance, permit a "manager [who] regularly requests and receives . . . vacancies that are earmarked for his subordinates" to base "his decision not to engage in that process because of an employee's disability or race." *Chambers*, 824 F.3d. at 145.

Although *Chambers* addressed a Title VII failure to promote—rather than a failure to hire—claim, its reasoning is applicable here, particularly where the complaint plausibly alleges that from August 2012 until February 2014, the FAA stalled the hiring of air traffic controllers. *See* Fourth Am. Compl. ¶¶ 37–38, 76. As the complaint alleges, the FAA delayed hiring even though the air traffic controller "hiring plan *required* the FAA to hire over 1,000 [air traffic] controllers per year in calendar years 2012, 2013, and 2014," *see id.* ¶ 37 (emphasis added); *see also id.* ¶ 38 (alleging that "the FAA slowed and eventually froze the processing and hiring of new ATCS applicants," and it did so "in anticipation of abandoning the CTI Qualified Applicant hiring preference and adopting a new, yet to be determined, hiring process that would favor African Americans"); Pls.' Opp'n at 19 ("[T]here was a backlog of thousands of ATCS position vacancies, but the FAA chose not to hire for them."). In other words, the FAA implemented a highly structured and consistent hiring process, Fourth Am. Compl. ¶¶ 23–35,

that it abandoned solely because of the racial composition of the successful candidate pool, *see id.* at 1–2. That is precisely the kind of "artificial, arbitrary, and unnecessary barrier[] to employment and professional development" that Title VII prohibits. *See Connecticut v. Teal*, 457 U.S. 440, 451 (1982) (internal quotation marks omitted).

In sum, reading the complaint as a whole and crediting all inferences in favor of the plaintiffs, as the Court must at this stage, the plaintiffs have plausibly alleged they were "applicants for employment." The plaintiffs were U.S. citizens who had graduated from CTI schools[5] and passed the AT-SAT.[6] S*ee* Fourth Am. Compl. ¶¶ 153–56, 167–69. They had been tracked by the FAA, *see id.* ¶¶ 32, 186, and were part of the FAA's preapproved inventory of applicants, *see id.* at 2. Neither, however, was able to complete the application process because the FAA declined to open a vacancy and then purged its preapproved list of candidates, allegedly for discriminatory reasons. *Id.* at 1–2. Thus, "unlike the typical employment situation where an individual applies for a particular opening," the plaintiffs were "appli[cants] for Controller positions that could [have] become vacant at any time." *Yeschick*, 521 F.3d at 504–05. Consistent with decisions in this Circuit, and based on the facts alleged in the complaint, the Court must reject the FAA's bright-line vacancy response position. *See Chambers*, 824 F.3d at 144.

---

[5] Brigida graduated in August 2013. Fourth Am. Compl. ¶ 154. Douglas-Cook graduated in December 2013. *Id.* ¶ 168.

[6] Unlike Brigida, Douglas-Cook lacked a favorable recommendation from his CTI school. *Compare* Fourth Am. Compl. ¶ 154, *with id.* ¶ 168. But as the complaint alleges, Douglas-Cook would have received a favorable recommendation but for the FAA's directive to CTI schools to suspend recommendation letters. *See id.* ¶ 168.

B. Adverse Employment Action Requirement

In the alternative, the FAA argues that, because "Title VII protects equal treatment, not preferential treatment," the FAA's decision to withdraw the separate hiring process previously afforded CTI-applicants was not an *adverse* employment action.  See Def.'s Mot. at 1; *Baloch*, 550 F.3d at 1196 (stating that an "essential element[] of a discrimination claim" is that "the plaintiff suffered an adverse employment action").

Here, the complaint alleges more than the mere withdrawal of a preference.  Instead, the allegations describe the FAA's decision to abolish, for allegedly discriminatory purposes, a purportedly race-neutral application process that the FAA designed and implemented and in which the plaintiffs had invested substantial time, energy, and resources at the encouragement of the FAA itself.  See Fourth Am. Compl. at 1–2.  According to the plaintiffs, the FAA purged the plaintiffs' AT-SAT scores and required them to reapply through a new process that, oddly enough, included the cognitive portion of the AT-SAT.  See id. ¶ 106.  This suggests the problem may not have been with the test itself, but "with a particular set of results."  *Cf. Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 95–96 (2d Cir. 2013) (holding at summary judgment that the plaintiff had failed to establish an inference of discrimination where the City did not "discard[]" "the results of a specific test" but instead engaged in a "generalized overhaul of departmental promotional requirements" between hiring rounds).

These allegations mirror those in cases that have found Title VII violations where an application process was redesigned solely to change the racial composition of the successful applicant pool.  See *Ricci v. DeStefano*, 557 U.S. 557, 579–80 (2009).  The Supreme Court has stressed that disparate treatment "occur[s] where an employer has treated a particular person *less favorably* than others because of a protected trait."  *Ricci*, 557 U.S. at 577 (emphasis added and

internal quotation marks omitted). This is because "Title VII . . . reflects the American promise of *equal* opportunity in the workforce." *Figueroa v. Pompeo*, 923 F.3d 1078, 1082–83 (D.C. Cir. 2019) (emphasis added); *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 434 (1971) (explaining that the purpose of Title VII "is to promote hiring on the basis of job qualifications, rather than on the basis of race or color"). The plaintiffs have plausibly alleged, at least at this stage, that they "experience[d] materially adverse consequences affecting . . . future employment opportunities." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).

## CONCLUSION

Because the plaintiffs have plausibly alleged that they were applicants who were subjected to an adverse employment action, the Court denies the FAA's partial motion to dismiss, Dkt. 119. A separate order consistent with this decision accompanies this memorandum opinion.

                                                                                              _____
                                                                                              DABNEY L. FRIEDRICH
                                                                                              United States District Judge

May 12, 2021