# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDREW J. BRIGIDA; MATTHEW L. DOUGLAS-COOK | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) Case No. 16-cv-2227 (DLF) ) |
| PETE BUTTIGIEG, Secretary, U.S. Department of Transportation, | ) ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR CLASS CERTIFICATION

## **TABLE OF CONTENTS**

**Page**

TABLE OF CASES AND OTHER AUTHORITIES.................................................... iii

GLOSSARY ........................................................................................................... viii

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 2

I.      The FAA Implemented a Uniform, Successful Air Traffic
        Collegiate Training Initiative.................................................................... 2

        A.      The FAA's Common Administration of the AT-CTI Program ......... 2

        B.      AT-SAT: A Uniform Pre-Employment Aptitude Test for
                CTI Applicants.................................................................................... 4

        C.      The CTI Program Produced More Successful ATCS Candidates ..... 5

II.     The 2014 ATCS Hiring Change: One Course of
        Discriminatory FAA Conduct..................................................................... 6

        A.      Development of FAA's Common Policy of
                Race-Conscious ATCS Hiring........................................................... 6

        B.      The FAA Strikes Valid Test Results and Proven
                Qualifications; Implements an Unvalidated Biographical
                Screening Instrument ........................................................................ 9

III.    The Named Plaintiffs, This Case, and the Class ........................................ 11

LEGAL STANDARD............................................................................................. 14

ARGUMENT.......................................................................................................... 17

I.      The Proposed Class of CTI Students Satisfies Rule 23(a)............................ 17

        A.      The Over 1,000 Putative Class Members Satisfy
                Numerosity ........................................................................................ 17

        B.      The FAA's Use of the Biographical Questionnaire and
                Common Policy Striking the AT-SAT Satisfy
                Commonality....................................................................................... 18

                1.      Use of the Biographical Questionnaire Satisfies
                        Commonality........................................................................... 19

| | | | |
|---|---|---|---|
| | 2. | The Striking of AT-SAT Scores Satisfies Commonality .......................................... | 21 |
| | 3. | Other Potentially Common Defenses and Sub-Issues............................................. | 22 |
| | 4. | Potential Common Back Pay Elements................................. | 23 |
| C. | | Plaintiffs' Claims are Typical of the Class ......................................... | 31 |
| D. | | The Named Plaintiffs Are Adequate Class Representatives ...................................... | 28 |
| II. | | A Rule 23(b)(2), 23(b)(3), or Hybrid Class is Appropriate ........................ | 30 |
| A. | | Rule 23(b)(2) is Met ......................................... | 30 |
| B. | | A Hybrid Certification, Pursuant to Rule 23(b)(3) or 23(c)(4) is Warranted........................ | 31 |
| | 1. | Common Questions Predominate .......................... | 32 |
| | 2. | Bifurcation of the Case May be Considered in the Predominance Analysis .......................... | 36 |
| | 3. | Class Action is the Superior Method of Adjudication........................................ | 39 |
| | 4. | Certification of an Issues Class is Appropriate Under Rule 23(c)(4)............................... | 41 |
| | | CONCLUSION........................................................... | 42 |

## TABLE OF CASES AND OTHER AUTHORITIES

**CASE**                                                                                          **Page**

*Aliotta v. Gruenberg*,
    237 F.R.D. 4 (D.D.C. 2006) ..............................................................                42

*Alvarez v. Keystone Plus Constr. Corp.*,
    303 F.R.D. 152 (D.D.C. 2014) .........................................................                17, 18

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997) .........................................................................                40

*Amgen Inc. v. Conn. Retirement Plans and Trust Funds*,
    568 U.S. 455 (2013) .........................................................................                16

*Am. Nat. Red. Cross v. Travelers Indem. Co. of R.I.*,
    924 F. Supp. 304 (D.D.C. 1996)......................................................                17

*Athridge v. Aetna Cas. & Sur. Co.*,
    604 F.3d 625 (D.C. Cir. 2010)........................................................                17

*Baloch v. Kempthorne*,
    550 F.3d 1191 (D.C. Cir. 2008).....................................................                16

*Barbour v. Merrill*,
    48 F.3d 1270 (D.C. Cir. 1995).......................................................                23

*Berger v. Iron Workers Reinforced Rodmen, Loc. 201*,
    170 F.3d 1111 (D.C. Cir. 1999).....................................................                17

*\*Bynum v. District of Columbia*,
    214 F.R.D. 27 (D.D.C. 2003) .........................................................                27, 39

*Bynum v. District of Columbia*,
    217 F.R.D. 43 (D.D.C. 2003) .........................................................                27, 31, 40

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) .........................................................................                14

*\*Coleman through Bunn v. District of Columbia*,
    306 F.R.D. 68 (D.D.C. 2015) .........................................................                18, 27, 39

*DL v. District of Columbia*,
    277 F.R.D. 38 (D.D.C. 2011) .........................................................                30

*DL v. District of Columbia,*
302 F.R.D. 1 (D.D.C. 2013) ................................................................. 15, 18

*DL v. District of Columbia,*
713 F.3d 120 (D.C. Cir. 2013)............................................................. 19, 26

*Easterling v. Conn. Dept. of Correction,*
265 F.R.D. 45 (D. Conn. 2010) ........................................................... 20, 33

*\*Easterling v. Conn. Dept. of Correction,*
278 F.R.D. 41 (D. Conn. 2011) ....................................................... 24, 31, 34

*Encinas v. J.J. Drywall Corp.,*
265 F.R.D. 3 (D.D.C. 2010) ...................................................................... 26

*Eubanks v. Billington,*
110 F.3d 87 (D.C. Cir. 1997)..................................................................... 30

*Ford Motor Co. v. EEOC,*
458 U.S. 219 (1982) .................................................................................. 23

*Franklin v. City of Chicago,*
102 F.R.D. 944 (N.D. Ill. 1984) ................................................................ 20

*\*General Telephone Co. of Sw. v. Falcon,*
457 U.S. 147 (1982) ........................................................................... 14, 18, 19

*Hardy v. District of Columbia,*
283 F.R.D. 20 (D.D.C. 2012) .................................................................... 32

*Hartman v. Duffy,*
158 F.R.D. 525 (D.D.C. 1994) .................................................................. 27

*Hartman v. Duffy,*
19 F.3d 1459 (D.C. Cir. 1994)................................................................... 31

*Hill v. Western Electric Co.,*
672 F.2d 381 (4th Cir.1982) ...................................................................... 37

*Houser v. Pritzker,*
28 F. Supp. 3d 222 (S.D.N.Y. 2014) ..................................................... 38, 42

*Hoyte v. District of Columbia,*
325 F.R.D. 485 (D.D.C. 2017) ........................................................... 18, 25, 32

*\*In re Johnson,*
760 F.3d 66 (D.C. Cir. 2014).............................................................. *Passim*

*In re Lorazepam & Clorazepate Antitrust Litig.*,
　202 F.R.D. 12 (D.D.C. 2001) ............................................................... 26

*In re McCormick & Co., Inc., Pepper Prods. Marketing and Sales Pract. Litig.*,
　422 F. Supp. 3d 194 (D.D.C. 2019) ...................................................... 15

*In re Vitamins Antitrust Litig.*,
　209 F.R.D. 251 (D.D.C. 2002) ............................................................. 25

*\*Int'l Brotherhood of Teamsters v. United States*,
　431 U.S. 324 (1977) ................................................................... Passim

*J.D. v. Azar*,
　925 F.3d 1291 (D.C. Cir. 2019) ............................................................ 15

*Jarvaise v. Rand Corp.*,
　212 F.R.D. 1 (D.D.C. 2002) ................................................................. 41

*Jean-Baptiste v. District of Columbia*,
　958 F. Supp. 2d 37 (D.D.C. 2013) ....................................................... 23

*Johnson v. District of Columbia*,
　248 F.R.D. 46 (D.D.C. 2008) ............................................................... 39

*\*Little v. WMATA*,
　249 F. Supp. 3d 394 (D.D.C. 2017) .............................................. Passim

*McCarthy v. Kleindienst*,
　741 F.2d 1406 (D.C. Cir. 1984) ..................................................... 14, 32, 37

*McDonnell Douglas Corp. v. Green*,
　411 U.S. 792 (1973) ............................................................................ 16

*McKinney v. U.S. Postal Serv.*,
　292 F.R.D. 62 (D.D.C. 2013) ............................................................... 40

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith*,
　672 F.3d 482 (7th Cir. 2012) ............................................................... 26

*McReynolds v. Sodexho Marriott Services, Inc.*,
　208 F.R.D. 428 (D.D.C. 2002) ....................................................... 28, 31

*Moore v. Napolitano*,
　926 F. Supp. 2d 8 (D.D.C. 2013) .................................................. 21, 26, 37

*Pigford v. Glickman*,
　182 F.R.D. 341 (D.D.C. 1998) ............................................................. 17

*Ricci v. DeStefano,*
    557 U.S. 557 (2009) ......................................................... 13, 21

Robinson v. Metro-North Commuter RR Co.,
    267 F.3d 147 (2d Cir. 2001) ............................................. 23, 33

Samuel v. University of Pittsburgh,
    538 F.2d 991 (3d Cir.1976) ............................................... 37

Segar v. Smith,
    738 F.2d 1249 (D.C. Cir. 1984).......................................... 32, 34

Taylor v. District of Columbia Water & Sewer Auth.,
    241 F.R.D. 33 (D.D.C. 2007) ............................................ 30, 31

TransUnion LLC v. Ramirez,
    594 U.S. __, 141 S.Ct. 2190 (2021) ................................... 31

Tyson Foods, Inc. v. Bouaphakeo,
    577 U.S. 442 (2016) ......................................................... Passim

United States v. City of New York,
    276 F.R.D. 22 (E.D.N.Y. 2011).......................................... 19, 23, 24, 34

Vichare v. AMBAC Inc.,
    106 F.3d 457 (2d Cir. 1996) ............................................. 17

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ......................................................... Passim

Wells v. Allstate Ins. Co.,
    210 F.R.D. 1 (D.D.C. 2002) .............................................. 39

STATUTES

42 U.S.C. §2000e ................................................................... 16

RULES

Fed. R. Civ. P. 23 .................................................................. Passim

Fed. R. Civ. P. 23(a) ............................................................. 14, 18, 28

Fed. R. Civ. P. 23(a)(1)-(4).................................................... 14

Fed. R. Civ. P. 23(a)(4).......................................................... 28

Fed. R. Civ. P. 23(b) ............................................................. 14

Fed. R. Civ. P. 23(b)(3)(A)-(D) ................................................................. 15

Fed. R. Civ. P. 23(c)(4) ............................................................................. 15, 31, 41

Fed. R. Civ. P. 23(c)(4)(A) ....................................................................... 31

Fed. R. Civ. P. 23(c)(5) ............................................................................. 15

Fed. R. Civ. P. 42(b) ................................................................................. 16

**OTHER AUTHORITIES**

7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure
§ 1778 pp 123–124 (3d ed. 2005)............................................................ 32

Law—Class Actions,
89 HARV. L.R. 1318 (1976) ..................................................................... 37

