# Barrier Analysis of the Air Traffic Control Specialists (ATCS) Centralized Hiring Process

Dr. James L. Outtz    |    Dr. Paul J. Hanges

Outtz and Associates

May 8, 2013

# Contents

TABLES ................................................................................................................................................. iii
ACRONYMS ........................................................................................................................................... xi
EXECUTIVE SUMMARY ....................................................................................................................... 12
TECHNICAL REPORT .......................................................................................................................... 26
   INTRODUCTION ............................................................................................................................. 26
   THE ORIGIN OF BARRIER ANALYSIS REQUIREMENTS ............................................................... 26
   MANAGEMENT DIRECTIVE 715 AND THE INSTRUCTIONS............................................................ 26
   SECTION II: BARRIER IDENTIFICATION AND ELIMINATION ....................................................... 26
   ATCS HIRING PROCESS .............................................................................................................. 28
      DIVERSITY AND APPLICANT SOURCE ...................................................................................... 32
      APPLICANT SOURCE RESULTS ................................................................................................ 34
ROOT CAUSE ANALYSIS OF THE SEVEN DECISION POINTS IN THE ATCS HIRING PROCESS ...................... 38
   DECISION POINT 1: QUALIFICATION DETERMINATION OF APPLICANTS ....................................... 38
      ROOT CAUSE ANALYSIS OF BARRIERS AT DECISION POINT 1 .................................................. 45
   DECISION POINT 2: AT-SAT TESTING PHASE.............................................................................. 46
      ROOT CAUSE ANALYSIS OF OVERALL COMPOSITE AT-SAT ..................................................... 50
      AT-SAT SCALES: DIALS ........................................................................................................ 54
      AT-SAT SCALES: APPLIED MATH ......................................................................................... 58
      AT-SAT SCALES: SCAN ......................................................................................................... 62
      AT-SAT SCALE: ANGLES ...................................................................................................... 66
      AT-SAT SCALE: THE LETTER FACTORY ............................................................................... 70
      AT-SAT SCALE: THE LETTER PERFORMANCE SCALE .......................................................... 74
      AT-SAT SCALES: AIR TRAFFIC SCENARIOS TEST (ATST)................................................... 78
      AT-SAT SCALES: ANALOGIES TEST ..................................................................................... 88
      AT-SAT SCALES: EXPERIENCE QUESTIONNAIRE (EQ) ......................................................... 96
      BARRIER ANALYSIS OF AT-SAT ........................................................................................... 131
   DECISION POINT 3: PREPARATION OF THE REFERRAL LIST OF ELIGIBLE AND QUALIFIED APPLICANTS...... 133
   DECISION POINT 4: CENTRALIZED SELECTION PANEL ............................................................. 137
      BARRIER ANALYSIS OF THE CENTRALIZED SELECTION PANELS (CSP) ................................ 141
   DECISION POINT 5: INTERVIEW................................................................................................. 142
   DECISION POINT 6: MEDICAL CLEARANCE................................................................................ 143

DECISION POINT 7: SECURITY CLEARANCE .................................................................................. 143
    SECURITY CLEARANCE: CONDITIONAL SUITABILITY ........................................................................ 143
    SECURITY CLEARANCE: FINAL SUITABILITY ..................................................................................... 147
RECOMMENDED ROOT CAUSE CORRECTIVE ACTIONS TO ELIMINATE BARRIERS ................................. 151
**STUDY LIMITATIONS/CHALLENGES.** ............................................................................................... 154
REFERENCES .......................................................................................................................................... 156
**GLOSSARY OF TERMS** ........................................................................................................................ 158
APPENDIX A ........................................................................................................................................... 1
  AUXILIARY TABLES ............................................................................................................................ 1
  TABLES 1A THROUGH 1F ..................................................................................................................... 1
  TABLES 10A THROUGH 10F: ............................................................................................................. 11
APPENDIX B ......................................................................................................................................... 17

