Certain Information Contained Herein May Be Deemed Confidential and Subject to a Protective Order

# Initial Expert Report
*of*
# GLENN W. PERDUE, MBA, CVA, MAFF, CLP

*Submitted on behalf of the Plaintiffs in the matter of:*

---

Andrew J. Brigida
Matthew L. Douglas-Cook

Plaintiffs

v.

Peter P. M. Buttigieg, Secretary of U.S. Department of Transportation

Defendant

Case No. 1:16-cv-02227-DLF
United States District Court for the District of Columbia

---

*Submitted:*

Thursday, June 10, 2021

# EXHIBIT 33

Certain Information Contained Herein May Be Deemed Confidential and Subject to a Protective Order

## I.   INTRODUCTION

1.  My name is Glenn W. Perdue.  I am the Managing Member of Kraft Analytics, LLC, an affiliate of KraftsCPAs PLLC in Nashville, Tennessee.

2.  I hold an undergraduate degree in Finance from Middle Tennessee State University ("MTSU") and an MBA from Vanderbilt University.  I also hold professional credentials as a Certified Valuation Analyst (CVA), Master Analyst in Financial Forensics (MAFF), and Certified Licensing Professional (CLP).  My practice focuses upon the assessment of liability, causation, and damages in commercial disputes; business and intangible asset valuation; transaction advisory services; and other forms of economic analysis for businesses.  I began my professional career in the venture capital industry and later became the President of a technology company.  Prior to joining my current firm, I was with Crowe Chizek and Company (now Crowe), a top-ten accounting and consulting firm where I also provided valuation, litigation support and transaction advisory services.  Prior to that, I was a Principal with LECG, an international economics and finance consulting firm.  My Curriculum Vitae is attached as **Exhibit 1**.

3.  I have been retained in this matter by Mountain States Legal Foundation, counsel for the Plaintiffs.  I have been asked to provide economic damage analysis in this employment discrimination matter.  I will not provide opinions on issues of liability and causation.

4.  My firm is being compensated at the rate of $550 per hour for the time I spend on this case.  Rates for others that may have assisted me range from $120 to $400 per hour.  None of this compensation is contingent upon the outcome or reaching of certain conclusions in this matter.

5.  While I have been provided with access to documents produced thus far by the plaintiffs and defendants, I understand that discovery in this matter is on-going.  Furthermore, this is my Initial Expert Report ("Initial Report").  I understand the purpose of this Initial Report is to broadly describe the types of calculations and data I would use to determine damages in this matter after additional discovery has occurred.  I will submit another report(s) ("Subsequent Report") later reflecting refined calculations using additional data produced in discovery and other information obtained independently. In consideration of this limited purpose and on-going discovery, I have relied upon the following in preparing this Initial Report:

    1)  Third Amended and Supplemental Class Action Complaint for Declaratory and Injunctive Relief ("Complaint #3")
    2)  Fourth Amended and Supplemental Class Action Complaint ("Complaint #4")
    3)  Answer filed by the Defendants on November 5, 2018 ("Answer #3").  I understand this Answer was in response to Complaint #3

4) US Department of Labor Directive 310 for "*Calculating Back Pay as a Part of Make-Whole Relief for Victims of Employment Discrimination*" dated July 17, 2013 ("Directive 310")
5) Social Security Administration 2017 Actuarial Table for Men, the most recent table available at the time of this writing
6) "*State Pension Funds Reduce Assumed Rates of Return*" research from the PEW Charitable Trusts published December 2019
7) Answer to Fourth Amended and Supplemental Class Complaint ("Answer #4") filed 6/2/2021
8) *FAA New Hire Training Performance Semi-Annual Report* dated June 7, 2012 ("2012 FAA Report")
9) *FAA New Hire Training Performance Semi-Annual Report* dated January 10, 2013 ("2013 FAA Report")
10) Wikipedia references cited herein related solely to sequestration timing
11) Discussions with retaining counsel
12) My experience in analyzing and modeling employee compensation for valuation purposes, transactional purposes, and in performing employment-related loss calculations

6.  This report is organized in the following sections:

   I.     Introduction
   II.    Background
   III.   Macro-Level Damage Considerations
   IV.    Preliminary Damage Calculation Model
   V.     Exhibits
          1. Perdue CV
          2. But-For Income and Benefits
          3. Pension Funding Calculation
          4. Actual/Estimated Income and Benefits
          5. Damage Calculation

7.  References found herein to "we" or "our" refer to me and individuals working under my supervision.

8.  **<u>While I provide certain calculations in this Initial Report, they are provided for illustration purposes only.  These calculations are based on round number estimates without specific support to demonstrate key concepts and calculation mechanics.  The values derived in this Initial Report are not intended to provide an estimate of damages for use in this proceeding.</u>**

9.  The basis and reasoning for the sample calculations in this Initial Report are set forth in the report detail and exhibits that follow and will be supplemented further by my Subsequent Report(s) and testimony.[1]  I understand I may also be

---

[1] Please note that rounding may cause minor discrepancies in calculated values on exhibits and tables which may be referenced in the narrative of this report.  In addition, rounded and truncated values may

Certain Information Contained Herein May Be Deemed Confidential and Subject to a Protective Order

called upon to respond to the opinions of others.  Such responses may involve expressing additional opinions not considered in my report(s).

10. In my opinion, certain calculation approaches introduced herein will be applicable in determining losses for members of the proposed class.  One reason this approach is applicable is because of the way air traffic controllers progress through their careers and are required to retire by age 56.  I understand the scope of issues to be certified for the class has yet to be determined and that a spectrum of loss calculation possibilities exist at this point.  The approach considered herein is consistent with generally accepted approaches for calculating back pay and front pay losses.

---

be referenced in this report for the sake of brevity and readability.  I may cite support for my observations and opinions using certain examples.  However, additional support may exist in other sources of information noted elsewhere.  I may reference this additional support in subsequent deposition and trial testimony.  I reserve the right to use the information cited in this report and documents I have reviewed as the basis for trial exhibits.  Trial exhibits may include exhibits included in this report or new exhibits developed later specifically for use at trial.  $M expresses amounts in millions of U.S. dollars. I reserve the right to update my opinions on the basis of new or changed information becoming available to me.

## II.    BACKGROUND[2]

11. The plaintiffs allege wrongful race-based employment practices involving air traffic control specialists ("ATCS") in violation of Title VII of the Civil Rights Act of 1964.   The challenged conduct involves hiring practices that adversely impacted ATCS candidates that graduated from colleges and universities affiliated with the Federal Aviation Administration's ("FAA") Air Traffic-Collegiate Training Initiative ("AT-CTI" or "CTI").  The CTI program was a helpful recruitment tool for new controllers.  While the FAA did not fully implement the challenged policies until 2014, the plaintiffs assert the alleged discriminatory conduct started no later than 2012.

12. In Answer #4, the Defendants admit to certain factual assertions made by the Plaintiffs but deny wrongdoing.

13. The following provides a brief timeline summary based primarily upon Complaint #4:

> <u>1991</u> – The FAA establishes the Air Traffic-Collegiate Training Initiative ("AT-CTI" or "CTI") as a recruitment source for entry-level controllers. Under this program, the FAA provided CTI Institutions with approximately 200 hours of classroom instruction materials.  The FAA promoted military experience and CTI Programs as the best ways to get hired as an air traffic controller. (23-27)

> <u>1992</u> – The CTI program begins with 5 institutions. (40)

> <u>1997</u> – The CTI program grows to 14 institutions (40)

> <u>2000</u> – A Task Force ("2000 Task Force") of the FAA National Employees Forum published *"A Business Case and Strategic Plan to Address Under-Representation of Minorities, Women and People with Targeted Disabilities"* citing the high percentage of "White Males" being hired through the CTI program. (54-56)

> <u>2005</u> – Graduates from CTI programs were required to pass the Air Traffic Control Selection and Training examination ("AT-SAT") to become eligible for employment as a trainee controller.  The AT-SAT test was first used to screen General Public ("GP") candidates in 2002.  In addition to screening for initial aptitude, the AT-SAT was also used to predict achievement of Certified Professional Controller ("CPC") status and future job performance. (28-31)

---

[2] Information in this section was obtained primarily from the Complaint #4.  I understand the Defendant may controvert some of this information.  However, this information is summarized herein only to provide context and illustrate timing factors that may be relevant to the calculation of damages. Information obtained from the complaint cites relevant paragraphs parenthetically.

Certain Information Contained Herein May Be Deemed Confidential and Subject to a Protective Order

<u>By 2008</u> – The FAA created and used CTI-only job posting in addition to posting for military and GP applicants.  Only graduates from CTI programs who were U.S. citizens, passed the validated AT-SAT assessment, and had not aged out of eligibility ("Qualified Applicants") were eligible to apply for CTI-only job postings.  New hires from CTI and GP postings would attend training at the FAA Academy in Oklahoma. (34-36)

<u>2009</u> – The CTI Program includes 36 institutions. (40)

<u>2009/2010</u> – Dr. Herbert Wong analyzes FAA diversity data.  The National Black Coalition of Federal Aviation Employees ("NBCFAE"), among others, used this analysis to lobby for changes in hiring practices in an effort to increase African American hiring for ATCS positions. (59-64)

<u>2011</u> – The Budget Control Act of 2011 ("BCA") was enacted and initially called for across-the-board budget cuts by federal agencies to take place at the beginning of 2013.[3]

<u>2012</u> – Hiring practices are affected by diversity lobbying efforts and the anticipation of new initiatives. (74-76)  The American Taxpayer Relief Act of 2012 postponed federal budget cutting under the BCA until March 2013.[4]

<u>2012/2013</u> – Published reports indicated CTI graduates, as compared to GP candidates, obtained higher scores on the AT-SAT, failed at a lower rate, obtained CPC status faster, and obtained CPC status at a higher rate. (46-52).

<u>2013</u> – The FAA released various barrier analysis reports claiming that the CTI program limited diversity, leading to the ultimate use of biographical assessments in the hiring process for air traffic controllers. (89-101). Lead Plaintiffs Brigida and Douglas-Cook both took and passed the AT-SAT test and each received a 100% score. (153-172)

<u>2014</u> – The FAA Implemented new hiring processes that included the use of biographical assessments. (112-131)

<u>2015</u> – Plaintiffs filed the initial Complaint in this matter on December 30.

<u>End of 2023</u> – Currently estimated trial date for demonstration calculation purposes.

---

[3] https://en.wikipedia.org/wiki/United_States_budget_sequestration_in_2013 - accessed 6/7/2021
[4] Ibid.

