**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANDREW J. BRIGIDA, et al.,       ) | |
|     ) | |
| Plaintiffs,     ) | |
|     ) | |
| v.     ) | Civil Action No. 16-cv-2227 (DLF) |
|     ) | |
| PETER P.M. BUTTIGIEG, Secretary, U.S.     ) | |
| Department of Transportation,     ) | |
|     ) | |
| Defendant.     ) | |
|     ) | |

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................ii

TABLE OF EXHIBITS .........................................................................................................iv

INTRODUCTION .................................................................................................................1

BACKGROUND ...................................................................................................................4

I. Air Traffic Control Specialists ........................................................................................4

II. Development of FAA Hiring ..........................................................................................5

  A. Hiring Sources...............................................................................................5

  B. Aptitude Tests ..............................................................................................7

  C. Biographical Data .........................................................................................8

III. Factors Leading to 2014 Changes .................................................................................9

  A. Analyses and Recommendations (2011-2013)..................................................9

  B. Interim Hiring Process (2014) .......................................................................11

  C. Subsequent Statutory Changes (2016 & 2019) ...............................................13

IV. Named Plaintiffs & Class Representatives .....................................................................14

V. Procedural History ........................................................................................................14

ARGUMENT .......................................................................................................................15

I. Plaintiffs Have Not Demonstrated That the Proposed Class Satisfies Rule 23(a). .................16

  A. Plaintiffs' Class Lacks Commonality...............................................................16

    1. Plaintiffs' Vague and Conclusory Assertions that the BA Was Biased Do Not Satisfy Their Burden of Demonstrating that Common Questions Exist. ...............................................................................17

    2. Because Women and Other Minority Groups May Have Benefitted from the BA, Plaintiffs Have Not Shown Their Claims are Common to the Broad Class. ......................................................................19

    3. Plaintiffs Have Not Demonstrated that a Common Question Exists Regarding the Cancellation of AT-SAT Score Claim. ......................................20

4.      Plaintiffs' Requests for Injunctive Relief and Backpay Do Not Establish Commonality. ............................................................................. 22

B.      Plaintiffs' Claims Are Not Typical of the Class They Seek to Represent.................... 24

1.      Plaintiffs Do Not Represent the Diversity of the Class. ................................. 25

2.      Plaintiffs Do Not Represent the Variation in Eligibility and Qualifications..................................................................................... 27

3.      Plaintiffs Do Not Represent the Range of Mitigation Efforts........................ 28

C.      Plaintiffs Cannot Adequately Represent the Entire Proposed Class. ........................ 30

1.      Plaintiffs Did Not Timely Exhaust Their AT-SAT Claim............................. 31

2.      Inclusion of Women, Hispanics, and Asians May Create a Class Conflict. ..................................................................................... 32

D.      Plaintiffs' Class Definition Lacks Ascertainability. .............................................. 33

II.     Plaintiffs Cannot Satisfy Rule 23(b)'s Requirements..................................................... 34

A.      Plaintiffs' Proposed Class Cannot Be Certified Under Rule 23(b)(2). ....................... 34

B.      Plaintiffs Cannot Certify a Class Under Rule 23(b)(3). .................................................. 36

1.      Plaintiffs Have Failed to Show that Common Issues Predominate over Individualized Issues.............................................................. 37

2.      Plaintiffs Have Failed to Show That a Class Action Is Superior. .................. 42

C.      Plaintiffs Have Not Demonstrated That an Alternative Certification Approach Would Resolve the Defects for Plaintiffs' Proposed Class. ........................ 44

CONCLUSION........................................................................................................................... 46

# TABLE OF EXHIBITS

The Air Traffic Controller Workforce Plan 2021-2030 (Mar. 2021) ........................................................ A

Air Traffic Controller Training Initiative (AT-CTI) Program, Program Overview and FAQs, Collegiate Edition, Version 3.2 (July 10, 201) ..................................................................................... B

Recovery of the FAA Air Traffic Control Specialist Workforce, 1981-1992 (Aug. 1998) (excerpt) ............................................................................................................................................... C

Incremental Validity of Biographical Data in the Prediction of En Route Air Traffic Control Specialist Technical Skills (July 2012) .................................................................................................. D

Development, Validation, and Fairness of a Biographical Data Questionnaire for the Air Traffic Control Specialist Occupation (Dec. 2012) ..................................................................................... E

Finch, et al., Multistage Selection Strategies: Simulating the Effects on Adverse Impact and Expected Performance for Various Predictor Combinations, 94 *J. Appl. Psych.* 318-40 (2009) .................................................................................................................................................. F

Vacancy Announcement FAA-AMH-13-CTI-27053 (Aug. 27, 2012) ................................................... G

Vacancy Announcement FAA-AMC-14-ALLSRCE-33537 (Feb. 10, 2014) ......................................... H

Vacancy Announcement FAA-ATO-16-ALLSRCE-49075 (Aug. 8, 2016) .............................................. I

Vacancy Announcement FAA-ATO-17-ALLSRCE-53474 (July 7, 2017) ................................................ J

CTI FAQs (Mar. 15, 2013) .................................................................................................................... K

Extension Requests (Oct. 22, 2013) ....................................................................................................... L

Amanda Quezada, Email re Extension Request (Mar. 25, 2013) (CTI graduate name redacted) ................................................................................................................................................ M

FAA Annual EEO Program Status Report FY 2007 (Mar. 2008) (excerpts) ......................................... N

FAA Annual EEO Program Status Report FY 2011 (Mar. 2012) (excerpts) .......................................... O

Final Report, Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process (Apr. 16, 2013) ................................................................................................................ P

Barrier Analysis of the Air Traffic Control Specialist Centralized Hiring Process (May 8, 2013) ................................................................................................................................................... Q

Memorandum, Freeze of Hiring and Non-Essential Spending (Jan. 2013) ............................................ R

FAA Report (June 4, 2013) ..................................................................................................................... S

Cong. Research Serv., Sequestration at the FAA (May 7, 2013) ............................................................. T

Craft, Email re FAA Hiring Rumors (July 16, 2013) ...................................................U

Ballentine, Email re Planned CTI Telecon (Dec. 18, 2013) ......................................V

Human Resource Policy Manual, Policy Bulletin No. 84, Suspension of Policy on Air Traffic
Control Specialist Academy Trainee Hiring (Feb. 7, 2014) ........................................W

Results of the ATCS Interim Hiring Process ...............................................................X

University of Alaska, Anchorage 2010-2011 Catalog, Associate of Applied Science, Air
Traffic Control ............................................................................................................Y

Klingerman Letter from Purdue University to Zhonette Brown (Jan. 22, 2021)..................Z

Middle Georgia State College, Air Traffic Control Recommendation Process...................AA

Eichelberger, Email re OTS Hiring (Jan. 2, 2014) ...................................................BB

Pearson, Email re Hiring of Air Traffic Controllers by FAA (Jan. 2, 2014) .........................CC

Facebook, CTI Connection...........................................................................................DD

Facebook, CTI Connection, Admins and Moderators....................................................EE

Delegated Examining Operations Handbook (May 2007) (excerpt) .....................................FF

Deposition of Glenn W. Perdue (July 20, 2021) (excerpts)............................................GG

Paul F. White, Review of Plaintiffs' Expert's Initial Report and Analysis of Potential
Economic Losses .........................................................................................................HH

Declaration of Jennifer Afflu (Oct. 26, 2021).............................................................II

## INTRODUCTION

From 2011-2013 a series of reviews by external panels and consultants highlighted multiple problems with the Federal Aviation Administration's (FAA) hiring process for air traffic control specialists (ATCS or controllers), ranging from inefficiency to significant barriers to equal opportunity. On the basis of those reviews, the FAA implemented interim changes to that hiring process in 2014. The FAA consolidated multiple streams of hiring into an all-sources announcement, dispensed with centralized selection panels and interviews, and inserted a biodata assessment (the Biographical Assessment or BA) as a screening tool to be used in advance of the FAA's legacy aptitude test (called the AT-SAT). These interim changes would be used until the FAA could complete the necessary analyses to replace the AT-SAT and further refine the hiring process.

Plaintiffs Andrew Brigida and Matthew Douglas-Cook wish that the FAA had left one stream of hiring alone—vacancy announcements for college graduates with degrees satisfying the FAA's Collegiate Training Initiative (CTI) program. Plaintiffs speculate that if the FAA had not cancelled their prior scores on the legacy AT-SAT and implemented the new BA, they would have become controllers. Their underlying grievance—that they pursued college degrees in reliance on their perception that the role of the CTI program in the FAA's hiring process would never change—is not actionable. Title VII does not protect CTI students or graduates as a group, nor does it give claims to groups of individuals who believe they are likely to succeed in a particular job. Accordingly, Plaintiffs have repackaged their reliance theory into a claim that the 2014 interim hiring process was designed to advantage African Americans over other applicants. They now propose a broad class of CTI graduates who applied in 2014, including women and all minority groups except African Americans.

Like their previous motion for class certification, Plaintiffs' second attempt fails to demonstrate that there is a putative class that can survive the rigorous analysis required under Rule 23. The class is impossibly fractured and Plaintiffs offer no manageable way to glue it together.

Plaintiffs fail to distinguish potential class members who could have been successful applicants under the legacy process from those who would not be eligible or were unlikely to succeed under that process. And even if Plaintiffs could establish that some class members were treated differently, they have not demonstrated they can show that all class members, regardless of gender, national origin, or race, were discriminated against, let alone in the same way. Plaintiffs' overbroad class would include:

(1) those with AT-SAT scores in the lower "qualified" band that were unlikely to have been selected under the legacy hiring process, who may have benefited from an opportunity to retake the test;

(2) those who may not have qualified for their CTI school's recommendation, a prerequisite for CTI-only announcements;

(3) those who had failed to extend their eligibility for CTI-only announcements;

(4) those who would have failed the medical, security, or suitability screening if their application had advanced;

(5) those who may not have passed the FAA Academy;

(6) women and other minorities in the controller workforce, who may have been as successful as African Americans in 2014 and who were potentially disadvantaged by the legacy process or advantaged by the interim hiring process;

(7) those who did not pass the BA due to their answers to questions that cannot plausibly be linked to intentional racial disparities;

(8) those with various combinations of these characteristics.

It would require fact-intensive individual inquiries to identify which of these potential class members were qualified for selection under the legacy hiring process, harmed by cancellation of the AT-SAT scores, and then excluded by the BA for an unlawful discriminatory reason.

Most strikingly, after insisting upon precertification discovery and receiving *inter alia* the actual responses more than 28,000 applicants gave to the BA questions, Plaintiffs did not present any statistical analysis or clearly articulate how any of the questions or the overall scoring of the BA may have favored African American applicants over all other applicants. Instead, they rely upon the conjecture and the conclusory allegations in the Fourth Amended Complaint which cannot survive

2

the required rigorous analysis. Commonality, typicality, adequacy of representation, and ascertainability all fail in light of these fractures. The proposed class lacks the homogeneity required for certification under Rule 23(b)(2).

The problems for class certification run even deeper when it comes to monetary relief sought under Rule 23(b)(3). Oversimplifying the problem, Plaintiffs propose to aggregate damages based on projected controllers' lifetime earnings, reduce the total by an indeterminate percentage to account for attrition, and then just divvy up the remainder to all class members by pro rata shares. But Plaintiffs' damages model fails to reasonably account for all of the variables affecting controller success and compensation. Plaintiffs also fail to explain how they would exclude individuals who would never have qualified for a controller position, and thus are precluded by Article III from recovering damages.

Plaintiffs seek to certify some "common" issues regarding backpay while leaving individual defenses and mitigation to an indefinite third stage of the case. But the issues Plaintiffs punt on are substantial. In 2016, under a Congressional mandate, the FAA changed its hiring process *again*, dropping the BA for CTI graduates, providing an age-waiver for unsuccessful 2014 applicants, and creating a separate pool of CTI and veteran applicants. Some of the proposed class members did not reapply, completely failing to mitigate damages. Some of the proposed class members were unsuccessful in their reapplication process. This suggests that they may not have been successful in a 2014 application even apart from their AT-SAT and BA claims. Some of the proposed class members found new positions, including professional positions with the FAA, and now have earnings exceeding those of controllers. By not seeking to certify these aspects of damages, Plaintiffs concede that there is a lack of commonality and that individual issues might predominate. Indeed, so much is left to individualized hearings that class certification would not be superior to ordinary litigation.

For all of these reasons, Plaintiffs have still failed to meet their burden and the Court should deny their second motion for class certification.

