EXHIBIT
A



# THE
# AIR TRAFFIC CONTROLLER
## WORKFORCE PLAN

2 0 2 1 | 2 0 3 0



**Federal Aviation Administration**

This 2021 report is the FAA's sixteenth annual update to the controller workforce plan. The FAA issued the first comprehensive controller workforce plan in December 2004. It provides staffing ranges for all of the FAA's air traffic control facilities and actual onboard controllers as of September 26, 2020. Section 221 of Public Law 108-176 (amended by Public Law 116-260) requires the FAA Administrator to transmit a report to the Senate Committee on Commerce, Science and Transportation and the House of Representatives Committee on Transportation and Infrastructure that describes the overall air traffic controller workforce plan.

# Contents

4 **EXECUTIVE SUMMARY**

8 **CHAPTER 1 | INTRODUCTION**

8 Staffing to Traffic

11 Meeting the Challenge

12 **CHAPTER 2 | FACILITIES & SERVICES**

12 Terminal and En Route Air Traffic Services

13 FAA Air Traffic Control Facilities

14 **CHAPTER 3 | STAFFING REQUIREMENTS**

17 Staffing Ranges

21 Air Traffic Staffing Standards Overview

23 Tower Cab Overview

24 TRACON Overview

25 En Route Overview

26 Summary

26 Air Traffic Controller Scheduling

27 Technological Advances

32 **CHAPTER 4 | LOSSES**

32 Controller Loss Summary

33 Actual Controller Retirements

33 Cumulative Retirement Eligibility

34 Controller Workforce Age Distribution

35 Controller Retirement Eligibility

36 Controller Retirement Pattern

37 Controller Losses Due to Retirements

38 Controller Losses Due to Resignations, Removals and Deaths

38 Developmental Attrition

38 Academy Attrition

39 Controller Losses Due to Promotions and Other Transfers

40 Total Controller Losses

42 **CHAPTER 5 | HIRING PLAN**

43 Controller Hiring Profile

44 Trainee-to-Total-Controller Percentage

47 **CHAPTER 6 | HIRING PROCESS**

47 Controller Hiring Sources

47 Recruitment

50 **CHAPTER 7 | TRAINING**

51 The Training Process

52 Designing and Delivering Effective Training

52 Infrastructure Investments

52 Time to Certification

53 Investing for the Future

54 **CHAPTER 8 | FUNDING STATUS**

55 **APPENDIX**

55 Facility Staffing Ranges

# Executive Summary

Safety is the top priority of the Federal Aviation Administration (FAA) as it manages America's National Airspace System (NAS). The FAA's mission is to provide the safest, most efficient aerospace system in the world and encourage global aerospace excellence. The NAS is the common network of U.S. airspace—air navigation facilities, equipment and services; airports or landing areas; aeronautical charts, information and services; rules, regulations and procedures; technical information; and manpower and material. Thanks to the expertise of people and the support of technology, tens of thousands of aircraft are guided safely and expeditiously every day through the NAS to their destinations.

**While safety is the top priority of the FAA as it manages the NAS, efficiency is also an important priority for the FAA.**

## IMPACT OF CORONAVIRUS DISEASE 2019 (COVID-19)

The COVID-19 pandemic has had substantial impact on the aviation industry and the FAA. At the onset of the pandemic, in order to protect employees and help ensure continuity of operations, certain activities were eliminated or significantly reduced at our air traffic control facilities. On-the-job training of developmental air traffic controllers was significantly reduced. This will result in delayed certification for most existing developmental controllers. In order to help the training pipeline recover and due to a significant drop in air traffic volume at most of our facilities, the FAA has decided to reduce the FY 2021 hiring target from 910 to 500. As always, the FAA will continue to assess the aviation industry and make future adjustments to plans as warranted. This plan reflects impacts of the pandemic on controller hiring plans given current projections of recovery.

## WORKLOAD

An important part of managing the NAS involves actively aligning controller resources with demand. The FAA "staffs to traffic," matching the number of air traffic controllers at its facilities with traffic volume and workload. The FAA's staffing needs are dynamic due to the dynamic nature of the workload and traffic volume.

## TRAFFIC

For the purposes of this plan, air traffic includes aircraft that are controlled, separated and managed by air traffic controllers. This includes commercial passenger and cargo aircraft, as well as general aviation and military aircraft. Due to the COVID-19 pandemic, air traffic volume dropped precipitously beginning in late March 2020. Traffic is slowly returning but isn't expected to recover to 2019 levels for several years. The FAA also incorporates location-specific traffic counts and forecasts in its staffing standards process to account for air traffic volume projections at individual facilities.



Also, unmanned Aircraft Systems (UAS) are changing the way we see the future of flight. Keeping pace with the technological advances in this growing industry presents unique challenges and innovative opportunities for the FAA and the aviation community. The FAA is taking an incremental approach to safe UAS integration. The impact of UAS on air traffic control will continue to evolve as the FAA pursues its vision for fully integrating unmanned systems into the NAS.

## HEADCOUNT

At individual facilities, the current Actual on Board (AOB) number may exceed the facility's target staffing range. This is because many facilities' current AOB numbers (all controllers at the facility) include many developmental controllers in training to offset expected future attrition. While the FAA strives to keep Certified Professional Controllers (CPCs) and Certified Professional Controllers in Training (CPC-ITs) within the range, individual facilities can be above the range due to advance hiring. The FAA hires and staffs facilities so that trainees, once fully certified, are prepared to take over responsibilities when senior controllers leave. Current staffing levels and ranges can be seen in the Appendix of this plan.

## RETIREMENTS

The long-anticipated wave of controller retirements peaked more than a decade ago, in 2007, at 828 retirements. Over the past five years, the FAA has averaged 501 controller retirements per year. Due to the shifting demographics of the workforce, controller retirements are expected to continue to decline for the next five years to a new average of 236 per year through 2030. In the last five years, 2,506 controllers have retired. Cumulative retirement eligibility has also fallen. More than 10,000 controllers were hired after the 1981 strike, and at the end of FY 2020 only 19 controllers remain from those who were hired before 1984. By the end of FY 2021, fewer than 600 controllers will be eligible to retire, which is the lowest number since the 2005 Controller Workforce Plan.

The FAA's goal is to ensure that it has the flexibility to match the number of controllers at each facility with traffic volume and workload. Staffing to traffic is just one of the ways we manage America's NAS.



**This clearly demonstrates that the controller retirement wave that peaked more than a decade ago is over.**

The FAA carefully tracks actual retirements and projects losses to ensure its recruitment and training keep pace.

### HIRING

Over the past five years, the FAA has hired over 7,200 new air traffic controllers. In FY 2020, we exceeded our target with 920 controller hires versus a plan of 910 in the midst of the COVID-19 pandemic.

FY 2020 hiring was significantly challenged by the COVID-19 pandemic. Despite those challenges, the FAA continued to recruit and hire through the use of a two-track announcement, utilizing virtual onboarding as well as virtual training. This consisted of new hires beginning their employment from their current residence and completing the Air Traffic Basics training virtually. After Basic training was completed, they reported to the FAA Academy in Oklahoma City for the next portion of their training. This was the fifth consecutive year that FAA met it's hiring goal.

The anticipated number of new controller hires in FY 2021 is 500. This represents a significant reduction to the FY 2021 target of 910 stated in the FY 2020 Controller Workforce Plan. The decrease is driven by ongoing impacts of the COVID-19 pandemic and our desire to not overload facilities with new hires. This would be the lowest number of new controller hires since 2013.

In FY 2016, Public Law 114-190 – the FAA Extension, Safety and Security Act (FESSA) of 2016 – was enacted. The law established two hiring tracks totaling three distinct hiring pools. It included pool-balancing requirements. The National Defense Authorization Act of 2020 replaced the balancing requirements with requirements to prioritize certain pools. This will give the FAA better access to the best-qualified candidates.

During FY 2021, the FAA will continue to recruit and hire air traffic control specialists to meet staffing requirements through the use of the two-track announcement process.

Over the past five years, the FAA has hired over 7,200 new air traffic controllers.





## TRAINING

In July 2019, the FAA implemented the National Training Initiative (NTI), providing minimum training hours per week for all trainees.  Since implementation of the NTI in 2019, the  FAA made significant increases in the certification of trainees to certified professional controllers (CPCs). NTI was temporarily paused as a result of COVID-19 for several months and training was significantly impacted.  As the FAA ramps back up and brings new employees on board, training continues to be closely monitored at all facilities. We must carefully manage the process to ensure that our trainees are hired into locations with need and progress in a timely manner to become CPCs. NTI is critical to our continued efforts to build a stable trainee pipeline and develop our workforce.

Ongoing hiring and training initiatives, as well as simulator use, are helping the FAA meet its goals. While the FAA is managing today's air traffic, we must also integrate new technologies into air traffic operations. From state-of-the-art simulators to satellite technology, air traffic is evolving into a more automated system. The FAA is working diligently to ensure well-trained controllers continue to uphold the highest safety standards as we plan for the future."

# Ch. 1 Introduction

## STAFFING TO TRAFFIC

Air traffic controller workload and traffic volume are dynamic, and so are the FAA's staffing needs. A primary factor affecting controller workload is the demand created by air traffic, encompassing both commercial and non-commercial activity. Commercial activity includes air carrier and commuter/air taxi traffic. Non-commercial activity includes general aviation and military traffic.

Adequate numbers of controllers must be available to cover the peaks in traffic caused by weather and daily, weekly or seasonal variations, so we continue to "staff to traffic." Although the FAA  generally staffs to traffic counts, it is not a one-to-one relationship.

Safety rules and hours of operation require watch schedules that establish staffing during low-volume periods or in facilities with low traffic counts. This practice gives us the flexibility throughout each day to match the number of controllers at each facility with traffic volume and workload.



**FIGURE 1.1  TRAFFIC TRENDS**

*Total Workforce Operations = Tower + TRACON + Aircraft Handled by En Route Centers

Air traffic was severely impacted by the COVID-19 pandemic. In late March 2020, air traffic dropped dramatically. It has begun a slow, steady recovery and the FAA projects it will take several years to return to 2019 levels. Prior to COVID-19, air traffic had shown slow growth in each of the last 5 years. However, system- wide, air traffic is down by 38.8 percent since peak year 2000 and the chart in Figure 1.1 shows that air traffic volume is not forecasted to return to peak levels in the near term.

Figure 1.2 shows system-wide controller staffing and traffic, indexed from FY 2000 and projected through FY 2030. Indexing is a widely used technique that compares the change over time of two or more data series (in this case, total controller headcount, CPC plus CPC-IT and traffic). The data series are set equal to each other (or indexed) at a particular point in time (in this case, FY 2000, a high mark for traffic) and measured relative to that index point in each successive year. This way we know how much growth or decline has occurred compared with the base value.



**FIGURE 1.2  SYSTEM-WIDE TRAFFIC AND TOTAL CONTROLLER TRENDS**

Legend: Headcount · Forecasted Headcount · CPC + CPC-IT · Forecasted CPC + CPC-IT · Historical Traffic · Forecasted Traffic

INDEX
PEAK TRAFFIC YEAR 2000 = 100

Staffing continued to rise while traffic dropped off

Staffing still ahead of traffic

FISCAL YEAR

Staffing to traffic not only applies on a daily basis, but also means that we staff to satisfy expected needs two to three years in advance. We do this to ensure sufficient training time for new hires. Despite the decline in air traffic shown in Figure 1.2, "staffing to traffic" requires us to anticipate controller attrition so that we plan and hire new controllers in advance of need. This is one reason that staffing remains ahead of traffic. The gap between the blue line (Headcount) and the green line (CPC and CPC-IT staffing) is the advance hire trainee pipeline and is projected to close significantly by 2025. The headcount and CPC+CPC-IT lines converge due to reduced retirements and other losses.

The FAA periodically validates its staffing models to check for fundamental changes in the nature of the air traffic control job. The FAA will update its staffing models when there are significant changes in air traffic controller workload. Future workload shifts could be driven by increased UAS activity and increases in commercial space launch activity.

In December 2015, the FAA began registration of all UAS. Initially UAS operated on a limited basis in the NAS and mainly supported public operations, such as military and border security operations. In recent years, UAS operations have significantly increased in number, technical complexity and application, but they have not had much impact on controller workload yet. The list of uses has rapidly expanded to encompass a broad range of activities, including aerial photography, surveying, communications and broadcast, as well as hobby and recreation.

In 2017, the FAA launched a prototype version of the Low Altitude Authorization and Notification Capability (LAANC). It provides UAS with access to controlled airspace near airports through near real-time processing of authorization requests. LAANC is a collaboration in which FAA supplies the source data and technical requirements, and industry builds mobile applications for commercial drone operators to plan their flights and access controlled airspace.



# Ch. 1 Introduction



The Remote Identification of Unmanned Aircraft Final Rule is the next incremental step towards further integration of Unmanned Aircraft (UA) in the National Airspace System. In its most basic form, remote identification can be described as a "digital license plate" for UA. Remote ID is necessary to address aviation safety and security issues regarding UA operations in the National Airspace System, and is an essential building block toward safely allowing more complex UA operations.

In December 2019, the FAA issued a notice of proposed rulemaking regarding remote identification of unmanned aircraft systems. This new regulation would continue the safe integration of drones into the nation's airspace by requiring them to be identifiable remotely. In the 60-day comment period following publication, the FAA received over 53,000 comments. We reviewed all of the comments and considered them when writing the final rule, which was published in the Federal Register on January 15, 2021.

As policy and technology updates allow widespread use of UAS for commercial applications, the impact on the ATC workload will be incorporated into our models and forecasts. Oversight of UAS is aided by the FAA's compliance program, which is designed to help identify and correct potential hazards before they result in an incident or accident.

Commercial space launch activity is growing in the United States. There continues to be strong investment in startup space ventures. The level of activity from air traffic controllers to coordinate airspace closures to support launch and re-entry will likely grow in areas of the country where commercial space activity is concentrated. The FAA will continue to monitor controller workload associated with commercial space activities and adjust our models and forecasts accordingly.

## MEETING THE CHALLENGE

The FAA's hiring plan is designed to phase in new hires as needed over time. To do so, the FAA plans its hiring vacancy announcement strategy to provide a sufficient pipeline to meet the hiring need. The hiring process is prolonged from announcement to onboarding, as it includes various screening activities that can take time (e.g., medical, security, aptitude). The primary goal of the FAA's hiring pipeline strategy is to ensure the pipeline of in-process candidates is sufficient to replace controllers who retire or leave due to other sources of attrition.

Annual retirements are dropping and well below those experienced in 2007, when the long-anticipated wave of retirements peaked. Retirements are expected to fall for the next five years and remain at relatively low levels for the next decade.

Hiring, however, is just one challenge. Other challenges involve controller placement, controller training and controller scheduling. It is important that newly hired and transferring controllers are properly placed in the facilities where they are needed. Once they are placed, they need to be effectively and efficiently trained, and assigned to efficient work schedules.

To address these challenges, the FAA:

- Revamped its placement process for ATC trainees, allowing increased flexibility for the FAA and improved efficiency in both hiring and initial training of air traffic controllers;
- Introduced a collaborative and centralized process to balance the controller ranks by revamping the employee requests for reassignments, matching employee requests with the agency's needs and establishing a national release policy aimed at expediting requests into facilities with the greatest staffing needs; and
- Took advantage of legislation (Consolidated Appropriations Act, 2018. Public Law 115-141, Section 108) that allows the FAA to target recruitment for the New York Terminal Radar Approach Control (TRACON) Facility to address specific recruiting challenges to that facility.

Effective and efficient training, as well as properly placing new and transferring controllers, are two important factors in the FAA's success.



Systematically replacing air traffic controllers where we need them, as well as ensuring the knowledge transfer required to maintain a safe NAS, is the focus of this plan.

# Ch. 2 Facilities & Services



America's NAS is a network of people, procedures and equipment. Pilots, controllers, technicians, engineers, inspectors and supervisors work together to make sure millions of passengers move through the airspace safely every day.

As of October 1, 2020, more than 14,000 federal air traffic controllers in airport traffic control towers, TRACONs and air route traffic control centers guided pilots through the system. An additional 1,400 civilian contract controllers and over 10,800 military controllers provide air traffic services for the NAS.

These controllers provide air navigation services to aircraft in domestic airspace, in addition to 24.6 million square miles of international oceanic airspace delegated to the United States by the International Civil Aviation Organization.

## TERMINAL AND EN ROUTE AIR TRAFFIC SERVICES

Controller teams in airport towers and TRACONs watch over aircraft traveling through Terminal airspace. Their main responsibility is to organize the flow of aircraft into and out of airports. Relying on visual observation, radar and satellite navigation, they closely monitor each aircraft to ensure safe distances among all aircraft and to guide pilots during takeoff and landing. In addition, controllers keep pilots informed about changes in weather conditions.

Once airborne, aircraft quickly depart the Terminal airspace surrounding the airport. At this point, controllers in the radar approach control notify En Route controllers, who take charge in the vast airspace between airports. There are 21 air route traffic control centers around the country. Each En Route center is assigned a block of airspace containing many defined routes. Aircraft fly along these designated routes to reach their destinations.

En Route controllers use surveillance methods to maintain a safe distance between aircraft. En Route controllers also provide weather advisory and traffic information to aircraft under their control. As aircraft near their destinations, En Route controllers transition them to the Terminal environment, where Terminal controllers guide them to a safe landing.

*En Route controllers use surveillance methods to maintain safe distances among aircraft.*

## FAA AIR TRAFFIC CONTROL FACILITIES

As of October 1, 2020, the FAA operated 313 air traffic control facilities. Table 2.1 lists the type and number of these FAA facilities. More than one type of facility may be co-located in the same building.

**TABLE 2.1 TYPES AND NUMBER OF FAA AIR TRAFFIC CONTROL FACILITIES**

| NAME | NUMBER OF FACILITIES | DESCRIPTION |
|------|----------------------|-------------|
| Tower | 139 | An ATC tower that provides traffic advisories, spacing sequencing and separation services to visual flight rules (VFR) and instrument flight rules (IFR) aircraft operating in the vicinity of the airport, using a combination of satellite, radar and visual observations. |
| Approach Control* | 25 | An ATC facility that provides approach and departure services to IFR and VFR aircraft arriving or departing an airport and to aircraft transiting the terminal airspace using satellite, radar and/or non-radar separation.<br><br>*These facilities are also known as Terminal Radar Approach Control or TRACON |
| Tower and Approach Control | 124 | An ATC facility divided into two functional areas, tower and approach and departure control, that provides services to IFR and VFR aircraft, including aircraft traffic advisories, spacing sequencing and separation services to aircraft operating in the vicinity of the airport, arriving or departing an airport, and transiting the terminal airspace using satellite, radar and/or non-radar separation. |
| Combined Control Facility | 4 | An ATC facility that provides approach control services for one or more airports, as well as En Route ATC (center control) for a large area of airspace. Some may provide tower services along with approach control and en route services. Also includes Combined Center/Radar Approach (CERAP) facilities. |
| Air Route Traffic Control Center En Route | 21 | An ATC facility that provides service to aircraft operating on IFR flight plans within controlled airspace and principally during the En Route phase of flight. When equipment capabilities and controller workload permit, certain advisory/assistance services may be provided to VFR aircraft. |

# 313 Total Facilities

# Ch. 3 Staffing Requirements

The FAA issued the first comprehensive controller workforce plan in December 2004. "A Plan for the Future: 10-Year Strategy for the Air Traffic Control Workforce" detailed the resources needed to keep the controller workforce sufficiently staffed. This report is updated each year to reflect changes in traffic forecasts, retirements and other factors.

The COVID-19 pandemic has dramatically impacted the aviation industry and world. Air traffic controllers perform critical work that requires them to be onsite in close quarters on jointly-used, high-touch equipment. The operating environment provides challenges in some facilities for social distancing.  At the onset of the COVID-19 pandemic, the FAA took quick action to ensure the necessary air traffic controllers were available to provide air traffic control services, while developing policies and procedures to limit the exposure of COVID-19 in air traffic control facilities. The FAA assessed traffic levels to determine how we could make initial adjustments to staffing while still ensuring flight safety and meeting demand. Flexible schedules allowed facilities to staff to the traffic demand while providing sterile crews. We matched staffing to air traffic and determined that, in most facilities, we could adjust the number of people working on shifts and divide employees into fixed teams. By doing this, we would ensure that if a member of one team became ill, only that team is concerned about infection. We would still have "sterile" teams that had not had contact with the sick individual and could be brought in to cover for that team if necessary.  As traffic demand increased, facilities made adjustments to flexible schedules and returned to the basic watch schedule.

Staffing to traffic requires the FAA to consider many facility-specific factors. They include traffic volumes based on FAA forecasts and hours of operation, as well as individualized forecasts of controller retirements and other non-retirement losses. In addition, staffing at each location can be affected by unique facility requirements such as temporary airport runway construction, seasonal activity and the number of controllers currently in training. Staffing numbers will vary as the requirements of the location dictate.

The FAA also tracks a number of indicators as part of its continuous staffing review. Some of these indicators are overtime, average time on position per shift, leave usage and the number of trainees. Time on position is defined as the amount of cumulative time controllers spend while "plugged in" to their position controlling live traffic. When not on position, controllers are on periodic breaks, in training or performing other assigned duties.

In FY 2020, the system average for overtime was 2.8 percent, a decrease from the FY 2019 level. Cumulative average time on position per 8-hour shift was 3 hours and 59 minutes, down from 4 hours and 1 minutes, in 2019.



**FIGURE 3.1 PROJECTED CONTROLLER TRENDS**

Figure 3.1 shows the expected end-of-year total headcount (blue line), CPC & CPC-IT headcount (green line), and new hires and losses (blue and gold bars) by year through FY 2030.

Figures for FY 2020 represent actual end-of-year headcount, losses and hires. Losses include retirements, promotions and transfers, resignations, removals, deaths, developmental attrition, and Academy attrition. The FAA ended FY 2020 with 147 controllers above the 2020 headcount plan. Because the FAA is targeting CPC + CPC- ITs headcount to be in the middle of the staffing range, the annual headcount forecast should not be viewed as a "target." Rather, it is a byproduct of the number of CPC + CPC-ITs in the system, as well as the developmental pipeline hired in advance of future needs.

In general, the FAA strives to keep the number of CPCs and CPC-ITs near the middle of the calculated staffing range. Figure 3.1 shows that FY 2021 staffing values are within the calculated staffing range shown by the "min" and "max" dotted lines. However, a facility's total staffing levels are often above the defined staffing range because new controllers are typically hired two to three years in advance of expected attrition to allow for sufficient training time. The total expected end-of-year headcount number shown in Figure 3.1 reflects this projected advanced hiring.

The FAA hires and staffs facilities so that trainees, once fully certified, are prepared to take over responsibilities when senior controllers retire.



# THE FAA USES MANY METRICS TO MANAGE ITS FACILITIES

TIME ON POSITION

PRODUCTIVE TIME

STAFFING RANGES

TRAINEES

OVERTIME

RETIREMENTS

FIELD INPUT

TRAFFIC

SIMULATORS & INSTRUCTORS

## STAFFING RANGES

Air traffic facilities staff open positions with a combination of certified controllers and developmentals, who are proficient, or checked out, in specific sectors or positions. Because traffic and other factors are dynamic at these facilities, the FAA produces facility-level controller staffing ranges. These ranges are calculated to ensure that there are enough controllers to cover operating positions every day of the year.

Ensuring that we have enough controllers is not only important on a daily basis but also means that we staff to satisfy expected needs two to three years in advance. We do this to ensure sufficient training time for new hires. The uptick caused by hiring two to three years ahead of time is one reason that staffing remains well ahead of traffic.



The FAA uses four inputs to calculate staffing ranges. Three are data driven; the other is based on field judgment. They are:

1. Staffing standards – output of mathematical models used to relate controller workload to air traffic activity.
2. Service unit input – the number of controllers requested to staff the facility, typically based on past position utilization and other unique facility operational requirements. The service unit input is provided by field management.
3. Past productivity – the headcount required to match the historical best productivity for the facility. Productivity is defined as operations per controller. Facility productivity is calculated using operations and controller data from the most recent 10-year period. If any annual point falls outside +/- 5 percent of the historical average, it is eliminated from the analysis. From the remaining data points, the highest productivity year is then used.
4. Peer productivity – the headcount required to match peer group productivity. Like facilities are grouped by type, level and part-time or full-time status, and their corresponding productivity is calculated. If the facility being considered is consistently above or below the peer group, the peer group figure is not used in the overall average and analysis.

The average of this data is calculated, multiplied by +/- 10 percent and then rounded to determine the high and low points in the staffing range. Exceptional situations or outliers are removed from the averages (for example, if a change in the type or level of a facility occurred over the period of evaluation). By analyzing the remaining data points, staffing ranges are generated for each facility. Given the drop in current traffic levels due to the COVID-19 pandemic, we kept the staffing ranges at 2020 levels and will review again in future plans when traffic stabilizes.

**FIGURE 3.2 CONTROLLER STAFFING**

# FACILITY STAFFING

**HIGH**

### CHARACTERISTICS/DRIVERS OF HIGH STAFFING LEVELS

- Inefficient scheduling
- Fewer losses than projected
- Less overtime
- Reduction in traffic volume
- Decrease in hours of operation
- Temporary airport construction
- Higher number of position-qualified controllers
- Higher number of advance hire trainees

### CHARACTERISTICS/DRIVERS OF LOW STAFFING LEVELS

- Higher than expected attrition
- Greater use of overtime
- Increase in traffic volume
- Increase in hours of operation
- Temporary airport construction
- Lower number of position-qualified controllers
- Lower number of advance hire trainees

**LOW**

Staffing ranges for controllers are published for each facility in the appendix of this report. In many facilities, the current AOB number may appropriately exceed the range. This is because many facilities' current AOB numbers (all controllers at the facility) include larger numbers of developmental controllers in training to offset expected future attrition. Individual facilities can be above the range due to advance hiring.

Facilities may also be above the range based upon facility-specific training and attrition forecasts.

In the longer term, the number of new hires and total controllers will decline. This is because the surge of developmental controllers that were hired to replace the long-expected retirement wave over the past decade will have become CPCs. In the future, the vast majority of the controllers will be CPCs and CPC-ITs, and more facilities will routinely fall within the ranges.

## FIGURE 3.3 EXAMPLE OF CONTROLLER TRAINING PROGRESSION



NOTE: All ATC facilities have individualized training progression to CPC based upon their type and level of complexity

Figure 3.3 depicts an example of a large Tower and Approach Control facility. To be CPCs in these types of facilities, controllers must be checked out on all positions in both the tower and the TRACON.

Trainees achieve "D1" status (and the corresponding increase in pay) after being checked out on several positions. The levels of responsibility (and pay) gradually increase as the trainees progress through training. Once developmental controllers are checked out at the D1 level, they can work several positions in the tower independently and without training supervision (Clearance Delivery, Ground Control and Local Control). Once checked out on the Runway Crossing Coordinator position, developmental controllers would be tower-certified and able to work any position in the tower cab independently and without supervision. They would still not be a "D2" however, as there are also several positions in the TRACON to be checked out on (Arrival Data, Departure Data, Final Vector 1 and Final Vector 2). A controller in Figure 3.3 must be certified on all positions in the tower and TRACON to become a CPC.

## Ch. 3 Staffing Requirements

The levels of responsibility continue to increase as one progresses toward CPC status, but trainees can and do control traffic much earlier in the training process. Historically, the FAA has used these position-qualified controllers to staff operations and free up CPCs for more complex positions, as well as to conduct training.

Having the majority of the workforce certified as CPCs makes the job of scheduling much easier at the facility. CPCs can cover all positions in their assigned area, whereas position-qualified developmentals require the manager to track who is qualified to work which positions independently.



Trainees include both developmental controllers and CPCs-ITs. A CPC-IT is a controller who moves to another area within a facility or to a new facility and must be trained to the qualifications of that new environment. CPC-ITs are different from developmentals in that developmentals have never been fully checked out and certified as CPCs anywhere.

**FIGURE 3.4 AIR TRAFFIC CONTROL POSITION AND FACILITY OVERVIEW**



| PREFLIGHT + TAKEOFF | DEPARTURE | EN ROUTE | DESCENT    APPROACH | LANDING + POST FLIGHT |
|---|---|---|---|---|
| AIRPORT TRAFFIC CONTROL TOWER | TERMINAL RADAR APPROACH CONTROL | AIR ROUTE TRAFFIC CONTROL CENTER | TERMINAL RADAR APPROACH CONTROL | AIRPORT TRAFFIC CONTROL TOWER |
| **Ground Controller** Issues approval for push back from gate and issues taxi instructions and clearances.  **Local Controller** Issues takeoff clearances, maintains prescribed separation between departure aircraft, provides departure aircraft with latest weather/field conditions.  **Clearance Delivery** Issues IFR and VFR flight plan clearance.  **Flight Data** Receives and relays weather information and Notices to Airmen. | **Departure Controller** Assigns headings and altitudes to departure aircraft. Hands off aircraft to the En Route radar controller.  **Flight Data-Radar** Issues IFR flight plan clearances to aircraft at satellite airports, coordinates releases of satellite departures. | **Radar Controller** Ensures the safe separation and orderly flow of aircraft through En Route center airspace (includes oceanic airspace).  **Radar Associate** Assists the radar controller  **Radar Associate (Flight Data)** Supports the En Route radar controller by handling flight data. | **Arrival Controller** Assigns headings and altitudes to arrival aircraft on final approach course. | **Local Controller** Issues landing clearances, maintains prescribed separation between arrivals, provides arrival aircraft with latest weather/ field conditions.  **Ground Controller** Issues taxi instructions to guide aircraft to the gate. |

## AIR TRAFFIC STAFFING STANDARDS OVERVIEW

The FAA has used air traffic staffing standards to help determine controller staffing levels since the 1970s, and they are periodically updated to reflect changes in workload, equipment and procedures.

FAA facilities are currently identified and managed as either Terminal facilities where airport traffic control services are provided, including the immediate airspace around an airport, or En Route facilities where high-altitude separation services are provided using computer systems and surveillance technologies. Terminal facilities are further designated as tower cabs or TRACONs. These Terminal facilities may be co-located in the same building, but because of differences in workload, their staffing requirements are modeled separately. Figure 3.4 provides an overview of FAA facilities and air traffic control positions.

# Ch. 3 Staffing Requirements



The dynamic nature of air traffic controller workload coupled with traffic volume and facility staffing needs are all taken into account during the development of FAA staffing models and standards.

All FAA staffing models incorporate similar elements:

- Controller activity data is collected and processed, commensurate with the type of work being performed in the facilities.
- Models are developed that relate controller workload to air traffic activity. These requirements are entered into a scheduling algorithm.
- The modeled workload/traffic activity relationship is forecast for the 90th percentile (or 37th busiest) day for future years for each facility. Staffing based on the demands for the 90th percentile day assures that there are adequate numbers of controllers to meet traffic demands throughout the year.
- Allowances are applied for off-position activities such as vacation, training and additional supporting activities that must be accomplished off the control floor.

All staffing standard models go through similar development processes. Some components of the model-development phase vary as a function of the work being performed by the controllers. For example, a crew-based approach was used to model tower staffing requirements because the number and type of positions in a tower cab vary considerably as traffic changes, compared with those of a single sector in a TRACON or En Route center. All staffing models reflect the dynamic nature of staffing and traffic. Controller staffing requirements can vary throughout the day and throughout the year.

**FAA**CTOID

The U.S. has

# 5.3 Million Square Miles

of Domestic Airspace

## TOWER CAB OVERVIEW

Air traffic controllers working in tower cabs manage traffic within a radius of a few miles of the airport. They instruct pilots during taxiing, takeoff and landing, and they grant clearance for aircraft to fly. Tower controllers ensure that aircraft maintain minimum separation distances between landing and departing aircraft, transfer control of aircraft to TRACON controllers when the aircraft leave their airspace, and receive control of aircraft for flights coming into their airspace.

- There are a variety of positions in the tower cab, such as Local Control, Ground Control, Flight Data, and Coordinator. Depending on the airport layout and/or size of the tower cabs (some airports have more than one tower), there can be more than one of the same types of position on duty.
- As traffic, workload and complexity increase, more or different positions are opened; as traffic, workload and complexity decrease, positions are closed or combined with other positions. In practice, minimum staffing levels may be determined by hours of operation and work rules.

Important factors that surfaced during the tower staffing model development included the availability, accessibility and increased reliability of traffic data and controller-on-position reporting systems. The FAA is now able to analyze much larger quantities of tower data at a level of granularity previously unattainable. Staffing data and traffic volumes are collected for every facility.

The workload portion of the tower cab staffing models were updated in early 2008. The revised tower cab staffing models were developed using regression analysis as the primary method for modeling the relationship between staffing and workload drivers. The models relate observed, on-position controllers to the type and amount of traffic they actually handle. Regression analysis allows us to relate modeled controller staffing requirements with traffic activity and then use this relationship to predict future staffing requirements (standards) based on traffic projections. Plans to update the workload portion of the tower staffing models in FY 2020 were canceled due to traffic levels and facility visitor restrictions put in place as a result of the COVID-19 pandemic.



## TRACON OVERVIEW

Air traffic controllers working in TRACONs typically manage traffic within a 40-mile radius of the primary airport; however, this radius varies by facility. They instruct departing and arriving flights, and they grant clearance for aircraft to fly through the TRACON's airspace. TRACON controllers ensure that aircraft maintain minimum separation distances between landing and departing aircraft, transfer control of aircraft to tower or En Route center controllers when the aircraft leave their airspace, and receive control of aircraft for flights coming into their airspace.

- TRACON airspace is divided into sectors that often provide services to multiple airports. Consolidated or large TRACONs in major metropolitan areas provide service to several primary airports. Their airspace is divided into areas of specialization, each of which contains groups of sectors.
- Controllers are assigned to various positions such as Radar, Final Vector and Departure Data to work traffic within each sector. These positions may be combined or de-combined based on changes in air traffic operations.
- As traffic, workload and complexity increase, the sectors may be subdivided (de-combined) and additional positions opened, or the sector sizes can be maintained with an additional controller assigned to an assistant position within the same sector.
- Similarly, when traffic, workload and complexity decline, the additional positions can be closed or the sectors recombined. In practice, minimum staffing levels may be determined by hours of operation and work rules.

Like the tower analysis, the FAA is able to analyze much larger quantities of TRACON data at a level of granularity previously unattainable. Important factors surfaced during the TRACON staffing model review, including the availability, accessibility and increased reliability of traffic data and controller-on-position reporting systems. Staffing data and traffic volumes were collected for every facility.

The TRACON staffing models were updated in early 2009. These revised TRACON models were developed using regression analysis as the primary method for modeling the relationship between staffing and workload drivers. The models relate observed, on-position controllers to the type and amount of traffic they actually handle. Regression allows us to relate modeled controller staffing requirements with traffic activity and then use this relationship to predict future staffing requirements (standards) based on traffic projections. The FAA intends to update the workload portion of the TRACON staffing models once revisions to the tower standards are completed.

## EN ROUTE OVERVIEW

Air traffic controllers assigned to En Route centers guide aircraft flying outside of Terminal airspace. They also provide approach control services to small airports around the country where no Terminal service is provided. As aircraft fly across the country, pilots talk to controllers in successive En Route centers.

- En Route center airspace is divided into smaller, more manageable blocks of airspace called areas and sectors.
- Areas are distinct and rarely change based on changes in traffic. Within those areas, sectors may be combined or de-combined based on changes in air traffic operations.
- Controllers are assigned to positions within the sectors (e.g., Radar, Radar Associate, Tracker). As traffic increases, sectors can be decombined and additional positions opened, or the sector sizes can be maintained but additional controllers added to assistant positions within the sectors.
- Similarly, when traffic declines, the additional positions can be closed or the sectors recombined. In practice, minimum staffing levels may be determined by hours of operation and work rules.

The FAA's Federally Funded Research and Development Center (FFRDC) developed a model to generate data needed for the FAA's En Route staffing models. Like the tower and TRACON standards models, this approach incorporated actual traffic and more facility-specific data.

The modeling approach reflects the dynamic nature of the traffic characteristics in a sector. It estimates the number of controllers, in teams of one to three people, necessary to work the traffic for that sector in 15-minute intervals. Differences in traffic characteristics in a sector could require different numbers of controllers to handle the same



volume of traffic. For example, at one time most traffic might be cruising through a sector toward another location requiring minimal controller intervention. At another time, traffic might be climbing and descending through the same sector, a more complex scenario requiring more controllers. The same modeling techniques were applied uniformly to all sectors, providing results based on a common methodology across the country.

During FY 2013 and FY 2014, the FFRDC collaborated with the FAA and the National Air Traffic Controllers Association (NATCA) to conduct an evaluation of the En Route on-position staffing model at the request of the National Academy of Sciences to validate its core assumptions and parameters via empirical data collection. The evaluation, completed in the field and in a controlled laboratory setting, established values for model parameters, identified additional controller tasks for coverage by the model, and informed other enhancements to the model. In FY 2015, these updates were made and the on-position staffing model was recalibrated. The evaluation results were shared with the FAA, NATCA and the National Academy of Sciences. In FY 2016, the evaluation results were incorporated into the on-position staffing model.

## SUMMARY

The FAA's staffing models incorporate output provided by the Tower, TRACON and En Route workload models, which is run through a shift-scheduling algorithm. Next, factors are applied to cover vacation time, break time, training, etc. Lastly, traffic forecasts are applied to provide the annual staffing standards that are incorporated into the staffing ranges presented in this plan for each facility.

## AIR TRAFFIC CONTROLLER SCHEDULING

Operating the NAS safely and efficiently are key objectives of the FAA. There is little doubt the FAA's ATC professionals safely operate the world's largest airspace. The FAA facilities currently use a variety of nonstandard scheduling methods that do not fully incorporate the complex resource management requirements that exist in today's environment. This could result in inefficient scheduling practices such



as sub-optimal shift start times and guidelines. Inefficient scheduling practices may lead to increased overtime costs and/or excess staffing requirements.

Most large, professional, shift-based workforces utilize centralized schedule policies and systems. They generally use software-based scheduling programs to develop more efficient schedules. For example, commercial air carriers such as Southwest and JetBlue use commercially available software to schedule flight and ground crews. Similar systems are also in use by air navigation service providers worldwide, like Nav Canada and Airservices (Australia).

The FAA developed the Operational Planning and Scheduling tool (OPAS) to support local schedule and annual leave negotiations. Its capabilities incorporated a fully functioning planning tool, including day-to-day scheduling. System-wide implementation was negotiated as part of the 2016 air traffic controller collective bargaining agreement. To date, OPAS has been implemented at the 34 largest facilities, primarily to support local scheduling and leave planning negotiations.

The FAA will use OPAS in the near-term to analyze efficiency of negotiated and actual schedules created by field facilities. Going forward the FAA will continue the pursuit of standardized, software-based scheduling programs to aid in annual schedule and leave planning and to assist schedulers in making day-to-day scheduling decisions.

## TECHNOLOGICAL ADVANCES

With most of the foundational technology supporting the Next Generation Air Transportation System (NextGen) now in the field, the FAA is shifting its focus from deployment to the operationalization of new, modernized capabilities in the National Airspace System (NAS). Although the COVID-19 pandemic has slowed some of our plans, these capabilities are coming together to enable the transition to Trajectory Based Operations (TBO). TBO manages traffic with the knowledge of where an aircraft will be at critical points during its flight.

TBO enables more strategic planning and execution of flights. It provides controllers decision support tools through Time Based Flow Management (TBFM) to deconflict flows of traffic using time based management. This will reduce controllers' need for manual deconfliction and vectoring of aircraft.

En Route Automation Modernization (ERAM), Automatic Dependent Surveillance-Broadcast (ADS-B) and System Wide Information Management (SWIM) have been fully implemented and are being used by controllers and air traffic management. ERAM and SWIM will continue to evolve with technology refreshes and enhancements. Standard Terminal Automation Replacement System (STARS), Terminal



Air navigation service providers "in other countries including Australia, Canada and Germany have replaced their legacy scheduling tools with sophisticated software capable of incorporating all constraints while generating efficient controller schedules."
— National Academy of Sciences

## Ch. 3 Staffing Requirements

Flight Data Manager (TFDM) and Data Communications (Data Comm) are in various stages of implementation. STARS will complete the deployment of its baseline programs in 2021.

Two examples of advances for terminal controllers come from the Data Comm and Terminal Automation Modernization and Replacement (TAMR) programs. Data Comm's departure clearance service was delivered to the initial commitment of 55 airport towers 29 months ahead of schedule and significantly under budget. The TAMR program completed the installation of STARS at the 11 large TRACON facilities ahead of schedule. In all, the FAA has deployed STARS to 99 percent of all U.S. TRACONs.

Data Comm is a capability that uses digital text messages to supplement voice communications in equipped aircraft. Data Comm services reduce communication time between controllers and flight crews, increase productivity, reduce gate and taxi-out times during adverse weather events, reduce fuel consumption and engine emissions, and enhance safety. Data Comm Tower Services provide support for departure clearance instructions and are available at 62 air traffic control towers nationwide.

En Route Data Comm Initial Services are available at Kansas City, Indianapolis, and Washington Centers. Initial En Route Services include messages such as rerouting and the transfer of communications from one en route sector to the next. A follow-on baseline will deliver Full En Route Services which will add additional capabilities, including the ability to issue speeds.

More than 5,900 U.S. aircraft have been equipped with Data Comm avionics. As of March 2020, there were over 60,000 weekly Data Comm equipped tower operations occurring at the 62 towers, and over 10,000 weekly Data Comm equipped En Route operations at the three centers.

The Initial Services deployment schedule for the remaining 17 En Route facilities is impacted by COVID-19 and is being replanned. Data Comm also enables future NextGen services, including TBO TAMR upgrades multiple legacy ATC systems to a single, state-of-the-art platform: STARS. This platform, along with the ERAM system, form the FAA's foundational technology supporting NextGen. They enable ADS-B and other NextGen capabilities, giving air traffic controllers a more complete airspace picture that will be necessary for TBO.

STARS offers new features that make the system easier for controllers to use than the aging systems it is replacing. Keyboard backlighting is adjustable to improve visibility for easier data entry, while flat-panel





LED displays increase the traffic picture quality. Controllers can assign a color to an aircraft to make it easier to follow. With a recall capability, individual controllers can save and retrieve their preferred workstation settings at the touch of a button.

Weather displays show six different levels of weather intensity to provide better situational awareness for controllers as they work with pilots to steer aircraft around hazardous weather. Using multiple radars and ADS-B, STARS can track 3,000 aircraft in a 512x512 nautical mile area to provide controllers with a clearer view of overall operations.

STARS also assists with terrain avoidance and conflict alerts. The Automatic Terminal Proximity Alert tool gives controllers significant visual cues to enable maximum landing rates while still maintaining safety margins. A minimum separation capability enables controllers to select two aircraft and ensure the required separation is maintained. A data block feature automatically lists the number of aircraft in a formation — a function that previously had to be performed manually.

ADS-B is bringing the precision of satellite-based positioning to track aircraft and provide a new level of situational awareness. ADS-B Out, which is mandatory for aircraft operating in most controlled U.S. airspace, has been integrated into automation platforms at all En Route air traffic control facilities and all terminal radar approach control (TRACON) facilities. The FAA completed the nationwide deployment of ADS-B ground stations in 2014, and ADS-B traffic and weather

## Ch. 3 Staffing Requirements

broadcasts are available nationwide. As of December 2020, more than 135,000 aircraft have been equipped with properly installed ADS-B avionics. As more aircraft are equipped, ADS-B increases safety and efficiency that will help meet the predicted increase in air traffic in the coming years and create the opportunity for future operational benefits.

SWIM streamlines shared information for improved planning and execution. Airlines and other users are able to access more efficiently the most current information affecting their areas than they were able to using legacy systems, thereby improving decision-making. The SWIM Visualization Tool (SVT) is in use at 17 air traffic control facilities across the country and was enhanced to include traffic flow management data, specifically gate assignment information that airlines started to publish into SWIM.

SVT deployment is supporting early implementation of TFDM. Another component of TFDM early implementation is the prototype Advanced Electronic Flight Strips (AEFS) system, which replaces traditional paper flight strips and manual tracking of incoming and outgoing flights with an electronic flight data display. The prototype AEFS was implemented in the Phoenix, Charlotte and Cleveland towers to provide feedback and lessons learned into the TFDM design and implementation. Phoenix is set to receive production TFDM in 2021, the first of 89 sites.

For other decision-support systems, the FAA will continue to develop modeling and predicting capabilities for the Traffic Flow Management System.

Increased productivity and efficiency, and their ultimate impact on the size and composition of the FAA's workforce, depend on many factors. The scope and precise impact of NextGen enhancements are unknown as they are still under development. Final impacts are still to be determined given the complex nature of the interaction of controllers and their tools.





The relationship between pilots and air traffic controllers, as well as the relationship between controllers and automated systems, is evolving. These changes are occurring gradually and require continued testing and analysis to ensure the safety of the NAS. Implementing TBO in the NAS will require the integration of multiple systems and training, and a culture change by controllers and pilots.

As these technological changes occur, the FAA will seek to understand the impact on controller workload and will validate and update its staffing standard models as needed.

# Ch. 4 Losses

In total, the FAA expects to lose nearly 1,000 controllers due to retirements, promotions and other losses this fiscal year. Other controller losses include transfers, resignations, removals, deaths, developmental attrition and academy attrition.

The FAA hires and staffs facilities so that trainees, once fully certified, are prepared to take over responsibilities when senior controllers leave.

### CONTROLLER LOSS SUMMARY
Table 4.1 shows the total estimated number of controllers that will be lost, by category, over the 10-year period FY 2021 through FY 2030.

**TABLE 4.1 CONTROLLER LOSS SUMMARY**



PROMOTIONS & TRANSFERS
**2,492**

RETIREMENTS
**2,359**

ACADEMY ATTRITION
**2,001**

RESIGNATIONS, REMOVALS & DEATHS
917

DEVELOPMENTAL ATTRITION
826

TOTAL LOSSES (2021-2030)
8,595



**FIGURE 4.1A ACTUAL CONTROLLER RETIREMENTS**

## ACTUAL CONTROLLER RETIREMENTS

FY 2007 was correctly projected to be a peak year for retirements of controllers hired in the early 1980s. The long-anticipated retirement wave has passed. Annual retirements decreased for a few years then increased during FY 2010 to FY 2015, but still below the 2007 peak, and are declining through FY 2025. In the last five years, 2,506 controllers have retired, and we expect an additional 1,175 controllers will retire in the next five years. FY 2020 retirements were lower than projected and future retirements are expected to fall and remain at relatively low levels over the next decade.

## CUMULATIVE RETIREMENT ELIGIBILITY

The figure below shows historical and forecasted controller retirement eligibility from FY 2005 to FY 2030. Each bar shows the net number of controllers in the entire controller workforce eligible to retire for each year shown. Because controllers can spend more than one year as eligible before they retire, the same individual controllers may be counted in multiple years. The forecast shows a significant decline in the net number of controllers eligible to retire from the peak in FY 2012 to FY 2025. At the end of FY 2020, only 19 controllers remain from those who were hired before 1984. At the end of FY 2020, fewer than 1,000 controllers were eligible to retire, which is the lowest number since the first Controller Workforce Plan in 2005. **This clearly demonstrates that the controller retirement wave is over.**



**FIGURE 4.1B CUMULATIVE RETIREMENT ELIGIBILITY**

**FIGURE 4.2 CONTROLLER WORKFORCE AGE DISTRIBUTION AS OF SEPTEMBER 26, 2020**



## CONTROLLER WORKFORCE AGE DISTRIBUTION

The FAA hired a substantial number of controllers in the years immediately following the 1981 strike. This concentrated hiring wave meant a large portion of the controller workforce would reach retirement age in roughly the same time period. In September 2006, the blue shaded age distribution peak on the right side of Figure 4.2 was almost 1,900 controllers. Today, the magnitude of that remaining peak is down to 317 controllers because the majority of the controllers hired shortly after the 1981 strike have already retired and been replaced. As Figure 4.2 shows, the current FAA controller workforce is substantially younger on average than it was in 2006. This was driven by relatively high levels of hiring within the last several years.

The FAA's hiring plan is designed to phase in new hires as needed. Figure 4.2 shows that the majority of the FAA controller workforce has been hired in the last 10-15 years and are ages 24-37. There are a relative small number of controllers approaching mandatory retirement at age 56 over the next few years.

*The FAA's hiring plan is designed to phase in new hires as needed.*



**FIGURE 4.3 RETIREMENT ELIGIBILITY**

............ 2012 eligibility high-water mark

As of 2020
As of 2006

*407 of the 764 controllers eligible for retirement will reach mandatory retirement age within the next 3 years

NUMBER OF CONTROLLERS

NTH FISCAL YEAR OF ELIGIBILITY

## CONTROLLER RETIREMENT ELIGIBILITY

In addition to normal civil service retirement criteria, controllers can become eligible under special retirement criteria for air traffic controllers (age 50 with 20 years of "good time" service or any age with 25 years of "good time" service). "Good time" is defined as service in a covered position in Public Law 92-297. Under Public Law 92-297, air traffic controllers are usually required to retire at age 56.

After computing eligibility dates using all criteria, the FAA assigns the earliest of the dates as the eligibility date. Eligibility dates are then aggregated into classes based on the fiscal year in which eligibility occurs.

Figure 4.3 shows the number of controllers who are currently retirement-eligible as of September 26, 2020 and those projected to become retirement-eligible each fiscal year for the next 10 fiscal years. FAA projections show that an additional 579 controllers will become eligible to retire in FY 2021. The number of retirement-eligible controllers has been in decline in recent years from the peak and should continue to decline for the next few years. Figure 4.3 also clearly shows that the current number of retirement-eligible controllers is substantially below the level in 2006 and below 2012 high-water mark. It further shows, based on the profile of the current controller workforce, that the number of additional controllers becoming retirement-eligible in each of the next few years is substantially below those incremental values from 2006.

Due to advance hiring, we have sufficient new hires in place to replace controllers currently eligible to retire when they do retire. The FAA strives to minimize retirement, hiring and training spikes through the process of examining trends and proactively planning years in advance of expected activity.

## CONTROLLER RETIREMENT PATTERN

History shows that not all controllers retire when they first become eligible. Recent data shows that 20 percent of controllers who first became eligible actually retired that year.

The FAA has observed that many controllers delay retirement until they get closer to the mandatory retirement age of 56. Because most controllers are retirement-eligible at the age of 50, they typically reach mandatory retirement age in their seventh year of eligibility.

These trends are seen in Figure 4.4 below, which shows fewer controllers are retiring earlier in their eligibility and are waiting until closer to their mandatory retirement age.

Despite the increased likelihood of delayed retirement, the majority of controllers still leave the controller workforce prior to reaching the mandatory age.



FIGURE 4.4 PERCENT OF CONTROLLERS RETIRING IN THE NTH FISCAL YEAR OF THEIR ELIGIBILITY

FY 2007 was the high-water mark for controller retirements. Annual retirements are expected to continue to decline for the next several years.

## CONTROLLER LOSSES DUE TO RETIREMENTS

For the current plan, the FAA incorporated FY 2018 through FY 2020 retirement data into the retirement histogram used for future retirements.

As in prior years, the FAA projected future retirements by analyzing both the eligibility criteria of the workforce (Figure 4.3) and the pattern of retirement based on eligibility (Figure 4.4).

For each eligibility class (the fiscal year the controller first becomes eligible to retire), the FAA applied the histogram percentage in Figure 4.3 to the retirement pattern in Figure 4.4 to estimate in Figure 4.5 the retirements for each class by year.

**FIGURE 4.5 RETIREMENT PROJECTION**



2007 actual retirement high-water mark

*Actual

FISCAL YEAR

NUMBER OF CONTROLLERS

## CONTROLLER LOSSES DUE TO RESIGNATIONS, REMOVALS AND DEATHS

Estimated controller losses due to resignations, removals (excluding developmental attrition) and deaths are based on historical rates and shown in Table 4.2.

**TABLE 4.2 CONTROLLER LOSSES DUE TO RESIGNATIONS, REMOVALS AND DEATHS**

| Fiscal Year | 2020 (actual) | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Controllers | 94 | 90 | 90 | 91 | 91 | 91 | 92 | 92 | 93 | 93 | 94 |

## DEVELOPMENTAL ATTRITION

Estimated losses of trainees who terminate from the FAA while still in developmental status are shown in Table 4.3. Hiring from FY 2013 to FY 2015 was lower than projected, which caused the need for increased hiring from FY 2016 through FY 2018. Correspondingly, this plan incorporates an increased number of developmental failures through 2021 as hires from those years progress through their training program.

**TABLE 4.3 DEVELOPMENTAL ATTRITION**

| Fiscal Year | 2020 (actual) | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Controllers | 84 | 118 | 71 | 83 | 87 | 92 | 76 | 69 | 72 | 77 | 81 |

## ACADEMY ATTRITION

Estimates of losses from new hires that are not successful in the FAA Academy training program are based on both historical rates and projections, and are shown in Table 4.4. The FAA will continue to monitor academy failure rates moving forward for the impact of these changes and adjust future projections accordingly.

**TABLE 4.4 ACADEMY ATTRITION**

| Fiscal Year | 2020 (actual) | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Controllers | 98 | 178 | 184 | 216 | 228 | 188 | 177 | 197 | 204 | 207 | 222 |

**NOTE:** Due to training delays caused by the COVID-19 pandemic in 2020, some of the academy and developmental failures that would have occurred in 2020 are now projected to occur in 2021.

# Ch. 4 Losses

## CONTROLLER LOSSES DUE TO PROMOTIONS AND OTHER TRANSFERS

This section presents FAA estimates of controller losses due to internal transfers to other positions (staff support specialists, traffic management coordinators, etc.) and controller losses due to promotions to operations supervisor (OS) or other air traffic management/supervisory positions.

Over the past five years, we've observed an average of 186 net promotions each year from CPC to supervisory positions. The majority of these promotions replace retiring supervisors. As a category, Other/Transfers/Promotions was abnormally high in 2020. Our future projection is more in line with historical norms. We expect total net transfers and promotions to decrease for several years and then level off in future years as seen in Figure 4.6.

**FIGURE 4.6 CONTROLLER LOSSES DUE TO PROMOTIONS AND OTHER TRANSFERS**



**FIGURE 4.7 TOTAL CONTROLLER LOSSES**



## TOTAL CONTROLLER LOSSES

The FAA projects a total loss of 8,595 controllers over the next 10 years. Should losses outpace projections for FY 2021, the FAA will hire additional controllers as needed to ensure sufficient controllers are available in the future to handle the anticipated workload.



# Ch. 5 Hiring Plan

The FAA safely operates and maintains the NAS because of the combined expertise of its people, the support of technology and the application of standardized procedures. Every day tens of thousands of aircraft are guided safely and expeditiously through the NAS to their destinations.

Deploying a well-trained and well-staffed air traffic control workforce plays an essential role in fulfilling this responsibility. The FAA's current hiring plan has been designed to phase in new hires as needed. To staff the right number of people in the right places at the right time, the FAA develops annual hiring plans that are responsive to changes in traffic and in the controller workforce.

The FAA hires new developmental controllers in advance of it's staffing needs in order to have ample time to train them to offset future attrition, including retirements, promotions, etc. Proper execution of the hiring plan, while flexibly adapting to the dynamic nature of traffic and attrition, is critical to the plan's success. If the new developmentals are not placed correctly or if CPCs are not transferred from other facilities, shortages could occur at individual facilities that may affect schedules, increase overtime usage or require the use of more developmentals on position.

Staffing is and will continue to be monitored at all facilities throughout the year. The FAA will continue to modify the hiring plan at the facility level should adjustments become necessary due to changes in traffic volume, retirements or other attrition.

The FAA continues to be able to attract large numbers of qualified controller candidates. Through a revised two-track controller hiring process, and management of staffing distribution, the FAA will attract and recruit a sufficient number of applicants to achieve this hiring plan.



## Ch. 5 Hiring Plan

### CONTROLLER HIRING PROFILE

The controller hiring profile is shown in Figure 5.1. The FAA hired 920 controllers compared with the plan of 910 controllers in FY 2020. Although we met our hiring goal in FY 2020, we are experiencing the continued impact of the COVID-19 pandemic. We reduced our hiring for FY 2021 and are planning steady-state hiring of about 1,000 controllers for several years beginning in FY 2022. The number of controllers projected to be hired through FY 2030 is 8,854.

**FIGURE 5.1 CONTROLLER HIRING PROFILE**





**FIGURE 5.2 TRAINEE-TO-TOTAL-CONTROLLER PERCENTAGE**

**NOTE:** The forecast assumes future CPC-IT levels are consistent with FY 2020 levels.

## TRAINEE-TO-TOTAL-CONTROLLER PERCENTAGE

The hiring plan allows the FAA to maintain an appropriate number of trainees (developmental and CPC-IT) in the workforce. The percentage shown is calculated as the sum of CPC-ITs plus developmentals divided by all controllers. While the FAA strives to keep the trainee percentage below 35 percent for both Terminal and En Route controllers, it is not the only metric used by the FAA to measure trainee progress.

Figure 5.2 shows the projected trainee-to-total-controller percentages for En Route and Terminal by year through 2030. The trainee ratio for En Route is generally below Terminal because there tends to be more transfer activity from lower level to higher level Terminal facilities, increasing the number of CPC-ITs. The En Route trainee ratio falls through 2023 due to reduced hiring focus in En Route in 2019-2020.

Note the trainee percentage for both En Route and Terminal is still well below 35 percent.



**FIGURE 5.3 HISTORICAL TRAINEE PERCENTAGE**

Controller Strike

Trainee percentages were routinely above 28% 10 years before the strike

Strike recovery period

Replacement of post strike hires

35% threshold

No Data

TRAINEE/TOTAL CONTROLLER (PERCENTAGE)

FISCAL YEAR

Before the 1981 strike, the FAA experienced trainee percentages ranging from 23 percent to 44 percent. Following the strike, through the end of the hiring wave in 1992, the trainee percentage ranged from 24 percent to 52 percent. When the post-strike hires became fully certified by the end of the decade, the trainee percentage declined.

As the new controllers hired en masse in the early 1980s achieved full certification, the subsequent need for new hires dropped significantly from 1993 to 2006. This caused trainee percentages to reach unusually low levels. The FAA's current hiring plans return trainee percentages to their historical averages.

By phasing in new hires as needed, the FAA will level out the significant training spikes and troughs experienced over the last 40 years. Figure 5.3 shows historical trainee percentages from 1969 to the present.

The FAA uses metrics (e.g., 35 percent trainee to total controllers) to manage the flow of trainees while accomplishing daily operations.

Facilities meter training to coincide with a number of dynamic factors, including technology upgrades, new runway construction and recurrent proficiency training for existing CPCs. Facility training is enabled by many factors. Examples include the use of contract instructors, access to simulators, scheduled overtime, and the seasonality and complexity of operations.

In itself, the actual number of trainees does not indicate the progress of each individual in the training program or the additional utility they provide that can help to supplement other on-the-job training instruction and support operations. A key facility measure of training performance is the measurement of trainee completion time against the goals. The goal ranges from one-and-a-half years at our lower-level Terminal facilities to three years at our En Route facilities.

The FAA is striving to meet these goals by improving training and scheduling processes through increased use of simulators and better tracking of controller training using the FAA's national training database.

The FAA will continue to closely monitor facilities to make sure trainees are progressing through each stage of training while also maintaining the safe and efficient operation of the NAS.





# Ch. 6 Hiring Process

### CONTROLLER HIRING SOURCES

The FAA has two primary categories of controller hiring sources.

- No prior air traffic control specialist (ATCS) experience: These individuals are not required to have prior air traffic control experience and may apply for vacancies announced by the FAA.
- Prior ATCS experience: These individuals have at least 52 weeks of certified air traffic control experience and may apply for vacancies announced by the FAA.

### RECRUITMENT

The FAA continues to attract and recruit high-quality applicants into the controller workforce to meet staffing requirements.

In FY 2014, the FAA instituted an interim change to the air traffic control hiring process. The changes allowed the FAA to more efficiently compare applicants across previous hiring sources to select those candidates most likely to succeed as air traffic control specialists. The new approach included: (1) single vacancy announcement for Collegiate Training Initiative (CTI) and certain veterans and general public applicants; (2) a single set of minimum qualifications/eligibility requirements; (3) a multi-hurdle selection process with increased efficiency; and (4) elimination of the Centralized Selection Panel process and interview.

In January 2015, the FAA modified the interim changes by establishing a two-track announcement process for hiring air traffic control specialists. The first track targeted candidates without operational air traffic control experience.

The second track included an announcement targeting applicants who have at least 52 weeks of certified air traffic control experience in either civilian or military air traffic control facilities. In December 2015, the FAA launched an extended announcement for applicants with previous experience.

In FY 2016, Public Law 114-190 – FAA Extension, Safety and Security Act (FESSA) of 2016– was enacted. The law established two hiring tracks totaling three distinct hiring pools. They are: Track 1 - CTI and Veterans, Track 1 - General Public and Track 2 - Previous Experience.

It included pool balancing requirements. Public Law 116-92, the National Defense Authorization Act of 2020 (NDAA) replaced the track one pool balancing requirements (Pool 1- CTI graduates/preference eligible veterans & Pool 2- general public applicants) with a prerequisite to prioritize pool one applicants, giving preferential consideration by qualification category (Best Qualified, Well Qualified, and Qualified), which is determined by their Air Traffic Skills Assessment result. This will give the FAA better access to the most qualified applicants.

More than 8,300 applicants responded to the January 2020 vacancy announcement. Additionally, the 10 percent variance requirement was eliminated per NDAA.

Once applicants are notified of selection and have accepted the offer, they will then be required to attain medical and security clearances. All applicants that applied to the January 2020 announcement have been notified of their current status. All of those that were selected have either been brought on board or are in the clearance process. Upon successful completion of clearances, the applicants will then be scheduled for FAA Air Traffic Academy training as FAA needs are identified. In FY 2021, the FAA will continue to recruit and hire air traffic control specialists to meet staffing requirements through the use of the two-track announcement process.

The FAA continues to attract and recruit high-quality applicants into the controller workforce to meet staffing requirements.

# Ch. 7 Training

The FAA is still dealing with the impacts from the COVID-19 pandemic on its controller training program. The FAA develops the national training curriculum and learning tools that increase the knowledge of its technical workforce who serve the world's largest, most efficient, and safest National Airspace System – today and for the future.

The cohort of air traffic professionals we hired in FY 2020 are essential in our transition to the Next Generation Air Transportation System. Our controllers are increasingly using real-time information to direct aircraft more efficiently while reducing delays. Capabilities such as Performance Based Navigation and Data Communications increase controller productivity while reducing communication errors. They must also, in coming years, effectively incorporate new entrants such as unmanned aircraft systems (UAS) and commercial space into routine operations.

We are meeting the challenge of training both new and experienced controllers by streamlining the training process, refreshing course content, and modernizing our technologies used for learning. The training program, directed by FAA Order 3120.4, Air Traffic Technical Training, is reviewed annually to ensure its technical accuracy. We regularly review performance metrics and work with research centers to identify areas for improvement and innovation to the training program.

## IMPACTS FROM THE COVID-19 PANDEMIC

To address the impact of the pandemic on the throughput of classes, the FAA has evaluated and converted several high demand courses. The initial FAA Academy course, Air Traffic Basics, was converted to a 100% virtual format using a combination of web-based lessons and instructor-facilitated individual and class activities. Other qualification courses for new hires have been partially converted to virtual.

A contingency plan for controllers in the field in certification training, both initial and CPC, was implemented to mitigate skill decay; trainees are using the mobile learning platform tools to engage in online training activities.

Several instructor-led, specialized courses are being evaluated as potential candidates for converting to a virtual format or by using a traveling instructor crew at remote locations. This response has reduced risks of exposure to COVID-19 to FAA Academy students and controllers in the field.



388 newly hired air traffic controllers used FAA provided iPads in FY 2020 to take their initial Academy course from home.

## THE TRAINING PROCESS



New hires with no previous air traffic control experience begin their federal career training at the FAA Academy, where they learn foundational aviation knowledge through classroom lectures, team exercises and computer-based instruction, and practice basic air traffic control skills using low-, medium- and high-fidelity simulation devices.

The academy lays the foundation for employee development by teaching common, fundamental air traffic control principles and procedures that are used at facilities throughout the country. After successfully completing training at the FAA Academy, developmental controllers are assigned to a field location, where they enter additional, site-specific qualification training and hone their technical abilities in the operational environment. This phase of training begins in the classroom, where students learn facility-specific equipment, rules and procedures. After students master initial learning objectives, the instruction transitions to simulators where learners can apply their knowledge and improve their skills in a hands-on, repetitive and safe environment.

Finally, employees enter the on-the-job training phase working the control position, where their performance is carefully monitored by certified professional controllers who help trainees develop their techniques in a progressively more difficult live-traffic environment.



New hires with previous air traffic experience are selected directly for a field facility and usually begin their federal service in an accelerated training program customized for their prior aviation experience.They are able to bypass certain phases of training, but they are required to meet the same certification standards for each control position as new hires with no previous experience.

The goal of all new employees is to become a certified professional controller, which is when they are finally considered to be at the full-performance level.Once developmental controllers are certified on control positions, they often work independently in those positions under the direction of a supervisor to gain experience and to supplement staffing.

All controllers are assigned periodic proficiency training and participate in both mandatory and optional supplemental training. One of the most successful uses of optional supplemental training is the Flight Deck Training (FDT) program.The program provides controllers real- time experience of air traffic control from the flight crew's perspective by observing flight operations from the flight deck in most of the nation's air carriers.Their observations enhance their awareness of effects of air traffic control instructions. An integrated, automated process for requesting, executing and reporting the controller's flight deck experience make this supplemental training informative and beneficial.

The FAA's recurrent training program is administered every six months as a combination of classroom and computer-based instruction for all operational personnel. It delivers evidence-based topics derived from a number of data sources. As contrasted with annually required refresher training on static topics, recurrent training delivers timely and relevant training based on safety trends and lessons learned from our analysis. Collaboratively developed and delivered to the controller and supervisory workforce, recurrent training ensures that the operational workforce is aware and prepared to mitigate the day to day risks associated with controlling traffic in the NAS.

## DESIGNING AND DELIVERING EFFECTIVE TRAINING

Experienced instructors, certified professional controllers and contractors provide both classroom and simulation training at the FAA Academy and at many field locations. The FAA ensures everyone who instructs developmental controllers – whether they are federal employees or contractors – has the background and skills needed to train new employees.

The FAA utilizes a process for the design, development, delivery and maintenance of its certification and specialized air traffic training courses. The Air Traffic Basics, Enroute and Terminal certification training courses are designed to train a younger, diverse and technologically savvy workforce. Advanced technology, modern learning theory, human factors concepts, and professionalism skills are incorporated into our courses. Managers and supervisors receive training on new training approaches. Throughout each phase of the controllers' career, training is available to ensure they have the right skills at the right time.

## INFRASTRUCTURE INVESTMENTS

The FAA continues to expand accessibility of the high-fidelity Tower Simulator System (TSS), a training device that has provided an interactive, realistic environment for controller training. There are 59 simulators installed at 42 locations, and these systems support training for 251 airports using a "hub and spoke" arrangement where employees at remote facilities travel to central locations to use the simulator. The FAA started the upgrade of these systems to improve the scenario generation capabilities, screen resolution, software responsiveness, and access to the system. The upgrade to all 59 systems was completed in August 2019.

Forty mobile systems were deployed to the field by September 2020 to support multiple locations. These systems complement the original procurement and provide us with a capability of installing a smaller-sized simulator at locations where it would have been cost-prohibitive for the full-sized system. During the COVID-19 pandemic, the TSS Program was able to successfully test a pilot program for remote training operations on the mobile TSS systems. This capability will be developed further and plans to fully deploy in 2021.

## TIME TO CERTIFICATION

The FAA continues to meet its overall goals for time to certification and number of controllers certified. Implementation of foundational NextGen platforms, such as ERAM and TAMR, and new training requirements are factors that affect overall time to CPC. Depending on the type of facility, facility level (complexity) and the number of candidates to certify, controllers are expected to complete certification in one-and-a-half years to three years.

Over 64 percent of those who began training in FY 2012 through FY 2016 successfully completed training at their first facility or a subsequent facility.



**TABLE 7.1 YEARS TO CERTIFY (FIRST ASSIGNED FACILITY ONLY)**

Completion means that employees achieved CPC status. The remaining members of the hiring classes (36 percent) have been removed from the FAA, resigned or are still in training. Developmental controllers who fail to certify at a facility may be removed from service or reassigned to a less complex facility in accordance with FAA policies and directives.

Table 7.1 shows the FAA's training targets and average training completion time by facility type for those who began training in FY 2012 through FY 2016. Only those who achieved CPC status at their first facility assignment are included in the average training completion times displayed because incorporation of training times at additional facilities can skew the average. Training data for hiring classes after FY 2016 are not reported here because greater than 10 percent of the students are still in active phases of training, resulting in continuously changing metrics as those students certify or fail. Because of the pandemic, fewer controllers were certified in FY 2020. The 2017 hiring class has not yet met the threshold to be shown in Table 7.1 because of COVID. Approximately 20 percent of the FY 2017 hiring class is still actively in training and may not meet the training target times shown above.

## INVESTING FOR THE FUTURE

As the FAA transitions to NextGen, the key to providing safe, reliable and efficient air traffic services remains the same: highly skilled, trained and certified professionals. The FAA must maintain curricula to keep pace with the evolving NAS, modernize how it trains employees, incorporate new techniques and technologies for learning, and improve data collection and sharing. Training professionals are part of an FAA team that evaluates how NextGen will change the air traffic work environment and what competencies will be required for the future workforce. The FAA is incorporating what it learns from this evolving and ongoing process into training programs as new systems are implemented. Outcomes-based training aligns NextGen functionality with job tasks so the FAA can make predictions on how training programs will need to change as NextGen evolves.

# Ch. 8 Funding Status

In addition to direct training costs, the FAA will incur salary and other costs for developmental controllers before they certify. The average compensation cost of a developmental controller in FY 2021 is projected to be $131,559 including salary and benefits.

Figure 8.1 depicts expected annual compensation costs of developmentals, as well as the expected number of developmentals by year through 2030. As training takes one-and-a-half to three years, the chart depicts a rolling total of hires and costs from the current and previous years.

**FIGURE 8.1 ESTIMATED COST OF DEVELOPMENTALS BEFORE CERTIFICATION**



# Appendix

## FACILITY STAFFING RANGES

The Appendix below presents controller staffing ranges, by facility, for En Route and Terminal air traffic control facilities. Additional detail on how the staffing ranges are calculated is provided in Chapter 3. Given the drop in current traffic levels due to the COVID-19 pandemic, we kept the staffing ranges at 2020 levels and will review again in future plans when traffic stabilizes.

In general, the FAA strives to keep the number of CPCs and CPC-ITs near the middle of the range. While most of the work is accomplished by CPCs, work is also being performed in facilities by CPC-IT and position-qualified developmental controllers who are proficient, or checked out, in specific sectors or positions and handle work independently.

Accordingly, facilities can safely operate even with CPC staffing levels below the defined staffing range.

Conversely, a facility's total staffing levels are often above the defined staffing range because new controllers are typically hired two to three years in advance of expected attrition to allow for sufficient training time. The total expected end-of-year staffing number shown in Figure 3.1 reflects this projected advanced hiring.

## Enroute

| ID | FACILITY NAME | Actual on board as of 09/26/20 | | | | Staffing range | |
|----|---------------|-----|--------|---------------|-------|-----|------|
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| ZAB | Albuquerque ARTCC | 142 | 2 | 71 | 215 | 180 | 220 |
| ZAN | Anchorage ARTCC | 80 | 7 | 30 | 117 | 83 | 102 |
| ZAU | Chicago ARTCC | 266 | 14 | 76 | 356 | 277 | 338 |
| ZBW | Boston ARTCC | 166 | 12 | 38 | 216 | 178 | 218 |
| ZDC | Washington ARTCC | 239 | 18 | 74 | 331 | 258 | 315 |
| ZDV | Denver ARTCC | 218 | 13 | 25 | 256 | 231 | 282 |
| ZFW | Fort Worth ARTCC | 240 | 14 | 59 | 313 | 245 | 300 |
| ZHU | Houston ARTCC | 246 | 12 | 47 | 305 | 233 | 285 |
| ZID | Indianapolis ARTCC | 226 | 21 | 62 | 309 | 266 | 326 |
| ZJX | Jacksonville ARTCC | 208 | 8 | 33 | 249 | 235 | 287 |
| ZKC | Kansas City ARTCC | 191 | 13 | 50 | 254 | 208 | 255 |
| ZLA | Los Angeles ARTCC | 189 | 17 | 52 | 258 | 231 | 282 |
| ZLC | Salt Lake City ARTCC | 124 | 5 | 17 | 146 | 154 | 189 |
| ZMA | Miami ARTCC | 219 | 12 | 46 | 277 | 214 | 262 |
| ZME | Memphis ARTCC | 193 | 8 | 83 | 284 | 235 | 288 |
| ZMP | Minneapolis ARTCC | 223 | 8 | 54 | 285 | 216 | 264 |
| ZNY | New York ARTCC | 215 | 12 | 83 | 310 | 235 | 287 |

## Enroute

| ID | FACILITY NAME | Actual on board as of 09/26/20 | | | | Staffing range | |
|---|---|---|---|---|---|---|---|
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| ZOA | Oakland ARTCC | 148 | 7 | 91 | 246 | 193 | 236 |
| ZOB | Cleveland ARTCC | 246 | 19 | 57 | 322 | 277 | 338 |
| ZSE | Seattle ARTCC | 136 | 9 | 34 | 179 | 142 | 173 |
| ZSU | San Juan ARTCC | 35 | 0 | 31 | 66 | 47 | 57 |
| ZTL | Atlanta ARTCC | 266 | 49 | 57 | 372 | 308 | 376 |
| ZUA | Guam ARTCC | 12 | 4 | 4 | 20 | 14 | 17 |
| | Enroute Total | 4,228 | 284 | 1,174 | 5,686 | 4,660 | 5,697 |

Note: Facility numbers do not include new hires at the FAA Academy

## Terminal

| ID | FACILITY NAME | Actual on board as of 09/26/20 | | | | Staffing range | |
|---|---|---|---|---|---|---|---|
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| A11 | Anchorage TRACON | 18 | 2 | 3 | 23 | 21 | 25 |
| A80 | Atlanta TRACON | 80 | 20 | 1 | 101 | 92 | 113 |
| A90 | Boston TRACON | 65 | 12 | 0 | 77 | 70 | 86 |
| ABE | Allentown Tower | 26 | 2 | 4 | 32 | 23 | 28 |
| ABI | Abilene Tower | 15 | 0 | 9 | 24 | 14 | 18 |
| ABQ | Albuquerque Tower | 15 | 8 | 12 | 35 | 26 | 31 |
| ACK | Nantucket Tower | 9 | 0 | 2 | 11 | 9 | 10 |
| ACT | Waco Tower | 17 | 5 | 2 | 24 | 16 | 20 |
| ACY | Atlantic City Tower | 22 | 2 | 5 | 29 | 18 | 23 |
| ADS | Addison Tower | 8 | 3 | 0 | 11 | 11 | 14 |
| ADW | Andrews Tower | 11 | 1 | 3 | 15 | 10 | 12 |
| AFW | Alliance Tower | 13 | 1 | 1 | 15 | 15 | 18 |
| AGC | Allegheny Tower | 12 | 1 | 3 | 16 | 12 | 15 |
| AGS | Augusta Tower | 9 | 0 | 8 | 17 | 13 | 16 |
| ALB | Albany Tower | 23 | 0 | 11 | 34 | 19 | 23 |
| ALO | Waterloo Tower | 7 | 0 | 8 | 15 | 10 | 12 |
| AMA | Amarillo Tower | 19 | 0 | 6 | 25 | 14 | 17 |
| ANC | Anchorage Tower | 19 | 3 | 2 | 24 | 22 | 26 |
| APA | Centennial Tower | 18 | 2 | 3 | 23 | 20 | 25 |
| APC | Napa Tower | 7 | 0 | 5 | 12 | 7 | 8 |
| ARB | Ann Arbor Tower | 8 | 1 | 1 | 10 | 8 | 10 |
| ARR | Aurora Tower | 11 | 0 | 1 | 12 | 9 | 11 |
| ASE | Aspen Tower | 8 | 0 | 6 | 14 | 11 | 13 |
| ATL | Atlanta Tower | 40 | 4 | 0 | 44 | 47 | 58 |
| AUS | Austin Tower | 33 | 9 | 0 | 42 | 38 | 46 |
| AVL | Asheville Tower | 14 | 2 | 1 | 17 | 15 | 18 |

| **Terminal** | | Actual on board as of 09/26/20 | | | | Staffing range | |
|---|---|---|---|---|---|---|---|
| ID | FACILITY NAME | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| AVP | Wilkes-Barre Tower | 15 | 0 | 6 | 21 | 16 | 20 |
| AZO | Kalamazoo Tower | 42 | 10 | 9 | 61 | 49 | 59 |
| BDL | Bradley Tower | 14 | 0 | 3 | 17 | 12 | 15 |
| BED | Hanscom Tower | 12 | 0 | 4 | 16 | 12 | 14 |
| BFI | Boeing Tower | 13 | 4 | 4 | 21 | 17 | 21 |
| BFL | Bakersfield Tower | 18 | 0 | 6 | 24 | 17 | 21 |
| BGM | Binghamton Tower | 12 | 0 | 3 | 15 | 11 | 14 |
| BGR | Bangor Tower | 15 | 0 | 10 | 25 | 18 | 22 |
| BHM | Birmingham Tower | 20 | 2 | 10 | 32 | 24 | 29 |
| BIL | Billings Tower | 17 | 0 | 7 | 24 | 17 | 21 |
| BIS | Bismarck Tower | 8 | 0 | 7 | 15 | 10 | 12 |
| BJC | Broomfield Tower | 10 | 0 | 1 | 11 | 12 | 15 |
| BNA | Nashville Tower | 28 | 7 | 3 | 38 | 39 | 48 |
| BOI | Boise Tower | 25 | 3 | 2 | 30 | 29 | 35 |
| BOS | Boston Tower | 26 | 10 | 1 | 37 | 31 | 38 |
| BPT | Beaumont Tower | 10 | 1 | 1 | 12 | 9 | 11 |
| BTR | Baton Rouge Tower | 17 | 2 | 7 | 26 | 15 | 18 |
| BTV | Burlington Tower | 18 | 1 | 8 | 27 | 16 | 19 |
| BUF | Buffalo Tower | 27 | 2 | 9 | 38 | 25 | 31 |
| BUR | Burbank Tower | 15 | 1 | 6 | 22 | 16 | 20 |
| BWI | Baltimore Tower | 19 | 4 | 1 | 24 | 21 | 26 |
| C90 | Chicago TRACON | 73 | 19 | 2 | 94 | 90 | 110 |
| CAE | Columbia Tower | 17 | 2 | 6 | 25 | 19 | 24 |
| CAK | Akron-Canton Tower | 14 | 0 | 6 | 20 | 14 | 17 |
| CCR | Concord Tower | 9 | 0 | 4 | 13 | 9 | 11 |
| CDW | Caldwell Tower | 11 | 0 | 0 | 11 | 10 | 12 |
| CHA | Chatanooga Tower | 15 | 2 | 3 | 20 | 16 | 20 |
| CHS | Charleston Tower | 19 | 3 | 3 | 25 | 22 | 27 |
| CID | Cedar Rapids Tower | 14 | 0 | 4 | 18 | 14 | 17 |
| CKB | Clarksburg Tower | 11 | 1 | 5 | 17 | 13 | 16 |
| CLE | Cleveland Tower | 42 | 19 | 2 | 63 | 37 | 46 |
| CLT | Charlotte Tower | 75 | 15 | 1 | 91 | 80 | 98 |
| CMA | Camarillo Tower | 11 | 0 | 2 | 13 | 9 | 11 |
| CMH | Columbus Tower | 33 | 7 | 1 | 41 | 39 | 48 |
| CMI | Champaign Tower | 12 | 1 | 6 | 19 | 14 | 17 |
| CNO | Chino Tower | 8 | 4 | 1 | 13 | 11 | 13 |
| COS | Colorado Springs Tower | 18 | 7 | 0 | 25 | 23 | 29 |
| CPR | Casper Tower | 8 | 0 | 6 | 14 | 11 | 13 |

# Terminal

| ID | FACILITY NAME | Actual on board as of 09/26/20 | | | | Staffing range | |
|---|---|---|---|---|---|---|---|
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| CPS | Downtown Tower | 10 | 1 | 0 | 11 | 9 | 11 |
| CRP | Corpus Christi Tower | 28 | 5 | 7 | 40 | 29 | 35 |
| CRQ | Palomar Tower | 11 | 0 | 1 | 12 | 10 | 12 |
| CRW | Charleston Tower | 16 | 3 | 5 | 24 | 16 | 20 |
| CSG | Columbus Tower | 7 | 0 | 1 | 8 | 7 | 8 |
| CVG | Cincinnati Tower | 33 | 13 | 1 | 47 | 40 | 48 |
| D01 | Denver TRACON | 71 | 8 | 1 | 80 | 76 | 92 |
| D10 | Dallas - Ft Worth TRACON | 70 | 24 | 1 | 95 | 87 | 106 |
| D21 | Detroit TRACON | 36 | 23 | 0 | 59 | 49 | 59 |
| DAB | Daytona Beach Tower | 46 | 13 | 3 | 62 | 50 | 61 |
| DAL | Dallas Love Tower | 21 | 3 | 1 | 25 | 21 | 26 |
| DAY | Dayton Tower | 12 | 2 | 3 | 17 | 11 | 14 |
| DCA | Washington National Tower | 19 | 9 | 0 | 28 | 25 | 31 |
| DEN | Denver Tower | 28 | 8 | 2 | 38 | 38 | 47 |
| DFW | DFW Tower | 45 | 11 | 0 | 56 | 53 | 65 |
| DLH | Duluth Tower | 17 | 0 | 7 | 24 | 17 | 21 |
| DPA | Dupage Tower | 15 | 1 | 1 | 17 | 14 | 17 |
| DSM | Des Moines Tower | 18 | 2 | 6 | 26 | 18 | 21 |
| DTW | Detroit Tower | 27 | 6 | 0 | 33 | 29 | 35 |
| DVT | Deer Valley Tower | 17 | 3 | 0 | 20 | 18 | 22 |
| DWH | Hooks Tower | 11 | 2 | 1 | 14 | 10 | 12 |
| ELM | Elmira Tower | 10 | 0 | 6 | 16 | 9 | 11 |
| ELP | El Paso Tower | 18 | 2 | 9 | 29 | 19 | 24 |
| EMT | El Monte Tower | 8 | 1 | 1 | 10 | 9 | 11 |
| ERI | Erie Tower | 9 | 0 | 2 | 11 | 9 | 11 |
| EUG | Eugene Tower | 18 | 4 | 1 | 23 | 18 | 22 |
| EVV | Evansville Tower | 14 | 0 | 5 | 19 | 13 | 15 |
| EWR | Newark Tower | 22 | 16 | 0 | 38 | 33 | 40 |
| F11 | Central Florida TRACON | 36 | 10 | 2 | 48 | 52 | 64 |
| FAI | Fairbanks Tower | 17 | 0 | 8 | 25 | 17 | 21 |
| FAR | Fargo Tower | 17 | 1 | 2 | 20 | 17 | 21 |
| FAT | Fresno Tower | 19 | 2 | 10 | 31 | 21 | 26 |
| FAY | Fayetteville Tower | 12 | 0 | 12 | 24 | 18 | 22 |
| FCM | Flying Cloud Tower | 12 | 0 | 2 | 14 | 10 | 12 |
| FFZ | Falcon Tower | 11 | 0 | 2 | 13 | 13 | 16 |
| FLL | Fort Lauderdale Tower | 20 | 6 | 0 | 26 | 25 | 31 |
| FLO | Florence Tower | 10 | 1 | 4 | 15 | 10 | 12 |
| FNT | Flint Tower | 10 | 0 | 1 | 11 | 8 | 10 |

| Terminal | | Actual on board as of 09/26/20 | | | | Staffing range | |
|---|---|---|---|---|---|---|---|
| ID | FACILITY NAME | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| FPR | St Lucie Tower | 11 | 1 | 0 | 12 | 11 | 13 |
| FRG | Farmingdale Tower | 11 | 3 | 2 | 16 | 12 | 14 |
| FSD | Sioux Falls Tower | 14 | 0 | 3 | 17 | 15 | 18 |
| FSM | Fort Smith Tower | 26 | 0 | 9 | 35 | 23 | 28 |
| FTW | Meacham Tower | 16 | 3 | 1 | 20 | 16 | 19 |
| FWA | Fort Wayne Tower | 18 | 0 | 9 | 27 | 18 | 22 |
| FXE | Fort Lauderdale Executive Tower | 11 | 1 | 5 | 17 | 14 | 17 |
| GCN | Grand Canyon Tower | 9 | 0 | 2 | 11 | 7 | 9 |
| GEG | Spokane Tower | 25 | 3 | 3 | 31 | 23 | 29 |
| GFK | Grand Forks Tower | 22 | 0 | 0 | 22 | 18 | 21 |
| GGG | Longview Tower | 18 | 0 | 6 | 24 | 15 | 18 |
| GPT | Gulfport Tower | 14 | 0 | 5 | 19 | 13 | 16 |
| GRB | Green Bay Tower | 18 | 1 | 1 | 20 | 17 | 20 |
| GRR | Grand Rapids Tower | 12 | 0 | 2 | 14 | 10 | 12 |
| GSO | Greensboro Tower | 23 | 2 | 2 | 27 | 22 | 27 |
| GSP | Greer Tower | 20 | 3 | 4 | 27 | 18 | 23 |
| GTF | Great Falls Tower | 12 | 0 | 5 | 17 | 12 | 15 |
| HCF | Honolulu Control Facility | 71 | 18 | 4 | 93 | 77 | 94 |
| HEF | Manassas Tower | 6 | 3 | 4 | 13 | 9 | 11 |
| HIO | Hillsboro Tower | 13 | 1 | 4 | 18 | 12 | 15 |
| HLN | Helena Tower | 7 | 1 | 2 | 10 | 9 | 11 |
| HOU | Hobby Tower | 19 | 2 | 1 | 22 | 18 | 22 |
| HPN | Westchester Tower | 12 | 0 | 7 | 19 | 11 | 14 |
| HSV | Huntsville Tower | 14 | 1 | 6 | 21 | 15 | 18 |
| HTS | Huntington Tower | 17 | 0 | 4 | 21 | 15 | 19 |
| HUF | Terre Haute /Hulman Tower | 14 | 1 | 4 | 19 | 15 | 19 |
| HWD | Hayward Tower | 9 | 2 | 1 | 12 | 9 | 11 |
| I90 | Houston TRACON | 79 | 16 | 0 | 95 | 85 | 103 |
| IAD | Dulles Tower | 29 | 4 | 1 | 34 | 26 | 32 |
| IAH | Houston Intercontinental Tower | 28 | 4 | 0 | 32 | 32 | 39 |
| ICT | Wichita Tower | 23 | 5 | 7 | 35 | 26 | 31 |
| ILG | Wilmington Tower | 11 | 1 | 0 | 12 | 9 | 11 |
| ILM | Wilmington Tower | 16 | 2 | 5 | 23 | 16 | 20 |
| IND | Indianapolis Tower | 30 | 11 | 7 | 48 | 38 | 47 |
| ISP | Islip Tower | 14 | 4 | 4 | 22 | 13 | 16 |
| ITO | Hilo Tower | 11 | 1 | 2 | 14 | 11 | 13 |
| JAN | Jackson Tower | 14 | 0 | 6 | 20 | 13 | 16 |
| JAX | Jacksonville Tower | 34 | 10 | 13 | 57 | 40 | 49 |

# Terminal

| ID | FACILITY NAME | Actual on board as of 09/26/20 | | | | Staffing range | |
|----|---------------|-----|--------|-------------|-------|-----|------|
| | | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| JCF | Joshua Control Facility | 18 | 2 | 5 | 25 | 21 | 25 |
| JFK | Kennedy Tower | 27 | 10 | 0 | 37 | 31 | 37 |
| JNU | Juneau Tower | 10 | 0 | 3 | 13 | 11 | 14 |
| L30 | Las Vegas TRACON | 32 | 7 | 0 | 39 | 41 | 50 |
| LAF | Lafayette Tower | 9 | 0 | 2 | 11 | 8 | 10 |
| LAN | Lansing Tower | 12 | 0 | 2 | 14 | 11 | 13 |
| LAS | Las Vegas Tower | 28 | 6 | 0 | 34 | 37 | 45 |
| LAX | Los Angeles Tower | 41 | 15 | 0 | 56 | 43 | 53 |
| LBB | Lubbock Tower | 14 | 0 | 3 | 17 | 16 | 20 |
| LCH | Lake Charles Tower | 13 | 0 | 8 | 21 | 12 | 15 |
| LEX | Lexington Tower | 18 | 1 | 9 | 28 | 21 | 25 |
| LFT | Lafayette Tower | 16 | 1 | 6 | 23 | 15 | 18 |
| LGA | La Guardia Tower | 26 | 11 | 0 | 37 | 30 | 37 |
| LGB | Long Beach Tower | 19 | 3 | 0 | 22 | 19 | 23 |
| LIT | Little Rock Tower | 23 | 1 | 6 | 30 | 22 | 26 |
| LNK | Lincoln Tower | 11 | 0 | 6 | 17 | 9 | 11 |
| LOU | Bowman Tower | 10 | 0 | 2 | 12 | 9 | 12 |
| LVK | Livermore Tower | 9 | 0 | 2 | 11 | 10 | 12 |
| M03 | Memphis TRACON | 20 | 1 | 4 | 25 | 27 | 33 |
| M98 | Minneapolis TRACON | 45 | 13 | 2 | 60 | 49 | 60 |
| MAF | Midland Tower | 9 | 0 | 14 | 23 | 16 | 20 |
| MBS | Saginaw Tower | 12 | 0 | 0 | 12 | 8 | 10 |
| MCI | Kansas City Tower | 33 | 4 | 0 | 37 | 30 | 37 |
| MCO | Orlando Tower | 22 | 0 | 0 | 22 | 26 | 32 |
| MDT | Harrisburg Tower | 20 | 0 | 12 | 32 | 22 | 26 |
| MDW | Midway Tower | 18 | 2 | 1 | 21 | 20 | 24 |
| MEM | Memphis Tower | 24 | 1 | 1 | 26 | 22 | 26 |
| MFD | Mansfield Tower | 10 | 0 | 0 | 10 | 9 | 11 |
| MGM | Montgomery Tower | 13 | 3 | 6 | 22 | 17 | 21 |
| MHT | Manchester Tower | 15 | 0 | 1 | 16 | 12 | 14 |
| MIA | Miami Tower | 65 | 31 | 0 | 96 | 85 | 104 |
| MIC | Crystal Tower | 11 | 0 | 2 | 13 | 9 | 11 |
| MKC | Downtown Tower | 11 | 1 | 2 | 14 | 12 | 14 |
| MKE | Milwaukee Tower | 31 | 9 | 2 | 42 | 34 | 41 |
| MKG | Muskegon Tower | 8 | 0 | 2 | 10 | 8 | 10 |
| MLI | Quad City Tower | 16 | 1 | 5 | 22 | 13 | 16 |
| MLU | Monroe Tower | 10 | 0 | 5 | 15 | 11 | 13 |
| MMU | Morristown Tower | 10 | 0 | 2 | 12 | 9 | 11 |

| Terminal | | Actual on board as of 09/26/20 | | | | Staffing range | |
|---|---|---|---|---|---|---|---|
| ID | FACILITY NAME | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| MOB | Mobile Tower | 21 | 2 | 0 | 23 | 18 | 21 |
| MRI | Merrill Tower | 11 | 1 | 0 | 12 | 11 | 13 |
| MRY | Monterey Tower | 6 | 1 | 2 | 9 | 7 | 9 |
| MSN | Madison Tower | 18 | 1 | 3 | 22 | 18 | 21 |
| MSP | Minneapolis Tower | 30 | 5 | 0 | 35 | 30 | 37 |
| MSY | New Orleans Tower | 27 | 6 | 3 | 36 | 32 | 40 |
| MWH | Grant County Tower | 11 | 1 | 6 | 18 | 12 | 15 |
| MYF | Montgomery Tower | 11 | 2 | 2 | 15 | 12 | 15 |
| MYR | Myrtle Beach Tower | 18 | 3 | 3 | 24 | 20 | 25 |
| N90 | New York TRACON | 125 | 28 | 80 | 233 | 173 | 211 |
| NCT | Northern California TRACON | 119 | 37 | 2 | 158 | 156 | 191 |
| NEW | Lakefront Tower | 9 | 0 | 4 | 13 | 8 | 10 |
| OAK | Oakland Tower | 16 | 6 | 0 | 22 | 21 | 26 |
| OGG | Maui Tower | 12 | 0 | 2 | 14 | 11 | 14 |
| OKC | Oklahoma City Tower | 19 | 6 | 9 | 34 | 26 | 32 |
| OMA | Eppley Tower | 12 | 0 | 4 | 16 | 12 | 15 |
| ONT | Ontario Tower | 12 | 1 | 5 | 18 | 14 | 17 |
| ORD | Chicago O'Hare Tower | 50 | 19 | 1 | 70 | 63 | 76 |
| ORF | Norfolk Tower | 24 | 2 | 5 | 31 | 26 | 31 |
| ORL | Orlando Executive Tower | 11 | 1 | 0 | 12 | 10 | 12 |
| P31 | Pensacola TRACON | 32 | 4 | 1 | 37 | 29 | 36 |
| P50 | Phoenix TRACON | 50 | 9 | 4 | 63 | 56 | 68 |
| P80 | Portland TRACON | 23 | 4 | 0 | 27 | 26 | 32 |
| PAE | Paine Tower | 11 | 1 | 1 | 13 | 10 | 12 |
| PAO | Palo Alto Tower | 8 | 0 | 3 | 11 | 8 | 10 |
| PBI | Palm Beach Tower | 37 | 21 | 5 | 63 | 44 | 54 |
| PCT | Potomac TRACON | 140 | 28 | 0 | 168 | 144 | 176 |
| PDK | DeKalb - Peachtree Tower | 12 | 2 | 3 | 17 | 13 | 16 |
| PDX | Portland Tower | 25 | 2 | 1 | 28 | 23 | 28 |
| PHF | Patrick Henry Tower | 9 | 1 | 3 | 13 | 8 | 9 |
| PHL | Philadelphia Tower | 57 | 16 | 2 | 75 | 71 | 86 |
| PHX | Phoenix Tower | 25 | 4 | 0 | 29 | 29 | 36 |
| PIA | Peoria Tower | 14 | 2 | 8 | 24 | 16 | 20 |
| PIE | St Petersburg Tower | 9 | 1 | 3 | 13 | 10 | 12 |
| PIT | Pittsburgh Tower | 28 | 17 | 2 | 47 | 35 | 42 |
| PNE | Northeast Philadelphia Tower | 9 | 1 | 3 | 13 | 9 | 11 |
| PNS | Pensacola Tower | 11 | 0 | 0 | 11 | 10 | 12 |
| POC | Brackett Tower | 9 | 2 | 2 | 13 | 9 | 10 |

| Terminal | | Actual on board as of 09/26/20 | | | | Staffing range | |
|---|---|---|---|---|---|---|---|
| ID | FACILITY NAME | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| POU | Poughkeepsie Tower | 9 | 3 | 2 | 14 | 8 | 9 |
| PRC | Prescott Tower | 10 | 3 | 4 | 17 | 11 | 14 |
| PSC | Pasco Tower | 15 | 1 | 5 | 21 | 16 | 19 |
| PSP | Palm Springs Tower | 10 | 0 | 1 | 11 | 9 | 11 |
| PTK | Pontiac Tower | 8 | 2 | 2 | 12 | 10 | 13 |
| PUB | Pueblo Tower | 11 | 0 | 2 | 13 | 13 | 16 |
| PVD | Providence Tower | 22 | 4 | 8 | 34 | 24 | 29 |
| PWK | Chicago Executive Tower | 10 | 1 | 0 | 11 | 9 | 11 |
| PWM | Portland Tower | 17 | 0 | 8 | 25 | 18 | 22 |
| R90 | Omaha TRACON | 18 | 2 | 1 | 21 | 19 | 23 |
| RDG | Reading Tower | 12 | 1 | 6 | 19 | 12 | 15 |
| RDU | Raleigh-Durham Tower | 37 | 8 | 2 | 47 | 41 | 50 |
| RFD | Rockford Tower | 17 | 1 | 6 | 24 | 19 | 23 |
| RHV | Reid-Hillview Tower | 10 | 0 | 3 | 13 | 11 | 13 |
| RIC | Richmond Tower | 13 | 0 | 4 | 17 | 13 | 15 |
| RNO | Reno Tower | 13 | 0 | 2 | 15 | 13 | 15 |
| ROA | Roanoke Tower | 20 | 1 | 3 | 24 | 18 | 23 |
| ROC | Rochester Tower | 17 | 1 | 9 | 27 | 20 | 25 |
| ROW | Roswell Tower | 10 | 0 | 7 | 17 | 11 | 14 |
| RST | Rochester Tower | 10 | 1 | 3 | 14 | 12 | 15 |
| RSW | Fort Myers Tower | 26 | 6 | 1 | 33 | 26 | 32 |
| RVS | Riverside Tower | 14 | 0 | 5 | 19 | 12 | 15 |
| S46 | Seattle TRACON | 35 | 6 | 4 | 45 | 49 | 60 |
| S56 | Salt Lake City TRACON | 33 | 2 | 15 | 50 | 40 | 48 |
| SAN | San Diego Tower | 22 | 3 | 0 | 25 | 22 | 27 |
| SAT | San Antonio Tower | 37 | 4 | 4 | 45 | 37 | 45 |
| SAV | Savannah Tower | 15 | 6 | 4 | 25 | 20 | 25 |
| SBA | Santa Barbara Tower | 22 | 0 | 6 | 28 | 23 | 28 |
| SBN | South Bend Tower | 18 | 0 | 13 | 31 | 18 | 23 |
| SCK | Stockton Tower | 11 | 0 | 1 | 12 | 8 | 10 |
| SCT | Southern California TRACON | 183 | 28 | 0 | 211 | 203 | 249 |
| SDF | Standiford Tower | 38 | 5 | 3 | 46 | 38 | 47 |
| SDL | Scottsdale Tower | 9 | 2 | 0 | 11 | 11 | 14 |
| SEA | Seattle Tower | 25 | 3 | 0 | 28 | 29 | 36 |
| SEE | Gillespie Tower | 11 | 2 | 5 | 18 | 13 | 16 |
| SFB | Sanford Tower | 17 | 1 | 1 | 19 | 17 | 20 |
| SFO | San Francisco Tower | 19 | 10 | 0 | 29 | 30 | 37 |
| SGF | Springfield Tower | 23 | 1 | 3 | 27 | 25 | 30 |

| Terminal | | Actual on board as of 09/26/20 | | | | Staffing range | |
|---|---|---|---|---|---|---|---|
| ID | FACILITY NAME | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| SHV | Shreveport Tower | 15 | 0 | 12 | 27 | 18 | 22 |
| SJC | San Jose Tower | 13 | 1 | 2 | 16 | 14 | 17 |
| SJU | San Juan Tower | 16 | 0 | 0 | 16 | 15 | 18 |
| SLC | Salt Lake City Tower | 24 | 6 | 0 | 30 | 27 | 33 |
| SMF | Sacramento Tower | 13 | 1 | 5 | 19 | 14 | 17 |
| SMO | Santa Monica Tower | 11 | 1 | 5 | 17 | 10 | 12 |
| SNA | John Wayne Tower | 15 | 6 | 2 | 23 | 20 | 25 |
| SPI | Springfield Tower | 11 | 0 | 2 | 13 | 9 | 12 |
| SRQ | Sarasota Tower | 11 | 0 | 2 | 13 | 12 | 14 |
| STL | St Louis Tower | 16 | 4 | 1 | 21 | 18 | 21 |
| STP | St Paul Tower | 7 | 3 | 2 | 12 | 8 | 10 |
| STS | Sonoma Tower | 7 | 0 | 3 | 10 | 8 | 9 |
| STT | St Thomas Tower | 10 | 0 | 2 | 12 | 8 | 10 |
| SUS | Spirit Tower | 9 | 1 | 1 | 11 | 10 | 12 |
| SUX | Sioux Gateway Tower | 11 | 1 | 5 | 17 | 11 | 13 |
| SYR | Syracuse Tower | 15 | 0 | 9 | 24 | 17 | 21 |
| T75 | St Louis TRACON | 21 | 2 | 6 | 29 | 26 | 31 |
| TEB | Teterboro Tower | 15 | 4 | 1 | 20 | 21 | 26 |
| TLH | Tallahassee Tower | 14 | 1 | 3 | 18 | 15 | 19 |
| TMB | Tamiami Tower | 17 | 0 | 1 | 18 | 15 | 18 |
| TOA | Torrance Tower | 8 | 2 | 1 | 11 | 8 | 10 |
| TOL | Toledo Tower | 19 | 2 | 6 | 27 | 17 | 21 |
| TPA | Tampa Tower | 41 | 9 | 5 | 55 | 54 | 65 |
| TRI | Tri-Cities Tower | 13 | 1 | 9 | 23 | 14 | 17 |
| TUL | Tulsa Tower | 22 | 5 | 5 | 32 | 25 | 30 |
| TUS | Tucson Tower | 10 | 2 | 5 | 17 | 12 | 15 |
| TVC | Traverse City Tower | 8 | 0 | 2 | 10 | 8 | 10 |
| TWF | Twin Falls Tower | 8 | 1 | 2 | 11 | 7 | 9 |
| TYS | Knoxville Tower | 19 | 4 | 14 | 37 | 24 | 29 |
| U90 | Tucson TRACON | 14 | 2 | 5 | 21 | 16 | 20 |
| VGT | North Las Vegas Tower | 11 | 0 | 0 | 11 | 11 | 13 |
| VNY | Van Nuys Tower | 18 | 4 | 2 | 24 | 17 | 21 |
| VRB | Vero Beach Tower | 12 | 0 | 0 | 12 | 11 | 14 |
| Y90 | Yankee TRACON | 15 | 3 | 10 | 28 | 19 | 23 |
| YIP | Willow Run Tower | 11 | 1 | 5 | 17 | 10 | 12 |
| YNG | Youngstown Tower | 13 | 1 | 8 | 22 | 16 | 19 |
| | Terminal Total | 6,040 | 1,025 | 1,079 | 8,114 | 6,636 | 8,104 |

Note: Facility numbers do not include new hires at the FAA Academy

## FAA Totals

| | Actual on board as of 09/26/20 | | | | Staffing range | |
|---|---|---|---|---|---|---|
| | CPC | CPC-IT | DEVELOPMENTAL | TOTAL | LOW | HIGH |
| En Route total | 4,228 | 284 | 1,174 | 5,686 | 4,660 | 5,697 |
| Terminal total | 6,040 | 1,025 | 1,079 | 8,144 | 6,636 | 8,104 |
| Facility total | 10,268 | 1,309 | 2,253 | 13,830 | 11,296 | 13,801 |
| FAA Academy Students | | | | 412 | | |
| Total Controller Headcount | | | | 14,242 | | |























U.S. Department
of Transportation

**Federal Aviation
Administration**

800 Independence Avenue, SW
Washington, DC 20591

Produced by FAA Communications • 2020-AFN-010

EXHIBIT

B



# Air Traffic Controller Training Initiative (AT-CTI) Program



*CTI Students Control Traffic Using a Tower Simulator at Broward College*

# Program Overview and FAQs
# Collegiate Version

**Updated:  July 10, 2013 Version  3.2**

# Change Log

| | |
|---|---|
| V3.2<br>July 10, 2013 | Revised ATSAT information:<br>From : The score can be extended for up to one year if approved by Aviation Careers.<br>To:  If the test score expires or will expire within a testing cycle, the applicant must contact Aviation Careers to be placed on the test list. |
| V3.1<br>June 11, 2013 | Updated Hiring Summary for FY13, Updated POC for MCTC |
| V3.0<br>April  24 2013 | Updated Hiring Summary for FY13<br>Added Selection Panel High Level Map   (page 50)<br>Updated number and percentage of CTI's hired in "Background" section of Document<br>Updated Degrees<br>Reformatted and updated content. |
| V2.5<br>2/3/13 | Updated Hiring Summary for FY13<br>Added Selection Panel High Level Map   (page 50)<br>Updated number and percentage of CTI's hired in "Background" section of Document |
| V2.4<br>1/13/13 | Updated Hiring Summary for FY13<br>Updated TSTC Degree Name<br>Updated Degree name FIT |
| V2.3<br>11/11/12 | Updated Hiring Summary for FY12 |
| V2.2<br>10/3/2012 | Updated Points of Contact<br>Updated Hiring Summary for FY12<br>Changed Name of Middle Georgia College to Middle Georgia State College (effective 1/1/2013) |
| V2.1<br>August 27, 2012 | Updated Points of Contact<br>Updated Metropolitan State College of Denver to Metropolitan State University of Denver<br>Updated Hiring Summary for FY12<br>Added Regional Flight Surgeon contact information in the Medical qualifications section<br>Added FY13 Hiring Plan |
| V2.0<br>July 29, 2012 | Updated Hiring Summary for FY12<br>Updated Points of Contact |
| V1.9<br>June 15, 2012 | Updated Hiring Summary for FY12<br>Updated Points of Contact<br>Updated Controller Workforce Hiring Plan |
| V1.8<br>May 20, 2012 | Edited Degree Name for CCBC-MD<br>Updated Hiring Summary for FY12 |
| V1.7<br>May 21, 2012 | Updated Hiring Summary for FY12<br>Updated CTI School Contact List |
| V1.6<br>March 19, 2012 | Added ATSAT Test List Procedures<br>Updated Hiring Summary for FY12<br>Added 4 questions to Section 4 FAQ "Hiring and Selection"<br>Added Regional Security Specialists for School Use |
| V1.5<br>2/24/2012 | Updated Hiring Summary for FY12<br> Added Regional Security POC's in "Security Section" |
| V1.4<br>1/30/2012 | Updated Hiring Summary for FY12<br>Added Question to Public Questions<br>Updated Security section<br>Added Security section to FAQ's |
| V1.3<br>1/18/2012 | Updated Hiring Process Overview<br>Added FAA AT CTI Program Section |
| V1.2<br>1/16/2012 | Added Degree Programs for Dowling College, Miami Dade and Hampton University<br>Added section of FAQ's for Pre Hire "Public Inquiries"<br>Updated POC's<br>Added new overview of Evaluation Process |
| V1.1<br>12/27/2011 | Updated Points of Contact<br>Update Degree Programs by Institution<br>Moved a medical question listed in error in the ATSAT section to Medical section<br>Added question 3 in FAQ Medical section (color blind test)<br>Updated FY11 Hiring Summary<br>Added Monthly Telcon Information<br>Added Degree Change Policy in detail<br>Updated missing elements of the current evaluation objectives<br>Added a new section to FAQ's "CTI Institutional Requirements (Section 7) added question about degree programs.<br>Renumbered subsequent sections. |
| V1.0<br>7/12/2011 | Original |

This document provides general guidance and information. This document will be updated as necessary. Although great care has been exercised to ensure its accuracy, always consult the appropriate source documents. This document does not supersede any other document, order, policy, or law.

Questions, comments, corrections, or suggestions should be directed to AJI ATO Safety and Technical Training 9-ato-atcti@faa.gov

# Table of Contents

BACKGROUND        1

CTI Institutional Participants        3

CTI Degree Programs        5

Partnership Agreement        11

HR Policy        13

    Air Traffic-Collegiate Training Initiative (AT-CTI) Standard Operating Procedures        13

    Eligibility Period for Air Traffic Collegiate Training Initiative (AT-CTI) Graduates        12

    Testing Policy for Filling Entry Level Air Traffic Control Specialist Positions in Terminal and En Route Options        20

    Citizenship Documentation        24

ATSAT        25

Hiring Process        31

Controller Hiring 2005-2013 YTD        33

Medical Investigation        35

Security investigation        43

Evaluations        45

Points of Contacts        47

Calendar        51

AT Basics Training Objectives        53

FAQ        59

Communications        73

Definitions ACRONYMS and Abbreviations        81

# Background

The Federal Aviation Administration (FAA) Air Traffic Collegiate Training Initiative (AT-CTI) Program is designed to establish partnerships with higher educational institutions to broaden the employment opportunities in the aviation industry, particularly among air traffic controllers. AT-CTI graduates are not guaranteed jobs as air traffic controllers, but the FAA does consider AT-CTI graduates as a valuable hiring source for Air Traffic Control Specialists (ATCS).

There are 36 FAA Air Traffic Collegiate Training Initiative partner institutions. These institutions offer 34 Associate's degrees, 56 Bachelor's degrees, and two Master's degrees Since FY 2005 the FAA has hired 4176,  (Air Traffic Controller Hiring Summary, February 23, 2013) from the CTI pool, 39.4 percent of all new hires.

The AT-CTI Program was tested in 1991 to determine whether colleges and universities were capable of screening and training air traffic controllers. This five-year test program was documented in FAA Order 3120.26, Pre-Hire Air Traffic Control Demonstration Program.

The objective of the demonstration program was to determine if post-secondary educational institutions could develop and validate an innovative selection process and training curriculum that encompassed the knowledge, skills, and abilities required of the air traffic control occupation (terminal and en route options) under the current air traffic operation and future automation systems. During the test period, graduates hired from this program bypassed all training or screening at the FAA Academy and reported directly to their facilities for classroom and On-The-Job (OJT) training.

The Pre-Hire Demonstration Program was tested with five schools including The Community College of Beaver County, Hampton University, Minneapolis Community and Technical College, The University of Alaska, and The University of North Dakota. Two evaluations were completed at the end of the test program to document the results and to determine the extent to which the program achieved its objectives. .

Based on the results of the Pre-Hire Demonstration Program, collegiate aviation was determined to be a viable method of developing and delivering air traffic curriculum. It is clear that this program could be a valuable source of new controllers.

As a result, the AT-CTI program is now an FAA authority created in accordance with Congressional intent as provided for in Section 362 of Public Law 102-388 and Section 347 of the 1996 DOT Appropriations Act, which states that the administrator may enter into new agreements and maintain existing agreements with post-secondary educational institutions, as he or she may define them, whereby such institutions prepare students for the position of an FAA ATCS. The AT-CTI special appointing authority allows hiring managers to recruit eligible graduates for potential employment with the FAA.

As a result of the authority the AT-CTI Program was expanded in 1997 from five to 13 schools.

With the introduction of Air Traffic Selection and Training (AT-SAT), the FAA decided that schools would no longer need to focus on selection and screening and instead would concentrate on delivering basic air traffic knowledge. Future AT-CTI graduates would bypass the AT Basics academic portion of training only and attend a pass/fail skills based course at the FAA Academy prior to reporting to their facility.

In response to the air traffic controller hiring needs, in 2006 the FAA began soliciting new schools to join the CTI Program. An announcement was sent out for interested institutions to submit an application

1

package for evaluation.  .FAA evaluators reviewed the applications and conducted site visits and as a result an additional nine schools were added in 2007, eight in 2008, and five in 2009.

The administrator, or his or her designee, may establish standards for entry of institutions into such programs and for their continued participation.

## Our Aspiration:

We will provide the FAA Academy and field facilities with highly motivated, educated, and adaptable Air Traffic Control (ATC) candidates who will certify as controllers and lead the next generation of controllers.

## Our Goals

- o   Ensure CTI institutions are familiar with, teach, test, and provide application of the Air Traffic Basics curriculum within approved degree programs.

- o   The FAA must ensure that our partner institutions are providing the agency with the most qualified individuals and are promoting the program and education in a manner that meets our needs of highly motivated, educated, and adaptable Air Traffic Control candidates who will certify as controllers and lead the next generation of controllers. The program allows institutions to provide a specialized education for their stakeholders and communities.

- o   Promote partnerships between CTI Institutions to address "Best Practices" that produce diverse, adaptable, and well educated candidates for Air Traffic Control positions.

- o   Ensure that CTI schools and students are familiar with the technical and cultural environment and needs of FAA facilities.

- o   Provide opportunities for practical application of knowledge and continued learning outside of the classroom.

- o   Improve the communication process to FAA AT-CTI member institutions thereby improve graduates knowledge of FAA policy and practice hiring and training process.

- o   Improve the collection of data and analysis of data to measure the success of the CTI Program as a hiring source.

# CTI Institutional Participants



**Initial Schools**

Community College of Beaver County

Hampton University

Minneapolis Community and Technical College

University of Alaska at Anchorage

University of North Dakota

| Accepted 1996 (9) | Accepted 2007 (9) |
|---|---|
| Vaughn College of Aeronautics ,Flushing, NY<br>Daniel Webster College Nashua, NH<br>Dowling College, Oakdale, NY<br>Embry-Riddle Aeronautical University, Daytona Beach, FL<br>Inter-American University of Puerto Rico, Bayamon, PR<br>Miami-Dade College, Homestead, FL<br>Middle Tennessee State University, Murfreesboro, TN<br>Mt. San Antonio College Walnut, CA<br>Purdue University, West Lafayette, IN | Arizona State University, Mesa , AZ<br>Florida State College at Jacksonville, Jacksonville, FL<br>Green River Community College, Auburn, WA<br>Kent State University, Kent, OH<br>Lewis University, Romeoville, IL<br>Middle Georgia State College, Macon, GA<br>Community College of Baltimore County, Catonsville, MD<br>University of Oklahoma, Norman, OK<br>Metropolitan State University of Denver,  Denver, CO |

| Accepted 2008 (8) | Accepted 2009 (5) |
|---|---|
| Aims Community College, Greely CO<br>Broward College, Fort Lauderdale, FL<br>Eastern New Mexico, Roswell, NM<br>Embry-Riddle Aeronautical University, Prescott AZ<br>Jacksonville University, Jacksonville, FL<br>Letourneau University, Longview TX<br>St. Cloud State University, St Cloud, MN<br>Tulsa Community College, Tulsa, OK | Florida Institute of Technology, Melbourne, FL<br>Hesston College, Hesston, KS<br>Sacramento City College, Sacramento, CA<br>Texas State Technical College, (Waco, TX<br>Western Michigan University , Kalamazoo, MI |

# CTI Degree Programs

The FAA CTI partner schools provide students with a diverse choice in aviation degrees types and areas. There are 16 different Associate's degree programs, 34 Bachelor's degree programs, and 2 Master's degree programs.

**Degrees Offered**

| Associate's Degrees (16) | Bachelor's Degrees (continued) |
|---|---|
| Aeronautical Engineering Technology | Airport Management |
| Aeronautical Technology | Airway Science Management |
| Air Traffic Control and Management | Applied Meteorology |
| Aircraft Operations | Aviation Computer Science |
| Airport Management | Aviation Flight Management |
| Aviation Administration | Aviation Flight Service |
| Aviation Flight Management | Aviation Maintenance |
| Aviation Maintenance | Aviation Maintenance Management |
| Aviation Maintenance Management | Aviation Maintenance Technology |
| Aviation Operations | Aviation Management |
| Aviation Science | Aviation Management Flight Option |
| Aviation Sciences Technology | Aviation Meteorology |
| Aviation Security | Aviation Meteorology Flight Option |
| Electronic Engineering Technology (Avionics Option) | Aviation Operations |
| Professional Flight | Aviation Science and Administration |
| Professional Pilot Technology | Aviation Security |
| **Bachelor's Degrees (34)** | Aviation Technology |
| Aeronautical Engineering Technology | Aviation Technology ATC emphasis |
| Aeronautical Science | Business Administration, Concentration Air Traffic Management |
| Aeronautical Science Flight Option | Electronic Engineering Technology (Avionics Option) |
| Aeronautical Technology | Management |
| Aeronautics | Professional Flight |
| Aerospace and Aerospace Studies | Airport Management |
| Aerospace Systems Technology | Airway Science Management |
| Air Traffic Control and Management | Applied Meteorology |
| Air Traffic Control with Flight Science Concentration | **Master's (2)** |
| Aircraft Operations | Aeronautics |
| Aircraft System Management | Aviation Management |
| Airline Management | |
| | |
| | |

The following are the currently recognized, accredited degree programs from each institution that contain the requisite FAA required curriculum to be considered for employment under the FAA AT-CTI Program.

| Institution/Accreditation | Approved Degree Program |
|---|---|
| **Aims Community College**<br>**North Central Association of Colleges and Schools, The Higher Learning Commission** | ASSOCIATE'S OF APPLIED SCIENCE<br>• Air Traffic Control |
| **Arizona State University**<br>**North Central Association of Colleges and Schools, The Higher Learning Commission** | BACHELOR OF SCIENCE<br>• Air Traffic Management |
| **Broward College**<br>**Southern Association of Colleges and Schools, Commission on Colleges** | ASSOCIATE'S OF APPLIED SCIENCE<br>• Air Traffic Control |
| **Community College of Beaver County**<br>**Middle States Commission on Higher Education** | ASSOCIATE'S OF APPLIED SCIENCE<br>• Air Traffic Control Terminal or En Route |
| **Daniel Webster College**<br>**New England Association of Schools and Colleges, Commission on Institutions of Higher Education** | BACHELOR OF SCIENCE<br>• Aviation Management<br>• Air Traffic Control |
| **Dowling College**<br>**Middle States Commission on Higher Education** | MASTER'S OF BUSINESS ADMINISTRTON<br>• Aviation Management  (Added 12/27/2011)<br><br>BACHELOR OF SCIENCE<br>• Aviation Management<br>• Aerospace Systems Technology |
| **Eastern New Mexico University – Roswell**<br>**North Central Association of Colleges and Schools, The Higher Learning Commission** | ASSOCIATE'S OF APPLIED SCIENCE<br>• Air Traffic Control |
| **Embry Riddle Aeronautical University  - Daytona**<br>**Southern Association of Colleges and Schools, Commission on Colleges** | MASTER'S of Science Aeronautics<br><br>BACHELOR OF SCIENCE<br>• Air Traffic Management<br>• Aviation Related when accompanied by an ATC Minor (Revised 8/3/2011) |
| **Embry Riddle Aeronautical University  - Prescott** | BACHELOR OF SCIENCE<br>• Aeronautics<br>• Aeronautical Science<br>• Applied Meteorology<br>• Air Traffic Management (Added 7/18/2011) |
| **Florida Institute of Technology College of Aeronautics**<br>**Southern Association of Colleges and Schools, Commission on Colleges** | BACHELOR OF SCIENCE<br>• Aeronautical Science Flight Option<br>• Aeronautical Science<br>• Aviation Computer Science<br>• Aviation Meteorology Flight Option<br>• Aviation Meteorology<br>• Aviation Management Flight Option<br>• Aviation Management |
| **Florida State College at Jacksonville**<br>**Southern Association of Colleges and Schools, Commission on Colleges** | ASSOCIATE'S DEGREE<br>• Aviation Operations |
| **Green River Community College**<br>**Northwest Commission on Colleges and Universities** | ASSOCIATE'S DEGREE<br>• Air Traffic Control |

6

| Institution/Accreditation | Approved Degree Program |
|---|---|
| **Hampton University**<br>**Southern Association of Colleges and Schools,**<br>**Commission on Colleges** | BACHELOR OF SCIENCE<br>• Aviation Management<br><br>ASSOCIATE'S DEGREE<br>• Air Traffic Control Management (Added 1/2/2012) |
| **Hesston College**<br>**North Central Association of Colleges and Schools,**<br>**The Higher Learning Commission** | ASSOCIATE'S OF APPLIED ARTS AND  SCIENCE<br>• Professional Pilot<br>• Air Traffic Control |
| **InterAmerican University of Puerto Rico** | BACHELOR OF SCIENCE<br>• Airway Science Management  (Minor in ATC)<br>• Aircraft System Management  (Minor in ATC) |
| **Jacksonville State  University**<br>**Southern Association of Colleges and Schools,**<br>**Commission on Colleges** | BACHELOR OF SCIENCE<br>• Aviation Management<br>• Aviation Management and  Flight Operations |
| **Kent State University**<br>**North Central Association of Colleges and Schools,**<br>**The Higher Learning Commission** | BACHELOR OF SCIENCE<br>• Aeronautics with a concentration in:<br>    ○ Aeronautical Studies<br>    ○ Aviation Management<br>    ○ Flight Technology<br>    ○ Air Traffic Control<br>    ○ Aeronautical Systems Engineering Technology |
| **LeTourneau University**<br>**Southern Association of Colleges and Schools,**<br>**Commission on Colleges** | BACHELOR OF SCIENCE<br>• Air Traffic Management (ATC Minor)<br>• Air Traffic Control with Flight Science Concentration<br><br>ASSOCIATE'S DEGREE<br>• Air Traffic Control |
| **Lewis University**<br>**North Central Association of Colleges and Schools,**<br>**The Higher Learning Commission** | BACHELOR OF SCIENCE<br>• Air Traffic Control Management (Minor in Air Traffic Control Management)<br>• Aviation Flight Management<br>• Aviation Security<br><br>ASSOCIATE'S DEGREE<br>• Air Traffic Control Management<br>• Minor in Air Traffic Control Management<br>• Aviation Flight Management<br>• Aviation Security |
| **Metropolitan State College of Denver**<br>**North Central Association of Colleges and Schools,**<br>**The Higher Learning Commission** | BACHELOR OF SCIENCE<br>• Aviation Technology |
| **Miami Dade College**<br>**Southern Association of Colleges and Schools,**<br>**Commission on Colleges** | ASSOCIATE'S DEGREE<br>• Aviation Administration<br>• AS Professional Pilot Technology<br>• Aviation Maintenance Management |
| **Middle Georgia State College**<br>**Southern Association of Colleges and Schools,**<br>**Commission on Colleges** | BACHELOR OF SCIENCE<br>• Business Administration, Concentration Air Traffic Management<br><br>ASSOCIATE'S OF APPLIED SCIENCE<br>• Air Traffic Management |
| **Middle Tennessee State University**<br>**Southern Association of Colleges and Schools,**<br>**Commission on Colleges** | BACHELOR OF SCIENCE:<br>• Aerospace |

7

| Institution/Accreditation | Approved Degree Program |
|---|---|
| **Minneapolis Community and Technical College**<br>**North Central Association of Colleges and Schools,**<br>**The Higher Learning Commission** | ASSOCIATE'S OF APPLIED SCIENCE<br>• Air Traffic Control |
| **Mount San Antonio College**<br>**Western Association of Schools and Colleges,**<br>**Accrediting Commission for Community and Junior Colleges** | ASSOCIATE'S DEGREE<br>• Aviation Science |
| **Purdue University**<br>**North Central Association of Colleges and Schools,**<br>**The Higher Learning Commission** | MASTER'S OF SCIENCE<br>• Aviation<br><br>BACHELOR OF SCIENCE<br>• Aviation Management<br>• Professional Flight<br>• Aeronautical Technology<br>• Aeronautical Engineering Technology<br><br>ASSOCIATE'S DEGREE (Until 2012)<br>• Aviation Management<br>• Professional Flight<br>• Aeronautical Technology<br>• Aeronautical Engineering Technology |
| **Sacramento City College**<br>**Western Association of Schools and Colleges,**<br>**Accrediting Commission for Community and Junior Colleges** | ASSOCIATE'S DEGREE<br>• Air Traffic Control |
| **St. Cloud State University**<br>**North Central Association of Colleges and Schools,**<br>**The Higher Learning Commission** | BACHELOR OF SCIENCE<br>• Aviation Operations<br>• Professional Flight<br>• Management |
| **The Community College of Baltimore County**<br>**Middle States Commission on Higher Education** | ASSOCIATE'S OF APPLIED SCIENCE<br>• Air Traffic Control |
| **Texas State Technical College - Waco**<br>**Southern Association of Colleges and Schools,**<br>**Commission on Colleges** | ASSOCIATE'S OF APPLIED SCIENCE<br>• Air Traffic Management |
| **Tulsa Community College**<br>**North Central Association of Colleges and Schools,**<br>**The Higher Learning Commission** | ASSOCIATE'S OF APPLIED SCIENCE<br>• Aviation Sciences Technology<br>• Air Traffic Control |
| **University of Alaska Anchorage**<br>**Northwest Commission on Colleges and Universities** | BACHELOR OF SCIENCE<br>• Aviation Technology ATC emphasis<br><br>ASSOCIATE'S OF APPLIED SCIENCE<br>• Air Traffic Control |
| **University of North Dakota**<br>**North Central Association of Colleges and Schools,**<br>**The Higher Learning Commission** | BACHELOR OF SCIENCE<br>• Aeronautics w/ Major in ATC |
| **University of Oklahoma**<br>**North Central Association of Colleges and Schools,**<br>**The Higher Learning Commission** | BACHELOR OF SCIENCE<br>• Aviation Management (ATC Minor)<br>• Aviation-Air Traffic Management<br>• Aviation Professional Pilot (ATC Minor) |

| Institution/Accreditation | Approved Degree Program |
|---|---|
| **Vaughn College of Aeronautics and Technology**<br>**Middle States Commission on Higher Education** | ASSOCIATES OF APPLIED SCIENCE<br>• Airport Management<br>• Aircraft Operations<br>• Aviation Maintenance<br>• Electronic Engineering Technology (Avionics Option)<br><br>BACHELOR OF SCIENCE<br>• Airport Management<br>• Aircraft Operations<br>• Aviation Maintenance<br>• Airline Management<br>• Aviation Maintenance Management<br>• Airline Management<br>• Electronic Engineering Technology (Avionics Option) |
| **Western Michigan University**<br>**North Central Association of Colleges and Schools, The Higher Learning Commission** | BACHELOR OF SCIENCE<br>• Aviation Flight Service<br>• Aviation Maintenance Technology<br>• Aviation Science and Administration |

## Adding, Deleting, or Changing a Degree Program

Schools will be allowed to add, remove, or modify a degree program once a year based on the needs of the institution.

### Adding a Degree Program

If a current partner institution has the need to add a degree program, they will submit:

- An electronic letter on institution letterhead to the FAA CTI Program Office requesting the addition of the degree; include the degree type, (i.e. Associate's or Bachelor's degree) and a projected date of the first degree awarded.

    **Using a template provided by the CTI Program Office**

- List all the required classes for the degree and catalog description of the courses included in the degree

- A mapping of the FAA required AT Basics Objectives to the applicable courses within the degree where the material is taught (See Sample ATTACHMENT 1)

The FAA will issue a letter to the institution through the Program Office advising as to whether the degree will be accepted. The institution must maintain all supporting documentation including syllabi and testing instruments to validate that AT Basics are taught in the courses outlined. The FAA may approve this degree and validate the package through a site visit or remote validation.

### Modifying a Degree Program

If a current partner institution has the need to add a degree program, they will submit:

- An electronic letter on institution letterhead to the FAA CTI Program Office requesting the modification of the degree and a catalog description of the courses included in the degree

## Using a template provided by the CTI Program Office

- A  document, listing all the required classes for the degree

- A document providing a mapping of the FAA required AT Basics Objectives to the applicable courses within the degree where the material is taught (See Sample ATTACHMENT 1)

The FAA will issue a letter to the institution through the Program Office advising as to whether the degree will be accepted. The institution must maintain all supporting documentation including syllabi and testing instruments to validate that AT Basics are taught in the courses outlined. The FAA may approve this degree and validate the package through a site visit or remote validation.

## Removing a Degree Program

If a current partner institution has the need to remove a degree program, they will submit:

- An electronic letter on institution letterhead to the FAA CTI Program Office advising that they will no longer offer a previously approved degree and a projected date of the last degree awarded for CTI purposes

# Partnership Agreement

## 1. Background

The Federal Aviation Administration (FAA) and the Collegiate Training Initiative (CTI) Participant, desire to collaborate via this partnership agreement to best serve the interests of both parties.

## 2. Purpose and Scope

The FAA has established the Collegiate Training Initiative (CTI) program for the purpose of implementing the FAA's intent of using collegiate aviation as one of the primary means of meeting the future needs of the agency for air traffic control specialists (ATCS). The purpose of this partnership are to encourage and facilitate collaborative efforts between the two parties with respect to an emphasis on collegiate aviation as an active source of future recruitment of ATCS's, and to promote a collegial environment wherein knowledge is shared with mutual respect for the institutional goals of each party. The intent of this document is to express the desire of the FAA to work in cooperation with CTI Institutional Participant to achieve the goals of the CTI program. Nothing contained herein is intended to prohibit either party from collaborating with any other organization, entity, or individual in the subject areas of interest.

## 3. Funding

This partnership agreement in no way obligates the FAA to any financial expenditure. Activities carried out by each party in support of this partnership are to be funded by the respective parties. Nothing contained herein is intended to prohibit either party from seeking and awarding funding available under any other program.

## 4. Term of Agreement

This partnership shall commence as of the last date entered in the signature block of the agreement. It may be terminated by either party after thirty (30) days written notice to the other party.

Recruitment of CTI program graduates will not be in effect until completion of all FAA recommendations, which have been communicated to the institution. Upon completion and approval of these activities by the specified FAA organizations, eligible program graduates can be considered for employment.

## 5. Amendments

This partnership agreement may be modified only by a written amendment. Any amendment must be jointly executed by the duly authorized representatives of both parties.

## 6. Roles, Responsibilities, and Expectations

### Federal Aviation Administration

- Provide access to current CTI-related technical documents (orders, directives, etc.)
- Provide electronic versions or a single hard copy of curriculum materials and guidance to include lesson plans, student handouts, and multimedia materials
- Provide technical advice and support
- Provide academic diagnostic testing materials
- Provide institutions with feedback

11

- Establish appropriate forums for regular communication among participating institutions and the FAA

- Consider recommended graduates for employment on the basis of FAA needs

### CTI Institutional Participant

- Ensure that the curriculum satisfies the CTI teaching objectives

- Ensure that the faculty is knowledgeable in current air traffic policies, procedures, and curriculum

- Provide counseling for students in all aspects of the CTI program

- Ensure that CTI-related advertising accurately reflects the intent of the CTI program, including employment opportunities

- Provide an institutional recommendation for employment



Broward University

## 7. CTI Program Graduate Qualification Requirements and Expectations

To qualify for employment consideration with the FAA, CTI program graduates must meet all legal and regulatory requirements including, but not limited to, the following:

- Achieve a qualifying score on the current FAA testing procedures

- Successfully complete the FAA interview process

- Receive institutional recommendation

- Meet entry level ATCS medical standards

- Pass a pre-employment drug test

- Pass the background investigation for security and suitability

- Have U.S. citizenship

- May not have reached their 31st birthday prior to initial appointment in the terminal or en route options

- Complete institutional graduation requirements

- Complete course work including all CTI-specific required courses

- Be able to read, write, and understand the English language and speak it rapidly without accent or impediment of speech that would interfere with two-way radio conversation

## 8. Summary

The FAA's employment goals include a need for a highly trained work force and the desire to enhance the cultural diversity of the work force. For any CTI graduates selected for employment, the FAA's intent is to assign these employees to targeted geographical areas. However, the actual assignments for the employees selected from the CTI program will depend upon the current needs of the FAA. CTI program graduates must understand that employment is not guaranteed for any individual.

# Human Resources Policy

## Human Resources Operating Instruction (HROI) - Air Traffic-Collegiate Training Initiative (AT-CTI) Standard Operating Procedures (SOP)

***This HROI established:*** *April 1, 2007*
***This version effective:*** *April 1, 2007*
***Use this HROI in conjunction with:***

- *HROI: Eligibility Period for Air Traffic Collegiate Training Initiative Graduates*
- *EMP-1.7 (Series 2152): Testing Policy for Filling Entry Level Air Traffic Control Specialist  Positions in Terminal and En Route Options*

1. **Purpose:** This document implements the Standard Operating Procedures (SOP) for the Air Traffic - Collegiate Training Initiative (AT-CTI) Program and provides instructions and guidance to all FAA offices to assist them in implementing these procedures.

2. **Background**: In 1990, the FAA established the AT-CTI program for the employment of Air Traffic Controllers. Graduates who meet the basic qualification requirements for the AT-CTI program may be considered for employment in terminal and en route facilities.

3. **Definitions:**
   a. **AT-CTI. Air Traffic – Collegiate Training Initiative:** A program established for the employment of entry level Air Traffic Controllers in the terminal and en route options.
   b. **AT-CTI Inventory:** A centralized register of AT-CTI candidates maintained by the Aviation Careers Division. The AT-CTI Inventory tracks important information about applicant eligibility including graduation date, recommendation status, and AT-SAT score. This inventory is used for placement and hiring of AT-CTI students.
   c. **AT-SAT Air Traffic – Selection and Training:** A required computer-based entrance exam for the Air Traffic Controller occupation in the terminal and en route options.
   d. **NET. Notice of Eligibility to Test:** A notice issued by the Aviation Careers Division that authorizes applicants to take the AT-SAT test.
   e. **NOTR. Notice of Test Results:** A notice issued by the Aviation Careers Division that provides the results of the AT-SAT test. This notice does not indicate employment eligibility.
   f. **On-Hold Rule:** An AT-SAT score of 70 or above will be placed in a hold status for students in the AT-CTI program until the candidate graduates from an FAA approved AT-CTI program. The score is activated upon graduation and is valid for three years from the candidate's graduation or eligibility date. The On Hold Rule applies to ATÂ¬CTI candidates only.

4. **AT-CTI Program Management Responsibilities**
   a. ATO-A, the Office of Acquisition & Business Services within the Air Traffic Organization (ATO):

      i.    Serves as the Program Manager for the AT-CTI program and as liaison between the colleges and the FAA.
      ii.   Funds the administration of the AT-SAT test.

   b. Office of Human Resources Management Programs and Policies, AHP, supports Acquisition & Business Services by developing and managing issues and policies relating to the qualifications, recruitment, and employment of AT-CTI graduates.
   c. AMH-300, the Aviation Careers Division within the Office of Human Resource Management:

13

      i. Maintains the centralized hiring of AT-CTI graduates, the overall management of the AT-CTI Inventory, and authorizes pre-employment testing of all AT-CTI students

      ii. Reviews applications for completeness, to include registration with the selective service, and verifies veterans' preference.

    d. The Office of Aerospace Medicine develops policy and manages the medical clearances for AT-CTI graduates.

    e. The Assistant Administrator for Security & Hazardous Materials develops policy and manages the security clearances for AT-CTI graduates.

5. **Management of the AT-CTI Inventory:** The Aviation Careers Division is responsible for the overall management of the AT-CTI Inventory.

    a. Establishment of the AT-CTI Inventory: All AT-CTI schools will provide the Aviation Careers Division an electronic list of students enrolled in the AT-CTI Program. This list should be provided as soon as practical after enrollment in the ATÂ¬CTI program. The list will include:

      i. Student Name
      ii. Address
      iii. Daytime Phone Number
      iv. Nighttime Phone Number
      v. Email address
      vi. Social Security Number
      vii. Date of Birth
      viii. Projected Graduation Date
      ix. Date Additional Course of Instruction

    b. Maintenance of the AT-CTI Inventory: The Aviation Careers Division establishes and maintains a roster of AT-CTI students and an inventory of eligible candidates. Candidate records are updated by the Aviation Careers Division to reflect changes or corrections as reported by the student/graduate or the AT-CTI school as appropriate. Information in each record includes:

      i. Personal Information including the data listed in paragraph 5a.
      ii. AT-CTI School
      iii. AT-SAT Score
      iv. Graduation Date
      v. Employment Eligibility Status
      vi. Geographic Preference
      vii. Cumulative Grade Point Average
      viii. Veterans' Preference
      ix. Self-Certified Citizenship
      x. Military Discharge Date

    c. Removal from the AT-CTI Inventory: There are several ways in which a candidate will be removed from the AT-CTI Inventory including:

      i. FAA approved AT-CTI school official does not recommend the candidate.
      ii. Candidate does not achieve a passing score on the AT-SAT test after two consecutive attempts.
      iii. The candidate was not selected within three years of graduation and did not request or receive approval for an extension of eligibility.
      iv. Candidate reaches age 31.
      v. The candidate fails to meet the Basic Qualification Requirements for AT-CTI Graduates detailed in paragraph 6.

6. **Basic Qualification Requirements for AT-CTI Graduates:** To be considered for employment with the FAA, AT-CTI graduates must:

   a. Successfully complete the FAA approved AT-CTI program including:

       i. Receiving a degree from the FAA approved AT-CTI school, in an aviation-related field, that includes the teaching objectives required by the FAA.
       ii. Receiving an institutional recommendation for employment from an authorized school official.

   b. Achieve a passing score (70 or above) on the AT-SAT test.
   c. Be a United States citizen at the time of application for the AT-SAT test.
   d. Not have reached their 31st birthday when entering on duty in an FAA terminal or en route facility.
   e. Meet FAA medical, security, and suitability requirements; and
   f. Successfully complete an interview to determine whether the candidate possesses the personal characteristics necessary for the performance of air traffic control work and that the candidate is able to speak English clearly enough to be understood over radios, intercoms, and similar communications equipment.

7. **Eligibility Requirements for AT-CTI Graduates:** The AT-CTI Program is designed to provide the FAA with qualified applicants for air traffic controller positions who possess a broad-based knowledge of the aviation industry with specific education in air traffic control. Due to the education received at approved AT-CTI schools, candidates hired through this program are authorized to by-pass the Air Traffic Basics Course at the FAA Academy in Oklahoma City.
   a. AT-CTI Eligibility: Candidates are eligible to be hired through the AT-CTI Program for three years after their graduation date.
   b. Extending AT-CTI Eligibility: Candidates who have passed the eligibility period may apply to have their eligibility extended in accordance with HROI: Eligibility Period for Air Traffic Collegiate Training Initiative Graduates.
   c. Establishing Eligibility for Previous AT-CTI Graduates: Students who graduated from an AT-CTI school with a qualifying aviation degree, including the AT-CTI required courses, and did not establish eligibility for employment consideration under the AT-CTI program may elect to do so under the following guidelines:

       i. (1) The candidate is within two years of their graduation date. (Note: With regard paragraph 7ci, AT-CTI graduates who enter active military duty after graduation will be given the opportunity to be considered under the AT-CTI program once they are released from active duty, provided they continue to meet all other eligibility requirements. Eligibility must be established within one year of being released from active duty.)
       ii. The candidate must meet the Basic Qualification Requirements for AT-CTI Graduates detailed in paragraph 6 of this document.
       iii. The candidate must be identified to the FAA as an AT-CTI student by an authorized school official.
       iv. The candidate may be authorized to take the AT-SAT exam.
       v. The AT-CTI Inventory will indicate the graduation date on the school transcript. (Note: Employment eligibility will be reduced depending upon the length of time between graduation and when the candidate establishes eligibility.)
       vi. Candidates may apply for an eligibility extension in accordance with paragraph 7b of this document.

   d. Reapplying to the AT-CTI Program: Candidates previously hired through the AT-CTI Program may not reapply through this hiring source.

8. **Administration of AT-SAT Testing:** AT-SAT testing is conducted in accordance with EMP-1.7 (Series 2152): Testing Policy for Filling Entry Level Air Traffic Control Specialist Positions in Terminal and En route Options. The Aviation Careers Division is responsible for coordinating AT-SAT testing for AT-CTI students. The following guidelines are used for the

administration of AT-SAT testing:

a.  The Aviation Careers Division issues the authority for AT-CTI students to take the AT-SAT test.

b.  To qualify for AT-SAT testing, AT-CTI students must:

      i.  Have completed specific coursework at the AT-CTI school indicating commitment to the program. Qualifying coursework is determined by the AT-CTI school and approved by the FAA.

      ii.  Be identified by an authorized school official as an AT-CTI student.

      iii.  Submit a signed self-certification of citizenship to the Aviation Careers Division.

      iv.  Be able to provide own transportation to and from the test site.

      v.  Meet FAA testing parameters at time of testing.

c.  The Aviation Careers Division issues a Notice of Eligibility to Test (NET) authorizing candidates to be tested.

d.  The Aviation Careers Division provides a Notice of Test Results (NOTR) to each candidate and updates the AT-CTI Inventory to reflect the AT-SAT score.

e.  The On-Hold Rule for the AT-SAT test score is used.

f.  Candidates who take the AT-SAT exam for the first time and fail must wait one year from the date of the initial exam before retesting.

g.  Candidates who take the AT-SAT exam and achieve a passing score are not authorized to retake the test under the AT-CTI Program to improve their test score.

h.  Candidates who take the test and do not achieve a passing score after two consecutive attempts are not allowed to retake the test through the AT-CTI program. This does not preclude them from applying through other hiring methods.

i.  The second AT-SAT score will replace the first AT-SAT score regardless of the outcome.

9.  **Employment of AT-CTI Graduates:** Employment of AT-CTI graduates in the En Route & Oceanic Service Unit and Terminal Service Unit is in accordance with established FAA hiring policies and practices used to fill air traffic control positions.

## Human Resources Operating Instruction (HROI) - Eligibility Period for Air Traffic Collegiate Training Initiative (AT-CTI) Graduates

*This HROI established: May 26, 2006*
*This version effective: April 1, 2007*
*Use this HROI in conjunction with:*

- EMP-1.10 Permanent External Hiring
- EMP-1.11 Temporary External Hiring
- EMP-1.20 Maximum Entry Age for Air Traffic Control Specialists
- EMP-1.7 (Series 2152): Testing Policy For Filling Entry Level Air Traffic Control Specialist Positions in Terminal and En Route Options

### Background Information

The FAA AT-CTI program is a separate and distinct recruitment source for terminal and en route air traffic controller candidates. This group of candidates consists of graduates from certain colleges and universities that provide a pre-approved major course of study and recommendations for employment.

All AT-CTI candidates must obtain passing AT-SAT scores.

Because the AT-CTI curriculum provides appropriate education, experience, and training which meet the basic requirements for the terminal and en route air traffic occupations, AT-CTI graduates may be permitted to bypass some of the FAA Academy's Air Traffic Control Training program.

The Aviation Careers Division (AMH-300) maintains an inventory of eligible AT-CTI candidates. Referral eligibility for the candidates is initially a three-year period after graduating from a CTI college or university. Eligibility to remain in the CTI inventory expires if the candidate is not referred or is not selected during the initial three-year eligibility period.

This Human Resources Operating Instruction (HROI) establishes a process for extending candidates' eligibility on the AT-CTI inventory. Candidates may request one-year eligibility extensions. This change will help the FAA successfully fulfill the Controller Workforce Plan to increase hiring of air traffic and en route controllers by maintaining a ready source of candidates in a viable active inventory of eligible AT-CTI candidates.

### General Requirements

- Candidates whose three-year eligibility on the inventory has expired or will expire within 60 calendar days may apply to continue to have their names on the inventory.
- Candidates who reestablish eligibility under this policy will be eligible for one additional year from the date that AMH-300 approves the request. Candidates may continue to reapply and have their names placed on the inventory in one-year increments after each additional year expires, until they reach the maximum entry age.
- If applicants have a valid Air Traffic Selection and Training (AT-SAT) test score in accordance with EMP-1.7 (Series 2152): Testing Policy For Filling Entry Level Air Traffic Control Specialist Positions in Terminal and En Route Options, they will not be required to retest. Approval will be based on all requirements being met.
- Candidates whose air traffic control specialist pre-employment test score expires prior to their being granted an extension must take and pass the AT-SAT examination in order to be eligible for an extension. Special testing sites will not be provided. Testing will be done in conjunction with current AT-CTI school testing. Applicants should keep in contact with AMH-300 for future testing cycles.
- Candidates who receive two consecutive non-qualifying AT-SAT test scores will not be allowed to retake the test for entrance on the AT-CTI inventory. This does not preclude candidates from applying through other hiring methods (e.g., general public announcement); however, they must wait the allotted time in accordance with national policy from the date of their last test.

17

- The Air Traffic Organization (ATO) may require that candidates who are granted these extensions take refresher training or take portions of the FAA Academy Air Traffic Training program that AT-CTI graduates are normally permitted to bypass.

## Who is eligible?

To apply for an extension, applicants must meet all of the following requirements:

- Have been identified by an AT-CTI school,
- Have received an AT-CTI school recommendation,
- Have passed a pre-employment test,
- Have submitted all appropriate paperwork to AMH-300 (i.e., geographic preference sheet, etc.), and
- Be under the maximum entry age.

**Please Note:** In addition to meeting the requirements stated above, applicants are required to have a valid AT-SAT test score of 70 or higher before an extension is approved.

## Who is not eligible?

Applicants who meet one of the following conditions under the AT-CTI program are not eligible to request an extension:

- Removed - Suitability,
- Removed - Medical,
- Failed to respond to official correspondence,
- Correspondence returned unclaimed, or
- Over the maximum entry age.

## How to apply?

Applicants must complete and return the Request for Air Traffic Collegiate Training Initiative Extension form (MS Word) to AMH-300 using one of the following methods:

- Fax to 405-954-8531, or
- E-mail to 9-amc-amh-cti@faa.gov, or
- Regular mail to:
  Aviation Careers Division
  AMH-300
  P.O. Box 25082
  Oklahoma City, OK 73125

## Extension Procedures

**Step 1. The AMH-300 AT-CTI Program Manager will:**

- Verify applicant record to ensure that eligibility requirements are met,
- Notify applicant of eligibility/ineligibility for extension and to include notification that AT-SAT testing will be scheduled at a later date, and
- Send applicant's name to the AMH-300 Testing Officer with the next group of AT-CTI applicants who are authorized to take AT-SAT.

**Step 2. The AMH-300 Testing Officer will send authorized applicant's name to AT-SAT Test Administrator.**

**Step 3. AT-SAT Test Administrator will:**

- Notify applicant,
- Schedule applicant to test (applicant will be tested with AT-CTI schools),
- Administer AT-SAT test, and
- Send test results to AMH-300 Testing Officer.

**Step 4. The AMH-300 Testing Officer will:**

- Enter all test results into database, and
- Notify the AMH-300 AT-CTI Program Manager that all test scores have been processed.

**Step 5. The AMH-300 AT-CTI Program Manager will:**

- Notify applicant of approval/disapproval of extension, which includes test score results and/or eligibility/ineligibility to apply for future extensions, and
- Place applicant's name on the inventory for one year from the date of approval.

## Maximum Entry Age

This policy does not change or supersede any laws, regulations, or agency policies related to the maximum entry age for air traffic controllers.

## Points of Contact

Questions about this guidance should be directed to the ATO Support Team, AHR-4, on (202) 267-9862.

19

# HRPM EMP-1.7 (Series 2152) Testing Policy for Filling Entry Level Air Traffic Control Specialist Positions in Terminal and En Route Options

Updated: 10:23 am ET June 11, 2010

**This Supplement applies to:** Filling entry-level air traffic control specialist (ATCS) positions in the terminal and en route options.

**Supplement established on:** April 1, 2007

**This version effective:** April 1, 2007

**Use this supplement in conjunction with:** EMP-1.7, Qualification Requirements

**Background information:** This supplement replaces Policy Bulletin #8. Changes were made in this supplement to include increasing the valid period of an Air Traffic Selection and Training test score from 2 years to 3 years. Other changes made were to bring the document into agreement with the Air Traffic Organization (ATO) structure.

Changes made to this document were coordinated between AHR and ATO. References to ATO internal administrative processes, roles, and procedures have been deleted. Responsibility for determining who must take AT-SAT was deleted as that is covered by this supplement and would be covered by the change procedures for the Human Resources Policy Manual. Reference to Human Resources Management Division, Mike Monroney Aeronautical Center, AMH-1, internal standard operating procedures has also been deleted.

1. **Policy:** Individuals covered by this supplement are required to pass Air Traffic Selection and Training (AT-SAT) prior to employment as an entry level ATCS in the terminal and en route options. AT-SAT is used in place of the Office of Personnel Management (OPM) written test for ATCS candidates and any further screening previously required, specifically the FAA Academy Screening Program or the Pre-Training Screen.

   a. All candidates must meet the established qualification requirements or alternatives in accordance with the guidelines contained in EMP-1.7, Qualification Requirements.
   b. Applicants seeking entry-level positions in the flight service option are subject to passing the OPM test for ATCS positions.

2. **Definitions:**

   a. **AT-CTI - Air Traffic Collegiate Training Initiative:** A program established for employment of entry level ATCS in the terminal and en route options.
   b. **AT-SAT - Air Traffic Selection and Training:** Computer based examination that screens potential candidates for entry-level ATCS positions in the terminal and en route options.
   c. **COTR - Contracting Officer's Technical Representative:** Refers to a Government employee who certifies payment and coordinates contracts with the contractor.
   d. **NET - Notice of Eligibility to Test:** A notice issued applicants to take the AT-SAT test.
   e. **NOTR - Notice of Test Results:** A notice that does not reflect eligibility for ATCS positions, but gives results of the test.
   f. **"On-Hold" Rule:** Students in the AT-CTI program with an AT-SAT score of 70 or above will be placed in a "hold" status until the applicant graduates from an FAA approved AT-CTI program. The score is activated upon graduation and is valid for 3 years from the student's graduation date. The "on-hold rule" applies only to those students in the AT-CTI program.
   g. **SMS -Score Management System:** A database that stores and maintains applicant AT-SAT

test scores.

h. **VRA - Veterans Readjustment Appointment:** A special appointing authority by which agencies can, if they wish, appoint eligible veterans without competition to positions up to the applicable pay band permitted by FAA policy.

3. **Coverage:**

   a. The following groups of individuals must pass AT-SAT to be eligible for selection for entry level terminal and en route ATCS positions:

      i. Individuals applying under a vacancy announcement open to the general public;
      ii. Candidates applying based on successful completion of AT-CTI programs;
      iii. Individuals who are part of the OPM inventory who did not take and successfully pass the Pre-Training Screen;
      iv. Former military personnel (with or without ATC experience) who apply to a specific vacancy announcement that states that passing AT-SAT is a qualification requirement;
      v. Entry level internal applicants (e.g., selections under provisions outlined in EMP-1.14, Permanent Internal Assignments).

   b. The following groups of individuals shall not be required to take AT-SAT to be eligible for selection:

      i. Former FAA controllers seeking reinstatement (e.g., former PATCO controllers);
      ii. Former military controllers who are eligible and are selected under a Veterans Readjustment Appointment (VRA);
      iii. Department of Defense civilian controllers (DOD 2152's);
      iv. Former military controllers selected under the Retired Military Air Traffic Controllers Program.

4. **Program Administration**

   a. **Test Administration:**

      i. **Contractor conducted testing:** AT-SAT may be administered by a test company awarded an FAA-wide government contract to provide AT-SAT testing services.
      ii. **Government conducted testing:** Under special circumstances, ATO may request that AHR conduct testing at certain locations without the involvement of the contractor.
      iii. **Selection to take AT-SAT:** Passing AT-SAT is an eligibility requirement for entry-level employment in the terminal or en route options. Selection to take the test battery shall be in accordance with merit principles.

   b. **Travel and transportation to an AT-SAT test site:** Applicants are responsible for all travel expenses incurred to and from an AT-SAT test site.

   c. **Re-testing or re-examination using AT-SAT:**

      i. Re-testing is not guaranteed: Applicants must apply through an appropriate and available hiring procedure or be participating in a recognized AT-CTI program to be considered for re-testing.
      ii. **Individuals who pass:** Applicants who pass the AT-SAT with a score of 70 or above are eligible to retest one year (12 months) from the initial test date. Regardless of the score, the second test score replaces the first score.
      iii. **Individuals who fail:** Applicants who fail the AT-SAT with a score of below 70 may retest one year (12 months) from the initial test date. Regardless of the score, the second test score replaces the first score.

iv. **Individuals who do not complete taking AT-SAT:** Applicants who do not complete the test may retest one year (12 months) from the initial test date.

v. **Exceptions to the one-year waiting period:** Exceptions to the one-year waiting period may be made in situations where candidates are unable to complete the test for technical reasons such as power failure, where the test administrator must stop the test for other reasons that are outside the candidate's control, and in a limited number of other cases as specified by the agency.

d. **Valid period**: Applicants' scores are valid for 3 years, except for AT-CTI students who use the "on-hold" rule. AT-SAT results may be used for any hiring source during the valid period.

e. **Qualification Requirements**: All qualification requirements of the position to be filled (e.g., maximum entry age, etc.) must be met before entering on duty.

5. **Program Responsibilities:**

   a. **Office of Human Resources Management Programs and Policies, AHP, is responsible for:**

      i. Conducting testing and providing the COTR for test administration contracts;
      ii. Testing procedures;
      iii. Exceptions/decisions to re-test candidates that are not addressed in the standard operating procedures (SOP's);
      iv. Resolving unusual testing problems;
      v. Approving/disapproving requests received from ATO for special testing sessions;
      vi. Responding to inquiries from outside entities (e.g., Congress, etc.);
      vii. Certifying contractor invoices for payment; and
      viii. Contacting the contractor regarding any incidents.
      ix. Programming, maintenance, and operation of staff acquisition software applications and appropriate interfaces to:
         i. Support the generation of lists of applicants eligible for AT-SAT testing
         ii. Record applicant AT-SAT test scores for use in referral of applicants; and
      x. Providing user instructions, training, and technical support to AMH-300 relative to the staff acquisition software applications and interfaces.

   b. **Vice President of Business and Acquisition Services, ATO-A, is responsible for:**

      i. Communicating the ATO's testing needs and hiring requirements to AHR;
      ii. Funding AT-SAT testing.

   c. **Office of Human Resource Management, Aviation Careers Division, AMH-300, is responsible for:**

      i. Exchanging information about examinees with the test administration contractor;
      ii. Day to day resolution of testing problems such as determining if "no-shows" may be re-scheduled, etc.;
      iii. Maintaining the SMS database of who has taken AT-SAT and their scores;
      iv. Serving as the single point of contact for the contractor for issuing test authorizations;
      v. Providing the names of AT-CTI candidates to be tested;
      vi. Resolving candidate problems, such as authorizing extensions for testing periods or retest issues;

6. **Recruitment:** See the Human Resources Policy Manual (HRPM) chapters Permanent External Hiring

(EMP-1.10) and Permanent Internal Assignments (EMP-1.14).

7. **Referral of Applicants**: The category grouping method, in which candidates are divided into "qualified" and "well qualified" groups, is mandatory when referring applicants who have passed AT-SAT. AMH-300 is responsible for grouping candidates. Applicants are grouped as follows:

   a. Well-Qualified applicants are those who passed AT-SAT with a score of 85 or higher.
   b. Qualified applicants are those who passed AT-SAT with a score of 70-84.9. The provisions outlined in EMP-1.12, Veterans' Preference in Hiring, apply when making selections under external competitive appointment procedures. Also refer to the HROI entitled, Method of Evaluating Candidates.

**Note:** This section should not be interpreted to mean that only scores of 85 or above are acceptable. Using the category ranking method, selecting officials may request the names of all candidates or only those in the well-qualified group (all CP and CPS veterans who pass the test must be referred regardless). If there are an insufficient number of candidates in the well qualified group, all candidates from the qualified group must be considered before resorting to testing more applicants for the same hiring effort.

8. **Exceptions**: Requests for exceptions to provisions of this policy should be submitted to the Manager, HR ATO Support Team. Exceptions are considered on a case-by-case basis. A request for an exception must clearly describe the exception requested, the reason for the request, and the impact if the request is granted.

---

**Related Information**

**Policies**
EMP-1.7 Qualification Requirements
EMP-1.10 Permanent External Hiring
EMP-1.12. Veterans' Preference in Hiring
EMP-1.14 Permanent Internal Assignments

**Human Resource Operating Instructions**
Method of Evaluating Candidates
Air Traffic Collegiate Training Initiative (AT-CTI) Standard Operating Procedures

## Citizenship Documentation

In order to apply for a federal job you must be a citizen of the United States.

### Born in the United States

A birth certificate provides proof of citizenship. To obtain a copy of your birth certificate, contact the Bureau of Vital Statistics in the State in which you were born. There is no "citizenship document" for a person who is a citizen by birth in the United States.

### Born Outside the United States

The citizenship of someone born outside of the United States, as the child of a U.S. citizen parent, could vary depending on the law in effect when the birth took place.  In most cases citizens born outside the U.S. requires a combination of evidence showing at least one parent being a U.S. citizen when the child was born and having lived in the United States or its possessions for a period of time.

To apply for recognition of citizenship, you must have:

- A Consular Report of Birth Abroad, or FS-240, which provides proof of citizenship if your birth was registered at the nearest U.S. consulate when you were born.

- If you are already in the United States, apply for a Certificate of Citizenship. Use Form N-600 available at the US Citizenship and Immigration Service website : http://www.uscis.gov

### Naturalized Citizen or Derivative Citizen

Naturalization Certificate or Certificate of Citizenship serves as proof of citizenship.  If you have lost either of your certificates, you can apply for a replacement using Form N-565 available at the US Citizenship and Immigration Service website:   http://www.uscis.gov

# AT-SAT

## Air Traffic Selection and Training (AT-SAT)

AT-SAT is a computer-based examination that assesses if job applicants have certain characteristics needed to perform effectively as air traffic controllers. Some of the abilities and characteristics assessed by AT-SAT include:

- Prioritization
- Decisiveness
- Tolerance for high intensity
- Problem solving
- Composure
- Visualization
- Planning
- Working cooperatively
- Execution
- Numeric ability
- Thinking ahead
- Working with angles
- Taking charge
- Movement detection
- Reasoning

The total maximum time to take AT-SAT is eight hours. Included in this testing time are two scheduled 15-minute rest breaks and a maximum 45-minute lunch break.

There are eight tests within AT-SAT. These are called:

- Scan
- Dial Reading
- Angles
- Applied Math
- Experience Questionnaire
- Analogies
- Letter Factory
- Air Traffic Scenario

Each sub-test starts with a section explaining the test and providing ungraded practice questions. The more complex tests have correspondingly more extensive explanations and practice questions.

## SCAN

In this test, multiple moving blocks of data appear at random on the computer screen. The numbers that appear in the data blocks will be either inside or outside a specific range displayed on the bottom of the computer screen. Scoring of the test is based on how quickly and accurately candidates can identify data blocks with numbers outside the specified range.



Type the identification numbers contained in the data block with lower line numbers falling beyond the range (360-710).

25

## READING



Air traffic controllers must be able to perceive visual information quickly and accurately and perform simple processing tasks like comparisons. The Dial Reading Test assesses ability to read dials quickly and accurately.

Temp.

1) 22    2) 24    3) 28    4) 30    5) 45

## ANGLES

Air traffic controllers must recognize angles and perform calculations based on those angles. The Angles Test measures the ability to perform these tasks.







## APPLIED MATH

This test consists of word math problems with four possible answers for each problem. All of the questions involve calculating time, distance, or speed based on information given in the problem. All problems involve the movement of aircraft. Knowledge of knots or nautical mile terminology is not required to determine the answer. Scoring of the test is based on the number of problems answered correctly.

## EXPERIENCE

Air traffic controllers must possess certain work-related attributes to perform their job well. The Experience Questionnaire determines whether candidates have these attributes by asking about past experience. There are no correct or incorrect answers. People will respond differently based on what is true for themselves.

26

## ANALOGIES

Air traffic controllers must solve reasoning problems by knowing which rules apply to a situation and then applying those rules. The Analogies Test measures reasoning ability in applying the correct rules to solve the problem. The test consists of both text and visuals.





## LETTER FACTORY



FIG. 1

This test measures three abilities required to perform the air traffic controller job:

1. Planning and deciding what action to take in a given situation
2. Thinking ahead to avoid problems before they occur
3. Maintaining awareness of the work setting

In the first of several scenarios, letters move down each conveyer belt as show in Figure-1. Candidates must place the correctly colored letter in the correct color box at the bottom of the diagram using the computer mouse. Candidates are asked to move empty boxes from the storage area to the loading area, order new boxes when supplies become low, and call Quality Control when "defective" letters appear. They are also asked to answer multiple choice questions about the letter factory display.



FIG. 2

Figure-2 shows the second type of question used in this test. Candidates are asked to answer multiple "situational awareness" questions based on the rules provided for this test and previous test scenarios.

27



## Air Traffic Scenarios

This test simulates air traffic situations and measures the ability to safely and efficiently guide airplanes. The test uses simple rules and does not require that candidates have knowledge of air traffic control.

Candidates are presented with simulated air traffic situations. Aircraft appear on the screen and must be routed to an appropriate exit or airport. All situations involve the movement of aircraft. Scoring of the test is based on how quickly and accurately the aircraft are directed to their destinations. There are practice and graded scenarios of different lengths and complexity.

## HELPFUL HINTS

1. Arrive for the testing session on time.
2. Take the rest breaks provided. Some of the tests can be mentally taxing. The test breaks are organized to help you concentrate and stay alert and relaxed.
3. Read the directions. The directions do not try to fool or trick you, but some of the questions are quite challenging. Frequently, when people have problems with a test, it is because they did not pay attention to the directions.

Test administrators are not permitted to answer questions about the test or the rules provided.

### AT-SAT Register

The AT-SAT eligibility register is provided by the partner institutions to Aviation Careers in order to schedule AT-SAT testing. The AT-SAT test is schedule twice per year, normally in the fall and spring. CTI students are eligible to take the test up to one year before the anticipated graduation date and the scores are good for three years. If the test score expires or will expire within a testing cycle, the applicant must contact Aviation Careers to be placed on the test list.

The partner institution must submit a list of eligible candidates for the AT-SAT test when requested by Aviation Careers. Aviation Careers will send the list back to the institution for corrections and amendments. Once the list is closed, schools will have to wait on the next call for AT-SAT candidates.

### Testing Eligibility and Submission of Testing List

### Initial AT-SAT Testing

In an effort to ensure that all students who are entitled to take the AT-SAT test have their names submitted in a timely manner, the following process will be used.

CTI partner institutions, will submit the names of those students who are within 12 months of graduation, enrolled in a FAA-approved degree program, and eligible for AT-SAT testing on or before the designated due date as advertised by Aviation Careers. No amendments will be accepted after the due date unless initialized by the FAA.

- The names must be submitted on a spreadsheet provided by Aviation Careers without modification of the columns, rows, or formulas.

- Amendments and corrections will be accepted up to the cutoff date. All amendments must be sent using the same spreadsheet. This amended/revised spreadsheet will replace all previous submissions.

Once a student's name has been submitted, the school should assume that the student was scheduled for and completed the test.

If a student was contacted, and was either not able to schedule the testing for which their name was submitted, or was scheduled and was not able to take the test:

If the student has:

- NOT GRADUATED: The student must notify the school that his/her name needs to be resubmitted for AT-SAT testing. Schools must submit the student for the next cycle of testing.

- GRADUATED: The student must contact Aviation Careers  at the address below and request to be placed on the next testing cycle. His/her name must have been previously submitted by the school.

**Retaking the AT-SAT Test**

A student who scored less than a 70 on the initial AT-SAT testing may retake the AT-SAT test -one year after the initial test.

If the student has:

- NOT GRADUATED: The student must notify the school that his/her name needs to be resubmitted for AT-SAT testing. Schools must submit the student for the next cycle of testing.

- GRADUATED: The student must contact Aviation Careers  at the address below and request to be placed on the list for the next testing cycle.


A student took the test before graduation and scored at least a 70 on the AT-SAT test may retake the test three years after graduation or three years from the test date if the test was taken after graduation.

If the student has:

- GRADUATED: The student must contact Aviation Careers  at the address below and request to be placed on the next testing cycle.

> Aviation Careers Division
> AMH-300
> P.O. Box 25082
> Oklahoma City, OK 73125
> Phone: (405) 954-4657
> Fax: (405) 954-8531
> Email: 9-AMC-AMH-CTI@faa.gov

29

# Hiring Process

Each year the Air Traffic Organization determines the field needs for controllers. Each facility determines the number of controllers that are retiring, moving for promotion, etc. These needs are forwarded to the ATO to determine a "hiring plan" for the year. Announcements are created based on these needs.

The ATO assembles Centralized Selection Panels with selecting officials from each of the service units and representatives from each service area. These officials are provided with lists of candidates from each announcement that have been deemed "qualified."

List may include:

- Veteran's Readjustment Appointment (VRA)
- For Retired Military Controller (RMC)
- For Certified Tower Operator (CTO)
- For Reinstatement eligible former FAA CPC ATCS and EVHO
- For Reinstatement eligible former DOD ATCS and EVHO
- General Public

Tentative selections are made by the teams for each facility through their representatives at the hiring panel.  Aviation Careers then must review the list to ensure that selections were made in accordance with applicable laws and criteria (i.e., veterans are considered as required; well-qualified lists are exhausted before qualified).

After all selections for interviews are made the interview process is started. Qualified interviewers and potential employees receive an email indicating that they need to set up an interview. The candidate will be interviewed and a recommendation will be made to the ATO.

Once the ATO receives all recommendations, Aviation Careers will send tentative offer letters to candidates. These letters differ depending on the service unit.  En route letters will indicate the facility to which the applicant has been assigned and the terminal letter will indicate the state to which the applicant has been assigned.

Each applicant will then begin the suitability process of medical, pre-employment clearances including security process. This process can take between 30 and 90 days. There may be a temporary waiver pending a full security and medical clearance, if necessary. If there are issues with the initial investigation this process could take longer.

After completion of the pre-employment clearances, Aviation Careers begins the process of working with the Academy on class dates in accordance with facility hiring needs throughout the fiscal year. The applicant will receive a Firm Offer Letter (FOL) approximately 30 days before their Academy date.

**Air Traffic Centralized Hiring Process**



# ATCS Centralized External Hiring – High Level Process

March 2011

# Controller Hiring

| Category | Total | % | Total | % | Total | % | Total | % | Total | % | Total | % | Total | % | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY | 2006 | 2006 | 2007 | 2007 | 2008 | 2008 | 2009 | 2009 | 2010 | 2010 | 2011 | 2011 | 2012 | 2012 | 2013 | 2013 |
| CTI Schools | 544 | 49% | 1019 | 56% | 823 | 37% | 335 | 19% | 252 | 25% | 245 | 29.7% | 467 | 50.5% | 360 | 65% |
| General Public | 44 | 4% | 130 | 7% | 653 | 30% | 1134 | 66% | 519 | 52% | 390 | 47.3% | 268 | 29% | 63 | 11% |
| VRA | 404 | 36% | 605 | 33% | 644 | 29% | 218 | 13% | 177 | 18% | 126 | 15.3% | 133 | 14.4% | 88 | 16% |
| All Others | 124 | 11% | 61 | 3% | 54 | 2% | 29 | 2% | 28 | 3% | 63 | 7.6% | 57 | 6.1% | 41 | 7% |
| GRAND TOTAL | 1116 | | 1815 | | 2196 | | 1731 | | 998 | | 824 | | 925 | | 552 | |

Through 04/20/2013



Figure 5.1 Controller Hiring Profile

*Source: A Plan for the Future 10-Year Strategy for the Air Traffic Control Workforce 2012 – 2021*
*http://www.faa.gov/air_traffic/publications/controller_staffing/media/CWP_2011.pdf*

## FY13 Hiring Plan

| FY | Terminal | % | En Route | % | Total |
|---|---|---|---|---|---|
| FY 2013 | 528 | 46.3% | 612 | 53.7% | 1140 |

# Medical Investigation

**Individuals must pass a rigid medical exam, which includes:**

- **Vision Standards** — Applicants for ATCS employment in an en route center or a terminal must have distant and near vision of 20/20 or better in each eye separately, without correction, or have lenses that correct distant and near vision to 20/20, each eye separately. Applicants for a flight service station specialist position must have distant and near vision of 20/20 or better in at least one eye, without correction, or have lenses that correct distant and near vision to 20/20, in at least one eye.

- **Color Vision Standards** — Applicants must have normal color vision.

- **Hearing Standards** — Applicants must have no hearing loss in either ear of more than 25 db at 500, 1,000 and 2,000 Hz, and no more than a 20 db loss in the better ear by audiometer, using ANSI (1969) standards.

- **Cardiovascular Standards** — Applicants must have no medical history of any form of heart disease. A history of high blood pressure requiring medication will require special review.

- **Neurological Standards** — Applicants must have no medical history or clinical diagnosis of a convulsive disorder, or a disturbance of consciousness, without satisfactory medical explanation of the cause, and must not be under any treatment, including preventive, for any condition of the nervous system.

- **Psychiatric Standard** — Any medical history or clinical diagnosis of a psychosis, or other severe mental disorders, is disqualifying.

- **Diabetes** — A medical history or diagnosis of diabetes mellitus will require special review.

- **Substance Abuse/Dependency** — A history of substance abuse/dependency, including alcohol, narcotic, non-narcotic drugs, and other substances will be extensively investigated.

- **Psychological Exam** — Individuals must take and pass a psychological exam.

- **General Medical** — All other medical conditions will be evaluated on an individual basis. All applicants' medical histories and current examinations will be carefully reviewed. This includes past medical records and, if applicable, a review of military medical records.

  http://www.faa.gov/about/office_org/headquarters_offices/ahr/jobs_careers/occupations/atc/medical/

The physical impairments/medical conditions that follow, unless otherwise noted, are disqualifying because there are medical and/or management reasons to conclude that an individual with such impairment/condition cannot perform the duties of the position without unacceptable risk to his or her own health, or to the health or safety of others (employees or the public).

**Initial Employment:**

Applicants for initial employment to air traffic control specialist positions must meet the following requirements. Unless otherwise indicated, these requirements are identical for all specializations.

**Eye**

1. *Visual Acuity*

    a. *Terminal and Center Positions* -- Applicants must demonstrate distant and near vision of 20/20 or better (Snellen or equivalent) in each eye separately. If glasses or contact lenses are required, refractive error that exceeds plus or minus 5.50 diopters of spherical equivalent or plus or minus 3.00 diopters of cylinder is disqualifying. The use of orthokeratology or radial keratotomy methods is not acceptable for purposes of meeting this requirement. The use of contact lenses for the correction of near vision only or the use of bifocal contact lenses for the correction of near vision is unacceptable.

    > *Equivalents in Near Visual Acuity Notations*
    > Standard Test Chart: 14/14
    > Snellen Metric: 0.50M
    > Jaeger: J-1
    > Metric: 6/6

2. *Color Vision* -- For all specializations, applicants must demonstrate normal color vision.

3. *Visual Fields*

    a. *Terminal and Center Positions* -- Applicants must demonstrate a normal central visual field (i.e, the field within 30 degrees of the fixation point, in each eye). They must also demonstrate a normal peripheral visual field, (i.e., the field of vision beyond the central field that extends 140 degrees in the horizontal meridian and 100 degrees in the vertical meridian, in each eye.

4. *Intraocular Pressure* -- For all specializations, if tonometry reveals either intraocular pressure greater than 20 mm of mercury, or a difference of 5 or more mm of mercury intraocular pressure between the two eyes, ophthalmological consultation is required to rule out the presence of glaucoma. If a diagnosis of glaucoma is made, or if any medication is routinely required for control of intraocular tension, the applicant is disqualified.

5. *Phorias*

    a. *Terminal and Center Positions* -- If an applicant demonstrates greater than 1-1/2 prism diopters of hyperphoria or greater than 10 prism diopters of esophoria or exophoria, evaluation by a qualified eye specialist is required. If this evaluation determines that bifoveal fixation and vergence-phoria relationships sufficient to prevent disruption of fusion under normal working conditions are not present, the applicant is disqualified.

6. *Eye Pathology* -- For all specializations, if examination of either eye or adnexa reveals any form of glaucoma or cataract formation, uveitis, or any other acute or chronic pathological condition that would be likely to interfere with proper function or likely to progress to that degree, the applicant is disqualified.

7. *Chronic Eye Disease* -- For all specializations, an applicant with any chronic disease of either eye that may interfere with visual function is disqualified.

8. *Ocular Motility* -- For terminal and center specialist positions, applicants must demonstrate full extraocular motility.

9. *History of Eye Surgery* -- For all specializations, a history of ocular surgery requires ophthalmological consultation. If consultation indicates that the condition that necessitated surgery could interfere with the visual function necessary for performance as an air traffic control specialist, the applicant is disqualified. A history of radial keratotomy is disqualifying.

**Ear, Nose, Throat, Mouth**

1. Examination must show no outer, middle, or inner ear disease, either acute or chronic, unilateral or bilateral.

2. Examination must show no active disease of either mastoid.

3. Examination must show no unhealed perforation of either eardrum.

4. Examination must show no deformity of either outer ear that might interfere with the use of headphones of the applied or semi-inserted type.

5. Examination must show no disease or deformity of the hard palate, soft palate, or tongue that interferes with enunciation. The applicant must demonstrate clearly understandable speech, and an absence of stuttering or stammering.

6. Applicants must demonstrate, by audiometry, no hearing loss in either ear of more than 25 decibels in the 500, 1000, or 2000 Hz ranges and must demonstrate no hearing loss in these ranges of more than 20 decibels in the better ear, using ISO (1964) or ANSI (1969) standards. Hearing loss in either ear of more than 40 decibels in the 4000 Hz range may necessitate an otological consultation. Incipient disease processes that may lead to early hearing loss will be cause for disqualification.

**Cardiovascular**

1. No medical history of any form of heart disease. Must demonstrate absence of heart disease to clinical examination, including resting and post-exercise electrocardiogram.

2. Blood pressure levels no greater than the appropriate values as shown below:

| Age | Maximum Reclining Blood Pressure | |
| --- | --- | --- |
| | Systolic | Diastolic |
| 20 to 29 | 140 | 90 |
| 30 to 39 | 150 | 90 |
| 40 to 49 | 150 | 100 |
| 50 & over | 160 | 100 |

3. Must demonstrate to X-ray no evidence of increase in heart size beyond normal limits.

4. An applicant under any form of treatment for any disease of the cardiovascular system is disqualified.

**Neurological**

1. No medical history or clinical diagnosis of a convulsive disorder.

2. No medical history or clinical diagnosis of a disturbance of consciousness without satisfactory

medical explanation of the cause.

3. No other disease of the nervous system that would constitute a hazard to safety in the air traffic control system.

4. An applicant under any form of treatment, including preventive treatment, of any disease of the nervous system, is disqualified.

**Musculoskeletal**

1. No deformity of spine or limbs of sufficient degree to interfere with satisfactory and safe performance of duty. Certain limitations of range of motion may be acceptable for certain specific options or positions, in which case acceptance of limitations will be noted specifically for that position or option only.

2. No absence of any extremity or digit, or any portion thereof, sufficient to interfere with the requirements for locomotion and manual dexterity of the position being sought. Acceptance of limitations for employment for a specific option or position will be noted for that option or position only.

3. No condition that predisposes to fatigue or discomfort induced by long periods of standing or sitting.

**General Medical**

1. No medical history or clinical diagnosis of diabetes mellitus.

2. Must possess such a body build as not to interfere with sitting in an ordinary office armchair.

3. Must have no other organic, functional, or structural disease, defect, or limitation found to indicate clinically a potential hazard to safety in the air traffic control system. A pertinent history and clinical evaluation, including laboratory evaluations, will be obtained, and when clinically indicated, special consultations or examinations will be accomplished.

**Psychiatric**

No established medical history or clinical diagnosis of any of the following:

1. A psychosis;

2. A neurosis; or

3. Any personality or mental disorder that clearly demonstrates a potential hazard to safety in the air traffic control system. Determinations will be based on medical case history (including past, social, and occupational adjustment) supported by clinical psychologists and board-certified psychiatrists, including such psychological tests as may be required as part of medical evaluation.

**Substance Dependency**

A history, review of all available records, and clinical and laboratory examination will be utilized to determine the presence or absence of substance dependency, including alcohol, narcotic, and non-narcotic drugs. Wherever clinically indicated, the applicant must demonstrate an absence of these on any clinical or psychological tests required as part of the medical evaluation.

**Retention Requirements:**

The physical requirements in this section apply to: (1) air traffic control specialists in the center and terminal specializations who are actively engaged in the separation and control of air traffic, (2) immediate supervisors of air traffic control specialists actively engaged in the separation and control of air traffic, and (3) air traffic control specialists in the station specialization who regularly perform flight assistance services.

Employees occupying the types of positions described above must requalify in an annual medical examination, usually given during the employee's month of birth. Controllers incurring illness, injury, or incapacitation at any time between the annual examinations must be medically cleared before returning to air traffic control duty. Examinations, including laboratory tests and consultations, will be accomplished to the extent required to determine medical clearance for continued duty. New employees are required to meet the retention requirements by examination during the first 10 months of service.

Employees who are found to be not physically or emotionally qualified for air traffic control duties at any time will be subject to reassignment to a position for which they are fully qualified, retirement for disability if eligible, or separation from the service.

To be medically qualified for retention, an air traffic control specialist must meet the following requirements. (Unless otherwise indicated these requirements are identical for all specializations.)

**Eye**

Retention requirements for vision and eye conditions are identical to the requirements for initial hire.

**Ear, Nose, and Throat**

1. *Ear Disease; Equilibrium*

   a. *Terminal and Center Positions* -- Must demonstrate no chronic disease of the outer or middle ear, unilateral or bilateral, that might interfere with the comfortable, efficient use of standard headphone apparatus or that might interfere with accurate perception of voice transmissions or spoken communications. Must have no ear disease that might cause a disturbance of equilibrium.

   b. *Flight Service Station Positions* -- Must demonstrate no chronic disease of the outer or middle ear, unilateral or bilateral, that might interfere with accurate perception of voice transmissions or spoken communications. Must have no ear disease that might cause a disturbance of equilibrium.

2. *Mastoid* -- No active disease of either mastoid.

3. *Eardrum Perforation* -- Must demonstrate no unhealed perforation of either eardrum.

4. *Speech* -- Must have no interference with enunciation, and must have clear speech free of stuttering or stammering.

5. *Hearing Loss* -- No hearing loss in either ear of more than 30 decibels in either the 500, 1000, or 2000 Hz ranges. No loss in these ranges greater than 25 decibels in the better ear. Non-static hearing loss in either ear of greater than 50 decibels in the 4000 Hz range will require an otological consultation.

**Cardiovascular**

1.  *Heart Disease*

    a.  *Terminal and Center Positions* -- No history or symptomatic form of heart disease or any form requiring therapy.

    b.  *Flight Service Station Positions* -- No symptomatic form of heart disease.

2.  *Disturbance of Rhythm; Other Abnormality; EKG* -- Must demonstrate no disturbance of rhythm or other cardiac abnormality on clinical examination, including resting, and when clinically indicated, post-exercise electrocardiography.

3.  *Blood Pressure* -- Retention requirements are identical to the requirements for initial hire.

4.  *Heart Size* -- Must have no increase in heart size beyond normal limits.

**Neurological**

Retention requirements are identical to the requirements for initial hire.

**Musculoskeletal**

Retention requirements are identical to the requirements for initial hire.

**General Medical**

1.  *Diabetes Mellitus*

    a.  *Terminal and Center Positions* -- An employee who has an established clinical diagnosis of diabetes mellitus will be evaluated for continued duty based upon the degree of control of the disease. Whether by diet alone, or diet and hypoglycemic drugs, control that results in the absence of symptoms and the absence of complications of the disease or the therapy may be considered as satisfactory control. A controller with diabetes mellitus who cannot demonstrate satisfactory control over specified and observed periods of 48 hours is not cleared for duty involving active air traffic control.

    b.  *Flight Service Station Positions* -- An employee who has an established clinical diagnosis of diabetes mellitus will be evaluated for continued duty based upon the degree of control of the disease. Whether by diet alone, or diet and hypoglycemic drugs, control that results in the absence of symptoms and the absence of complications of the disease or the therapy may be considered as satisfactory control.

2.  *Body Configuration* -- Must possess such a body build as not to interfere with sitting in an ordinary office armchair.

3.  *Other Medical Conditions* -- Must have no other organic, functional, or structural disease, defect, or limitation found to indicate clinically a potential hazard to safety in the air traffic control system. A pertinent history and clinical evaluation, including laboratory screening, will be obtained, and when clinically indicated, special consultations and examinations will be accomplished.

**Psychiatric**

1. *Psychotic Disorder* -- No established medical history or clinical diagnosis of a psychosis.

2. *Mental, Neurotic, or Personality Disorder* -- No neurosis, personality disorder, or mental disorder, that clearly indicates a potential hazard to safety in the air traffic control system. Determinations will be based on medical case history (including past, social, and occupational adjustment) supported by clinical psychologists and board-certified psychiatrists, including such psychological tests as may be required as part of medical evaluation.

3. *Alcoholism and/or Alcohol Abuse* -- No clinical diagnosis of alcoholism or alcohol abuse, since these constitute a hazard to safety in the air traffic control system. A history and clinical evaluation, including laboratory evaluation (when indicated) will be accomplished to determine the presence or absence of alcohol addiction, dependency, habituation, abuse, or use.

4. *Addiction, Dependency, Habituation, or Abuse of Dangerous Drugs* -- No clinical diagnosis of addiction, habituation, dependency, or abuse of any narcotic or non-narcotic drug, since these constitute a threat to safety in the air traffic control system. A history and clinical evaluation, including laboratory evaluation (when indicated), will be accomplished to determine the presence or absence of drug addiction, dependency, habituation, abuse, or use.

*Source: US Office of Personnel Management , Standards, Air Traffic Control Series 2152*
*http://www.opm.gov/qualifications/standards/IORs/GS2100/2152.htm*

For more information or for questions those students have about particular cases contact a regional Flight Surgeons Office"

| Region | NAME | TELEPHONE # |
|---|---|---|
| Alaska | Willis M. Simmons, M.D. | (907) 271-5431 |
| Central | Daniel K. Berry, D.O., Ph.D | (816) 329-3250 |
| Eastern | Harriet Lester, M.D. | (718) 553-3300 |
| Great Lakes | David Schall, M.D | (847) 294-7491 |
| New England | Paul H. Clark, M.D. | (781) 238-7300 |
| Northwest Mountain | Michael D. Jones, M.D. | (425) 227-2300 |
| Southern | Susan E. Northrup, M.D. | (404) 305-6150 |
| Southwest | G.J. Salazar, M.D., M.P.H. | (817) 222-5300 |
| Western Pacific | Stephen H. Goodman, M.D | (310) 725-3750 |

# Security Investigation

The FAA and OPM must investigate all persons who are considered for a job because the interests of national security require that all persons privileged to be employed in these departments and agencies of the government shall be reliable, trustworthy, of good conduct and character, and of complete and unswerving loyalty to the United States. This means that the appointment of each civilian employee in any department or agency of the government is subject to investigation. The scope of the investigation will vary, depending on the nature of the position and the degree of harm that an individual in that position could cause.

The requirement to be investigated applies whether or not the position requires a security clearance (in order to have access to classified national security information).

Air traffic controllers hold a job that provides access to information that is not for public dissemination. This includes the movement of elected officials, military, and local law enforcement. The responsibility of the controller is important to ensuring not only safe movement of aircraft, but the safe movement of these groups as they conduct their jobs. As a result, the security investigation is even more rigorous than a general background investigation and requires a "National Security Clearance."

The investigation is a job requirement. Providing the information is voluntary, but if you choose not to provide the required information, you will not meet the requirements of the job and will therefore not be considered further. If you are already employed by the federal government, your appointment will be terminated. The courts have upheld this principle.

The following are types of issues, which are reviewed as part of the background/security check:

- General or dishonorable military discharge
- Statutory debarment issue
- Government loyalty issues
- Evidence of dishonesty in an application or examination process (e.g., falsification of application)
- Drug-related offenses
- Felony offenses
- Firearms or explosives offenses
- Alcohol-related incidents
- Willful disregard of financial obligations
- Derogatory employment terminations
- Patterns and/or combinations of incidents which lead to questions about your behavior and intent

   http://www.faa.gov/about/office_org/headquarters_offices/ahr/jobs_careers/occupations/atc/security_investigation/

For more information or for questions those students have about particular cases contact a Regional Security Specialist.

| Region | NAME | TELEPHONE # |
|---|---|---|
| Alaska | Rowell, Marilyn | 907-271-4811 |
| Eastern | Ellison, Yvette (Supervisor) | 718-553-3129 |
| Eastern | Duarte, Maritza (Federal n - v) | 718-553-2577 |
| Great Lakes | Langosch, Susan (all of IN & WI) | 847-294-7701 |
| Great Lakes | Uehlein, Joe (Investigations Manager) | 847-294-7118 |
| New England | Whitaker-Gray, Pamela (Manager) | 781-238-7703 |
| New England | Azar, Laura (Federal) | 781-238-7709 |
| Northwest Mountain | Rodgers, Pat | 425-227-2714 |
| Northwest Mountain | Vacant | 425-227-2736 |
| Northwest Mountain | Rowell, Marilyn | 907-271-4811 |
| Southern | Parker, Barbara (Supervisor) | 404-305-6808 |
| Southern | Sanders, Val (Federal a - f) | 404-305-6706 |
| Southwest | Stinson, Lisa (supervisor) | 817-222-5719 |
| Southwest | Bernal, Rachel | 817-222-5718 |
| Southwest /Central | McBurrows, Walter, (CE Manager) | 816-329-3700 |
| Southwest/Central | Williams, Camisha (CE Region) | 816-329-3711 |
| Western Pacific | Ramos, Flor (Branch Manager) | 310-725-3726 |
| Western Pacific | Robinson, Donna (A - H/contract CA) | 310-725-3713 |



# Evaluations

The Air Traffic Collegiate Training Initiative Evaluation Model has evolved since the first evaluations were conducted in 2007. The model was built for program expansion and has been adjusted every year. The primary use of the evaluation model was to rank candidates that requested entry into the   Program. The FAA also used the model to recertify existing schools. The model includes four components and associated sub-factors that are assigned a score. The scores are added up to provide an overall score for comparison.

In January 2012, a new evaluation model was introduced. The new evaluation process requires institutions to complete a self-assessment and is concentrated more on the "technical" aspect of the "Partnership Agreement."

The evaluation has been broken the evaluation down into two primary areas:

**Administrative Evaluation**

In an effort to ensure that member institutions, at a minimum, remain at the level in which they were accepted into the CTI Program, the FAA conducts "technical" and "administrative" evaluations. These evaluations serve as documentation for continuing the partnership.

Administrative evaluations primarily address the areas associated with the institution and policy including:

- Component I Accreditation

- Component II Degree Programs

- Component III Faculty

- Component IV Program Support

- Component V EEO/Recruitment/Outreach

- Component VI Continuous Performance and Improvement Initiatives

**Technical Evaluation**

This is where we document the "technical" side of the college/university CTI Program. This section is to be completed and updated as necessary.

In an effort to ensure that member institutions satisfy the teaching of the FAA Objectives "AT Basics," the FAA conducts technical and administrative evaluations. These evaluations serve as documentation and justification for continuing the partnership.

- Component I Curriculum

- Component II Testing

- Component III Quality Control

- Component IV AT Basics Scorecard

**AT Basics Score-card/Mapping**

There are two parts to this evaluation: narrative questions included in this document and a spreadsheet that lists all elements of the AT Basics curriculum. Schools will be scored on areas associated with each element:

- Teaching of the material

- Quizzing of the material

- Part-tasking exercises where applicable

- Midterm or final examination testing of the element

Templates for the Evaluations can be found at:

KSN Share Point https://ksn2.faa.gov/ajl/ajl-1/ajl-14/cti/default.aspx

# Points of Contact

### FAA: Program Office

| POC | Phone | Title | Email |
|---|---|---|---|
| Terry Craft | 202-385-6788 | Manager | terry.craft@faa.gov |

### FAA: HR

| POC | Phone | Title | Email |
|---|---|---|---|
| Lexsee Waterford | (202) 267-7181 | Manager, AHR ATO Support Team Team, AHR-4 | lexsee.waterford@faa.gov |

### FAA: HR Aviation Careers

| POC | Phone | Title | Email |
|---|---|---|---|
| Amanda Quezada | (405) 954-3943 | Office of Human Resource Management, Aviation Careers Division | Amanda.Quezada@faa.gov |
| Beau Bruhwiler | 405-954-0637 | Office of Human Resource Management, Aviation Careers Division CTI Backup | Beau.Bruhwiler@faa.gov |

### FAA: Security

| POC | Phone | Title /Region | Email |
|---|---|---|---|
| Rowell, Marilyn | 907-271-4811 | Alaska | marilyn.rowell@faa.gov |
| Ellison, Yvette | 718-553-3129 | Eastern(Supervisor) | yvette.ellison@faa.gov |
| Duarte, Maritza | 718-553-2577 | Eastern | maritza.duarte@faa.gov |
| Langosch, Susan | 847-294-7701 | Great Lakes | susan.langosch@faa.gov |
| Uehlein, Joe | 847-294-7118 | Great Lakes (Investigations Manager) | joe.uehlein@faa.gov |
| Whitaker-Gray, Pamela | 781-238-7703 | New England (Manager) | pamela.whitaker-gray@faa.gov |
| Azar, Laura | 781-238-7709 | New England (Federal) | laura.j.azar@faa.gov |
| Rodgers, Pat | 425-227-2714 | Northwest Mountain | pat.rodgers@faa.gov |
| Parker, Barbara | 404-305-6808 | Southern (Supervisor) | barbara.parker@faa.gov |
| Sanders, Val | 404-305-6706 | Southern (Federal a - f) | val.sanders@faa.gov |
| Stinson, Lisa | 817-222-519 | Southwest (supervisor) | lisa.d.stinson@faa.gov |
| Bernal, Rachel | 817-222-5718 | Southwest | rachel.bernal@faa.gov |
| McBurrows, Walter, | 816-329-3700 | Central (CE Manager) | walter.mcburrows@faa.gov |
| Williams, Camisha | 816-329-3711 | Central (CE Region) | camisha.williams@faa.gov |
| Ramos, Flor | 310-725-3726 | Western Pacific (Branch Manager) | flor.ramos@faa.gov |
| Robinson, Donna | 310-725-3713 | Western Pacific (A - H/contract CA) | donna.robinson@faa.gov |

47

## CTI Schools Primary Contacts

| College | POC | POC Title | Phone1 | Email |
|---|---|---|---|---|
| Aims Community College | Les Wilkinson | ATC Coordinator | 970-339-6652 | lwilkin2@aims.edu |
| Arizona State University | Verne Latham | Lecturer | 480-727-1652 | verne.latham@asu.edu\ |
| Broward College | Andrew Sikora | Manager of the Air Traffic Control Simulation Lab | 954-201-8669 | asikora@broward.edu |
| Community College of Beaver County | James E. Scott | ATC Coordinator | 724-480-3603 | Jim.Scott@ccbc.edu |
| Daniel Webster College | Peter Wyman, | Associate Professor, Air Traffic Management | 603-577-6204 | wyman_peter@dwc.edu |
| Dowling College | Joseph Donofrio, | Assistant Professor of Aviation | 631-244-1320 | donofrij@dowling.edu |
| Eastern New Mexico - Roswell | Deborah Abingdon, | Air Traffic Control Faculty | 575-624-7023 | Deborah.abingdon@roswell.enmu.edu |
| Embry Riddle Aeronautical University, Daytona Beach | William Coyne | Associate Professor , ATM Coordinator | 386- 226-6794 | coynea7e@erau.edu |
| Embry-Riddle Aeronautical University, Prescott | Brent Spencer, | Assistant Professor, Project Coordinator | 928-777-3869 | Spenceb3@erau.edu |
| Florida Institute of Technology | Dr. Donna Wilt | Air Traffic Control Program Administrator | 321-674-8120 | dwilt@fit.edu |
| Florida State College at Jacksonville | Mr. Sam Fischer, | Project Coordinator, Air Traffic Control Program | 904-317-3844 | sfischer@fscj.edu |
| Green River Community College | Curtis E. (Curt) Scott, | Aviation and ATC Instructor | 253-833-9111 X4335 | cscott@greenriver.edu |
| Hampton University | Margaret Browning | Assistant Professor and CTI Program Manager | 757-727-5520 | Margaret.browning@hamptonu.edu |
| Hesston College | Dan Miller | Aviation Director | 800-995-7257 X8333 | danm@hesston.edu |
| Inter American University of Puerto Rico | Maria T. Franqui-Vélez | ATC CTI Program Manager | 787-279-1912 X2400 | mtfranqui@gmail.com |
| Jacksonville University | Dr. Juan R. Merkt | Director and Associate Professor of Aeronautics | 904-256-7895 | jmerkt@ju.edu |
| Kent State University | Lt. Col Maureen McFarland, | Academic Program Director, Aeronautics Division | 330-672-9867 | mmcfarl2@kent.edu |
| LeTourneau University | Sean Fortier, | Associate Dean, School of Aeronautical Science | 903-233-4221 | Seanfortier@letu.edu |
| Lewis University | William Parrot | Director, AT-CTI Program | 815-836-5809 | parrotwi@lewisu.edu |
| Metropolitan State University of Denver | Kevin R. Kuhlmann | Professor | 303-556-4623 | kuhlmank@msudenver.edu |
| Miami Dade College | Andre Naumann | Program Coordinator | 305-237-5952 | anaumann@mdc.edu |
| Middle Georgia State College | Ramey Pace | Chair, Air Traffic Management Department | 478-448-4701 | rpace@mgc.edu |
| Middle Tennessee State University | Ron Ferrara | Chair | 615-898-5835 | ron.ferrara@mtsu.edu |

48

| College | POC | POC Title | Phone1 | Email |
|---|---|---|---|---|
| **Minneapolis Community and Technical College** | Trena Mathis, | ATC Faculty | 952-826-2420 | trena.mathis@minneapolis.edu |
| **Mount San Antonio College** | Robert Rogus | Aeronautics Faculty, Co-Chairman Aeronautics Department, CTI Coordinator | 909-274-5006 | rrogus@mtsac.edu |
| **Purdue University** | Prof. Michael S. Nolan | Professor of Aviation Technology | 765-494-9962 | mnolan@purdue.edu |
| **Sacramento City College** | Donetta Webb | Dean, Advanced Technology | 916-558-2408 | webbd@scc.losrios.edu |
| **St. Cloud State University** | Dr. Steven L. Anderson | Professor | 320-308-2107 | slanderson@stcloudstate.edu |
| **Texas State Technical College – Waco** | Ramon Claudio | ATC Department Chair | 254-867-2086 | ramon.claudio@tstc.edu |
| **The Community College of Baltimore County** | Douglas Williams | Aviation Program Director | 443-840-4157 | dwilliams@ccbcmd.edu |
| **Tulsa Community College** | Gary Wescott | Coordinator | 918-828-4158 | gwescott@tulsacc.edu |
| **University of Alaska, Anchorage** | Sharon LaRue | Associate Professor | 907-786-7218 | afsll@uaa.alaska.edu |
| **University of North Dakota** | Paul V.J. Drechsel, | Associate Professor/Co-Director ATC Program | 701-777-4923 | drechsel@aero.und.edu |
| **University of Oklahoma** | Stephen West | Director, AT-CTI Training Program | 405-325-3586 | stephenwest@ou.edu |
| **Vaughn College of Aeronautics and Technology** | Sharon DeVivo | Senior Vice President | 718-429-6600 X102 | sharon.devivo@vaughn.edu |
| **Western Michigan University College of Aviation** | Ryan Seiler | Faculty Specialist , College of Aviation | 269-964-6652 | ryan.seiler@wmich.edu |

# Calendar

**Reporting of New CTI Students**

Schools must report all newly declared or eligible CTI students in their respective programs to Aviation Careers no later than the first day of July, October, and February.

This list includes all students who are in programs that will make them eligible whether they have declared the intent or are in a degree program that will automatically make them eligible.

**ATSAT Register**

The AT-SAT eligibility register is provided by the partner institutions to Aviation Careers in order to schedule AT-SAT testing. The AT-SAT test is schedule twice per year, normally in the fall and spring. CTI students are eligible to take the test up to one year before anticipated graduation and the scores are good for three years. If the test score expires or will expire within a testing cycle, the applicant must contact Aviation Careers to be placed on the test list..

☐

# AT Basics Training Objectives

The list of objectives in this document was originally developed by the FAA Academy in January 1997 for two purposes: 1) to guide the design of the instruction for the Air Traffic Basics Course (Air Traffic Basics is a course on fundamental ATC knowledge that is common to En Route, Terminal, and Flight Service Specialist options and is taken as part of the FAA Initial Qualifications Training Program for ATCSs at the Academy), and 2) to provide guidance to institutions in the Air Traffic Collegiate Training Initiative (CTI) on FAA expectations for their graduates' level of knowledge.

After the objectives were established, individual lessons and their respective content and instructional activities were developed.  As a part of this normal course development process, the initial list of objectives was reviewed and refined as each of the lessons were developed.  The resulting list of revised objectives is provided below.

All AT-CTI partner institutions ensure that the content contained in the "objectives" is included in at least one of the courses that required for the approved degree program. It should be noted that most of the objectives are fundamental to any aviation degree.

| Lesson/Topic | Objectives |
|---|---|
| **Introduction to the ATC System and National Airspace System** | In accordance with Order 7110.65, 7210.3, AC 61-27, and the AIM, the student will identify the following concepts: <br><br>1.    Elements of the National Airspace System (NAS) <br>2.    Role of the Traffic Management System (TMS) within the NAS <br><br>Without references and in accordance with AC 61-27 and  Orders 7110.65, Chapter 2; 7110.10, Chapter 1; 3120.4, and the AIM, the student will identify the primary functions and associated team responsibilities (to include interrelationships between positions) of: <br><br>1.    Air Traffic Control Tower <br>　　a. Local <br>　　b. Ground <br>　　c. Clearance Delivery/Flight Data <br><br>2.    Approach Control <br>　　a. Arrival <br>　　b. Departure <br><br>3.    Air Route Traffic Control Center <br>　　a. Radar <br>　　b. Handoff <br>　　c. Radar Associate (D side) <br>　　d. Assistant Controller (A side) <br><br>4.    Flight Service Station <br>　　a. Weather Observer <br>　　b. Flight Data/Search and Rescue/Notice to Airmen <br>　　c. Preflight (includes pilot weather briefing) <br>　　d. Inflight <br>　　e. Flight Watch <br>　　f  Broadcast <br>　　g. Coordinator <br>　　h. Controller-in-Charge <br><br>In accordance with Order 7110.65, Chapter 2, you will identify duty priority, procedural preference, and operational priorities of the Air Traffic Controller. |

| Lesson/Topic | Objectives |
|---|---|
| **Teamwork in the ATC Environment** | The student will discuss the:<br><br>1. Characteristics of effective teams<br>2. Functions affecting team performance<br>3. Stages of group development |
| **Airports** | In accordance with the AIM, you will identify airport:<br><br>1. Lighting<br>2. Markings |
| **Airspace** | In accordance with FAR, Parts 71 and 73, ATC Orders 7110.65 and 7400.2, and the AIM, you will identify:<br><br>1. Classes of airspace and their use<br>2. Special Use Airspace |
| **Introduction to Federal Aviation Regulations** | In accordance with the Federal Aviation Regulations (FARs), Parts 1, 65, 67, and 91 and FAA Orders 7110.65 and 3930.3, you will identify:<br><br>1. Terms and definitions<br>2. General operating rules<br>3. General flight rules<br>4. ATC certification<br>5. Medical requirements |
| **Wake Turbulence** | In accordance with the AIM , FAA Order 7110.65, and AC 61-23C *Pilot's Handbook*, you will identify the following categories related to wake turbulence:<br><br>1. Definition of Wake Turbulence<br>2. Factors Affecting Wake Turbulence Intensity<br>3. Wingtip Vortices<br>4. Induced Roll<br>5. Helicopter Downwash<br>6. Jet Blast |
| **Aircraft Characteristics and Aircraft Recognition** | In accordance with FAA Order 7110.65 and the ATG-2, *Tri-Option Controller Reference Manual*, you will:<br><br>1. Identify aircraft:<br>   A. Categories<br>   B. Weight Classes<br>   C. Designators<br>   D. Performance Characteristics<br>   E. Identification Features<br><br>2. Recognize selected aircraft |
| **Special Operations** | In accordance with FAA Orders 7110.65 and 7610.4, Special Military Operations, you will identify flights requiring special handling, including terms and definitions associated with these flights. |
| **Basic Navigation** | In accordance with the FAA Order 7110.65, *An Invitation to Fly*, AC 61-23, *The Pilot's Handbook*, and the AIM, you will identify:<br><br>1. Reference lines of the Earth and their purpose<br>2. Great circle route, distance, and direction measurement<br>3. Methods of time conversion and acronyms used with time<br>4. Magnetic variations and headings<br>5. Basic methods of navigation<br>6. Basic calculations for time, speed, and distance<br>7. Effects of wind on flight<br>8. Effects of altitude and temperature on speed<br><br>In accordance with AC 61-23, *The Pilot's Handbook,* you will compute aircraft time, speed, and distance. |

| Lesson/Topic | Objectives |
|---|---|
| **Radio and Satellite Navigation** | In accordance with FAA ORDER 7110.65; FAR, PART 71.75; the AIM, AC 61-23, *The Pilot's Handbook*, and FAA-H-8083-15 *Instrument Procedures Handbook, Instrument Flying Handbook,* you will identify the characteristics of:<br><br>1.   Radio and Satellite Navigation<br>2.   Federal Airway System |
| **VFR Charts and Publications** | Given aeronautical charts and an airport facility directory, and in accordance with the AIM, AC 61-23, FAA Order 7110.65, and chart/directory legends (Dallas-Fort Worth VFR Sectional Aeronautical Chart, a Sample VFR Terminal Area Chart, South Central U.S. Airport/Facility Directory), you will identify the purpose, features,  contents, and specific items and information (e.g., NAVAIDS, airport, elevation, etc.) related to:<br><br>1.   Sectional Aeronautical Charts<br>2.   VFR Terminal Area Charts<br>3.   World Aeronautical Charts<br>4.   Airport/Facility Directory |
| **En Route IFR Charts** | In accordance with FAA Order 7110.65 the AIM, AC 61-23, and as depicted in the chart legends (L-5/L-6 En Route Low Altitude Chart; H-2/H-4 En Route High Altitude Chart; IFR Area Chart), you will identify the purpose, contents, and specific items and information for the following En Route charts:<br><br>1.   Low Altitude<br>2.   High Altitude<br>3.   IFR Area |
| **SIDs and STARs** | In accordance with FAA Order 7110.65, AIM, FAA-H-8083-15 *Instrument Procedures Handbook,* and the *U.S. Terminal Procedures Publication,* you will identify the purpose, types, contents, and specific items and information (e.g., altitudes, headings, etc.) of:<br><br>1.   SIDs<br>2.   STARs |
| **Approaches** | In accordance with FAA Order 7110.65, the AIM, FAA-H-8083-15 *Instrument Procedures Handbook,* and the *U.S. Terminal Procedures Publication,* you will identify types of approaches, and the purpose, contents, and specific items and information (e.g., minimum altitudes, courses, missed approaches, etc.) of an Instrument Approach Procedure (IAP) Chart.<br><br>Given an IAP Chart, and in accordance with a U.S. Terminal Procedures Chart, you will identify the contents and geographical features. |
| **Pilot's Environment** | In accordance with the AIM; AC 61-23, *The Pilot's Book of Aeronautical Knowledge;* AC 61-27, *Instrument Flying Handbook;* and ATC and TCAS System Overview, you will identify:<br><br>1.   Characteristics and uses of aircraft instrumentation<br>2.   Physiological factors affecting flight |
| **Introduction to Emergencies** | In accordance with FAA Orders 7110.65 and 7110.10 and the AIM, you will identify:<br><br>1.   The meaning of distress, urgency, mayday, and pan-pan<br>2.   Roles and responsibilities of the pilot and controller during an emergency.<br>3.   Information necessary to handle an emergency<br>4.   Types of emergencies |
| **Search and Rescue** | In accordance with FAA Orders 7110.10 and 7110.65 and the AIM, you will identify the:<br><br>1.   Purpose of the National Search and Rescue Plan<br>2.   Roles, responsibilities, and procedures of search and rescue |

| Lesson/Topic | Objectives |
|---|---|
| **Fundamentals of Weather and Aviation Weather Services** | In accordance with AC 00-45, Aviation Weather Services, and AC 00-6, Aviation Weather, you will identify: <br><br> 1. Characteristics of the atmosphere <br> 2. Principles of atmospheric temperature <br> 3. Characteristics and modification of air masses <br> 4. Characteristics of atmospheric pressure <br> 5. Formation and types of fronts <br> 6. Characteristics of convection currents <br> 7. Causes of wind <br> 8. Formation and types of clouds <br> 9. Formation and types of precipitation <br><br> In accordance with AC 00-45, Aviation Weather Services, and AC 00-6, Aviation Weather, you will identify the duties and responsibilities of the National Weather Service (NWS) and the Center Weather Service Unit (CWSU). |
| **Hazardous Weather** | In accordance with Aviation Weather, AC 00-6 and Aviation Weather Services, AC 00-45, and the AIM, you will identify the characteristics of hazardous weather that impact aviation. |
| **Current Weather** | In accordance with AC 00-45, Aviation Weather Services, and AC 00-6, Aviation Weather, you will identify the contents of METAR, including associated contractions and terms. <br><br> Given examples of current weather reports, and in accordance with AC 00-45, Aviation Weather Services, and FAA Order 7110.10, you will decode METARs. |
| **Pilot Reports (PIREP)** | In accordance with FAA Orders 7110.65 and 7110.10, and the AIM, you will identify the purpose, uses, and contents of Pilot Weather Reports (PIREP). <br><br> In accordance with FAA Order 7110.10, you will decode PIREPs. |
| **Forecasts and Advisories** | In accordance with AC 00-45, Aviation Weather Services, you will identify the contents and purpose of the following weather products: <br><br> 1. Aviation Terminal Forecast (TAF) <br> 2. Area Forecast (FA) <br> 3. Airman's Meteorological Information (AIRMET) <br> 4. Significant Meteorological Information (SIGMET) <br> 5. Convective SIGMET (WST) <br> 6. Center Weather Advisory (CWA) <br> 7. Meteorological Impact Statement (MIS) <br> 8. Winds Aloft Forecast (FD) <br><br> In accordance with AC 00-45, Aviation Weather Services, you will decode the following weather products: <br><br> 1. Aviation Terminal Forecast (TAF) <br> 2. Area Forecast (FA) <br> 3. Airman's Meteorological Information (AIRMET) <br> 4. Significant Meteorological Information (SIGMET) <br> 5. Convective SIGMET (WST) <br> 6. Center Weather Advisory (CWA) <br> 7. Meteorological Impact Statement (MIS) <br> 8. Winds Aloft Forecast (FD) |
| **Basic Communications** | In accordance with FAA Orders 7110.65 and 7110.10, you will identify: <br><br> 1. Radio and interphone communications <br> 2. ICAO phonetics <br> 3. Numbers usage <br> 4. Basic phraseology <br> 5. Coordination procedures <br> 6. Purpose and steps of the position relief briefing |

| Lesson/Topic | Objectives |
|---|---|
| **Strip marking** | In accordance with FAA Orders 7110.65 and 7110.10, you will identify:<br><br>1. Purpose and legal requirements of flight progress strips<br>2. Meaning of selected abbreviations and symbols used in strip marking<br>3. Content requirements of selected blocks in terminal, en route, and flight service strips |
| **ATC Clearances** | In accordance with FAA Order 7110.65 and FAR 91.123, you will identify:<br><br>1. Purpose of an ATC clearance<br>2. Pilot's responsibility for compliance with an ATC clearance<br>3. ATC clearance items and their sequence<br>4. Clearance prefixes and their use<br>5. Types of ATC clearances |

# **FAQs**



---

## SECTION 1:  General CTI Program Questions

**1. Question: What is the expected duration of the CTI Program at the universities - being that so many controllers have been hired already, what is the Program's expected "expiration date"? That will help to know when to stop enrolling students who may not have good employment possibilities.**

*Answer: There is no movement towards ending the CTI Program; as a matter of fact, the hiring source for controllers may be military veterans and CTI students as the need for hiring will diminish slightly from the peak of 2007-08.  Employment opportunities will always be dependent on the needs of the agency. For information on future hiring plans see the section entitled "Controller Hiring."*

---

## SECTION 2:  Public Inquiry

**1. Question: How do I become an air traffic controller?**

*Answer:  For a candidate to become an air traffic controller in the FAA for the first time, there are generally four paths to employment. First there must be an "announcement" or "job vacancy" that is open. All announcements are listed at www.usajobs.gov.*

*The path depends on whether or not the candidate has previous air traffic control experience.*

***Candidates with Experience:***

*Prior air traffic control experience announcements are reserved for those who have been certified and actively controlled air traffic either with the military or for a private entity.*

> ***Retired Military Controllers (RMC):***
>
> *This announcement is for candidates who previously retired or will retire from the military and have actively controlled air traffic. This program provides for appointment for five-year time periods. They are on terminal leave pending retirement from active duty military service, or retired from active duty on or after September 17, 1999.*
>
> *Applicants must meet at a minimum the following requirements:*
>
> - *Be a United States citizen*
> - *Pass a medical examination*
> - *Pass a security investigation*
> - *Speak English clearly enough to be understood over communications equipment*
> - *May need to complete an interview*

***Veterans Recruitment Appointment (VRA)***

> *The VRA is a special authority by which agencies can appoint an eligible veteran without competition. To qualify for this announcement, at a minimum, controllers must have:*

- *52 consecutive weeks of air traffic control experience in a military or civilian air traffic control facility that shows you have the knowledge, skills, and ability to perform air traffic controller duties*

- *You must be discharged from active duty or on terminal leave, and have not reached age 31. These types of veterans are eligible to apply for a VRA appointment:*

  - *Disabled veterans*

  - *Veterans separated from active duty within three years*

  - *Veterans who served on active duty in the Armed Forces during a war declared by Congress, or in a campaign or expedition for which a campaign badge has been authorized*

  - *Veterans who, while serving on active duty in the Armed Forces, participated in a military operation for which the Armed Forces Service Medal was awarded*

*Applicants must meet at a minimum the following requirements:*

- *Be a United States citizen*

- *In most cases, not have reached age 31*

- *Pass a medical examination*

- *Pass a security investigation*

- *Achieve a score of at least 70 on the FAA pre-employment test (ATSAT)*

- *Speak English clearly enough to be understood over communications equipment*

- *Complete an interview*

**Control Tower Operator**

*This announcement is for candidates who have experience working air traffic control and possess an FAA-issued Control Tower Operator (CTO) certificate (i.e., have been certified to work in a control tower).*

*Applicants must meet at a minimum the following requirements:*

- *Be a United States citizen*

- *In most cases, not have reached age 31*

- *Pass a medical examination*

- *Pass a security investigation*

- *Achieve a score of at least 70 on the FAA pre-employment test (AT-SAT)*

- *Speak English clearly enough to be understood over communications equipment*

- *Complete an interview*

60

*Candidates without Experience:*

### *Public Announcement*

*A public announcement is the solicitation of candidates for openings across the country.*

*Applicants must meet at a minimum the following requirements:*

- *Be a United States citizen*
- *In most cases, not have reached age 31*
- *Pass a medical examination*
- *Pass a security investigation*
- *Have three years of progressively responsible work experience and/or a full four-year course of study leading to a Bachelor's degree, or some combination of the two*
- *Achieve a score of at least 70 on the FAA pre-employment test*
- *Speak English clearly enough to be understood over communications equipment*
- *Complete an interview*

### *Collegiate Training Initiative CTI*

*A CTI announcement is open to those candidates who successfully meet the requirements of the CTI Program including:*

*To qualify for employment consideration with the FAA, CTI program graduates must meet all legal and regulatory requirements including, but not limited to, the following:*

- *Achieve a qualifying score on the current FAA testing procedures*
- *Successfully complete the FAA interview process*
- *Receive an institutional recommendation*
- *Meet entry level ATCS medical standards*
- *Pass a pre-employment drug test*
- *Pass the background investigation for security and suitability*
- *Have U.S. citizenship*
- *May not have reached their 31st birthday prior to initial appointment in the terminal or en route options*
- *Complete institutional graduation requirements*

*A list of approved CTI institutions, degrees offered and contact information can be found at: http://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/operations/at_cti*

## 2.  What is the FAA Air Traffic Collegiate Training Initiative (CTI) Program?

*Answer: The FAA CTI Program encourages potential college students who are interested in aviation, and specifically, air traffic control, to apply for a job as an air traffic controller utilizing a separate "path" provided that they meet additional requirements:*

*Successfully complete the FAA-approved AT-CTI program and:*

61

- *Receive a degree from the FAA-approved AT-CTI school, in an aviation-related field, that includes the teaching objectives required by the FAA*

- *Receive an institutional recommendation for employment from an authorized school official*

- *Achieve a passing score (70 or above) on the AT-SAT (pre-employment) test*

- *Be a United States citizen at the time of application for the AT-SAT test*

- *Have not reached their 31st birthday when entering on duty in an FAA terminal or en route facility*

- *Meet FAA medical, security, and suitability requirements*

- *Successfully complete an interview to determine whether the candidate possesses the personal characteristics necessary for the performance of air traffic control work and that the candidate is able to speak English clearly enough to be understood over radios, intercoms, and similar communications equipment*

**3. Question: I live in (City, State) and I wanted to know if the program is offered down here?**

*Answer: Currently there are 36 schools located throughout the US and Puerto Rico. The list is located at:* **http://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/operations/at_cti/**

*There are points of contact listed for each school who can give you specific information about each school. Additionally, there are links to the institutions' websites.*

**4. Question: I Should I select a two-year or four-year program?**

*Answer: That decision is totally up to each individual. It is your preference as to the type of degree that you want to obtain. You should consider a degree that gives you flexibility in the marketplace should you decide not to become an Air Traffic Controller. If you are interested in aviation, we encourage you to look at a degree that will give you broad appeal to future employers. There are many jobs available in the FAA other than an Air Traffic Controller Specialist (ATCS) as well as the aviation community.*

*Understand that CTI schools are not training ATCS per se, but providing an aviation education that includes FAA mandatory and approved curriculum in the degree programs that qualify them as CTI partner institutions. Graduating with an approved degree from a CTI school is only one of the requirements to become an ATCS. Other requirements are:*

- o *Receive an official school recommendation*

- o *Be a United States citizen*

- o *In most cases, be under the age of 31*

- o *Pass a medical examination*

- o *Pass a security investigation*

- o *Achieve a score of at least 70 on the FAA pre-employment test*

- o *Speak English clearly enough for others to understand you on communications equipment*

- o *Complete an interview*

62

**5. Question: What's the hire rate for new graduates?**

*Answer:* *The new hire rate is determined strictly by the number of controllers we need in any given year. This may vary due to many factors including the economy, mandatory retirement, etc. According to our projections, which can be found in the Controller Workforce Plan, we are looking at hiring about 1,000 new controllers per year for the next 10 years.*

*There are a number of hiring sources including former military controllers, CTI graduates, I, and on occasion general public with no experience required. These hiring sources will determine the size of the pool thus determine the rate of hire from any individual source.*

**6. Question: Should I go to a school that offers a certificate program, an Associate's degree program, or a Bachelor's degree program?**

*Answer:* *The type of college program you enroll in is entirely based on your goals and preferences.*

*Degree programs are based on the amount of knowledge you will receive about a given area of study. Some jobs require a "certificate." These are usually reserved for career entry where there is not a specific college degree for the knowledge required by the employer. As for an Associate's degree versus a Bachelor's degree, again, this depends on what your future employer may require as a minimum and what will make you competitive with other applicants.*

*Of course, other considerations must be taken into account including financial obligations.*

*The bottom line is to choose a degree that will make you competitive in an aviation field and that you can use provided you are not hired as an air traffic controller.*

**7. Question: Will the CTI Program and degree train me to be an air traffic controller?**

*Answer:* *The CTI Program is not specifically training to be an air traffic controller. The degree programs offered by CTI-approved institutions vary and are all aviation related. The only requirement for the school is that the "basics" of aviation or air traffic are included within the courses required for the approved degree program. The subjects are fundamental to aviation and include aviation weather, airspace, clearances, map-reading, federal air regulations, etc.*

*Some institutions may offer degrees that are more air traffic control intensive, but this is not required by the FAA (as part of the agreement between the institution and the FAA) to be included in the CTI Program.*

**8. Question: Can you recommend a CTI school to attend?**

*Answer:* *The FAA cannot recommend any school. All CTI institutions are treated equally for their primary purpose – which is to include aviation fundamentals within the classes required for the approved degree. These fundamentals are necessary for almost any job in aviation. The candidate should contact the schools they are interested in and talk to them about the degrees that they provide.*

**9. Question: Are there CTI Schools that are more successful than others?**

*Answer:* *Success is based primarily on the applicant and his/her abilities. The agreement between the FAA and the approved institution is that they include the fundamentals of aviation within classes that are part of the degree program. These fundamentals are necessary for almost any job in aviation. Although there are some schools which offer degrees that include more intensive ATC curriculum, they do this as a service to their students. This may help a student once they become an air traffic controller, but the FAA takes full responsibility for training all air traffic control students.*

63

*All CTI approved institutions are treated equally when it comes to the ability to apply for a job as an air traffic controller under the CTI Vacancy Announcement. The success in getting hired is based on a candidate's application, experience, networking, and most importantly, the Air Traffic Skills and Training aptitude (AT-SAT) test. All applicants must pass the aptitude test, which is a measure of the candidate's aptitude to become a certified air traffic controller. Knowledge and college education have very little influence on the aptitude and test score.*

**10. Question: "I want to take Air Traffic Controller classes. How do I apply?"**

***Answer:*** *There are no air traffic controller classes, specifically. If you mean that you are interested in becoming an air traffic controller.  In order to apply as an air traffic controller under the Collegiate Training Initiative announcement, it is required that you complete one of the degrees at the approved CTI institution.*

**11. Question: How do I apply for "FAA School "and how much does it cost?**

***Answer:*** *The FAA trains all new air traffic controllers at the FAA Academy in Oklahoma City. This training takes place after a candidate accepts a job offer. All new controllers must be selected from the application under the various vacancy announcements. There is no cost for the training; and, as a matter of fact, you get paid during your training.*

*The FAA CTI Program is an agreement to allow those graduates with approved degree programs from approved institutions to apply for a job as an air traffic controller. The cost varies from institution to institution and degree type.*

**12. Question: Is there a CTI school I can attend online?**

***Answer:*** *CTI schools are public colleges and universities. Under the CTI Program, the FAA recognized the "Aeronautical/Aviation Degree" from partner schools.  Some colleges and universities offer some of their "general education" courses online, but we are not aware of any institution that is part of the CTI Program that allows you to complete the entire degree online.*

*Due to the nature of ATC, specifically the teamwork concept,  it is beneficial to have the one-on-one experience and  many schools provide hands-on part-tasking and simulation that does not lend itself to an online experience.*

***13. Question:*** **Is there a school that offers air traffic certification?**

***Answer:*** *The FAA is the only body that provides "certification" for air traffic controllers.*

---

**SECTION 3:  Application Process**

---

**1. Question: Are there any plans to change the "geographic selection" to more than two states?**

***Answer:*** *At this time there are no plans to change the geographic selection. This method of selecting states was an effort to ensure that those who were native to a local area were able to stay in that area as a controller (if they so desired). This however, has not always proven to be the case as applicants appear to change states based on the perception of where hiring will take place.*

*As with all program objectives, we will be exploring this one to determine if it indeed meets our goal.*

**2. Question: At what point in the CTI process are specific items weighted (i.e., Veterans' Preference, AT-SAT score, geographical preference, ethnicity, degree(s), and pilot certificates)?**

*Answer: The selection panel uses a list of vacancies based on the state location of the facility and a list of candidates that are separated into "Qualified" or "Well-Qualified" who have selected that particular state on their FAA application. .*

*If there are veterans or qualifying "disabled vets" who are entitled to "preference" points, they will be added to the top of the respective lists.*

*There are no preferences whatsoever for ethnicity or any other EEO protected class. Ethnicity is a protected class, meaning that you cannot discriminate based on an applicant's ethnicity therefore it does not carry a selection weight.*

*Degrees and certificates should be listed in section titled "Other Qualifications" of the candidate application for selecting officials to review; but, at this time we do not assign a weight to the degree but hiring officials do review the application for a complete picture of the candidate.*

**3. Question: Will students have the option of choosing terminal or en route when they are ready *to fill out their job application?***

*Answer: Currently, there is no method to indicate service unit (terminal or en route) preference. There are some inherent issues with making this a preference, for example, if a candidate selects en route, but the particular state he/she selected the en route centers did not have vacancies, yet the terminal facility did – the student will not be considered for the opening in terminal.*

*We will discuss this issue with the service units to determine if they want to be provided lists based on facility "type" preference.*

**SECTION 4:  Hiring and Selection**

**1. Question: Does training for a specific facility increase the odds of a pick-up?**

*Answer: In general, the selecting officials from the service units (terminal and en route) are not privy to the local facilities taught within the CTI curriculum at each school. The CTI Program is based on AT Basics curriculum being taught, graduates should be prepared for the Academy. The knowledge of a local facility may help the graduate to grasp the application of AT procedures and concepts, but will not necessarily ensure that they are picked up by the facility which is taught at the institution.*

**2. Question: It's very disturbing that CTI students aren't getting hired with a "Qualified" score on the AT-SAT.  The AT-SAT should be issued earlier than the final semester if this policy stays in place.**

*Answer: There is a perception that those who score between a 70 and an 84.9 and are classified by Human Resources as "qualified" will not get a job. This is not necessarily the case as it depends on the state in which the applicant is selected. The larger states that have high numbers of facilities also have high numbers of applicants. This provides a large number of applicants for a limited number of jobs available and the hiring officials may not get to the "qualified" list. There are other cases where a student has selected a smaller state where there are no "well-qualified" applicants and have been selected off the "qualified" list.*

*The AT-SAT can be taken up to a year before graduation. Typically, the contractor who administers the test are bound by contracted locations and timelines based on availability of those locations. If you have a student who is eligible for the AT-SAT their name should be forwarded to Aviation Careers as soon as possible.*

**3. Question: In 2010 I asked if the FAA would consider moving the Spring Hiring Panel meeting back to late April, so schools on term schedule (quarters) that had students graduating in the winter quarter (which ends in late March) would be eligible for the Spring Hiring Panel. This would mean that the student could avoid waiting nearly seven months (between March and late October) for the Fall Hiring Panel which has traditionally met in late October or early November.  Do you have any news regarding moving the Spring Panel back to late April?**

*Answer: At this time there is no movement towards conducting the Spring Hiring Panel in April. The Spring Panel is usually a follow-up panel to select candidates for ATC positions for the remainder of the current fiscal year and replace students selected in the fall who did not accept an offer, thereby filling in new gaps not realized in the fall.*

*The panels are set up by workforce services and the service unit (terminal and en route) as hiring needs are identified.*

**4. Question: Can a student be recommended a second time for employment consideration through the AT-CTI hiring source if the graduate has been hired and terminated or has resigned from the FAA?**

*Answer:  No. There is only one opportunity for employment through the AT-CTI hiring source. HROI - Air Traffic-Collegiate Training Initiative (AT-CTI) Standard Operating Procedures, paragraph 7d states, "Reapplying to the AT-CTI Program: Candidates previously hired through the AT-CTI Program may not reapply through this hiring source."*

**5. Question: If an applicant fails to successfully complete/pass the interview stage for whatever reason, what are his/her options for further employment consideration, if any?**

*Answer:  If an applicant fails the interview, he/she is moved back to the list for referral to future Centralized Hiring Panels (CSP).*

**6. Question: If an applicant does not accept a Tentative Offer Letter (TOL) for whatever reason, what are his/her options for further employment consideration, if any?**

*Answer:  If an applicant "does not accept a TOL," he/she is moved back to the list for referral to future CSPs.*

**7. Question: If an applicant does not accept a Firm Offer Letter (FOL) for whatever reason, what are his/her options for further employment consideration, if any?**

*Answer:  If an applicant "does not accept a FOL," he/she is moved back to the list for referral to future CSPs.*

**8. Question: Is an applicant who is selected at a CSP and successfully completes an interview and initial Employment Agreement paperwork guaranteed a TOL eventually?**

*Answer:  If an applicant is selected and recommended after the interview, he/she should receive a TOL with the possible exception including Congressional/Presidential hiring freezes or budget actions where the FAA cannot hire."*

**9. Question: Is an applicant receives a TOL can they apply for again for the position while undergoing background and medical clearances with different geographic preferences, in an attempt to receive a TOL faster?**

*Answer: The applicant can reapply while in a waiting status, although if it is because of budget or law there would probably be no new announcements.*

**10. Question: Once an applicant is selected at a CSP, is their application somehow removed from further employment consideration at future CSPs (assuming their application is still currently submitted and under the one year of eligibility for employment consideration?**

*Answer: If an applicant is selected for an interview from a CSP, he/she will remain in the list of eligible referrals with a note that he/she has been selected. Most selecting officials will not select someone already in process.*

## SECTION 5:  Air Traffic Skill Assessment Test (ATSAT)

**1. Question: Is it possible that CTI students will have the option to retake the AT-SAT after one year if they pass instead of having them wait three years before being permitted to retake the test?**

*Answer: Currently, there is conflicting information on when a CTI graduate can retake the ATSAT Currently, the policy is that if a candidate fails the test by scoring less than a 70, they can retake the test after one year. Those who pass the test cannot retake the test for three years. The thought is that they have passed the test and there is no need to re-pass the test.*

*With the hiring groups being divided into "qualified" (AT-SAT scores of 70-84.9) and "well-qualified" (AT-SAT scores of 85 or greater,  the perception is that those who make the "qualified" list are not going to get an offer for employment.*

*The Program Office is working with Human Resources to determine additional criteria for "well-qualified" as well as whether the AT-SAT can be retaken before the current three-year timeline.*

**2. Question: Why can students only take the AT-SAT twice? It's disturbing that students who receive the score of "Qualified" have to wait three years until that score expires, while those who totally fail the test can retake it in a year.**

*Answer: The students recommended by the CTI  Institution can take the ATSAT twice. The timeline is dependent on the initial test results. Those who pass the test (score greater than 70) are required to wait three years. Those who do not pass the test (score less than 70) may retake the test after one year.*

*We do understand the frustration associated with this policy. It is a remnant of the era when there was only one list for CTI students. As the hiring pools became larger, we split the lists into "qualified" and "well-qualified" to ensure that the selecting officials had a more manageable list to choose from.*

*The Program Office is working with Human Resources to determine additional criteria for "well-qualified" as well as determining whether the AT-SAT can be retaken before the current three-year timeline.*

## SECTION 6: Air Traffic Basics

**1. Question: Can we get the FAA provided AT Basics curriculum in June of each year  so that adjustments can be made to courses in the summer and we can make all appropriate adjustments for the next semester class during the summer recess?**

*Answer*: Currently, the AT Basics curriculum is provided to institutions in the fall. The FAA Academy compiles the most up-to-date lesson plans and student handouts and provides DVDs to the institutions.

As AT Basics is continuously updated, based on revisions to orders and policies, we post any updates to the CTI webpage..

## 2. Question: Is the AT Basics test a pre-hire test?

*Answer*:  The AT Basics "pre-test" is a test given to all new hires who bypassed AT Basics. The largest group  of test takes is the CTI graduates. This test is "post-hire" given the first day of initial training for either terminal or en route at the Academy to measure the AT Basics knowledge of all incoming CTI students. This is subject to change, so students are encouraged to remain familiar with the material, especially if they have been given a tentative offer letter.

## SECTION 7:  Institutional CTI Requirements

## 1. Question: Must students complete CTI requirements at the same time as they are earning their degrees?

*Answer*: Ideally, the requirements are met within the approved degree program. In some cases, students may take different electives if they are not pursuing an institutional recommendation for the CTI Program.

Students who earn an approved degree under the CTI Program and have not completed all the institution required courses to meet CTI requirements can, at the institution's discretion, take those classes that meet all the requirements for institutional recommendation.

All candidates must have received an approved degree and meet institutional requirements, including classes that are mapped to the AT Basics objectives.

## SECTION 8:  Institution Curriculum

## 1. Question: Our institution goes above and beyond what is required for the AT Basics objectives. Will this provide us with a better ranking?

*Answer*: Those schools that go above and beyond the FAA Program requirements of incorporating the AT Basics objectives into their curriculum are not currently ranked.. The "above and beyond" is an important contract between the institution and the student. The FAA benefits from the advanced instruction; but, the student, provided that the curriculum is taught and learned at an advanced level, benefits most in the certification process at the Academy and facility.

## SECTION 9:  Program Evaluation

## 1. Question:  Will the evaluation process continue? What are the dates of expected data submission, formats, etc.?

*Answer*: The Program Office has developed a new self-performing annual evaluation. The due dates for the evaluation Are October 1 of each year effective October 1, 2013.

68

**SECTION 10:  Medical Clearance**

**1. Question:  Will "diabetes mellitus" disqualify a person from passing the ATC Medical?**

*Answer: Diabetes mellitus is a disqualifying condition; however, if the condition is adequately controlled and there are no other disqualifying sequelae, an individual may be found qualified under special consideration. This means that the individual may need to follow a strict protocol while performing safety-related duties and be willing to notify management and co-workers of his/her condition and needs in the case of an emergency. He/she must be willing and able to work all shifts and be responsible for providing all medical documentation necessary to maintain qualification at his/her own expense– (from the FAA Medical Office).*

**2. Question:  If I pass a Class II Medical "color blind test" will I pass the ATC Medical?**

*Answer: Having a Class II medical certificate is not the same as passing the color vision test for air traffic controllers. Many schools falsely believe that a Class II medical certificate is proof of fitness for the ATC career field. Due to a dilemma of employment law, we cannot offer the test to individuals before a tentative offer of employment. A color deficient applicant may not be able to pass the test and, as a result, may never be able to get a return on his/her educational investment. I would not offer encouragement to an individual who has a color deficiency and would offer a stern warning before investing in an education in ATC– (from the FAA Medical Office).*

**3. Question: I understand there are several color vision tests available. If an applicant fails the test given by the FAA, can he/she take a different color vision test from his/her eye doctor and have that information sent to the flight surgeon to pass the medical requirements?**

*Answer: The FAA color test is specific to controllers and is a prerequisite for employment.  Passing any other color test does not ensure that the applicant will pass the FAA test. Due to a dilemma of employment law, we cannot offer the test to individuals before a tentative offer of employment.*

**4. Question: My son/daughter has Crohn's Disease.  He/she takes the drug Remicade. It does not do anything to him/her psychologically; it just works in the intestines. Can he/she get a flight medical, and if so, what class? In addition, will he/she be able to be hired after completion of the CTI Degree Program?**

*Answer: The disease is not disqualifying, but there will be a review of the individual case history. If selected, he/she would need to provide a complete history of the disease course. The drug is acceptable, but there would be limitations regarding the performance of safety duties around dosing intervals– (from the FAA Medical Office).*

**5. Question: My son/daughter has a history of being prescribed Zoloft (for anxiety/depression) and Vyvanse (for ADHD-related symptoms). These problems are completely under control and do not interfere with her ability to perform (academically or athletically).Does the use of these medications disqualify him/her from becoming an air traffic controller?**

*Answer: Continued use of these medications is generally disqualifying. If the son/daughter has been off the medications for a year and he/she has demonstrated stability, he/she might very well be found qualified for the job of air traffic controller.*

**SECTION 11:  Security   (Background Investigations)**

**1.  Question:  The personnel security questionnaire is very long and asks a lot of personal questions. Do I have to answer all the questions on the form? Much of that information is already on my resume.**

*Answer: Yes. The resume is part of the application process. The Security Questionnaire is part of the investigation process. All of the security questionnaire questions should be answered fully, accurately, and honestly.*

**2.  Question:  What will happen if I refuse to give you some of this personal information on the Security Questionnaire?**

*Answer: The investigation is a job requirement. Providing the information is voluntary, but if you choose not to provide the required information, you will not meet the requirements of the job and will therefore not be considered further. If you are already employed by the federal government, your appointment will be terminated. The courts have upheld this principle.*

**3.  Question:  What should I do if I remember something later, after I've filled out the form and returned it?**

*Answer: Immediately notify the security officials to whom you submitted the questionnaire.*

**4.  Question:  Who has access to the information collected?**

*Answer: The only persons authorized to see your personal information are Personnel Security, Suitability, and Investigations professionals who have been investigated at the appropriate level and who have a genuine and demonstrated need for access to the information.*

**5.  Question:  I'm not a criminal. Why do you want my fingerprints?**

*Answer: So that we can verify your claim that you are not a criminal by checking the FBI's fingerprint files. Executive Order 10450 requires that all federal employees be fingerprinted.*

**6.  Question:  Are you going to interview people other than those I name on the questionnaire? If so, why?**

*Answer: Yes. Background investigators are required to identify, locate, and interview a sufficient number of people who know you well. We want a balanced and unbiased investigation. It would be a questionable investigative practice to only interview persons whom the individual being investigated identified for us.*

**7.  Question:  Is it okay if I guess at dates and addresses that I can barely remember?**

*Answer: Providing information that is as complete and accurate as possible will ensure that your investigation is completed in an efficient and timely manner. If you are unable to answer a question with precision, provide approximate information and note that you have done so on the questionnaire. If you are interviewed in person, point out the approximated information on the questionnaire to the investigator.*

**8.  Question:  Why do you need information about my relatives?**

*Answer: Relatives sometimes influence the actions of family members. We need to determine if you could be exploited by threats or pressure against your relatives or if they themselves could exert pressure against you.*

**9.  Question:  Will I get a chance to explain some of the answers I provide?**

*Answer: Yes. Many types of background investigations involve a personal interview. Moreover, you may submit information on extra pages with your questionnaire if you feel you need to more fully explain details or circumstances of the answers you put on the form.*

**10.  Question:  Can I get a copy of the report you prepare about me?**

*Answer: The only persons authorized to see this information are Personnel Security, Suitability, and Investigations professionals who have been investigated and have a demonstrated need to review the information. You may request a copy of your investigation file under provisions of the Privacy Act. For an OPM investigation request, write to OPM-CIS, FOIP, Post Office Box 618, Boyers, PA 16018-0618. You must include your full name, Social Security number, date and place of birth, and you must sign your request.*

**11.  Question:  What if you talk to someone who just doesn't like me and they lie about me?**

*Answer: We talk to as many knowledgeable people as possible to get a balanced, accurate, and comprehensive picture of the person being investigated. Later, you may have an opportunity to refute any misleading or false information that was reported about you.*

**12.  Question:  I was cited for speeding once. Will that keep me from getting a job or a clearance?**

*Answer: Not necessarily. Any negative information is evaluated regarding its recency, seriousness, relevance to the position and duties, and in light of, and in relationship to, all other information about you.*

**13.  Question:  I was arrested for shoplifting 20 years ago. Is that going to be held against me now?**

*Answer: Not necessarily. Any negative information is evaluated regarding its recency, seriousness, relevance to the position and duties, and in light of, and in relationship to, all other information about you.*

**14.  Question:  I have a physical disability. Will that hurt my chances for a job?**

*Answer: No. It is against federal law to discriminate against an individual based on his or her disability.*

**15.  Question:  Are you going to tell my current employer that I'm looking for a job?**

*Answer: It is a requirement of a background investigation, and actual employment, that your current employer be contacted. We must verify your employment data and make other inquiries concerning your background. If you are a federal employee or contractor, for example, it may be that your current employer needs you to have a security clearance for the work you do. In other instances, you are asked to complete the investigative form for an investigation and clearance only after a conditional offer of employment has been made for a position requiring a security clearance.*

**16.  Question:  Is it true that the investigation will include a credit report about me?**

*Answer: Yes. A search of the records of commercial credit reporting agencies is an integral part of almost all background investigations.*

**17.  Question:  Do you ever interview someone's ex-spouse or relatives?**

*Answer: Yes; although, in many instances, interviewing ex-spouses or relatives is not mandatory.*

**18.  Question:  Why is detailed information about my education required?**

*Answer: Educational history is necessary for jobs that require specific education and expertise. Any information supplied by the applicant must be verified.*

**19.  Question:  I was politically active during the last elections. Will that hurt my chances for a job or a clearance?**

*Answer:* No. It will neither hurt nor help your chances.

**20.  Question:  Do I have to go to a police station to be fingerprinted?**

*Answer:* You may go to a police station to be fingerprinted. In most instances, however, the agency requiring the investigation and clearance will fingerprint you.

**21.  Question:  Doesn't the FBI conduct all federal background investigations?**

*Answer:* The U.S. Office of Personnel Management, the Department of Defense, and a few other agencies share this responsibility. The FBI mostly conducts investigations on the following:  High-level Presidential appointees, cabinet officers, agency heads, and staff who may work at the White House directly for the President.

**22.  Question:  How long does a background investigation take?**

*Answer:* The timeliness of a background investigation depends on the type of investigation conducted. Depending on the type of background investigation, the scope of the investigation may require coverage for specific items.

The need for a security clearance may affect the time period in which an investigation is completed. Each background investigation requires that certain areas are covered before an investigation is completed.

# Communications

## KSN SharePoint Web Site

The Air Traffic CTI Program has established a Microsoft SharePoint website so that CTI schools and the FAA can share information. The location of the site is https://ksn2.faa.gov/ajl/ajl-1/ajl-14/cti/default.aspx.

To access the site, you must be registered with the CTI Program Office. Once your name is added to the site by the Program Office you will receive an  email similar to the one below:

The following email provides your sign-on and password information. Please change your password once you successfully log on. If you forget or lose your password, please send an email to terry.craft@faa.gov. The password cannot be reset through the help-desk for users outside the FAA domain.





There are four sections that can be accessed by using the "navigation tabs" at the top of the page:

**Calendar:** This section will contain CTI-related events including telephone conferences (telcons), conferences, etc. Feel free to add events that will highlight your institution's activities as they relate to the CTI Program. Please include graduation dates, Air Traffic Club activities, etc.

**Document Library**: This section will contain documents and materials for your CTI Program. Some of the folders included are:

- **Air Traffic Selection and Training Battery (AT-SAT):** This section contains research reports for the ATSAT. It will definitely make for interesting reading for those who relish research papers.

- **At Basics Curriculum: In previous years, the FAA has sent AT Basics curriculum to the** partner institutions once a year on DVD. In an effort to ensure that our partners have the most up-to-date information, we are posting the material online for your use.

- **NOTE:** The curriculum material posted is for instructor use to ensure that the teaching material is accurate. In its current format, the FAA logo is not to be distributed or sold. Feel free to use the graphics and text, as appropriate, in your own material.


- **CTI Institution Folders:** This is a temporary placeholder. We will be developing folders for each institution that are only accessible by the FAA and the individual institution; this will allow a secure method to transfer data.

- **CTI Pictures:**  This library contains pictures submitted by partner institutions to "show off" your program and students. These pictures may be used in the CTI Program Office **presentations** and documents

- **FAA CTI Telcons**: This library contains the agendas and minutes for program telcons.

- **FAA Source Orders:** This library will hold orders and notices that may not be accessible online through faa.gov. Although every effort will be made to ensure that orders and notices are up to date, always use caution

**Useful Links:**  This page will have links to CTI information such as HR policy Orders and Notices, Workforce Plans. If you have additional links you would like to see, please let the Program Office know.

**CTI Institution Contacts:** This section is the official contact list for CTI school contacts. When a school adds faculty or staff, they will add them to the contact page. In order to gain access to the site, primary or secondary point of contact must send an email to the Program Office at 9-ato-atcti@faa.gov . To view all the contact information select name from list.



**Contact Fields:**

- **Last Name:** For the purposes of this database, the "Last Name" is the "Full Name."

- **Company:** CTI School

- **Contact Type:** The contact types are classified to filter those who should receive program office emails.

  - **P: Primary Contact**; receives all program office, and school-specific emails. Serves as PRIMARY contact if there are any questions from the CTI Program Office.

  - **S:** Secondary Contact; receives all program office, and school-specific emails.  Is the SECONDARY contact if the program office needs to contact the school and are unable to reach the primary contact.

  - **SA:** School's signing authority for any policy and agreements. This can also be a primary or secondary contact. Does not receive emails from the Program Office unless also designated as a primary or secondary contact. (see below)

- o  **N:** Is a school contact, but is not included in emails sent to schools.

**Combinations:**

- o  **SA/P** Signing Authority and Primary Contact

- o  **SA/S** Signing authority and Secondary contact

- **Full Name:** Same as "Last Name"
- **Job Title:** Self-explanatory
- **Business Phone:** Primary means of contact
- **Secondary Phone:** Self-explanatory
- **Mobile Phone:** Self-explanatory
- **Email Address:** Self-explanatory
- **Web Page:** This is the web page address that will appear in the public FAA website for the institution. This page lists all CTI schools and acts as a point of contact for interested students.

- **Mailing Address:**  This is the general mailing address for the contact/institution
- **Physical Address (If different from Mailing):** Complete this address if it is not the same as your "mailing address
- **Shipping Address (If different from Physical):** Complete if there is an address for shipping other than the physical address
- **Public Contact:** This is the contact that will appear on the FAA Webpage that indicates the appropriate contact for the school for those interested in your degree programs. The name, email and phone number of this person will be published on the FAA AT-CTI public website [http://www.faa.gov/about/office_org/headquarters_offices/ato/service_units/operations/at_cti/schools/  }

**Creating a New Contact**

On the top of the page, select: "CTI Institution Contacts", then under  "List Tools" select
"Items"



Select "New Item".



This will bring up a new "contact card" that can be completes, click "Save" when complete.



## Editing a Current Contact

From the CTI Institution Contacts List

Select the card to edit by scrolling over the name and selecting the "check box". This will also bring up the tools bar in the top navigation pane.



Select "Edit Item" from the toolbar.  Make all necessary edits and "Save" before closing/

## Deleting a Contact

From the CTI Institution Contacts List

Select the card to delete  by scrolling over the name and selecting the "check box". This will also bring up the tools bar in the top navigation pane.



Select "Delete Item" from the toolbar.

## MONTHLY TELCONS

The FAA CTI Program has an ongoing monthly telcon with CTI institutions. The telcon is held the 3rd Wednesday of each month at 2:00 p.m. Eastern Standard Time.

Dial-in Number: 1-712-432-3066
Conference Code: 542998

Agenda items should be sent to 9-ato-atcti@faa.gov no later than close of business on the Thursday prior to the telcon. Minutes will be posted no later than Wednesday following the telcon.

# Abbreviations

| | |
|-----|--------------------------|
| ATC | Air Traffic Controller |
| ATCT | Air Traffic Control Tower |
| CBI | Computer-Based Instruction |
| CTI | Collegiate Training Initiative |
| OJT | On-the-Job Training |
| POC | Point of Contact |
| SA | Service Area |
| LOA | Letter of Agreement |

EXHIBIT

C

DOT/FAA/AM-98/23

# Recovery of the FAA Air Traffic Control Specialist Workforce, 1981-1992

Office of Aviation Medicine
Washington, D.C. 20591

Dana Broach, Editor

Civil Aeromedical Institute
Oklahoma City, Oklahoma 73125

August 1998

Final Report

19981027 037

This document is available to the public
through the National Technical Information
Service, Springfield, Virginia 22161.



U.S. Department
of Transportation

**Federal Aviation
Administration**

DTIC QUALITY INSPECTED 2

# NOTICE

This document is disseminated under the sponsorship of
the U.S. Department of Transportation in the interest of
information exchange. The United States Government
assumes no liability for the contents thereof.

## Technical Documentation Page

| 1. Report No.<br>DOT/FAA/AM-98/23 | 2. Government Accession No. | 3. Recipient's Catalog No. |
|---|---|---|
| 4. Title and Subtitle<br>Recovery of the FAA Air Traffic Control Specialist Workforce,<br>1981–1992 | | 5. Report Date<br>August 1998 |
| | | 6. Performing Organization Code |
| 7. Author(s)<br>Dana Broach, Editor | | 8. Performing Organization Report No. |
| 9. Performing Organization Name and Address<br>FAA Civil Aeromedical Institute<br>P.O. Box 25082<br>Oklahoma City, OK 73125 | | 10. Work Unit No. (TRAIS) |
| | | 11. Contract or Grant No. |
| 12. Sponsoring Agency Name and Address<br>Office of Aviation Medicine<br>Federal Aviation Administration<br>800 Independence Avenue, S. W.<br>Washington, DC 20591 | | 13. Type of Report and Period Covered |

| 15. Supplementary Notes |
|---|
| This research was conducted under task AM-97-B-HRR-509 |

16. Abstract

    The Federal Aviation Administration was confronted in 1981 with the challenge of rebuilding its core, technical, and highly-trained air traffic control specialist (ATCS) workforce following the PATCO strike. From late 1981 through mid-1992, the FAA rebuilt this critical workforce through a large-scale testing, screening and training program. By mid-1992, recovery of the controller workforce was complete, and it was no longer necessary for the FAA to conduct a large-scale hiring program. The six papers presented in this report represent the first major retrospective analysis of the complete data set describing the recovery of the FAA's en route and terminal ATCS workforce following the 1981 controller strike. The first paper describes the personnel processes, focusing on recruitment and hiring programs for the en route and terminal options. The second paper presents a detailed description of the aptitude test battery used to evaluate over 400,000 applicants between 1981 and 1992. The third paper offers a definitive statistical portrait of the FAA Academy Screening programs as predictors of field training outcomes. On-the-job training (OJT) programs in en route and terminal facilities are described in the fourth paper. These four papers, taken together, provide a definitive description of the processes used to recruit, test, screen, and train persons for the ATCS occupation between 1981 and 1992. The fifth paper draws on FAA organizational survey data to describe controller perceptions of the organizational climate in which the workforce recovery occurred. The sixth paper analyzes current controller workforce demographics and technological trends in air traffic control to identify potential areas of future research.

| 17. Key Words<br>Air Traffic Control Specialist (ATCS) Selection;<br>Training; Personnel, FAA; Psychology; Organizational<br>Climate; Demographics | 18. Distribution Statement<br>Document is available to the public through<br>the National Technical Information Service,<br>Springfield, VA 22161 | | |
|---|---|---|---|
| 19. Security Classif. (of this report)<br>UNCLASSIFIED | 20. Security Classif. (of this page)<br>UNCLASSIFIED | 21. No. of Pages<br>62 | 22. Price |

**Form DOT F 1700.7** (8-72)    Reproduction of completed page authorized

# TABLE OF CONTENTS

|                                                                                                      | Page |
|------------------------------------------------------------------------------------------------------|------|

Introduction ............................................................................................................................ 1
  Dana Broach, Ph.D.,  FAA Civil Aeromedical Institute


**Chapter 1: Employing Air Traffic Controllers, 1981–1992** ........................................................ 3
  Jay C. Aul, FAA Office of Personnel

**Chapter 2: Air Traffic Control Specialist Aptitude Testing, 1981-1992** ..................................... 7
  Dana Broach, Ph.D.,  FAA Civil Aeromedical Institute

**Chapter 3: FAA Academy Air Traffic Control Specialist Screening Programs and Strike Recovery** ........ 17
  Pamela Della Rocco, Ph.D., FAA Civil Aeromedical Institute

**Chapter 4: Air Traffic Control Specialist Field Training Programs, 1981-1992** ....................................... 23
  Carol A. Manning, Ph.D., FAA Civil Aeromedical Institute

**Chapter 5: Organizational Climate Perceptions of the Air Traffic Control Specialist (ATCS)**
**Workforce, 1981-1992** ............................................................................................................ 33
  Richard C. Thompson, Ph.D., FAA Civil Aeromedical Institute

**Chapter 6: Current FAA Controller Workforce Demographics, Future Requirements,**
**and Research Questions** ........................................................................................................ 43
  David J. Schroeder, Ph.D., Dana Broach, Ph.D., and William L. Farmer, M.S.,
  FAA Civil Aeromedical Institute

# LIST OF FIGURES

| Figure                                                                                                  | Page |
|---------------------------------------------------------------------------------------------------------|------|

2–1: Example Multiplex Controller Aptitude Test (MCAT) item ............................................................. 12

2–2: Example Abstract Reasoning (ABSR) test item ....................................................................... 12

2–3: Distribution of RATING for examinees and selectees .................................................................. 13

2–4: Regression of test score (TMC) on FAA Academy score (SCREEN) by gender .................................. 13

2–5: Regression of test score (TMC) on FAA Academy score (SCREEN) by race ..................................... 14

3–1: Percent achieving en route FPL field status by FAA Academy score ................................................... 21

3–2: Percent achieving terminal FPL field status by FAA Academy score ................................................... 21

5–1: Job satisfaction (based on a single item) perceptions of air traffic control specialists ......................... 38

5–2: Satisfaction perceptions of air traffic control specialists ............................................................... 38

5–3: Management concern for employee's perceptions of air traffic control specialists ............................... 39

5–4: Pay and benefits perceptions of air traffic control specialists .......................................................... 39

5–5: Organization of work perceptions of air traffic control specialists ..................................................... 40

5–6: Management direction perceptions of air traffic control specialists ..................................................... 40

6–1: Age distribution of controller workforce ($N$=14,569) as of April 1996 ............................................ 48

| Figure | Page |
|---|---|
| 6-2: Projected controller workforce (CWF) vs. aviation activity (1982-2002) | 49 |
| 6-3: Controller retirement eligibilities after the year 2000 | 50 |
| 6-4: Outcomes at FAA Academy by age category for 1986-1992 ($N = 14,392$) | 51 |
| 6-5: Outcomes at first facility by age category for en route controllers ($N = 9,063$) for 1986-1992 FAA Academy graduates | 51 |
| 6-6: Outcomes at first facility by age category for level 4 and 5 terminal controllers ($N = 839$) for 1986-1992 FAA Academy graduates | 52 |

## LIST OF TABLES

| Table | Page |
|---|---|
| 2–1: ATCS Aptitude test battery scoring | 14 |
| 2–2: Correlation matrix structure for regression analyses | 14 |
| 2–3: Descriptive statistics and correlations for 1982-85 Terminal Screen graduates assigned to terminal OJT | 15 |
| 2–4: Descriptive statistics and correlations for 1982-85 En Route Screen graduates assigned to en route OJT | 15 |
| 2–5: Descriptive statistics and correlations for 1986-92 Non-radar Screen graduates assigned to terminal OJT | 15 |
| 2–6: Descriptive statistics and correlations for 1986-92 Non-radar Screen graduates assigned to en route OJT | 16 |
| 2–7: Civil service RATING validity in predicting FIELD TRAINING outcome by sample, based on corrected correlations | 16 |
| 2–8: Adverse impact analysis by gender based on OPM eligibility codes | 16 |
| 3–1: Demographic profile of FAA Academy entrants | 22 |
| 4–1: Demographics of FAA Academy program graduates | 27 |
| 4–2: Coding of field training status at first facility by option | 28 |
| 4–3: En Route field training status by FAA Academy program | 28 |
| 4–4: Terminal field training status by FAA Academy program | 29 |
| 4–5: En Route field training status by demographic variables | 30 |
| 4–6: Terminal field training status by demographic variables | 31 |
| 4–7: Time to attrition (years) by field option, FAA Academy program, and type of attrition | 32 |
| 5–1: Sample size, means and standard deviations for the organization climate measures by survey administration | 41 |

# GLOSSARY OF ABBREVIATIONS AND STATISTICAL TERMS

**ABSR** — Abstract Reasoning Test

$\alpha$ — "Cronbach's alpha;" A measure of the internal consistency of a set of items. a ranges from 0 to 1, and indicates how much the items in a scale are measuring the same thing.

**ANOVA** — Analysis of variance

**ARTCC** — Air Route Traffic Control Center

**ATA** — Air Traffic Assistant

**ATC** — Air traffic control

**ATCS** — Air Traffic Control Specialist

$\beta$ — "Beta weight," or standardized regression coefficient; used to weight each $X$ predictor in a multiple regression equation

**CAMI** — Civil Aeromedical Institute, Oklahoma City, Oklahoma

**CSC** — Civil Service Commission

**CST** — Controller Skills Test

$\eta^2$ — "Eta-squared;" A type of correlation coefficient that can be used to express a curvilinear relationship between 2 variables

$F$ — Statistic computed in analyses of variance, used for testing the statistical significance of the amount of variance accounted for in one (or more) dependent variables by one (or more) independent variables

**FAA** — Federal Aviation Administration

**FPL** — Full performance level controller

**FSS** — Flight Service Station

**GAO** — General Accounting Office

$M$ — Statistical symbol for the mean (or average)

**MANOVA** — Multiple analysis of variance

**MCAT** — Multiplex Controller Aptitude Test

$N$ — Statistical symbol for number of persons in sample or analysis

**NAS** — National Airspace System

**NTIS** — National Technical Information Service, Springfield, VA

**OAM** — Office of Aviation Medicine

**OJT** — On-the-job training

**OKT** — Occupational Knowledge Test

**OPM** — U.S. Office of Personnel Management

$p$ — "P-value." A statistical symbol indicating the probability of obtaining a result by chance alone 5 times or less in 100 ($p \leq .05$), 1 time or less in 100 ($p \leq .01$), or 1 time or less in 1000 ($p \leq .001$) independent samples

**PATCO** — Professional Air Traffic Controller Organization

$R$ — Statistical symbol for the multiple correlation between a single criterion (Y) and multiple predictors ($X_1$, $X_2$, ... $X_i$). $R$ may range between 0 and 1, with 1 indicating that Y is perfectly predicted by some weighted combination of Xs. In multiple regression analysis, the values on one or more predictors ($X_1$, $X_2$, ... $X_i$) are used to predict or estimate values on the criterion (Y). Each predictor is statistically weighted by the standardized regression coefficient (b) such that overall errors in the prediction of Y values are minimized. The degree of overall linear relationship between Y and the predictors $X_1$, $X_2$, ... $X_i$ is indexed by the multiple correlation ($R$). An $R$ of 1.0 indicates that Y is perfectly predicted from the combination of predictors, and an $R$ of 0 indicates that Y cannot be predicted from any of the predictors.

# GLOSSARY OF ABBREVIATIONS AND STATISTICAL TERMS

$R^2$ — "R-squared;" Statistical symbol for the squared multiple correlation. $R^2$ estimates the proportion or amount of variability in criterion (Y) values or scores accounted for or explained by the optimally weighted combination of predictors.

RATING — Final civil service rating at hire, based on OPM test scores and veteran's preference points

SCREEN — Variable representing controller performance in the FAA Academy ATCS initial qualifications training program

$SD$ — Statistical symbol for standard deviation

STATUS — Variable representing outcomes in controller on-the-job field training at the first assigned field air traffic control facility

TMC — Transmuted Composite score, a weighted sum of ABSR and MCAT scores on the OPM test battery

VFR — Visual Flight Rules

VRA — Veterans Readjustment Act

$Z$ — Statistical symbol used to denote the magnitude of difference between two proportions in terms of the area under a normal curve. $Z$ is a statistic used for testing if two proportions are truly different from each other, taking into account the base population on which the proportions are calculated. The likelihood of obtaining a $Z$ (or any other statistic) by chance alone in 100 or 1000 analyses based on different samples is the significance ($p$) of the statistic. A $p \leq .05$, $\leq .01$, or $\leq .001$ indicates that less than 5 in 100, 1 in 100, or 1 in 1000 such analyses, respectively, would yield a statistic of that magnitude by chance alone.

# INTRODUCTION

## Dana Broach

FAA Civil Aeromedical Institute, Oklahoma City, Oklahoma

On August 3, 1981, the majority of the nation's air traffic controllers went on strike. On August 5, 1981, President Reagan summarily fired the controllers who had not returned to work. The controller strike left 4,669 operational controllers available in August 1981 to staff the nation's Air Route Control Centers, terminal radar approach control, and airport control towers (National Transportation Safety Board, 1981). The Federal Aviation Administration (FAA) confronted a challenge unique in the annals of American government: that of rebuilding a core, technical, highly trained workforce in an occupation directly responsible for the safety of millions of lives on a daily basis. From late calendar year 1981 to mid-year 1995, the FAA rebuilt this critical workforce through a large-scale testing, screening and training program.

The testing and screening programs operated from 1981 through March, 1992. Field training data collection ended in the summer of 1995. By then, the controller workforce was near its pre-strike level, with about 14,400 controllers working in the nation's en route centers, terminal radar facilities, and airport towers. Throughout this period, the Civil Aeromedical Institute conducted a longitudinal research program focused on the validation of the air traffic control specialist (ATCS) selection program.

The following papers represent the first major retrospective analysis of the complete data set describing the recovery of the FAA's en route and terminal ATCS workforce following the 1981 controller strike.

In the first paper, Jay Aul describes the personnel processes supporting the recovery of the controller workforce, focusing on recruitment and hiring programs for the center and terminal options.

Second, a detailed description of the numbers of persons tested and the instrument used to test for aptitude are presented by Dana Broach. The second paper also evaluates the validity of the test battery as a predictor of performance at the FAA Academy and in the field.

The third paper, by Pam Della Rocco, offers a definitive statistical portrait of the 1981 to 1992 FAA Academy screening programs for the en route and terminal options. Della Rocco also evaluates the validity of the FAA Academy screening programs as predictors of field training outcomes.

Fourth, the on-the-job training (OJT) program in en route and terminal field facilities through June, 1995, is described by Carol Manning. These papers, taken together, provide a definitive description of the processes used to test, screen, and train persons for the ATCS occupation between 1981 and 1992.

The fifth paper, by Richard Thompson, chronicles air traffic controller perceptions of organizational climate in which this recovery occurred, drawing on FAA survey data and documented organizational initiatives.

Finally, the demographics of the current ATCS workforce, projections about future trends and possible requirements, and potential areas of research in relation to both demographic and technological trends, are described by David Schroeder, Dana Broach, and Bill Farmer.

# CHAPTER 1:

## EMPLOYING AIR TRAFFIC CONTROLLERS, 1981–1992

### Jay C. Aul

FAA Office of Personnel, Washington, District of Columbia

*The civil service procedures and processes used to recruit and select air traffic control specialists (ATCS) following the 1981 controller strike are described. Recruitment approaches and strategies, basic occupational qualifications requirements for applicants applying under competitive rules, and additional selection criteria such as an interview, medical examination, and security and suitability investigation are presented. Different noncompetitive employment processes, such as cooperative education, are briefly surveyed, concluding with current trends in controller selection.*

On August 3, 1981, 10,438 members of the Professional Air Traffic Control Organization (PATCO) staged a job action, or strike, against the Federal government. On August 5, 1981, President Reagan summarily fired the controllers who had not returned to work. The PATCO strike left 4,669 operational controllers available in August 1981 to staff the nation's airport control towers, terminal radar approach control facilities, and Air Route Traffic Control Centers (National Transportation Safety Board, 1981). The Federal Aviation Administration (FAA) needed to rebuild as quickly and prudently as possible after the loss of more than half of its controller workforce. As the FAA's air traffic controllers, more properly called air traffic control specialists (ATCSs), are civil servants, the employment process was governed by United States federal civil service laws and regulations. The regulatory agency overseeing these laws and regulations was the U.S. Office of Personnel Management (OPM). The rules and regulations resulted in well-defined and rather strict employment procedures to ensure that there was open and fair competition for controller positions in the FAA. The purpose of this paper is to provide an overview of the employment procedures used by the FAA to recruit and select ATCSs during the recovery from the 1981 strike.

### Recruitment

The process logically began with finding and attracting controller candidates. Under civil service rules, job openings must be advertised in a way that ensures open competition. The government calls these advertisements "vacancy announcements." In concrete form, they are printed documents that contain certain detailed information, disclaimers, and statements. The announcements must also be distributed to organizations, such as state employment services. Advertising was not only a legal requirement, it was a practical necessity during the recovery period. The traditional sources of candidates were former military controllers (Collins, Manning, & Taylor, 1984), and people who knew about the job from some kind of personal contact. That contact often turned out to be relatives or neighbors who were air traffic controllers. Those sources were insufficient to rebuild the work force after the 1981 strike. To hire enough people, it was necessary for the FAA to recruit from the general population. Advertising also had to overcome the perception that the strike circumstances did not make the job the of an ATCS sound appealing. The FAA and controller jobs received much negative publicity in the years following the strike. Moreover, the FAA was competing for a scarce resource consisting of people under age 31 who could score high on the civil service examination for air traffic control positions. The military and private sectors also valued and tried to attract bright young people.

The first post strike vacancy announcements were little different from those issued by other government agencies. They were several pages printed in black ink on white paper, and the only graphic was the agency logo. There was an attempt shortly after the strike to create a more attractive, exciting announcement. That turned out to be a picture of an airliner taking off, with a banner above it saying something like, "Control the Skies." Unfortunately, the picture was

**Preceding Page Blank**

printed with red ink. With the smoke or dust trailing the aircraft, it looked to some people as if the airliner was in trouble. That particular format for the announcement was dropped. At the same time, for budget reasons, there were government-wide restrictions on printing in multiple colors. Eventually, however, the FAA received permission to print its announcement as a four-color glossy brochure. The brochure was quite different from the standard government vacancy announcement. In addition to the required information, it contained a brief story outlining how controllers handle a single airline flight. There were sample items from the civil service examination for air traffic controllers and color pictures of controllers at work in various settings. The FAA built a staff of full time recruiters who sought out sources of applicants. The FAA learned to use other recruitment methods during this period as well. FAA field personnel offices frequently used newspaper advertisements to recruit. Magazine, television, and radio advertisements were also used in some markets (Schultz & Marshall-Mies, 1988).

### Selection
#### Competitive processes
**Basic qualifications and pre-hire testing.** One reason that extensive recruitment was necessary was that potential controllers had to meet a number of qualifications requirements. First, they had to be United States citizens. Second, in most cases, they could be no younger than 18 years of age. They could not have reached their 31st birthday prior to initial appointment into the terminal or en route options. To qualify for consideration at the entry level civil service grade 5 ("GS-5"), an applicant needed some combination of undergraduate or graduate level education, progressively responsible work experience, and/or specialized aviation experience. Candidates were also required to take (and pass) the OPM civil service examination for air traffic control specialists. This written test was designed to identify people with the aptitude to be air traffic controllers (Broach, this volume). Under Title 5 of the U.S. Code of Federal Regulations, all such civil service entrance examinations must be scored on a scale of 100. The bottom point is not designated in the regulations. The passing score for a civil service test must be set at 70. To avoid adverse impact against minority groups and women,

OPM required that the score of 70 on this test be calibrated to the 50th percentile of the population applying for these jobs at the GS-5 grade level.

However, most recruitment was for grade 7 ("GS-7"), which was the more common entry grade for the controller occupation. The qualifying score on the written ATCS aptitude test for the GS-7 grade level was 75.1 for applicants without prior specialized experience or education. To qualify for GS-7 with a score of 70, an individual had to have additional experience or education. Typically, this was certain kinds of aviation experience, one year of graduate school, or superior grades in college. Federal law also required that extra points be given to certain military veterans. The matter of who received these extra points is too complex to fully explain here. For simplicity, it can be explained as including veterans of the U.S. military, who served in declared wars, or in military actions for which campaign badges or expeditionary medals were awarded. Normally, five extra points were added onto the examination score for veteran's meeting these criteria. If the veteran had a military service-related disability, he or she received ten extra points, instead of five. Veterans also had priority in hiring over non-veterans. For example, a candidate with veteran's preference had priority in hiring over a candidate with the same score, but without the veteran's preference.

#### Interview, medical, and security criteria.
Candidates were also interviewed. The interview had several purposes. One key purpose was to provide information to the candidates about the ATCS occupation. Most candidates did not have a clear understanding of the work of air traffic controllers. It was important to explain the concept of rotating shift work, because many did not understand it. It was also a chance for the interviewer to evaluate the candidate for such factors as ability to speak clearly and to speak in English. Interviewers were asked to make a hiring recommendation for each candidate, although the interview was rarely used to screen out candidates.

Candidates who progressed through these hurdles then had to meet the medical requirements for these positions. The medical standard for entry into these positions was (and is) quite strict. It included vision and hearing standards, as well as a form of mental health screen. Personality assessment has been used formally by the FAA in conjunction with the ATCS programs since 1965 (Convey, 1984). From the outset, the 38-item

subset from the two 187-item parallel forms of the Sixteen Personality Factor Questionnaire (16PF; Cattell, Eber, & Tatsuoka, 1970) was intended to operate as an indicator of emotional instability. Candidates flagged by the 38-item scale were referred for psychiatric and psychological evaluation.

Finally, the candidates had to pass a background investigation. This investigation was used for two purposes. One was to determine if the person would receive a security clearance. The other was to determine the person's general suitability for federal employment. Individuals who had been found guilty of crimes, who had been discharged from the military under less than honorable conditions, who had been fired with cause from previous employers, or who had been convicted of any alcohol or drug-related offense had great difficulty being cleared under this process. The FAA also looked with caution on people who had repeated minor violations, such as multiple speeding tickets.

Large numbers of people were processed under these procedures. At peak, nearly 50,000 people were tested in a year. During the first years after the strike, the FAA's personnel offices were required to recruit and hire specific numbers of people for each new class date at the FAA Academy. These numbers were set ambitiously high; initially, therefore, a few people with test scores as low as 70 were sent to the FAA Academy. Over time, the FAA was able to recruit and hire people with increasingly higher test scores. During the late 1980s until 1992, the minimum hiring scores varied from about 85 to about 95.

**Post-hire screening.** Once someone met the basic eligibility criteria, passed the OPM test, was medically cleared, passed a background investigation, and was interviewed, the person was usually hired. However, the selection process did not stop there. Selectees reported to the FAA Academy screening program in Oklahoma City, Oklahoma (Della Rocco, this volume). The individuals were officially appointed into the civil service at the FAA Academy, becoming paid employees of the FAA. They spent the first several weeks of their employment in the FAA Academy screening program. The FAA Academy program was considered to be initial training, but was conducted with an emphasis on screening out those unlikely to be successful in further FAA controller training (Boone, 1984). The last version of the screening program was approximately nine weeks long. Those who failed the FAA Academy program usually had their employment terminated. The pass rate

varied, but was about 60 percent for most of the period it operated. On average, about 30 percent failed outright, and another 10 percent withdrew from the program. This meant that nine weeks after starting with the FAA, approximately 40 percent of the new hires might no longer be employed with the agency.

**Re-engineering the selection process.** The process described up to this point was quite lengthy. In 1988, it was estimated to take on average 18 months to hire an entry level controller to send to the FAA Academy. In particular, it might take several months to obtain a background check on someone or to medically clear someone who required a special review of his or her medical situation. As a result, in the late 1980s the FAA embarked on what today would be called a "reengineering project." It successfully reengineered the hiring process for entry level controllers and effectively reduced the time to hire from 18 months to about six weeks. This was, however, late in the post-strike recovery period and many people still experienced delays due to existing backlogs of work. There was another complicating factor in the hiring process. A number of companies discovered a market for teaching people to take the OPM test. These companies aggressively marketed their services and, as a result, may have brought many more applicants to the FAA. Unfortunately, we also know that the more times a person takes the test, the lower the relationship between test score and success in the FAA Academy screening program (Broach, Young, & Farmer, 1994; Collins, Nye, and Manning, 1990). From evidence like this, we concluded that the test was subject to practice effects. The graduates of these training programs may have had inflated scores on the test, and this could have contributed to some increases that were seen in the failure rates at the FAA Academy in the late 1980s.

### Noncompetitive processes

So far, only the conventional, competitive hiring process has been described. Other legitimate, but less well-known processes were also used. One such method was cooperative education. The FAA formally recruited students at colleges in certain majors, such as aviation, mathematics, geography, and engineering. As employees in the FAA's cooperative education program, the students alternated periods of training to be controllers at the FAA with periods of study in college. College graduates who met all the requirements described previously, and completed the cooperative education training program, could be assigned to positions as entry

*Recovery of the FAA Air Traffic Control Workforce, 1981–1992*

level controllers. They then attended the FAA Academy screening program. In addition, the FAA moved people internally from other occupations into controller jobs. Programs were established that allowed lower-graded employees to take the OPM written ATCS aptitude test battery, and bid for entry-level positions in air traffic control. Thus, for example, a secretary or clerical worker could compete for an entry level training position as a controller. The people hired under this program usually started as controllers below the normal GS-7 entry grade. They received additional training before they reached GS-7. The minimum passing scores on the OPM test still applied to them, and they were required to meet the same medical and background investigation requirements as other applicants. Of course, they also had to pass the FAA Academy screening program upon reaching the GS-7 grade.

Other alternative hiring methods centered around former military controllers. The FAA hired many former military controllers through the basic civil service hiring process, described at length in the first part of this paper. It was also not uncommon for the FAA to hire military controllers through alternative hiring procedures. For example, Congress established special, expedited hiring mechanisms for Vietnam-era veterans, and for people who had recently left military service. The FAA still required the test, medical, and background investigations when using this approach, but it was, nevertheless, somewhat easier to hire people by this method. Not uncommonly, former military controllers might be hired at one step above the normal entry grade, based on their military controller experience. These individuals could bypass the FAA Academy screening program and go directly into training at an FAA air traffic control facility. In 1988, the military services reduced the size of their forces. The FAA took advantage of the opportunity to hire military controllers (Manning & Aul, 1992). This program was conducted under very different procedures as authorized by OPM. The controllers were hired at the GS-9 grade, one grade above the normal entry grade. Above the GS-7 grade, the OPM test was optional. In this case, the agency chose not to use it. Instead, subject matter experts (personnel experts and controllers) rated the candidates' experience, education, and training. This was a daunting task, as there were over 1,400 eligible applicants. A standard rating guide, containing six factors, was used. All selectees had to meet the medical requirements and be cleared through a background investigation. In addition, FAA air traffic control staff contacted the selectees' former military

facilities to verify their work experience and obtain references or recommendations. About 600 military controllers were hired in this way. They were placed directly into facility training, bypassing the FAA Academy screening program (Manning & Aul).

## Current Trends in Controller Selection

On February 21, 1992, the FAA closed the process of hiring from the general population. No new applications to take the OPM test were processed, except for certain veterans who had a statutory right to take the examination. On August 12, 1993, President Clinton again permitted the former controllers who had left the agency in 1981 to be considered for employment with the FAA. The FAA accepted applications from the former controllers from September 1, 1993 through October 15, 1993. Over 5,000 applications were received in that short period. From 1992 until now, it has not been necessary to hire significant numbers of people. Between 1992 and 1997, the FAA hired approximately 100 controllers per year. This has been due to stable workforce with very low attrition and retirement rates (General Accounting Office, 1997), use of contractors to operate less busy non-radar towers, and a slower than anticipated growth in aviation in the early part of the decade.

However, the FAA may increase its hiring in the near future but under very different conditions. The reason for the hiring is primarily that attrition is anticipated to increase in the next five years, as the post-strike generation of controllers ages. The FAA is now starting to hire, to ensure that replacement staff are trained and ready when needed. The FAA estimates that about 500 new controllers per year will be needed over the next several years. The General Accounting Office (GAO) has recently produced slightly lower estimates (GAO, 1997); but both organizations point to the need for future hiring (Schroeder, Broach, & Farmer, this volume). Approximately 50 cooperative education students also began work study programs with the agency in 1997. These individuals will come to a different FAA. In April of 1996, the FAA was legally exempted from most of the civil service laws. The agency now has the authority to develop new and innovative personnel systems and, for many months, has been incorporating new procedures based on studies of the best practices in other organizations. Based on those best practices and lessons learned in the recovery of the controller workforce between 1981 and 1992, the FAA is developing and implementing innovative processes to select and train the next generation of air traffic controllers.

# CHAPTER 2:

# AIR TRAFFIC CONTROL SPECIALIST APTITUDE TESTING, 1981-1992

Dana Broach

FAA Civil Aeromedical Institute, Oklahoma City, Oklahoma

*Between 1981 and 1992, entry into the demanding air traffic control specialist (ATCS) occupation in the Federal Aviation Administration (FAA) was determined by applicant performance on a written aptitude test battery. That ATCS aptitude test battery was administered over 400,000 times between 1981 and 1992. The reliability, validity, and technical fairness of the test battery are evaluated in this paper. Available data indicated that the tests comprising the battery had acceptable reliability. A composite score on the test battery predicted performance in initial ATCS qualification training at the FAA Academy, but did not predict outcomes in field training. Evidence for differential prediction of FAA Academy outcomes on the basis of race and gender was found in the technical fairness analyses. However, the validity evidence supported using the battery as a mass testing tool by the FAA in rebuilding the controller workforce.*

The Air Traffic Control Specialist (ATCS) occupation is the single largest (about 17,000) and most publicly visible occupational group in the Federal Aviation Administration (FAA). Air traffic controllers are at the heart of a web of radars, computers, and communication facilities that comprise an increasingly complex and busy air transportation system. Appropriate selection of personnel into these critical positions is an important human factors problem. From 1981 through 1992, the FAA used noncompensatory, multiple hurdles to select people into the ATCS occupation. The first hurdle was a written aptitude test battery administered by the U.S. Office of Personnel Management (OPM; Aul, 1991, this volume). Between 1981 and 1992, the test was administered over 400,000 times. Only 25,277 applicants were selected on the basis of their test scores to attend the FAA Academy initial controller training program, the second major hurdle in the FAA's selection process. The purpose of this paper is to describe the test battery and evaluate its psychometric characteristics.

## Description of the ATCS Written Test Battery

The aptitude test battery used from 1981 to 1992 was developed in response to the inadequacies of a more traditional civil service battery that was in use from 1964 to 1981. The effectiveness of the 1964 civil service battery was questioned as early as 1970, in the final report of the Air Traffic Controller Career Committee (Corson, Berhard, Catterson, Fleming, Lewis, Mitchell, & Ruttenberg, 1970). A review of controller training in the mid-1970s concluded that improved selection methods could have substantial monetary implications for the agency (Henry, Ramrass, Orlansky, Rowan, String, & Reichenbach, 1975). A subsequent technical study of controller selection tests found that the 1964 test battery was, at best, marginal in predicting the job performance of controllers (Milne & Colmen, 1977). Cooperative research by scientists from the FAA Office of Aviation Medicine (Dailey & Pickrel, 1984a, b), Civil Aeromedical Institute (CAMI; Collins, Boone, & VanDeventer, 1984), and OPM (Rock, Dailey, Ozur, Boone, & Pickrel, 1982) resulted in the development, validation, and implementation of a new written ATCS aptitude test battery in 1981 following the strike by members of the Professional Air Traffic Controller Organization (PATCO).

Three tests comprised the new 1981 test battery: the Multiplex Controller Aptitude Test (MCAT), the Abstract Reasoning Test (ABSR), and the Occupational Knowledge Test (OKT). The MCAT was a timed, paper-and-pencil test simulating activities required for control of air traffic. Aircraft locations and direction of flight were indicated with graphic symbols on a simplified, simulated radar display (Figure 2–1); an accompanying table provided relevant

information required to answer the item, including aircraft altitudes, speeds, and planned routes of flight. MCAT test items required examinees to identify situations resulting in conflicts between aircraft, to solve time, speed, and distance problems, and to interpret the tabular and graphical information. The ABSR was a 50-item civil service examination (OPM-157). To solve an item, examinees determined what relationships existed within sets of symbols or letters. The examinee then identified the next symbol or letter in the progression or the element missing from the set. A sample ABSR item is presented in Figure 2-2. The OKT was an 80-item job knowledge test that contained items related to seven knowledge domains generally relevant to aviation, and specifically relevant to air traffic control phraseology and procedures. The OKT was developed as an alternative to self-reports of aviation and air traffic control experience. The OKT was found to be more predictive of performance in ATCS training than self-reports (Dailey & Pickrel, 1984b; Lewis, 1978).

The scoring of the MCAT, ABSR, and OKT is presented in Table 2-1. The sum of the weighted MCAT raw score and the ABSR score was then transformed into a linear composite ranging from 19.5 to 100. This "Transmuted Composite" (TMC) score was used to determine employment eligibility. For applicants without specialized prior experience, education, or superior academic achievement, a minimum TMC of 75.1 was required to qualify at the entry level GS-7 grade (Aul, 1991, this volume). If an applicant achieved the minimum TMC, extra points were awarded on the basis of scores on the OKT, as noted in Table 2-1. The final civil service rating (RATING) was the sum of TMC, extra points on the basis of OKT scores, and any adjudicated veteran's preference points. Ranking, referral, and selection were based on an applicant's final RATING. In general, only those competitive applicants with a RATING of at least 90 were selected by the FAA for employment as controllers. The distributions of applicant and selectee RATING scores are presented in Figure 2-3, based on over 200,000 applicant records archived at CAMI for research purposes.

## Psychometric Characteristics
### Reliability

Reliability in testing refers to the degree to which scores on a test are free from errors of measurement (American Educational Research Association, Ameri-can Psychological Association, & National Council on Measurement in Education, 1985). Test-retest reliability is an estimate of the degree to which a person will obtain approximately the same score when re-tested after some time interval. The test-retest correlation for the MCAT was estimated at .60 in a sample of 617 newly-hired controllers (Rock, Dailey, Ozur, Boone, & Pickrel, 1981, p. 59). Parallel form reliability estimates the degree to which an applicant will obtain approximately the same score on a different version of the same test. The parallel form reliability, as computed on the same sample, ranged from .42 to .89 for various combinations of items (Rock et al., p. 103). Internal consistency estimates the degree to which the items in a test are homogenous (Ghiselli, Campbell, & Zedeck, 1981). Lilienthal and Pettyjohn (1981) examined internal consistency and item difficulties for ten versions of the MCAT. Cronbach's alpha for the ten versions ranged from .63 to .93; the alphas for 7 of the 10 versions were greater than .80. The available data suggest that the MCAT had acceptable reliability but was vulnerable to practice effects. In contrast, no item analyses, parallel form, test-retest, or internal consistency estimates of the ABSR (OPM-157) test have been reported by the FAA. Therefore, no conclusion can be drawn about the measurement properties of the ABSR. Published data are available for the OKT. Parallel form reliability for the OKT ranged from .88 to .91 (Rock et al., p. 65, 70). The internal consistency estimate of reliability (Kuder-Richardson Formula 20 (KR-20); Kuder & Richardson, 1937) for a 100-item version of the OKT was .95 (Rock et al., p. 51). Lilienthal and Pettyjohn reported Cronbach alphas for ten versions of the OKT ranging from .85 to .94 on a sample of about 2,000 FAA Academy air traffic control students. However, test-retest estimates of reliability have not been published. The available data suggest that the OKT had acceptable reliability.

### Validity

Validity generally refers to the appropriateness, meaningfulness, and usefulness of specific inferences made on the basis of test scores (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, 1985). Validity in the specific context of employee selection, as discussed in the federal *Uniform Guidelines on Employee Selection Procedures*

(Equal Employment Opportunity Commission, 1978), refers to the degree to which test scores used for making employment decisions are predictive or correlated with important and/or critical work outcomes, elements, or behaviors. The ATCS aptitude test battery has been validated against two classes of work outcomes in previous studies: (a) performance in the FAA Academy initial training programs (SCREEN; Della Rocco, this volume); and (b) outcomes of on-the-job field training (OJT) at the first assigned field facility (STATUS; Manning, this volume).

As the final civil service RATING was the basis of operational personnel selection decisions, this retrospective analysis examined the validity of the final RATING as a predictor of these two criteria for the 15,876 controllers who survived the FAA Academy and were placed into field training between 1981 and 1992. The field training STATUS criterion was coded as follows: 1 = *Reached Full Performance Level*; 2 = *Still in Training (Developmental)*; 3 = *Switched facilities*; 4 = *Switched options*; and 5 = *Failed*. As recommended by Manning, persons who had attrited for reasons other than performance were excluded from the validity analysis. Because the samples had been truncated by selection first, on RATING, and second, by selection on FAA Academy score (SCREEN), corrections for restriction in range were made as shown in Table 2-2, using the formulae presented by Ghiselli, Zedeck, and Campbell (1984). Correlations between civil service RATING and FAA Academy SCREEN scores were corrected for direct restriction in range due to explicit selection on RATING. The corrections were based on the population standard deviations presented in the Tables 2-3 through 2-6. Correlations between FAA Academy (SCREEN) and field training outcomes (STATUS) were corrected for direct restriction in range due to explicit selection on the FAA Academy score. Finally, correlations between civil service RATING and field training outcomes were corrected for incidental restriction in range due to selection of the samples on FAA Academy SCREEN scores. The uncorrected, zero-order correlations are presented in the lower left corner of each correlation matrix and the corrected correlations in the upper right corner. The corrected correlation matrices for each sample were submitted to regression analysis to estimate the validity of RATING as a predictor of FAA Academy SCREEN and field training STATUS.

In view of the iterations of the FAA Academy initial training programs, described by Della Rocco, and differences in field training as described by Manning, the sample was divided into four groups: (a) 1982-85 FAA Academy Terminal program graduates assigned to training in the terminal option (Table 2-3); (b) 1982-85 FAA Academy En route program graduates assigned to field training in the en route option (Table 2-4); (c) 1986-92 FAA Academy Non-radar Screen assigned to field training in the terminal option (Table 2-5); and (d) 1986-92 FAA Academy Non-radar Screen graduates assigned to field training in the en route option (Table 2-6).

On one hand, this retrospective analysis found that the final civil service RATING had acceptable validity as a predictor of performance in initial training at the FAA Academy for all four groups. The uncorrected correlations between RATING and SCREEN were statistically significant and ranged from .178 to .222 across the four groups. The corrected correlations between civil service RATING and FAA Academy SCREEN ranged from .458 to .502. On the other hand, regression analyses of the corrected correlation matrices found that RATING was a relatively poor predictor of field training STATUS in three of the four FAA Academy and field training variations (Table 2-7). The standardized regression weight ($\beta$) for RATING was not statistically significant for graduates of 1982-85 Terminal Screen program assigned to field training in the terminal option ($\beta$ = -.025, *ns*) or for 1986-92 Non-radar Screen program graduates assigned to either terminal ($\beta$ = -.041, *ns*) or en route ($\beta$ = -.010, *ns*) field training. However, RATING did enter into the regression equation predicting STATUS in en route field training, with a standardized regression weight of -.107 ($p \leq .001$), for graduates of the 1982-85 En Route Screen program, as shown in Table 2-7.

### Fairness

The FAA, in its 1993 Diversity Plan, made a commitment to attract, retain, develop, and manage a diverse work force that visibly reflected the American population at large by the year 2000. Achieving this goal will require substantial changes in the demographic profile of the ATCS occupation. Air traffic control is a career field in which female and minority workers have been historically under-represented relative to the American population at large. The techni-

cal fairness of the written ATCS aptitude test battery was recently examined in a series of papers as the first step toward assessing to what degree, if any, the battery may have served as an "engine of exclusion" (Seymour, 1988) of women and minorities from the ATCS occupation (Young, Broach, & Farmer, 1996; Broach, Farmer, & Young, 1997). Technical fairness refers to the regression model of test bias for which there is a reasonable professional consensus, as embodied in the 1985 *Standards for Educational and Psychological Testing* (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education), rather than a socially constructed standard regarding test use (Sackett & Wilk, 1994; Gottfredson, 1994). Technical fairness in the regression model, and under the *Uniform Guidelines on Employee Selection Procedures* (Equal Employment Opportunity Commission, 1978), encompasses two issues. First, the effect on protected groups arising from use of a particular cut score on the predictor must be evaluated. A selection rate for any protected group that is less than four-fifths (4/5 or 80%) of that of the majority group will "... generally be regarded by the Federal enforcement agencies as evidence of adverse impact" (29 CFR 1607.4.D). Second, where the use of a selection procedure results in adverse impact, the *Uniform Guidelines on Employee Selection Procedures* require that the test user evaluate the degree to which differential predictions of future job performance are made from selection test scores by subgroup (29 CFR 1607.14.B.(8).(b)).

## Gender

Previous research on written ATCS selection tests suggested that mean score differences by gender were insignificant (Rock, Dailey, Ozur, Boone, & Pickrel, 1984a, pp. 476) and that, overall, "the evidence for adverse impact against women based, on this sample, was marginal, at best" (Rock, Dailey, Ozur, Boone, & Pickrel, 1984b, pp. 507). This conclusion was based on results of a 1984 study in which 57% of men ($n = 3,835$) passed the written test, compared to 45% of women ($n = 1,473$). The adverse impact ratio in this case was 0.78, rather than the 0.80 required under the "four-fifths rule of thumb." Young, Broach and Farmer (1996) analyzed archival records for 170,578 applicants. Based on test scores, OPM determined the eligibility of applicants for employment by the FAA. OPM codes indicating that an applicant

had either failed the test ('IA') or scored too low for consideration ('IS') were categorized as test failures. All other ineligibility codes were categorized as "other ineligible," and excluded from the analysis. OPM codes indicating eligibility were categorized as "eligible" for employment. The adverse impact analysis compared the proportion of women considered eligible with that of men. The analysis is presented in Table 2-8. A significantly lower percentage of women (42.0%) than men (58.1%) were coded by OPM as eligible for employment as controllers, based on test scores ($Z = -3.58$, $p \leq .001$). The ratio of female to male selection rates was .72. Using the 4/5ths rule of thumb of the *Uniform Guidelines on Employee Selection Procedures*, it appeared that the use of scores on the written ATCS aptitude test battery to determine eligibility for employment in the ATCS occupation between 1981 and 1992 resulted in statistically significant adverse impact on female applicants.

Given the finding that there appeared to be adverse impact against women, the *Uniform Guidelines on Employee Selection Procedures* (29 CFR 1607.14.B.(8).(b)) and *Standards for Educational and Psychological Testing* (Standard 1.20, p. 17) next required an investigation of the relationship between test scores and job performance for evidence of differential prediction by subgroup. The classical, regression-based model of test bias was used as the analytic framework by Young, Broach, and Farmer to evaluate the degree to which the written ATCS test battery differentially predicted performance in initial ATCS qualification training at the FAA Academy. After correcting correlations between test score, FAA Academy composite score, and gender for explicit and implicit restrictions in range due to prior selection of the sample on aptitude test score, the null hypothesis of a common regression line for the genders was rejected, suggesting the presence of some degree of test bias. Statistically significant differences by gender in regression slopes and intercepts were found in the step-down regression analysis, indicating the need for separate regression equations for men and women. The regression line for men slightly over-predicted the performance of women in the FAA Academy, as shown in Figure 2-4. The practical consequence of the apparent differential prediction was that women effectively needed a higher test score than men to have an equal likelihood of passing the initial qualification training at the FAA Academy.

## Race

A formal adverse impact analysis on the basis of race was not technically feasible, as racial identifiers were not collected for ATCS job candidates. However, previous research (Rock, Dailey, Ozur, Boone, & Pickrel, 1984) found that the OPM test battery had adverse impact against African-Americans and Hispanics. In view of the previous research, Broach, Farmer, and Young (1997) investigated the relationship between test scores and performance in the FAA Academy for evidence of differential prediction on the basis of race. The classical, regression-based model of test bias was again used as the analytic framework to evaluate the degree to which the written ATCS test battery differentially predicted performance in initial ATCS qualification training at the FAA Academy for African-American and white controllers. After correcting correlations between test score, FAA Academy composite score, and race for explicit and implicit restrictions in range, the null hypothesis of a common regression line for African-American and white controllers was rejected, suggesting the presence of some degree of test bias. Statistically significant differences by race in regression slopes and intercepts were found in the step-down regression analysis, indicating the need for separate regression equations for African-American and white controllers. The regression line for whites over-predicted the performance of African-Americans in the FAA Academy. The practical consequence of the apparent differential prediction was that African-American controllers effectively needed a higher test score than white controllers to have an equal likelihood of passing the initial qualification training at the FAA Academy, as shown in Figure 2-5.

## Discussion

The written ATCS aptitude test battery in use from 1981 through 1992 was developed to enable the agency to make reasonable predictions, for large numbers of applicants, about their future job performance as the basis for initial selection into a safety-related occupation. From a practical perspective, the primary function of the written ATCS test battery was to winnow a huge pool of applicants down to a smaller, manageable number suitable for further intensive, expensive evaluation. On one hand, the written ATCS aptitude test battery, as used from 1981 to 1992, achieved that organizational goal. The tests comprising the battery produced reliable scores. A composite of those reliable scores, used as the basis for selection decisions, was valid as a predictor of near-term (relative to date-of-hire) training outcomes.

On the other hand, the composite score was not a valid predictor of far-term (2 to 3 years from hire) field training outcomes. Moreover, the fairness analyses suggested that the battery had adverse impact against women, and was likely to have had adverse impact on African-American job candidates. The test battery over-predicted performance in initial ATCS qualification training at the FAA Academy on the basis of gender and race. Adverse impact and over-prediction of training and job performance is commonly reported for tests of cognitive ability similar to the ATCS test battery, such as the General Aptitude Test Battery (GATB) (Hartigan & Wigdor, 1989; Schmidt, 1988; Wigdor & Sackett, 1993). This outcome does not result because scores on the ATCS aptitude test battery mean something different for women and African Americans. The test is not biased in that sense. Rather, the adverse impact and over-prediction of subsequent performance in initial training for both groups results from the interplay of two factors: the lower average scores for African Americans and women relative to white males, and the less-than-perfect validity of the composite test score. As a consequence of these facts, the predicted performance of minorities and women is higher than their actual performance. The practical result is that more women and minorities were hired on the basis of their predicted performance than would have been hired on the basis of their actual job performance.

In conclusion, the written test battery was a valid mass testing tool, with which the FAA could reduce the applicant pool to a smaller, affordable number for more intensive evaluation of their aptitude for the controller occupation. The relative costs of assessment methods must be carefully considered, particularly in view of the substantial numbers of job applicants. For example, the cost of administering the paper-and-pencil ATCS test battery was about $20 per examinee, compared with a cost of about $10,000 per person for initial training at the FAA Academy (Broach & Brecht-Clark, 1993). There was significant financial utility for the agency in using a valid test as the first step in a multiple-hurdle, sequential personnel selection system. Moreover, the test battery was fair, in that test scores over-predicted subsequent training performance of African Americans and women. Overall, the written ATCS aptitude test battery was an inexpensive, practical, valid, fair, and invaluable tool in rebuilding the controller workforce between 1981 and 1992.

*Recovery of the FAA Air Traffic Control Workforce, 1981–1992*



| AIRCRAFT | ALTITUDE | SPEED | ROUTE |
|----------|----------|-------|-------|
| 10 | 7000 | 480 | AGKHC |
| 20 | 7000 | 480 | BGJE |
| 30 | 7000 | 240 | AGJE |
| 40 | 6500 | 240 | CHKJF |
| 50 | 6500 | 240 | DIKGB |
| 60 | 8000 | 480 | DIKJE |
| 70 | 8000 | 480 | FJKID |

**SAMPLE QUESTION**

WHICH AIRCRAFT WILL CONFLICT?

A. 60 AND 70
B. 40 AND 70
C. 20 AND 30
D. NONE OF THESE

**Figure 2–1:** Example Multiplex Controller Aptitude Test (MCAT) item

# Symbols

1.

| □ ◪ ◗ | △ ◯ ? | ◎ ⚠ ◲ ▱ ☁ |
|-------|-------|-----------|
|       |       | A  B  C  D  E |

2.

| ⌐ ◡ ◥ | ∨ ∧ ? | ⌐ ⌐ ～ ⌐ ◥ |
|-------|-------|-----------|
|       |       | A  B  C  D  E |

# Letters

1) XCXDXEX      A) FX   B) FG   C) XF   D) EF   E) XG

2) ARCSETG      A) HI   B) HU   C) UJ   D) UI   E) IV

**Figure 2–2:** Example Abstract Reasoning (ABSR) test item

12



**Figure 2–3:** Distribution of RATING for examinees and selectees



**Figure 2–4:** Regression of test score (TMC) on FAA Academy score (SCREEN) by gender

*Recovery of the FAA Air Traffic Control Workforce, 1981–1992*



**Figure 2–5:** Regression of test score (TMC) on FAA Academy score (SCREEN) by race

### Table 2–1: ATCS Aptitude test battery scoring

| Test | OPM # | Scoring | Weight | N Items |
|------|-------|---------|--------|---------|
| MCAT | 510 | N Right | 2 | 110 |
| ABSR | 157 | N Right - (0.25*N Wrong) | 1 | 50 |
| OKT | 512 | N Right | [a] | 80 |

*Note:* Extra points awarded as follows for OKT raw scores: 0-51 = 0 extra points; 52-55 = 3 extra points; 56-59 = 5 extra points; 60-63 = 10 extra points; 64-80 = 15 extra points for computation of the civil service rating.

### Table 2–2: Correlation matrix structure for regression analyses

| | RATING | SCREEN | STATUS |
|--------|--------|--------|--------|
| RATING | | $r_{e_{(RATING)}}$ | $R_{i_{(SCREEN)}}$ |
| SCREEN | $r_s$ | | $R_{e_{(SCREEN)}}$ |
| STATUS | $r_s$ | $r_s$ | |

*Note:* Sample correlation matrix structure shown below the diagonal, corrected matrix structure above the diagonal. $r_s$ = sample correlation; $r_{e_{(RATING)}}$ = correlation corrected for explicit selection on RATING; $r_{i_{(SCREEN)}}$ = correlation corrected for incidental restriction in range due to selection on SCREEN; and $r_{e_{(SCREEN)}}$ = correlation corrected for explicit selection on SCREEN

**Table 2–3: Descriptive statistics and correlations for 1982-85 Terminal Screen graduates assigned to Terminal OJT**

| Variable | Sample[a] | | | Population[b,c] | | | Correlations[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | *N* | *M* | *SD* | *N* | *M* | *SD* | (1) | (2) | (3) |
| (1) RATING | 2,814 | 92.31 | 5.72 | 99,887 | 74.93 | 14.24 | | .493 | -.168 |
| (2) SCREEN | 3,174 | 79.45 | 5.48 | 4,686 | 73.82 | 11.32 | .222*** | | -.303 |
| (3) STATUS | 3,174 | 88.0% | FPL | | | | -.037 | -.146*** | |
| | | 12.0% | NOT FPL | | | | | | |

*Notes:* [a]STATUS outcomes for first assigned field facility only as of March 1997        ** p < .01, ***p < .001
[b]RATING based on CAMI records for examinees tested 1982-85
[c]SCREEN based on Terminal Screen entrants who did not withdraw, 1982-1985
[d]Uncorrected correlations in lower left half, corrected in upper right half.

**Table 2–4: Descriptive statistics and correlations for 1982-85 En Route Screen graduates assigned to En Route OJT**

| Variable | Sample[a] | | | Population[b,c] | | | Correlations[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | *N* | *M* | *SD* | *N* | *M* | *SD* | (1) | (2) | (3) |
| (1) RATING | 4,021 | 92.56 | 5.37 | 99,887 | 74.93 | 14.24 | | .502 | -.256 |
| (2) SCREEN | 4,276 | 82.02 | 7.17 | 4,686 | 73.82 | 11.32 | .214*** | | -.351 |
| (3) STATUS | 4,276 | 66.1% | FPL | | | | -.047** | -.231** | |
| | | 33.9% | NOT FPL | | | | | | |

*Notes:* [a]STATUS outcomes for first assigned field facility only as of March 1997        ** p ≤ .01, ***p ≤ .001
[b]RATING based on CAMI records for examinees tested 1982-85
[c]SCREEN based on En route Screen entrants who did not withdraw, 1982-1985
[d]Uncorrected correlations in lower left half, corrected in upper right half.

**Table 2–5: Descriptive statistics and correlations for 1986-92 Non-radar Screen graduates assigned to Terminal OJT**

| Variable | Sample[a] | | | Population[b,c] | | | Correlations[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | *N* | *M* | *SD* | *N* | *M* | *SD* | (1) | (2) | (3) |
| (1) RATING | 2,765 | 93.31 | 5.15 | 106,201 | 76.33 | 14.67 | | .458 | -.095 |
| (2) SCREEN | 3,145 | 78.28 | 6.07 | 12,756 | 72.26 | 11.80 | .178*** | | -.137 |
| (3) STATUS | 3,298 | 95.0% | FPL | | | | -.027 | -.071*** | |
| | | 5.0% | NOT FPL | | | | | | |

*Notes:* [a]STATUS outcomes for first assigned field facility only as of March 1997        ** p ≤ .01, ***p ≤ .001
[b]RATING based on CAMI records for examinees tested 1982-85
[c]SCREEN based on Non-radar Screen entrants who did not withdraw, 1982-1985
[d]Uncorrected correlations in lower left half, corrected in upper right half.

*Recovery of the FAA Air Traffic Control Workforce, 1981–1992*

**Table 2–6: Descriptive statistics and correlations for 1986-92 Non-radar Screen graduates assigned to En Route OJT**

| Variable | Sample[a] | | | Population[b,c] | | | Correlations[d] | | |
|---|---|---|---|---|---|---|---|---|---|
| | N | M | SD | N | M | SD | (1) | (2) | (3) |
| (1) RATING | 3,969 | 93.79 | 5.06 | 106,201 | 76.33 | 14.67 | | .493 | -.129 |
| (2) SCREEN | 4,449 | 80.26 | 5.89 | 12,756 | 72.26 | 11.80 | .192*** | | -.247 |
| (3) STATUS | 4,732 | 77.3% FPL | | | | | -.014 | -.126*** | |
| | | 22.7% NOT FPL | | | | | | | |

*Notes:* [a]STATUS outcomes for first assigned field facility only as of March 1997    ** $p \leq .01$, *** $p \leq .001$
  [b]RATING based on CAMI records for examinees tested 1982-85
  [c]SCREEN based on Non-radar Screen entrants who did not withdraw, 1982-1985
  [d]Uncorrected correlations in lower left half, corrected in upper right half.

**Table 2–7: Civil service RATING validity in predicting FIELD TRAINING outcome by sample, based on corrected correlations**

| | Sample | | | | | |
|---|---|---|---|---|---|---|
| Period | FAA Academy | Field OJT | R | β-RATING | β-SCREEN |
|---|---|---|---|---|---|
| 1982-85 | Terminal Screen | Terminal | .304*** | -.025 | -.291*** |
| 1982-85 | En Route Screen | En route | .363*** | -.107*** | -.297*** |
| 1986-92 | Non-radar Screen | Terminal | .142*** | -.041 | -.118*** |
| 1986-92 | Non-radar Screen | En route | .247*** | -.010 | -.242*** |

*$p \leq .05$, **$p \leq .01$, ***$p \leq .00$

**Table 2–8: Adverse impact analysis by gender based on OPM eligibility codes**

| OPM Eligibility | Sex | | Row totals |
|---|---|---|---|
| | Males | Females | |
|---|---|---|---|
| Eligible | 69,056 | 14,564 | 84,070 |
| | (58.1%) | (42.0%) | |
| Failed test | 49,902 | 20,077 | 69,979 |
| | (41.9%) | (58.0%) | |
| Column totals | 118,985 | 34,641 | 53,599 |

*Notes:* Percents are column percentages

# CHAPTER 3:

# FAA ACADEMY AIR TRAFFIC CONTROL SPECIALIST
# SCREENING PROGRAMS AND STRIKE RECOVERY

## Pamela Della Rocco

FAA Civil Aeromedical Institute, Oklahoma City, Oklahoma

*In 1976, the Federal Aviation Administration (FAA) implemented screening programs for Air Traffic Control Specialists (ATCSs) at the FAA Academy which, in combination with a paper-and-pencil selection test, provided a robust two-stage selection system used in recovery from the 1981 Professional Air Traffic Controller Organization (PATCO) strike. The purpose of the present paper is to review data from the FAA Academy screening programs with regard to their role in the FAA strike recovery efforts, as well as the evolution of the programs in the post-strike years. Data are presented for pass rates, demographics, and evidence of validity of the programs.*

At the time of the 1981 Professional Air Traffic Controller Organization (PATCO) strike, the Federal Aviation Administration (FAA) selected Air Traffic Control Specialists (ATCSs) through a two-stage process (Della Rocco, Manning, & Wing, 1990). The first stage was the Office of Personnel Management (OPM) written air traffic control (ATC) test battery (Broach, this volume). The second stage was a FAA Academy initial qualification course. This two-stage process provided a robust foundation for recovery of the controller workforce in the wake of the firing of the striking ATCSs. The purpose of the present paper is to review the FAA Academy screening programs with regard to their role in the FAA recovery from the strike, as well as the evolution of the programs in the post-strike years. Data are presented for pass rates, demographics, and validity of the programs.

## Background

The FAA has conducted research on the selection of ATCSs since the 1950s (Collins, Boone, & VanDeventer, 1984). Written aptitude tests for the occupation were implemented as early as 1964 and were administered nation-wide. Despite the increased validity of the written Civil Service Commission (CSC) selection tests over the previous system based on prior experience alone, the high occupational attrition rates were a concern through the late 1960s and into the early 1970s. In 1974, for example, the

failure rate was about 43% for en route trainees and 38% for terminal trainees (Henry, Ramrass, Orlansky, Rowan, String, & Reichenbach, 1975). This training attrition typically occurred two to three years into an individual's career (Manning, 1991). During the early 1970s, several groups examined the FAA's air traffic training and selection process (Corson, 1970; Henry et al., 1975; Committee on Government Operations, 1976). The reports recommended the development of a validated, standardized, and centralized pass/fail training program, designed to screen persons who lacked sufficient potential to become fully certified ATCSs early in their career (Boone, 1984). The FAA committed to the development of screening programs, which would follow successful performance on the written CSC (renamed Office of Personnel Management in 1978) air traffic test battery (Boone, 1984).

## Description of FAA Academy Screening programs
## Pre-strike Screening programs

In 1976, the pass/fail FAA Academy initial qualification courses were implemented. They were based on non-radar air traffic control procedures. Separate courses existed for the two career options, En Route and Terminal. Entrants were assigned to an option based upon agency staffing needs. The screening programs evolved from training previously administered by the FAA Academy. The courses were designed to assess the aptitude of an individual with no prior knowledge of the

occupation. These screening courses were the equivalent of a miniaturized training-testing model of selection (Manning, Kegg, & Collins, 1989; Della Rocco, Manning, & Wing, 1990).

The Terminal and En Route Screen programs contained two pass/fail phases covering (1) an introduction to aviation and air traffic control and (2) procedures for non-radar control of air traffic in the airspace relevant to each option (Boone, 1984). The first pass/fail segment was strictly academic and covered topics such as principles of flight, meteorology, air traffic service and the National Airspace System. However, it was the non-radar procedures phase of training that identified the candidates with less chance of succeeding in the occupation. The non-radar phase for both options included academics, laboratory simulation problems, and the Controller Skills Test (CST). During the academic classroom training, entrants were taught the rules and principles of non-radar ATC. Students received a score from this academic training which was included in the final non-radar phase score. During the laboratory training, entrants were required to apply the rules and principles learned in the classroom to air traffic simulation problems. Each entrant performed non-radar controller job tasks in one or two thirty-minute scripted scenarios daily. An individual instructor was assigned to each student for each scenario. Following the scenario, the instructor reviewed the student's performances and provided feedback on errors as well as correct application of the rules and scenario scores. Instructors assigned a technical assessment (number of errors), as well as an instructor assessment (subjective evaluation of student performance) for each scenario. The laboratory scenarios were structured to escalate in complexity. Five of six of the final laboratory problems were graded and counted in the final score. The CST was the final test administered in the non-radar phase. It was a timed, paper-and-pencil, multiple-choice assessment of the student's ability to apply non-radar ATC rules and procedures. A final composite score of at least 70 (out of a possible score of 100) was required to pass the non-radar phase. Failure to achieve a composite score of 70 resulted in removal from the ATCS job. Although the En Route and Terminal Screen programs were modified over the years, the basic structure remained much the same between 1976 and 1985.

At the time of the strike in 1981, the En route and Terminal Screen programs had effectively achieved the goal of reducing field attrition (Manning, 1991). Between 1971 and 1975, field attrition in both options

averaged 41%. Following the implementation of the screening programs between 1976 and 1981, FAA Academy attrition rates were 29% and subsequent field attrition was cut to 8%. Thus, within the first few months of appointment to the occupation, the FAA Academy programs screened out most of those individuals who lacked sufficient potential to become fully certified ATCSs. The pass rate was 67% for En Route Screen entrants and 74% for Terminal, with an overall average of 70%. Of historical note, subsequent to the strike, a new Office of Personnel Management (OPM) test battery was implemented, replacing the previous CSC battery (Broach, this volume; Collins, Boone, & VanDeventer, 1984).

A key feature of the 1976 effort was to implement a research database system to document and monitor the effectiveness of the program. The database was established at the Civil Aeromedical Institute (CAMI). Data were collected on all FAA Academy entrants. Planning for the second-stage pass/fail screening programs was influenced by requirements identified by publication of the original *Uniform Guidelines on Employee Selection Procedures* in 1966 (Boone, 1984). The database provided a source for monitoring compliance with those guidelines. In 1984, the CAMI tracking database was established to track FAA Academy graduates through Full Performance Level (FPL; Manning, this volume). This database provided criterion measures for program validation.

### Strike recovery, 1981-1985

By the time of the strike in 1981, the FAA had five and a half years of experience using the En Route and Terminal initial qualification courses as screening programs. In addition, data on all entrants had been collected in the research database. Thus, the system was in place to select and monitor the progress of ATCS candidates, including individuals who had no knowledge of the occupation. The FAA Academy only needed to gear up to manage the increased student load resulting from the strike recovery effort. Prior to the strike, 8,262 candidates (4,138 En Route and 4,124 Terminal) entered the programs in the approximately five and a half year period between January 1976 and August 1981 (Manning, Kegg, & Collins, 1988). Following the strike, 13,533 candidates entered during the four-year period between August 1981 and September 1985. The number of En Route Screen program entrants more than doubled to 8,536, while the number of Terminal Screen program entrants rose approximately 20% to

4,997. The structure of the screening programs was not changed to accommodate the strike recovery (Boone, 1984).

Following the strike, the pass rates in both the En Route and Terminal Screen programs declined (Manning, Kegg, & Collins, 1989). Between August 1981 and September 1985, entrants to the En Route Screen program had an average pass rate of 52%, compared with the pre-strike pass rate of 67%. En Route Screen failures represented 36% and withdrawals represented 12% of the total 8,536 entrants. In the Terminal Screen program, the post-strike pass rate was 68%, compared with the pre-strike rate of 74%. Terminal Screen program entrant failures represented 26%. The Terminal Screen program withdrawal rate was 6% of total entrants.

Examination of the demographic data from pre- and post-strike FAA Academy entrants (Collins, Manning & Taylor, 1984) revealed a shift in the proportion of entrants reporting prior ATC experience. Prior to the strike, 70% of FAA Academy entrants reported either aviation or air traffic control experience prior to entry. After the strike, nearly two-thirds of the entrants had no prior aviation-related experience. FAA Academy pass rates were higher for the group of entrants with prior ATC experience than entrants with no prior experience (Collins, Manning, & Taylor, 1984). The decline in the percentage of entrants with previous ATC experience, particularly prior military controllers, may have affected the pass rates. Because the initial qualification courses were designed for individuals with no prior experience, this shift in demographics was manageable. Table 3-1 presents demographics for each of the time periods examined in this paper.

### The "Non-radar Screen," 1986-1992

Changes to the program during the first decade involved such modifications as alterations in scoring and the number of graded problems (Manning, Kegg, & Collins, 1989). In 1985, however, a major change was made to consolidate the En Route and Terminal Screen programs into a single FAA Academy program, the "Non-radar Screen." Analyses of the longitudinal databases had begun to point to areas in which the screening effectiveness and cost benefits could be enhanced. Because the En Route Screen program was found to better correlate with measures of field success such as supervisor's ratings (VanDeventer, 1981), than the Terminal program, the En Route Screen program was selected as the basis for the Non-radar Screen (Manning, Kegg, & Collins, 1989). Some changes were made to the

weights assigned to the scores on various components to achieve a projected 60% pass rate. The change to using a single screening course meant that students were not assigned to an option or facility until they completed the Non-radar Screen and their FAA Academy scores could be used to place graduates. It was anticipated that assigning students with higher aptitude to more complex facilities would result in further reductions in field training attrition. In addition, the Non-radar Screen was re-sequenced in Fiscal Year 1989 to be the first course completed by FAA Academy students. It was anticipated that by postponing the three-week, academic phase of training that originally preceded the pass/fail Non-radar Screen, the training costs associated with people who would fail or withdraw from the screen would be avoided through the re-sequencing. The nine-week Non-radar Screen was implemented in October 1985 (FY 1986) and continued through the January 1992 entering class. Non-radar Screen pass rates were 56.6% for 14,392 entrants. Failures represented 32.2%, and 11.2% withdrew.

### Validity Evidence

Over the years, several studies examined various measures to assess the predictive validity of the FAA Academy screening programs. These included attrition rates, supervisor ratings, and field training progress. VanDeventer (1981) reported a correlation of .56 (adjusted for explicit restriction in range on FAA Academy score) between the FAA Academy final composite score and the field supervisor's rating for the en route option. Manning, Della Rocco, and Bryant (1989) used field-training status as well as field instructor rating as criterion measures. They reported adjusted correlations between the FAA Academy composite score and instructor ratings of .46 and .30 for the En Route and Terminal Screen programs, respectively. In the first report of data on Non-radar Screen graduates, Della Rocco, Manning, and Wing (1990) reported an adjusted correlation of .44 between FAA Academy composite score and field training status of graduates assigned to the En Route option. In 1994, Broach and Manning reported evidence that the Non-radar Screen was a valid predictor of FAA Academy radar training performance.

To evaluate the final status of the Non-radar Screen program, correlations between the FAA Academy composite score and field training status from the CAMI tracking database for FAA Academy graduates who entered as competitive hires were examined. Field status was a variable that identified ATCSs in their first field

facility as follows (Manning, 1991): 1 = *Reached Full Performance Level*, 2 = *Still in training (Developmental)*, 3 = *Switched facilities*, 4 = *Switched options*, or 5 = *Failed*. Data for individuals who separated from the occupation for reasons unrelated to performance were excluded. The correlation between Non-radar Screen scores and field status in the en route option was -.12 ($N$ = 3,484, $p \leq .001$). Adjusted for explicit restriction in range on the FAA Academy score (Thorndike, 1949), this correlation was -.25. The correlation between Non-radar Screen scores and terminal field status was -.08 ($N$ = 2,505, $p \leq .001$). The correlation, adjusted for range restriction, was -.17. Figures 3-1 and 3-2 present the relationship between FAA Academy Score and attainment of Full Performance Level (FPL) field status at the first facility assignment for en route and terminal options, respectively.

### Evaluation of Potential Adverse Impact

The screening programs were monitored on an ongoing basis for the success of minorities and women to determine compliance with the *Uniform Guidelines on Employee Selection Procedures* ("*Uniform Guidelines*," Equal Employment Opportunity Commission, 1978). The *Uniform Guidelines* provided a "rule of thumb" for assessing adverse impact in protected groups to determine if the procedure differentially selected one group over another. An impact ratio is calculated for each target group's pass rate by the pass rate of the group with the highest rate (typically the non-minorities). By the rule of thumb, if the impact ratio is greater than or equal to .80, the program is usually assumed to demonstrate no adverse impact. The En Route and Terminal Screen programs were found to have adverse impact against African Americans in 1984-85 (Manning, Kegg, & Collins, 1989). Part of the rationale for modifying the FAA Academy program scoring was to reduce the adverse impact. Initial assessments of the Non-radar Screen program for the January 1986-January 1988 entrants revealed an impact ratio of .832, an improvement over the old En Route Screen program. However, for the final two and a half years of the program the ratio for African Americans fell below the .80 rule of thumb. A review of impact ratios by fiscal year revealed the following: .55 for FY 90, .60 for FY 91, and .52 for the final classes during FY 92.

### Discussion

The two-stage ATCS selection process involving the Office of Personnel Management (formerly Civil Service Commission) testing and FAA Academy screening, was a very robust and predictable system that served the agency well as a gateway to a safety-critical career. The experience with the two-stage system, as well as a database for assessing system performance, provided a foundation for recovery from the PATCO strike in 1981.

The correlations in the present analyses between Non-radar Screen scores and field status were lower than those previously reported. One possible reason was that field training was modified during the late 1980s (Manning, 1991). The influx of a large number of developmentals at the lower-staffed facilities would certainly have led to some adjustments in the processes needed to provide instruction and supervision for the on-the-job training provided to the developmentals. To date, adequate criterion measures have been a problem in establishing the validity of the ATCS screening programs (Della Rocco, Manning, & Wing, 1990; Broach & Manning, 1997). The decline in impact ratios may have resulted from the direct hire authority granted to the FAA by OPM during the late 1980s (Della Rocco & Sawyer, 1990). A higher percentage of applicants with lower OPM scores were hired with a predictable outcome of lower FAA Academy pass rates.

In March 1992, the final classes graduated from the FAA Academy Non-radar Screen program, marking the end of an era for air traffic control specialist selection procedures, which had lasted nearly two decades. The system succumbed to various pressures, such as calls to shorten and reduce the costs of the second stage screen (Aerospace Sciences, Inc., 1991), as well as a compromise of the OPM test battery (Manning, 1991). In the Screen's miniaturized training-testing program, individuals with no prior knowledge of the ATC occupation demonstrated that they could separate airplanes in laboratory simulations prior to continuing in the career field. The FAA is currently examining the possibility of using a computerized test battery to replace the former selection systems. It remains to be seen whether or not a cognitive test battery, which measures component skills and abilities in combination with noncognitive measures, can, in fact, effectively replace the work sample model employed in the screening programs. The history of ATCS selection certainly suggests that a robust system can be developed to supply a steady flow of qualified applicants.



**Figure 3–1:** Percent achieving en route FPL field status by FAA Academy score



**Figure 3–2:** Percent achieving terminal FPL field status by FAA Academy score

*Recovery of the FAA Air Traffic Control Workforce, 1981–1992*

### Table 3–1. Demographic profile of FAA Academy entrants

|  | **Pre-Strike 1976-1981** ($N$=6,059) | **Post-Strike 1981-1985** ($N$=13,533) | **Screen 1986-1992** ($N$=14,392) |
|---|---|---|---|
| **Experience** | | | |
| No related experience | 30% | 65% | 79% |
| Aviation Only | 20% | 17% | 5% |
| ATC Operations | 50% | 18% | 16% |
| **Average Age** | 26.5 | 26.5 | 26.2 |
| **Education** | | | |
| High School Only | 14% | 9% | 11% |
| Some College | 48% | 44% | 54% |
| College Degree | 38% | 47% | 35% |
| **Gender** | | | |
| Male | 83% | 85% | 80% |
| Female | 17% | 15% | 20% |
| **Minority Status** | | | |
| Minority | 13% | 8% | 12% |
| Non-Minority | 87% | 92% | 88% |



**Federal Aviation Administration**

EXHIBIT

D

DOT/FAA/AM-12/8
Office of Aerospace Medicine
Washington, DC 20591

# Incremental Validity of Biographical Data in the Prediction of En Route Air Traffic Control Specialist Technical Skills

Dana Broach

Civil Aerospace Medical Institute
Federal Aviation Administration
Oklahoma City, OK 73125

July 2012

Final Report

# NOTICE

This document is disseminated under the sponsorship of the U.S. Department of Transportation in the interest of information exchange. The United States Government assumes no liability for the contents thereof.

––––––––––––

This publication and all Office of Aerospace Medicine technical reports are available in full-text from the Civil Aerospace Medical Institute's publications Web site: www.faa.gov/go/oamtechreports

FAA_00001087

**Technical Report Documentation Page**

| 1. Report No.<br>DOT/FAA/AM-12/8 | 2. Government Accession No. | 3. Recipient's Catalog No. |
|---|---|---|
| 4. Title and Subtitle<br>Incremental Validity of Biographical Data in the Prediction of En Route Air Traffic Control Specialist Technical Skills | | 5. Report Date<br>July 2012 |
| | | 6. Performing Organization Code |
| 7. Author(s)<br>Broach, D | | 8. Performing Organization Report No. |
| 9. Performing Organization Name and Address<br>FAA Civil Aerospace Medical Institute<br>P.O. Box 25082<br>Oklahoma City, OK 73125 | | 10. Work Unit No. (TRAIS) |
| | | 11. Contract or Grant No. |
| 12. Sponsoring Agency name and Address<br>Office of Aerospace Medicine<br>Federal Aviation Administration<br>800 Independence Ave., S.W.<br>Washington, DC 20591 | | 13. Type of Report and Period Covered |
| | | 14. Sponsoring Agency Code |

15. Supplemental Notes

This work was completed under approved FAA Human Factors research task 1209AC082110. HRR523.AV9300, Evaluation of ATCS Biographical Data and Interview Selection Procedures.

16. Abstract

Previous research demonstrated that an empirically-keyed, response-option scored biographical data ("biodata") scale predicted supervisory ratings of air traffic control specialist (ATCS) job performance (Dean & Broach, 2011). This research focused on the validity of scores on the Controller Background Assessment Survey (CBAS) in predicting an objective, computerized measure of en route controller technical skills.

**Method.** The analysis was conducted in two steps. First, computerized aptitude test battery ("AT-SAT") scores for 229 en route controllers were regressed on the Computer-Based Performance Measure (CBPM; Hanson, Borman, Mogilka, Manning, & Hedge, 1999). Second, biodata scores were entered into the equation.

**Results.** AT-SAT scores accounted for 27% of variance in the criterion measure ($\beta$=0.520, adjusted $R^2$=.271, $p$<.001). Biodata accounted for an additional 2% of the variance in CBPM ($\beta$=0.134; adjusted $\Delta R^2$=0.016, $\Delta F$=5.040, $p$<.05).

**Discussion.** The empirically-keyed, response-option scored biodata scale demonstrated incremental validity over the computerized aptitude test battery in predicting scores representing the core technical skills of en route controllers. Utility analysis suggested that even a small increment in validity was likely to have substantial organizational utility, given the high applicant volume and ATCS training costs. Further research to examine the relationship of CBAS scores to training outcomes at the FAA Academy and in field ATC facilities is recommended.

| 17. Key Words<br>Air Traffic Control Specialist, Personnel Selection, Biographical Data, Bootstrap | 18. Distribution Statement<br>Document is available to the public through the Internet:<br>www.faa.gov/go/oamtechreports | | |
|---|---|---|---|
| 19. Security Classif. (of this report)<br>Unclassified | 20. Security Classif. (of this page)<br>Unclassified | 21. No. of Pages<br>13 | 22. Price |

**Form DOT F 1700.7**  (8-72)                    Reproduction of completed page authorized

FAA_00001088

FAA_00001089

## ACKNOWLEDGMENTS

Research reported in this paper was conducted under the Air Traffic Program Directive/Level of Effort Agreement between the Human Factors Division (ANG-C1), FAA Headquarters, and the Aerospace Human Factors Division (AAM-500) of the Civil Aerospace Medical Institute.

The opinions expressed are those of the author alone, and do not necessarily reflect those of the Federal Aviation Administration, the Department of Transportation, or the government of the United States of America.

FAA_00001090

FAA_00001091

# Incremental Validity of Biographical Data in the Prediction of En Route Air Traffic Control Specialist Technical Skills

The measurement of biographical data (or "biodata") encompasses the notion of asking individuals to recall and report their typical, and sometimes, specific behaviors or experiences in a referent situation, generally from an earlier time in their lives (Mumford & Owens, 1987; Nickels, 1994). While approaches such as diaries have been used to collect biodata, the most common form is that of a scale, survey, inventory, or questionnaire. Such biodata instruments have demonstrated reasonable and useful reliability and validity in the prediction of job performance across a variety of occupations (see Stokes, Mumford, & Owens, 1994). Average cross-validities in the .3 to .4 range have been reported for biodata selection instruments in narrative and meta-analytic review (Asher, 1972; Hunter & Hunter, 1984; Reilly & Chao, 1982; Schmitt, Gooding, Noe, & Kirsh, 1984). Moreover, biodata scales can be constructed so as to have less adverse impact by race without significant loss in criterion-related validities (Dean, 1999).

The United States federal government has long had an interest in the development, validation, and use of biodata, reaching back to World War I, at least (see Farmer, 2002, for a review). The Federal Aviation Administration (FAA), in particular, has invested significant research effort in the development and validation of biodata instruments for the Air Traffic Control Specialist (ATCS, or air traffic controller) occupation. Early efforts focused on the validity of specific experience, such as having been a pilot or an air traffic controller in the military (Brokaw, 1957; Cobb & Nelson, 1974). The research program broadened following the 1981 strike by the Professional Air Traffic Controller Organization (PATCO) as the agency began to rebuild the ATCS workforce. Two biodata instruments were adapted by the FAA for research purposes: the Applicant Background Assessment (ABA); and the Biographical Questionnaire (BQ) (see Farmer, 2002, pp. 93-94 for more detailed history). The instruments were administered to most (but not all) newly hired controllers entering on duty for initial training at the FAA Academy between 1981 and 1992. Job-related outcomes such as performance in initial training at the FAA Academy and in on-the-job training (OJT) at the first assigned field facility were collected and matched with the biodata. The resulting datasets have been mined by multiple researchers to assess biodata predictive validity. Factors such as self-reported grades in high school mathematics were found to be predictive of outcomes at the FAA Academy and in field OJT (Broach, 1992, 2008; Cobb, Young, & Rizutti, 1976; Collins, Manning, & Taylor, 1984; Collins, Nye, & Manning, 1992; Taylor, VanDeventer, Collins, & Boone, 1983).

Statistical analyses in the prior work were based on correlations, multiple regression, or discriminat analysis. While the FAA enjoyed large samples, capitalization on chance characteristics of a particular sample was a risk. The analyses used a traditional scaling method, in which the response options for an item were treated as interval-type data. For example, response options to items about grades in high school on various subjects were based on letter grades ("A+ to A-," "B+ to B-," etc.), where the "A" had a higher value than the "B" range and so forth. The biodata were, then, based on self-reports; as such, they would be vulnerable to misrepresentation by an applicant in operational use.

The veracity of biodata item responses, particularly in high-stakes selection processes, has long been a concern with empirically-keyed scales (Hogan, 2004; Lautenschlager, 1994). And the stakes are certainly high for the FAA's ATCS selection process. For example, some applicants invest thousands of dollars in tuition and fees to attend 2- and 4-year colleges participating in the FAA's Air Traffic Control Collegiate Training Initiative (ATC-CTI) with the hope of being hired by the FAA. They seek out and share information about the selection procedures in a number of on-line forums. The applicants are generally highly motivated to become controllers. The pay-off is the prestige of and compensation for the job. The stakes are equally high for the agency. Completion of all field training phases takes an average of 2 to 3 years for someone with no prior experience. False positives (training failures) waste training resources and can impact facility staffing, a critical concern for the agency as the "Post-Strike Generation" of controllers reaches mandatory retirement age. On one hand, given the high stakes, it is reasonable to expect that applicants will attempt to answer questions about life experiences, attitudes, and expectations in what is seen as an employer-desired direction. On the other hand, again given the high stakes, it is just as reasonable for the agency to counter such response sets.

The FAA began exploring an alternative framework for scoring biodata to mitigate both capitalization on chance characteristics and motivated response distortion in the

1

FAA_00001092

late 1990s. The alternative framework has two elements: *bootstrapping* (see Efron & Tibshirani, 1993); and *response-option scoring* (Kluger, Reilly, & Russell, 1991). Bootstrapping estimates the sampling distribution of a statistic (e.g., correlation between to variables X and Y, or $r_{xy}$) by iteratively resampling cases from a set of observed data. Russell, Dean, and Broach (2000) demonstrated that the true population bivariate correlation between a predictor and criterion could be accurately estimated via bootstrapping with samples as small as 175-200 persons. The next study investigated response-option scoring. Response-option scoring assigns empirically derived weights to response options, based on the correlation between response option and criterion (Kluger, et al.) Bootstrapping was used to estimate the correlation between the response options to items in the ABA and BQ with a criterion measure. The criterion in that study was a composite of over-the-shoulder ratings used by peers and supervisors to assess typical on-the-job performance (Borman et al., 2001). The result was an 80-item empirically keyed, response-option scored biodata scale ("Controller Background Assessment Survey" or CBAS) (Dean & Broach, 2011). The purpose of this study is to build on the previous work through an investigation of the validity of the 80-item CBAS as a predictor of an objective, computer-based measure of controller technical skill and knowledge. The research question was "What is the incremental validity of CBAS in predicting performance on an objective, computerized measure of air traffic controller technical knowledge and skill?"

## METHOD

### Sample

Archival data for 229 controllers who participated in the concurrent, criterion-related validation of the AT-SAT test battery in the late 1990s were used in this study. The 229 controllers were a sub-set of 1,232 controllers who participated in that validation study. Full and complete data for the ABA, BQ, and the criterion measure were available for these 229 controllers. Demographic characteristics for the sample are summarized in Table 1. Demographic data on the other 1,003 controllers in the AT-SAT validation study and for FAA Academy first-time entrants between 1981 and 1992 are also summarized in Table 1. The CBAS sample was predominately male (83%) and white (87%). Over half of the sample had at least some college (59%), with more than an additional quarter (29%) reporting an undergraduate college degree. Most (76%) had no prior aviation-related experience as either a pilot or air traffic controller. The sample was similar to the other 1,003 controllers who participated in the AT-SAT validation study and to new hires entering the FAA Academy for the first time between 1981 and 1992 (Table 1).

### Measures

*AT-SAT.* AT-SAT is a computerized test battery designed to assess abilities and other personal characteristics required to perform critical and/or important ATCS job duties. The test battery was developed on the basis of a comprehensive job/task analysis (Nickels, Bobko, Blair, Sands, & Tartak, 1995). AT-SAT was validated in a concurrent, criterion-related validation study in 1997-1998 (Ramos, Heil, & Manning, 2001a, b); the FAA began using the test for ATCS selection in 2002 (King, Manning, & Drechsler, 2007). AT-SAT has eight subtests (Table 2). Scores from the tests are combined into a single overall score; a minimum of 70 is required to be considered eligible for consideration. The test takes about 8 hours to complete. The overall reliability of the composite total score (a weighted linear combination of 22 part scores) was estimated at .74 (Ramos et al., 2001b, p. 41).

*Biodata.* The development of the empirically-keyed, response-option scored 80-item scale CBAS is described in Dean and Broach (2011). Briefly, each response option for each item was assigned a statistical weight based on its point-biserial correlation with the composite of supervisory ratings of job performance from the AT-SAT validation study. If a given response was selected, it was assigned a value based on the bootstrapped estimate of the point-biserial correlation of that response with the criterion; otherwise a 0 weight was assigned. For example, the response options to a question about average grades earned in high school English classes were A (A- to A+), B (B- to B+), C (C- to C+), and "Less than a C average." The bootstrapped point-biserial correlations of each response option might be .21 for A, .39 for B, .07 for C, and -.12 for "Less than a C average." A participant marking response option A would earn an item score of .21, while a participant marking the "Less than a C average" would earn an item score of -.12. The item scores are then summed across the 80 items and normalized to a mean of 70, a standard deviation of 14, with a minimum of 0 and maximum of 100, to conform to traditional U.S. federal civil service scoring models. The scaled CBAS score distribution is shown in Figure 1; descriptive statistics are presented in Table 3. Scale reliability (Cronbach's $\alpha$) was estimated as .74 (Dean & Broach, 2011).

*Criterion.* Two criterion measures were developed in the course of the AT-SAT concurrent validation study: a computer-based measure of situational judgment and a job performance rating. The computer-based performance measure (CBPM) served as the criterion in this incremental validity study. The CBPM was modeled on situational judgment tests. It was designed as an assessment of "the very important technical proficiency part of the controller job that involves separating aircraft" (Hanson et al., 1999, p. 204). Target performance constructs included procedural

2

**Table 1.** Demographics

| Characteristic | | CBAS (n=229) | AT-SAT (n=1,003) | FAA Academy (1981-1992) (n=25,277) |
|---|---|---|---|---|
| Sex[a] | | | | |
| | Male | 189 (83%) | 488 (84%) | 21,001 (83%) |
| | Female | 40 (18%) | 90 (16%) | 4,276 (17%) |
| Race | | | | |
| | Minority | 28 (13%) | 74 (13%) | 2,219 (9%) |
| | Non-minority | 195 (87%) | 497 (87%) | 22,529 (91%) |
| Age[b] | | | | |
| | At Entry-on-Duty | 24.8 (2.9) | 25.5 (3.4) | 27.0 (3.1) |
| | At AT-SAT validation | 33 (2.8) | 37.9 (6.2) | |
| Education | | | | |
| | HS/GED | 23 (10%) | 46 (8%) | 2,493 (10%) |
| | Some College | 134 (59%) | 315 (55%) | 12,264 (49%) |
| | Bachelor's Degree or higher | 71 (31%) | 207 (36%) | 10,396 (41%) |
| Prior Experience | | | | |
| | None | 169 (87%) | 376 (75%) | 16,475 (65%) |
| | Pilot | 7 (4%) | 44 (9%) | 2,490 (10%) |
| | ATC | 19 (9%) | 84 (17%) | 3,495 (16%) |

Notes:  [a]Number in group (% of sample)
[b]Mean (Standard Deviation)

**Table 2.** Description of the AT-SAT tests

| Test | Description |
|---|---|
| *Dials (DI)* | Scan and interpret readings from a cluster of analog instruments |
| *Applied Math (AM)* | Solve basic math problems as applied to distance, rate, and time |
| *Scan (SC)* | Scan dynamic digital displays to detect targets that regularly change |
| *Angles (AN)* | Determine the angle of intersecting lines |
| *Letter Factory (LF)* | Manage a "factory" with three production lines (with variable speeds) and products, package the products, provide supplies for packaging, and respond to inquiries and interruptions |
| *Air Traffic Scenarios Test (ATST)* | Control air traffic in an interactive, dynamic low-fidelity simulation of radar-based air traffic control |
| *Analogies (AY)* | Solve verbal and non-verbal analogies |
| *Experience Questionnaire (EQ)* | A questionnaire about life experiences relevant to air traffic control |

**Table 3.** Descriptive statistics & correlations (n=229)

| Variable[a] | Mean | SD | Min | Max | AT-SAT | CBAS | CBPM |
|---|---|---|---|---|---|---|---|
| AT-SAT | 73.67 | 7.57 | 41.79 | 88.34 | .76[b] | | |
| CBAS | 69.98 | 13.96 | 22 | 100 | .332*** | .74 | |
| CBPM | 191.62 | 13.78 | 134.61 | 224.54 | .520*** | .292*** | .63 |

Notes:  [a]AT-SAT=AT-SAT Predictor Composite Score; CBAS=Score on Controller Background Assessment Survey; CBPM=Score on ATCS Computer-Based Performance Measure in AT-SAT validation study

[b]Scale reliability (Cronbach's α) on diagonal

***p<.001

3

FAA_00001094



**Figure 1.** Distribution of CBAS Score (*n*=229)

knowledge about how to perform technical tasks, judgment and decision making, and conflict prediction (Hanson, et al., p. 204). Essentially, a realistic air traffic situation was presented to the participant on a simulated radar screen along with supporting information, such as flight progress strips for aircraft in the scenario, weather, and a map of the synthetic airspace. The controller was given 60 seconds to review the air traffic situation before aircraft began to move on screen, accompanied in some scenarios by pilot communications. The situation unfolded over a few minutes and then stopped. Test items and response options were then presented to the controller. For example, a scenario might involve two aircraft on intersecting flight paths. The participant might be asked, "What control action should be taken to ensure separation between flights ABC123 and XYZ987?" Response options represented specific air traffic control actions such as (a) giving a speed control instruction to ABC123, (b) a change in heading for XYZ987, (c) an instruction to ABC123 to climb to a higher altitude, or (d) an instruction to XYZ987 to descend to a lower altitude. The participant had 25 seconds in which to select a response. Then a new scenario was presented on screen. There were 29 scenarios total in the CBPM, accompanied by 84 test items, with an internal consistency estimate of $\alpha$=.63 (Ramos et al., 2001b, Table 4-9, p. 88). For some items, such as conflict detection and

FAA_00001095

Step 1: Regress AT-SAT on the criterion
REGRESSION
     /VARIABLES = …
     /STATISTICS = DEFAULTS CHA ...
     /DEPENDENT = CRITERION
     /ENTER = AT-SAT



Step 2: Enter CBAS to estimate $\Delta R2$
     /ENTER = BIODATA



**Figure 2.** Incremental validity analysis (with SPSS syntax)

avoidance, there was a single correct answer; for others, the responses had been ranked by subject matter experts (all controllers) in terms of their effectiveness.

### Procedure

A hierarchical regression analysis was conducted to assess the incremental validity of CBAS. In a hierarchical regression analysis, the variance in the dependent variable can be uniquely partitioned based on the order in which the (correlated) independent variables are entered (Cohen, Cohen, West, & Aiken, 2003, p. 158). In this instance, the first variable entered was the AT-SAT score. The standardized regression weight (β) for the independent variable entered in the first step is equal to its zero-order correlation with the criterion. CBAS scores were entered in the second step to estimate the effect of the second independent variable, taking into account the first predictor and the correlation between the two predictors (see Cohen et al. p. 67). The critical question in incremental validity is the additional variance (change in the multiple correlation coefficient, or $\Delta R^2$) in the criterion explained by the additional test score (Hunsley & Meyer, 2003; see Figure 2). No corrections were made for predictor incidental restriction in range or unreliability.[1] SPSS Version 19 was used for all statistical analyses.

---

[1] Incidental (or indirect) restriction of range is the reduction in variance on the alternative predictor due to explicit selection of the sample on the current predictor. Unreliability is the degree of unsystematic variance in scores due to errors of measurement, as opposed to reliability (Ghiselli, Campbell, & Zedeck, 1981; Guion, 2011).

FAA_00001096

# RESULTS

Descriptive statistics for and uncorrected correlations between the three measures are presented in Table 3. Results of the hierarchical regression are presented in Table 4. AT-SAT scores accounted for about 27% of variance in the CBPM criterion measure ($\beta$=0.520, adjusted $R^2$=.271, $p$<.001). This is consistent with results from the validation of AT-SAT ($r_{xy}$=.52, Ramos et al., 2001b, Table 5.5.1, p. 120). The biodata scale accounted for an additional 2% of the variance in CBPM scores, without corrections ($\beta$=0.134; $\Delta R^2$=0.016, $\Delta F$=5.040, $p$<.05).

# DISCUSSION

The empirically-keyed, response-option scored biodata scale demonstrated incremental validity over the computerized air traffic controller aptitude test battery in predicting scores representing the technical knowledge and skills of en route controllers. In other words, after taking AT-SAT into account, CBAS accounted for just a bit more of the variance in the criterion measure. While an additional 2% seems small in an absolute sense, that increment can have substantial utility in high-stakes selection such as that for air traffic controllers. For example, after taking into account aptitude (as measured by the written aptitude test used between 1981 and 1992 (Broach, 1998)), personality explained an additional 6-9% of variance in performance in the FAA Academy Screen (Schroeder, Broach, & Young, 1993). The utility analysis, based on the Taylor-Russell tables (Taylor & Russell, 1939), demonstrated that incorporation of a "Big Five"

personality test into the aptitude testing in use at the time would have increased the FAA Academy Screen pass rate by about 3% (from 55% to about 58%). The avoided "lost" costs were estimated at about $600,000 per year.

A similar logic was used to estimate the potential utility of adding biodata to the current controller selection process. Utility, in this analysis, is defined as the change (increase or decrease) in the proportion of new controllers successfully completing their training and the avoided (or additional) costs associated with attrition. The expected utility of the selection procedure depends on (a) the base rate of satisfactory performance, (b) the validity of the selection procedure, and (c) how it is implemented.

The FAA plans to hire between 800 and 1,100 new controllers per year between now and 2020 (FAA, 2011). About 20% will be lost in training (estimated from FAA, 2011, Figure 4.10, p. 35 and Figure 5.1, p. 37). The base rate of "satisfactory performance" (in terms of completing training), given selection on the basis of AT-SAT scores, then, is 80%. The proposed biodata instrument (CBAS) could be implemented either (a) before AT-SAT is administered, as part of the initial on-line application process, or (b) as part of AT-SAT. Validity is the zero-order correlation between the CBAS score and the job performance criterion in the first implementation scenario (.29 in Table 3, rounded to .3 for the utility analysis). If CBAS were added to the AT-SAT composite score (Scenario 2), validity is the CBAS standardized regression coefficient in the incremental validity analysis ($\beta$CBAS=.13 [Table 4], rounded to .1). Finally, hiring rates from very lenient (90% selected) to very strict (just 10% selected) were considered. The Taylor-Russell (Taylor & Russell,

**Table 3.** Descriptive statistics & correlations ($n$=229)

| Variable[a] | Mean | SD | Min | Max | AT-SAT | CBAS | CBPM |
|---|---|---|---|---|---|---|---|
| AT-SAT | 73.67 | 7.57 | 41.79 | 88.34 | .76[b] | | |
| CBAS | 69.98 | 13.96 | 22 | 100 | .332*** | .74 | |
| CBPM | 191.62 | 13.78 | 134.61 | 224.54 | .520*** | .292*** | .63 |

Notes: [a]AT-SAT=AT-SAT Predictor Composite Score; CBAS=Score on Controller Background Assessment Survey; CBPM=Score on ATCS Computer-Based Performance Measure in AT-SAT validation study    ***p<.001

[b]Scale reliability (Cronbach's $\alpha$) on diagonal

**Table 4.** Hierarchical regression analyses

| Step | Predictor[a] | $\beta$ | $t$ | $R$ | $R^2$ | Adj-$R^2$ | $\Delta R^2$ | $F$ Change |
|---|---|---|---|---|---|---|---|---|
| 1 | AT-SAT | .520 | 9.183*** | .520 | .271 | .268 | .271 | 84.333*** |
| 2 | AT-SAT | .476 | 7.993*** | .536 | .287 | .280 | .016 | 5.040* |
| 2 | CBAS | .134 | 2.245* | | | | | |

Notes: [a]AT-SAT=AT-SAT Predictor Composite Score as computed in Ramos, Heil, & Manning (2001a, 2001b); CBAS=Controller Background Assessment Survey score    *p<.05, ***p<.001

6

FAA_00001097



**Figure 3.** Gain in proportion of new hires successfully completing ATCS training as a function of selection rate (from lenient to strict) and CBAS validity for two implementation scenarios (before AT-SAT or as part of AT-SAT)

1939) tables were used to estimate the proportion of new controllers that would be successful in each of the two implementation scenarios.

The results for the utility analysis are illustrated in Figure 3 for the two implementation scenarios. If biodata were made part of the on-line application process (Scenario 1), the expected proportion of new hires completing field training could increase from 80% to 82% at a lenient selection rate (90% selected). At more stringent selection rates, the expected proportion successful increases to as much as 92% in the first implementation scenario. Scenario 2 (adding CBAS to AT-SAT) is more conservative. With a lenient selection rate (80-90% selected), the proportion of successes increases very modestly to just 81%. Even at the strict selection rate (just 10% selected), the proportion of successes increases to just 85% in the second implementation scenario. However these are statistical predictions given the assumptions of the Taylor-Russell approach. The likely gains in practice are more likely to be closer to those of the second implementation scenario.

But even very modest gains in the proportion successful in field training can have substantial financial implications in terms of avoided costs. FAA plans to hire 800-1,000 new controllers per year for the next several years in its annual controller workforce plan (FAA, 2011). In that same plan, FAA estimated the personnel compensation and benefits cost of each trainee at about $93,000 per developmental (p. 47). Increasing the field training success rate by just 1% (8-10 controllers at $93K each per year) equates to about $744,000 per year in avoided direct

costs of failures, using the more conservative estimate assumptions (lower validity [.1], higher selection rate [.9]) of the second implementation scenario.

Net utility to the agency would be determined by the actual benefits (increase in completions and avoided costs attributable to better selection) and costs for implementation and evaluation of biodata as part of the controller selection process. Further research is needed to evaluate the validity and utility of CBAS by linking it with actual training outcomes in the FAA Academy and field facilities, to better quantify costs and benefits. The FAA hired 6,484 new controllers in 2007-2010 according to the FAA in the annual controller workforce plans submitted to the U.S. Congress (FAA, 2011). In those same reports, FAA reported that the average training time was about 2 years for controllers assigned to terminal facilities and about 3 years for en route controllers. A substantial proportion of the controllers hired in 2007 and 2008 should have completed (or not) training at the first assigned field facility. Such data could provide an empirical basis for determining if and how CBAS might be operationally implemented and the likely benefits to the FAA.

A final consideration is the degree to which the response-option scoring key developed on the Post-Strike Generation can be applied to response data from the Next Generation of controllers. Comparison of response data from both generations, as well as the validity analyses suggested above, will provide an empirical basis for assessing the stability and validity of the response-option scoring key.

FAA_00001098

# REFERENCES

Asher, J.J. (1972). The biographical item: Can it be improved? *Personnel Psychology, 25,* 251–269.

Borman, W.C., Hedge, J.W., Hanson, M.A., Bruskiewicz, K.T., Mogilka, H., Manning, C., Bunch, L.B., & Horgen, K.E. (2001). Development of criterion measures of air traffic controller performance. In R.A. Ramos, M.A. Heil, & C.A. Manning (Eds.) *Documentation of validity for the AT-SAT computerized test battery: Volume II* (pp. 1–12) (FAA Report No. DOT/FAA/AM-01/6). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Broach, D. (1992, June). *Non-cognitive predictors of performance in radar-based air traffic control training.* Paper presented at the 4th Annual Convention of the American Psychological Society, San Diego, CA.

Broach, D. (1998). Air traffic control specialist aptitude testing, 1981-1992. In D. Broach (Ed.), *Recovery of the air traffic control specialist workforce, 1981-1992* (pp. 7-16) (FAA Report No. DOT/FAA/AM-98/23). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Broach, D. (2008). *Overview of CAMI Life Experiences Questionnaire (Version 1.0).* Unpublished manuscript, FAA Civil Aerospace Medical Institute Aerospace Human Factors Research Division (AAM-500).

Brokaw, L.D. (1957). *Selection measures for air traffic control training* (USAF Report No. PL-TM-57-14). Lackland AFB, TX: United States Air Force Personnel & Training Research Center Personnel Laboratory.

Cobb, B.B. & Nelson, P.L. (1974). *Aircraft-pilot and other pre-employment experience as factors in the selection of air traffic controller trainees* (FAA Report No. DOT/FAA/AM-74/8). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Cobb, B.B., Young, C.L., & Rizutti, B.L. (1976). *Education as a factor in the selection of air traffic controller trainees* (FAA Report No. DOT/FAA/AM-76/16). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Cohen, J., Cohen, P., West, S.G., & Aiken, L.S. (2003). *Applied multiple regression/correlation analysis for the behavioral sciences (3rd Ed.).* Hillsdale, NJ: Erlbaum.

Collins, W.E., Manning, C.A., & Taylor, D.K. (1984). A comparison of prestrike and poststrike ATCS: Biographic factors associated with Academy training success. In A.D. VanDeventer, W.E. Collins, C.A. Manning, D.K. Taylor, & N.E. Baxter (Eds.). *Studies of poststrike air traffic control specialist trainees: I. Age, biographical factors, and selection test performance related to Academy training success* (pp. 7–14) (FAA Report No. DOT/FAA/AM- 84/6). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Collins, W.E., Nye, L.G., & Manning, C.A. (1992). Poststrike air traffic control trainees: Biodemographic predictors of success in selection and screening. *International Journal of Aviation Psychology, 2,* 213-223.

Dean, M.A. (1999, June). *A response-option examination of biodata adverse impact and criterion validity.* Presented at the 1999 International Personnel Management Association Assessment Council meeting, St. Petersburg, FL.

Dean M.A. & Broach, D. (In press). *Development, validation, and fairness of a biographical data questionnaire for the Air Traffic Control Specialist (ATCS) occupation.* Manuscript submitted for publication as an Office of Aerospace Medicine technical report.

Efron, B. & Tibshirani R.J. (1993). *An Introduction to the bootstrap.* New York: Chapman & Hall.

Farmer, W.L. (2002). *Characteristics of biodata keys as a function of scaling method, sample size, and criterion.* Dissertation Abstracts International: Section B: The Sciences and Engineering, 63(3-B).

Federal Aviation Administration. (2011, April). *A plan for the future: 10-Year strategy for the air traffic control workforce 2011–2020.* Washington, DC: Federal Aviation Administration.

Ghiselli, E.E., Campbell, J.P., & Zedeck, S. (1981). *Measurement theory for the behavioral sciences.* San Francisco, CA: W. H. Freeman & Co.

Guion, R.M. (2011). *Assessment, measurement, and prediction for personnel decisions* (2nd Ed.). New York, NY: Routledge Academic.

Hanson, M.A., Borman, W.C., Mogilka, H.J., Manning, C., & Hedge, J.W. (1999). Computerized assessment of skill for a highly technical job. In F. Drasgow & J.B. Olson-Buchanan (Eds.), *Innovations in computerized assessment* (pp.197–220). Mahwah, NJ: Erlbaum.

8

FAA_00001099

Hogan, J.B. (2004). Empirical keying of background data measures. In G.S. Stokes, M.D. Mumford, & W.A. Owens (Eds.), *Biodata handbook: Theory, research, and use of biographical information in selection and performance prediction* (pp. 69-107). Palo Alto, CA: CPP Books.

Hunsley, J. & Meyer, G.J. (2003). The incremental validity of psychological testing and assessment: Conceptual, methodological, and statistical issues. *Psychological Assessment, 15*, 446–455.

Hunter, J.E. & Hunter, R.F. (1984). Validity and utility of alternative predictors of job performance. *Psychological Bulletin, 96*, 72–98.

King, R.E., Manning, C.A., & Drechsler, G.K. (2007). *Operational use of the Air Traffic Selection and Training battery* (FAA Report No. DOT/FAA/AM-07/14). Washington, DC: Federal Aviation Administration, Office of Aerospace Medicine.

Kluger, A.N., Reilly, R.R., & Russell, C.J. (1991). Faking biodata tests: Are option-keyed instruments more resistant? *Journal of Applied Psychology, 76*, 889–896.

Lautenschlager, G.J. (1994). Accuracy and faking of background data. In G.S. Stokes, M.D. Mumford, & W.A. Owens, (Eds.), *Biodata handbook: Theory, research and use of biographical information in selection and performance prediction* (pp. 391–419). Palo Alto, CA: Consulting Psychologists Press.

Mumford, M.D. & Owens W.A. (1987). Methodological review: Principles, procedures, and findings in the application of background data measures. *Applied Psychological Measurement, 11*, 1–31.

Nickels, B.J. (1994). The nature of biodata. In G.S. Stokes, M.D. Mumford, & W.A. Owens, (Eds.), *Biodata handbook: Theory, research and use of biographical information in selection and performance prediction* (pp. 1–16). Palo Alto, CA: Consulting Psychologists Press.

Nickels, B.J., Bobko, P., Blair, M.D., Sands, W.A., & Tartak, E.L. (1995). *Separation and control hiring assessment (SACHA) final job analysis report* (Deliverable item 007A under FAA contract DFTA01-91-C-00032). Washington, DC: Federal Aviation Administration, Office of Personnel Management.

Ramos, R.A., Heil, M.A., & Manning, C.A. (2001a). *Documentation of validity for the AT-SAT computerized test battery: Volume I* (FAA Report No. DOT/FAA/AM-01/5). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Ramos, R.A., Heil, M.A., & Manning, C.A. (2001b). *Documentation of validity for the AT-SAT computerized test battery, Volume II* (FAA Report No. DOT/FAA/AM-01/6). Washington, DC: Federal Aviation Administration Office of Aviation Medicine.

Reilly, R.R. & Chao, G.T. (1982). Validity and fairness of some alternative employee selection procedures. *Personnel Psychology, 35*, 1–62.

Russell, C.J., Dean, M.A., & Broach, D. (2000). *Guidelines for bootstrapping validity coefficients in ATCS selection* (FAA Report No. DOT/FAA/AM-00/15). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Schmitt, N., Gooding, R.Z., Noe, R.A., & Kirsch, M. (1984). Meta-analyses of validity studies published between 1964 and 1982 and the investigation of study characteristics. *Personnel Psychology, 37*, 407-422.

Schroeder, D.J., Broach, D., & Young, W.C. (1993). *Contribution of personality to the prediction of success in initial Air Traffic Control Specialist training* (FAA Report No. DOT/FAA/AM-93/4). Washington, DC: Federal Aviation Administration Office Aviation Medicine.

Stokes, G.S., Mumford, M.D., & Owens, W.A. (1994). *Biodata handbook: Theory, research and use of biographical information in selection and performance prediction.* Palo Alto, CA: Consulting Psychologists Press.

Taylor, H.C. & Russell, J.T. (1939). The relationship of validity coefficients to the practical effectiveness of tests in selection: Discussion and tables. *Journal of Applied Psychology, 23*, 565-578.

Taylor, D.K., VanDeventer, A.D., Collins, W.E., & Boone, J.O. (1983). Some biographical factors associated with success of air traffic control specialist trainees at the FAA Academy during 1980. In A.D. VanDeventer, D.K. Taylor, W.E. Collins, & J.O. Boone (Eds.), *Three studies of biographical factors associated with success in air traffic control specialist screening/training at the FAA Academy* (pp. 6–11) (FAA Report No. DOT/FAA/AM-83/6). Washington, DC: Federal Aviation Administration Office of Aviation Medicine.

FAA_00001100

FAA_00001101



**Federal Aviation Administration**

EXHIBIT

E

DOT/FAA/AM-12/19
Office of Aerospace Medicine
Washington, DC 20591

# Development, Validation, and Fairness of a Biographical Data Questionnaire for the Air Traffic Control Specialist Occupation

Michelle Dean
San Diego State University
San Diego, CA 92127

Dana Broach
Civil Aerospace Medical Institute
Federal Aviation Administration
Oklahoma City, OK 73125

December 2012

Final Report

# NOTICE

This document is disseminated under the sponsorship
of the U.S. Department of Transportation in the interest
of information exchange. The United States Government
assumes no liability for the contents thereof.

———————————

This publication and all Office of Aerospace Medicine
technical reports are available in full-text from the Civil
Aerospace Medical Institute's publications Web site:
www.faa.gov/go/oamtechreports

**Technical Report Documentation Page**

| 1. Report No.<br>DOT/FAA/AM-12/19 | 2. Government Accession No. | 3. Recipient's Catalog No. |
|---|---|---|
| 4. Title and Subtitle<br>Development, Validation, and Fairness of a Biographical Data Questionnaire for the Air Traffic Control Specialist (ATCS) Occupation | | 5. Report Date<br>December 2012 |
| | | 6. Performing Organization Code |
| 7. Author(s)<br>Dean MA,[1] Broach DM[2] | | 8. Performing Organization Report No. |
| 9. Performing Organization Name and Address<br>[1]San Diego State University, San Diego, CA 92127<br>[2]FAA Civil Aerospace Medical Institute, P.O. Box 25082<br>Oklahoma City, OK 73125 | | 10. Work Unit No. (TRAIS) |
| | | 11. Contract or Grant No. |
| 12. Sponsoring Agency name and Address<br>Office of Aerospace Medicine<br>Federal Aviation Administration<br>800 Independence Ave., S.W.<br>Washington, DC 20591 | | 13. Type of Report and Period Covered |
| | | 14. Sponsoring Agency Code |

15. Supplemental Notes

This work was completed under approved FAA Human Factors research task 1209AC082110.HRR523.AV9300, Evaluation of ATCS Biographical Data and Interview Selection Procedures

16. Abstract

Development and validation of a biographical data ("biodata") instrument for selection into the Air Traffic Control Specialist occupation is described. Bootstrapping was used to estimate correlations between item responses to the Applicant Background Assessment (ABA; 142 items; n=266), Biographical Questionnaire (BQ; 145 items; n=482), and average supervisory job performance ratings. Scoring keys were developed for the most predictive 80, 100, and 120 items from the instruments. Reliabilities for the proposed scales ranged from .74 to .78. Criterion-related validities were .59, .62, and .63 for the 80-, 100-, and 120-item versions, respectively.

Each version of the biodata scale had significant incremental validity over the AT-SAT composite score, accounting for 29% to 32% additional variance in average job performance ratings. Score distributions and cut-scores by race and sex were investigated. Differences ($d$) in mean scores by gender and ethnicity were generally low (ranging from -.08 to .37). Finally, cut score analyses were performed to examine pass rates of demographic subgroups using banding and percentiles.

Based on the findings of this study, it is recommended that the 80-item biodata scale, renamed the Controller Background Assessment Survey (CBAS), be further developed as a potential ATCS selection procedure.

| 17. Key Words<br>Air Traffic Control Specialist, Personnel Selection, Biographical Data, Bootstrap | | 18. Distribution Statement<br>Document is available to the public through the Internet:<br>www.faa.gov/go/oamtechreports | |
|---|---|---|---|
| 19. Security Classif. (of this report)<br>Unclassified | 20. Security Classif. (of this page)<br>Unclassified | 21. No. of Pages<br>16 | 22. Price |

**Form DOT F 1700.7** (8-72)     Reproduction of completed page authorized

FAA_00001104

FAA_00001105

## ACKNOWLEDGMENTS

Research reported in this paper was conducted under the Air Traffic Program Directive/Level of Effort Agreement between the Human Factors Research and Engineering Group (AJP-61), FAA Headquarters, and the Aerospace Human Factors Division (AAM-500) of the FAA Civil Aerospace Medical Institute.

The opinions expressed are those of the authors alone, and do not necessarily reflect those of the Federal Aviation Administration, the Department of Transportation, or federal government of the United States of America.

FAA_00001106

FAA_00001107

## CONTENTS

Development, Validation, and Fairness of a Biographical Data Questionnaire for the
Air Traffic Control Specialist (ATCS) Occupation...................................... 1

Method.............................................................................. 2

    Sample............................................................................ 2

    Measures ......................................................................... 3

    Procedures ....................................................................... 4

    Analyses ......................................................................... 4

Results ............................................................................ 6

    Statistical Analyses .............................................................. 6

    Fairness Analysis................................................................. 6

Discussion ......................................................................... 9

References.......................................................................... 9

Endnotes........................................................................... 11

FAA_00001108

FAA_00001109

# Development, Validation, and Fairness of a Biographical Data Questionnaire for the Air Traffic Control Specialist (ATCS) Occupation

The measurement of biographical data (or "biodata") encompasses the notion of asking individuals to recall and report their typical, and sometimes, specific behaviors or experiences in a referent situation, generally from an earlier time in their lives (Mumford & Owens, 1987; Nickels, 1994). While different approaches such as diaries have been used to collect biodata, the most common form is that of a scale, survey, inventory, or questionnaire. Such biodata instruments have demonstrated reasonable and useful reliability and validity in the prediction of job performance in a variety of occupations (see Stokes, Mumford, & Owens, 1994). Average cross-validities in the .3 to .4 range have been reported for biodata selection instruments in narrative and meta-analytic review (Asher, 1972; Hunter & Hunter, 1984; Reilly & Chao, 1982; Schmitt, Gooding, Noe, & Kirsh, 1984). Moreover, biodata scales can be constructed so as to have less adverse impact by race without significant loss in criterion-related validities (Dean, 1999).

The United States federal government has long had an interest in the development and validation of biodata, reaching back to World War I, at least (see Farmer, 2002, for a review). The Federal Aviation Administration (FAA) has conducted similar investigations of the air traffic control specialist (ATCS) occupation. Following the 1981 controller strike, the FAA faced an enormous organizational challenge in rebuilding this highly technical workforce (see Broach, 1998, 2005). While the core of the post-strike ATCS selection process from 1981 through the mid-1990s was a cognitive aptitude test battery, researchers at the FAA's Civil Aerospace Medical Institute (CAMI) investigated alternative assessments, including biodata. Two instruments in particular were administered to several thousand newly hired air traffic controllers for research purposes between 1981 and 1992: the Applicant Background Assessment (ABA) and the Biographical Questionnaire (BQ). Research with these instruments indicated that biodata had promise as a personnel selection tool for the ATCS occupation.

The technical approach to scoring these instruments was straightforward and traditional: responses to specific items such as prior experience, self-reported grades in high school math, and the candidate's expectations about future performance as an ATCS, were regressed on criteria representing performance in training (Broach, 1992; Cobb, Young, & Rizutti, 1976; Collins, Manning, & Taylor, 1984; Collins, Nye, & Manning, 1992; Taylor, VanDeventer, Collins, & Boone, 1983). Alternatively, item responses were regressed on training performance criteria to empirically derive a scale (Broach, 2008). Both approaches fall under the broad rubric of empirical keying, that is, developing the scoring key on the basis of item-criterion relationships. However, empirical keys can capitalize on chance associations and, hence, could yield unstable estimates of item and scale validities.

Cross-validation is the primary strategy for countering capitalization on chance or sample-specific associations in the development of an empirically-keyed scale (e.g., a scale based on data rather than judgment). Cross-validation ensures estimates of item and scale validities are 1) not simply capitalizing on chance characteristics of the calibration sample and 2) appropriately attenuated to reflect the effect of random sampling error in any future samples (e.g., future applicant pools). A second strategy is to use very large samples for development. As the sample size increases, scoring weights become more stable and prediction errors are smaller. As sample size decreases, the weights are less stable and errors are larger. A third strategy is to hold out a portion of the original sample for cross-validation. However, this approach reduces confidence in the scoring weights (Cohen, Cohen, West, & Aiken, 2003; Murphy, 1983). There is no generally acceptable minimum standard sample size required for cross-validation, but Gatewood, Field, and Barrick (2008) recommended a sample size of at least 300 for cross-validating biodata instruments. Assuming a 3:1 ratio for the development to cross-validation sample sizes, about 1,200 cases might be required to develop and cross-validate an empirically-keyed biodata scale.

The FAA enjoyed the luxury of large samples after the 1981 ATCS strike as the basis for development of empirically-keyed biodata scales. However, the veracity of biodata item responses, particularly in high-stakes selection processes, has long been a concern with empirically keyed scales (Lautenschlager, 1994). The stakes are certainly high for the FAA's ATCS selection process. ATCS job applicants are generally highly motivated. For example, some invest thousands of dollars in tuition and fees to attend two- and four-year colleges participating in the FAA's Air Traffic Control Collegiate Training Initiative (ATC-CTI) with the hope of getting hired by the FAA. They seek out and share information about the

1

FAA_00001110

selection procedures in a number of on-line forums. The pay-off is the prestige and pay associated with the job. The stakes are equally high for the agency. ATCS training is intensive, extensive, and expensive. Completion of all training phases takes an average of two to three years, depending on facility assignment (FAA, 2011; Manning, 1998). Failures waste FAA training dollars and personnel resources. They also result in fewer people becoming controllers, a critical concern for the agency as the post-strike generation of controllers reaches retirement age (FAA, 2011). Given the high stakes, it is reasonable to expect that applicants will attempt to answer questions about life experiences, attitudes, and expectations in what they believe is an employer-desired direction. At the same time, it is reasonable – and necessary – for the agency to counter that tendency to gain honest and accurate information about an applicant's job-related life experiences, attitudes, and expectations as the basis for justifiable and accurate employment decisions.

An alternative to binary scoring ("item keying") is to score each response option. In "response option keying," each item response option is analyzed separately as if it were an item in and of itself. A response option contributes to the overall score if and only if it is correlated significantly with the criterion (Kluger, Reilly, & Russell, 1991). While still an empirical scoring strategy, response option keying is thought to be less susceptible to response biases (Kluger et al., 1991). However, response-option keying can be problematic because of the sheer number of correlations to be computed. Capitalization on chance characteristics of the sample is possible with small samples relative to the number of computed item response-criterion correlations.

One possible solution to this problem is bootstrapping. Bootstrapping is a statistical technique that holds promise for statistically analyzing small sample sizes. Bootstrapping estimates the sampling distribution of a statistic (e.g., correlation between to variables X and Y, or $r_{xy}$) by iteratively resampling cases from a set of observed data. Basically, $B$ "bootstrap" samples of size $N$ are taken with replacement from the original sample of size $N$, then the statistic of interest (in this case, a correlation between an individual response option and the criterion of interest) is generated within each bootstrap sample and then saved to a file. An investigation using $B=1,000$ bootstrap samples of size $N$ is able to approximate the actual sampling distribution that would have been obtained if multiple independent samples of size $N$ were drawn from the population (Efron & Tibshirani, 1993). Bootstrapping is computationally time-intensive as the sample at hand is resampled with replacement many times to derive a statistic of interest. Bootstrap estimation uses all available information in the sample in estimating prediction

error; therefore, a hold-out cross-validation sample is not needed. An additional benefit of bootstrap estimation is that data need not meet the usual parametric assumptions (i.e., the data need not be normally distributed; Efron & Tibshirani). Using bootstrap analyses on CAMI archival controller data, Russell, Dean, and Broach (2000) found that sample sizes as small as 175-200 incumbents might provide sufficient data for accurately estimating the "true" population validity coefficient.

These three concepts – empirical keying, response-option scoring, and bootstrapping – were utilized in this study to derive a biodata instrument that might be used in the selection of air traffic controllers. The study was conducted in three steps. First, bootstrap analyses were conducted with datasets for the BQ and ABA independently. The ABA and BQ items were rank-ordered by their average correlation with the criterion, and the top 80, 100, and 120 items selected for inclusion in a biodata scale. Scale scores were then computed for each of the proposed scales. Second, hierarchical regression analyses were conducted to determine the incremental validity of the 80-, 100-, and 120-item biodata scales over the computerized Air Traffic Selection and Training (AT-SAT) aptitude test battery composite score in predicting the supervisory ratings criterion. Third, analyses of score distributions and score banding were conducted to assess fairness of the proposed scale.

## METHOD

### Sample

*Development and validation.* ABA, BQ, and criterion data were extracted from AT-SAT concurrent, criterion-related validation database. Overall, 1,232 incumbent controllers participated in the AT-SAT validation (Keenan, 2001, p. 31). The AT-SAT validation database included 266 records with ABA and criterion data and 482 with BQ and criterion data. The bootstrap analysis was run for each instrument separately to develop an empirical response-option scoring key for that instrument. Previous work on bootstrapping demonstrated that these sample sizes were sufficient to estimate the true population validity coefficient for each response option (Russell et al., 2000). The participants in the AT-SAT validation study were not selected on the basis of their ABA or BQ responses, so incidental restriction in range[1] (on those instruments) was likely. However, there is no accepted procedure for correcting the bootstrapped item-criterion correlations for incidental restriction in range. Finally, the bootstrap procedure handled each item individually, without regard to or dependence on other item responses. There are no data suggesting that item responses in one instrument were dependent on responses to the other instrument.

2

FAA_00001111

Table 1
Development and validation sample demographic information (from the AT-SAT concurrent, criterion-related validation)

| | AT-SAT ATCS ($N$=1,232) | | ABA & Criterion ($n$=266) | | BQ & Criterion ($n$=482) | | ABA, BQ, & Criterion ($n$=260) | |
|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % |
| Males | 909 | 72.2 | 226 | 85.0 | 404 | 83.4 | 221 | 85.0 |
| Females | 178 | 19.5 | 40 | 15.0 | 78 | 16.2 | 39 | 15.0 |
| Missing data | 145 | | | | | | | |
| | | | | | | | | |
| Native American | 77 | 6.3 | 1 | 0.4 | 3 | 0.6 | 1 | 0.4 |
| Asian/Pacific Islander | 9 | 0.7 | 4 | 1.5 | 6 | 1.2 | 4 | 1.5 |
| Black | 95 | 7.7 | 23 | 8.6 | 42 | 8.8 | 22 | 8.5 |
| Hispanic | 64 | 5.2 | 11 | 4.1 | 26 | 5.4 | 11 | 4.2 |
| Non-minority | 804 | 65.3 | 227 | 85.0 | 404 | 83.8 | 221 | 85.0 |
| Other | 20 | 24.6 | 1 | 0.4 | 1 | 0.2 | 1 | 0.4 |
| Mixed race | 4 | 0.3 | | | | | | |
| Missing data | 159 | 12.9 | | | | | | |

A subset of 260 controllers in the AT-SAT dataset had full and complete ABA, BQ, and criterion data (i.e., 260 of the 482 cases with BQ also had ABA data). Data from this subset ($n$=260) were used to estimate the criterion-related and incremental validity of the response-option scored 80-, 100-, and 120-item scales. As shown in Table 1, the development and validation samples were largely male (~85%) and White (~85%).

*Group differences.* The sample used to investigate group differences was drawn from the CAMI archival database on the 27,925 controllers hired between 1981 and 1992 ("post-strike" controllers). There were 5,826 records in CAMI's archival database with both ABA and BQ data for the period 1988 through 1992. These 5,826 records included the 260 cases in the validation sample (complete BQ, ABA, & criterion data). However, as the AT-SAT concurrent, criterion-related validation study records made available for this research were de-identified, a definitive match was not possible between the CAMI archival and the AT-SAT validation data. As in the development and validation samples, the CAMI archival sample was largely male (81.3%) and White (90.6%). Blacks ($n$=253; 4.5%) and Hispanics ($n$=179; 3.2%) were numerically the largest minority groups in the archival sample.

**Measures**

*Predictors.* The Applicant Background Assessment (ABA) is a 142-item multiple choice (five response options per item) biodata questionnaire. The ABA was based on: 1) a review of ATCS occupational qualification standards, 2) a review of job analyses conducted by the FAA, 3) a review of previous biodata research done at the FAA, 4) interviews with training staff members to determine characteristics that differentiated those controllers who

succeeded or failed in training, and 5) interviews with ATCS supervisors to ascertain characteristics differentiating good and poor ATCSs. The items included on the ABA were limited to those dealing with experiences that were under the control of the applicant.

The Biographical Questionnaire (BQ) is a 145-item inventory that was developed based on items from Owens' Biographical Questionnaire (Owens & Schoenfeldt, 1979). The BQ items tap eight areas: 1) educational background, 2) prior military or civilian experience in ATC, 3) importance placed on various factors (e.g., salary, benefits, job security), 4) time expected to become an effective ATCS, 5) commitment to an ATCS career, 6) work-related attitudes, 7) expected satisfaction with aspects of ATCS careers, and 8) general personal information (e.g., socioeconomic status growing up, alcohol and tobacco usage; Collins, et al, 1992).

AT-SAT is a computerized selection test battery designed for ATCS selection. This test battery was designed to replace the two-stage selection process in which ATCS applicants completed an Office of Personnel Management (OPM) test battery and then a nine-week training program at the FAA Academy. This multiple-hurdle selection process, used from late 1981 through early 1992, was both time consuming and expensive (Broach, 1998; Ramos, Heil, & Manning, 2001a). AT-SAT was developed based on the results of the Separation and Control Hiring Assessment (SACHA) job analysis, an extensive analysis of the ATCS job (Nickels, Bobko, Blair, Sands, & Tartak, 1995). Specifically, the worker requirements determined necessary for the job of ATCS were used to design a series of computerized tests to assess these worker requirements. The overall AT-SAT composite score, as computed in the 1997-1998 concurrent, criterion-related validation study, was used as the baseline predictor in this study.

FAA_00001112

*Job performance criterion.* Two criterion measures were developed in the course of the AT-SAT concurrent validation study: a computer-based measure of technical performance; and a job performance rating. The computer-based performance measure (CBPM) was designed as a practical and economical assessment of a controller's technical proficiency in separating aircraft (Hanson, Borman, Mogilka, Manning, & Hedge, 1999). The ratings-based measure consisted of over-the-shoulder ratings used by peers and supervisors to assess typical on-the-job performance (Borman, Hedge, Hanson, Bruskiewicz, Mogilka, Manning, et al., 2001). The assessment consists of behaviorally anchored rating scales (BARS) for the ten performance categories identified as important to the ATCS occupation by subject matter experts: 1) maintaining safe and efficient air traffic flow; 2) maintaining attention and vigilance; 3) prioritizing communicating, and informing; 4) coordinating; 5) managing multiple tasks; 6) reacting to stress; 7) adaptability and flexibility; 8) technical knowledge; 9) teamwork; and 10) overall effectiveness. A composite of the two criteria was used in the concurrent validation of AT-SAT (Ramos, Heil, & Manning, 2001b). In subsequent analyses, the average rating of the ten BARS was used as the criterion (Wise, Tsacoumis, Waugh, Putka, & Hom, 2001). Therefore, to be consistent with the later validity and reweighting studies of AT-SAT, the average rating of job performance was used as the criterion for estimating the validity of ABA and BQ item responses and the overall 80-, 100-, and 120-item scales.

## Procedures

The first step was to convert the biodata item-level data into response option-level data. Converting the ABA from item-level to response option-level data resulted in 710 response options for the ABA (142 items with five response options each) and 725 response options for the BQ (145 items with five response options each). The majority of the BQ items contained five response options with the exception of 26 items that had either three or four response options. For programming simplicity, all BQ items were set to have five response options. For example, for those items with four response options, the "5th option" created by the response option program would simply be scored "0" across all cases and would not contribute to the biodata scores. Data preparations also involved screening for no variance response options (i.e., no one or very few [1 or 2] controllers chose that response option) as these response options would cause the bootstrap program to stop and need to be restarted (and it is already known that these response options would receive a "0" weight in the scoring key due to lack

of variance). Response options with no variance were manually assigned a "0" weight.

Next, the predictor data were standardized in the validation dataset (the ratings criterion data were already standardized). Standardization was performed to simplify and more efficiently run the bootstrap programs. SYSTAT 10.2 (Systat Inc., Chicago, IL), the statistical package used to perform the bootstrap procedure, can more efficiently save regression coefficients using its bootstrap routine in the Regression Procedure, compared to saving correlations generated in its Correlation Procedure. In a bivariate analysis, the standardized regression coefficient ($\beta$) is equal to the familiar correlation coefficient ($r_{xy}$).

The next step in preparing the data for bootstrapping was to identify subsets of the data with complete cases on each of the biodata instruments and the criterion. One subset included only cases that had complete data on both the ABA and the criterion ($n$=266), and another subset included cases that had complete data on both the BQ and the criterion ($n$=482). This helped to decrease the time required to run each bootstrap.

The last step was to execute the bootstrap analyses for each subset of data to estimate the correlation between response options and the criterion. Each bootstrap program generated 1,000 samples of the same size as the original sample from which it was drawn, with replacement. Correlations between each respective biodata response option and the criterion (one correlation for each of the 1,000 random samples taken) were generated and saved to a file.

The output from the bootstrap analysis (1,000 correlations between each biodata response option and average supervisory rating of ATCS job performance) was used to develop the scoring weights for the biodata instruments. The average of 1,000 correlations was used to weight each response option in the scoring keys. The larger the correlation, the stronger the relationship of that particular response option with the criterion. Three scoring keys were developed using the 80, 100, and 120 most predictive items from the ABA and BQ. The sum of the absolute values of the response options' correlations with the criterion (within item) was used to identify the ABA and BQ items with the most predictive set of response options. Each scoring key started with an arbitrary point of 100, then adding or subtracting the weights of response options chosen, then multiplying the overall score by 10 to increase the range of scores.

## Analyses

The biodata scores generated from the 80-, 100-, and 120-item scoring keys were correlated with the job performance measure to obtain criterion-related validities in the validation dataset (e.g., the records with full and

FAA_00001113



Figure 1
Incremental validity analysis (with SPSS syntax)

complete data on the ABA, BQ, and criterion; n=260). Second, the incremental validity of the biodata score was estimated through hierarchical regression. In hierarchical regression analysis, the variance in the dependent variable is uniquely partitioned based on the order in which the (correlated) independent variables are entered (Cohen et al., 2003, p. 158). The standardized regression weight (β) for the independent variable entered in the first step is equal to its zero-order correlation with the criterion. In the second step, the effect of the second independent variable is estimated, taking into account the first predictor (see Cohen et al. p. 67). The critical question in incremental validity is the additional variance (change in the multiple correlation coefficient, or $\Delta R^2$) in the criterion explained by the second predictor (Hunsley & Meyer, 2003; see Figure 1).

Score distributions by ethnicity and sex, cut scores, and subgroup pass rates using score banding and percentile scores were investigated. The number of minorities in the subset of AT-SAT cases with ABA, BQ, and criterion data ($n$=260) was very small, making fairness analyses with the validation sample impractical. However, the larger archival sample of 5,826 controllers hired between 1988 and 1992 was diverse enough to support the analysis of biodata scale scores by subgroup. Two analyses were conducted, both requiring comparisons between groups. First, subgroup differences ($d$s) were calculated for the 80-, 100-, and 120-item biodata scales in the larger archival data set ($n$=5,826) for cases with complete data on demographics and biodata. A $d$ statistic represents the difference between group means (e.g., Male vs. Female) divided by the pooled (sample-weighted, within-group) standard deviation of the two groups (Hunter & Schmidt, 2004). Second, score bands were created by using ±2 times the standard error of measurement for each of the biodata scales (Cascio, Outtz, Goldstein & Zedeck, 1991). Cut scores were also examined by percentile.

FAA_00001114

## RESULTS

### Statistical Analyses

Descriptive statistics for the top 80-, 100-, and 120-item biodata scales, AT-SAT predictor composite, and the job performance criterion are found in Table 2. The mean scores for the 80-, 100- and 120-item scales were very nearly the same while the score variance increased slightly with the number of items. Some items were reverse-coded for the purposes of calculating reliability estimates so that all items were scored in the same direction. Reliabilities (Cronbach's $\alpha$) for the 80-, 100-, and 120-item scales were .74, .74, and .78 respectively. Correlations among the study variables are also reported in Table 2. The correlations between AT-SAT and the proposed biodata scale scores were .37, .34, and .34. These correlations suggested that AT-SAT and biodata might be tapping different controller personal characteristics. The correlation between scores on the AT-SAT test battery and the average job performance rating in this analysis was .26 ($n$=260, $p$<.01), compared to .21 reported by Ramos, et al. (2001b, Table 5.5.1).

The zero-order correlations between the 80-, 100-, and 120-item biodata scales and average job performance ratings (e.g., "criterion-related validities") were .59, .62, and .63 respectively. The results of the hierarchical regression analysis are presented in Table 3 for the 80-, 100-, and 120-item biodata scales. As shown in Table 3, AT-SAT was a valid predictor of average job performance ratings ($\beta$=.26, $p$ < .01; $R^2$=.07, $p$ < .01) in the first step of the incremental validity analyses. The biodata scales demonstrated incremental validity over AT-SAT. The standardized regression coefficient for the 80-item biodata scale was .58; it accounted for an additional 29% of variance in the criterion ($\Delta R^2$=.29, $p$ < .01). The 100- and 120-item versions accounting for an additional 32% of criterion variance as shown in Table 3.

### Fairness Analysis

The first step in the fairness analysis was to investigate group differences in mean scores on the proposed scales. The scoring keys for the 80-, 100-, and 120-item scales were applied to the CAMI archival data ($n$=5,826). Mean group differences ($d$) were calculated for three

*Table 2*
Descriptive statistics and intercorrelations for predictors and criterion in validation dataset[1]

| | Measure | Mean | SD | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|---|---|
| 1 | 80-item Biodata Scale | 107.12 | 15.78 | .74[2] | | | | |
| 2 | 100-item Biodata Scale | 107.33 | 17.24 | .99 | .74 | | | |
| 3 | 120-item Biodata Scale | 108.56 | 19.14 | .98 | .98 | .78 | | |
| 4 | AT-SAT | 73.39 | 7.96 | .37 | .34 | .34 | - | |
| 5 | Job Performance | 5.02 | .73 | .59 | .62 | .63 | .26 | - |

Notes:  [1]All correlations are significant at $p$ < .01; $n$=260

[2]Reliabilities for biodata scales on diagonal (all items). (Reliabilities calculated without categorical items for the 80, 100, and 120-item scales were .78 [65 items], .79 [80 items], and .83 [97 items], respectively).

*Table 3*
Hierarchical regression analyses

| | | 80-items | | | 100-items | | | 120-items | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Step | Predictor | $\beta$ | $\Delta R^2$ | $R^2$ | $\beta$ | $\Delta R^2$ | $R^2$ | $\beta$ | $\Delta R^2$ | $R^2$ |
| 1 | AT-SAT Score | .26** | .07** | .07** | .26** | .07** | .07** | .26** | .07** | .07** |
| 2 | Biodata | .58** | .29** | .35** | .53** | .32** | .39** | .61** | .32** | .39** |

**$p$<.01

FAA_00001115

comparisons: female-to-male ($d_{F\text{-}M}$); Black-to-White ($d_{B\text{-}W}$); and Hispanic-to-White ($d_{H\text{-}W}$). There were too few American Indian/Alaskan Native and Asian/Pacific Islander trainees to support meaningful comparisons. Results from the mean group differences analysis are presented in Table 4. The $d_{F\text{-}M}$ was quite small across all of the biodata scales in the archival dataset and much smaller than reported for AT-SAT ($d_{F\text{-}M}$=.44; Ramos et al., 2001b). The mean group differences on the proposed biodata scales were were larger by race, with $d_{B\text{-}W}$=.37. and $d_{H\text{-}W}$=.22 for the 80-item scale. The $d_{B\text{-}W}$ for the biodata scales was about half of the $d_{B\text{-}W}$ for Blacks on AT-SAT. However, the $d_{H\text{-}W}$ for the biodata scales was comparable to the $d_{H\text{-}W}$ reported by Waugh (2001) for AT-SAT.

The second step in the fairness analysis was to examine pass rates by subgroup. Two sets of subgroup pass rate

analyses were conducted. First, score banding was used to develop groupings of scores. Scores within a band are treated as equivalent (Henle, 2004). In this instance, bandwidth was calculated as two times the standard error of measurement. Three ranges of scores were created (with the lowest band being made up of the lowest two bands combined) to model category ranking as used in the FAA. Next, selection ratios by group were computed in two score banding scenarios: selection from the highest band only (the functional equivalent of selecting from the "Well Qualified" band only); and selection from both the highest and middle bands (selecting from the "Well Qualified" and "Qualified" bands). Overall, less than 10% of any group was placed in the highest score band (Figure 2 for 80-item scale; results were comparable for the 100- and 120-item scales[2]).

*Table 4*
Biodata mean gender and ethnic group differences (*d*)[1]

|  | 80 Items | 100 Items | 120 Items | AT-SAT[2] |
|---|---|---|---|---|
| Male-Female *d* | -.08 | -.07 | -.15 | -.44 |
| Black-White *d* | .37 | .39 | .41 | .74 |
| Hispanic-White *d* | .22 | .22 | .21 | .24 |

Notes:  [1]Based on CAMI archival data: $d_{F\text{-}M}$ *n*=5,826 (*n*$_{Female}$=1,087); $d_{B\text{-}W}$ *n*=5,382 (*n*$_{Black}$=253); $d_{H\text{-}W}$ *n*=5,308 (*n*$_{Hispanic}$=179)
  [2]From Table 5.6.5, Ramos, Heil & Manning, 2001b



Figure 2
Score band replacements by group for 80-item biodata instrument

7

The first selection scenario was stringent, with selections from the top score band only. In this stringent scenario, the female-to-male selection ratio was .99 for the 80-item version. The Black-to-White selection ratio was .53 for the 80 item version. When selections were made from the top score band only, the ratios of Hispanic-to-White selection rates were .99 for 80-item version. These results suggest that, for the 80-item version, selection from the top band would not adversely impact women or Hispanic applicants.

The second selection scenario was relatively lenient, with selection from the top and middle score bands. About three-quarters of men, women, and Whites were in the middle and top score bands. However, as shown in Table 5, only about 65% of Black and Hispanics were in the middle and top score bands. Selection from the middle and top bands resulted in a female-to-male selection ratio at or above 1.00 for all versions of the biodata instrument. The Black-to-White selection ratio was .80 for the 80-item version of the biodata instrument but less than .80 for the longer versions. Selection from the middle and top bands combined resulted Hispanic-to-White selection ratio greater than .80. The results for the 80-item version indicate that selection from the middle and top score bands combined would not adversely impact women, Blacks, or Hispanics.

The final step in the fairness analysis was to investigate pass rates by percentile cut scores. Selection ratios were computed at each percentile. The female-to-male ($SR_{F-M}$), Black-to-White ($SR_{B-W}$), and Hispanic-to-White ($SR_{H-W}$) selection ratios are plotted by percentile in Figure 3 for the 80-item version. The $SR_{H-W}$ and $SR_{H-W}$ selection ratios were greater than .80 at all percentiles. However, the $SR_{B-W}$ was less than .80 at higher percentile scores. For example, selection at the 80th percentile (20% selected, 80% rejected) resulted in $SR_{B-W}$ of .61. Setting a cut score

*Table 5*
Cut score results for 80-, 100-, and 120-item biodata scale by number and percentage of each group within-band for CAMI archival data[1]

|  | Male | | Female | | Black | | Hispanic | | White | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | N | % | N | % | N | % | N | % | N | % |
|  | | | | | 80 Items | | | | | |
| Top Band | 447 | 9.4 | 101 | 9.3 | 13 | 5.1 | 17 | 9.5 | 495 | 9.6 |
| Middle Band | 2,955 | 62.4 | 722 | 66.4 | 136 | 53.8 | 98 | 54.7 | 3,271 | 63.8 |
| Lowest 2 Bands | 1,337 | 28.4 | 264 | 24.3 | 104 | 41.1 | 64 | 35.8 | 1,363 | 26.6 |

[1]CAMI archival data (N=5,826): M=4,739, F=1,087; B=253, H=179, W=5,129



Figure 3
Selection ratios by group for the 80-item biodata instrument

FAA_00001117

at the 50th percentile (50% selected, 50% rejected), for example, resulted in $SR_{\text{B-W}}$ of .72 for the 80-item version, still below the .80 rule-of-thumb promulgated in the *Uniform Guidelines for Employee Selection Procedures*. In other words, selection on higher percentile scores on the 80-item version was unlikely to adversely impact women and Hispanics but adverse impact on Black candidates was possible.

## DISCUSSION

The results of this study suggest that an empirically-keyed, response option-scored biodata instrument has validity as a predictor of ATCS job performance ratings. From a test fairness perspective, biodata yielded nearly identical mean scores across gender and ethnicity scores that were well below *d*s typically found for tests of general mental ability—which tend to yield high subgroup differences of around 1.0. The results of this study follow the typical research findings on biodata—that it holds promise for prediction while at the same time causing less adverse impact potential relative to tests of general cognitive ability. Finally, the 80-item version was more efficient (fewer questions for about the same statistical gain) than either the 100- or 120-item versions of the biodata scale.

Three additional studies are recommended. First, an investigation of the internal structure of the biodata instrument is recommended. This investigation should include the convergent and discriminant validity of the biodata scale with personality measures. Second, an assessment of the incremental validity of biodata in predicting more objective measures of controller job performance is warranted. Third, cross-validation of the biodata scale on the incoming generation of air traffic controllers is recommended. Example job performance criteria include performance in initial occupational training at the FAA Academy, typically in the first few months after hire. More distal criteria include on-the-job training performance assessments and achieving Certified Professional Controller (CPC) at the first assigned field facility (1-3 years from hire (FAA, 2011, p. 40)). Further investigations of CBAS in relation to these outcomes seem warranted as data become available and empirical studies are technically feasible under the relevant professional guidelines, standards, principles, and practices for the validation of employee selection procedures.

## REFERENCES

Asher, J.J. (1972). The biographical item: Can it be improved? *Personnel Psychology, 25,* 251–269.

Borman, W.C., Hedge, J.W., Hanson, M.A., Bruskiewicz, K.T., Mogilka, H., Manning, C., … & Horgen, K.E. (2001). Development of criterion measures of air traffic controller performance. In R.A. Ramos, M.A. Heil, & C.A. Manning (Eds.) *Documentation of validity for the AT-SAT computerized test battery: Volume II* (pp. 1–12). (FAA Report No. DOT/FAA/AM-01/6). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Broach, D. (1992, June). *Non-cognitive predictors of performance in radar-based air traffic control training.* Paper presented at the 4th Annual Convention of the American Psychological Society, San Diego, CA.

Broach, D. (Ed.) (1998). *Recovery of the FAA air traffic control specialist workforce, 1981-1992.* (DOT/FAA/AM-98/23). Washington, DC: Federal Aviation Administration Office of Aviation Medicine.

Broach, D. (2005). A singular success: Air traffic control specialist selection 1981-1992. In B. Kirwan, M. Rodgers & D. Schafer (Eds.). *Human factors impacts in air traffic management* (p. 177–205). Burlington, VT: Ashgate.

Broach, D. (2008). *Overview of CAMI Life Experiences Questionnaire (Version 1.0).* Unpublished manuscript, FAA Civil Aerospace Medical Institute Aerospace Human Factors Research Division (AAM-500).

Cascio, W.F., Outtz, J., Zedeck, S., & Goldstein, I.L. (1991). Statistical implications of six methods of test score use in personnel selection. *Human Performance, 4,* 233–264.

Cobb, B.B., Young, C.L., & Rizutti, B.L. (1976). *Education as a factor in the selection of air traffic controller trainees.* (FAA Report No. DOT/FAA/AM-76/16). Washington, DC: Federal Aviation Administration Office of Aviation Medicine.

Cohen, J., Cohen, P., West, S.G. & Aiken, L.S. (2003). *Applied multiple regression/correlation analysis for the behavioral sciences* (3rd ed.). Hillsdale, NJ: Erlbaum.

FAA_00001118

Collins, W.E., Manning, C.A., & Taylor, D.K. (1984). A comparison of prestrike and poststrike ATCS: Biographic factors associated with Academy training success. In A.D. VanDeventer, W.E. Collins, C.A. Manning, D.K. Taylor, & N.E. Baxter (Eds.). *Studies of poststrike air traffic control specialist trainees: I. Age, biographical factors, and selection test performance related to Academy training success* (pp. 7–14). (FAA Report No. DOT/FAA/AM- 84/6). Washington, DC: Federal Aviation Administration Office of Aviation Medicine.

Collins, W.E., Nye, L.G., & Manning, C.A. (1992). Poststrike air traffic control trainees: Biodemographic predictors of success in selection and screening. *International Journal of Aviation Psychology, 2* 213-223.

Dean, M.A. (1999, June). *A response-option examination of biodata adverse impact and criterion validity.* Presented at the 1999 International Personnel Management Association Assessment Council meeting, St. Petersburg, FL.

Efron, B., & Tibshirani R.J. (1993). *An Introduction to the bootstrap.* New York: Chapman & Hall.

Farmer, W.L. (2002). *Characteristics of biodata keys as a function of scaling method, sample size, and criterion.* Dissertation Abstracts International: Section B: The Sciences and Engineering, 63(3-B).

Federal Aviation Administration. (2011). *A plan for the future: 10-Year strategy for the air traffic control workforce 2011–2020.* Washington, DC: Federal Aviation Administration. Last retrieved May 25, 2011 from http://www.faa.gov/air_traffic/publications/controller_staffing/media/CWP_2011.pdf

Gatewood, R.D., Feild, H.S., & Barrick, M. (2008). *Human resource selection.* (6th ed.)Fort Worth, TX: Harcourt.

Hanson, M.A., Borman, W.C., Mogilka, H.J., Manning, C., & Hedge, J.W. (1999). Computerized assessment of skill for a highly technical job. In F. Drasgow & J.B. Olson-Buchanan (Eds.), *Innovations in computerized assessment* (pp.197–220). Mahwah, NJ: Erlbaum.

Henle, C.A. (2004). Case review of the legal status of banding. *Human Performance, 17,* 415–432.

Hunsley, J. & Meyer, G.J. (2003). The incremental validity of psychological testing and assessment: Conceptual, methodological, and statistical issues. *Psychological Assessment, 15,* 446–455.

Hunter, J.E., & Hunter, R.F. (1984). Validity and utility of alternative predictors of job performance. *Psychological Bulletin, 96,* 72–98.

Hunter, J.E., & Schmidt, F.L. (2004). *Methods of meta-analysis: Correcting for error and bias in research findings* (2nd Ed.). Newbury Park, CA: Sage.

Keenan, P.A. (2001). *Biographical and computer experience information: Demographics for the validation study.* In R.A. Ramos, M.A. Heil, & C.A. Manning (Eds.) Documentation of validity for the AT-SAT computerized test battery: Volume II (pp. 31–35). (FAA Report No. DOT/FAA/AM-01/6). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Kluger, A.N., Reilly, R.R., & Russell, C.J. (1991). Faking biodata tests: Are option-keyed instruments more resistant? *Journal of Applied Psychology, 76,* 889–896.

Lautenschlager, G.J. (1994). Accuracy and faking of background data. In G.S. Stokes, M.D. Mumford, & W.A. Owens, (Eds.), *Biodata handbook: Theory, research and use of biographical information in selection and performance prediction* (pp. 391–419). Palo Alto, CA: Consulting Psychologists Press.

Manning, C.A. (1998). Air traffic control specialist field training programs, 1981-1992. In D. Broach (Ed.), *Recovery of the FAA Air Traffic Control Specialist Workforce, 1981-1992* (pp. 23–32). (FAA Report No. DOT/FAA/AM-98/23). Washington, DC: Federal Aviation Administration Office of Aviation Medicine.

Mumford, M.D., & Owens W.A. (1987). Methodological review: Principles, procedures, and findings in the application of background data measures. *Applied Psychological Measurement, 11,* 1–31.

Murphy, K.R. (1983). Fooling yourself with cross-validation: Single sample designs. *Personnel Psychology, 36,* 111–118.

Nickels, B.J. (1994). The nature of biodata. In G.S. Stokes, M.D. Mumford, & W.A. Owens, (Eds.), *Biodata handbook: Theory, research and use of biographical information in selection and performance prediction* (pp. 1–16). Palo Alto, CA: Consulting Psychologists Press.

Nickels, B.J., Bobko, P., Blair, M.D., Sands, W.A., & Tartak, E.L. (1995). *Separation and control hiring assessment (SACHA) final job analysis report* (Deliverable item 007A under FAA contract DFTA01-91-C-00032). Washington, DC: Federal Aviation Administration, Office of Personnel Management.

FAA_00001119

Owens, W.A., & Schoenfeldt, L.F. (1979). Toward a classification of persons. *Journal of Applied Psychology, 53*, 569-607.

Ramos, R.A., Heil, M.A., & Manning, C.A. (2001a). *Documentation of validity for the AT-SAT computerized test battery: Volume I*. (FAA Report No. DOT/FAA/AM-01/5). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Ramos, R.A., Heil, M.A., & Manning, C.A. (2001b). *Documentation of validity for the AT-SAT computerized test battery, Volume II*. (FAA Report No. DOT/FAA/AM-01/6). Washington, DC: Federal Aviation Administration Office of Aerospace Medicine.

Reilly, R.R., & Chao, G.T. (1982). Validity and fairness of some alternative employee selection procedures. *Personnel Psychology*, 35, 1–62.

Russell, C.J., Dean, M.A., & Broach, D. (2000). *Guidelines for bootstrapping validity coefficients in ATCS selection*. (FAA Report No. DOT/FAA/AM-00/15). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Schmitt, N., Gooding, R.Z., Noe, R.A., & Kirsch, M. (1984). Meta-analyses of validity studies published between 1964 and 1982 and the investigation of study characteristics. *Personnel Psychology. 37*, 407-422.

Stokes, G.S., Mumford, M.D., & Owens, W.A. (1994). *Biodata handbook: Theory, research and use of biographical information in selection and performance prediction*. Palo Alto, CA: Consulting Psychologists Press.

Taylor, D.K., VanDeventer, A.D., Collins, W.E. & Boone, J.O. (1983). Some biographical factors associated with success of air traffic control specialist trainees at the FAA Academy during 1980. In A.D. VanDeventer, D.K. Taylor, W.E. Collins, & J.O. Boone (Eds.). *Three studies of biographical factors associated with success in air traffic control specialist screening/training at the FAA Academy* (pp. 6–11). (FAA Report No. DOT/FAA/AM-83/6). Washington, DC: Federal Aviation Administration Office of Aviation Medicine.

Waugh, G. (2001). Predictor-criterion analyses. In R.A. Ramos, M.A. Heil, & C.A. Manning (Eds.) *Documentation of validity for the AT-SAT computerized test battery: Volume II (pp. 37–42)*. (FAA Report No. DOT/FAA/AM-01/6). Washington, DC: Federal Aviation Administration, Office of Aviation Medicine.

Wise, L.L., Tsacoumis, S., Waugh, G.W., Putka, D.J., & Hom, I. (2001). *Revision of the AT-SAT*. (Unpublished Manuscript). Washington, DC: Federal Aviation Administration Office of the Assistant Administrator for Human Resources Management.

## Endnotes

[1]Incidental restriction in range occurs when a sample is selected on the basis of a different variable than the one being analyzed. For example, the controllers in this analysis were selected on the basis of completing the FAA Academy and field on-the-job training; as a consequence, their scores on the proposed biodata scales might have been incidentally restricted. See personnel selection texts such as Gatewood, Feild, & Barrick, 2008.

[2]Analyses for the 100- and 120-item scales can be requested from the second author.

FAA_00001120

FAA_00001121

Journal of Applied Psychology
2009, Vol. 94, No. 2, 318–340

© 2009 American Psychological Association
0021-9010/09/$12.00   DOI: 10.1037/a0013775

# Multistage Selection Strategies: Simulating the Effects on Adverse Impact and Expected Performance for Various Predictor Combinations

David M. Finch
University of Georgia

Bryan D. Edwards
Auburn University

J. Craig Wallace
Oklahoma State University

Examination of the trade-off between mean performance and adverse impact has received empirical attention for single-stage selection strategies; however, research for multistage selection strategies is almost nonexistent. The authors used Monte Carlo simulation to explore the trade-off between expected mean performance and minority hiring in multistage selection strategies and to identify those strategies most effective in balancing the trade-off. In total, 43 different multistage selection strategies were modeled; they reflected combinations of predictors with a wide range of validity, subgroup differences, and predictor intercorrelations. These selection models were examined across a variety of net and stage-specific selection ratios. Though it was still the case that an increase in minority hiring was associated with a decrease in predicted performance for many scenarios, the current results revealed that certain multistage strategies are much more effective than others for managing the performance and adverse impact trade-offs. The current study identified several multistage strategies that are clearly more desirable than those strategies previously suggested in the literature for practitioners who seek a practical selection system that will yield a high-performing and highly representative workforce.

*Keywords:* adverse impact, Monte Carlo simulation, multistage, multiple hurdle, selection

The development of employment selection systems that simultaneously identify high-performing and diverse individuals remains one of the most frustrating challenges faced by selection researchers and practitioners. For example, cognitively loaded tests of knowledge and ability are arguably the strongest predictors of job and training performance (e.g., Schmidt & Hunter, 1998). However, cognitive ability measures are notorious for yielding very large race-based group mean differences, such as a widely cited one standard deviation difference in Black–White test performance (Chan & Schmitt, 1997; Roth, Bevier, Bobko, Switzer, & Tyler, 2001; Sackett, Schmitt, Ellingson, & Kabin, 2001; Schmitt, Clause, & Pulakos, 1996).

As a result, organizations face a difficult dilemma, often referred to as the trade-off problem (or trade-off), as the organizational goals of maximizing performance and minimizing adverse impact (AI) appear to be in direct conflict in many selection systems. This dilemma has driven much of the empirical selection research over the last decade, from the search for alternative predictors with smaller subgroup differences than cognitive ability (e.g., Clevenger, Pereira, Wiechmann, Schmitt, & Harvey, 2001; Cortina, Goldstein, Payne, Davison, & Gilliland, 2000; Mount, Witt, & Barrick, 2000); to investigation of alternative measurement methods (e.g., constructed response; Arthur, Edwards, & Barrett, 2002; Edwards & Arthur, 2007); to simulation studies of the trade-off associated with compensatory (e.g., Bobko, Roth, & Potosky, 1999; De Corte, Lievens, & Sackett, 2007; Potosky, Bobko, & Roth, 2005; Schmitt, Rogers, Chan, Sheppard, & Jennings, 1997) and multistage selection strategies (i.e., De Corte, Lievens, & Sackett, 2006; Sackett & Roth, 1996). The trade-off problem was recently the focus of a forum in *Personnel Psychology* (cf. Pyburn, Ployhart, & Kravitz, 2008).

Our primary objective in the current study was to provide researchers and practitioners with valuable insight into what can be expected (with respect to the levels of AI and expected performance) when various multistage selection strategies are employed and discuss the relative merits of different multistage selection strategies in managing (or balancing) the trade-off. The development of a selection system (single- or multistage) that effectively meets both the diversity and performance goals of the organization is very complicated, as has been demonstrated by previous simulation studies. Single-stage simulation studies have demonstrated the potential of the use of composites for reducing AI and the integral role of predictor intercorrelations and predictor subgroup differences in determining AI. Additionally, Sackett and Roth (1996) demonstrated the potential of multistage strategies over

David M. Finch, Department of Psychology, University of Georgia; Bryan D. Edwards, Department of Psychology, Auburn University; J. Craig Wallace, Spears School of Business, Oklahoma State University.

This article is based in part on David M. Finch's doctoral dissertation, completed under the direction of Garnett S. Stokes at the University of Georgia. David M. Finch extends special thanks to Garnett Stokes and Gary J. Lautenschlager for their helpful comments and support in the preparation of the dissertation. We also thank Suzanne Bell for helpful comments on a previous draft of this article.

Correspondence concerning this article should be addressed to David M. Finch, APT, Inc., One Thorndal Circle, 2nd Floor, Darien, CT 06820. E-mail: dfinch@aptmetrics.com

single-stage approaches for reducing AI. However, few efforts have been successful at reducing AI without leading to large reductions in predictive validity.

Although previous analytical and simulation work provides some guidance regarding the trade-off, further simulation work is needed so the potential of multistage selection strategies can be assessed. Multistage selection strategies are commonly utilized in practice; however, the trade-off for multistage selection has not been fully researched. The present study was intended to fill this gap. This article examines the trade-off for several important yet previously unexplored multistage selection strategies (e.g., the use of correlated predictors in composites). In addition, our simulation models a wide range of predictor properties demonstrated to be integral to the trade-offs observed as well as multiple indicators of AI.

Extensive research has been conducted to identify alternative measures to cognitive ability that have comparable predictive validity but smaller subgroup differences. If the goal is to identify suitable replacements to cognitive ability, it is logical to question how well these alternative predictors would be expected to perform relative to cognitive ability within typical selection systems. A commonly held assumption is that supplementing a predictor that has large subgroup differences with one that has small subgroup differences (referred to as the "supplemental strategy") will yield lower levels of standardized mean differences (which we refer to throughout as $d$) for the composite and, subsequently, less adverse impact potential (e.g., Ones, Viswesvaran, & Schmidt, 1993; Pulakos & Schmitt, 1996; Stokes, Mumford, & Owens, 1994).

Most research shows that a carefully selected composite of alternative predictors that have small subgroup differences with cognitive ability will reduce AI (to varying degrees); however, the selection battery will still violate the four-fifths rule (often used in defining AI) unless the highest selection ratios ($SR$s) are used (e.g., Potosky et al., 2005; Roth, Bobko, & Switzer, 2006; Sackett & Ellingson, 1997; Sackett & Wilk, 1994; Schmitt et al., 1997). In fact, prior single-stage simulations demonstrated that even the best balance of the performance and minority hiring goals resulted in unacceptable levels of AI and required a rather substantive sacrifice in validity to achieve these mediocre minority hiring levels. One explanation for these results is that within compensatory models, there is only one opportunity to maximize both performance and minority hiring, and regression-weighted composites are designed to maximize predicted performance. Given that the higher validity predictor (or predictors) also tends to have larger subgroup differences than do the other predictors, this optimal prediction comes at the expense of low minority hiring. These trade-offs are a function of the complex interplay between several factors (e.g., predictor intercorrelations, $SR$, validity, and subgroup differences; Schmitt et al., 1997). We posited that multistage systems would afford greater flexibility than would single-stage strategies for the use of a given set of predictors and predictor composites that could help companies achieve more acceptable performance and minority hiring levels.

The decision to use multistage systems is typically driven by minimum ability requirements or practical considerations (e.g., time and expense to administer and scoring assessments). However, we believe there are compelling reasons for the use of multistage strategies over single-stage strategies for managing the AI and performance trade-offs. With a multistage strategy, one could ostensibly introduce the predictors in a stepwise fashion, so as to maximize the advantages of each predictor at the different stages. Indeed, we posited that with a known set of predictor psychometric properties, it would possible to build multistage systems that more effectively took advantage of the most desirable properties of all predictors being considered in a particular selection situation.

Although previous studies have offered some valuable insight into the trade-off problem for single-stage selection strategies, we know of only two studies (De Corte et al., 2006; Sackett & Roth, 1996) that have examined the degree to which various multistage selection strategies sacrifice one organizational goal (e.g., optimal performance) for the sake of the other (e.g., maximized minority hiring). The results of the studies by Sackett and Roth (1996) and De Corte et al. (2006) provide a solid foundation, and we use their studies as a basis for better understanding of the trade-off in multistage systems.

### Sequential Ordering of Predictors and Number of Stages

The number of stages in a multistage selection system, the predictors, and the stages in which they are administered may play an important role in the trade-off between AI and expected performance. There are theoretical and practical considerations that drive decisions regarding the predictors appropriate in a given selection situation, when to administer them, and the number of stages in the process. Job analytic data dictate which specific knowledge, skills, abilities, and other characteristics (KSAOs) are appropriate for assessment (e.g., are important and required upon entry). The chosen method of assessment in turn depends upon which KSAOs are to be assessed (e.g., mathematical skills are not typically assessed in an interview). Cost, time, logistical constraints, and other practical considerations influence the method of assessment as well as when the assessment is administered within the selection process. For example, paper-and-pencil tests of cognitive ability and personality are relatively inexpensive to administer and score. In contrast, assessment centers and interviews require substantially more resources to administer and score and are more likely to be administered in later stages than are the paper-and-pencil tests.

In many cases, the order in which predictors will be administered in a multistage process is determined by minimum ability or skill requirements. That is, if it has been determined through a job analysis that individuals need minimum skills or ability to perform the job, it would be impractical for an organization to administer expensive and time-consuming tests before screening on minimum ability requirements unless it were absolutely necessary (e.g., if there was a small window in which to fill vacancies). The practitioner is left to decide how best to utilize predictors in multistage systems. In choosing what selection strategies to model in this article, we took the practicality of the strategy into consideration. For example, assessments that are more expensive and time consuming to administer (e.g., interviews) were modeled only in the final stage of the selection process, as is common in practice.

One key consideration in multistage designs is the stage in which predictors with a specific set of psychometric properties are positioned. For example, a common belief is that the large-$d$ predictor should be administered in the first stage of a selection

process and should be used with a low cut score (e.g., high first-stage *SR*). In this way, more minorities might be expected to progress to later stages, when the hiring decision would be based on predictors with smaller subgroup differences. However, Sackett and Roth (1996) and De Corte et al. (2006) demonstrated that placement of the large-*d* predictor alone in the first stage does not always lead to increased minority hiring. Specifically, when the first-stage *SR* was lower (more selective) than the second-stage *SR*, positioning the large-*d* predictor in the second stage yielded less AI. Given that cognitive ability represents an extreme outlier in terms of magnitude of subgroup differences, it is important to understand the extent to which predictor ordering and first-stage selectivity impact predictors with less extreme subgroup differences. Thus, one of our primary objectives in the present study was to examine the impact the sequential ordering of predictors has within multistage systems in determining the trade-off. We varied the predictors used at each stage and examined the impact of predictor composites at various stages. Additionally, we expanded the number of stages used by Sackett and Roth (1996) by examining selection systems with two and three stages.

### *SR*

*SR*s play a prominent role in the trade-off in multistage selection systems. One of the key advantages of multistage selection systems is that they allow one to reduce the pool of applicants to a more manageable size for further screening on some predictor or predictors. The net selection ratio ($SR_{net}$) represents the proportion of applicants who will ultimately be selected to fill vacancies. In practice, organizations commonly implement a selection process with the intention of filling a preestablished and fixed number of vacancies from the applicant pool. Often, then, organizations know (or at the very least have a good idea) what the $SR_{net}$ will be from the outset. Another key consideration for the practitioner is the *SR* associated with the first stage of the process ($SR_1$), because this *SR* determines how many (or how few) applicants proceed to the second stage. For example, with 500 applicants and $SR_1 = .15$, only 75 (500 × .15) candidates will proceed to the second stage of the selection process for subsequent screening. The decision of how low (e.g., $SR_1 = .15$) or high (e.g., $SR_1 = .75$) to set $SR_1$ is situation specific and is informed by many factors, such as the number of vacancies and the costs associated with screening applicants in subsequent stages of the process.

The $SR_{net}$ is a mathematical function of the *SR*s associated with each stage in the process ($SR_{net} = SR_1 \times SR_2$; see Table 1 for an example of the relationship between the stage-specific *SR*s and the $SR_{net}$). As such, the lower (or more selective) the first-stage *SR*, the less influence the second-stage predictor will have on the final selection decision. Thus, when a low first-stage *SR* is desired to greatly reduce the magnitude of the candidate pool, positioning the small-*d* predictor as the first-stage predictor will allow a greater number of minority candidates the opportunity to move forward in the process to the second stage than would positioning the large-*d* predictor as the first-stage predictor. Such a strategy can be expected to increase minority hiring. This also means that the second-stage predictor will contribute less to the overall prediction of performance. To the extent that the second-stage predictor has higher validity than the first-stage predictor, lower expected per-

Table 1
*Example of Impact of First-Stage SR*

| $SR_{net}$ | First-stage SR ($SR_1$) | Two-stage strategies | Three-stage strategies | |
|---|---|---|---|---|
| | | Second-stage SR ($SR_2$) | Second-stage SR ($SR_2$) | Third-stage SR ($SR_3$) |
| .10 | .15 | .67 | .76 | .88 |
| | .25 | .40 | .57 | .70 |
| .30 | .45 | .67 | .76 | .88 |
| | .60 | .50 | .64 | .78 |
| | .75 | .40 | .57 | .70 |

*Note.* *SR* = selection ratio.

formance may result. As such, *SR*s have a clear impact on the trade-offs observed for multistage strategies.

### Predictor Intercorrelations

Predictor intercorrelations also play a critical role for expected performance and minority hiring levels. In their single-stage simulation, Schmitt et al. (1997) found that manipulating the intercorrelations among the predictors within a composite had the greatest impact on the trade-off between minority hiring and performance objectives. Specifically, as the intercorrelations between non-zero *d* alternative predictors and cognitive ability decreased, levels of composite *d* increased. Similarly, Sackett and Ellingson (1997) demonstrated that as the correlation between two predictors in a composite increased, the level of composite *d* decreased because the predictors shared an increasing amount of common variance. Furthermore, as the number of alternative predictors in the composite increased, low intercorrelations yielded even larger levels of composite *d*. Expected performance based on composites will also be influenced by predictor intercorrelations in a predictable manner. Specifically, as the correlation between two predictors increases, the incremental variance in performance explained by either predictor will decrease.

Predictor intercorrelations play a unique role in multistage selection in terms of indirect range restriction (given prior selection on a correlated predictor; Sackett, Lievens, & Berry, 2007). Prior selection has well-known implications for validity, and Roth, Bobko, Switzer, and Dean (2001) recently demonstrated that substantial indirect range restriction can be for observed subgroup differences as well. Specifically, observed subgroup differences for second-stage predictors tend to become much smaller as the intercorrelations between the first- and second-stage predictors increase. Additionally, the more selective the first-stage *SR*, the greater the restriction is for the correlated second-stage predictor.

Taken together, predictor intercorrelations appear to play a more influential, and certainly more complicated, role in determining the AI and performance outcomes for multistage strategies that utilize composites than they do for single-stage composites or multistage strategies that lack composites. Although past research has revealed the impact predictor intercorrelations have on expected performance and minority hiring levels within single-stage composites as well as their impact for two-predictor, two-stage strategies (i.e., indirect range restriction), we are unaware of any research that has examined the performance and AI outcomes

when correlated predictors and composites are used in a multistage system. However, such multistage selection strategies are common in practice. Meta-analytic estimates indicate that commonly used predictors tend to be correlated to some degree, and practitioners frequently administer three or more assessments in a multistage approach. The present simulation fills a gap in the literature by examining the trade-off when correlated predictors are included in more complex multistage systems.

## Adverse Impact Statistics

Numerous methods for assessing AI have been recommended in the literature and by governmental agencies. Although the four-fifths rule is the most commonly used method and is the one described in the *Uniform Guidelines* (Equal Employment Opportunity Commission et al., 1978), significance testing is generally conducted as well (particularly, in litigation-related matters). Reliance upon the four-fifths rule as the sole basis for a conclusion of AI can be problematic. These conclusions are particularly susceptible to sampling error and are subsequently prone to false positives (concluding that AI exists when it does not), especially when sample sizes are small (Morris & Lobsenz, 2000). Roth et al. (2006) recently demonstrated that the four-fifths rule produced an alarming percentage of false positives in applicant pools as large as 400 under realistic selection conditions, and they suggested that the four-fifths rule be supplemented with a statistical test to minimize Type I errors.

The $Z$ test on the difference in selection rates ($Z_D$ test; also known as the 2-*SD* test) and the Fisher exact test are two statistical significance tests commonly used in practice. The Fisher exact test is recommended and is generally regarded as the appropriate significance test for examining small applicant pools (Office of Federal Contract Compliance Programs, 1993; Siskin & Trippi, 2005). Although significance testing can be effective for detecting false positives resulting from the four-fifths rule, significance tests may lack the power necessary to avoid Type II errors (false negatives) when the sample sizes are small (Collins & Morris, 2008; Morris, 2001; Morris & Lobsenz, 2000). In fact, the recent studies by Morris and colleagues revealed that both the Fisher exact test and $Z_D$ test tend to be underpowered when applicant pools are small, have low overall selection rates, and have a small proportion of minority applicants. However, an alternate significance test known as $Z_{IR}$ has been demonstrated in recent studies to be a more powerful indicator of AI and thus is a better significance test under these conditions (Morris, 2001; Morris & Lobsenz, 2000). $Z_{IR}$ is a significance test of the AI ratio (*AIR*) and has the same effect size as the four-fifths rule; in contrast, the $Z_D$ test is a test of the difference between selection rates (Morris & Lobsenz, 2000).

Morris (2001) recommended that a more liberal significance criterion be adapted to increase power. Although common, the use of two-tailed significance tests to identify AI may be overly conservative in many situations, given that tests of AI are usually directional (to detect AI against a particular group). A one-tailed test ($Z_{crit} = 1.645$) is consistent with theory; it provides greater power than does a two-tailed test and still controls for a Type I error (Morris, 2001). Therefore, we operationalized AI in the present study using the four-fifths rule, Fisher exact test (two-tailed), and the $Z_{IR}$ test (one-tailed).

## Applicant Sample Size and Percentage of Minorities

Another potential factor that could influence our results is the size of the applicant pool, particularly with respect to AI conclusions (e.g., Morris & Lobsenz, 2000; Roth et al., 2006). Given the problems associated with the four-fifths rule and significance testing in small sample sizes, we decided to model the same selection strategies for different size applicant pools (i.e., $N = 500$ and $N = 160$). In particular, power to detect AI is a function of the proportion of minorities in the applicant pool (Morris & Lobsenz, 2000). Minority representation in applicant pools varies in practice, and we believe it is instructive to model different proportions when examining the trade-off in multistage selection.

## Theoretical and Practical Contributions to the Literature

The present study adds to the existing literature in several ways. First, despite the popularity of multistage selection strategies in practice, very little is known about the trade-offs within multistage selection systems. In fact, several researchers have called for more research in this area (e.g., Bobko et al., 1999; Hoffman & Thornton, 1997; Kehoe, 2002; Potosky et al., 2005; Sackett & Roth, 1996). We know of only two studies that have simultaneously modeled AI and performance outcomes for multistage systems (De Corte et al., 2006; Sackett & Roth, 1996). Each of these studies has a few key limitations. Though Sackett and Roth's results are informative, the generalizability of these results is limited to two-predictor strategies in which the predictors are uncorrelated and have extremely different subgroup differences ($d = 0$ and $d = 1.0$). Second, although Sackett and Roth did model second-stage composites, the composites contained predictors that were uncorrelated, and one of the predictors in the composite had already been administered in the first stage. The primary focus of De Corte et al. was to provide evidence for a computer program that compares the cost, mean performance, and *AIR*s for multistage selection, rather than to explore the various strategies for managing the trade-off in a more comprehensive study. Only a few multistage scenarios were modeled, and none of them included composites.

Practitioners commonly utilize more than two predictors within multistage designs, and some of the predictors will likely be correlated. Administration of more than two predictors in a two-stage process requires the use of composites in either the first or second stage. When each stage in the process contains only one predictor, the stage-specific *SR*s dictate how much weight is given to each predictor in the process. However, when two predictors are combined in a regression-weighted composite in the second stage, the weighting of the second-stage predictors is determined not only by the stage-specific *SR* but by the relative validity of the composite predictors and the intercorrelations between the composite predictors and between the first- and second-stage predictors. The outcomes associated with these strategies have yet to be explored, although such strategies are of practical and theoretical interest. The present simulation modeled several unique, correlated predictors with varying levels of subgroup differences, both as first-stage predictors and in second-stage composites. This model represents a major advancement, given the potential reduction in composite $d$ when correlated predictors are used and the potential influence of indirect range restriction.

Another major contribution of the current simulation is the modeling of multiple indicators of AI (i.e., statistical significance

testing and the four-fifths rule). AI results reported in previous simulations (both single- and multistage selection) have been fairly discouraging. However, these studies defined AI on the basis of the four-fifths rule. Given the high incidence of false positives associated with the four-fifths rule (e.g., Roth et al., 2006), it would be informative to investigate alternative operationalizations of AI. Significance testing is commonly done in practice, and it is critical that significance tests be considered when interpreting and reporting AI in studies of this nature.

To increase the generalizability of our findings, we modeled an extensive number of multistage selection strategies that reflected combinations of predictors with various psychometric properties under a range of *SR*s. The choices involved in building these selection systems (e.g., battery composition, sequential ordering, *SR*s) were driven by two considerations: theoretical and practical relevance. For example, the specific predictors that we modeled (i.e., cognitive ability, biodata, structured interview, conscientiousness, integrity) are commonly used in practice and have received significant attention in the literature. In addition, the meta-analytic estimates for the predictors examined in previous single- and multistage selection research represent a great deal of diversity with respect to the key psychometric properties that interact in determining the mean performance and minority hiring levels associated with a given selection strategy. This last point is especially important, because studies such as ours are heuristic in nature and the choice of parameters to model determines the generalizability of the results. Therefore, predictors with a range of subgroup differences were simulated under a variety of scenarios (i.e., as the first-stage predictor as well as a predictor within the second and third stage, either in a composite or as a single predictor, of a selection process).

Given the important role that intercorrelations play both within composites and between predictors in the first and subsequent stages, varying degrees of intercorrelations were simulated. Specifically, we simulated predictors that have comparable levels of validity to cognitive ability (e.g., structured interview, biodata, integrity) but that vary in their intercorrelations with the other predictors as well as in their levels of subgroup differences. We also modeled the AI and performance outcomes when conscientiousness—a low-validity but non-zero *d* predictor that is correlated with some of the other predictors—was incorporated into various selection strategies. Modeling the same meta-analytic estimates as have been simulated in previous studies facilitates comparisons.

Finally, to our knowledge, this study is the first in which features of predictor composites and multistage strategies in selection systems that reflect the complexity of the performance and the AI trade-off issue were combined and directly examined. Overall, this study greatly extends our knowledge of multistage selection by modeling a wider range of predictor properties, more complicated selection batteries (e.g., predictor composites, three-, four-, and five-predictor selection systems) across a range of *SR*s within a variety of applicant pools (e.g., different proportions of minority representation, pool size).

## Method

The simulation technique we used to examine the trade-off between AI and expected performance relied upon best estimates (in most cases, meta-analytic estimates) of intercorrelations among the predictors, predictor subgroup differences, and predictive validity estimates. Using these estimates, we generated observed predictor and criterion scores and used them to simulate the effects on AI and expected performance under a variety of conditions meaningful for practitioners and researchers. It must be noted that the predictor properties (i.e., validity, subgroup differences, intercorrelations) were used exclusively to illustrate the importance of decisions made and the outcomes of those decisions regarding expected performance and AI when predictors were combined in multistage selection systems.

Although we modeled meta-analytic values for various predictors and refer to these predictors as cognitive ability, biodata, and so on, throughout the Method and Results and Discussion sections, these labels are merely used to facilitate the communication of results. We in no way intend to suggest that all biodata measures, for example, are alike psychometrically (e.g., validity, level of *d*, predictor intercorrelations) and therefore will yield the same outcomes as those reported herein. Rather, our primary focus in this simulation (and simulations of this nature) was on the actual parameters being modeled with the goal of illuminating expected performance and minority hiring under a wide variety of conditions. For example, any conclusions about the biodata predictor should generalize to any other selection instrument (e.g., situational judgment tests) with similar psychometric properties.

### Predictor Scenarios

First, a note on terminology: We use the term *selection model* to represent a specific set and order of predictors within a multistage strategy and the term *scenario* to represent a particular selection model at a specific first-stage *SR*. Additionally, for ease of presentation of the various selection models, text references use the following notation: "first stage, second stage, third stage." For example, "CA, Bio + SI" refers to a selection model in which cognitive ability is administered in the first stage and a composite of biodata and structured interview is administered in the second stage.

As previously discussed, the decision of which scenarios to model was based on several practical and theoretical reasons. There was an extensive number of combinations worthy of examination. Ultimately, we decided upon 43 two- and three-stage selection models that were simulated for a range of *SR*s, minority representation, and size of applicant pool. In addition, three compensatory models (i.e., single-stage composites) were simulated to illustrate the difference between single- and multistage strategies for managing the trade-offs. A complete listing of the 46 selection models that were simulated can be found in the Appendix.

### AI Statistics

We believe that multiple indicators of AI should generally be considered in reaching a conclusion regarding AI. Thus, we present the results for the four-fifths rule (AI ratio, or *AIR*) and follow this with results for two statistical significance tests when violations of the four-fifths rule occurred: Fisher exact test and the more powerful $Z_{IR}$ test.

### Minority Representation

Previous simulations have modeled minority percentages in the range of 5%–50%, but most percentages are typically less than 40%, as would be consistent with most applicant pools. In selecting the percentage of minority applicants in the applicant pool, we relied on the rationale provided by Roth et al. (2006) in their selection of values/proportions. We selected 12% because it corresponds to estimates of employed minorities from the Bureau of Labor Statistics (2000). We selected 20% and 30% to correspond with results of previous simulation studies (e.g., De Corte et al., 2006; Sackett & Roth, 1996) and to reflect the fact that in several regions and in several occupational types, the proportion of minority applicants is much higher than the national norms.

### Size of Applicant Pool

The choice of applicant pool size was based on two considerations: practical relevance and power. It was important that the applicant pool contained a sufficient number of minorities for modeling the trade-off over the full range of $SR$s, given our boundary conditions of 12% minority representation and 10% $SR_{net}$. However, it was important that the size of the applicant pool not be too large, so as to limit the practical relevance of the observed outcomes. An applicant pool of 500 gave us adequate power to model the trade-offs and was consistent with previous simulations of this nature (e.g., Roth et al., 2006; Sackett & Roth, 1996).

However, selection frequently takes place on a smaller scale, and low power for tests of AI is an unavoidable reality. Salgado (1998) reported that the average sample size for validation studies is $N = 153$. Therefore, we modeled the trade-off effects for pools of 160 applicants (we rounded up for convenience). Additionally, modeling the trade-offs in pools of different sizes provides an understanding of the influence applicant pool size has on the trade-offs for complex two- and three-stage selection systems and of the behavior of the different AI statistics for a wide variety of real-world selection strategies.

### Simulation Process

#### Step 1: Statistical Properties

*Validity.* The validity estimates were obtained from Bobko et al.'s (1999) meta-analysis (cognitive ability, $r = .30$; structured interview, $r = .30$; biodata, $r = .28$; conscientiousness, $r = .18$) and from Ones et al.'s (1993) meta-analysis (integrity, $r = .25$). We used uncorrected estimates, because we were focused on the operational validity of the predictors.

*Intercorrelations.* Simulated predictor intercorrelations were obtained from Bobko et al. (1999). Predictor intercorrelations ranged from uncorrelated to highly correlated (e.g., $r$s = .00 to .51). The intercorrelations regarding integrity were obtained from a combination of meta-analyses and primary studies (i.e., McFarland & Ryan, 2000; Ones et al., 1993; Sackett, Burris, & Callahan, 1989; Sackett & Wanek, 2004).

*Standardized mean group differences (d).* For purposes of the simulation, we used estimates of the standardized Black–White differences for these predictors, because these subgroup differences are widely available in the literature. As such, our use of the terms *majority* and *minority* refer to White and Black applicants, respectively. The standardized mean group difference estimate for cognitive ability was set at $d = 1.00$; this figure indicated that White applicants score, on average, one standard deviation higher than do Black applicants (Hunter & Hunter, 1984). For structured interview, $d$ was estimated at 0.23, per Huffcutt and Roth's (1998) meta-analysis. Biodata was estimated at $d = 0.33$. This figure reflected Bobko et al.'s (1999) sample weighting of Gandy, Dye, and MacLane's (1994) meta-analytic estimate and Pulakos and Schmitt's (1996) estimated $d$. For conscientiousness, $d$ was set at 0.09 (Bobko et al., 1999). For integrity, $d$ was set at 0.00 (Ones & Viswesvaran, 1998). For job performance, $d$ was set at 0.45 (Ford, Kraiger, & Schechtman, 1986). For ease of discussion, we have categorized the magnitude of the effect sizes as follows: large $d$ (cognitive ability), moderate $d$ (biodata and structured interview), and small $d$ (conscientiousness and integrity). The mean $d$, intercorrelations, and validity estimates are provided in Table 2.

*Net SR ($SR_{net}$).* Net $SR$s of .10 and .30 were simulated for the single-stage, two-stage, and three-stage selection systems. These levels are consistent with the Sackett and Roth (1996) Monte Carlo simulation and are common net $SR$s in practice.

*Stage-specific SRs.* The $SR$s at each stage are denoted as follows: first stage = $SR_1$; second stage = $SR_2$; third stage = $SR_3$. The $SR$ for the first stage was varied across five levels for the net $SR$s: .15, .25, .45, .60, and .75. For example, first-stage $SR$s of .15 and .25 were modeled for the 10% $SR_{net}$ and first-stage $SR$s of .45, .60, and .75 were modeled for the 30% $SR_{net}$. A complete listing of the stage-specific $SR$s for the two- and three-stage selection systems is presented in Table 1.

#### Step 2: Simulate Applicant Pool

*Factor correlation matrix.* The intercorrelation matrix compiled in Step 1 was decomposed with the Cholesky method. This decomposition yielded a matrix of factor loadings that we used to

Table 2
*Matrix of Correlations and Standardized Mean Differences*

| Variable | $d$ | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|---|
| 1. Cognitive ability | 1.00 | — | | | | | |
| 2. Structured interview | 0.23 | .24 | — | | | | |
| 3. Conscientiousness | 0.09 | .00 | .12 | — | | | |
| 4. Biodata | 0.33 | .19 | .16 | .51 | — | | |
| 5. Integrity | 0.00 | .00 | .00 | .39 | .25 | — | |
| 6. Job performance | 0.45 | .30 | .30 | .18 | .28 | .25 | — |

generate predictor and criterion scores. This decomposition and all ensuing analyses were performed using SAS Version 9.1.

*Generate random data (fitting a normal distribution).* Next, to simulate the observed predictor and criterion scores, we generated normally distributed random data (error scores). To do this, we had to compute one random variable for each predictor plus one (for the criterion) for as many cases as there were applicants (Doverspike, Winter, Healy, & Barrett, 1996). Thus, six random variables were created (five predictors plus one criterion) for each of the applicants.

*Calculate predictor and criterion scores.* Observed predictor and criterion scores were formed by multiplying the factor loadings for the given test or performance measure in the factor correlation matrix (obtained from the Cholesky decomposition) by the random data. Multiplication of these factor loadings by the standard normal variates produced $z$ scores for the predictors and the criterion. We conducted a simple correlation analysis to verify the accuracy of the data generated from this procedure; the original correlation matrix from Step 1 should be reproduced within random sampling error. Estimates were examined to verify that the confidence limits around the sample values included the population values.

*Add subgroup differences.* Finally, it was necessary to incorporate majority–minority group differences into the data. As described above, group proportions of the population were modeled with (a) 88% majority and 12% minority; (b) 80% majority and 20% minority; and (c) 70% majority and 30% minority. Group membership was randomly assigned to reflect these majority–minority proportions, and the standardized mean difference value ($d$) for each predictor and criterion was subtracted from the respective scores for all minority candidates.

### Step 3: First Stage

All candidates were assessed on the first-stage predictor (or predictors). Using top-down selection, we retained only the scores on the first-stage predictor (or predictor composite) that met the specified first-stage $SR$ ($SR_1$). For example, if $SR_1 = .25$ for $n = 500$, the top 125 scores (candidates) were retained for subsequent screening on the second-stage predictor (or predictor composite).

### Step 4: Second Stage

For the two-stage selection strategies, those candidates who remained in the pool after the initial screening (i.e., who had passed the first stage) were selected top down on the basis of the second-stage predictor (or predictor composite) score. The number of selections depended on the $SR_{net}$. For example, with $SR_1 = .25$ and a 10% $SR_{net}$, the top 50 (or top 40%) of the remaining 125 candidates were selected at the second stage.[1] Scores from the first stage were not weighed in the final selection decision. That is, we used scores from the first stage only to determine whether a candidate moved on to the second stage of the process. Applicants who passed the first-stage screening were selected top down solely on the basis of their performance on the second-stage predictors.

### Step 5: Third Stage

We modeled several different three-stage selection strategies in addition to the two-stage strategies. For the three-stage scenarios, those candidates who remained in the pool after the second-stage screening (i.e., who had passed both the first and second stages) were selected top down on the basis of their scores on the Stage 3 predictor. The number of selections depended upon the $SR_{net}$.

### Step 6: Calculate AI

AI was defined in three ways: AIR, $Z_{IR}$, and the Fisher exact test. AIR was calculated as the proportion of minority group hires out of all minority group applicants divided by the proportion of majority group hires out of all majority group applicants. According to the four-fifths rule, AIRs of less than .80 provide support for a prima facie case of discrimination. In addition, we examined differences in minority–majority selection rates using two statistical significance tests: the Fisher exact test and $Z_{IR}$ test (the $Z$ test on the ratio of selection rates). A two-tailed Fisher exact test is commonly used in practice to detect significance. Fisher exact probability values of less than .05 were interpreted as evidence of AI. In addition, we conducted a one-tailed $Z_{IR}$ test to detect AI. For the $Z_{IR}$ test, $|Z|$ values greater than 1.645 (corresponding to a one-tailed $\alpha = .05$) were interpreted as evidence of AI.

### Step 7: Repeat Steps 2 Through 6

The process from generation of expected performance scores (Step 2) through calculation of AI (Step 6) was repeated 2,000 times for each scenario (e.g., CA, SI + Consc + Bio, where $SR_1 = .25$). Thus, 2,000 data sets containing the applicant predictor and criterion scores were generated for each scenario for a given applicant pool condition (e.g., $N = 500$ with 20% minority representation). Results for a given scenario in a given applicant pool condition were then averaged across the 2,000 repetitions to yield the final expected performance and AI outcomes for that scenario.

Models 1–43 were examined under all five first-stage $SR$s and resulted in a total of 215 different selection scenarios (i.e., Model $\times$ $SR_1$s). These 215 scenarios were modeled across all three minority representation conditions for the large applicant pool ($N = 500$). Models 1–43 were also modeled for the $N = 160$ pool with 20% minority representation, although only for the 30% net $SR$ (i.e., 45%, 60%, 75% first-stage $SR$s), given power concerns. The single-stage strategies (Models 44–46) were examined only for the $N = 500$, 20% minority representation conditions.

## Results and Discussion

Given the complex interplay of numerous factors in determining the mean performance and degree of minority representation obtained for the pool of applicants ultimately selected, the challenge is to present results in a manner that would enhance the clarity and brevity of our presentation. We first summarize some general trends for the minority representation and applicant pool size manipulations. Next, we focus our analysis on particular selection strategies for achieving each organizational objective. We then discuss trends associated with the positioning of predictors when composites are used within multistage strategies and the influence that characteristics such as $SR$, predictor intercorrelations, validity,

---

[1] Overall $SR$ ($SR_{net}$) = $SR_1 \times SR_2$. As such, given $SR_{net}$ and $SR_1$ for a given scenario, $SR_2$ was determined.

and subgroup differences had on the observed outcomes. Last, in the *Conclusion* section, we pull it all together to discuss the larger picture and provide specific recommendations for managing the trade-off. We emphasize that although we modeled actual selection measures (e.g., biodata, integrity), the results and conclusions of the present study are based on the psychometric properties modeled. The predictor labels are meant only to facilitate the communication of results.

### Trade-Off for Minority Representation and Applicant Pool Size

Before we delve into a detailed analysis of the impact of various selection strategies on the AI and performance objectives, we discuss the influence of applicant pool characteristics on the observed results as well as convergence among the AI indicators under different conditions. We note that although the specific operationalization of AI impacted our conclusions in certain circumstances, our primary focus in this study was not to model the behavior of the four-fifths rule relative to significance testing. We present the results obtained for all three AI indicators for each scenario in our tables, given the importance of considering multiple AI indicators when one is making a determination of AI. Our side-by-side presentation of these results facilitates making comparisons between the conclusions reached under the different AI methods and is instructive; however, it was not our intention to explore this issue in great depth. We believe this is a critical topic for exploration but one worthy of dedicated Monte Carlo work (see Collins & Morris, 2008, for a recent examination of this issue).

*Minority representation.* Figure 1 illustrates the trade-off averaged across Models 1–43 for each first-stage $SR$ and for each minority representation condition. The results clearly support a general trade-off between performance and AI as well as the influence of stage-specific and net $SR$s. Increasing the proportion of minorities in the applicant pool did not change the trade-off trends discussed herein; however, it did result in slightly different AI and performance outcomes. Specifically, increasing minority representation in the applicant pool resulted in a slightly higher

selection rate for minorities but a lower expected mean performance for those selected. Additionally, the increase in minority selection rates associated with greater minority representation in the pools did not translate into fewer scenarios that violated the four-fifths rule. In fact, across the 215 common scenarios, violations of the four-fifths rule were nearly identical for the 12%, 20%, and 30% minority representation conditions (88%, 89%, and 89%, respectively). Results for the $Z_{IR}$ significance test were also generally consistent across conditions (79%, 80%, and 82%, respectively). Results for the Fisher exact test varied quite a bit across conditions (56%, 65%, and 73%, respectively). These differences may be attributed to low power to detect true differences in selection rates with the Fisher exact test, particularly when the 10% $SR_{net}$ was used. As the proportion of minorities in the pool increased, power increased and the results of the Fisher exact test converged with those of the $Z_{IR}$ and four-fifths rule.

*Size of applicant pool.* With regard to the applicant pool size, the results revealed different conclusions of AI for the selection strategies depending upon how AI was defined. First, it is important to note here that a two-tailed Fisher exact test had fairly low power to guard against false negatives for the small applicant pool ($N = 160$) conditions (i.e., fairly competitive $SR_{net}$, relatively low minority representation). For example, the Fisher exact test suggested that 59% (63 of 107) of the four-fifths violations were false positives; however, approximately one half of these false positives were cases in which only 5 minority applicants were hired and the majority $SR$ was more than twice the minority $SR$. Extreme caution should be used when interpreting the Fisher exact test results for the small sample scenarios (and any other situation when there are very small cells). Under these selection conditions, the one-tailed $Z_{IR}$ test was far superior to the Fisher exact test in tempering false positives based on the four-fifths rule. Follow-up significance testing based on the $Z_{IR}$ test flagged 13% of the violations of the four-fifths rule in the small sample as false positives (the same 14 scenarios were flagged by the Fisher exact test). For these violations, the selection of 1 additional minority applicant in lieu of a majority applicant would not have resulted in a violation of the four-fifths rule. This fact underscores the importance of conducting follow-up analyses (e.g., significance testing, sensitivity analysis) when violations of the four-fifths rule are identified.

Results for the different pool sizes were compared with each other. Overall, the same trade-off trends that we discuss in the next section were observed in both the small ($N = 160$) and large ($N = 500$) applicant pools. Expected mean performance for the scenarios was essentially the same in both pools, although performance estimates were more varied in the smaller pool (i.e., the smaller sample yielded more sampling variability, as would be expected). Similar conclusions of AI were generally reached for the large and small applicant pools when AI was defined by the four-fifths rule. The key difference between the pools was in AI conclusions reached with the significance tests, particularly with the Fisher exact test. The $Z_{IR}$ test resulted in 7% fewer conclusions of AI in the small pool than in the larger pool, whereas the Fisher exact test resulted in 30% fewer conclusions of AI in the small pool for the same scenarios. The differences between the small and large applicant pools for the significance tests are largely attributed to greater sampling variability in the smaller pool and to a lack of power of the Fisher exact test to detect true differences in selection rates in the smaller applicant pool, when they existed.



*Figure 1.* Average trade-off effects observed. AI = adverse impact; JP = job performance.

*Overall Results for $N = 500$ With 20%
Minority Representation*

To help manage the presentation of results, we focused our analysis of the different selection strategies around the scenarios simulated in the large applicant pool ($N = 500$) with 20% minority representation, given that the trends observed for the different applicant pool conditions were similar. Table 3 presents the expected mean performance and AI outcomes associated with all 215 two- and three-stage scenarios that were simulated for this applicant pool condition. Results for the same scenarios modeled for the 12% and 30% minority representation and $N = 160$ applicant pool conditions are available from David M. Finch upon request.

*Descriptive statistics.*    We generated a total of 221 million sets of applicant predictor and criterion scores to examine the various scenarios in the $N = 500$, 20% minority representation condition. Sample means, standard deviations, and correlations for the simulated observed scores were analyzed to verify the quality of the estimates. Ninety-five percent of the estimates fell within a 95% confidence interval around the population values. The simulation revealed a wide range of expected values of mean performance (or expected mean $z$ scores on the criterion) and AI across the multistage scenarios. Specifically, expected mean performance ranged from .15 to .74 ($M = .44$, $SD = .13$) and expected $AIR$s ranged from .17 to .96.

As was noted previously, the results clearly support a trade-off between performance and AI, as is illustrated in Figure 1. However, and perhaps more important, the current simulation modeled several multistage strategies that did not produce AI based on the four-fifths rule (23 scenarios). Results from follow-up significance testing were even more encouraging. Follow-up significance testing indicated that 72 scenarios (33%) did not produce AI with the Fisher exact test and that 43 (20%) scenarios had no AI for the $Z_{IR}$ test. The Fisher exact test results suggested that an alarming 26% of the four-fifths violations were false positives, whereas the more conservative $Z_{IR}$ test suggested that a smaller, though still sizable, percentage (i.e., 10%) of the four-fifths signals were false positives. The wide variety of selection strategies that did not produce AI represents a marked improvement over previous single- and multistage simulations. The characteristics of these no-AI strategies as well as the trade-off in mean performance observed are discussed in the subsequent sections.

Next, we offer a few observations relative to meeting each organizational objective independently when using multistage selection strategies. Then we shift our focus to a detailed discussion of trends and those strategies that were more effective in balancing the AI and performance goals.

*Maximizing Performance*

To put mean performance levels in better perspective relative to all multistage strategies that were modeled, we note the highest mean performance for the two net $SR$s. For the 10% $SR_{net}$, the highest mean performance was .74. It was observed for Strategy 30 (Consc + Bio + CA + Integrity, SI) at 15% $SR_1$. This strategy utilized every predictor, and all but one of these predictors was in a first-stage composite. Regression weighting (and no prior selection) ensured optimal prediction for this composite. By utilizing the most selective first-stage $SR$ (15%), we based the majority of prediction on this optimal composite. As a point of comparison, a compensatory model

of Integrity + CA + SI for the same 10% $SR_{net}$ yielded mean performance of .76. This figure was only slightly higher (difference in expected performance = .02) than that for the best performance multistage strategy; however, it is important to note, this compensatory model did utilize fewer predictors.

As another instructive comparison, for all the scenarios that did not produce AI, the highest expected performance was .61. It was observed for Model 23 (Integrity, Bio + SI + Consc) at 25% $SR_1$. For the 30% $SR_{net}$, the highest mean performance (.46) was observed for Model 15 (Integrity, CA + Bio + Consc + SI) at 30% $SR_1$. The compensatory model of Integrity + CA + SI for the same 30% $SR_{net}$ yielded mean performance of .48. For this $SR_{net}$, then, the mean was only slightly higher than the best performance multistage strategy.

*Minimizing AI*

Prior research on the trade-off has consistently demonstrated that combining predictors with various psychometric properties in selection strategies typically results in AI, in particular when regression-weighted selection strategies are employed (De Corte et al., 2007; Sackett & Ellingson, 1997; Sackett & Roth, 1996; Schmitt et al., 1997). In contrast to previous research, the current simulation demonstrated numerous strategies that produced no AI.

*No AI strategies.*    Table 4 contains those scenarios that either met the four-fifths rule or had no significant differences in hiring rates for the $Z_{IR}$ test. We modeled 43 scenarios that did not produce AI based on $Z_{IR}$; 23 of them did not violate the four-fifths rule. In the interest of facilitating comparisons with previous research, which has relied solely upon the four-fifths rule to define AI, we offer a few observations for those scenarios that met the four-fifths rule. First, nine different predictor combinations met or exceeded the .80 rule of thumb (and did so regardless of the level of minority representation in the applicant pool). Second, many of these strategies did not produce any AI when both low and high first-stage $SR$s were used. Third, none of these strategies contained cognitive ability, and all except for one contained the zero-$d$ predictor (i.e., integrity) as the first-stage predictor. The one predictor combination that did not contain integrity was Model 14 (Bio, Consc). It consisted of two highly correlated predictors: biodata with a moderate $d$, used in the first stage with high $SR$s (i.e., $SR_1$ = .60 and .75), and conscientiousness, a small-$d$ predictor, used alone in the second stage.

*Single- versus multistage AI.*    To illustrate the potential that multistage strategies have over single-stage approaches for reducing AI, in particular when a large-$d$ predictor, such as cognitive ability, is used, we present a comparison of our results with those of Bobko et al. (1999) in Table 5. Recall that we modeled the same meta-analytic estimates as did Bobko et al. in an applicant pool with the same proportional minority representation. As is illustrated in the table, modeling a battery of assessments in a multistage design produced less AI than did presenting the assessments in a compensatory model in all cases, except when a large-$d$ predictor was administered in the first stage with a low first-stage $SR$. As another example, compare Strategies 45 and 21 in Table 6 (also cf. Strategies 46 and 20). Whereas the single-stage strategy (Nos. 45 and 46) produced substantial AI for low first-stage $SR$s, administration of the same predictors in a multistage strategy (Nos. 21 and 20) produced minority selection rates that were much more favor-

(text continues on page 330)

Table 3

*Mean Predicted Performance and Adverse Impact Results for N = 500 and 20% Minority Representation*

| Predictor combination | First-stage *SR* | Mean performance | *AIR* | $Z_{IR}$ | Fisher exact test |
|---|---|---|---|---|---|
| 1. CA, SI + Bio + Consc | 15 | 0.626 | 0.167 | 5.342 | * |
| | 25 | 0.677 | 0.167 | 5.342 | * |
| | 45 | 0.399 | 0.286 | 7.335 | * |
| | 60 | 0.416 | 0.380 | 5.672 | * |
| | 75 | 0.412 | 0.444 | 4.748 | * |
| 2. CA, Consc + SI | 15 | 0.597 | 0.167 | 5.342 | * |
| | 25 | 0.637 | 0.167 | 5.342 | * |
| | 45 | 0.383 | 0.317 | 6.735 | * |
| | 60 | 0.383 | 0.412 | 5.196 | * |
| | 75 | 0.368 | 0.511 | 3.928 | * |
| 3. CA, SI + Bio | 15 | 0.614 | 0.167 | 5.342 | * |
| | 25 | 0.659 | 0.167 | 5.342 | * |
| | 45 | 0.400 | 0.286 | 7.335 | * |
| | 60 | 0.410 | 0.380 | 5.672 | * |
| | 75 | 0.404 | 0.444 | 4.748 | * |
| 4. CA, Bio + Consc | 15 | 0.578 | 0.167 | 5.342 | * |
| | 25 | 0.594 | 0.167 | 5.342 | * |
| | 45 | 0.357 | 0.286 | 7.335 | * |
| | 60 | 0.349 | 0.380 | 5.672 | * |
| | 75 | 0.322 | 0.444 | 4.748 | * |
| 5. CA, SI | 15 | 0.563 | 0.167 | 5.342 | * |
| | 25 | 0.583 | 0.167 | 5.342 | * |
| | 45 | 0.357 | 0.317 | 6.735 | * |
| | 60 | 0.347 | 0.412 | 5.196 | * |
| | 75 | 0.325 | 0.511 | 3.928 | * |
| 6. CA, Bio | 15 | 0.557 | 0.167 | 5.342 | * |
| | 25 | 0.566 | 0.167 | 5.342 | * |
| | 45 | 0.345 | 0.286 | 7.335 | * |
| | 60 | 0.333 | 0.380 | 5.672 | * |
| | 75 | 0.312 | 0.444 | 4.748 | * |
| 7. CA, Consc | 15 | 0.534 | 0.167 | 5.342 | * |
| | 25 | 0.516 | 0.167 | 5.342 | * |
| | 45 | 0.311 | 0.317 | 6.735 | * |
| | 60 | 0.279 | 0.412 | 5.196 | * |
| | 75 | 0.234 | 0.511 | 3.928 | * |
| 8. Bio, SI + CA + Consc | 15 | 0.591 | 0.348 | 3.149 | * |
| | 25 | 0.666 | 0.255 | 4.070 | * |
| | 45 | 0.387 | 0.444 | 4.748 | * |
| | 60 | 0.419 | 0.380 | 5.672 | * |
| | 75 | 0.431 | 0.380 | 5.672 | * |
| 9. Bio, SI + Consc | 15 | 0.539 | 0.545 | 1.807 | |
| | 25 | 0.577 | 0.545 | 1.807 | |
| | 45 | 0.335 | 0.651 | 2.512 | * |
| | 60 | 0.346 | 0.688 | 2.194 | |
| | 75 | 0.338 | 0.688 | 2.194 | |
| 10. Bio, SI + CA | 15 | 0.581 | 0.348 | 3.149 | * |
| | 25 | 0.643 | 0.255 | 4.070 | * |
| | 45 | 0.378 | 0.444 | 4.748 | * |
| | 60 | 0.409 | 0.380 | 5.672 | * |
| | 75 | 0.411 | 0.348 | 6.184 | * |
| 11. Bio, CA + Consc | 15 | 0.549 | 0.348 | 3.149 | * |
| | 25 | 0.596 | 0.255 | 4.070 | * |
| | 45 | 0.354 | 0.380 | 5.672 | * |
| | 60 | 0.372 | 0.317 | 6.735 | * |
| | 75 | 0.367 | 0.286 | 7.335 | * |

(*table continues*)

Table 3 (*continued*)

| Predictor combination | First-stage *SR* | Mean performance | *AIR* | $Z_{IR}$ | Fisher exact test |
|---|---|---|---|---|---|
| 12. Bio, SI | 15 | 0.515 | 0.545 | 1.807 | |
| | 25 | 0.556 | 0.545 | 1.807 | |
| | 45 | 0.330 | 0.651 | 2.512 | * |
| | 60 | 0.333 | 0.651 | 2.512 | * |
| | 75 | 0.321 | 0.688 | 2.194 | |
| 13. Bio, CA | 15 | 0.527 | 0.255 | 4.070 | * |
| | 25 | 0.573 | 0.167 | 5.342 | * |
| | 45 | 0.336 | 0.348 | 6.184 | * |
| | 60 | 0.346 | 0.286 | 7.335 | * |
| | 75 | 0.340 | 0.255 | 7.994 | * |
| 14. Bio, Consc | 15 | 0.430 | 0.545 | 1.807 | |
| | 25 | 0.383 | 0.651 | **1.279** | |
| | 45 | 0.224 | 0.724 | 1.888 | |
| | 60 | 0.190 | **0.800** | **1.307** | |
| | 75 | 0.153 | **0.839** | **1.030** | |
| 15. Integrity, CA + Bio + Consc + SI | 15 | 0.555 | 0.651 | **1.279** | |
| | 25 | 0.675 | 0.444 | 2.418 | |
| | 45 | 0.378 | 0.580 | 3.188 | * |
| | 60 | 0.436 | 0.478 | 4.327 | * |
| | 75 | 0.461 | 0.412 | 5.196 | * |
| 16. Integrity, CA + Bio + Consc | 15 | 0.526 | 0.545 | 1.807 | |
| | 25 | 0.621 | 0.348 | 3.149 | * |
| | 45 | 0.348 | 0.545 | 3.549 | * |
| | 60 | 0.396 | 0.412 | 5.196 | * |
| | 75 | 0.407 | 0.348 | 6.184 | * |
| 17. Integrity, CA + Bio + SI | 15 | 0.550 | 0.651 | **1.279** | |
| | 25 | 0.666 | 0.444 | 2.418 | |
| | 45 | 0.378 | 0.580 | 3.188 | * |
| | 60 | 0.434 | 0.478 | 4.327 | * |
| | 75 | 0.457 | 0.412 | 5.196 | * |
| 18. Integrity, CA + Consc + SI | 15 | 0.542 | 0.651 | **1.279** | |
| | 25 | 0.649 | 0.444 | 2.418 | |
| | 45 | 0.368 | 0.580 | 3.188 | * |
| | 60 | 0.417 | 0.478 | 4.327 | * |
| | 75 | 0.437 | 0.412 | 5.196 | * |
| 19. Integrity, CA + Bio | 15 | 0.516 | 0.545 | 1.807 | |
| | 25 | 0.610 | 0.348 | 3.149 | * |
| | 45 | 0.348 | 0.511 | 3.928 | * |
| | 60 | 0.391 | 0.412 | 5.196 | * |
| | 75 | 0.402 | 0.348 | 6.184 | * |
| 20. Integrity, CA + Consc | 15 | 0.501 | 0.545 | 1.807 | |
| | 25 | 0.585 | 0.348 | 3.149 | * |
| | 45 | 0.331 | 0.511 | 3.928 | * |
| | 60 | 0.366 | 0.380 | 5.672 | * |
| | 75 | 0.378 | 0.317 | 6.735 | * |
| 21. Integrity, CA + SI | 15 | 0.527 | 0.545 | 1.807 | |
| | 25 | 0.637 | 0.444 | 2.418 | |
| | 45 | 0.364 | 0.580 | 3.188 | * |
| | 60 | 0.404 | 0.478 | 4.327 | * |
| | 75 | 0.420 | 0.412 | 5.196 | * |
| 22. Integrity, CA | 15 | 0.481 | 0.545 | 1.807 | |
| | 25 | 0.561 | 0.348 | 3.149 | * |
| | 45 | 0.321 | 0.478 | 4.327 | * |
| | 60 | 0.345 | 0.348 | 6.184 | * |
| | 75 | 0.351 | 0.286 | 7.335 | * |
| 23. Integrity, Bio + SI + Consc | 15 | 0.521 | 0.762 | **0.811** | |
| | 25 | 0.611 | 0.651 | **1.279** | |
| | 45 | 0.344 | **0.800** | **1.307** | |
| | 60 | 0.379 | 0.724 | 1.888 | |
| | 75 | 0.394 | 0.688 | 2.194 | |

(*table continues*)

Table 3 (*continued*)

| Predictor combination | First-stage *SR* | Mean performance | *AIR* | $Z_{IR}$ | Fisher exact test |
|---|---|---|---|---|---|
| 24. Integrity, Bio + Consc | 15 | 0.448 | **0.878** | **0.388** | |
| | 25 | 0.484 | 0.762 | **0.811** | |
| | 45 | 0.279 | **0.839** | **1.030** | |
| | 60 | 0.289 | 0.762 | **1.592** | |
| | 75 | 0.287 | 0.724 | 1.888 | |
| 25. Integrity, Bio + SI | 15 | 0.509 | 0.762 | **0.811** | |
| | 25 | 0.597 | 0.651 | **1.279** | |
| | 45 | 0.337 | **0.800** | **1.307** | |
| | 60 | 0.379 | 0.724 | 1.888 | |
| | 75 | 0.391 | 0.688 | 2.194 | |
| 26. Integrity, Bio | 15 | 0.437 | **0.878** | **0.388** | |
| | 25 | 0.475 | 0.651 | **1.279** | |
| | 45 | 0.274 | **0.800** | **1.307** | |
| | 60 | 0.286 | 0.762 | **1.592** | |
| | 75 | 0.282 | 0.688 | 2.194 | |
| 27. Integrity, Consc + SI | 15 | 0.480 | **0.878** | **0.388** | |
| | 25 | 0.549 | 0.762 | **0.811** | |
| | 45 | 0.314 | **0.878** | **0.762** | |
| | 60 | 0.335 | **0.800** | **1.307** | |
| | 75 | 0.341 | **0.800** | **1.307** | |
| 28. Integrity, Consc | 15 | 0.372 | **0.878** | **0.388** | |
| | 25 | 0.351 | **0.878** | **0.388** | |
| | 45 | 0.200 | **0.959** | **0.247** | |
| | 60 | 0.177 | **0.918** | **0.501** | |
| | 75 | 0.160 | **0.918** | **0.501** | |
| 29. Integrity, SI | 15 | 0.468 | **0.878** | **0.388** | |
| | 25 | 0.529 | 0.762 | **0.811** | |
| | 45 | 0.301 | **0.878** | **0.762** | |
| | 60 | 0.321 | **0.839** | **1.030** | |
| | 75 | 0.319 | **0.800** | **1.307** | |
| 30. Consc + Bio + CA + Integrity, SI | 15 | 0.742 | 0.255 | 4.070 | * |
| | 25 | 0.720 | 0.255 | 4.070 | * |
| | 45 | 0.450 | 0.412 | 5.196 | * |
| | 60 | 0.410 | 0.478 | 4.327 | * |
| | 75 | 0.363 | 0.580 | 3.188 | * |
| 31. Bio + CA + Integrity, SI | 15 | 0.739 | 0.255 | 4.070 | * |
| | 25 | 0.716 | 0.255 | 4.070 | * |
| | 45 | 0.450 | 0.412 | 5.196 | * |
| | 60 | 0.411 | 0.511 | 3.928 | * |
| | 75 | 0.366 | 0.580 | 3.188 | * |
| 32. Bio + Consc + Integrity, CA, SI | 15 | 0.645 | 0.348 | 3.149 | * |
| | 25 | 0.687 | 0.255 | 4.070 | * |
| | 45 | 0.412 | 0.444 | 4.748 | * |
| | 60 | 0.416 | 0.380 | 5.672 | * |
| | 75 | 0.408 | 0.348 | 6.184 | * |
| 33. Consc + Integrity, CA + Bio, SI | 15 | 0.547 | 0.545 | 1.807 | |
| | 25 | 0.643 | 0.444 | 2.418 | |
| | 45 | 0.371 | 0.580 | 3.188 | * |
| | 60 | 0.409 | 0.478 | 4.327 | * |
| | 75 | 0.421 | 0.412 | 5.196 | * |
| 34. CA + Consc + Integrity, Bio, SI | 15 | 0.701 | 0.255 | 4.070 | * |
| | 25 | 0.700 | 0.255 | 4.070 | * |
| | 45 | 0.427 | 0.412 | 5.196 | * |
| | 60 | 0.404 | 0.478 | 4.327 | * |
| | 75 | 0.379 | 0.545 | 3.549 | * |
| 35. CA + Integrity, Consc + Bio, SI | 15 | 0.710 | 0.255 | 4.070 | * |
| | 25 | 0.712 | 0.255 | 4.070 | * |
| | 45 | 0.431 | 0.412 | 5.196 | * |
| | 60 | 0.413 | 0.444 | 4.748 | * |
| | 75 | 0.388 | 0.545 | 3.549 | * |

(*table continues*)

330                                    FINCH, EDWARDS, AND WALLACE

Table 3 (*continued*)

| Predictor combination | First-stage *SR* | Mean performance | *AIR* | $Z_{IR}$ | Fisher exact test |
|---|---|---|---|---|---|
| 36. Integrity, CA, Bio | 15 | 0.590 | 0.167 | 5.342 | * |
| | 25 | 0.626 | 0.167 | 5.342 | * |
| | 45 | 0.374 | 0.317 | 6.735 | * |
| | 60 | 0.377 | 0.412 | 5.196 | * |
| | 75 | 0.367 | 0.545 | 3.549 | * |
| 37. CA, Integrity + SI | 15 | 0.628 | 0.167 | 5.342 | * |
| | 25 | 0.691 | 0.167 | 5.342 | * |
| | 45 | 0.412 | 0.317 | 6.735 | * |
| | 60 | 0.428 | 0.412 | 5.196 | * |
| | 75 | 0.417 | 0.545 | 3.549 | * |
| 38. CA, Integrity | 15 | 0.559 | 0.167 | 5.342 | * |
| | 25 | 0.577 | 0.255 | 4.070 | * |
| | 45 | 0.349 | 0.317 | 6.735 | * |
| | 60 | 0.332 | 0.444 | 4.748 | * |
| | 75 | 0.302 | 0.580 | 3.188 | * |
| 39. CA, Integrity + SI + Consc | 15 | 0.637 | 0.167 | 5.342 | * |
| | 25 | 0.698 | 0.167 | 5.342 | * |
| | 45 | 0.416 | 0.317 | 6.735 | * |
| | 60 | 0.431 | 0.412 | 5.196 | * |
| | 75 | 0.428 | 0.511 | 3.928 | * |
| 40. CA, Integrity + Consc | 15 | 0.581 | 0.167 | 5.342 | * |
| | 25 | 0.603 | 0.167 | 5.342 | * |
| | 45 | 0.363 | 0.317 | 6.735 | * |
| | 60 | 0.348 | 0.412 | 5.196 | * |
| | 75 | 0.319 | 0.545 | 3.549 | * |
| 41. Bio, Integrity | 15 | 0.481 | 0.651 | **1.279** | |
| | 25 | 0.482 | 0.651 | **1.279** | |
| | 45 | 0.285 | 0.762 | **1.592** | |
| | 60 | 0.275 | **0.839** | **1.030** | |
| | 75 | 0.249 | **0.878** | **0.762** | |
| 42. Consc, CA + Bio + SI | 15 | 0.444 | 0.545 | 1.807 | |
| | 25 | 0.577 | 0.348 | 3.149 | * |
| | 45 | 0.320 | 0.545 | 3.549 | * |
| | 60 | 0.386 | 0.444 | 4.748 | * |
| | 75 | 0.425 | 0.380 | 5.672 | * |
| 43. Consc, Bio | 15 | 0.336 | 0.762 | **0.811** | |
| | 25 | 0.395 | 0.651 | **1.279** | |
| | 45 | 0.214 | 0.762 | **1.592** | |
| | 60 | 0.243 | 0.724 | 1.888 | |
| | 75 | 0.250 | 0.688 | 2.194 | |
| 44. CA + Integrity + Bio | 10% $SR_{net}$ | 0.712 | 0.255 | 4.070 | * |
| | 30% $SR_{net}$ | 0.442 | 0.348 | 6.184 | * |
| 45. CA + Integrity + SI | 10% $SR_{net}$ | 0.761 | 0.255 | 4.070 | * |
| | 30% $SR_{net}$ | 0.475 | 0.412 | 5.196 | * |
| 46. CA + Integrity + Consc | 10% $SR_{net}$ | 0.673 | 0.255 | 4.070 | * |
| | 30% $SR_{net}$ | 0.419 | 0.348 | 6.184 | * |

*Note.* *SR* = selection ratio; $Z_{IR}$ = z difference on adverse impact ratio (*AIR*); CA = cognitive ability; SI = structured interview; Bio = biodata; Consc = conscientiousness. *AIRs* ≥.80 are in bold. Bold values for $Z_{IR}$ indicate that there was no significant difference on the ratio of selection rates. An asterisk indicates significant difference for the Fisher exact test.

able in an absolute sense; in a relative sense, the minority selection rates for the multistage strategies were approximately twice as high as those observed for the single-stage strategy.

Although multistage strategies generally produce less AI than do similarly comprised, single-stage strategies, it is important to note that the dominance of multistage strategies for minimizing AI is conditional upon the relative weight the less adverse predictors receive in the selection process. This weighting is influenced heavily by the *SRs* used, in particular the level of the first-stage *SR* relative to the second-stage *SR*, and the positioning of the larger *d* predictor in the process (a comparison of Strategies 37 and 45 for the 10% $SR_{net}$ illustrates this point).

Table 4
*Scenarios With No Adverse Impact*

| Predictor combination | First-stage *SR* | Mean *JP* | *AIR* | $Z_{IR}$ | Fisher exact test |
|---|---|---|---|---|---|
| 14. Bio, Consc | 25 | 0.383 | 0.651 | **1.279** | |
| | 60 | 0.190 | **0.800** | **1.307** | |
| | 75 | 0.153 | **0.839** | **1.030** | |
| 15. Integrity, CA + Bio + Consc + SI | 15 | 0.555 | 0.651 | **1.279** | |
| 17. Integrity, CA + Bio + SI | 15 | 0.550 | 0.651 | **1.279** | |
| 18. Integrity, CA + Consc + SI | 15 | 0.542 | 0.651 | **1.279** | |
| 23. Integrity, Bio + SI + Consc | 15 | 0.521 | 0.762 | **0.811** | |
| | 25 | 0.611 | 0.651 | **1.279** | |
| | 45 | 0.344 | **0.800** | **1.307** | |
| 24. Integrity, Bio + Consc | 15 | 0.448 | **0.878** | 0.388 | |
| | 25 | 0.484 | 0.762 | **0.811** | |
| | 45 | 0.279 | **0.839** | **1.030** | |
| | 60 | 0.289 | 0.762 | **1.592** | |
| 25. Integrity, Bio + SI | 15 | 0.509 | 0.762 | **0.811** | |
| | 25 | 0.597 | 0.651 | **1.279** | |
| | 45 | 0.337 | **0.800** | **1.307** | |
| 26. Integrity, Bio | 15 | 0.437 | **0.878** | 0.388 | |
| | 25 | 0.475 | 0.651 | **1.279** | |
| | 45 | 0.274 | **0.800** | **1.307** | |
| | 60 | 0.286 | 0.762 | **1.592** | |
| 27. Integrity, Consc + SI | 15 | 0.480 | **0.878** | 0.388 | |
| | 25 | 0.549 | 0.762 | **0.811** | |
| | 45 | 0.314 | **0.878** | 0.762 | |
| | 60 | 0.335 | **0.800** | **1.307** | |
| | 75 | 0.341 | **0.800** | **1.307** | |
| 28. Integrity, Consc | 15 | 0.372 | **0.976** | 0.388 | |
| | 25 | 0.351 | **0.878** | 0.388 | |
| | 45 | 0.200 | **0.959** | 0.247 | |
| | 60 | 0.177 | **0.918** | 0.501 | |
| | 75 | 0.160 | **0.918** | 0.501 | |
| 29. Integrity, SI | 15 | 0.468 | **0.878** | 0.388 | |
| | 25 | 0.529 | 0.762 | **0.811** | |
| | 45 | 0.301 | **0.878** | 0.762 | |
| | 60 | 0.321 | **0.839** | **1.030** | |
| | 75 | 0.319 | **0.800** | **1.307** | |
| 41. Bio, Integrity | 15 | 0.481 | 0.651 | **1.279** | |
| | 25 | 0.482 | 0.651 | **1.279** | |
| | 45 | 0.285 | 0.762 | **1.592** | |
| | 60 | 0.275 | **0.839** | **1.030** | |
| | 75 | 0.249 | **0.878** | 0.762 | |
| 43. Consc, Bio | 15 | 0.336 | 0.762 | **0.811** | |
| | 25 | 0.395 | 0.651 | **1.279** | |
| | 45 | 0.214 | 0.762 | **1.592** | |

*Note.*  *SR* = selection ratio; *JP* = job performance; *AIR* = adverse impact ratio; $Z_{IR}$ = z difference on *AIR*; Bio = biodata; Consc = conscientiousness; CA = cognitive ability; SI = structured interview. *AIR*s ≥.80 are in bold. Bold values for $Z_{IR}$ indicate that there was no significant difference on the ratio of selection rates. No significant differences were found for the Fisher exact test for these scenarios.

### Positioning of Large(r)-d Predictor

Previous research has shown that positioning the large-*d* predictor in the first stage will yield a greater proportion of minority hires when the first-stage *SR* is equal to or higher than the *SR* for the second stage (i.e., De Corte et al., 2006; Sackett & Roth, 1996). Conversely, similar results are observed when the large-*d* predictor is used in the second stage with a second-stage *SR* that is greater than the first-stage *SR*. The current simulation examined the generalizability of this rule to three important, yet unexplored, conditions: (a) when the magnitude of the difference between the first- and second-stage predictor levels of *d* is small and the predictors are highly correlated, (b) when using a large-*d* first-stage predictor and a composite of smaller *d* alternatives in the second stage, and

(c) when the large-*d* predictor in a second-stage composite is supplemented with smaller *d* alternatives ("supplemental strategy") with prior screening on a smaller *d* predictor.

*Two-predictor case.*  To examine the generalizability of this rule for the case of correlated predictors with small differences in *d*, we modeled biodata and conscientiousness in a two-stage process. These predictors are highly correlated ($r = .51$). Moreover, the difference between predictor subgroup differences was relatively small (difference in $d = 0.24$) and was much smaller than has been previously examined (i.e., differences in $d < 0.76$ that reflected the difference between *d*s for cognitive ability and structured interview). We compared the *AIR* results for the two models (No. 14, Bio, Consc, vs. No. 43, Consc, Bio)

Table 5
*Comparison of AIR Results With Bobko et al. (1999) Results*

| | Bobko et al. (1999) | Current simulation | | |
|---|---|---|---|---|
| $SR_{net}$ | CA + Bio + Consc + SI | Consc, CA + Bio + SI | Bio, CA + Consc + SI | CA, Bio + Consc + SI |
| 10% $SR_{net}$ | .23 | .55 | .35 | .17 |
| 30% $SR_{net}$ | .37 | .55 | .45 | .45 |

*Note.* AIR = adverse impact ratio; CA = cognitive ability; Bio = biodata; Consc = conscientiousness; SI = structured interview; SR = selection ratio.

obtained at the 25% first-stage *SR*. Recall from Table 1 that the second-stage *SR* associated with a 25% first-stage *SR* was 40%. This means a much larger proportion of applicants are being screened out on the basis of the first-stage predictor than of the second-stage predictor for the *SR*. Prior research and intuition suggest that the larger *d* predictor (i.e., biodata) should be used in the second stage under these conditions in order to minimize AI. That is, strategies that place greater weight on the smaller *d* predictor in a selection system are expected to reduce AI. However, use of such strategies did not translate into less AI when the predictors were highly correlated and had a smaller disparity between predictor *d* levels. This is an important exception to the rule put forth in previous research, because decisions regarding sequential ordering are driven by practical considerations as well as by considerations for minimizing AI. If the expected performance and AI levels for two test implementation options are similar (as is the case here), greater

consideration can be given to other factors, such as administration and scoring costs and concerns (e.g., proctored testing).

*Large-d predictor alone in first stage versus large-d predictor in composite.*    Second, and unique to this simulation, was an examination of whether higher minority selection rates were still achieved by positioning the large-*d* predictor in the first stage when we used higher first-stage *SR*s and two or more alternative predictors (in a composite) in the second stage. Several strategies were modeled in which the large-*d* predictor was positioned alone in the first stage with subsequent screening on a composite of other predictors (e.g., Nos. 1, 37, 39). These strategies were compared with supplemental strategies in which the same predictors were used but the large-*d* predictor was administered in the second stage along with one or two other alternative predictors in a composite (i.e., Strategies 8, 21, 18, respectively). In all cases with $SR_1 = 75\%$, minority hiring rates were higher when the large-*d* predictor was used in the first stage than when it was included in a second-

Table 6
*Single Versus Multistage Selection*

| | $SR_{net} = .10$ | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | $SR_1 = .15$ | | | | $SR_1 = .25$ | | | |
| Predictor combination | JP | AIR | $Z_{IR}$ | Fisher exact test | JP | AIR | $Z_{IR}$ | Fisher exact test |
| 22. Integrity, CA | 0.481 | 0.545 | 1.807 | | 0.561 | 0.348 | 3.149 | * |
| 45. Integrity + CA + SI | 0.761 | 0.255 | 4.070 | * | 0.761 | 0.255 | 4.070 | * |
| 21. Integrity, CA + SI | 0.527 | 0.545 | 1.807 | | 0.637 | 0.444 | 2.418 | |
| 37. CA, Integrity + SI | 0.628 | 0.167 | 5.342 | * | 0.691 | 0.167 | 5.342 | * |
| 46. Integrity + CA + Consc | 0.673 | 0.255 | 4.070 | * | 0.673 | 0.255 | 4.070 | * |
| 20. Integrity, CA + Consc | 0.501 | 0.545 | 1.807 | | 0.585 | 0.348 | 3.149 | * |

| | $SR_{net} = .30$ | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $SR_1 = .45$ | | | | $SR_1 = .60$ | | | | $SR_1 = .75$ | | | |
| | JP | AIR | $Z_{IR}$ | Fisher exact test | JP | AIR | $Z_{IR}$ | Fisher exact test | JP | AIR | $Z_{IR}$ | Fisher exact test |
| 22. Integrity, CA | 0.321 | 0.478 | 4.327 | * | 0.345 | 0.348 | 6.184 | * | 0.351 | 0.286 | 7.335 | * |
| 45. Integrity + CA + SI | 0.475 | 0.412 | 5.196 | * | 0.475 | 0.412 | 5.196 | * | 0.475 | 0.412 | 5.196 | * |
| 21. Integrity, CA + SI | 0.364 | 0.580 | 3.188 | * | 0.404 | 0.478 | 4.327 | * | 0.420 | 0.412 | 5.196 | * |
| 37. CA, Integrity + SI | 0.412 | 0.317 | 6.735 | * | 0.428 | 0.412 | 5.196 | * | 0.417 | 0.545 | 3.549 | * |
| 46. Integrity + CA + Consc | 0.419 | 0.348 | 6.184 | * | 0.419 | 0.348 | 6.184 | * | 0.419 | 0.348 | 6.184 | * |
| 20. Integrity, CA + Consc | 0.331 | 0.511 | 3.928 | * | 0.366 | 0.380 | 5.672 | * | 0.378 | 0.317 | 6.735 | * |

*Note.* SR = selection ratio; JP = job performance; AIR = adverse impact ratio; $Z_{IR}$ = z difference on adverse impact ratio; CA = cognitive ability; SI = structured interview; Consc = conscientiousness. An asterisk indicates significant difference for the Fisher exact test.



*Figure 2.* Sequential ordering of large-*d* predictor. AI= adverse impact; JP = job performance.

stage composite. This finding is consistent with those for simple two-stage selection strategies (i.e., De Corte et al., 2006; Sackett & Roth, 1996). However, this rule did not always generalize when $SR_1 = 60\%$ was used for the same predictor combinations. Figure 2 illustrates a comparison of the large-*d* first-stage and the supplemental strategy. Even though the first-stage *SR* was higher than the second-stage *SR* when $SR_1 = 60\%$, the large-*d* first-stage (No. 39) resulted in lower minority hiring rates than did the supplemental strategy (No. 18). Our results revealed that when composites are used in the second stage, the first-stage *SR* may need to be made much higher than the second-stage *SR* (in this case nearly twice as high), as opposed to merely equal to or higher than the second-stage *SR*, if better minority hiring rates are to be achieved with a large-*d* first-stage. From a practical perspective, this may not be feasible or desirable.

An examination of the mean performance results for these two strategies is instructive for management of the performance and minority hiring trade-offs. As Figure 2 illustrates for this low first-stage *SR,* though a modest level of performance was sacrificed when the large-*d* predictor was positioned in the second-stage composite, the minority hiring gains were substantial (i.e., 7% minority selection rates for the composite strategy vs. 2% for the first-stage strategy). Similarly, when a slightly higher first-stage *SR* was used (i.e., 25% $SR_1$), the sacrifice in performance was relatively trivial compared with the sizable increase in minority selection rates. For many practitioners, these minority hiring gains and potential elimination of AI (at least for the 15% $SR_1$) would likely outweigh the relatively small loss in performance. Thus, the supplemental strategies dominated the large-*d* first-stage strategies in management of the performance and minority hiring trade-offs for most first-stage *SR*s.

The increases in minority selection rates should not be taken to mean that this large-*d* rule eliminated AI. This is an important point that previous research has not made explicitly clear. In fact, all of the large-*d* first-stage strategies simulated in the current study produced AI (regardless of the AI operationalization), even

though a wide variety of smaller *d* predictors and predictor composites was used in the second stage (and fairly high *SR*s were used in the first stage) to minimize AI. Some AI occurred even when we used predictors with no subgroup differences, either alone in the second stage or in a second-stage composite with another small-*d* predictor (e.g., Nos. 38 and 40).

Although no large-*d* first-stage strategy was identified that yielded sufficient minority hiring rates to avoid a conclusion of AI based on either the four-fifths rule or significance testing, minority hiring rates were improved by inclusion of the large-*d* predictor in a second-stage composite under certain conditions. As shown in Table 4, there were three selection models (Nos. 15, 17, 18) that included cognitive ability in a second-stage composite and did not result in AI, based on follow-up significance testing. These selection models had a few characteristics in common. Specifically, each model used a zero-*d* predictor alone in the first stage, at least one smaller *d* predictor in the second-stage composite, and a highly selective first-stage *SR* that was substantially more selective than was the second-stage *SR*. Figure 2 compares one of these no-AI, large-*d* supplemental strategies (No. 18) with a selection model that contains the same predictors but that presents the large-*d* predictor in the first stage (No. 39). The supplemental strategy did not produce AI, on the basis of significance testing for the lowest first-stage *SR*; however, the large-*d* first-stage strategy produced substantial AI (i.e., 2% minority *SR* vs. 12% majority *SR*). Moreover, minority hiring rates were nearly 4 times worse when the first stage was a large-*d* predictor.

*Three-stage processes.* A comparison of Models 19, 36, and 44 for the 10% $SR_{net}$ is instructive. These three models contain the same predictors (integrity, cognitive ability, and biodata) and differ only in regard to whether all predictors were administered simultaneously in a single-stage composite, in two stages, or in three stages. The single-stage composite strategy resulted in mean performance that was much higher (job performance = .71) than that for the multistage strategies (as expected), but it yielded very poor minority hiring rates (*AIR* = .26). The three-stage process resulted in respectable prediction (job performance = .59); however, minority hiring rates were similar (*AIR* = .17) to those for the



*Figure 3.* Choice of supplemental predictor. AI= adverse impact; JP = job performance.

single-stage model, which yielded much higher mean performance. The two-stage process here struck the best balance between performance and minority hiring (job performance = .52, $AIR$ = .55). Several things are occurring here. First, use of a low first-stage $SR$ on integrity (a high-validity predictor with no subgroup differences) placed the greatest weight on the small-$d$ predictor. Second, integrity has a moderately strong correlation with biodata, and prior selection on integrity restricted the variance of biodata (a moderate-$d$ predictor) in the second stage. A moderate intercorrelation between the composite predictors (biodata and cognitive ability) also served to reduce the composite $d$, for reasons discussed previously (e.g., Sackett & Ellingson, 1997; Schmitt et al., 1997). Finally, the fact that biodata had comparable validity to cognitive ability further limited the weight applied to the largest $d$ predictor in the process (i.e., given regression weighting).

## Supplemental Predictors Within Multistage Selection

It is instructive to examine the consequences associated with the use of different supplemental predictors. Figure 3 compares the relative effectiveness of two different two-predictor supplemental strategies for achieving the AI and performance objectives. In both strategies, a high-validity predictor with no subgroup differences was used as the first-stage predictor (reflective of integrity). The two strategies differ only in the predictor used to supplement cognitive ability in the second-stage composite. One strategy (No. 21) supplemented cognitive ability with a moderate-$d$ predictor that was equally valid and moderately correlated ($r = .24$) with cognitive ability but was uncorrelated with integrity (reflective of the structured interview). The other strategy (No. 20) supplemented cognitive ability with a small-$d$ predictor that had lower validity and that was uncorrelated with cognitive ability but was highly correlated with integrity ($r = .39$, reflective of conscientiousness).

As shown by Figure 3 and Table 6, Strategy 21 dominated Strategy 20 for both the performance goals and the minority hiring goals. In this example, the strategy with the larger $d$ supplemental predictor actually outperformed the smaller $d$ supplemental approach for both the AI and the performance objectives across all $SR$s. More compelling is the fact that one can add a second larger $d$ predictor to this composite mix (e.g., No. 17, Integrity, CA + Bio + SI) and still get more minority hiring than if one combines a single small-$d$ predictor with a large-$d$ predictor in a composite. The observed results are a function of several factors.

First, conscientiousness, despite being uncorrelated with cognitive ability and having moderate validity, contributed very little to the composite. The substantially lower validity of conscientiousness than of cognitive ability in the composite resulted in heavier weighting of cognitive ability in the composite, given the manner in which regression weights are determined. Second, given the high intercorrelation between integrity (the first-stage predictor) and conscientiousness, prior screening on integrity in the first stage limited the potential (incremental) variance that conscientiousness might otherwise have had in the second stage. Conscientiousness received an even smaller weight (or contribution) for both minority hiring and performance in the second-stage composite than it would have had, had there been no prior screening on integrity. Less weight on the predictor means that the small-$d$ predictor had less influence in the reduction of AI. Although the interview had

a larger $d$ than did conscientiousness, it was uncorrelated with the first-stage predictor (integrity). The interview and cognitive ability were equally valid and were uncorrelated with the first-stage predictor; this means that both would receive similar weight in the composite. Thus, the equally valid, smaller $d$ predictor (interview) helped to mitigate the resulting AI that a large-$d$ predictor (cognitive ability) used alone in the second stage would have produced.

Last, the intercorrelations between the composite predictors played an instrumental role in determining the outcomes. As previous researchers have noted, composite $d$ decreases as the correlation between the composite predictors increases (e.g., Sackett & Ellingson, 1997). Integrity had a moderately high correlation with conscientiousness but was uncorrelated with cognitive ability. As such, the weight conscientiousness received in the second-stage composite was further attenuated, given prior selection on integrity. Indirect range restriction is always a concern in multistage selection when predictors are correlated; however, with the addition of a third unique predictor to a two-stage process, the dynamics of optimally weighted composites becomes an important consideration for those choosing how best to leverage a given set of predictors to meet the selection goals.

Similar results were observed for the larger composites. In fact, all two- and three-predictor composites that supplemented cognitive ability with a moderate-$d$ predictor (or predictors; i.e., Nos. 17, 19, 21) dominated (both in minority hiring and performance) all strategies that supplemented cognitive ability with this small-$d$ predictor (conscientiousness; i.e., Nos. 16, 18, 20). In other words, supplementing cognitive ability with a small-$d$ (instead of a moderate-$d$) predictor did not result in greater minority hiring; in the majority of situations, it resulted in fewer minority hires as well as lower performance than when one or two moderate-$d$ predictors were used. As the first-stage $SR$ increased, and thereby shifted greater weight onto the second-stage composite, the difference between the small-$d$ and moderate-$d$ strategies became more pronounced.

Finally, although supplementing cognitive ability with any one of the smaller $d$ alternatives did not increase minority hiring at the lowest first-stage $SR$, the addition of two smaller $d$ alternatives was effective in eliminating AI at the lowest $SR$ (see, e.g., Nos. 17 and 18).[2] As mentioned, though, only 3 of the 31 strategies that included cognitive ability yielded sufficient minority hiring to avoid a conclusion of AI. Thus, we next consider the effectiveness of strategies that did not include cognitive ability but still utilized predictors with moderately large levels of subgroup differences (e.g., biodata).

*Strategies that did not include cognitive ability.* In contrast to results concerning selection strategies that included a large-$d$ predictor in the first stage, results revealed that the use of a moderate-$d$ predictor in the first stage did not necessitate the use of high first-stage $SR$s in order to avoid AI. For example, screening on biodata in the first stage ($d = 0.33$) and a small-$d$ predictor (i.e., conscientiousness; $d = 0.09$) in the second stage did not result in AI for high or low first-stage $SR$s. This is an important finding, as it makes clear that the practitioner does not need to rely on predictors that have zero or small subgroup differences (which, on

---

[2] The four-fifths rule was not met; however, follow-up significance testing indicated no AI.

Table 7
*Best Balance Strategies*

| Predictor combination | First-stage $SR$ | $JP$ | $AIR$ | $Z_{IR}$ | Fisher exact test |
|---|---|---|---|---|---|
| 9. Bio, SI + Consc | .25 | 0.577 | 0.545 | 1.807 | |
| 12. Bio, SI | .25 | 0.556 | 0.545 | 1.807 | |
| 15. Integrity, CA + Bio + Consc + SI | .15 | 0.555 | 0.651 | **1.279** | |
| | .25 | 0.675 | 0.444 | 2.418 | |
| 17. Integrity, CA + Bio + SI | .25 | 0.666 | 0.444 | 2.418 | |
| 18. Integrity, CA + Consc + SI | .25 | 0.649 | 0.444 | 2.418 | |
| 21. Integrity, CA + SI | .25 | 0.637 | 0.444 | 2.418 | |
| 23. Integrity, Bio + SI + Consc | .25 | 0.611 | 0.651 | **1.279** | |
| 25. Integrity, Bio + SI | .25 | 0.597 | 0.651 | **1.279** | |
| 33. Consc + Integrity, CA + Bio, SI | .25 | 0.643 | 0.444 | 2.418 | |

*Note.* $SR$ = selection ratio; $JP$ = job performance; $AIR$ = adverse impact ratio; $Z_{IR}$ = $z$ difference on adverse impact ratio; Bio = biodata; SI = structured interview; Consc = conscientiousness; CA = cognitive ability. Bold values for $Z_{IR}$ indicate there were no significant difference on the ratio of selection rates. No significant differences were found for the Fisher exact test for these scenarios.

the basis of meta-analytic research, are rare) in order to avoid AI; nor is it necessary to set the initial screening bar lower than might be preferred when moderate-$d$ predictors are used. However, the second-stage predictor must have small subgroup differences to avoid AI in this case, as slightly larger subgroup differences ($d$ = 0.09 vs. $d$ = 0.23) resulted in AI (e.g., No. 12, Bio, SI). It is important to note, though, that the expected performance for the former predictor combination is very low for those conditions in which there was no AI. This low expected performance is largely a result of the predictors being so highly correlated ($r$ = .51) and thereby limiting the incremental validity of the second-stage predictor.

### Balancing Performance and AI

Ultimately, the primary goal of selection researchers and practitioners is to develop selection systems that help organizations achieve a high-performing and diverse workforce and do so efficiently (e.g., low cost, low administrative burden). Given the trade-off problem, the challenge is to identify the circumstances under which the loss in performance associated with a reduction in AI can be better managed. The current simulation highlights certain strategies that are better than others for accomplishing this. Table 7 presents the 10 strategies that were deemed to result in the best balance of expected performance and minority hire rates. We note that the classification of best cases is necessarily subjective, because a preferable balance in one selection context may be an undesirable one in another. For example, given the modest increase in performance (difference in expected performance = .01) that Strategy 23 provides above Strategy 25 by the inclusion of an additional predictor (i.e., conscientiousness), one might reasonably question the practical value of implementing the former strategy (because it adds to the cost). Our classification of best cases was based on predicted performance and AI levels relative to all other scenarios and specifically relative to the highest levels obtained for each goal (maximized performance and minimized AI). The trade-offs for these strategies, which have not been explored in previous research, represent a more acceptable balance of the AI and performance goals than has been modeled and recommended in previous research. We offer several observations regarding these best balance scenarios.

First, none of these best balance scenarios met the four-fifths rule, although significance testing did suggest that some of these four-fifths violations were false positives (i.e., Nos. 15, 23, and 25). Second, of the three scenarios that had no AI, Strategy 23 resulted in the highest mean performance (.61). To illustrate just how much was sacrificed in terms of mean performance when AI was eliminated, we plotted this scenario along with the multistage strategy with the highest mean performance (Strategy 30) in Figure 4. There was some loss in prediction (difference in performance = −.11) at $SR_1$ = 25%, but the loss was relatively modest, given the substantial increase in minority hiring. Although such a loss in performance is not ideal, the reality revealed by our study and by previous simulation studies is that concessions need to be made when one is balancing organizational goals. This balance represents a dramatic improvement over strategies presented in previous single- and multistage simulation studies.

Third, all of these were multistage strategies, although single-stage strategies were also considered. In fact, the single-stage composites performed poorly in striking any kind of balance between the two goals. As expected, these strategies (Nos. 44–46)



*Figure 4.* Best balance of trade-off. AI = adverse impact; JP = job performance.

maximized performance (expected performance as high as 0.76) but resulted in very poor minority selection rates (e.g., 3%) and substantial AI (e.g., $AIR = .26$). Multistage selection strategies were clearly superior to the single-stage composite strategies for balancing the AI and performance goals.

Fourth, none of these best balance scenarios administered cognitive ability as the first-stage predictor. Comparison of the best overall balance scenario (No. 23 at 25% $SR_1$) and the best balance scenario when cognitive ability was used as the first-stage predictor (No. 38; CA, Integrity) for this same $SR$ shows that mean performance was slightly lower when cognitive ability was used as the first-stage predictor (i.e., .58 vs. .61) and resulted in drastically worse minority selection rates (i.e., .26 vs. .65). In fact, the simulation revealed that the commonly suggested strategy of using cognitive ability in the first stage and one or more smaller $d$ predictors in the second stage actually appears to be one of the worst strategies for achieving an acceptable balance of the organizational objectives. These results indicated that the subgroup differences associated with cognitive ability were so large relative to those for the other predictors that even a major redistribution of weight via $SR$s still resulted in very high levels of AI and resulted in mean performance levels that were drastically lower than those for strategies that produced substantially better minority hiring and for several strategies that produced no AI at all. Furthermore, if one was to include cognitive ability in the process at all and still have an acceptable balance, one had to use integrity (i.e., Nos. 15, 17, 18, 21, 33). This was the case for both two- and three-stage selection processes. Unfortunately, high-validity, zero-$d$ predictors, such as integrity, are not always available.

*Results without integrity.* This last point warrants further investigation. That is, a predictor such as integrity provides a distinct advantage in managing the trade-offs, in that it has comparable validity to cognitive ability and other larger $d$ predictors (i.e., biodata, structured interview) but has no subgroup differences. It is instructive to examine what kind of balance is achieved when integrity is not included in these selection processes.

In terms of managing the trade-offs without high-validity, zero-$d$ predictor, such as integrity, the best balance of AI and mean performance was achieved by strategies that excluded cognitive ability altogether. Several of the non-zero $d$ strategies not only outperformed these cognitive ability strategies in terms of AI (as might be expected) but outperformed these strategies in terms of expected mean performance. As a case in point, Figure 5 compares CA, Consc + SI (No. 2) with a biodata first-stage strategy, namely, Bio, SI (No. 12). Notice that the biodata strategy has levels of AI at the 25% $SR_1$ comparable with those the best case cognitive ability strategy had at the 75% $SR_1$. We note that the biodata strategy is expected to yield a similarly diverse but much stronger performing group of hires (job performance = .56 vs. .37) than is the strategy that uses cognitive ability. The composition of this particular biodata example is significant as well, because it uses predictors that have moderate levels of subgroup differences and are moderately correlated, and it requires only two predictors to strike this balance. Moreover, it strikes a reasonable balance of the goals under highly selective conditions. This is an important finding. As it makes clear, the practitioner does not need to use numerous predictors, high $SR$s, or predictors that have zero or small subgroup differences and are uncorrelated (which, according to meta-analytic research, are rare) to simultaneously achieve reasonable levels of performance and minority hiring.



*Figure 5.* Managing the trade-offs without high validity-zero $d$ predictor. AI= adverse impact; JP = job performance; CA = cognitive ability; CONSC = conscientiousness; SI = structured interview; BIO = biodata.

## Conclusion

This study reinforced the trade-off observed in previous research, in that selection strategies that increase the proportion of minority hires generally do so at the expense of mean predicted performance. Thus, researchers who seek to maximize performance and minimize AI must give careful consideration to strategies for balancing these two goals. There are no simple, general rules for placing predictors with specific psychometric properties and validity in multistage systems in order to manage the trade-off. Sackett and Roth (1996) originally noted this in their simulation of uncorrelated predictors. The issue is even more complex when multiple correlated predictors are used in multistage strategies, yet such selection strategies are commonly used. Thus, simulations of this nature can be very informative for demonstrating the expected outcomes associated with various selection strategies.

This study fills a critical gap in the literature because of its more comprehensive approach to examining the complexity and interactive effects of the large number of characteristics that can affect performance and AI in multistage selection systems. Our approach included modeling of correlated predictors; composites in various stages; supplemental strategies; strategies that exclude cognitive ability altogether; strategies that optimize the use of a high-validity, zero-$d$ predictor (integrity); and variation of the sequential ordering of the various predictors. We have provided considerable discussion around the relative merits of these various multistage strategies in a variety of selection environments (e.g., different levels of selectivity). We remind the reader that the results and conclusions of the present study are based on the psychometric properties modeled and that the use of predictor labels (e.g., biodata, cognitive ability) is merely illustrative. As such, the outcomes associated with Bio, SI, for example, will depend upon the psychometric properties associated with these two predictors in the specific selection context. Moreover, the results for Bio, SI generalize to the use of other predictors with similar psychometric properties.

The multistage strategies examined in the present study provided a much broader range of possibilities for use of a given set of predictors

to address the trade-off. Simulation of two predictors (biodata and the structured interview) that are of comparable validity to cognitive ability but are correlated and have moderate levels of subgroup differences; another predictor (integrity) with comparable validity to cognitive ability but with no subgroup differences; and a small-$d$, less valid, and uncorrelated measure (conscientiousness) allowed us to increase the boundary conditions substantially beyond those modeled in previous studies (e.g., De Corte et al., 2006; Sackett & Roth, 1996). As a result, the current study paints a much more complete picture than does previous research of the trade-offs associated with selection strategies that are likely to be used in practice (e.g., CA, SI + Bio + Consc) and those that may be particularly attractive to researchers and practitioners who seek a more effective way to balance the trade-offs (e.g., Integrity, CA + SI). Ultimately, definition of a best balance strategy depends upon the selection context (e.g., possible predictors, $SR$s, feasibility of multistage process) and the goals of the organization (e.g., relative importance of diversity vs. performance). Our discussion of several significant trends in the Results section can help guide researchers and practitioners in developing a selection system that will achieve their specific organizational objective, particularly if that objective is a high performing and highly representative workforce. Although these results are too extensive to recap here, we offer some general insights for minimizing AI and balancing the performance and minority hiring objectives.

When minimizing *AI* is the primary organizational objective, there are several important considerations to keep in mind. First and foremost, the trade-off literature indicates that the four-fifths standard for AI will rarely be met for single-stage strategies and only for very high (and generally uncommon) $SR$s (i.e., $SR$s >.70; Bobko et al., 1999; Roth et al., 2006; Schmitt et al., 1997). Though the current simulation demonstrated that violations of the four-fifths rule were frequent for multistage strategies, these strategies were far more effective than were single-stage strategies in increasing minority hiring and eliminating AI. Moreover, single-stage strategies required the use of higher (less selective) net $SR$s in order to eliminate AI.

In addition, every strategy that modeled cognitive ability as the first-stage predictor resulted in a conclusion of AI, regardless of the method of operationalizing AI; however, AI can be eliminated by including cognitive ability in a second-stage composite, assuming certain conditions are met. To the extent that low first-stage $SR$s are appropriate for a given selection context (which they often are), the strategy of positioning the large-$d$ predictor in the second-stage composite clearly dominates the strategies that placed the large-$d$ predictor in the first-stage in meeting the AI goal. In fact, the results for most first-stage $SR$s revealed that considerably higher minority selection rates can be obtained by including the large-$d$ predictor in a second-stage composite rather than as the first-stage predictor, and the associated loss in performance was relatively small.

Compared with multistage strategies, single-stage strategies were clearly less effective for balancing the goals. Although the addition of alternative predictors to a regression-weighted composite may do very little in terms of reducing AI (e.g., Potosky et al., 2005), the current simulation demonstrated that positioning such a composite within the second stage of a multistage selection process can be much more effective for balancing the performance and diversity goals. Although the trade-off was apparent in our simulation, many of the multistage selection strategies yielded an acceptable balance between minority hiring and expected performance. Realizing that "an acceptable bal-ance" in the face of the trade-off is necessarily subjective, we identified nine multistage selection strategies that did not result in AI and yielded performance estimates at least 1 standard deviation above the mean expected performance obtained in the present study. If one relies on the significance tests as a basis of AI conclusions, there were dozens more scenarios that struck an acceptable balance between minority hiring and performance. In fact, the current simulation demonstrated many different strategies in which a signal of AI can be avoided and performance can still be quite high. We believe these strategies are realistic in a general sense and are fairly generalizable.

There were several other noteworthy findings regarding the use of multistage strategies for balancing the trade-off. First, using a small-$d$ predictor instead of a larger $d$ predictor to mitigate the AI associated with screening on cognitive ability was not always the best strategy for minimizing AI. In fact, we modeled several situations in which strategies that supplemented cognitive ability with one and even two larger $d$ predictors (e.g., biodata, structured interview) actually outperformed strategies that instead supplemented cognitive ability with a small-$d$ predictor (i.e., conscientiousness). These strategies also dominated the smaller $d$, supplemental approach in the prediction of performance across all $SR$s.

Second, the present simulation represented a strong test of the widely held belief that presenting the large-$d$ predictor in the first stage with an equal or lower level of selectivity than in the second stage will minimize AI. Although the large-$d$ first-stage rule appears to be fairly generalizable, our simulation illustrates a few important points. First, there were two key exceptions to the rule: when the predictors were highly correlated and had a smaller disparity between predictor $d$ levels and when composites were used in the second stage. In many cases under these conditions, the decision to position the large or larger $d$ predictor in the first stage required the use of $SR$s that were much higher than the second-stage $SR$ as opposed to merely equal to or higher than the second-stage $SR$ in order to achieve better minority hiring rates.

From a practical perspective, this may not be feasible or desirable. In fact, the framing of this general rule in previous research implies that a first-stage administration of the large-$d$ predictor is more desirable for the practitioner than is a second-stage administration, though this is not always the case. For example, the meta-analytic estimate of $d$ for the structured interview is much larger than that observed for certain paper-and-pencil assessments, such as conscientiousness and integrity testing. Rarely, if ever, would it make sense to screen all applicants on an assessment that is labor intensive to conduct and score (e.g., structured interview) and then to administer paper-and-pencil assessments to the remaining pool of applicants in the second stage. In addition, the large-$d$ first-stage strategy is conditional on use of high or higher first-stage $SR$s, and their use may be impractical in many selection contexts. Having to set a high first-stage $SR$ means that one loses a key advantage of multistage selection, namely, the ability to save testing costs and administrative time. One also loses the ability to limit the unnecessary exposure of assessments in the second (or later) stages to unqualified candidates.

Moreover, the current results revealed that when composites are used in the second stage, the first-stage $SR$ may need to be much higher than the second-stage $SR$ (e.g., nearly twice as high) if one is to achieve better minority hiring rates with a large-$d$ predictor in the first stage. With $SR_1 = 75\%$ and a moderately large applicant pool (e.g., $N = 500$), this means that a substantial number of applicants (e.g., 375) would proceed to the second stage of the

process for further screening on multiple assessments. The financial costs and burden of screening this many applicants through assessments can be prohibitive and will be much higher than those of a lower first-stage *SR*.

Third, there is reluctance to exclude cognitive ability altogether from selection systems, primarily given the strong predictive validity of cognitive ability for a wide variety of jobs and practical advantages (i.e., the low cost and time for development, administration, and scoring). It was important to consider how cognitive ability scenarios performed in multistage selection systems. Although those strategies that included cognitive ability either in the first stage or in a composite (in either stage) did outperform most other strategies in predicting mean performance, these strategies resulted in fewer minority hires than when cognitive ability was excluded altogether. However, this simulation demonstrated the potential of multistage strategies to increase minority hiring with relatively little sacrifice in performance when predictors such as cognitive ability are used.

Finally, previous studies have typically focused on strategies that include cognitive ability and that supplement the selection system with less adverse predictors when they model the trade-off. Our simulation examined numerous strategies that did not include cognitive ability and illustrated the potential of such noncognitive strategies for simultaneously achieving the performance and diversity goals. In fact, under many practical conditions, noncognitive strategies outperformed cognitive ability strategies not only in minimizing AI but in maximizing performance (e.g., Integrity, Bio + SI). This is a new and important finding.

Current results clearly illustrated that the four-fifths rule and the Fisher exact test were frequently in disagreement for moderately large applicant pools ($N = 500$) under realistic selection conditions (i.e., moderate-to-low $SR_{net}$, moderate-to-low levels of minority representation in the pool); however, there was better convergence between the four-fifths rule and the more powerful $Z_{IR}$ test. There appears to have been a sizable percentage of false positives for the four-fifths rule, but it was not as high as the Fisher exact test would suggest. The majority of the four-fifths violations that were flagged as false positives by the $Z_{IR}$ test would not have violated the four-fifths rule had 1 additional minority applicant (and 1 less majority applicant) been selected. Significance tests are intended to control for Type I errors resulting from the four-fifths rule; however, a lack of power can trigger a false negative for significance testing. Although power could have been increased in the present simulation by changing certain parameters (i.e., model much larger applicant pools, use higher overall $SR$s, increase minority representation in the pool), we felt this would diminish the practical contribution of the simulation. That is, the conditions modeled were intended to reflect conditions that researchers and practitioners are more likely to face, where low power is frequently an unavoidable reality. To increase the generalizability of the simulation results, we wanted to model selection contexts that researchers and practitioners frequently encounter and to provide a better idea of what we can expect to see when various selection strategies are modeled under these conditions. We encourage researchers and practitioners to consider higher power significance tests (e.g., $Z_{IR}$) when they examine AI for smaller or more selective pools.

## Limitations and Future Research

The findings of the present study (and simulations of this nature) are limited to the specific parameters modeled: in this case, predictor subgroup differences, validity, predictor intercorrelations, and *SR*s (both net and stage-specific *SR*s). Meta-analytic estimates were used for practical reasons. Our choice of meta-analytic estimates of subgroup differences, validity, and intercorrelations for particular predictors might be criticized because other values could have been used (e.g., Potosky et al., 2005); however, it is the range of these key predictor properties that is important for studies of this nature. That is, it is the trends observed when key properties are manipulated across various scenarios—in this case, the impact of selection strategy on minority hiring and expected performance—that are instructive, and modeling a wide range of validities, subgroup differences, and intercorrelations that were practically relevant increases our understanding of the trade-off and the overall generalizability of the results. Moreover, our conclusions will hold for any set of predictors with similar properties (e.g., situational judgment test, physical ability test) in multistage selection systems.

Although we chose to model meta-analytic estimates of commonly utilized and researched predictors and occasionally referred to these predictors using terms such as *biodata* and *structured interview* in our discussion, these are merely labels intended to facilitate the communication of the results. The reader might be tempted to conclude, for example, that screening on integrity in the first stage and selecting on a structured interview in the second stage (one of the best balance scenarios presented in Table 7) would not produce AI. We caution the reader not to do so. Indeed, the actual validities, subgroup differences, intercorrelations, and effects of range restriction in operational selection settings will likely not be the same as those reported in any meta-analytic studies, due to factors such as sample specificity and test construction.

We recognize concerns that the specific predictors we modeled confound the method/construct distinction (Arthur & Villado, 2008; Edwards & Arthur, 2007). That is, we compared cognitive ability, conscientiousness, and integrity, which are psychological constructs that can be measured using a variety of methods (e.g., paper-and-pencil, simulation, interview), with structured interview, which is a method that can be used to measure a variety of constructs (e.g., conscientiousness, cognitive ability, social skills). As such, to the extent that interviews are designed to measure cognitively loaded constructs, an interview may produce large subgroup differences and may not be an effective alternative predictor.

We also note that the trade-off might well differ on the basis of how performance is operationalized. Our meta-analytic estimates of validity are task based. Validity estimates may be different with other criterion dimensions (e.g., Borman, Penner, Allen, & Motowidlo, 2001). Although task performance is the most widely used operationalization of job performance, organizational citizenship behaviors (OCBs), counterproductive work behaviors, innovation, adaptive performance, and many other work behaviors have been used to defined job performance. These performance dimensions share differential relationships with the predictors simulated in the present study. We decided not to manipulate performance dimensions in the present study for several reasons. Most alternative performance dimensions (i.e., OCBs, adaptive performance, or innovation) are infrequently used to validate selection tests because they are not likely to emerge from a job analysis (e.g., most OCBs are not job related). In addition, these dimensions are not widely researched in relation to selection, such that the validity estimates and/or subgroup differences are unknown for some of our predictors (e.g., counterproductive work behaviors, innova-

tion). In addition, given all of the variables that were manipulated in the current simulation, the addition of even one more dimension of job performance would have obfuscated an already complex study. Researchers could use the results of the present study as a basis for dropping some of our manipulations and instead manipulate those features that had the greatest impact on the trade-off (e.g., predictor intercorrelations, *SR*). Such studies could allow researchers to manipulate job performance and provide information on the trade-off for different criterion dimensions in a complex set of simulations.

In sum, the current simulation provides a wealth of information with which to better understand the performance and AI outcomes associated with a wide variety of selection strategies. This information is instructive for practitioners who seek to strike a better balance between these key outcomes. We modeled several strategies that represent a more acceptable balance of the AI and performance goals than has been previously modeled and recommended in previous research. The best balance strategies (presented in Table 7) reflect a variety of selection situations that a practitioner may face. Specifically, the current simulation revealed best balance strategies when the desired assessments all have moderate levels of subgroup differences (No. 12), when cognitive ability is included (Nos. 15, 17, 18, 21, 33) and when a three-stage process is used (No. 33). These best balance strategies are generalizable to a number of realistic selection situations.

The balance for selection systems that do not contain zero-*d* or small-*d* predictors but instead consist of moderate-*d* predictors, such as biodata and the structured interview, is particularly instructive for practitioners, given that many selection tools are likely to have some degree of subgroup differences. Practically speaking, implementing one of these best balance predictor combinations (e.g., Bio, SI) with a low first-stage *SR* is very appealing. For one thing, most organizations prefer the use of structured interviews and already utilize them; many also use some form of biodata measure. From a utility perspective, a low first-stage *SR* maximizes the practical benefits of using biodata measures, such as the relatively low cost of administration and the ability to conduct large-scale testing, and at the same time minimizes the increased financial and time expense associated with conducting interviews. As such, the current study identified several multistage strategies that are clearly more desirable to practitioners who seek a practical selection system that will yield a high-performing *and* highly representative workforce.

## References

Arthur, W., Jr., Edwards, B. D., & Barrett, G. V. (2002). Multiple-choice and constructed response tests of ability: Race-based subgroup performance differences on alternative paper-and-pencil test formats. *Personnel Psychology, 55,* 985–1008.

Arthur, W., Jr., & Villado, A. J. (2008). The importance of distinguishing between constructs and methods when comparing predictors in personnel selection and research and practice. *Journal of Applied Psychology, 93,* 435–442.

Bobko, P., Roth, P., & Potosky, D. (1999). Derivation and implications of a meta-analytic matrix incorporating cognitive ability, alternative predictors, and job performance. *Personnel Psychology, 52,* 561–588.

Borman, W., Penner, L., Allen, T., & Motowidlo, S. (2001). Personality predictors of citizenship performance. *International Journal of Selection and Assessment, 9,* 52–69.

Bureau of Labor Statistics. (2000). *Employment and Earnings, 46*(1), 13–14, Chart A-4.

Chan, D., & Schmitt, N. (1997). Video-based versus paper-and-pencil method of assessment in situational judgment tests: Subgroup differences in test performance and face validity perceptions. *Journal of Applied Psychology, 82,* 143–159.

Clevenger, J., Pereira, G., Wiechmann, D., Schmitt, N., & Harvey, V. (2001). Incremental validity of situational judgment tests. *Journal of Applied Psychology, 86,* 410–417.

Collins, M. W., & Morris, S. B. (2008). Testing for adverse impact when sample size is small. *Journal of Applied Psychology, 93,* 463–471.

Cortina, J., Goldstein, N., Payne, S., Davison, H., & Gilliland, S. (2000). The incremental validity of interview scores over and above cognitive ability and conscientiousness scores. *Personnel Psychology, 53,* 325–351.

De Corte, W., Lievens, F., & Sackett, P. R. (2006). Predicting adverse impact and mean criterion performance in multistage selection. *Journal of Applied Psychology, 91,* 523–537.

De Corte, W., Lievens, F., & Sackett, P. R. (2007). Combining predictors to achieve optimal trade-offs between selection quality and adverse impact. *Journal of Applied Psychology, 92,* 1380–1393.

Doverspike, D., Winter, J., Healy, M., & Barrett, G. (1996). Simulations as methods of illustrating the impact of differential weights on personnel selection outcomes. *Human Performance, 9,* 259–273.

Edwards, B. D., & Arthur, W., Jr. (2007). An examination of factors contributing to a reduction in race-based subgroup differences on a constructed response paper-and-pencil test of scholastic achievement. *Journal of Applied Psychology, 92,* 794–801.

Equal Employment Opportunity Commission et al. (1978). Adoption by four agencies of uniform guidelines on employee selection procedures. *Federal Register, 43*(166), 38290–38315.

Ford, J., Kraiger, K., & Schechtman, S. (1986). Study of race effects in objective indices and subjective evaluations of performance: A meta-analysis of performance criteria. *Psychological Bulletin, 99,* 330–337.

Gandy, J., Dye, D., & MacLane, C. (1994). Federal government selection: The individual achievement record. In G. Stokes, M. Mumford, & W. Owens (Eds.), *Biodata handbook: Theory, research, and use of biographical information in selection and performance prediction* (pp. 275–310). Palo Alto, CA: Consulting Psychologists Press.

Hoffman, C., & Thornton, G. (1997). Examining selection utility where competing predictors differ in adverse impact. *Personnel Psychology, 50,* 455–470.

Huffcutt, A., & Roth, P. (1998). Racial group differences in employment interview evaluations. *Journal of Applied Psychology, 83,* 179–189.

Hunter, J. E., & Hunter, R. (1984). Validity and utility of alternative predictors of job performance. *Psychological Bulletin, 96,* 72–98.

Kehoe, J. F. (2002). General mental ability and selection in private sector organizations: A commentary. *Human Performance, 15,* 97–106.

McFarland, L. A., & Ryan, A. M. (2000). Variance in faking across noncognitive measures. *Journal of Applied Psychology, 85,* 812–821.

Morris, S. B. (2001). Sample size required for adverse impact analysis. *Applied HRM Research, 6,* 13–32.

Morris, S. B., & Lobsenz, R. E. (2000). Significance tests and confidence intervals for the adverse impact ratio. *Personnel Psychology, 53,* 89–111.

Mount, M., Witt, L., & Barrick, M. (2000). Incremental validity of empirically keyed biodata scales over GMA and the five factor personality constructs. *Personnel Psychology, 53,* 299–323.

Office of Federal Contract Compliance Programs. (1993). *Federal contract compliance manual* (SUDOC L 36.8: C 76/993). Washington, DC: U. S. Department of Labor, Employment Standards Administration.

Ones, D. S., & Viswesvaran, C. (1998). Gender, age, and race differences on overt integrity tests: Results across four large-scale job applicant data sets. *Journal of Applied Psychology, 83,* 35–42.

Ones, D. S., Viswesvaran, C., & Schmidt, F. L. (1993). Comprehensive meta-analysis of integrity test validities: Findings and implications for personnel selection and theories of job performance. *Journal of Applied Psychology, 78,* 679–703.

Potosky, D., Bobko, P., & Roth, P. L. (2005). Forming composites of

cognitive ability and alternative measures to predict job performance and reduce adverse impact: Corrected estimates and realistic expectations. *International Journal of Selection and Assessment, 13,* 304–315.

Pulakos, E., & Schmitt, N. (1996). An evaluation of two strategies for reducing adverse impact and their effects of criterion-related validity. *Human Performance, 9,* 241–258.

Pyburn, K. M., Jr., Ployhart, R. E., & Kravitz, D. A. (2008). The diversity–validity dilemma: Overview and legal context. *Personnel Psychology, 61,* 143–151.

Roth, P., Bevier, C., Bobko, P., Switzer, F., III, & Tyler, P. (2001). Ethnic group differences in cognitive ability in employment and educational settings: A meta-analysis. *Personnel Psychology, 54,* 297–330.

Roth, P., Bobko, P., & Switzer, F. (2006). Modeling the behavior of the four-fifths rule for determining adverse impact: Reasons for caution. *Journal of Applied Psychology, 91,* 507–522.

Roth, P., Bobko, P., Switzer, F., & Dean, M. (2001). Prior selection causes biased estimates of standardized ethnic group differences: Simulation and analysis. *Personnel Psychology, 54,* 591–617.

Sackett, P., & Ellingson, J. (1997). The effects of forming multi-predictor composites on group differences and adverse impact. *Personnel Psychology, 50,* 707–721.

Sackett, P., & Roth, L. (1996). Multi-stage selection strategies: A Monte Carlo investigation of effects on performance and minority hiring. *Personnel Psychology, 49,* 549–572.

Sackett, P., Schmitt, N., Ellingson, J., & Kabin, M. (2001). High-stakes testing in employment, credentialing, and higher education: Prospects in a post-affirmative-action world. *American Psychologist, 56,* 302–318.

Sackett, P., & Wilk, S. (1994). Within-group norming and other forms of score adjustment in preemployment testing. *American Psychologist, 49,* 929–954.

Sackett, P. R., Burris, L. R., & Callahan, C. (1989). Integrity testing for personnel selection: An update. *Personnel Psychology, 42,* 491–529.

Sackett, P. R., Lievens, F., & Berry, C. M. (2007). A cautionary note on the effects of range restriction on predictor intercorrelations. *Journal of Applied Psychology, 92,* 538–544.

Sackett, P. R., & Wanek, J. E. (1996). New developments in the use of measures of honesty, integrity, conscientiousness, dependability, trustworthiness, and reliability for personnel selection. *Personnel Psychology, 49,* 787–829.

Salgado, J. F. (1998). Sample size in validity studies of personnel selection. *Journal of Occupational and Organizational Psychology, 71,* 161–164.

Schmidt, F. L., & Hunter, J. (1998). The validity and utility of selection methods in personnel psychology: Practical and theoretical implications of 85 years of research findings. *Psychological Bulletin, 124,* 262–274.

Schmitt, N., Clause, C. S., & Pulakos, E. D. (1996). Subgroup differences associated with different measures of some common job relevant constructs. *International Review of Industrial and Organizational Psychology, 11,* 115–139.

Schmitt, N., Rogers, W., Chan, D., Sheppard, L., & Jennings, D. (1997). Adverse impact and predictive efficiency of various predictor combinations. *Journal of Applied Psychology, 82,* 719–730.

Siskin, B. R., & Trippi, J. (2005). Statistical issues in litigation. In F. J. Landy (Ed.), *Employment discrimination litigation: Behavioral, quantitative, and legal perspectives* (pp. 132–166). San Francisco: Jossey-Bass.

Stokes, G., Mumford, M., & Owens, W. (1994). *Biodata handbook: Theory, research, and use of biographical information in selection and performance prediction.* Palo Alto, CA: Consulting Psychologists Press.

Van Iddekinge, C. H., Raymark, P. H., & Eidson, C. E., Jr. (2004). What do structured selection interviews really measure? The construct validity of behavior description interviews. *Human Performance, 17,* 71–93.

## Appendix

### Predictor Combinations

| | |
|---|---|
| 1. CA, SI + Bio + Consc | 24. Integrity, Bio + Consc |
| 2. CA, SI + Consc | 25. Integrity, Bio + SI |
| 3. CA, SI + Bio | 26. Integrity, Bio |
| 4. CA, Bio + Consc | 27. Integrity, Consc + SI |
| 5. CA, SI | 28. Integrity, Consc |
| 6. CA, Bio | 29. Integrity, SI |
| 7. CA, Consc | 30. Consc + Bio + CA + Integrity, SI |
| 8. Bio, CA + Consc + SI | 31. Bio + CA + Integrity, SI |
| 9. Bio, Consc + SI | 32. Bio + Consc + Integrity, CA, SI |
| 10. Bio, CA + SI | 33. Consc + Integrity, CA + Bio, SI |
| 11. Bio, CA + Consc | 34. CA + Consc + Integrity, Bio, SI |
| 12. Bio, SI | 35. CA + Integrity, Consc + Bio, SI |
| 13. Bio, CA | 36. Integrity, CA, Bio |
| 14. Bio, Consc | 37. CA, Integrity + SI |
| 15. Integrity, CA + Bio + Consc + SI | 38. CA, Integrity |
| 16. Integrity, CA + Bio + Consc | 39. CA, Integrity + SI + Consc |
| 17. Integrity, CA + Bio + SI | 40. CA, Integrity + Consc |
| 18. Integrity, CA + Consc + SI | 41. Bio, Integrity |
| 19. Integrity, CA + Bio | 42. Consc, CA + Bio + SI |
| 20. Integrity, CA + Consc | 43. Consc, Bio |
| 21. Integrity, CA + SI | 44. Integrity + CA + Bio |
| 22. Integrity, CA | 45. Integrity + CA + SI |
| 23. Integrity, Bio + SI + Consc | 46. Integrity + CA + Consc |

*Note.* CA = cognitive ability; SI = structured interview; Bio = biodata; Consc = conscientiousness.

Received September 11, 2007
Revision received July 24, 2008
Accepted July 28, 2008 ∎

Transportation: FAA-AMH-13-CTI-27053, Series: 2152
Grade(s): FG-1
Status:  Closed Vacancy



# Air Traffic Control Specialist

DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

Federal Aviation Administration (FAA), Air Traffic Organization, various Terminal and En Route (Center) air traffic facilities nationwide

## Overview

| | |
|---|---|
| **Open & closing dates** | **Service** |
| 08/27/2012 to 09/10/2012 | Excepted |
| **Pay scale & grade** | **Salary** |
| FG 1 | $17,803.00 - $17,803.00 / Per Year |
| | Salary shown above is base pay only. Locality pay, plus COLA if applicable, will be added based upon the duty location. |
| **Appointment type** | **Work schedule** |
| Temporary NTE - 13 months | Full Time |

## Locations

Many vacancy(s) in the following locations:

FAA Air Traffic Control Locations Throughout the States, United States

| | |
|---|---|
| **Relocation expenses reimbursed** | **Telework eligible** |
| No | |

### Announcement number

FAA-AMH-13-CTI-27053

### Control number

325024600

## Duties

### Summary

### Responsibilities

Air Traffic Control Specialists (ATCS's) in the Terminal option are responsible for the safe, orderly and expeditious flow of air traffic. Tower Controllers duties involve the sequencing, spacing, and issuing of clearances and instructions to aircraft operating in the Tower's area of responsibility. The controller considers position, type, speed and direction of movement of aircraft desiring to land; estimate of the future positions; the number and capabilities of aircraft wishing to depart from the airport; the patter, length, direction and condition of runways available for use; wind speed and direction; noise abatement requirements; and wake turbulence and traffic information. Radar Controller's provide separation for aircraft operating under IFR and VFR procedures from other aircraft landing, departing and/or overflying within their designated airspace. Operate radar and communication equipment to apply radar separation standards and vectoring

procedures. Detects and adjusts malfunctions and interferences in the equipment. Issues speed, altitude, and directional instructions to pilots to keep aircraft properly separated. Provide air traffic advisory services to pilots including clearance to operate aircraft, weather and field conditions and safety and traffic alerts. Provide training to developmental air traffic controllers and other employees in the facility. ATCS's in the En Route (Center) option give aircraft instructions and authorize flight path changes, issue air traffic clearances, and provide weather updates, and flight conditions while in route between airports. Operate radar and communication equipment to apply radar separation standards and vectoring procedures. Detects and adjusts malfunctions and interferences in the equipment. Issues speed, altitude, and directional instructions to pilots to keep aircraft properly separated. They provide separation between aircraft flying along the Federal airways or operating into or out of airports. This is a developmental ATCS position responsible for the safe, orderly and expeditious movement of air traffic through the nation's airspace. Developmental controllers receive a wide range of training in controlling and separating live air traffic within designated airspace at and around an air traffic control tower or radar approach control facility. Additional information regarding these positions is located at http://www.faa.gov/jobs/job_opportunities/airtraffic_controllers/

## Travel Required

## Supervisory status

## Promotion Potential

1

## Job family (Series)

2152 Air Traffic Controller

# Requirements

## Key Requirements

- U.S. Citizen
- Submission of transcript required with application
- You must provide proof for claims of veterans' preference
- Required documents must be received on or before the closing date
- Pre-appointment medical, drug and security clearances required

## Qualifications

1) Applicants must have successfully completed all program requirements for graduation from an FAA-approved Air Traffic-Collegiate Training Initiative (AT-CTI) College or University* and received a passing score on the Air Traffic Selection & Training (AT-SAT) exam. 2) Applicants must be able to speak English clearly enough to be understood over radios, intercoms, and similar communications equipment. 3) Age Requirements: As established in Public Law 92-291, a maximum age of 30 years is established for entry into Federal civilian ATCS positions in the FAA. Persons who have reached their 31st birthdays may not be originally appointed to FAA ATCS positions. If an individual has previously held a civilian ATCS position with the Department of Defense or FAA he/she may be appointed over age 31. 5 USC 8335(a) and t USC 8425(a) require mandatory separation at age 56 for employees in career controller positions. Please contact Aviation Careers at (405) 954-4657 for any questions regarding these requirements. *You MUST submit a copy of your transcript (official or unofficial) upon submission of your on-line application. Failure to do so WILL eliminate you from consideration. Official transcript required prior to appointment.

We are not accepting applications from noncitizens.

- **Requirement for pre-employment medical clearance**: Applicants selected for ATCS positions must pass a medical examination that includes psychological screening prior to appointment. Applicants with prior military service are encouraged to obtain a sealed copy of their military medical records prior to discharge and to retain these records to be provided upon request if selected.
- **Requirement for security clearance**: This position requires an Access National Agency Check and Inquiry with Credit (ANACI) or higher, based on the facility, prior to appointment unless a waiver is obtained.
- **Department of Transportation's Drug and Alcohol Testing Program**: This position is covered by the Department of Transportation's Drug and Alcohol Testing Program. Any applicant tentatively selected for this position will be subject to a pre-employment or pre-appointment drug screening. Persons occupying covered positions will be subject to random drug and/or alcohol testing.

- **Training Requirements**: Developmentals will enter the appropriate phase of field training as determined by the assigned facility to prepare for advancement to the Certified Professional Controller (CPC) level. They must learn the skills needed for operation at higher levels of responsibility. Failure to meet training requirements for or accept promotion to higher grade ATCS positions may constitute grounds for reassignment, demotion or separation from employment.
- **Certificate and Rating Requirements**: ATCS's must possess or obtain a valid ATCS Certificate and/or Control Tower Operator Certificate (CTO) if appropriate. They must also obtain the facility ratings required for full performance at assigned facilities within uniformly applicable time limits.
- **Interview**: Candidates for ATCS positions may be subject to pre-appointment interviews to determine whether they possess the personal characteristics necessary to perform air traffic control work.
- **Requirement for nonstandard duty hours or work week**: Incumbent may be required to work irregular duty hours or a nonstandard work week or tour of duty.

## Education

### Preview Job Questionnaire
https://jobs.faa.gov/aviator/login/viewquestionnaire.aspx?vid=27053

Make sure your Resume includes detailed information to support your qualifications and answers to the job questionnaire.

## Additional information
We may use this vacancy to fill other similar vacant positions.

Travel may be required.

Position may be subject to a background investigation.

A one-year probationary period may be required.

As a condition of employment, male applicants born after December 31, 1959, must certify that they have registered with the Selective Service System, or are exempt from having to do so under the Selective Service Law.

Direct deposit of pay is required.

The person selected for this position may be required to file a financial disclosure statement within 30 days of entry on duty. FAA policy limits certain outside employment and financial investments in aviation-related companies.

Notes: 1) ATCS's are required to attend the initial qualifications training at the FAA Academy and will be placed on temporary excepted appointments not to exceed thirteen (13) months while attending training. The actual duration of time-limited appointment for each individual will be based on the amount of time required to complete the training program. The Terminal training program requires up to 38 classroom days. The En Route training program requires up to 62 classroom days. Individuals who do not successfully complete training at the FAA Academy and all other requirements for continuing employment may have their employment terminated. 2) Upon completion of initial qualification training at the FAA Academy and all other requirements for continuing employment, including evaluations required by the Air Traffic Organization, salary may be adjusted based on the current Air Traffic collective bargaining agreement. These adjustments reflect the facility level and previous experience. Salary will be adjusted to include locality pay or COLA, if applicable, based on duty location of the position. Salary increases will be received as subsequent phases of training are completed. 3) Newly hired ATCS's will be paid long term expense rate (per diem) for Oklahoma City, OK to help offset daily cost of living while attending FAA Academy. The FAA will also pay for cost of travel to and from the training Academy in accordance with applicable agency travel policy. 4) Applicants must apply on-line to receive consideration for this vacancy announcement. Faxed, mailed or e-mailed applications cannot be accepted. 5) Terminal facilities are located in all 50 states. En Route facilities are located in: Alaska, California, Colorado, Florida, Georgia, Guam, Hawaii, Illinois, Indiana, Kansas, Minnesota, New Hampshire, New Mexico, New York, Ohio, Puerto Rico, Tennessee, Texas, Utah, Virginia and Washington. 6) This replaces announcement AAC-AMH-11-CTI-19558. 7) Reemployed annuitants will be given time-limited appointments of no more than one (1) year; which may be extended, or terminated at the FAA's discretion. In no case will appointments be made or extended past the last month in which the reemployed annuitant reaches their 56th birthday. 8)

A unique job code is required to apply for this announcement.

This is a bargaining unit position.

**Links to Important Information:** Locality Pay, COLA

## How You Will Be Evaluated

Applicants may be rated on the extent and quality of experience, education, and training relevant to the duties of the position(s). All answers provided in the on-line process must be substantiated.

## Background checks and security clearance

### Security clearance                              Drug test required

# REQUIRED DOCUMENTS
YOU MUST SUBMIT A COPY OF YOUR TRANSCRIPT BY UPLOAD, FAX OR MAIL UPON SUBMISSION OF THE ONLINE APPLICATION. Failure to do so will eliminate you from consideration.

Please include the letters "CTI" and your first and last name on each document.

**All Veterans:** You must submit a DD Form 214, Military Discharge (Member Copy 4 or equivalent). If you are claiming 10 point preference, in addition to your DD Form 214, you must submit a completed SF-15 and supporting documents outlined on the SF-15. Documents must be uploaded or faxed to the Servicing Human Resource Office listed in this announcement and all documents **must be received by the closing date** of the announcement. If you fail to submit documentation, you will be assessed as a non-veteran.

If you are claiming 10 point preference and submit a DD Form 214 but fail to submit the supporting documents outlined on the SF-15, you will be assessed as a 5 point preference eligible if your DD Form 214 reflects you have the service qualifying for tentative preference (i.e. served in a war, campaign or expedition). Documents must be uploaded or faxed to the Servicing Human Resource Office listed in this announcement and all documents **must be received by the closing date** of the announcement. If you fail to submit documentation, you will be assessed as a non-veteran.

**Veterans on active duty claiming veterans' preference:** You will be granted a tentative preference if your application shows that you have the required service (i.e. served in a war, campaign or expedition). Prior to being appointed, you must provide to the Servicing Human Resource Office a DD Form 214 documenting that the service was honorable or general. If you are on terminal leave, you must provide documentation certifying authorized terminal leave.

## If you are relying on your education to meet qualification requirements:

Education must be accredited by an accrediting institution recognized by the U.S. Department of Education in order for it to be credited towards qualifications. Therefore, provide only the attendance and/or degrees from schools accredited by accrediting institutions recognized by the U.S. Department of Education(http://www.ed.gov/admins/finaid/accred/).

Failure to provide all of the required information as stated in this vacancy announcement may result in an ineligible rating or may affect the overall rating.

# Benefits
FAA offers an excellent comprehensive benefits programs. To learn more about the federal government benefits, please click here.

# How to Apply
You must apply online to receive consideration. Your application must have a status of **"Received"** by 11:59 PM **Eastern Time** on the Close Date for it to be accepted. If you are applying for positions associated with FAA registers, your application must have a status of **"Received"**

each time a referral list is created in order to receive consideration for positions associated with register.

**IN DESCRIBING YOUR WORK EXPERIENCE AND/OR EDUCATION, PLEASE BE CLEAR AND SPECIFIC REGARDING YOUR EXPERIENCE OR EDUCATION.**

**We strongly encourage applicants to utilize the USAJOBS resume builder in the creation of resumes.**

**Please ensure EACH work history includes ALL of the following information:**

- Job Title (include series and grade if Federal Job)
- Duties (be specific in describing your duties)
- Employer's name and address
- Supervisor name and phone number
- Start and end dates including month and year (e.g. June 2007 to April 2008)
- Full-time or part-time status (include hours worked per week)
- Salary

**Determining length of General or Specialized Experience is dependent on the above information and failure to provide ALL of this information may result in a finding of ineligible.**

You may upload completed documents to your USAJOBS Account. This will provide you the opportunity to utilize the uploaded information again when applying for future vacancies. Please see this guide, Document Upload Guide, for more information on uploading and re-using the documents in your applications.

**Forms:**

- SF-15 : Application for 10-Point Veteran Preference

## Agency contact information
## Aviation Careers

### Phone
405-954-4657

### Fax
405-954-5766/0593

### Email
9-amc-amh-cti@faa.gov

### Address
Federal Aviation Administration
Aviation Careers
6500 S MacArthur Blvd
HQ 130
Oklahoma City, OK
73169
US

The Department of Transportation (DOT) is ranked #4 in the 2017 best places to work in the Federal Government!

Thanks to the work of the Federal Aviation Administration (FAA), over the past 50 years, aviation has become central to the way we live and do business, linking people from coast to coast and connecting America to the world. In fact, FAA has created the safest, most reliable, most efficient, and most productive air transportation system in the world.

## Visit our careers page

Learn more about what it's like to work at Federal Aviation Administration, what the agency does, and about the types of careers this agency offers. http://www.faa.gov/jobs/

## Next steps

Candidates for FAA positions are evaluated using our Automated Vacancy Information Access Tool for Online Referral (AVIATOR) system. AVIATOR compares your skills and experience as described in your application with the requirements of the position. If you are found to be an eligible, highly-qualified candidate, you will be referred to the selecting official for further consideration. (In some cases, individuals with priority for special consideration must be considered and selected before other candidates.) Whether or not you are contacted for an interview depends upon the location of the position and the judgment of the selecting official.

**Important** - If you make any change to your application, you must resubmit it. If you change your application and do not resubmit it, your changes will not be considered part of your application package, and your previous application will be considered.

# Fair & Transparent

The Federal hiring process is setup to be fair and transparent. Please read the following guidance.

## Equal Employment Opportunity Policy

The United States Government does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy And gender identity), national origin, political affiliation, sexual orientation, marital status, disability, genetic information, age, membership in an employee organization, retaliation, parental status, military service, or other non-merit factor.

- Equal Employment Opportunity (EEO) office at OPM
  (https://www.opm.gov/about-us/our-people-organization/support-functions/equal-employment-opportunity/)
- Office of Equal Opportunity
  (http://www.eeoc.gov/eeoc/internal_eeo/index.cfm)

## Reasonable Accommodation Policy

Federal agencies must provide reasonable accommodation to applicants with disabilities where appropriate. Applicants requiring reasonable accommodation for any part of the application process should follow the instructions in the job opportunity announcement. For any part of the remaining hiring process, applicants should contact the hiring agency directly. Determinations on requests for reasonable accommodation will be made on a case-by-case basis.

A reasonable accommodation is any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability. Under the Rehabilitation Act of 1973 the Equal Employment Opportunity Commission (EEOC) must provide reasonable accommodations:

- An applicant with a disability needs an accommodation to have an equal opportunity to apply for a job.
- An employee with a disability needs an accommodation to perform the essential job duties or to gain access to the workplace.
- An employee with a disability needs an accommodation to receive equal access to benefits, such as details, training, and office-sponsored events.
- Disability Employment - Reasonable Accommodations
  (https://www.opm.gov/policy-data-oversight/disability-employment/reasonable-accommodations/)
- How to contact an agency
  (https://www.uat.usajobs.gov//Help/how-to/application/agency/contact/)

**Legal and regulatory guidance**

Financial suitability
(https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/financial-suitability/)

Privacy Act
(https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/privacy-act/)

Selective Service
(https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/selective-service/)

Social security number request
(https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/social-security-number/)

Signature & False statements
(https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/signature-false-statements/)

New employee probationary period
(https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/probationary-period/)

Transportation: FAA-AMC-14-ALLSRCE-33537, Series: 2152
Grade(s): FG-1
Status:  Closed Vacancy

EXHIBIT

H

# Air Traffic Control Specialist - Trainee

DEPARTMENT OF TRANSPORTATION

<u>Federal Aviation Administration</u>

Air Traffic Organization - ATO

## Overview

**Open & closing dates**

02/10/2014 to 02/21/2014

**Pay scale & grade**

FG 1

**Service**

Excepted

**Salary**

$20,527.00 - $27,942.00 / Per Year

This salary includes locality pay which will be applicable while attending the FAA ATC Academy.

**Appointment type**

Temporary NTE - 13 months

**Work schedule**

Full Time

## Locations

Many vacancy(s) in the following locations:

All Air Traffic Locations

**Relocation expenses reimbursed**

No

**Announcement number**

FAA-AMC-14-ALLSRCE-33537

**Control number**

361350500

**Telework eligible**

## Duties

### Summary

### Responsibilities

This is a developmental Air Traffic Control Specialist (ATCS) position responsible for the safe, orderly, and expeditious movement of air traffic through the nation's airspace. Developmental controllers receive a wide range of training in controlling and separating live air traffic within designated airspace at and around an airport traffic control tower or radar approach control facility, or air route traffic control center. As a new ATCS, you will spend your first several weeks of employment in an intensive training program at the FAA Academy in Oklahoma City, OK. While attending academy training you will be on a temporary appointment. Academy students receive basic air traffic control training at the FAA Academy, which includes: - Complete occupational indoctrination including highlights of Federal employment, familiarization with organizational structure & functions, aircraft, air traffic control system, & aviation industry, classroom instruction & workshop exercises relating to air traffic control system. Individuals who do not successfully

complete training at the FAA Academy and all other necessary requirements will have their employment terminated. Upon successful completion of the Academy initial training program & other employment requirements, newly hired ATCS will be offered a permanent appointment at an FAA facility with a basic salary of $37,441, plus applicable locality pay based on facility assignment. Applicants with prior ATC experience will have their salary set in accordance with the ATCS Collective Bargaining Agreement, upon conversion. ATCS's will be paid long term expense rate (per diem) for Oklahoma City, OK to help offset daily cost of living while attending FAA Academy. FAA will pay for cost of travel in accordance with applicable agency policy. As an ATCS you will receive pay increases as you successfully complete the progressive phases of controller training at your assigned facility. The FAA has Air Traffic Control Facilities in every state as well as Puerto Rico, Virgin Islands, and Guam. This announcement is open to those applicants willing to work at any FAA Air Traffic Control Facility. Applicant geographic area preferences are for informational purposes only and will not be used in the selection process; however, preferences may be considered at time of placement after successful completion of Academy training. Ultimately, placement will be based upon the needs of the FAA.

## Travel Required

## Supervisory status

No

## Promotion Potential

1

## Job family (Series)

2152 Air Traffic Controller

# Requirements

## Key Requirements

- US Citizenship is required.
- Selective Service Registration is required for males born after 12/31/1959.
- Three requirements must be met to be referred for selection consideration:
- 1. Basic Qualifications
- 2. Biographical Assessment
- 3. AT-SAT Exam

## Qualifications

Age Requirements: A maximum age of 30 years is established for entry into air traffic control positions covered by Public Law 92-297. Persons who have reached their 31st birthday may not be originally appointed to these positions. If experience was gained as a civilian ATCS with the Federal Aviation Administration (FAA) or Department of Defense (DOD), you must have been hired prior to age 31. Maximum Retention Age: 5 USC 8335 (a) and 5 USC 8425 (a) require mandatory separation at age 56 in a career controller position. Prior experience or training in air traffic control is not required. Applicants will be evaluated based on their responses to the online application. You can qualify in 1 of the following 5 ways: 1. TO QUALIFY BASED ON PROGRESSIVELY RESPONSIBLE WORK EXPERIENCE: applicants must document 3 years of full time (40 hours per week) progressively responsible experience. Most types of paid or unpaid employment will provide progressively responsible experience as the individual doing the work learns about the organization, gains knowledge about the work, and demonstrates responsibility. OR 2. TO QUALIFY BASED UPON EDUCATION: applicants must document a full 4-year course of study leading to a Bachelor's degree. Schools must be accredited by an accrediting institution recognized by the U.S. Department of Education. If qualifying based on education, applicants must submit a copy of the transcript which includes the name of the institution, quarter or semester hours earned and/or confer date. OR 3. TO QUALIFY BASED UPON THE COMBINATION OF BOTH WORK EXPERIENCE AND EDUCATION: The applicant's total qualifying experience is converted to a percentage of the experience required then the applicant's education is converted to a percentage of the education required. The combined percentages must equal 100%. At the undergraduate level, successfully completed education that has not led to possession of a degree is credited based on its relationship to 120 semester hours or 180 quarter hours. For example, 30 semester hours or 45 quarter hours is comparable to 1 year of undergraduate education. For study at a business or technical school, 36 weeks of study (20+ classroom hours per week) is comparable to 1 academic year above high school. OR 4. TO QUALIFY BASED ON SPECIALIZED

WORK EXPERIENCE AS AN AIR TRAFFIC CONTROL SPECIALIST: applicants qualifying based on specialized experience must provide supporting documentation that verifies that this requirement has been met (e.g., FAA certificate, military certificate or training record). OR 5. TO QUALIFY BASED ON ALTERNATIVE REQUIREMENTS, applicants must provide supporting documentation that verifies at least one of the following alternative requirements being met: a. Do you hold or have held an appropriate facility rating and have actively controlled air traffic in civilian or military air traffic control terminals or centers? b. Do you hold or have held an FAA certificate as a dispatcher for an air carrier? c. Do you hold or have held an instrument flight rating? d. Do you hold or have held an FAA certificate as a navigator or have been fully qualified as a Navigator/Bombardier in the Armed Forces? e. Do you have 350 hours of flight time as a copilot or higher and hold or have held a private certificate or equivalent Armed Forces rating? f. Have you served as a rated Aerospace Defense Command Intercept Director? Successful candidates must be able to speak English clearly enough to be understood over radios, intercoms, and similar communications equipment.

We are not accepting applications from noncitizens.

## Education

### Preview Job Questionnaire
https://jobs.faa.gov/aviator/login/viewquestionnaire.aspx?vid=33537

Make sure your Resume includes detailed information to support your qualifications and answers to the job questionnaire.

## Additional information

We may use this vacancy to fill other similar vacant positions.

Travel may be required.

Position may be subject to a background investigation.

A one-year probationary period may be required.

The person selected for this position may be required to file a financial disclosure statement within 30 days of entry on duty. FAA policy limits certain outside employment and financial investments in aviation-related companies.

There will be two pre-employment tests: 1: Biographical assessment administered through the online application. 2: Applicants meeting basic qualifications and passing the Biographical Assessment may be scheduled to take the AT-SAT at a designated test site. Travel to & from testing locations will be at the expense of the applicant. The Biographical Assessment will be scored at the close of the vacancy announcement. Applicants may check their USAJOBs account to get updates on the status of their application after the announcement closes. Applicants who set up their USAJOBs account to provide email updates will receive an email notification with any change in status of their applications. Candidates who have successfully met all three requirements (Basic Qualifications, Biographical Assessment, and the AT-SAT) will be placed into pre-determined quality categories, group 1, group 2, or group 3 based on their veterans' preference and pre-employment exam composite scores. Requirement for pre-employment medical clearance: Applicants selected for ATCS positions must pass a medical examination that includes psychological screening prior to appointment. Applicants with prior military service are encouraged to obtain a sealed copy of their military medical records prior to discharge and to retain these records to be provided upon request if selected. Requirement for security clearance: This position requires an Access National Agency Check and Inquiry with Credit (ANACI) or higher prior to appointment unless a waiver is obtained. Department of Transportation's Drug and Alcohol Testing Program: This position is covered by the Department of Transportation's Drug and Alcohol Testing Program. Any applicant tentatively selected for this position will be subject to a pre-employment or pre-appointment drug screening. Persons occupying covered positions will be subject to random drug and/or alcohol testing. Training Requirements: Developmentals will enter the appropriate phase of field training as determined by the assigned facility to prepare for advancement to the Certified Professional Controller (CPC) level. They must learn the skills needed for operation at higher levels of responsibility. Failure to meet training requirements for or accept promotion to higher grade ATCS positions may constitute grounds for reassignment, demotion or separation from employment. Requirement for nonstandard duty hours or work week: Incumbent may be required to work irregular duty hours or a nonstandard work week or tour of duty.

This is not a bargaining unit position.

**Links to Important Information:** Locality Pay, COLA

## How You Will Be Evaluated

Applicants may be rated on the extent and quality of experience, education, and training relevant to the duties of the position(s). All answers provided in the on-line process must be substantiated.

## Background checks and security clearance

### Security clearance                                        ### Drug test required

Public Trust - Background Investigation

## REQUIRED DOCUMENTS

Applicants who are using education as a qualifier must submit a copy of the official/unofficial transcripts to substantiate all credit hours and/or confer date.

Applicants who have reached the maximum entry age of 31 must provide a copy of an SF-50, Notification of Personnel Action, which verifies original appointment to a Federal Civilian ATCS position (2152 series) with the Department of Defense or FAA prior to age 31.

Facility rating records issued by the FAA or military issued ratings and/or training records must be provided, if qualifying based on specialized experience or one of the alternative requirements.

**All Veterans:** If you are claiming veterans' preference, you must submit either a DD Form 214 Certificate of Release or Discharge from Active Duty (Member 4 Copy or equivalent), or a document from the armed forces certifying that within 120 days you are expected to be discharged or released from active duty service under honorable conditions. If you are claiming 10 point preference, you must also submit a completed SF-15, Application for 10-Point Veteran's Preference, and supporting documents outlined on the SF-15. Documents must be uploaded or faxed to the Servicing Human Resource Management Office listed in this announcement and all documents must be received by the closing date of the announcement. If you fail to submit documentation, you will be assessed as a non-veteran.

If you are claiming 10 point preference but fail to submit the supporting documents outlined on the SF-15, you will be tentatively assessed as a 5 point preference eligible provided your DD Form 214 reflects that you have the service required to qualify for preference. Documents must be uploaded or faxed to the Servicing Human Resource Management Office listed in this announcement and all documents must be received by the closing date of the announcement. If you fail to submit documentation, you will be assessed as a non-veteran.

**Veterans currently on active duty claiming veterans' preference:** You will be granted tentative preference if you submit a document from the armed forces certifying that within 120 days you are expected to be discharged or released from active duty service under honorable conditions and your application shows that you have the required service. Prior to being appointed, you must provide to the Servicing Human Resource Management Office a DD Form 214 documenting discharge/release and showing that the service was honorable or general. If you are on terminal leave, you must provide documentation certifying authorized terminal leave.

## If you are relying on your education to meet qualification requirements:

Education must be accredited by an accrediting institution recognized by the U.S. Department of Education in order for it to be credited towards qualifications. Therefore, provide only the attendance and/or degrees from schools accredited by accrediting institutions recognized by the U.S. Department of Education(http://www.ed.gov/admins/finaid/accred/).

Failure to provide all of the required information as stated in this vacancy announcement may result in an ineligible rating or may affect the overall rating.

## Benefits

A career with the U.S. Government provides employees with a comprehensive benefits package. As a federal employee, you and your family will have access to a range of benefits that are designed to make your federal career very rewarding.

- Benefits for federal employees
  (https://www.usa.gov/benefits-for-federal-employees#item-36407)

- Healthcare insurance
  (https://www.opm.gov/healthcare-insurance/)
- Pay and leave
  (https://www.usajobs.gov/Help/working-in-government/pay-and-leave/)


http://www.faa.gov/jobs/working_here/benefits/


Eligibility for benefits depends on the type of position you hold and whether your position is full-time, part-time, or intermittent. Contact the hiring agency for more information on the specific benefits offered.

## How to Apply

You must apply online to receive consideration. Your application must have a status of **"Received"** by 11:59 PM **Eastern Time** on the Close Date for it to be accepted. If you are applying for positions associated with FAA registers, your application must have a status of **"Received"** each time a referral list is created in order to receive consideration for positions associated with register.


**IN DESCRIBING YOUR WORK EXPERIENCE AND/OR EDUCATION, PLEASE BE CLEAR AND SPECIFIC REGARDING YOUR EXPERIENCE OR EDUCATION.**
**We strongly encourage applicants to utilize the USAJOBS resume builder in the creation of resumes.**
**Please ensure EACH work history includes ALL of the following information:**

- Job Title (include series and grade if Federal Job)
- Duties (be specific in describing your duties)
- Employer's name and address
- Supervisor name and phone number
- Start and end dates including month, day and year (e.g. June 18 2007 to April 05 2008)
- Full-time or part-time status (include hours worked per week)
- Salary

**Determining length of General or Specialized Experience is dependent on the above information and failure to provide ALL of this information may result in a finding of ineligible.**

You may upload completed documents to your USAJOBS Account. This will provide you the opportunity to utilize the uploaded information again when applying for future vacancies. Please see this guide, Document Upload Guide, for more information on uploading and re-using the documents in your applications.

**Forms:**

- SF-15 : Application for 10-Point Veteran Preference


### Agency contact information
### Aviation Careers

#### Phone

405-954-4657

#### Fax

405-954-5766

#### Email

Aviation.Careers@faa.gov

#### Address

Federal Aviation Administration
Aviation Careers
6500 South Mac Arthur Blvd.
Oklahoma City, OK
73160
US


The Department of Transportation (DOT) is ranked #4 in the 2017 best places to work in the Federal Government!

Thanks to the work of the Federal Aviation Administration (FAA), over the past 50 years, aviation has become central to the way we live and do business, linking people from coast to coast and connecting America to the world. In fact, FAA has created the safest, most reliable, most efficient, and most productive air transportation system in the world.

### Visit our careers page

Learn more about what it's like to work at Federal Aviation Administration, what the agency does, and about the types of careers this agency offers. http://www.faa.gov/jobs/

### Next steps
Candidates for FAA positions are evaluated using our Automated Vacancy Information Access Tool for Online Referral (AVIATOR) system. AVIATOR compares your skills and experience as described in your application with the requirements of the position. If you are found to be an eligible, highly-qualified candidate, you will be referred to the selecting official for further consideration. (In some cases, individuals with priority for special consideration must be considered and selected before other candidates.) Whether or not you are contacted for an interview depends upon the location of the position and the judgment of the selecting official.

**Important** - If you make any change to your application, you must resubmit it. If you change your application and do not resubmit it, your changes will not be considered part of your application package, and your previous application will be considered.

## Fair & Transparent

The Federal hiring process is setup to be fair and transparent. Please read the following guidance.

### Equal Employment Opportunity Policy

The United States Government does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy And gender identity), national origin, political affiliation, sexual orientation, marital status, disability, genetic information, age, membership in an employee organization, retaliation, parental status, military service, or other non-merit factor.

- Equal Employment Opportunity (EEO) office at OPM (https://www.opm.gov/about-us/our-people-organization/support-functions/equal-employment-opportunity/)
- Office of Equal Opportunity (http://www.eeoc.gov/eeoc/internal_eeo/index.cfm)

### Reasonable Accommodation Policy

Federal agencies must provide reasonable accommodation to applicants with disabilities where appropriate. Applicants requiring reasonable accommodation for any part of the application process should follow the instructions in the job opportunity announcement. For any part of the remaining hiring process, applicants should contact the hiring agency directly. Determinations on requests for reasonable accommodation will be made on a case-by-case basis.

A reasonable accommodation is any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability. Under the Rehabilitation Act of 1973 the Equal Employment Opportunity Commission (EEOC) must provide reasonable accommodations:

- An applicant with a disability needs an accommodation to have an equal opportunity to apply for a job.

- An employee with a disability needs an accommodation to perform the essential job duties or to gain access to the workplace.

- An employee with a disability needs an accommodation to receive equal access to benefits, such as details, training, and office-sponsored events.

- Disability Employment - Reasonable Accommodations (https://www.opm.gov/policy-data-oversight/disability-employment/reasonable-accommodations/)

- How to contact an agency (https://www.uat.usajobs.gov//Help/how-to/application/agency/contact/)

## Legal and regulatory guidance

Financial suitability (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/financial-suitability/)

Social security number request (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/social-security-number/)

Privacy Act (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/privacy-act/)

Signature & False statements (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/signature-false-statements/)

Selective Service (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/selective-service/)

New employee probationary period (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/probationary-period/)



Transportation: FAA-ATO-16-ALLSRCE-49075, Series: 2152

Grade(s): FG-1

Status:  Closed Vacancy

# Air Traffic Control Specialist - Trainee

DEPARTMENT OF TRANSPORTATION

<u>Federal Aviation Administration</u>

Air Traffic Organization - ATO

## Overview

**Open & closing dates**

08/08/2016 to 08/15/2016

**Pay scale & grade**

FG 1

**Service**

Excepted

**Salary**

$22,888.00 - $28,626.00 / Per Year

This salary includes locality pay which will be applicable while attending the FAA ATC Academy.

**Appointment type**

Temporary NTE - 13 months

**Work schedule**

Full Time

## Locations

Many vacancy(s) in the following locations:

All Air Traffic Locations

**Relocation expenses reimbursed**

No

**Announcement number**

FAA-ATO-16-ALLSRCE-49075

**Control number**

446961800

**Telework eligible**

## Duties

**Summary**

**Responsibilities**

- This is a developmental Air Traffic Control Specialist (ATCS) position responsible for the safe, orderly, and expeditious movement of air traffic through the nation's airspace. Developmental controllers receive a wide range of training in controlling and separating live air traffic within designated airspace at and around an airport traffic control tower or radar approach control facility, or air route traffic control center.
- As a new ATCS, you will spend your first several weeks of employment in an intensive training program at the FAA Academy in Oklahoma City, OK. While attending academy training you will be on a temporary appointment. Academy students receive basic air traffic control training at the FAA Academy, which includes:

- Complete occupational indoctrination including highlights of Federal employment, familiarization with organizational structure & functions, aircraft, air traffic control system, & aviation industry, classroom instruction & workshop exercises relating to air traffic control system.
- Individuals who do not successfully complete training at the FAA Academy and all other necessary requirements will have their employment terminated.
- Prior failure of FAA Academy training or prior declination of permanent facility placement offer after completing Academy training may constitute a basis for non-selection and/or veterans' preference pass over.
- Upon successful completion of the Academy initial training program & other employment requirements, newly hired ATCS's will be offered a permanent appointment at an FAA facility with a basic salary of $38,193, plus applicable locality pay based on facility assignment. Applicants with prior ATC experience will have their salary set in accordance with the ATCS Collective Bargaining Agreement, upon conversion.
- ATCS's will be paid long term expense rate (per diem) for Oklahoma City, OK to help offset daily cost of living while attending FAA Academy. FAA will pay for cost of travel in accordance with applicable agency policies.
- As an ATCS you will receive pay increases as you successfully complete the progressive phases of controller training at your assigned facility. The FAA has Air Traffic Control Facilities in every state as well as Puerto Rico, The U. S. Virgin Islands, and Guam. This announcement is open to those applicants willing to work at any FAA Air Traffic Control Facility. Applicant geographic area preferences are for informational purposes only and will not be used in the selection process; however, preferences may be considered at time of placement. Facility placements will be finalized the day following successful completion of Academy training. Declining to select a facility from the list of available facilities will result in termination of employment, as placement will be based upon the needs of the FAA.
- Prior experience or training in air traffic control is not required. If a candidate applies for and is selected under this temporary trainee announcement, all of the employment conditions associated with this FG-1 position will apply, regardless of whether the candidate possesses the specialized experience that would have otherwise qualified him/her under the December 2015 - March 2016 ATCS vacancy announcement FAA-ATO-ATC-EXP-44955.
- The FAA expects to issue an announcement within the next 60 days for applicants with 52 consecutive weeks of air traffic control involving the full-time active separation of air traffic after receipt of an air traffic certification or air traffic control (ATC) facility rating within 5 years of application for those who served at a FAA air traffic control facility, OR a civilian or military ATC facility, OR a tower operating under contract with the FAA under section 47124. The maximum entry age for applicants under this experience announcement will be age 35.

## Travel Required

## Supervisory status

No

## Promotion Potential

1

## Job family (Series)

2152 Air Traffic Controller

# Requirements

## Key Requirements

- US Citizenship is required.
- Selective Service Registration is required for males born after 12/31/1959.
- Applicants may be required to pass a Biographical Assessment (BA).
- All applicants must pass the Air Traffic Skills Assessment (AT-SA) Exam.
- If eligible for Pool 1; may elect consideration for Pool 2, but not both.

## Qualifications

**APPLICANT POOLS**

**POOL 1 - All U.S. Citizens who also meet the following Pool 1 eligibility criteria:**

Applicants **MUST** meet one of the following criteria (1, 2, OR 3) listed below in order to be eligible for consideration in Pool 1.

**1.** A graduate from an institution participating in the Collegiate Training Initiative (CTI) program and who has received from the institution an appropriate recommendation.

**2.** A veteran eligible for a Veterans Recruitment Appointment (VRA) pursuant to section 4214 of Title 38 and can provide a Certificate of Release or Discharge from Active Duty within 120 days from the announcement closing.

**3.** An eligible veteran maintaining aviation experience obtained in the course of your military experience and/or entitled to veterans' preference (must meet eligibility requirements in section 2108 of Title 5, Unites States Code).

Applicants eligible for **Pool 1** will not take the Biographical Assessment (BA) unless they voluntarily elect to be considered in **Pool 2**.

**POOL 2 - All U.S. Citizens**

Pool 2 applicants are all other U.S. Citizens not meeting the requirements for Pool 1 and <u>will be required</u> to complete and pass the BA at the time of application to receive further consideration.

<u>Pool 2 applicants do not have an option to elect to be considered for Pool 1.</u>

Applicants who applied to FAA-AMC-14-ALLSRCE-33537 vacancy announcement (issued on February 10, 2014), and were found disqualified from the position as the result of the BA but do not meet one of the above mentioned Pool 1 criteria (1, 2 or 3) will be required to take the BA and will not be eligible to elect consideration in Pool 1.

**Biographical Assessment (BA) Exemptions**

During the application process, you will be directed to either bypass the BA or complete the BA based upon your Applicant Pool election and/or the following:

- Applicants who applied for the air traffic controller vacancy FAA-AMC-14-ALLSRCE-33537 (issued on February 10, 2014), and were found disqualified from the position as the result of a BA are eligible to reapply under this announcement. You must have met one of the Pool 1 criteria referenced above, (1, 2, or 3) to bypass the BA (see age requirements below).
- Applicants who are required to take the BA (Pool 2) must achieve a passing score to receive further consideration.
- **You may qualify in 1 of the following 5 ways**:
- **TO QUALIFY BASED ON PROGRESSIVELY RESPONSIBLE WORK EXPERIENCE:** applicants must document 3 years of full time (40 hours per week) progressively responsible experience. Most types of paid or unpaid employment will provide progressively responsible experience as the individual doing the work learns about the organization, gains knowledge about the work, and demonstrates responsibility. **OR**
- **TO QUALIFY BASED UPON EDUCATION:** applicants must document a full 4-year course of study leading to a Bachelor's degree. Schools must be accredited by an accrediting institution recognized by the U.S. Department of Education. If qualifying based on education, applicants must submit a copy of the transcript which includes the name of the institution, quarter or semester hours earned and/or confer date. **OR**
- **TO QUALIFY BASED UPON THE COMBINATION OF BOTH WORK EXPERIENCE AND EDUCATION:** The applicant's total qualifying experience is converted to a percentage of the experience required then the applicant's education is converted to a percentage of the education required. The combined percentages must equal 100%. At the undergraduate level, successfully completed education that has not led to possession of a degree is credited based on its relationship to 120 semester hours or 180 quarter hours. For example, 30 semester hours or 45 quarter hours is comparable to 1 year of undergraduate education. For study at a business or technical school, 36 weeks of study (20+ classroom hours per week) is comparable to 1 academic year above high school. **OR**
- **TO QUALIFY BASED ON SPECIALIZED WORK EXPERIENCE AS AN AIR TRAFFIC CONTROL SPECIALIST:** applicants qualifying based on specialized experience must provide supporting documentation that verifies that this requirement has been met (e.g., FAA certificate, military certificate or training record). **OR**
- **TO QUALIFY BASED ON ALTERNATIVE REQUIREMENTS:** applicants must provide supporting documentation that verifies at least one of the following alternative requirements being met: **a.** Do you hold or have held an appropriate facility rating and have actively controlled air traffic in civilian or military air traffic control terminals or centers? **b.** Do you hold or have held an FAA certificate as a

dispatcher for an air carrier? **c.** Do you hold or have held an instrument flight rating? **d.** Do you hold or have held an FAA certificate as a navigator or have been fully qualified as a Navigator/Bombardier in the Armed Forces? **e.** Do you have 350 hours of flight time as a copilot or higher and hold or have held a private certificate or equivalent Armed Forces rating? **f.** Have you served as a rated Aerospace Defense Command Intercept Director?

- Successful candidates must be able to speak English clearly enough to be understood over radios, intercoms, and similar communications equipment.

**Veterans Recruitment Appointment (VRA) eligible applicants:**

- Disabled veterans; or
- Veterans who served on active duty in the Armed Forces during a war, or in a campaign or expedition for which a campaign badge has been authorized; or
- Veterans who, while serving on active duty in the Armed Forces, participated in a United States military operation for which an Armed Forces Service Medal was awarded; or
- Recently separated veterans (defined as; within the last 3 years).

Veterans claiming eligibility on the basis of service in a campaign or expedition for which a medal was awarded must be in receipt of the campaign badge or medal.

In addition to meeting the criteria above, eligible veterans must have been separated under honorable conditions (i.e., the individual must have received either an honorable or general discharge).

**Entrance on Duty Requirements (EOD):** If you are selected for a position but are unable to complete pre-employment requirements and EOD within 15 months of this announcement, you will no longer be considered for this vacancy.

**Age Requirements:**

Maximum entry age may be waived for Pool 1 applicants who are reapplying and were found disqualified due to the BA in the February 10, 2014 announcement.

A maximum age of 30 years is established for **initial** entry into air traffic control positions covered by Public Law 92-297. Persons who have reached their 31st birthday may not be originally appointed to these positions. If experience was gained as a civilian ATCS with the Federal Aviation Administration (FAA) or Department of Defense (DOD), you must have been hired prior to age 31. Please see the **Required Documents** section of this announcement for further information on specific documentation that MUST be provided if you were previously hired by the FAA or DOD prior to the maximum entry age for this position.

We are not accepting applications from noncitizens.

## Education

Applicants who are using education as a qualifier must submit a copy of the official/unofficial transcripts to substantiate all credit hours and/or confer date.

Applicants qualifying based on Collegiate Training Initiative (CTI) education must submit a copy of the official/unofficial transcripts to substantiate all credit hours and/or confer date AND an appropriate recommendation letter or endorsement certifying the individual would have met the CTI requirements in effect as of December 31, 2013 for an appropriate recommendation.

Preview Job Questionnaire
https://jobs.faa.gov/aviator/login/viewquestionnaire.aspx?vid=49075

Make sure your Resume includes detailed information to support your qualifications and answers to the job questionnaire.

## Additional information
We may use this vacancy to fill other similar vacant positions.

Travel may be required.

Position may be subject to a background investigation.

A one-year probationary period may be required.

The person selected for this position may be required to file a financial disclosure statement within 30 days of entry on duty. FAA policy limits certain outside employment and financial investments in aviation-related companies.

**There will be two pre-employment tests for <u>some</u> applicants, <u>all</u> applicants will be required to take and pass the Air Traffic Skills Assessment (AT-SA):**

- **1:** BA administered through the online application system.
- **2:** Applicants meeting basic qualifications and/or passing the BA will be scheduled to take the AT-SA at a designated test site.

- Travel to & from testing locations will be at the expense of the applicant.
- The BA will be scored at the close of the vacancy announcement.
- Applicants may check their USAJOBS account to get updates on the status of their application after the announcement closes. Applicants who set up their USAJOBS account to provide email updates will receive an email notification with any change in status of their applications.
- Candidates referred and tentatively selected for ATCS positions will be randomly assigned to either the En Route or Terminal track. Prior ATCS experience will not be factored when determining track assignments.
- **Requirement for pre-employment medical clearance:** Applicants selected for ATCS positions must pass a medical examination that includes psychological screening prior to appointment. Applicants with prior military service are encouraged to obtain a sealed copy of their military medical records prior to discharge and to retain these records to be provided upon request if selected.
- **Requirement for security clearance:** This position requires an Access National Agency Check and Inquiry with Credit (ANACI) or higher prior to appointment unless a waiver is obtained.
- **Department of Transportation's Drug and Alcohol Testing Program:** This position is covered by the Department of Transportation's Drug and Alcohol Testing Program. Any applicant tentatively selected for this position will be subject to a pre-employment or pre-appointment drug screening. Persons occupying covered positions will be subject to random drug and/or alcohol testing.
- **Training Requirements:** After successful completion of Academy training, the ATCS will enter the appropriate phase of field training as determined by the assigned facility to prepare for advancement to the Certified Professional Controller (CPC) level. They must learn the skills needed for operation at higher levels of responsibility.
- Successful certification at assigned FAA facility is required. Failure to certify will result in separation, demotion or reassignment.
- **Requirement for nonstandard duty hours or work week:** Incumbent may be required to work irregular duty hours or a nonstandard work week or tour of duty.

This is not a bargaining unit position.

**Links to Important Information:** Locality Pay, COLA

## How You Will Be Evaluated

**IMPORTANT:** Applicants may be rated on the extent and quality of experience, education, and training relevant to the duties of the position(s). All answers provided in the on-line process must be substantiated. Ensure that your application package/resume supports your responses.

## Background checks and security clearance

### Security clearance                                  Drug test required

Public Trust - Background Investigation

# REQUIRED DOCUMENTS

Applicants qualifying based on education, including Collegiate Training Initiative (CTI) must submit a copy of the official/unofficial transcripts to substantiate all credit hours and/or confer date. CTI applicants must also submit an appropriate recommendation letter or endorsement certifying the individual would have met the CTI requirements in effect as of December 31, 2013 for an appropriate recommendation.

Applicants who do not meet one of the waivers to maximum entry age to be considered in Pool 1, but have previous 2152 experience and are past

the maximum entry age of 31, MUST provide a copy of a Notification of Personnel Action (SF-50) that verifies original appointment to the civilian 2152 occupational series prior to reaching the maximum entry age of 31. This would be the initial Notification of Personnel Action (SF-50/new-hire action into the 2152 series) received from your servicing Federal Human Resources office.

If you do not have a copy of your initial Notification of Personnel Action (SF-50/new-hire action into the 2152 series), you can request it through the National Personnel Records Center at the following link: http://www.archives.gov/st-louis/civilian-personnel/

Service Computation Dates (SCD's) cannot be used for maximum entry age verification purposes, as this could include prior military service and/or current or previous federal civilian service in another occupational series.

Facility rating records issued by the FAA or military issued ratings and/or training records must be provided, if qualifying based on specialized experience or one of the alternative requirements.

Applicants qualifying under VRA must provide either a DD Form 214 Certificate of Release or Discharge from Active Duty (Member 4 Copy or equivalent), OR a document from the armed forces certifying that within 120 days you are expected to be discharged or released from active duty

**All Veterans:** If you are claiming veterans' preference, you must submit either a DD Form 214 Certificate of Release or Discharge from Active Duty (Member 4 Copy or equivalent), or a document from the armed forces certifying that within 120 days you are expected to be discharged or released from active duty service under honorable conditions. If you are claiming 10 point preference, you must also submit a completed SF-15, Application for 10-Point Veteran's Preference, and supporting documents outlined on the SF-15. Documents must be uploaded or faxed to the Servicing Human Resource Management Office listed in this announcement and all documents must be received by the closing date of the announcement. If you fail to submit documentation, you will be assessed as a non-veteran.

If you are claiming 10 point preference but fail to submit the supporting documents outlined on the SF-15, you will be tentatively assessed as a 5 point preference eligible provided your DD Form 214 reflects that you have the service required to qualify for preference. Documents must be uploaded or faxed to the Servicing Human Resource Management Office listed in this announcement and all documents must be received by the closing date of the announcement. If you fail to submit documentation, you will be assessed as a non-veteran.

**Veterans currently on active duty claiming veterans' preference:** You will be granted tentative preference if you submit a document from the armed forces certifying that within 120 days you are expected to be discharged or released from active duty service under honorable conditions and your application shows that you have the required service. Prior to being appointed, you must provide to the Servicing Human Resource Management Office a DD Form 214 documenting discharge/release and showing that the service was honorable or general. If you are on terminal leave, you must provide documentation certifying authorized terminal leave.

## If you are relying on your education to meet qualification requirements:

Education must be accredited by an accrediting institution recognized by the U.S. Department of Education in order for it to be credited towards qualifications. Therefore, provide only the attendance and/or degrees from schools accredited by accrediting institutions recognized by the U.S. Department of Education(http://www.ed.gov/admins/finaid/accred/).

Failure to provide all of the required information as stated in this vacancy announcement may result in an ineligible rating or may affect the overall rating.

## Benefits

A career with the U.S. Government provides employees with a comprehensive benefits package. As a federal employee, you and your family will have access to a range of benefits that are designed to make your federal career very rewarding.

- Benefits for federal employees (https://www.usa.gov/benefits-for-federal-employees#item-36407)
- Healthcare insurance (https://www.opm.gov/healthcare-insurance/)

- Pay and leave
(https://www.usajobs.gov/Help/working-in-government/pay-and-leave/)


http://www.faa.gov/jobs/working_here/benefits/


Eligibility for benefits depends on the type of position you hold and whether your position is full-time, part-time, or intermittent. Contact the hiring agency for more information on the specific benefits offered.

## How to Apply

You must apply online to receive consideration. Your application must have a status of **"Received"** by 11:59 PM **Eastern Time** on the Close Date for it to be accepted. If you are applying for positions associated with FAA registers, your application must have a status of **"Received"** each time a referral list is created in order to receive consideration for positions associated with register.


**IN DESCRIBING YOUR WORK EXPERIENCE AND/OR EDUCATION, PLEASE BE CLEAR AND SPECIFIC REGARDING YOUR EXPERIENCE OR EDUCATION.**

**We strongly encourage applicants to utilize the USAJOBS resume builder in the creation of resumes.**

**Please ensure EACH work history includes ALL of the following information:**

- Job Title (include series and grade if Federal Job)
- Duties (be specific in describing your duties)
- Employer's name and address
- Supervisor name and phone number
- Start and end dates including month, day and year (e.g. June 18 2007 to April 05 2008)
- Full-time or part-time status (include hours worked per week)
- Salary

**Determining length of General or Specialized Experience is dependent on the above information and failure to provide ALL of this information may result in a finding of ineligible.**

You may upload completed documents to your USAJOBS Account. This will provide you the opportunity to utilize the uploaded information again when applying for future vacancies. Please see this guide, Document Upload Guide, for more information on uploading and re-using the documents in your applications.

**Forms:**

- SF-15 : Application for 10-Point Veteran Preference


## Agency contact information
## Aviation Careers

### Phone

(405) 954-4657

### Fax

(405) 954-5766

### Email

aviation.careers@faa.gov

### Address

Federal Aviation Administration
Aviation Careers
6500 South Mac Arthur Blvd.
Oklahoma City, OK
73160
US


The Department of Transportation (DOT) is ranked #4 in the 2017 best places to work in the Federal Government!

Thanks to the work of the Federal Aviation Administration (FAA), over the past 50 years, aviation has become central to the way we live and do

business, linking people from coast to coast and connecting America to the world. In fact, FAA has created the safest, most reliable, most efficient, and most productive air transportation system in the world.

### Visit our careers page

Learn more about what it's like to work at Federal Aviation Administration, what the agency does, and about the types of careers this agency offers. http://www.faa.gov/jobs/

### Next steps

Candidates for FAA positions are evaluated using our Automated Vacancy Information Access Tool for Online Referral (AVIATOR) system. AVIATOR compares your skills and experience as described in your application with the requirements of the position. If you are found to be an eligible, highly-qualified candidate, you will be referred to the selecting official for further consideration. (In some cases, individuals with priority for special consideration must be considered and selected before other candidates.) Whether or not you are contacted for an interview depends upon the location of the position and the judgment of the selecting official.

**Important** - If you make any change to your application, you must resubmit it. If you change your application and do not resubmit it, your changes will not be considered part of your application package, and your previous application will be considered.

## Fair & Transparent

The Federal hiring process is setup to be fair and transparent. Please read the following guidance.

### Equal Employment Opportunity Policy

The United States Government does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy And gender identity), national origin, political affiliation, sexual orientation, marital status, disability, genetic information, age, membership in an employee organization, retaliation, parental status, military service, or other non-merit factor.

- Equal Employment Opportunity (EEO) office at OPM (https://www.opm.gov/about-us/our-people-organization/support-functions/equal-employment-opportunity/)
- Office of Equal Opportunity (http://www.eeoc.gov/eeoc/internal_eeo/index.cfm)

### Reasonable Accommodation Policy

Federal agencies must provide reasonable accommodation to applicants with disabilities where appropriate. Applicants requiring reasonable accommodation for any part of the application process should follow the instructions in the job opportunity announcement. For any part of the remaining hiring process, applicants should contact the hiring agency directly. Determinations on requests for reasonable accommodation will be made on a case-by-case basis.

A reasonable accommodation is any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability. Under the Rehabilitation Act of 1973 the Equal Employment Opportunity Commission (EEOC) must provide reasonable accommodations:

- An applicant with a disability needs an accommodation to have an equal opportunity to apply for a job.

- An employee with a disability needs an accommodation to perform the essential job duties or to gain access to the workplace.

- An employee with a disability needs an accommodation to receive equal access to benefits, such as details, training, and office-sponsored events.

- Disability Employment - Reasonable Accommodations (https://www.opm.gov/policy-data-oversight/disability-employment/reasonable-accommodations/)

- How to contact an agency (https://www.uat.usajobs.gov/Help/how-to/application/agency/contact/)

## Legal and regulatory guidance

Financial suitability (https://www.uat.usajobs.gov/Help/working-in-government/fair-and-transparent/financial-suitability/)

Privacy Act (https://www.uat.usajobs.gov/Help/working-in-government/fair-and-transparent/privacy-act/)

Selective Service (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/selective-service/)

Social security number request (https://www.uat.usajobs.gov/Help/working-in-government/fair-and-transparent/social-security-number/)

Signature & False statements (https://www.uat.usajobs.gov/Help/working-in-government/fair-and-transparent/signature-false-statements/)

New employee probationary period (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/probationary-period/)

EXHIBIT

J

# Air Traffic Control Specialist - Trainee

DEPARTMENT OF TRANSPORTATION

<u>Federal Aviation Administration</u>

Air Traffic Organization - ATO

## Overview

**Open & closing dates**

07/07/2017 to 07/14/2017

**Pay scale & grade**

FG 1

**Service**

Excepted

**Salary**

$23,547.00 - $29,450.00 / Per Year

This salary includes locality pay which will be applicable while attending the FAA ATC Academy.

**Appointment type**

Temporary NTE - Temporary NTE - 13 months

**Work schedule**

Full Time

## Locations

Many vacancy(s) in the following locations:

All Air Traffic Locations

**Relocation expenses reimbursed**

No

**Announcement number**

FAA-ATO-17-ALLSRCE-53474

**Control number**

473871400

**Telework eligible**

## Duties

**Summary**

**Responsibilities**

- This is a developmental Air Traffic Control Specialist (ATCS) position responsible for the safe, orderly, and expeditious movement of air traffic through the nation's airspace. Developmental controllers receive a wide range of training in controlling and separating live air traffic within designated airspace at and around an airport traffic control tower or radar approach control facility, or air route traffic control center.

- As a new ATCS, you will spend your first several weeks of employment in an intensive training program at the FAA Academy in Oklahoma City, OK. While attending academy

training you will be on a temporary appointment. Academy students receive basic air traffic control training at the FAA Academy, which includes:

- ◦ Complete occupational indoctrination including highlights of Federal employment, familiarization with organizational structure & functions, aircraft, air traffic control system, & aviation industry, classroom instruction & workshop exercises relating to the air traffic control system.

- Individuals who do not successfully complete training at the FAA Academy and all other necessary requirements will have their employment terminated.

- Prior failure of FAA Academy training or prior declination of permanent facility placement offer after completing Academy training may constitute a basis for non-selection and/or veterans' preference pass over.

- Upon successful completion of the Academy initial training program & other employment requirements, newly hired ATCS's will be offered a permanent appointment at an FAA facility with a basic salary of $38,575, plus applicable locality pay based on facility assignment. Applicants with prior ATC experience will have their salary set in accordance with the ATCS Collective Bargaining Agreement, upon conversion.

- ATCS's will be paid long term expense rate (per diem) for Oklahoma City, OK to help offset daily cost of living while attending FAA Academy. FAA will pay for cost of travel in accordance with applicable agency policies.

- As an ATCS you will receive pay increases as you successfully complete the progressive phases of controller training at your assigned facility. The FAA has Air Traffic Control Facilities in every state as well as Puerto Rico, The U. S. Virgin Islands, and Guam. This announcement is open to those applicants willing to work at any FAA Air Traffic Control Facility. Applicant geographic area preferences are for informational purposes only and will not be used in the selection process; however, preferences may be considered at time of placement. Facility placements will be finalized the day following successful completion of Academy training. Declining to select a facility from the list of available facilities will result in termination of employment, as placement will be based upon the needs of the FAA.

- Prior experience or training in air traffic control is not required. If a candidate applies for and is selected under this temporary trainee announcement, all of the employment conditions associated with this FG-1 position will apply, regardless of whether the candidate possesses the specialized experience that would have otherwise qualified him/her under the April/May 2017 vacancy announcement FAA-ATO-ATCEXP-52850.

**Travel Required**

**Supervisory status**

No

**Promotion Potential**

1

**Job family (Series)**

2152 Air Traffic Controller

# Requirements

## Key Requirements

- US Citizenship is required.

- Selective Service Registration is required for males born after 12/31/1959.
- Applicants may be required to pass a Biographical Assessment (BA).
- All applicants must pass the Air Traffic Skills Assessment (AT-SA) Exam.
- If eligible for Pool 1; may elect consideration for Pool 2, but not both.

## Qualifications

**APPLICANT POOLS**

**POOL 1 - All U.S. Citizens who also meet the following Pool 1 eligibility criteria:**

Applicants **MUST** meet one of the following criteria (1, 2, OR 3) listed below in order to be eligible for consideration in Pool 1.

**1.** A graduate from an institution participating in the Collegiate Training Initiative (CTI) program and who has received from the institution an appropriate recommendation.

**2.** A veteran eligible for a Veterans Recruitment Appointment (VRA) pursuant to section 4214 of Title 38 and can provide a Certificate of Release or Discharge from Active Duty within 120 days from the announcement closing.

**3.** An eligible veteran maintaining aviation experience obtained in the course of your military experience and/or entitled to veterans' preference (must meet eligibility requirements in section 2108 of Title 5, Unites States Code) and can provide a Certificate of Release or Discharge from Active Duty within 120 days from the announcement closing.

Applicants eligible for **Pool 1** will not take the Biographical Assessment (BA) unless they voluntarily elect to be considered in **Pool 2**.

**POOL 2 - All U.S. Citizens**

Pool 2 applicants are all other U.S. Citizens not meeting the requirements for Pool 1 and <u>will be required</u> to complete and pass the BA at the time of application to receive further consideration.

<u>Pool 2 applicants do not have an option to elect to be considered for Pool 1.</u>

Applicants who applied to FAA-AMC-14-ALLSRCE-33537 vacancy announcement (issued on February 10, 2014), and were found disqualified from the position as the result of the BA but do not meet one of the above mentioned Pool 1 criteria (1, 2 or 3) will be required to take the BA and will not be eligible to elect consideration in Pool 1.

**Biographical Assessment (BA) Exemptions**

During the application process, you will be directed to either bypass the BA or complete the BA based upon your Applicant Pool election and/or the following:

- Applicants who applied for the air traffic controller vacancy FAA-ATO-16-ALLSRCE-49075 **AND** successfully passed the BA are not required to re-take the BA, as the passing score is valid for up to 3 years from the closing date of that vacancy (08/15/16).
- Applicants who applied for the air traffic controller vacancy FAA-AMC-14-ALLSRCE-33537 (issued on February 10, 2014), and were found disqualified from the position as the result of a BA are eligible to reapply under this announcement. You must have met one of the Pool 1 criteria referenced above, (1, 2, or 3) to bypass the BA (see age requirements below).
- Applicants who are required to take the BA (Pool 2) must achieve a passing score to receive further consideration.
- <u>**You may qualify in 1 of the following 5 ways**</u>:
- **TO QUALIFY BASED ON PROGRESSIVELY RESPONSIBLE WORK EXPERIENCE:** applicants must document 3 years of full time (40 hours per week) progressively responsible experience. Most types of paid or unpaid employment will provide progressively responsible experience as the individual doing the work learns about the organization, gains knowledge about the work, and demonstrates responsibility. **OR**
- **TO QUALIFY BASED UPON EDUCATION:** applicants must document a full 4-year course of study leading to a Bachelor's degree. Schools must be accredited by an accrediting institution recognized by the U.S. Department of Education. If qualifying based on education, applicants must submit a copy of the transcript which includes the name of the institution, quarter or semester hours earned and/or confer date. **OR**
- **TO QUALIFY BASED UPON THE COMBINATION OF BOTH WORK EXPERIENCE AND EDUCATION:** The applicant's total qualifying experience is converted to a percentage of the experience required then the applicant's education is converted to a percentage of the education required. The combined percentages must equal 100%. At the undergraduate level, successfully completed education that has not led to possession of a degree is credited based on its relationship to 120 semester hours or 180 quarter hours. For example, 30 semester hours or 45 quarter hours is comparable to 1 year of undergraduate education. For study at a business or technical school, 36 weeks of study (20+ classroom hours per week) is comparable to 1 academic year above high school. **OR**
- **TO QUALIFY BASED ON SPECIALIZED WORK EXPERIENCE AS AN AIR TRAFFIC CONTROL SPECIALIST:** applicants qualifying based on specialized experience must provide supporting documentation that verifies that this requirement has been met (e.g., FAA certificate, military certificate or training record). **OR**
- **TO QUALIFY BASED ON ALTERNATIVE REQUIREMENTS:** applicants must provide supporting documentation that verifies at least one of the following alternative requirements being met: **a.** Do you hold or have held an appropriate facility rating and have actively controlled air traffic in civilian or military air traffic control terminals or centers? **b.** Do you hold or

have held an FAA certificate as a dispatcher for an air carrier? **c.** Do you hold or have held an instrument flight rating? **d.** Do you hold or have held an FAA certificate as a navigator or have been fully qualified as a Navigator/Bombardier in the Armed Forces? **e.** Do you have 350 hours of flight time as a copilot or higher and hold or have held a private certificate or equivalent Armed Forces rating? **f.** Have you served as a rated Aerospace Defense Command Intercept Director?

- Successful candidates must be able to speak English clearly enough to be understood over radios, intercoms, and similar communications equipment.

**Veterans Recruitment Appointment (VRA) eligible applicants:**

- Disabled veterans; or
- Veterans who served on active duty in the Armed Forces during a war, or in a campaign or expedition for which a campaign badge has been authorized; or
- Veterans who, while serving on active duty in the Armed Forces, participated in a United States military operation for which an Armed Forces Service Medal was awarded; or
- Recently separated veterans (defined as; within the last 3 years).

Veterans claiming eligibility on the basis of service in a campaign or expedition for which a medal was awarded must be in receipt of the campaign badge or medal.

In addition to meeting the criteria above, eligible veterans must have been separated under honorable conditions (i.e., the individual must have received either an honorable or general discharge). Please also see the section 'All Veterans' at the bottom of this vacancy for further documentation requirements for Veterans.

- **Entrance on Duty Requirements (EOD):** If you are selected for a position but are unable to complete pre-employment requirements **and** EOD within 15 months of this announcement, you will no longer be considered for this vacancy.

**Age Requirements**:

Maximum entry age may be waived for Pool 1 applicants who are reapplying and were found disqualified due to the BA in the February 10, 2014 announcement.

A maximum age of 30 years is established for **initial** entry into air traffic control positions covered by Public Law 92-297. Persons who have reached their 31st birthday may not be originally appointed to these positions. If experience was gained as a civilian ATCS with the Federal Aviation Administration (FAA) or Department of Defense (DOD), you must have been hired prior to age 31. Please see the **Required Documents** section of this announcement for further information on specific documentation that MUST be provided if you were previously hired by the FAA or DOD prior to the maximum entry age for this position

We are not accepting applications from noncitizens.

## Education

Applicants who are using education as a qualifier must submit a copy of the official/unofficial transcripts to substantiate all credit hours and/or confer date.

Applicants qualifying based on Collegiate Training Initiative (CTI) education must submit a copy of the official/unofficial transcripts to substantiate all credit hours and/or confer date AND an appropriate recommendation letter or endorsement certifying the individual would have met the CTI requirements in effect as of December 31, 2013 for an appropriate recommendation.

Preview Job Questionnaire
https://jobs.faa.gov/aviator/login/viewquestionnaire.aspx?vid=53474

Make sure your Resume includes detailed information to support your qualifications and answers to the job questionnaire.

## Additional information

We may use this vacancy to fill other similar vacant positions.
Travel may be required.
Position may be subject to a background investigation.
A one-year probationary period may be required.
The person selected for this position may be required to file a financial disclosure statement within 30 days of entry on duty. FAA policy limits certain outside employment and financial investments in aviation-related companies.

**There will be two pre-employment tests for some applicants, all applicants will be required to take and pass the Air Traffic Skills Assessment (AT-SA):**

- **1:** BA administered through the online application system.
- **2:** Applicants meeting basic qualifications and/or passing the BA will be scheduled to take the AT-SA at a designated test site.

- Travel to & from testing locations will be at the expense of the applicant.

- The BA will be scored at the close of the vacancy announcement.
- Applicants may check their USAJOBS account to get updates on the status of their application after the announcement closes. Applicants who set up their USAJOBS account to provide email updates will receive an email notification with any change in status of their applications.
- Candidates referred and tentatively selected for ATCS positions will be randomly assigned to either the En Route or Terminal track. Prior ATCS experience will not be factored when determining track assignments.
- **Requirement for pre-employment medical clearance:** Applicants selected for ATCS positions must pass a medical examination that includes psychological screening prior to appointment. Applicants with prior military service are encouraged to obtain a sealed copy of their military medical records prior to discharge and to retain these records to be provided upon request if selected.
- **Requirement for security clearance:** This position requires an Access National Agency Check and Inquiry with Credit (ANACI) or higher prior to appointment unless a waiver is obtained.
- **Department of Transportation's Drug and Alcohol Testing Program:** This position is covered by the Department of Transportation's Drug and Alcohol Testing Program. Any applicant tentatively selected for this position will be subject to a pre-employment or pre-appointment drug screening. Persons occupying covered positions will be subject to random drug and/or alcohol testing.
- **Training Requirements:** After successful completion of Academy training, the ATCS will enter the appropriate phase of field training as determined by the assigned facility to prepare for advancement to the Certified Professional Controller (CPC) level. They must learn the skills needed for operation at higher levels of responsibility.
- Successful certification at assigned FAA facility is required. Failure to certify will result in separation, demotion or reassignment.
- **Requirement for nonstandard duty hours or work week:** Incumbent may be required to work irregular duty hours or a nonstandard work week or tour of duty.

This is not a bargaining unit position.

**Links to Important Information:** Locality Pay, COLA

## How You Will Be Evaluated

**IMPORTANT:** Applicants may be rated on the extent and quality of experience, education, and training relevant to the duties of the position(s). All answers provided in the on-line process must be substantiated. Ensure that your application package/resume supports your responses.

**Background checks and security clearance**

## Security clearance                                    **Drug test required**

Public Trust - Background Investigation
## REQUIRED DOCUMENTS
Applicants qualifying based on education, including Collegiate Training Initiative (CTI) must submit a copy of the official/unofficial transcripts to substantiate all credit hours and/or confer date. CTI applicants must also submit an appropriate recommendation letter or endorsement certifying the individual would have met the CTI requirements in effect as of December 31, 2013 for an appropriate recommendation.

Applicants who do not meet one of the waivers to maximum entry age to be considered in Pool 1, but have previous 2152 experience and are past the maximum entry age of 31, MUST provide a copy of a Notification of Personnel Action (SF-50) that verifies original appointment to the civilian 2152 occupational series prior to reaching the maximum entry age of 31. This would be the initial Notification of Personnel Action (SF-50/new-hire action into the 2152 series) received from your servicing Federal Human Resources office.

If you do not have a copy of your initial Notification of Personnel Action (SF-50/new-hire action into the 2152 series), you can request it through the National Personnel Records Center at the following link: http://www.archives.gov/st-louis/civilian-personnel/

Service Computation Dates (SCD's) cannot be used for maximum entry age verification purposes, as this could include prior military service and/or current or previous federal civilian service in another occupational series.

Facility rating records issued by the FAA or military issued ratings and/or training records must be provided, if qualifying based on specialized experience or one of the alternative requirements.

Applicants qualifying under VRA must provide either a DD Form 214 Certificate of Release or Discharge from Active Duty (Member 4 Copy or equivalent), OR a document from the armed forces certifying that within 120 days you are expected to be discharged or released from active duty.

**All Veterans:** If you are claiming veterans' preference, you must submit either a DD Form 214 Certificate of Release or Discharge from Active Duty (Member 4 Copy or equivalent), or a document from the armed forces certifying that within 120 days you are expected to be discharged or released from active duty service under honorable conditions. If you are claiming 10 point preference, you must also submit a completed SF-15, Application for 10-Point Veteran's Preference, and supporting documents outlined on the SF-15. Documents must be uploaded or faxed to the Servicing Human Resource Management Office listed in this announcement

and all documents must be received by the closing date of the announcement. If you fail to submit documentation, you will be assessed as a non-veteran.

If you are claiming 10 point preference but fail to submit the supporting documents outlined on the SF-15, you will be tentatively assessed as a 5 point preference eligible provided your DD Form 214 reflects that you have the service required to qualify for preference. Documents must be uploaded or faxed to the Servicing Human Resource Management Office listed in this announcement and all documents must be received by the closing date of the announcement. If you fail to submit documentation, you will be assessed as a non-veteran.

**Veterans currently on active duty claiming veterans' preference:** You will be granted tentative preference if you submit a document from the armed forces certifying that within 120 days you are expected to be discharged or released from active duty service under honorable conditions and your application shows that you have the required service. Prior to being appointed, you must provide to the Servicing Human Resource Management Office a DD Form 214 documenting discharge/release and showing that the service was honorable or general. If you are on terminal leave, you must provide documentation certifying authorized terminal leave.

## If you are relying on your education to meet qualification requirements:

Education must be accredited by an accrediting institution recognized by the U.S. Department of Education in order for it to be credited towards qualifications. Therefore, provide only the attendance and/or degrees from schools accredited by accrediting institutions recognized by the U.S. Department of Education(http://www.ed.gov/admins/finaid/accred/).

Failure to provide all of the required information as stated in this vacancy announcement may result in an ineligible rating or may affect the overall rating.

## Benefits

A career with the U.S. Government provides employees with a comprehensive benefits package. As a federal employee, you and your family will have access to a range of benefits that are designed to make your federal career very rewarding.

- Benefits for federal employees
  (https://www.usa.gov/benefits-for-federal-employees#item-36407)
- Healthcare insurance
  (https://www.opm.gov/healthcare-insurance/)
- Pay and leave
  (https://www.usajobs.gov/Help/working-in-government/pay-and-leave/)

http://www.faa.gov/jobs/working_here/benefits/

Eligibility for benefits depends on the type of position you hold and whether your position is full-time, part-time, or intermittent. Contact the hiring agency for more information on the specific benefits offered.

## How to Apply

You must apply online to receive consideration. Your application must have a status of **"Received"** by 11:59 PM **Eastern Time** on the Close Date for it to be accepted. If you are applying for positions associated with FAA registers, your application must have a status of **"Received"** each time a referral list is created in order to receive consideration for positions associated with register.

**IN DESCRIBING YOUR WORK EXPERIENCE AND/OR EDUCATION, PLEASE BE CLEAR AND SPECIFIC REGARDING YOUR EXPERIENCE OR EDUCATION.**
**We strongly encourage applicants to utilize the USAJOBS resume builder in the creation of resumes.**
**Please ensure EACH work history includes ALL of the following information:**

- Job Title (include series and grade if Federal Job)
- Duties (be specific in describing your duties)
- Employer's name and address
- Supervisor name and phone number
- Start and end dates including month, day and year (e.g. June 18 2007 to April 05 2008)
- Full-time or part-time status (include hours worked per week)
- Salary

**Determining length of General or Specialized Experience is dependent on the above information and failure to provide ALL of this information may result in a finding of ineligible.**

You may upload completed documents to your USAJOBS Account. This will provide you the opportunity to utilize the uploaded information again when applying for future vacancies. Please see this guide, Document Upload Guide, for more information on uploading and re-using the documents in your applications.

**Forms:**

- SF-15 : Application for 10-Point Veteran Preference

## Agency contact information

**Aviation Careers**

**Phone**

(405) 954-4657

**Fax**

(405) 954-5766

**Email**

aviation.careers@faa.gov

**Address**

Federal Aviation Administration
Aviation Careers
6500 South Mac Arthur Blvd.
Oklahoma City, OK
73160
US

The Department of Transportation (DOT) is ranked #4 in the 2017 best places to work in the Federal Government!

Thanks to the work of the Federal Aviation Administration (FAA), over the past 50 years, aviation has become central to the way we live and do business, linking people from coast to coast and connecting America to the world. In fact, FAA has created the safest, most reliable, most efficient, and most productive air transportation system in the world.

**Visit our careers page**

Learn more about what it's like to work at Federal Aviation Administration, what the agency does, and about the types of careers this agency offers.
http://www.faa.gov/jobs/

**Next steps**

Candidates for FAA positions are evaluated using our Automated Vacancy Information Access Tool for Online Referral (AVIATOR) system. AVIATOR compares your skills and experience as described in your application with the requirements of the position. If you are found to be an eligible, highly-qualified candidate, you will be referred to the selecting official for further consideration. (In some cases, individuals with priority for special consideration must be considered and selected before other candidates.) Whether or not you are contacted for an interview depends upon the location of the position and the judgment of the selecting official.

**Important** - If you make any change to your application, you must resubmit it. If you change your application and do not resubmit it, your changes will not be considered part of your application package, and your previous application will be considered.

# Fair & Transparent

The Federal hiring process is setup to be fair and transparent. Please read the following guidance.

**Equal Employment Opportunity Policy**

The United States Government does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy And gender identity), national origin, political affiliation, sexual orientation, marital status, disability, genetic information, age, membership in an employee organization, retaliation, parental status, military service, or other non-merit factor.

- Equal Employment Opportunity (EEO) office at OPM (https://www.opm.gov/about-us/our-people-organization/support-functions/equal-employment-opportunity/)
- Office of Equal Opportunity (http://www.eeoc.gov/eeoc/internal_eeo/index.cfm)

**Reasonable Accommodation Policy**

Federal agencies must provide reasonable accommodation to applicants with disabilities where appropriate. Applicants requiring reasonable accommodation for any part of the application process should follow the instructions in the job opportunity announcement. For any part of the remaining hiring process, applicants should contact the hiring agency directly. Determinations on requests for reasonable accommodation will be made on a case-by-case basis.

A reasonable accommodation is any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability. Under the Rehabilitation Act of 1973 the Equal Employment Opportunity Commission (EEOC) must provide reasonable accommodations:

• An applicant with a disability needs an accommodation to have an equal opportunity to apply for a job.

• An employee with a disability needs an accommodation to perform the essential job duties or to gain access to the workplace.

• An employee with a disability needs an accommodation to receive equal access to benefits, such as details, training, and office-sponsored events.

• Disability Employment - Reasonable Accommodations (https://www.opm.gov/policy-data-oversight/disability-employment/reasonable-accommodations/)

• How to contact an agency (https://www.uat.usajobs.gov//Help/how-to/application/agency/contact/)

**Legal and regulatory guidance**

Financial suitability (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/financial-suitability/)

Privacy Act (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/privacy-act/)

Selective Service (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/selective-service/)

Social security number request (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/social-security-number/)

Signature & False statements (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/signature-false-statements/)

New employee probationary period (https://www.uat.usajobs.gov//Help/working-in-government/fair-and-transparent/probationary-period/)

**EXHIBIT K**

# FAQs

## Preliminary Questions:

**Is the CTI program a guarantee of an Air Traffic Control Specialist position with the FAA?**

No.  Graduating from the CTI program will provide you the opportunity to apply to an Air Traffic Control Specialist (ATCS) CTI-specific announcement.  These announcements are available to graduates who fulfill all of the ATCS CTI program requirements.

**What CTI school do you recommend?**

The FAA cannot endorse any one CTI school.  Please refer to the FAA website to obtain the listing of CTI schools and contact the individual schools for additional information and determine which program would best suit your needs.

**Is there an advantage to the Bachelor's degree versus the Associates degree offered at the FAA-approved CTI institution?**

No.  The FAA has approved all of the specified programs and views them equally in terms of meeting eligibility requirements.

**Am I financially responsible for the CTI schooling and is there any financial aid?**

Yes.  The FAA is not responsible for your tuition or any financial obligation to the CTI institution.

**How long is the process from the time I graduate to the time I get a class at the academy?**

There is not a specified time line between graduation and employment.

## AT-SAT Questions:

**Does the examinee have to pay to take the AT-SAT exam?**

No.  The FAA will fund the exam.

**Does the examinee need to be a U.S. citizen to take the AT-SAT exam?**

Yes, no exceptions are allowed.

FAA_00007848

**How will I be notified of the testing time and location for the AT-SAT?**

At this time, the testing contractor will send an e-mail to the e-mail address that the CTI institution provides our office approximately two weeks prior to the test date.

**Where will the AT-SAT be administered?**

At this time, the testing contractor schedules the exam near the CTI institution.  If a school does not identify enough students to take the test, then the test site might be merged with another school in the same region.

**Can I extend my AT-SAT score?**

No.  The AT-SAT score expires three years after graduation, if the test was taken before graduation, or three years from the date of test, if the test was taken after graduation.  No extensions are offered for AT-SAT.  Yes, this means that there may be a time period where there is a lapse between having a valid AT-SAT score.

**If I have a passing score, can I retake the exam to better my score?**

No.  The only time an individual can retake the AT-SAT before the three-year expiration date, is if the individual failed.  The examinee can retake the exam 12 months from the last test date.  If the examinee fails the test twice, then they are no longer eligible to retake the exam.

**What if I fail the AT-SAT?**

Please refer to the question above.

**How will I know when my eligibility or AT-SAT expires?**

The onus is on the graduate to maintain contact with Aviation Careers to ensure eligibility and AT-SAT is as up-to-date as possible.

Eligibility expires 3 years from graduation and then the graduate must submit an extension request that can extend eligibility for one year.  The extension can only be approved if the AT-SAT score has not yet expired.

## Recommendation/Application Questions:

**When will I receive my job code?**

If you were recently recommended from the school and have a passing AT-SAT score on file, then the job code will be e-mailed to you once there is an Air Traffic Control Specialist – CTI

FAA_00007849

vacancy announcement is available through USAJobs.gov.  Typically, announcements are posted prior to a centralized selection panel.

**Do you know when the next announcement will become available?**

No, the ATO has not determined when the next announcement will become available. Please continue to monitor USAJobs for any new job postings.

If you have previously graduated and have a valid AT-SAT score on file, the job code will be emailed to you as soon as the next announcement is available.

**I (or the school) has sent my transcript to Aviation Careers, will it automatically be uploaded into my application on USAJobs.gov?**

It depends on when the transcripts were sent.  If the transcripts are sent during an open announcement, then it will be uploaded if an application has been submitted.  If there is no open announcement available, then the transcripts are filed and the graduate is responsible for contacting our office to ensure that the transcripts have been received and is uploaded to the application at the time an announcement is open.

**Do the transcripts need to be official or are unofficial transcripts acceptable?**

At this time both official and unofficial transcripts are accepted; however, all applicants must read the vacancy announcement that they are applying to, to ensure that they are supplying the appropriate supporting document.  If the unofficial copy of the transcript is supplied at the time of application, then the official transcript will be required prior to appointment.

**Will I have to reapply every time there is a new announcement?**

Yes.  Aviation Careers will try to contact everyone who had applied to the previous announcement; however, it is the responsibility of the CTI graduate to monitor USAJobs.gov for any new CTI vacancy announcements.

**Can I get a copy of my recommendation letter from the school?**

The recommendation received from the school is not in a letter format.  Our office receives the recommendations, typically, with more than one individual on the list.  Due to privacy reasons, we are unable to release that information to the graduates.

FAA_00007850

**Employment Questions:**

**Is there a waiver for the age 31 maximum entry age requirement?**

No.  The only individuals who are eligible to apply after the age of 31 are those who have been previously appointed as a 2152 with the DOD or FAA before they turned 31.  One caveat, their previous appointment could not have been through the CTI hiring authority.  The CTI hiring authority is a one-time appointment authority.

**Can I be rehired through the CTI announcement, if I have already been hired once?**

No.  The CTI hiring authority is a one-time hiring opportunity.  If you have been appointed to a 2152 series position through a CTI announcement, you cannot reapply through the same hiring authority (even if you meet the CTI requirements at another CTI institution).

**Can I choose where I want to work?**

Currently, the CTI vacancy announcement allows for two geographic preferences (states).  However, it is at the discretion of the ATO where within those two states placement will be made.

FAA_00007851



# Extension Requests

Extension requests are submitted when a graduate exceeds their initial three-year eligibility period. The graduate can submit the request up to 60 days prior to the eligibility expiring.

The requirements to approve an extension request are:

1) Passing, unexpired AT-SAT score on file
   a. If the score is due to expire soon and the individual is on the next available AT-SAT test list, then approve the form after the new, passing score is received from the testing contractor.
2) Have not exceeded the maximum age 31 requirement
   a. Exception: If they were previously appointed as a 2152 before the age of 31 with the DOD or FAA through another hiring source, they can still be eligible for an extension.
3) Have not been previously appointed through a CTI announcement

Extension requests can be e-mailed to the graduate at any time, however, we can not approve the extension request until they are either within 60 days of the eligibility expiration date or a passing AT-SAT score is on file.

When the extension requests are received, a notation must be made in the CTI database, noting the receipt of the document in the "extension comments" data field and what is needed prior to approving.

Extensions can be approved annually until the graduate either turns 31 or is hired.

Once approved/not approved, the extension request must be filed in the filing cabinet in Amanda's cubicle.

**EXHIBIT M**

| | |
|---|---|
| **From:** | Amanda Quezada <Amanda.Quezada@faa.gov> |
| **Sent:** | Monday, March 25, 2013 9:24 AM |
| **To:** | ███████████ |
| **Cc:** | Bruhwiler, Beau (FAA) |
| **Subject:** | Re: Fw: Extension Request |
| **Attachments:** | EXT - REQUEST.doc |

Good Morning ████

I have attached the extension request form to this e-mail, however, we are not able to accept/approve the form until you are within 60 days of your current eligibility expiring, which is 6/11/2013. I have CC'd my back-up, Beau Bruhwiler, who you can send the extension request to at that time. I will be out of the office until mid-May.



At this time, the scheduled centralized selection panel for March has been post-poned indefinitely due to sequestration. I do not know when the next panel will be, nor when the next CTI announcement will become available. I know that this is not information that you would like to hear but its the only information that I have to provide at this time.

Respectfully,

Amanda Quezada
Human Resource Specialist – CTI Program
Aviation Careers, AMH-300
FAA, Mike Monroney Aeronautical Center
Amanda.quezada@faa.gov
Phone: 405-954-5702
Fax: 405-954-5766

Click here to provide feedback on my service

─────────────────────────────────────────────

████████---03/19/2013 03:23:43 PM---Amanda, Can you let me know when I need to submit another eligibility form to you?

From: ████████████████████
AMH-300, Aviation Careers Division
To: Amanda Quezada/AMC/FAA@FAA,
Date: 03/19/2013 03:23 PM
Subject: Re: Fw: Extension Request

Amanda,

Can you let me know when I need to submit another eligibility form to you? Also, I am not sure if you can provide me with any informatin on this, but the majority of my classmates have all been picked up by some location throughout the country. I am trying to patiently wait, but there seem to be no opportunuties opening up

1

Confidential - Subject to Protective Order

for me. Do you now if there is anything I can do to increase my chances of being called for an interview?

Thanks!

███████████

On Wed, Jun 27, 2012 at 9:05 PM, ████████████████████████████████████ wrote:

Amanda,

Sorry for my delay in responding. I have been moving.

I have attached the enrollment form for you. Please let me know if you have any questions.

Thank you,

███████████

On Mon, Jun 11, 2012 at 9:30 AM, < Amanda.Quezada@faa.gov > wrote:

Hi ████

I am in the process of approving eligibility extensions. Can you please send me another signed extension request with a sooner date? FAA policy requires that the extension is not received more than 60 days prior to the expiration date. I apologize for the repeated request.

Respectfully,


Amanda Quezada
Human Resource Specialist – CTI Program
Aviation Careers, AMH-300
FAA, Mike Monroney Aeronautical Center
Amanda.quezada@faa.gov
Phone: 405-954-5702
Fax: 405-954-5766


Click here to provide feedback on my service

----- Forwarded by Amanda Quezada/AMC/FAA on 06/11/2012 09:28 AM -----

| | |
|---|---|
| From: | Amanda Quezada/AMC/FAA |
| | AMH-300, Aviation Careers Division |
| To: | ████████████████ |
| Date: | 01/06/2012 12:36 PM |
| Subject: | Extension Request |




Hi ████

Per our conversation, please fill out the attached form to extend your eligibility.

2

FAA_00011056

Respectfully,

Amanda Quezada
Human Resource Specialist
Aviation Careers Division-AT-CTI
Phone: 405-954-5702
Fax: 405-954-5766

Confidential - Subject to Protective Order

FAA_00011057

**REQUEST FOR**
**AIR TRAFFIC COLLEGIATE TRAINING INITIATIVE**
**(AT-CTI) EXTENSION**

Name: _____

Last four of SSN: _____

School: _____

In order to request an extension of AT-CTI eligibility, I understand that I must meet all of the following conditions:

- Previously been identified by AT-CTI school as enrolled in the AT-CTI program
- Graduated and received AT-CTI school recommendation
- Passed AT-SAT pre-employment test
- Be under the maximum entry age of 31

In addition, I understand that:

- If I do not have a valid AT-SAT score, I must retest and receive a passing score of 70 or higher before an extension will be authorized
- Upon passing AT-SAT, my eligibility will be extended in the AT-CTI program for one additional year from my AT-SAT test date
- I may be required to take some or all of the FAA Academy Air Traffic Training program
- After my extension for eligibility expires, I must reapply and meet the eligibility requirements shown above
- I am not guaranteed a position

My signature below acknowledges the above information and I hereby request an extension of my AT-CTI eligibility.

_____     _____
　　　　　Signature                                    Date

_____

**Applicants must complete and return this form to AMH-300 using one of the following methods:**

- **Fax to 405-954-5766**
- **E-mail to 9-amc-amh-cti@faa.gov**
- **Regular mail to:**
  **Aviation Careers Division/AMH-300**
  **P.O. Box 25082**
  **Oklahoma City, OK 73125**



**Federal Aviation Administration**

*Federal Aviation Administration (FAA)*

# Annual EEO Program Status Report

## Fiscal Year

# 2007

Prepared by FAA Civil Rights
2007

## EEOC Forms and Documents Included in this Report

- EEOC (Form 715-01 Part A-D)                                      Tab1

- FAA Executive Summary (Form 715-01 Part E)        Tab 2

- FAA Statement of Establishment of Continuing
  EEO Programs (Form 715-01 Part F)                         Tab 3

- FAA Policy Statements                                             Tab 4

- FAA Annual Self-Assessment Checklist of
  Essential Elements (Form 715-01 Part G)                Tab 5

- FAA EEO Plan to obtain the Essential Elements
  of a Model EEO Program (Form 715-01 Part H)      Tab 6

- FAA EEO Plan to Eliminate Identified Barrier
  (Form 715-01 Part I)                                                 Tab 7

- FAA Special Program Plan for Recruitment,
  Hiring, and Advancement of Individuals with Targeted
  Disabilities for Agencies with 1000 or more
  Employees (Form 715-01 Part J)                              Tab 8

- FAA Workforce Data Tables ("A" Tables)                 Tab 9

- FAA Disability Workforce Data Tables ("B" Tables)    Tab 10

- FAA 462 Report                                                        Tab 11

- FAA Facility Accessibility Survey                             Tab 12

- FAA Organization Chart                                           Tab 13

| EEOC FORM 715-01 PART A - D | *U.S. Equal Employment Opportunity Commission* **FEDERAL AGENCY ANNUAL EEO PROGRAM STATUS REPORT** |
|---|---|

| **For period covering October 1, <u>2006</u>, to September 30, <u>2007.</u>** | | |
|---|---|---|
| **PART A** Department or Agency Identifying Information | **1. Agency** | **1. Federal Aviation Administration (FAA)** |
| | 1.a. 2nd level reporting component | NONE |
| | 1.b. 3rd level reporting component | NONE |
| | 1.c. 4th level reporting component | NONE |
| | **2. Address** | **2. 800 Independence Avenue SW** |
| | **3.** City, State, Zip Code | **3. Washington, DC 20591** |
| | **4.** CPDF Code   **5.** FIPS code(s) | **4. TD-03**       5. 110010001 |

| **PART B** Total Employment | **1.** Enter total number of permanent full-time and part-time employees | **1.** 44,428 |
|---|---|---|
| | **2.** Enter total number of temporary employees | **2.** 986 |
| | **3.** Enter total number employees paid from non-appropriated funds | **3.** –0– |
| | **4. TOTAL EMPLOYMENT [add lines B 1 through 3]** | **4.** 45,414 |

| **PART C** Agency Official(s) Responsible For Oversight of EEO Program(s) | 1. Head of Agency Official Title | **1. Robert A. Sturgell Acting Administrator** |
|---|---|---|
| | 2. Agency Head Designee | **2. Fanny Rivera** |
| | 3. Principal EEO Director/Official Official Title/series/grade | **3. Fanny Rivera Assistant Administrator, Office of Civil Rights, FV/301/SES** |
| | 4. Title VII Affirmative EEO Program Official | **4. Fanny Rivera** |
| | 5. Section 501 Affirmative Action Program Official | **5. John Benison** |
| | 6. Complaint Processing Program Manager | **6. Harnetta Williams** |
| | 7. Other Responsible EEO Staff | **7a.** |
| | | **7b.** |
| | | |

1

| EEOC FORM 715-01 PART A - D | U.S. Equal Employment Opportunity Commission FEDERAL AGENCY ANNUAL EEO PROGRAM STATUS REPORT | | |
|---|---|---|---|
| **PART D** List of Subordinate Components Covered in This Report | **Subordinate Component and Location (City/State)** | | **CPDF and FIPS codes** |
| | Not Applicable | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| EEOC FORMS and Documents Included With This Report | | | |
|---|---|---|---|
| *Executive Summary [FORM 715-01 PART E], that includes: **TAB B** | X | *Optional Annual Self-Assessment Checklist Against Essential Elements [FORM 715-01 PART G] **TAB E** | X |
| Brief paragraph describing the agency's mission and mission-related functions | X | *EEO Plan To Attain the Essential Elements of a Model EEO Program [FORM 715-01 PART H] for each programmatic essential element requiring improvement **TAB F** | X |
| Summary of results of agency's annual self-assessment against MD-715 "Essential Elements" | X | *EEO Plan To Eliminate Identified Barrier [FORM 715-01 PART I] for each identified barrier **TAB G** | X |
| Summary of Analysis of Work Force Profiles including net change analysis and comparison to RCLF | X | *Special Program Plan for the Recruitment, Hiring, and Advancement of Individuals With Targeted Disabilities for agencies with 1,000 or more employees [FORM 715-01 PART J] **TAB H** | X |
| Summary of EEO Plan objectives planned to eliminate identified barriers or correct program deficiencies | X | *Copy of Workforce Data Tables as necessary to support Executive Summary and/or EEO Plans **TABS I & J** | X |
| Summary of EEO Plan action items implemented or accomplished | X | *Copy of data from 462 Report as necessary to support action items related to Complaint Processing Program deficiencies, ADR effectiveness, or other compliance issues **TAB K** | X |
| *Statement of Establishment of Continuing Equal Employment Opportunity Programs [FORM 715-01 PART F] **TAB C** | X | *Copy of Facility Accessability Survey results as necessary to support EEO Action Plan for building renovation projects **TAB L** | X |
| *Copies of relevant EEO Policy Statement(s) and/or excerpts from revisions made to EEO Policy Statements **TAB D** | X | *Organizational Chart **TAB M** | X |

2

| EEOC FORM<br>715-01<br>PART E | *U.S. Equal Employment Opportunity Commission*<br>**FEDERAL AGENCY ANNUAL**<br>**EEO PROGRAM STATUS REPORT** |
|---|---|
| Federal Aviation Administration (FAA) | For period covering October 1, 2006 to September 30, 2007. |
| **EXECUTIVE SUMMARY** ||

### Mission and Mission Related Functions

The Federal Aviation Administration's (FAA's) mission is to provide the safest, most efficient aviation system in the world. To ensure the success of this mission, the FAA is committed to achieving organizational excellence in managing its human resources.

### Results of Agency's Annual Self-Assessment

- Under Essential Element A, Demonstrated Leadership Commitment, the EEO policy statements are communicated to all employees and vigorously enforced. Policy statements are also provided to all new employees in the employee orientation package. The FAA also will continue to make written materials available to employees and applicants on the variety of EEO programs. Supervisors and managers performance standards will be revised so that they are evaluated on their commitment to EEO principles and policies. In addition, all supervisors and managers are briefed on proper ethics, which includes a reminder of the Conduct and Discipline penalties related to EEO matters.

- For Essential Element B, Integration of EEO into the Agency's Strategic Mission, FAA's reporting structure provides its Principal EEO Official with the authority to be effective and to inform the Administrator and senior managers regularly on EEO matters. FAA also established a process by which to review personnel policies, procedures and practices at regular intervals to assess if there are any barriers to equal employment opportunity. FAA will focus on improving collaboration between its EEO and Human Resource functions, especially in the areas of data collection. FAA will continue to monitor its compliance with the Uniform Federal Accessibility Standards (UFAS) at its facilities. In addition, FAA will develop a schedule to bring noncompliant facilities into compliance with UFAS.

- Under Essential Element C, Management and Program Accountability, FAA will develop timetables to review its Merit Promotion Program Policy and Procedures, Employee Recognition Awards Program and Procedures, and Employee Development/Training Programs for any systemic barriers.

- Under Essential Element D, Proactive Prevention of Unlawful Discrimination, FAA continues to evaluate whether there are barriers that may be impeding the realization of EEO. A process in accordance with the requirements of MD 715 will be developed to conduct trend analysis of the workforce's major occupations by race, national origin, sex and disability.

- Essential Element E, Efficiency, the FAA has conducted twelve facility audits in an effort to achieve a model EEO program and eliminate discrimination under Title VII and the Rehabilitation Act. FAA has identified full-time dedicated EEO counselors. Since the implementation of the dedicated EEO counselors, FAA has accomplished 100% of counseling cases within the established 30 days timeframe, except for those cases where the employee engaged in Alternative Dispute Resolution or agreed to an extension. FAA will establish a process to help ensure timely compliance with reasonable accommodation requests. In addition, FAA will track recruitment efforts and analyze the efforts for any potential barriers.

- Lastly, FAA was compliant with regard to Responsiveness and Legal Compliance, Essential Element F. FAA will establish a process to ensure compliance with all EEOC orders, completing actions and reporting requirements.

3

**Workforce Profiles**

In the beginning of FY-2007, the FAA employed 44,886 workers compared with 45,414 workers at the end of FY-2007. In FY-2007 the agency separated 2,684 employees to attrition. For the same timeframe, FAA hired a total of 3,789 employees in permanent and temporary positions. The agency experienced an increase of 528 employees or a net rate of change of 1.18%.

Among the FAA workforce, the following ethnic/gender groups are above the Civilian Labor Force (CLF) participation rates: White males, Black males, Asian males, Native Hawaiian or Other Pacific Islander males, and American Indian or Alaska Native males and females. The following ethnic/gender groups are lower than the expected CLF participation rates: Hispanic males and females, White females, Black females, Asian females, and Native Hawaiian or Other Pacific Islander females.

During FY-2007, the number of FAA employees reporting targeted disabilities increased by 14 or a net rate of change of 7.5%. During, FY-2008, FAA will host a National People with Targeted Disabilities Conference sponsored by the FAA Office of Civil Rights. In addition, FAA will partner with disability employment associations to create a network for announcing FAA job opportunities to the disability community.

**EEO Plan Activities to Eliminate Identified Barriers or Correct Program Deficiencies**

FAA identified fifteen program deficiencies in its Self-Assessment. Objectives have been developed (Part H) to address these deficiencies. Managers/Supervisors Performance Standards will be revised so that their evaluation includes commitment to agency EEO policies and principles. FAA will focus on improving collaboration between its EEO and Human Resource functions, especially in the area of data collection. A schedule will be developed for completing renovation projects at facilities that have been found not to be in compliance with UFAS. In addition, a process will be put in place to help ensure timely processing of reasonable accommodation requests.

Several Barrier Statements were identified in Part I focusing on recruitment and selection of Aviation Safety Inspectors (1825s) and Air Traffic Controllers (2152s) to determine if existing policies, procedures, and practices may be a barrier.  In addition, goals have been set using Part J regarding People with Targeted Disabilities in an effort to meet or exceed the 3% hiring goal.

**EEO Plan Action Items Implemented or Accomplishments**

During the past fiscal year, FAA has implemented a number of initiatives at the corporate level to move the agency forward in achieving a Model EEO program, as required by MD 715.

With regard to the EEO Complaint Program, FAA established a cadre of six full-time, dedicated EEO Counselors to conduct all counseling nationwide.  This cadre replaced the collateral duty counselors who had been volunteered from the different FAA organizations.  Since the full-time cadre was established, FAA has not had any EEO counseling sessions extend beyond the 30 days, without an agreed upon extension.   The FAA Administrator signed a letter to all managers encouraging the use of Alternative Dispute Resolution, as a mechanism for resolving EEO complaints.  FAA also established department wide EEO object codes to monitor financial costs incurred as a result of EEO complaints.  On August 20, 2007, the Administrator expanded the availability of the Center for Early Dispute Resolution Pilot Program to the Aeronautical Center and the geographic area covered by the Air Traffic Organization's Eastern Service Area, which is comprised of the U.S. east coast, to ensure early resolution of work place issues.

FAA is hiring approximately 1,000 air traffic controllers each year for the next ten years.  As such, FAA has stepped up its efforts with regard to outreach.  FAA attended over **70** career fairs and other outreach events to cultivate relationships and form partnerships with colleges and universities, as well as organizations that assist the public in seeking employment. Air Traffic, Civil Rights and Human Resources have established additional positions to lead the recruitment effort and are tracking the applicant pool.  For example, the FAA Assistant Administrator for Civil Rights chairs the DOT Hispanic Leadership Council, which, in part, led to FAA partnering with the Veterans Administration and the League of United Latin American Citizens on their Community Partnership Program to recruit veterans.

During FY 2007 the FAA Office of Civil Rights Selected John Benison to serve as the Manager of its Equal Employment Opportunity Consulting Group (ACR-6).  The FAA National People with Disabilities Program is part of ACR-6.  Mr. Benison is recognized as a National expert on the employment, retention, and accommodation of individuals with disabilities.  Prior to joining FAA, Mr. Benison served as a Senior Advisor on disability matters in the Office of the Secretary at the Department of Transportation (DOT).

The FAA continues to conduct UFAS/Section 504 Facility Accessibility Surveys throughout its facilities. The Facilities Accessibility Program Office conducted 94 surveys in FY 2007.

The FAA conducted twelve nationwide facility audits to ensure EEO requirements are being met. The audits involved the major Lines of Business and Staff Offices.

Executive Summary

| EEOC FORM 715-01 PART F | *U.S. Equal Employment Opportunity Commission* FEDERAL AGENCY ANNUAL EEO PROGRAM STATUS REPORT |
|---|---|

### CERTIFICATION of ESTABLISHMENT of CONTINUING EQUAL EMPLOYMENT OPPORTUNITY PROGRAMS

I,                                  Fanny Rivera, Assistant Administrator for Civil Rights,    am the
                                    FV/301/SES

Principal EEO Director/Official for        Federal Aviation Administration

The agency has conducted an annual self-assessment of Section 717 and Section 501 programs against the essential elements as prescribed by EEO MD-715. If an essential element was not fully compliant with the standards of EEO MD-715, a further evaluation was conducted and, as appropriate, EEO Plans for Attaining the Essential Elements of a Model EEO Program, are included with this Federal Agency Annual EEO Program Status Report.

The agency has also analyzed its work force profiles and conducted barrier analyses aimed at detecting whether any management or personnel policy, procedure or practice is operating to disadvantage any group based on race, national origin, gender or disability. EEO Plans to Eliminate Identified Barriers, as appropriate, are included with this Federal Agency Annual EEO Program Status Report.

I certify that proper documentation of this assessment is in place and is being maintained for EEOC review upon request.

Signature of Principal EEO Director/Official
Certifies that this Federal Agency Annual EEO Program Status Report is in compliance with EEO MD-715.

*Fanny Rivera*                                                       Date    3/18/08

Signature of Agency Head or Agency Head Designee

*Ruth Leverenz*                                                     Date    3/27/08

6

Note: This page has been replaced by pages 61-68.

| EEOC FORM 715-01 PART I | *U.S. Equal Employment Opportunity Commission* FEDERAL AGENCY ANNUAL EEO PROGRAM STATUS REPORT |
|---|---|
| **FAA, Human Resource Management (AHR), Office of Civil Rights (ACR), and Air Traffic Organization (ATO)** | **FY 2007 - Closed** |
| **STATEMENT OF CONDITION THAT WAS A TRIGGER FOR A POTENTIAL BARRIER:** <br><br> Provide a brief narrative describing the condition at issue. <br><br> How was the condition recognized as a potential barrier? | **Low Participation for Job Series 2152** <br> Job series 2152, Air Traffic Controller, has a lower than expected participation rate for several ethnic and gender categories. |
| **BARRIER ANALYSIS:** <br><br> Provide a description of the steps taken and data analyzed to determine cause of the condition. | 1. Analyzing the MD-715 Workforce Table A6, there is a lower than expected participation rate in the White Female, Hispanic Female, Black Male and Female, and Asian Male and Female categories. <br> 2. Analyzing the 2152 New Hires for FY 06 Q1-Q3, the participation rate for the ethnic groups has increased. <br> 3. While final applicant pool data is available, because the 2152 application process is complex there is a need for greater analysis at the different stages of the application process. |
| **STATEMENT OF IDENTIFIED BARRIER:** <br><br> Provide a succinct statement of the agency policy, procedure or practice that has been determined to be the barrier of the undesired condition. | FAA has not been collecting data to determine where applicants for the Air Traffic Controller occupation are failing in the recruitment and hiring process (e.g. recruiting, testing, medical exams, applications, security, etc.).* |
| **OBJECTIVE:** <br><br> State the alternative or revised agency policy, procedure or practice to be implemented to correct the undesired condition. | Establish a process for the systematic collection of applicant pool data by race, national origin and disability for job series 2152 in the various stages of the pre-employment process, and to use the data to analyze 2152 data for FY 2007 MD-715. |
| **RESPONSIBLE OFFICIAL:** | **Assistant Administrators for Human Resource Management and Civil Rights and ATO Director, Workforce Services** |
| **DATE OBJECTIVE INITIATED:** | **September 1, 2006** |
| **TARGET DATE FOR COMPLETION OF OBJECTIVE:** | **October 30, 2007** |

| EEOC FORM 715-01 PART I | EEO Plan To Eliminate Identified Barrier |
|---|---|

| PLANNED ACTIVITIES TOWARD COMPLETION OF OBJECTIVE:<br><br>**FAA, AHR, ACR, and ATO** | **TARGET DATE**<br>(Must be specific) |
|---|---|
| 1. AHR and ACR will collaborate to determine what fields should be collected for the various stages of the application process in consultation with ATO Workforce Services. | September 1, 2006<br>(Not completed) |
| 2. Finalize collection method and data to be analyzed. | January 31, 2007<br>(Not completed) |
| 3. Implement the collection process in the 2152 application process. | March 30, 2007<br>(Not completed) |
| 4. Receive quarterly update on data collection and data gathered. | June 15, 2007<br>(Not completed) |
| 5. Compile data into an annual report for use in FY 2007 MD-715. | October 30, 2007<br>See below. |

**REPORT OF ACCOMPLISHMENTS and MODIFICATIONS TO OBJECTIVE**

**FY 2007**

During FY 2007, ACR expanded its staff to include an Outreach Specialist and AHR expanded its outreach effort to a team. The major focus during FY 2007 was conducting outreach to diverse candidate pools for Air Traffic Controller (2152) positions. The major recruiting effort diverted focus from the objective to establish the tracking system.

**FY 2006**

**November 2006**

**Activity #1:** ACR has collaborated with AHR, in consultation with ATO, in determining that at several specific stages (Job Fairs, AT-SAT tests, Academy Entrance and Graduation, New Hires), RNO, Gender, and Disability data should be collected. A tentative data collection spreadsheet was produced.

**Activity #2:** The collection spreadsheet was finalized and the data collection process was initialized.

\* FAA has data for certain 2152 applicant sources but not all; therefore it is not possible to state definitively that the applicant there is lower than expected participation in all of the applicant pools.

**NEW – FY 2008**

| EEOC FORM 715-01 PART I | U.S. Equal Employment Opportunity Commission<br>FEDERAL AGENCY ANNUAL<br>EEO PROGRAM STATUS REPORT |
|---|---|
| **FAA, Air Traffic Organization (ATO)** | **FY 2007** |
| **STATEMENT OF CONDITION THAT WAS A TRIGGER FOR A POTENTIAL BARRIER:**<br><br>Provide a brief narrative describing the condition at issue.<br><br>How was the condition recognized as a potential barrier? | **Low Participation for Asian Females**<br>Job series 2152, Air Traffic Controller, has a lower than expected participation rate for Asian females. |
| **BARRIER ANALYSIS:**<br><br>Provide a description of the steps taken and data analyzed to determine cause of the condition. | 1. In FY '07, the FAA Asian female workforce participation rate for 2152s is .28%, which is lower than the expected Asian female RCLF rate of 0.43%.<br>2. In FY '07, there were 628 Asian female 2152 applicants or 0.60% (total applicants, 105,242), which is higher than the expected Asian female RCLF rate of 0.43%.<br>3. In FY '07 there were 5 Asian females selected or 0.63% (total selectees: 793), which is higher than the expected Asian female RCLF rate of 0.43%. |
| **STATEMENT OF IDENTIFIED BARRIER:**<br><br>Provide a succinct statement of the agency policy, procedure or practice that has been determined to be the barrier of the undesired condition. | Current recruitment and selection procedures may be a barrier to equal employment for Asian females. |
| **OBJECTIVE:**<br><br>State the alternative or revised agency policy, procedure or practice to be implemented to correct the undesired condition. | If any barriers are identified in the 2152 job series for Asian females, every appropriate effort will be made to eliminate such barriers. |
| **RESPONSIBLE OFFICIAL:** | **ATO Director, Workforce Development** |
| **DATE OBJECTIVE INITIATED:** | **November 30, 2007** |
| **TARGET DATE FOR COMPLETION OF OBJECTIVE:** | **September 30, 2008** |

| EEOC FORM 715-01 PART I | EEO Plan To Eliminate Identified Barrier |
|---|---|
| **PLANNED ACTIVITIES TOWARD COMPLETION OF OBJECTIVE:**<br><br>**FAA, Air Traffic Organization (ATO)** | **TARGET DATE**<br>**(Must be specific)** |
| 1. AHR and ACR will collaborate determine what fields should be collected for the various stages of the application process in consultation with ATO Workforce Services. | September 30, 2008 |
| 2. Develop an action plan to implement collection process in the 2152 application process. | September 30, 2008 |
| 3. Implement FY'08 activities in the action plan. | September 30, 2008 |
| **REPORT OF ACCOMPLISHMENTS and MODIFICATIONS TO OBJECTIVE** | |

NEW – FY 2008

| EEOC FORM 715-01 PART I | *U.S. Equal Employment Opportunity Commission* **FEDERAL AGENCY ANNUAL EEO PROGRAM STATUS REPORT** |
|---|---|
| **FAA, Air Traffic Organization (ATO)** | **FY 2007** |
| **STATEMENT OF CONDITION THAT WAS A TRIGGER FOR A POTENTIAL BARRIER:**<br><br>Provide a brief narrative describing the condition at issue.<br><br>How was the condition recognized as a potential barrier? | **Low Participation for Black Males and Females**<br>Job series 2152, Air Traffic Controller, has a lower than expected participation rate for Black females and males. |
| **BARRIER ANALYSIS:**<br><br>Provide a description of the steps taken and data analyzed to determine cause of the condition. | 1. In FY '07, the FAA Black workforce participation rate for 2152s is 5.06% (3.96% male, 1.10% female), which is lower than the expected Black RCLF rate of 7.31% (5.37% male, 1.94% female).<br>2. In FY '07, there were 30,637 Black 2152 applicants or 29.11% (total applicants, 105,242), which is higher than the expected Black female RCLF rate of 7.3%.<br>3. In FY '07 there were 54 Blacks selected or 6.81% (total selectees: 793), which is lower than the expected Black RCLF rate of 7.31%. |
| **STATEMENT OF IDENTIFIED BARRIER:**<br><br>Provide a succinct statement of the agency policy, procedure or practice that has been determined to be the barrier of the undesired condition. | Current recruitment and selection procedures may be a barrier to equal employment for Blacks. |
| **OBJECTIVE:**<br><br>State the alternative or revised agency policy, procedure or practice to be implemented to correct the undesired condition. | If any barriers are identified in the 2152 job series for Blacks, every appropriate effort will be made to eliminate such barriers. |
| **RESPONSIBLE OFFICIAL:** | **ATO Director, Workforce Development** |
| **DATE OBJECTIVE INITIATED:** | **November 30, 2007** |
| **TARGET DATE FOR COMPLETION OF OBJECTIVE:** | **September 30, 2008** |

| EEOC FORM 715-01 PART I | EEO Plan To Eliminate Identified Barrier |
|---|---|
| **PLANNED ACTIVITIES TOWARD COMPLETION OF OBJECTIVE:**<br><br>**FAA, Air Traffic Organization (ATO)** | **TARGET DATE**<br>**(Must be specific)** |
| 1. AHR and ACR will collaborate determine what fields should be collected for the various stages of the application process in consultation with ATO Workforce Services. | September 30, 2008 |
| 2. Develop an action plan to implement collection process in the 2152 application process. | September 30, 2008 |
| 3. Implement FY'08 activities in the action plan. | September 30, 2008 |
| **REPORT OF ACCOMPLISHMENTS and MODIFICATIONS TO OBJECTIVE** | |

NEW – FY 2008

| EEOC FORM<br>715-01<br>PART I | *U.S. Equal Employment Opportunity Commission*<br>**FEDERAL AGENCY ANNUAL<br>EEO PROGRAM STATUS REPORT** |
|---|---|
| **FAA, Air Traffic Organization (ATO)** | **FY 2007** |
| **STATEMENT OF CONDITION THAT WAS A TRIGGER FOR A POTENTIAL BARRIER:**<br><br>Provide a brief narrative describing the condition at issue.<br><br>How was the condition recognized as a potential barrier? | **Low Participation for White Females**<br>Job series 2152, Air Traffic Controller, has a lower than expected participation rate for White females. |
| **BARRIER ANALYSIS:**<br><br>Provide a description of the steps taken and data analyzed to determine cause of the condition. | 1. In FY '07, the FAA White female workforce participation rate for 2152s is 13.44%, which is lower than the expected White female RCLF rate of 14.45%.<br>2. In FY '07, there were 37,132 White female 2152 applicants or 35.28% (total applicants, 105,242), which is higher than the expected White female RCLF rate of 14.45%.<br>3. In FY '07 there were 120 White females selected or 15.13% (total selectees: 793), which is higher than the expected White female RCLF rate of 14.45%. |
| **STATEMENT OF IDENTIFIED BARRIER:**<br><br>Provide a succinct statement of the agency policy, procedure or practice that has been determined to be the barrier of the undesired condition. | Current recruitment and selection procedures may be a barrier to equal employment for White females. |
| **OBJECTIVE:**<br><br>State the alternative or revised agency policy, procedure or practice to be implemented to correct the undesired condition. | If any barriers are identified in the 2152 job series for White females, every appropriate effort will be made to eliminate such barriers. |
| **RESPONSIBLE OFFICIAL:** | **ATO Director, Workforce Development** |
| **DATE OBJECTIVE INITIATED:** | **November 30, 2007** |
| **TARGET DATE FOR COMPLETION OF OBJECTIVE:** | **September 30, 2008** |

| EEOC FORM 715-01 PART I | EEO Plan To Eliminate Identified Barrier |
|---|---|

| PLANNED ACTIVITIES TOWARD COMPLETION OF OBJECTIVE:<br><br>**FAA, Air Traffic Organization (ATO)** | **TARGET DATE**<br>(Must be specific) |
|---|---|
| 1. AHR and ACR will collaborate determine what fields should be collected for the various stages of the application process in consultation with ATO Workforce Services. | September 30, 2008 |
| 2. Develop an action plan to implement collection process in the 2152 application process. | September 30, 2008 |
| 3. Implement FY'08 activities in the action plan. | September 30, 2008 |

**REPORT OF ACCOMPLISHMENTS and MODIFICATIONS TO OBJECTIVE**

NEW – FY 2008

| EEOC FORM<br>715-01<br>PART I | *U.S. Equal Employment Opportunity Commission*<br>**FEDERAL AGENCY ANNUAL**<br>**EEO PROGRAM STATUS REPORT** |
|---|---|
| **FAA, Air Traffic Organization (ATO)** | **FY 2007** |
| **STATEMENT OF CONDITION THAT WAS A TRIGGER FOR A POTENTIAL BARRIER:**<br><br>Provide a brief narrative describing the condition at issue.<br><br>How was the condition recognized as a potential barrier? | **Low Participation for Hispanic Females**<br>Job series 2152, Air Traffic Controller, has a lower than expected participation rate for Hispanic females. |
| **BARRIER ANALYSIS:**<br><br>Provide a description of the steps taken and data analyzed to determine cause of the condition. | 1. In FY '07, the FAA Hispanic female workforce participation rate for 2152s is 0.81%, which is lower than the expected Hispanic female RCLF rate of 0.98%.<br>2. In FY '07, there were 1094 qualified Hispanic female 2152 applicants or 1.04% (total qualified applicants, 105,242), which is higher than the expected Hispanic female RCLF rate of 0.98%.<br>3. In FY '07 there were 10 Hispanic females selected or 1.26% (total selectees: 793), which is higher than the expected Hispanic female RCLF rate of 0.98%. |
| **STATEMENT OF IDENTIFIED BARRIER:**<br><br>Provide a succinct statement of the agency policy, procedure or practice that has been determined to be the barrier of the undesired condition. | Current recruitment and selection procedures may be a barrier to equal employment for Hispanic females. |
| **OBJECTIVE:**<br><br>State the alternative or revised agency policy, procedure or practice to be implemented to correct the undesired condition. | If any barriers are identified in the 2152 job series for Hispanic females, every appropriate effort will be made to eliminate such barriers. |
| **RESPONSIBLE OFFICIAL:** | **ATO Director, Workforce Development** |
| **DATE OBJECTIVE INITIATED:** | **November 30, 2007** |
| **TARGET DATE FOR COMPLETION OF OBJECTIVE:** | **September 30, 2008** |

| EEOC FORM 715-01 PART I | EEO Plan To Eliminate Identified Barrier |
|---|---|

| PLANNED ACTIVITIES TOWARD COMPLETION OF OBJECTIVE:<br><br>**FAA, Air Traffic Organization (ATO)** | TARGET DATE<br>(Must be specific) |
|---|---|
| 1. AHR and ACR will collaborate determine what fields should be collected for the various stages of the application process in consultation with ATO Workforce Services. | September 30, 2008 |
| 2. Develop an action plan to implement collection process in the 2152 application process. | September 30, 2008 |
| 3. Implement FY'08 activities in the action plan. | September 30, 2008 |

**REPORT OF ACCOMPLISHMENTS and MODIFICATIONS TO OBJECTIVE**

## List of Workforce Data Tables

| A Tables | Description | Comments |
|----------|-------------|----------|
| Table A1 | Total Workforce – Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A2 | Permanent Workforce by Component - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A3-1 | Occupational Categories - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A3-2 | Occupational Categories - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A4-1 | Participation Rates for General Schedule Grades – Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A4-2 | Participation Rates for General Schedule Grades - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A5NS-1 | Participation Rates for Non-Supervisory Wage Grades - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A5NS-2 | Participation Rates for Non-Supervisory Wage Grades - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A5S-1 | Participation Rates for Supervisory Wage Grades - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A5S-2 | Participation Rates for Supervisory Wage Grades - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A6 | Participation Rates for Major Occupations - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A7 | Hires for Major Occupations - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A8 | New Hires by Type of Appointment - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A9 | Selections for Internal Competitive Promotions for Major Occupations - Distribution by Race/Ethnicity and Sex | Not Available |
| Table A10 | Non-Competitive Promotions – Time in Grade - Distribution by Race/Ethnicity and Sex | Not Available |
| Table A11 | Internal Selections for Senior Level Positions (GS 13, 14, 15 and SES) - Distribution by Race/Ethnicity and Sex | Not Available |
| Table A12 | Participation in Career Development - Distribution by Race/Ethnicity and Sex | Not Available |
| Table A13 | Employee Recognition and Awards - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A14 | Separations by Type of Separation - Distribution by Race/Ethnicity and Sex | Data Provided |

**The information in the data tables is a statistical snapshot of the workforce demographics. Conclusions concerning the existence of workplace barriers must not be drawn from gross numerical assessments. The use of this data in any employment decision is PROHIBITED without the express written authorization of the Deputy Chief Counsel for Operations, AGC-3.

**FAA  Pay Period 200721**

**Table A6: PARTICIPATION RATES FOR MAJOR OCCUPATIONS – Distribution by Race/Ethnicity and Sex – Permanent Workforce**

| Job Title/Series Agency Rate Occupational CLF | | TOTAL EMPLOYEES | | | Hispanic or Latino | | Non- Hispanic or Latino | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | White | | Black or African American | | Asian | | Native Hawaiian or Other Pacific Islander | | American Indian or Alaska Native | | Two or more races | |
| | | All | male | female | male | female | male | female | male | female | male | female | male | female | male | female | male | female |
| Misc. Administration and Programs (0301) | # | 1008 | 429 | 579 | 23 | 36 | 337 | 374 | 45 | 137 | 11 | 14 | 1 | 0 | 11 | 15 | 1 | 3 |
| | % | 100.00% | 42.56% | 57.44% | 2.28% | 3.57% | 33.43% | 37.10% | 4.46% | 13.59% | 1.09% | 1.39% | 0.10% | 0.00% | 1.09% | 1.49% | 0.10% | 0.30% |
| Occupational CLF | # | 100.00% | 43.44% | 56.56% | 4.74% | 5.27% | 30.24% | 39.74% | 4.89% | 7.79% | 2.57% | 2.34% | 0.07% | 0.08% | 0.24% | 0.40% | 0.67% | 0.94% |
| Management/Program Analyst (0343) | # | 1772 | 467 | 1305 | 31 | 58 | 304 | 785 | 107 | 389 | 16 | 37 | 0 | 3 | 7 | 25 | 2 | 8 |
| | % | 100.00% | 26.35% | 73.65% | 1.75% | 3.27% | 17.16% | 44.30% | 6.04% | 21.95% | 0.90% | 2.09% | 0.00% | 0.17% | 0.40% | 1.41% | 0.11% | 0.45% |
| Occupational CLF | # | 100.00% | 61.38% | 38.62% | 1.97% | 1.62% | 52.49% | 31.11% | 2.52% | 3.28% | 3.40% | 1.89% | 0.03% | 0.03% | 0.15% | 0.14% | 0.82% | 0.55% |
| General Engineer (0801) | # | 723 | 623 | 100 | 45 | 13 | 450 | 55 | 49 | 22 | 75 | 9 | 0 | 0 | 4 | 1 | 0 | 0 |
| | % | 100.00% | 86.17% | 13.83% | 6.22% | 1.80% | 62.24% | 7.61% | 6.78% | 3.04% | 10.37% | 1.24% | 0.00% | 0.00% | 0.55% | 0.14% | 0.00% | 0.00% |
| Occupational CLF | # | 100.00% | 89.61% | 10.39% | 3.19% | 0.60% | 71.83% | 7.15% | 3.04% | 0.77% | 9.92% | 1.63% | 0.09% | 0.01% | 0.21% | 0.05% | 1.32% | 0.18% |
| Civil/Highway Engineers (0810) | # | 360 | 315 | 45 | 32 | 2 | 217 | 29 | 20 | 8 | 42 | 6 | 1 | 0 | 2 | 0 | 1 | 0 |
| | % | 100.00% | 87.50% | 12.50% | 8.89% | 0.56% | 60.28% | 8.06% | 5.56% | 2.22% | 11.67% | 1.67% | 0.28% | 0.00% | 0.56% | 0.00% | 0.28% | 0.00% |
| Occupational CLF | # | 100.00% | 89.86% | 10.14% | 3.71% | 0.61% | 74.05% | 7.53% | 2.91% | 0.62% | 7.44% | 1.09% | 0.03% | 0.01% | 0.33% | 0.08% | 1.37% | 0.21% |
| Electronics Engineer (0855) | # | 866 | 779 | 87 | 50 | 11 | 507 | 38 | 63 | 13 | 145 | 21 | 1 | 1 | 13 | 3 | 0 | 0 |
| | % | 100.00% | 89.95% | 10.05% | 5.77% | 1.27% | 58.55% | 4.39% | 7.27% | 1.50% | 16.74% | 2.42% | 0.12% | 0.12% | 1.50% | 0.35% | 0.00% | 0.00% |
| Occupational CLF | # | 100.00% | 91.31% | 8.69% | 3.63% | 0.45% | 72.08% | 5.51% | 3.55% | 0.92% | 10.47% | 1.62% | 0.05% | 0.01% | 0.23% | 0.03% | 1.31% | 0.16% |
| Aerospace Engineer (0861) | # | 706 | 608 | 98 | 25 | 7 | 466 | 72 | 36 | 6 | 74 | 12 | 1 | 0 | 4 | 1 | 2 | 0 |
| | % | 100.00% | 86.12% | 13.88% | 3.54% | 0.99% | 66.01% | 10.20% | 5.10% | 0.85% | 10.48% | 1.70% | 0.14% | 0.00% | 0.57% | 0.14% | 0.28% | 0.00% |
| Occupational CLF | # | 100.00% | 90.94% | 9.06% | 4.10% | 0.54% | 74.24% | 6.47% | 2.56% | 0.66% | 8.25% | 1.20% | 0.15% | 0.00% | 0.24% | 0.03% | 1.39% | 0.16% |
| Aviation Safety (1825) | # | 4033 | 3725 | 308 | 209 | 10 | 3207 | 277 | 175 | 9 | 57 | 6 | 6 | 0 | 63 | 6 | 8 | 0 |
| | % | 100.00% | 92.36% | 7.64% | 5.18% | 0.25% | 79.52% | 6.87% | 4.34% | 0.22% | 1.41% | 0.15% | 0.15% | 0.00% | 1.56% | 0.15% | 0.20% | 0.00% |
| Occupational CLF | # | 100.00% | 83.84% | 16.16% | 7.32% | 1.65% | 65.31% | 10.99% | 7.69% | 2.72% | 1.64% | 0.31% | 0.10% | 0.00% | 0.51% | 0.18% | 1.26% | 0.31% |
| Transportation Specialist/Analyst (2101) | # | 6116 | 5554 | 562 | 472 | 33 | 4217 | 395 | 489 | 82 | 225 | 31 | 13 | 2 | 115 | 13 | 23 | 6 |
| | % | 100.00% | 90.81% | 9.19% | 7.72% | 0.54% | 68.95% | 6.46% | 8.00% | 1.34% | 3.68% | 0.51% | 0.21% | 0.03% | 1.88% | 0.21% | 0.38% | 0.10% |
| Occupational CLF | # | 100.00% | 43.44% | 56.56% | 4.74% | 5.27% | 30.24% | 39.74% | 4.89% | 7.79% | 2.57% | 2.34% | 0.07% | 0.08% | 0.24% | 0.40% | 0.67% | 0.94% |
| Air Traffic Controller (2152) | # | 19062 | 16045 | 3017 | 804 | 155 | 13995 | 2562 | 754 | 210 | 251 | 53 | 30 | 5 | 180 | 22 | 31 | 10 |
| | % | 100.00% | 84.17% | 15.83% | 4.22% | 0.81% | 73.42% | 13.44% | 3.96% | 1.10% | 1.32% | 0.28% | 0.16% | 0.03% | 0.94% | 0.12% | 0.16% | 0.05% |

**FAA  Pay Period 200721**

**Table A6: PARTICIPATION RATES FOR MAJOR OCCUPATIONS – Distribution by Race/Ethnicity and Sex – Permanent Workforce**

| Job Title/Series Agency Rate Occupational CLF | | TOTAL EMPLOYEES | | | RACE/ETHNICITY | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Hispanic or Latino | | Non- Hispanic or Latino | | | | | | | | | | |
| | | | | | | | White | | Black or African American | | Asian | | or Islander | | or Alaska Native | | Two or more races |
| | | All | male | female | male | female | male | female | male | female | male | female | male | female | male | female | male | female |
| Occupational CLF | # | 100.00% | 81.58% | 18.42% | 3.79% | 0.98% | 69.03% | 14.45% | 5.37% | 1.94% | 1.36% | 0.43% | 0.12% | 0.01% | 0.49% | 0.11% | 1.41% | 0.51% |
| Information Technology (2210) | # | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Occupational CLF | # | 100.00% | 66.77% | 33.23% | 3.14% | 1.55% | 50.42% | 24.73% | 4.29% | 3.48% | 7.40% | 2.89% | 0.05% | 0.02% | 0.24% | 0.11% | 1.23% | 0.45% |

**FAA  For Period ( 10/01/2006 TO 09/29/2007 )**

**Table A7-Alt: HIRES FOR MAJOR OCCUPATIONS - Distribution by Race/Ethnicity and Sex - Permanent Workforce**

| Job Title/Series Agency Rate Occupational CLF | | TOTAL EMPLOYEES | | | Hispanic or Latino | | White | | Black or African American | | Asian | | Native Hawaiian or Other Pacific Islander | | American Indian or Alaska Native | | Two or more races | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | All | male | female | male | female | male | female | male | female | male | female | male | female | male | female | male | female |
| **Misc. Administration and Programs (0301)** | | | | | | | | | | | | | | | | | | |
| Accessions | # | 31 | 14 | 17 | 0 | 0 | 12 | 12 | 1 | 5 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | % | 100.00% | 45.16% | 54.84% | 0.00% | 0.00% | 38.71% | 38.71% | 3.23% | 16.13% | 0.00% | 0.00% | 0.00% | 0.00% | 3.23% | 0.00% | 0.00% | 0.00% |
| From Temporary | # | 6 | 3 | 3 | 0 | 0 | 1 | 1 | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 100.00% | 50.00% | 50.00% | 0.00% | 0.00% | 16.67% | 16.67% | 16.67% | 33.33% | 16.67% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Total Hires | # | 37 | 17 | 20 | 0 | 0 | 13 | 13 | 2 | 7 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | % | 100.00% | 45.95% | 54.05% | 0.00% | 0.00% | 35.14% | 35.14% | 5.41% | 18.92% | 2.70% | 0.00% | 0.00% | 0.00% | 2.70% | 0.00% | 0.00% | 0.00% |
| Occupational CLF | # | 100.00% | 43.44% | 56.56% | 4.74% | 5.27% | 30.24% | 39.74% | 4.89% | 7.79% | 2.57% | 2.34% | 0.07% | 0.08% | 0.24% | 0.40% | 0.62% | 0.94% |
| **Management/Program Analyst (0343)** | | | | | | | | | | | | | | | | | | |
| Accessions | # | 128 | 59 | 69 | 2 | 2 | 38 | 42 | 15 | 24 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 100.00% | 46.09% | 53.91% | 1.56% | 1.56% | 29.69% | 32.81% | 11.72% | 18.75% | 3.13% | 0.78% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| From Temporary | # | 10 | 5 | 5 | 1 | 0 | 4 | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 100.00% | 50.00% | 50.00% | 10.00% | 0.00% | 40.00% | 40.00% | 0.00% | 10.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Total Hires | # | 138 | 64 | 74 | 3 | 2 | 42 | 46 | 15 | 25 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 100.00% | 46.38% | 53.62% | 2.17% | 1.45% | 30.43% | 33.33% | 10.87% | 18.12% | 2.90% | 0.72% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Occupational CLF | # | 100.00% | 61.38% | 38.62% | 1.97% | 1.62% | 52.49% | 31.11% | 2.52% | 3.28% | 3.40% | 1.89% | 0.03% | 0.03% | 0.15% | 0.14% | 0.82% | 0.55% |
| **General Engineer (0801)** | | | | | | | | | | | | | | | | | | |
| Accessions | # | 17 | 14 | 3 | 0 | 0 | 10 | 2 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 100.00% | 82.35% | 17.65% | 0.00% | 0.00% | 58.82% | 11.76% | 11.76% | 5.88% | 11.76% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| From Temporary | # | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 100.00% | 100.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Total Hires | # | 18 | 15 | 3 | 0 | 0 | 11 | 2 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 100.00% | 83.33% | 16.67% | 0.00% | 0.00% | 61.11% | 11.11% | 11.11% | 5.56% | 11.11% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Occupational CLF | # | 100.00% | 89.61% | 10.39% | 3.19% | 0.60% | 71.83% | 7.15% | 3.04% | 0.77% | 9.92% | 1.63% | 0.09% | 0.01% | 0.21% | 0.05% | 1.32% | 0.18% |
| **Civil/Highway Engineers (0810)** | | | | | | | | | | | | | | | | | | |
| Accessions | # | 15 | 10 | 5 | 1 | 0 | 6 | 3 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | % | 100.00% | 66.67% | 33.33% | 6.67% | 0.00% | 40.00% | 20.00% | 13.33% | 6.67% | 6.67% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 6.67% |
| From Temporary | # | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Total Hires | # | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Occupational CLF | # | 100.00% | 89.86% | 10.14% | 3.71% | 0.61% | 74.05% | 7.53% | 2.91% | 0.62% | 7.44% | 1.09% | 0.03% | 0.01% | 0.33% | 0.08% | 1.37% | 0.21% |
| **Electronics Engineer (0855)** | | | | | | | | | | | | | | | | | | |
| Accessions | # | 55 | 50 | 5 | 0 | 0 | 46 | 3 | 1 | 1 | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| | % | 100.00% | 90.91% | 9.09% | 0.00% | 0.00% | 83.64% | 5.45% | 1.82% | 1.82% | 3.64% | 1.82% | 0.00% | 0.00% | 1.82% | 0.00% | 0.00% | 0.00% |
| From Temporary | # | 2 | 2 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 100.00% | 100.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Total Hires | # | 57 | 52 | 5 | 0 | 0 | 48 | 3 | 1 | 1 | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| | % | 100.00% | 91.23% | 8.77% | 0.00% | 0.00% | 84.21% | 5.26% | 1.75% | 1.75% | 3.51% | 1.75% | 0.00% | 0.00% | 1.75% | 0.00% | 0.00% | 0.00% |
| Occupational CLF | # | 100.00% | 91.31% | 8.69% | 3.63% | 0.45% | 72.06% | 5.51% | 3.55% | 0.92% | 10.47% | 1.62% | 0.05% | 0.01% | 0.23% | 0.03% | 1.31% | 0.16% |
| **Aerospace Engineer (0861)** | | | | | | | | | | | | | | | | | | |
| Accessions | # | 51 | 41 | 10 | 1 | 0 | 31 | 9 | 3 | 1 | 5 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| | % | 100.00% | 80.39% | 19.61% | 1.96% | 0.00% | 60.78% | 17.65% | 5.88% | 1.96% | 9.80% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 1.96% | 0.00% |
| From Temporary | # | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |

**FAA  For Period ( 10/01/2006 TO 09/29/2007 )**

**Table A7-Alt: HIRES FOR MAJOR OCCUPATIONS - Distribution by Race/Ethnicity and Sex – Permanent Workforce**

| Job Title/Series Agency Rate Occupational CLF | | TOTAL EMPLOYEES | | | Hispanic or Latino | | White | | Black or African American | | Asian | | Islander | | American Indian or Alaska Native | | Two or more races | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | All | male | female | male | female | male | female | male | female | male | female | male | female | male | female | male | female |
| Total Hires | # | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Occupational C | # | 100.00% | 90.94% | 9.06% | 4.10% | 0.54% | 74.24% | 6.47% | 2.56% | 0.66% | 8.25% | 1.20% | 0.15% | 0.00% | 0.24% | 0.03% | 1.39% | 0.16% |
| **Aviation Safety (1825)** | | | | | | | | | | | | | | | | | | |
| Accessions | # | 349 | 317 | 32 | 19 | 1 | 286 | 29 | 9 | 0 | 2 | 0 | 0 | 0 | 1 | 2 | 0 | 0 |
| | % | 100.00% | 90.83% | 9.17% | 5.44% | 0.29% | 81.95% | 8.31% | 2.58% | 0.00% | 0.57% | 0.00% | 0.00% | 0.00% | 0.29% | 0.57% | 0.00% | 0.00% |
| From Temporary | # | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| | % | 100.00% | 100.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% | 0.00% | 0.00% | 0.00% |
| Total Hires | # | 350 | 318 | 32 | 19 | 1 | 286 | 29 | 9 | 0 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 |
| | % | 100.00% | 90.86% | 9.14% | 5.43% | 0.29% | 81.71% | 8.29% | 2.57% | 0.00% | 0.57% | 0.00% | 0.00% | 0.00% | 0.57% | 0.57% | 0.00% | 0.00% |
| Occupational C | # | 100.00% | 83.84% | 16.16% | 7.32% | 1.65% | 65.31% | 10.99% | 7.69% | 2.72% | 1.61% | 0.31% | 0.10% | 0.00% | 0.51% | 0.18% | 1.26% | 0.31% |
| **Transportation Specialist/Analyst (2101)** | | | | | | | | | | | | | | | | | | |
| Accessions | # | 208 | 204 | 4 | 13 | 0 | 165 | 3 | 18 | 1 | 3 | 0 | 0 | 0 | 2 | 0 | 3 | 0 |
| | % | 100.00% | 98.08% | 1.92% | 6.25% | 0.00% | 79.33% | 1.44% | 8.65% | 0.48% | 1.44% | 0.00% | 0.00% | 0.00% | 0.96% | 0.00% | 1.44% | 0.00% |
| From Temporary | # | 27 | 23 | 4 | 4 | 0 | 13 | 1 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 |
| | % | 100.00% | 85.19% | 14.81% | 14.81% | 0.00% | 48.15% | 3.70% | 7.41% | 7.41% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 14.81% | 3.70% |
| Total Hires | # | 235 | 227 | 8 | 17 | 0 | 178 | 4 | 20 | 3 | 3 | 0 | 0 | 0 | 2 | 0 | 7 | 1 |
| | % | 100.00% | 96.60% | 3.40% | 7.23% | 0.00% | 75.74% | 1.70% | 8.51% | 1.28% | 1.28% | 0.00% | 0.00% | 0.00% | 0.85% | 0.00% | 2.98% | 0.43% |
| Occupational C | # | 100.00% | 43.44% | 56.56% | 4.74% | 5.27% | 30.24% | 39.74% | 4.89% | 7.79% | 2.57% | 2.34% | 0.07% | 0.08% | 0.24% | 0.40% | 0.67% | 0.94% |
| **Air Traffic Controller (2152)** | | | | | | | | | | | | | | | | | | |
| Accessions | # | 524 | 425 | 99 | 34 | 5 | 348 | 78 | 28 | 12 | 10 | 3 | 1 | 1 | 2 | 0 | 2 | 0 |
| | % | 100.00% | 81.11% | 18.89% | 6.49% | 0.95% | 66.41% | 14.89% | 5.34% | 2.29% | 1.91% | 0.57% | 0.19% | 0.19% | 0.38% | 0.00% | 0.38% | 0.00% |
| From Temporary | # | 268 | 213 | 55 | 21 | 5 | 175 | 42 | 8 | 6 | 5 | 2 | 1 | 0 | 3 | 0 | 0 | 0 |
| | % | 100.00% | 79.48% | 20.52% | 7.84% | 1.87% | 65.30% | 15.67% | 2.99% | 2.24% | 1.87% | 0.75% | 0.37% | 0.00% | 1.12% | 0.00% | 0.00% | 0.00% |
| Total Hires | # | 792 | 638 | 154 | 55 | 10 | 523 | 120 | 36 | 18 | 15 | 5 | 2 | 1 | 5 | 0 | 2 | 0 |
| | % | 100.00% | 80.56% | 19.44% | 6.94% | 1.26% | 66.04% | 15.15% | 4.55% | 2.27% | 1.89% | 0.63% | 0.25% | 0.13% | 0.63% | 0.00% | 0.25% | 0.00% |
| Occupational C | # | 100.00% | 81.58% | 18.42% | 3.79% | 0.98% | 69.03% | 14.45% | 5.37% | 1.94% | 1.36% | 0.43% | 0.12% | 0.01% | 0.49% | 0.11% | 1.41% | 0.51% |
| **Information Technology (2210)** | | | | | | | | | | | | | | | | | | |
| Accessions | # | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| From Temporary | # | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Total Hires | # | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | % | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Occupational C | # | 100.00% | 66.77% | 33.23% | 3.14% | 1.55% | 50.42% | 24.73% | 4.29% | 3.48% | 7.40% | 2.89% | 0.05% | 0.02% | 0.24% | 0.11% | 1.23% | 0.45% |

RACE/ETHNICITY — Non- Hispanic or Latino (Islander = Native Hawaiian or Other Pacific Islander)



**Federal Aviation Administration**

*Federal Aviation Administration (FAA)*

# Annual EEO Program Status Report

## Fiscal Year

# 2011

Prepared by FAA
Office of Civil Rights 2011

<u>EEOC Forms and Documents Included in this Report</u>

- EEOC (Form 715-01 Part A-D)                                          Tab 1

- FAA Executive Summary (Form 715-01 Part E)                   Tab 2

- FAA Statement of Establishment of Continuing
  EEO Programs (Form 715-01 Part F)                              Tab 3

- FAA Policy Statements                                             Tab 4

- FAA Annual Self-Assessment Checklist of
  Essential Elements (Form 715-01 Part G)                        Tab 5

- FAA EEO Plan to obtain the Essential Elements
  of a Model EEO Program (Form 715-01 Part H)                  Tab 6

- FAA EEO Plan to Eliminate Identified Barrier
  (Form 715-01 Part I)                                           Tab 7

- FAA Special Program Plan for Recruitment, Hiring,
  and Advancement of Individuals with Targeted
  Disabilities for Agencies with 1000 or more
  Employees (Form 715-01 Part J)                                 Tab 8

- FAA Workforce Data Tables ("A" Tables)                        Tab 9

- FAA Disability Workforce Data Tables ("B" Tables)            Tab 10

- FAA 462 Report                                                 Tab 11

- FAA UFAS/Section 504 Rehabilitation Act Assessment          Tab 12

- FAA Organization Chart                                        Tab 13

# TAB 1

**Parts A-D**

**Agency Information**

# FIRES Exercise

# Department of Transportation

# DOT Federal Aviation Administration

# MD715 - 2011

# Parts

### PARTS A Through E

Enter your Agency or Component data for PARTs A through E below.

In PART E, the Executive Summary should be as short and concise as possible. Extraneous information, such as a complete iteration of the agency's strategic plan, should not be included in the Executive Summary. Remember that the Executive Summary is intended to be an introductory summary which catches the attention of the agency's top managers and supervisors. This is to ensure their understanding of the agency's overall EEO program direction and of their expected contributions necessary for the agency to become a Model Employer.

## PART A - Department or Agency Identifying Information

| Agency | Second Level Component | Address | City | State | Zip Code (xxxxx-xxxx) | CPDF Code (xxxx) | FIPS Code |
|---|---|---|---|---|---|---|---|
| Department of Transportation | DOT Federal Aviation Administration | 800 Independence Avenue SW | Washington | DC | 20591 | | |

## PART B - Total Employment

| Total Employment | Permanent Workforce | Temporary Workforce | Non-Appropriated Workforce | Total Workforce |
|---|---|---|---|---|
| Number of Employees | 47415 | 847 | 0 | 48262 |

## PART C.1 - Head of Agency and Head of Agency Designee

| Agency Leadership | Name | Title |
|---|---|---|
| Head of Agency | Michael P. Huerta | Acting Administrator |

1

| Agency Leadership | Name | Title |
|---|---|---|
| Head of Agency Designee | Mamie Mallory | Acting Assistant Administrator, Office of Civil Rights |

## PART C.2 - Agency Official(s) Responsible For Oversight of EEO Program(s)

| EEO Program Staff | Name | Title | Occupational Series (xxxx) | Pay Plan and Grade (xx-xx) | Phone Number (xxx-xxx-xxxx) | Email Address |
|---|---|---|---|---|---|---|
| Principal EEO Director/Official | Mamie Mallory | Acting Assistant Administrator, Office of Civil Rights | 0340 | EV/SES | 202-267-3254 | Mamie.Mallory@faa.gov |
| Title VII Affirmative EEO Program Official | Bobbie Moore | Director, Model EEO Program | 0260 | K band | 202-267-7442 | Bobbie.Moore@faa.gov |
| Section 501 Affirmative Action Program Official | Miriam Vega | Director, EEO Outreach Program | 0260 | K band | 202-385-8440 | Miriam.Vega@faa.gov |
| Complaint Processing Program Manager | Cheryl Wilkes | Director, EEO Complaint Services | 0260 | K band | 609-485-6676 | Cheryl.Wilkes@faa.gov |
| Hispanic Program Manager (SEPM) | Kimberly Castillo | Manager, Hispanic Employment Program (HEP) | 0260 | H band | 202-385-8130 | Kimberly.Castillo@faa.gov |
| Women's Program Manager (SEPM) | Deena Collier | Manager, Federal Women's Program (FWP) | 0260 | J band | 202-385-8128 | Deena.Collier@faa.gov |
| Disability Program | Michael Looney | Manager, People with | 0260 | H band | 202-385- | Michael.Looney@faa.gov |

| EEO Program Staff | Name | Title | Occupational Series (xxxx) | Pay Plan and Grade (xx-xx) | Phone Number (xxx-xxx-xxxx) | Email Address |
|---|---|---|---|---|---|---|
| Manager (SEPM) | | Disability Program (PWD) | | | 8127 | |
| ADR Program Manager | Harnetta Williams | Director, National EEO Policy and ADR | 0260 | K band | 609-485-6676 | Harnetta.Williams@faa.gov |
| Compliance Manager | Cheryl Wilkes | Director, EEO Complaint Services | 0260 | K band | 609-485-6676 | Cheryl.Wilkes@faa.gov |
| Principal MD-715 Preparer | Yvette Aine | Principal MD-715 Preparer | 0343 | J band | 202-2679928 | Yvette.Aine@faa.gov |

## PART D.2 - Forms/Documents Included with This Report

| Is the following Form or Document Uploaded? | (Please respond "Yes" or "No") | Comments |
|---|---|---|
| PART F - Statement of Establishment of Continuing EEO Programs | Yes | |
| EEO Policy Statement Issued During Reporting Period | Yes | |
| Facility Accessibility Survey Results Necessary to Support EEO Action Plan for Building Renovation Projects | Yes | |
| Organizational Chart | Yes | |
| FEORP Report | No | |
| Anti-Harassment Policy and Procedures | Yes | |
| Diversity Policy Statement | No | |
| Strategic Plan (excerpts of EEO goal only) | No | |
| Human Capital Strategic Plan | No | |
| EEO Strategic Plan | No | |
| Federal Employee Viewpoint Survey or Annual Employee Survey | No | |

# TAB 2

**Part E**

**Executive Summary**

## PART E.1 - Executive Summary: Mission

The Federal Aviation Administration (FAA) is a component of the U. S. Department of Transportation (DOT). Its continuing mission is to provide the safest, most efficient aerospace system in the world. To ensure the success of our mission, the FAA is committed to achieving organizational excellence in managing its human resources. Our vision is to strive to reach the next level of safety, efficiency, environmental responsibility and global leadership. We are accountable to the American public and our stakeholders. Our values are the following: "Safety is our passion; excellence is our promise; integrity is our touchstone; people are our strength; and innovation is our signature."

**Results of the Agency's Annual Self-Assessment**

The FAA FY 2011 Annual Equal Employment Opportunity (EEO) Program Status Report has three purposes. First, the report identifies program deficiencies and barriers to achieving a Model EEO Program. Second, the report delineates the planned actions necessary to address and/or eliminate the program deficiencies and barriers. Finally, the report outlines the agency's accomplishments toward rectifying the program deficiencies and barriers. An analysis of the FAA workforce for FY 2011 was conducted to complete this report.

The agency has conducted its annual self-assessment against the MD 715 "Essential Elements." The following highlights the agency's FY 2011 activities in support of a Model EEO Program.

## PART E.2 - Executive Summary: Essential Element A

·       In May 2011, Administrator Babbitt affirmed his commitment to EEO and diversity at the FAA by issuing his policy statements in support of EEO, diversity, and a workplace free of discriminatory harassment.

·       EEO policy statements were communicated to all employees including notification that the policies would be vigorously enforced.

·       Agency senior executives and managers were evaluated on the EEO critical element in their performance plans.

## PART E.3 - Executive Summary: Essential Element B

·       FAA continues to evaluate whether barriers may be impeding the realization of a Model EEO Program. The FAA's tracking of employment data will allow us to conduct thorough statistical analyses looking at the detrimental impact of policies, practices, and procedures on the goal of a Model EEO Program.

## PART E.4 - Executive Summary: Essential Element C

·      The DOT average for formal complaints is 0.60%.   The FAA formal complaint average is 0.54%.

4

## PART E.5 - Executive Summary: Essential Element D

·      FAA continues to evaluate whether barriers may be impeding the realization of a Model EEO Program. The FAA's tracking of employment data will allow us to conduct thorough statistical analyses looking at the detrimental impact of policies, practices, and procedures on the goal of a Model EEO Program.

## PART E.6 - Executive Summary: Essential Element E

·      ACR offered alternative dispute resolution (ADR) to employees who filed complaints and processed 100% of all pre-complaints timely. ADR usage has continued to increase from27.7% in FY 2010 to 28.3% in FY 2011.

·      ACR performs EEO counseling through full-time dedicated counselors employed by the FAA.

·      FAA utilized the OPM Employee Viewpoint Survey to gather feedback on the services provided to the workforce. This annual survey allows Federal employees to express their views on the implementation of human capital management practices such as: Recruitment and Retention of Qualified Talent, Performance Management, Leadership, Rewards and Recognition, Training and Development, and Work/Life Balance.

## PART E.7 - Executive Summary: Essential Element F

·      FAA posted statistical complaint data on the website in compliance with the No FEAR Act.

·      FAA holds agency personnel accountable for ensuring compliance with EEOC orders, completing actions, and reporting requirements.

## PART E.8 - Executive Summary: Workforce Analyses

In the beginning of FY 2011, the FAA employed 48,648 workers compared with 48,262 workers at the end of FY 2011. In FY 2011, the agency lost 2,367 employees to attrition. In the same timeframe, FAA hired a total of 2,306 employees in permanent and temporary positions. Therefore, during the course of FY 2011, the agency's workforce decreased by 386 employees for a -0.79% net rate of change.

Among the FAA workforce, the following race/ethnic/gender groups are above or equal to the Civilian Labor Force (CLF) participation rates: White males, Black males, Asian males, Native Hawaiian or Other Pacific Islander males and females, and American Indian or Alaska Native males and females. From FY10 to FY11 the following race/ ethnic/gender groups are lower than the expected CLF participation rates with Net Changes at FAA:  Hispanic males (On-Board: 4.95%, CLF: 6.17%, Net Change: 2.57%) and Hispanic females (On-Board: 1.64%, CLF: 4.52%, Net Change: -0.50%), White females (On-Board: 17.02%, CLF: 33.74%, Net Change: -1.39%), Black females (On-Board: 4.42%, CLF: 5.66%, Net Change: -0.88%), Asian females (On-Board:

1.03%, CLF: 1.71%, Net Change: -0.20%), Two-or–more-races males (On-Board: 0.57%, CLF: 0.88%, Net Change 22.42%) and Two-or-more-races females (On-Board: 0.17%, CLF: 0.76%, Net Change 12.16%).

Note that although Hispanic males and Two-or-more-races males and females had a participation rate below the National 2000 CLF, their participation rate increased at the FAA during FY 2011. During FY 2011, the number of FAA permanent and temporary employees reporting targeted disabilities reflects a positive change of 12 employees (FAA On-Board: 0.59% versus the Federal High: 2.95%--although below the Federal High the FAA resulted in a net change of 4.41%).

## PART E.9 - Executive Summary: Accomplishments

During the past fiscal year, FAA had the following accomplishments at the corporate level to move the agency closer to achieving MD 715's Model EEO program:

The FAA's onboard rate of PWTD increased from .56% in FY 10 to .59% in FY 11.

During FY11, the FAA Office of Civil Rights collaborated with the FAA Office of Human Resource Management (AHR), the Department of Transportation (DOT) Office of Civil Rights and Human Resources to develop our strategic plan for Executive Order 13548: Increasing Federal Employment of People with Disabilities. DOT's plan was submitted to OPM for approval on April 11, 2011. DOT's plan included specific hiring goals for people with disabilities and a sub goal for people with targeted disabilities. Also included is a proposed training module for all AHR specialists on the schedule A hiring authority. FAA's AHR and ACR collaborated on creating a proposed training module for AHR specialists on the On-the-Spot hiring authority.

During FY 11, the FAA processed 85% of reasonable accommodation requests within the 25 business day time frame set forth in our reasonable accommodation procedures. This is an increase from FY 10 when we processed 80% of reasonable accommodations requests within 25 business days.

**EEO Training Institute**

During FY 2011, ACR delivered 384 training sessions to 5,286 managers and employees. Additionally, of the 1,079 new Air Traffic Controllers and Technical Operation students hired, 1,012 (93.7%) of them received training at the EEO Training Institute.

**Outreach Events**

In FY 2011, the FAA ACR Outreach Team collaborated with AHR and all of the Agency lines of business/staff offices (LOB/SO) participated in 114 outreach events targeting women, Hispanics/Latinos, and people with disabilities. During the events, the Agency collected 7,511 signatures from attendees with expressed interest in specific job areas. In FY 2011, FAA ACR also purchased advertisement space in the IMAGE, Inc. Conference Program, an article in the

Latina Style Magazine, and a permanent on-line FAA advertisement in the Hispanic Network Magazine, Professionals Women Magazine, Black Equal Opportunity Employment Magazine, and the Asian American, African American, Hispanic, and Arab Yearbooks (TIYM P Publishing Company).

## PART E.10 - Executive Summary: Planned Activities

The FAA identified program deficiencies in its Self-Assessment. Please see part H for the Agency's plan for addressing these deficiencies.  The FAA has developed a process in accordance with the requirements of MD 715 to conduct additional trend analyses of the workforce's major occupations by race, national origin, sex and disability based upon the data gathered in the refined data tracking system. The FAA will also continue to monitor its compliance with the Uniform Federal Accessibility Standards (UFAS) at its facilities. In addition, the Agency implemented a process for timely processing of reasonable accommodation requests.

Several Barrier Statements were identified in Part I, focusing on recruitment and selection of Aviation Safety Inspectors (1825), Air Traffic Controllers (2152), and Transportation Specialists (2101) to determine if existing policies, procedures, and practices need to be modified.   In addition, goals have been set using Part J, regarding People with Targeted Disabilities in an effort to meet or exceed the 3% hiring goal.

# TAB 3

**Part F**

**Certification**

**CERTIFICATION of ESTABLISHMENT of CONTINUING
EQUAL EMPLOYMENT OPPORTUNITY PROGRAMS**

I,                                    Mamie Mallory, Acting Assistant Administrator for Civil Rights,      I am the
                                      EV/340/SES

Principal EEO Director/Official for        Federal Aviation Administration

The agency has conducted an annual self-assessment of Section 717 and Section 501 programs against the essential elements as prescribed by EEO MD-715. If an essential element was not fully compliant with the standards of EEO MD-715, a further evaluation was conducted and, as appropriate, EEO Plans for Attaining the Essential Elements of a Model EEO Program, are included with this Federal Agency Annual EEO Program Status Report.

The agency has also analyzed its work force profiles and conducted barrier analyses aimed at detecting whether any management or personnel policy, procedure or practice is operating to disadvantage any group based on race, national origin, gender or disability. EEO Plans to Eliminate Identified Barriers, as appropriate, are included with this Federal Agency Annual EEO Program Status Report.

I certify that proper documentation of this assessment is in place and is being maintained for EEOC review upon request.

_Mamie F.W. Mallory_                                                                2/24/2012
Signature of Principal EEO Director/Official                                    Date
Certifies that this Federal Agency Annual EEO Program Status Report is in compliance with EEO MD-715.

                                                                                MAR  1 2012
Signature of Agency Head or Agency Head Designee                              Date

# TAB 7

**Part I**

**Barrier Analysis**

**PART I.1 - Agency EEO Plan to Eliminate Identified Barrier**

## Statement of Condition That Was a Trigger for a Potential Barrier:

| Source of the Trigger | Specific Workforce Data Table (if applicable) | Row within Identified Workforce Data Table (if applicable) | Narrative Description of Trigger |
|---|---|---|---|
| Workforce Data Tables (See tables below) | Table A6/B6 | Aviation Safety Inspector (1825) Major Occupation | Lower than expected participation rate in several categories |

## EEO Group(s) Affected by Trigger

| EEO Group | Affected By Trigger? |
|---|---|
| All Men | |
| All Women | Yes |
| Hispanic or Latino Males | Yes |
| Hispanic or Latino Females | |
| White Males | |
| White Females | |
| Black or African American Males | Yes |
| Black or African American Females | |
| Asian Males | |
| Asian Females | |
| Native Hawaiian or Other Pacific Islander Males | |
| Native Hawaiian or Other Pacific Islander Females | |
| American Indian or Alaska Native Males | |
| American Indian or Alaska Native Females | |
| Two or More Races Males | |
| Two or More Races Females | |
| Individuals with Targeted Disabilities | |

**Barrier Analysis Process**

| Sources of Data | Has Source Been Reviewed? | Identify Information Collected |
|---|---|---|
| Workforce Data Tables Reviewed | Yes | |
| Complaint Data (i.e., Trends, Findings of Discrimination, etc.) | No | |
| Grievance Data | No | |
| Climate Assessment Survey | Yes | |
| Exit Interview Data | Yes | |
| Interviews | Yes | |
| Applicable Policies and Procedures | No | |
| Reports (OIG, EEOC, MSPB, GAO, etc.) | No | |
| Other (Please Describe) | No | |

**Status of Barrier Analysis Process**

| Barrier Analysis Process Completed? | Barrier(s) Identified? |
|---|---|
| No | No |

**Statement of Identified Barrier(s)**

| Types of Barrier | Description of Policy, Procedure, or Practice |
|---|---|
| None | Barrier Analysis Process is not completed. |

**Objective(s) and Dates for EEO Plan**

| Objective | Date Objective Initiated (mm/dd/yyyy) | Target Date for Completion of Objective (mm/dd/yyyy) | Date Objective Completed (mm/dd/yyyy) |
|---|---|---|---|
| Conduct a barrier analysis of the 1825 occupational series. | 3/1/2012 | 09/30/2013 | |
| Develop a plan to | 3/1/2012 | 09/30/2014 | |

| Objective | Date Objective Initiated (mm/dd/yyyy) | Target Date for Completion of Objective (mm/dd/yyyy) | Date Objective Completed (mm/dd/yyyy) |
|---|---|---|---|
| eliminate, when possible any identified barriers. | | | |

## Responsible Official(s)

| Title | Name |
|---|---|
| Associate Administrator for Aviation Safety / Assistant Administrator for Civil Rights and FAA Diversity Advocate | Margaret Gilligan, Associate Administrator for Aviation Safety (AVS)/ Mamie Mallory, Acting Assistant Administrator for Civil Rights and FAA Diversity Advocate |

## Planned Activities Toward Completion of Objective

| Planned Activities | Target Date (mm/dd/yyyy) | Modified Date (mm/dd/yyyy) | Completed? | Completion Date (mm/dd/yyyy) |
|---|---|---|---|---|
| Review the results of trend analysis conducted of the 1825 occupational series to identify any potential barriers. | 09/30/2012 | | No | |
| Complete barrier analysis of 1825 occupational series. | 09/30/2013 | | No | |
| Develop a plan to eliminate when possible any identified barriers. | 09/30/2014 | | No | |

## Report of Accomplishments and Modifications to Objective

Participated in a trend analysis of the 1825 occupational series. The trend analysis is scheduled for completion FY2012.

### PART I.2 - Agency EEO Plan to Eliminate Identified Barrier

## Statement of Condition That Was a Trigger for a Potential Barrier:

| Source of the Trigger | Specific Workforce Data Table (if applicable) | Row within Identified Workforce Data Table (if applicable) | Narrative Description of Trigger |
|---|---|---|---|
| Workforce Data Tables (See tables below) | Table A6/B6 | Air Traffic Control Specialist (2152) Major Occupation | Lower than expected participation rate in several categories |

## EEO Group(s) Affected by Trigger

| EEO Group | Affected By Trigger? |
|---|---|
| All Men | |
| All Women | |
| Hispanic or Latino Males | |
| Hispanic or Latino Females | |
| White Males | |
| White Females | Yes |
| Black or African American Males | Yes |
| Black or African American Females | Yes |
| Asian Males | |
| Asian Females | Yes |
| Native Hawaiian or Other Pacific Islander Males | |
| Native Hawaiian or Other Pacific Islander Females | |
| American Indian or Alaska Native Males | |
| American Indian or Alaska Native Females | |
| Two or More Races Males | Yes |
| Two or More Races Females | Yes |
| Individuals with Targeted Disabilities | Yes |

## Barrier Analysis Process

| Sources of Data | Has Source Been Reviewed? | Identify Information Collected |
|---|---|---|
| Workforce Data Tables Reviewed | Yes | |

38

| Sources of Data | Has Source Been Reviewed? | Identify Information Collected |
|---|---|---|
| Complaint Data (i.e., Trends, Findings of Discrimination, etc.) | No | |
| Grievance Data | No | |
| Climate Assessment Survey | No | |
| Exit Interview Data | No | |
| Interviews | No | |
| Applicable Policies and Procedures | No | |
| Reports (OIG, EEOC, MSPB, GAO, etc.) | No | |
| Other (Please Describe) | No | |

## Status of Barrier Analysis Process

| Barrier Analysis Process Completed? | Barrier(s) Identified? |
|---|---|
| No | No |

## Statement of Identified Barrier(s)

| Types of Barrier | Description of Policy, Procedure, or Practice |
|---|---|
| None | Barrier Analysis Process has not been completed. |

## Objective(s) and Dates for EEO Plan

| Objective | Date Objective Initiated (mm/dd/yyyy) | Target Date for Completion of Objective (mm/dd/yyyy) | Date Objective Completed (mm/dd/yyyy) |
|---|---|---|---|
| Review and analyze current Outreach plan and recruitment and selection process to determine if there are any barriers to EEO. | 11/30/2007 | 09/30/2012 | |
| Eliminate, when possible, any barriers to EEO. | 11/30/2007 | 09/30/2012 | |

## Responsible Official(s)

| Title | Name |
|---|---|
| ACR, EEO Outreach Office, ACR-7, in Consultation with ATO | Miriam Vega, Director, EEO Outreach Program |

## Planned Activities Toward Completion of Objective

| Planned Activities | Target Date (mm/dd/yyyy) | Modified Date (mm/dd/yyyy) | Completed? | Completion Date (mm/dd/yyyy) |
|---|---|---|---|---|
| Review and analyze current Outreach plan and recruitment and selection process to determine if there are any barriers to EEO. | 09/30/2012 | 09/30/2010 | No | |
| Eliminate, when possible, any barriers to EEO. | 09/30/2012 | 09/30/2010 | No | |

## Report of Accomplishments and Modifications to Objective

ATO is focusing on reviewing, analyzing, and researching its Outreach Plan along with the recruitment and selection process to determine if there are any barriers to EEO. A barrier analysis for this MCO is scheduled for completion in FY2012.

### PART I.3 - Agency EEO Plan to Eliminate Identified Barrier

## Statement of Condition That Was a Trigger for a Potential Barrier:

| Source of the Trigger | Specific Workforce Data Table (if applicable) | Row within Identified Workforce Data Table (if applicable) | Narrative Description of Trigger |
|---|---|---|---|
| Workforce Data Tables (See tables below) | Table A6/B6 | Airway Transportation System Specialist (2101) | Lower than expected for females in this occupation. |

## EEO Group(s) Affected by Trigger

| EEO Group | Affected By Trigger? |
|---|---|

| EEO Group | Affected By Trigger? |
|---|---|
| All Men | |
| All Women | Yes |
| Hispanic or Latino Males | |
| Hispanic or Latino Females | |
| White Males | |
| White Females | |
| Black or African American Males | |
| Black or African American Females | |
| Asian Males | |
| Asian Females | |
| Native Hawaiian or Other Pacific Islander Males | |
| Native Hawaiian or Other Pacific Islander Females | |
| American Indian or Alaska Native Males | |
| American Indian or Alaska Native Females | |
| Two or More Races Males | |
| Two or More Races Females | |
| Individuals with Targeted Disabilities | |

## Barrier Analysis Process

| Sources of Data | Has Source Been Reviewed? | Identify Information Collected |
|---|---|---|
| Workforce Data Tables Reviewed | Yes | |
| Complaint Data (i.e., Trends, Findings of Discrimination, etc.) | | |
| Grievance Data | | |
| Climate Assessment Survey | | |
| Exit Interview Data | | |

| Sources of Data | Has Source Been Reviewed? | Identify Information Collected |
|---|---|---|
| Interviews | | |
| Applicable Policies and Procedures | | |
| Reports (OIG, EEOC, MSPB, GAO, etc.) | | |
| Other (Please Describe) | | |

## Status of Barrier Analysis Process

| Barrier Analysis Process Completed? | Barrier(s) Identified? |
|---|---|
| No | No |

## Statement of Identified Barrier(s)

| Types of Barrier | Description of Policy, Procedure, or Practice |
|---|---|
| None | Barrier Analysis has not been completed. |

## Objective(s) and Dates for EEO Plan

| Objective | Date Objective Initiated (mm/dd/yyyy) | Target Date for Completion of Objective (mm/dd/yyyy) | Date Objective Completed (mm/dd/yyyy) |
|---|---|---|---|
| Review and analyze current Outreach plan and recruitment and selection process to determine if there are any barriers to EEO. | 10/01/2009 | 09/30/2012 | |
| Eliminate, when possible, any identified barriers to EEO. | 10/01/2009 | 09/30/2012 | |

## Responsible Official(s)

| Title | Name |
|---|---|
| ACR, EEO Outreach Office, ACR-7, in Consultation with ATO | Miriam Vega, Director, EEO Outreach Program |

42

## Planned Activities Toward Completion of Objective

| Planned Activities | Target Date (mm/dd/yyyy) | Modified Date (mm/dd/yyyy) | Completed? | Completion Date (mm/dd/yyyy) |
|---|---|---|---|---|
| Review and analyze current Outreach plan and recruitment and selection process to determine if there are any barriers to EEO. | 09/30/2012 | 10/01/2009 | No | |
| Eliminate, when possible, any identified barriers to EEO. | 09/30/2012 | 10/01/2009 | No | |

## Report of Accomplishments and Modifications to Objective

ATO is focusing on reviewing, analyzing, and researching its Outreach plan along with the recruitment and selection process to determine if there are any barriers to EEO. A barrier analysis is scheduled for completion in FY12.

# TAB 9

**Tables by RNO and Gender A1-A14**

## List of Workforce Data Tables

| "A" Tables | Description | Comments |
|------------|-------------|----------|
| Table A1 | Total Workforce - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A2 | Permanent Workforce By Component - Distribution by Race/Ethnicity and Sex | Not Applicable to the FAA |
| Table A3-1 | Occupational Categories - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A3-2 | Occupational Categories - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A4-1 | Participation Rates For General Schedule Grades - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A4-2 | Participation Rates For General Schedule (GS) Grades by Race/Ethnicity and Sex | Data Provided |
| Table A5-1 | Participation Rates For Wage Grades by Race/Ethnicity and Sex | Data Provided |
| Table A5-2 | Participation Rates For Wage Grades by Race/Ethnicity and Sex | Data Provided |
| Table A5NS-1 | Participation Rates for Non-Supervisory Wage Grades - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A5NS-2 | Participation Rates for Non-Supervisory Wage Grades - Distribution by Race/Ethnicity and Sex - Permanent Workforce | Data Provided |
| Table A5S-1 | Participation Rates for Supervisory Wage Grades - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A5S-2 | Participation Rates for Supervisory Wage Grades - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A6 | Participation Rates for Major Occupations - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A7 | Hires for Major Occupations Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A8 | New Hires by Type of Appointment - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A9 | Selections for Internal Competitive Promotions for Major Occupations by Race/Ethnicity and Sex | Not Available |
| Table A10 | Non-Competitive Promotions - Time in Grade - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A11 | Internal Selections for Senior Level Positions (GS 13, GS 14, GS 15, and SES) by Race/Ethnicity and Sex | Not Available |
| Table A12 | Participation in Career Development by Race/Ethnicity and Sex | Not Available |
| Table A13 | Employee Recognition and Awards - Distribution by Race/Ethnicity and Sex | Data Provided |
| Table A14 | Separations by Type of Separation - Distribution by Race/Ethnicity and Sex | Data Provided |

**\*\*This is a statistical snapshot of the workforce demographics. Conclusions concerning the existence of workplace barriers must not be drawn from gross numerical assessments. The use of this data in any employment decision is PROHIBITED without the express written authorization of the Deputy Chief Counsel, AGC-2.**

**DOT FAA FEDERAL AVIATION ADMINISTRATION   Pay Period 201120**

Table A6: PARTICIPATION RATES FOR MAJOR OCCUPATIONS - Distribution by Race/Ethnicity and Sex - Permanent Workforce

Job Title/Series Agency Rate Occupational CLF — RACE/ETHNICITY

| Job Title/Series | #/% | TOTAL EMPLOYEES All | male | female | Hispanic or Latino male | female | Non-Hispanic White male | female | Black or African American male | female | Asian male | female | Native Hawaiian or Other Pacific Islander male | female | American Indian or Alaska Native male | female | Two or more races male | female |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | 1709 | 1195 | 514 | 63 | 22 | 908 | 344 | 119 | 95 | 70 | 39 | 4 | 0 | 20 | 14 | 11 | 0 |
| INFORMATION TECHNOLOGIST (0334) | % | 100% | 69.92% | 30.08% | 3.69% | 1.29% | 53.13% | 20.13% | 6.96% | 5.56% | 4.10% | 2.28% | 0.23% | 0.00% | 1.17% | 0.82% | 0.64% | 0.00% |
| Occupational CLF | # | 100% | 66.73% | 33.00% | 3.14% | 1.55% | 50.42% | 24.73% | 4.29% | 3.48% | 7.40% | 2.89% | 0.05% | 0.02% | 0.24% | 0.11% | 1.23% | 0.45% |
| | # | 844 | 713 | 131 | 52 | 11 | 494 | 64 | 62 | 36 | 98 | 18 | 0 | 0 | 5 | 2 | 2 | 0 |
| GENERAL ENGINEERING (0801) | % | 100% | 84.48% | 15.52% | 6.16% | 1.30% | 58.53% | 7.58% | 7.35% | 4.27% | 11.61% | 2.13% | 0.00% | 0.00% | 0.59% | 0.24% | 0.24% | 0.00% |
| Occupational CLF | # | 100% | 89.58% | 10.30% | 3.19% | 0.60% | 71.83% | 7.15% | 3.04% | 0.77% | 9.92% | 1.63% | 0.09% | 0.01% | 0.21% | 0.05% | 1.32% | 0.18% |
| | # | 405 | 350 | 55 | 39 | 6 | 241 | 33 | 21 | 8 | 42 | 8 | 2 | 0 | 1 | 0 | 4 | 0 |
| CIVIL ENGINEERING (0810) | % | 100% | 86.42% | 13.58% | 9.63% | 1.48% | 59.51% | 8.15% | 5.19% | 1.98% | 10.37% | 1.98% | 0.49% | 0.00% | 0.25% | 0.00% | 0.99% | 0.00% |
| Occupational CLF | # | 100% | 89.83% | 10.02% | 3.71% | 0.61% | 74.05% | 7.53% | 2.91% | 0.62% | 7.44% | 1.09% | 0.03% | 0.01% | 0.33% | 0.08% | 1.37% | 0.21% |
| | # | 834 | 750 | 84 | 53 | 12 | 469 | 34 | 65 | 15 | 151 | 22 | 1 | 0 | 11 | 0 | 0 | 0 |
| ELECTRONICS ENGINEERING (0855) | % | 100% | 89.93% | 10.07% | 6.35% | 1.44% | 56.24% | 4.08% | 7.79% | 1.80% | 18.11% | 2.64% | 0.12% | 0.00% | 1.32% | 0.12% | 0.00% | 0.00% |
| Occupational CLF | # | 100% | 91.28% | 8.60% | 3.63% | 0.45% | 72.08% | 5.51% | 3.55% | 0.92% | 10.47% | 1.62% | 0.05% | 0.01% | 0.23% | 0.03% | 1.31% | 0.16% |
| | # | 763 | 653 | 110 | 33 | 8 | 494 | 80 | 38 | 9 | 79 | 13 | 1 | 0 | 4 | 0 | 4 | 0 |
| AEROSPACE ENGINEERING (0861) | % | 100% | 85.58% | 14.42% | 4.33% | 1.05% | 64.74% | 10.48% | 4.98% | 1.18% | 10.35% | 1.70% | 0.13% | 0.00% | 0.52% | 0.00% | 0.52% | 0.00% |
| Occupational CLF | # | 100% | 90.92% | 8.97% | 4.10% | 0.54% | 74.25% | 6.47% | 2.56% | 0.66% | 8.25% | 1.20% | 0.15% | 0.00% | 0.24% | 0.03% | 1.39% | 0.16% |
| | # | 458 | 283 | 175 | 37 | 12 | 201 | 104 | 28 | 48 | 12 | 6 | 0 | 3 | 4 | 1 | 1 | 1 |
| GENERAL INSPECTION, INVESTIGATION & COMPLIANCE (1801) | % | 100% | 61.79% | 38.21% | 8.08% | 2.62% | 43.89% | 22.71% | 6.11% | 10.48% | 2.62% | 1.31% | 0.00% | 0.66% | 0.87% | 0.22% | 0.22% | 0.22% |
| Occupational CLF | # | 100% | 52.87% | 46.74% | 4.17% | 3.52% | 41.33% | 34.08% | 4.47% | 6.95% | 1.66% | 1.41% | 0.06% | 0.05% | 0.39% | 0.44% | 0.82% | 0.65% |
| | # | 4320 | 3989 | 331 | 230 | 13 | 3439 | 293 | 188 | 12 | 58 | 6 | 9 | 3 | 49 | 4 | 16 | 0 |
| AVIATION SAFETY INSPECTOR (1825) | % | 100% | 92.34% | 7.66% | 5.32% | 0.30% | 79.61% | 6.78% | 4.35% | 0.28% | 1.34% | 0.14% | 0.21% | 0.07% | 1.13% | 0.09% | 0.37% | 0.00% |
| Occupational CLF | # | 100% | 83.79% | 15.90% | 7.32% | 1.65% | 65.29% | 10.99% | 7.69% | 2.72% | 1.64% | 0.31% | 0.10% | 0.00% | 0.51% | 0.18% | 1.26% | 0.31% |
| AIRWAY TRANSPORTATION SYSTEMS SPECIALIST (2101) | # | 6164 | 5619 | 545 | 509 | 36 | 4208 | 371 | 499 | 84 | 221 | 34 | 25 | 2 | 99 | 10 | 58 | 8 |
| | % | 100% | 91.16% | 8.84% | 8.26% | 0.58% | 68.27% | 6.02% | 8.10% | 1.36% | 3.59% | 0.55% | 0.41% | 0.03% | 1.61% | 0.16% | 0.94% | 0.13% |
| Occupational CLF | # | 100% | 43.42% | 56.05% | 4.74% | 5.27% | 30.24% | 39.74% | 4.89% | 7.79% | 2.57% | 2.34% | 0.07% | 0.08% | 0.24% | 0.40% | 0.67% | 0.94% |
| AIR TRAFFIC CONTROL SPECIALIST (2152) | # | 20115 | 16748 | 3367 | 1030 | 210 | 14107 | 2726 | 934 | 290 | 339 | 78 | 40 | 9 | 167 | 24 | 131 | 30 |
| | % | 100% | 83.26% | 16.74% | 5.12% | 1.04% | 70.13% | 13.55% | 4.64% | 1.44% | 1.69% | 0.39% | 0.20% | 0.04% | 0.83% | 0.12% | 0.65% | 0.15% |
| Occupational CLF | # | 100% | 81.51% | 18.14% | 3.79% | 0.98% | 69.02% | 14.45% | 5.37% | 1.94% | 1.36% | 0.43% | 0.12% | 0.01% | 0.49% | 0.11% | 1.41% | 0.51% |

DOT FAA FEDERAL AVIATION ADMINISTRATION  For Period ( 2010-10-01 TO 2011-09-30 )

Table A7: HIRES FOR MAJOR OCCUPATIONS - Distribution by Race/Ethnicity and Sex - Permanent Workforce

| Job Title/Series Agency Rate Occupational CLF | | TOTAL EMPLOYEES | | | Hispanic or Latino | | White | | Black or African American | | Asian | | Native Hawaiian or Other Pacific Islander | | American Indian or Alaska Native | | Two or more races | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | All | male | female | male | female | male | female | male | female | male | female | male | female | male | female | male | female |
| **INFORMATION TECHNOLOGIST (0334)** | # | 32 | 28 | 4 | 2 | 0 | 20 | 3 | 1 | 1 | 4 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Accessions | % | 100% | 87.50% | 12.50% | 6.25% | 0.00% | 62.50% | 9.38% | 3.13% | 3.13% | 12.50% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 3.13% | 0.00% |
| CLF | # | 100% | 66.77% | 33.23% | 3.14% | 1.55% | 50.42% | 24.73% | 4.29% | 3.48% | 7.40% | 2.89% | 0.05% | 0.02% | 0.24% | 0.11% | 1.23% | 0.45% |
| **GENERAL ENGINEERING (0801)** | # | 23 | 19 | 4 | 1 | 0 | 15 | 2 | 1 | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accessions | % | 100% | 82.61% | 17.39% | 4.35% | 0.00% | 65.22% | 8.70% | 4.35% | 4.35% | 8.70% | 4.35% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| CLF | # | 100% | 89.61% | 10.39% | 3.19% | 0.60% | 71.83% | 7.15% | 3.04% | 0.77% | 9.92% | 1.63% | 0.09% | 0.01% | 0.21% | 0.05% | 1.32% | 0.18% |
| **CIVIL ENGINEERING (0810)** | # | 17 | 15 | 2 | 0 | 0 | 11 | 2 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accessions | % | 100% | 88.24% | 11.76% | 0.00% | 0.00% | 64.71% | 11.76% | 0.00% | 0.00% | 23.53% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| CLF | # | 100% | 89.86% | 10.14% | 3.71% | 0.61% | 74.05% | 7.53% | 2.91% | 0.62% | 7.44% | 1.09% | 0.03% | 0.01% | 0.33% | 0.08% | 1.37% | 0.21% |
| **ELECTRONICS ENGINEERING (0855)** | # | 15 | 15 | 0 | 1 | 0 | 11 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accessions | % | 100% | 100.00% | 0.00% | 6.67% | 0.00% | 73.33% | 0.00% | 13.33% | 0.00% | 6.67% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| CLF | # | 100% | 91.31% | 8.69% | 3.63% | 0.45% | 72.08% | 5.51% | 3.55% | 0.92% | 10.47% | 1.62% | 0.05% | 0.01% | 0.23% | 0.03% | 1.31% | 0.16% |
| **AEROSPACE ENGINEERING (0861)** | # | 27 | 21 | 6 | 2 | 1 | 16 | 5 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Accessions | % | 100% | 77.78% | 22.22% | 7.41% | 3.70% | 59.26% | 18.52% | 3.70% | 0.00% | 3.70% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 3.70% | 0.00% |
| CLF | # | 100% | 90.94% | 9.06% | 4.10% | 0.54% | 74.24% | 6.47% | 2.56% | 0.66% | 8.25% | 1.20% | 0.15% | 0.00% | 0.24% | 0.03% | 1.39% | 0.16% |
| **GENERAL INSPECTION, INVESTIGATION & COMPLIANCE (1801)** | # | 14 | 11 | 3 | 1 | 0 | 10 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accessions | % | 100% | 78.57% | 21.43% | 7.14% | 0.00% | 71.43% | 14.29% | 0.00% | 7.14% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| CLF | # | 100% | 52.91% | 47.09% | 4.17% | 3.52% | 41.32% | 34.08% | 4.47% | 6.95% | 1.66% | 1.41% | 0.06% | 0.05% | 0.39% | 0.44% | 0.82% | 0.65% |
| **AVIATION SAFETY INSPECTOR (1825)** | # | 115 | 102 | 13 | 8 | 0 | 87 | 13 | 6 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| Accessions | % | 100% | 88.70% | 11.30% | 6.96% | 0.00% | 75.65% | 11.30% | 5.22% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.87% | 0.00% | 0.00% | 0.00% |
| CLF | # | 100% | 83.84% | 16.16% | 7.32% | 1.65% | 65.31% | 10.99% | 7.69% | 2.72% | 1.64% | 0.31% | 0.10% | 0.00% | 0.51% | 0.18% | 1.26% | 0.31% |
| **AIRWAY TRANSPORTATION SYSTEMS SPECIALIST (2101)** | # | 302 | 294 | 8 | 28 | 0 | 229 | 5 | 17 | 2 | 9 | 0 | 1 | 0 | 2 | 0 | 8 | 1 |
| Accessions | % | 100% | 97.35% | 2.65% | 9.27% | 0.00% | 75.83% | 1.66% | 5.63% | 0.66% | 2.98% | 0.00% | 0.33% | 0.00% | 0.66% | 0.00% | 2.65% | 0.33% |
| CLF | # | 100% | 43.44% | 56.56% | 4.74% | 5.27% | 30.24% | 39.74% | 4.89% | 7.79% | 2.57% | 2.34% | 0.07% | 0.08% | 0.24% | 0.40% | 0.67% | 0.94% |
| **AIR TRAFFIC CONTROL SPECIALIST (2152)** | # | 650 | 543 | 107 | 56 | 9 | 406 | 79 | 36 | 13 | 14 | 3 | 1 | 0 | 2 | 0 | 28 | 3 |
| Accessions | % | 100% | 83.54% | 16.46% | 8.62% | 1.38% | 62.46% | 12.15% | 5.54% | 2.00% | 2.15% | 0.46% | 0.15% | 0.00% | 0.31% | 0.00% | 4.31% | 0.46% |
| CLF | # | 100% | 81.58% | 18.42% | 3.79% | 0.98% | 69.03% | 14.45% | 5.37% | 1.94% | 1.36% | 0.43% | 0.12% | 0.01% | 0.49% | 0.11% | 1.41% | 0.51% |