

# Middle Georgia State College
# Air Traffic Control Recommendation Process
### Federal Aviation Administration (FAA) AT-CTI Requirements:

**Visit www.faa.gov for more information**

☐ Graduate from an FAA approved AT-CTI program
☐ Receive an official school recommendation
☐ Be a United States citizen
☐ In most cases, not have reached age 31
☐ Pass a medical examination
☐ Pass a security investigation
☐ Achieve a score of at least 70 on the FAA pre-employment test (ATSAT)
☐ Speak English clearly enough for others to understand you on communications equipment
☐ Complete an interview

The recommendation process uses the whole person concept to include character and academic achievement. Students will also be required to take the MGSC Recommendation Exam. The minimum score for passing the recommendation exam will be a score of 80%. Many factors are involved with respect to a student's character; punctuality, respect for others, professionalism, work ethic, and many other positive attributes are factored when considering a student for recommendation. Upon graduation students will be required to apply for their Official School Recommendation with their advisor.

Once a student graduates and receives the official school recommendation the student's information is forwarded to the FAA AT-CTI Department. The student will receive notification from the FAA and now the process is between the FAA and the AT-CTI graduate.

CONFIDENTIAL

| | |
|---|---|
| **From:** | Eichelberger, Joseph J. <jeichelberger@ccbcmd.edu> |
| **Sent:** | Thursday, January 2, 2014 7:17 PM |
| **To:** | Sharon L LaRue |
| **Cc:** | Ramon Claudio; Fischer, Sam; Kintner, Steve; Verne Latham; Trena Mathis; Allen C Hoffman; Rocky P Capozzi; Albert.culp@tstc.edu; anaumann@mdc.edu; Carolyn D Sanborn; asikora@broward.edu; aviation@greenriver.edu; Barb.soleta@aims.edu; beverly.byrdsong@hamptonu.edu; Brad.Sherman@tstc.edu; Brent.Spencer@erau.edu; broganwi@lewisu.edu; carey.freeman@hamptonu.edu; Cheatum, Carter L.; Komsa, Chris; Coynea7e@erau.edu; craigc@aero.und.edu; cscott@greenriver.edu; danm@hesston.edu; David Kangas; dbraun1@broward.edu; David J Cushwa; Deborah.abingdon@roswell.enmu.edu; Gallion Jr, Donald K.; dlewis4@mdc.edu; domenic.proscia@vaughn.edu; donofrij@dowling.edu; drechsel@aero.und.edu; Dusty.lewis@roswell.enmu.edu; Williams, Doug; dwilt@fit.edu; forrestj@msudenver.edu; gcomollo@greenriver.edu; gil.sinclair@wmich.edu; gregory.mcguirk@erau.edu; greverdi@fitaviation.com; gwescott@tulsacc.edu; gzlotky@mtsu.edu; hayden_scott@dwc.edu; idar@scc.losrios.edu; jboerger@kent.edu; jcain@fit.edu; JCALAF@BAYAMON.INTER.EDU; Jim.Scott@ccbc.edu; jmerkt@ju.edu; John Gilding; Joseph Gridley; jshakesp@broward.edu; juan.salmon@roswell.enmu.edu; kencarson@ou.edu; koplinkl@dowling.edu; kuhlmank@msudenver.edu; Linda Bracewell; lstephe4@aims.edu; lwilkin2@aims.edu; Margaret.browning@hamptonu.edu; Mary Niemczyk; millers@scc.losrios.edu; mmcfarl2@kent.edu; mnolan@purdue.edu; mtfranqui@gmail.com; mtsuatc@mtsu.edu; mummeb6e@erau.edu; mwillet@ju.edu; nradi@aero.und.edu; parrotwi@lewisu.edu; RBancroft@tulsacc.edu; rcharles@mgc.edu; ron.ferrara@mtsu.edu; Rosalinda.Herrera@tstc.edu; rpace@mgc.edu; rrogus@mtsac.edu; Rusty.Chandler@cecilairport.com; ryan.seiler@wmich.edu; ryates@ju.edu; sandraz@hesston.edu; sandyt@hesston.edu; Fortier, Sean; senglish@broward.edu; sharon.devivo@vaughn.edu; slanderson@stcloudstate.edu; smithabc@erau.edu; Sshackelford@mtsac.edu; stephenwest@ou.edu; streitmi@lewisu.edu; webbd@scc.losrios.edu; wyman_peter@dwc.edu |
| **Subject:** | Re: OTS hiring |
| **Attachments:** | logo.gif |

CTI partners,

Some graduates of mine have started a Facebook group with the intent of giving a unified voice to CTI students and grads. This page is not in any way run by or sponsored by my school, and is an independent act by students who recognize their voice will only be heard if they stand together as a community.  I have agreed to put the word out for them, as I think they have a right to be heard. To that end, and with the previous disclaimer, can you please make your students and graduates aware of said group?  It can be found by searching Facebook under "CTI school connection".

Again, this group does not belong to my, or any school, but is an independent effort by the students to rally for their cause.

Thanks,
Joe Eichelberger

CTI0001031.01567



| | |
|---|---|
| **From:** | Michael W. Pearson <mpearson@azlaw.com> |
| **Sent:** | Thursday, January 2, 2014 5:59 PM |
| **To:** | Joseph.Teixeira@faa.gov |
| **Cc:** | West, Stephen G.; les.wilkinson@aims.edu; 'Verne Latham'; Ramon Claudio; lstephe4 @aims.edu; Mary Niemczyk; Joseph Gridley; John Gilding; ecolageo@broward.edu; asikora@broward.edu; jshakesp@broward.edu; senglish@broward.edu; dbraun1 @broward.edu; Jim.Scott@ccbc.edu; hayden_scott@dwc.edu; wyman_peter@dwc.edu; donofrij@dowling.edu; koplinkl@dowling.edu; LindenfM@dowling.edu; dalyt@dowling.edu; Deborah.abingdon@roswell.enmu.edu; Dusty.lewis@roswell.enmu.edu; juan.salmon@roswell.enmu.edu; Coynea7e@erau.edu; smithabc@erau.edu; mummeb6e@erau.edu; gregory.mcguirk@erau.edu; frances.mitchell@erau.edu; Brent.Spencer@erau.edu; Jack.Panosian@erau.edu; moore@fit.edu; dwilt@fit.edu; sam.fischer@fscj.edu; ccheatum@fscj.edu; dgallion@fscj.edu; Margarita.Cabral-Maly@fscj.edu; cscott@greenriver.edu; gcomollo@greenriver.edu; aviation@greenriver.edu; Eely@greenriver.edu; Margaret.browning@hamptonu.edu; beverly.byrdsong@hamptonu.edu; eric.sheppard@hamptonu.edu; carey.freeman@hamptonu.edu; sandyt@hesston.edu; danm@hesston.edu; sandraz@hesston.edu; mtfranqui@gmail.com; JCALAF@BAYAMON.INTER.EDU; jmartinez@bayamon.inter.edu; ryates@ju.edu; Rusty.Chandler@cecilairport.com; mwillet@ju.edu; jmerkt@ju.edu; mmcfarl2 @kent.edu; jboerger@kent.edu; rpriestl@kent.edu; lefton@kent.edu; Jonweber@letu.edu; Seanfortier@letu.edu; SteveKintner@letu.edu; parrotwi@lewisu.edu; streitmi@lewisu.edu; broganwi@lewisu.edu; kuhlmank@msudenver.edu; forrestj@msudenver.edu; vgolich@msudenver.edu; anaumann@mdc.edu; dlewis4@mdc.edu; jeffery.thomas@mdc.edu; ataylor@mgc.edu; lhenry@mgc.edu; rpace@mgc.edu; rcharles@mgc.edu; gzlotky@mtsu.edu; mtsuatc@mtsu.edu; ron.ferrara@mtsu.edu; linda.bracewell@minneapolis.edu; David.Kangas@minneapolis.edu; trena.mathis@minneapolis.edu; rrogus@mtsac.edu; Sshackelford@mtsac.edu; sdaum@mtsac.edu; bdbowen@purdue.edu; mnolan@purdue.edu; congert@scc.losrios.edu; millers@scc.losrios.edu; idar@scc.losrios.edu; webbd@scc.losrios.edu; slanderson@stcloudstate.edu; jwpalmer@stcloudstate.edu; james.rowland@tstc.edu; Rosalinda.Herrera@tstc.edu; Albert.culp@tstc.edu; Brad.Sherman@tstc.edu; jeichelberger@ccbcmd.edu; dwilliams@ccbcmd.edu; ckomsa@ccbcmd.edu; gwescott@tulsacc.edu; RBancroft@tulsacc.edu; Rocky P Capozzi; Sharon L LaRue; Carolyn D Sanborn; David J Cushwa; Allen C Hoffman; Rocky P Capozzi; lovelace@aero.und.edu; drechsel@aero.und.edu; craigc@aero.und.edu; nradi@aero.und.edu; bsmith@aero.und.edu; Carson, Kenneth R.; sharon.devivo@vaughn.edu; domenic.proscia@vaughn.edu; felix.esquibel@wmich.edu; ryan.seiler@wmich.edu; gil.sinclair@wmich.edu; dave.powell@wmich.edu; Michael Pearson |
| **Subject:** | RE: Hiring of Air Traffic Controllers by the FAA |
| **Attachments:** | Michael W Pearson.vcf |

Dear Mr. Teixeira, et. al.,

Mr. Teixeira, I'm not sure if you personally crafted the policy you announced via email on December 30, 2013, or are simply the FAA's chosen messenger. My communication is not in any manner meant to be insulting,

1

CTI0001031.01570

simply the truth that most folks (including those in the FAA) feel, yet cannot state for a variety of reasons. As Mr. Esquibel did a fine job in illustrating glaring shortcomings of the report in his email to you earlier today (regarding statistical and research methodologies -confusing correlation with causation, etc.), I'll focus on different issues. Specifically what I believe the "other reason" is for the change in policy Mr. Esquibel speaks of.

It has been proven that CTI graduates have a much higher success rate regarding initial certification. The FAA knows this. The best way to ensure that you have a "diverse" workforce is by properly preparing a controller candidate regardless of race, ethnicity or gender. Quotas are illegal <u>regardless</u> of who they impact. In the second to the last sentence, of your email it says "...those who meet the qualification standards and **pass** the biographical questionnaire." [emphasis added]. Could you please enumerate the objective and subjective factors and/or benchmarks that determine whether or not a prospective applicant "passes" a biographical questionnaire? By its very nature this would involve subjective interpretation which leads directly to bias. In addition, please provide a copy of the raw data your consultants and/or employees used in the design and implementation of the questionnaire itself and grading criteria to all affected parties including CTI institutions. Using a biographical questionnaire to screen folks based on their race, ethnicity, or gender is likely facially discriminatory. Racial and gender gerrymandering of the hiring process is not only illegal- it is odorous and shameful.

By essentially ignoring the thousands of current CTI controller applicants (including many, many, minority graduates) who have a statistically higher chance of achieving a full performance level rating as a certified professional controller, the FAA is circumventing congressional mandate. In addition, CTI students have been purposefully mislead by the FAA. They have had a carrot placed in front of them- that they have intentionally and artificially been prevented from "getting"- due to blatant FAA racial politics. All folks deserve a fair chance regardless of gender or skin color.

I am not trying to attack you in any sense and certainly not insult you-yet your email appears to be a whitewashing of the actual purpose behind the new OTS hiring program. I believe it is an illegal form of discrimination on its face. Ironically those who have crafted this program are short sighted. There are many students, regardless of race or gender, who with proper preparation may become successful CPCs. That is, successfully pass the certification process and have rewarding careers versus being placed in a situation where the odds are stacked greatly against them due to lack of preparation. Color nor gender is a "barrier" to successful completion of the air traffic control training process- lack of aptitude and desire is. The best way to achieve the admirable goal of diversity is through preparation- not reverse discrimination.

The term "Barrier Analysis" is interesting in, and of, itself. I am personally aware of many minority (race/gender) CTI air traffic control students that have already achieved full performance level position with the FAA or are well on their way to that recognition. I see **no barrier** to any qualified college student (regardless of race or gender) from enrolling and successfully graduating from a CTI program that actually prepares them for success. Could you please elaborate on the data that your consultants used in making this determination? Again, I agree with Mr. Esquibel, a fundamental error students make is confusing correlation with causation. What data and determinative models where used in making what appears to be a results oriented titling that a barrier exists?

The United States Supreme Court has spoken many times on the issue of discrimination. Reading *Ricci v. Destefano*, the following factors may indicate reverse discrimination:
1. the employer (FAA) conducted disparity analyses (Barrier Analysis Report ) **after** an assessment (AT-SAT) was implemented; and

CTI0001031.01570

2.    **after** an assessment had been implemented, the employer "changed" assessment implementation characteristics (*See* the Barrier Analysis Report) like cut scores, weighting schemes, and so forth (or cancelled the results as in *Ricci*) based in part on the results of the disparity analysis and/or adequacy of the assessment.

As the FAA conducted the Barrier Analysis Report after a much debated and analyzed assessment process was implemented and thousands of CTI students who have passed the assessment, are on the FAA's hiring rolls, and have been artificially delayed from gaining employment due to elements within the FAA's Human Resources office who apparently do not like the racial makeup of those on the list, it appears that the FAA is in fact going against settled law and engaging in disparate treatment and racial discrimination.  It is interesting to me that one of the consultants the FAA paid to craft the new policy, James Outtz, lists his expertise as race discrimination issues and selection system design. In a recent case involving Bridgeport Connecticut firefighters Mr. Outtz apparently played some role in the design of a selection system that the parties felt violated *Ricci* and caused the defendants to settle the matter. In short, Mr. Outtz participated in the design and/or implementation for the firefighters that excluded a fully-qualified white and Hispanic males and permitted the promotion of a minority that was objectively under-qualified for the position.  The ensuing lawsuit against Bridgeport triggered nationwide publicity regarding reverse-discrimination policies.

Mr. Teixeira, if you are just the messenger, and your recognize the unfairness and flaws of this policy, I apologize for the tone and tenor of this email. If you actually supported it and played a role in its architecture-shame on you and the rest of the folks who have apparently gamed the CTI and FAA hiring process after so many folks have built their dreams on multiple representations by the FAA. The rest of my missive is addressed to the many folks affected by the FAA's policy change.  As with Mr. Mr. Esquibel, I am not some outside stakeholder pounding the table. I have almost 27 years of FAA service as a FPL/CPC controller in several of the FAA's busiest facilities. My sincere hope is that the FAA will hire the eligible candidates already waiting (including many minority applicants) and ensure moving forward that the process is fair for all regardless of race or gender. Using a subjective tool (biographical questionnaire) to screen out ATC applicants based on race and/or gender is disparate treatment and unfair to all.  In instituting this policy I believe the FAA is opening itself up for complaints and lawsuits regarding institutional reverse discrimination.

I urge all institutions to ask these pointed questions of the FAA should they choose to actually have a meeting/telecon explaining their actions. I further urge the meeting/telecon participants to not take platitudes and evasive answers in lieu of honest and straightforward data. Insist on verifiable data. Lastly, I **urge all CTI graduates, students, invested parents, and CTI institutions** who have been intentionally and purposefully mislead to immediately contact their congressional representatives. This includes CTI students of both genders and all races. I believe the FAA will take no action and will implement this facially discriminatory policy despite this email unless your collective voices are heard by Congress. Silence is your enemy. The thimblerig engaged in by the FAA through this new policy should not go unchallenged.

In the event that the FAA continues with this apparent illegal "quota" screening tool a nationwide class action discrimination lawsuit may be in order. Be advised, that although I am a lawyer that handles many different types of litigation, this is not in any manner a solicitation. In fact, a specialist in this area is needed and I, nor my firm, will handle <u>any cases</u> regarding the above issues. Please do not call or email my firm with a request to represent your interests- it is simply outside the scope of what we do and not the intent of this email. The purpose of this email is to bring discriminatory hiring practices to your attention- **not** solicit litigation.

Respectfully,

Michael Pearson (MP)

CTI0001031.01570

CURRY, PEARSON
& WOOTEN, PLC
**814 West Roosevelt Street**
**Phoenix, Arizona 85007**

http://www.azlaw.com

602.258.1000 **Phone**
602.523.9000 **Fax**

**ATTENTION**: The information in this e-mail message is attorney privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify our office by telephone and e-mail and return the original message to us at the above address. Thank You.








> On Dec 30, 2013, at 3:20 PM, "Joseph.Teixeira@faa.gov" <Joseph.Teixeira@faa.gov> wrote:
>
>
> Dear Colleagues,
>
> The quoted text below, is an extract from letters we sent today to all our
> primary Collegiate Training Initiative (CTI) contacts. This email is being
> sent to an expanded list of CTI stakeholders to initiate a dialogue on
> upcoming changes to the hiring process for of air traffic controllers by
> the FAA.
>
> "The Federal Aviation Administration (FAA) has enjoyed a long-standing
> relationship with your organization and values our partnership in the
> training of potential Air Traffic Controllers (ATC). Recently, the FAA
> completed a barrier analysis of the ATC occupation pursuant to the Equal
> Employment Opportunity Commission's (EEOC) Management Directive 715. As a
> result of the analysis, recommendations were identified that we are
> implementing to improve and streamline the selection of ATC candidates.

CTI0001031.01570

> These improvements will have a direct and present impact on all hiring
> sources, including CTI.
> An overview of the immediate changes being made to the ATC hiring process
> is presented below.
>
> Revisions to ATC Hiring Process
>
> ·    A nationwide competitive FG-01 vacancy announcement open to all U.S.
> Citizens will be issued in February 2014. Any individual desiring
> consideration for employment (including CTI graduates) MUST apply.
> Existing inventories of past applicants will not be used.
>
>
> ·    All applicants will be evaluated against the same set of
> qualification standards. Specifically, applicants must have at least
> 3 years of progressively responsible work experience, a 4 year
> degree, or a combination of the two.
>
>
> ·    The existing testing process has been updated. The revised testing
> process is comprised of a biographical questionnaire (completed as
> part of the application process) and the cognitive portion of the
> AT-SAT.  The cognitive portion of the AT-SAT will be administered
> only to those who meet the qualification standards and pass the
> biographical questionnaire. Applicants for the February 2014
> announcement will be required to take and pass the new assessments in
> order to be referred on for a selection decision.
>
>
> ·    Since a single vacancy announcement will be used for all applicant
> sources, a single nationwide referral list will be generated
> containing all candidates who meet the qualification standards and
> pass the assessments. Location preference will no longer be used as a
> determining factor for referral or selection.
>
>
> Centralized selection panels will no longer be convened to make selections
> from the referral list. Selections will now be fully automated, grouping
> candidates by assessment scores and veteran's preference.
>
> These improvements to the ATC hiring process will significantly strengthen
> the long term sustainability of our program and offer our candidates a fair
> and viable opportunity to demonstrate their capabilities and potential for
> the ATC position.
>
> We recognize that you may have questions concerning these changes.
> Considering the upcoming holiday season, we are planning a teleconference
> for Mid-January when we will more fully address questions and concerns you
> may have.
>
> We want to reiterate that we very much value our partnership with the CTI

5

CTI0001031.01570

> program and look forward to assisting you in understanding our changes to
> the ATC selection process.  We will be contacting you soon to schedule the
> January teleconference."
>
>
> Best Regards, Joseph
>
> Joseph Teixeira
> Vice President for Safety &
> Technical Training
> Air Traffic Organization
> Tel:  202-267-3341
> Email:  joseph.teixeira@faa.gov
> (Embedded image moved to file: pic26439.gif)
> <pic26439.gif>


--


**Ramon Claudio**
ATC Department Chair
Texas State Technical College
3801 Campus Drive
Waco, Texas 76705
Office: 254-867-2086
Mobile 254-523-7519
Email: ramon.claudio@tstc.edu

*"This email may contain the thoughts and opinions of Ramon Claudio and does not represent official Texas State Technical College-Waco policy."*

CTI0001031.01570

EXHIBIT DD



**facebook**                                                                 Log In

**CTI Connection**
■ Private group · 1.8K members                                      Join Gr...

**About**    Discussion

### About This Group

Alright all, here is our forum to get to communicate among other CTI school supporters. Let's open the communication country wide. Our C.T.I. schools need to stand together, providing a unified and professional front. Spread the word, Let the C.T.I. Schools unite! This is intended to be a communication avenue. This page doesn't support the "angry mob" mentality or anything but positive "We believe in CTI schools" vibes. We believe that all of the simulator hours spent, materials studied, and education taught in C.T.I. schools has value and is of worth.
Important:
Approval is needed for admittance to the group. Check you "other" inbox for a message as you may get a message asking what CTI school you attended. Answer back for pending approval **See Less**

■ **Private**
Only members can see who's in the group and what they post.

