IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

Andrew J. Brigida, et al.,        ) Civil Action
                                  ) No. 1:16-cv-02227-DLF
              Plaintiffs,         )
                                  ) **Motion Hearing** (via
vs.                               ) teleconference)
                                  )
United States Department of       )
Transportation, et al.,           ) Washington, D.C.
                                  ) **January 13, 2022**
              Defendants.         ) Time:  1:00 p.m.
_____

Transcript of **Motion Hearing** (via teleconference)
Held Before
The Honorable Dabney L. Friedrich (via teleconference)
United States District Judge
_____

A P P E A R A N C E S

For the Plaintiffs:        **Zhonette M. Brown**
(via teleconference)       **David C. McDonald**
                           **William E. Trachman**
                           MOUNTAIN STATES LEGAL FOUNDATION
                           2596 South Lewis Way
                           Lakewood, Colorado 80227

                           **Michael W. Pearson**
                           CURRY, PEARSON & WOOTEN PLC
                           814 West Roosevelt
                           Phoenix, Arizona 85007

For the Defendants:        **Galen N. Thorp**
(via teleconference)       **Michael L. Drezner**
                           UNITED STATES DEPARTMENT OF JUSTICE
                           Civil Division, Federal Programs Branch
                           1100 L Street, Northwest, Room 11220
                           Washington, D.C. 20005
_____

Stenographic Official Court Reporter:
(via teleconference)       Nancy J. Meyer
                           Registered Diplomate Reporter
                           Certified Realtime Reporter
                           333 Constitution Avenue, Northwest
                           Washington, D.C. 20001

P R O C E E D I N G S

1

(REPORTER'S NOTE:  This hearing was held during the COVID-19 pandemic restrictions and is subject to the limitations of technology associated with the use of technology, including but not limited to telephone and video signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing.)

THE COURTROOM DEPUTY:  Your Honor, we're in Civil Action 16-2227, Brigida, et al. v. U.S. Department of Transportation, et al.

If I can have counsel for -- if I can have the parties identify themselves for the record, beginning with counsel for the plaintiff.

MS. BROWN:  Good afternoon, Your Honor.

This is Zhonette Brown from Mountain States Legal Foundation on behalf of the plaintiffs.  With me on the line is my co-counsel, Mr. Pearson.  I believe also on the line is Mr. William Trachman from my firm as well as David McDonald.

Further, on the line are the two proposed named plaintiffs, Mr. Andrew Brigida and Mr. Matthew Douglas-Cook.

THE COURTROOM DEPUTY:  And counsel for defendant.

MR. THORP:  Yes, Your Honor.  Galen Thorp, Department of Justice Civil Division for the defendants.  Also with me on the line are Carlotta Wells and Michael Drezner from the Department of Justice, and Lisa Holden and Elisabeth Fry from the FAA.

1          THE COURT:  All right.  Thank you, everyone, and good

2    afternoon again.

3          If at any point you can't hear me, please speak up, and

4    I'll count on Mr. Hopkins to step in if my voice is fading or

5    the reception is not clear.

6          For the record, this is a telephonic hearing.  The court

7    is closed now to hearings in light of the rising numbers

8    related to the pandemic.  So this is being conducted by

9    telephone.

10          To start, I want to apologize for having to cancel the

11    December hearing.  As you-all may know, the court docket is

12    particularly heavy right now on the criminal side, especially

13    with the backup from the pandemic, and this has complicated

14    scheduling hearings across the board, particularly in civil

15    cases.  So, again, my apologies.

16          We all want to get this case moving to the next stage.

17    So I'll make every effort to do so moving forward.  And in the

18    interest of time, I think it would be most helpful for me to

19    start with a number of questions that I have for each side.

20    After I've heard answers from you both to those questions, I'm

21    certainly willing to give each of you a chance to make any

22    additional points and to respond to one another, but I think it

23    would be most helpful to -- again, by focusing on -- on some of

24    the questions that are at the forefront of my mind.

25          So starting with the plaintiffs, who -- who will be

1    arguing, taking the lead for the plaintiffs?

2              MS. BROWN:  This is Zhonette Brown, Your Honor, and I

3    will be.

4              THE COURT:  All right.  Thank you, Ms. Brown.

5         Ms. Brown, let me start out with one issue that relates

6    to commonality.  On the one hand, the -- the operative

7    complaint alleges that the FAA made hiring changes to benefit

8    African Americans, but elsewhere in the complaint you suggest

9    that the FAA's hiring changes were done to benefit all

10   minorities, as well as women.  And if that's what the evidence

11   ends up showing, how -- how can you say that there will be a

12   common answer to that critical question of why a plaintiff was

13   disfavored?  Won't that answer differ with the various sets of

14   plaintiffs?

15             MS. BROWN:  Thank you, Your Honor.

16        And, no, I don't believe that it will work differently.

17   Two reasons.  First --

18             THE COURT REPORTER:  I'm sorry, Ms. Brown.  This is

19   the court reporter.  So you were cutting out there right at the

20   beginning.  You had said, "I don't believe that it will work

21   differently.  Two reasons.  First . . ."

22             MS. BROWN:  Okay.  First, because at this stage of

23   the proceedings, and as it relates to evaluating class

24   certification, the class is evaluated according to the

25   allegations in the complaint.  And really the focus of the

1    complaint -- and I think that in maybe both of our opening

2    briefs and our reply, we list all of the allegations that we've

3    made specific to the preferences for African Americans.  And so

4    that is our case.  So we are asserting that these changes were

5    made to benefit African Americans over every other single

6    group.

7         Second, Your Honor -- and this is, I think, a point that

8    goes throughout responding to the defendants' opposition to

9    class certification.  Title VII isn't about protecting groups.

10   Title VII is about protecting individuals and individual

11   opportunity.  And so I think that the idea that we're going to

12   have differing evidence, I think, is simply not true.

13        We're going to present one, essentially, course of

14   evidence as to the history and development of what culminated

15   in 2014 and then some of the reaction that -- the fallout from

16   that.  And that evidence isn't going to vary according to the

17   demographics of the class members.  That evidence is going to

18   be one common course of facts related to one common set of

19   claims which is shared by each one of the class members.

20        Additionally, a lot of the focus on differing groups --

21   in addition to not being appropriate pursuant to *Connecticut v.*

22   *Teal* and others, a lot of the focus on the groups assumes that

23   we're trying some sort of a disparate impact case, but we're

24   not trying a disparate impact case.  We're trying a disparate

25   treatment case.  And so unlike some other disparate impact

1    cases where the evidence of statistical impact varies

2    potentially by demographics, such as in *Little* or such as in

3    *Houser*, that's not going to be the case here.  It doesn't need

4    to be the case here.

5        The point will be, rather, statistically, to the extent

6    that statistical evidence comes in, the benefit to the

7    African Americans from the way that the changes were structured

8    and implemented.  So I don't believe that we're going to have

9    an issue of needing the further breakdown of class by

10   demographics, because so far as we know, that's not the way the

11   evidence is going to come in, and that's not the way the

12   evidence will ultimately be presented at trial.

13       THE COURT:  Well, will -- the presence of women

14   and -- and a broader group of minorities than just

15   African Americans, will that not affect the adequacy

16   requirement?  If -- if the FAA's actions were intended to

17   benefit some members of the class but not others, won't there

18   be some potential for -- for conflict and antagonism between

19   the different plaintiffs?

20       For example, the requested injunctive relief includes

21   barring the FAA from involving special interest groups

22   associated with protected classifications from involvement in

23   designing hiring methodologies.  Isn't it possible that some of

24   the class members could want a special interest group that

25   represents them to be involved in designing hiring

1    methodologies?

2          MS. BROWN:  Yes, Your Honor.  And, again, two

3    responses to that question.  The first is, essentially, looking

4    at the *J.D. v. Azar* case and the issues and decisions, the

5    rationale in that case.  *J.D. v. Azar* was the case regarding

6    unaccompanied minors having access to abortions.  And some of

7    the arguments against why that class should be certified was

8    because some of the class members weren't affected or would

9    choose to carry their pregnancy to term and some of the class

10   members would have strong ideological oppositions, the relief

11   that was being sought.

12         The Court addressed and -- what addressed those

13   concerns, essentially, finding that some people's lack of

14   interest or ideological differences are an everyday occurrence

15   of many class actions, particularly as they think injunctive

16   relief relates to things like civil rights.  And so I don't see

17   that an ideological conflict would cause what's called a

18   conflict in the context of Rule 23(a)(4) relating to adequacy

19   of representation.

20         The other part of that answer, of course, is that should

21   the Court choose to bifurcate and decide the issues of

22   liability and the need for injunctive relief at the first

23   stage, the Court will then have before it the evidence and can

24   address whether or not that particular element of requested

25   relief is something that it chooses to provide.  We're looking

1    at, if the class is certified, probably another two years until

2    liability is determined and then some additional time after

3    that while remedies are addressed.

4         It's impossible to say now exactly what the scope and

5    the contours are for what the relief may be appropriate at

6    that time.  The FAA may change its hiring processes again

7    between now and then.  Congress may dictate additional hiring

8    changes between now and then.  So the idea that the affinity

9    group issue would create some sort of conflict, number one, is

10   both premature and also sort of a speculative type of conflict

11   the courts, again, have rejected when analyzing 23(a)(4)

12   issues.

13         THE COURT:  Okay.  Well, let me ask you about what

14   appears to be a bit of a discrepancy between the operative

15   complaint and your class cert motion.  So the complaint

16   highlights the purging of the prequalified applicant list and

17   the removal of the hiring preference for the class members.

18   Your motion seems to focus almost exclusively on the striking

19   of the AT-SAT scores.

20         Is your claim that the striking of the scores itself

21   violated Title VII; and, if so, is that a claim that Brigida

22   exhausted?

23         MS. BROWN:  So our claim is essentially that akin to

24   what was presented in the *Ricci* case.  Our claim is that the

25   FAA, dissatisfied with the racial mix of successful applicants

1    coming out of the CTI schools, decided to break the process

2    midstream and change the rules, change the application process

3    to change the racial mix of applicants.

4        Our claim is based on the purging of the list, but the

5    purging of the list largely focuses on the getting rid of the

6    AT-SAT scores.  It focuses on other aspects of changing the

7    hiring process.  But, basically, based on the last hearing

8    where we addressed the motions to dismiss and the question of

9    at what point does someone become an applicant, we focused on

10   the AT-SAT scores, I suppose, to underscore the fact that these

11   are applicants.  So it is the purging, and the AT-SAT score is

12   an element of that first one.

13        THE COURT:  All right.  It's -- it's just an element,

14   though, but -- but there are also all these other factors that

15   have to be met for a plaintiff to be an applicant; right?  The

16   graduation, with the recommendation, with the age requirement,

17   with the citizenship.  And so, you know, are those not

18   additional individualized determinations that weigh against

19   certifying the class?

20        MS. BROWN:  Your Honor, I don't believe those are

21   additional individualized determinations that weigh against

22   certifying the class, largely because the way the class is

23   defined.  The class definition, as the Court's well aware, had

24   evolved and been sculpted and contoured over time so that the

25   people in this class are those people who were harmed both by

1    the purging of the qualifications, the AT-SAT score, and by the

2    biographical questionnaire.  And by definition, it includes

3    people who met the minimum requirements to apply to be an air

4    traffic controller, whether under the CTI program or under the

5    new settings.

6         So that's why we have -- for example, if their AT-SAT

7    score had expired, they're not part of the class.  If they're

8    not U.S. citizens, they're not part of the class.  If they

9    hadn't aged out, they're not part of the class.  So I think

10   that's one aspect of the answer.

11        But another aspect of the answer, Your Honor, is that,

12   again, in this type of a setting where the Court first must

13   determine -- or generally determine whether there was a

14   discriminatory act, frequently the issues of individual

15   qualifications aren't addressed at the liability stage.

16   They're addressed at the remedy stage.  And that's the point at

17   which through the *Teamsters* hearing or something else, the FAA

18   may assert some other objective disqualification that would

19   prevent somebody from being a class member, although I take

20   issue with some of the things they characterize in that vein.

21        But both because of the way the class definition

22   functions and because of the way the Title VII, sort of,

23   bifurcated liability first and then, sort of, comparing class

24   members to -- the liability into the class definitions, I don't

25   believe that that -- that that would be an issue.

1        Further, the only other thing that I can see really that

2    would be an issue -- so, again, most of the qualifications are

3    baked in.  The FAA claims that there are other issues that have

4    to be addressed through individualized hearings, like failure

5    to mitigate damages or something to those regards.  A lot of

6    that information can be gathered objectively through

7    documentation through a claims process, which would prevent

8    that from overwhelming any of the common issues.

