UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANDREW J. BRIGIDA, *et al.*,

    *Plaintiff Class*,

vs.

PETER P.M. BUTTIGIEG, Secretary, U.S. Department of Transportation,

    *Defendant*.

No. 16-cv-2227 (DLF)

## JOINT STATUS REPORT

Pursuant to the Scheduling Order dated February 23, 2022, ECF No. 151, and the Court's February 2, 2023 Minute Order, counsel for Plaintiffs Andrew J. Brigida, Matthew L. Douglas-Cook, and the certified Class (together, "Plaintiffs") and for Defendant Peter P.M. Buttigieg, in his official capacity as Secretary of Transportation ("Defendant" or "the FAA"), conferred and submit the following joint status report.

### Merits Discovery Update

Since the last Joint Status Report on February 1, 2023, ECF No. 170, the parties have taken the following actions:

- On February 2, 2023, Defendant produced 6,682 documents received from APT Metrics, completing production of documents from that source through December 2014, except for 23 documents held back pending entry of a protective order for sensitive testing materials.

- On February 21, 2023, Defendant completed its review of 973 documents responsive to Plaintiffs' subpoenas to the University of Maryland and Don Simons and produced the documents to Plaintiffs except for 340 withheld or redacted on the basis of privilege and 5 documents held back pending entry of a protective order for sensitive testing materials.

1

- On February 24, 2023, Defendant reproduced 60 documents from prior productions to align with the January 31, 2023 privilege logs, making supplemental releases for 40 documents and clawing back 20 documents pursuant to the Rule 502(d) Order, ECF No. 54.

- On February 23 and 28, 2023, Defendant produced the contracts under which Don Simons did work for the FAA relevant to the controller hiring process, which Plaintiffs sought to assess Defendant's privilege assertions.

- On March 7, 2023, the parties conferred regarding pending issues, including Defendant's progress on email collection, next steps for collection of other documents, and an amended protective order for sensitive testing materials.

Additionally, by March 10, 2023, Defendant expects to produce about 12,000 documents received from APT Metrics for the 2015-2016 period. The parties are also finalizing a proposed motion to enter an amended protective order for sensitive testing materials, which they hope to file in the next few days.

## **Plaintiffs' Concerns**

Plaintiffs' concerns about the pace of discovery remain. It has now been over a year since Plaintiffs served their initial requests for production on the FAA, and *still* the FAA can provide no identification of the exact sources of data that it will examine, nor can it provide an estimate of when it may complete its collection, processing, or production of responsive documents. And the FAA continues revising the basics of its process, introducing additional delays as it goes. For example, in the last joint status report, the FAA noted that it was soliciting bids for the restoration of backup tapes. ECF No. 168 at 9. But now the FAA is back to deciding that it will do the restoration itself and suggesting that they can complete restoration in early April. These steps should have occurred in 2022, not 2023.

Various other steps that the FAA outlines below should also have been performed over a year ago, such as a routine decision to apply e-mail threading, the assignment of a person within the FAA responsible for promptly answering questions about the FAA's technology and assisting

with the collection process, and the review of custodians' responses to litigation hold questionnaires. The FAA failed in its basic obligations to understand the scope and form of its data, and to timely formulate a well-considered discovery plan. Given that the FAA produced more documents in February 2023 than it produced in all of 2022, Plaintiffs acknowledge the progress that has been made, but Plaintiffs have no assurance that the FAA's production of documents in response to Plaintiffs first request for documents will be completed in a time frame that allows an orderly and proper completion of discovery in this case.

Plaintiffs' concerns about the completeness of the FAA's discovery responses also remains, and if anything, has been amplified by the FAA's inclusion of hundreds of documents in their privilege logs. However, Plaintiffs continue to review the logs and would fully confer with the FAA before requesting that the Court engage this particular issue.