5 J. Moore *et al.*, Moore's Federal Practice § 23.23 (3d ed.2011) ........................... 18

William B. Rubenstein, *1 Newberg on Class Actions* (5th ed. 2021)...................... 15

William B. Rubenstein, *2 Newberg on Class Actions* (5th ed. 2012)...................... 20, 32

William B. Rubenstein, *4 Newberg on Class Actions* (5th ed. 2014)...................... 27, 33

Richard Nagareda, *Class Certification in the Age of Aggregate Proof*,
84 N.Y.U. L. REV. 97 (2009) .................................................................. 22

## **ABBREVIATIONS**

| | |
|---|---|
| ATC | Air Traffic Controller |
| ATCS | Air Traffic Control Specialist |
| AT-CTI | Air Traffic – College Training Initiative |
| AT-CTI FAQs | AT-CTI Program Overview & FAQs |
| AT-SAT | Air Traffic –Selection and Training Examination |
| AT-SAT SOPs | Standard Operating Procedures |
| BA | Barrier Analysis |
| BQ | Biographical Questionnaire |
| CPC | Certified Professional Controller |
| CTI | College Training Initiative |
| CAMI | Civil Aeronautical Medical Institute |
| FAA | Federal Aviation Administration |
| HR | Human Resources department |
| NBCFAE | National Black Coalition of Federal Aviation Employees |
| OCR | Office of Civil Rights |
| SOP | Standard Operating Procedures |

**INTRODUCTION**

Over 1,000 individuals attended a Federal Aviation Administration ("FAA")-designed college program for training air traffic controllers, and passed an FAA pre-employment aptitude test, but had their career hopes shattered when the FAA purged their successful test results to subject them to a racially motivated biographical screening mechanism, which they "failed." Plaintiffs Andrew Brigida and Matthew Douglas-Cook, victims of the FAA's racial prejudice, bring this action pursuant to Title VII, and seek to represent the Class of similarly situated 2014 applicants.  Plaintiffs further propose that this case be bifurcated, with issues of liability, and injunctive and declaratory relief addressed in phase one.  Other common remedial issues, such as common elements of back pay, would be addressed in the second phase.  The parties and the Court could then determine how to resolve any individual issues that may remain, whether through a claims process, subclasses, *Teamsters*[1] hearings, or otherwise.

The putative Class satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, and class treatment is appropriate.  First, the Rule 23(a)(1) numerosity requirement is not disputed.  Second, questions of law and fact are common to the Class as required by Rule 23(a)(2)—namely, the intent behind and the legality of the FAA striking Plaintiffs' employment test results to change the racial balance of air traffic controllers, the intent motivating and the legality of a Biographical Questionnaire that the FAA used to disqualify Plaintiffs from hiring consideration, and appropriate remedies.  Third, Plaintiffs' claims are typical of the Class per Rule 23(a)(3) since they are based on the same Title VII legal theory and their injuries arose from the FAA's common discriminatory conduct. Fourth, Plaintiffs have and will vigorously represent the

---

[1] *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 361 (1977).

1

Class, including through qualified Class Counsel, satisfying Rule 23(a)(4).  Further, the Class seeks appropriate common injunctive and declaratory relief, warranting class treatment pursuant to Rule 23(b)(2).  Additionally, common questions of whether the FAA intentionally discriminated based on race, and potential common questions related to the FAA's defenses and/or calculations of back pay, predominate over any individual issues; and class treatment is superior to litigating hundreds of identical cases meriting certification under Rule 23(b)(3) or 23(c)(4).  These common facts, common questions, common legal theories, and common equitable relief place this case squarely within the strata of cases class proceedings were designed to facilitate.

## BACKGROUND

All members of the proposed Class: (1) participated in the FAA-partnered Air Traffic-Collegiate Training Initiative ("AT-CTI" or "CTI"); (2) met the FAA's pre-qualification requirements for air traffic control specialist ("ATCS") applicants; (3) had their pre-employment test results eliminated from consideration; (4) failed a new biographical employment screening test; and (5) have never been offered employment for an ATCS position.  They were similarly situated and suffered the same harm, at the same time, for the same reasons.

## I.  The FAA Implemented a Uniform, Successful Air Traffic Collegiate Training Initiative

### A.  The FAA's Common Administration of the AT-CTI Program

In the late 1980s and early 1990s the FAA began investigating ways to produce more qualified air traffic controller candidates.  *See* History of the AT-CTI Program 1991-2016 ("CTI History"), Ex. 1 at 5–6.  The FAA eventually outlined an initiative through which it would partner with selected colleges ("CTI Institutions") to produce skilled applicants who come to the FAA prepared to pass the required tests and screens.  *See* CTI History, Ex. 1 at 6.

Colleges had to apply to the FAA to become CTI Institutions and to meet FAA standards to remain in the CTI program.  *See id.* at 25–26; AT-CTI Program Overview & FAQs, ("AT-CTI FAQs"), Ex. 2 at 1, 5, 43.  The FAA administered the CTI program with standard operating procedures ("SOP") and other common memoranda, analyses, and documentation.  *See* CTI History, Ex. 1 at 11, 13, 25–26.  For example, each CTI Institution entered into a partnership agreement with the FAA which lists several common responsibilities that the FAA owes to the CTI Institutions and students, such as providing access to CTI-related technical documents, CTI curriculum materials and lesson plans, technical support, diagnostic testing materials, regular communication, and consideration of CTI graduates for employment.  *See* AT-CTI FAQs, Ex. 2 at 9–10.  Other CTI-specific SOPs include the Human Resources Operating Instruction: Air Traffic Collegiate Training Initiative Standard Operating Procedures, which implemented uniform procedures for the CTI program.  *See id.* at 13–19.  In addition, the FAA published Standard Operating Procedures for Submitting Student Information for AT-SAT ("AT-SAT SOPs"), which discussed how to collect, manage, and provide a list that "contains those students who have declared that they are interested in applying for a job as an air traffic controller after graduation and are enrolled in a FAA approved degree program."  Ex. 3.  All CTI students, regardless of which CTI Institution they attended, were required to take and pass these FAA-mandated courses to complete the CTI program.  *See* AT-CTI FAQs, Ex. 2 at 10–11, 15.

Although the CTI program was dispersed among the qualifying schools, it was always a single program.  For instance, in 2012, when looking at the ATCS new hire training performance, the FAA evaluated training performance by hiring source—with one source being CTI, as an aggregated whole.  *See* FAA New Hire Training Performance Semi-Annual Report ("New Hire Training Report"), Ex. 4.  In 2013, when studying the utility of its pre-employment aptitude test,

the FAA specifically reported on the test's utility in the context of the CTI program. *See* The Utility of the AT-SAT Test Battery in Hiring Graduates of an AT-CTI Program ("2013 AT-SAT Utility"), Ex. 5. And ultimately, in the 2012–2013 timeframe, while FAA officials were laying the groundwork to discriminate by race in hiring ATCSs, the FAA condemned the CTI program as a whole. *See* Excerpt of Barrier Analysis of the Air Traffic Control Specialist Centralized Hiring Process ("Barrier Analysis"), Ex. 6 at 16–17, 32–33; Excerpt of Extension to Barrier Analysis of the Air Traffic Control Specialist Centralized Hiring Process ("Extension to Barrier Analysis"), Ex. 7 at 5, 22–27.

**B.     AT-SAT: A Uniform Pre-Employment Aptitude Test for CTI Applicants**

By approximately 2005, one required qualification for CTI air traffic controller applicants was passing the FAA's pre-employment screening aptitude test, the Air Traffic Selection and Training Exam ("AT-SAT"). *See* AT-CTI FAQs, Ex. 2 at 10, 15; 2013 AT-SAT Utility, Ex. 5 at 1; The Validity of the AT-SAT Test Battery in Operational Use ("2013 AT-SAT Validation"), Ex. 8 at 1 (CTI and general public applicants must pass AT-SAT).

The FAA developed and validated the AT-SAT through extensive testing and analysis, then began using the AT-SAT as the primary testing instrument for ATCS applicants around 2002. *See* CTI History, Ex. 1 at 17; 2013 AT-SAT Validation, Ex. 8 at 1; Operational Use of the AT-SAT Battery, Ex. 9 at 1–3. The AT-SAT was revalidated again in 2006 and 2013. *See* 2013 AT-SAT Validation, Ex. 8 at 1, 6. An applicant scoring 70 or above met the FAA's AT-SAT requirement; applicants scoring below 70 were not qualified. *See* AT-CTI FAQs, Ex. 2 at 15 ¶ 6.b.

CTI students were permitted to take the AT-SAT once they were within a year of graduating from a CTI institution. *See* AT-SAT SOPs, Ex. 3 at 1. Their AT-SAT scores remained valid for three years from their graduation date and could then be renewed for a year. *See* AT-CTI

4

FAQs, Ex. 2 at 13, 15, 17.  Further, the FAA maintained an inventory of CTI students, tracking their birthdates, progression to graduation, AT-SAT scores, and other data.  *See* R. Mitchell Decl., Ex. 10 ¶¶ 9–11, 14.  The FAA used this inventory to provide pre-qualified CTI graduates with job codes so that they could complete their employment applications.  *Id.* ¶ 24.  In contrast, applicants from the general public were not permitted to take the AT-SAT until they had applied for a specific ATCS vacancy announcement and cleared preliminary qualifications.  *See* Extension to Barrier Analysis, Ex. 7 at 12.

### C.   The CTI Program Produced More Successful ATCS Candidates

As a result of their training, aptitude, and commitment, CTI graduates were more likely to be hired than general public applicants.  CTI students were more likely to pass the AT-SAT and to get a higher score than general public applicants.  *See* 2013 AT-SAT Utility, Ex. 5 at i, 8.  Not surprisingly, CTI graduates advanced to FAA hiring selection panels at much higher rates than general public applicants.  *See* Extension to Barrier Analysis, Ex. 7 at 38.  Indeed, field trainers expressed preference for CTI graduates over general public hires.  *See* FAA Independent Review Panel on the Selection, Assignment and Training of Air Traffic Control Specialists, Ex. 11 at 16. In 2013, the FAA reported that CTI applicants were more likely to be hired than general public applicants.  *See* 2013 AT-SAT Utility, Ex. 5 at 8 (for example, 1,084 of 1,424 well-qualified CTI applicants selected versus 2,531 of 6,887 well-qualified general public applicants selected).

Once hired, CTI graduates were more likely to be successful than general public hires. All ATCS hires attended the same FAA Academy in Oklahoma.  *See* CTI History, Ex. 2 at 4, 17–19; A Plan for the Future: 10-Year Strategy for the Air Traffic Control Workforce 2013-2022, Ex. 12 at 47.  If a controller candidate successfully completed the Academy, he/she would be placed at a field facility as a "developmental" controller to complete additional training.  *Id.*  If a controller

completed the developmental stage, he/she became a Certified Professional Controller ("CPC").
*See* Ex. 12 at 49; New Hire Training Report, Ex. 4 at 1–5, 15.  CTI students achieved CPC status
at a rate "more than 50% greater" than general public applicants.  *See* CPC Analysis: Success of
CTI New Hires Compared to All Hiring Sources ("CTI Success"), Ex. 13 at 1.  For example, of
hires made in FY 2006, 84.57% of CTI graduates obtained CPC status, compared to only 44.68%
of general public hires.  *Id.* at 2.  The CTI graduates also obtained CPC status sooner than general
public hires and did so while being assigned to more complex facilities.  *Id.* at 2, 26; *see also* New
Hire Training Report, Ex. 4 at 15.  CTI graduates, therefore, became the primary hiring source for
ATCS candidates.  *See* 2013 AT-SAT Utility, Ex. 5 at 1.