# EXECUTIVE SUMMARY

The Federal Aviation Administration (FAA) performs critical functions to ensure safe and efficient air travel in the National Airspace System (NAS). To accomplish this mission, the Agency relies heavily on trained service providers—the 35,000 controllers, technicians, engineers, and support personnel whose daily efforts keep aircraft moving safely through the nation's skies. These professionals are responsible for managing a very complex and highly automated network of interconnected systems to ensure the safety of the nation's commercial airliners. In particular, air traffic controllers, or the 2152 job series, carry out thousands of air traffic control activities daily and require significant training to prepare them for this job. The Federal Aviation Administration officials have unveiled a plan to hire 12,500 controllers during the next decade. The hiring surge was designed to offset the effects of an anticipated wave of retirements. The Federal Aviation Administration officials have projected that 11,000 air traffic controllers will leave the agency by 2014. The surge in retirements is linked to the 1981 Professional Air Traffic Controllers Association strike, when thousands of workers walked off the job and were replaced. These employees are now nearing retirement age.

Questions have been raised regarding the disproportionate underrepresentation of women and minorities among the air traffic control profession. This report provides the results of a barrier analysis for the Air Traffic Control Specialist (ATCS) centralized hiring process at the FAA.

The Equal Employment Opportunity Commission's (EEOC) Management Directive (MD) 715 outlines a comprehensive workforce analysis process to identify triggers for barrier analysis. MD 715 requires federal agencies to ensure the workplace is free of barriers that impede full opportunities to all persons in the workplace. The objective of the barrier analysis is the identification of specific barriers to the employment by race/national origin, sex, and disability. If the barriers identified are sufficiently detailed, effective actions must be taken by specific organizations to remove the barriers and improve the diversity of their workforces. The barriers must be specific, clear, and sufficiently detailed or else the barriers identified will be too general to yield appropriate actions to improve the diversity status of any particular class group. More importantly, agencies are required to file annual reports with EEOC that detail how well they are doing with identifying and addressing adverse effects from barriers to employment.

The FAA, Office of Civil Rights commissioned Outtz and Associates to conduct a barrier analysis of the ATCS position. The process was guided by MD 715 and the Uniform Guidelines on Employee Selection Procedures. Based upon the review of the ATCS Centralized Hiring

Process, seven critical decision points were identified for analysis as potential barriers to racial and gender employment opportunities:

1. Qualification determination of applications
2. AT-SAT testing phase
3. Preparation of the referral list of eligible and qualified applicant list
4. Centralized Selection Panel determination of selections to the interview process
5. Interview process
6. Medical clearance process
7. Security clearance process

Evidence of barriers was found for racial/ethnic minorities at the first four decision points. Evidence of barriers was found with regard to race/ethnicity and gender for the second decision point. No barriers were found for the last three decision points. Overall, women and minorities were underrepresented among those successfully completing the ATCS Centralized Hiring Process and being hired.

Recommendations to address the barriers include making improvements to the ATCS hiring process, developing a targeted marketing and outreach campaign to increase diversity within applicants pools, standardization of human resources (HR) evaluation criteria, removing inconsistencies in centralized selection process criteria, and revising how the AT-SAT is used in establishing best-qualified lists.

OVERVIEW

## BACKGROUND

The FAA unveiled a plan for replacing three-quarters of the air traffic controller workforce by hiring 12,500 controllers during the next decade to offset the effects of an anticipated wave of retirements resulting in 11,000 controllers leaving the agency by 2014. The surge in retirements is linked to the 1981 Professional Air Traffic Controllers Association strike, when thousands of workers walked off the job. President Ronald Reagan fired the striking controllers and the FAA subsequently hired mandatory replacement workers. Those newly hired controllers are now nearing retirement age. In 2014 the hiring surge is estimated at or around 11,000 hires, and the FAA expects to have more than 16,000 air traffic controllers in the agency.