### III.    MACRO-LEVEL DAMAGE CONSIDERATIONS

14. This section provides a macro-level analysis of the activities relevant to this matter along with an introduction to the damage calculation approach being considered.  The discussion in this section follows **Figure 1** below:



FIGURE 1: Macro-Level Damage Considerations for CTI Candidates

*(A) Graduate from AT-CTI School*

15. The proposed class involves graduates of CTI schools that applied to become air traffic controllers with the FAA.

*(B) Take AT-SAT Test*

16. To be considered by the FAA for employment as a controller, CTI graduates applying through the CTI hiring channel were required to take the AT-SAT test. I understand that CTI graduates that applied through the GP channel were permitted to take this test at a later time.

*(C) Eligible for Employment*

17. Prior to implementation of the challenged biographical assessment, CTI graduates were required to score 70 or more on the AT-SAT test, be a U.S. citizen, and meet the FAA's age criteria.

### (D) Proposed Class

18. In addition to meeting the eligibility requirements cited in Section C, the proposed class includes other criteria which is indicated in paragraph 173 of Complaint #4.

### (E) FAA Hiring Considerations

19. In my Subsequent Report, if necessary, I will consider various FAA hiring factors such as:

   i.   Hiring rates for the proposed class prior to any impact from the challenged conduct (perhaps before 2012).

   ii.  Hiring demand within the FAA for new controllers to demonstrate the existence of capacity to hire members of the proposed class (perhaps starting in 2014).  As noted in the timeline, I am generally aware of the federal budget sequestration that became effective in early 2013.  I expect that information provided in subsequent discovery will allow for further analysis to determine what impact, if any, sequestration might have had on the hiring of controllers.

   iii. Prior to hiring, I understand candidates were required to take and pass various screening tests.  Some candidates would not pass these tests.  I will consider this issue as part of the attrition analysis in my Subsequent Report.

   iv.  Employee on-boarding that may occur over time in tiers or waves of candidates.

### (F) Expected Hiring

20. Based upon the additional analysis discussed above, my Subsequent Report will assess expected FAA hiring of proposed class members to become controllers.

### (G) Lost Earnings

21. The purpose of Directive 310 is to "*provide guidance on calculating back pay as a part of make whole relief for victims of employment discrimination …*"  While this directive provides several definitions, the following two are helpful in introducing the topic of Lost Earnings.

   Make-Whole Relief – Remedy for discrimination that restores the victim of discrimination to his or her rightful place, *i.e.*, the position, both economically and in terms of employment status, that he/she would have occupied if the discrimination had not taken place.  Common elements of make-whole relief include an award of the position the individual was wrongly denied, back pay with interest and retroactive seniority.

Back Pay **–** Total lost earnings due to a contractor's discriminatory employment action, practice, or procedure.  Lost earnings include but are not limited to: compensation or salary, overtime, premium pay and shift differentials, incentive pay, raises, bonuses, lost sales commissions, cost-of-living increases, tips, medical and life insurance, fringe benefits and pensions, stock awards, and options.

22. The above definitions are consistent with my training and experience.  The objective of a lost earnings calculation in this setting is to provide the aggrieved party with the economic benefits they were deprived of due to the discrimination.  While Directive 310 is focused on back pay, in this setting it is necessary to also consider front pay under the concept of making the aggrieved party whole since earnings losses will continue past the date of trial.  My calculation of front pay is consistent with the calculation of back pay other than the necessity to use discounting to bring front pay back to a present value.

23. Like lost profit calculations in commercial litigation, lost earnings calculations are based upon three basic components:

But-For Earnings **–** Income and benefits that would have been earned *but-for* the alleged discriminatory conduct.

Actual Earnings **–** Income and benefits that were earned – and/or are reasonably expected to be earned in the future.  This element of earnings may also be referred to as *mitigating earnings* because it serves to reduce the severity of the loss.

Lost Earnings **–** But-For Earnings minus Actual Earnings equals Lost Earnings.  Put another way, Lost Earnings are the difference between what an aggrieved party would have made and what they actually made.

24. The next section provides more granular detail on specific elements and calculations being considered for use in determining Lost Earnings in this matter.

Certain Information Contained Herein May Be Deemed Confidential and Subject to a Protective Order

## IV.   PRELIMINARY DAMAGE CALCULATION MODEL

25. **Figure 2** summarizes the exhibits and high-level amounts calculated in this section for illustration purposes.



**FIGURE 2: Preliminary Damage Calculation Model**
*(approximate values provided below are for illustration purposes only)*

26. Expanding upon the introductory discussion of lost earnings provided in the previous section, this section considers more detailed data and calculations in **Exhibits 2-5**. Again, these exhibits are being provided for illustration purposes only as explained in paragraphs 5 and 8 of this Initial Report.[5]

27. **Exhibits 2-5** all contain Columns A-C that relate to timing considerations as noted below.

### (A) Year of Service

28. This column considers the year of service starting with year 1 of employment.

---

[5] The calculation elements noted in this section will ultimately be based on actual data obtained in discovery or independently and will be reflected in my Subsequent Report(s).

Certain Information Contained Herein May Be Deemed Confidential and Subject to a Protective Order

*(B) Age*

29. This column considers the employee's age during each year of service starting with the assumed age of 22 for year 1.

30. I understand many get started in their career as a controller at a later age than 22. This age will be adjusted based on consideration of age statistics for the proposed class and FAA data obtained in discovery.

*(C) Year*

31. This column reflects the calendar year starting in 2014 for year 1.

## EXHIBIT 2: But-For Income & Benefits

*(D) Base Pay*

32. Following graduation from the FAA Academy, controller base pay reflects the complexity of the controller's facility assignment along with education and certification attainment.  While the issue of certification is considered further below, the issue of facility assignment complexity is not explicitly considered in this Initial Report.

33. I have assumed that base pay during the first six months of employment during initial training at the FAA Academy is $15,000 while base pay for the next six months is $20,000.

34. According to the 2013 FAA Report for hiring years 2006 to 2009, the "*Time to Certify*" averaged approximately 2.4 years for CTI graduates.  This measure is the time "*from the day the developmental enters facility training until the date of certification*."[6]  This metric is relevant because of the way CPC certification accelerates pay increases for controllers.  I understand facility-level training begins after FAA Academy graduation, which takes approximately 6 months. Therefore, CTI graduates, on average, would be fully certified entering their fourth year of employment as a controller.

35. I also understand that CPC status attainment occurs in levels and that increases in base pay occur as achievement levels increase.

36. I understand that $90,000 annually is a reasonable estimate of base pay - inclusive of complexity adjustments - for a CTI graduate that achieves CPC status 3 years after employment begins.  I use $90,000 for base pay starting in year 4.  In recognition of how increasing levels of achievement leads to increased base pay, I use $70,000 for year 3 and $50,000 for year 2.

---

[6] The term "developmental" appears to refer to an early-stage controller that is in the process of becoming CPC certified.  This term is not defined in the Definitions section of the report.

Certain Information Contained Herein May Be Deemed Confidential and Subject to a Protective Order

37. Starting in year 5, I assume base pay grows at 4% annually.

38. I understand the FAA has a mandatory retirement age of 56 for controllers so controller-related compensation calculations end at age 56.

### (E) Locality Pay

39. I understand locality pay exists to compensate controllers for assignments in busy locations, typically large cities where it is more expensive to live.  In this respect, locality pay functions as additional compensation to address cost of living differentials.

40. I understand locality pay is based on a percentage of base pay and generally ranges from 15% to 35%.  I have used 20% for illustration purposes.

### (F) OT Pay

41. Controllers are paid overtime.  This column assumes a typical controller generates OT Pay equal to 5% of base pay.

### (G) Total Income

42. This column provides a total for all three types of compensation (D-F).

### (H) Non-Retirement Benefits

43. Employers pay for their portion of an employee's social security and unemployment benefits along with other benefits they may provide such as life insurance and health insurance.

44. When modeling employee benefits, we use 20% of base compensation as a common estimate.  Given that federal government benefit packages are often considered more generous, I have used 25% here for illustration purposes.  Additionally, controllers are represented by a union that may help in negotiating more favorable benefits.

### (I) Retirement Benefits

45. I understand controllers are provided with both pension and 401K retirement benefits.  For illustrative purposes, my focus in this Initial Report is on pension benefits only.  I will consider 401K benefits in my Subsequent Report(s).

46. As federal civil service employees, qualifying controllers are provided with pension benefits upon retirement.  Pensions are a "defined benefit plan" in which benefits are defined up-front.  In contrast, most non-government employers today only provide "defined contribution plans" such as 401K plans

in which the employer provides a defined contribution amount up-front, but not defined a retirement amount on the back end.

47. **Exhibit 3** addresses the issue of pension benefits and is discussed further below. The calculated amounts in Column H of **Exhibit 3** are used in Column I of **Exhibit 2**.

### (J) But-For Total

48. This column provides a total for Columns G-I. This is the but-for total for an individual by year.  The individual total for all years is $9.3 million.

### EXHIBIT 3: Pension Funding Calculation

### (D) Retirement Benefits (Pension)

49. For illustration purposes, I have estimated retirement benefits at 60% of the last year's Total Income (before benefits) from Column G of **Exhibit 2**.  Since the last year's income is $379,478, 60% is $227,687 which is the first entry in this column.

50. Based on death rate statistics from the Social Security Administration ("SSA Actuarial Data"), the expected probability of survival is considered in Column A and is used to adjust the starting pension benefit downward each year.  This downward adjustment reflects the diminishing level of expected pension benefit payouts due to the death of recipients at various ages.  The SSA Actuarial Data also indicated that the life expectancy of a 56-year old male was 24.7 years, thus suggesting an overall life expectancy 80.7 years.  For purposes of this initial report, I have used age 80 as the stopping point for benefit calculations.  While I understand controllers are predominantly male, I may also incorporate female life expectancy in my Subsequent Report based on gender mix statistics.

51. The sum of actuarially adjusted payouts from age 57 to 80 (24 years) is $4.4 million.  This amount is predicated upon an individual controller that remains employed until the mandatory retirement age of 56 and receives full pension benefits.  However, I understand that this pension, like others, has eligibility requirements which may involve differing tiers of benefits based on length of service.  This issue will be considered more fully based upon additional information in my Subsequent Report(s).

### (E) Expected Annual Rate of Return

52. To determine how much money is needed in a current period to fund future pension obligations, it is necessary to understand the expected rate of return ("RoR") on pension fund investments.  I consulted a report from the PEW Charitable Trusts published in December 2019 entitled "*State Pension Funds Reduce Assumed Rates of Returns*" to assess these rates.  Citing a variety of sources,

this report explains that rates of return had generally been about 8% through 2010 but then started drifting downward to about 7.5% by 2017.  For purposes of this initial analysis, I used an 8% rate of return.[7]

53. The 8% RoR was used to calculate present value factors for use in discounting future pension payouts at the bottom of Column E.

### (F) Present Value (PV) Calculation

54. Multiplying pension benefits in Column D times the present value factor in Column E provides the present value of expected future pension benefits upon retirement.  The sum of these present value amounts is $2.1 million.  Put another way, the pension fund needs $2.1 million when the controller retires at 56 to pay for the controller's retirement benefits which start at age 57 in this model.