## BACKGROUND

### I. Air Traffic Control Specialists

The FAA employs more than 14,000 air traffic control specialists ("ATCS" or "controllers") at 313 facilities nationwide. Ex. A, Air Traffic Controller Workforce Plan 2021-2030 at 12 (2021 Workforce Plan). To ensure that they can perform the essential functions of their positions without risking safety, potential controllers must meet rigorous medical and security requirements. *See* Office of Personnel Management (OPM) General Schedule Qualification Standards, Air Traffic Control Series, 2152 (link); Ex. B, AT-CTI Program Overview and FAQs, Version 3.2 (July 10, 2013) at 35-43; Ex. C, Recovery of the FAA ATCS Workforce, 1981-1992 at 5 (1998) (link).

The FAA's hiring process for controllers "begins with the opening of a vacancy announcement against which interested persons may apply." Pls.' Ex. 1 at FAA_00001576; 2013 Overview at 32. An individual must submit an application for consideration under each new announcement, regardless of whether the individual had submitted a prior application. *See, e.g.*, Ex. G, FAA-AMH-13-CTI-27053 (2012) at 3-4. After an applicant has been determined to meet the basic eligibility criteria for an announcement and has been selected, several steps follow: the selectee receives a tentative offer letter; if the selectee accepts the offer, he or she must pass medical and psychological exams, security and suitability investigations, and a drug test. *Id.* at 2. Upon satisfactory results from those processes, FAA sends the selectee a final offer letter. *Id.* at 3.

Individuals that accept the FAA's offer must report to the FAA Academy in Oklahoma City for training when a class becomes available. *Id.* at 3. Depending on the track to which the trainee is assigned, this training generally takes from 12 to 17 weeks. *See* Pls.' Ex. 1 at FAA_00001578, FAA_00001593-94. Trainees must pass final assessments at the FAA Academy or be terminated. *See* Pls.' Ex. 5 at 2-3. Those who succeed are assigned to an FAA facility, where they complete field or "on the job" training for an average of 18 to 36 months. *See* Pls.' Ex. 1 at FAA_00001578. Some

developmental controllers do not succeed at their first facility and must be reassigned to a lower level facility, transferred to a non-controller position, or terminated. *See* Pls.' Ex. 5 at 7.

## II.  Development of FAA Hiring

As discussed below, the FAA has long studied how to recruit, select, and train successful air traffic control specialists, and adjusted and refined its hiring process accordingly. *See, e.g.*, Ex. C at 17. A large portion of this work is conducted by the Civil Aeromedical Institute (CAMI), a research institute established by statute. *See* 49 U.S.C. §106(j).

### A.  Hiring Sources

Since the mid-1990s, the FAA has generally had separate application processes for three groups of candidates—experienced controllers, applicants from the general public, and graduates from the CTI Program. *See* Pls.' Ex. 5 at 2. While hiring from each source ebbed and flowed, a CAMI study in 2013 reported that for hires since 2006, about 30% had prior experience as controllers, about 35% had been selected through a CTI-only announcement, and about 35% had been selected through a general public announcement. *See* Pls.' Ex. 8, FAA_00001130. The FAA adjusted the mix of hiring from these sources due to availability and staffing needs. *See* 4th Am. Compl. ¶ 41; Pls.' Ex. 12 at 44.

The CTI Program began as a pilot with five schools in 1990 and by 2013 had grown to a partnership with 36 different schools offering 52 degree options in the field of aviation. *See* 2013 Overview at 1, 5-9. The FAA-required material covered by the CTI schools involved basic information that would otherwise be taught during the first 25 days at the FAA Academy. *See* 2013 Overview at 53-57; Pls.' Ex. 1 at FAA_00001594. Each of the CTI schools had its own requirements for successful graduation from these degree programs and recommendation to the FAA. *See* 2013 Overview at 12; Exs. Y, Z, AA. Some schools produced more graduates than others. *See* Pls.' Ex. 5 at 6 (ranging between 1 and 282 graduates over three year period). CTI graduates have never been guaranteed employment with FAA. *See* Pls.' Ex. 1 at FAA_00001581, 1599; Pls.' Ex. 2 at FAA_00007934; *see also*

Pls.' Ex. 5 at 8 (showing that 31% of CTI applicants were not selected over three-year period).

The FAA's process for CTI graduates also regularly changed. For example, in the mid-1990s, the handful of graduates from the pilot CTI program were permitted to take an aptitude test and apply before graduation, complete their medical and security screening before they were selected, and if selected proceed directly to field training. *See* Pls.' Ex. 1 at FAA_00001581-FAA_00001586. From 1997, CTI graduates had to attend the FAA Academy upon selection. *See id.* at FAA_00001591. In 2005, CTI graduates were required to take the AT-SAT. *See* Pls.' Ex. 5 at 1; *see also* Pls.' Ex. 9 at 3. By 2008, the FAA had instituted centralized vacancy announcements for each hiring source and a centralized selection panel to conduct interviews and make selections from all sources simultaneously. *See* Pls.' Ex. 5 at 2; Pls.' Ex. 1 at FAA_00001599; Pls.' Ex. 12 at 44. Both general public and CTI graduates had to apply to the current vacancy announcement for that source to be considered by a centralized selection panel. *See, e.g.,* Ex. G at 3-4. There were three aspects of eligibility for CTI-only announcements that could expire:

- First, the individual's AT-SAT score was only valid for three years, or three years after graduation, whichever was longer. *See* 4AC ¶¶ 32, 173, 186; Pls.' Ex. 3 at 3. To remain eligible, one had to retake the AT-SAT. *See* Pls.' Ex. 3 at 3.[1]

- Second, the CTI graduate's initial period of eligibility to apply for CTI-only vacancy announcements expired three years after graduation. *See* Ex. K, at FAA_00007849; Ex. L, at FAA_00009371. To maintain eligibility, the graduate had to request an extension annually. *See* Ex. L, FAA_00009371; Ex. M, FAA_00011055-1058; Pls.' Ex. 3 at FAA_00007938, FAA_00007940.

- Third, if a CTI graduate was hired through a CTI-only announcement, but later left the FAA, they could not be considered for future CTI announcements. *See* Pls.' Ex. 3 at FAA_00007939, FAA_00007985.

Due to the number of available applicants, new announcements were not necessary for each source every year. *See* Pls.' Ex. 12 at 44 ("Due to the thousands of qualified . . . applicants available from

---

[1] Plaintiffs erroneously assert that AT-SAT scores could be extended for a fourth year. *See* Pls.' Mot. at 4. Graduates "are not able to extend their AT-SAT score." Pls.' Ex. 3 at 3.

previously advertised general public announcements, the agency did not offer a vacancy announcement to this pool in FY 2012[.]").

The FAA compared the scores and success of individuals selected from various sources. For example, a 2013 CAMI study found that CTI graduates scored an average of only 2.49 points higher on the AT-SAT than general public applicants. Pls.' Ex. 5 at 12. This study found overall CTI and general public applicant outcomes to be within 3-6 percentage points and did not measure statistical significance. *Id.* at 9-10. While the study found CTI-only applicants marginally more likely to successfully complete training compared to general public applicants in the same band, *see id.* at 12 (55.7% vs. 52.4%), that did not mean that every CTI graduate was superior to every general public applicant. For example, at certain types/levels of facilities general public applicants were *more likely* to complete training than CTI graduates, *see id.* at 11 (en route levels 8-9, terminal levels 4-6, 7-9) and "well qualified" general public applicants were *less likely* to be unsuccessful than the "qualified" band of CTI-only applicants. *Id.* at 12 (21.2% vs. 23.5% unsuccessful).[2]

**B. Aptitude Tests**

In the 1980s and 1990s, the FAA used an OPM test in conjunction with a nine-week combined screening and training at the FAA Academy, which proved expensive and inefficient. *See* Pls.' Ex. 9 at 1; Pls.' Ex. 5 at 1. The AT-SAT test battery was developed in 2001. Pls.' Ex. 9 at 1. It included seven subtests that assessed cognitive ability and an "Experiences Questionnaire" that assessed "issues in the personal history/personality realm." *Id.* As originally scored, it was intended to pass 60% of applicants. *Id.* at 2. However, only 3% of African American applicants were predicted to pass. *Id.* The

---

[2] This 2013 CAMI study provides a broader, more careful comparison than the isolated data Plaintiffs highlight from 2006. *See* Pls.' Mot. at 6 (noting an analysis by the FAA's CTI Program Office suggesting that for fiscal year 2006 hires, 85% of CTI-only applicants completed training compared to 45% of general public applicants). Other analyses of the same data show that FY 2006 was an outlier; by FY 2008, disparities in attrition and completion of training for CTI-only and general public applicants had all but disappeared. *See* Pls.' Ex. 4, FAA_00000031.

FAA reweighted the scoring to reduce such differential pass rates, expecting 80% of applicants to pass. *Id.* at 2. The FAA also adopted "well qualified" (85-100) and "qualified" (70-84) bands, with applicants in the higher band to be selected before the lower band. *Id.* ("Qualified candidates cannot be considered until no more than two candidates remain on the Well-Qualified list.")

Once the AT-SAT was in operational use, CAMI repeatedly found that well over 90% of applicants passed the test. *See* Pls.' Ex. 9 at 6 (93.3% passed, which might "be of concern"); Pls.' Ex. 5 at 12 (97% of CTI-only applicants and 93% of general public applicants passed). More than 50% of applicants scored in the "well-qualified" band. *Id.* And almost all selections came from that band. Pls.' Ex. 5 at 8 (87.5% of total selections). However, CAMI's 2007 review of racial disparities among actual applicants focused on passing the AT-SAT and did not quantify the large racial disparities at the "well-qualified" band. Pls.' Ex. 9 at 5. A 2013 CAMI study found only "modest" correlation between AT-SAT scores and "achievement of CPC status at the first field facility." Pls.' Ex. 8, FAA_00001135-1136; *see also* Pls.' Ex. 5 at 13 (another 2013 CAMI study showing that 53% of selectees from "well-qualified" band had completed training compared to 51% from qualified band).

### C. Biographical Data

CAMI administered biographical questionnaires to most new hires between 1981 and 1992 and then correlated the responses with those individuals' success at the Academy and as developmental controllers. *See* Ex. D, Incremental Validity of Biographical Data (July 2012) at 1; Ex. E, Development, Validation, and Fairness of a Biographical Data Questionnaire for the ATCS Occupation (Dec. 2012) at 1-3. Since 2001, biographical questions had also been included in one section of the AT-SAT. *See* Pls.' Ex. 8, FAA_00001132 ("Experience Questionnaire" addressed "[l]ife experiences, preferences, and typical behavior in situations"); Pls.' Ex. 9 at 1. Around 2006, a "biographical questionnaire" was used to determine which general public applicants would be selected to take the AT-SAT at job fairs. *See* Pls.' Ex. 9 at 3-4.

In 2011, CAMI researchers converted some of these long-studied questions into an 80-item survey and began to weigh its validity in predicting success at controller training. *See* Ex. D at 2. In two studies published in 2012, CAMI researchers concluded that the 80-item survey, along with two longer versions, "had significant incremental validity over the AT-SAT composite score." Ex. E at FAA_00001104; *see also* Ex. D at FAA_00001097.

APT Metrics explained that its construction of the BA for use in 2014 "relie[d] on extensive CAMI research as well as best practices in maximizing validity and minimizing adverse impact." Pls.' Ex. 24 at 1. Academic studies have found that using a multistage process that places a biodata screen before a cognitive test can reduce adverse impact for minorities while maintaining predictive value in selecting candidates likely to succeed in the position. *See* Ex. F, Finch, Multi-stage Selection Strategies, 94 J. Appl. Psych. 337-38 (2009). Accordingly, APT Metrics explained that it proposed to use the BA to "validly screen[] out 70% (projected) of candidates with no discernable adverse impact" and that the remaining candidates would "go[] on to take the cognitive assessment portion of the AT-SAT." Pls.' Ex. 24 at 1. This approach also "obviate[d] the need for the [centralized selection panel]." *Id.*

## III. Factors Leading to 2014 Changes

### A. Analyses and Recommendations (2011-2013)

In 2011, the FAA convened a panel to evaluate controller selection, assignment, and training. *See* Pls.' Ex. 11 at 51-55 (including the dean of one of the CTI schools, an aviation safety professor, a union representative, an individual who had led training in the Air Force and at United Airlines, and an FAA psychologist). Focusing primarily on improvements to FAA training, *see id.* at 19-42, the panel also recommended changes to the controller hiring process. *Id.* at 7-18. The panel suggested significant changes to centralized selection panels, interviews, when selectees were assigned to facilities, and how many locations applicants could list, along with recommendations to weigh CTI graduates' applications based on the quality of the CTI school they attended. *Id.* at 17-18.