# facebook

Log In

General

### History
Group created on January 2, 2014. Name last changed on September 30, 2019. **See more**

### Members · 1.8K

### Activity

■ No new posts today
1 in the last month

■ 1,799 total members
No new members in the last week/month

■ Created 7 years ago

EXHIBIT

EE

14:03

## ← Admins and Moderators

 **Joe Eichelberger**
Assistant Professor, Aviation Department at Community College of Baltimore County
**Add Friend**

 **Sam Fischer**
**Add Friend**

 **Kevin Siragusa**
System Engineer at L3Harris Technologies
**Add Friend**

 **Dan Bird**
Works at U.S. Department of Transportation
**Message**

 **Moranda Reilly**
Aviation Systems at L3Harris Technologies
**Add Friend**

 **Jorge Rojas**
Arizona State University
**Message**

 **Andrew Brigida**
**Add Friend**

    

EXHIBIT

FF

On June 26, 2013, the Supreme Court ruled that Section 3 of the Defense of Marriage Act (DOMA) is unconstitutional. As a result of the Supreme Court's decision, the United States Office of Personnel Management (OPM) will now be able to extend certain benefits to Federal employees and annuitants who have legally married a spouse of the same sex, regardless of the employee's or annuitant's state of residency. OPM is currently in the process of updating and revising the website to reflect this change, and will be updating this information as soon as possible. Please check back in the coming weeks for updates.

# Delegated Examining Operations Handbook:

## *A Guide for Federal Agency Examining Offices*

### May 2007

# Table of Contents

- Introduction
- Chapter 1 – OPM and Agency Responsibilities
  - Section A - What is Delegated Examining Authority?
  - Section B - OPM Responsibilities
  - Section C - Agency Responsibilities
  - Section D - Delegated Examining Training Responsibilities
  - Section E - References
- Chapter 2 - Identifying the Job and its Assessments
  - Section A - Review Hiring Flexibilities
    - Temporary Limited Employment
    - Term Employment
    - Administrative Careers With America (ACWA), Alternative Assessments, And Other Hiring Programs
    - Direct-Hire Authority
    - Excepted Service Positions, Senior Executive Positions, and Appointments Authorized by Statute
  - Section B -Conduct A Job Analysis
  - Section C - Identify Assessment Tools
    - Assessment Tools
    - Indicators of Proficiency
  - Section D - Submit Request to the Delegated Examining Officer
  - Section E - References
- Chapter 3 - Recruit and Announce the Job
  - Section A – Recruitment
  - Section B - What is Public Notice?
  - Section C - Create a Job Announcement
  - Section D - References
- Chapter 4 - Accept and Review Applications
  - Section A - Accepting Applications
    - Application Forms
    - Receiving Applications
    - Incomplete Applications
  - Section B - Reviewing Applications
    - Career Transition Assistance Program Requirements
    - Citizenship, Veterans' Preference, Age, and Other Requirements
    - Qualifications Requirements
    - Suitability
  - Section C - References
- Chapter 5 - Assess Applicants
  - Section A - Requirements for Competitive Employment
  - Section B - Rating the Applicants
    - Minimum Qualification Requirements
    - Occupational Qualification Standards
    - Selective Factors

- ▪ Quality Ranking Factors
- ▪ Rating Procedures
  - • A-C-E or Quality Level Rating
  - • Generic Ratings
  - • Category Rating Procedures, an alternative ranking and selection procedure
- ▪ Documenting the Rating Process
- o Section C - Establishing an Inventory
  - ▪ Case Examining
  - ▪ Competitor Inventory
  - ▪ Maintaining a Competitor Inventory
  - ▪ Terminating or Combining Inventories
  - ▪ Issuing Notices of Results
  - ▪ Reconsideration of Rating
- o Section D - References
- • Chapter 6 - Certify Eligibles
  - o Section A - Criteria Outlined in the Job Announcement
    - ▪ Geographic Area of Consideration
    - ▪ Interdisciplinary Positions
    - ▪ Dual Certification
    - ▪ Positions Restricted to Veterans
    - ▪ Positions Restricted to One Gender
  - o Section B -Creating a Certificate of Eligibles
    - ▪ Ranking the Eligibles
    - ▪ Tied Ratings
    - ▪ Number of Names Certified
    - ▪ Create A Certificate of Eligibles
  - o Section C - Audit a Certificate
    - ▪ Preparing the Certificate for the Audit
    - ▪ Auditing a Certificate of Eligibles Under the Traditional "Rule of Three" Procedures
    - ▪ Auditing a Certificate of Eligibles Under Category Rating Procedures
    - ▪ Documenting the Personnel Action
  - o Section D - Object to an Eligible
    - ▪ Objecting to an Eligible
    - ▪ Pass Over of a Preference Eligible
  - o Section E - Priority Consideration
    - ▪ Lost Consideration Due to Erroneous Certification
    - ▪ Lost Employment Consideration
    - ▪ Lost Certification
  - o Section F - References
- • Chapter 7 - Reporting and Accountability
  - o Section A - Safeguarding the Examining Process
  - o Section B - Freedom of Information (FOIA) and Privacy Acts
  - o Section C - Quarterly Workload Reports
  - o Section D - Annual Self-Audits

- o Section E - OPM Review
- o Section F - References
- Glossary
- Appendix A - Sample Interagency Delegated Examining Agreement
- Appendix B - Vendor Criteria List
- Appendix C - Records Retention and Disposition Schedule
- Appendix D – Administrative Careers With America, Alternative Assessments, and Other Hiring Program Positions
- Appendix E - Handbook for Agency Test Administrators and Test Control Officers
  - o Responsibilities
  - o Test Materials
  - o Administering the Test
  - o Test Security Procedures
  - o Sample Test Security Agreement
- Appendix F - Multipurpose Occupational Systems Analysis Inventory - Close-Ended (MOSAIC) Competencies
  - o Professional/Administrative Study Occupations
    - MOSAIC Competencies: Professional & Administrative Occupations 1996-1997
    - General Competencies
    - Technical Competencies
  - o Clerical/Technical Study Occupations
    - Clerical
    - Technical
    - MOSAIC Competencies: Clerical/Technical Study - 1993-1994
  - o MOSAIC Competencies: Leadership Effectiveness Study – 1992
  - o MOSAIC Competencies: Leadership Update Study – 1998
    - Leading Change
    - Leading People
    - Building Coalitions/Communication
    - Results Driven
    - Business Acumen
  - o Information Technology Study Occupations and Specialty Titles
    - Occupations
    - Specialty Titles
    - MOSAIC Competencies: Information Technology Study  -  2000-2001
    - General Competencies
    - Technical Competencies
  - o Trades And Labor Study Occupations
    - MOSAIC Competencies: Trades & Labor Occupational Study (TLOS) - 2000-2002
    - General Competencies
    - Technical Competencies
  - o Science & Engineering Study Occupations
    - Science & Engineering Professional Occupations
    - Science & Engineering Technician Occupations

- ▪ MOSAIC Competencies: Science and Engineering Occupational Study - 2000 – 2002
  - ▪ General Competencies
  - ▪ Technical Competencies
- Appendix G - OPM's Job Analysis Methodology
  - o Job Analysis Worksheet For Tasks
  - o Job Analysis Worksheet For Competencies
  - o Job Analysis Worksheet For Task And Competency Linkage
  - o Accomplishments Worksheet
  - o Multiple Choice/Yes-No Rating Schedule Worksheet
  - o Rating Schedule Benchmark Worksheet
  - o Sample Job Analysis Worksheet For Tasks
  - o Sample Job Analysis Worksheet For Competencies
  - o Sample Job Analysis For Task And Competency Linkage
  - o Sample Accomplishments Worksheet
  - o Sample Multiple Choice/Yes-No Rating Schedule Worksheet
  - o Sample Rating Schedule Benchmark Worksheet
  - o Occupational Analysis Scales
- Appendix H - Model Agency-Based Accountability Coverage Agenda
  - o Merit Principles and Law
  - o Merit Principle Assessment
- Appendix I - CTAP/ICTAP Charts
  - o CTAP Special Selection Consideration
  - o ICTAP Special Selection Consideration
- Appendix J – Transmutation Tables for General Schedule Positions
  - o Transmutation Table for the Maximum Number of Matching Points (6)
  - o Transmutation Table for the Maximum Number of Matching Points (7)
  - o Transmutation Table for the Maximum Number of Matching Points (8)
  - o Transmutation Table for the Maximum Number of Matching Points (9)
  - o Transmutation Table for the Maximum Number of Matching Points (10)
  - o Transmutation Table for the Maximum Number of Matching Points (11)
  - o Transmutation Table for the Maximum Number of Matching Points (12)
  - o Transmutation Table for the Maximum Number of Matching Points (13)
  - o Transmutation Table for the Maximum Number of Matching Points (14)
  - o Transmutation Table for the Maximum Number of Matching Points (15)
  - o Transmutation Table for the Maximum Number of Matching Points (16)
  - o Transmutation Table for the Maximum Number of Matching Points (17)
  - o Transmutation Table for the Maximum Number of Matching Points (18)
  - o Transmutation Table for the Maximum Number of Matching Points (19)
  - o Transmutation Table for the Maximum Number of Matching Points (20)
  - o Transmutation Table for the Maximum Number of Matching Points (21)
  - o Transmutation Table for the Maximum Number of Matching Points (22)
  - o Transmutation Table for the Maximum Number of Matching Points (23)
  - o Transmutation Table for the Maximum Number of Matching Points (24)
  - o Transmutation Table for the Maximum Number of Matching Points (25)
  - o Transmutation Table for the Maximum Number of Matching Points (26)

- o Transmutation Table for the Maximum Number of Matching Points (27)
- o Transmutation Table for the Maximum Number of Matching Points (28)
- o Transmutation Table for the Maximum Number of Matching Points (29)
- o Transmutation Table for the Maximum Number of Matching Points (30)
- Appendix K - Professional and Scientific Positions
- Appendix L - Random Referral Instructions
  - o Random Number List
- Appendix M - Instructions for Completing the Delegated Examining Quarterly Workload Report Form
- Appendix N - Oversight Review Guide
- Appendix O - Assessing Applicants with Disabilities

# Introduction

## Purpose of the Delegated Examining Operations Handbook (DEOH)

The Delegated Examining Operations Handbook (DEOH) is designed to provide assistance to agencies with delegated examining authority granted under section 1104 of title 5, United States Code (U.S.C.).

This DEOH applies to competitive examining only and not merit promotion, excepted service, senior executive service, or non-competitive service (see 5 U.S.C. § 1104). It provides agencies with guidance, options, and, where necessary, specific operational procedures that are designed to ensure that examining programs comply with merit system laws and regulations.

## Audience

Although OPM delegates examining authority at the agency headquarters level, agencies may assign examining responsibilities to subordinate offices, which serve as "delegated examining offices" (DEOs).

This DEOH is designed primarily for:

- Delegated examining staff;
- Test Administrators;
- Test Control Officers; and
- Human resources offices.

## Materials needed

Use this DEOH in conjunction with:

- Specific authorities cited in the agency's delegation agreement;
- Applicable laws in title 5, United States Code; and
- Regulations published in the Code of Federal Regulations (CFR).

(While the information in this DEOH is current as of the date of issue, any changes in regulation or law will supersede the information in this DEOH.)

## How the DEOH is organized

We have organized this DEOH in a manner that corresponds to the examining process, starting with recruitment planning and finishing with issuing and auditing certificates.

To help you understand the examining process and the organization of this DEOH, we have provided a flow chart outlining the major steps of the process (see next page). The main headings of the flow chart (outlined in red) reflect the major steps of the examining process. These major steps are:

- Identifying the job and its assessments (Chapter 2);
- Recruiting and announcing the job (Chapter 3);
- Accepting and reviewing applications (Chapter 4);
- Assessing applicants (Chapter 5); and
- Certifying eligibles (Chapter 6).

## Pledge to Applicants

Performing delegated examining activities properly is one step in fulfilling the "Pledge to Applicants".

OPM and the Partnership for Public Service recognize that a Government's most important asset is its people. To attract talented people to the service of the Nation, we believe the application process should enable rather than deter job seekers. To that end, we will work to ensure a process that reflects these principles.

1. A user-friendly application process that is not unduly burdensome or time consuming.
2. Clear, understandable job announcements and instructions for applying.
3. Timely and informed responses to questions about the requirements and the process.
4. Prompt acknowledgement that their application has been received.
5. Regular updates on the status of their applications as significant decisions are reached.
6. A timely decision-making process.

# Section C - Establishing an Inventory

There are two types of examining processes available for use by an agency when filling a job. You may fill a job either by announcing the position through "case examining" or through a competitor inventory.

The basic concept of case examining is to issue a job announcement for the immediate filling of a specific job(s), and close the case file when the selection process is completed.  A competitor inventory provides a list of interested and qualified applicants ready to be certified for current and future vacancies.  Before you make a decision as to which process to use, you may want to review and consider the advantages and disadvantages of each.

| Types of Examining Processes | Advantages | Disadvantages |
|---|---|---|
| **Case Examining** | • Competencies/KSAs are tailored to the job<br>• Applicants are available because they applied for the specific job | • Time delays in issuing a certificate because each job must be announced<br>• Applicants must apply for each position unless otherwise stated in the job announcement |
| **Competitor Inventory** | • Speed of referral<br>• Applicant applies only once and is assured consideration for recurring jobs | • High applicant unavailability rate over a period of time<br>• Continual maintenance is required |

This section contains the following topics:

- Case Examining
- Competitor Inventory
- Maintaining a Competitor Inventory
- Terminating or Combining Inventories
- Issuing Notices of Results
- Reconsideration of Rating

## Case Examining

The basic concept of case examining is to conduct targeted recruitment, issue a job announcement for the immediate filling of a specific job(s), and close a case file when the selection process is completed.  It is an effective technique for filling a job because the job seeker applies directly for a specific job and is rated and ranked using job-related competencies/KSAs.

### Special handling of a preference eligible's application

You must ensure a 10-point preference eligible's entitlement under 5 U.S.C. § 3305 to file an application at anytime for an examination for any position to which an appointment was made within the preceding three (3) years.

In addition, 5 CFR Part 332 identifies the conditions for accepting an application from a 10-point preference eligible.  The 10-point preference eligible's application must be accepted for any position for which a:

1. Non-temporary appointment has been made in the preceding three years;
2. List of eligibles currently exists but is closed to new applicants; or
3. List of eligibles is about to be established.

Under case examining, we recommend that when you receive a preference eligible's application, you:

- Review your records to identify any non-temporary appointments made in the preceding three years; and
- Compare the preference eligible's application against the title, series, grade, and duty location of the position identified in your review.  If the records are inconclusive as to the similarity of the positions, you must give the preference eligible the benefit of the doubt, and accept the application.

If the preference eligible applies for a specific position, meets the qualifications of the position, and is within reach for referral for the position, the examining office must ensure that the preference eligible is referred on the certificate as soon as possible.

If no job announcement is open and you receive a 10-point preference eligible's application, you should establish procedures for handling the application in compliance with 5 U.S.C. § 3305.  You should inform the preference eligible of these procedures as well as the status of his or her application.

**Issuing certificates**

Case examining procedures involve a one-time-only action with no expectation of filling other vacancies at a later date.  You have the option of sending the selecting official:

- The minimum number of eligibles, (i.e., three eligible names);
- All the qualified eligible names; or
- An appropriate number of eligible names based on past experience with the occupation (more than three names per vacancy but less than all).

The number of eligibles to be certified is flexible.  If the selecting official needs additional names to consider, you may send all the remaining names or the next three eligible names (see Chapter 6, Section B, Creating a Certificate of Eligibles or Number of Names Certified).

**Three considerations under traditional rating and ranking procedures**

If an eligible was considered and non-selected from a certificate from which three valid selections were made, you may eliminate the eligible from further consideration on that certificate.  Each time a job is announced on a case examining basis, the same eligible has the right to be considered for the position again even if he or she was considered three times for a previous case examining certificate.

**Documentation**

To ensure a complete audit trail, you should document the case file or card file/automated system to show that the 10-point file was checked, and then you should document the names of any preference eligibles whose applications were pulled from the file and to whom additional material was sent.

When the established retention period has expired, you may dispose of applications in accordance with records retention and disposition schedule instructions in Appendix C.

## Competitor Inventory

As an alternative to case examining, you may wish to establish a competitor inventory. This type of inventory is also referred to as a "standing competitor inventory," "standing register," or "register." For the purpose of this section, the term "competitor inventory" will be used.

A competitor inventory is usually established when positions in an occupation are frequently filled with non-status candidates and it is not efficient to recruit and examine for each job filled. A competitor inventory provides a list of interested and qualified applicants ready to be certified for current and future vacancies.

### Definition

A competitor inventory is a rank-ordered list of eligibles who meet one set of qualification requirements, have passed at least one assessment and are available to be considered for:

- One or more grade levels;
- One or more occupational specialties;
- At one or more geographical locations; and
- Various employment conditions identified on the job announcement, such as, travel, night or shift work.

### Types of inventories

There are two types of competitor inventories:

**Pre-rated inventory** is a list of eligibles who have been rated and ranked and placed in rank order, by option and by grade. This type of listing has traditionally been called a register, and applications are referred to as being "pre-rated" or "front-end rated."

**Deferred-rated inventory** is a list of applicants in alphabetical or identification number order. The list includes options and grades for which the applicants are considered. Although there may be an initial screening for basic qualifications, applications are rated only when a certificate is requested for a specific job. Typically, the rating is valid only for that specific position.

### Requirements for establishing a competitor inventory

When establishing a competitor inventory, you should record and maintain the following basic information to make it possible to reconstruct the history of a competitor inventory:

- Examination title and number;
- Position, grade and geographic area covered;
- Date the inventory was established; and
- Disposition of other competitor inventories, which the new one may have superseded.