9        And this is not a case like -- it's similar to *Little*,

10   but here -- whereas in *Little*, the damages issues weren't

11   certified.  Here there's much more homogeneity between the

12   class members.  In *Little*, the Court was concerned that they

13   would have to examine for every plaintiff the position applied

14   for, the date they applied, the date they were denied, the

15   other reasons why they were denied, the salary for the position

16   for which they had applied, the benefits for the position for

17   which they had applied, the retention rate for the position for

18   which they had applied, as well as mitigation for a class that

19   encompassed a five-year period.

20       For this class, almost all of those issues are the same.

21   They're addressed and uniform in the class definition.  They

22   all applied for the same position at the same time.  They were

23   all rejected at the same time.  And whether the Court views it

24   as an aggregate pro rata method or benchmark method, the salary

25   and the benefits of the foregone position, I believe, should be

1    determined through uniformity of things, as well as the same

2    retention rates.  So I don't believe that we will have the

3    problem of the individual issues overcoming the common issues.

4          THE COURT:  All right.  Let me ask you about one

5    point that the defense has raised relating to how far back

6    the class can extend.  Your proposed class includes individuals

7    who graduated as far back as 2009.  How could those individuals

8    be eligible to apply to be air traffic controllers in 2014?

9          MS. BROWN:  Again, Your Honor, that goes back to the

10   issue of -- if you look at the defendants' reply -- the

11   defendants' opposition, one of the things they noted, that your

12   CT [sic] eligibility can expire if your AT-SAT score expires.

13   However, you have the ability to retake the AT-SAT and,

14   essentially, extend or reup that eligibility.

15         One element of the class definition is that you have to

16   have an active AT-SAT score.  Your AT-SAT score could not have

17   expired.  And so if someone graduated in 2009 and didn't retake

18   the AT-SAT score -- or the AT-SAT test, they're not in the

19   class.  They would have had to proactively have taken some

20   steps to extend their eligibility, and I think that addresses

21   multiple points to the defendants' case.

22         THE COURT:  Okay.  With the BQ class, you agree that

23   the injunctive relief would have to apply to the whole class.

24   Yet it does seem like some of the injunctive relief you

25   request, you know, the hiring preferences, could vary

1    considerably based on the individual circumstances of the

2    various class members.

3          You know, for example, with -- wouldn't the relief vary

4    depending on whether the individuals reapplied to another

5    position in the FAA, whether they had qualified or

6    well-qualified scores, whether they would have passed later

7    screening functions, like the medical screening?

8          MS. BROWN:  Your Honor, two responses.  Again, first,

9    I don't believe that the hiring preference would have to be

10   that variable.  Again, I -- we sort of laid out in -- I think

11   it was our opening brief, but, again, it may have been the

12   reply.  I see the hiring preference working something like a

13   veterans' preference.  It's a point preference that could be

14   applied in the same way but subject to the veterans'

15   preference.

16         I don't think they would have to vary depending on

17   whether you're already in the FAA, when you joined the FAA,

18   whether or not you're in the FAA, geographic considerations.  I

19   don't think any of that would affect the ability to provide a

20   preference to this group.

21         And some of those concerns may also be addressed should

22   the Court decide to use, again, an aggregate sort of shortfall

23   method.  There are times when in these sorts of circumstances

24   not only does the monetary back pay get sort of capped by an

25   aggregate amount, but the number of positions for which

1   preferences are available get capped.  That's one response.

2         Another response, Your Honor, is that we are seeking

3   declaratory relief and that the rule and the cases address the

4   fact that declaratory relief is part of the (b)(2)

5   consideration.  So whether it's permanent injunctive relief for

6   hiring preference or other injunctive relief -- and I don't

7   believe that to satisfy Rule 23(b)(2) that every single aspect

8   of injunctive relief has to benefit all class members, although

9   I think what we're seeking here could.

10        But the fact that, for instance, some of the, what I'll

11   call, waterfall injunctive relief that we seek, the retraining

12   or training of FAA OCLR [sic] and human rights -- human --

13   sorry -- resources department employees, those certainly would

14   benefit people mostly who worked for the FAA, potentially for

15   other government agencies.  But the primary things that we're

16   seeking are the declaration and the hiring preference as it

17   relates to injunctive declaratory relief.

18        THE COURT:  All right.  So I know that you do seek

19   this hybrid certification under (b)(2) for injunctive and

20   declaratory relief and under (b)(3) for back pay and damages.

21   But, alternatively, you ask that I certify a liability

22   declaratory injunctive class under, I think, 23(c)(4) and leave

23   the damages and individual equitable relief calculations for

24   individualized hearings.

25        Would you object if the Court were to certify the class

1    as to liability and injunctive relief under 23(b)(2) and

2    reserve the damage issues for later on an individual basis?

3           MS. BROWN:  No, Your Honor, we would not if the Court

4    were to do that.  We would request, however, that even though

5    the class is only certified as to (b)(2), that notice be sent

6    out under the class similar to a (b)(3) setting.  I think it's

7    similar in what's -- what's contemplated in some other cases.

8    I think it would be appropriate if the Court is going to

9    address liability to provide class notice.

10          THE COURT:  Okay.  All right.  So, Ms. Brown, I'll

11   give you some more time to make any additional points you want

12   after I hear from the government.

13          And who will be speaking for the government?

14          MR. THORP:  Galen Thorp, Your Honor.

15          THE COURT:  Mr. Thorp.  Okay.  All right.  Thank you,

16   Mr. Thorp.

17          Just responding to some of your points in your

18   opposition brief, why are the class members' responses to

19   individual questions on the biographical questionnaire

20   relevant?  If this is not a disparate impact case, why does it

21   matter whether there were any disparate effects if the issue is

22   whether the biographical questionnaire was intended to

23   discriminate?

24          MR. THORP:  Your Honor, I think it would be highly

25   unusual for plaintiffs to be able to prove that the agency

1    intended to discriminate without showing that the instrument as

2    a whole actually discriminated or that individual -- or that

3    individual questions discriminated against the class as a

4    whole.

5         So we pointed to individual questions because plaintiffs

6    pointed to individual questions.  And we pointed how the -- the

7    individual questions the plaintiffs point to actually create

8    wedges in the class.  So, for example, plaintiffs said that

9    they thought that a question asking about your lowest

10   high school grade was racially charged and cited statistics

11   about African Americans having the lowest high school math

12   grades as a group.

13        We pointed out -- since plaintiffs pointed to that, we

14   pointed out two things about that.  One, asking about your own

15   lowest grade isn't racially charged, and it doesn't have any

16   sort of -- doesn't match, sort of, what white people point to

17   because you could have -- you could be an all-A student and

18   have a B plus in -- in math, and that -- you would answer it

19   yes, and that was my lowest grade.  So it doesn't have anything

20   to do with, sort of, the overall demographics.  It has to do

21   with relative interests and abilities.  And the agency picked

22   the question because it is correlated with success in -- in

23   the -- in the job.

24        But to -- but that also -- to the extent plaintiffs want

25   to highlight individual questions, this creates a wedge in

1      their class, because we pointed out that, as best we can

2      identify their class at this point, 18 percent of their class

3      scored highest on that question.

4           So if plaintiffs are going to -- so we are, sort of,

5      trying to, sort of, respond to the potential ways plaintiffs

6      could try to prove discrimination.  And here plaintiffs suggest

7      at one point in their reply brief that they may try to prove

8      discrimination even if the biographical assessment had no

9      disparate impact, had no -- in a sense, no discriminatory

10     results for the class as a whole.  And there were -- I have

11     notes for exactly where they said that.  I think it's page 8 or

12     9 of the reply brief.

13          And we think that's very troubling; that in a -- in a

14     case about a testing instrument, I -- I am not aware of any

15     case where people successfully proved disparate treatment for a

16     testing instrument by sort of -- by just a background narrative

17     of purpose without showing that the instrument itself had a

18     discriminatory impact on the class.  I mean, we can't just

19     focus on the class for the fact that these -- these class

20     members were -- were excluded from further consideration by

21     the BA because Title VII requires that somebody be excluded

22     because of the race or other protected category.  And so what

23     matters for Title VII is how the whole group was treated.

24          So plaintiffs' claim a moment ago that Title VII

25     protected individuals, not groups, is not quite right because

1    Title VII only comes to bear when an adverse employment action

2    occurred because of plaintiff's race.  And the best way to

3    assess whether an action was because of someone's race is to

4    look at how the agency through the process or through the

5    challenged instrument treated everybody of that group.

6        So we think -- plaintiffs seem to be concerned that the

7    BA may not actually have had a discriminatory result and,

8    therefore, want to just rely on their, sort of, background,

9    like, conspiracy theory narrative.  But we think it would be

10   entirely improper to rely exclusively on that, and we will put

11   forward the evidence about the pass rates and the way the test

12   as a whole -- and to the extent plaintiffs challenge individual

13   questions, individual questions -- came out.

14       And I think that shows how plaintiffs can't hold

15   together this class of everybody but African Americans when the

16   whole genesis of the change in process is that the agency

17   observed that the legacy process had effects on women,

18   Hispanics and other groups and sought to introduce a revised

19   process that leveled the playing field for everyone.

20         THE COURT:  But at this stage, at least, though,

21   don't I have to assume that the plaintiffs' allegations are

22   true when they have made specific allegations about, for

23   example, the FAA failing to validate the biographical

24   questionnaire and points being awarded not based on

25   qualifications but on other things?  And they have a lot of,

1    you know, specific allegations that support their theory.  You

2    may be right in the end, they don't prevail, but at least at

3    this stage, don't I have to accept all of that as true?

4         MR. THORP:  Your Honor, in general, at this stage,

5    the Court accepts the allegations of the pleadings as true.

6    But as recognized in *Wal-Mart* and other cases, courts may have

7    to probe behind the pleadings, quote/unquote, to conduct the

8    rigorous analysis required here.

9         And plaintiffs -- I mean, every time the plaintiffs have

10   come to this Court, their allegations have shifted.  As the

11   Court noted, it -- I think it's -- previously their emphasis

12   was that the agency was discriminating against the majority or

13   was concerned about results for Caucasians or white males.

14   They have, in response to this Court's questions and concerns,

15   repeatedly changed the nature of their case.  And now they're

16   saying that they intend to prove that the FAA was intentionally

17   discriminating in favor of African Americans alone, but that

18   slender read does not match well to the circumstances here.

19   And we --

20              THE COURT:  So --

21              (Indiscernible simultaneous cross-talk.)

22              THE COURT:  Sorry to interrupt.

23              MR. THORP:  -- and that that will hold.

24              THE COURT:  Sorry to interrupt, Mr. Thorp.

25         I guess I'm -- are they saying it's exclusively

```
1    African Americans right now, or are they saying it's women and
2    minorities too?  But, anyway, it seems like -- I hear what
3    you're saying about it shifting, but I'm not -- I'm not quite
4    sure that it's this narrow.  Certainly it was intended to
5    benefit African Americans primarily.
6              MR. THORP:  So I think that's a problem for
7    plaintiffs.  If plaintiffs argue it was intended to benefit
8    African Americans primarily but it equally benefited other
9    minority groups that are included, it seems implausible that
10   plaintiffs will be able to prove that a significant portion of
11   the class was injured, because they have to show that the
12   plaintiffs were injured because of their race.
13             And so if the agency -- if the agency is seeking to
14   benefit anybody other than African Americans, I think the --
15   the -- the narrowest way that plaintiffs frame the claim fails.
16   And our concern is we don't expect plaintiffs to walk away from
17   this case if the evidence doesn't support their
18   African Americans only.  And -- and, therefore, proceeding now
19   on, sort of -- seeking to represent everyone, I think, creates
20   a variety of -- of conflicts.
21             And as the Court noted in a question already, that, sort
22   of, some of the relief the plaintiffs seek being ideologically
23   opposed to, apparently, any consideration of race or even, sort
24   of, of various demographic groups of the agency commenting on
25   hiring processes.
```

1          Plaintiffs' point, reaching out to *J.D. v. Azar*, it

2     doesn't really fit because it's not about -- this isn't a

3     question of ideological, sort of, like, interest in, sort of,

4     availing one's self of abortion services or not.  Instead, the

5     relief plaintiffs seek, such as excluding professional women

6     controllers from commenting on revised hiring processes, would

7     actually work against the interests -- the interests -- not

8     merely ideological interests, but work against the interests of

9     a significant portion of the class that are women who have

10    been -- who are a significant minority in this job at the FAA.