Separately, Plaintiffs continue to be concerned that the FAA is engaging in an undefined "proportionality" evaluation process that affects their search for and production of documents. Throughout this litigation, the FAA has asserted that various classes or forms of discovery sought by Plaintiffs are not "proportional" to the needs of the case. What the FAA means by this or how this is guiding the FAA's discovery is unknown. But Plaintiffs maintain grave concerns that the FAA is unilaterally limiting the scope of discovery to what it views as "proportional," while Plaintiffs do not have a clear understanding of what the FAA is doing. Does the FAA view specific issues as unimportant? Do they deem there not to be enough at stake to be worth the effort? Or is it just a rough feeling that some sources need not be searched? To be clear, Plaintiffs have never sought every bit and byte of data, contrary to the FAA's imaginings. But Plaintiffs do seek a thorough and fair production of relevant information, consistent with Title VII. Yet the FAA is making decisions about what data sources to search or not search, potentially even what data sources

to disclose or not disclose, and making rote proportionality arguments, often without having any true idea of the burden at issue or considering ways in which its burden can be mitigated. Nor has the "opportunity to comment" the FAA claims it has provided fulfilled the purpose of facilitating agreement in light of the delayed and changed responses to Plaintiffs' inquiries, the FAA's characterization of Plaintiffs' inquiries as "always demanding more," and the FAA's decision that it is "entitled to proceed with [its] own approach." A year of experience demonstrates that the "opportunity to comment" has been a fruitless path to delay and refraining from futile, mischaracterized comments is not acquiescing to the FAA's "own approach."

The FAA's reflexive "proportionality" claims and its argument about the ATSA below present a microcosm of the difficulty of discovery in this case. The FAA resists producing information about its use of the Occupational Personality Questionnaire ("OPQ") on the basis that that instrument assesses "personality," rather than "biographic" information. The FAA then claims that this information should be out of bounds, because the Fourth Amended Complaint refers to the discriminatory use of biographic, but not personality, data. These are unpersuasive semantics. The FAA's suddenly manufactured alleged dichotomy between "personality" and "biographical" data to avoid producing information is unwarranted.

Plaintiffs' allegations center around the use of the race-based/race-biased test instrument the FAA used in 2014 to alter the racial mix of successful applicants. Plaintiffs refer to this instrument as a Biographical Questionnaire because that is how the FAA referred to the instrument, along with later referring to it as a Biographical Assessment. Likely, the FAA's use of "biographic" was a misnomer or overgeneralization, as the FAA itself acknowledged that the 2014 instrument was allegedly aimed in part at "characteristics" such as "flexibility, risk tolerance, self-confidence, dependability, resilience," and other obviously personality-based traits. Plaintiffs have sought

4

information about the FAA's selection of 2016-era non-cognitive testing options for ATCS candidates expecting that it will shed light on the FAA's motives. The FAA's standards for and objectives in adopting a particular test, again while most of the key players were still involved, is relevant to the FAA's intent in 2014. Plaintiffs also seek information about the OPQ non-cognitive testing to determine whether the FAA's is still employing a race-driven testing process. For example, the SHL website lauds the OPQ for its ability to "make accurate, reduced-bias talent decisions that increase your workforce's diversity."[1] The first phase of this bifurcated litigation will address declaratory and injunctive relief, which, if needed, should include an order to discontinue ongoing discriminatory practices of the same nature as those the FAA imposed in 2014, no matter how denominated.

Moreover, the FAA objects to Plaintiffs' request apparently without even knowing whether the FAA's use of the OPQ, the selection of questions, or the weighting of questions is customized to the FAA such that it could be subject to manipulation to achieve a particular objective; and without knowing whether the type of questions on the OPQ mirrors the type of questions asked on the 2014 Biographical Questionnaire. At the very least, the FAA was unable to provide that information as of March 7, 2023, when Plaintiffs asked during the parties' live conferral. This "object now and learn the facts later" approach is emblematic of its other responses to discovery in this litigation.

Plaintiffs' concern about the FAA's preservation of documents also remains but is more appropriately addressed after the parties evaluate what the FAA can eventually produce.

---

[1] https://www.shl.com/solutions/products/assessments/personality-assessment/shl-occupational-personality-questionnaire-opq/

Plaintiffs, once again, renew their request for a status conference or other appropriate hearing. Not every issue above is properly the subject of a specific motion to compel, and many issues like the speed and timing of production are over-arching concerns, as opposed to concerns that can be litigated with reference to discreet document disputes.

At a minimum, Plaintiffs request that the FAA be ordered to provide Plaintiffs and the Court with a description of what metrics the FAA is using as the bases for its "proportionality' arguments. Plaintiffs also request that the parties be required to submit joint status reports every 30 days (instead of 60 days), as the impendency of a joint status report appears to motivate the FAA to provide information relevant to the discovery process that otherwise would languish.