## II.      The 2014 ATCS Hiring Change: One Course of Discriminatory FAA Conduct

From approximately 2008 through 2013, the FAA had three common hiring sources for
ATCS, each with separate hiring paths: CTI graduates, military veterans with aviation experience,
and the general public.  *See* New Hire Training Report, Ex. 4 at 4–5.  In the background, however,
special interest groups and certain FAA factions lobbied for race-conscious hiring.  *See* FAA Task
Force, A Business Case and Strategic Plan to Address Under-Representation of Minorities,
Women, and People with Targeted Disabilities ("2000 Task Force Business Case"), Ex. 14 at 14,
43–44.  Eventually, these groups' influence and other political considerations caused the FAA to
lay the groundwork for dismantling CTI hiring.  These groups and the contractors they retained
asserted that CTI hiring was a barrier to African American employment.  Like the construction
and administration of the CTI program, the attacks on the CTI program did not distinguish between
schools or degrees.

### A.      Development of FAA's Common Policy of Race-Conscious ATCS Hiring

For years special interest groups such as the National Black Coalition of Federal Aviation
Employees ("NBCFAE") criticized the results of the CTI program and lobbied the FAA to alter

hiring practices to benefit African Americans.  This effort began as early as July 2000, when an FAA National Employee's Forum Task Force published an analysis of purported racial under-representation within the agency, and specifically critiqued the racial and gender results of CTI hiring.  *See* 2000 Task Force Business Case, Ex. 14 at 33–34.  The Task Force provided several recommendations, including conducting an audit to identify barriers to diversity.  *Id.* at 32, 54–55. The Task Force consisted of three members, including one from the Council of African American Employees, and one from the NBCFAE, an individual named Mamie Mallory.  *Id.* at 1.

The political pressure to change FAA hiring to incorporate race-based considerations increased and started gaining traction.  In 2009, NBCFAE sent letters to the FAA Administrator and the Secretary of Transportation, claiming that the FAA engaged in disparate treatment of African Americans.  *See* NBCFAE Talking Points, Ex. 15 at 1.  Indeed, the NBCFAE had sent several letters to the FAA concerning the alleged "disparate treatment and under-representation" of African Americans within the agency.  *Id.* at 1.  By 2010, the NBCFAE specifically budgeted for its effort to change FAA hiring and was in the process of "building a coalition of supporters from entities, outside the FAA, that possess the power to influence the FAA…."  *Id.* at 3.  NBCFAE formed a "Team 7," consisting of senior NBCFAE officers who had already met with officials in the FAA's Office of Civil Rights ("OCR"), Human Resources department ("HR"), and legal offices.  *Id.* at 2.

In early 2012, the FAA issued a report indicating that CTI candidates were hired with greater success than general public applicants.  *See* CTI Success, Ex. 13 at 1–2.  Shortly thereafter, members of Team 7 met with the Secretary of Transportation, the FAA Administrator, and other senior FAA leaders.  *See* Rainbow Push-NBCFAE Meeting Agenda, Ex. 16.  One of these senior leaders was the FAA's Acting Administrator for Civil Rights, Ms. Mallory, the author of the 2000

Task Force Business Case referred to above, and who at that time was associated with NBCFAE. *See* Apr. 17, 2012, M. Huerta Agenda, Ex. 17 at 2; *see* 2000 Task Force Business Case, Ex. 14 at 1. The FAA Administrator tasked the FAA OCR, led by Ms. Mallory, to conduct barrier analyses of the ATCS position—one of the highest-paid positions within the FAA. *See* Test. of T. Bristol and R. Cannon Before the Comm. on Transp. and Infrastructure, on Aviation, on a Review of the FAA's Air Traffic Controller Hiring, Staffing and Training Plans ("Bristol-Cannon Test."), Ex. 18 at 2; FAA Statement on the Barrier Analysis of the ATCS Centralized Hiring Process ("FAA Statement on the Barrier Analysis"), Ex. 19.

Barrier analyses were conducted and revised by third-party contractors managed by the FAA OCR between 2012 and 2013. *See* FAA Statement on the Barrier Analysis, Ex. 19; Presentation: Extension to Barrier Analysis of ATC Centralized Hiring Process ("BA Presentation"), Ex. 20 at 3, 18. The analysis reports condemned the CTI program as a cause for racial disparities in ATCS hiring. *See* Barrier Analysis, Ex. 6 at 16–17, 32–33; Extension to Barrier Analysis, Ex. 7 at 5, 22–27. As part of its report, the Barrier Analysis recommended considering "non-cognitive" measures ahead of the AT-SAT score to "maximize[] diversity." Ex. 6 at 23–24.

The FAA engaged another contractor, APTMetrics, in December 2012 to "conduct a detailed root cause analysis of the identified barriers [to ATCS hiring] and establish the foundation for corrective interventions." *See* Extension to Barrier Analysis, Ex. 7 at 3. APTMetrics' report, issued in early 2013, again blamed the CTI program for racial imbalances in ATCS hiring, *id.* at 4–5, 22–27, and recommended consideration and use of qualifications "based on background and experience dimensions (and other factors)," biographical data, to "differentiate between" minimally qualified candidates. *Id.* at 53, 52.

B.       **The FAA Strikes Valid Test Results and Proven Qualifications; Implements an Unvalidated Biographical Screening Instrument**

Within approximately one month of receiving the APTMetrics report and final barrier analysis, an Executive Steering Committee—including representatives of the FAA OCR and HR—had been created to oversee a new ATCS hiring process.  *See* FAA Statement on the Barrier Analysis, Ex. 19; R. Coates Decl., Ex. 21 ¶¶ 5–6.  A few weeks later, an OCR and HR presentation stated "[c]orrective actions" may include considering race/national origin and gender diversity a high priority when determining applicant sources and revising or replacing the AT-SAT.  *See* BA Presentation, Ex.20 at 14, 16.

In September 2013, APTMetrics was awarded a new contract to develop recommended changes to ATCS hiring.  *See* Def.'s Answer to Fourth Am. Compl. ("Answer"), ECF No. 133 ¶ 93.  In contrast to the years of study and validation associated with the AT-SAT test, APTMetrics provided their recommendations that same month.  *Id.*  In late October 2013, APTMetrics's recommendations were presented to the Executive Steering Committee, which immediately adopted the recommendation to incorporate a Biographical Questionnaire into the next ATCS vacancy announcement.  *Id.* ¶ 94.

In anticipation of using the Biographical Questionnaire to increase African American hiring, the FAA uniformly purged the AT-SAT scores and pre-qualified status of all CTI applicants in the ATCS pipeline.  *See* CTI History, Ex. 1 at 28.  In a December 30, 2013, e-mail to the CTI Institutions, the FAA laid out the framework for the new ATCS hiring process: "[a] nationwide competitive FG-01 vacancy announcement open to all U.S. Citizens will be issued in February 2014.  Any individual desiring consideration for employment (including CTI graduates) MUST

apply. Existing inventories of past applicants will not be used." J. Teixeira Email to CTI Institutions ("Teixeira Email"), Ex. 22 at 2.

The FAA introduced the Biographical Questionnaire to the CTI Institutions, informing them that changes were made "[a]s a result of the [barrier] analysis." *Id*. "The revised testing process is comprised of a biographical questionnaire (completed as part of the application process) and the cognitive portion of the AT-SAT. The cognitive portion of the AT-SAT will be administered only to those who meet the qualification standards and pass the biographical questionnaire." *Id*. The FAA claimed defensively that "[t]hese improvements to the ATC hiring process … offer our candidates a fair and viable opportunity to demonstrate their capabilities and potential for the ATC position." *Id*. Over 2,000 CTI graduates had passed the AT-SAT and met the FAA's pre-qualifications by late 2013 or early 2014, when the FAA flipped a switch and eliminated their test results from consideration. Over 1,000 of those meet the definition for the proposed Class. *See* P. White Dep. Tr. 43:16–19, Ex. 23.

On February 10, 2014, the FAA opened a new "all sources" ATCS vacancy announcement. *See* Bristol-Cannon Test., Ex. 17 at 3; 2014 Vacancy Announcement, Ex. 27. The Biographical Questionnaire that the FAA had designed, weighted, and programmed into its application process in a matter of months was built into the 2014 application process to screen out a large proportion of applicants. *See* J. Scott (APTMetrics) Nov. 2013 Email, Ex. 24 (Biographical Questionnaire was projected to screen out 70% of candidates). The Biographical Questionnaire covered an assorted range of topics like self-professed learning styles, self-evaluations of what others would say about the applicant, number of times unemployed and the length of time unemployed, sports played, and relative performance among school subjects, in addition to expected topics like the possession of aviation experience, etc. *See* Biographical Questionnaire, Ex. 25. Various questions

10

on the Biographical Questionnaire were weighted differently, and the weighting of at least some of the questions appears to systematically favor African American applicants. *See* Jan. 17, 2014, Documentation for Aviator Change to Add 2152 All Sources Proficiency QN, Ex. 26 at 8–24; https://www.nationsreportcard.gov/ndecore/xplore/nde (last visited Sept. 3, 2021) (Science, Grade 12, 2019, National Average scale score for Black students lower than any other race).

On February 21, 2014, the 2014 ATC vacancy announcement closed. *See* 2014 Vacancy Announcement, Ex. 27. Shortly thereafter every member of the proposed Class was notified that they "failed" the Biographical Questionnaire and would no longer be considered for employment as an ATCS, despite their prior pre-qualified status.[2] *Compare* Compl., ECF No. 114 ¶¶ 160, 171 *with* Answer, ECF No. 133 ¶¶ 160, 171. Approximately 4,000 CTI students took the Biographical Questionnaire, but less than 14% of them "passed." *Id.* ¶ 115. In other words, over 85% of applicants with CTI training "failed" the Biographical Questionnaire.

### III. The Named Plaintiffs, This Case, and the Class

Each of the proposed named Plaintiffs meets the Class definition, suffered the same harm as other Class members, and is willing and able to represent the proposed Class. Messrs. Brigida and Douglas-Cook have been actively involved in the pursuit of this litigation, communicating with counsel, attending proceedings, providing documentation, and providing declarations. *See* A. Brigida Decl., Ex. 28 ¶¶ 10–11; M. Douglas-Cook Decl., Ex. 29 ¶¶ 11–12. Each is ready,

---

[2] As set forth in the complaint, the FAA incorporated other questionable and seemingly unstudied changes into the 2014 hiring process, such as changing how candidates identified a geographic preference and eliminating selection panels. Compl., ECF No. 114 ¶¶ 86–101. In the interest of brevity and because Plaintiffs have adequately alleged their prima facie case for purposes of this class certification motion, Plaintiffs do not engage in an extensive discussion of the additional evidence that will be presented on the merits.

willing, and able to represent the proposed Class.  A. Brigida Decl., Ex. 28 ¶¶ 12–13; M. Douglas-Cook Decl., Ex. 29 ¶¶ 13–14.