## SCOPE

This report was commissioned in part due to the legal requirements contained in the EEOC MD 715, which requires federal agencies to ensure that the workplace is free of barriers that impede full opportunities to all persons in the workplace. Management Directive 715 provides policy guidance and standards for establishing and maintaining effective programs of equal employment opportunity under Section 717 of Title VII (Part A) and effective affirmative action programs under Section 501 of the Rehabilitation Act (PART B). Section II of these instructions contains operational guidance on how to identify barriers that tend to inhibit free and open workplace competition, and how to develop a meaningful plan to eliminate those barriers to equal employment opportunities.

## METHODOLOGY

Before examining the effects of the ATCS Centralized Hiring Process, we first examined the diversity within the application sources used by the FAA as input into the hiring system. Prior to assessing the diversity of the applicant pools, the data had to be adjusted to the applicant level of analysis. That is, the data set originally represented applications, not applicants, in that a single applicant could apply multiple times throughout a fiscal year depending upon the number of posted announcements. The Race and National Origin (RNO) and gender analysis that we are reporting required an assessment of individuals (i.e., applicants) and not applications.

The methodology we used to conduct the barrier analysis also involved an in-depth, root-cause analysis on a multivariance analysis approach and the Uniform Guidelines on Employee Selection Procedures. The Federal government's need for a uniform set of principles on the

question of the use of tests and other selection procedures has long been recognized. The EEOC, the Civil Service Commission, the Department of Labor, and the Department of Justice jointly have adopted these uniform guidelines to meet that need, and to apply the same principles to the Federal government as are applied to other employers. These guidelines incorporate a single set of principles that are designed to assist employers, labor organizations, employment agencies, and licensing and certification boards to comply with requirements of federal law prohibiting employment practices that discriminate on grounds of race, color, religion, sex, and national origin. They are designed to provide a framework for determining the proper use of tests and other selection procedures. These guidelines do not require a user to conduct validity studies of selection procedures where no adverse impact results have been seen. However, all users are encouraged to use selection procedures that are valid, especially users operating under the Federal government's merit principles.

As such, for each year from 2006 to 2011, we analyzed the qualification decision rates made as a function of the RNO and gender subgroups that comprised more than two percent of the population of applicants. We determined from this analysis that Native American/American Indian/Alaska Native and Native Hawaiian/Other Pacific Islander subgroups would be excluded from all subsequent analyses in this report due to their less than two percent representation in the applicant population. The decision to exclude these two subgroups is consistent with the analysis recommendations of the Uniform Guidelines issued by the EEOC, Civil Service Commission, Department of Labor, and the Department of Justice in 1978.

We relied on several criteria to determine the presence of a barrier. Specifically, one criterion that we used was computing a statistic referred to as *effect size* or *d-ratio*. This is a common statistic used in the scientific literature and it is used to understand the magnitude of the difference in selection rates between two groups. The benefit of using *d-ratios* is that there are standards that have been proposed to help researchers and practitioners interpret the magnitude of the *d-ratio*. In particular, *d-ratios* are considered small if they are less than 0.30; they are considered moderate if they are in close to 0.50; and they are generally considered large if they are close to 0.80 or above (Cohen, 1988). Smaller *d-ratios* may be considered trivial whereas larger *d*-values are more problematic. This, however, is not always the case. There are conditions when even small *d-ratios* indicate significant, practical effects. As an example, this can occur in situations in which the overall selection ratio (i.e., number of vacancies divided by the number of applicants) is very low. Very low selection ratios occur when there are typically very few openings and many applicants. In this situation, even small differences in the selection rates for various applicant groups can have meaningful negative consequences and constitute a barrier. For this reason we used three criteria to identify barriers. Our criteria are based on the weighted average of statistical values across years. Our specific criteria are:

- a statistically significant difference between a minority or gender group and the majority group (in this instance Whites and males),

- an effect size of 0.20 or higher, or

- an adverse impact ratio below 0.80.

If a selection step or component of the hiring process meets at least two of the three criteria, we consider it a barrier. Examining Tables 3 through 6, for example, it can be seen that qualification decisions for African-Americans meet all three criteria and therefore constitute a barrier for that group.

In the Technical Report that follows, there is a complete description of the scope and methodology of the barrier analysis and our approach using the data that we received from the agency.