55. At the bottom of the model, we see that this $2.1 million amount is 53% less than the attrition adjusted sum of payments in Column D of $4.4 million.  This difference is due to discounting based on the expected 8% rate of return.

### (G) Total Income

56. This column restates total pre-benefit income from **Exhibit 2** Column G for use in the next calculation.

### (H) Pension Funding Rate

57. The 8.22% rate stated at the top of this column represents the percentage of Total Income in Column G required to fund future pension obligations.  Put another way, for every $100 in total income another $8.22 must be set aside to fund future pension obligations.  The basis for this calculation is provided in the discussion of the next two columns that follows.

58. Ignoring present and future value adjustments, the sum of pension fund contributions calculated in this column is approximately $595,000.

59. The 8.22% rate used herein is calculated for illustration purposes.  It may not be necessary to calculate this rate or even provide what is presented here as **Exhibit 3** if subsequent discovery provides pension funding rates or dollar amounts directly.

---

[7] Given the inverse relationship that exists between the RoR and the benefit obligation amount (i.e., less money is required now to fund future obligations as rates of return increase) my selection of 8.0% results in a smaller damage amount than would have occurred if 7.5% had been used.

### (I) Future Value (FV) Factors

60. This column provides future value factors which show how much pension fund contributions for each year of employment are expected to grow until the controller retires based on the 8% rate of return.  For instance, pension investments made during the first year of employment at age 22 are expected to grow 13.69 times by retirement at age 56.

### (J) Future Value (FV) Calculation

61. Multiplying pension fund contribution amounts in Column H by the FV Factor in Column I provides the future value amount by year.  Again, using the first year of employment as an example, we see that the $3,288 pension contribution times the FV Factor of 13.69 provides a future value of $45,013 at the time of retirement.  The sum of future value amounts for all years of employment is $2.1 million, thus providing the amount of funding needed to meet future pension obligations as calculated in Column F, which is also $2.1 million.

### EXHIBIT 4: Actual/Estimated Income & Benefits

### (K) Income

62. This column will provide base compensation that reflects what a CTI graduate that does not become a controller could reasonably expect to earn through the age of 56.

63. For illustration purposes, I assumed base pay for Year 1 starts at $45,000 per year and increases at 4% annually.

### (L) Non-Retirement Benefits

64. This column considers non-retirement benefits which are assumed to be 20% of base pay as discussed previously.

### (M) Retirement Benefits

65. This column assumes a typical defined contribution benefit plan.  In this case, I have assumed a common 3% match by the employer.

### (N) Actual Total

66. This column provides a total for columns K-M discussed above.  This is the actual total for an individual by year.  The individual total for all years is $4.1 million.

### EXHIBIT 5: Damage Calculation

**(J) But-For Total**

67. This column restates individual but-for compensation amounts, including all benefits, from **Exhibit 2** Column J.

**(N) Actual Total**

68. This column restates individual actual/estimated compensation amounts, including all benefits, from **Exhibit 4** Column N.

**(O) But-For Minus Actual**

69. This column provides the individual compensation loss by year, which is the difference between the But-For Total (J) and Actual Total (N). The sum of these individual losses through age 56 is $5.2 million before consideration of attrition and discounting, which are considered next.

**(P) Acceptance and Retention**

70. This column reflects two different measures that are used in a similar way to determine how many individuals are expected to remain in a subsequent year.

> Acceptance – reflects the acceptance rate of proposed class members into the FAA training program in Oklahoma to become a controller. For illustration purposes, I have used 80%. As noted in Section III, to the extent that other issues impact acceptance rates they too will be considered in my Subsequent Report(s).

> Retention – reflects the rate at which individuals from a prior year remain employed in the following year. For illustration purposes, I have assumed 90% retention. Retention is the opposite of attrition, which reflects a rate of loss. In this example, the 90% retention rate indicates that the attrition rate is 10%. Controller attrition may occur for a variety of reasons such as:

> - Death
> - Personal decisions (*e.g.*, staying home to care for family)
> - Termination
> - Leaving the federal government to pursue a career elsewhere
> - Accepting a non-controller position within the FAA
> - Accepting a position elsewhere within the federal government

71. In the 2013 FAA Report I noted sections addressing the "Status" of 2006-2009 "Hiring Classes" by year. In each of these sections, it appears attrition statistics were tracked through the end of fiscal year 2012. Attrition levels ranged from 14.5% for the 2006 hiring class to 9.5% for the 2009 hiring class. On a compound annual basis, it appears attrition levels generally ranged from 2-3% per year. I

Certain Information Contained Herein May Be Deemed Confidential and Subject to a Protective Order

will adjust attrition levels based on the best available evidence in my Subsequent Report(s).

### (Q) Class Member Count

72. Starting with the assumed class member count of 1,250, this column reflects the expected reduction in member count based on the acceptance and retention rates in Column P.

### (R) Net Retention Rate

73. This column calculates the net rate of retention by dividing the class member count (Q) by the beginning class member count of 1,250.

### (S) Attrition Adjusted Loss Amount

74. This column is the product of the individual earnings loss amount (O) times the net retention rate (R) which provides the loss amount for an individual after adjusting for attrition.

### (T) PV Rates and Factors

75. This column assumes a 4% rate for interest and discounting purposes to enable present value and future value calculations.  Based upon Directive 310, I understand quarterly compounding is recommended for interest calculations involving back-pay.  Therefore, I calculated an equivalent annual rate based on annual compounding since we are using annual amounts.  **Figure 3** provides this calculation:

**FIGURE 3: Annual Equivalent Rate Calculation**

| | **4%** | Rate Based on Annual Compounding |
| --- | --- | --- |

| | | Quarterly Compounding Rate | | |
| --- | --- | --- | --- | --- |
| **PV** | 1.000% | 1.000% | 1.000% | 1.000% |
| 1 | 1.0100 | 1.0201 | 1.0303 | **1.0406** |

76. Based on **Figure 3**, the annual equivalent rate based on quarterly compounding is 4.06%, which is what is used for all PV calculations involving both interest and discounting for the sake of simplicity in this illustration model.

77. Based upon the 4.06% rate, PV factors are then calculated for each year to bring back pay "forward" with interest up to the year of trial and bring front pay "backward" through discounting to account for the time value of money.

78. Since the trial is assumed to occur at the end of 2023 for illustration purposes, the PV factor for this year is 1.000 denoting no present value adjustments. For prior periods the PV factors are greater than 1 which denotes the calculation of interest. For future periods the PV factors are less than 1 which denotes discounting.

### (U) Individual Amount by Year

79. This column provides the product of the Attrition Adjusted Loss Amount for an individual (S) times the PV factor (T) to obtain an individual loss amount that reflects both attrition and present value calculations.

### (V) Individual Cumulative by Year

80. This column provides the running cumulative loss for the fully adjusted Individual Amount by Year (U) on an annual basis. I often provide this type calculation to assess various potential cut-off points for damages to assist the trier of fact if they deem that an earlier end point for damages is appropriate.

81. This type of cumulative calculation also provides a double check for totals at the bottom of the page.

### (W) Class PV Amount by Year

82. This column provides the product of the Class Member Count (Q) times the Individual PV Amount by Year (U). This product is the basis for a weighted average loss calculation for the entire class that considers both attrition, future value calculations, and present value calculations.

### (X) Class Cumulative by Year

83. As with the prior Individual Cumulative by Year calculation (V), this column provides a similar cumulative amount but this time it is based on the Class PV Amount by Year (W).

### Totals and Calculations Considered at the Bottom of EXHIBIT 5

84. **Column J:** The $9.3 million total reflects work life compensation - before adjustments for attrition, interest, and discounting - for a CTI graduate that becomes a controller at 22, obtains CPC status and retires at 56.

85. **Column N:** The $4.1 million total reflects compensation - before adjustments for attrition, interest, and discounting – for a comparable CTI graduate through age 56 that did not become a controller.

86. **Column O:** The $5.2 million total reflects the total for annual loss amounts through age 56.  Logically, this $5.6 million loss also equates to the difference between the but-for and actual totals discussed above ($9.3M - $4.1M = $5.2M).  Again, this amount does not consider attrition or adjustments for interest and discounting.

87. **Column S:** The $570,741 total reflects the attrition adjusted total loss for an individual.  This amount is 89% less than the pre-adjustment total of $5.2 million for Column O.  This reduction is due solely to the attrition.

88. The $524,039 total at the bottom of Column U reflects the fully adjusted individual loss after consideration of attrition, interest, and discounting.  This amount is 8% less than the attrition adjusted amount discussed in the preceding paragraph and reflects the net impact of interest and discounting adjustments.

89. On a combined basis, attrition and discounting account for a 90% reduction to the unadjusted individual loss.

90. The $187 million total at the bottom of Column W reflects the fully adjusted cumulative loss for the entire class.  This is a weighted total based on remaining class members each year in Column Q.  Not surprisingly, the presence of more people early and less people later due to attrition causes damages to more heavily weighted in the early years.  To illustrate, Column X indicates that half of the damages are accrued sometime between year 5 and 6.  Put another way, it takes about 5 years to accumulate the first $93 million and about 30 years to accumulate the remaining $93 million.

91. The $187 million loss total is 356 times greater than the fully adjusted individual loss amount of $524,039.  Put another way, multiplying the individual loss of $524,039 times 356 class members provides the final class-level loss amount of $187 million.

92. The mid-point (or average) individual loss amount for the entire period is $262,019 ($524,039/2).  This $262,109 Individual Cumulative Loss amount occurs sometime between year 8 and 9 in Column V as does the Member Count of 356 in Column Q.  This weighted average member count of 356 times the fully adjusted individual loss amount of $524,039 provides the class-level loss amount of $187 million.

93. Below the $187 million loss total for the class, the beginning class member assumption of 1,250 members is restated and then divided into the class-level loss total of $187 million in arriving at a pro-rata loss amount per class member of $149,437.  This pro-rata individual loss amount per class member reflects a 97% reduction to $5.2 million unadjusted individual loss total for Column O.

Certain Information Contained Herein May Be Deemed Confidential and Subject to a Protective Order

94. Again, these calculations were not intended to provide and do not provide a usable damage amount. They are provided for illustration purposes only. Amounts calculated in my Subsequent Report(s) will differ.

Respectfully Submitted,

Glenn W. Perdue
Thursday, June 10, 2021

Certain Information Contained Herein May Be Deemed Confidential and Subject to a Protective Order

# V – EXHIBITS

EXHIBIT 1



**Glenn Perdue, MBA, CVA, MAFF, CLP**
**Managing Member**
gperdue@kraftcpas.com
615.782.4206

## Background

Mr. Perdue leads Kraft Analytics, LLC which provides valuation, forensics, and transaction advisory services. Forensic experience includes work with attorneys related to contract disputes, valuation, economic damages (lost profits, unjust enrichment/disgorgement, reasonable royalty, loss/diminution of value, etc.) intellectual property, licensing, antitrust, insurance recovery, financial reconstruction, investigative analysis, computer forensics, and e-discovery.  Valuation experience includes the valuation of businesses, equity interests, intangible assets (including intellectual property) and executive/professional compensation for transactional, managerial, compliance, accounting, tax, and litigation purposes.