In early 2012, pursuant to Equal Employment Opportunity Commission (EEOC) directives, the FAA initiated analyses of whether the controller hiring process imposed barriers to equal opportunity. The EEOC requires federal agencies to "regularly evaluate their employment practices to identify barriers to equality of opportunity for all individuals. Where such barriers are identified, agencies must take measures to eliminate them." Management Directive 715 ("MD-715") § Part A.I (link); 42 U.S.C. § 2000e-16(b). The FAA Administrator tasked the Office of Civil Rights to conduct barrier analyses for three job series, including air traffic controllers, *see* Pls.' Exs. 16, 19, based on EEO data demonstrating long-standing low participation rates for certain groups and predominantly white male hires for air traffic controllers. Ex. O, Annual EEO Program Status Report, FY 2011 at 39-40 & Tables A-6, A-7 (Mar. 2012) (hires were 74.61% white and 83.54% male); Ex. N, Annual EEO Program Report FY 2007 at 59-68 & Tables A-6, A-7 (Mar. 2008).

In October 2012, industrial psychologists James Outtz and Paul Hanges completed the initial barrier analysis, which found that several decision points in the controller hiring process had a potential adverse impact on certain demographic groups. *See* 4AC ¶ 72; *see also* Ex. Q, Barrier Analysis of the ATCS Centralized Hiring Process (as finalized, May 8, 2013). To further study the issue, the FAA's Office of Human Resources contracted with APT Metrics in December 2012 to conduct a detailed root cause analysis of the identified barriers to establish a foundation for corrective interventions. *See* Ex. P, Final Report, Extension to Barrier Analysis of Air Traffic Control Specialist Centralized Hiring Process (Apr. 16, 2013) at 3; Pls.' Ex. 20 at 18. This report also reviewed and commented on each of the 2011 Panel's recommendations in light of employment selection principles and the results of the barrier analyses. *See id.* at FAA_00000385-402. The FAA also established an Executive Steering Committee of senior agency executives to oversee revision of the hiring process and implementation of the recommendations. *See* Pls.' Ex. 19.

The panel and barrier analyses identified several key issues. APT Metrics recommended

conducting an updated job analysis for the controller position so that factors used at different steps of the hiring process could be tied to the knowledge, skills, and abilities required for the job. *See* Extension to Barrier Analysis at 51. For example, the FAA had not validated the distinct eligibility standards used for each hiring source. *See id.* at 10, 51-52. The studies also raised a variety of concerns about the centralized selection panels and interviews. *See id.* at 54-55. As for the AT-SAT, it did not effectively function to screen applicants, as over 95% of test takers passed the exam. *See id.* at 6, 8, 23, 53. Moreover, its de facto cutoff score of 85 "produce[d] significant adverse impact" for various groups. *Id.* at 53; *see also id.* at 43 (70% of white applicants reached the "well qualified" band, but only 36% of African Americans, 47% of Hispanics, 45% of females, and 56% of Native Americans). APT Metrics also noted stakeholder concerns that the "test may have been compromised by its availability through public websites." *Id.* at 17; *see also* Pls.' Ex. 18 at 4 (referring to possibility that the AT-SAT "ha[d] been over-exposed and is potentially compromised"). The studies also raised concerns about the CTI applicant pool. By examining data regarding applicants from 2008-2011, it showed that the CTI applicant pool was 72% white and 77% male, with African Americans far less represented than among the experienced or general public sources and women also less represented. *See id.* at 21-22.

## B.  Interim Hiring Process (2014)

Because these independent analyses identified barriers to equal opportunity at the agency, it was FAA's responsibility to explore ways to adjust its hiring criteria to reduce barriers to full participation while also ensuring the agency could meet its mission requirements. *See* MD-715 Part A § IV; *see also King v. Jackson*, 468 F. Supp. 2d 33, 35 (D.D.C. 2006). In March 2013, the FAA's Workforce Plan stated that the FAA was "planning to open a general public announcement in FY 2014 [for the first time since 2009] to add more depth and diversity to our controller hiring sources." Pls.' Ex. 12 at 44. Though the FAA's consultants in June 2013 described the possibility of revising the centralized selection panel and making additional selections from prior announcements, *see* Pls.' Ex. 20 at 36, the

11

2013 budget sequestration disrupted the FAA's hiring and training plans. *See* 78 Fed. Reg. 14633 (Mar. 1, 2013). The FAA Administrator implemented a hiring freeze from March 1st through December 2013 and the FAA Academy was closed. Ex. R, FAA_00009571; Ex. S, FAA Administrator, FAA Report, NextGen Advisory Committee, June 4, 2013 (link). The FAA also began to furlough existing controllers in April 2013, until Congress provided a temporary fix. *See* Ex. T, Cong. Research Serv., Sequestration at the FAA: Air Traffic Control Furloughs and Congressional Response (May 7, 2013). As a result, the FAA completed the hiring of significantly fewer controllers in fiscal year 2013 than projected. *See* Pls.' Ex. 1 at FAA_00001578 (showing 554 new controllers were onboarded instead of the projected 1,315); Ex. U, CTI0016308 (July 16, 2013).

When the hiring freeze ended, the Executive Steering Committee decided to implement an interim hiring process for 2014 to immediately address the barriers to the extent possible. On December 30, 2013, the FAA provided the CTI schools with a detailed outline of the plan for the interim hiring process. *See* Pls.' Ex. 22; *see also* Ex. V, CTI0016310. Prior applications and AT-SAT scores were closed. *See* Pls.' Ex. 22.[3] FAA issued a single nationwide vacancy announcement open to all U.S. citizens who would compete against all other applicants. *See* Ex. H, FAA-AMC-14-ALLSRCE-33537 (Feb. 10, 2014). All applicants were required to take the Biographical Assessment ("BA") as a threshold screening tool. *Id.* at 3. Applicants who passed the BA would then take the cognitive sections of the AT-SAT and be ranked based on a weighted composite of the BA, AT-SAT, and veterans' preference. *See id.*; Pls.' Ex. 22; Ex. W, Policy Bulletin No. 84 § 2(h)-(i). However, the "AT-CTI program was not abolished or suspended . . . by this change in the ATCS hiring process" and the FAA

---

[3] Requiring everyone to apply to a new announcement is consistent with general principles such as OPM's handbook for personnel tests, which recommends closing prior registers of applicants when a hiring process has significantly changed or new announcements are issued. *See* Delegated Examining Operations Handbook at J-7 (2019) (link); *see also* Ex. FF, Delegated Examining Operations Handbook (2007), Chapter 5, Section C, Terminating or Combining Inventories.

reaffirmed its commitment to cooperate with the CTI schools. *See* Pls.' Ex. 1 at 28.

More than 28,000 people applied to the new vacancy announcement. *See* Ex. X, Results of the ATCS Interim Hiring Process at 2.[4] About 1590 were referred for possible selection based on their scores on the BA and AT-SAT and received tentative offers. *See id.* An internal FAA estimate from mid-2014 calculated that among applicants who self-identified their race, non-African Americans received 89.8% of the tentative offers in 2014, while African Americans received 10.2% of the offers. *Id.* at 5. Women and Hispanics received offers at the rate most in contrast to the FAA's existing controller workforce. *Id.* (12.6% and 10.1% above the incumbent workforce). The same report calculated that CTI graduates made up more than 1/3 of successful applicants, and that CTI graduate applicants had been referred for selection at more than triple the rate of all other applicants. *Id.* at 3.

### C. Subsequent Statutory Changes (2016 & 2019)

In 2016, Congress enacted statutory requirements for controller hiring. *See* FAA Extension, Safety, and Security Act of 2016, Pub. L. No. 114-190, Title II § 2106 (July 15, 2016) (codified at 49 U.S.C. § 44506(f)). The law prohibited use of a biographical assessment for CTI graduates and veterans, 49 U.S.C. § 44506(f)(1)(C)(ii), (f)(2)(A), required the FAA to hire approximately equally from a pool of eligible CTI graduates and veterans and a general public pool, *id.* § 44506(f)(1)(B) (2016), and waived the age restriction for CTI graduates and veterans who applied in 2014 but were disqualified by the BA. *Id.* § 44506(f)(2)(B) (for applications submitted through December 31, 2017). The FAA's 2016 and 2017 announcements reiterated that CTI graduates who failed the 2014 BA could reapply with the age restriction waived. *See, e.g.*, Ex. I, FAA-ATO-16-ALLSRCE-49075 (Aug. 2016) at 4; Ex. L, FAA-ATO-17-ALLSRCE-53474 (July 2017) at 4.

---

[4] Plaintiffs rely on this document in their complaint and motion. *See* 4th Am. Compl. ¶¶ 115, 118; Pls.' Mot. at 11 (relying on 4th Am. Compl. ¶ 115); *see also* Def.'s Opp'n to Pls.' Mot. for Leave to Amend at 28-29, ECF No. 105 (explaining Plaintiffs' reliance).

In December 2019, Congress further amended § 44506(f) to give applicants from the CTI and veterans pool "preferential consideration, within each qualification category based upon pre-employment testing results" before general public applicants. *See* Pub. L. No. 116-92, Nat'l Defense Auth. Act, Div. A, Title XI § 1132, 133 Stat. 1198, 1615 (Dec. 20, 2019).

## IV. Named Plaintiffs & Class Representatives

The two named Plaintiffs, Andrew Brigida and Matthew Douglas-Cook, graduated from CTI programs in August and December 2013, respectively. 4AC ¶¶ 154, 168. They both took the AT-SAT in April 2013 and received scores that placed them in the "well-qualified" band. *Id.* ¶¶ 153, 167. They both applied to the 2014 Announcement. *Id.* ¶¶ 157, 170. It was the first time either of them completed an application for a controller position. *Id.* ¶¶ 157, 170. They both took and were disqualified by the BA and were accordingly not eligible for further employment consideration under that vacancy announcement. *Id.* ¶¶ 153, 158, 160, 167, 170-71. Mr. Brigida never reapplied for a controller position; however, he became an FAA management analyst in November 2016. *Id.* ¶ 166; *see also* Feds Data Center ([link](link)) (publically reported data showing that Mr. Brigida's salary rose from $124,000 in FY 2017 to $146,190 in FY 2020). Mr. Douglas-Cook did not reapply after Congress revised the process in 2016 to remove the BA for CTI graduates. *See* Ex. II, Afflu Decl. ¶ 20.

Plaintiffs rely exclusively on Mr. Brigida's EEO complaint for exhaustion of administrative remedies. *See id.* ¶¶ 159-65; Pls.' Ex. 30. Mr. Brigida first contacted the FAA's EEO office on February 25, 2014. *See* Pls.' Ex. 30 at 2. Mr. Brigida filed suit before the EEOC acted on his formal complaint, and his administrative complaint was subsequently dismissed. 4AC ¶ 165.

## V.  Procedural History

In December 2015, Mr. Brigida filed a putative class action complaint in the U.S. District Court for the District of Arizona. *See* Compl., ECF No. 1, *Brigida v. DOT*, No. 2:15-cv-02654 (D. Ariz.). In November 2016, the case was transferred to this Court. *See id.*, ECF Nos. 26, 33. In

September 2019, the Court denied Plaintiffs' motion for class certification based on their Third Amended Complaint after full briefing and a hearing. *See* Minute Order, Sept. 13, 2019; Hr'g Tr. at 49:6-50:9, ECF No. 86. The Court denied Plaintiffs' subsequent motion for leave to file an amended complaint for futility because "[u]pon receiving an opportunity to fix the flaws specifically identified by the Court, Brigida has failed to do so." Order at 4, ECF No. 98. The Court ultimately granted amendment, *see* ECF No. 112, which was filed in October 2020. *See* ECF No. 114.

The parties agreed to engage in limited class certification discovery while the FAA's partial motion to dismiss was pending, and Plaintiffs served third-party subpoenas on the CTI schools. *See* ECF Nos. 113, 123, 127, 132. The FAA produced thousands of documents and over 100,000 lines of database entries regarding FAA hiring, training, and career progression. *See* ECF No. 123 at 2. In May 2021, the Court rejected the FAA's partial motion to dismiss, concluding at this stage of the litigation that "plaintiffs have plausibly alleged that they were applicants who were subjected to an adverse employment action." Mem. Op. at 13, ECF No. 130. The parties' class certification discovery period concluded on August 30, 2021. *See* ECF No. 132; Minute Order, June 2, 2021.