**Date of establishment**

The date for establishing the competitor inventory depends on the length of time that the job announcement is open.

| IF a job announcement is open… | THEN the date of establishment is the date… |
|---|---|
| For a limited period | Of the first certificate issued from the inventory. |
| Continuously | When the first eligible applicant is entered into the inventory. |

In either case, if the public notice says that all those who apply by a certain date are considered first, then the applicants from the first group are entered onto the inventory at the same time, and those who apply later are entered as they are rated.

**Period of eligibility for a competitor inventory**

The applicant's period of eligibility is based on your need for the competitor inventory. Typically, the period of eligibility lasts for one year; however, you may set a shorter time period.

It is important to note the date of an applicant's entry onto the competitor inventory, because this is the date from which the length of the period of consideration is determined.

**Requests for additional information**

You may establish the competitor inventory without waiting for applicants to respond to requests for additional information.  However, you should make this fact known to the applicants from whom you are seeking additional information.  If it appears that the number of incomplete forms is very large, you may delay selections from the certificate until you receive the additional information or until the deadline for additional information has passed.

**Pre-rated inventory**

When establishing a pre-rated standing inventory, it should contain a complete record of the applicant's eligibility.  For each applicant on the inventory, you may use a register card, an automated data record, or other non-automated approach.  Generally, a separate record is prepared for each position, grade, and option for which an applicant is eligible.  The record should contain the following information:

- The eligible applicant's rating, including appropriate veterans' preference points and symbol (CP, CPS, XP, TP).  If the examination includes a written test, the part scores are recorded if part scores exist;

- The job specialty in which the applicant has been rated eligible.  If separate register cards are made for each grade, option, or position, you may wish to post only rating, grade, etc., at the top of the card and annotate the bottom of the card with the other grades and options for cross reference purposes;

- Examination number.  This is the public notice or announcement number;

- Identification number.  If the applications are filed numerically, record the application number.  Record each applicant's social security number, if it will be used to break ties;

- Date of entry (registration date) onto the competitor inventory;

- Other eligibilities.  When separate cards are prepared for each option and grade, you may want to list at the bottom of the card all other eligible ratings, grades, options, or positions resulting from the same application;

- Special notations.  Note any limitations or modifications of eligibility, (e.g., subject to completion of a 4-year college degree).  In a card system, you would typically note this at the bottom of the card; and

- If the application was accepted after the closing date, annotate the register card to show the reason for acceptance, e.g., "Reopened" or "Delayed."

**Deferred-rated inventory**

You may use an automated or electronic file to maintain your inventory. It may contain a single entry following the applicant's name or a separate listing for each grade or occupational specialty. The file may also include:

- Appropriate preference symbol (CPS, CP, XP, TP) if applicable;

- Application number if you will file the qualifications statements numerically;

- Examination/announcement number;

- Date of entry onto the competitor inventory; and

- Any limitation on eligibility (e.g., meeting maximum entry age requirements) or availability (e.g., geographic, nature of employment, willingness to travel).

**Notice of receipt of application**

We suggest sending a notice or letter to each applicant confirming your examining office's receipt of the applicant's application. The notice should include the following information:

- Title and number of the examination;
- Name of the issuing office;
- Date of issue; and
- Positions, options, and grades covered by the inventory.

It should also describe how the applicant will receive consideration. The notice should clearly state that it is not a notice of rating or a determination of eligibility. However, some deferred-rated examinations may provide for a general screening and rating of qualifications. You should include this determination/rating in the notice of receipt of application.

## Maintaining a Competitor Inventory

**Period of eligibility on a competitor inventory**

The period of eligibility for an individual on a competitor inventory is established when developing the examination plan.

You should inform the applicant how long his/her eligibility is valid and how to extend it. Remove from consideration any eligibles who do not communicate their continued interest in employment within the prescribed period and put them in the inactive inventory for a period of one year.

Upon request, the eligible may have his/her eligibility reinstated during the one-year-period, whether the examination is open or closed. You should consider any communication received from the applicant during his/her eligibility that clearly indicates continued interest in employment as a request to extend eligibility (e.g., letter changing address, congressional inquiry).

**Re-examining (recompeting) applicants**

As long as the examination is still open, applicants may reapply and be reexamined at any time unless the examination says otherwise. If an applicant competes more than once in a written test, the highest rating is the official one unless a previous eligibility has expired, in which case the latest rating is the official one. If the applicant is limited to a specific number of times he/she can apply for an examination within a limited period of time (such as 6 months or 1 year) disregard the second application submitted by the applicant during the designated period.

When an examination is closed or suspended as to the receipt of new applications, eligibles may to submit information about additional qualifications gained after the closing/suspension date. An eligible may request consideration under different options and/or grade levels at any time if the announcement was open for those options and/or grades anytime during the eligible's period of eligibility and the eligible meets the qualification requirements during the open period.

Your office may set the reexamining and recompetition policy and procedures. This policy, however, should be clearly stated and documented in your standard office procedures manual.

**Multiple applications from a single applicant**

You may receive multiple applications from a single applicant. If the applications are different, you should review both applications to determine if any changes were made or new information added to one application and not the other. You should combine the applications, then reconcile the rating, if necessary.

**Changes to applicant record**

You are responsible for annotating the record with any notices of change in name, address, or availability, and for notifying the appointing officer of any significant change in an eligible applicant's status while that person is on a certificate to the official. You should also record any changes in an eligible applicant's qualifications, veterans' preference status, or other information that would affect his/her eligibility or position on a certificate.

**Removal based on selection**

When an eligible is selected for a career-conditional position, remove him/her from the inventory for those positions in the grade, series, and promotion potential for which he/she was selected. The individual retains eligibility for all other series and grades for which he/she qualifies.

When an eligible is selected for a temporary or term position, he/she remains on the inventory for consideration for permanent positions (see 5 CFR Part 316).

**Restoring after removal**

You may not restore an eligible who has been removed from an inventory, except when the applicant does not need to retake any written test because the previous test scores are available.

The following applicants are entitled to be restored, upon request, to an inventory or its successor whether the inventory is open or closed to the receipt of new applications:

- A preference eligible who resigned without delinquency or misconduct from a career or career-conditional position provided he/she applies within 90 calendar days after separation; and
- An employee separated (voluntarily or involuntarily) during probation without delinquency or misconduct.

## Terminating or Combining Inventories

**When to terminate/combine inventories**

Before you establish a new inventory covering the same positions (as when a new qualification standard or rating schedule is issued), you should either terminate the old inventory or combine it with an equivalent new inventory.  You should terminate:

- Old inventories if one examination has a written test and the other does not, unless OPM authorizes another procedure, and

- An existing inventory when it is no longer needed to fill vacancies, or when a case examining approach is better suited to the agency's needs.

**Alternative to termination**

Usually you should terminate the old inventory when qualification requirements or rating schedules change.

- You should allow applicants who may not meet the new requirements to submit new application materials.

- If an eligible applicant's score or eligibility changes under the new examination, you should issue a new notice of results.

**Maintaining a case file**

You should maintain sufficient information in the case file to permit reconstruction of the inventory.  The following are examples of information you should include:

- Termination date of the competitor inventory;
- Disposition of the applications on the competitor inventory;
- Date of the last appointment from the inventory; and
- Whether a successor inventory was established.

**Retaining applications for extended consideration**

If you do not establish a new inventory but you expect to fill future vacancies through case examining, you should retain the applications of persons entitled to extended consideration in a separate file for future vacancies.

**Note**: This applies to 10-point preference eligibles (see Special Handling of Preference Eligibles in this section) and individuals who lost certification opportunities or failed to receive bona fide consideration (see Chapter 6, Section E, Priority Consideration).

**Notification of termination**

Whenever you plan to terminate an existing inventory, you should notify all active eligibles in writing if one of the following circumstances occurs:

| IF you use… | THEN you should… |
|---|---|
| A new examination to establish a new inventory | Tell the eligible applicants the open and close dates and the procedures to follow if they wish to apply; or |
| Case examining | Tell competitors how to find out about future announcements. |

**Combining inventories**

When you combine an existing inventory with a new one, you should follow the procedures cited below:

- Merge current eligibles on the existing inventory with the new inventory in the same order as if the list had resulted from one examination;

- Eligible applicants entitled to priority consideration on the old inventory for reasons such as lost consideration or lost certification retain their preferred standing on the combined inventory; and

- Current eligible applicants on the existing inventory remain on the new inventory for the unexpired period of eligibility.

If an eligible is on both the new and old inventories with different scores, enter him/her on the combined inventory with the higher rating.  However, eligibles with preferred standing (e.g., erroneous consideration, CTAP/ICTAP, priority referrals) on the old inventory retain their preferred standing on the combined inventory.

**Disposition of records**

Schedule applications for disposal according to the records retention and disposition schedule instructions in Appendix C.  Attach terminated register cards or equivalent records to your reconstruction sheet for disposition.

## Issuing Notices of Results

**Introduction**

It is a good business practice to keep applicants informed of the status of their application. Thus, upon completing the rating process, you should notify applicants of their eligibility for appointment. In addition to keeping applicants informed, a written notification also serves as the applicant's record in case he/she chooses to challenge or appeal a rating, and may effectively prevent later inquiries.

**Information on the notice of results**

The information on the notice of results tells applicants whether they are qualified for the position for which they applied. The following information should be included in the notice:

- Title, series, grade of the job, occupational specialty(ies), plus job announcement number or other job identifier;

- Whether the applicant is eligible or ineligible;

- Level of veterans' preference awarded (if eligible);

- Any restrictions on eligibility, such as "subject to meeting education requirements";

- Whether the eligible applicant was referred to the selecting official for employment consideration;

- Brief explanation of the reason that applicant was not qualified -- for example, "did not pass the written test," "did not meet basic experience or education requirements," "did not meet a mandatory selective placement factor," or "salary of the job was below the minimum acceptable level stated in your application" (if eligible); and

- Length of eligibility and the procedures for extending that eligibility (for standing inventories only).

## Reconsideration of Rating

Examining decisions made by your office are subject to reconsideration upon reasonable demonstration that a review is necessary. You must establish a written procedure for the processing of an applicant's request for reconsideration of his or her rating(s). The same procedure may be incorporated into the agency administrative grievance system or alternative dispute resolution system and used for agency-employed applicants who grieve an assigned rating (5 CFR Part 300).

You should make your reconsideration procedure available to applicants who wish to challenge an assigned rating.

**Contents**

Your procedure should incorporate the following elements:

- Any request that might result in a rating change should be made in writing and should indicate why the applicant believes the original decision was not proper;

- The office that made the original decision should conduct the first level of review;

- A staff member other than the person who made the original decision should conduct the review; and

- The response to the request should contain a full explanation of the reasons for the decision, without unduly compromising the rating schedule.

Upon request, the applicant may submit a second level appeal to a designated official within the agency for review. That decision is final. **There is no further appeal to OPM**.

**Rating changes**

If a reconsideration request leads to a rating change, the applicant's record should reflect the new rating. In case examining, the certificate should reflect the new rating *if you have not yet issued the certificate*. Once a certificate is issued, you should not amend it unless the:

- New rating is "ineligible;"

- Eligible was improperly awarded a higher type of veterans' preference (Example: the applicant was awarded 10-point veterans' preference but after reviewing the final documents, the applicant was not entitles to this 10 points preference); or

- Rating error was the result of the rater/examining office (see Chapter 6).

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3

4   ANDREW J. BRIGIDA; MATTHEW

5   L. DOUGLAS-COOK,

6              Plaintiffs,

7     vs.                    Case No. 16-cv-2227 (DLF)

8   PETE BUTTIGIEG, Secretary, U.S.

9   Department of Transportation,

10             Defendant.

11  _____

12

13

14         DEPOSITION OF GLENN W. PERDUE

15            via videoconference

16          Tuesday, July 20, 2021

17             10:03 a.m. EST

18

19  Job No.:  385730

20  Pages: 1 - 164

21  Stenographically Reported By:

22  Alison C. Webster, CSR-6266, RPR, RMR, CRR, RDR

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                    2

```
1                    A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF

4        ZHONETTE BROWN, ESQUIRE

5        MICHAEL PEARSON, ESQUIRE

6        WILL TRACHMAN, ESQUIRE

7        Mountain State Legal Foundation

8        2596 South Lewis Way

9        Lakewood, Colorado 80277

10       303.292.2021

11       zhonnette@mslegal.org

12

13   ON BEHALF OF THE DEFENDANT

14       GALEN N. THORP, ESQUIRE

15       REBECCA CUTRI KOHART, ESQUIRE

16       ELISABETH FRY, ESQUIRE

17       U.S. Department of Justice, Civil Division

18       Federal Programs Branch

19       1100 L Street, N.W.

20       Room 12024, Washington, D.C. 20530

21       202.305.8693

22       galen.thorp@usdoj.org
```

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                    3

```
1              A P P E A R A N C E S   C O N T I N U E D

2

3   ALSO PRESENT:

4   Julie Frizell, expert consultant

5   Saul Gan, Planet Depos tech

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                                    64

1              mischaracterizes.

2    A.   I don't think that's what I'm saying.  Let's try --

3         let's try it again.

4    BY MR. THORP:

5    Q.   Yeah, so let me just try that again.  So you would look

6         at the actual hires and what waves they came in, and

7         then you would use that to create subgroups for your

8         damages analysis; is that right?

9                   MS. BROWN:  Objection.  Incomplete

10        hypothetical.

11   A.   Well, maybe not.  So let's say that the analysis

12        demonstrates -- just for our hypothetical here, let's

13        say that our analysis indicates that the training

14        academy in Oklahoma is indeed the bottleneck to this

15        production system.  And let's say that it accommodates

16        400 people at a time, and they're there for six

17        months, and you had one wave go through and there was

18        only 250 people in it, but the FAA wanted 400, well,

19        there's still more capacity in there.

20                   So I don't know that it would be right to

21        use the 250 or the 400.  I just don't know right now.

22        I could see where in one case you would use one of

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                                    65

1             those numbers and, in the other case, you would use

2             the other number.

3                       But I think you would look at it based upon

4             those tiers or waves based upon the bottleneck; you

5             know, the class of the first half of '13, the class of

6             second half of '13, and you would have tiered subsets

7             of analysis as these people come into the system.

8      BY MR. THORP:

9      Q.    Romanette 3, you spoke to various screening tests.  What

10            do you understand that to involve?

11     A.    Well, and this may not even be one of them, but I

12            know, like, color blindness.  You know, are you color

13            blind?  Well, if you're color blind, that's a problem

14            in terms of being an air traffic controller, so you

15            potentially wash out.

16                      So that's just the one example that I can

17            think of that might be kind of a screening test that

18            might cause someone to wash out of the system.  And

19            I'm guessing that there's also some other

20            psychological tests or whatever.  But I am generally

21            aware of screening tests.

22     Q.    Okay.  And things like background investigations?

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                                    66

1    A.    Well, that would make sense too.

2    Q.    And how do you expect to account for these factors?

3    A.    Yeah, so once we have the data and we understand how

4          that impacts the movement through the system -- and

5          the best place to talk about this might be Exhibit 5

6          in the report.

7                     So are you there, Galen, on 5?

8    Q.    Yes.

9    A.    So column P, Acceptance and Retention, you see that

10         I've got three numbers there in shaded gray boxes at

11         the very tip-top?

12   Q.    Yes.

13   A.    We might have more shaded gray boxes.  We might see

14         that certain levels of washout occur because of, you

15         know, various tests, and so the 1,250 might get -- a

16         slice might come out for the screening tests that's

17         not considered in the three boxes that I've got

18         identified there.

19   Q.    So just to sort of put a point on that, your

20         illustration analysis does not discount for effect of

21         the screening test.

22   A.    Well, as a practical matter, it may, because of the

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                    67

```
1           fact -- so that -- I don't explicitly call it out

2           here, but I'm using, you know, these big, round

3           numbers for the demonstration of 80 percent,

4           90 percent, 90 percent.  I may have overestimated the

5           fallout.  So as a practical matter, it may be

6           accounted for in those, but as a specific matter and a

7           specifically delineated line item, it is not

8           considered in there yet.

9    Q.     So I take it you accept the possibility that some of the

10          class members might not actually have become controllers

11          even if they had received a job offer?

12   A.     Yes.

13   Q.     And they would not become controllers if they failed

14          various screening tests that were conditions for

15          starting the job?

16   A.     Yes, that's my understanding.

17   Q.     Is there any way to know which class members would fail

18          the screening tests?

19   A.     Well, in a model like this, you use central

20          tendencies.  You look at historic failure rates over

21          time and you apply those central tendencies to the

22          model.
```

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                                    68

1   Q.   Would you exclude people who were known to be

2        ineligible?  Someone who had been debarred from -- in a

3        prior selection process from being selected again for

4        several years?

5   A.   No.  I think what the right thing to do here is that

6        that fallout would -- would be accounted for in these

7        observable statistics.  I mean, I know the FAA has got

8        great data, the government's got good data.  And I

9        think we would be able to reasonably estimate those

10       fallout rates based on that data.

11  Q.   With the waves of onboarding, would you be assigning --

12       allocating class members to each wave?

13  A.   Yes.

14                MS. BROWN:  Objection to the form of that

15       question.

16  A.   You wouldn't do it in a specific class member way.

17       You would basically look at it as layers.  And let's

18       get back to the numbers that we have been playing with

19       thus far.  Let's say that the Academy has space for --

20       I'm going to make the math work out perfectly here --

21       420 people.

22                Let's say that the Academy has 420 seats

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                 69

```
 1         available.  If we've got 1,250 class members, it would
 2         take three Academy classes, at a minimum, to get those
 3         1,250 people through.  So you would have three tiers
 4         or waves using that example.
 5  BY MR. THORP:
 6  Q.   Yeah, but in that hypothetical you're -- you just
 7       disregarded all the people who are actually hired.
 8       Right?
 9  A.   Well, we talked about this earlier, that the seat --
10       in the hypothetical, the seat that the person takes,
11       that's in the class, is either a seat that was filled
12       by someone as a result of the challenged conduct or
13       it's a new seat that's available.
14  Q.   Would you remain agnostic on that or determine that from
15       data?
16  A.   I will completely remain agnostic as to the liability
17       and the causation issues.  But the data is going to
18       tell us -- the data is gonna tell us what the
19       bottleneck is and the data is gonna tell us how many
20       tiers we need.
21  Q.   Circling back to paragraph 20 of your report.
22  A.   Okay.
```

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                    117

1    A.    Yeah, I'm pausing -- I'm pausing because I was

2          instructed to pause.  So, yeah, there's -- first of

3          all, FAA employees are civil service employees.  Okay?

4          FAA employees, air traffic controllers, have a union.

5          So there's two published sources, I would think, that

6          would tell us what these things look like.  So, yes,

7          indeed, there may be published resources like that

8          that I would be able to rely upon too.

9                  But, again, I intentionally went high level

10         here and didn't dive into those details for -- for this

11         model.

12   Q.    Do you expect to see everyone's earnings -- base

13         earnings grow at the same right?

14                 MS. BROWN:  Object to the form of the

15         question.

16   A.    No.  We know that people will progress through this

17         job and other jobs at different rates.  So, again,

18         what we're after here is the central tendency.

19   BY MR. THORP:

20   Q.    So you intend to account for the variation in base rate

21         increases by looking for a median or mean?

22   A.    Yeah.  I think generally we're looking, again, for

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                              118

1          central tendencies here.

2     Q.   So you would take that central tendency and apply it to

3          the whole class?

4                    MS. BROWN:  Object to the form of the

5          question.  Incomplete hypothetical.

6     A.   Yeah, so, I think generally, yes, but you gave an

7          interesting example earlier, this idea of this

8          barbell-shaped distribution where you've got a bunch

9          of 22-year-olds and then a bunch of 30-year-olds.  So

10         the answer is, it depends on what the data tells us.

11         So using that hypothetical that you gave earlier, that

12         would be a situation where we would bifurcate the

13         model.  So the real answer comes from what the data

14         tells us.

15    BY MR. THORP:

16    Q.   Can you describe specifically the data you would need to

17         model the effects of locality pay?

18    A.   Yeah, so, again, it depends on the manner in which the

19         data is provided to us.  If locality pay is baked in

20         and we have overall numbers, then locality pay is

21         looked at as a part of this overall central tendency.

22         If it's broken out, then we might break it out, as I

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                                    119

1          have in this illustration model.  It depends on how

2          the data is presented.

3     Q.   But you're -- are you expecting that locality pay

4          varies -- I think locality pay was included in the pay

5          tables that you reviewed; is that right?

6     A.   It was, yes.

7     Q.   You saw that there's quite a wide range of pay -- of

8          locality pay at the same base pay level; is that fair?

9     A.   Yes.

10    Q.   And so you -- if I hear you correctly, you're

11         anticipating just picking a central throughline that

12         averages out all those variations across the country in

13         locality pay.

14              MS. BROWN:  Object to the form of the

15         question to the extent that that misstates his

16         testimony.

17    A.   Yeah, so, again, that central throughline that you're

18         talking about, once we have actual data and I see what

19         form it's in, then I'll be able to see if it makes

20         sense to isolate locality or just keep it baked in.

21         Because at this point, I have not seen any data to

22         suggest that there wouldn't be a fairly even

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                                        156

1          problem, would your damages model still work for that?

2                    MS. BROWN:  I object to the form of the

3          question in terms of periods of time being sort of

4          undefined as it relates to the claim and/or the waves

5          and tiers that he's talking about.

6                    MR. THORP:  That's a -- that's a pretty long

7          speaking objection.

8    A.    Could you ask --

9                    MS. BROWN:  I didn't say anything about

10         waves or tiers.  I'd rather you keep your objections

11         towards...

12   A.    Could you give me the question one more time, please?

13   BY MR. THORP:

14   Q.    As best I understand it -- I'm not trying to pin you

15         down on the particular time period in play, but I

16         understand you to be saying your model is trying to

17         calculate damages from some period of time affected by

18         discriminatory action.  And I understand you to be

19         proposing a single damages model for all of plaintiffs'

20         claims -- or all the claims sort of reflected in the

21         complaint; is that correct?

22                   MS. BROWN:  Objection to the form of the

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                              157

```
 1          question.