11          THE COURT:  Okay.

12          THE COURTROOM DEPUTY:  I'm sorry, Your Honor, for

13    interrupting.

14          Whoever just joined the call, can you put your phone on

15    mute.  Thank you.

16          THE COURT:  All right.  Mr. Thorp, my earlier ruling

17    decided the exhaustion question.  You raised this exhaustion

18    defense with respect to the AT-SAT.  Why isn't that waived at

19    this point?

20          MR. THORP:  Your Honor, the case plan points to the

21    waiver, dealt with the case where someone raised an exhaustion

22    question on the eve of trial, and the court said it should have

23    been raised at summary judgment.  Exhaustion frequently

24    requires being resolved later in the case, because only the

25    exhaustion questions that are obvious on the face of the

1    complaint itself are -- are -- can be inherently resolved at

2    the earliest stage of the case.

3        Here, there are two reasons.  We raised exhaustion as a

4    defense in the answer, Docket No. 113.  And so we simply

5    haven't waived this defense and can develop it as things

6    proceed in the case.  The reason that we're raising it now is

7    plaintiffs for the first time provided the factual evidence

8    about when plaintiff learned of the fact that he would not be

9    able to use his AT-SAT in the time that places it outside of

10   the 45-day window, which we suspected -- and we're expected to

11   have to develop later.  But as plaintiffs put forward the

12   evidence themselves, we were able to use that party admission

13   to show that the claim is not exhausted.

14               THE COURT:  Okay.

15               MR. THORP:  Specifically, the agency announced its

16   prior decision that prior AT-SAT scores would not be used in an

17   email to -- and letters to all the CTI schools on

18   December 30th.  That immediately got spread around, and by

19   January 2nd plaintiffs' counsel Michael Pearson was sending an

20   email to the CTI schools and copying a variety of folks, saying

21   this is obviously evidence of discrimination.

22       And Mr. Brigida acknowledges that in early January he

23   was shocked to learn this.  That shows that he knew immediately

24   the effect that -- this decision by the agency, and yet he

25   waited until February 25 to reach out for EEO contacts.

1    Therefore, the decision had been made.  He was aware of it, and

2    yet he waited more than 45 days, which means that his AT-SAT

3    claim has not been exhausted.

4            THE COURT:  All right.  As I discussed with

5    Ms. Brown, you know, I do tend to agree with the government

6    some -- that some of the plaintiffs' requests for injunctive

7    relief apply differently to the different class members, but it

8    doesn't seem to be true for all the class members.  And so why

9    can't the Court grant class-wide injunctive relief under (b)(2)

10   as to those requests, you know, like barring the FAA from

11   engaging in impermissible race-based hiring decisions?

12           MR. THORP:  Your Honor, a follow-the-law injunction

13   isn't usually enough to establish the appropriateness of class

14   relief.  And we also note, that has already been discussed,

15   some of the relief plaintiffs seek is relevant not merely to,

16   sort of, like, whether they satisfy (b)(2) but whether they're

17   adequately representing the -- the class they seek to

18   represent.  So the injunction -- injunctive relief, sort of,

19   plays multiple roles.

20           But for the (b)(2) aspect specifically, plaintiffs need

21   to describe in reasonably specific detail the injunction they

22   seek.  Until their reply brief, they may vaguely refer to

23   instatement preferences.  So it's entirely new to us to hear

24   that -- some sketched-out idea of what their preference would

25   look like.  So they only came to that under -- under -- under

1     pressure.  And we don't really understand what they're

2     proposing for an instatement preference.

3          As the Court noted, a variety of -- most of the other

4     things would really only benefit people who became employed by

5     the FAA and potentially employed in these particular job

6     series.  Generally, the relief goes no further than the injury.

7          So the injunctions wouldn't, sort of, generally cover

8     the FAA as a whole, and yet plaintiffs are expecting that

9     most -- even if they seek instatement preferences, they're

10    not -- don't seem to be expecting that people are going to be

11    still seeking controller jobs.  So there doesn't really seem to

12    be a match between the injunctions they're proposing and the

13    class as a whole.  It seems to be why they've fallen back on

14    the declaratory notion; that while -- just say what happened in

15    2014 was illegal and that benefits everyone.

16              THE COURT:  And that's not enough, in your view?

17              MR. THORP:  I think not, because that sort of thing

18    would -- would come in in -- in every case, and the courts

19    generally haven't treated that as enough to justify class

20    certification.

21          And as we note, also -- I think also important is that

22    the (b)(2) certification question is not merely about can the

23    Court imagine an injunction that it could get to the whole --

24    give to the whole class.  It's also about whether the class is

25    sufficiently cohesive for -- for legality to be established for

1    the class as a whole.  And that circles back to all of the

2    23(a) problems we've identified; that not everyone is -- is

3    injured, not everyone is affected the same way, and we don't

4    expect plaintiffs to be able to prove liability for the class

5    as a whole for the host of reasons identified in our opposition

6    brief.

7              THE COURT:  All right.  Mr. Thorp, can you just

8    sketch out for me your -- your -- just succinctly, your view on

9    why the individualized damages determinations would predominant

10   here?

11             MR. THORP:  Your Honor, plaintiffs' proposal is that

12   after a liability finding, they would certify a (b)(3) class

13   for the purpose of -- of exploring the -- their experts'

14   damages model, and then they would leave whatever

15   individualized for further individualized hearings.  We've

16   shown that plaintiffs' model and approach doesn't take into

17   account a host of considerations relevant here, and so they

18   haven't carried their burden to show that even what they

19   propose to do in common would work, and even what they've

20   proposed to do leaves a lot of things for the individualized

21   stage.

22             I want to point out one sort of blatant thing that comes

23   out of this.  Plaintiffs say that -- in their reply brief at

24   page 20, that they are not waiving compensatory damages.  It

25   says they're reserving them.  Since they don't seem to seek

1    class -- compensatory damages as class relief, this seems to

2    imply -- the best we understand, they're saying that they're

3    reserving the right for some individual folks or -- absent

4    class members to seek compensatory damages in *Teamsters*

5    hearings at the end of the case.

6        This creates complex jury issues that we want to

7    highlight, because it's well established that if compensatory

8    damages are in play, either party is entitled to a jury.  And

9    they're entitled to a jury not merely for the compensatory

10   damages valuation but for all facts that would relate to it.

11   That would include the liability finding itself.

12       So our understanding of plaintiffs' position now is that

13   this would have to be a jury trial at the first stage on

14   liability.  And then it would also require jury trials or any

15   individualized *Teamsters* hearing or otherwise that included a

16   compensatory damages claim.  We don't know if plaintiffs

17   intended that, but that is the consequence of plaintiffs'

18   retaining compensatory damages in this case.

19       THE COURT:  Okay.  So, Mr. Thorp, after I give

20   Ms. Brown a chance to make any additional points, you'll get an

21   opportunity as well.

22       Ms. Brown, if you can just start by focusing on this

23   issue on, you know, the fact that you do in the complaint

24   allege that the hiring changes were undertaken to benefit

25   African Americans uniquely and yet there are allegations in the

1    complaint that show the FAA was concerned more broadly with

2    benefiting all minorities and women.  And just help me -- can

3    you just clarify your -- your theory of the case.  Is it -- is

4    the theory that this was to benefit African Americans only or

5    other groups too, but not to the same degree as

6    African Americans?  It's hard for me to understand exactly what

7    your theory is based on the complaint.

8           MS. BROWN:  Yes, Your Honor.  Our theory is

9    essentially that the -- the political forces that were driving

10   this and the people who were managing those forces and managing

11   the process engaged in this entire course of action to benefit

12   African Americans primarily and, from their point of view,

13   perhaps exclusively.  I think that from a, sort of, political

14   and practical point of view, the FAA when it was going through

15   this process made broader statements.  When it went through the

16   barrier analysis, it made a broader analysis because I think it

17   had to do that in order to get these changes to go through.

18          But I think that it's very easy to see when you look at

19   the questions on the biographical questionnaire or some of the

20   changes that were made to the hiring process that we talked

21   about, like the elimination of the centralized selection panel,

22   it's very easy to see how the process could be structured to

23   benefit African Americans above all others.  And this is not,

24   you know, a decision that was made by one individual.  I

25   suspect (inaudible due to audio distortion) because then other

1   people have input, and I don't think they would have ever

2   gotten these approved if it would have explicitly said this is

3   for the benefit of one group only.

4       However, I think, again, that the evidence will show

5   that that was the driving factor; that was the operating, sort

6   of, function; that was what resulted in various selections made

7   that changed the hiring process.

8       So I'm sure that the evidence will, to some extent, say

9   that this was done, and we -- we say that they say that it was

10  done for, quote/unquote, diversity purposes, to expand

11  diversity.  But our point is that this process was done --

12  primarily designed, intended, driven, and implemented -- to

13  benefit African Americans; and that it was that that drove the

14  entire process, the speed of the process, the lack of

15  validation, and all of the other, sort of, faults that resulted

16  in this being an illegal hiring process.  So --

17      THE COURT:  It's just -- it's hard to see how there

18  won't be wedges between the different groups of plaintiffs

19  depending on how the evidence shakes out.  And what would the

20  plaintiffs' position be; that the Court revisit that and

21  decertify the class in the future if that becomes apparent?

22      MS. BROWN:  First, to your first point, Your Honor,

23  as I, you know, look at the case and as I anticipate the

24  evidence that's going to come in, as I argued, I don't see the

25  evidence that's going to be presented to prove discriminatory

1    intent.  I don't see that evidence differing by demographic

2    group.

3          I do anticipate the FAA making the argument that they've

4    made here, which is, well, we just wanted to help lots of

5    people; but that's the defense.  That's not our case.  And so I

6    don't see that the actual evidence -- particularly the

7    liability phase, you know, I don't see any conflict, but I

8    suppose that should any conflict arise, there could be some

9    subclasses.  I don't think it would be appropriate to -- to

10   rule all of these people out.  Because --

11         THE COURT:  I'm sorry.  You broke up.  Sorry to

12   interrupt, but you broke up there.  You said there could be an

13   opportunity for what?  Subclasses, is that what you said?

14         MS. BROWN:  Yes, sub- -- yes, Your Honor, subclasses.

15   I don't believe that it would be appropriate to exclude these

16   people because they were hired.  And essentially this is --

17   this is sort of an argument that --

18         You take a triathlon; right?  And let's say they're --

19   there's a triathlon and the African Americans in the triathlon

20   get to swim their portion of the -- the swim with the current

21   instead of against the current and that other groups have

22   different weights attached to their bikes for the bicycle

23   portion of the triathlon.  That race was discriminatory.  It

24   was biased in favor of African Americans.  And even if the

25   weights that are attached to other people's bikes differ,

1    everyone was harmed so that one group could be benefited.

2    That's our case.

3         THE COURT:  But, you know, early on when I expressed

4    concerns about including African Americans in the class --

5    because you said some of them who scored top on this test were

6    entered as well and I was concerned about the wedge given that

7    the -- as alleged, the primary, or perhaps exclusive, as you

8    say, purpose here was to benefit African Americans.  Don't --

9    don't the same concerns arise if some of these groups were

10   benefited but maybe -- even if not as much as African

11   Americans, they still were benefited by the change?

12        And, you know, is -- is -- you know, how do we weigh

13   whether there was more benefit to them versus, you know,

14   negative consequence from the -- the restructuring of the

15   hiring process?  If everyone benefited to some degree, it just

16   seems like at a certain point it could be against certain

17   groups' interests to invalidate the change in hiring practice

18   depending on how the evidence shakes out.  And, again, your

19   point would be at that point I revisit it, I decertify the

20   class, rather -- that I go ahead and forge ahead now at this

21   point, recognizing that could be an issue as we proceed?

22        MS. BROWN:  Well, Your Honor, my first response

23   really is more along the lines of *Connecticut v. Teal* and some

24   of the other cases that say a defendant cannot insulate

25   themselves from liability against some people claiming

 1   discrimination because they helped other people in that

 2   person's demographic group.

 3          So, for instance, in *Teal*, there was a discriminatory

 4   element of the hiring process, but by the time the complete

 5   hiring process had come around -- and, of course, after

 6   litigation was filed -- then the claim typically was, well,

 7   there was no discriminatory impact and, so, therefore, there

 8   can't be a claim.  That's essentially the same argument that

 9   the government is making here.  The government is saying, well,

10   but what if we helped some groups?

11          I can guarantee you by the definition of this class,

12   every single class member here was harmed and not benefited.