## Defendant's View Regarding the Current Status of Discovery

Defendant is taking reasonable steps to move discovery forward in this case.  As Defendant explained in the December 2022 status report, it has placed the highest priority on negotiating a plan for identifying and retrieving emails, which are expected to comprise the most relevant documents as they capture the communications among and between the core decisionmakers in this case.  *See* ECF No. 165 at 6.  For Outlook email retrievable from FAA's Proofpoint application, Defendant has collected, deduplicated, and uploaded to Relativity 236,710 documents from 2014-2016 for 33 custodians.  For Lotus Notes email, Defendant has loaded and run search terms on the May 2014 mailboxes for 28 custodians, plus 7 additional months for former FAA Administrator Michael Huerta, and 7 custodians' mail archive folders saved on from their hard drives when they left FAA.  Defendant has applied email threading to identify duplicates across email platforms and reduce redundancy.  These documents are being loaded into Relativity's Active Learning process. Review and production of this category of  documents will be ongoing while other documents are being collected and loaded.

Defendant is also moving forward with restoring Lotus Notes email from disaster recovery backup tapes. As explained in the February 1, 2023 status report, Defendant will restore one or more mail files for each of 31 custodians in addition to what has already been collected. This is expected to require restoration from approximately 200 backup tapes and collection of approximately 500 GB of mail files. FAA expects to receive the tapes by March 13 and complete restoration of the relevant mail files by April 3. Document processing, including deduplication, application of search terms and loading the results into Relativity's Active Learning tool should be completed by May 5.

Defendant reviewed the documents located by the University of Maryland (932 documents) and former FAA subcontractor Don Simons (41 documents) and produced to Plaintiffs all documents except for 340 privileged documents and 5 documents regarding sensitive testing materials that will be released once an amended protective order is entered.

Defendant has also nearly completed review of the documents received from FAA contractor APT Metrics. With the documents scheduled to be produced by no later than March 10, 2023, more than 20,000 documents will have been produced to Plaintiffs, with fewer than 3,000 documents APT Metrics documents remaining for review. Because APT Metrics was integrally involved in development of the 2014 interim hiring process, the explanation of that interim process to stakeholders after it was implemented, and the further development of FAA hiring processes after 2014, these documents from 2012-2016 pertain to the core decisionmaking at issue in this case.

Defendant continues to adjust the resources dedicated to this case to improve efficiency. For example, the FAA added to its team a program manager from its information technology office to ensure that the wide variety of technology questions and tasks are addressed promptly. Among other things, this program manager will help develop processes for identifying and collecting non-

7

email electronically stored information. The FAA reports that it can turn to three key custodians' hard drives for which Plaintiffs have suggested search terms once the Lotus Notes restoration is underway. Defendant is reviewing custodian responses to litigation hold questionnaires and other queries in preparing a plan for collecting documents from additional sources, including documents from key custodian hard drives, individual network folders, and shared network folders. Defendant expects to provide an initial plan to Plaintiffs by March 24, 2023. Cooperation between the parties with respect to this category of documents is necessary as it would be neither practical nor proportional to the needs of this case to exhaustively collect documents from every individual who had some connection to the subject matter of this case. Defendant has invited Plaintiffs to suggest prioritization among potential custodians and document sources. Defendant is perplexed by Plaintiffs' suggestion that Defendant is using proportionality arguments to somehow unilaterally limit discovery without explanation. To the contrary, Defendant provided Plaintiffs an opportunity to comment on the plan for collection of both Lotus Notes and Outlook email, after conferring for months regarding search terms, custodians, and time periods. And the initial plan for other ESI that Defendant proposes to send Plaintiffs by March 24 is intended to provide an opportunity for the parties to discuss what information should be collected, balancing all of the Rule 26(b)(1) factors.