In 2013, Andrew Brigida graduated from a CTI Institution, passed the AT-SAT, and received a recommendation.  A. Brigida Decl., Ex. 28 ¶¶ 5–6.  Mr. Brigida was a U.S. citizen, not African American, and not yet 31 years of age during the events at issue.  *Id.* at ¶ 2.  Mr. Brigida applied to the 2014 FAA all sources ATCS vacancy announcement, "failed" the Biographical Questionnaire and was never offered employment as an ATCS.  *Id.* at ¶¶ 7–9; Answer, ECF No. 133 ¶¶ 160, 166.  Mr. Brigida retained counsel and followed the required administrative process to pursue the employment discrimination claims before this Court.  *See* Brigida EEO Compl. (without exhibits), Ex. 30.  Mr. Brigida was also active in organizing a student response and opposition to the FAA's 2014 hiring changes.  A. Brigida Email to V. Latham, Ex. 31.

Matthew Douglas-Cook also graduated from a CTI Institution in 2013, passed the AT-SAT, and was eligible for and would have received a recommendation but for the fact that the FAA stopped soliciting recommendations in anticipation of the 2014 hiring changes.  M. Douglas-Cook Decl., Ex. 29 ¶¶ 5–7.  Mr. Douglas-Cook was a U.S. Citizen, not African American, and not yet 31 years of age during the relevant time period.  *Id.* at ¶ 2.  Mr. Douglas-Cook applied to the 2014 FAA all sources ATCS vacancy announcement, "failed" the Biographical Questionnaire, and has never been offered employment as an ATCS.  *Id.* at 8–10; Answer, ECF No. 133 ¶¶ 171–72.

This case was originally filed in December 2015.  ECF No. 1.  The operative pleading, the Fourth Amended Complaint, elaborates on the facts above and asserts claims for intentional race discrimination in violation of Title VII.  Fourth Am. Compl. ("Compl.") ECF No. 114 ¶¶ 13–172; 193–208.  Plaintiffs contend that the FAA's purging of Class members' valid AT-SAT test results to change the racial mix of applicants advancing in employment screening was the type of conduct

12

the Supreme Court found to be illegal in *Ricci v. DeStefano*. 557 U.S. 557, 579 (2009) ("Without

some other justification, this express, race-based decisionmaking violates Title VII's command

that employers cannot take adverse employment actions because of an individual's race.").

Plaintiffs further contend that the FAA's use and design of the invalid Biographical Questionnaire

was racially motivated.  Compl., ECF No. 114 ¶ 198.  Plaintiffs seek a declaration that the FAA

violated Title VII, as well as injunctive relief to prevent further discriminatory conduct.

Additionally, Plaintiffs seek injunctive relief to instate or otherwise provide hiring options to the

Class, equitable relief in the form of back and front pay, and other compensation.  *Id.* at 41–42.

> Plaintiffs request certification of a Class of the non-African American CTI graduates who:

>> (1) by February 10, 2014: (a) graduated from a CTI program at one
>> of the 36 FAA-partnered CTI Institutions between 2009-2013 and
>> (b) passed the AT-SAT; (2) applied to be an ATCS trainee through
>> the 2014 all sources vacancy announcement but failed the
>> Biographical Questionnaire that was incorporated into the 2014
>> ATCS hiring process and was therefore not hired; and (3) have never
>> been offered employment as an FAA ATCS.

*Id.* ¶ 173.  Excluded from the Class are CTI graduates: (a) who were not U.S. citizens as of

February 10, 2014; (b) who by February 21, 2014 had reached 31 years of age (or 35 if they had

52 consecutive weeks of prior air traffic control experience); (c) whose academic records as of

February 21, 2014 explicitly stated that they were ineligible to receive a letter of recommendation

from their CTI school; or (d) whose AT-SAT scores had expired as of February 21, 2014.  *Id*.

> Further, Plaintiffs request that the Court bifurcate the issues in this case.  Plaintiffs request

that the first phase of class proceedings address the questions of liability, injunctive relief, and

declaratory relief.  This phase would also address any common defenses asserted by the FAA, such

as whether various class members were "applicants" before responding to the 2014 vacancy

announcement and whether the FAA had a legitimate non-discriminatory reason for changing the

hiring process.  Plaintiffs propose that if liability is found, a second class phase be used to resolve common questions of monetary relief such as the availability of and variables affecting back pay. This phase could address any common defenses to payment of compensation, such as the FAA's suggestion that failure to apply to later ATCS vacancy announcements is a failure to mitigate damages.  Any remaining individualized issues affecting a Class member's recovery could later be resolved through sub-classes, claims procedures, *Teamsters* hearings, or other mechanisms.

## LEGAL STANDARD

"[A] principal purpose of the class-action mechanism is to advance the efficiency and economy of multi-party litigation."  *McCarthy v. Kleindienst*, 741 F.2d 1406, 1410 (D.C. Cir. 1984).  Class treatment is "'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'"  *General Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 693 (1979)).

A lawsuit may proceed as a class action if all the requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b) are met; Plaintiffs seek certification under both 23(b)(2) and 23(b)(3).  Fed. R. Civ. P. 23(a)–(b).  Rule 23(a)'s requirements are often stated as numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a)(1)–(4); *In re Johnson*, 760 F.3d 66, 70 (D.C. Cir. 2014).  Rule 23(b)(2) permits a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Civil rights cases are "illustrative" of the types of cases suitable for (b)(2) certification.  *See* Fed. R. Civ. P. 23(b)(2), Advisory Comm. notes to 1966 Amend. ("Illustrative are various actions in the civil-rights field

where a party is charged with discriminating unlawfully against a class…").  A class is proper according to Rule 23(b)(3) when "questions of law or fact common to class members predominate over any questions affecting only individual members, and … a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see In re Johnson*, 760 F.3d at 70.  Matters relevant to predominance and superiority include class members' interests in individually controlling the case; other related pending litigation by class members; whether concentrating the litigation in a particular forum is desirable; and any expected difficulties in managing the case as a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D).[3]  Additionally, when appropriate, an action may be brought or maintained as a class action for particular issues, Fed. R. Civ. P. 23(c)(4), and/or a class may be divided into subclasses. Fed. R. Civ. P. 23(c)(5).

Because a court evaluating class treatment must ensure that the requirements of Rule 23 are satisfied, determination of class certification frequently overlaps with issues concerning the case merits.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *In re McCormick & Co., Inc., Pepper Prods. Marketing and Sales Pract. Litig.*, 422 F. Supp. 3d 194, 223–24 (D.D.C. 2019).  A court may consider merits questions "to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Retirement Plans and Trust Funds*, 568 U.S. 455, 466 (2013).  For example,

---

[3] While not explicit in Rule 23, district courts have sometimes also required that the class be ascertainable, generally meaning a person can know whether they are in the class by reading the class definition.  *See J.D. v. Azar*, 925 F.3d 1291, 1319–20 (D.C. Cir. 2019) (noting circuit split and issue unaddressed by D.C. Circuit); *DL v. District of Columbia*, 302 F.R.D. 1, 16 (D.D.C. 2013) (addressing ascertainability and quoting William B. Rubenstein, 1 Newberg on Class Actions § 3:3 (5th ed. 2021)).  Here all elements of the proposed Class definition are objective and the data supporting a person's membership in the Class is verifiable in the records of the FAA, the CTI Institutions, or the proposed Class members; the Class is thus ascertainable.

the Court may consider the issues to be proved and determine whether some, most, or even all elements of a plaintiff's case and/or asserted defenses may be proved on a common basis.

Here, Title VII prohibits employers from taking adverse employment actions, including refusal to hire, because of an individual's race. *See* 42 U.S.C. §2000e. In the specific context of failure to hire, the Supreme Court articulated the elements of a prima facie case as requiring a plaintiff to show "(i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). When a plaintiff relies upon circumstantial evidence to prove discrimination, once the plaintiff establishes her prima facie case, the defendant has a burden of production to show that the action was taken for a legitimate non-discriminatory reason. If the defendant meets that burden, the burden of proof shifts back to the plaintiff to show that the defendant's alleged reason was a pretext for discrimination. *Id*. at 804.

Finally, bifurcation is common in Title VII class actions. *See Berger v. Iron Workers Reinforced Rodmen*, *Loc. 201*, 170 F.3d 1111, 1124 (D.C. Cir. 1999) ("Class action lawsuits brought under Title VII are typically bifurcated into two phases, a liability phase and a damages phase…") (internal citation omitted). Issues may be tried separately for convenience, to avoid prejudice, or where holding separate trials will expedite or "economize" the proceedings. *See* Fed. R. Civ. P. 42(b); *Am. Nat. Red. Cross v. Travelers Indem. Co. of R.I.*, 924 F. Supp. 304, 306 (D.D.C. 1996). A court has broad discretion in determining whether bifurcation would serve the ends of justice. *Id.* Bifurcation can be appropriate where the evidence on separate issues will be wholly distinct or where the resolution of one issue may preclude the need for a trial on another

16

issue.  *See Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 635 (D.C. Cir. 2010) (quoting *Vichare v. AMBAC Inc.,* 106 F.3d 457, 466 (2d Cir. 1996)).

## ARGUMENT

### I.      The Proposed Class of CTI Students Satisfies Rule 23(a)

More than 1,000 CTI graduates fit the Class definition, all members of the Class suffered the same legal harm arising from the FAA's common conduct, and the proposed Class representatives have actively pursued and supervised this case and have retained experienced counsel to represent the Class. Plaintiffs satisfy the requirements of Rule 23(a).

### A.      The Over 1,000 Putative Class Members Satisfy Numerosity

Over 1,000 putative Class members were adversely affected by the FAA's common discriminatory hiring change.  Defendant has stipulated that the proposed Class satisfies the Rule 23(a)(1) numerosity requirement and the FAA's expert estimated that over 1,000 people meet the Class definition.  *See* Joint Status Rep. May 28, 2021, ECF No. 132 at 2; P. White Dep. Tr., Ex. 23, 43:16–19.  Numerosity is satisfied for putative classes of 40 members or more.  *See Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 160 (D.D.C. 2014) (certifying class of 47 members). Plaintiffs are not required to show "an exact number of putative class members" to establish numerosity; all that is required is an approximate class size and a reasonable basis for the estimate provided.  *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015) (certifying class of 34 individuals) (quoting *Pigford v. Glickman*, 182 F.R.D. 341, 347 (D.D.C. 1998)).  Plaintiffs' putative Class is much larger than the 40-member threshold.