## General Items to Note

Before discussing our specific findings, we note the following three general items. First, the percentage of applicants self-reporting RNO and gender status is quite high. This supports the premise that the samples reporting RNO and gender data are sufficiently large in relation to the total sample to indicate that there is little, if any, difference between the statistics from the self-report sample and what would be expected from the total sample. This is true even though more applicants self-reported RNO status than gender status. Second, the centralized hiring process was not fully implemented until 2007. The data for FY 2006 reflects the pre-2007 hiring process together with the ATCS Centralized Hiring Process currently under examination. Thus, even though we present results from FY 2006, we do not place as much weight on the FY 2006 results as we do on the results from FY 2007 to FY 2011. Finally, we computed weighted averages (e.g., Table 1) to provide an aggregate picture of the RNO and gender diversity composition in the various applicant sources across the fiscal years. This weighted average is computed using the formula described on page 34.

When we analyzed the variability of RNO and gender representation across sources of applicants, it became clear that the FAA has not used all applicant sources throughout the years. Indeed, announcements generating applications from the public source were only posted during FY 2007, FY 2008, and FY 2009. This is despite the extensive representation of African-Americans in this application pool (average 31.3%), as well as our finding that the General Public application source has the second highest pass-rate of minimum qualifications compared to the other sources of applicants. This finding (General Public source having the highest RNO diversity and second highest pass rate) is at odds with current FAA policies, such as not posting ATCS jobs to the General Public since 2009. This policy is consistent with general comments from trainers such as, "Please tell them not to send me any more public hires" (quoted in Barr, Brady, Koleszar, New, & Pounds, 2011; p. 16). The Barr et al. (2011) report interpreted this quote and other similar data, as indicating that the FAA "needs to review its hiring practices to

take advantage of the Air Traffic-Collegiate Training Initiative (AT-CTI) system it has created" (p. 16). As a result of our findings, we question these policies and conclusions. Given the limited number of applicants and especially the diminished diversity in the AT-CTI application source, there are serious diversity consequences for not fully using the General Public application source.

We also identified concerns about the RNO and gender diversity of the CTI schools. A recent report produced by the FAA titled "Air Traffic-Collegiate Training Initiative Diversity Data 2011-12" dated June 12, 2012, sought to determine the diversity of the potential applicant pool from the partner CTI colleges and universities. The authors of that report sought to establish a baseline that would be used to assess the effectiveness of future efforts to improve the diversity of the AT-CTI program. However, when the report was examined in detail, several issues became clear. First, there is a dropout of African-Americans from freshman year (16.9%) to the senior year (6.0%) in four-year CTI programs. This dropout rate of African-Americans is troubling. We recommend that the FAA undertake efforts to understand the cause for this selective dropout rate and take reasonable countermeasures to reduce it in the future. The FAA should investigate this problem by contacting four-year CTI schools and working with them to identify the possible causes of this problem.

Second, while the report "Air Traffic-Collegiate Training Initiative Diversity Data 2011-12" estimated the percentage of African-Americans in the CTI schools to be 12%, that percentage is an overestimate determined by including all students, regardless of their matriculation credits. For purposes of the FAA diversity assessment, the more important statistic is to examine the percentage of students from each ethnic subgroup who are in their senior year in their programs. Specifically, 6% of the CTI seniors from universities are African-American, which actually more closely corresponds to the 2011 CTI applicant source results that we report in Table 1F in Appendix A (5.4%) than the 12% African-American students reported in "Air Traffic-Collegiate Training Initiative Diversity Data 2011-12."

Finally, it would be helpful in future reports for the RNO and gender results to be reported at the school level as well as the individual level of analysis. A school-level analysis will identify diversity problems at the college or university level. This issue is not addressed in the analysis reported in "Air Traffic-Collegiate Training Initiative Diversity Data 2011-12."