Mr. Perdue began his professional career in the venture capital industry and later became the president of a technology company.  He is experienced with business transactions involving equity investments, debt financing, mergers, acquisitions, divestitures, buy-outs, joint ventures, bankruptcy, financial distress, foreclosures, licensing, and asset sales.  He consults with clients and counsel as a transaction advisor.  Industry experience includes work in information technology (software, SaaS, hardware, data communications, Internet, and telecommunications), life sciences (pharmaceuticals, biotech, and medical device), healthcare services (hospital, ASC, dialysis, LTC/SNF, physician practices, health insurance, imaging centers, healthcare IT, and PBMs), media (Internet, CATV) entertainment (music, touring, publishing, gaming, video), automotive, advertising, banking, financial services, construction, real estate, professional services, restaurants, transportation, manufacturing, and distribution.

## Employment History

Kraft Analytics, LLC (an affiliate of KraftCPAs PLLC) – Nashville, Tennessee
- *Managing Member, August 2008 - Present*

Crowe Chizek & Company, LLC – Nashville, Tennessee
- *Executive, Technology and Intellectual Property Practice Leader, January 2006 – August 2008*
- *Executive, August 2004 to August 2008*

LECG, LLC – Nashville, Tennessee
- *Principal, January 2004 to August 2004*
- *Senior Managing Consultant, July 2002 to December 2003*

Independent Consultant – Nashville, Tennessee
- *January 1993 to June 2002*
- *Phyve Corporation, Director of Consulting Services, 2001*

Transouth Systems Group – Nashville, Tennessee
- *President/Co-Founder, October 1987 to January 1993*

Tennessee Equity Capital Corporation – Nashville, Tennessee
- *Associate, September 1986 to September 1987*

Glenn W. Perdue, MBA, CVA, MAFF, CLP

## Education and Certifications

- BBA – 1987 from Middle Tennessee State University (Concentration in Finance)

- MBA – 1995 from the Owen School of Management at Vanderbilt University

- CVA (Certified Valuation Analyst) – 2004 Certification from the National Association of Certified Valuator and Analysts related to proficiency and experience in business valuation

- MAFF (Master Analyst in Financial Forensics) – 2008 Certification from the National Association of Certified Valuators and Analysts with specialty designations in Business and Intellectual Property Damages, and Financial Litigation

- CLP (Certified Licensing Professional) – 2011 Certification recognized by the Licensing Executives Society International related to proficiency and experience in the licensing and commercialization of intellectual property

## Expert Testimony

Mr. Perdue has provided expert testimony in federal court, state court, depositions, arbitrations, and mediations as follows:

*(67) Lone Star Technological Innovations, LLC v. Asustek Computer Inc.*
Case No. 6:19-cv-00059-RWS in the United States District Court for the Eastern District of Texas
Trial Testimony: May 18/19, 2021 in Tyler, Texas

*(66) Amanda Cashion v. Brandt Cashion*
Case No: 19-CI-01685 in the Circuit Court of Warren County, Kentucky
Deposition Testimony: December 30, 2020 via Video Conference

*(65) Rachelle Davis v. Roy Davis*
Case No: 13D-2078 in the Circuit Court of Davidson County, Tennessee
Deposition Testimony: November 19, 2019 in Brentwood, TN
Trial Testimony: December 2, 2020 in Nashville, TN

*(64) First Wheel Management, Limited v. Inventist, Inc. and Shane Chen*
Case No:17-CV-1059-VAC-MPT in the United States District Court for the District of Delaware
Deposition Testimony: August 14, 2020 in Nashville, TN

*(63) Global Force Entertainment and Jeffrey Jarrett v. Anthem Wrestling Exhibitions, LLC*
Case No: 3:18-cv-00749 in the United States District Court for the Middle District of Tennessee
Hearing Testimony: June 25, 2020 in Nashville, TN
Deposition Testimony: April 28, 2020 in Nashville, TN

*(62) Nissan North America, Inc. v. West Covina Nissan, LLC et al*
Case No: 16-0883-BC in the Chancery Court for Davidson County Tennessee
Deposition Testimony: February 21, 2020 in Nashville, TN

Glenn W. Perdue, MBA, CVA, MAFF, CLP

*(61) Eugene Ferraro v. Convergent, Inc. et al*
Case No: 17-cv-00781-RBJ in the United States District Court for the District of Colorado
Trial Testimony: February 13, 2020 in Denver, CO

*(60) Northwest Eye Institute v. AmSurg Holdings, Inc. et al v. John S. Beretska, MD et al*
Case No: 02-19-0000-0323 American Arbitration Association
Deposition Testimony: December 27, 2019 in Nashville, TN
Arbitration Testimony: January 23, 2020 in Minneapolis, MN

*(59) Peggy Arnold v. Jeffrey Arnold*
Case No: 18-CI-01011 in the Circuit Court for Warren County Kentucky in Bowling Green
Deposition Testimony: September 6, 2019 in Bowling Green, KY
Trial Testimony: February 26, 2020 in Bowling Green, KY

*(58) Hiller, LLC v. Success Group International Learning Alliance, LLC et al*
Case No: 3:17-CV-743 in the United States District Court for the Middle District of Tennessee
Deposition Testimony: October 30, 2018 in Nashville, TN
Trial Testimony (Jury): March 7-8, 2019 in Nashville, TN

*(57) Kimberly Donchez v. Nathaniel Donchez*
Case No. 2017-271 in the Circuit Court for Williamson County, Tennessee
Deposition Testimony: May 24, 2018 in Franklin, TN

*(56) FDA Properties, LLC v. David Doyle Miller*
Case No. 2013-510 in the Circuit Court for Williamson County, Tennessee
Trial Testimony (Bench): March 28, 2018 in Franklin, TN

*(55) Brian Moore and M&E, LLC v. Glenn Dukes*
Case No. 15-1146-BC-(I)(IV) in the Chancery Court of Davidson County, Tennessee
Deposition Testimony: January 17, 2018 in Nashville, TN

*(54) Ernst Hospitality Corp. v. Hardaway Construction Corp.*
Arbitration Matter
Mediation Appearance: October 3, 2017 in Nashville, TN

*(53) USA Fundraisers, LLC v. Great American Opportunities, Inc.*
Case No. 16-957-BC in the Chancery Court of Davidson County, Tennessee
Mediation Appearance: September 26, 2017 in Nashville, TN

*(52) Nissan North America, Inc. v. Tustin Import Auto Sales, LLC et al*
Case No. 44679 Williamson County Chancery Court (transferred to Davidson Count Business Court)
Damages Hearing Testimony: April 27, 2017

*(51) Franchise Risk Solutions, Inc. v. Conifer Holdings, Inc. et al*
Case No. 16-0176-BC in the Chancery Court of Davidson County Tennessee
Deposition Testimony: January 26, 2017 in Nashville, TN
Trial Testimony (Jury): March 9-10, 2017 in Nashville, TN

Glenn W. Perdue, MBA, CVA, MAFF, CLP

*(50) Carl Stubner v. Erica Stubner*
Case No. 35066 in the Chancery Court of Williamson County, Tennessee
Deposition Testimony: January 20, 2017 in Franklin, TN

*(49) Elizabeth Perkins v. Phil Perkins*
Mediation Appearance (telephonic): December 6, 2016 in Nashville, TN

*(48) Protect-A-Car Wash Systems, Inc. v. Car Wash Partners, Inc. et al*
Case No. 1:16-cv-00534-JFM in the USDC for the Northern District of Maryland
Deposition Testimony: November 9, 2016 in Potomac, MD

*(47) Grady Cunningham v. Bedford County, Tennessee et al*
Case No. 30129 in the Chancery Court of Bedford County, Tennessee
Trial Testimony (Bench): September 1, 2016 in Shelbyville, TN

*(46) American Brokerage Network et al v. American International Group et al*
Case No. 01-15-0002-7786 – American Arbitration Association
Deposition Testimony: April 21, 2016 in Nashville, TN
Arbitration Testimony: May 22, 2016 in Nashville, TN

*(45) Virtual Studios, Inc. v. Stanton Carpet Corp.*
Case No. 4:15-cv-00070-HLM for the Northern District of Georgia in Rome
Deposition Testimony: April 19, 2016 in Chattanooga, TN

*(44) International Medcom, Inc. v. S.E. International, Inc.*
Case No. 1110018729 – Private Arbitration through JAMS
Arbitration Testimony: April 13, 2016 in San Jose, CA

*(43) Quality Manufacturing Systems, Inc. v. R/X Automation Solutions, Inc.*
Case No. 3:13-cv-00260 in the USDC for the Middle District of Tennessee in Nashville
Deposition Testimony: January 21, 2016 in Nashville, TN

*(42) ACS Transport Solutions, Inc. v. Nashville Metropolitan Transit Authority*
Case No. 3:13-CV-01137 in the USDC for the Middle District of Tennessee in Nashville
Deposition Testimony: January 12, 2016 in Nashville, TN

*(41) Accurate Energetic Systems, LLC v. American Sporting Supplies, LLC*
Case No. 01-14-0001-6388 – American Arbitration Association
Deposition Testimony: November 9, 2015 in Nashville, TN
Arbitration Testimony: December 3, 2015 in Nashville, TN

*(40) Carsar, LLC and Aspen Medical Products, Inc. v. DeRoyal Industries, Inc.*
Case No. 8:14-cv-01141-CJC-AN in the USDC for the Central District of California, Southern Division
Deposition Testimony: October 12, 2015 in Nashville, TN

Glenn W. Perdue, MBA, CVA, MAFF, CLP

*(39) Chapter 11 Bankruptcy of WASCO, Inc. and Lovell's Masonry, Inc.*
Case No. 3:15-bk-00068 in United States Bankruptcy Court for the Middle District of Tennessee
Deposition Testimony: August 6, 2015 in Nashville, TN
Confirmation Hearing Testimony on Behalf of Unsecured Creditors: August 21, 2015 in Nashville, TN

*(38) Sole Supports, Inc. v. MoJo Feet, LLC et al*
Case No. 13-cv-5044 in the Chancery Court for Hickman County, Tennessee at Centerville
Deposition Testimony: August 12, 2014 in Nashville, TN
Trial Testimony (Jury): April 21/22, 2015 in Centerville, TN

*(37) Colorado State University Research Foundation v. XY, LLC and Inguran, LLC*
Deposition Testimony: December 5, 2014 in San Antonio, TX
Arbitration Testimony: December 18, 2014 in Fort Collins, CO