Plaintiffs define their proposed class as follows:

> non-African American CTI students who: (1) by February 10, 2014: (a) graduated from a CTI program at one of the 36 FAA-partnered CTI Institutions between 2009-2013 and (b) passed the AT-SAT, (2) applied to be an ATCS trainee through the 2014 all sources vacancy announcement but failed the Biographical Questionnaire . . . ; and (3) have never been offered employment as an FAA ATCS. Excluded from the Class are any CTI graduates: (a) who were not U.S. citizens as of February 10, 2014; (b) who by February 21, 2014 had reached 31 years of age (or 35 years of age if they had had 52 consecutive weeks of prior air traffic control experience); (c) whose academic records as of February 21, 2014 explicitly stated that they were ineligible to receive a letter of recommendation from their CTI school; or (d) whose AT-SAT scores had expired as of February 21, 2014.

4AC ¶ 173; Pls.' Mot. for Class Certification at 13, ECF No. 139.

## ARGUMENT

This Court's assessment of whether the putative class can be certified requires a "rigorous

analysis" to ensure that all "prerequisites of Rule 23(a) have been satisfied," because "actual, not presumed, conformance with Rule 23(a) remains indispensable." *White v. Hilton Hotels Retirement Plan*, No. 16-856, 2020 WL 5946066, at *2 (D.D.C. Oct. 7, 2020) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).[5] "A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 564 U.S. at 350 (emphasis in original); *see also McCarthy v. Kleindienst*, 741 F.2d 1406, 1414 n.9 (D.C. Cir. 1984).

## I.     Plaintiffs Have Not Demonstrated That the Proposed Class Satisfies Rule 23(a).

No class may be certified that does not meet each of the prerequisites set forth in Federal Rule of Civil Procedure 23(a). *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). While the total number of putative class members is unclear, the FAA does not dispute Rule 23(a)(1)'s numerosity requirement,[6] Plaintiffs have failed to satisfy the other three express requirements, as well as the implied requirement of ascertainability.

### A.   Plaintiffs' Class Lacks Commonality.

Commonality under Rule 23(a)(2) requires not merely the literal raising of "common 'questions,'" but rather "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart v. Dukes*, 564 U.S. 338, 350 (2011); *see also D.L. v. Dist. of Columbia*, 713 F.3d 120, 125 (D.C. Cir. 2013). In other words, not only must Plaintiffs demonstrate that their claims depend on a "common contention," but that contention "must be of such a nature that it is capable of classwide resolution." *Wal-Mart,* 564 U.S. at 350. "A plaintiff seeking class

---

[5] Hereinafter, internal quotation marks, citations, and alterations are omitted unless otherwise noted.

[6] Dr. Paul White identified "1,021 potential members of the putative class" using "conservative (i.e., potentially over-inclusive) assumptions." Ex. HH, Dr. Paul F. White Report at 9. The number of individuals who actually satisfy every term of Plaintiffs' class definition may be significantly fewer. For example, Dr. White included individuals without regard to whether they received a recommendation due to the ascertainability problems discussed below. *See infra*, Arg. § I.D.

certification . . . must show that the elements of [the] claim are susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013).

Plaintiffs claim that they can meet their burden to demonstrate commonality for their contentions about the BA and cancellation of prior AT-SAT scores, Pls.' Mot. at 17-22; for the FAA's defenses to those claims, *id.* at 22; and for the injunctive relief and backpay they seek, *id.* at 22-26. But Plaintiffs fail to provide anything more than conclusory allegations that the BA was biased in favor of African Americans. While Title VII claims regarding an allegedly discriminatory test are sometimes amenable to class treatment, numerous dissimilarities within Plaintiffs' proposed class defeat their reductionist argument that the key questions of liability, injury and relief are capable of classwide resolution for either their BA or their AT-SAT claims.

### 1. Plaintiffs' Vague and Conclusory Assertions that the BA Was Biased Do Not Satisfy Their Burden of Demonstrating that Common Questions Exist.

Plaintiffs strikingly do not offer any analysis of the actual BA responses or pass rates to demonstrate that any common answers exist with respect to whether or not the BA was intentionally skewed in favor of African American applicants. Instead, they rely upon the vague and speculative allegations, *see* Pls.' Mot. at 11, 20. They had opportunity. Plaintiffs attached both the BA questions and scoring, *see* Pls.' Exs. 25-26, and through pre-certification discovery, the FAA produced the responses of the more than 28,000 applicants for the BA, as well as the race, gender, and national origin provided by applicants in conjunction with their applications. *Cf.* Afflu Decl. ¶ 6-7.

Plaintiffs cannot establish commonality by relying on such vague and conclusory allegations of a biased testing procedure. *See Burton v. District of Columbia*, 277 F.R.D. 224, 229 (D.D.C. 2011) (denying class certification for failure to establish commonality where plaintiffs failed to explain how the examination was biased); *see also Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 196 (D.D.C. 2017) (finding no commonality with respect to a companywide evaluation system where plaintiffs "does not supply an account of how those procedures themselves resulted in the racially disparate

outcomes that Plaintiffs have observed"). Even in *Easterling v. Conn. Dept. of Correction*, upon which Plaintiffs here rely, the putative class presented a statistical analysis of comparative test passage rates to demonstrate commonality. 265 F.R.D. 45, 49 (2010).

Indeed, the only evidence Plaintiffs attach regarding the expected results of the BA is an email from APT Metric's John Scott from November 2013 stating that the BA was "designed . . . with no discernable adverse impact" and when combined with the AT-SAT "does not show adverse impact based on our current research." *See* Pls.' Ex. 24. Ignoring this, Plaintiffs vaguely refer to their complaint's description of a handful of BA questions, *see* Pls.' Mot. at 11, 20, and only single out Question 15, which awarded points for having science as the "high school subject in which I received my lowest grades." *See* Pls.' Ex. 26 at 9-10 (Question 15); Pls.' Mot. at 11. BA Question 15 cuts against commonality in two ways. First, a portion of the proposed class scored the maximum possible points on this question and therefore could not be negatively affected by it. *See* Afflu Decl. ¶¶ 24-25 (190 potential class members, 18.6% of the potential class).[7] Second, the statistics Plaintiffs trot out cannot show that this question "systematically favor[s] African American[s]" over all other applicants. Pls.' Mot. at 11. Even if African American high school students have average science scores "lower than any other race" as Plaintiffs assert, *id.*, Question 15 requires comparison of the applicant's own grades—the question would reward a straight A student who earned a solitary B in science, regardless of what grades the rest of their class received.[8] Accordingly, Plaintiffs have failed to show that they

---

[7] For the convenience of the court, Ms. Afflu's declaration summarizes information in spreadsheets produced to Plaintiffs during class certification discovery, simply adding up the number of individuals within the potential class identified by Dr. White, *see supra* n. 6, that meet certain criteria.

[8] Other BA questions flagged in Plaintiffs' pleading lacked a negative impact on even larger portions of the proposed class. *See* 4AC ¶¶ 119-120. For Question 16 regarding subject with lowest college grades, 327 potential class members received the maximum possible points. *See* Afflu Decl. ¶¶ 26-27 (32% of the proposed class). And while Plaintiffs want more points for a pilot's certification in Question 47, 696 potential class members did not have that certificate and were therefore unaffected. *See id.* ¶¶ 28-29 (68.17% of the proposed class).

would analyze the BA in a way likely to produce common answers for the proposed class.

### 2. Because Women and Other Minority Groups May Have Benefitted from the BA, Plaintiffs Have Not Shown Their Claims are Common to the Broad Class.

Plaintiffs' failure to establish "[a]ctual, not presumed" commonality, *Wal-Mart,* 564 U.S. at 350, is heightened by the range of protected groups they seek to represent. Disparate treatment requires a showing that "an employer has treated that particular person less favorably than others because of the plaintiff's race, color, religion, sex, or national origin." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986-87 (1988). Plaintiffs point to no caselaw, especially after *Wal-Mart*, finding commonality for a class lumping together many different minority groups alleging that all were discriminated against in favor of one other group. Instead, each of their cases involves a single group that could be subject to a common effect. *See, e.g., Easterling*, 265 F.R.D. at 50 (certifying class of women challenging a timed run test that men passed more frequently than women).

This is too steep a hill for Plaintiffs' to climb. There are a host of potentially different answers regarding whether the BA in fact caused disparities for any particular subgroup, let alone was intended to. Even if a single question or the whole BA benefited African Americans as compared to white men, on average, that would not mean that it would confer the same differential for Hispanics or women. *See, e.g.*, Ex. X at 5 (suggesting that women and Hispanics may have benefitted most from the reduction of barriers afforded by the new hiring process); *see* Afflu Decl. ¶¶ 14, 17 (potential class is about 18.6% female and about 13.5% Hispanic). The FAA intends to show that it designed the BA to have the highest predictive value balanced against the lowest disparate impact on each protected group, *see* Pls.' Ex. 24, which would likely benefit a number of protected groups simultaneously. Yet, if it were to become clear that the FAA sought to improve outcomes for women or some other minorities, it seems unlikely that Mr. Brigida, a white male, will abandon this class action even though the FAA did not seek to "benefit African American applicants" alone. Pls.' Mot. at 20.

Lacking statistical analysis, Plaintiffs can only speculate that the evidence will be cohesive

rather than breaking down for various minority groups. They have not shown that "[a]ll members of the class will rely on the same statistical evidence to make the same claim," *Moore v. Napolitano*, 926 F. Supp. 2d 8, 33 (D.D.C. 2013); or that there "is no evident variation among [the class] concerning their ultimate entitlement to relief: if any person in the class has a meritorious claim, they all do." *J.D. v. Azar*, 925 F.3d 1291, 1321 (D.C. Cir. 2019). Thus, for both intent and results there is little certainty that Plaintiffs' contentions, and thus the FAA's defenses thereto, will produce common answers across the diverse groups included in the proposed class.

### 3. Plaintiffs Have Not Demonstrated that a Common Question Exists Regarding the Cancellation of AT-SAT Score Claim.

Plaintiffs have recharacterized and narrowed their "hiring preference" claim to simply a claim that the FAA should not have cancelled their prior AT-SAT scores. *See, e.g.,* Pls.' Mot. at 22 (asserting an "alleged policy" of "striking test scores to adjust FAA applicants' rankings"); *id.* at 26 ("[I]f the FAA lawfully purged their AT-SAT scores . . . the government wins.").

As an initial matter, by focusing exclusively on their passing AT-SAT scores, Plaintiffs appear to no longer claim that the FAA was obligated to allow them to complete an application through a CTI-only vacancy announcement.[9] *Cf.* Pls.' Opp'n to Partial Mot. to Dismiss at 4, 20, ECF No. 120; Hr'g Tr. at 41:19-22, Apr. 21, 2021, ECF No. 134. After all, the FAA did not need to provide CTI-only announcements to give effect to Plaintiffs' AT-SAT scores. Under the legacy hiring process, Plaintiffs' AT-SAT scores could be used both for CTI-only announcements and for general public

---

[9] This Court held that Plaintiffs had plausibly alleged they were "applicants" for purposes of Title VII on the ground that taking the AT-SAT started an application "even if other steps in the application process remain." Op. at 8, ECF No. 130. While this resolves for the moment that Plaintiffs' "progression through the CTI program, specifically their taking of the AT-SAT, made them 'applicants' entitled to Title VII protection," Pls.' Mot. at 20, the Court's decision did not adopt Plaintiffs' argument at the June 14, 2021 hearing that the FAA was required to leave the hiring process unchanged for anyone who had taken the AT-SAT. Courts have drawn significant distinctions for purposes of Title VII between those who merely started applications and those who had completed applications. *See, e.g.*, *Bourdais v. New Orleans City*, 485 F.3d 294, 300 (5th Cir. 2007).

announcements. *See* Ex. B at 22. For example, Plaintiffs' existing AT-SAT scores could have been used if the FAA had merely issued a general public announcement as it proposed to do in March 2013. *See* Pls.' Ex. 12 at 44.

The precise nature of Plaintiffs' claim demonstrates that their contention does not generate common answers. Many potential class members lost little to nothing by cancellation of their prior AT-SAT scores. Given Plaintiffs' exclusion of people who passed the BA, cancellation of their AT-SAT scores had no effect on any class member by itself. Because the AT-SAT was only retaken by those who passed the BA, *see supra* Background § III.B, no potential class member lost a high AT-SAT score for a lower AT-SAT score in 2014. Plaintiffs' AT-SAT theory is a red herring and cannot justify backpay or a hiring preference because that would go far beyond make-whole relief for an action that had no effect on the Plaintiffs' hiring. *See Sparrow v. Comm'r*, 949 F.2d 434, 440 (D.C. Cir. 1991).