 2    A.    No.  And we talked about this earlier that, you know,

 3          going back to your barbell example, there may be

 4          places where I bifurcate the model; going back to that

 5          vintage year idea, that gets into these different

 6          tranches of employees.  So there may be different

 7          iterations or versions of the model that accommodate

 8          some of these various nuances that we've discussed.

 9    BY MR. THORP:

10    Q.    If plaintiffs' only claim that survives through the

11          court was the claim that the biographical assessment in

12          2014 was discriminatory, would you craft a different

13          model than you've proposed?

14                     MS. BROWN:  Object to incomplete

15          hypothetical.

16    A.    Yeah, so I would go to counsel and I would say, okay,

17          you've had this ruling, how does that impact what I

18          need to calculate here, and I would -- again, I would

19          be relying upon counsel to tell me, from a legal

20          perspective, how that impacts my calculation and if

21          something had to be adjusted.

22    BY MR. THORP:
```

Transcript of Glenn W. Perdue
Conducted on July 20, 2021                                    158

```
 1    Q.    And I'm just asking you, sort of in this hypothetical,

 2          where a test is administered to a -- a set of applicants

 3          in 2014 that is -- could be discriminatory, or that's

 4          allegedly discriminatory, how would you calculate

 5          damages for that injury?  That seems to be a different

 6          injury than this sort of -- a period of hiring time

 7          where we now are looking at just a point in time and the

 8          people -- and a single administration.

 9                MS. BROWN:  Object to the form of the

10          question.

11    A.    Okay.  So let's extend your hypothetical.  Let's say

12          that there -- the judge has ruled on this -- this

13          issue that we're talking about here, and the judge has

14          said the only thing that matters here is this

15          biographical assessment from 2014.  I would go to

16          retaining counsel and I would say, okay, how does this

17          affect the funnel at the top and how far we calculate

18          backpay and how far we calculate front pay.  And some

19          of that may be spelled out in the judge's order in

20          this hypothetical, some of it might not be.