13   There is no class member who benefited from this change.  They

14   all failed the biographical questionnaire.  And so this concept

15   that we have to put people into groups even in, you know,

16   responding to a Title VII claim that people are simply

17   components of their race, that's not required by a Title VII

18   case.

19          So I think that those are the primary responses, which

20   is Title VII protects opportunity that belongs to individuals,

21   not results or outcomes for groups.  And, in fact, the Court

22   has been wary of -- different courts have been wary of doing

23   anything that would encourage employers to engage in the type

24   of hiring that the sole purpose is sort of demographically

25   meeting the population.  That concern was expressed by the

1    court in the *Ricci* case and I think also in the *Shea v. Kerry*

2    case.  So those are my (inaudible due to audio distortion),

3    Your Honor.

4            THE COURT:  Okay.  Two more quick questions and I'll

5    let you make your points.  One, if the class were restricted to

6    white males, would you have a numerosity problem here under

7    23(a)?

8            MS. BROWN:  No, Your Honor.  I'm quite certain that

9    we can exceed 20 members even if it were -- were limited to

10   white males.

11           THE COURT:  All right.  And on -- if you could just

12   respond to the exhaustion point that Mr. Thorp made.

13           MS. BROWN:  Sure.  There's a couple of different --

14   well, there's a lot of different responses to that.  First

15   response is it's simply incorrect to say that this is a new

16   issue.  That allegation that they're referring to was in the

17   declarations associated with the first motion for class

18   certification in 2018.  So those facts that they point to have

19   been on the table for at least three years.

20           Second, I believe that that is a merits issue that's not

21   really appropriate to consider at the class certification phase

22   and it is common to all the class members.

23           Third, the cases that the government relies upon

24   regarding exhaustion being relevant to the question of adequacy

25   each dealt with different types of claims:  one, a

1    Rehabilitation Act claim and, one, an ERISA claim where

2    exhaustion was either jurisdictional or could not be

3    accomplished vicariously as a Title VII class action case.

4        Finally, my other response on the merits really would be

5    that while they say they had informed the schools that this was

6    going to happen, we don't know when they actually took an act

7    to -- to purge the qualifications, to let the students know

8    that they were no longer under consideration.  I believe that

9    people who were in the previous inventory had been informed by

10   the FAA approximately January 27th, 2014, that that sort of

11   inventory was being struck and they would have to reapply.  But

12   I don't believe that they can use their announcement of an

13   intent to discriminate as the triggering event for exhaustion.

14       Those are my various responses there, Your Honor.

15       THE COURT:  Okay.  Thanks, Ms. Brown.

16       Go ahead and make any other points you want or responses

17   to Mr. Thorp's argument.

18       MS. BROWN:  Thank you, Your Honor.

19       And I will try to be brief and streamline this according

20   to the questions.  I just want to make a couple of points.

21       One is the FAA argues the class is overbroad and there

22   are too many people in the class who weren't harmed.  There's

23   two responses to that.  One is I don't believe there's anybody

24   in the class who didn't suffer the type of injury that

25   Title VII is meant to remediate, that it's meant to address.

1    Everyone in the class was subject to a discriminatory act.  And

2    there's plenty of case law, including *Shea v. Kerry*, *Houser*,

3    and others, that you do not have to prove that you would have

4    been hired in order to show that you suffered an injury under

5    Title VII.

6          The other response regarding the government's concern as

7    overbroad is, as the Court is aware, this class has been

8    sculpted and shaped over time.  As a result of making this

9    class as narrow as it is and creating the homogeneity that

10   exists, there are hundreds of people who were previously

11   injured in the class who were harmed by the defendants' acts

12   who are no longer part of this class.  There were probably more

13   than 500 people who had been hired later, what in other cases

14   have been called a deferred hire class.  That would include

15   Ms. Wang who was part of the original motion for class

16   certification and others.

17         And in the *Bourdais* case out of New Orleans, it

18   recognized -- the courts have recognized delayed hire is also

19   an injury, but those people will get a (inaudible due to audio

20   distortion) in this case, nor will the people whose AT-SAT

21   score expired because the FAA had stopped giving AT-SAT tests

22   in late 2013 or providing notice to people that their AT-SAT

23   score was expiring.  And I believe the evidence will show that

24   the prior proposed representative Ms. Suzie Rebich may,

25   unfortunately, be in that group of people whose AT-SAT scores

1     may have expired.  And so, again, I think that there are

2     hundreds of people who are harmed but aren't even part of this

3     class because we've tried to narrow it.

4           The other point that I was going to make very early at

5     the outset that we took forward is the Court does take the

6     claims as they are alleged in the complaint and analyzes those

7     claims.  They don't analyze -- I'm sure every defendant would

8     love to have a class action or proposed class action analyzed

9     according to their view of how the case is going to come in,

10    but that's not how it works.  And *Moore v. Napolitano*, *Wells*,

11    *In re Lorazepam* are some of the citations for that.

12          I want to focus again on the point of who's harmed and

13    who should be in the class.  The quote from *Smith v. Secretary*

14    *of Navy,* what the court said there is that an illegal act of

15    discrimination, whether based on race or some other factors, is

16    a wrong itself under Title VII regardless of whether that wrong

17    would warrant an award of back pay or preferential hiring.  So

18    to the extent that the -- the defendants say that there are

19    uninjured members of the class and that plaintiffs admit

20    there's uninjured members of the class, that is not correct.

21          As it relates to the commonality point, again, one

22    common question will do.  We presented half a dozen, the most

23    important of which are -- was the AT-SAT -- the striking and

24    the purging and employment action, was that action taken for a

25    race-based reason, was the biographical questionnaire and the

 1   other elements of the 2014 hiring process instrumentalities of

 2   a race-based employment selection method.

 3       None of those answers will vary according to whether

 4   someone was well qualified or qualified or belonged in one

 5   demographic group or another.  The answers to those questions

 6   are uniform across the class, and that commonality is

 7   established.

 8       I would agree with Your Honor that I don't believe

 9   it's appropriate to analyze these cases question by question.

10   That came up to some limited extent in *Little*, which was

11   the criminal background hiring case where WMATA suggested

12   that the questions should be addressed, essentially

13   disqualifying crime by disqualifying crime, and the Court

14   rejected that idea.

15       The other point about statistics, particularly as it

16   relates to this commonality question, is not to pay attention

17   to the role statistics are meant to play.  The point on

18   commonality, as the Court said in *Falcon* and *Wal-Mart*, is to

19   bridge the conceptual gap between injuries to an individual

20   class member and to a class -- and to the claim that there's a

21   class of people who suffered that same harm.

22       There's hardly any sort of a gap like that in this case.

23   Because we're all talking about an event that applied to every

24   single class member at the exact same time, the exact same

25   reason, unlike *Little,* which was five years; *Easterling*, which

1    was multiple years; and other cases that aggregate multiple

2    years and events.  That conceptual gap just really isn't an

3    issue in here.  And I really don't understand, frankly, the

4    FAA's claim that some people benefited in my class -- that some

5    people in the class benefited from the ability to take the test

6    again.  Because even if they had a qualified score, they went

7    from qualified to being thrown out, and I just don't see how

8    that's a benefit.

9         There's a great deal of cases we cited in our brief -- I

10   won't recount them here -- regarding typicality and the fact

11   that typicality is not defeated by minor factual variations,

12   different amount of damages.  It's also clear that it's not

13   defeated by individual defenses, such as mitigation, unless

14   they're going to rise to the point of skewing the focus of the

15   litigation on those defenses and taking the attention of the

16   named representatives away from pursuing the claims on behalf

17   of the class.

18        Again, if it's a bifurcated process here, that's most

19   definitely not going to happen, but either way, the focus here

20   is going to be on liability.  And we don't anticipate that the

21   mitigation issues are going to skew the focus of this

22   litigation in any way.

23        Also, as it relates to typicality, according to *Hoyte*

24   and other cases, typicality doesn't turn on the characteristics

25   of the plaintiffs.  It turns on the likeness of the plaintiffs'

1    claim to the rest of the class.  Typicality is done by if all

2    class members, including the plaintiffs, assert the same legal

3    theory based on the same course of conduct that applies to them

4    all in the same way, and that is met here.

5         Adequacy of representation.  Again, I've addressed the

6    exhaustion point on the other one regarding race may create a

7    conflict.  That, again, falls into the cases that reject claims

8    of hypothetical conflicts because speculation and hypothetical

9    conflicts will not defeat adequacy of representation.  The

10   Court hasn't asked about ascertainability, but it's our

11   contention that all of the elements of the class definition are

12   objective here, and the one concern that the government raised

13   in their opposition doesn't actually go to adequacy of

14   representation.  It goes to their theories that class members

15   had to be able to apply -- had to be eligible, and that's also

16   addressed through the expiration of the AT-SAT score.

17        As it relates to injunctive relief, Your Honor -- and

18   this is probably the more important area where I want to focus.

19   Nearly everything -- I mean, the FAA's opposition is riddled

20   with errors of law or misuse of the law.  And so, for instance,

21   where they cite -- and they talk about *Wal-Mart* here.  It's

22   important to keep in mind that to the extent that the *Wal-Mart*

23   court addressed injunctive relief, they did it in the context

24   of saying that the compensatory damages claims shouldn't be

25   certified under (b)(2), they need to be certified under (b)(3)

1    because there are different procedural protections.

2          And so the -- the citation that the government uses is

3    wrong, and I think their only issue goes to one of the points

4    that we've already discussed.  The FAA cites *Wal-Mart* and says

5    on page 40 -- I think it's the ECF site, page 40 -- that for

6    certification under (b)(2), challenged conduct must be such

7    that it can be enjoined only as to all the class members or

8    none of them.  So that -- that citation, they cite to page 366.

9    That cite is actually on page 360.

10          And what the court said -- what the Supreme Court said

11   is that the key to a (b)(2) class is the individual nature of

12   the injunctive or declaratory remedy warranted or the notion

13   that the conduct is such that it can be enjoined or declared

14   unlawful only as to all the class members or none.  So, again,

15   I think that that quote is taken out of context, key omissions,

16   and sort of misplaced as it relates to the question of the

17   requirements for injunctive relief under (b)(2) as opposed to

18   monetary relief.

19          Likewise, the -- the FAA, kind of, half quotes the

20   Tenth Circuit standard from *Stricklin v. Devaughn*, and

21   Mr. Thorp has already sort of addressed that.  But the point is

22   whether or not there can be injunctive relief that the Court

23   has the power to grant that can benefit the entire class, and

24   that exists here, and the Court had already found that that

25   possibility, that requirement exists here when it reinstated

1   some of the injunctive relief.

2        So the Court does have the -- the ability.  And, like I

3   said, we can't say what the FAA hiring is going to look like by

4   the time the Court needs to make that injunctive relief, but it

5   will, of course, be sculpted to the facts as they are at that

6   time.

7        Also, I reviewed the complaints and the motion for class

8   certification in *Little* and *Taylor* where classes were

9   certified.  The injunctive relief that we claim here is no less

10  clear or less defined than it was in those cases when those

11  classes were certified.

12       Another issue that I think is important and extremely

13  interesting relates to (b)(2) but also to the FAA arguments

14  against 23(b)(3).  The -- the FAA seems to assume that use of

15  the *Teamsters* hearing actually cuts across -- cuts against the

16  certification of a class.  That can't be correct.  The

17  Supreme Court created -- sort of outlined this need for a

18  *Teamsters* process following -- in that case it wasn't a class,

19  but it was a class-like finding of liability -- and finding

20  that the presumption arose.  And in *Wal-Mart*, again, the Court

21  reiterated the importance to the defendant and to the

22  procedural protections that they have in the *Teamsters* hearing.

23       So it cannot be that having a *Teamsters* hearing in and

24  of itself cuts across -- cuts against certification, but the

25  government's citations to -- to *Jamie S. v. Milwaukee Pub. Sch.*

1    in their opposition to the (b)(2) certification, indicates that

2    that's their understanding.  They say the relief sought can't

3    just initiate a process for which highly individualized

4    determinations of liability and remedies are made.  Most

5    importantly, liability here is not going to vary, and that's

6    why the class should be certified certainly as to liability.

7    There are not -- whether it relates to this issue or to the --

8    to the reasons why context doesn't apply.  There aren't

9    issues -- individual issues of liability among the class

10   members.

11         But, additionally, individual determinations of relief

12   are exactly what the Court has required in both *Teamsters* and

13   *Wal-Mart*.  And so that's not like the sort of fail-safe case

14   that *Jamie S.* was, but that was the plaintiffs following the

15   pattern that has been set and reinforced by the Supreme Court.