There is one potential disputes that may shortly require the Court's attention. Although Defendant is producing significant information about the FAA's development of the ATSA during 2015 and 2016, in a series of letters beginning September 27, 2022, Defendant has objected to producing the ATSA test itself to Plaintiffs. The ATSA is comprised of seven off-the-shelf assessments for which the FAA has software licenses. The assessments are conducted by a test administrator at the administrator's network of testing facilities. Defendant is still researching this issue, but it currently does not appear that the software licenses provide any mechanism or right to

Defendant to make the assessments available to Plaintiffs. Even assuming *arguendo* that the assessments were within Defendant's custody and control, Defendant objects to producing the assessments themselves on the grounds of relevance, burden, and risk of disclosing sensitive testing material. Plaintiffs claim that ATSA questions "similar in kind" to the 2014 Biographical Assessment are relevant to the FAA's intent to discriminate in 2014 and possible injunctive relief. However, the questions on the ATSA were not written by the FAA or APT Metrics and thus are not demonstrative of the FAA's alleged intent when the 2014 Biographical Assessment was drafted. Defendant has explained that the only non-cognitive component of the ATSA is the Occupational Personality Questionnaire (OPQ) licensed from SHL, which is a widely used and respected personality-based measures of workplace behavioral style.[2] Moreover, Plaintiffs' claim that they should be able to review the ATSA to see if any of the personality questions on the test are discriminatory is far beyond the allegations in the Fourth Amended Complaint which alleges that a biographical assessment—not a personality assessment—is discriminatory. Plaintiffs do not need access to the specific test questions and scoring adopted in late 2016 in order to advance their claims in this case. Moreover, any compromise of this currently-used test would be very damaging to FAA, SHL, and the other users of the OPQ. Therefore, if the parties cannot reach agreement on this issue, Defendant expects to file a motion for protective order to confirm that this information is not subject to discovery in this case.

---

[2] The OPQ is not a "biographical assessment" which Congress directed not to be used for selection of certain pools of air traffic controller applicants. *See* 49 U.S.C. § 44506(f)(2). As a personality assessment, it is in a longstanding category of tests that industrial psychology treats as distinct from a biodata assessment. *See, e.g.*, OPM, https://www.opm.gov/policy-data-oversight/assessment-and-selection/other-assessment-methods/. While undersigned counsel for Defendant could not answer some of the questions about the OPQ raised by Plaintiffs for the first time in the parties' March 7 video conference, that does not render Defendant's objections unfounded or dismissive of the needs of discovery in this case.

In sum, Defendant is committed to expeditiously moving discovery forward in this case and has committed substantial resources both to document collection and review/production. Defendant does not believe monthly status reports are necessary and instead proposes that status reports continue to be due every 60 days with the parties conferring monthly (i.e., a month after the status report and shortly before the next one). *See* Joint Status Report at 3, ECF No. 160 (Aug. 23, 2022) ("Finally, the parties have agreed that in addition to continuing their conferrals via correspondence, they will have a regularly scheduled conferral call a month before each joint status report to the Court."). Plaintiffs' interest in interim targets should be satisfied by the dates set forth above: (1) Defendant plans to share an initial plan for non-email document collection by March 24; and (2) Defendant expects to have the additional Lotus Notes documents collected, processed, and loaded for review by May 5. Review of already collected documents will be ongoing in the meantime, and once the full scale of document collection is known the parties will better be able to assess how long it may take to produce the documents relevant to this case. Defendant again notes its concerns about the adequacy of Plaintiffs' discovery responses, but has deferred further development of those issues until making further progress on Defendants' discovery responses as discussed above.

DATED: March 8, 2023

/s/ Zhonette M. Brown (by permission)
Zhonette M. Brown, D.C. Bar # 463407
William E. Trachman, D.C. Bar # 502500
David C. McDonald, D.C. Bar # CO0079
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
Telephone: (303) 292-2021
Facsimile: (303) 292-1980
Email: zhonette@mslegal.org

*Counsel for Plaintiff Class*

/s/ Michael W. Pearson (by permission)
Michael W. Pearson, DC Bar No. 997169
CURRY, PEARSON, & WOOTEN, PLC
814 West Roosevelt
Phoenix, Arizona 85007
Telephone: (602) 258-1000
Facsimile: (602) 523-9000
Email: mpearson@azlaw.com

*Counsel for Plaintiff Class*

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CARLOTTA P. WELLS
Assistant Director
Civil Division, Federal Programs Branch

/s/ Galen N. Thorp
Galen N. Thorp (VA Bar No. 75517)
Senior Trial Counsel
Michael Drezner (VA Bar No. 83836)
Hilarie E. Snyder (D.C. Bar No. 464837)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Telephone: (202) 514-4781
Facsimile: (202) 616-8470
Email: galen.thorp@usdoj.gov

*Counsel for Defendant*