### B.      The FAA's Use of the Biographical Questionnaire and Common Policy Striking the AT-SAT Satisfy Commonality

Common questions and answers will determine whether Class members suffered legally cognizable harm when the FAA implemented the Biographical Questionnaire and purged AT-SAT

scores.  Rule 23(a)(2) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  In Title VII cases there are two well-established means to prove commonality.  First, if an employer "used a biased testing procedure," then a class action on behalf of every applicant or employee "who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a)."  *Falcon*, 457 U.S. at 159 n. 15.  Second, "[s]ignificant proof that an employer operated under a general policy of discrimination" may justify a class "if the discrimination manifested itself … in the same general fashion…"  *Id*.; *see Hoyte v. District of Columbia*, 325 F.R.D. 485, 490 (D.D.C. 2017) (certifying class of persons with property seized and retained allegedly in violation of due process requirements) (quoting 5–23 Moore's Federal Practice–Civil § 23.23 n.7.5.1).  A common policy of providing discretion to a wide array of decision-makers is not sufficient; rather commonality requires a "common contention" "of such a nature that it is capable of classwide resolution."  *Wal-Mart Stores*, 564 U.S. at 350.  The central inquiry of commonality is the "capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *DL v. District of Columbia*, 302 F.R.D. 1, 12 (D.D.C. 2013) (certifying sub-classes after certification of larger class was overturned post *Wal-Mart*) (quoting *Wal-Mart*, 564 U.S. at 350) (emphasis in original).

Here, Plaintiffs can prove both paths to commonality.  First and most simply, the FAA used a single discriminatory and flawed screening mechanism, the Biographical Questionnaire, to eliminate every Class member from hiring consideration.  Second, the FAA's simultaneous striking of the Class members' AT-SAT scores was a common policy applied to all Class members at the same time and in the same fashion.

Ultimately, however, Plaintiffs need only show one common issue to satisfy Rule 23(a)(2). *See Wal-Mart Stores*, 564 U.S. at 359 (even a single common question will suffice)*.  In a Title VII

case, a putative class may have sufficient commonality if it posits a systematic process or procedure that is the cause of the class's harm, even if the specific harm to each class member might be different, such as the specific position lost or the amount of back pay owed. *Little v. WMATA*, 249 F. Supp. 3d 394, 419 (D.D.C. 2017) (certifying class asserting Title VII claims).

### 1.    Use of the Biographical Questionnaire Satisfies Commonality

When an employer uses a biased testing procedure to evaluate applicants, a class on behalf of all potentially prejudiced applicants satisfies commonality. *See Falcon*, 457 U.S. at 159 n. 15; *Wal-Mart Stores*, 564 U.S. at 352–53 (noting the *Falcon* Court's example of a biased testing procedure to bridge the "conceptual gap" between a claim that an individual suffered discrimination and the assertion that a class of persons suffered the same injury); *DL*, 713 F.3d at 130 ("And all claimants who are similarly blocked by the policy may join a class action to challenge it.  Such a class action would easily satisfy the commonality requirement of Rule 23 even after *Wal-Mart*.") (Edwards, J., concurring); *United States v. City of New York*, 276 F.R.D. 22, 44 (E.D.N.Y. 2011) ("An employer's use of a biased testing procedure to evaluate applicants for employment is sufficient to demonstrate the existence of questions of fact and law common to the claims of the members of the class alleging they were harmed by the discrimination."); *Easterling v. Conn. Dept. of Correction*, 265 F.R.D. 45, 52 (D. Conn. 2010) (granting class certification to challenge of pre-employment test).

Plaintiffs' challenge to the Biographical Questionnaire is similar to the employment screening test confronted in *Easterling.  Id.*  In that case, correctional officer applicants who passed a written exam advanced to a physical test, which included a timed 1.5 mile run. *Id.* at 48–49. Women passed the timed run test at a materially lower rate than men. *Id.* at 49.  Plaintiff had passed the written test, but failed one of the three timed run tests administered in 2004–2006, and

brought a Title VII claim asserting that use of the test was discriminatory. *Id.* The court certified a class of women applicants who took and failed tests in 2004–2006. *Id.* at 55. The court noted that "[w]here the question of law involves 'standardized conduct of the defendant towards members of the proposed class… the commonality requirement of Rule 23(a)(2) is usually met.'" *Id.* at 52 (citing *Franklin v. City of Chicago*, 102 F.R.D. 944, 949 (N.D. Ill. 1984)). Because the defendant had used the exact same test with the exact same standards, commonality existed. *Id.*

In this case, there is no dispute that the FAA used the Biographical Questionnaire to screen out applicants nor that Class members took and "failed" that test. *See* Class definition *supra* p. 15; J. Scott (APTMetrics) Nov. 2013 Email, Ex. 24. Plaintiffs contend that the FAA intended the Biographical Questionnaire, including its selection and weighting of questions, to benefit African American applicants, and that the circumstances surrounding the adoption and implementation of the Biographical Questionnaire support an inference of discrimination. Compl., ECF No. 114 ¶¶ 110–131, 198. The truth or falsity of those contentions "will resolve an issue that is central to the validity of each one of the [Class members'] claims in one stroke", thus Plaintiffs satisfy commonality. *Wal-Mart Stores*, 564 U.S. at 350.

## 2. The Striking of AT-SAT Scores Satisfies Commonality.

The FAA's simultaneous striking of Class members' qualifications, particularly Plaintiffs' AT-SAT scores, also establishes commonality. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized class-wide proof.") (quoting William B. Rubenstein, 2 Newberg on Class Actions § 4:50, pp. 196–97 (5th ed. 2012)).

Plaintiffs contend that their progression through the CTI program, specifically their taking of the AT-SAT, made them "applicants" entitled to Title VII protection. Compl., ECF No. 114 ¶¶

20

10, 32.  Plaintiffs contend that, just as in *Ricci*, the FAA illegally invalidated their test scores, taking a detrimental employment action with a racially based motive.  *Id.* ¶ 196.  The central and uniform nature of these questions satisfies commonality.  *Wal-Mart*, 564 U.S. at 352–53.

Indeed, the Class here shares even more facts and issues in common than other classes that have been certified in this District.  For example, in *Moore v. Napolitano*, 926 F. Supp. 2d 8, 35 (D.D.C. 2013), the court certified a class of all African American agents who bid for one of two specific promotions over a span of nine years and who were not promoted on their first bid.  *Id.* The defendant appealed class certification, asserting that commonality could not be found where the allegedly discriminatory evaluation mechanism had been applied to plaintiffs at different times in the promotion process and involved different decision-makers.  *In re Johnson*, 760 F.3d at 72. The class was certified nonetheless, and the D.C. Circuit found no manifest error or other reason to revisit the class certification on an interlocutory basis.  *Id.* at 71–76.  The D.C. Circuit noted that, unlike *Wal-Mart*, "every class member was evaluated upon the same criteria and scored using the same numerical system."  *Id.* at 73.  And "[b]ecause there is a good deal of commonality in the way all those promotion decisions were made, the district court did not manifestly err in finding class claims could be moved together toward resolution."  *Id.* at 73.

Likewise, in *Little,* a court certified classes of applicants and employees affected by a discriminatory policy of criminal background checks.  249 F. Supp. 3d at 426.  Notably, the classes consisted of both applicants and employees, not only of the defendant, but of the defendant's contractors; the class challenged decisions made by different decision-makers on a rolling basis over at least four years; and the disqualifying crime varied among the class members, including between felonies and misdemeanors.  *Id.* at 404, 426.  The court found that the question of whether the policy had an unjustified disparate impact is a common question, the answer to which will

resolve a significant question as to the entire class. *Id.* at 419. In holding the commonality requirement of Rule 23(a)(2) was satisfied, the court noted the fact that candidates applied for positions with either the defendant directly or its contractors did not affect the commonality of the question, because the policy was mandated for non-discretionary application to all hiring decisions. *Id.* The policy at issue in this case, striking test scores to adjust FAA applicants' rankings, was even more uniform and thus commonality has been met.

### 3. Other Potentially Common Defenses and Sub-Issues Also Exist

While the common issues identified above are sufficient to satisfy Rule 23(a)(2), there are likely a bevy of additional common issues to be litigated in this case. As defenses the FAA asserts, *inter alia*, that the complaint fails to state a claim, that the FAA changed the 2014 hiring process for legitimate non-discriminatory reasons, and that the FAA adopted the Biographical Questionnaire for legitimate non-discriminatory reasons. Answer, ECF No. 133 at 1–2. Whether the complaint states a claim and whether the FAA had legitimate non-discriminatory reasons for each of its actions are questions common to the Class and should the FAA prevail on any of these defenses, the resulting ruling would "resolve an issue that is central to the validity of each one of the [Class members'] claims in one stroke." *Wal-Mart* at 350; *see Tyson Foods*, 577 U.S. at 457 (noting defendant's assertion that key expert testimony was faulty was "itself common to the claims made by all class members" and that where the defense was common to the class, it should be addressed "as a matter of summary judgment, not class certification") (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 107 (2009)).

Further, Plaintiffs seek injunctive relief which may include remedial training for FAA members, utilization and approval of a third party to validate other proposed hiring changes, and priorities in hiring for Class members. Comp., ECF No. 114 ¶ 42. The availability and appropriateness of such equitable remedies are common questions.

4.      **Potential Common Back Pay Elements**

The back pay that Plaintiffs seek will also involve some common decisions and calculations.  Title VII gives district courts wide discretion to award equitable relief.  *Jean-Baptiste v. District of Columbia*, 958 F. Supp. 2d 37, 40 (D.D.C. 2013).  A back pay remedy is equitable and may be provided per the court's discretion.  *Id.* at 43.  (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 226 (1982)).  Front pay may also be appropriate if an employee cannot be instated or re-instated.  *Barbour v. Merrill*, 48 F.3d 1270, 1278–79 (D.C. Cir. 1995).  As with back pay, the purpose of front pay is to make discrimination victims "whole," and to restore them to the economic position they would have occupied but for the unlawful conduct of their employer.  *Id.*

One recognized method of calculating back pay in a failure to hire class is the aggregate and pro rata or shortfall method.  Aggregate and pro rata back pay calculations are appropriate when the number of qualified class members exceeds the number of openings lost to the class through discrimination, or when it is impossible to determine which of the class members would have received job offers.  *See Easterling*, 278 F.R.D. at 48 (class-wide calculation and pro rata distribution of back pay is appropriate when "'the number of qualified class members exceeds the number of openings lost to the class through discrimination, and identification of the individuals entitled to relief would drag the court into a quagmire of hypothetical judgments.'") (quoting *Robinson v. Metro-North Commuter RR Co.*, 267 F.3d 147, 161 n.6 (2d Cir. 2001)); *see also City of New York*, 276 F.R.D. at 44 ("Because it is impossible to determine exactly which non-hire victims would have received job offers…, the court must first determine the aggregate amount of individual relief to which the subclasses are entitled and then distribute that relief pro rata to eligible claimants."); United States Department of Labor, Office of Federal Contractor Compliance Directive 2013-04 (as renumbered Sept. 16, 2013) (Issued as No. 310 on July 17, 2013 ADM

Notice) ("Directive 310"), Ex. 32 at 1, 3–5;  *see also* P. White Dep. Tr., Ex. 23, 6:5–14 (FAA expert acknowledging that it can be appropriate to calculate back pay on a class basis in some circumstances); *Id.* 37:16–38:3 (expressing belief there could be a way to calculate representative back pay with more information); *Id.* 144:14–147:9 (acknowledging potential need for or appropriateness to use formula relief when number of class members exceeds number of available job opportunities).