Another barrier that we identified concerned the decision regarding the applicant sources that will be used to sample applications. The definition of the applicant pool affects the extent to which different RNO and gender groups are able to pass the minimum qualification criterion. This application source barrier precedes all other barriers in this process because it not only is the first step in determining the hiring process, but it also influences where to draw the applicants from outside the legal requirements that must be met and what sources are the best

- o A Steering group responsible for monitoring and improving the ATCS Hiring Process should be established. At a minimum this committee should include a representative from the Office of Human Resources (AHR) and a representative from the Office of Civil Rights (ACR). ACR should have oversight per policy order 1400.8A, Chapter2, Section 4e (5/16/12).
  - ➢ This committee could be an existing FAA unit/division or a group of persons drawn from various units throughout the FAA who are stakeholders in the ATCS selection process.

- ❖ There should be continued community outreach efforts to educate applicant populations about the ATCS occupational series.

- ❖ Qualification decision point:

  - o A standardized training program for HR specialists should be established. The training program should focus on how to properly evaluate applicant qualifications.
  - o The list of collegiate training initiative (CTI) schools needs to be reconsidered with regard to the degree to which it fosters a diverse applicant pool.
  - o CTI school differential effectiveness
    - ➢ Barr et al. (2011) reported that not all AT-CTI programs are equal. They recommended that the FAA track the success of the graduates from each program. The AT-CTI schools differ in terms of equipment (e.g., simulations time and equipment) and the length of training (e.g., 2-year versus 4-year education) given to the students. The Barr et al. (2011) report recommended categorizing the AT-CTI schools by levels based upon the strength of curriculum. We highly recommend analyzing the quality of the product from these schools as well as their diversity. RNO and gender diversity need to be explicitly considered when determining the sources for applicants in each upcoming recruitment year.
  - o CTI diversity data for 2011-12 indicated that a significant number of African-Americans drop out of CTI programs between the freshman and senior year. The FAA should investigate this problem by contacting four-year CTI schools, working with them to identify possible reasons for this phenomenon to correct the problem.

- ❖ AT-SAT decision point

  - o The agency uses this cognitively loaded test while minimizing the use of noncognitive tests to select applicants, despite the fact that applicants are trained in required competencies, and many noncognitive competencies are important to job success. There is little, if any, evidence that use of the AT-SAT with today's

applicants predicts subsequent job performance, therefore less weight should be given to it. The original validation report recommended a cut score of 70. The Agency's use of highly qualified band creates additional RNO and gender diversity problems; therefore one band of 70 and higher should be used. There are alternative ways of combining multiple predictors to handle high applicant volume within ATCS selection (e.g., multiple hurdles, unit weighting of components, pareto-optimal weighting of components).

- o We recommend using a version of the multiple hurdle approach in which the components with the least adverse impact are used first in the hiring process to identify applicants with maximum potential. We recommend that stringent but defensible pass scores be set for these front loaded components. Then the components that have the most adverse impact are used in the latter stages of the hiring process. Given that a large portion of the applicant pool will be eliminated by the first hurdle(s), the pass scores for subsequent components can be more lenient. Research has demonstrated that this approach maximizes diversity while minimizing reductions to criterion-related validity.

- o Our overall recommendation is to revise the way AT-SAT is used (near-term), and eventually replace it (long-term).
    - ➢ Update the items for those components that can be shown to be valid.
    - ➢ Revise the test so that it assesses cognitive ability in the context of how that ability is used on the job while considering RNO and gender diversity.
    - ➢ Further, search for additional predictors to add to the selection protocol.
    - ➢ Apply a multihurdle approach to reduce adverse impact. In this approach, the experience components of the AT-SAT would be used to first identify the applicants with the most promise. This is accomplished by setting a strict pass score for this component of the AT-SAT. The cognitive AT-SAT components would then be used as the second hurdle to identify the applicants who will advance to the next step, the Centralized Selection Panel.
    - ➢ Immediately complete any AT-SAT validation projects that are in progress and use this information to improve the selection process.

- ❖ Centralized Selection Panel (CSP) decision point

    - o Remove inconsistencies in the CSP process by taking the following steps:

        - ➢ Either prohibit calls to applicants' references or mandate that calls be made to all references.