*(36) Pate Santa Fe, LLC v. The Estate of David Wachtel (jointly retained)*
Mediation Appearance: November 10, 2014 in Nashville, TN

*(35) Global Systems, LLC v. Batesville Manufacturing, Inc.*
Case No. 4:12-CV-00031 in the United States District Court for the Eastern District of Tennessee
Deposition Testimony: May 27, 2014 in Nashville, TN

*(34) Coupled Products, LLC v. Calsonic Kansei North America, Inc.*
Case No. 50-457 T 00205 13 – International Centre for Dispute Resolution
Deposition Testimony: May 2, 2014 in Nashville, TN

*(33) William F. Hunt v. Veropele Nashville I, LLC*
Case No. 12-938-I in the Chancery Court for Davidson County Tennessee in Nashville
Deposition Testimony: March 19, 2014 in Nashville, TN
Trial Testimony (Bench): April 9, 2014 in Nashville, TN

*(32) Middle Tennessee Lumber Company, Inc. et al v. Door Components, LLC et al*
Case No. 3:12-cv-00343 in the U.S.D.C. for the Middle District of Tennessee in Nashville
Deposition Testimony: February 19, 2013 in Nashville, TN
Trial Testimony (Bench): August 28, 2013 in Nashville, TN

*(31) Jerry Dunlap v. The Nexus Group, Inc. et al*
Case No. 10-1951-I in the Chancery Court for Davidson County, Tennessee
Deposition Testimony: May 31, 2013 in Nashville, TN
Trial Testimony (Bench): August 20, 2013 in Nashville, TN

*(30) Sabre Defence Industries, LLC v. Steyr Arms, Inc.  et al*
Case No. 30 Y 118 00729 12 – American Arbitration Association
Deposition Testimony: July 25, 2013 in Atlanta, GA
Arbitration Testimony (Panel): August 14, 2013 in Atlanta, GA

*(29) Big Vision Private Limited v. E.I. DuPont De Nemours and Company*
Case No. 11 Civ. 8511-WHP-THK in the U.S.D.C for the Southern District of New York
Deposition Testimony: May 15, 2013 in Wilmington, DE

Glenn W. Perdue, MBA, CVA, MAFF, CLP

(28) *Middle Tennessee Lumber Company, Inc. et al v. Michael Lewis et al*
Private Arbitration Pursuant to the Commercial Arbitration Rules of the AAA
Deposition Testimony: March 19, 2012 in Nashville, TN
Arbitration Testimony: June 6, 2012 in Nashville, TN

(27) *PPG Industries, Inc. et al v. Lee Payne et al*
Case No. 3:10-CV-73 in the U.S.D.C. for the Eastern District of Tennessee in Knoxville
Deposition Testimony: April 11, 2012 in Nashville, TN

(26) *Raymond Jackson, et al v. Regions Bank*
Case No. 3:09-cv-00908 in the U.S.D.C. for the Middle District of Tennessee in Nashville
Deposition Testimony: January 30, 2012 in Nashville, TN

(25) *BSN Medical, Inc. v. Parker Medical Associates LLC, et al*
Case No. 3:09-cv-00015-RJC-DCK in the U.S.D.C. for the District of North Carolina
Deposition Testimony: May 20, 2011 in Charlotte, NC
Trial Testimony (Jury): December 15, 2011 in Charlotte, NC

(24) *Alfred K. Nippert, Jr. v. James R. Jackson, Jr. et al*
Case No. 3-09-1068 in the U.S.D.C. for the Middle District of Tennessee in Nashville
Trial Testimony (Bench): November 9, 2011 in Nashville, TN

(23) *Wendy's of Bowling Green, Inc. v. Marsh USA, Inc.*
Case No. 3:10-cv-01043 in the U.S.D.C. for the Middle District of Tennessee in Nashville
Deposition Testimony: October 26, 2011 in Nashville, TN

(22) *LiveOnTheNet.com, Inc. v. Digium, Inc. et al*
Case No. CV09-220 in the Circuit Court of Madison County, Alabama
Deposition Testimony: December 22, 2010 in Nashville, TN
Deposition Testimony: July 19, 2011 (telephonic)
Trial Testimony (Jury): August 19, 2011 in Huntsville, AL

(21) *United States of America v. James W. Carell, et al*
Case No. 3:09-0445 in the U.S.D.C. for the Middle District of Tennessee in Nashville
Deposition Testimony: July 27, 2011 in Nashville, TN

(20) *Joseph D. Freedman v. Leslie E. Freedman*
Case No. 10D-1017in the Circuit Court of Davidson County, Tennessee in Nashville
Mediation Appearance: June 1, 2011 in Nashville, TN

(19) *King Pharmaceuticals, Inc., et al v. Actavis, Inc. et al*
Case No. 07-CV-5041 (SDW) (MCA) in the U.S.D.C. for the District of New Jersey
Deposition Testimony: January 25, 2011 in New York, NY
Trial Testimony (Bench): March 8, 2011 in Trenton, NJ

Glenn W. Perdue, MBA, CVA, MAFF, CLP

_(18) ADS Security, LP_ v. _Superior Detection Systems, Inc._
Case No. 08-1543-II in the Chancery Court of Davidson County, Tennessee
Deposition Testimony: August 4, 2010 in Nashville, TN

_(17) Jess Hansen (Personal Representative)_ v. _KIA Motors Corporation et al_
Case No. 16-2007-CA-10437-XXXX-A in the Circuit Court of Duval County, Florida
Deposition Testimony: July 30, 2010 in Nashville, TN

_(16) Geocel Corporation et al_ v. _One Beacon Risk Management, Inc. et al_
Case No. 20C01-0802-CT-07 in the Circuit Court of  Elkhart County, Indiana
Deposition Testimony:  July 28, 2010 in South Bend, IN

_(15) Second Growth, LLC_ v. _Atlantic Station Wine, LLC et al_
Case No. 30 114 00654 09 before the American Arbitration Association in Atlanta, GA
Deposition Testimony: March 25, 2010 (telephonic)
Arbitration Testimony: July 22, 2010 (telephonic)

_(14) 1900 Telcom Holdings and BE&K, Inc._ v. _AFL Network Services, Inc._
Case No. 30 494 Y 00347 09 before the American Arbitration Association
Mediation Appearance: February 22, 2010 in Birmingham, AL

_(13) Randall L. Woodruff as Bankruptcy Trustee for Legacy Healthcare et al_ v. _South Central Conference of Seventh-Day Adventists_
Case No. 08-1633-II Chancery Court of Davidson County Tennessee
Deposition Testimony: September 8, 2009 in Nashville, TN

_(12) Kristen Alison Hall_ v. _Jennifer Nettles & Kristian Bush_
Case No. 1:08-CV-2437-TCB U.S.D.C. for the Northern District of Georgia
Deposition Testimony: July 22, 2009 in Nashville, TN

_(11) Classic Pride & Associates_ v. _BFI Waste Services, LLC_
Case No: 06-2960-IV, Chancery Court for Davidson County, TN
Deposition Testimony: May 15, 2009 in Nashville, TN

_(10) American Mensa, LTD._ v. _Inpharmatica, LTD. and BIOFOCUS DPI, LTD._
Case No:  1:07-CV-3283 U.S.D.C for the District of Maryland
Deposition Testimony: July 23, 2008 in Washington, D.C.
Trial Testimony (Jury): May 1, 2009 in Baltimore, MD

_(9) Van Bloem, Inc., et al_ v. _BDO Seidman, LLP_
Case No. 03-VS044687-C, State Court of Fulton County Georgia
Deposition Testimony: September 19, 2007 in Atlanta, GA
Trial Testimony (Jury): February 17, 2009 in Atlanta, GA

_(8) Division 2 Constructors_ v. _Tishman Construction Corporation of TN_
Case No: 06-1240-III Chancery Court for Davidson County, Tennessee
Deposition Testimony: November 18, 2008 in Nashville, TN

Glenn W. Perdue, MBA, CVA, MAFF, CLP

*(7) Schwarz Pharma, Inc. et al v. Teva Pharmaceuticals USA, Inc.*
Case No. 01-4995 (DRD) U.S.D.C. for the District of New Jersey
Deposition Testimony: January 16, 2008 in New York, NY

*(6) Grover Wayne Whaley v. Lisa D. Whaley*
Case No. DR02 – 1632, Circuit Court for Madison County, Alabama
Trial Testimony (Bench): September 6, 2007 in Huntsville, AL

*(5) Joel Goldman v. Healthcare Management Systems et al*
Case No. 1:05cv0035, USDC for the Western District of Michigan
Deposition Testimony: January 30, 2007 in Nashville, TN
Deposition Testimony: February 18, 2008 in Nashville, TN

*(4) Brim Holding Company, Inc. v. Province Healthcare Company (jointly retained)*
Case No. 06-1597-I, State of Tennessee Davidson County Chancery Court
Deposition Testimony: January 4, 2007 in Nashville, TN

*(3) Xerox Corporation v. Larry O'Dowd and Digital Document Systems, Inc.*
Case No. 3:06-0434, USDC for the Middle District of Tennessee
Hearing Testimony: October 19, 2006 in Nashville, TN

*(2) Investment Scorecard, Inc. v. Black Diamond et al*
Case No. 05-1136-IV, Chancery Court for Davidson County, Tennessee
Mediation Appearance: February 23, 2006 in Nashville, TN

*(1) Kellwell Food Management, Inc. v. Corrections Corporation of America, Inc.*
Case No. 03-536-KSF, USDC for the Eastern District of Kentucky in Lexington
Deposition Testimony: March 29, 2005 in Richmond, KY

## Other Engagement Experience

In addition to engagements where Mr. Perdue was retained as an expert in both testifying and non-testifying roles, he has provided business clients with consulting services involving valuation, strategic analysis, capital formation, new market entry, business development, technology planning, and other forms of economic analysis.  Mr. Perdue has also been involved in numerous other valuation, litigation, antitrust, and investigative matters in a support capacity.  Mr. Perdue has worked with Fortune 500 companies, middle-market companies, venture-backed companies, and early-stage/start-up businesses.

## Memberships and Affiliations

- Nashville Conflict Resolution Center – Member of the Board of Directors (current)

- BioTN Foundation, Inc. – Member of the Board of Directors and Executive Committee (current)

- Vanderbilt University Center for Technology Transfer and Commercialization – Member of the Entrepreneurship Advisory Council (current)

- Life Science Tennessee – Member of the Board of Directors and Executive Committee (current)

Glenn W. Perdue, MBA, CVA, MAFF, CLP

- Nashville Technology Council – Member of the Board of Directors and Executive Committee (prior)

- University of Tennessee Research Foundation (UTRF) - Member of the Board of Directors (prior)

- Nashville Area Red Cross – Member of the Board of Directors (prior)

- National Association of Certified Valuators and Analysts (NACVA) - Member

- Licensing Executives Society (LES) – Member

- American Bar Association – Associate Member

## Publications

- "*Intangible Asset Valuation: A Comprehensive Framework*" published in the December 2020 edition of les Nouvelles pages 269-274.