Plaintiffs' focus also drives wedges among the potential class. Consider those whose passing score was less than 85, leaving them in the lower "qualified" band. Merely passing conferred little benefit because almost everyone achieved a passing score. *See supra* Background § II.B. Yet, "qualified" band applicants were exceedingly unlikely to be selected because almost all applicants in the "well-qualified" had to be selected first. *See id.*; Pls.' Ex. 5 at 8 (86% of selections from 2006-2011 came from the "well-qualified" band). But under the legacy process for CTI graduates, those unsatisfied with a low passing score could not retake the test until their existing score was about to expire. *See* Ex. B at 67. In this context, striking the AT-SAT scores could have been a significant advantage to some of the potential class members. A large portion of the proposed class falls in the lower "qualified" band. *See* Afflu Decl. ¶¶ 8-9 (296 potential class members, almost 30% of the class). Striking the AT-SAT score gave these class members an opportunity to re-take the test and potentially score higher. Conversely, retaking the test carried little risk of failing.

Moreover, Plaintiffs' allegation that the FAA "str[uck] test scores to adjust FAA applicants'

21

rankings," Pls.' Mot. at 22; *see also id.* at 12 ("to change the racial mix of applicants"), also defeats commonality. For example, if the FAA intended to increase the representation of women or Hispanics alongside African Americans, it would be difficult for Plaintiffs to show that female or Hispanic members of the putative class were subject to intentional discrimination. Yet Plaintiffs include all minorities other than African Americans in their putative class, unlike the class of African Americans certified in *Moore v. Napolitano*, 926 F. Supp. 2d 8 (D.D.C. 2013), or *Little v. Washington Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 419 (D.D.C. 2017), who all shared the same protected attribute.

In sum, cancellation of prior AT-SAT scores did not have the same effect on all members of the putative class. Plaintiffs have not shown by "preponderance of the evidence that common proof can be used to answer the question." *See e.g. In re Rail Freight Fuel Surcharge Antitrust Litig.* (*Rail Freight II*), 292 F. Supp. 3d 14, 101 (D.D.C. 2017), *aff'd*, 934 F.3d 619 (D.C. Cir. 2019) (*Rail Freight III*).

### 4. Plaintiffs' Requests for Injunctive Relief and Backpay Do Not Establish Commonality.

It is far from clear that the general injunctions Plaintiffs seek would "resolve an issue that is central to the validity of *each one* of the claims *in one stroke.*" *Wal-Mart*, 564 U.S. at 350 (emphasis added). For example, Plaintiffs seek an injunction "barring the FAA from involving special interest groups . . . associated with protected classifications from involvement in designing hiring methodologies." 4AC ¶ 206(c). Yet many of the potential class members likely share interests with one or more of the FAA's employee associations, *see* https://www.faa.gov/jobs/diversity_inclusion/ (listing eight associations and three government-wide special emphasis programs), and would not want to prevent those groups from consulting on hiring processes. For example, women in the class may not want the Professional Women Controllers group to be excluded from commenting on proposed changes.

Nor have Plaintiffs satisfied commonality through their expert's proposal of a model for calculating backpay and frontpay because too many individualized issues remain. Indeed, Plaintiffs acknowledge that damages as a whole are not capable of classwide resolution, by proposing to divide

damages into two phases: first certifying "common questions of monetary relief such as the availability of and variables affecting back pay," Pls.' Mot. at 14, and second, postponing selection of a process for "[a]ny remaining individualized issues affecting Class member's recovery . . . [such as via] sub-classes, claims procedures, *Teamsters* hearings, or other mechanisms." *Id.* This proposal is unexplained, internally inconsistent, and fails to prevent a tsunami of mini-trials relating to damages.

Plaintiffs acknowledge that at this stage they must demonstrate a "viable method" to determine class-wide relief. Pls.' Mot. at 25; *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C. 2002). But Plaintiffs do not even attempt to explain their "conceptual" damages model, instead merely arguing at a high level of abstraction that "[a]ggregate and pro rata backpay calculations" can be appropriate. Pls.' Mot. at 23-25. But Plaintiffs cannot simply gesture in the direction of a damages model by depositing a lengthy proposed methodology with the Court via an exhibit, without explanation, to carry their burden to show that damages can be measured on a classwide basis. *Accord Sicav v. James Jun Wang*, No. 12 CIV. 6682 PAE, 2015 WL 268855, at *6 (S.D.N.Y. Jan. 21, 2015) (denying certification in part because "plaintiffs have not shown or explained, concretely, how damages would be calculated as to any individual purchaser").

Moreover, Defendant's expert, labor economist Dr. Paul White analyzed the pertinent data and Plaintiffs' proposed model and concluded that there are numerous fatal flaws with that model. Notably, he found that "[t]he high level of variation among the purported class members and their comparators prevents the use of a broad, formulaic approach to calculating a meaningful and representative calculation of potential economic losses for the purported class." White Report at 10. Rather than attempt to accurately model the variation among the class and those actually selected, Plaintiffs' expert relies almost exclusively on the use of a "central tendency" to assign a "median or

. . . mean" value for the population as a whole. *Id.* at 17.[10] Dr. White explained that Plaintiffs' model (1) would provide a "windfall" to applicants with no economic damages; (2) fails to account for the age of class members, which governs the potential years until their retirement; (3) fails to incorporate placement of new hires in various facilities that substantially differ from each other in compensation (due to geography and complexity); (4) fails to account for employees' frequent movement between grades and facility levels throughout their careers; and (5) fails to account for "separation from FAA at various points in time," and at different levels. *See id.* at 10-14. In sum, Plaintiff's model "would not produce a representative value of potential earnings and benefits while an ATC at the FAA" and thus fails to accurately calculate damages on a classwide basis. *Id.* at 14.

In the face of these defects in Plaintiffs' model, they have failed to carry their burden to show that they have a viable model for class-wide damages—even for the limited aspects of monetary relief they propose to certify. The mere possibility that some representative model could be constructed does not carry Plaintiffs' burden to put forward such a model now, at the class certification stage. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 n. 8 (2d Cir. 2013) ("[C]ourts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis.").

## B. Plaintiffs' Claims Are Not Typical of the Class They Seek to Represent.

Plaintiffs' proposed class includes numerous putative class members who are not similarly situated to either of the named Plaintiffs, defeating typicality. *See* Fed. R. Civ. P. 23(a)(3) (requiring

---

[10] At his deposition, Plaintiffs' expert conceded that his unspecified preference of a median or mean value would be inadequate for situations in which the population is not evenly distributed around a "central tendency." Ex. GG, Perdue Dep. at 118:2-14. His only response is that he might "bifurcate the model" or address "different tranches of employees." *Id.* at 156:14-157:8. Indeed, he admitted that these would constitute "different iterations or versions" of his model. *Id.* at 157:7. But these vague notions do not constitute an actual model of damages, let alone enable the Court to conclude that such hypothetical models could reasonably determine classwide damages.

that "claims or defenses of the representative parties are typical of the claims or defenses of the class"). The central inquiry in determining whether a proposed class has Rule 23(a)(3) typicality is whether the "class representative [is] part of the class and 'possess[es] the same interest and suffers the same injury' as the class members." *Council of & for the Blind of Delaware Cty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1544-45 (D.C. Cir. 1983); *see also Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 34 (D.D.C. 2003).

Like the commonality requirement, it seeks to "measure the degree of interrelatedness between the claims in a class action," but it "is more exacting because it requires sufficient factual and legal similarity between the class representative's claims and those of the class to ensure that the representative's interests are in fact aligned with those of the absent class members." William B. Rubenstein, *Newberg on Class Actions* § 3:31 (5th ed. 2013); *In re Navy Chaplaincy*, 306 F.R.D. 33, 53 (D.D.C. 2014). Thus, "typicality screens out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Ramirez v. U.S. Immigration & Customs Enf't*, No. 18-508, 2018 WL 4178176, at *27 (D.D.C. Aug. 30, 2018).

### 1. Plaintiffs Do Not Represent the Diversity of the Class.

The named Plaintiffs are two males who identify as Caucasian and Native American. *See* 4AC ¶¶ 153, 167. However, the purported class includes both men and women, along with all race and national origin groups apart from African-Americans. This nearly boundless class, in the context of a discrimination claim, precludes a finding of typicality. *Cf. Sperling v. Donovan*, 104 F.R.D. 4, 9 (D.D.C. 1984) (rejecting argument that "unsupported allegations of discrimination supply the requisite classwide typicality" because "specificity" is required, not a "host of conclusory statements").

This Court denied Plaintiffs' prior motion for class certification in part because the proposed class would "include African Americans." Tr. of Mot. Hearing at 49, Sept. 13, 2019. Plaintiffs could not show that they would "adequately represent the[] interests" of African American class members,

and could not resolve issues of commonality and typicality surrounding such class members. *Id.* Indeed, named Plaintiffs could not show that they presented claims typical of potential African American class members, in challenging a policy that was purportedly implemented to increase representation of African Americans, among others. A similar problem undermines Plaintiffs' proposed class here.

It is unclear how each demographic group among the proposed class could show that they were discriminated against by a policy which was ostensibly implemented to reduce barriers for applicants of their own gender, national origin, or race. *See, e.g.,* Pls.' Ex. 20 at 13-17, 20-36 (FAA's consultants examined multiple potential barriers for numerous groups); Pls.' Mot. at 9 (acknowledging that the presentation to employee groups recommended "considering race/national origin and gender diversity a high priority when determining applicant sources"). Plaintiffs' own claims may well not be representative of other groups. Nor have they made clear that they would exclusively argue that the FAA sought to advantage African Americans alone, and to abandon their claim if the evidence shows that the FAA sought to advantage any group in addition to African Americans—such as the women or Hispanics who are also in the proposed class. *See, e.g.,* Ex. P at 30-37 (showing disparate impact for women and Hispanics at various stages of process); Ex. X at 5 (showing success for women and Hispanics in 2014 hiring process).[11] Accordingly, this case is readily distinguishable from *Hartman v. Duffy*, 158 F.R.D. 525 (D.D.C. 1994) which certified a class in which everyone shared the same

---

[11] Plaintiffs' assertion that the class they seek to certify is appropriate is undermined by their repeated allegations in this litigation that the FAA was concerned about an overrepresentation of Caucasians in FAA hiring. *See, e.g.,* 4AC ¶ 54 (alleging that "detractors" of the CTI program in July 2000 "observed that of the 680 persons hired out of the CTI program by 2000, 401 of them were 'White Males.'"); ¶ 118 (alleging that under the 2014 hiring process "'whites' received offers for employment at a rate 23.3% below the proportion of white CPCs, the greatest change for any ethnic group"); Pls.' 1st Mot. for Class Cert. at 2, ECF No. 73-1 ("The FAA committed an unlawful employment practice by eliminating the AT-SAT examination results because of a belief that too many Caucasians passed the examination.").

protected trait—all were women alleging sex-based discrimination.

## 2. Plaintiffs Do Not Represent the Variation in Eligibility and Qualifications.

While differences in race, national origin, and gender between named Plaintiffs and absent class members undermine typicality, that problem is only further exacerbated by differences in the FAA's legacy and interim hiring processes. Plaintiffs cannot show that the purported injuries due to cancelling AT-SAT scores and using the BA are typical of the experience of numerous class members.

First, some members of the putative class could not have been harmed by the AT-SAT claim, for the simple reason that they were ineligible for selection under a CTI-only vacancy announcement in 2014. To apply to such an announcement, an individual must not only have a passing AT-SAT score, a degree from a CTI school, and recommendation, but also request and receive approval annually to extend their eligibility if it has been more than three years since they graduated. *See supra* Background § II.A. However, the proposed class here includes non-African American CTI students who graduated as long ago as 2009. *See* 4AC ¶ 173. Proposed class members who graduated in 2009 and 2010 would have been ineligible to apply to a CTI-only announcement in 2014, unless they sought and received annual eligibility extensions. *See supra*, Background § II.B. Similarly, some class members may have been ineligible for a recommendation from their CTI school without that being "explicitly stated" in their academic records. *See infra*, Arg. § I.D. Certainly, the arguments and claims of named Plaintiffs, who were eligible to apply to a CTI-only announcement, are not typical of these class members.

In addition, the named Plaintiffs and class members diverge in another significant manner: whether they had previously completed an application under the legacy hiring process. That is, while neither Mr. Brigida nor Mr. Douglas-Cook applied to a CTI-only vacancy announcement prior to the 2014 hiring process revision, they seek to represent class members who *did*. Both Plaintiffs took the AT-SAT and graduated in 2013, after the last CTI-only vacancy announcement, which had closed in

August 2012. *See* 4AC ¶¶ 153-158, 167-170; Ex. G at 1. But the proposed class includes individuals

who completed applications under one or more prior CTI-only vacancy announcements. *See, e.g.,* Def's

Opp'n to Pls.' Mot. for Class Cert. at 12, ECF No. 75 (noting that now-dismissed Plaintiffs Suzanne

Rebich and Pollyanna Wang "submitted applications under the 2012 CTI vacancy announcement").