21                But I would be -- again, I would be relying

22          upon the legal interpretations that I'm not qualified
```



# Review of Plaintiffs' Expert's Initial Report
## and
## Analysis of Potential Economic Losses

*In the matter of*

Andrew J. Brigida and Matthew Douglas-Cook
v.
Peter P.M. Buttigieg, Secretary of U.S. Department of Transportation

United States District Court for the District of Columbia
Case No. 1:16-cv-02227-DLF

*Prepared for*

U.S. Department of Transportation

*Prepared by*

Paul F. White, Ph.D.
Partner
Resolution Economics, LLC
Washington, D.C.

July 28, 2021

# Review of Plaintiff's Expert's Initial Report
## and
## Analysis of Potential Economic Losses

## I.    Introduction

This report was undertaken at the request of the United States Department of Transportation as part of a lawsuit filed against the Federal Aviation Administration ("FAA"). Plaintiffs in this matter seek to represent a purported class of Air Traffic Collegiate Training Initiative (CTI) graduates who applied for FAA's entry-level vacancy announcement for Air Traffic Controllers in 2014.  Plaintiffs allege that the FAA "purged the merit-based hiring preference for Qualified Applicants for Air Traffic Controllers with the intent and purpose of benefitting African American Air Traffic Controller applicants and hindering the Class members."[1]  Plaintiffs also claim the "FAA's race-based decision to use the Biographical Questionnaire in the 2014 ATCS hiring process harmed the Class members."[2]  In this report, Resolution Economics, LLC was asked to (i) review the Initial Expert Report submitted by Plaintiffs' expert witness, Mr. Glenn W. Perdue, MBA, CVA, MAFF, CLP, and (ii) provide my opinions on whether a representative and accurate measure of potential economic losses can be calculated for the purported class using a broad, formulaic approach that combines individuals who are not similarly situated.

I am a Ph.D. labor economist and a Partner in Resolution Economics' Washington, D.C. office.  Resolution Economics is a research firm that specializes in the economic and statistical analyses of labor and employment issues, including but not limited to selection analyses and calculations of potential economic losses associated with allegations of employment discrimination.  For approximately 28 years, I have conducted economic and statistical analyses

---

[1] Fourth Amended and Supplemental Class Action Complaint (Fourth Amended Complaint), filed 10/27/2020, Paragraph 195.

[2] Fourth Amended Complaint, Paragraph 199.

1

involving a wide variety of industries and occupations, including public sector employers.  I have served as an expert witness and have testified numerous times in local, state, and federal court. Resolution Economics charges $562 per hour for my services.  My compensation does not depend on the substance of my testimony or the outcome of this case.  My résumé and testimony experience are attached as <u>Appendix A</u> to this report.

This report is organized as follows: Section II provides the sources of information used in the preparation of this report. Section III discusses Mr. Perdue's methodology for calculating the potential economic losses for the purported class.  Section IV provides an overview of the database construction that was used to create the tables referenced throughout my report.  Section V provides my discussion of whether a representative and accurate measure of potential economic losses can be calculated for the purported class using Plaintiffs' expert's methodology.  Section VI contains my conclusions based upon the information I currently have.  I reserve the right to revise my report and opinions as more information becomes available.

## II.    Sources Relied Upon

For purposes of conducting my analyses and preparing this report, I relied upon a number of documents and data sources.  Below is a list of this information:

- <u>Fourth Amended and Supplemental Class Action Complaint</u>, filed October 27, 2020, Bates EXA0001-0044

- <u>Initial Report of Glenn W. Perdue, MBA, CVA, MAFF, CLP</u>, dated June 10, 2021, and attached exhibits, Bates EXA0045-0081

- Transcript of Mr. Perdue's deposition, dated July 20, 2021

- A Plan for the Future: 10-Year Strategy for the Air Traffic Control Workforce 2013 – 2022, U.S. Department of Transportation, Federal Aviation Administration publication, Bates EXA0082-EXA0149

- A Plan for the Future: 10-Year Strategy for the Air Traffic Control Workforce 2014 – 2023, Bates EXA0150-EXA0205

- Air Traffic Controller Training Initiative (AT-CTI) Program, Program Overview and FAQs, Collegiate Version, updated July 10, 2013, Version 3.2, Bates EXA0206-0290

- Air Traffic Specialized Pay Plan (ATSPP) Pay Band tables for years 2009-2020

- CTI Database Eff 4.29.13.xslx: data file containing FAA's tracking of student information from CTI institutions

- FPPS – Employment History of 33537 Selectees.csv: personnel action records for hired applicants from the 2014 all source vacancy announcement

- Requested Data for 33537 – Application Data (Redacted).xslx: data file from FAA AVIATOR system containing applicants to the 2014 all source vacancy announcement

- Requested Data for 33537 – Other Applications (2012-2020): data file from FAA AVIATOR system containing all applications submitted by applicants to the 2014 all source vacancy announcement

- Requested Data for 33537 – RNO: data file from FAA AVIATOR system containing self-reported RNO data for all applications submitted by applicants to the 2014 all source vacancy announcement

- Phone conversation with Mike D. Williams, Supervisory Management and Program Analyst, AFN, Chris Pinheiro, Economist, and Robert Budd, Financial Analyst, regarding the FPPS – Employment History of 33537 Selectees.csv data

- National Center for Education Statistics, and United States. Digest of Education Statistics. 2019. Table 502.30

- Documents produced by CTI institutions in response to Plaintiffs' subpoenas. The list of these files is found in Appendix D of this report.

- Arizona State University, Aeronautical Management Technology (Air Traffic Management), BS program. "Career Opportunities" https://webapp4.asu.edu/programs/t5/majorinfo/ASU00/ESAMTATBS/undergrad/false?init=false&nopassive=true

- Publically available information about the 36 CTI institutions

- Discussions with retaining counsel

3

### III.    Overview of Plaintiffs' Expert's Methodology

In Paragraph 5 of his June 10, 2021 report, Plaintiffs' expert states that "the purpose of this Initial Report is to broadly describe the types of calculations and data [he] would use to determine damages in this matter after additional discovery has occurred" and that he will "submit another report(s) ("Subsequent Report") later reflecting refined calculations using additional data produced in discovery and other information obtained independently."  As such, Plaintiffs' expert's initial report consists of his current methodology for calculating potential economic losses, along with exhibits that illustrate the loss calculations under the assumptions he specifies in his report.[3]  He states in Paragraph 8 of his report that the calculations are provided for "illustration purposes only" and "are not intended to provide an estimate of damages for use in this proceeding."  In summary, the Plaintiffs' expert's proposed methodology:

(1) Begins with the number of purported class members identified by Plaintiffs and/or the court;
(2) Estimates the **But-For Income & Benefits** of all purported class members;
(3) Estimates the **Actual/Estimate Income & Benefits** of all purported class members;
(4) Subtracts the estimated **Actual/Estimate Income & Benefits** from the estimated **But-For Income & Benefits** to estimate the aggregate damages to the purported class;
(5) Divides the estimated aggregate damages by the number of purported class members;
(6) Results in an award of a *pro rata* share of the aggregate damages to each purported class member, without regard to whether individualized calculations could result in a higher or lower award, or zero damages.

**Proposed Class Definition**

One of the first steps in Plaintiffs' expert's methodology is his discussion on how he will limit the data files to individuals whom he believes meet the criteria for inclusion in the purported class.  He points to three primary factors he understands to make purported class

---

[3] It should be noted that Plaintiffs' expert limits his testimony to the subject of potential economic damages, and not to liability or causality (page 43 of Plaintiffs' expert's deposition transcript).

members "eligible for employment":  (1) scoring 70 or more on the AT-SAT test, (2) having

U.S. citizenship, and (3) meeting FAA's age criteria.  He also acknowledges that the purported

class will be limited by the other factors listed in Paragraph 173 of the Fourth Amended

Complaint.[4]  Separately, he contemplates adjusting for the following FAA hiring considerations

if necessary:

- Analyzing the CTI hiring rates before the challenged conduct
- Accounting for the hiring demand for new controllers based on expected openings
- Accounting for various pre-hire screening tests
- Accounting for the possibility that the on-boarding may occur in waves of candidates, and not all at once

It should be noted that Plaintiffs' expert does not propose to determine the expected hiring levels

for either of Plaintiffs' theories of liability separately, deferring to retained counsel to identify

where the damages calculations should begin and end.[5]

### FAA But-For Income and Benefits

This section describes the Plaintiffs' expert's assumptions and method for calculating the

projected income and benefits the expected number of purported class member hires would have

received working at FAA but-for the allegations in the Fourth Amended Complaint.

- Base Pay
  - $15,000 for the first six months of employment during initial training at the FAA academy (Initial Report ¶33)
  - $20,000 for the next six months ¶33
  - $50,000 in year two ¶36
  - $70,000 in year three ¶36
  - $90,000 in year four ¶36
  - 4% annual growth in base pay until mandatory retirement at age 56 ¶37

- Locality Pay
  - 20% for illustrative purposes ¶40

---

[4] Page 45 of Plaintiffs' expert's deposition transcript.
[5] Initial Report ¶20 and page 156-159 of Plaintiffs' expert's deposition transcript.

- Overtime Pay
    - Valued at 5% of base pay ¶41

- Non-Retirement Benefits
    - Valued at 25% of base compensation ¶44

- Retirement Benefits
    - Comprised of both pension and 401(k) retirement benefits ¶45
    - For pension, 60% of the last year's total income before benefits (base + locality + overtime) ¶45
    - Accounts for probability of survival each year with age 80 as the stopping point ¶50
    - May account for differing tiers of benefits based on length of service ¶51
    - Annual rate of return on the retirement benefits of 8% for discounting to present value ¶55
    - Calculates an 8.22% pension funding rate to fund future pension obligations ¶¶57, 59

- Age and Year
    - Assumes purported class members would have started at age 22 on January 1, 2014 ¶29

**Actual/Estimated Income and Benefits**

This section describes the Plaintiffs' expert's assumptions and method for estimating income and benefits the expected class members have "actually" received given that they were not hired by FAA. These mitigating amounts are subtracted from the above "but-for" calculated amounts to obtain Plaintiffs' expert's illustrative estimate of alleged economic losses.

- Income
    - $45,000 base pay for Year 1 ¶63
    - 4% annual increase for subsequent years ¶63

- Non-Retirement Benefits
    - Valued at 20% of base pay ¶64

- Retirement Benefits
    - 3% employer match for a 401(k) plan ¶65

**Acceptance and Retention**

Plaintiffs' expert admits that not all proposed class members who purportedly would have received tentative offer letters would also have passed pre-employment screenings; thus, some proposed class members would never have started employment with the FAA as trainees at the FAA Academy regardless of the challenged actions.[6]  He uses the term "acceptance" to account for the difference between the total number of purported class members and those who could have been accepted into training at the FAA Academy.  For illustration purposes, Plaintiffs' expert assumes 80% of the purported class members would have been accepted into FAA training (Initial Report ¶70 & Exhibit 5).  Under this assumption, 20% of the purported class members would have zero economic damages.

Plaintiffs' expert also admits that not all purported class members accepted into the FAA Academy would have remained employed by the FAA as an air traffic controller until retirement. He uses the term "retention" to account for this attrition.  For illustration purposes, Plaintiffs' expert assumes 90% retention rate each year.  This includes assuming that 90% of those who start at the FAA Academy will complete their initial training, that 90% of those who complete training will still be employed as controllers at the end of their first year at an FAA facility, and that 90% of those individuals will remain as controllers in each subsequent year (Initial Report ¶70 & Exhibit 5).

**Present Value Rates**

Plaintiffs' expert assumes a 4% rate for interest and discounting purposes for calculating the present value and future value of potential economic losses. ¶75

---

[6] Page 65 of Plaintiffs' expert's deposition transcript.

## IV.     Database Construction

It is important to review the available data to determine whether a particular model of economic damages may be appropriate.  I therefore began with the FAA's AVIATOR data containing all of the 2014 applicants and merged on information from the FAA's CTI Database that tracks information received from the CTI institutions and other AVIATOR data files containing race and other application information.  I also merged CTI institution and degree information from the FAA's CTI Database and the FAA's AVIATOR data to the FPPS employment history data.  From those consolidated data, I identified two sets of individuals for further analysis.

The AVIATOR data identifies 1,227 applicants who appear to have accepted a final offer and are listed as "appointed."  Of those, 1,185 individuals appear in the FAA's personnel/payroll data, indicating that some selectees never entered FAA employment.  Further, 790 appear to have successfully completed the FAA Academy and become a controller at an FAA facility.  The data allowed me to track when these individuals achieved developmental levels and the certified professional controller (CPC) certification, as well as the type/level of facility to which they were assigned, and their geographic locations.  The data also shows when they separated from the FAA.

The AVIATOR data, as consolidated with the CTI data, contains most of the information necessary to identify which individuals come within Plaintiffs' definition of the putative class.[7]

---

[7] Paragraph 173 of the Fourth Amended Complaint defines the putative class as:

> [T]he approximately 1,000 to 1,500 non-African American CTI students who: (1) by February 10, 2014: (a) graduated from a CTI program at one of the 36 FAA-partnered CTI Institutions between 2009-2013 and (b) passed the AT-SAT , (2) applied to be an ATCS trainee through the 2014 all sources vacancy announcement but failed the Biographical Questionnaire that was incorporated into the 2014 ATCS hiring process and was therefore not hired; and (3) have never been offered

Based in part upon guidance from counsel, applying the criteria specified in Plaintiffs' class definition and making conservative (i.e., potentially over-inclusive) assumptions where the data was imprecise, I identified 1,021 potential members of the putative class. The class population will be further refined if more complete data becomes available.

Analyses of these two populations—comparators actually selected in 2014 and the purported class—are discussed in the following section.

## V.    Review of Plaintiffs' Expert's Methodology

This section of my report provides an overview of my concerns with the Plaintiffs' expert's methodology as stated in his report, and discussed further in his deposition.[8]

### Purported Class Members Without Damages

Plaintiffs' expert estimates that a significant percentage of purported class members would not have entered the FAA Academy ("Acceptance") and thus would have no economic damages. This includes individuals with objective medical disqualifications.[9]  Nonetheless, he proposes paying every one of the 1,250 purported class members a pro rata share of the aggregate damages.[10]  He also indicated that he expects to determine the "Acceptance" rate from historical data, and thus does not propose a methodology for identifying the individual purported

---

employment as an FAA ATCS. Excluded from the Class are any CTI graduates: (a) who were not U.S. citizens as of February 10, 2014; (b) who by February 21, 2014 had reached 31 years of age (or 35 years of age if they had had 52 consecutive weeks of prior air traffic control experience); (c) whose academic records as of February 21, 2014 explicitly stated that they were ineligible to receive a letter of recommendation from their CTI school; or (d) whose AT-SAT scores had expired as of February 21, 2014.

[8] My discussion of Plaintiffs' expert's methodology is limited to the proposed structure of his analysis and does not address his assumed values which he clearly states are inserted for illustrative purposes only.  Thus, my opinions of his analyses are subject to revision once I have the opportunity to review his supplemental report(s).

[9] Pages 65, 144 of Plaintiffs' expert's deposition transcript.

[10] See Exhibit 5 of Plaintiffs' expert's report.

class members who could not have been accepted into the FAA Academy. Thus, some purported class members would receive a windfall under this methodology.

**<u>High Level of Variation Relevant to "But-For Earnings"</u>**

The high level of variation among the purported class members and their comparators (i.e., those who were hired as controllers) prevents the use of a broad, formulaic approach to calculating a meaningful and representative calculation of potential economic losses for the purported class.

Age of purported class members

As mentioned by Plaintiffs' expert in his report, he will need to account for the ages of the purported class members to determine, among other things, the number of years until their retirement dates. However, given the wide variation in the ages of the purported class members, and given the specific age Plaintiffs' expert is assuming each person will retire, one would need to account for age at the individual level instead of an aggregation of people with different ages.

For example, Table 1 in Appendix B shows the distribution of ages for the purported class members. As can be seen from the table, there are 14 different ages of the purported class at the time of application to the 2014 all sources vacancy announcements with ages ranging from 19 to 32. Given that Plaintiffs' expert anticipates projecting losses until retirement, each purported class member of a different age will need a separate calculation to reach the mandatory retirement age of 56.

Initial Placement of Training Academy Graduates

After the purported class members complete training, the FAA would place them into an Air Traffic Control (ATC) facility. These initial placement decisions would be based in part on

facility need and employee qualifications under a system that offers "a field facility assignment to new hires only after successful demonstration of capability at the FAA Academy."[11]

There are nine ATC facility classification levels that are incrementally based on various factors such as "traffic volume, complexity and sustainability of traffic."[12]  Controllers who are able to succeed in the highest and most complex volume of traffic facilities are compensated at a higher rate as they progress in their ATC careers and achieve higher developmental certifications.  For example, many of the 2014 ATSPP Pay Band tables show that a certified professional controller ("CPC level controller") in the highest level facility (i.e., Level 12) can earn three times the amount of a CPC level controller in the lowest level facility (i.e., Level 4).[13]  Additionally, controllers who live in higher cost of living areas, regardless of their certification status, are compensated with higher locality adjustments.  For example, locality adjustments ranged from 14.16% to 35.15% in 2014.[14]

The best source of this information comes from the initial placements for the applicants who were actually hired from the 2014 "all sources" vacancy announcement.  Table 2 below reports the initial post-training FAA pay grades associated with the academy graduates.[15]

---

[11] A Plan for the Future: 10-Year Strategy for the Air Traffic Control Workforce 2014 – 2023, page 43, Bates EXA0192.
[12] A Plan for the Future: 10-Year Strategy for the Air Traffic Control Workforce 2014 – 2023, page 9, Bates EXA0158.
[13] 2014_ATSPP_Tables.xls
[14] 2014_ATSPP_Tables.xls
[15] The FAA's personnel data identifies 1,185 applicants selected in 2014 who actually started employment as students at the FAA Academy, of which 393 (or over 33%) separated from the FAA before completing academy training. There are two additional hires that are removed from this table as one was placed as a developmental at an L-level facility and the other was a current FAA employee who converted from a non-ATC occupational series but did not complete training so reverted back to their pre-training occupational series.

**Table 2: Initial Placement of Academy Graduates**

| ATC Facility | | Initial Placements | |
|---|---|---|---|
| Code | Level | Count | Percent |
| DC | 4 | 5 | 0.63% |
| EC | 5 | 118 | 14.94% |
| FC | 6 | 124 | 15.70% |
| GC | 7 | 91 | 11.52% |
| HC | 8 | 33 | 4.18% |
| IC | 9 | 33 | 4.18% |
| JC | 10 | 76 | 9.62% |
| KC | 11 | 119 | 15.06% |
| LC | 12 | 191 | 24.18% |
| Total | | 790 | 100.00% |

As the personnel action records for academy graduates from the 2014 all source vacancy announcements show, there is wide dispersion in initial placement of new hires. Thus, in addition to the age variation, the estimates of potential economic losses should differentiate among purported class members who would have been placed in a wide variety of ATC facility levels.

Subsequent Employee Movements

After the initial placement, academy graduate controllers experience grade level and/or facility level changes throughout their careers at the FAA. Table 3 in Appendix C summarizes the movements in facility levels for controllers who were hired from the 2014 all sources vacancy announcement until their last personnel record in the available employee history data. It is my understanding that the greater facility level numbers found in Table 3 represents an increased level of facility complexity.

As can be seen from Table 3, there is a wide variation in the career progressions of controllers with respect to facility level after they complete their training. For example, FAA documentation states "Developmental controllers who fail to certify at a facility may be removed

from service or reassigned to a less complex facility…"[16]  Once again, an aggregated formula-driven approach will not sufficiently capture the wide variation in the career paths of the purported class members.

Subsequent Separations after Academy Graduation

Plaintiffs' expert's report acknowledges that not all controllers remain employed with FAA for the remainder of their careers.  As mentioned in Paragraph 70 of Plaintiffs' expert's report, some controllers leave due to reasons such as death, personal reasons, termination, leaving the federal government to pursue a career elsewhere, accepting a non-controller position within FAA, or accepting a position elsewhere within the federal government.  Table 4 shows 92 (or 11.6%) of the 790 academy graduates from the 2014 all sources vacancy announcement separate from the FAA or move into a non-controller position in the FAA by 2021.[17]  The table also shows the various levels at which separations occur in each individual's progression.  For example, 24 CPC level controllers do not remain controllers at the FAA by 2021, or the end of the time period covered by the employee history data.