16         Also as it relates to 23(b)(2), the FAA, again, uses the

17   wrong standard and selective quotation.  So in the final

18   stand -- essentially the final paragraph that the FAA argues

19   against certification under 23(b)(2), they say that because it

20   wouldn't be self-evident that individ- -- indivisible relief is

21   warranted, then certification should be denied.

22         But that's not the standard.  The standard isn't

23   self-evidence.  And what the government says, essentially --

24   actually -- and this is on page 41 of their opposition -- they

25   say, "the problems outlined above in satisfying . . . 23(a)'s

1    requirements . . . preclude certification under 23(b)(2).

2    Certification . . . under 23(b)(2) is only appropriate where

3    the satisfaction of those conditions is 'self-evident.'"  And

4    they cite *Wal-Mart* for that.

5         But *Wal-Mart* says, "When a class seeks indivisible

6    injunction benefitting all of its members at once, there is no

7    reason to undertake a case-specific inquiry into whether class

8    issues predominant or whether the class action is a superior

9    method of adjudicating the dispute.  Predominance and

10   superiority are self-evident."  Again, the court was focusing

11   on why injunctive relief is appropriate under (b)(2) and you

12   don't have the same procedural protections as under (b)(3).

13        And so the court in *Wal-Mart* is not citing the

14   requirements for 23(a) as FAA does, and they're not saying that

15   the indivisibility of the relief has to be self-evident or

16   class certification should not be denied -- or class

17   certification must be denied.

18        And then, Your Honor, to the extent -- I don't know

19   which way the Court is leaning.  I'd be happy to address

20   questions as it relates to predominance as well.  I think some

21   of the key issues really are the number of common issues in

22   this class and this class's homogeneity compared to even, as I

23   indicated, *Little*'s where there were different positions over

24   different time periods and different events or instances of

25   discrimination.  We're talking about one fell swoop -- or

1    really two, the purging and the -- the new hiring process.

2        But this class is more uniform than almost any that gets

3    to be presented because it is one challenge to one hiring -- or

4    rejection in a hiring event.  And there is precedent.  There's

5    extensive precedent for the fact that individual damages does

6    not defeat commonality or predominance.

7        And in the *Coleman* case, the court said common liability

8    issues are normally far more important and contested than

9    damages.  And, also, in the *Barnes* case cited by the FAA,

10   common liability morphed into individual damages issues.

11       Further, to the extent that -- how back pay is going to

12   be calculated is not yet certain; whether the Court uses the

13   aggregate pro rata method that's addressed in our proposal and

14   also addressed in the cases that we cited or the Court uses a

15   benchmark of the sort that the court discussed in *Berger v.*

16   *Iron Workers*, where that one benchmark -- and said, okay.  If

17   people would have been hired, this is their but-for income, and

18   then we'll measure everything against that.  Neither one of

19   those approaches will have the same number, high number, of

20   common issues as -- to address as it relates to calculating

21   back pay.

22       The other point that I want to address as it relates to

23   the jury issue -- I guess, finally, Your Honor, is that I do --

24   we do acknowledge there would need to be a jury for liability

25   for any class member who's seeking compensatory damages.  We

1   believe class members should be given the option themselves to

2   opt out of compensatory damages because that would expedite the

3   timeline whether they are or not.  We don't believe that would

4   change anything through the liability phase, other than if some

5   people opt out, perhaps the jury would be advisory to the judge

6   at that point.

7           THE COURT:  Okay.  Is that everything, Ms. Brown?

8           MS. BROWN:  Yes, until we hear from Mr. Thorp,

9   Your Honor.

10           THE COURT:  Okay.  I'll give you a brief opportunity

11   to respond to Mr. Thorp.

12       Mr. Thorp.

13           MR. THORP:  Yes, Your Honor.

14       I'd like to start with -- with commonality, particularly

15   focused on the range of groups they're trying to hold together

16   in one class.  In their briefing, plaintiffs construe *Falcon*

17   and *Wal-Mart*'s preferential bias testing procedure, basically

18   conclude that we establish that you have commonality for any

19   group when a single administration of a test is challenged; or

20   here, as they've said today, when they're challenging, sort of,

21   a sweep of an effort to change a process.  But that can't be

22   right.  The courts in this district require, quote, detail

23   about how the examination operated in a biased way.  That's

24   *Burton* (D.D.C.) in 2011 and *Ross* in 2017.

25           Plaintiffs try to distinguish both of those cases on

1      their facts, but both of them directly addressed alleged

2      commonality or a procedure and said that plaintiffs hadn't

3      shown -- were resting on vague and conclusory allegations that

4      haven't shown how those examinations operated in a biased way.

5      And despite plaintiffs' best efforts today, they haven't really

6      responded to your Court's concern that they won't be able to

7      show that the biographical assessment, for example, operated in

8      a biased way.

9           They're -- they're trying to say that a purpose for the

10     change was to benefit African Americans; therefore, everyone

11     was injured.  But that isn't consistent with the elements of

12     Title VII, which require the showing that -- that the plaintiff

13     suffered an adverse employment action because of the

14     plaintiff's race.  If the FAA sought to level the playing field

15     for African Americans and leveled the playing field for -- for

16     these -- the other groups that are involved here, plaintiffs

17     can't meet the element of a -- of a Title VII claim.

18          And plaintiffs' theory, I think, as I have it written

19     down, the political forces engaged in a course of action to

20     benefit African Americans primarily or perhaps in their own

21     view exclusively, this conflates a lot of things.  One, it

22     conflates a nongovernmental actor, the NBCFAE's interest in

23     improving things for African Americans with the FAA's own

24     purpose, and they suggest that they are going to somehow prove

25     that the eight people on the executive steering committee,

1    including women, Hispanics, and others, had the primary purpose

2    of benefiting African Americans.  And it -- it all falls apart.

3    They can't hold together a class that includes women,

4    Hispanics, and others in this -- in this context.

5         And the main way I can imagine them doing it is if they

6    showed that it actually was African Americans versus everyone

7    else in the instrument itself; plaintiff -- throughout this

8    rather strange theory, that you could have a -- a race in which

9    African Americans were given different weights than other

10   competitors.  But plaintiffs don't propose to show that the BA

11   actually gave African Americans different weights than

12   everybody else.  They seem to want to rely just on their

13   background narrative about intent when it's likely that the

14   biographical assessment will show that other racial groups were

15   less weighted than -- than African Americans using -- using

16   their theory.

17        Their reference to bottom-line analysis in *Teal* is

18   entirely misplaced.  This is not a case where the -- *Teal*

19   addressed the situation where an employer tried to avoid

20   liability for a discriminatory aspect of the process by

21   pointing out that later acts in the process got the results in

22   the workforce -- or balanced out in the hiring process of the

23   workforce.  Here, the plaintiffs are challenging the

24   biographical assessment.  They can't avoid the examination of

25   whether the biographical assessment actually discriminated.

1    And so there's no bottom-line analysis -- no bottom-line

2    defense in what the government is saying here.  And it shows

3    how their effort to hold together all these groups remains

4    untenable.

5         The same thing is shown by the one case plaintiffs point

6    to in which the court allowed multiple different racial

7    demographics in -- in one case on commonality with *Leonard v.*

8    *Southtec* from the Middle District of Tennessee.  That court's

9    approach to commonality is actually far broader than what's

10   accepted in D.C. and accepted as an across-the-board theory,

11   supervisory and nonsupervisory employees in the same class,

12   et cetera.

13        But, most importantly, the reason that the class of

14   African Americans and Hispanics was appropriate was because the

15   alleged policy was, quote/unquote, whites only.  In fact, there

16   the lead plaintiff's job had been to maintain that spreadsheet

17   of applicants, and she alleged, quote, that supervisors

18   reviewed the spreadsheet for racial and demographic information

19   and only invited white applicants to interview.  And also

20   plaintiffs pointed out specifically racially charged language

21   against both African Americans and Hispanics in that workplace.

22        That's very different than here.  There's no claim here

23   that, like, only African Americans got promoted.  In fact,

24   plaintiffs' evidence suggests that African Americans made up

25   only about 10 percent of the successful applicants and that CTI

1      graduates were very successful.  These CTI graduates as a class

2      were excluded by the BA, but that doesn't mean that their kind

3      of education was devalued or that -- or still lacks that they

4      were discriminated against on the basis of race.  So their case

5      doesn't really support it because there's nothing like a

6      whites-only policy here.

7           Because the -- the case is going to involve evidence of

8      the -- both that the impetus, the factors, of how the legacy's

9      process was discriminating -- was -- was having a negative -- a

10     negative impact, potential justification on a variety of racial

11     groups, and the agency's implementing the process to level that

12     playing field, there's no way that the plaintiffs can hold

13     together this class without showing that it could.  And

14     plaintiffs already have the data about the -- the more than

15     26,000 applicants, their responses to the BA questionnaire, the

16     weighting of the BA questions.

17          So if they wanted to show that it actually affected --

18     it benefited African Americans over everyone else, they could

19     have already put that on the class cert.  And I think it was

20     their burden here where they want to hold this -- this highly

21     unusual class together to show that it actually can be proved

22     on a class-wide basis.

23          For example, in *Wagner v. Taylor*, a D.C. Circuit case

24     from 1987 -- I'm not sure it's in the briefing.  So it's at

25     836 F.2d 578.  That case described the major role played by

1    statistical evidence and disparate impact class actions which

2    usually rely on, quote, a combination of statistics and

3    testimony of particular instances of discrimination.  In that

4    case, the court emphasized that at class cert, courts must,

5    quote, examine plaintiff's offering, make an initial

6    determination that there's a plausible fit between the coverage

7    of the proposed class and the group to which the statistics

8    relate.

9          In that case, the court found no commonality where

10   plaintiffs left the court -- the district court with a

11   combination of broad conclusory allegations and a jumble of

12   numbers.  Here we don't even have the jumble of numbers because

13   plaintiffs suggest that they intend to rely on statistics

14   marginally, if at all.

15         Plaintiffs raise -- in relation to this, plaintiffs

16   raise that they'll be able to show that the agency's purpose

17   was to benefit African Americans over everyone else because of

18   the elimination of the central -- centralized selection panels.

19   This is striking for a number of reasons.  First, plaintiffs

20   are challenging the -- the AT-SAT -- the loss of the AT-SAT and

21   do not specifically challenge other -- and -- and the

22   introduction of the biographical assessment and do not

23   specifically challenge other aspects of the changes in the

24   hiring process.

25         So the notion that they're going to bring in other --

1    other changes between old and new for the first time now is --

2    is problematic.  But, even more, plaintiffs argue that the --

3    the centralized selection panels only negatively affected

4    African Americans.  Citing Exhibit 20 to their motion at

5    page 13 of their -- of that exhibit, it showed that the first

6    barrier analysis found a statistically significant negative

7    effect for African Americans but not other groups.

8         But on page 25 of that exhibit, it shows that

9    APTMetrics' more detailed analysis of -- of individual

10   centralized selection panels across time actually found adverse

11   impacts per women and numerous other groups.  So it's not the

12   case that plaintiffs are going to be able to show that even

13   that element benefited African Americans exclusively.  Their

14   own exhibit shows that the agency had concerns that even that

15   aspect of the process was negatively impairing women and other

16   groups.

17        I'd like to turn next to the AT-SAT claim.  We still

18   don't understand what plaintiffs -- so their challenge to the

19   biographical assessment is relatively clear, but their hiring

20   preference claim seems to morph every time it's described.  And

21   with what plaintiffs said today, it's still unclear to us

22   exactly what their claim is.  As I heard it today, they said

23   that their objection is that the agency broke the process

24   midstream by purging the list, quote, largely getting rid of

25   the AT-SAT scores.  We don't know what that means.

1          Their reply brief says, quote, if the FAA lawfully

2    purged their AT-SAT scores, then the government wins.  If it's

3    a focus on the AT-SAT scores, then the government going forward

4    will explain why it chose to use a modified AT-SAT in 2014

5    and -- and, therefore, that the prior scores were no longer --

6    would no longer be useful.