Under the aggregate/pro rata method, a court determines the aggregate amount of back pay lost as a result of the discrimination; that aggregate amount is then distributed to the class members pro rata.  *See* Directive 310, Ex. 32 at 3–4, 9, 13; *Easterling*, 278 F.R.D. at 48–49.  This method of assessing monetary relief "is a consequence of substantive Title VII law, and not a creative method of proof intended to accommodate the logistical demands of class proceedings." *Id.* (quoting *City of New York*, 276 F.R.D. at 44 n. 11).  Calculation of a front pay award "would similarly mirror the back-pay calculation methodology." *Id.*  In *United States v. City of New York*, the court recognized that even the remedial phase of a discrimination case involving back pay may raise common issues.  *City of New York*, 276 F.R.D. at 44 (common questions raised by victims' claims for individual relief included how to organize the process for determining which claimants were victims of discrimination, what qualified as non-discriminatory reasons for not hiring a claimant, and the aggregate values of back pay and benefits lost by the class).

Just the step of determining the aggregate amount of back pay and benefits involves common questions including: how many Class members would have been hired absent the discriminatory conduct; what would the starting salary have been; what additions would have been made to salary, such as overtime and locality pay, and what are their value; what benefits would have been available; what is the monetary value of those benefits; what raises or career progression

should be considered; how long did the loss continue; is there a basis to overcome the presumption of continuous employment; if so, what attrition rate should be assumed; should interest be applied and, if so, how should interest be calculated; should front pay be available and, if so, for how long and what discount rate should apply.  Directive 310, Ex. 32, at 4–11.

Plaintiffs do not yet have complete data that would allow them to make these calculations, nor are such calculations required at the class certification stage.  *See Hoyte*, 325 F.R.D. at 495 ("'[A]t the certification stage, the preliminary inquiry in assessing the proposed methods [of calculating damages] is limited:  The inquiry is not whether the methods are valid, but is only to assess whether the methods are available to prove damages on a class-wide basis.'") (quoting *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C. 2002)).  Right now, it is sufficient for Plaintiffs to demonstrate that there is a viable method to determine relief.  The expert analysis of Glenn Perdue explains the method that could be used to calculate elements of back pay and front pay on a formulaic basis.  *See* Initial Expert Report of G. Perdue, MBA, CVA, MAFF, CLP, Ex. 33.  Mr. Perdue's methodology is consistent with Directive 310 and demonstrates the conceptual model to calculate but-for income and benefits throughout an ATCS's career.  *Id.*  Once official and sufficient FAA hiring, career progression, salary, attrition, and other data are produced, Plaintiffs will be able to calculate at least the aggregate Class loss.[4]

In summary, Plaintiffs not only allege that they and the putative Class members have suffered a violation of the same provision of law, they also allege that they have suffered the same injury—loss of their successful pre-employment hiring test results and denial of employment— due to the FAA's discriminatory hiring practices.  Even if the amount of back pay owed to each

---

[4] While Mr. Perdue's model carries further, explaining how back pay could be offset by assumed mitigating earnings on a class basis, consistent with Directive 310, Plaintiffs do not currently propose to have those issues resolved on a class basis.

Class member varies, and even if a subclass elects to pursue compensation beyond back pay, the harms incurred were due to the FAA's uniform policies, and the but-for earnings can be calculated aggregately.  Indeed, Plaintiffs fully acknowledge that if the FAA lawfully purged their AT-SAT scores and lawfully implemented the Biographical Questionnaire the government wins.  But a Court's determination of these issues and related common defenses will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart,* 564 U.S. at 350.  Rule 23(a)(2) is satisfied.  *See DL*, 713 F.3d at 127 ("The putative class in *McReynolds* was appropriate post-*Wal-Mart* because the economic harm alleged by each class member was the result of the same corporate-wide policies and if the policies were held unlawful then a question central to the validity of each class member's claim would be resolved in one stroke.") (citing *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith*, 672 F.3d 482, 488-490 (7th Cir. 2012)).

### C.      Plaintiffs' Claims are Typical of the Class

Plaintiffs' claims are typical of the Class; each arises from the FAA's uniform race-based hiring change, and each asserts an identical Title VII violation.  The Rule 23(a)(3) typicality requirement is satisfied where the class representatives' "claims are based on the same legal theory as the claims of the other class members and [their] 'injuries arise from the same course of conduct that gives rise to the other class members' claims." *Coleman*, 306 F.R.D. at 83 (quoting *Bynum v. District of Columbia*, 214 F.R.D. 27, 35 (D.D.C. 2003)); *see Little*, 249 F. Supp. 3d at 420 ("The typicality requirement is satisfied 'if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability.'" (quoting *In re Lorazepam & Clorazepate Antitrust Litig*., 202 F.R.D. 12, 27 (D.D.C. 2001)).  "Typical" has never meant identical.  *Moore*, 926 F. Supp. 2d at 30–31; *see Encinas v. J.J. Drywall Corp.*, 265 F.R.D. 3, 9 (D.D.C. 2010) ("A

plaintiff's claims can be typical of those of the class even if there is some factual variation between them."); *Bynum*, 214 F.R.D. at 35; *see also* William B. Rubenstein, 4 Newberg on Class Actions § 3:43 (5th ed. 2014) ("Courts routinely find that the proposed class representative's claims are typical even if the amount of damages sought differ from those of the class or if there are differences among class members in the amount of damages each is claiming.").

*Hartman v. Duffy* is a Title VII class action that features several similarities to the case at hand. 158 F.R.D. 525 (D.D.C. 1994). The plaintiffs in *Hartman*—women who unsuccessfully applied for civil service or foreign service positions within the United States Information Agency—filed a Title VII sex-based discrimination action. *Id.* at 530. The Court held that class certification was proper because of the common injury shared by the class members—the denial of employment due to hiring discrimination against females. *Id.* at 531. The typicality requirement was met since the named plaintiff and the subsequent intervenor class members were all women who applied for the same position; alleged sex-based discrimination was evidenced by, *inter alia*, use of gender-biased evaluations, subjective criteria, and discriminatory recruitment devices; and all were ultimately denied employment. *Id.* at 544–45.

While the discrimination there was sex-based rather than race-based, the events which led to class certification in *Hartman* are analogous to the events that transpired here. All Plaintiffs are non-African American applicants who applied for the same position, just as the *Hartman* plaintiffs were all women who applied for the same position. The FAA discriminated against Plaintiffs by using a racially biased evaluation in the form of the Biographical Questionnaire, just as the *Hartman* plaintiffs were subject to sex-biased evaluation procedures. Finally, both sets of plaintiffs were ultimately denied employment. Accordingly, since the claims of the named Plaintiffs are typical of those of the Class as a whole, typicality is satisfied.

27

### D.    The Named Plaintiffs Are Adequate Class Representatives

Plaintiffs have diligently prosecuted this case for years and will continue to do so on behalf of the putative Class until final judgment.  Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Two principal requirements considered in evaluating the adequacy of the proposed representatives are: (1) the named representatives must not have conflicts with class members, and (2) the representatives must be "able to vigorously prosecute the interests of the class through qualified counsel." *McReynolds v. Sodexho Marriott Services, Inc.*, 208 F.R.D. 428, 446 (D.D.C. 2002) (citing *Califano*, 717 F.2d at 1458).

The named Plaintiffs will fairly and adequately protect the interests of the putative Class at all stages of litigation.  Plaintiffs, along with all Class members, were CTI graduates who applied for the same position under the same job posting, and identical forms of relief are sought for everyone.  Mr. Brigida exhausted all administrative remedies by actively pursuing discrimination charges with the EEOC, both individually and as a putative Class Representative on behalf of those similarly situated, *see* Brigida EEO Compl., Ex. 30, and he has worked with Class Counsel to initiate this litigation and prepare the Complaint.  Mr. Douglas-Cook has also zealously advocated for the Class, having been actively involved at all stages of litigation and having assisted in contacting members of the media to get word of the lawsuit out to the public.  *See* M. Douglas-Cook Decl., Ex. 28 ¶¶ 12–15; M. Douglas-Cook Email to Fox News, Ex. 34.

Plaintiffs are represented by qualified counsel who have extensive civil litigation experience, including class actions, civil rights lawsuits, and aviation litigation, in both state and federal courts.  Ms. Brown is a seasoned trial attorney who has represented clients from a wide array of industry areas and jurisdictions before international, federal, state, and local courts and

agencies.  *See* Brown Resume, Ex. 35.  She has represented both plaintiffs and defendants in various class actions.  *Id.*  Mr. Trachman has extensive experience in the areas of employment and civil rights law, having served as the Deputy Assistant Secretary in the U.S. Department of Education's Office of Civil Rights, and as General Counsel to a school district in Colorado.  *See* Trachman Resume, Ex. 36.  Mr. Pearson worked as an FAA ATCS for over 26 years before pursuing a legal career specializing in aviation and complex litigation.  *See* Pearson Resume, Ex. 37.  Mr. Pearson was also an instructor at a CTI Institution who helped the graduates and institutions resist the FAA's illegal policy, including through filing numerous administrative EEOC complaints to challenge the 2014 hiring process.

In addition to their experience in complex litigation, both firms have committed substantial time and resources in prosecuting this action for the past five years and plan to continue through final resolution of the dispute.  Finally, Class Counsel do not have any conflicts of interest with putative Class members.  As such, Plaintiffs and Class Counsel will adequately represent and protect the interests of the putative Class.

## II.   A Rule 23(b)(2), 23(b)(3), or Hybrid Class is Appropriate

Having met the requirements of Rule 23(a), Plaintiffs must next establish that they meet at least one subsection of Rule 23(b) before a class may be certified; Plaintiffs satisfy two.  Consistent with their complaint, Plaintiffs seek certification pursuant to Rule 23(b)(2), which pertains to common actions by a defendant that can be addressed with common injunctive and declaratory relief.  Compl., ECF No. 114 ¶ 173.  Plaintiffs also seek certification for their monetary claims pursuant to Rule 23(b)(3), which enables the recovery of damages in a class action if common issues predominate and the class mechanism is a superior avenue for resolving the claims at hand.  *Id.*  In the alternative to a Rule 23(b)(3) class for the non-equitable compensatory claims, Plaintiffs

request certification of class issues of liability and aggregate back pay via Rule 23(c)(4), with elements of individual damages to be determined in subclasses, *Teamsters* hearings, or outside the class construct. *Id.* Title VII or other discrimination claim hybrid classes have repeatedly been certified in this District and in other courts as well. *See Little*, 249 F. Supp. 3d at 425–26 (certifying class for liability and injunctive/declaratory relief per Rule 23(b)(2) and Rule 23(c)(4)); *DL*, 277 F.R.D. at 47–48 (certifying hybrid class under Rules 23(b)(2) and 23(b)(3)); *Easterling*, 278 F.R.D. at 51 (same).