- ☐ Two-year initial eligibility from graduation date
- ☐ Extensions could be requested/granted until maximum entry age is met

**DIVERSITY AND APPLICANT SOURCE**

Before examining the impact of the ATCS Centralized Hiring Process, we first examined the diversity within the different application sources used by the FAA as input into the hiring system. Prior to assessing the diversity of the applicant pools, the data had to be adjusted to the applicant level of analysis. That is, the data set originally represented applications, not applicants, in that a single applicant could apply multiple times throughout a fiscal year depending upon the number of posted announcements. The RNO and gender analysis that we are reporting required an assessment of individuals (i.e., applicants) and not applications. Thus, we aggregated the data by applicant unique identifier so that the applicants for each fiscal year could be identified. The data presented in Table 1 are a function of this applicant level of analysis. Specifically, Table 1 provides the ethnic and gender composition of the applicants by weighted average of FY 2007 through FY 2011 from the different application sources. The data in Table 1 is based on the weighted average of data from FY 2007 through FY 2011.

Table 1: Subgroup Race/Ethnicity and Gender as a Function of Weighted Average by Application Source

| Ethnicity | Weighted Average FY2007–FY2011* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Veterans Recruitment Appointment (VRA) | | Retired Military Controller (RMC) | | Other (CTO) | | Public | | Reinstatement-DOD CPC | | College Training Initiative (CTI) | |
| | Total | % | Total | % | Total | % | Total | % | Total | % | Total | % |
| Asian | 414 | 2.1% | 318 | 2.2% | 239 | 2.2% | 1136 | 2.8% | 62 | 2.0% | 154 | 4.6% |
| African-American | 6,646 | 34.6% | 6,100 | 42.5% | 3291 | 30.8% | 12,433 | 31.3% | 844 | 27.9% | 179 | 5.4% |
| Hawaiian | 141 | 0.7% | 67 | 0.5% | 63 | 0.6% | 274 | 0.7% | 27 | 1.0% | 16 | 0.9% |
| Hispanic | 1,182 | 6.0% | 849 | 5.9% | 628 | 5.6% | 2,390 | 5.8% | 183 | 5.8% | 219 | 6.5% |
| Multi | 1,409 | 7.4% | 920 | 6.4% | 797 | 7.2% | 2,920 | 7.0% | 210 | 7.0% | 231 | 6.9% |
| Native American | 109 | 0.6% | 72 | 0.5% | 66 | 0.6% | 225 | 0.5% | 20 | 0.7% | 9.0 | 0.3% |
| Unanswered | 1,054 | 5.6% | 707 | 5.1% | 529 | 4.7% | 1,890 | 4.5% | 223 | 7.2% | 191 | 5.7% |
| White | 8,894 | 45.5% | 5,546 | 38.8% | 5,638 | 50.7% | 20,400 | 49.8% | 1,634 | 51.9% | 2,373 | 70.4% |
| **Gender** | | | | | | | | | | | | |
| Female | 4,203 | 21.4% | 3,522 | 24.3% | 2,316 | 20.8% | 9,846 | 23.9% | 652 | 20.4% | 577 | 17.2% |
| Male | 13,321 | 67.3% | 9,278 | 63.8% | 7,595 | 67.7% | 27,151 | 65.3% | 2,114 | 66.1% | 2,481 | 73.6% |
| Unanswered | 2,325 | 11.9% | 1,779 | 12.3% | 1,340 | 12.1% | 4,671 | 11.2% | 437 | 13.8% | 314 | 9.7% |
| | | | | | | | | | | | | |
| Total | 19,849 | | 14,579 | | 11,251 | | 41,668 | | 3,203 | | 3,372 | |

*The weighted averages are based on available data from FY 2007 to FY 2011

Before drawing conclusions from the data in Table 1, three points should be noted. First, the percentage of applicants self-reporting RNO and gender status is high. This supports the premise that the samples reporting RNO and gender data are sufficiently high in relation to the total sample to indicate that there is little, if any, difference between the statistics from the self-report sample and what would be expected from the total sample. This is true even though more