- "*Copyright: A Historical and Economic Perspective*" published in the September 2020 edition of les Nouvelles pages 181-184

- "*Trademarks, Brands and Goodwill: Overlapping Sources of Economic Value*" published in the September 2018 edition of les Nouvelles pages 258-264 (Selected as the June 2020 Article of the Month).

- "*The Centerpiece Exhibit and Other Courtroom Communication Considerations*" published in the Fall 2017 Expert Witness Newsletter from the American Bar Association's Section of Litigation

- "*IRS proposal aimed at family-controlled entities would eliminate certain valuation discounts*" published in the Fall 2016 Kraft Advantage

- "*Risk and Return: Understanding the Cost of Capital for Intellectual Property*" 2-part article published in les Nouvelles Volume L No. 2 (June 2015) pages 67-80.  (Part 1 selected as the October 2015 Article of the Month)

- "*Beware the Deal-Killing Valuation Gap*" published in the Summer 2014 Kraft Advantage newsletter with portions also published in the Nashville Business Journal on-line on May 14, 2014

- "*Understanding the Economic Value of Trade Secrets*" published in the Spring 2014 edition of the Intellectual Property Litigation Newsletter (published by the American Bar Association's Section of Litigation)

- "*Patent Valuation Standards in the United States: Applying Existing Standards and Terminology to a Developing Field of Practice*" published in les Nouvelles, Volume XLVII No. 2 (June 2013) pages 130-136

- *Is Profiting from the Online Use of Another's Property Unjust? The Use of Brand Names as Paid Search Keywords,* 53 IDEA 131 (2013) (with coauthors, "*judged one of the best law review articles related to intellectual property law published within the last year*" and selected for inclusion in the INTELLECTUAL PROPERTY L. REV. (West 2014) (an anthology published annually by Thomson Reuters)

Glenn W. Perdue, MBA, CVA, MAFF, CLP

- *"Identifying and Protecting Brand Value in the Digital Age"* published in the Winter 2013 edition of the <u>Kraft Advantage</u> newsletter

- *"The Broad Spectrum of Trade Secret Damages"* published in the Spring 2012 Edition of the <u>Intellectual Property Litigation Newsletter</u> (published by the American Bar Association's Section of Litigation)

- *"IP Value as a Basis of Economic Recovery"* published in the May/June 2010 edition of <u>Landslide</u> (published by the American Bar Association's Section of Intellectual Property Law).

- "*Determining Lost Profit Damages in Litigation*" published in the Winter 2010 edition of <u>Kraft Advantage</u> newsletter

- "*Software-Related IP Damages in the United States*" published in the September/October 2009 edition of <u>World Intellectual Property Review</u>

- "*Trademarks and Other Intellectual Property May Qualify for Tax-Free Swaps*" published in the Summer 2009 <u>Kraft Advantage</u> newsletter

- "*Financial Experts Have Various Roles in Litigation*" <u>Kraft Advantage</u>, Fall 2008 issue, co-authored with Michael Collins

- *"The Economics of Judicial Patent Reform in the United States"* published in <u>Intellectual Asset Management Magazine ("IAM")</u>, October/November 2007, and republished in <u>IP in the Life Sciences Industries 2008</u> an annual supplement publication of IAM

- *"Preventive Medicine: Early Detection Helps Ensure Healthy Dealership Purchase Transactions"* Published in <u>Defender: The NADC Newsletter</u>, Co-authored with Richard Kotzen, September 2006

- *"Early Assessment of IP Damages Can Prove Beneficial",* Published in <u>Expert Perspectives</u> Winter 2006

- *"Is Your Claim Processor's IT House in Order?"* Published in <u>Self-Funding Advisor</u>, Summer 2006

- *"Payback: The Price of Trademark Infringement",* by Glenn Perdue.  Published in <u>Smart Business Chicago</u>, October 2005 (This article is an excerpt from a more comprehensive article entitled "Determining Trademark Infringement Liability and Damages" noted below

- *"Determining Trademark Infringement Liability and Damages",* by Glenn Perdue.  Published in <u>Expert Perspectives</u>, November 2005 (Volume 3)

- *"Using Economic Analysis to Assess Patent Challenges Based on Claims of Obviousness",* by Glenn Perdue.  Published in <u>Expert Perspectives</u>, April 2005

- *"New Tools, New Rules, New Economy"*, by Glenn Perdue, published in <u>Tennessee Business Journal</u> in volume 10 No. 1 2000 (published by the Business and Economic Research Center at Middle Tennessee State University)

Glenn W. Perdue, MBA, CVA, MAFF, CLP

**Presentations**

Mr. Perdue has presented at conferences and seminars sponsored by CLE and CPE training companies, the Licensing Executives Society (LES), the Association of University Technology Managers (AUTM), the American Bar Association (ABA), state and local bar associations, state CPA societies, state banking associations, and other professional associations regarding business valuation, economic damage analysis, technology/IP valuation, mergers and acquisitions (M&A) and technology strategy.  Mr. Perdue has guest lectured at Middle Tennessee State University, Tennessee State University and Vanderbilt University (Law, Engineering, Tech Transfer).

**EXHIBIT 2: But-For Income & Benefits (For Illustration Purposes ONLY)**

| | TIMING | | | BUT-FOR INCOME & BENEFITS | | | | | | |
| | A | B | C | D | E | F | G | H | I | J |
| | Year of Service | Age | Year | Base Pay | Locality Pay | OT Pay | TOTAL INCOME | Non-Retirem. Benefits | Retirem. Benefits (Pension) | BUT-FOR TOTAL |
| | | | | 4% | 20% | 5% | Sum(D-F) | 25% | Ex3-H | Sum(G-I) |
| *Academy (6 months)* | | | | 15,000 | | | To Ex3-G | | | To Ex5-J |
| *Initial Post (6 months)* | | | | 20,000 | 4,000 | 1,000 | | | | |
| *Year 1 of employment* | 1 | 22 | 2014 | 35,000 | 4,000 | 1,000 | 40,000 | 8,750 | 3,288 | 52,038 |
| | 2 | 23 | 2015 | 50,000 | 10,000 | 2,500 | 62,500 | 12,500 | 5,138 | 80,138 |
| *CPC Status Achieved* | 3 | 24 | 2016 | 70,000 | 14,000 | 3,500 | 87,500 | 17,500 | 7,193 | 112,193 |
| *with CPC Pay Increase* | 4 | 25 | 2017 | 90,000 | 18,000 | 4,500 | 112,500 | 22,500 | 9,248 | 144,248 |
| | 5 | 26 | 2018 | 93,600 | 18,720 | 4,680 | 117,000 | 23,400 | 9,617 | 150,017 |
| | 6 | 27 | 2019 | 97,344 | 19,469 | 4,867 | 121,680 | 24,336 | 10,002 | 156,018 |
| | 7 | 28 | 2020 | 101,238 | 20,248 | 5,062 | 126,547 | 25,309 | 10,402 | 162,259 |
| | 8 | 29 | 2021 | 105,287 | 21,057 | 5,264 | 131,609 | 26,322 | 10,818 | 168,749 |
| | 9 | 30 | 2022 | 109,499 | 21,900 | 5,475 | 136,873 | 27,375 | 11,251 | 175,499 |
| *Likely Trial - End 2023* | 10 | 31 | 2023 | 113,879 | 22,776 | 5,694 | 142,348 | 28,470 | 11,701 | 182,519 |
| | 11 | 32 | 2024 | 118,434 | 23,687 | 5,922 | 148,042 | 29,608 | 12,169 | 189,820 |
| | 12 | 33 | 2025 | 123,171 | 24,634 | 6,159 | 153,964 | 30,793 | 12,656 | 197,413 |
| | 13 | 34 | 2026 | 128,098 | 25,620 | 6,405 | 160,123 | 32,025 | 13,162 | 205,309 |
| | 14 | 35 | 2027 | 133,222 | 26,644 | 6,661 | 166,527 | 33,305 | 13,689 | 213,522 |
| | 15 | 36 | 2028 | 138,551 | 27,710 | 6,928 | 173,189 | 34,638 | 14,236 | 222,062 |
| | 16 | 37 | 2029 | 144,093 | 28,819 | 7,205 | 180,116 | 36,023 | 14,806 | 230,945 |
| | 17 | 38 | 2030 | 149,857 | 29,971 | 7,493 | 187,321 | 37,464 | 15,398 | 240,183 |
| | 18 | 39 | 2031 | 155,851 | 31,170 | 7,793 | 194,814 | 38,963 | 16,014 | 249,790 |
| | 19 | 40 | 2032 | 162,085 | 32,417 | 8,104 | 202,606 | 40,521 | 16,654 | 259,782 |
| | 20 | 41 | 2033 | 168,568 | 33,714 | 8,428 | 210,710 | 42,142 | 17,320 | 270,173 |
| | 21 | 42 | 2034 | 175,311 | 35,062 | 8,766 | 219,139 | 43,828 | 18,013 | 280,980 |
| | 22 | 43 | 2035 | 182,323 | 36,465 | 9,116 | 227,904 | 45,581 | 18,734 | 292,219 |
| | 23 | 44 | 2036 | 189,616 | 37,923 | 9,481 | 237,021 | 47,404 | 19,483 | 303,908 |
| | 24 | 45 | 2037 | 197,201 | 39,440 | 9,860 | 246,501 | 49,300 | 20,262 | 316,064 |
| | 25 | 46 | 2038 | 205,089 | 41,018 | 10,254 | 256,361 | 51,272 | 21,073 | 328,707 |
| | 26 | 47 | 2039 | 213,293 | 42,659 | 10,665 | 266,616 | 53,323 | 21,916 | 341,855 |
| | 27 | 48 | 2040 | 221,824 | 44,365 | 11,091 | 277,280 | 55,456 | 22,792 | 355,529 |
| *Retirement Eligible at* | 28 | 49 | 2041 | 230,697 | 46,139 | 11,535 | 288,372 | 57,674 | 23,704 | 369,750 |
| *50 w/ 20 yrs service =>* | 29 | 50 | 2042 | 239,925 | 47,985 | 11,996 | 299,907 | 59,981 | 24,652 | 384,540 |
| | 30 | 51 | 2043 | 249,522 | 49,904 | 12,476 | 311,903 | 62,381 | 25,638 | 399,922 |
| | 31 | 52 | 2044 | 259,503 | 51,901 | 12,975 | 324,379 | 64,876 | 26,664 | 415,919 |
| | 32 | 53 | 2045 | 269,883 | 53,977 | 13,494 | 337,354 | 67,471 | 27,731 | 432,555 |
| | 33 | 54 | 2046 | 280,679 | 56,136 | 14,034 | 350,848 | 70,170 | 28,840 | 449,858 |
| *Mandatory* | 34 | 55 | 2047 | 291,906 | 58,381 | 14,595 | 364,882 | 72,976 | 29,993 | 467,852 |
| *Retirement at 56 =>* | 35 | 56 | 2048 | 303,582 | 60,716 | 15,179 | 379,478 | 75,896 | 31,193 | 486,566 |