Unlike Plaintiffs, these individuals could have been selected by the FAA under the legacy hiring

process, but were not. Thus, these individuals are not in the same boat as Plaintiffs to the extent

Plaintiffs must argue exclusively that cancelling their AT-SAT scores harmed them or that they were

entitled to another CTI-only vacancy announcement shortly after they passed the AT-SAT. At the

very least, these material differences between named Plaintiffs and the purported class bar a finding

of typicality. *See Moore v. Napolitano*, 269 F.R.D. 21, 33 (D.D.C. 2010) (holding typicality absent in part

because class included members who "may not have suffered an injury at all, much less an injury

typical of the injuries alleged by the class representatives").

The proposed class also features a wide variance in the AT-SAT score itself. Plaintiffs both

received high scores on the AT-SAT, placing them in the "well qualified" score band. *See* 4AC ¶¶ 153,

167. But many of the putative class members received passing scores below 85 and were instead on

the "qualified" score band. As discussed above, applicants with AT-SAT scores in the "qualified"

band were unlikely to be selected, but had no opportunity to retake the test to improve their score

until their current score was close to expiring. *See* Pls.' Ex. 3 at 3-4; Pls.' Ex. 2 at FAA_00007988. It is

therefore unclear how class members with low AT-SAT scores would have been harmed by the FAA's

"striking" of their scores. *Id.* At the very least, the interests and potential arguments of the named

Plaintiffs are distinct from these low-scoring class members.

### 3.   Plaintiffs Do Not Represent the Range of Mitigation Efforts.

Typicality is also absent because the named Plaintiffs do not represent those who reapplied

for a controller position after Congress changed the challenged hiring process by statute or those who

were not hired by the FAA into non-controller positions with similar pay. First, Mr. Brigida currently earns at least $146,000 per year as an FAA analyst, a position he secured in 2016, after choosing not to reapply for a controller position. *See* Background § IV. He therefore has no need of an injunction giving him the opportunity to secure a similar position. *Cf.* Pls.' Mot. at 30 (seeking "hiring preferences . . . beyond ATCS positions). Second, neither Mr. Brigida nor Mr. Douglas-Cook reapplied for a controller position after Congress changed the challenged hiring process by statute. By contrast, much of the proposed class reapplied under a new hiring process specifically favorable to CTI graduates, which was mandated by Congress in 2016 and is unchallenged here. *See, e.g.*, Afflu Decl. ¶¶ 18-19 (37% of proposed class reapplied in 2016 or later); 49 U.S.C. §§ 44506(f)(1)(C)(ii), (f)(2)(A) (prohibiting use of any further biographical assessments for CTI graduates). Moreover, Congress explicitly allowed CTI graduates who were disqualified by the 2014 BA to reapply, waiving the relevant age restriction for applications through the end of 2017. *Id.* § 44506(f)(2)(B). Finally, in 2019, Congress further required that CTI graduates generally receive preferential consideration over applicants from the general public within the same test band. *See* Pub. L. No. 116-92, 133 Stat. 1198, 1615 (Dec. 20, 2019).

The named Plaintiffs' failure to reapply under the preferential, statutory process renders their claims atypical from many in the proposed class. *Accord Daskalea v. Washington Humane Soc.*, 275 F.R.D. 346, 376–77 (D.D.C. 2011) (finding typicality absent given the named plaintiff's "unique circumstances" in having "taken advantage of post-deprivation process" when other class members did not). Indeed, "courts typically reject as inadequate proposed class representatives who are the subject of unique defenses because the proposed representatives would have to direct at least some of their litigation efforts to defeating those defenses, disadvantaging the members of the class not subject to them." *Borum v. Brentwood Assocs.*, L.P., 329 F.R.D. 90, 99 (D.D.C. 2019). At the very least, both named Plaintiffs will have to explain their failure to mitigate, and potentially obviate their claims altogether, via the process specifically created by Congress for CTI graduates. Such unique defenses

to Plaintiffs' individual claims prevent a finding of typicality. *See Allen-Wright v. Allstate Ins. Co.*, No. 07-CV-4087, 2008 WL 5336701, at *4 (E.D. Pa. Dec. 17, 2008); *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 441 (C.D. Cal. 2007).

### C. Plaintiffs Cannot Adequately Represent the Entire Proposed Class.

Plaintiffs' motion should also be denied because it fails to establish that they are adequate representatives of absent putative class members. Rule 23(a)(4) provides for certification "only if . . . the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Where, as here, monetary relief is sought, this requirement has constitutional due process implications. *See Cobell v. Salazar*, 679 F.3d 909, 922 (D.C. Cir. 2012). Because absent class members will be bound by a final judgment when a class action is certified, courts are required to "undertake a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation." *Nat'l Ass'n of Reg'l Med. Programs v. Matthews,* 551 F.2d 340, 344 (D.C. Cir. 1976). The adequacy of representation inquiry concerns both the behavior of the class representatives and class counsel. *See, e.g., Twelve John Does v. Dist. of Columbia,* 117 F.3d 571, 575 (D.C. Cir. 1997). It is meant to uncover conflicts of interest between the named plaintiffs and the class they seek to represent, as well as conflicts within the class or conflicts that implicate class counsel's ability to vigorously prosecute the case on behalf of the whole class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 & n.20 (1997); *Gen. Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 331 (1980).

For the named Plaintiffs to satisfy the adequacy requirement, they "must not have antagonistic or conflicting interests with the unnamed members of the class." *Thorpe v. Dist. Of Columbia,* 303 F.R.D. 120, 150 (D.D.C. 2014) (quoting *Twelve John Does,* 117 F.3d at 575). This includes conflicts among the unnamed class members. *See also Barnes v. Dist. of Columbia*, 242 F.R.D. 113, 122 (D.D.C. 2007). The D.C. Circuit has stressed that "[c]lass members whose interests are antagonistic in fact to, or even 'potentially conflicting' with, the interests of the ostensibly representative parties cannot be bound,

consistent with the requirements of due process to an adjudication taken in their name." *Phillips v. Klassen*, 502 F.2d 362, 366 (D.C. Cir. 1974). Here, the named representatives have significant interests conflicting with unnamed class members, and certification should accordingly be denied.

### 1. Plaintiffs Did Not Timely Exhaust Their AT-SAT Claim.

Mr. Brigida's declaration makes clear that he first contacted the FAA's EEO office more than 45 days after learning about the cancellation of his AT-SAT scores. And Mr. Douglas-Cook does not claim he ever contacted the EEO office. As this Court has recognized, a federal applicant must timely exhaust administrative remedies for each claim in order to press a Title VII claim. *See* Mem. Op. at 4, ECF No. 112; *Tumblin v. Barr*, No. 19-2204, 2020 WL 7078826, at *3 (D.D.C. 2020). Where the named Plaintiff did not exhaust a claim on behalf of the class, he or she cannot be an adequate representative for that claim. *See Int'l Union v. Clark*, No. 02–1484, 2006 WL 2687005, at *5–*6 (D.D.C. Sept. 12, 2006) (discussed in *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 30 (D.C. Cir. 2014)); *cf. Kifafi v. Hilton Hotel Retirement Plan*, No. 98-1517, 2004 WL 3619156, at *1-2, 6 (D.D.C. Sept. 27, 2004) (representatives with unexhausted claims inadequate for ERISA class).

Mr. Brigida contacted the EEO office on February 25, 2014, *see* 4AC ¶ 160; Pls.' Ex. 30 at 2; therefore discrete acts occurring more than 45 days earlier (i.e., before January 11, 2014) are not exhausted. *See* 29 C.F.R. § 1614.105(a)(1); *Tumblin*, 2020 WL 7078826, at *3. The clock begins as soon as an individual "should reasonably suspect discrimination, but before all the facts that would support a charge of discrimination have become apparent." 29 C.F.R. § 1614.105(b); *Fortune v. Holder*, 767 F. Supp. 2d 116, 119 (D.D.C. 2011). Mr. Brigida explains that he learned in "early January" 2014 that he would have to apply to an all source vacancy announcement and could not use his prior "AT-SAT score." *See* Pls.' Ex. 28, Brigida Decl. ¶ 7. Indeed, by January 2, 2014, the CTI schools had notified many of their students and graduates, Ex. BB; some graduates had created a Facebook group to coordinate advocacy (of which Mr. Brigida is an administrator), Exs. DD, EE; and current Plaintiffs'

counsel Michael Pearson (also one of Mr. Brigida's professors, *see* Pls.' Ex. 31) had copied the CTI schools on his email to the FAA claiming that the policy changes violated Title VII. *See* Ex. CC. Accordingly, Mr. Brigida did not administratively exhaust a claim regarding cancellation of his prior AT-SAT score and therefore cannot adequately represent a class for such a claim.

### 2.   Inclusion of Women, Hispanics, and Asians May Create a Class Conflict.

Courts routinely hold that class certification is improper where the purported class includes members of different races or genders, and where conflicts of interest arise as a result. *See Moore v. Nat'l Ass'n of Sec. Dealers, Inc.*, No. 80-3067, 1981 WL 274, at \*7 (D.D.C. Aug. 31, 1981) (rejecting on adequacy grounds a plaintiff's effort to "represent a class composed of both black and female employees" where plaintiff's own allegations "indicate antagonism between the two groups" and plaintiff "believe[d] she was treated less favorably than white females"); *Talley v. ARINC, Inc.*, 222 F.R.D. 260, 269-70 (D. Md. 2004) (finding conflict and striking class action allegations for classes composed of African Americans employees and female employees, where at least one named plaintiff claimed that he was denied a promotion in favor of a female); *Orlowski v. Dominick's Finer Foods, Inc.*, 172 F.R.D. 370, 375 (N.D. Ill. 1997) (holding that "where a minority woman holds interests in conflict with those of minority men, she cannot represent the minority class composed of both" and such conflicts were present where "proof of gender discrimination will involve evidence of . . . more favorable treatment of Hispanic men than Hispanic women").

Here, is unclear whether the interests of the class are antagonistic to each other. Despite Plaintiffs' assertion that the FAA discriminated against all putative class members "because of those applicants' race," 4AC ¶ 202, through an effort to "benefit African American applicants" Pls.' Mot. at 20, it is unlikely that Plaintiffs will be able to uniformly press a claim that the FAA discriminated against all demographics other than African Americans. Because the named Plaintiffs, white and Native American males, *see* 4AC ¶¶ 153, 167, may find it in their interests to more narrowly focus on

comparisons between their own demographics and African Americans, it is unlikely that women or Hispanics, for example, would be adequately represented. *Cf.* Ex. P at 25-26, 51-56 (finding disparate impact for women and numerous minority groups). This problem extends not only to Plaintiffs' selection of proof for their claims, but also to the type of injunctive relief, which could have different impacts on different demographics, including working against the interests of a significant number of minority class members. *See supra* Arg. § I.A.3. *Cf. Spano v. Boeing Co.*, 633 F.3d 574, 587 (7th Cir. 2011) (holding that adequacy of representation had not been proven when the proposed class was defined so broadly that it included individuals who would actually be harmed by the relief plaintiffs sought).

### D. Plaintiffs' Class Definition Lacks Ascertainability.

Some courts in this district have held that Rule 23 implicitly requires that the class "definition must be precise, objective, and presently ascertainable." *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017); *Brewer v. Lynch*, No. 08-1747, 2015 WL 13604257, at *5 (D.D.C. Sept. 30, 2015). An individual should "be able to determine, simply by reading the class definition, whether he or she is a member of the proposed class." *White*, 2020 WL 5946066, at *3 (citation omitted). Plaintiffs propose to exclude from the class those "whose academic records . . . explicitly state that they were ineligible to receive a letter of recommendation." 4AC ¶ 173. This language does not serve Plaintiffs' purpose of excluding those who could not meet the CTI recommendation requirement under the legacy hiring process. They offer no reason to think that graduates who fail to meet a school's recommendation criteria will have the lack of recommendation "explicitly state[d]" on their transcript or other record. It is also unclear how to apply Plaintiffs' term to actual situations. For example, some schools merely require a "C" in each of the courses containing CTI material in order to secure a recommendation. *See, e.g.*, Ex. Y, CTI0001031.10475 (University of Alaska); Ex. Z, CTI0014680 (Purdue University). Would an individual who got a D in one of these classes be excluded from Plaintiffs' definition if his academic record made no mention of eligibility for an FAA

recommendation? And what about schools with more comprehensive standards? *See, e.g.*, Ex. AA, CTI0010996 (Middle Georgia State College, requiring at least 80% on school's recommendation exam and part of the decision to be based on "whole person concept to include character and academic achievement"). Plaintiffs have now presumably surveyed each school's recommendation criteria and should have articulated a process by which class membership could be ascertained. Failure to do so weighs against certification.