**Table 4: Academy Graduates from the 2014 All Sources Vacancy Announcement Who Do Not Remain ATCs at the FAA**

| Progression prior to separation: | Total Separations | | Percent of Academy Graduates |
|---|---|---|---|
| | *Count* | *Percent* | |
| No developmental certifications | 47 | 51.1% | 5.9% |
| Developmental certifications | 21 | 22.8% | 2.7% |
| CPC certification | 24 | 26.1% | 3.0% |
| **Total Separations** | 92 | 100.0% | 11.6% |

---

[16] A Plan for the Future: 10-Year Strategy for the Air Traffic Control Workforce 2014 – 2023, page 46, Bates EXA0195.
[17] There is an additional selectee who was a current, non-controller FAA employee prior to the selection but did not finish training and returned to their non-controller FAA position before becoming an academy graduate.

As the above tables demonstrate, not only is there wide variation in the initial placement of academy graduates, there is even more variation in their career progression, which includes multiple directions one can go with respect to pay grades, assignments to non-ATC positions within the FAA, and separation from FAA at various points in time. For these reasons, individualized calculations, or at a minimum, many different cohorts of similarly-situated individuals, would be needed to generate more accurate damages for the purported class.

Plaintiffs' expert states on page 79 of his deposition transcript that the career progression for ATCs is "a lockstep type of career path, and it's more lockstep than probably anything I've ever seen in terms of the way people go into the system, they start out taking the same amount of hours. So I feel really good about the central tendency related to the but-for world." The above tables demonstrate that a measure of central tendency overlooks the wide variation in the career progressions for academy graduates and thus would not produce a representative value of potential earnings and benefits while an ATC at the FAA.

### High Level of Variation Relevant to Mitigating Earnings

The best starting point for understanding the level of the mitigating earnings for the purported class members is to collect documents (e.g., W-2 forms) that report their actual earnings levels. With that information one can use their actual earnings levels for a measure of mitigating earnings, unless there is a question about whether the plaintiffs have sufficiently attempted to fully mitigate their potentially lost FAA earnings.[18] Plaintiffs' expert admits that mitigation can be calculated in individual cases using person-specific data such as W-2s, age,

---

[18] Plaintiffs' expert appears to agree with the use of estimated earnings when someone is underemployed. See page 100 of his deposition transcript, "…if someone is not working but could have, that it's reasonable to use an estimate of what they should have made."

education, military experience and whether a person stopped seeking better employment.[19]  But Plaintiffs' expert proposes to calculate mitigating earnings based on little to no individualized information out of a concern for "efficiency."[20]  This approach raises significant concerns because it has the potential to substantially understate losses for some class members, and overstate potential losses for others.

In his report, Plaintiffs' expert's damages model proposes to use a single mitigating earnings amount for all purported class members.  This approach assumes that it is reasonable to treat all purported class members as though they would earn the same salary, reflecting "what a CTI graduate that does not become a controller could reasonably expect to earn through the age of 56."[21]  This assumption is inappropriate for a purported class that includes members with substantially different levels of education, and with different education backgrounds.

It's a fundamental element of labor economics that individuals with different level of educational attainment generally earn different incomes.  For example, in 2014 full-time workers between the ages of 25 and 34 with Bachelor's degree earned a median annual earnings level that was 43% more than the median for workers with Associate's degrees.[22]  The same data shows that workers with Master's degrees earn more than workers with Bachelor's degrees.  This is directly relevant to a damages methodology, as the purported class members vary substantially in their educational attainment.  Approximately 60% of the purported class (as it is currently defined) has completed an Associate's degree, 39% have completed a Bachelor's degree and approximately 1% have completed a Master's degree according to the AVIATOR system Application data.  Although not mentioned in his initial report, Plaintiffs' expert acknowledged

---

[19] Pages 95-102 and 159-160 of Plaintiffs' expert's deposition transcript.
[20] Pages 76-77, 109 of Plaintiffs' expert's deposition transcript.
[21] Page 15 of Plaintiffs' expert's report.
[22] See, for example, National Center for Education Statistics, and United States. Digest of Education Statistics. 2019. Table 502.30.

in his deposition testimony (pages 99-100) that the level of education is important and for his actual calculations it would be appropriate to account for different earning levels of plaintiffs with different college degrees.

> *"Q. You indicated awareness that some of these people get associates degrees, some get bachelor's degrees. Are you also aware that some people get master's degrees in this that qualify?*
>
> *A. Yeah, well, I would want to know that too, and I would want to know what those proportions look like."*

Plaintiffs' expert's deposition testimony (page 99) also acknowledges that the institution each plaintiff graduated from can be relevant to the damages calculation.

> *"We might also be able to look at data from the schools potentially -- I don't know yet because I've not looked -- that says, do you have any statistics for people that graduate from this program in terms of where they work, how much money they make, and things like that."*

From the Application data we know that purported class members have earned degrees from 36 different institutions, and these institutions represent many different types of schools. Embry-Riddle is a private university focused on aviation and aerospace while the University of Oklahoma is a large comprehensive public university. All purported class members who reported completed degree from these schools have earned Bachelor's or Master's degrees. In contrast, Hesston College is a very small private school that awards Associate's degrees in its aviation program, and Miami Dade is a public college awarding Associate's degrees and is the largest college in the Florida State system. All purported class members who report completed degree from these schools have earned Associate's degrees.

16

With regard to the determination of estimated earnings for the purported class, Plaintiffs' expert stated in his deposition testimony that he would consider data from the Bureau of Labor Statistics and would potentially also consider, "data from the colleges where they talk about the outplacement of people who graduated from their programs."[23]  This illustrates an additional source of variation in earnings potential among purported class members.  The extent by which graduates have the opportunity for employment in the public or private sector, or the various industries in which graduates are typically employed can substantially impact potential earnings.  For example, Arizona State University (one of the CTI program institutions) currently reports career opportunities for graduates of its Air Traffic Management BS degree that include positions such as Airport Operations Specialist and Distribution Center Manager with median salaries that range from $51,330 to $96,390.[24]

In short, although Plaintiffs' expert's proposed model in his preliminary report does not address the substantial variation in purported class members' earnings potential, his deposition testimony repeatedly confirms the necessity of accounting for these important differences when calculating the mitigating component of damages.[25]  Without accounting for these variations in purported class members' earning potential and purported class members actual earnings in some form, it is not feasible to establish a reasonable representation of those earnings.

**The Reliance on Measures of Central Tendency**

In his deposition, Plaintiffs' expert makes numerous references to relying on a measure of central tendency for calculating his measure of potential economic losses for the purported class.

---

[23] Plaintiffs' expert's deposition transcript pages 99-100.

[24] Arizona State University, Aeronautical Management Technology (Air Traffic Management), BS program. "Career Opportunities" https://webapp4.asu.edu/programs/t5/majorinfo/ASU00/ESAMTATBS/undergrad/false?init=false&nopassive=true

[25] See, for example, pages 96-101 of Plaintiffs' expert's deposition transcript.

By this he means, "the median or the mean . . . probably," for the population as a whole.[26] For example, on page 76 of his deposition transcript:

> "…for every example of someone that we see that's to the right of the central tendency, there's going to be a mirror example of someone to the left of the central tendency that don't do as well and was worse off by potentially a larger fraction than I've calculated here.  So you're gonna – you're gonna have people that are, you know, a tick or two to the left and a tick or two to the right, but we're looking at the central tendency."

Indeed, a measure of central tendency is a reasonable approach in situations where the factors under consideration are normally distributed with a similar number of outliers below the average (or median) as there are above the average (or median).  However, as the above tables demonstrate, the career progression of academy graduates is not lock-step and normally distributed.  As such, the sole reliance on central tendency to summarize the purported class will not provide a representative measure of their potential economic losses.

When further asked about this in his deposition, Plaintiffs' expert acknowledged that a measurement of central tendency could be inadequate for some distributions of a population, such as a "barbell-shaped distribution" for a single variable.[27]  His solution would be to "bifurcate the model," and "build two models around those two different clusters."[28]  But Plaintiffs' expert did not analyze any data before proposing his model.  Therefore, he could not assess whether this or any other solution would reasonably address the data.  Due to the wide dispersion of the career progressions at the FAA and the wide variation in the earnings capacity of the purported class given that they were not employed as controllers at the FAA, taking the measure of central tendency for two or three primary groups would not be sufficient.  Such a

---

[26] Page 109 of Plaintiffs' expert's deposition transcript.

[27] Pages 110-111, 118, 145, 157 of Plaintiffs' expert's deposition transcript.

[28] Page 111 of Plaintiffs' expert's deposition transcript.  He also alluded to potentially doing "three tranches of employees" on page 157 of his deposition transcript.

simplistic approach would not reliably account for the known variations among the relevant populations.

## VI.    Summary and Conclusions

Resolution Economics, LLC was asked to (i) review the Initial Expert Report submitted by Plaintiffs' expert witness, Mr. Glenn W. Perdue, MBA, CVA, MAFF, CLP, and (ii) provide my opinions on whether a representative and accurate measure of potential economic losses can be calculated for the purported class using a broad, formulaic approach that combines individuals who are not similarly situated.

Although Plaintiffs' expert claims numerous times in his deposition that he will rely on the data to help structure his damages model, based upon my review of the initial data that is already available, I find there is substantial variation in the characteristics of the purported class with respect to age at application, initial placement of actual hires, career progression of actual hires (including pay grade changes and movements out of the ATC position), and potential mitigating earnings levels of the purported class members.  As such, a broad, formulaic analysis that relies on measures of central tendencies (average or median, for example) among individuals who are not similarly situated will not produce a reliable representative estimate of potential economic losses for each member of the purported class.

**Review of Plaintiffs' Expert's Initial Report**
**and**
**Analysis of Potential Economic Losses**


The opinions set forth in this report are based upon the information available to me at this time.  If additional information becomes available that substantially impacts my conclusions, then this report is subject to update.


Signed this 28th day of July, 2021.




_____

Paul F. White, Ph.D.

# Appendix A



1155 Connecticut Ave NW
Suite 900
Washington, DC
20036
Direct: 202-803-6988
Pwhite@resecon.com

# PAUL F. WHITE, Ph.D.
## Partner

## Professional Experience

**Resolution Economics LLC – Washington D.C.**

Dr. White is a labor economist with significant experience in all aspects of the application of labor economics and statistical methods to problems involving labor and employment issues. His practice areas cover all aspects of employment discrimination cases, including compensation, hiring, promotion, and termination. Dr. White's labor and employment practice also includes FLSA wage and hour cases, EEOC investigations, OFCCP investigations of federal contractors, proactive monitoring of compensation and employee selections, economic damages (single-plaintiff, multi-plaintiff, and class actions), union contract negotiations, and NLRB hearings. Additionally, Dr. White has conducted analyses on Title VI matters, police dispatch models, mutual fund trading practices, asbestos exposure, and prescription drug pricing. Dr. White has testified numerous times in local, state, and federal courts.

**The Institute for Workplace Equality (Formerly "The OFCCP Institute")**

The Institute for Workplace Equality is a non-profit organization formed to assist the federal contractor community in responding to compliance regulations.

- Faculty Member (2014 – present)

**ERS Group**

- Managing Director – Washington, D.C. Office (2002 – 2015)

- Vice President (1998 – 2002)

- Research Economist (1993-1998)



**Florida State University**

Member of the graduate faculty for the Executive Management program.  Taught courses in Economics and Analytic Research Methods.

- Adjunct Professor (1996 - 2002)

**National Institutes of Health**

Awarded fellowship to study the economics of aging.

- Research Fellow (1990 - 1993)

**Womble, Carlyle, Sandridge, and Rice, Winston-Salem, NC**

Researched and analyzed health insurance statistics to be used as evidence in a medical malpractice case.

- Consultant (1992)

## Testimony

- Everette Prince v. Barnes Group, Inc. and Bowman Distribution; No. 5:94-CV-483-F(3), U.S. District Court, Eastern District of North Carolina, Western Division. (Declaration)

- Kenneth Causey v. City of Gretna, Florida, et al.; No. 94-40586-WS, U.S. District Court, Northern District of Florida, Tallahassee Division. (Deposition)

- Joseph C. Mulé, et al. v. Larry Alton Carr, et al.; No. 93-7395 Division "O" Civil Division, Circuit Court, 13th Judicial Circuit, in and for Hillsborough County, Florida. (Deposition)

- Stuart N. Robins v. Flagship Airlines and AMR Corporation; No. 94-C3589, Circuit Court, Davidson County, Tennessee. (Declaration)

- Louise L. Wilson, Beowulf L. Snell, et al. v. Macon Telegraph Publishing Company, Inc.; No. 5:95- CV-522-2 (DF), U.S. District Court, Middle District of Georgia, Macon Division. (Affidavit)



- David Hipp, Harry W. McKown, Jr., et al. v. Liberty National Life Insurance Company; No. 95- 1332-CIV-T-17A, U.S. District Court, Middle District of Florida, Tampa Division. (Deposition)

- Margaret H. Daniel v. University of Southwestern Louisiana; No. 95-2170, U.S. District Court, Western District of Louisiana, Lafayette-Opelousas Division. (Trial)

- Lois Gordon, et al. v. Columbia Gas & Electric, et al., No. 95-CI-0095, Court of Common Pleas, Civil Division, Marion County, Ohio. (Deposition)

- Connie Yon and Delores Bryant v. Department of Corrections and Steve Comeford; No. 93-4635, Second Judicial Circuit, Leon County, Florida. (Hearing)

- Sergio Bonich, et al. v. Herman Miller, Inc., No. 95-3455/CA21, Circuit, Court, 11th Judicial Circuit, Dade County, Florida. (Deposition)

- Caroline Burney v. Rheem Manufacturing Company, Inc., No. CV-97-D-1300-N, U.S. District Court, Middle District of Alabama, Northern Division. (Affidavit)

- Pamela L. Biggs v. State of Florida, Board of Regents, No. 1:96-CV-185-MMP, U.S. District Court, Northern District of Florida, Gainesville Division. (Deposition)

- Faith D. McKnight v. State of Florida, Department of Health and Rehabilitative Services, et al., No. 96-1167-CIV-J99(S), U.S. District Court, Middle District of Florida, Jacksonville Division. (Deposition)

- Grant H. Danskine, et al. v. Metro Dade County, No. 97-2068-CIV-HIGHSMITH, U.S. District Court, Southern District of Florida, Miami Division. (Affidavit and Deposition)

- Michael Corlett v. Fine Air Services, Inc., No. 97-3906-CIV-UNGARO-BENAGES, U.S. District Court, Southern District of Florida, Miami Division. (Affidavit)

- Gina Edwards v. University of Central Florida, Florida Board of Regents, et. al, No. CI 97-3420(32), Circuit Court, 9th Judicial Circuit, Orange County, Florida. (Deposition)

- Garry Joe Tawney v. The Bolles School, No. 97-03038 CA, Circuit Court, 4th Judicial Circuit, Duval County, Florida. (Deposition)

- Waymond Pollocks, et al., v. Sunland Training Center at Marianna, Florida, et al., No. TCA 87- 40103-RH, U.S. District Court, Northern District of Florida, Tallahassee Division. (Trial)



- Jeanette Robinson Ward v. Florida State Hospital, Department of Labor and Employment Security, Division of Workers' Compensation, District "A East". (Affidavit)

- Craig H. Hull v. Cash America International, Inc., No.98-607-CIV-ORL-19A, U.S. District Court, Middle District of Florida, Orlando Division. (Deposition)

- Robert Schanzer, and Robert R. Madison v. United Technologies Corporation, Pratt & Whitney Aircraft Division, No. 3:98CV00834, U.S. District Court, District of Connecticut. (Deposition and Trial)

- Donna Aldret v. State of Florida Department of Labor and Employment Security Division of Workers' Compensation, Claim No. 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. (Deposition and Hearing)

- Wilma Nicole Stout v. Baxter Healthcare Corporation, No. 4:99 CV 129-EMB, U.S. District Court, Northern District of Mississippi, Greenville Division. (Affidavit)

- Theodore R. Perin v. County of Nassau, Nassau County Department of General Services and R.A. Augisiewicz, No. 95-024094, Supreme Court of the State of New York, County of Nassau. (Affidavit)

- National Association for the Advancement of Colored People, et al. v. State of Florida Department of Corrections, et al., No. 5:00-CV-100-OC-10, U.S. District Court, Middle District of Florida, Ocala Division. (Affidavits, Hearings, Depositions and Trial Testimony)

- Kenneth Epperson, et al. v. Pennzoil Products Company, No. CV97-1797, U.S. District Court, Western District of Louisiana, Shreveport Division. (Affidavits)

- American Federation of Government Employees, Local 1617, Kelly Air Force Base, San Antonio, Texas v. San Antonio Air Logistics Center, Kelly Air Force Base, San Antonio, Texas, FMCS No. 990929-17655-3. (Arbitration Testimony)

- Birmingham Airport Authority v. Alabama State Licensing Board for General Contractors, No. CV- 99-G-1504-S, U.S. District Court, Northern District of Alabama, Southern Division. (Deposition)

- Linda Rice Chapman v. Florida Department of Health and Rehabilitative Services, No. 96-23274- CA-09, Circuit Court for the Eleventh Judicial Circuit, Dade County, Florida. (Trial)

- Dunkin' Donuts/Third Dunkin' Donuts Realty, Inc. v. Al-Karim Kassam, et al., No. CIV00-1428 LH, U.S. District Court, District of New Mexico. (Affidavit)



- Jerry R. Pike and Patrick A. Thomas v. Lucent Technologies, Inc., No. 1 00-CV-1406 RWS, U.S. District Court, District of Georgia, Atlanta Division. (Deposition)

- Mary E. O'Shea v. Summit Bancorp, Jill Christians, Antoinette Foti, Kevin Gillen, and Mary Przybyla, No. L-9865-98, Superior Court of New Jersey, Law Division: Bergen County. (Affidavit)

- Michelle Iliadis and Angela Nelson-Croxton v. Wal-Mart Stores, Inc., et al., No. L-5498-02, Superior Court of New Jersey, Middlesex County. (Deposition)

- John Kohlbek, William Schrack, and Michael Pritchard v. The City of Omaha, Nebraska, a Municipal Corporation, No. 8:03CV68, U.S. District Court, District of Nebraska. (Deposition)

- Shelley Hnot, et al. v. Willis Group Holdings Ltd., et al., No. 01-CV-6558 (GEL), U.S. District Court, Southern District of New York. (Declaration)

- International Association of Machinists and Aerospace Workers, et al. v. U-Haul International, Inc., et al., No. 28-CA-18783, National Labor Relations Board, Region 28. (Hearing)

- Rosa Scott v. Eastman Chemical Company, No. 2:03-CV-311, U.S. District Court, Eastern District of Tennessee, Greenville Division. (Deposition and Affidavit)

- Jacqueline McCoy v. Alberto Gonzales, No. 1:05 CV 371, U.S. District Court, Eastern District of Virginia, Alexandria Division. (Deposition)

- Lewis v. City of Chicago, No. 1:98 CV 05596, U.S. District Court, Northern District of Illinois, Eastern Division. (Deposition and Trial)

- Barkley, et al. v. Kmart Corporation and Melinda Hart, Civil Action 06-C-69, Circuit Court of Randolph County, West Virginia. (Deposition)

- Hillmann v. City of Chicago, No. 04 C 6671, U.S. District Court, Northern District of Illinois, Eastern Division. (Deposition)

- King v. ISG Weirton, Inc., Mittal Steel USA, Inc., et al., No. 5:06-CV-74, U.S. District Court, Northern District of West Virginia. (Affidavits)

- C. Westbrook Murphy and Harold Schuler v. PricewaterhouseCoopers, LLP, et al., No. 1:02cv982 (RJL)(DAR), U.S. District Court, District of Columbia. (Deposition)



- Shiloh, et al. v. New Cingular Wireless Services, Inc., et al., Case No. 05AS00372, Superior Court of the State of California, County of Sacramento. (Declaration)

- Vernon Walton v. Bluefield Regional Medical Center, Inc., No. 05-C-768-F, Circuit Court of Mercer County, West Virginia. (Deposition)

- Corline Allen, et al. v. McWane, Inc., No. 2-06CV-158, U.S. District Court, Eastern District of Texas, Marshall Division. (Affidavit)

- Lisa Svensson v. Putnam Investments LLC, et al., Case No. 04-12711-PBS, U.S. District Court, District of Massachusetts. (Deposition, Affidavit and Trial)

- Sharon Dye, et al. v. Kmart Corporation, et al., No. 06-C-121, Circuit Court of Wood County, West Virginia. (Affidavit)

- Keith Sharick v. Southeastern University of the Health Sciences, et al., No. 93-15077 (32), Circuit Court of the Eleventh Judicial Circuit, Dade County, Florida. (Deposition and Trial)

- Reginald Moore, et al. v. Chertoff, No. 00-953 (RWR)(DAR), U.S. District Court, District of Columbia. (Deposition)

- Claude Grant, et al. v. Metropolitan Government of Nashville and Davidson County, Tennessee, No. 3:04-0630, U.S. District Court, Middle District of Tennessee, Nashville Division. (Trial)

- Thomas Janusz v. City of Chicago, No. 03 C 4402, U.S. District Court, Northern District of Illinois, Eastern Division. (Deposition)