7          But if it's actually still a claim about the fact that

8    anybody who had started in the stream by taking an AT-SAT was

9    entitled to go all the way and -- and have an application

10   process for them, that's a very different claim.  And

11   plaintiffs remain cagey about what their actual claim is, which

12   leaves it difficult for us to respond.  But to the extent that

13   plaintiffs are saying that there -- like they did at the -- at

14   the last hearing -- I think the hearing last year -- that

15   anybody who took the AT-SAT, therefore, required the agency to

16   put out a future vacancy announcement under the legacy process

17   with no changes, that creates a wedge in their class.  Because

18   they said -- the last time around, my opposing counsel said

19   that, well, plaintiffs like Mr. Brigida and Mr. Douglas-Cook

20   never got an opportunity to apply and, therefore, they should

21   have that one last opportunity.

22         But some of the people in -- in this class actually did

23   apply in -- in 2012 and, therefore, don't need to rely on this

24   idea of the AT-SAT itself becoming a -- a hiring process --

25   starting a hiring process, meaning that they were entitled to

1    finish it.  So that creates a wedge in their class.

2        The other problem with saying that this -- this claim

3    means that the legacy process should continue is that there are

4    people who aren't injured.  Only people who are eligible for an

5    additional CTI application could really work under their

6    theory.  And while they've made some efforts to tailor their --

7    their class to that, they still haven't succeeded in tailoring

8    to people who are actually eligible to apply to the CTI

9    process.

10        For example, they conflate having a -- an unexpired

11    AT-SAT score, which means three-year -- up to three years after

12    you took the test or three years after you graduate, with

13    maintaining your eligibility for CTI.  We've explained, laid

14    out by documents exchanged in discovery in our opening brief --

15    and plaintiffs continue to conflate the two -- that people had

16    to -- if you were more than -- if you -- after three years

17    after graduation, you had to individually apply to the FAA to

18    extend your eligibility.  It was a form.  You sent it in, and

19    if you did that and had a current AT-SAT, the agency would list

20    you as continuing to be eligible for the CTI vacancy

21    announcement.

22        But a significant portion of plaintiffs' class are

23    graduates from 2009 and 2010 who didn't send in that form, and

24    they can't -- and plaintiffs can't say, well, it's the

25    government's fault because people [sic] expired long before

1       December 2013 when the agency was changing the process and so

2       people chose not to continue their eligibility, and some people

3       who chose not to continue their eligibility then applied in

4       2014 when anybody was eligible to apply.  So their -- their

5       AT-SAT claim doesn't work because people who -- were not

6       eligible for a continuing use of the legacy process when they

7       remain in their class.

8              As we noted in our ascertainability point, the

9       recommendation one continues to be confusing and unclear and,

10      again, doesn't serve to match on to people who were not

11      recommended by the schools or didn't meet their school's

12      recommendation criteria.  It's not the case -- we're not simply

13      talking about the December 2013 graduates for whom the schools

14      may not have been -- didn't get around to sending a

15      recommendation because they found out the FAA was changing its

16      process.

17             We're talking about people who -- the class includes

18      people who graduated long, long before -- I guess back through

19      2009 -- and -- and may not have sought a recommendation or got

20      one from their school and -- or been eligible to.  And so

21      plaintiffs' criteria doesn't -- doesn't fit that, at least it's

22      unclear, which matters not merely for identifying the class but

23      goes to the very issue of liability.

24             Because to the extent plaintiffs proceed on this one

25      title to the legacy process, anybody who's included who doesn't

1    qualify for that legacy process for -- on other grounds can't

2    be injured by an action that -- that ends -- that -- that

3    doesn't include them in the process for which they couldn't

4    have been considered in the first place.

5         The AT-SAT claim also remains clear because in their

6    reply briefs they focus exclusively on the AT-SATs and say it

7    was the test score that gave them the opportunity for hiring.

8    This just furthers our point that the focus on AT-SAT is really

9    a red herring.  While it may have -- made them applicants in

10   some sense because they had started an application process --

11   and the Court was willing to treat it as plausible at this

12   stage of the case -- it was not the AT-SAT that gave them any

13   hiring opportunity.

14        As is abundantly clear throughout the documents

15   plaintiffs attached for this motion, well over 90 percent of

16   people pass the test.  So merely passing was no accomplishment.

17   And it wasn't what the government relied on, what the FAA

18   relied on in -- in selecting -- in selecting people.  It also

19   makes it implausible that the government struck the AT-SAT

20   scores to change the race of applicants with well over

21   90 percent of people passing.  The -- those who were excluded

22   by the AT-SAT -- by just the mere passing of the AT-SAT rate,

23   were a very minor effect on -- on the -- who was available for

24   consideration.  So the AT-SAT -- the focus -- the -- the myopic

25   focus on the AT-SAT either seems to be disingenuous to us and

1    they're really claiming they're entitled to the whole legacy

2    process or it -- it breaks down in other ways.

3         As we discussed for commonality, holding together all of

4    these groups is fatal to typicality and adequacy as well -- as

5    well, because as plaintiffs said in responding to your -- the

6    Court's question, they are not going to abandon their claim if

7    the evidence shows the FAA sought to benefit all minorities or

8    any other group alongside African Americans.  At most, they

9    didn't go along with your Court's -- Your Honor's suggestion of

10   decertification.  At most they would suggest some kind of

11   actual break into a subclass, but that wouldn't address the

12   typicality and adequacy issues that are in play here.

13        In responding to my opposing counsel on exhaustion, it's

14   not the case that the FAA's December 30 announcement was an

15   announcement that they're going to discriminate in the future.

16   Instead, it was the definitive statement that the FAA had

17   decided not to use the old process anymore.  The fact that the

18   new process was implemented in February doesn't mean that the

19   discrete action that plaintiffs are complaining about for loss

20   of the old process occurred any later than December 30.

21        In fact, a public announcement by the FAA makes clear

22   that the old process wasn't going to be used anymore.  And so

23   plaintiff's AT-SAT claim or legacy hiring process claim accrued

24   no later than he learned of it, and he acknowledges that he

25   learned of it in early January.  And, therefore, the challenge

1    to the legacy process, distinct from the new process, is

2    unexhausted.  Anything plaintiff wants to complain about

3    should -- should focus on the defects of the new process.

4                THE COURT:  Anything else, Mr. Thorp?

5                MR. THORP:  Your Honor, I'm just looking over my

6    notes to see if there are any other responses, if necessary, on

7    other aspects.

8         I think what's already been covered in the case and in

9    the briefing, without our concerns about (b)(2) and (b)(3)

10   certification, I just want -- I just want the -- the focus on

11   (b)(3) certification for monetary -- for common questions of

12   monetary relief, we just want to highlight that we're not

13   saying that *Teamsters* hearings can never be appropriate.  But

14   *Comcast*, which has been applied to Title VII, and others

15   emphasize that if you want to certify a damages stage, you have

16   to show that your model works on a class-wide basis.

17        Plaintiffs here want to certify a -- some aspect of

18   damages, and yet, as Dr. White has shown, their model fails

19   to -- to justify what they're trying to do.  And, therefore,

20   under plaintiffs' own approach, what they want to certify isn't

21   justified on its own terms and doesn't predominant over the

22   individualized questions that they acknowledge remain.

23        And I'll rest on my briefing for the remainder of the

24   arguments, Your Honor.

25                THE COURT:  All right.  Thank you.

1          Ms. Brown.

2          MS. BROWN:  Thank you, Your Honor.

3          Very briefly, and sort of in reverse order.  As it

4     relates to *Comcast*, the government offers no way in which

5     *Comcast* can be reconciled with *Teamsters* and *Wal-Mart*.

6     *Wal-Mart* makes clear that the *Teamsters* process is actually

7     required in order to afford a defendant the opportunity,

8     essentially, to winnow people out of a Title VII case, and that

9     can't be reconciled with the idea of a class-wide damages

10    formula as set forth in *Comcast*.

11         And as set forth in our brief, *Comcast* is an entirely

12    different animal related to economic harm and economic harm

13    that is an element of the plaintiffs' case, which is not true

14    with Title VII.  And so we simply don't believe that *Comcast* is

15    properly applicable to a Title VII case.  We do believe --

16         THE COURT:  You're -- sorry.  Ms. Brown, sorry to

17    interrupt.  Do you have a Title VII case post-*Comcast* that

18    applied an aggregate pro rata model for back pay?

19         MS. BROWN:  I'd have to look at -- most -- I

20    acknowledge that most of the cases are before that.  I believe

21    that the *Easterling* case -- so the *Easterling* case reexamined

22    class certification -- they were certified first before

23    *Wal-Mart* -- reexamined class certification after *Wal-Mart*

24    changed its certification of the back pay issues from (b)(2)

25    to (b)(3).  So that would be one that was after *Wal-Mart* where

1   it was still certified for class in an aggregate pro rata

2   basis.

3         Also -- Title VII.  I'd have to think about whether

4   Title VII did or not.  I know that some of the other cases that

5   we cite in our reply brief are post-*Wal-Mart* and post-*Comcast*

6   and sort of reconcile them and -- in part by saying *Comcast* is

7   less applicable or less of a concern in a bifurcated

8   proceeding.

9         THE COURT:  But Judge Collyer did apply the *Comcast*

10  standard in refusing to certify the (b)(3) class; right?  In

11  *Little*?

12        MS. BROWN:  Yes, Judge.  But, again, in that case,

13  Your Honor, there were a lot of other issues that the Court

14  found would affect the damages calculations far beyond what is

15  here as it relates to uniformity of our class.  And I believe

16  more --

17        So in *Little*, the judge essentially said that -- that it

18  addressed the (b)(3) certification -- basically it's the stage

19  that we're at now -- as opposed to putting that determination

20  off until the point where it's needed to be made after a

21  liability determination, which is sort of the opposite approach

22  of what *Moore* and other cases have done, and part of the reason

23  we've suggested bifurcation.

24        Moving backwards to the other points that Mr. Thorp

25  made, Your Honor, as it relates to the idea that some people

1    shouldn't be in the class because they could have applied to an

2    earlier application, we give the two reasons why that's wrong.

3    One is which this 2012 process that they're talking about

4    resulted in no one being hired.  So that didn't actually

5    provide anyone with any benefit.

6        But, more importantly, is the fact that our class is

7    limited to those people with an active AT-SAT score.  And so

8    like the people in the -- the plaintiffs in *Ricci*, these are

9    the people who were in line, had prequalified themselves,

10   had shown they were eligible, had gone through the steps that

11   the FAA had said was required, and then had those

12   qualifications, those merits qualifications, that they had

13   worked for and sacrificed for ripped away from them before

14   they -- and, essentially, before they had the opportunity to

15   follow through.

16       So when Mr. Thorp is confused about what we're arguing,

17   one only needs to look at the *Ricci* case.  And while there's

18   some factual differences, that's, essentially, what our case is

19   and has always been, sort of, based on as it relates to the

20   purging of the qualifications.  I believe *Ricci* was cited as

21   early as the original EEO administrative complaint.

22       So we're not trying to be, quote/unquote, cagey here as

23   Mr. Thorp suggested.  What we're saying is that we've used

24   earned test scores like the test scores earned in *Ricci*, and

25   they were struck for race-based reasons like in *Ricci*, and that

1    was illegal because it was a race-based decision made without a

2    justifiable defense.

3          And then the final point, sort of, again, working

4    backwards from the FAA's arguments, Mr. Thorp addressed *Burton*,

5    *Ross*, and *Wagner*, each of which he addressed in the context of

6    commonality.  And he argued that *Burton* and *Ross* say that you

7    have to say why a test specifically is flawed in order to prove

8    commonality, but that's not the case.  There was no test at

9    issue in *Ross*.  That was layer upon layer of subjective

10   evaluations.

11         And in *Burton*, there were multiple claims, many of which

12   have reference that it clearly was a promotions test.  But to

13   the extent that promotions tests were at issue, there were

14   three tests at issue for three different reasons.  There was a

15   2006 test, and that was similar -- that claim was similar to

16   our AT-SAT claim; where the claim was it was illegal because

17   they purposefully allowed the list to expire for appropriate

18   reasons.

19         There was a 2008 test, and they said that the change of

20   contractors to administer the test was part of a discriminatory

21   scheme.  And there was a 2010 test where they complain about

22   the way that the test was administered because of the fact that

23   some -- the way that the sequestration works for the test.

24   None of those relates to this case.

25         And in that type -- also in *Burton*, not every one of the

1    plaintiffs had even taken the promotional test that was at

2    issue.  And so arguing that *Burton* somehow requires that you

3    show that if you're challenging a test, in order to have the --

4    to pass class certification, you have to show how the test was

5    defective is wrong.  And it's the same sort of wrong that the

6    Supreme Court has rejected in various security class action

7    cases where they say you do not have to prove, for example,

8    materiality to prove class certification.