A.      **Rule 23(b)(2) is Met**

Rule 23(b)(2) is satisfied if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Accordingly, class certification under Rule 23(b)(2) requires two factors to be present: (1) the defendant's action or refusal to act must be generally applicable to the class; and (2) plaintiffs must seek injunctive or declaratory relief on behalf of the class. *Taylor v. District of Columbia Water & Sewer Auth.*, 241 F.R.D. 33, 47 (D.D.C. 2007) (citing *Bynum*, 217 F.R.D. at 48). Title VII class actions are "illustrative" of the types of cases suitable for certification under Rule 23(b)(2). *Id.* (quoting Fed. R. Civ. P. 23(b)(2) Advisory Comm. notes to 1966 Amend.); *see also Eubanks v. Billington*, 110 F.3d 87, 92 (D.C. Cir. 1997) ("Title VII and other civil rights class actions are frequently certified pursuant to Rule 23(b)(2).").

Here, the injury to the putative Class was caused by the FAA's conduct based on practices applicable to the Class generally, and Plaintiffs are seeking declaratory and injunctive relief on behalf of and that would benefit the entire Class. Specifically, Plaintiffs seek hiring preferences, which may extend beyond ATCS positions, training and prophylactic measures to prevent future discrimination within the FAA, and declaratory relief, declaring the FAA's practices contrary to

30

Title VII. Compl., ECF No. 114 at 42 ¶¶ 4–6.  Plaintiffs' claims for class-wide injunctive relief and declaratory judgments may therefore be certified pursuant to Rule 23(b)(2).

### B.      A Hybrid Certification, Pursuant to Rule 23(b)(3) or 23(c)(4) is Warranted

Rule 23(b)(3) allows certification when "questions of law or fact predominate over any questions affecting only individual members, and the class action is superior to other methods for a fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Under "hybrid" certification, courts may certify a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief.  *Taylor*, 241 F.R.D. at 47.  Alternatively, under the "partial" certification approach, courts may bifurcate the class action into liability and damages phases and certify a (b)(2) class on liability only, postponing the damages issue until plaintiffs have made it to that stage.  *Id.*; *see McReynolds*, 208 F.R.D. at 448 (certification under (b)(2) affirmed for liability determination in a race discrimination case); *see also* Fed. R. Civ. P. 23(c)(4)(A) (partial class certification permitted when "an action may be brought or maintained as a class action with respect to particular issues.").  If Plaintiffs succeed in establishing liability, class-wide injunctive and declaratory relief can be ordered, common elements of back pay and the potential number of preferred employment positions for the Class can be decided, and then the Court may identify subclasses, or, utilizing a magistrate or special master, may hold "*Teamsters* hearings" for individualized determinations as to whether particular Class members are eligible for back pay or to address additional claims for compensation.  *See Int'l Broth. of Teamsters*, 431 U.S. at 361; *Hartman v. Duffy*, 19 F.3d 1459, 1462 n. 2 (D.C. Cir. 1994) (describing burden of proof in a "*Teamsters*" hearing).[5]

---

[5] Plaintiffs acknowledge that, "[e]very class member must have Article III standing in order to *recover* individual damages." *TransUnion LLC v. Ramirez*, 594 U.S. __, 141 S.Ct. 2190, 2208

### 1.      Common Questions Predominate

Common questions predominate Plaintiffs' claims in this case.  "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Tyson Foods*, 577 U.S. at 453 (affirming class certification) (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:49, pp. 195–96 (5th ed. 2012)).  Importantly, "[w]hen 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'"  *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 pp 123– 124 (3d ed. 2005)); *see Hoyte*, 325 F.R.D. at 494 ("The D.C. Circuit has likewise held that 'the mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification.'") (quoting *McCarthy*, 741 F.2d at 1415); *Hardy v. District of Columbia*, 283 F.R.D. 20, 28 (D.D.C. 2012) (Even assuming the defendant has evidence that it treated a specific plaintiff differently (giving extra notice/process), the defendant "can come forward with that evidence without disrupting the class action.") (citing 7AA Wright & Miller § 1778 ("…when one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately…".)); William B. Rubenstein,

---

(2021).  Recovery, however, does not occur until after liability is determined and usually in a separate phase or hearing.  It is widely recognized that a class definition may include individuals that were not actually harmed and that this does not prevent class certification.  *See Segar v. Smith*, 738 F.2d 1249, 1290–91 (D.C. Cir. 1984) ("If effective relief for the victims of discrimination necessarily entails the risk that a few nonvictims might also benefit from the relief, then the employer, as the proven discriminator, must bear that risk.").

4 Newberg on Class Actions § 4:54 (5th ed. 2014) ("courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations.").

Courts often find predominance satisfied in failure to hire and failure to promote cases, even where individual back pay awards are sought.  For example, the class in the *Easterling* case discussed above was first certified under Rule 23(b)(2) in 2010, before the *Wal-Mart* decision. *Easterling,* 265 F.R.D. 45.  Post *Wal-Mart*, the court rejected the defendant's request to decertify the class, instead modifying the certification such that plaintiffs' class-wide claims for declaratory and injunctive relief were certified pursuant to 23(b)(2) but plaintiffs' claims for monetary and individualized injunctive relief were certified pursuant to 23(b)(3).  *Easterling*, 278 F.R.D. at 51. The court found that the number of class members impacted by the discriminatory timed run exceeded the number of jobs the class would have filled without discrimination.  *Id.* at 48.  Further, the court would not be able to identify which specific members of the class would have been hired without entering "a quagmire of hypothetical judgments."  *Id.* at 48 (citing *Robinson v. Metro-North Commuter RR Co.*, 267 F.3d 147, 161 n.6 (2d Cir. 2001)).  As a result, the court determined that it would "make an aggregate calculation of the back pay to which the class is entitled," then distribute the proceeds to eligible class members pro rata.  *Id.* at 49.  The court identified common issues subject to generalized proof to include: whether the run had a disparate impact; whether the run was justified by a business necessity; "the total amount of back pay that should be awarded to the class (a figure which itself depends on a number of common issues, including the number of additional…positions that would have been filled by women in the absence of a discriminatory test, the rate at which those women would have been paid, the value of the benefits they would have received in addition to salary, and time period for which they should receive back pay);" the

number of priority hiring slots that should be set aside for the class; and the total amount of front pay. *Id.* at 49–50. The court held that these common issues predominated over individual issues of class membership, eligibility for instatement, and individual mitigation. *Id.* at 50; *see also City of New York*, 276 F.R.D. at 48 (denying post *Wal-Mart* request to decertify case and finding predominance met even for remedial phase of non-hire and delayed hire classes where back pay would be determined on aggregate/pro rata basis).

This Circuit has similarly approved the use of aggregate back pay as an element of make-whole relief in certain discrimination cases. *See Segar*, 738 F.2d at 1290–91 (approving district court decision to award "class-wide back pay" where it would have been "impossible to reconstruct the employment histories" of the discrimination victims as if the discrimination had not occurred).

The issues to be resolved in this case correlate to those in *Easterling*, but in fact there are *more* common issues here: (1) whether the FAA's striking of the AT-SAT scores was an employment action; (2) whether the FAA struck the employment scores for race-based reasons or legitimate non-discriminatory reasons; (3) whether the FAA implemented the Biographical Questionnaire for race-based reasons; (4) whether the use of the Biographical Questionnaire resulted in the FAA passing over more qualified Class members for lesser qualified African-American candidates; (5) what common injunctive or declaratory relief is appropriate, including priority hiring; (6) should back pay be calculated on an aggregate basis, and if so: (a) the shortfall in hiring of Class members, (b) the salary Class members would have been paid (including locality pay, overtime pay, complexity of assignment, and career progression), (c) benefits the hired Class members would have received, (d) the impact of attrition, (e) the time period for back pay, and (f) interest rates to be applied; and (7) the amount of front pay, if any.

The Supreme Court recently dealt with the predominance requirement in *Tyson Foods*. The plaintiffs in that case sought to establish a Fair Labor Standards Act claim, asserting that Tyson Foods failed to pay plaintiffs for donning and doffing time—time the employees spent putting on and taking off required protective gear.  577 U.S. at 446.  The employees worked in three different departments, each with a different set of mandatory gear.  *Id.* at 446–48.  Tyson Foods resisted class certification, asserting that the variance of protective gear worn by each employee—which would affect that employee's donning and doffing time—precluded class certification.  *Id.* at 448.  The district court rejected Tyson Foods' argument, finding that there were "far more factual similarities than dissimilarities" and certified a class of over 3000 current and former employees.  *Id.* at 448–49.  On appeal, the Supreme Court affirmed class certification. *Id.* at 461–462.  Tyson Foods argued that representative evidence such as estimated average donning and doffing time "manufactures predominance," unfairly short-circuiting the intent and purpose of Rule 23.  *Id.* at 454–55.  The Supreme Court rejected this argument and noted that under the Rules Enabling Act, if an employee could use representative evidence (averages) in their individual case, which they could here, then Rule 23 could not change the plaintiffs' ability to prove their claim.  *Id.* at 455, 458.

So too here.  The FAA has claimed that a class cannot be certified because the likelihood of being hired varies from plaintiff to plaintiff.  Def.'s Opp'n to Pls.' Mot. for Leave to Am., ECF No. 105 at 35–36.  The FAA asserted that every plaintiff must prove that they would have been hired in order to assert damages.  *Id.* at 37–38.  Such arguments are erroneous and inconsistent with other failure to hire cases.  In short, plaintiffs often employ statistical and econometric data to prove both liability and damages.  As in *Tyson Foods*, Plaintiffs here would use common evidence to establish liability.  As set forth in their complaint, historic data concerning the CTI

program demonstrated that CTI students had a higher likelihood of being hired and a higher likelihood of being certified, faster, and in more complex settings, than general public hires. Compl., ECF No. 114 ¶¶ 46, 49, 51. Plaintiffs' evidence and their back pay calculations will rely on common evidence about the success of the CTI program and its graduates, whether the CTI students were applicants once they took the AT-SAT, political undercurrents motivating the FAA to drift away from this demonstrably effective and efficient program, the methods that the FAA used to justify and implement racially focused hiring, the haphazard assembly and shortcomings of the Biographical Questionnaire specifically and the 2014 application process generally, why any claimed non-discriminatory reasons justifying the change were pretextual, and but-for income lost by the Class. These common issues far and away predominate over individual issues such as objective medical disqualifications, failure to mitigate damages, or some Class members' eventual elections to pursue other relief.

### 2. Bifurcation of the Case May be Considered in the Predominance Analysis.

One other aspect of the *Tyson Foods* case is worthy of note: the Supreme Court observed that the defendant's resistance to bifurcating the case may well have caused invited error. *Id.* at 460–62. The *Tyson Foods* jury returned a verdict for the plaintiffs, but the verdict did not align precisely with the expert's analysis. *Id.* at 451–52, 460–61. Tyson Foods asserted that the jury must therefore have reduced the time estimates offered by the expert, and so a problem arose in identifying exactly which members of the class had worked more than 40 hours a week. *Id.* at 460–61. The Court stated, "it bears emphasis that this problem appears to be one of petitioner's own making," which could have been avoided if the case were bifurcated, and suggested that on remand, the district court should address whether any problems resulting from failure to bifurcate should be "deemed invited." *Id.* at 461–62.