**TOTALS**

| | |
| --- | --- |
| | 9,288,898 |

**EXHIBIT 3: Pension Funding Calculation (For Illustration Purposes ONLY)**

| | TIMING | | | PENSION FUNDING CALCULATIONS | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J | |
| Year of Service | Age | Year | Retirem. Benefits (Pension) | Expect. Annual RoR% | PV Calculation | TOTAL INCOME | Pension Funding Rate | FV Factors | FV Calculation | |
| | | | | 8.0% | | Ex2-G | 8.22% | 8% | | |
| *Academy (6 months)* | | | | | | | | | | |
| *Initial Post (6 months)* | | | | | | To Ex2-I | | | | |
| *Year 1 of employment* | 1 | 22 | 2014 | | | | 40,000 | 3,288 | 13.690 | 45,013 |
| | 2 | 23 | 2015 | | | | 62,500 | 5,138 | 12.676 | 65,123 |
| *CPC Status Achieved* | 3 | 24 | 2016 | | | | 87,500 | 7,193 | 11.737 | 84,419 |
| *with CPC Pay Increase* | 4 | 25 | 2017 | | | | 112,500 | 9,248 | 10.868 | 100,499 |
| | 5 | 26 | 2018 | | | | 117,000 | 9,617 | 10.063 | 96,777 |
| | 6 | 27 | 2019 | | | | 121,680 | 10,002 | 9.317 | 93,192 |
| | 7 | 28 | 2020 | | | | 126,547 | 10,402 | 8.627 | 89,741 |
| | 8 | 29 | 2021 | | | | 131,609 | 10,818 | 7.988 | 86,417 |
| | 9 | 30 | 2022 | | | | 136,873 | 11,251 | 7.396 | 83,216 |
| *Likely Trial - End 2023* | 10 | 31 | 2023 | | | | 142,348 | 11,701 | 6.848 | 80,134 |
| | 11 | 32 | 2024 | | | | 148,042 | 12,169 | 6.341 | 77,166 |
| | 12 | 33 | 2025 | | | | 153,964 | 12,656 | 5.871 | 74,308 |
| | 13 | 34 | 2026 | | | | 160,123 | 13,162 | 5.437 | 71,556 |
| | 14 | 35 | 2027 | | | | 166,527 | 13,689 | 5.034 | 68,906 |
| | 15 | 36 | 2028 | | | | 173,189 | 14,236 | 4.661 | 66,354 |
| | 16 | 37 | 2029 | | | | 180,116 | 14,806 | 4.316 | 63,896 |
| | 17 | 38 | 2030 | | | | 187,321 | 15,398 | 3.996 | 61,530 |
| | 18 | 39 | 2031 | | | | 194,814 | 16,014 | 3.700 | 59,251 |
| | 19 | 40 | 2032 | | | | 202,606 | 16,654 | 3.426 | 57,056 |
| | 20 | 41 | 2033 | | | | 210,710 | 17,320 | 3.172 | 54,943 |
| | 21 | 42 | 2034 | | | | 219,139 | 18,013 | 2.937 | 52,908 |
| | 22 | 43 | 2035 | | | | 227,904 | 18,734 | 2.720 | 50,949 |
| | 23 | 44 | 2036 | | | | 237,021 | 19,483 | 2.518 | 49,062 |
| | 24 | 45 | 2037 | | | | 246,501 | 20,262 | 2.332 | 47,245 |
| | 25 | 46 | 2038 | | | | 256,361 | 21,073 | 2.159 | 45,495 |
| | 26 | 47 | 2039 | | | | 266,616 | 21,916 | 1.999 | 43,810 |
| | 27 | 48 | 2040 | | | | 277,280 | 22,792 | 1.851 | 42,187 |
| *Retirement Eligible at* | 28 | 49 | 2041 | | | | 288,372 | 23,704 | 1.714 | 40,625 |
| *50 w/ 20 yrs service =>* | 29 | 50 | 2042 | | | | 299,907 | 24,652 | 1.587 | 39,120 |
| | 30 | 51 | 2043 | | | | 311,903 | 25,638 | 1.469 | 37,671 |
| | 31 | 52 | 2044 | | | | 324,379 | 26,664 | 1.360 | 36,276 |
| | 32 | 53 | 2045 | | | | 337,354 | 27,731 | 1.260 | 34,932 |
| | 33 | 54 | 2046 | | | | 350,848 | 28,840 | 1.166 | 33,639 |
| *Mandatory* | 34 | 55 | 2047 | | | | 364,882 | 29,993 | 1.080 | 32,393 |
| *Retirement at 56 =>* | 35 | 56 | 2048 | | | | 379,478 | 31,193 | 1.000 | 31,193 |

| Present and Future Value Totals | | | | | | 2,097,712 | <=== ~ Equivalent Amounts ===> | | 2,097,003 | |
|---|---|---|---|---|---|---|---|---|---|---|

| Pension Benefit - Est. at 60% Last Year Income | | | 227,687 | PV Factors | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *Actuarial* | 99.08% | 57 | 2049 | 225,602 | 0.926 | 208,891 | | | | |
| *Survival* | 99.01% | 58 | 2050 | 223,369 | 0.857 | 191,503 | | | | |
| *Rates* | 98.93% | 59 | 2051 | 220,985 | 0.794 | 175,425 | | | | |
| | 98.85% | 60 | 2052 | 218,440 | 0.735 | 160,560 | | | | |
| | 98.76% | 61 | 2053 | 215,727 | 0.681 | 146,820 | | | | |
| | 98.67% | 62 | 2054 | 212,856 | 0.630 | 134,136 | | | | |
| | 98.58% | 63 | 2055 | 209,842 | 0.583 | 122,441 | | | | |
| | 98.50% | 64 | 2056 | 206,687 | 0.540 | 111,667 | | | | |
| | 98.40% | 65 | 2057 | 203,378 | 0.500 | 101,739 | | | | |
| | 98.29% | 66 | 2058 | 199,892 | 0.463 | 92,589 | | | | |
| | 98.16% | 67 | 2059 | 196,222 | 0.429 | 84,156 | | | | |
| | 98.03% | 68 | 2060 | 192,357 | 0.397 | 76,388 | | | | |
| | 97.88% | 69 | 2061 | 188,284 | 0.368 | 69,232 | | | | |
| | 97.71% | 70 | 2062 | 183,975 | 0.340 | 62,636 | | | | |
| | 97.51% | 71 | 2063 | 179,400 | 0.315 | 56,554 | | | | |
| | 97.29% | 72 | 2064 | 174,539 | 0.292 | 50,946 | | | | |
| | 97.04% | 73 | 2065 | 169,375 | 0.270 | 45,777 | | | | |
| | 96.76% | 74 | 2066 | 163,888 | 0.250 | 41,013 | | | | |
| | 96.43% | 75 | 2067 | 158,042 | 0.232 | 36,620 | | | | |
| | 96.06% | 76 | 2068 | 151,816 | 0.215 | 32,572 | | | | |
| | 95.65% | 77 | 2069 | 145,219 | 0.199 | 28,849 | | | | |
| | 95.22% | 78 | 2070 | 138,274 | 0.184 | 25,434 | | | | |
| | 94.74% | 79 | 2071 | 130,994 | 0.170 | 22,310 | | | | |
| | 94.18% | 80 | 2072 | 123,369 | 0.158 | 19,455 | | | | |
| | | | | 4,432,532 | *Less: 53%* | 2,097,712 | | 595,450 | | 2,097,003 | |

**EXHIBIT 4: Actual/Estimated Income & Benefits (For Illustration Purposes ONLY)**

| | TIMING | | | ACTUAL/ESTIMATED INCOME & BENEFITS | | | |
|---|---|---|---|---|---|---|---|
| | *A* | *B* | *C* | *K* | *L* | *M* | *N* |
| | Year of Service | Age | Year | Income | Non-Retirem. Benefits | Retirem. Benefits (401K) | **ACTUAL TOTAL** |
| | | | | 4% | 20% | 3% | Sum(K-M) |
| | | | | | | | To Ex5-N |
| *Academy (6 months)* | | | | | | | |
| *Initial Post (6 months)* | | | | | | | |
| Year 1 of employment | 1 | 22 | 2014 | 45,000 | 9,000 | 1,350 | 55,350 |
| | 2 | 23 | 2015 | 46,800 | 9,360 | 1,404 | 57,564 |
| *CPC Status Achieved* | 3 | 24 | 2016 | 48,672 | 9,734 | 1,460 | 59,867 |
| w/CPC Pay Increase | 4 | 25 | 2017 | 50,619 | 10,124 | 1,519 | 62,261 |
| | 5 | 26 | 2018 | 52,644 | 10,529 | 1,579 | 64,752 |
| | 6 | 27 | 2019 | 54,749 | 10,950 | 1,642 | 67,342 |
| | 7 | 28 | 2020 | 56,939 | 11,388 | 1,708 | 70,035 |
| | 8 | 29 | 2021 | 59,217 | 11,843 | 1,777 | 72,837 |
| | 9 | 30 | 2022 | 61,586 | 12,317 | 1,848 | 75,750 |
| *Likely Trial - End 2023* | 10 | 31 | 2023 | 64,049 | 12,810 | 1,921 | 78,780 |
| | 11 | 32 | 2024 | 66,611 | 13,322 | 1,998 | 81,932 |
| | 12 | 33 | 2025 | 69,275 | 13,855 | 2,078 | 85,209 |
| | 13 | 34 | 2026 | 72,046 | 14,409 | 2,161 | 88,617 |
| | 14 | 35 | 2027 | 74,928 | 14,986 | 2,248 | 92,162 |
| | 15 | 36 | 2028 | 77,925 | 15,585 | 2,338 | 95,848 |
| | 16 | 37 | 2029 | 81,042 | 16,208 | 2,431 | 99,682 |
| | 17 | 38 | 2030 | 84,284 | 16,857 | 2,529 | 103,670 |
| | 18 | 39 | 2031 | 87,656 | 17,531 | 2,630 | 107,816 |
| | 19 | 40 | 2032 | 91,162 | 18,232 | 2,735 | 112,129 |
| | 20 | 41 | 2033 | 94,808 | 18,962 | 2,844 | 116,614 |
| | 21 | 42 | 2034 | 98,601 | 19,720 | 2,958 | 121,279 |
| | 22 | 43 | 2035 | 102,545 | 20,509 | 3,076 | 126,130 |
| | 23 | 44 | 2036 | 106,646 | 21,329 | 3,199 | 131,175 |
| | 24 | 45 | 2037 | 110,912 | 22,182 | 3,327 | 136,422 |
| | 25 | 46 | 2038 | 115,349 | 23,070 | 3,460 | 141,879 |
| | 26 | 47 | 2039 | 119,963 | 23,993 | 3,599 | 147,554 |
| | 27 | 48 | 2040 | 124,761 | 24,952 | 3,743 | 153,456 |
| *Retirement Eligible at* | 28 | 49 | 2041 | 129,752 | 25,950 | 3,893 | 159,594 |
| 50 w/ 20 yrs service => | 29 | 50 | 2042 | 134,942 | 26,988 | 4,048 | 165,978 |
| | 30 | 51 | 2043 | 140,339 | 28,068 | 4,210 | 172,617 |
| | 31 | 52 | 2044 | 145,953 | 29,191 | 4,379 | 179,522 |
| | 32 | 53 | 2045 | 151,791 | 30,358 | 4,554 | 186,703 |
| | 33 | 54 | 2046 | 157,863 | 31,573 | 4,736 | 194,171 |
| *Mandatory* | 34 | 55 | 2047 | 164,177 | 32,835 | 4,925 | 201,938 |
| *Retirement at 56 =>* | 35 | 56 | 2048 | 170,744 | 34,149 | 5,122 | 210,015 |