## II.  Plaintiffs Cannot Satisfy Rule 23(b)'s Requirements.

In addition to their failures to meet Rule 23(a)'s requirements, Plaintiffs also fail to meet the standards required for certification of classes under Rule 23(b)(2) and 23(b)(3). Plaintiffs' lead proposal is "hybrid" certification of a (b)(2) class for liability and injunctive relief and a (b)(3) class for a portion of the monetary claims. *See* Pls.' Mot. at 13-14, 31. This approach does not ameliorate any of the problems with each of these kinds of certification individually. A hybrid class simply addresses unusual instances where the "cohesion of the class certified for one remedy – injunctive relief – breaks down as to individual damages claims." *See Keepseagle v. Veneman*, No. 99-3119, 2001 WL 34676944, at *14 (D.D.C. Dec. 12, 2001). Otherwise, such a class "must meet the requirements of both subsections (b)(2) and (b)(3)." *Id.* Because Plaintiffs fail establish they can certify a class under either Rule 23(b)(2) or (b)(3), they cannot certify it as a hybrid. *See Garcia v. Veneman*, 211 F.R.D. 15, 24-25 (D.D.C. 2002).

### A.  Plaintiffs' Proposed Class Cannot Be Certified Under Rule 23(b)(2).

Plaintiffs propose to certify the class under Rule 23(b)(2) for "common injunctive and declaratory relief." Pls.' Mot. at 2, which would encompass a "first phase of class proceedings" to address "the questions of liability, injunctive relief, and declaratory relief," along with "any common defenses asserted by the FAA." *Id.* at 13. These issues cannot be certifiedfor two reasons.

First, Plaintiffs' proposed class does not meet the requirement of Rule 23(b)(2) to show that final injunctive relief be "appropriate respecting the class as a whole." *See Wal-Mart*, 564 U.S. at 366

(for certification under Rule 23(b)(2), challenged conduct must be "such that it can be enjoined . . . only as to all of the class members or as to none of them"). Plaintiffs do not even attempt to show that the injunctions they briefly hint at would provide relief to the entire class. *See, e.g.*, Pls.' Mot. at 30 ("Plaintiffs seek hiring preferences, which *may* extend beyond ATCS positions, training and prophylactic measures to prevent future discrimination within the FAA[.]") (emphasis added); *see also* 4AC, Prayer for Relief ¶ 6 (vaguely asking to enjoin FAA to "[c]omply with Title VII," "[e]radicate the effects of past unlawful employment practices . . . including through possible instatement preferences and eligibility extensions" and to "[i]mplement training and other measures"); *id.* ¶ 206 (despite listing seven topics for an injunction, it is unclear how the entire class would benefit).

Where Defendant and this Court are left to guess at what Plaintiffs seek by way of injunctive relief, and whether it would provide a class-wide remedy, certification under Rule 23(b)(2) is inappropriate. *See DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1200 (10th Cir. 2010) ("Rule 23(b)(2)'s bottom line, therefore, demands at the class certification stage plaintiffs describe in reasonably particular detail the injunctive relief they seek[.]"); *Midland Pizza, LLC v. Sw. Bell Tel. Co.*, 277 F.R.D. 637, 640–41 (D. Kan. 2011) (finding certification inappropriate, in part because the plaintiff "does not suggest what these [injunctive] measures might be, or how the court could craft any such injunction or enforce any such injunction"). Without an attempt by Plaintiffs to carry their burden, Defendant cannot address all potential defects, and this Court cannot evaluate whether hypothetical relief would redress the claimed injuries of the class as a whole.[12] To the extent anything can be discerned from Plaintiffs' vague references to injunctive relief, they appear to suggest that numerous orders would be required, crafted to the needs of each class member, or as-yet-unspecified groups of class members.

---

[12] Nor would it be fair to absent class members to certify a Rule 23(b)(2) class without determining what relief is sought. As *Wal-Mart* explained, Rule 23(b)(2), "does not require that class members be given notice and opt out rights[.]" 564 U.S. at 363. Absent class members should not be bound to a class for injunctive relief, without first determining the potential relief at issue.

*See, e.g.*, 4AC Prayer for Relief ¶ 6(b) (referring to *multiple* "instatement preferences" and "eligibility extensions"); Pls.' Mot. at 30 (similar). This is improper. *See Wal-Mart*, 564 U.S. at 360–61 (holding certification improper under Rule 23(b)(2) where "each individual class member would be entitled to a different injunction or declaratory judgment."). Nor could "the relief sought . . . merely initiate a process through which highly individualized determinations of liability and remedy are made[.]" *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 499 (7th Cir. 2012). *Cf.* 4AC ¶ 206(c) (asking for order requiring FAA to "evaluate the forgiveness of student loan debt . . . or partial reimbursement of tuition").

Second, the problems outlined above in satisfying Rule 23(a)'s requirements also preclude certification under Rule 23(b)(2). Certification of a class under Rule 23(b)(2) is only appropriate where the satisfaction of those conditions is "self-evident." *Wal-Mart*, 564 U.S. at 363. Where a class is not "sufficiently cohesive" the legality of the behavior at issue cannot be settled with respect to the class as a whole, and certification under Rule 23(b)(2) is inappropriate. *See Lightfoot v. D.C.*, 273 F.R.D. 314, 329 (D.D.C. 2011); *see also Wal-Mart*, 564 U.S. at 360 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted[.]") (citation omitted). As explained *supra* Arg. § I.A-D, Plaintiffs' proposed class encompasses individuals affected in different ways by the challenged policies and by potential injunctions in this case, especially due to the range of protected groups that Plaintiffs have aggregated into one class. Plaintiffs cannot show that the FAA "acted or refused to act on grounds that apply generally to the class," Fed. R. Civ. P. 23(b)(2). *See supra* Arg. § I.A.3. Because it is not "self-evident" that indivisible relief is warranted and would be effective across the wide range of putative class members here, certification under Rule 23(b)(2) should be denied.

**B.  Plaintiffs Cannot Certify a Class Under Rule 23(b)(3).**

Plaintiffs propose to certify a class under Rule 23(b)(3) for a "second class phase" for "common questions of monetary relief such as the availability of and variables affecting backpay" along with "common defenses to payment of compensation." Pls.' Mot. at 13; *see id.* at 29 (seeking

"certification for their monetary claims").[13] They propose to leave "[a]ny remaining individualized issues" for unspecified further proceedings. *Id.* at 13. However, Plaintiffs are not able to satisfy the strict requirements of Rule 23(b)(3).

### 1. Plaintiffs Have Failed to Show that Common Issues Predominate over Individualized Issues.

Rule 23(b)(3)'s predominance requirement is "even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). The courts in this circuit weigh the respective issues in the case subject to common proof against those subject to individualized proof. *See Coleman ex rel. Bunn v. Dist. of Columbia*, 306 F.R.D. 68, 85 (D.D.C. 2015). Accordingly, where issues of injury, liability, and relief "turn upon highly individualized facts," denial of certification is warranted. *See McCarthy*, 741 F.2d at 1415. Here, Plaintiffs seek (b)(3) certification solely to add certain monetary relief questions to their proposed certification under (b)(2). *See* Pls.' Mot. at 14, 31. The primary focus of the predominance inquiry should not be Plaintiffs' background narrative, *see* Pls.' Mot. at 35-36, but on the weight of Plaintiffs allegedly common monetary relief issues. Plaintiffs have come nowhere close to showing that "damages are capable of measurement on a classwide basis so that individual calculations will not 'inevitably overwhelm questions common to the class.'" *Bruce v. Teleflora, LLC*, No. 2:13-CV-03279, 2013 WL 6709939, at *7 (C.D. Cal. Dec. 18, 2013) (quoting *Comcast Corp.*, 569 U.S. at 34).

#### i. Plaintiffs' Damages Model is Deficient.

Indeed, Plaintiffs' have failed to meet the basic requirement under Rule 23(b)(3) to establish "that damages are capable of measurement on a classwide basis." *Comcast Corp.*, 569 U.S. at 34; *see also Little*, 249 F. Supp. 3d at 413 ("In order to certify a class under Rule 23(b)(3), Plaintiffs must present a reasonable theory for computing class-wide damages."). Courts must conduct a "rigorous analysis"

---

[13] Plaintiffs passingly refer to certification for "non-equitable compensatory claims." Pls.' Mot. at 29. If Plaintiffs seek compensatory damages beyond "equitable remedies" such as backpay and frontpay, they should make that clear. *See* Def.'s Br. at 11, ECF No. 119; Def.'s Br. at 12, ECF No. 105.

of a proposed damages model, to determine whether the proposed methodology can reliably establish damages on a classwide basis. *See Comcast Corp.* 569 U.S. at 34. Here, Plaintiffs have failed to explain or justify their damages model, merely asserting that it is a form of "[a]ggregate and pro rata back pay calculations." Pls.' Mot. at 23. The commonality problems for damages discussed above, *see supra* Arg. § I.A.3, are even more significant through the predominance lens.

Plaintiffs offer no response to Dr. White's detailed critique showing that Plaintiffs' model would not be representative of the class or of actual pay at the FAA since 2014. *See supra* Arg. § I.A.3; White Report at 9-14. Key to the predominance analysis, Plaintiffs fail to explain how their allegedly common backpay determinations would eventually be applied to individuals. Given the variation identified by Dr. White in data available to Plaintiffs' expert, *see id.*, Plaintiffs' failure to address this issue in detail bars a finding of predominance. *See, e.g., Harris v. Med. Transp. Mgmt., Inc.*, No. 17-01371, 2020 WL 5702085, at *10 (D.D.C. Sept. 24, 2020) (finding that "differences in pay structure, pay rates, [and] hours worked" would improperly "give rise to a plethora of individualized inquiries").

Moreover, Plaintiffs cannot show that common issues predominate where they would leave so much to the individualized third stage. This includes estimation of mitigating earnings, *see* Pls.' Mot. at 25 n. 4, and a host of issues related to the fact that only some class members sought controller positions again. Because Plaintiffs' damages model is built around the notion that an FAA controller position was uniquely beneficial, individualized reasons for not reapplying or reapplying unsuccessfully would be relevant. Additional individualized mitigation questions include whether and to what extent every class member lessened their damages at all, via alternate career paths, education, or other qualifications. *Accord Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 441 (C.D. Cal. 2007) (holding that defenses such as "mitigation of damages" precluded certification since they "require an individualized determination for each putative class member because these defenses turn, in large part, on each class member's knowledge and conduct"); *Daskalea v. Washington Humane Soc.*, 275 F.R.D. 346, 381 (D.D.C.

2011) ("[W]hen computation of damages will require separate mini-trials, then the individualized damage determinations predominate over common issues and a class should not be certified."); *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (same).

In sum, Plaintiffs' model fails to accurately capture damages on a classwide basis, which is fatal to their proposed Rule 23(b)(3) class.

### ii.   *Plaintiffs Improperly Seek to Provide a Windfall to Uninjured Class Members.*

Plaintiffs admit that the proposed class includes uninjured members. To meet the predominance requirement, Plaintiffs must show by a "preponderance of the evidence that injury to 'all or virtually all' putative class members can be proved through common evidence and that plaintiffs have a reliable way to ensure that all class members suffered some injury by the time the Court awards damages." *Rail Freight II*, 292 F. Supp. 3d at 135. "Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury." *In re Rail Freight Fuel Surcharge Antitrust Litig.* (*Rail Freight I*), 725 F.3d 244, 252-53 (D.C. Cir. 2013). Plaintiffs' proposed class fails for both reasons: it is not composed of "virtually all" injured class members and identifies no reliable way to exclude uninjured members from monetary relief.

*First*, there are undisputedly uninjured individuals in the proposed class. *See Rail Freight I*, 725 F.3d at 252 ("The plaintiffs must . . . show that they can prove, through common evidence, that all class members were in fact injured by the alleged [illegal action]). The Court "expect[s] the common evidence to show all class members suffered some injury." *Id.* "When a case turns on individualized proof of injury, separate trials are in order." *Id.* at 253. Here, for a class member to establish an injury, he or she would also have to show, among other things, that he or she "was qualified" for the job and did not receive it based on a discriminatory reason. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Some members of the potential class were not eligible for hire under the legacy hiring process, the 2014 hiring process, or both: (1) those whose CTI eligibility had expired, *see* Afflu Decl. ¶¶ 10-13

(showing that up to 11% of the potential class may have eligibility issues); (2) those who could not

pass the medical exam, Pls.' Mot. at 26 (mentioning medical disqualifications); (3) those who could

not pass the security and suitability screening, *see* Pls.' Ex. 33, Perdue Expert Report at 8 ("Some

candidates would not pass [various screening tests]"); Afflu Decl. ¶ 23; *cf.* Ex. GG, Perdue Dep. 65:9-

68:10. Some members of the potential class had AT-SAT scores in the "qualified" band and could

have benefited from an opportunity to retake the test. *See* Afflu Decl. ¶¶ 8-9 (about 29% of the

potential class). Some members would not have successfully complete training at the Academy. *See*

Pls.' Ex. 5 at 2-3. And some members likely performed poorly on parts of the BA that Plaintiffs cannot

plausibly link to discrimination. Each of these individuals was not injured by the challenged FAA

actions and is not entitled to relief to "make them whole" because they could not have been hired or

succeeded as a controller, regardless of Plaintiffs' claims. And for that reason, the class fails.