- Smithfield Food, Inc. and Smithfield Packaging Company v. United Food and Commercial Workers International Union, et al., No. 3:07CV641, U.S. District Court, Eastern District of Virginia, Richmond Division. (Deposition)

- Jason Campbell and Sarah Sobek v. PricewaterhouseCoopers LLP, No. 06-CV-02376 LKK GGH, U.S. District Court, Eastern District of California. (Declaration)

- Burch, et al. v. Qwest Communications International, Inc., et al., No. 06-CV-3523, U.S. District Court, District of Minnesota. (Deposition)



- Forrest Thomas v. Centennial Communications Corp., et al., Civil No. 2003/163, District Court of the Virgin Islands, Division of St. Croix. (Deposition)

- Starks, et al. v. H&R Block, Inc., No. 0622-CC00029, Circuit Court of the City of St. Louis, State of Missouri. (Affidavit)

- Dalton, et al. v. Lee Publications, et al., No. 08-CV-1072, U.S. District Court, Southern District of California. (Declaration)

- Taylor, et al. v. District of Columbia Water and Sewer Authority, Civil Action No. 01CV00561(HHK), U.S. District Court, District of Columbia. (Declaration and Deposition)

- Diaz, et al. v. Target Corporation, No. 8:10-CV-01103-AG-MLG, U.S. District Court, Central District of California. (Declaration)

- Zivali, et al. v. AT&T Mobility, et al., No. 08-CV-10310, U.S. District Court, Southern District of New York. (Deposition)

- Rodney Gooch, et al. v. Metropolitan Government of Nashville and Davidson County, Tennessee, No. 3:09-cv-00826, U.S. District Court, Middle District of Tennessee, Nashville Division. (Deposition)

- Parks, et al. v. Alpharma, Inc., et al., No. RBD-06-2411, U.S. District Court, District of Maryland. (Deposition)

- Young and Leite v. Simon, et al. and Acosta v. Simon, et al., Case Nos. BC433329 and BC434287, Superior Court of California, County of Los Angeles. (Deposition)

- Bickley, et al. v. Schneider National Carriers, Inc., Case No. 3:08-cv-05806-JSW (NMC), U.S. District Court, Northern District of California. (Declaration)

- Jeff Parmet v. PricewaterhouseCoopers LLP, Case No. 13 107 Y 00860 11, Before the American Arbitration Association. (Deposition and Arbitration)

- Hall, et al. v. Rite Aid Corporation, Case No. 37-2009-00087938-CU-OE-CTL, Superior Court of the State of California in and for the County of San Diego. (Deposition)

- David Moore v. Gilead Sciences, Inc., Case No. 3:07-cv-03850 SI, U.S. District Court, Northern District of California. (Deposition)



- Misty Neal, et al. v. The Cheesecake Factory Restaurants, Inc. (Arbitration Testimonies)

- Jesus Hernandez, et al. v. Ashley Furniture Industries, et al., Case No. 5:10-cv-05459-BMS, U.S. District Court, Eastern District of Pennsylvania. (Deposition)

- Miguel De La Cueva v. Alta-Dena Certified Dairy, LLC, et al., Civil Action No. CV 12-1804-GHK (CWx), U.S. District Court, Central District of California, Western Division. (Declaration)

- Nobles, et al. v. State Farm Mutual Automobile Insurance Company, Case No. 2:10-cv-04175, U.S. District Court, Central District of Missouri. (Declarations and Deposition)

- Linda Roberts v. Target Corporation, Case No. CV-11-951-HE, U.S. District Court, Western District of Oklahoma. (Declaration and Deposition)

- Gabriel Hernandez, et al. v. Creative Concepts, Inc., et al., Case No. 2:10-cv-02132-PMP-VCF, U.S. District Court, District of Nevada. (Deposition and Declaration)

- Romero, et al. v. Kmart Corporation, et al., Case No. BC527557, Superior Court of California, County of Los Angeles. (Declaration)

- Stacy Thompson v. Target Corporation, Case No. CV12-00010 MWF (MRWx), U.S. District Court, Central District of California. (Declarations)

- Hart, et al. v. Rick's Cabaret International, et al., No. 1:09-cv-03043-PAE-RLE, U.S. District Court, Southern District of New York. (Deposition and Declaration)

- Gasio v. Target Corporation, Case No. 2:14-cv-2214, U.S. District Court, Central District of California. (Declaration)

- Betties, et al. v. Target Corporation, Case No. 5:14-cv-00926, U.S. District Court, Central District of California. (Declaration)

- Grogan, et al. v. Holder, Case No. 1:08-cv-01747-BJR, U.S. District Court, District of Columbia. (Deposition)

- Fitzpatrick v. Booz Allen Hamilton, Inc., Civil Action No. 2011 CA 006775, Superior Court of the District of Columbia, Civil Division. (Deposition)



- EEOC v. Mavis Discount Tire, Inc., et al., No. 12-CV-0741 (KPF)(GWG), U.S. District Court, Southern District of New York. (Deposition and Affidavit)

- Gonzalez v. Local 52, International Alliance of Theatrical Stage Employees, et al., Case No. 2:14- cv-03407-JS-GRB, U.S. District Court, Eastern District of New York. (Deposition)

- Jimenez, et al. v. Moark LLC, et al. (dba Land O'Lakes), Case No. BC583048, Superior Court of the State of California for the County of Los Angeles – Central District. (Declaration)

- Sanchez, et al. v. McDonald's Restaurants of California, et al., Case No. BC499888, Superior Court of the State of California for the County of Los Angeles – Central District. (Depositions, Declarations and Trial)

- Rojas, et al. v. Target Corporation, Case No. 8:14-cv-01229-AG-RNB, U.S. District Court, Central District of California. (Declaration)

- Savannah, et al. v. Sodexo, Inc., et al., Case No. C15-02147, Superior Court of the State of California for the County of Contra Costa. (Declaration)

- LaPointe, et al. v. Target Corporation, Case No. 8:14-cv-01229-AG-RNB, U.S. District Court, Central District of California. (Declaration)

- Pitt, et al. v. The Times Picayune, L.L.C. and Advance Publications, Inc., Case No. 2:14-cv-68, et al., U.S. District Court, Eastern District of Louisiana. (Declaration)

- Bokanoski, et al. v. LePage Bakeries, et al., Case No. 3:15-cv-00021, U.S. District Court, District of Connecticut. (Declaration)

- Bowen v. Target Corporation, Case No. BC 602994, Los Angeles County Superior Court. (Declaration)

- Craft v. Target Corporation, Case No. BC 613268, Los Angeles County Superior Court. (Declaration)

- Daniels v. Target Corporation, Case No. BC 607742, Los Angeles County Superior Court. (Declaration)

- OFCCP v. WMS Solutions, LLC, Case No. 2015-OFC-00009, United States Department of Labor, Office of Administrative Law Judges. (Deposition and Hearing)

- Nesbitt v. University of Maryland Medical System, et al., Case No. 1:13-CV-00125-WDQ, U.S. District Court, District of Maryland. (Deposition)



- Artiaga, et al. v. Target Corporation, Case No. 16CECG01530, Fresno County Superior Court. (Declaration)

- Stuart Green v. Actin Biomed LLC, et al., No. 01-16-0000-6593, American Arbitration Association. (Deposition and Hearing)

- Lisa Ferguson, et al. v. Jeff B. Sessions and Federal Bureau of Prisons, EEOC No. 480-2016-00563x, Agency No. BOP-2012-0053, Equal Employment Opportunity Commission, Los Angeles Office. (Deposition)

- Halley, et al. v. Target Corporation, Case No. BC653367, Los Angeles County Superior Court. (Declaration)

- OFCCP v. Enterprise RAC Company of Baltimore, LLC, Case No. 2016-OFC-00006, United States Department of Labor, Office of Administrative Law Judges. (Declaration, Deposition and Hearing)

- Shoots, et al. v. iQor Holdings US Inc., Case No. 0:15-cv-00563, United States District Court, District of Minnesota. (Deposition)

- Urbina v. Comcast Inc., et al., Case No. 3:16-cv-09348-LB, United States District Court, Northern District of California. (Deposition)

- Loughrie, et al. v. Target Corporation, Case No. CIVDS1720075, San Bernardino County Superior Court. (Declaration)

- Espinoza, et al. v. Target Corporation, Case No. CIVDS1724914, San Bernardino County Superior Court. (Declaration)

- Sampson v. Vita-Mix Corporation, Case No. 17-cv-0233 GPC-BGS, United States District Court, Southern District of California. (Declaration)

- Anger v. General Motors LLC, Case No. 2:17-cv-10083, United States District Court, Eastern District of Michigan. (Deposition)

- Huang, et al. v. Twitter, Inc., Case No. CGC-15-544813, San Francisco County Superior Court. (Declaration)

- Noll, et al. v. Flowers Foods, Inc., et al. Case No. 1:15-cv-00493, United States District Court, District of Maine. (Deposition)



- Neff, et al. v. Flowers Foods, Inc., et al. Case No. 5:15-cv-00254, United States District Court, District of Vermont. (Deposition)

- De La Cruz, et al. v. Target Corporation, Case No. 37-2018-00011389-CU-OE-CTL, San Diego County Superior Court. (Declaration)

- Dennis Turner, et al. v. Jeff B. Sessions and Federal Bureau of Prisons, EEOC No. 541-2008-00255X, Agency No. P-2004-0296 and P2000-0138, Equal Employment Opportunity Commission, Denver Field Office. (Deposition and Hearing)

- Amezquita, et al. v. Target Corporation, Case No. CIVDS1808827, San Bernardino County Superior Court. (Declaration)

- Topete, et al. v. Target Corporation, Case No. BCV-18-101145, Kern County Superior Court. (Declaration)

- Hudgins, et al. v. Total Quality Logistics, LLC, Case No. 1:16−cv−07331, United States District Court, Northern District of Illinois. (Deposition)

- Franklin v. Flowers Baking Co. of Houston, LLC, Case No. 01-17-0007-1081, American Arbitration Association. (Deposition)

- Lokosky v. Acclarent, Inc., Case No. 1:11-CA-11217-WGY, United States District Court, District of Massachusetts. (Deposition)

- Lara-Brown v. Flowers Baking Co. of Houston, LLC, Case No. 01-17-0007-1097, American Arbitration Association. (Arbitration)

- Marques, et al. v. Centerplate, Inc., et al., Case No. CGC-18-567402, San Francisco County Superior Court. (Declaration)

- Ayala, et al. v. GEICO, Case No. 7-18-cv-03583, United States District Court, Southern District of New York. (Declaration)

- Carr, et al. v. Flowers Foods, Inc., et al., Civil Action No. 15-6391 and Boulange, et al. v. Flowers Foods, Inc., et al., Civil Action No. 16-2581. (Deposition)

- Thomas, et al. v. Target Corporation, Case No. 19CIV00584, San Mateo County Superior Court. (Declaration)



- Eidson v. Board of Regents of the University of California, et al., Case No. RG17856649, Alameda County Superior Court. (Deposition and Trial)

- Langley v. International Business Machines Corporation, Case No. 1:18-cv-00443-LY, United States District Court, Western District of Texas. (Declaration)

- Garcia, et al. v. Target Corporation, Case No. 34-2019-00254638-CU-OE-GDS, Sacramento County Superior Court. (Declaration)

- Young v. Flowers Baking Co. of Tyler, LLC, Case No. 01-18-0001-9556, American Arbitration Association. (Arbitration)

- EEOC v. AutoZone, Inc. et al., Case No. 1:14-cv-03385, United States District Court, Northern District of Illinois. (Deposition)

- Ebarb v. Flowers Baking Co. of Tyler, LLC, Case No. 01-18-0001-9583, American Arbitration Association. (Arbitration)

- Loose v. General Dynamics Corporation, et al., Case No. 1:19-cv-00471, United States District Court, Eastern District of Virginia. (Deposition)

- Ornelas, et al. v. Target Corporation, Case No. CIVDS1924533, San Bernardino County Superior Court. (Declarations)

- Fair Housing Justice Center, Inc. v. Pelican Management, Inc., et al., Case No. 1:15-cv-01564, United States District Court, Southern District of New York. (Deposition)

- Felps, et al. v. Mewbourne Oil Company, Inc., Case No. 2:18-cv-811-RB-GJF, United States District Court, District of New Mexico. (Deposition)

- EEOC v. R+L Carriers, Inc., et al., Case No. 1:17-cv-00515-SJD, United States District Court, Southern District of Ohio. (Deposition)

- Tuaua, et al. v. William Barr, EEOC No. 570-2010-01061X, Agency No. USM-2010-00422, Equal Employment Opportunity Commission, Washington Field Office. (Declaration)

- Barnes, et al. v. Target Corporation, Case No. CIVDS2007761, San Bernardino County Superior Court. (Declarations)



- Scalia v. Arizona Logistics, Inc., et al., Case No. 2:16-cv-04499-DLR, United States District Court, District of Arizona. (Declaration)

- Fogg, et al. v. William P. Barr, Attorney General, Department of Justice, EEOC Case No. 570-2016-00501X, Agency No. M-94-6376, United States of America EEOC, Washington Field Office. (Declaration)

- Writers Guild of America, West, Inc. v. Netflix US, LLC, et al., Arbitration Tribunal Case No. 19-CL-0094. (Arbitration Hearings)

- People of the State of California v. Lear Capital, Inc., Case No. 19STCV19362, Superior Court of the State of California, County of Los Angeles. (Declaration)

- Van Brunt-Piehler v. Absolute Software, Inc., et al., No. 16-cv-6313-EAW-MWP, U.S. District Court, Western District of New York. (Deposition)

## Publications and Research Papers

- "Employer Strategies to Limit COVID-19 Discrimination Claims," (with Amy Traub), Law360, June 8, 2020

- "9 Ways to Manage Risks Associated with Year-End Bonuses," (with Rick Holt), Law360, December 16, 2016

- "Compensation Self-Audits," Chicago Lawyer, Vol. 32, No. 8, August 2009

- "Layoffs and Statistical Evidence of Discrimination," (with Edward Bierhanzl), Law360, December 18, 2008

- Reply to "Comments on 'The Use of Attrition Rates for Economic Loss Calculations in Employment Discrimination Cases:  A Hypothetical Case Study,'" (with Josefina V. Tranfa-Abboud and Fredrick M. Holt), Journal of Forensic Economics, Vol. XVIII, No. 1.

- "Recent Developments in the Analysis of Employment Practices," (with Joan Haworth and Janet Thornton), Development in Litigation Economics, Vol. 87.  Eds. Patrick Gaughan and Robert Thornton, Contemporary Studies in Economic and Financial Analysis. New York:  Elsevier, 2005.



- "The Use of Attrition Rates for Economic Loss Calculations in Employment Discrimination Cases: A Hypothetical Case Study," (with Josefina V. Tranfa-Abboud and Fredrick M. Holt), <u>Journal of Forensic Economics</u>, Vol. XVI, No. 2, Spring/Summer 2003 (Published September 2004).

- "The Numbers Game:    Statistics offered to show discrimination may promise more than they prove," (with Leslie Turner), <u>Legal Times</u>, Volume XXVII, No. 16, April 2004.

- "Cost-Efficient Use of Your Expert Witness – From the Expert Witness' Point of View," <u>Bar Bulletin</u>, Maryland State Bar Association, October 2002.

- "The Use of an Economist in Labor and Employment Disputes: Legal and Practical Considerations," (with James Garrity), <u>The Florida Bar Journal</u>, Vol. LXXIV, No. 11, December 2000.

- "Approaches for Dealing With Small Sample Sizes in Employment Discrimination Litigation," (with Michael J. Piette), <u>Journal of Forensic Economics</u>, Vol. XII, No. 1, Winter 1999.

- "Use of 'Reverse Regression' in Employment Discrimination Analysis," (with Michael J. Piette), <u>Journal of Forensic Economics</u>, Vol. XI, No. 2, Spring/Summer 1998.

- Review of "Tenure, Discrimination, and the Courts" by Terry L. Leap, <u>Journal of Forensic Economics</u>, Vol. IX, No. 2, Spring/Summer 1996.

- Long-Term Care of the Disabled Elderly, "Working vs. Helping - A Caregiver's Dilemma," Ph.D. Dissertation, Department of Economics, North Carolina State University, August, 1993.

- "The Proposed Virginia Coal Slurry Pipeline and Its Employment Effects on the Railroad Industry," (with Ehsan Ahmed), <u>Journal of Applied Business Research</u>, Fall, 1990.

## Presentations and Professional Meetings

- "Strategies for Moving the Diversity Needle," (with Consuela Pinto and Marina Williams) WorldatWork Workplace Equity Virtual Forum, 2021.

- "California Equal Pay Laws and Reporting," (with Lara de Leon) National Industry Liaison Group Webinar, 2021.

- "OFCCP's Final Rule on Procedures to Resolve Potential Employment Discrimination," (with Cara Crotty) National Industry Liaison Group Webinar, 2020.



- "Making and Messaging Pay Adjustments," (with Michelle Duncan) The Institute for Workplace Equality 2020 Virtual Pay Equity Symposium, 2020.

- "Reopening the Workplace - COVID-19 Special Series:  Key Considerations for WARN Notices," (with Joon Hwang) The Institute for Workplace Equality Webinar, 2020.

- "Recalling, Rehiring, and Hiring Anew: Proactive COVID-19 Strategies to Limit Systemic Discrimination Risk," (with Amy Traub and David Martin) Webinar, 2020.

- "Covid-19: Layoffs, the WARN Act and Related Issues," (with Nathaniel Glasser, Marc Mandelman, Rick Holt and John Fahr) Webinar, 2020.

- "Developing Strategic Pay Analysis Groups for OFCCP Audit Submissions," (with Mickey Silberman) The Institute for Workplace Equality 2020 Higher Education Symposium, Coral Gables, FL, 2020.

- "Unique Considerations for Conducting a Proactive Pay Analysis in Higher Education," (with David Cohen) The Institute for Workplace Equality 2020 Higher Education Symposium, Coral Gables, FL, 2020.

- "Compensation Roundtable with OFCCP," NILG Advisory Panel on Compensation Standards and Best Practices, Washington, DC, 2020.

- "Gender Pay 3? True Measures and Remedy," (with Sally Isaacs) Eversheds-Sutherland seminars in London and Leeds, UK, 2019.

- "Employment Class Action and FLSA Litigation:  Tools and Techniques You Must Know," (with JoAnna Brooks, Allegra Lawrence-Hardy, Cheryl Orr and Katherine Den Bleyker) The Knowledge Group Webinar, 2019.

- "International Equal Pay Legislation and Proactive Analysis" (with Kenneth Gage), The Institute for Workplace Equality Webinar, 2019.

- "Making and Messaging Pay Adjustments" (with David Fortney), The Institute for Workplace Equality 2019 Higher Education Compliance Symposium, Washington, DC, 2019.

- "Conducting Proactive Pay Analysis" (with Michael Aamodt), The Institute for Workplace Equality 2019 Higher Education Compliance Symposium, Washington, DC, 2019.



- "Pay Equity in Law Firms: Using Data to Identify and Address Potential Issues," (with Julie Frizell) Association of Legal Administrators Webinar, 2019.

- "Pay Equity Compliance: Practical Guide for Employers in 2019," (with Lynne Anderson, Amy Traub and Jonathan Segal) The Knowledge Group Webinar, 2019.

- "Pay Equity Analyses: Insights from the Experts," (with David Cohen and Dan Kuang) Northeast Region Corporate Industry Liaison Group Conference, Newark, NJ, 2018.

- "Privileged Pay Equity Analysis," (with Gretchen Ewalt) Capital Associated Industries Compensation and Benefits Conference, Raleigh, NC, 2018.

- "A Look at Federal and State Equal Pay Laws: Unique Perspectives from In-House Counsel, Outside Counsel, and a Labor Economist," (with Zina Deldar and Peter Cooper) The Knowledge Group Webinar, 2018.

- "A Wave Of Audits Will Soon Be Upon Us:  What Do We Do? How Do We Prepare?" (with Mickey Silberman), The Institute for Workplace Equality Fall Compliance Conference, Denver, CO, 2018.

- "UK and International Equal Pay Laws and Proactive Analysis" (with Jon Geier), The Institute for Workplace Equality Fall Compliance Conference, Denver, CO, 2018.

- "Strategic Issues When Conducting EEO Pay Studies?" (with Chris Wilkinson), The Institute for Workplace Equality Fall Compliance Conference, Denver, CO, 2018.

- "Big Data Algorithms and EEO:  A Primer for Institute Attendees," (with Eric Dunleavy) The Institute for Workplace Equality Annual Summit, Washington, D.C., 2018.

- "Pay Equity: Legal Developments and Practical Steps," (with Joseph Sellers, Kris Meade, Jeremy Guinta and Lisa Lupion) Roundtable with ABA Section of Litigation, Employment and Labor Relations Committee, 2018.

- "UK Gender Pay Gap Disclosures:  Lessons Learned and Next Steps," (with David Cohen and Jon Geier) The Institute for Workplace Equality Webinar, 2018.

- "Pay Equity: Legal, Data, and Practical Considerations," (with Elaine Reardon, Krissy Katzenstein and Tauseef Rahman) The Knowledge Group Webinar, 2017.



- "Using Big Data to Make Employment Decisions," (with David Baffa, Annette Tyman and Kathleen Lundquist) Seyfarth Shaw Webinar, 2017.

- "Gender Pay Disparity – OFCCP and the New Reporting Regulations," (with Andrew Kingsley and Liz Washko) The College of Labor and Employment Lawyers - 5th Circuit Annual CLE Event, New Orleans, LA, 2017.

- "Effective Use of Statistical Evidence in Employment Class Action Litigation:  Practical Guide in 2017," (with Dubravka Tosic, Brian Kriegler and Eric Savage) The Knowledge Group webinar. 2017.

- "Statistical Analysis of Discrimination," moderator and session organizer (with Carole Amidon, Stephen Bronars and Elaine Reardon) Southern Economic Association conference, Washington, D.C., 2016.

- "Pay Equity in Practice:  What Are Employers Doing, What Can They Do, and What Works?" (with Rachel Geman, Samantha C. Grant, Wendy L. Kahn and Tamika Lynch) ABA Labor and Employment Law Conference, Chicago, IL, 2016.

- "Data Issues Every Federal Contractor Needs to Understand" (with David Cohen and Jon Geier) The Institute for Workplace Equality Compliance Conference, Chicago, IL. 2016.

- "Pay Equity De-mystified: Practical Legal, Data, and Statistical Considerations," (with Lori Andrus and Katie Mantoan) State Bar of California Labor & Employment Law Section webinar. 2016.

- "Pay Equity De-mystified: Practical Legal, Data, and Statistical Considerations," (with Michael Lieder and Alison Marshall) Seminar and webinar presented by the Washington D.C. Bar Association. 2016.

- "Compensation:  Data Issues Every Federal Contractor Needs to Understand," (with David Cohen and Jon Geier) presented as part of a webinar series through The Institute for Workplace Equality.  2016.

- "What is Big Data and how Big Data Impacts Federal Contractors," (with Valerie Hoffman and David Fortney) presented as part of The Institute for Workplace Equality's "Big Data Webinar," 2016.

- "Pay Equity Legislation and EEO-1 Reporting:  Practical Strategies for Reducing Pay Discrimination," (with Leigh M. Nason) presented as part of Ogletree Deakins' "The Capital Area Employment Law Conference:  The Changing Landscape Facing Employers in 2016," Bethesda, MD, 2016.



- "Strategies for Successful OFCCP Compensation Compliance" (with Gary Siniscalco and David Cohen) presented as part of The Institute for Workplace Equality Compliance Conference, San Francisco, CA. 2016.

- "Adverse Impact Analysis" (with David Cohen) presented as part of The Institute for Workplace Equality Compliance Conference, San Francisco, CA, 2016.

- "Successful Testing and Validation Strategies" (with Eric Dunleavy and Mickey Silberman) presented as part of a webinar series through The Institute for Workplace Equality.  2015.

- "Conducting a Compensation Analysis in response to the New Scheduling Letter" (with W. Carter Younger and Mickey Silberman) presented as part of a webinar series through The Institute for Workplace Equality. 2015.

- "Strategies for Successful OFCCP Compensation Compliance" (with David Cohen, Leigh Nason, and Mickey Silberman) presented as part of The Institute for Workplace Equality Annual Summit, Washington, D.C., 2015.

- "Systemic Compensation" (with David Fortney) presented as part of The Institute for Workplace Equality Annual Summit, Washington, D.C., 2015.

- "Employment Discrimination: Economic and Statistical Evident," ERS Group seminar, various dates and locations.

- "Crafting Effective and OFCCP Compliant Affirmative Action Plans," ERS Group seminar, various dates and locations.

- "Analyzing and Monitoring Compensation in Today's Regulatory Environment," ERS Group seminar, various dates and locations.

- "Defending and Managing the Latest Off-the-Clock Claims Involving the Use of Smartphones/Mobile Devices Outside of Scheduled Hours and Working Remotely," (with Linda M. Doyle and John J. Myers), presented as part of a seminar entitled "ACI Wage & Hour Claims and Class Actions," Miami, FL, 2015.

- "OFCCP Compliance Evaluations: Understanding and Using HR Data to Aid Compliance and Diversity Efforts," (with Jon Geier and David Cohen), webinar presented by The Institute for Workplace Equality, September 2014.



- "Latest Developments in Class Actions: Update on Class Certification of Title VII and Other Discrimination Claims post-Dukes, and the Enforceability of Class Action Waivers in Arbitration Agreements," (with William Martucci and Jeffrey Wohl), presented as part of a seminar entitled "ACI's Forum on Defending and Managing Employment Discrimination Litigation," New York, NY, 2014.

- "Understanding Multiple Regression Analysis," (with David Cohen), and "Conducting the Statistical and Non-Statistical Analysis," (with Jon Geier) presented as part of The Institute for Workplace Equality's "Assessing Compensation and Pay Equity Compliance with a Self-Audit" seminar, Washington, D.C., 2014.