9        Also, the *Wagner v. Taylor* was, again, a different set

10   of factual circumstances and a different way of proving the

11   case.  This is not trying to group people from different

12   events, different decisions made by different supervisors over

13   a course of years.  And that seems to be lost on the FAA in

14   terms of why that's relevant to if and how statistics will play

15   a role in this case.

16       We have established common questions.  We've established

17   them with regard to the BA, the biographical questionnaire, and

18   they don't address -- I think it should be addressed, the

19   common questions that would arise as it relates to their

20   defenses.  They're either going to have to claim that they

21   engaged in affirmative action, which would have its own set of

22   challenges and requirements associated with *Kerry,* or they're

23   going to have to say that they -- even if they say they did it,

24   for example, to, quote/unquote, improve diversity, that's

25   essentially the same argument that the town of Concord [sic]

1    made in *Ricci* and that the Court found, again, had certain

2    examinations that were required to it that were common across

3    the group.  *Ricci* wasn't a class case, but meeting the

4    standards and answering the questions set forth in the *Ricci*

5    case will be common across our case.  And so we have

6    established commonality.  And not only that, we believe we've

7    established that the common question is predominant.

8                THE COURT:  Okay.  Ms. Brown, I do -- you know, I

9    appreciate that you don't have to show discriminatory, you

10   know, effect or impact here in this disparate treatment case.

11   I also appreciate that you have very specific allegations about

12   the various issues with the biographical questionnaire and

13   outside influences in the complaint.

14               But aside from -- as Mr. Thorp said, aside from the

15   allegations about the efforts to the outside groups acting to

16   benefit African Americans specifically, what -- remind me, what

17   plausible allegations have you made that show that the FAA

18   challenged the biographical questionnaire or the -- you know,

19   the removal of the preference/striking of the AT-SAT was done

20   with the discriminatory intent to benefit African Americans as

21   opposed to minorities and women as a whole?

22               What -- apart from the efforts to the outside group at

23   this stage, even with the discovery you have, what -- what

24   shows that that's a plausible claim; that -- that the intent

25   was to benefit African Americans -- African Americans as

1    opposed to a broader group of minorities and perhaps women?

2    These -- you know, the troubling point system that you've

3    illustrated with regard to, you know, the fact that individuals

4    received 10 points for not being employed or, you know,

5    15 points if their lowest grade in high school was in a science

6    class, what evidence do you have to show that those were added

7    to benefit the specific minority group?

8              MS. BROWN:  Yes, Your Honor.  And --

9              (Indiscernible simultaneous cross-talk between the

10    Court and Ms. Brown.)

11              MS. BROWN:  Yes, Your Honor.  And our complaint goes

12    back to 2000 on that point where we -- where we indicate --

13    basically, you can see -- with even just the facts that we've

14    alleged in the complaint, you can see an opposition to the

15    AT-SAT, to the CTI program as the perceived lack of diversity

16    in the CATI [sic] program.  And you can see that ratchet up

17    over time as the CTI program expands and grows.

18              And the important thing you -- the FAA wants to refer to

19    the NBCFAE as an outside group.  It's a group of FAA employees.

20    So the people who are, for instance, representing the NBCFAE at

21    the FAA's national employee forum, which they have quarterly, I

22    believe, or at least three-times-a-year meetings on, those

23    people are FAA employees.

24              And as our complaint and even the administrative

25    complaint alleged, a number of employees, we believe, who were

1    involved in this process, whether in the human rights -- human

2    resources group or in the OCR, those were people who were

3    associated with the NBCFAE.  So it's not a purely external

4    group.

5         And as we put forth, I believe, in our complaint and in

6    our motion, the head of the OCR at the time that these changes

7    were made, the person who met with the NBCFAE and the Secretary

8    of Transportation and was tasked with creating this barrier

9    analysis and implementing these changes, that person, who would

10   be head of the -- the civil rights part of FAA at the time, was

11   a former, I believe, six-year president of the NBCFAE.  And so

12   the idea this is somehow exclusive or outside the FAA is simply

13   not true.

14        Then there are the other allegations, Your Honor.

15   Again, it's the questions that were -- were asked and how they

16   weighted on the BA, BQ.  There is -- it's -- it's the whole

17   history from two thousand -- really from 2016 of how the

18   changes were driven, why they were driven, and how they were

19   implemented and looking at the individual people who were

20   involved in those changes and the relationships that they had

21   with, for example, the NBCFAE and others, including their

22   membership.  And so we use the NBCFAE, but -- but those are all

23   FAA employees, except the fired employees.

24             THE COURT:  Mr. Thorp's point about -- and the

25   question I asked you earlier -- about the -- the slight shift

1      in focus on the AT-SAT rather than the hiring preference

2      playing -- you said that was a reaction to the Court's recent

3      opinion in talking about what deemed someone an applicant.  The

4      government is saying that's to avoid creating a wedge in the

5      class.

6           Just, you know, whatever additional points you can make

7      on that, on why that's not a meaningful change and walking away

8      from your claims as set forth in the operative complaint.  Just

9      clarify that.  Because I want to make sure when I rule on this

10     that I'm -- you know, the claims set forth in your complaint is

11     a driver here -- right? -- not what's in the brief here.

12          MS. BROWN:  That's correct, Your Honor.  And we have

13     made an effort to be consistent.  And as I've said, the -- the

14     administrative complaint and our complaint focused on -- and

15     the focus of the last hearing was on this purging of

16     qualifications.  The definition of our class was qualified

17     applicants registered.  Those were the people who were in our

18     class because those are the people who were eligible to apply

19     under the old process when the FAA wiped out that set of

20     qualifications.

21          The AT-SAT is one of several qualifications, but it's

22     striking the AT-SAT that had potentially and logically the

23     largest impact on these class members because it took them out

24     of the qualified status.  They still had their degrees.  They

25     still had their U.S. citizenship.  Their age hadn't changed.

1          The most important thing about what the FAA did in terms

2     of striking their qualifications or purging that qualified list

3     was striking their test results.  And besides making it more

4     true to the discussions that we've had regarding someone who's

5     applied or started the application process for the FAA, it also

6     brings it back around to the *Ricci* case, which we had

7     discussed, where there were test results who -- that were at

8     issue in that.  And so I think that -- that discussing that

9     purging as a qualification claim in the context of the AT-SAT

10    score makes the application of *Ricci* more intuitive, more

11    understandable.

12          THE COURT:  But not because you're shifting your

13    claim here?

14          MS. BROWN:  No, we're not shifting our claim.

15          THE COURT:  The hiring preference more broadly

16    defined and the AT-SAT is one piece of this.  So I should be

17    looking this -- at this as a -- like the complaint frames it,

18    not to the extent the motion takes a slightly different tact?

19    That's just for -- for -- your view is that just makes -- it's

20    an easier way to truncate the arguments?  Is that -- is that

21    fair?

22          I'm not trying to put words in your mouth.  I'm just

23    trying to confirm that your claim is what's set forth in the

24    complaint, not -- not this narrower -- narrowing of it with the

25    AT-SAT.

1           MS. BROWN:  Yes.  Our claim is the purging; and, like

2      I said, we don't know when -- when the federal government

3      actually did that purge or whether they actually pushed a key

4      to do that or how exactly it happened.  But our claim is the

5      purging of the qualifications.  The AT-SAT is the most, sort

6      of, easily understandable that relates to other legal precedent

7      that we're relying on.  But it is the entire, sort of, striking

8      of people's qualifications.

9           If in *Ricci* there had been other things -- and I'm sure

10     there were -- that went to people being qualified, it's the

11     same concept as *Ricci* but using AT-SAT as a shorthand.  The

12     other reason that we use AT-SAT and talk about it so

13     extensively is, in part, it responds -- the government refers

14     to it as it talks about AT-SAT scores expiring, and they talk

15     about it as it relates to -- they seem to assume that people

16     who renewed their AT-SAT score wouldn't have also extended

17     their eligibility.  And that doesn't really make sense,

18     logically.

19          But part of -- part of the focus is, again, *Ricci*, the

20     discussion on who is an employee.  As -- as I argued during our

21     last hearing, I don't think the fact that you start at a CTI

22     school makes you an applicant, but -- but at least crossing

23     that Rubicon of taking the AT-SAT and passing it does.

24          THE COURT:  Okay.  I know in the past that the

25     government's made clear -- or suggested, rather, that there is

1    no list to purge, there was no master list here.  But when

2    you're talking about the purging, you're just talking about

3    people who meet Criteria 1 through 5, one of which is the

4    AT-SAT score, they were -- their hiring preference was taken

5    away, whether it was a list or not?

6         MS. BROWN:  Right.  And we, to some extent, tried to

7    stay away from the term hiring preference because it wasn't a

8    statutory preference.  It was a practical preference.  But,

9    yes, Your Honor.

10        THE COURT:  Okay.  So -- so regardless of whether or

11   not any potential class member exhausted this -- this AT-SAT

12   claim, you think my prior decision relating to the hiring

13   preference claim was, you know, sufficient on the exhaustion

14   point?

15        MS. BROWN:  Absolutely.  AT-SAT is based, again, to

16   someone being a qualified applicant.  The whole allegation at

17   the beginning of this case was, you know, related to people who

18   were on the qualified applicant register, and so that -- taking

19   the AT-SAT is part of that, and it's developed in the

20   shorthand.  But, you know, as the FAA points out, there were

21   other things that would have required someone to have been

22   qualified and, therefore, in their view, other things that

23   would have required someone to have been harmed.  And all of

24   those things are part of what we tried to wrap into this class

25   definition.

 1          THE COURT:  Okay.  So, Mr. Thorp, I'll give you a

 2     brief chance to respond.

 3          And, Ms. Brown, I'll give you the last word.

 4          But I'm not looking for a whole extensive argument here,

 5     Mr. Thorp.  If there's any --

 6               (Indiscernible simultaneous cross-talk between

 7     Mr. Thorp and the Court.)

 8          MR. THORP:  Yes, Your Honor.

 9          THE COURT:  -- Ms. Brown.

10          MR. THORP:  Yes, a few responses.

11          One, your prior decision did not address exhaustion of

12     the hiring preference claim.  It wasn't --

13          THE COURT:  I thought it did.

14          MR. THORP:  It wasn't challenged in that way.  We

15     challenged exhaustion of the --

16          THE COURT:  The biograph- --

17          MR. THORP:  No.  We challenged the exhaustion of the

18     disparate impact theory, and the Court ruled on that.

19          THE COURT:  Okay.  All right.

20          MR. THORP:  This is the first time that we pointed

21     out -- whether it's framed as the AT-SAT alone or the hiring

22     preference as a whole, plaintiffs acknowledge that in early

23     January, they knew that the old process was gone and there

24     would be a new process.  And, therefore --

25          THE COURT:  Is this premature, though, now at this

1    stage?  Do you think --

2           MR. THORP:  Your Honor, plaintiffs -- we -- we have

3    an admission from plaintiffs that they knew in early January.

4    And so it is clear as a matter of law that -- that the action

5    occurred and they knew before -- outside the 45 days prior to

6    February 25th.

7           Plaintiffs say, well, we don't know when they purged a

8    list, but remember here that Mr. Brigida had taken the AT-SAT.

9    Nobody erased his score in the agency database.  We've turned

10   over everybody's AT-SAT scores going back a decade -- a decade

11   or more.  There wasn't anything else for the agency to do other

12   than to say we're not using the old process anymore, we're

13   going to use the new process.

14          So the action -- the decision had been made.  There was

15   no other action to take.  This wasn't, sort of, an announcement

16   of future discrimination as -- as opposing counsel suggests.

17   He knew, but for some reasons that aren't clear to us, he says

18   he acknowledges he knew in early January, but he made it to

19   February 25th to complain about the loss of the old system, the

20   old process.  That takes him outside of the way Title VII is

21   exhausted for federal employees.

22          THE COURT:  Okay.  What other points would you like

23   to --

24          MR. THORP:  Yeah.  The next one, plaintiffs suggested

25   that it would be odd that plaintiffs wouldn't renew their CTI

1    eligibility but have an active AT-SAT score.  I would

2    just point out that as it's laid out in the documents exchanged

3    in discovery, explanation in our -- in the back-up section of

4    our brief, the AT-SAT score when he took it was valid for three

5    years.  So somebody who would have taken it in school, it

6    would be valid for three years after you graduate.  Then you'd

7    have to take it again.  The AT-SAT would then be valid for

8    three years, but you had to apply annually to renew your

9    eligibility.

10        And so there's actually no lack of logic in the fact

11   that some people had taken the AT-SAT but did not continue to

12   keep up their eligibility to apply to CTI-only announcements.