Thus Court's discretion and ability to bifurcate this case, to certify specific issues, to use subclasses, or to eventually decertify the Class after common issues have been resolved should be taken into account during the predominance analysis. *See McCarthy*, 741 F.2d at 1415 ("A district court should, of course, ordinarily consider such well-established methods as bifurcating the trial into liability and damages phases before denying certification.") (citing *Hill v. Western Electric Co.*, 672 F.2d 381, 387 (4th Cir. 1982); *Samuel v. University of Pittsburgh*, 538 F.2d 991, 995–96 (3d Cir. 1976); Developments in the Law—Class Actions, 89 HARV. L.R. 1318, 1491–92 (1976)); *see Moore*, 926 F. Supp. 2d at 33–34 ("The only apparent non-common factual issues are whether there were legitimate, nondiscriminatory reasons not to promote a specific [plaintiff]….These issues, however, are not germane to the liability stage of a pattern and practice claim….and thus do not destroy predominance."). (Internal citation omitted).

In *In re Johnson*, the DC Circuit, looking through the lens of the Rule 23(b)(3) predominance requirement, rejected a defendant's argument that the district court's bifurcation and certification of only common issues was error. 760 F.3d at 74–75. In that case, the district court found predominance because there were no individual issues in determining whether the defendant's promotion mechanism was discriminatory. *Id.* at 74. Should the plaintiffs prevail in showing liability and then encounter individualized issues, the court determined that it could send those issues to separate hearings outside of the class procedure at that point. *Id.* The D.C. Circuit noted that the "practical effect of the district court's decision is that it certified a 'class action with respect to particular issues,' which it is expressly authorized to do by Rule 23(c)(4)," and that most circuit courts addressing the issue allowed certification of limited issues to impact the predominance analysis. *Id.* at 75.

37

A few years after *Johnson*, another court in this district took a similar approach, certifying discrimination claims under Rule 23(b)(2) and (c)(4), while indicating an intention to conduct *Teamsters* hearings should the case proceed beyond liability. *Little*, 249 F. Supp. 3d at 418, 425–26. In that case, because of the way the hiring and firing process worked, plaintiffs may not have been hired or may have been fired for reasons other than the defendant's discriminatory criminal background policy. The court was concerned that these individual facts could defeat predominance, but held "Rule 23(c)(4) gives the Court discretion to certify a class as to particular issues and resolve others on an individual basis, 'so long [as] the proposed class satisfies the requirements of Rule 23(a) and (b) with respect to liability.'" *Id.* at 425 (quoting *Houser v. Pritzker*, 28 F. Supp. 3d 222, 253–54 (S.D.N.Y. 2014)).

In this case, all Plaintiffs were eliminated from hiring consideration before any individualized evaluations were made. Each was informed that they "failed" the Biographical Questionnaire, and therefore could not advance in the hiring process. Unlike in *Little*, every Plaintiff in this case was eliminated from hiring consideration, at least in part, because of the FAA's discriminatory screening tool. And while consideration of individual issues may ultimately impact any pro rata distribution of class proceeds or pursuit and award of other damages, the Court can address those issues through subclasses, *Teamsters* hearings, or other available tools that facilitate rather than preclude class certification. *Little*, 249 F. Supp. 3d at 425 (noting availability of bifurcation, appointment of a magistrate or master, decertification, creating subclasses, or amending the class as potential ways to address differences arising after a liability determination); *see also Coleman*, 306 F.R.D. at 86–87, 87 n.9 (holding common legal questions regarding liability claims predominate over individualized issues, even if damages issues were "entirely individualized" and even if certain defenses, such as statute of limitations, had to be determined

during damages phase); *Johnson v. District of Columbia*, 248 F.R.D. 46, 57 (D.D.C. 2008) (certifying class of female detainees subject to strip search policy and noting that even if individual damages considerations existed, it would not affect class certification).

In this case, common questions predominate; all of the most complex and important questions regarding liability and many of the questions regarding back pay can be resolved on a common basis. Further, the predominance of common questions can and should be further facilitated through the bifurcation of the issues. Either way, Plaintiffs satisfy the predominance element of Rule 23(b)(3).

### 3.    Class Action is the Superior Method of Adjudication

Class treatment is also a superior method to resolve the disputes in this case. The superiority element of Rule 23(b)(3) is typically met when "common questions of law or fact permit the court to 'consolidate otherwise identical actions into a single efficient unit.'" *Bynum*, 214 F.R.D. at 40 (quoting *Wells v. Allstate Ins. Co*., 210 F.R.D. 1, 12 (D.D.C. 2002). The superiority requirement ensures that resolution by class action will "achieve economies of time, effort, and expense, and promote…uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Little*, 249 F. Supp. 3d at 424 (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). In making the superiority determination, courts consider "the class members' interests in individually controlling the prosecution or defense of separate actions," "any litigation concerning the controversy already begun by or against class members," "the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Courts in this District have recognized that there are no bright-

line rules to evaluate superiority; rather, the evaluation is a pragmatic one.  *McKinney v. U.S. Postal Serv.*, 292 F.R.D. 62, 65 (D.D.C. 2013).

A class action is the most efficient way to adjudicate the common questions facing the thousand-plus individuals who were affected by the FAA's discriminatory employment actions. Title VII cases often require complicated and costly expert evidence, involve voluminous discovery, and place a heavy and complex burden on individual plaintiffs.  *Little*, 249 F. Supp. 3d at 424.  And "[w]hen a group of individuals may be disparately affected by a single policy, resolving the question of liability on a class-wide basis is the most efficient use of limited judicial resources and allows for consistent findings for all similarly-situated individuals."  *Id.*; *see McKinney*, 292 F.R.D. at 66 (resolving a "uniform legal issue through a single, cohesive proceeding is far superior to requiring the potential class members to initiate a multiplicity of individual actions.").

In this case, Plaintiffs anticipate expert testimony from industrial/organizational psychologists concerning the requirements for and proper methods to develop an employment screening tool, as well as expert testimony concerning the FAA's shortfall in hiring the Plaintiff Class and associated calculations of back pay.  The expense associated with this evidence, coupled with the risk of return on investment, would serve as a deterrent for any individual to bring claims on their own. And while the FAA as a government entity is supported by the might of the Department of Justice and has nearly unlimited amounts of money to pursue years of extensive litigation, the putative Class members simply do not.

Hundreds of EEOC complaints were filed to address the 2014 hiring process, yet Plaintiffs' counsel are not aware of any other pending litigation.   This bears witness to the fact that individual plaintiffs are not willing or able to bring their cases individually in order to control the litigation.

40

*See Jarvaise v. Rand Corp.*, 212 F.R.D. 1, 4 (D.D.C. 2002) (noting in superiority analysis that class members had not expressed interest in controlling prosecution of case and had not filed their own lawsuits). A class action mechanism is superior to "a significant number of individuals deprived of their day in court because they are otherwise unable to afford independent representation." *Id.*

Class certification will allow the affected individuals to resolve their dispute with the FAA in one fell swoop, and will allow the Court to rule on this issue efficiently and consistently. For example, it would not serve justice for multiple courts to address the complex issues in this case or for one court to conclude that CTI graduates taking the AT-SAT were "applicants" and another court to conclude otherwise. Nor would it serve justice for courts to reach different conclusions as to whether the actions of the FAA were racially motivated, whether the Biographical Questionnaire was biased, and whether the FAA had legitimate reasons for the actions it took. *Aliotta v. Gruenberg*, 237 F.R.D. 4, 13 (D.D.C. 2006) (class actions are superior when a single action can eliminate repeated and potentially inconsistent adjudications).

Finally, particularly with the availability of bifurcation, there are no unusual difficulties in managing this case as a class action. All the central liability issues are common, and individual defenses that may preclude a specific plaintiff from recovering or individual injuries that may drive a plaintiff to see additional monetary compensation may be addressed through the well-established *Teamsters* process or other methods. Certification under Rule 23(b)(3) is appropriate.

### 4. Alternatively Certification of an Issues Class is Appropriate Under Rule 23(c)(4)

Rule 23(c)(4) states that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). As an alternative to certification under Rule 23(b)(3), a court may isolate liability and injunctive relief and certify a

41

class under Rule 23(c)(4) concerning those specific issues, leaving damages and individual equitable relief calculations for individualized hearings. *In re Johnson,* 760 F.3d at 74–75 (the "practical effect of the district court's decision is that it certified a 'class action with respect to particular issues,' which it is expressly authorized to do by Rule 23(c)(4)"); *Little,* 249 F. Supp. 3d at 410 (citing *Houser*, 28 F. Supp. 3d at 241); *see also* William B. Rubenstein, 2 Newberg on Class Actions § 4.91 (5th ed. 2020) (discussing merits of Rule 23(c)(4) class certification approach and providing cases). To the extent that the Court finds any element of Rule 23(b)(3) lacking, certification under Rule 23(c)(4) remains appropriate. The issue of whether the FAA is liable under Title VII for instituting a racially discriminatory hiring process is one common to all putative Class members; as such, certifying a class on this issue would materially advance the resolution of this case, leaving only individual equitable relief and individual non-equitable damages to be determined. Accordingly, certification of an issue class under Rule 23(c)(4) would be proper.[6]

## CONCLUSION

For the reasons stated above, the Plaintiffs' Motion for Class Certification should be granted. Further, Plaintiffs Andrew J. Brigida and Matthew L. Douglas-Cook should be appointed as Class Representatives and MSLF and Curry, Pearson & Wooten should be jointly appointed as Class Counsel.

DATED this 10th day of September 2021.

> Respectfully submitted,
>
> */s/ Zhonette M. Brown*
> Zhonette M. Brown, D.C. Bar No. 463407
> William E. Trachman, D.C. Bar No. 502500
> David McDonald, D.C. Bar No. CO0079
> Corey Bartkus, CO Bar No. 54789, *pro hac vice*

---

[6] Plaintiffs propose to provide notice to potential class members whether certification is granted pursuant to Rule 23(b)(3) or Rule 23(c)(4). Pursuant to Local Civil Rule 23.1, Plaintiffs' proposed notice plan is attached as Ex. 38.

MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
zhonette@mslegal.org
wtrachman@mslegal.org
dmcdonald@mslegal.org
corey@mslegal.org


*/s/ Michael W Pearson*
Michael W. Pearson, D.C. Bar No. 997169
CURRY, PEARSON & WOOTEN, PLC
814 West Roosevelt
Phoenix, Arizona 85007
(602) 258-1000
mpearson@azlaw.com

*Attorneys for Plaintiffs and Putative Class Counsel*

43

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of September 2021, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** to be electronically filed with the Clerk of the Court using the Court's CM/ECF system which sent notification of such filing to the following counsel of record in this matter:

Michael Leon Drezner
U.S. DEPARTMENT OF JUSTICE
Email: Michael.L.Drezner@usdoj.gov

Galen Nicholas Thorp
U.S. DEPARTMENT OF JUSTICE
Email: galen.thorp@usdoj.gov

Rebecca Cutri-Kohart
U.S. DEPARTMENT OF JUSTICE
Rebecca.cutri-kohart@usdoj.gov

/s/ Zhonette M. Brown
Zhonette M. Brown
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
zhonette@mslegal.org

44