**TOTALS**     4,076,651

**EXHIBIT 5: Damage Calculation (For Illustration Purposes ONLY)**

| Label | TIMING | | | EXHIBIT 2 | EXHIBIT 4 | LOSS | CLASS MEMBERS & ATTRITION | | | | PRESENT VALUE & TOTALS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A Year of Service | B Age | C Year | J BUT-FOR TOTAL | N ACTUAL TOTAL | O But-For Minus Actual | P Acceptance and Retention | Q Class Member Count | R Net Reten. Rate | S Attrition-Adjusted Loss Amt. | T PV Rates and Factors | U Individual PV Amount by Year | V Individual Cumulative by Year | W Class PV Amount by Year | X Class Cumulative By Year |
| | | | | | | J-N | | | | OxR | 4% | SxT | | QxU | |
| Academy (6 months) | | | | | | | | 1,250.0 | | | 4% | SxT | | QxU | |
| Initial Post (6 months) | | | | | | | 80% | 1,000.0 | | | 4.060% with quarterly compounding | | | | |
| | | | | | | | 90% | 900.0 | | | | | | | |
| Year 1 of employment | 1 | 22 | 2014 | 52,038 | 55,350 | (3,312) | 90% | 810.0 | 64.80% | (2,146) | 1.431 | (3,071) | (3,071) | (2,487,252) | (2,487,252) |
| | 2 | 23 | 2015 | 80,138 | 57,564 | 22,574 | 90% | 729.0 | 58.32% | 13,165 | 1.375 | 18,101 | 15,030 | 13,195,562 | 10,708,310 |
| CPC Status Achieved | 3 | 24 | 2016 | 112,193 | 59,867 | 52,326 | 90% | 656.1 | 52.49% | 27,465 | 1.321 | 36,289 | 51,319 | 23,809,242 | 34,517,552 |
| with CPC Pay Increase | 4 | 25 | 2017 | 144,248 | 62,261 | 81,986 | 90% | 590.5 | 47.24% | 38,730 | 1.270 | 49,176 | 100,496 | 29,038,168 | 63,555,721 |
| | 5 | 26 | 2018 | 150,017 | 64,752 | 85,266 | 90% | 531.4 | 42.52% | 36,251 | 1.220 | 44,233 | 144,729 | 23,507,264 | 87,062,985 |
| | 6 | 27 | 2019 | 156,018 | 67,342 | 88,676 | 90% | 478.3 | 38.26% | 33,931 | 1.173 | 39,787 | 184,515 | 19,029,832 | 106,092,816 |
| | 7 | 28 | 2020 | 162,259 | 70,035 | 92,223 | 90% | 430.5 | 34.44% | 31,759 | 1.127 | 35,787 | 220,303 | 15,405,217 | 121,498,033 |
| | 8 | 29 | 2021 | 168,749 | 72,837 | 95,912 | 90% | 387.4 | 30.99% | 29,727 | 1.083 | 32,190 | 252,492 | 12,470,983 | 133,969,016 |
| | 9 | 30 | 2022 | 175,499 | 75,750 | 99,749 | 90% | 348.7 | 27.89% | 27,824 | 1.041 | 28,954 | 281,446 | 10,095,633 | 144,064,648 |
| Likely Trial - End 2023 | 10 | 31 | 2023 | 182,519 | 78,780 | 103,739 | 90% | 313.8 | 25.10% | 26,043 | 1.000 | 26,043 | 307,490 | 8,172,716 | 152,237,364 |
| | 11 | 32 | 2024 | 189,820 | 81,932 | 107,888 | 90% | 282.4 | 22.59% | 24,377 | 0.961 | 23,437 | 330,915 | 6,616,057 | 158,853,421 |
| | 12 | 33 | 2025 | 197,413 | 85,209 | 112,204 | 90% | 254.2 | 20.33% | 22,817 | 0.923 | 21,071 | 351,986 | 5,355,896 | 164,209,317 |
| | 13 | 34 | 2026 | 205,309 | 88,617 | 116,692 | 90% | 228.8 | 18.30% | 21,356 | 0.887 | 18,953 | 370,939 | 4,335,758 | 168,545,075 |
| | 14 | 35 | 2027 | 213,522 | 92,162 | 121,360 | 90% | 205.9 | 16.47% | 19,990 | 0.853 | 17,047 | 387,986 | 3,509,925 | 172,055,000 |
| | 15 | 36 | 2028 | 222,062 | 95,848 | 126,214 | 90% | 185.3 | 14.82% | 18,710 | 0.820 | 15,334 | 403,320 | 2,841,389 | 174,896,389 |
| | 16 | 37 | 2029 | 230,945 | 99,682 | 131,263 | 90% | 166.8 | 13.34% | 17,513 | 0.788 | 13,792 | 417,112 | 2,300,189 | 177,196,578 |
| | 17 | 38 | 2030 | 240,183 | 103,670 | 136,513 | 90% | 150.1 | 12.01% | 16,392 | 0.757 | 12,406 | 429,518 | 1,862,072 | 179,058,650 |
| | 18 | 39 | 2031 | 249,790 | 107,816 | 141,974 | 90% | 135.1 | 10.81% | 15,343 | 0.727 | 11,159 | 440,677 | 1,507,403 | 180,566,053 |
| | 19 | 40 | 2032 | 259,782 | 112,129 | 147,653 | 90% | 121.6 | 9.73% | 14,361 | 0.699 | 10,037 | 450,715 | 1,220,288 | 181,786,340 |
| | 20 | 41 | 2033 | 270,173 | 116,614 | 153,559 | 90% | 109.4 | 8.75% | 13,442 | 0.672 | 9,028 | 459,743 | 987,859 | 182,774,200 |
| | 21 | 42 | 2034 | 280,980 | 121,279 | 159,701 | 90% | 98.5 | 7.88% | 12,582 | 0.645 | 8,121 | 467,863 | 799,701 | 183,573,901 |
| | 22 | 43 | 2035 | 292,219 | 126,130 | 166,089 | 90% | 88.6 | 7.09% | 11,776 | 0.620 | 7,304 | 475,168 | 647,382 | 184,221,283 |
| | 23 | 44 | 2036 | 303,908 | 131,175 | 172,733 | 90% | 79.8 | 6.38% | 11,023 | 0.596 | 6,570 | 481,738 | 524,075 | 184,745,358 |
| | 24 | 45 | 2037 | 316,064 | 136,422 | 179,642 | 90% | 71.8 | 5.74% | 10,317 | 0.573 | 5,910 | 487,648 | 424,255 | 185,169,613 |
| | 25 | 46 | 2038 | 328,707 | 141,879 | 186,828 | 90% | 64.6 | 5.17% | 9,657 | 0.550 | 5,316 | 492,963 | 343,447 | 185,513,060 |
| | 26 | 47 | 2039 | 341,855 | 147,554 | 194,301 | 90% | 58.1 | 4.65% | 9,039 | 0.529 | 4,781 | 497,745 | 278,030 | 185,791,090 |
| | 27 | 48 | 2040 | 355,529 | 153,456 | 202,073 | 90% | 52.3 | 4.19% | 8,460 | 0.508 | 4,301 | 502,045 | 225,074 | 186,016,164 |
| Retirement Eligible at | 28 | 49 | 2041 | 369,750 | 159,594 | 210,156 | 90% | 47.1 | 3.77% | 7,919 | 0.488 | 3,868 | 505,914 | 182,204 | 186,198,368 |
| 50 w/ 20 yrs service => | 29 | 50 | 2042 | 384,540 | 165,978 | 218,562 | 90% | 42.4 | 3.39% | 7,412 | 0.469 | 3,479 | 509,393 | 147,500 | 186,345,868 |
| | 30 | 51 | 2043 | 399,922 | 172,617 | 227,304 | 90% | 38.2 | 3.05% | 6,938 | 0.451 | 3,130 | 512,523 | 119,405 | 186,465,273 |
| | 31 | 52 | 2044 | 415,919 | 179,522 | 236,397 | 90% | 34.3 | 2.75% | 6,494 | 0.434 | 2,815 | 515,338 | 96,662 | 186,561,935 |
| | 32 | 53 | 2045 | 432,555 | 186,703 | 245,853 | 90% | 30.9 | 2.47% | 6,078 | 0.417 | 2,532 | 517,870 | 78,251 | 186,640,186 |
| | 33 | 54 | 2046 | 449,858 | 194,171 | 255,687 | 90% | 27.8 | 2.23% | 5,689 | 0.400 | 2,278 | 520,148 | 63,346 | 186,703,532 |
| Mandatory | 34 | 55 | 2047 | 467,852 | 201,938 | 265,914 | 90% | 25.0 | 2.00% | 5,325 | 0.385 | 2,049 | 522,196 | 51,281 | 186,754,813 |
| Retirement at 56 => | 35 | 56 | 2048 | 486,566 | 210,015 | 276,551 | 90% | 22.5 | 1.80% | 4,984 | 0.370 | 1,843 | 524,039 | 41,513 | 186,796,327 |
| TOTALS | | | | 9,288,898 | 4,076,651 | 5,212,247 | | Less: 89% | | 570,741 | Less: 8% | 524,039 | Multiple: 356 | | 186,796,327 |

*Individual controller compensation thru age 56* — *Individual non-controller actual/estimated compensation thru age 56* — *Individual compensation loss total thru age 56* — *Reduction Due To Attrition* — *Attrition Adjusted Individual Loss* — *Reduction Due To PV Calculations* — *Fully Adjusted Individual Loss* — *Calculated Multiple* — *Fully Adjusted Cumulative Loss for Class*

| Participating Class Members | 1,250 |
|---|---|
| Pro-Rata $s Per Class Member | 149,437 |