In some circumstances, courts have considered certifying classes which include a *de minimis*

number of uninjured members. *See Rail Freight II*, 292 F. Supp. 3d at 135 (calling the "all or virtually

all" and "de minimis" standards "two sides of the same coin"). But even assuming a *de minimis*

standard, Plaintiffs make no effort to quantify the number of uninjured class members to demonstrate

they represent as a *de minimis* amount. Plaintiffs' expert assumed for illustration purposes that 20% of

class members could or would not be hired and that 10% of those hired would not complete the

Academy. *See* Pls.' Ex. 33, Perdue Report ¶ 70 & Ex. 5; *see also id.* at 16 (noting that one FAA report

suggested a range of total attrition of new hires between 9.5% and 14.5%). The D.C. Circuit found no

abuse of discretion in *Rail Freight II*'s finding that 12.7% of uninjured class members was "beyond the

outer limits of what can be considered *de minimis* for purposes of establishing predominance." 292 F.

Supp. 3d at 138; *Rail Freight III*, 934 F.3d at 625. Because the Court will need to determine who the

uninjured class members are for the purposes of damages, "[t]he number of uninjured class members

in relationship to the size of the class also may matter." *Rail Freight II*, 292 F. Supp. 3d at 138 (citing

cases where circumstances caused 5-6% uninjured class members to exceed a *de minimis* amount).

*Second*, Plaintiffs offer no mechanism for the Court to identify uninjured class members when fashioning relief. *See* Perdue Dep. 68:1-10 (admitting that he has no proposal to exclude ineligible individuals from the class). Supreme Court decisions do not "permit district courts considering class certification to defer questions about the number and nature of any individualized inquiries that might be necessary to establish liability." *Rail Freight III*, 934 F.3d at 626. Although the *Easterling* court took that approach years ago, Supreme Court justices have more recently emphasized that "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 464 (2016) (Roberts, C.J. concurring). It is Plaintiffs' burden to provide "a mechanism for ensuring that uninjured class members do not recover damages." *Id.* at 460 (Roberts, C.J. concurring) ("If there is no way to ensure that the [] damages award goes only to injured class members, that award cannot stand."). Though Plaintiffs make a clumsy attempt to account for the uninjured class members in reducing the aggregate damages, they fail to provide a method to eventually identify these uninjured class members when it comes to determining liability, benefiting from an injunction, or allocating monetary relief. *Cf.* Pls.' Mot. at 31 n.5 (acknowledging every class member must eventually establish their own standing to recover).

Nor can Plaintiffs solve this problem with their poorly-conceived proposal to just prorate damages for all class members. *See* Pls.' Mot. at 32 (relying on out-of-district cases in which there were more potentially injured class members denied positions than positions available). Cases about dividing up damages for a limited number of positions to a larger class of members with near-equal qualifications are not applicable to the present situation. *See, e.g., United States v. City of New York*, 276 F.R.D. 22, 44 (E.D.N.Y. 2011) (addressing the issue only in context of receiving a pro rata share because there were more class members than positions available). Even if one district court explored using a pro rata approach with an allegedly discriminatory test given midway through the hiring

process, *see Easterling*, 278 F.R.D. at 41, this case and cases like it have been undermined by the subsequent *Comcast* decision.

In *Comcast*, the Supreme Court held that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to [Plaintiff's] theory" of liability. 569 U.S. at 35. Thus, a damages model may not provide relief to individuals who would not have been hired even under the legacy process. As a consequence, courts have found that "pro rata" models similar to Plaintiffs' "do[] not survive scrutiny under *Comcast*," where they are "overinclusive, and doubtlessly include[] individuals who are not entitled to backpay under the proposed theory of liability because they would not have been hired even absent the alleged discrimination[.]" *Houser v. Pritzker*, 28 F. Supp. 3d 222, 253 (S.D.N.Y. 2014); *see also Stockwell v. City & Cty. of San Francisco*, No. C 08-5180 PJH, 2015 WL 2173852, at *9 (N.D. Cal. May 8, 2015) (same). Here, given the presence of uninjured class members, and the fact that "Plaintiffs' pro rata model makes no attempt whatsoever to separate those class members who are entitled to damages from those who are not," *Houser*, 28 F. Supp. 3d at 253, certification is improper. Plaintiffs offer nothing more than a method that would arbitrarily award damages to injured and uninjured class members alike. *See Comcast*, 569 U.S. at 36 (warning that accepting "any method of measurement" that can be applied classwide, "no matter how arbitrary the measurements might be" would "reduce [the] predominance requirement to a nullity").

## 2. Plaintiffs Have Failed to Show That a Class Action Is Superior.

Plaintiffs also cannot satisfy Rule 23(b)(3)'s further requirement that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." In determining whether superiority is present, courts examine factors such as the interest of the class members in controlling their own litigation, whether there is related litigation pending elsewhere, and the likely difficulties in managing the proposed class action. *See* Fed. R. Civ. P. 23(b)(3). Here, all relevant factors counsel against certifying Plaintiffs' proposed class.

*First*, it is possible the class members would rather control their own litigation. Plaintiffs suggest that, because none of the EEOC complainants have brought individual claims, they are not "willing or able" to bring their own cases and control the litigation. *See* Pls.' Mot. at 40. This is an unfounded assumption regarding the motivation of non-parties. It is just as possible, after having gone through the effort of pursuing EEOC claims, the same individuals may be very interested in control over their own litigation. Plaintiffs also claim the cost of litigation would deter individual litigation. *See id.* But Title VII permits compensatory damages up to $300,000 per person, *see* 42 U.S.C. § 1981a(b)(3)(D), which Plaintiffs have foregone. And this is not a case where even an individual backpay claim is inherently small. *See, e.g.*, Pls.' Ex. 33, Perdue Report, Subex. 5 (estimating that backpay/frontpay through retirement for one individual would exceed $5 million).

*Next*, a class action here does not promote efficiency or judicial economy. There are two circumstance in which a class action might be superior in terms of efficiency: for small claims or very large claims to avoid the legal system being flooded with claims. *See Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 163 (D.D.C. 2014). This is neither. If Title VII claims are large individual claims, "courts generally find individual lawsuits superior to a class action." *Newberg on Class Actions* § 4:88 (collecting cases); *see also Amchem Prods.*, 521 U.S. at 617 (class actions resolve "the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights"). Nor is there a risk of the legal system being "flooded by particular types of claims" if a class is not certified. 2 *Newberg on Class Actions* § 4:64; *see Coleman*, 306 F.R.D. at 87. Plaintiffs refer to a few hundred EEOC complaints filed in 2014, Pls.' Mot. at 40, but apart from Lucas Johnson (whose case was consolidated with this one before being voluntarily dismissed, *see* ECF No. 100), no individual with exhausted claims has filed *any* cases in federal court in the last seven years.

*Finally*, Plaintiffs' proposed class would be unmanageable. If the "proposed class action would require significant individualized inquiries regarding both injury and damages, the court cannot

conclude that a class action would be superior in this case." *Rail Freight II*, 292 F. Supp. 3d at 144-45. And some of the issues Plaintiffs believe can be resolved on a classwide basis, *see* Pls.' Br. at 41, may actually turn on individualized issues, as explained above. *See supra* Arg. §§ I.A-D. Plaintiffs' assurances that everything could ultimately be resolved through "sub-classes, claims procedures, *Teamsters* hearings, or other mechanisms," Pls.' Mot. at 14, are unpersuasive. For example, Plaintiffs offer no reason to expect they could resolve the numerous Rule 23 defects identified above. *See Hinton v. Dist. of Columbia*, No. 21-1295, 2021 WL 4476775, at *12 (D.D.C. Sept. 30, 2021) ("[E]ach subclass must independently satisfy Federal Rule of Civil Procedure 23's requirements."). And *Teamsters* hearings apply a rebuttable presumption that a decision was based on an established pattern of discrimination, *see In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014), but this is not a pattern and practice case.

## C. Plaintiffs Have Not Demonstrated That an Alternative Certification Approach Would Resolve the Defects for Plaintiffs' Proposed Class.

Plaintiffs' alternative proposal is to certify liability "under Rule 23(c)(4)," leaving all questions regarding monetary relief and individualized aspects uncertified. *See* Pls.' Mot. at 41-42. To the extent Plaintiffs construe Rule 23(c)(4) to provide an unstructured, open-ended way around the types of certification provided for in Rule 23(b), they are mistaken. *See Little,* 249 F. Supp. 3d at 425 (holding that (c)(4) certification requires that "the proposed class satisfy the requirements of Rule 23(a) and (b) with respect to liability"); *In re Gen. Motors Corp. Dex-Cool Prod. Liab. Litig.*, 241 F.R.D. 305, 314 (S.D. Ill. 2007) ("Rule 23(c)(4)(A) does not create . . . a fourth type, the 'issue' class action."). Instead, Plaintiffs are effectively proposing to certify a partial (b)(2) class on the "issue" of liability. *See* Pls.' Mot. at 42 (vaguely describing the issue as "whether the FAA is liable under Title VII for instituting a racially discriminatory hiring process"). But given the substantial (b)(2) defects, *see supra* Arg. § II.A, it would not be appropriate to merely "postpon[e] consideration of whether class certification is appropriate for the damages phase until plaintiffs have made it that far." *Taylor*, 241 F.R.D. at 47.

Contrary to Plaintiffs' vague assertion that liability for their AT-SAT and BA claims is

"common to all putative Class members," Pls.' Mot. at 42, those claims are not subject to common class-wide answers. *See supra*, Arg. § I.A. Nor do the named Plaintiffs satisfy the typicality and adequacy prongs even if liability could be considered in isolation. *See id.*, Arg. § I.B-C. Lastly, by referring to whether this issue "would materially advance the resolution of this case," Pls.' Mot. at 42, Plaintiffs are asking the Court to join the courts that have concluded that Rule 23(c)(4) does not require a finding that certification would satisfy Rule 23(b) requirements in light of the cause of action as a whole. *See* Laura J. Hines, *Codifying the Issue Class Action*, 16 Nev. L.J. 625, 636 (2016) (explaining each Circuit's approach to Rule 23(c)(4)). The D.C. Circuit has not taken a position on this question, *see In re Johnson*, 760 F.3d 66, 75 (D.C. Cir. 2014), but various courts have crafted their own standards so that (c)(4) does not swallow the rest of Rule 23. *See* Hines, 16 Nev. L.J. at 636 (collecting cases and noting concerns); *see also Harris v. Med. Transp. Mgmt., Inc.*, No. 17-01371, 2021 WL 3472381, at *9 (D.D.C. Aug. 6, 2021) (adopting broad reading).

Plaintiffs have not shown that certification of issues related to liability would "materially advance" resolution of this case. For example, the Second Circuit rejected certification of "the issue of defendants' scheme to defraud" because "it would not dispose of larger issues such as reliance, injury, and damages." *See McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008) (holding that "given the number of questions that would remain for individual adjudication, issue certification would not reduce the range of issues in dispute and promote judicial economy"); *see also Harris*, 2021 WL 3472381, at *11 (holding that an issue relevant to damages would not be certified under (c)(4) where "individual trials to determine damages will be necessary"). Here, issue certification would run up against both the numerous ways the class includes uninjured members whose own claims would not be advanced, *see supra*, Arg. § II.B.1.ii, and the host of damages issues Plaintiffs want to ignore.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' renewed Motion for Class Certification.

Dated: October 26, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

CARLOTTA P. WELLS
Assistant Director
Civil Division, Federal Programs Branch

*/s/ Galen N. Thorp*

GALEN N. THORP (V.A. Bar No. 75517)
Senior Trial Counsel
REBECCA CUTRI-KOHART (D.C. Bar No. 1049030)
MICHAEL DREZNER (V.A. Bar No. 83836)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Telephone: (202) 514-4781
Facsimile: (202) 616-8470
Email: galen.thorp@usdoj.gov

*Counsel for Defendant*