- "Equal Pay Enforcement: Minimizing the Risks," (with Leigh M. Nason and T. Scott Kelly) presented as part of Ogletree Deakins' "Corporate Labor and Employment Counsel" seminar, Charleston, SC, 2013.

- "How Labor Economists Correctly Analyze Contractor Pay Data in Anticipation of, or in Defense of, OFCCP Compensation Audits," presented as part of a seminar entitled "National Employment Law Institute Affirmative Action Briefing," Chicago, IL and Washington, D.C., 2013.

- "Class Actions: Update on Standards For Class Certification in the Wake of Walmart v. Dukes, McReynolds v. Merrill Lynch and Progeny, and the Intersection of Class Action Waivers and Arbitration in Light of Recent Supreme Court Rulings," (with Donald R. Livingston, Gerald Maatman, and Jay W. Waks), presented as part of a seminar entitled "ACI's Forum on Defending and Managing Employment Discrimination Litigation," New York, NY, 2013.

- "Use (And Abuse) Of Experts In Class And Collective Actions," (with A. Craig Cleland, Tracey T. Barbaree, and Chris R. Pace) presented as part of Ogletree Deakins' "Workplace Strategies 2013" seminar, New Orleans, LA, 2013.

- "The OFCCP And Affirmative Action—What Every Federal Contractor Must Know And Do," (with Leigh M. Nason, Gretchen W. Ewalt, and T. Scott Kelly) presented as part of Ogletree Deakins' "Workplace Strategies 2013" seminar, New Orleans, LA, 2013.

- "Expert Analysis in FLSA Cases," presented at the Florida Bar Association – Labor & Employment Law Section's Advanced Labor Topics 2013 Conference, Duck Key, FL, 2013.

- "Selection and Compensation Audits – A Statistical Review," (with Rick Holt) presented to a meeting of the Maryland Association of Affirmative Action Officers, Columbia, MD, 2012.



- "Wage and Hour Litigation and Government Investigations: Trends, Types and the Turbulent Landscape for Employers," (with Anne Marie Estevez, Howard M. Radzely, and John C. Ryan) presented as part of "ALM's Litigation Summit and Exposition," Washington, D.C., 2012.

- "Class and Pattern Cases: Emerging Trends and Issues," (with Apalla Chopra, David Offen-Brown, and Roberta Steele) presented as part of Practising Law Institute's "California Employment Law, 2012.

- "Class Actions: How to Advise Your Clients Given the Uncertainty of Class Action Law and Waivers post-Wal-Mart v. Dukes, AT&T Mobility v. Concepcion, and the NLRB Decision in DR Horton," (with Jay W. Waks, Steven W. Suflas, Elise M. Bloom and Lynn C. Hermle), presented as part of a seminar entitled "ACI Defending and Managing Employment Discrimination Litigation," New York, NY, 2012.

- "I Was Told There Would Be No Math: What Every Employment Lawyer Should Know About Statistical Proof In Employment Matters," (with Susan Dunnings and Kris Meade) presented to the Washington Metropolitan Area Corporate Counsel Association (WMACCA), Washington, D.C., 2012.

- "Economic and Statistical Considerations in Wage & Hour Litigation" (with Jeff Goodman and Sarah Graves) presented as part of Heenan Blaikie's CLE seminar entitled "The Overtime Bomb: Employee Class Actions," Toronto, Ontario, 2012.

- "Employment Discrimination—Hot Topics & Trends" (with Craig Cleland) presented as part of the ALM "In-House Counsel Labor and Employment Forum," New York, NY, 2012.

- "Keep It Ethical: Identifying and Addressing Wage and Hour Compliance Gaps, and Responding to Wage and Hour Division Investigations," (with Paul DeCamp, Judith E. Kramer and Maritoni D. Kane) presented as part of Practising Law Institute's "Managing Wage & Hour Risks 2012" program, New York, NY, 2012.

- "Expert Witnesses in Wage and Hour Litigation: Selection and Permissible Use of Expert Testimony" (with Michael Alaimo, Todd Jackson and Michael Rubin), presented as part of a seminar entitled "ACI Wage & Hour Claims and Class Actions," San Francisco, CA, 2011.

- "New Tools for the Calculation of Infringement Damages," (with Roy Weinstein and Janet Thornton). Prepared for The Center of American and International Law, Plano, TX, October 2010.

- "Statistical Analyses of Compensation and Employee Selection – Practical Tips," (with Edward Bierhanzl, Ph.D.). for the Triangle Industry Liaison Group. Raleigh, NC, 2010.



- Invited Mock Trial Witness. National Institute for Trial Advocacy. Advanced Advocates Program. Georgetown University Law School. Washington, D.C., 2009.

- "Use of Statistics in Employment Litigation," presented as part of a seminar entitled "Federal Aviation Administration Personnel and Labor Law Conference," Atlanta, GA, 2005.

- "Economic Damages: The Effects of Explicit and Implicit Methodological Decisions," paper presented as part of a seminar entitled "Current Developments in Labor & Employment Law," The Center of Continuing Professional Development, Louisiana State University, Baton Rouge, LA, 2005.

- "Employment Class Actions: Case Law Developments, Statistical Issues and Practical Suggestions," (with Alison B. Marshall). Sponsored by the Bar Association of the District of Columbia, Washington, D.C., 2004.

- "The Use of Statistics in Employment Litigation: The Importance of Assumptions," Employment Law Seminar, Sponsored by: Federal Bar Association, Broward County Chapter, Broward County Bar Association - Employment Law Section, Broward County Women Lawyers Association, Fort Lauderdale, Florida, 2003.

- "What Happens When We Assume: Don't Let It Happen to Your Economic and Statistical Expert," paper presented as part of a seminar entitled "Current Developments in Labor & Employment Law," The Center of Continuing Professional Development, Louisiana State University,  Baton Rouge, LA, 2003.

- "The Use (and Misuse) of Economics and Statistics in Employment Litigation," paper presented as part of a seminar entitled "Employment Law 2000: The Right Mix," Louisiana State Bar Association, New Orleans, LA, 2000.

- "Analyzing Allegations of Discrimination in Termination Cases," paper presented as part of a seminar entitled "Employee Discharge and Documentation," Tallahassee, Florida, 1995-2000.

- "Private Sector Employment Opportunities for Economics Majors," presentation for Omicron Delta Epsilon, Florida State University's economics honor society, Tallahassee, FL, 1998.

- "Approaches for Dealing With Small Sample Sizes in Employment Discrimination Litigation," (with Michael J. Piette) paper presented at the Southern Economic Association Annual Meetings, Atlanta, GA, 1997.



- "The Use of 'Reverse Regression' in Employment Discrimination Analysis" (with Michael J. Piette), paper presented at the Allied Social Science Association Annual Meetings, New Orleans, Louisiana, 1997.

- "Employment Discrimination," presentation for Alpha Kappa Psi, Florida State University's professional business fraternity, Tallahassee, FL, 1996.

- "Informal Caregivers of the Disabled: Applications for the Forensic Economist," paper presented at the Southern Economic Association Annual Meetings, New Orleans, Louisiana, 1995.

- "Allocating Time to Caring and Working: Evidence from the National Long-Term Care Survey," paper presented at the Southern Economic Association Annual Meetings, Orlando, Florida, 1994.

- "Estimating the Shadow Price of Informal Care," paper presented at the Allied Social Science Association Annual Meetings, Boston, Massachusetts, 1994.

- "What President Clinton's Health Care Plan Will Mean to You," lecture presented as part of the Valencia Community College Notable Speaker Series, Orlando, Florida, 1994.

## Professional Association and Memberships

American Economics Association

National Association of Forensic Economics

## Professional Journal Referee

Contemporary Economic Policy, Western Economic Association

Journal of Forensic Economics, National Association of Forensic Economics

Litigation Economics Review, National Association of Forensic Economics

## Professional Journal Board of Editors

Journal of Business Valuation and Economic Loss Analysis, National Association of Certified Valuation Analysts.



## Education

**North Carolina State University**
Doctor of Philosophy Labor/Health Economics, Minor in Statistics, 1993
Master's of Education, Economics, 1992

**James Madison University**
Bachelor of Science, Economics, 1989

## Honors and Awards

National Institutes of Health Fellowship, 1990 to 1993

## Specialization

Labor Economics, Health Economics, Economics of Aging

# Appendix B

# Appendix B

The distribution of the potential class members' ages as of January 1, 2014 is listed in the table below. Two potential class members are missing age as their stated birth years were after 2014.

### Table 1: Potential Class Members at Time of Application

| Age | Count | Percent |
|:---:|:---:|:---:|
| -- | 2 | 0.20% |
| 19 | 1 | 0.10% |
| 20 | 8 | 0.78% |
| 21 | 24 | 2.35% |
| 22 | 68 | 6.66% |
| 23 | 137 | 13.42% |
| 24 | 178 | 17.43% |
| 25 | 132 | 12.93% |
| 26 | 97 | 9.50% |
| 27 | 99 | 9.70% |
| 28 | 87 | 8.52% |
| 29 | 84 | 8.23% |
| 30 | 74 | 7.25% |
| 31 | 26 | 2.55% |
| 32 | 4 | 0.39% |
| Total | 1,021 | 100.00% |

# Appendix C

# Appendix C

**Table 3: Facility Level Progression From Initial Placement**

| Initial ATC Facility | | | Final ATC Facility[1] | | |
|---|---|---|---|---|---|
| Code | Level | # | Code | Level | # |
| DC | 4 | 5 | F | 6 | 1 |
| | | | G | 7 | 1 |
| | | | H | 8 | 1 |
| | | | L | 12 | 2 |
| EC | 5 | 118 | A | | 1 |
| | | | D | 4 | 1 |
| | | | E | 5 | 58 |
| | | | F | 6 | 9 |
| | | | G | 7 | 6 |
| | | | H | 8 | 18 |
| | | | I | 9 | 5 |
| | | | J | 10 | 2 |
| | | | K | 11 | 7 |
| | | | L | 12 | 11 |
| FC | 6 | 124 | D | 4 | 3 |
| | | | E | 5 | 9 |
| | | | F | 6 | 35 |
| | | | G | 7 | 13 |
| | | | H | 8 | 16 |
| | | | I | 9 | 5 |
| | | | J | 10 | 5 |
| | | | K | 11 | 4 |
| | | | L | 12 | 34 |
| GC | 7 | 91 | A | | 3 |
| | | | E | 5 | 3 |
| | | | F | 6 | 7 |
| | | | G | 7 | 33 |
| | | | H | 8 | 9 |
| | | | I | 9 | 5 |
| | | | J | 10 | 4 |
| | | | K | 11 | 11 |
| | | | L | 12 | 16 |

[1] The shaded rows represent those who have remained in the same facility level through the end of their available data.

**Table 3: Facility Level Progression From Initial Placement (continued)**

| Initial ATC Facility | | | Final ATC Facility | | |
|---|---|---|---|---|---|
| Code | Level | # | Code | Level | # |
| | | | E | 5 | 2 |
| | | | F | 6 | 3 |
| | | | G | 7 | 1 |
| HC | 8 | 33 | H | 8 | 18 |
| | | | I | 9 | 3 |
| | | | J | 10 | 1 |
| | | | K | 11 | 1 |
| | | | L | 12 | 4 |
| | | | F | 6 | 1 |
| | | | H | 8 | 3 |
| IC | 9 | 33 | I | 9 | 18 |
| | | | K | 11 | 2 |
| | | | L | 12 | 9 |
| | | | E | 5 | 1 |
| | | | F | 6 | 1 |
| | | | G | 7 | 2 |
| | | | H | 8 | 1 |
| JC | 10 | 76 | I | 9 | 2 |
| | | | J | 10 | 57 |
| | | | K | 11 | 8 |
| | | | L | 12 | 4 |
| | | | E | 5 | 4 |
| | | | F | 6 | 2 |
| | | | G | 7 | 6 |
| | | | H | 8 | 1 |
| KC | 11 | 119 | I | 9 | 2 |
| | | | J | 10 | 4 |
| | | | K | 11 | 88 |
| | | | L | 12 | 12 |
| | | | D | 4 | 2 |
| | | | E | 5 | 5 |
| | | | F | 6 | 3 |
| | | | G | 7 | 3 |
| LC | 12 | 191 | H | 8 | 6 |
| | | | I | 9 | 2 |
| | | | J | 10 | 12 |
| | | | K | 11 | 19 |
| | | | L | 12 | 139 |
| Total | | 790 | | | |

# Appendix D

# Appendix D

**CTI Institution Documents Received in Response to Plaintiffs' Request
(List of Beginning Bates Numbers)**

CTI0000268
CTI0000286
CTI0003670
CTI0009645
CTI0009650
CTI0010004
CTI0010014
CTI0010359
CTI0010434
CTI0010437
CTI0010964
CTI0010966
CTI0010975
CTI0010987
CTI0010996
CTI0010997
CTI0013597
CTI0013982
CTI0014082
CTI0014510
CTI0014664
CTI0014680
CTI0014685
CTI0015662
CTI0015682
CTI0015687
CTI0015792
CTI0017486
CTI0018979
CTI0020029
CTI0020029
CTI0020042

EXHIBIT

**II**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANDREW J. BRIGIDA; MATTHEW L. DOUGLAS-COOK | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 16-cv-2227 (DLF) |
| vs. | ) ) | |
| PETER P.M. BUTTIGIEG, Secretary, U.S. Department of Transportation, | ) ) ) | |
| Defendant | ) ) ) | |
| _____ | ) | |

## DECLARATION OF JENNIFER AFFLU

I, Jennifer Afflu, declare as follows:

1.    I am a Law Clerk I, serving as a contractor in the Federal Programs Branch, Civil

Division, U.S. Department of Justice through Leidos.  I have held this position since May 2021.

2.    This declaration is based on my personal knowledge. All the information

contained in this declaration as made available to me through my official duties.

3.    I was asked to make simple calculations based on data created by Defendant's

expert witness, Dr. Paul White, in connection with his expert report dated July 28, 2021.

**Background**

4.    Dr. White's report explained that he "began with the FAA's AVIATOR data

containing all of the 2014 applicants and merged on information from the FAA's CTI Database

that tracks information received from the CTI institutions and other AVIATOR data files

containing race and other application information."  *See* Paul F. White, Review of Plaintiffs'

Expert's Initial Report and Analysis of Potential Economic Losses (July 28, 2021) ("White Report") at 8.

5.     Using this data, "applying the criteria specified in Plaintiffs' class definition and making conservative (i.e., potentially over-inclusive) assumptions where the data was imprecise, [Dr. White] identified 1,021 potential members of the putative class." White Report at 9. I refer to these 1,021 individuals as "potential class members" or "total potential class."

6.     On August 20, 2021, Defendant produced to Plaintiffs, among other things, "the two final databases used by Dr. White for his analyses, including crosswalk tabs describing each data field; [and] the programs used to produce those databases." *See* Def.'s Response to Pls.' 2d Req. for Production of Documents Concerning Class Certification at 3 (Aug. 20, 2021). I reviewed the document from that production titled Consolidated Application Data.xlsx.

7.     I also reviewed three documents that were produced to Plaintiffs on December 23, 2020: (a) the document titled CTI Database Eff 4.29.13 Copy.xlsx, which contains information regarding CTI students and graduates; (b) the document titled Requested Data for 33537 – Other Applications(2012-2020).xlsx, which contains information about other controller applications by individuals who applied in 2014; and (c) the document titled Requested Data for 33537 – RNO.xlsx, which contains self-reported race and other demographic information.

**AT-SAT Scores**

8.     I understand that AT-SAT scores were divided into two bands, with scores 85 or above called "well-qualified" and scores from 70-84.9 called "qualified." *See* 4th Am. Compl. ¶ 32.

9.     In Consolidated Application Data.xlsx, I filtered Column A for the value "1" to focus only on the 1,021 potential class members. I then reviewed Column EX, which reports the

most recent passing AT-SAT test score recorded in AVIATOR.  I filtered that column for scores

below 85.  The data showed that 296 potential class members had a score between 70 and 84.9.

This is 28.99% of the total potential class.

**CTI Eligibility**

10.    I understand that CTI graduates' eligibility to apply for CTI-only announcements

expired three years after their graduation unless they applied annually to extend their eligibility.

*See* Def.'s Ex. L.  Therefore, individuals who graduated in 2009 or 2010 would not be eligible to

apply for a CTI-only announcement in 2014 without an eligibility extension.

11.    In Consolidated Application Data.xlsx, with Column A filtered for the value "1"

to focus only on the 1,021 potential class members, I reviewed Column GJ, which reports

whether the CTI Database lists the individual as graduating in 2009 or 2010.  I filtered that

column for the value "1."  The data showed that 44 potential class members clearly graduated in

2009 or 2010.  This is 4.31% of the total potential class.

12.    I also reviewed Column GL, which reports whether the CTI Database is missing a

graduation date for the individual.  I filtered that column for the value "1."  The data showed that

172 potential class members did not have a graduation date recorded.  I further filtered Column

GK, which reports the projected graduation year from the CTI Database for the individuals, to

include all years before 2013.  The data showed that 69 of those 172 potential class members

without a graduation date were projected to graduate before 2013.

13.    Combining the data from paragraphs 13 and 14, it appears that as many as 113

potential class members could have needed an eligibility extension in 2014.  This is 11.07% of

the total potential class.

**Gender Demographics**

14.    In Consolidated Application Data.xlsx, with Column A filtered for the value "1" to focus only on the 1,021 potential class members, I reviewed Column AM, which reports whether applicants had registered with the Selective Service. I filtered that column for the response "I am a female, and therefore I am exempt from registering with the Selective Service." The data showed that 187 potential class members identified themselves as female. This is 18.32% of the total potential class.

**Racial/Ethnic Demographics**

15.    I also reviewed Requested Data for 33537 – RNO.xlsx and isolated the rows containing AVIATOR Record Numbers of potential class members. I then filtered the data in several different ways:

   a.    I filtered Column F, Ethnicity, by the response "Hispanic or Latino." The data showed that 95 potential class members identified themselves as Hispanic on their 2014 application.

   b.    I filtered Column F by the response "Not Hispanic or Latino" and filtered Column G, Race(s) for the response "White." The data showed that 418 potential class members identified themselves in this way.

   c.    I filtered Column G, Race(s), for responses that contained "Indian." The data showed that 18 potential class members identified themselves as American Indian or Alaska Native.

   d.    I filtered Column G for responses that contained "Asian." The data showed that 64 potential class members identified themselves as Asian.

    e.   I filtered Column G for responses that contained "Pacific." The data showed that 5 potential class members identified themselves as Native Hawaiian or Other Pacific Islander.

16.    Next I examined the 431 potential class members listed as "Unknown" in Columns F and G. I understand that these are individuals whose demographic data was not captured by AVIATOR in 2014, perhaps because the applicants did not provide it. I also understand that demographic data may be available from other FAA applications that use the same AVIATOR Record Number. For these individuals, I filtered Column J, RNO from Other Applications (if different), in several different ways:

    a.   I filtered Column J for responses that began "Hispanic or Latino." The data showed that an additional 43 potential class members identified themselves as Hispanic on other FAA applications.

    b.   I filtered Column J for responses that contained "Not Hispanic or Latino – White." The data showed that an additional 226 potential class members identified themselves this way.

    c.   I filtered Column J for responses that contained "Indian." The data showed that an additional 14 potential class members identified themselves as American Indian or Alaska Native on other FAA applications.

    d.   I filtered Column J for responses that contained "Asian." The data showed that an additional 19 potential class members identified themselves as Asian on other FAA applications.

e.  I filtered Column J for responses that contained "Pacific."  The data showed that
an additional 3 potential class members identified themselves as Native Hawaiian
or Other Pacific Islander on other FAA applications.

17.    A summary of the demographic results is provided in the following table.  Note
that some individuals appear multiple times in the table due to having overlapping
identifications.

|  | 2014 Response | For Unknowns in 2014, Other Applications | Total | % of 1,021 |
|---|---|---|---|---|
| Hispanic or Latino | 95 | 43 | 138 | 13.52% |
| American Indian or Alaska Native | 18 | 14 | 32 | 3.13% |
| Asian | 64 | 19 | 83 | 8.13% |
| Native Hawaiian or Other Pacific Islander | 5 | 3 | 8 | 0.78% |
| Not Hispanic or Latino, White (only) | 418 | 226 | 644 | 63.08% |

**Applications in 2016 or Later**

18.    I reviewed Requested Data for 33537 – Other Application (2012-2020).xlsx and
isolated applications for the all source announcements from 2016-2020: FAA-ATO-16-
ALLSRCE-49075, FAA-ATO-17-ALLSRCE-53474, FAA-ATO-18-ALLN90-54212, FAA-
ATO-18-ALLSRCE-57792, FAA-ATO-19-ALLSRCE-61676, FAA-ATO-20-ALLSRCE-65607.

19.    I then compared the AVIATOR Record Numbers for the total potential class to
the applications to announcements identified in the previous paragraph.  The data showed that
373 potential class members applied to one or more announcements from 2016-2020.  This is
36.53% of the total potential class.

6

20.     I also checked for Andrew Brigida's and Mathew Douglas-Cook's AVIATOR Record Numbers. No subsequent applications for controller positions were recorded for Mr. Brigida. The only subsequent application recorded for Mr. Douglas-Cook was an application to FAA-ATO-15-ALLSRCE-40166 on March 31, 2015.

**CTI Recommendations**

21.     I reviewed CTI Database Eff 4.29.13 Copy.xlsx, and filtered Column O, Date Recommended in the "Active" tab for the response "Not Recommended." Two of those identified as "Not Recommended" have the same name, date of birth, and social security number as potential class members with AVIATOR Record Nos. 936260, 936480.

22.     Next, I filtered Column O in the "Active" tab for blank responses with no recommendation date, and then searched Column V, General Comments, for the phrase "not recommended." One comment stated "12/19/12 - Per school spreadsheet, applicant is not recommended at this time." for an individual with the same name, date of birth, and social security number as a potential class member with AVIATOR Record No. 933632.

**Suitability**

23.     I reviewed CTI Database Eff 4.29.13 Copy.xlsx, and searched for the word "suitability" in the "Active" tab. Column V, General Comments, contained the following note for Row 3831: "10/25/12 Student has been debarred from applying to any FAA position due to a suitability determination made by the security office." An individual with the same name, date of birth, and social security number is included as a potential class member under AVIATOR Record No. 770802.

**Biographical Assessment Question Nos. 15, 16, 47**

24.     Because Plaintiffs singled out Question No. 15 on the Biographical Assessment as potentially causing bias, *see* Pls.' Mot. at 11; 4th Am. Compl. ¶ 119, I reviewed the responses for the potential class members to this question, as reflected in Column CK in Consolidated Application Data.xlsx.

25.     A total of 190 potential class members identified "Science" as "the high school subject in which I received my lowest grade." Pls.' Ex. 26 at 9-10.  This is 18.6% of the total potential class.

26.     Plaintiffs' complaint also alleges that Question No. 16 on the Biographical Assessment potential causes bias.  *See* 4th Am. Compl. ¶ 119. I reviewed the responses for the to this question, as reflected in Column CL in Consolidated Application Data.xlsx.

27.     A total of 327 potential class members identified "History/Political Science" as "the college subject in which I received my lowest grades." Pls.' Ex. 26 at 10.  This is 32.02% of the total potential class.

28.     Plaintiffs' complaint also alleges that Question No. 47 should have given more points for a pilot's certificate.  *See* 4th Am. Compl. ¶ 119.  I reviewed the responses for the potential class members to this question, as reflected in Column DQ in Consolidated Application Data.xlsx.

29.     A total of 696 potential class members indicated that they did not have a pilot's certificate, and were thus unaffected by the weighting of the question.  This is 68.17% of the total potential class.

\*     \*     \*     \*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.


Dated: October 26, 2021

_Jennifer Afflu_

JENNIFER AFFLU
Law Clerk I
Leidos

9