13   Plaintiffs are now clarifying that their -- their AT-SAT claim

14   is -- is that they are some -- that having taken AT-SAT,

15   they're entitled to the continued availability of the legacy

16   hiring process.  That -- we just want to point out that that

17   means that it's going to, sort of, have to be available in

18   perpetuity for some extended period of time.  And it remains

19   very unclear as to exactly what they're claiming.  But there's

20   no -- but they haven't focused their class definition on -- to

21   include only people who would be eligible to apply for those

22   announcements.

23        One -- I think two more points, Your Honor.

24        One is that in response to your question about what

25   evidence do you rely on in your complaint that -- that the

1    FAA's purpose is to benefit African Americans specifically, one

2    of the things they point to is, well, we allege the questions

3    asked and weighted on the test benefit African Americans.  It's

4    striking that they rely on the bare allegation of their

5    complaint when they have all of the data now to assess that,

6    and they haven't.  And that matters because -- because of the

7    wide variety of groups they try to hold together.

8         So if they -- at this point in class certification in

9    this case, they should not be permitted to rely merely on the

10    allegations that are in the complaint.  Instead, they go

11    forward in probing behind the -- the complaint in order to

12    assess adequacy, typicality, and commonality for a class that

13    includes everybody but African Americans, should need to know

14    that the questions asked and weighted that plaintiffs want to

15    rely on actually show that it benefits African Americans and

16    doesn't benefit Hispanics or women more.

17         THE COURT:  But what about their point about the

18    individuals from the FAA being on these committees that were

19    looking at this and they too expressed the intent to benefit

20    African Americans?  And given that this is not a disparate

21    impact case, why is that not sufficient at this stage?  Maybe

22    not down the road, but --

23         MR. THORP:  Your Honor --

24         THE COURT:  -- at this stage.

25         MR. THORP:  Yeah.  I think there's two different

1    things going on there.  One is that plaintiffs show a history

2    of the NBCFAE trying to motivate the agency to do a barrier

3    analysis and address the very low participation of

4    African Americans in -- in a number of job series, including

5    air traffic controllers.  That's not a strange or

6    conspiratorial thing for an affinity group at -- at an employer

7    to do.  And that just shows a continued effort to get the

8    agency to do a barrier analysis and look at whether there were

9    unwarranted barriers to participation for -- for their own

10   group.

11        There's nothing strange about that.  In fact, EEOC

12   regulations tell agencies to -- to look at this.  They have to

13   report data about -- by -- by group annually to -- to the EEOC,

14   and DOC regulations created under -- under Title VII require

15   agencies to do these sort of analyses and to remedy observed

16   barriers that aren't justified as necessary.  So there's

17   nothing strange about that.

18        So what matters for purposes of this case is not the

19   NBCFAE's efforts to get a barrier analysis but what the agency

20   did when it did a barrier analysis and found effects for

21   African Americans and other groups.  And what that decision is

22   going to come down to is that there was a -- what -- after they

23   did the barrier analysis, there was a steering committee of, I

24   think, 8 to 10 individuals and an implementation team of -- I

25   think of about 20 individuals, including the participation of

1    the highly credentialed contractor and industrial psychologist,

2    who had led his field in -- in many ways, who participated in

3    designing the new process.

4         Plaintiffs are going to have to show that those teams,

5    those large groups of people, acted to benefit

6    African Americans alone, even though they were women and

7    Hispanic and were looking at data that suggested harmful

8    effects on a wide variety of groups.

9         Plaintiffs also, sort of, point out -- and plaintiffs

10   point out that the agency was describing, sort of, what they

11   were potentially doing to the national employee forum.  The

12   national employee forum is just a -- is just made up of all the

13   agency's affinity groups.  That includes groups focused on

14   women.  The NBCFAE focused on African Americans.  And I forgot

15   the specific other groups.  I think there's one on Asian

16   Americans and other groups.

17        So the fact that the FAA was -- from these committees

18   was reporting back on the results of the barrier analysis and

19   the potential actions they might take to these -- these groups

20   representing the various agency employee affinity, again, is

21   not going to be evidence of a -- put a thumb up on the scale of

22   favoring African Americans or -- unfairly or, sort of, somehow

23   improperly being under the influence of one employee group.

24   Rather, it's just evidence of a good employer including

25   relevant information for a variety of interested employee

1    groups.

2           So, again, plaintiffs have an effort by one group to get

3    the agency to take an action that -- that started -- that

4    started through, but they don't have any evidence that they've

5    put before the Court, including -- even though they could have

6    tried -- to show that what the agency actually did and the

7    decision-makers that actually made the decision can be shown to

8    uniformly favor African Americans over everyone else.  And the

9    Court can defer some of those things to later in the case if

10   they were representing a narrower -- a narrower group, but

11   where they're trying to hold together everybody but

12   African Americans, it simply doesn't add up.

13          Lastly, on damages, with regard to the pro rata model,

14   the -- we cited *Houser v. Pritzker*, a S.D.N.Y case from 2014,

15   that relied on *Comcast* to address concerns about a damages

16   model in a Title VII case.  So I think you could look to that

17   for -- for some discussion there.  And I don't think the Court

18   needs to decide in the abstract whether an aggregate pro rata

19   model could ever be done.

20          Our point, primarily, is what plaintiffs have done here,

21   they can't rely on the highest level of abstraction, but they

22   have to show that what they intend to do on a class-wide basis

23   works for damages, for something they're going to certify, and

24   they simply haven't done that.

25          Thank you, Your Honor.

1          THE COURT:  Okay.  Ms. Brown, very briefly.

2          And so I do -- I do feel like there is this high risk

3     that the evidence is going to show that this effort was to

4     benefit all minorities and women, not just African Americans.

5     And tell me why -- given the potential wedge between groups,

6     why I shouldn't be very cautious to certify the class as

7     defined.

8          MS. BROWN:  Your Honor, I -- it goes to this -- this

9     issue, to some extent, that Mr. Thorp has talked about, which

10    is we have alleged consistently that this was done to benefit

11    primarily African Americans and even, again, going back to the

12    administrative complaint, the role of the NBCFAE in driving

13    this process and the crossover in members of the NBCFAE and the

14    Office of Civil Rights and human resources.

15         All the way through all of our allegations, the -- the

16    focus has been on the efforts to benefit African Americans.

17    Now, I -- as I've acknowledged before, I expect that the

18    evidence will -- that the FAA will come in with evidence that

19    they were trying to benefit everybody.  From -- from -- I think

20    as I said before, I think they had to do that in order to get

21    this through the NEF, which well predated -- the national

22    employee forum -- sorry -- which well predated these events,

23    and through other channels to get this change approved.

24         But at the end of the day, whether it's looking at what

25    the affinity groups do or looking at what the head of OCR does

1    or -- and human resources, all of those things, each one of

2    those things is a tile in a mosaic.  You don't look at them

3    individually, examine them on their own, and determine whether

4    or not the -- the discrimination has been proven.

5         We are going to be proving discrimination here by

6    inferential evidence.  And so you look at all of those things

7    as a whole, and when you look at the allegations that we have

8    made and that we have focused on in the administrative

9    complaint and each iteration of the complaint, it's the focus

10   on the benefit to African Americans.

11        And I think that as a whole, if -- if, for instance, one

12   were to do -- and this is -- if one were to do a disparate

13   impact-type analysis of the BQ and show that as a whole what

14   they -- Hispanics did benefit, I don't think that changes the

15   fact that the BQ in the process was geared toward and, we

16   believe will show, primarily benefited African Americans.  The

17   fact that there may have been some other incidental collateral

18   benefit doesn't take away from the fact that this was meant to

19   benefit African Americans and by comparison every other group

20   was detrimented.

21        Then my final point, Your Honor, as it relates to the

22   *Houser* case, which Ms. Thorp -- Mr. Thorp just referred you to,

23   the *Houser* case decided not to do 23(b) certification in part,

24   in large part, because the plaintiffs in that case did not

25   provide for the type of individualized process that *Wal-Mart*

1   requires, and the Court was concerned that as a result, people

2   who were not injured would be benefited through an aggregate

3   pro rata model.

4         Our proposed method addresses that concern, as does the

5   narrowness of our class, and the fact that we're only talking

6   about one group of people who applied at one time through one

7   opening as opposed to people who applied everywhere across the

8   country for different types of positions.

9         THE COURT:  Yeah.  I guess I just -- it seems like

10  there's -- given my ruling initially with respect to

11  African Americans who might have had a perfect score on the

12  AT-SAT and were harmed by this, but, you know, nonetheless,

13  correct or incorrect, as you may think, I did decide that the

14  potential wedge between -- including that set of individuals in

15  the class was problematic.  And so I'm -- I'm struggling in the

16  same way with broadening the class to include, you know, women

17  and other minorities.

18        It just seems like the same logic applies if -- you

19  know, if -- if the evidence shows in the end that there was an

20  intent to benefit all minorities and women and there's some

21  subset of these folks who don't -- who had perfect scores or --

22  large set, whatever, if -- if -- for the most part, the net

23  benefit, it just seems like the same hesitation I had in

24  including African Americans in the class of plaintiffs here.

25        It's -- the same -- the same logic would -- would

1    suggest that I should not include the minorities and women.  So

2    I don't know if you can speak to that in particular, Ms. Brown,

3    but it does seem to be the same -- the same, you know, driving

4    concern and potential wedge as is the case early on when --

5    when I rejected your attempt to include African Americans in

6    the class.

7           MS. BROWN:  Yes, Your Honor.

8           Two -- two responses to that.  The first is part of the

9    reason that African Americans -- the reason we had to change

10   our class definition was because the government, essentially,

11   argued you have to show the protected class and you have to

12   show that one class was benefited above the others, and we have

13   alleged all along consistently that this was done to benefit

14   African Americans.  And so to meet the Title VII requirement of

15   protected class, African Americans were excluded.

16          But also -- and -- and another important difference

17   here, the cases where a representative is found not adequate or

18   typical of another group involves cases where there are

19   allegations that a -- there is essentially a hierarchy or

20   waterfall in the hiring process.

21          And so, for instance, in the case out of Maryland that

22   the government cited -- *Talley*, I think it was -- there the

23   complaint itself, essentially, said there was -- I believe it

24   was -- it was a minority gentleman saying I've been harmed and

25   I've been harmed by whites and I've also been harmed by the

1    favor given to this minority woman.  And, essentially, it was

2    that type of conflict where someone says in a complaint and

3    tried to -- to address more than one protected group at a time

4    and says they believe that there's this waterfall where, let's

5    say, African Americans are benefited first and then Hispanics

6    are benefited second and then, you know, Asian Americans are

7    benefited third, you know, but I'm -- I'm a Caucasian, and I'm

8    going to be trying to address this.

9         It's in those cases where the Court finds these

10   conflicts and problems, which is why, again, we had to cut

11   African Americans out because we do believe this was driven to

12   benefit African Americans.  But we don't allege any other sort

13   of waterfall.  We don't allege that Hispanics were intended to

14   be benefited above other groups or that women were intended to

15   be benefited above men.  That's the defendants' case.  That's

16   not our case, and that's not going to, again, drive our

17   evidence.  It's not a disparate impact case where that's going

18   to drive our evidence.

19        So I think when you focus on the history of the

20   allegations and you focus on what it was that caused courts in

21   those cases usually to certify one class but refuse to -- to

22   allow a plaintiff to represent a different class that they

23   claim harmed them, whether, again, it's race, gender,

24   supervisor, whatever it may be, there the allegations of

25   conflict are in the complaint themselves.  We don't make those

1    kinds of allegations.

2              THE COURT:  Okay.  That's helpful.

3         All right.  Well, I really appreciate your time.  This

4    has been a really, really helpful argument, and I will -- I'm

5    not prepared to rule now.  I'll take this under advisement, and

6    I will do my very best to issue an opinion shortly.

7              Is there anything else we need to address right now?

8              MS. BROWN:  No, Your Honor, not from the plaintiffs.

9              THE COURT:  Mr. Thorp?

10             MR. THORP:  No, Your Honor.  No, Your Honor.

11             THE COURT:  Okay.  All right.  Thank you, all.

12             (Proceedings were concluded at 3:21 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Nancy J. Meyer, Registered Diplomate Reporter,

4   Certified Realtime Reporter, do hereby certify that the above

5   and foregoing constitutes a true and accurate transcript of my

6   stenograph notes and is a full, true, and complete transcript

7   of the proceedings to the best of my ability.

8

9                    Dated this 20th day of February, 2022.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25